IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| CASA DE MARYLAND, INC., *et al.*,<br><br>Plaintiffs,<br><br>*– versus –*<br><br>CHAD F. WOLF, *et al.*,<br><br>Defendants. | **Case No. 8:20-cv-2118** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 3

The Significance of Work Authorization Within the Asylum System ........................ 3

The Administration's Efforts to Block Access to Asylum ......................................... 5

The Impact of the Rules ............................................................................................ 8

ARGUMENT .................................................................................................................... 9

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS ................................ 9

    A.   DHS Violated the APA by Failing to Comply with Its Notice and Comment
       Requirements and by Failing to Engage in Reasoned Decisionmaking. ...................... 10

       1.   DHS Violated the APA with Respect to the Asylum EAD Rules by Impermissibly
           Restricting the Scope of Comments and of Its Analysis .......................................... 11

       2.   DHS Violated the APA with Respect to the Asylum EAD Rules by Failing to
           Account for Harms to Bona Fide Asylum Seekers. ................................................. 17

       3.   DHS Violated the APA with Respect to the Broader EAD Rule by Failing to
           Establish the Problem It Purported to Address. ....................................................... 20

       4.   DHS Violated the APA with Respect to the Timeline Repeal Rule by Failing to
           Explain Why It Declined to Hold Itself to Any Timeline ........................................ 23

       5.   DHS Violated the APA with Respect to the Timeline Repeal Rule by Failing to
           Explain Why It No Longer Would Prioritize Deciding Initial EAD Applications
           Filed by Asylum Applicants. .................................................................................. 24

    B.   DHS Violated Applicable Laws When Defendant Chad Wolf, Who Was Not Lawfully
       the Acting DHS Secretary, Issued the Asylum EAD Rules .......................................... 26

       1.   DHS Issued Both Asylum EAD Rules in Violation of the FVRA. ......................... 27

       2.   DHS Issued Both Asylum EAD Rules in Violation of the HSA. ........................... 28

II.   PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT PRELIMINARY
     RELIEF. .............................................................................................................. 31

III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WARRANT A
      REMEDY BEFORE AUGUST 21. ........................................................................ 34

CONCLUSION ................................................................................................................ 35

i

# TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. Civ. Aeronautics Bd.*, 699 F.2d 1209 (D.C. Cir. 1983) ........ 23, 24

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ...................... 25

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987)…………...…………………...15

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ................................................. 34

*Bedford Cnty. Mem'l Hosp. v. Health & Human Servs.*,
    769 F.2d 1017 (4th Cir. 1985) ..............................................................11, 13, 19, 23

*California ex rel. Becerra v. Department of the Interior*,
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) ....................................................... 12, 13, 14

*CASA de Md., Inc. v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019),
    *appeal filed,* No. 19-2222 (4th Cir. filed Nov. 4, 2019) ......................................... 31

*Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532 (4th Cir. 2007)……………..…34

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ........................................................ 10

*Diaz v. INS*, 648 F. Supp. 638 (E.D. Cal 1986) ...................................................................... 33, 34

*Dist. of Columbia v. U.S. Dep't of Agric.*, __ F. Supp. 3d. __,
    No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020),
    *appeal filed*, No. 20-5136 (D.C. Cir. filed May 15, 2020) ........................................ 9

*E. Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2020 WL 3637585 (9th Cir. July 6, 2020) . 31

*Edmond v. United States*, 520 U.S. 651 (1997) ........................................................................... 26

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................................... 24, 25

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 500 (4th Cir. 1981) ............................. 32

*Gonahasa v. INS*, 181 F.3d 538 (4th Cir. 1999) .......................................................................... 19

*Grace v. Barr*, __F.3d __, No. 19-5013, 2020 WL 4032652 (D.C. Cir. July 17, 2020)......... 19, 25

*Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure Div. of World Color Press, Inc.*,
    843 F.2d 1490 (D.C. Cir. 1988) ................................................................................ 21

*Grijalva v. Ilchert*, 815 F. Supp. 328 (N.D. Cal. 1993) ....................................................... 33, 34

*HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669 (D. Md. 2020),
   *appeal filed*, No. 20-1160 (4th Cir. filed Feb. 13, 2020) .................................. 31, 35

*Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977) ........................................ 20

*Judulang v. Holder*, 565 U.S. 55 (2011) .......................................................... 18, 20, 24

*L.M.-M. v. Cuccinelli*, No. CV 19-2676 (RDM),
   2020 WL 985376 (D.D.C. Mar. 1, 2020)..................................................... 26, 28, 30

*Mayor of Balt. v. Azar*, 439 F. Supp. 3d 591 (D. Md. 2020),
   *appeal filed*, No. 20-1215 (4th Cir. filed Feb. 25, 2020) ................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)............................................................................................ passim

*N.C. Growers' Ass'n, Inc. v. United Farm Workers*,
   702 F.3d 755, 763 (4th Cir. 2012) ....................................... 10, 11, 13, 14

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................... 34

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) .......................................................... 27

*O'Donnell Constr. Co. v. Dist. of Columbia*, 963 F.2d 420 (D.C. Cir. 1992).............. 35

*Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413 (D.C. Cir. 1983)..... 12, 15

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ................................................... 23

*Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164 (D.C. Cir. 1994).......................... 25

*Portland Cement Ass'n v. EPA*, 665 F.3d 177 (D.C. Cir. 2011)........................ 14, 15, 17

*Ramos v. Thornburgh*, 732 F. Supp. 696 (E.D. Tex. 1989).................................. 33, 34

*Roe v. Dep't of Defense*, 947 F.3d 207 (4th Cir. 2020) ............................................ 9

*Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir. 1991) ..................... 34

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................... 9

**The Constitution & Statutes**

5 U.S.C. § 553................................................................................................ 10, 11

5 U.S.C. § 705................................................................................................ 2, 9, 35

5 U.S.C. § 706 ..................................................................................... 10, 27

5 U.S.C. § 3345 ......................................................................................... 28

5 U.S.C. § 3346 ............................................................................... 26, 27, 28

5 U.S.C. § 3347 ......................................................................................... 27

5 U.S.C. § 3348 ........................................................................... 26, 27, 28, 30

6 U.S.C. § 113 ..................................................................................... 27, 28

8 U.S.C. § 1101 .......................................................................................... 3

8 U.S.C. § 1229a ......................................................................................... 4

8 U.S.C. § 1158 ................................................................................... 3, 4, 5

8 U.S.C. § 1159 .......................................................................................... 3

8 U.S.C. § 1427 .......................................................................................... 3

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102 ................... 3, 17

U.S. Const. art. II § 2…………………………………………………………………………….26

**Rules & Regulations**

8 C.F.R. § 208.7 ..................................................................................... 5, 11

8 C.F.R. § 274a.12 ................................................................................... 4, 25

8 C.F.R. § 274a.13 ................................................................................... 7, 25

Fed. R. Civ. P. 65 ............................................................................... 2, 9, 35

**Federal Register Notices**

Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg.
38,532 (June 26, 2020) ....................................................................... passim

Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg.
62,374 (proposed Nov. 14, 2019) .............................................................. 6, 12

Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69,640 (proposed Dec. 19,
2019) ................................................................................................ 6, 17

Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264 (proposed June 15, 2020).................................................... 6, 17

Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148 (proposed Sept. 9, 2019) ................................................. 6, 7, 12

Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants, 85 Fed. Reg. 37,502 (June 22, 2020)................. passim

Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82,398 (Nov. 18, 2016).......................... 25

Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 62,284 (Dec. 5, 1994)............ 24

Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 14,779 (proposed Mar. 30, 1994).................................................................... 5, 24

U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280 (proposed Nov. 14, 2019) . 6

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)........................................................................ 19

Citizenship and Immigr. Serv. Ombudsman, Annual Report 2018 (June 28, 2018) ................... 22

David A. Martin, Making Asylum Policy: The 1994 Reforms, 70 Wash. L. Rev. 725 (1995)...... 5

David A. Martin, Reforming Asylum Adjudication: On Navigating the Coast of Bohemia, 138 U. Pa. L. Rev. 1247 (1990)................................................................................ 20

David A. Martin, The 1995 Asylum Reforms, Ctr. for Immigr. Stud. (May 1, 2000) ................. 22

Donald J. Trump, Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019) ........................................... 6, 16

## INTRODUCTION

This case challenges two final rules scheduled to go into effect August 21 and 25. The two rules threaten the ability of people who have fled persecution to live with dignity and in safety in the United States as they pursue their claims for asylum.

Because there is no system of federal public assistance for asylum seekers, work authorization in the form of an employment authorization document ("EAD") has been the primary means for asylum seekers to meet their material and legal needs while pursuing their claims. The new rules, which were issued by Defendant the Department of Homeland Security ("DHS") through Defendant Chad Wolf, the purported Acting DHS Secretary, will delay or eliminate work authorization for thousands of asylum seekers by dismantling important aspects of the well-established EAD application and adjudication system. *See* Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38,532 (June 26, 2020) ("Broader EAD Rule"); Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants, 85 Fed. Reg. 37,502 (June 22, 2020) ("Timeline Repeal Rule").[1] DHS issued these rules (together, "Asylum EAD Rules") without requisite authority and in disregard of law requiring agency accountability and reasoned decisionmaking.

Plaintiffs are five organizations that provide legal, social, and other services to asylum seekers. They respectfully request that this motion be resolved before August 21, the day the first rule would go into effect. Anticipating the rules, Plaintiffs have already begun to divert resources in a way that threatens their core missions. If the rules are permitted to go into effect, Plaintiffs

---

[1] These rule changes are summarized in Exhibit 1 to the Declaration of Geroline Castillo, dated July 23, 2020. The Timeline Repeal Rule is attached as Exhibit 2 to the Declaration and the Broader EAD Rule is attached as Exhibit 3. At the Court's direction, Plaintiffs would be happy to submit copies of other Federal Register documents cited in the brief for ease of reference.

will face new and acute demands for their services and simultaneously risk losing crucial revenue streams, threatening their operations. Asylum applicants who would have been on the brink of receiving work authorization—including Plaintiffs' members and clients—will face forced destitution for months, or even indefinitely, limiting their access to food, shelter, medical care, and legal counsel. Plaintiff Oasis Legal Services, for example, whose clients to date have been granted asylum in 99% of its decided cases, estimates that 80% of its clients will be provisionally or permanently barred from working while their asylum applications are pending, while the remainder will be without employment for at least one year after filing for asylum.[2]

W.L., a member of Plaintiff The Asylum Seeker Advocacy Project, is one of the thousands of people who will be harmed by the new rules. W.L. fled Guatemala after she was raped repeatedly, forced to have an abortion, and threatened with death by a prominent man who used his connections to government officials to evade arrest. W.L. applied for asylum in April and is living temporarily with her two young children in the home of a family member. W.L. hopes to hire an attorney to represent her in immigration court and secure protection for her family, but she cannot afford to do so without work authorization. Under the Asylum EAD Rules, W.L. will be barred from even applying for work authorization until next spring, with no assurances as to whether or when such authorization will be granted.[3]

Plaintiffs ask the Court to issue an order under 5 U.S.C. § 705 to postpone the effective date of the rules or, in the alternative, a preliminary injunction under Rule 65 while this case is being adjudicated. Plaintiffs are prepared to move the case expeditiously to resolution as the claims

---

[2] Ex. 7, Oasis Decl. ¶¶ 5, 9. This and other declarations from plaintiff organizations are attached as Exhibits 4-8 of the Castillo declaration. All other exhibits referenced in this brief are similarly attached to the Castillo declaration.
[3] Ex. 5, ASAP Decl. ¶¶ 22-25.

present pure questions of law; in fact, some of the claims presented below can be resolved now without the production of an administrative record.

In Part I, Plaintiffs show that they are likely to succeed on their claims that DHS violated the Administrative Procedure Act ("APA"), the Federal Vacancies Reform Act ("FVRA"), and/or the Homeland Security Act ("HSA"), and that the likelihood of succeeding on any one of those claims would be sufficient to stay the rules. Plaintiffs will suffer irreparable harm if the rules are permitted to go into effect (Part II), and the balance of equities and the public interest warrant the requested relief (Part III).

## BACKGROUND

**The Significance of Work Authorization Within the Asylum System**

Consistent with this country's longstanding humanitarian commitments, for forty years Congress has permitted "[a]ny [person] who is physically present in the United States or who arrives in the United States"—"whether or not [they arrive] at a designated port of arrival" and "irrespective of [their] status"—to apply for asylum. 8 U.S.C. § 1158(a)(1); *see, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands[.]"). A person is eligible for asylum if they are a "refugee"—that is, if they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42). Asylum is a first step toward making a new home in this country: the status provides a pathway to lawful permanent resident status (*i.e.*, a "green card"), *see* 8 U.S.C. § 1159(b), and, ultimately, U.S. citizenship, *see* 8 U.S.C. § 1427(a).

3

Unlike many other industrialized countries, the United States generally does not provide public assistance to the people it permits to remain here to pursue claims for asylum. *See* Ex. 20, State Att'ys Gen. Cmt. n.21, at 29. Instead, the federal government has historically authorized asylum applicants to work and earn income in this country so that they may meet their needs while pursuing their asylum cases. An EAD, *see* 8 C.F.R. § 274a.12(c)(8),[4] confers benefits beyond access to jobs: it is a critical form of identification that enables asylum applicants to apply for drivers' licenses, enroll in school, obtain basic utilities, and access banking. *See* Ex. 2, 85 Fed. Reg. at 37,527 (summarizing comments). Without an EAD, asylum applicants must rely on the support—if available—of states, localities, social services organizations, and family and friends for their basic survival needs, and/or risk exploitation by working off the books. *See id.*; Ex. 3, 85 Fed. Reg. at 38,591. The ability to access employment while an asylum application is pending is particularly important because the asylum process is complicated and lengthy. *See* Compl. ¶¶ 39-46. Asylum applicants are responsible for securing their own counsel to navigate the process, *see* 8 U.S.C. § 1229a(b)(4)(A), and having such counsel increases an applicant's likelihood of success by approximately fivefold. *See* Ex. 18, Nat'l Immigrant Just. Ctr. Timeline Cmt. at 5-6. And although the asylum laws require the government to reach an initial decision on an asylum application within 180 days of filing absent exceptional circumstances, *see* 8 U.S.C. § 1158(d)(5)(A)(iii), the government routinely fails to meet that deadline; most asylum applicants wait much longer. *See* Ex. 19, Immigr. Just. Network Cmt. at 6 & n.14.

Under the current regulations, which date to 1994 reforms, an asylum applicant whose case has not yet been decided may reliably secure work authorization 180 days after applying for

---

[4] Citations to the regulations are to the version in effect as of the filing of this motion, except where otherwise indicated.

asylum: once their underlying asylum application has been pending for 150 days, they may submit an EAD application, and the agency must adjudicate it within 30 days. *See* 8 C.F.R. § 208.7(a)(1). DHS must grant the application unless the applicant has been convicted of an aggravated felony or their asylum application has already been denied. *See id.*

The agency adopted the policy of staggering asylum and EAD applications after a previous policy of permitting simultaneous asylum and EAD applications yielded evidence that a substantial number of people were filing facially boilerplate asylum applications as hooks to quickly obtain EADs. *See* Ex. 10, David A. Martin, Making Asylum Policy: The 1994 Reforms, 70 Wash. L. Rev. 725, 734-37 (1995) (cited at Ex. 3, 85 Fed. Reg. at 38,544 n.30). In requiring a waiting period for EAD applications, the agency nonetheless took pains to minimize the hardship to asylum seekers: it based the waiting period on the time "beyond which it would not be appropriate to deny work authorization to a person whose claim ha[d] not been adjudicated"; committed to deciding EAD applications on a shortened, 30-day timeline; and sought to cut asylum processing times by more than half to minimize the number of people still waiting for decisions at the 180-day mark. *See* Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization ("Notice of 1994 Reforms"), 59 Fed. Reg. 14,779, 14,780, 14,788 (proposed Mar. 30, 1994). Congress later codified this system, requiring asylum applicants to wait at least 180 days to work absent an earlier decision on their asylum application, but continued DHS's authority to implement an EAD system for asylum applicants through its regulations. *See* 8 U.S.C. § 1158(d)(2).

**The Administration's Efforts to Block Access to Asylum**

In the fall of 2019, the Trump Administration proposed to severely restrict and, in many cases, eliminate asylum seekers' access to EADs. On September 9, 2019, DHS issued a notice of

5

proposed rulemaking ("Timeline Repeal Notice") that proposed in relevant part to repeal the requirement that its sub-agency U.S. Citizenship and Immigration Services ("USCIS") adjudicate on a priority basis, and within 30 days of filing, the initial EAD applications of people with pending asylum applications. *See* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148. On November 14, 2019, six days after the close of the comment period for the Timeline Repeal Notice, DHS issued another notice proposing further changes to the EAD system. In addition to again proposing regulatory text that would repeal the 30-day adjudication timeline, this notice ("Broader EAD Notice") proposed to extend the waiting period before an asylum applicant could apply for an initial EAD and to restrict who might receive work authorization. *See* Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62,374.

These rulemakings were part of a longer, scattershot series of rulemakings initiated by the Trump Administration to burden asylum seekers and block access to asylum.[5] Many were undertaken at the express, public direction of President Trump, and all are in line with his Administration's agenda of curtailing humanitarian immigration to the United States. *See* Ex. 9, Donald J. Trump, Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019).

---

[5] *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280 (proposed Nov. 14, 2019) (charging asylum applicants fees to apply for asylum and EADs, raising fees in general, and eliminating fee exemptions and fee waivers); Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69,640 (proposed Dec. 19, 2019) (expanding bars to asylum); Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264 (proposed June 15, 2020) (among other things, making late payment of taxes or failure to report income a barrier to asylum; making it more difficult to pass a credible fear screening; making it easier to find an application frivolous; and dramatically heightening the legal standards applicants must meet to qualify as a refugee and therefore to be eligible for asylum).

Of these rulemakings, DHS has to date finalized and issued, under the purported authority of Defendant Wolf, the Asylum EAD Rules that are the subject of this challenge.[6] The Timeline Repeal Rule was published in the Federal Register on June 22, 2020 and is set to go into effect on August 21, 2020. *See* Ex. 2, 85 Fed. Reg. 37,502 (to be codified at 8 C.F.R. pt. 208). The Broader EAD Rule was published on June 26, 2020 and is set to go into effect on August 25, 2020. *See* Ex. 3, 85 Fed. Reg. 38,532 (to be codified at 8 C.F.R. pts. 208 & 274a).

As finalized, the Asylum EAD Rules restrict—and, in many cases, eliminate—the means through which asylum seekers may work and earn income to meet their basic needs while navigating the complex and often-lengthy asylum application process. Among other things, the Asylum EAD Rules more than double the waiting period before an asylum applicant may apply for work authorization from 150 to 365 days; eliminate the 30-day timelines on which the agency was previously required to make a decision whether to accept an asylum application as complete (and thereby start the EAD waiting period) and to adjudicate asylum applicants' initial EAD applications; render asylum applicants ineligible for EADs on new grounds, including entering the country without inspection, even though an asylum seeker is statutorily entitled to apply for asylum regardless of how they entered the United States; grant individual immigration officers discretion to deny EADs even to applicants who are eligible for such authorization; impose a new, duplicative biometrics requirement for EADs; and deny asylum applicants permission to work during periods of federal judicial review of asylum decisions. *See generally* Complaint ¶¶ 68-103; Castillo Decl.

---

[6] Plaintiffs exclude from the scope of their challenge the portion of the Timeline Repeal Rule that deletes regulatory language requiring people with pending asylum applications who seek to renew EADs to do so at least 90 days before the expiration of their EAD. This is a conforming amendment to account for a 2017 regulation that provides automatic, 180-day EAD extensions to asylum applicants who file EAD renewal applications *at any time* before the expiration of their EADs, *see* 8 C.F.R. § 274a.13(d)(1), and thus rendered the 90-day requirement superfluous. *See* Timeline Repeal Notice, 84 Fed. Reg. at 47,155 (characterizing the change as a "clarifying amendment").

Ex. 1 (summarizing rule changes). The agency advanced these changes with the supposed goals of increasing agency "flexibility" and deterring frivolous, fraudulent, and otherwise non-meritorious asylum applications at whatever cost. *See* Ex. 2, 85 Fed. Reg. at 37,509; Ex. 3, 85 Fed. Reg. at 38,543.

**The Impact of the Rules**

The policy changes embodied in the Asylum EAD Rules are devastating to asylum seekers, their families, and their communities. DHS itself estimates the costs of the Asylum EAD Rules to include billions of dollars in lost compensation to asylum seekers annually, not even counting lost compensation to several groups of asylum seekers whose numbers DHS claimed to be unable to estimate. Ex. 2, 85 Fed. Reg. at 37,505; Ex. 3, 85 Fed. Reg. at 38,538-41. DHS recognizes that absent authorization to work, many asylum seekers will be without any means of support: "Asylum seekers who are concerned about homelessness during the pendency of their employment authorization waiting period," it advises, "should become familiar with the homelessness resources provided by the state where they intend to reside." Ex. 3, 85 Fed. Reg. at 38,567, 38,591.

As DHS itself anticipated, organizations like Plaintiffs CASA de Maryland, Inc. ("CASA"), the Asylum Seeker Advocacy Project, Inc. ("ASAP"), Centro Legal de la Raza ("Centro Legal"), Oasis Legal Services ("Oasis"), and Pangea Legal Services ("Pangea"), which advocate for and serve asylum seekers and other noncitizens, will be strained as the Asylum EAD Rules prevent their clients and members from working. *See* Ex. 2, 85 Fed. Reg. at 37,505 (acknowledging burdens on non-profit organizations that support asylum seekers); Ex. 3, 85 Fed. Reg. at 38,542 (same). These irreparable harms are already occurring and will intensify if the Asylum EAD Rules are permitted to take effect. *See infra* Part II.

**ARGUMENT**

Plaintiffs request that the Court postpone the effective dates of the Asylum EAD Rules under the APA's express authorization to courts to preserve the status quo during the pendency of litigation. 5 U.S.C. § 705; *see Dist. of Columbia v. U.S. Dep't of Agric.*, __ F. Supp. 3d. __, No. CV 20-119 (BAH), 2020 WL 1236657, at \*33-34 (D.D.C. Mar. 13, 2020), *appeal filed*, No. 20-5136 (D.C. Cir. filed May 15, 2020).  In the alternative, Plaintiffs request that the Court grant a preliminary injunction to similarly stay the rules' effective dates. *See* Fed. R. Civ. P. 65; *Roe v. Dep't of Defense*, 947 F.3d 207, 234 (4th Cir. 2020). Plaintiffs meet the standards for both forms of relief because they are likely to succeed on the merits of their claims, they are experiencing irreparable harm that will grow without preliminary relief, and the balance of equities and the public interest weigh in favor of the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *U.S. Dep't of Agric.*, 2020 WL 1236657, at \*8 (applying preliminary injunction factors to issuance of a stay under 5 U.S.C. § 705).

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS

Plaintiffs are likely to succeed on the merits of their claims that the EAD Rules are unlawful because they violate the APA's requirements for rulemaking and reasoned decisionmaking and because they were issued without authority. Each of these reasons is sufficient to warrant postponing the Asylum EAD Rules' effective dates while this case proceeds to final judgment.[7]

---

[7] Plaintiffs submit that the legal arguments in Parts I.A.1 and I.B below are ripe for final resolution should the Court find it appropriate to convert this motion into a partial summary judgment motion. For the remainder of the claims in this motion and alleged in the complaint, Plaintiffs will seek the production of the administrative record prior to summary judgment.

A. **DHS Violated the APA by Failing to Comply with Its Notice and Comment Requirements and by Failing to Engage in Reasoned Decisionmaking.**

This Court should stay the Asylum EAD Rules because Plaintiffs are likely to succeed on the claim that the rules are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that they were issued "without observance of procedure required by law" in violation of the APA. 5 U.S.C. § 706(2)(A), (D). These APA requirements include the obligation that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). When, as here, an agency issues substantive rules, the agency must also provide the public with notice of the proposed rules; "give interested persons an opportunity to participate in the rule making" in a manner that is meaningful; and issue alongside its final rules a "statement of their basis and purpose." 5 U.S.C. § 553; *see N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012).

The Supreme Court warned recently in another APA challenge involving this Administration's rushed effort to curtail the rights of immigrants "that particularly when so much is at stake, . . . the Government should turn square corners in dealing with the people." *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (internal quotation marks omitted) (holding DACA rescission arbitrary and capricious under the APA). DHS has again disregarded this mandate in at least the four ways described below—any one of which would be independently sufficient for the APA claim to succeed as to each or both of the Asylum EAD Rules.[8]

---

[8] The Challenged Rules violate the APA for other reasons as well, including reasons specific to the particular changes they encompass. *See* Compl. ¶¶ 211-73, ECF No. 1.

10

1.     **DHS Violated the APA with Respect to the Asylum EAD Rules by Impermissibly Restricting the Scope of Comments and of Its Analysis.**

The Asylum EAD Rules are invalid because they violate the basic APA principles articulated by the Fourth Circuit in *United Farm Workers*, 702 F.3d 755. In that case, the Department of Labor had proposed to suspend an existing regulation and reinstate the prior one, but limited the comments it sought to those that related to the suspension itself and refused to consider comments on the merits of either of the rules. *See id.* at 760-61, 769-70. The Fourth Circuit held that the agency's content restriction violated the APA because it foreclosed comments on, and consideration of, issues that were "relevant and important" to the proposed action. *See id.* Such restrictions deprived the public of the opportunity to meaningfully comment on the proposed rules under 5 U.S.C. § 553(c); contravened the agency's obligation to identify and respond to relevant, significant issues and to reasonably explain its decision in a statement of basis and purpose, *see id.*; *Bedford Cnty. Mem'l Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1020 (4th Cir. 1985), and precluded the agency from considering important aspects of the problem, *see State Farm*, 463 U.S. at 43. *See United Farm Workers*, 702 F.3d at 769 (listing and relying on these APA principles to strike down the suspension due to unlawful content restriction).

DHS engaged in the very content restriction the Fourth Circuit condemned in *United Farm Workers* when it issued the Asylum EAD Rules. **First,** DHS artificially split up and sequenced rulemakings of  an intradependent regulatory regime—the asylum EAD regulation in 8 C.F.R. § 208.7 and related provisions—in a manner that deprived the public of a meaningful opportunity to comment on "relevant and important" issues. *United Farm Workers*, 702 F.3d at 769. In particular, DHS isolated the proposal to repeal the 30-day timeline for adjudicating initial EAD applications into its own rulemaking in the Timeline Repeal Notice, even though that proposal was "relevant and important" to the Broader EAD Notice, and vice versa. Whether the agency would

11

take 30 days or an unregulated amount of time to adjudicate an application (per the Timeline Repeal Notice) was "relevant and important" to whether DHS should make other changes to the EAD application process proposed in the Broader EAD Notice, such as giving immigration officers additional discretion and lengthening the time before an asylum applicant could apply for an EAD. *See Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1441 (D.C. Cir. 1983) (agency's decision to eliminate a means of oversight of broadcast radio licensees was "disturbing" in light of a "concurrent proceeding" that would make such oversight all the more important). In turn, the changes in the Broader EAD Notice, including substantially narrowing EAD eligibility, were "relevant and important" to assessing the volume of initial EAD applications the agency might expect, and thus to whether DHS should repeal the 30-day adjudication timeline. Despite this interrelatedness, DHS provided *no* overlapping comment period between the notices, erroneously asserted that "[t]he two rulemakings include distinct proposals[,]" and instructed that comments pertaining to the timeline repeal and comments pertaining to the remainder of the rule changes be submitted to the "correct docket," implying that comments that related to the other proposal would be considered misfiled. 84 Fed. Reg. at 47,148; *id.* at 62,375. Indeed, even though the agency embedded the proposal to repeal the 30-day adjudication timeline within the proposed regulatory text in the Broader EAD Notice, it explicitly declined to address that proposal in the notice, signaling that comments that related to the timeline repeal would not be considered in the context of the Broader EAD rulemaking. *See* 84 Fed. Reg. at 62,422 (proposing text that would eliminate the 30-day adjudication timeline); *id.* at 62,377 n.4 (explaining that it would not address processing time).

DHS's manner of segregating rulemaking on a single topic mirrors the content restriction found to be unlawful in *California ex rel. Becerra v. Department of the Interior*, 381 F. Supp. 3d

1153 (N.D. Cal. 2019), which relied on and closely followed *United Farm Workers*' reasoning. In that case, the agency had issued two simultaneous notices, one proposing to repeal the existing rule and another to solicit input on a proposed replacement rule. *See id.* at 1175-76. Even though the proposal to repeal the rule did not explicitly limit the scope of comments the agency would receive, the court held that the agency impermissibly imposed a de facto content restriction akin to the explicit content restriction in *United Farm Workers* by suggesting that substantive comments regarding the existing rule would be considered only in the rulemaking on the replacement rule—notwithstanding the relevance and importance of such comments to the question of repeal. *Id.* Similarly, in issuing the Asylum EAD Notices, DHS prevented the public from commenting on relevant and important issues by artificially directing comments to two separate rulemaking dockets. *See supra* at 11-12.

**Second**, to the extent the public submitted comments regarding the regulatory scheme as a whole, including the interaction of the two proposed rules, DHS further violated the APA when it refused to consider them, thereby contravening the agency's obligation to identify and respond to relevant, significant issues raised. *See Bedford Cnty. Mem'l Hosp.*, 769 F.2d at 1020; *United Farm Workers*, 702 F.3d at 769. In its preamble to the Timeline Repeal Rule, DHS labeled comments on the anticipated Broader EAD Rule and the aggregated costs and impact of the two proposed rules as "out of scope." Ex. 2, 85 Fed. Reg. at 37,530. Although DHS "recognize[d]" that the two rules "could have some interaction," it impermissibly deflected this issue, promising that it "w[ould] address such concerns if it finalize[d] the broader rule." *Id.* at 37,530-31. That deferral of relevant, significant issues to a parallel rulemaking violated the APA in itself. S*ee Becerra*, 381 F. Supp. 3d at 1176.

DHS made matters worse when it broke its promise to consider the interaction of the rules just a few days later: when issuing the Broader EAD Rule, it refused to respond to comments on the cumulative and compounding impact of the rules. It failed to even acknowledge comments urging the agency not to repeal the 30-day adjudication deadline given the aggregated impact of the two rules. *See, e.g.*, Ex. 22, 50 Members of Cong. Cmt. at 4-5; Ex. 21, N.Y.C. Cmt. at 5-8. In fact, in responding to criticism that DHS's cost-benefit analysis of the Broader EAD Rule failed to account for the Timeline Repeal Rule and aggregate impact, DHS admitted that it did not consider the Timeline Repeal Rule in analyzing the Broader EAD Rule, asserting that "incorporating such interactions in the impact assessments for this rule would be speculative as it assumes [the Timeline Repeal Rule] will be finalized, and without change." Ex. 3, 85 Fed. Reg. at 38,590. But DHS was simply wrong on this point: the Timeline Repeal Rule had already been finalized and published (without change) earlier in the week. *See* Ex. 2, 85 Fed. Reg. at 37,502.

**Finally,** the problems identified above predictably led DHS to another APA violation identified in *United Farm Workers*, 702 F.3d at 769: the "failure to consider . . . important aspect[s] of the problem," *State Farm*, 463 U.S. at 43; *Becerra*, 381 F. Supp. 3d at 1153. The D.C. Circuit has held that an agency violates this principle when it bases its decisions "on a premise the agency itself has already planned to disrupt," by ignoring impending related changes that are "clearly a 'relevant factor' or an 'important problem' that must be considered." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43). In *Portland Cement*, the agency had engaged in simultaneous, parallel rulemaking on two environmental standards that were relevant to each other. *See id.* at 184-86. As the court noted, "[i]nstead of treating the two rules as truly interdependent efforts and acknowledging their close correlations, [the agency] let each [rulemaking] run its own course regardless of the collateral impact." *Id.* at

185. The court held that this was arbitrary and capricious because the agency had an "obligation to acknowledge and account for a changed regulatory posture the agency creates–especially when the change impacts a contemporaneous and closely related rulemaking." *Id.* at 187; *see also United Church of Christ*, 707 F.2d at 1441-42 (finding it "seriously disturbing" and "almost beyond belief" that an agency would undertake rulemaking that undercuts another "concurrent" rulemaking process).

DHS acknowledged that the Asylum EAD Rules "could have some interaction," Ex. 2, 85 Fed. Reg. at 37,530-31, but like the agency in *Portland Cement*, it failed to consider this interaction in finalizing the rules, *see* 665 F.3d at 187. DHS repeatedly dismissed commenters' concerns regarding injuries that asylum applicants would suffer because of the Timeline Repeal Rule on the ground that "*this* rulemaking does not make changes to eligibility requirements or the process by which asylum seekers obtain employment authorization"—even as it had proposed to do those very things in the Broader EAD Notice. *See id.* at 37,511 (emphasis added).[9] And DHS rejected comments to the Timeline Repeal Notice suggesting the reasonable alternative of shortening the EAD application waiting period to offset the harms of repealing the 30-day adjudication provision, assuming that the resulting waiting period would be shorter than the existing 150-day period. *See id.* at 37,521-22. But that assumption, and therefore DHS's reasoning for rejecting this reasonable alternative, was flawed given that DHS was preparing to extend the baseline waiting period to 365 days through the Broader EAD Rule. *See Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (the notice and comment process is designed to ensure that the agency will have before it the relevant facts and information "as well as suggestions for alternative solutions").

---

[9] Some version of that refrain appears at least nine times in the preamble. *See* Ex. 2, 85 Fed. Reg. at 37,508, 37,511, 37,513, 37,514, 37,527, 37,528, 37,541; *see also, e.g.*, *id.* at 37,520 ("*this* rulemaking is not intended as a deterrent") (emphasis added)).

These flaws pervaded the Broader EAD Rule as well. Because it based the rulemaking on the mistaken premise that the repeal of the 30-day timeline was a distinct issue, *see supra* at 12, DHS failed to consider the magnifying impact that the Timeline Repeal Rule would have on the changes in the Broader EAD Rule. For example, DHS dismissed comments expressing concerns about how the new 365-day waiting period would affect asylum applicants by stating that it was not reasonable for asylum applicants to expect immediate employment given that the statute prohibits issuing an EAD prior to 180 days from the filing of an asylum application. *See* Ex. 3, 85 Fed. Reg. at 38,565-66. In doing so, DHS ignored the significant difference among a 180-day wait, a 365-day waiting period under the Broader EAD Rule, and the indefinite wait when accounting for the repeal of the 30-day adjudication timeline as well. As another example, DHS justified granting USCIS the discretion to deny EAD applications of asylum applicants by asserting that the existing system in which EADs are readily available is "too strong a draw for economic migrants from around the world," 85 Fed. Reg. 38,577, while willfully ignoring that it had just simultaneously altered that system dramatically, including by giving itself unfettered discretion to in the Timeline Repeal Rule to take as long as it desires to adjudicate EAD applications.

In addition to ignoring the interrelated impact of the rule changes in the Asylum EAD Rules, DHS contravened *State Farm* and the lessons of *Portland Cement* by ignoring other parallel rulemakings that are part of the package of reforms that the Trump Administration has ordered for the alleged purpose of "safeguard[ing] our system against rampant abuse of our asylum process." *Compare* Ex. 9, April 29, 2019 Memorandum § 3 (directing DHS to propose multiple regulations relating to the asylum system, including what became the Broader EAD Rule ) *and* Ex. 3, 85 Fed. Reg. 38,544 (acknowledging that the Broader EAD rulemaking "is part of a series of reforms DHS is undertaking"), *with* Ex. 3, 85 Fed. Reg. at 38,590 (considering only the impact "of regulations

and policies in effect when establishing the baseline used for the rule's analysis"). For example,

DHS is currently engaging in rulemaking that would significantly change the standards for, and

process of, asylum eligibility. *See* Procedures for Asylum and Withholding of Removal; Credible

Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264 (proposed June 15, 2020). If adopted,

these rule changes would further transform the landscape of the EAD system for asylum applicants,

affecting at minimum the number of applicants for EADs. This rulemaking undermines DHS's

stated rationale for the Timeline Repeal, which was allegedly based on adjusting to "current

operational realities" (which will now drastically change), Ex. 2, 85 Fed. Reg. at 37,507-08, and

for the Broader EAD Rule, which was allegedly based on a systemic need to reduce "frivolous and

non-meritorious" asylum filings due to the lack of changes to the asylum system in recent years

(which will now also change), Ex. 3, 85 Fed. Reg. at 38,623. At minimum, when an agency seeks

to fundamentally alter the entire regulatory system on a topic at one time, as DHS is seeking to do

here, it is arbitrary and capricious to ignore the interrelated impact of the rules and assess each

change in a piecemeal manner without accounting for the overall "changed regulatory posture"

that the agency is simultaneous creating. *Portland Cement Ass'n*, 665 F.3d at 187.[10]

### 2. DHS Violated the APA with Respect to the Asylum EAD Rules by Failing to Account for Harms to Bona Fide Asylum Seekers.

In addition to being the product of the fatal content restriction described above, the Asylum

EAD Rules violate the APA because the agency failed to account for harms that the rule would

---

[10] As another example, at the same time that DHS was engaging in the rulemaking for the Asylum EAD Rules that would change the criminal bars to EADs, the agency proposed a rule change to the criminal bars to asylum eligibility in a parallel rulemaking. *See* 84 Fed. Reg. 69,640 (proposed Dec. 19, 2019) ("Asylum Criminal Bars Notice"). DHS then ultimately decided to align the criminal bars to EADs and to asylum eligibility. But because the revised criminal bars to asylum eligibility in the parallel rulemaking had not been finalized, the public was deprived of a meaningful opportunity to comment on whether the new ineligibility grounds that may be adopted as a result of the Asylum Criminal Bars Notice are also appropriate grounds for denying EADs. *See* Compl. ¶ 231.

inflict on bona fide asylum seekers. Congress created the U.S. asylum system to further longstanding U.S. policy of "respond[ing] to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102. Since the asylum laws exist to serve people subject to persecution, the agency, in enforcing those laws, must respect and promote their interests. *See Judulang v. Holder*, 565 U.S. 42, 55 (2011) (agency action must reflect "the purposes of the immigration laws" or the "appropriate operation" of the system).

As an initial matter, excepting conclusory—and thus insufficient—assertions that its policy would not deter bona fide asylum seekers from seeking protection,[11] DHS failed to respond to the grave criticism that its proposed rules "w[ould] actually discourage and reduce legitimate claims for asylum." Ex. 3, 85 Fed. Reg. at 38,564-65; *see also* Ex. 2, 85 Fed. Reg. at 37,520 (summarizing comments expressing concern that the Timeline Repeal Rule would deter asylum seekers). Commenters explained, for example, how the expenses of pursuing an asylum application— including for printing, photocopying, transportation, gathering evidence, and hiring translators, interpreters, and counsel—could prove prohibitive absent work authorization, but the agency did not engage with them. *See e.g.*, Ex. 25, Refugee & Immigrant Ctr. For Educ. & Legal Servs. Cmt. at 2; Ex. 19, Ex. 18, Nat'l Immigr Just. Ctr. Timeline Cmt. at 5-6. DHS's assertions that there is no right to be granted asylum and that the rules do not, as a technical matter, bar anyone from seeking asylum or participating in the adjudication process are nonresponsive. *See* Ex. 3, 85 Fed.

---

[11] Ex. 3, 85 Fed. Reg. at 38,558 (asserting without citation that "this rule does not deter legitimate asylum seekers who are fleeing persecution from entering the United States," and that "[b]ona fide asylum-seekers urgently needing protection from persecution for whom the U.S. is the first country available in which to seek refuge will apply for asylum regardless of when they would receive work authorization"); *id.* at 38,555 (asserting without citation that the "final rule . . . [will] encourage[e] only legitimate asylum seekers . . . to seek asylum"); Ex. 2, 85 Fed. Reg. at 37,512 ("This rulemaking does not impede an alien's opportunity to seek asylum . . . ."); *id.* at 37,520 ("[T]his rulemaking is not intended as a deterrent and does not impede an aliens' opportunity to seek asylum in the United States").

Reg. at 38,555, 38,562, 38,591, 48,592; Ex. 2, 85 Fed. Reg. at 37,520. The agency did not address the criticism that the *practical effect* of its rules is to erect a de facto barrier to pursuing relief, and this failure to respond in a reasoned manner to a major criticism again violates notice and comment procedures and was arbitrary and capricious. *See Bedford Cnty. Mem'l Hosp.*, 769 F.2d at 1021.

Moreover, the agency's thesis, expressed repeatedly in the Broader EAD Rule—that its policy could somehow "result in decreased filings of frivolous, fraudulent, or non-meritorious asylum applications" without also deterring "bona fide" or "legitimate" asylum seekers—is simply irrational. Ex. 3, 85 Fed. Reg. at 38,583. For one, it is incoherent on its face: if the policy deters "non-meritorious" applications beyond those that are frivolous or fraudulent, it will necessarily deter some "bona fide" applications (*i.e.*, those "made in good faith"). *See id.* at 38,585 ("DHS is promulgating this rule . . . to reduce the number of non-meritorious asylum applications," including those filed "in good faith."); *see also Bona Fide*, Black's Law Dictionary (11th ed. 2019) ("bona fide" means "[m]ade in good faith").

But even construing "bona fide" asylum seeker to mean a person who will prevail on the merits, the agency's reasoning makes no sense. Which applicants will ultimately prevail on the merits is necessarily unknowable at the threshold of a case: it will depend on country conditions and personal circumstances, as well as where and by whom the case is tried and decided and if the applicant is represented by counsel. *See, e.g.*, *Gonahasa v. INS*, 181 F.3d 538, 540-43 (4th Cir. 1999) (concluding improved circumstances in the applicant's home country after the applicant fled warranted denial of asylum); *see also Grace v. Barr*, __F.3d __, No. 19-5013, 2020 WL 4032652, at *13 (D.C. Cir. July 17, 2020) (noting variation in asylum law across circuits); Ex. 26, McLaughlin Cmt. at 1 (describing 80% differences in grant rates between immigration judges); Ex. 18, Nat'l Immigr. Just. Ctr. Timeline Cmt. at 5-6, 6 n.19 (citing statistic that asylum seeker is

approximately five times as likely to prevail with representation). The Asylum EAD Rules have no mechanism for identifying and exempting those who will prevail on the merits and instead resort to burdening all asylum seekers, as the agency itself recognized. *See, e.g.*, Ex. 3, 85 Fed. Reg. at 38,549 ("DHS acknowledges that these reforms will also apply to [those] with meritorious asylum claims, and that these applicants may experience some degree of economic hardship as a result"). DHS's position that people who will ultimately win their cases—an unknowable group— would somehow resist the deterrent effects of the policy has no rational basis,[12] and was arbitrary and capricious in this way as well. *See, e.g.*, *State Farm*, 463 U.S. at 43 (explanation that runs counter to the evidence is arbitrary and capricious); *Judulang*, 565 U.S. at 55.

### 3. DHS Violated the APA with Respect to the Broader EAD Rule by Failing to Establish the Problem It Purported to Address.

The Broader EAD Rule is also arbitrary and capricious because DHS violated the fundamental APA requirement that an agency putting forward a regulatory solution establish that there is a problem to be solved. *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) ("[A] regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist."). Explanatory statements that are "conclusory," *see Mayor of Balt. v. Azar*, 439 F. Supp. 3d 591, 609 (D. Md. 2020), *appeal filed*, No. 20-1215 (4th

---

[12] Professor David Martin, whose work was cited by the agency, *see infra* at 21, anticipated this problem for the agency: "If work authorization is now to be denied, any lawyer for the Department of Justice is bound to be asked in court how the government expects asylum seekers to survive during the months (and possibly years) until a final ruling is obtained on the application. Unless the government takes further steps to provide for such people during the pendency of the claim, the lawyer has no respectable answer. *Courts might easily conclude that the government was trying to starve people out of pursuing a congressionally mandated right. And they would surely point out that a no-work-authorization policy falls as heavily on bona fide refugees as on the abusers who are the ostensible targets.*" *See* Ex. 12, David A. Martin, Reforming Asylum Adjudication: On Navigating the Coast of Bohemia, 138 U. Pa. L. Rev. 1247, 1374 (1990) (cited at Ex. 3, 85 Fed. Reg. at 38,544 n.32 *et al.*) (emphasis added).

Cir. filed Feb. 25, 2020), or based in mere "conjecture," *see Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure Div. of World Color Press, Inc*., 843 F.2d 1490, 1494 (D.C. Cir. 1988), are insufficient, and any explanation that "runs counter to the evidence before the agency" will necessarily fail, *State Farm*, 463 U.S. at 43.

In explaining the Broader EAD Rule, DHS failed to present any evidence that the EAD system must be "reformed" as the rule provides and instead relied on a record that contradicted its proposal. While DHS claimed to have identified EADs' "low eligibility threshold and nearly limitless renewals. . . as a driver for economic migrants who are ineligible for lawful status in the United States to file frivolous, fraudulent, and otherwise non-meritorious asylum applications," Ex. 3, 85 Fed. Reg. at 38,555; *see also id.* at 38,546, it provided no support for this statement and instead acknowledged that it "does not track cases that are frivolous, or fraudulent, or otherwise non-meritorious claims," *id.* at 38,590. Lacking the relevant data, DHS relied principally on decades-old work of Professor David Martin to irrationally claim that there are problems with the current EAD system. *See id.* at 38,544 n.30; *id.* at 38,546 & n.58;[13] *id.* at 38,555 & n.93. The cited articles discuss problems of the early 1990s that the current EAD system addressed; they do not conclude that the current system is in need of reform. If anything, they contradict the agency's position that the system requires or warrants further restriction. For example, reflecting in 2000 on the regulations promulgated in 1994, Martin explained that those reforms had successfully broken the psychological link that he believed had led people to file boilerplate asylum applications with an eye to work authorization, and that in the future, it might be prudent to make work authorization *more* freely available—not less—in the absence of direct government aid. *See* Ex. 11, David A.

---

[13] The agency's internal cross-references are incorrect, but the agency's references to Martin's work at "note 27" are evidently references to sources cited at note 30.

Martin, The 1995 Asylum Reforms, Ctr. for Immigr. Stud. (May 1, 2000) (cited at Ex. 3, 85 Fed. Reg. at 38,544 n.30 *et al.*).

Other data presented by the agency, and even the agency's own assertions, similarly undermined DHS's position that the EAD system, as structured, is a "driver" for so-called "economic migrants" to file non-meritorious asylum applications. For example, DHS elsewhere cited a 2018 USCIS Ombudsman report that notes that the USCIS "surmises" and "presumes" that a backlog of affirmative asylum cases has created an incentive to apply for asylum to obtain an EAD. *See* Ex. 3, 85 Fed. Reg. at 38,585 n.153; *id.* at 38,555; Ex. 13, Citizenship and Immigr. Serv. Ombudsman, Annual Report 2018, at 43-44 (June 28, 2018). Even if the agency's own conjecture were sufficient, this source blames agency backlogs in asylum processing, not the "low eligibility threshold" and "nearly unlimited renewal opportunit[ies]" for EADs. Ex. 3, 85 Fed. Reg. at 38,555.

In addition to failing to establish the existence of a problem, DHS conceded an utter lack of relationship between the problem that it was purporting to address—the alleged asylum "crisis" at the border, Ex. 3, 85 Fed. Reg. at 38,543—and its proposed solutions in the Broader EAD rules. DHS's own data between 2008 and 2019 showed that nearly 45 percent of people in removal proceedings after being detained at the border "did not file for asylum with an IJ," *id.* at 38,583, and therefore would not be eligible to obtain EADs under the current rules. *Id.* at 38,583. And strikingly, the agency itself responded to comments expressing concern about the reliance interests asylum applicants have in the EAD system by dismissing as "not reasonable" the notion that an asylum applicant would have "refrained from violating immigration laws requiring lawful entry or a timely-filed asylum application, or criminal laws proscribing public safety offenses, if he had known it would later render him ineligible for an ancillary, discretionary benefit." *Id.* at 38,587. This directly contradicts its premise that the rulemaking would shape asylum seekers' conduct.

*See, e.g.*, *id.* at 38,562 ("This rulemaking addresses DHS' interest in deterring unlawful entry into the United States . . . ."); *id.* at 38,538 ("[P]rovisions seek . . . to disincentivize criminal behavior and illegal entry into the United States").

DHS's failure to explain the problem its regulation was intended to address was arbitrary and capricious for the additional reason that commenters brought this defect to the agency's attention and the agency did not address it. *See, e.g.*, Ex. 23, Lutheran Soc. Servs. of N.Y. Cmt. at 2-3 (pointing out unjustified reliance on articles by Prof. Martin); Ex. 24, Mich. Immigr. Rts. Ctr. Cmt. at 3 (pointing to lack of supporting evidence). In notice and comment rulemaking, an agency must respond to "significant comments," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), including "major criticisms of the information forming the basis for the [challenged] rule," *Bedford Cnty. Mem'l Hosp.*, 769 F.2d at 1021. The agency's failure to respond to major criticisms of the premise of its rulemaking, even beyond the defective reasoning, violated notice and comment procedures and was arbitrary and capricious. *See Action on Smoking & Health v. Civ. Aeronautics Bd.*, 699 F.2d 1209, 1215-17 (D.C. Cir. 1983) (agency action arbitrary and capricious for failure to respond sufficiently to comments in statement of basis and purpose).

> **4.    DHS Violated the APA with Respect to the Timeline Repeal Rule by Failing to Explain Why It Declined to Hold Itself to Any Timeline.**

With respect to the Timeline Repeal Rule, DHS acted in an arbitrary and capricious manner for the additional reason that it relied on a legally illegitimate explanation for its action: the desire to be free of any accountability. *See Action on Smoking & Health*, 699 F.2d at 1217 (rejecting an attempt by the agency to issue regulations based on a similar explanation). In issuing the Timeline Repeal Rule, DHS repeatedly—and insufficiently—purported to explain its decision to free itself of any adjudicatory deadline at all by pointing to the need for "flexibility." Ex. 2, 85 Fed. Reg. at 37,509 (stating that the 30-day timeframe did not provide "sufficient flexibility"); *id.* at 37,517

(rejecting alternative timelines to the 30 days by citing a desire for "greater flexibility"). But as the D.C. Circuit has held, an agency's decision cannot be based on a desire "to impose only a bare minimum of government control"—the agency must assess the "appropriate *degree* of regulation." *Action on Smoking & Health*, 699 F.2d at 1217 (emphasis added). Similarly, here, the agency could not justify its decision simply by pointing to a need for flexibility: it was required to explain why it believed that repealing the 30-day adjudication timeline and replacing it with nothing struck the appropriate balance between flexibility, accountability, and the humanitarian purposes of the statutory scheme it administers. *See also Judulang*, 565 U.S. at 55. Because the agency did not do so, its actions were arbitrary and capricious.

> **5.     DHS Violated the APA with Respect to the Timeline Repeal Rule by Failing to Explain Why It No Longer Would Prioritize Deciding Initial EAD Applications Filed by Asylum Applicants.**

Additionally, in issuing the Timeline Repeal Rule, DHS failed to reasonably explain its departure from its prior position that it should decide initial EAD applications from asylum applicants within 30 days. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (requiring "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy"). Although DHS asserted that the rule "brings the regulatory scheme by which [initial asylum-applicant EAD] applications are processed in line with processing for other types of applications for employment authorization, [which do not impose a processing timeline,]" Ex. 2, 85 Fed. Reg. at 37,519-20, it failed to explain why this is reasonable when it had previously decided that initial asylum-applicant EADs should be treated differently because they are situated differently. As the agency recognized when creating the 30-day adjudication timeline, only asylum applicants are required to observe a waiting period to initially apply for an EAD.[14] In

---

[14] *See* Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 62,284, 62,303 (Dec. 5, 1994)

addition, renewal EAD applicants do not face the same problems of delay as initial EAD applicants because many such applicants benefit from automatic, 180-day extensions that prevent gaps in employment.[15]

When an agency has "recognized . . . significant differences" in the past, an agency "must justify its failure to take account of circumstances that appear to warrant different treatment for different parties." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172-73 (D.C. Cir. 1994). Mere pronouncement of a belief that various parties should be treated the same is insufficient. *See Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993) (holding that the "conclusory statement" that the agency "believe[d] . . . the surcharge should be the same for all . . . licensees" was insufficient); *see also Grace*, 2020 WL 4032652, at *12 ("[H]owever the agency justifies its new position, what it may not do is gloss over or swerve from prior precedents without discussion[.]") (original alterations omitted) (citations omitted). The agency's insistence that asylum applicants applying for an initial EAD should be treated the same as all other EAD applicants, without accounting for differences that the agency previously recognized as material and weighty, is another way in which the rule is arbitrary and capricious. *See Fox Television*, 556 U.S. at 515-16.

---

(through amendments to 8 C.F.R. § 274a.13(d), setting an adjudication deadline of 90 days except in the case of asylum applicants initially applying for EADs); Notice of 1994 Reforms, 59 Fed. Reg. at 14,788 (requiring a 30-day adjudication timeline for asylum applicants who are "temporarily barred" from seeking employment authorization).

[15] *See* 8 C.F.R. § 274a.12(c); 8 C.F.R. § 274a.13(d); *see also* Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82,398, 82,458 (Nov. 18, 2016) (repealing the 90-day adjudication deadline for other EADs but mitigating the harm by providing for earlier filings and automatic, 180-day EAD extensions).

**B.      DHS Violated Applicable Laws When Defendant Chad Wolf, Who Was Not Lawfully the Acting DHS Secretary, Issued the Asylum EAD Rules.**

Plaintiffs are likely to prevail on their claims that the Asylum EAD Rules are contrary to law for an additional, alternative reason: Defendant Wolf had no authority to issue them. He assumed and acts in the position of Acting DHS Secretary in violation of law.

Under President Trump's leadership, DHS has been without a properly nominated and confirmed Secretary since April 10, 2019 at the latest—in what appears to be the longest cabinet-level vacancy in history. The President has not submitted a nominee for the position since then and a revolving cast of officials has purported to be the Acting DHS Secretary. Defendant Wolf is not the only acting official in DHS operating without lawful authority. One court has already vacated a DHS policy because the Acting USCIS Director who enacted it was not lawfully installed in office.  *See, e.g., L.M.-M. v. Cuccinelli*, No. CV 19-2676 (RDM), 2020 WL 985376, at *24 (D.D.C. Mar. 1, 2020).

Defendant Wolf's exercise of authority at DHS violates the laws governing Executive agencies. The Appointments Clause of the Constitution limits the President's power to select principal officers by requiring that the Senate provide Advice and Consent. *See* U.S. Const. art II, § 2, cl. 2. This is no mere technicality; the limit "serves both to curb Executive abuses of the appointment power . . . and to promote a judicious choice of persons for filling the offices of the union." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (internal quotations marks and citations omitted). To prevent a President from employing temporary acting officials, who do not require Senate confirmation, to do their bidding, Congress passed the Federal Vacancies Reform Act ("FVRA"). The FVRA prevents the President from circumventing Senate oversight by limiting the time anyone in an acting capacity can fill a position that requires Senate confirmation when no nomination for that position is pending before the Senate. *See* 5 U.S.C. §§ 3346(a)(1), 3348(b)(1);

*NLRB v. SW Gen., Inc*., 137 S. Ct. 929, 936 (2017) (recognizing that Congress enacted the FVRA "[p]erceiving a threat to the Senate's advice and consent power"). The FVRA includes a default framework for who may temporarily fill vacant offices, but Congress explicitly left open the possibility of legislating a different order of succession for specific agencies. *See* 5 U.S.C. § 3347(a). For DHS, Congress did just that: in the Homeland Security Act ("HSA") it legislated an order of succession specifying who may serve as the temporary Acting DHS Secretary. *See* 6 U.S.C. § 113(a)(1)(A), (g)(1).

Defendant Wolf's service as Acting DHS Secretary violates both statutes. As a consequence, his issuance of the Asylum EAD Rules "shall have no force or effect" under the FVRA, 5 U.S.C. § 3348(d)(1), and independently, should be set aside under the APA as issued "not in accordance with law" (i.e., the FVRA and the HSA) and "in excess of statutory . . . authority, 5 U.S.C. § 706(2)(A), (C).

### 1. DHS Issued Both Asylum EAD Rules in Violation of the FVRA.

Defendant Wolf's service as Acting DHS Secretary violates the plain text of the FVRA, which states that a temporary official may serve "for no longer than 210 days beginning on the date the vacancy occurs,"[16] unless "a first or second nomination for the office is submitted to the Senate," in which case that person may serve while the nomination is pending. 5 U.S.C. § 3346(a); *see SW Gen.*, 137 S. Ct. at 942 (in analyzing another portion of the FVRA, holding that the plain text is dispositive in showing that an acting officer's continued service violated the FVRA). Because Secretary Nielsen, the last Senate-confirmed DHS Secretary, resigned on April 7 or 10,

---

[16] The statute provides some exceptions to the 210-day rule, but they are not relevant here. *See* 5 U.S.C. § 3346(a).

2019,[17] "the vacancy occur[red]" under the FVRA by April 10, 2019 at the latest. November 6, 2019 is 210 days from April 10, 2019. Thus, under the FVRA, no official has lawfully served as Acting DHS Secretary since November 6, 2019 at the latest, *see* 5 U.S.C. § 3346(a)(1); § 3348(b)(1).

Because Defendant Wolf's service began on November 13, 2019, seven days after the latest possible expiration of the 210-day period, the entirety of his tenure has been unlawful under the FVRA. Consequently, the Asylum EAD Rules, which were issued on June 22 and 26, 2020—more than a year after the start of the vacancy of the office of the Secretary—cannot have effect under the FVRA and must be set aside under the APA. *See, e.g., L.M.-M.*, 2020 WL 985376, at *24 (ordering a similar remedy of setting aside a policy enacted by the Acting USCIS Director because he held office in violation of both the FVRA and the APA).

### 2. DHS Issued Both Asylum EAD Rules in Violation of the HSA.

Defendant Wolf's succession to office also violated the HSA's requirements for who may serve as the Acting DHS Secretary if the DHS Secretary resigns. *See* 6 U.S.C. § 113(g). Under the HSA, the Deputy DHS Secretary is first in line, *see* 6 U.S.C § 113(a)(1)(A) (designating the Deputy Secretary as "first assistant" for purposes of succession under 5 U.S.C. § 3345 [the FVRA]), followed by the Under Secretary of Management, *see* 6 U.S.C. §§ 113(g)(1), 113(a)(1)(F) (designating the Under Secretary as the "first assistant" to the Deputy Secretary). The DHS Secretary has the authority to designate other officers "in further order of succession"—that is, to decide which officers are next in line, and in what order. 6 U.S.C. § 113(g)(2).

---

[17] As explained in more detail below, *see infra* at 29, Secretary Nielsen resigned effective April 7, 2019, but purported to continue exercising her authority until April 10. The distinction is immaterial for the purposes of the FVRA claim, and in this brief Plaintiffs use her latest possible date of service as the start of the FVRA's 210-day period.

Defendant Wolf's service as Acting DHS Secretary violates the HSA and the orders of succession promulgated pursuant to it because he was never lawfully the next in line to assume the role of Acting DHS Secretary. When Secretary Nielsen resigned in April 2019, she issued a resignation letter with the effective date of April 7, 2019. Ex. 14, Nielsen Resignation Ltr. Dated April 7, 2019. Under the existing DHS Order of Succession & Delegation, when Secretary Nielsen resigned, Claire Grady, who was serving as the Senate-confirmed Under Secretary of Management, became the Acting DHS Secretary by law. *See* Compl. ¶ 174. Nonetheless, former Secretary Nielsen purported to remain in office an additional three days, until April 10, 2019. *See id.* ¶ 172. On April 10, 2019, she purported to amend the DHS Orders of Succession & Delegation, but only changed the order of succession "in the event [she was] unavailable to act during a disaster or catastrophic emergency." *See* Ex. 15, DHS, DHS Orders of Succession and Delegation of Authorities for Named Positions (Dec. 15, 2016), *as amended* (Apr. 10, 2019).

Kevin McAleenan, then-Commissioner of U.S. Customs and Border Protection ("CBP"), purported to assume the office of Acting DHS Secretary on April 11, 2019. But this violated the HSA because, even assuming that former Secretary Nielsen left office on April 10, there were at least two offices with incumbents that were ahead of Commissioner McAleenan in the line of succession under the DHS Orders of Succession & Delegation (even assuming that the Nielsen amendments were valid and taking into account Under Secretary Grady's resignation on April 10, 2019). *See id.*; *see also* Ex. 16, Executive Order 13753 (making the Commissioner seventh in the order of succession behind, among others, the Under Secretary for National Protection and Programs and the Under Secretary for Intelligence and Analysis); Complaint ¶¶ 178-79.

From the time he assumed office, Commissioner McAleenan's tenure as Acting DHS Secretary violated the HSA and was thus unlawful. His tenure became doubly unlawful after

November 6, 2019, by operation of the FVRA, because 210 days had passed since the office of the Secretary had been vacated. *See supra* at 27-28. Simply put, McAleenan had no authority to act after November 6, 2019, for two independent reasons – the FVRA and HSA – and thus he had no authority on November 8, 2019 to purportedly amend further the DHS Orders of Succession & Delegation to place the Under Secretary for Strategy, Policy, and Plans fourth in the line of succession. *See* Ex. 17, DHS, *Amendment to the Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019). At the time of Commissioner McAleenan's resignation, all positions higher than the Under Secretary for Strategy, Policy, and Plans in the orders of succession were unoccupied.  On November 13, Defendant Wolf, who had been serving as the Acting Under Secretary for Strategy, Policy, and Plans, was confirmed in that role, and Commissioner McAleenan resigned from DHS that same day. Commissioner McAleenan's resignation and his purported changes to the DHS Orders of Succession & Delegation thus paved the way for Defendant Wolf to immediately purport to assume the office of Acting DHS Secretary.

Defendant Wolf's succession was unlawful because it purported to take place under Commissioner McAleenan's amendments to the DHS Order of Succession & Delegation, which themselves were unlawful.  Because Commissioner McAleenan's tenure as Acting DHS Secretary violated the HSA and the DHS Orders of Succession & Delegation, as well as the FVRA after November 6, 2019, Commissioner McAleenan could not lawfully exercise the authority of the Office of the Acting DHS Secretary to amend the DHS Orders of Succession & Delegation on November 8, 2019, and handpick his replacement. *See* 5 U.S.C. § 3348(d)(1) (providing that when an official without lawful authority performs a "function or duty of a vacant office" it "shall have no force or effect"); *L.M.-M.*, 2020 WL 985376, at *24. Thus, Defendant Wolf, too, assumed his position in violation of the HSA and the DHS Orders of Succession & Delegation, and was without

lawful authority to issue the Asylum EAD Rules. Plaintiffs are therefore also likely to succeed on the merits of their claim that the Defendants violated the HSA and the APA.

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT PRELIMINARY RELIEF.

The Asylum EAD Rules have already inflicted irreparable harm on Plaintiffs, and those harms will only intensify once the rules begin to go into effect on August 21, 2020.

**First,** Defendants' Asylum EAD Rules are frustrating and will continue to frustrate Plaintiffs' core missions of advancing the rights of immigrant communities. *See HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 685 (D. Md. 2020), (organizations irreparably harmed by being "diverted from their main purpose and mission" of providing supportive services to refugees), *appeal filed*, No. 20-1160 (4th Cir. filed Feb. 13, 2020); *CASA de Md., Inc. v. Trump*, 414 F. Supp. 3d 760, 785 (D. Md. 2019) (organization established irreparable harm from "frustration of its mission and diversion of its resources" from time-sensitive legislative advocacy), *appeal filed,* No. 19-2222 (4th Cir. filed Nov. 4, 2019); *E. Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2020 WL 3637585, at *17 (9th Cir. July 6, 2020) (ongoing harm to organizational mission irreparable). Already, Plaintiffs have been forced to divert substantial resources from time-sensitive core advocacy as they analyze the Asylum EAD Rules and educate their staff and clients on the rules' impact. Plaintiff ASAP, for example, has been forced to shift resources away from providing assistance for emergency filings to prevent deportations. *See* Ex. 5, ASAP Decl. ¶¶ 33-35. Similarly, Plaintiff Centro Legal has been forced to deprioritize submitting guardianship petitions to support applications for Special Immigrant Juvenile Status for minor children who may soon age out of eligibility, *see* Ex. 6, Centro Legal Decl. ¶¶ 22-23, and Plaintiff Oasis has been forced to stop filing new citizenship and family-based petitions as a result of the Asylum EAD Rules, *see* Ex. 7, Oasis Decl. ¶ 41.

Once the rules go into effect, Plaintiffs' harms will be amplified. Plaintiffs will be forced to divert even more staff time and resources to EAD applications as eligibility criteria become more stringent and the application process becomes more complicated. *See* Ex. 6, Centro Legal Decl. ¶ 27 (estimating that it may take "more than twice as long" to prepare initial and renewal EAD applications under the new rules); *see also* Ex. 8, Pangea Decl. ¶¶ 23-32; Ex. 5, ASAP Decl. ¶¶ 37-39. The rules will also create significant additional burdens as Plaintiffs step in to provide asylum applicants with the financial and social supports they will need due to their inability to work lawfully. *See* Ex. 4, CASA Decl. ¶¶ 31-32 (explaining that once the Asylum EAD Rules go into effect, more of CASA's members will rely on the organization's in-house pandemic financial assistance program); Ex. 7, Oasis Decl. ¶ 47 (explaining that Oasis will be required to hire more staff to provide case management services to their clients); Ex. 5, ASAP Decl. ¶ 41 ("ASAP will also be forced to expend time and resources on connecting clients with social services that may offer support while our clients are unable to legally work.").

At the same time, the Asylum EAD Rules will diminish key revenue streams for some Plaintiffs, *see* Ex. 8, Pangea Decl. ¶ 38 ("The new EAD rules will also cause a loss in revenue to Pangea from client fees"); Ex. 4, CASA Decl. ¶ 33 (noting that the Asylum EAD Rules will make it difficult for CASA to meet the requirements of their funding contracts with local governments), and jeopardize others' ability to operate at all, *see* Ex. 7, Oasis Decl. ¶ 46 (explaining that a third of Plaintiff Oasis's budget comes from client revenue, which Oasis expects to decrease substantially if clients cannot obtain EADs). These injuries to Plaintiffs' operations and goodwill will be irreparable. *See Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) (deeming injuries threatening enterprise's very existence or loss of goodwill irreparable).

**Second,** as numerous courts have already recognized, the delay or denial of work authorization to asylum applicants like ASAP and CASA's members will inflict irreparable harm. *See, e.g.*, *Diaz v. INS*, 648 F. Supp. 638, 647-48 (E.D. Cal 1986); *Ramos v. Thornburgh*, 732 F. Supp. 696, 699-70 (E.D. Tex. 1989); *Grijalva v. Ilchert*, 815 F. Supp. 328, 331-32 (N.D. Cal. 1993). ASAP, for example, identifies two members who submitted their asylum applications in April of this year. Under the regulatory framework that existed when they applied for asylum, these members planned to apply for work authorization in August and September with an expectation of being permitted to work—and with promising chances of employment—in September or October. *See* Ex. 5, ASAP Decl. ¶¶ 22-29. If these new rules go into effect, however, both will be forced to wait until next spring before they are even potentially eligible to submit their work authorization applications, and then an indeterminate length of time before the government adjudicates the applications, with no certainty as to whether their applications will be granted even if they are eligible. *Id.* Similarly, CASA identifies three members who will not be able to file their EAD applications before the effective date, and therefore will either have to wait an indeterminate length of time for their EADs, or may be barred based on one of the ineligibility grounds. Ex. 4, CASA Decl. ¶¶ 23-28.

Unable to work lawfully, ASAP and CASA's members will suffer lost wages and face housing and food insecurity as a result. *See* Ex. 5, ASAP Decl. ¶¶ 23-29. To the extent they attempt to support themselves and their family by engaging in unauthorized work, they will be vulnerable to exploitation, wage theft, and discrimination. *See* Ex. 7, Oasis Decl. ¶ 13. Without EADs, they will also lack an important form of government-issued identification, preventing them from accessing resources housing, food, and health benefits. *See* Ex. 8, Pangea Decl. ¶ 13. These harms will only be more severe in the context of the current pandemic, which makes access to medical

33

care and stable housing especially vital. *See* Ex. 7, Oasis Decl. ¶¶ 14-16. Ultimately, the Asylum

EAD Rules will threaten the members' ability to secure humanitarian relief. Without a means of

support, they may be forced to abandon their claims. *See* Ex. 6, Centro Legal Decl. ¶ 15. And even

if they do not, they will be unable to afford to hire attorneys to help them navigate the adversarial

process, dramatically reducing the odds of winning their cases. *See* Ex. 5, ASAP Decl. ¶ 31.

All of these harms are irreparable because they "lack an adequate legal remedy." *Ariz.*

*Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Many are intangible and cannot

be compensated through money damages. *See Diaz*, 648 F. Supp. at 648 ("I am hard pressed to see

how placing a refugee in a position where he or she must break the law to survive during the years

it may take for a decision on a political asylum application *cannot* be considered an irreparable

hardship."); *Ramos*, 732 F. Supp. at 699-70 (being forced to live in poverty and to risk one's

asylum case are irreparable harms); *Grijalva*, 815 F. Supp. at 331-32 (same); *see also Christopher*

*Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007) (attributing irreparability

to the intangible nature of the injury). And even if they were compensable, money damages will

be unavailable here, rendering the harms nevertheless irreparable. *See Rum Creek Coal Sales, Inc.*

*v. Caperton*, 926 F.2d 353, 362 (4th Cir. 1991) (finding irreparable harm in § 1983 action that did

not allow for recovery of monetary damages from the State defendant). Because both Plaintiffs

and their members have already been and will continue to be irreparably harmed as a direct result

of the Asylum EAD Rules, the need for preliminary relief is great and acute.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WARRANT A REMEDY BEFORE AUGUST 21.

The balance of equities and the public interest, which merge in cases against the government,

*see Nken v. Holder*, 556 U.S. 418, 435 (2009), support the issuance of the preliminary relief that

Plaintiffs seek to preserve the status quo pending full adjudication on the merits. As described above,

plaintiff organizations and their members will suffer further irreparable harm once the rules are in effect. *See supra* Part II. In contrast, preliminary relief until adjudication on the merits will result in the government simply continuing to operate under the system that has been the status quo for over two decades. Moreover, given the likelihood of success, the issuance of a stay under 5 U.S.C. § 705 or a preliminary injunction "would serve the public's interest in maintaining a system of laws" where the Government must comply with its legal obligations. *O'Donnell Constr. Co. v. Dist. of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992); *see also HIAS, Inc.*, 415 F. Supp. 3d at 686.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court grant a stay under 5 U.S.C. § 705 to postpone the effective dates of the Asylum EAD Rules until the resolution of this case, or in the alternative, a preliminary injunction under Rule 65 .

Dated:  July 24, 2020


Respectfully submitted,


_____/s/_____
Mariko Hirose (*pro hac vice*)
Kathryn Austin (*pro hac vice*)
Geroline A. Castillo*
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
One Battery Park Plaza, 4th Floor
New York, New York 10004
Tel: (516) 701-4620
Fax: (929) 999-8115
mhirose@refugeerights.org
kaustin@refugeerights.org
gcastillo@refugeerights.org


_____/s/_____
Justin B. Cox (Bar No. 17550)
(signed by Mariko Hirose
with permission of Justin B. Cox)
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
PO Box 170208
Atlanta, GA 30317
Tel: (516) 701-4233
Fax: (929) 999-8115
jcox@refugeerights.org


*Attorneys for Plaintiffs*

* *Pro hac vice application pending*

Conchita Cruz (*pro hac vice*)
Zachary Manfredi (*pro hac vice*)
Dennise Moreno (Bar No. 21358)
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Avenue S. #84810
New York, NY 10003-1502
Tel: (305) 484-9260
Fax: (646) 968-0279
conchita.cruz@asylumadvocacy.org
zachary.manfredi@asylumadvocacy.org
dennise.moreno@asylumadvocacy.org

Richard W. Mark (*pro hac vice*)
Joseph Evall (*pro hac vice*)
Katherine Marquart (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Tel: (212) 351-4000
Fax: (212) 351-4035
RMark@gibsondunn.com
JEvall@gibsondunn.com
KMarquart@gibsondunn.com