# Exhibit 5

to Plaintiffs' Motion for a Stay of Effective Dates Under 5 U.S.C. § 705, Or, In The Alternative, Preliminary Injunction

*CASA De Maryland, Inc. v. Wolf*, No. 8:20-cv-2118

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CASA DE MARYLAND, INC., ET AL.

*Plaintiffs*,

– *versus* –

CHAD F. WOLF, ET AL.

*Defendants*.

Case No. 8:20-cv-02118-PX

**DECLARATION OF SWAPNA C. REDDY**

I, Swapna Reddy, declare:

1. I am a Co-Executive Director of the Asylum Seeker Advocacy Project (ASAP).

2. I make this sworn statement based upon personal knowledge, files and documents of ASAP that I have reviewed such as case files, reports, and collected case metrics, as well as information supplied to me by employees of ASAP whom I believe to be reliable, including ASAP's management, attorneys, paralegals, and administrative staff. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting ASAP business.

3. ASAP was founded in 2015 and is incorporated in New York with its primary address in New York City. ASAP employs staff working remotely in Colorado, Florida, Illinois, Massachusetts, New York, North Carolina, and Virginia.

4. ASAP's mission is to provide individuals who came to the Mexico-U.S. border seeking asylum with community support and legal services regardless of where they are located.

We implement our mission by providing emergency legal aid and other support to our members and other asylum seekers and by engaging in nationwide systemic reform on issues identified as important by our members.

5. Since its establishment, ASAP has provided over 4,000 members with critical legal information and successfully resolved more than 1,650 legal emergencies for clients, the vast majority of whom are members, using a remote legal assistance model.

**ASAP's Members**

6. ASAP members have arrived at the Mexico-U.S. border to seek asylum in the United States and have been placed in removal proceedings.

7. ASAP has over 4,000 members, the majority of whom are mothers who sought asylum at the Mexico-U.S. border, were detained by Customs and Border Protection (CBP) and/or Immigration and Customs Enforcement (ICE), and were then released and placed in removal proceedings. Many of the mothers arrived with one or more of their children.

8. New members are typically referred either by a nonprofit at the border working with asylum seekers who are being released from detention or by an existing member. These individuals are then screened and approved by ASAP staff before becoming members. ASAP is always growing its membership and adds an average of 70 new members per month.

9. ASAP's current members are Spanish speakers who live throughout the United States in over 40 U.S. states and the District of Columbia. A smaller number of our members are located in Mexico and have pending U.S. immigration court cases under the "Migrant Protection Protocols" program. Our members are in various stages of their immigration proceedings. For example, some members are still awaiting notice of a first hearing in immigration court, some have

pending immigration court cases, some have won asylum, and others have pending appeals. Some members become clients of ASAP, some secure immigration legal representation from non-ASAP attorneys, and others do not have immigration legal representation.

10. ASAP provides daily support to our members Monday through Friday. ASAP employees answer members' questions on asylum and the immigration court process, as well as questions related to work, access to health care, and education. ASAP staff also provide customized referrals to local legal service organizations, private attorneys, and social service organizations. In the last year, ASAP staff answered over 9,000 questions from members.

11. Members also have continuous access to ASAP-created information and resources shared online. For example, ASAP has created Spanish-language videos on topics such as how to complete an I-589, Application for Asylum and for Withholding of Removal ("asylum application"), what to expect at immigration court hearings, and how to apply for an Employment Authorization Document (EAD) based on a pending asylum application. ASAP has also created accessible infographics to explain key parts of the immigration process and developed over 100 pages of Frequently Asked Questions. At the same time, ASAP regularly writes up-to-date announcements to share with our members, including information and analysis on new regulations, federal court decisions, availability of COVID-related relief for asylum seekers, court and office closures, and more.

12. ASAP's members set the priorities and goals for our systemic reform and advocacy work. ASAP staff facilitate discussions among members about what advocacy goals are important to them and should be a priority for ASAP. For instance, ASAP's members expressed serious concern when the Department of Homeland Security (DHS) announced proposed changes to the EAD application process in 2019. DHS first announced that it intended to remove the 30-day

processing requirement for asylum seeker EAD applications on September 9, 2019. *See* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148 (proposed September 9, 2019) ("30-day Processing Rule"). DHS then proposed a second rule on November 14, 2019 that would substantially limit asylum seekers' eligibility for work authorization. *See* Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62374 (proposed November 14, 2019) ("Broader EAD Rule", collectively with 30-day Processing Rule, "EAD Rules").

13. After hearing the concerns of our members, ASAP staff worked to oppose these proposed rules, submitting formal comments in opposition to both. ASAP's comments detailed the devastating impact the proposed rule would have on its members.

**ASAP's Clients**

14. Many of ASAP's members and their families become clients of ASAP's legal emergency room, where ASAP's staff provides limited-scope emergency legal aid.

15. ASAP's legal emergency room provides legal services in moments of crisis to members and other asylum seekers who have little or no access to traditional legal service providers, often because they live in rural areas or in states with relatively few legal aid organizations. The members for whom ASAP provides emergency legal aid become clients during the period of time ASAP is providing this limited-scope legal assistance.

16. ASAP's legal services focus on preparing emergency motions and other legal filings to prevent deportations. For example, over the past year, ASAP's staff has helped over 100 asylum seekers meet their one-year filing deadline for their asylum applications; prepared Notices

of Appeal for dozens of asylum seekers to appeal negative decisions to the Board of Immigration Appeals (BIA); and prepared emergency Motions to Reopen for asylum seekers who received *in absentia* removal orders because they were unable to attend their hearings in immigration court either because they never received proper notice or because of other exceptional circumstances beyond their control, like medical emergencies. By preventing premature deportations, ASAP's legal services provide asylum seekers a more meaningful opportunity to pursue their claims for protection in the U.S.

17. When capacity has allowed, ASAP's staff has also provided limited-scope legal assistance for non-emergency filings, such as EAD applications or requests under the Freedom of Information Act (FOIA). In 2019, ASAP assisted in the preparation of over 50 EAD applications.

18. In all, ASAP's employees have provided limited-scope emergency legal aid to clients in over 35 immigration courts across the U.S. as part of our remote legal assistance practice.

19. ASAP also provides full-scope legal representation to a smaller subset of members and their families, as well as other asylum seekers referred to ASAP, both in asylum cases as well as monetary damages cases against the government and government contractors.

20. ASAP has represented many clients before the BIA, DHS, federal courts, and in administrative filings with United States Citizenship and Immigration Services (USCIS). As part of this full-scope representation, ASAP has also filed asylum applications and EAD applications on behalf of clients.

**Impact of the EAD Rules on ASAP's Members and Clients**

21. Many of our members and clients will be directly and seriously impacted by the EAD Rules if they are implemented. For example, many members will not have had their asylum

applications pending for 150 days – the required length of time before they can apply for an EAD under the current system – before the rules become effective. These members, who otherwise would likely have been eligible to receive an EAD after 180 days, will now have to wait more than twice as long to apply for an EAD under the new EAD Rules, plus an indeterminate length of time for the government to process their application. These members will therefore miss out on months' worth of lost wages, leaving them with no ability to provide stable housing, food, medical care, or other necessities for themselves or their families. They also will be left without an important – and for many asylum seekers, their only – means of identification, which could otherwise be used to apply for driver's licenses and other state-level benefits, such as healthcare.

22. For instance, one of ASAP's members, W.L., a single mother with an 8-year-old son and an 8-month-old U.S. citizen daughter, will face hardships as a result of the EAD Rules. W.L. fled Guatemala after being repeatedly raped, forced to have an abortion, and threatened with death by a prominent man who used his connections to government officials to evade arrest. She entered the U.S. in April 2019 and was given a Notice to Appear for immigration court proceedings.

23. W.L. depends on the support of a family member who allows her and her children to stay in his two-bedroom home rent-free. To be able to sustainably provide adequate food, medical care, and other basic necessities for her children, W.L. needs to be able to work and earn income. She has been offered employment opportunities by members of her church on several occasions that she would be able to accept if she had an EAD. W.L. also cannot receive a driver's license in her state without an EAD and has been forced to rely on others for transportation.

24. In her current situation, W.L. does not have the means to move out of her family member's home, where she shares a single room with her two children. She also does not have the

means to hire a private immigration attorney to help her bring her asylum claims. She believes that if she could obtain an EAD, she and her children would be able to find a better living situation and she would be able to arrange for a payment plan with an immigration attorney.

25. W.L. submitted her asylum application on April 3, 2020. Under the current rules, she would be able to apply for an EAD on August 31, 2020, and would likely receive a response from the government in approximately 30 days. However, once both of the new rules have taken effect on August 25, 2020, W.L. will be forced to wait an additional seven months before she can even apply for an EAD and an indeterminate length of time for the government to process her application. This additional delay will result in a significant loss of earnings for W.L. and will make it nearly impossible for her to pay for a private attorney to pursue her claims for protection in the U.S.

26. Similarly, another of ASAP's members, N.G., will be unable to apply for an EAD prior to the effective date of the new rules and will suffer additional months of housing and food instability as a result. N.G. fled Honduras with her young daughter because she and her family experienced severe targeted violence and death threats after defying a drug cartel. Because N.G. did not trust the Honduran police to protect her due to their corruption and collusion with drug traffickers, she came to the U.S. to seek protection in May 2019.

27. N.G. currently lives in a trailer with her 9-year-old daughter, a friend, and her friend's two children. N.G.'s daughter received pandemic-related food benefits from their state, which has helped them a great deal. However, those benefits will soon run out, and N.G. is worried about how she will make ends meet when they do. She has no money to hire a lawyer.

28. Neighbors who work at a local factory have offered to help N.G. get a job there once she has an EAD. These neighbors make over $500 a week at their jobs, and N.G. believes

such a salary would go a long way in helping her find more suitable housing and alleviating her family's food insecurity. She was also hoping to save extra money to hire a lawyer for her case.

29. N.G. filed her asylum application in April 2020. Under the current rules, she would have been able to apply for an EAD in September 2020. However, N.G. and her daughter will now face housing and food insecurity while N.G. is forced to wait, at a minimum, an additional 7 months to apply for and receive an EAD under the new rules.

30. Other members who file their asylum application past their one-year filing deadline due to exceptional circumstances, such as a medical emergency or the long-term effects of trauma, will face additional delays as a result of the EAD Rules. Under the EAD Rules, these members will not be able to file their EAD application until a judge determines that they qualify under an exception to the one-year filing deadline. It is likely that these members will have to wait years before a judge determines that they meet an exception to the deadline due to the long backlog in immigration courts. Even those members who file asylum applications one day after their one-year filing deadline will likely face such delays.

31. ASAP members whose EADs take longer to process or who become ineligible for an EAD as a result of the EAD Rules are also likely to have greater difficulty finding long-term legal representation because they will be less able to afford private immigration attorneys. This will negatively impact their ability to win asylum, live in safety from the violence and persecution they fled, and ultimately pursue a path to U.S. citizenship for themselves and their children. Studies have shown that having an attorney makes it significantly more likely for asylum seekers to win their cases, and numerous articles have reported on the murder of asylum seekers after their deportation to their country of origin.

32. Some of ASAP's clients will also be affected by the EAD Rules. For example, ASAP recently agreed to represent a family that includes two minor children who were separated from their mother and are not currently in removal proceedings. The two minor children have not yet filed their asylum applications and were already past the one-year deadline when they became our clients less than one month ago. We believe the children were designated as Unaccompanied Alien Children (UACs), which would exempt them from the one-year deadline to file their asylum applications. However, we cannot be certain of this designation because we have not yet received the records we requested from the government. Due to ongoing backlogs with FOIA requests, we do not expect to receive these records for several months. While we would normally wait to receive records from the government before counseling the family on their options and preparing their asylum applications, the family must now rush to decide whether these two minor children should file their affirmative asylum applications before the Broader EAD Rule goes into effect on August 25, 2020. On the one hand, if the children file asylum applications affirmatively before August 25, 2020, the government may require them to attend an interview with an asylum officer before their parents' asylum case is resolved, and the children could be subjected to the unnecessary stress of discussing the reasons why they fled their country, rather than have their parents do so for them. On the other hand, if they do not file their asylum application before August 25, 2020, the children will risk being found ineligible for EADs under the new rules for failing to apply for asylum before their one-year deadline. If they do choose to file, we will have to allocate substantial staff time to complete their asylum applications before August 25, 2020.

**Impact of the EAD Rules on ASAP's Ability to Provide Emergency Legal Aid**

9

33.     ASAP has prioritized defending asylum seekers against the risk of deportation in order to ensure they have a meaningful opportunity to present their claims. For example, ASAP's legal emergency room staff help asylum seekers meet their one-year deadline for filing asylum applications; file Notices of Appeal to preserve their right to appeal a negative decision in their case; and pursue motions to reopen their case and rescind their *in absentia* removal orders.

34.     Under the new EAD Rules, however, many of ASAP's members run the risk of waiting significantly longer periods of time before receiving EADs or becoming ineligible for EADs altogether. These changes would significantly hamper members' ability to meaningfully pursue their claims for protection in the United States, either because they will be unable to afford an attorney or because they and their children will face housing instability, food insecurity and other forms of economic distress with no form of income or support.

35.     As a result of these changes, ASAP has begun to prioritize filing EAD applications before the new rules take effect, at the expense of our other programming. In fact, ASAP has already had to turn down requests for assistance from members with *in absentia* removal orders and members seeking to avoid such orders by petitioning to have their cases transferred to nearby, accessible courts. In addition, ASAP has been forced to create a running waitlist for members seeking assistance with their asylum applications.

36.     ASAP has also expended, and will continue to expend, significant resources to train staff, outside attorneys, and asylum seekers on the new EAD Rules. Since the publication of the final rules on June 22, 2020 and June 26, 2020, ASAP has devoted substantial staff time to analyzing the impact of potential rules on asylum seeker eligibility for EADs. ASAP has spent more than 100 hours of staff time holding staff trainings and meetings and creating new resources for asylum seekers and attorneys regarding the changes imposed by the EAD Rules.

37.     However, even more staff time and training will be required to address our members' needs as a result of the EAD Rules. For instance, ASAP's staff answers questions asked by our members regarding EAD eligibility and applications on a daily basis. ASAP's staff must now be retrained on how to answer questions related to EADs as a result of the EAD Rules. Furthermore, ASAP anticipates a significant increase in questions from community members related to EADs as a result of the new, more complicated process, and has already seen a spike in questions since the rules were announced. For example, ASAP's first announcement about the new EAD rules on June 24, 2020 received nearly 200 comments and questions requiring a staff response. ASAP staff will also need to re-make explanatory videos and other resources that they previously created to explain both the EAD and asylum application process, re-write dozens of responses to Frequently Asked Questions, and prepare extensive new announcements regarding the Rules' changes. Preparing these resources and answering these additional questions has already required significant staff time, and will likely require well over 100 hours of additional staff time moving forward.

38.     The lack of clarity in certain provisions of the EAD Rules will cause ASAP to expend even more staff time to understand the rules' complexities and their effects on our members. For instance, the Broader EAD Rule replaces the Asylum EAD Clock currently used to determine asylum seekers' eligibility for an EAD with a provision that calls for EAD applications to be denied due to "applicant-caused delays." However, the Broader EAD Rule does not explain what may constitute an "applicant-caused delay" in immigration court proceedings, and instead only defines such delays for affirmative asylum cases. Due to this lack of clarity, ASAP staff will have to, at a minimum, reach out to court staff, including immigration court administrators, to

better understand the circumstances in which an asylum seeker could be found to have an "applicant-caused delay" based on their actions in immigration court.

39. The changes imposed by the EAD Rules will also significantly burden ASAP's model of short-term, limited-scope emergency assistance. Not only have the EAD Rules made EAD applications a greater priority for ASAP – thus, drawing resources away from other legal emergencies – but the complexity of the new rules will require ASAP to expend more time and resources on single cases. In many instances, filing applications under the new EAD Rules will likely require more time from trained immigration attorneys, whereas previously paralegals were able to play a larger role in providing this assistance. For instance, attorneys must assess a client's potential criminal record for disqualifying offenses. Attorneys will also be required to assess whether an applicant who entered the United States without inspection may be able to qualify for a good cause exemption. This change in particular would likely affect a portion of the EAD applications ASAP files in the future, as many asylum seekers are forced to enter without inspection because of months-long wait times at ports of entry and dangerous conditions at the border. Due to the lack of clarity in the rules, it is also likely that attorneys will have to make individualized arguments about why each asylum seeker should be found not to have an "applicant-caused delay."

40. The $85 biometrics fee imposed by the EAD Rules will similarly result in individual EAD applications taking more staff time and resources to complete. The biometrics fee will likely be prohibitive for many of ASAP's members, especially before they have had the opportunity to work legally. As a result, ASAP's staff will be required to complete and attach an 11-page fee waiver form, requiring significant supporting documentation, to many of the EAD applications we prepare in the future.

41. At the same time, the EAD Rules will require ASAP to keep cases open with individual clients for a much longer period of time. Currently, when ASAP provides assistance with an EAD application, we are able to close the case once USCIS has made a final decision on the application – typically within approximately 30 days. However, under the new rules, EAD processing times will be much greater, and ASAP staff will have to continually follow up with clients and USCIS regarding the status of individual EAD applications. ASAP will also be forced to expend time and resources on connecting clients with social services that may offer support while our clients are unable to work legally.

42. Finally, the EAD Rules will lead a smaller percentage of ASAP's members to receive EADs, and members will require additional ASAP staff support due to their inability to work legally. Many of our members will either be ineligible for EADs or be forced to wait significantly longer before receiving an EAD. This will make it harder for ASAP's members to hire an immigration attorney or establish stable living conditions for their families. With fewer members able to afford private immigration representation, ASAP will have to allocate additional staff time to answer questions from unrepresented members and address their emergency legal needs in a limited-scope capacity. ASAP will also need to allocate additional time to refer members to a wide range of social services that may offer support while they are unable to work legally.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 24, 2020
Chicago, Illinois

_____
Swapna Reddy
Co-Executive Director
Asylum Seeker Advocacy Project

13