**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CASA DE MARYLAND, INC., *et al.*,

Plaintiffs,

v.

CHAD F. WOLF, *et al.*,

Defendants.

Case No. 8:20-cv-02118-PX

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

ELIZABETH B. WYDRA
BRIANNE J. GOROD
BRIAN R. FRAZELLE
DAYNA J. ZOLLE
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
dayna@theusconstitution.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICUS CURIAE* ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The FVRA Is a Critical Check on the Manipulation of Appointments by the Executive Branch ........ 2

II. Chad Wolf Is Violating the FVRA by Serving as Acting Secretary of Homeland Security ........ 5

A. Wolf Never Lawfully Became the Acting Secretary ........ 6

B. The FVRA's Time Limits on Acting Service for the Secretary's Office Have Expired ........ 10

III. Because Chad Wolf Is Not Validly Serving as Acting Secretary, the Asylum EAD Rules Are Void and Must Be Set Aside ........ 15

A. The Asylum EAD Rules Are Void Under the FVRA ........ 15

B. The Asylum EAD Rules Must Be Set Aside Under the APA ........ 17

CONCLUSION ........ 19

## TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*,
139 F.3d 203 (D.C. Cir. 1998) .......... 3, 4

*Edmond v. United States*,
520 U.S. 651 (1997) .......... 3

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
140 S. Ct. 1649 (2020) .......... 1, 3

*Freytag v. Comm'r of Internal Revenue*,
501 U.S. 868 (1991) .......... 3

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
816 F.3d 550 (9th Cir. 2016) .......... 18

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
534 U.S. 124 (2001) .......... 13

*La Clínica de La Raza v. Trump*,
No. 19-4980 (N.D. Calif.) .......... 7

*L.M.-M. v. Cuccinelli*,
No. 19-2676, 2020 WL 985376 (D.D.C. Mar. 1, 2020) .......... 16, 17

*Morton v. Mancari*,
417 U.S. 535 (1974) .......... 13

*New York Gaslight Club, Inc. v. Carey*,
447 U.S. 54 (1980) .......... 12

*NLRB v. SW Gen., Inc.*,
137 S. Ct. 929 (2017) .......... *passim*

*SW Gen., Inc. v. NLRB*,
796 F.3d 67 (D.C. Cir. 2015) .......... 18

*United States v. Menasche*,
348 U.S. 528 (1955) .......... 12

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Williams v. Taylor*,
529 U.S. 362 (2000) .......... 12

CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

U.S. Const. art. II, § 2, cl. 2 .......... 2

Act of Feb. 13, 1795, 1 Stat. 415 .......... 3

S. Rep. No. 105-250 (1998) .......... 4, 5

5 U.S.C. § 3345 .......... 13

5 U.S.C. § 3345(a)(1) .......... 4, 5

5 U.S.C. § 3345(a)(2) .......... 4

5 U.S.C. § 3345(a)(3) .......... 4

5 U.S.C. § 3346(a)(1) .......... 5, 10

5 U.S.C. § 3346(a)(2) .......... 10

5 U.S.C. § 3347(a) .......... 7, 14, 19

5 U.S.C. § 3348(a)(2) .......... 15, 16 17, 18

5 U.S.C. § 3348(b)(1) .......... 5, 10

5 U.S.C. § 3348(b)(2) .......... 16

5 U.S.C. § 3348(d)(1) .......... *passim*

5 U.S.C. § 3348(d)(2) .......... 5, 15

5 U.S.C. § 706(2) .......... 2, 17, 19

6 U.S.C. § 112(a)(2) .......... 15

6 U.S.C. § 112(a)(3) .......... 16

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

6 U.S.C. § 112(b) .......... 16

6 U.S.C. § 113(a) .......... 5, 12, 13

6 U.S.C. § 113(g) .......... 6, 7, 11, 12

6 U.S.C. § 271 .......... 15

12 U.S.C. § 5491 .......... 13

<u>OTHER AUTHORITIES</u>

Kevin K. McAleenan, Acting Secretary of Homeland Security, *Amendment to the Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019) .......... 9

Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151 .......... 4

Department of Homeland Security, *Chad F. Wolf*, https://www.dhs.gov/person/chad-f-wolf .......... 9

Department of Homeland Security, *Leadership*, https://www.dhs.gov/leadership .......... 15

DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authorities for Named Positions* (Apr. 10, 2019) .......... 6, 7, 8

Exec. Order No. 13753, 81 Fed. Reg. 90,667 (Dec. 9, 2016) .......... 6, 7

85 Fed. Reg. 37,502 (June 22, 2020) .......... 1

85 Fed. Reg. 38,532 (June 26, 2020) .......... 1

85 Fed. Reg. 38,557 (June 26, 2020) .......... *passim*

*The Federalist No. 76* (Alexander Hamilton) (Clinton Rossiter ed., 1961) .......... 2

*Memorandum for the Secretary from John M. Mitnick, General Counsel*, (Apr. 9, 2019) .......... 7

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

Morton Rosenberg, Cong. Research Serv., No. 98-892, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* (1998) .............. 3, 4

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................................ 12

U.S. Government Accountability Office, *Federal Vacancies Reform Act*, https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act ........................................ 15

*The Vacancies Act*, 22 Op. O.L.C. 44 (1998) ........................................ 4

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees. CAC has a strong interest in preserving the checks and balances set out in our nation's charter, as well as the proper interpretation of laws that help maintain that balance.

## INTRODUCTION

The Secretary of Homeland Security is empowered to make a range of decisions that have enormous consequences for those affected. To ensure that the Secretary wields those powers responsibly, the Constitution requires that he or she be appointed by the President with the advice and consent of the Senate. "By limiting the appointment power in this fashion," the Constitution seeks to make the officers who exercise the authority of the federal government "accountable to political force and the will of the people." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020) (quotation marks omitted). But despite that, the Department of Homeland Security (DHS) has operated without a Senate-confirmed Secretary for more than a year, and no one has been nominated to fill the position. Instead, lower-level officials who were never vetted for the Secretary's role have run the Department and steered its policies.

In June 2020, the Department issued two final rules that "will delay or eliminate work authorization for thousands of asylum seekers." Pls. PI Mem. 1; *see* 85 Fed. Reg. 37,502 (June 22, 2020); 85 Fed. Reg. 38,532 (June 26, 2020) (together, the "Asylum EAD Rules"). Both rules

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

were approved by the purported Acting Secretary of DHS, Chad Wolf.  But Wolf has no legal authority to hold that position, and he therefore lacked the power to approve these new rules. Federal laws, including the Federal Vacancies Reform Act of 1998 (FVRA), place careful limits on service by acting officials in order to preserve the Senate's constitutional power over appointments.  Under the FVRA and the Department's organic statute, Wolf never lawfully became the Acting Secretary of DHS.  And by the time he approved the new asylum rules in June, *no one* was eligible to serve as Acting Secretary, because the period during which the Secretary's office could be filled by acting officials under the FVRA had long expired.

The consequences of this illegality are twofold.  Because Wolf unlawfully exercised the powers of a vacant office when he approved the asylum rules, the FVRA demands that his actions "shall have no force or effect."  5 U.S.C. § 3348(d)(1).  And because Wolf acted without legal authority in approving the new rules, the Administrative Procedure Act (APA) also requires that those rules be set aside as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2).  For these reasons, Plaintiffs are likely to succeed on the merits of their claims.

## ARGUMENT

### I.    The FVRA Is a Critical Check on the Manipulation of Appointments by the Executive Branch.

"Article II of the Constitution requires that the President obtain 'the Advice and Consent of the Senate' before appointing 'Officers of the United States.'"  *NLRB v. SW Gen.*, *Inc.*, 137 S. Ct. 929, 934 (2017) (quoting U.S. Const. art. II, § 2, cl. 2).  The Framers imposed that requirement as a check on the President, recognizing that giving him the "sole disposition of offices" would result in a Cabinet "governed much more by his private inclinations and interests" than by the public good.  *The Federalist No. 76*, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

Indeed, "the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism," and "[t]he manipulation of official appointments had long been one of the American revolutionary generation's greatest grievances against executive power." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (quotation marks omitted).

Thus, "[t]he Senate's advice and consent power is a critical 'structural safeguard [ ] of the constitutional scheme.'" *SW Gen.*, 137 S. Ct. at 935 (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)).   And the Appointments Clause, "like all of the Constitution's structural provisions, is designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty." *Id.* at 949 (Thomas, J., concurring) (quotation marks omitted); *see Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 140 S. Ct. at 1657 ("the Appointments Clause helps to preserve democratic accountability").

"Over the years, Congress has established a legislative scheme to protect the Senate's constitutional role in the confirmation process."   Morton Rosenberg, Cong. Research Serv., No. 98-892, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative*, at 5 (1998).   Indeed, "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant . . . office without first obtaining Senate approval." *SW Gen.*, 137 S. Ct. at 935; *see Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 209-11 (D.C. Cir. 1998).

"[F]rom the beginning," however, "Congress limited how long the President's designee could serve."   *Doolin*, 139 F.3d at 210; *see, e.g.*, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415, 415 (empowering the President to authorize persons "to perform the duties" of vacant offices, but providing that "no one vacancy shall be supplied, in manner aforesaid, for a longer term than six months").   In the 1860s, "Congress repealed the existing statutes on the subject of vacancies and

enacted in their stead a single statute," the Vacancies Act, which has been in force since then, with modifications. *Doolin*, 139 F.3d at 210. "The Federal Vacancies Reform Act of 1998 . . . is the latest version of that authorization." *SW Gen.*, 137 S. Ct. at 934.

Congress enacted the FVRA in response to the executive branch's increasing non-compliance with the Vacancies Act and circumvention of the Appointments Clause. Beginning in the 1970s, the Justice Department took the position that "any executive department or agency whose authorizing legislation vests all powers and functions of the agency in its head and allows the head to delegate such powers and functions to subordinates in her discretion, d[id] not have to comply with th[e] [Vacancies] Act." Rosenberg, *supra*, at 1; *see, e.g.*, *The Vacancies Act*, 22 Op. O.L.C. 44, 44 (1998). Because virtually all federal departments are governed by such legislation, "those who were ineligible for appointment as acting officers under the terms of the Vacancies Act were frequently 'delegated' the title and duties of precisely the same office, meaning the act's restrictions had become largely toothless." Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 155.

Dismayed that "acting service beyond the time limitations in the act was widespread," *id.* at 154, Congress enacted the FVRA "to create a clear and exclusive process to govern the performance of duties of offices in the Executive Branch that are filled through presidential appointment by and with the consent of the Senate." S. Rep. No. 105-250, at 1 (1998). Accordingly, the FVRA carefully limits who may serve as an acting officer when a vacancy arises. By default, the "first assistant" to the vacant office must perform the functions and duties of that office. 5 U.S.C. § 3345(a)(1). The President "may override that default rule by directing [a different person] to become the acting officer instead," *SW Gen.*, 137 S. Ct. at 935, but the President's choice of whom to select is limited. *See* 5 U.S.C. § 3345(a)(2), (3).

To prevent acting officers from filling vacancies for "constitutionally unacceptable" periods of time, S. Rep. No. 105-250, at 8, the FVRA also limits the length of their service. Relevant here, unless the President sends a nomination to the Senate to fill a vacancy permanently, acting officials may perform the functions and duties of the vacant office for no more than 210 days from when the vacancy begins. 5 U.S.C. § 3346(a)(1). Once that period runs out, no one may continue to serve in an acting capacity, and "the office shall remain vacant." *Id.* § 3348(b)(1).

To encourage compliance with the FVRA's mandates, Congress provided that an agency action "shall have no force or effect" if it was taken by a person performing a function or duty of a vacant office without authorization by the FVRA. *Id.* § 3348(d)(1). These void actions "may not be ratified" by other officials. *Id.* § 3348(d)(2).

## II. Chad Wolf Is Violating the FVRA by Serving as Acting Secretary of Homeland Security.

In creating DHS and the office of its Secretary, Congress incorporated the FVRA while also superseding some of its provisions. Congress incorporated the FVRA by establishing a Deputy Secretary who "shall be the Secretary's first assistant for purposes of subchapter III of chapter 33 of Title 5," which includes the FVRA. 6 U.S.C. § 113(a)(1)(A). Congress further incorporated the FVRA by creating a third-in-line official, the Under Secretary for Management, who "shall be first assistant to the Deputy Secretary . . . for purposes of subchapter III of chapter 33 of Title 5." *Id.* § 113(a)(1)(F).

Congress then departed from some of the FVRA's rules concerning who may serve as Acting Secretary. Under the FVRA, only the Secretary's "first assistant" (i.e., the Deputy Secretary) would be able to serve as the Acting Secretary by default in the event of a vacancy. *See* 5 U.S.C. § 3345(a)(1). Congress superseded this rule in DHS's organic statute, establishing that, in the absence of a Deputy, the Department's third-in-line officer may serve as the Acting Secretary

by default: "Notwithstanding chapter 33 of Title 5, the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary." 6 U.S.C. § 113(g)(1). Moreover, Congress empowered the Department to establish a further order of succession to fill the Secretary's office when the top three positions are all vacant: "Notwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2).

In short, DHS's organic statute provides a limited order of succession for periods when the Secretary's office is vacant, and it empowers the Department to establish a further order of succession beyond those two officials. Executive Order 13753, issued in December 2016, establishes that further order of succession. After the Deputy Secretary and Under Secretary for Management, the executive order lists sixteen additional DHS officials in a further line of succession. *See* Exec. Order No. 13753, § 1, 81 Fed. Reg. 90,667 (Dec. 9, 2016). Consistent with the executive order, an internal DHS regulation states that "[i]n case of the Secretary's . . . resignation, . . . the orderly succession of officials is governed by Executive Order 13753." DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authorities for Named Positions*, § II.A (Apr. 10, 2019).

**A. Wolf Never Lawfully Became the Acting Secretary.**

Chad Wolf purportedly became the Acting Secretary of DHS by virtue of an order signed by the previous Acting Secretary, Kevin McAleenan, shortly before McAleenan resigned from government. McAleenan himself, however, was never a valid Acting Secretary of DHS. As a result, he had no power to issue any such order, and his attempt to install Wolf as his successor is void and without effect.

1. The last Senate-confirmed DHS Secretary was Kirstjen Nielsen, who resigned in April 2019. At that point, Kevin McAleenan was the Commissioner of U.S. Customs and Border Protection (CBP). Under Executive Order 13753, the CBP Commissioner is *seventh* in line to become Acting Secretary following a resignation. *See* Exec. Order No. 13753, *supra*, § 1. Nevertheless, McAleenan purported to take over as Acting Secretary. In doing so, he departed from the "further order of succession to serve as Acting Secretary," 6 U.S.C. § 113(g)(2), that had been set forth in the executive order and in DHS's internal regulation. And because he lacked authority to serve under DHS's organic statute, his tenure violated the FVRA, which is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" unless an agency-specific statute like § 113(g)(2) applies. 5 U.S.C. § 3347(a).

Despite this clear-cut violation of the law, DHS has elsewhere defended the validity of McAleenan's tenure (and by extension, Wolf's) based on an order signed by Kirstjen Nielsen in April 2019. Nielsen's order stated that it was revising Annex A to the internal DHS regulation that provides the line of succession for the Department's various offices. *See Memorandum for the Secretary from John M. Mitnick, General Counsel*, at 1 (Apr. 9, 2019) (memorializing Nielsen's "approval of the attached document," identified as "Annex A"); *id.* at 2 (the attached document, which reads: "Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof").[2] Annex A governs who may exercise the Secretary's powers during a disaster or catastrophic emergency. *See* DHS Delegation No. 00106, *supra*, § II.B ("I hereby delegate to the officials occupying the identified positions in the

[2] *See* Docket No. 166-3, *La Clínica de La Raza v. Trump*, Case No. 4:19-cv-04980-PJH (N.D. Calif. June 10, 2020).

order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office . . . in the event I am unavailable to act during a disaster or catastrophic emergency.”).

The following day, DHS updated its internal regulation accordingly. Consistent with Nielsen’s order, Annex A of the updated regulation now contained a new line of succession for cases of “disaster or catastrophic emergency,” DHS Delegation No. 00106, *supra*, § II.B, which matched the line of succession approved by Nielsen, *see id.*, Annex A. Also consistent with Nielsen’s order, the updated regulation left intact the line of succession for cases in which the Secretary resigns from office. That situation was still governed by the executive order. *See id.* § II.A (“In case of the Secretary’s . . . resignation, . . . the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016.”).

The order signed by Nielsen, and DHS’s subsequently revised internal regulation, are consistent with each other and perfectly clear: Nielsen altered the line of succession for cases of disaster or catastrophic emergency, but did not alter the line of succession for resignations, which remained governed by Executive Order 13753. And under that executive order, McAleenan was not entitled to become Acting Secretary when Nielsen resigned.

To defend McAleenan’s tenure in the face of these unambiguous documents, DHS has claimed that Nielsen’s order accomplished something different from what the order plainly states. Specifically, DHS claims that Nielsen established a new line of succession for *all* scenarios, including cases of resignation, and that in doing so she overrode the executive order. As DHS puts it: “On April 9, 2019, then-Secretary Nielsen . . . establish[ed] the order of succession for the Secretary of Homeland Security. This change to the order of succession applied to any vacancy . . . . [and it] superseded the FVRA and the order of succession found in E.O. 13753.” 85 Fed. Reg. 38,557 (June 26, 2020).

DHS has apparently confused what Secretary Nielsen did in April 2019 with what Kevin McAleenan later purported to do in November of that year. That month, McAleenan signed an order that ostensibly changed the Secretary's line of succession. Unlike Nielsen's earlier order, however, McAleenan's new order replaced the executive order with the line of succession set forth in Annex A: "Section II.A of DHS Delegation No. 00106 . . . is amended hereby to state as follows: 'In case of the Secretary's . . . resignation, . . . the order of succession of officials is governed by Annex A.'" Kevin K. McAleenan, Acting Secretary of Homeland Security, *Amendment to the Order of Succession for the Secretary of Homeland Security*, at 1 (Nov. 8, 2019).

When Secretary Nielsen resigned in April 2019, however, Executive Order 13753 still prescribed who would serve as Acting Secretary following a resignation. *See* DHS Delegation No. 00106, *supra*, § II.A. And for that reason, no legal authority permitted Kevin McAleenan—who, again, was *seventh* in the line of succession—to become the Acting Secretary.

2. Notwithstanding his lack of authority to do so, Kevin McAleenan purported to serve as Acting Secretary from April to November 2019. Exercising the powers of the Secretary, McAleenan purported to amend the line of succession for the Secretary's office shortly before he left that office, as noted above. *See Amendment to the Order of Succession*, *supra* (Nov. 8, 2019). Specifically, his order purported to amend DHS Delegation No. 00106 so that, upon the Secretary's resignation, the line of succession would no longer be governed by Executive Order 13753. Instead, it would be governed by Annex A to Delegation No. 00106. *Id.* at 1. McAleenan's order also amended Annex A itself, elevating the Under Secretary for Strategy, Policy, and Plans to be fourth in the line of succession. *Id.*

Days later, Chad Wolf was confirmed as Under Secretary for Strategy, Policy, and Plans.[3]

---

[3] *See* DHS, *Chad F. Wolf*, https://www.dhs.gov/person/chad-f-wolf.

By virtue of holding that position, he purported to become the new Acting Secretary of DHS when McAleenan resigned from government the same day.

Wolf's claim to be Acting Secretary, therefore, rests entirely on the November 2019 order signed by Kevin McAleenan amending the line of succession.  *See* 85 Fed. Reg. 38,557 (June 26, 2020) (defending the legitimacy of Wolf's tenure on the basis of this order alone).  But because McAleenan served as the Acting Secretary of DHS illegally and without statutory authorization, the official actions he took in that role "have no force or effect" under the FVRA.  5 U.S.C. § 3348(d)(1).  And that includes his attempt to install Wolf as the next Acting Secretary.

**B.      The FVRA's Time Limits on Acting Service for the Secretary's Office Have Expired.**

Even if Chad Wolf could have validly become the Acting Secretary of Homeland Security under the Department's line of succession for that office, any authority to exercise the powers of the Secretary in an acting capacity expired long before Wolf approved the Asylum EAD Rules.

The FVRA limits the amount of time during which a vacant office may be filled by an acting official.  Except in the case of vacancies caused by sickness, "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs."  5 U.S.C. § 3346(a)(1).  This time limit is extended if the President nominates someone to fill the office permanently, *id.* § 3346(a)(2), but in the absence of such a nomination, the outer limit on acting service is 210 days from the beginning of the vacancy.  After that period expires, "the office shall remain vacant."  *Id.* § 3348(b)(1).

The office of DHS Secretary became vacant in April 2019, and President Trump has not nominated anyone to fill the office permanently.  The FVRA's time limits for the Secretary's office therefore expired in early November 2019.

In response to this objection, DHS has argued that the FVRA's time limits do not apply to

the Secretary's office. The Department points to the provision in its organic statute that allows it to designate a "further order of succession to serve as Acting Secretary" beyond the Deputy Secretary and Under Secretary for Management. 6 U.S.C. § 113(g)(2). According to DHS, this provision displaces the entire FVRA—not merely its rules affecting *who* may serve as the Acting Secretary, but also its time limits on acting service. *See* 85 Fed. Reg. 38,557 (June 26, 2020) (asserting that DHS's designation of an order of succession under § 113(g)(2) "superseded the FVRA" and that Kevin McAleenan "served as Acting Secretary without time limitation").

The implication of this argument is that DHS may operate indefinitely without ever having a Senate-confirmed Secretary. Because no time limits on acting service apply to the Secretary's office, and because DHS itself can modify its line of succession at will, a series of Acting Secretaries can run the Department in perpetuity. Not only that, but these Acting Secretaries can choose their own successors, as long as the offices of Deputy Secretary and Under Secretary for Management remain vacant. Before leaving office, all they have to do is revise the line of succession, as Kevin McAleenan did, to put their chosen replacement at the top of the list. Moreover, the individuals who make up this chain of Acting Secretaries need not have been confirmed by the Senate to *any* position in DHS. That is because § 113(g)(2) permits any "officers of the Department" to be included in the Secretary's line of succession, not merely those whose offices require Senate confirmation. In short, a self-perpetuating sequence of Acting Secretaries, some of whom may have been selected for their underlying positions in the Department without presidential nomination or Senate confirmation, may run the Department indefinitely.

Even if such a system were constitutional, it is plainly impermissible under the relevant statutes. Those statutes make clear that § 113 does not displace the FVRA's time limits on acting service for the Secretary's office.

Far from displacing the FVRA entirely, § 113 explicitly *incorporates* the FVRA.  It does so by providing that the Deputy Secretary "shall be the Secretary's first assistant for purposes of subchapter III of chapter 33 of Title 5," 6 U.S.C. § 113(a)(1)(A), and by similarly providing that the Under Secretary for Management "shall be first assistant to the Deputy Secretary of Homeland Security for purposes of subchapter III of chapter 33 of Title 5," *id.* § 113(a)(1)(F).  If DHS were correct that § 113 displaces all of the FVRA, these two provisions would serve no purpose.  "It is, however, a cardinal principle of statutory construction that [courts] must 'give effect, if possible, to every clause and word of a statute.'"  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).  The Department's view that § 113 displaces the FVRA entirely would "render the words . . . a complete nullity."  *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 62 (1980).

Moreover, there are only two conceivable bases for DHS's interpretation, and neither withstands scrutiny.  To start, § 113(g)(2) permits the Secretary to designate a further order of succession "[n]otwithstanding chapter 33 of Title 5."  6 U.S.C. § 113(g)(2).  Because chapter 33 of Title 5 includes the entire FVRA (in addition to other provisions), the Department might argue that this "notwithstanding" clause displaces the FVRA's time limits for Acting Secretaries who are serving pursuant to a further order of succession under § 113(g)(2).

This argument, however, misinterprets the meaning of the word "notwithstanding."  That word "shows which provision prevails *in the event of a clash*."  *SW Gen.*, 137 S. Ct. at 939 (quoting Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 126-27 (2012)) (emphasis added); *id.* ("The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'" (quoting dictionaries)).  "A 'notwithstanding' clause," in short, "just shows which of two or more provisions prevails in the event of a conflict."

*Id.* at 940. When two provisions do not conflict, there is nothing for a "notwithstanding" clause to resolve. And there is no conflict between § 113(g)(2) and the FVRA's time limits. Nothing in § 113(g)(2) addresses how long Acting Secretaries may serve or refers to time limits at all. And Congress knows how to address such matters when it wants to. *See, e.g.*, 12 U.S.C. § 5491(c)(2) (permitting officer to serve "until a successor has been appointed and qualified").

Nor is there any implicit conflict between the two statutes. Section 113(g)(2) permits DHS officers to serve as Acting Secretary by default even though they are not the "first assistant" to the Secretary's office—an arrangement that the FVRA would otherwise forbid, *see* 5 U.S.C. § 3345. Allowing such officers to serve as Acting Secretary does not conflict with the FVRA's imposition of a time limit on how long they may serve. And "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

To appreciate just how untenable DHS's position is, recall that § 113(a)(1)(A), which addresses acting service by the Deputy Secretary, does not contain a "notwithstanding" clause or supersede any part of the FVRA. To the contrary, it incorporates the FVRA by designating the Deputy Secretary as the "first assistant" of the Secretary for FVRA purposes. 6 U.S.C. § 113(a)(1)(A). There is no conceivable textual basis, therefore, for claiming that a Deputy Secretary who is serving as the Acting Secretary is exempt from the FVRA's time limits. But although the Senate-confirmed Deputy Secretary is clearly bound by those time limits, DHS insists that lower-level officers who are listed in an order of succession that the Department can revise at will are permitted to serve as Acting Secretary "without time limitation." 85 Fed. Reg. 38,557 (June 26, 2020). To state the proposition is to refute it.

The only other potential basis for DHS's view is a provision in the FVRA itself. While the FVRA is normally "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office," 5 U.S.C. § 3347(a), it becomes non-exclusive if another statute authorizes the head of a department "to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," *id.* § 3347(a)(1)(A). Section 113(g)(2) fits that bill, as it authorizes the Secretary to designate a further order of succession for the Secretary's office. Thus, the FVRA is not "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of [that] office." *Id.* § 3347(a).

That, however, does not speak to the issue at hand. The question here is not whether the FVRA is the only means of "authorizing" someone to serve as the Acting Secretary. It plainly is not, because § 113 establishes an alternative mechanism for authorizing acting service. The question, rather, is whether the existence of an alternative appointment mechanism, standing alone, erases the FVRA's limits on how long an acting official may serve. There is no reason to think that it does. As explained above, nothing in § 113 explicitly or implicitly overrides the FVRA's time limits. Nor does the FVRA itself suggest that these time limits vanish whenever another statute provides an alternative means of designating an acting officer. Quite the opposite: under the FVRA, department heads may utilize statutes like § 113(g)(2) to designate a person "to perform the functions and duties of a specified office *temporarily*." 5 U.S.C. § 3347(a)(1)(A) (emphasis added). According to DHS, however, the Department may utilize § 113(g)(2) to designate a person to perform those functions and duties "without time limitation." 85 Fed. Reg. 38,557 (June 26, 2020). Nothing in the FVRA or in the Department's organic statute supports that interpretation.

### III. Because Chad Wolf Is Not Validly Serving as Acting Secretary, the Asylum EAD Rules Are Void and Must Be Set Aside.

#### A. The Asylum EAD Rules Are Void Under the FVRA.

The FVRA imposes severe penalties on certain violations of its limits. If "any person" who is not validly filling a vacant office under the FVRA performs any "function or duty" of that office, this person's action "shall have no force or effect." 5 U.S.C. § 3348(d)(1). Such actions also "may not be ratified." *Id.* § 3348(d)(2). For purposes of these penalties, the FVRA defines a "function or duty" as including "any function or duty of the applicable office that is established by statute and is required by statute to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A) (punctuation and headings omitted).

Approving the Asylum EAD Rules is the type of function that is "required by statute to be performed by the [DHS Secretary] (and only that officer)." *Id.* "The Secretary is the head of the Department and shall have direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Only one other Department official could plausibly have the necessary authority—the Director of U.S. Citizenship and Immigration Services (USCIS), who is required by statute to "establish the policies" for USCIS's performance of its functions and to "establish national immigration services policies and priorities." 6 U.S.C. § 271(a)(3)(A), (D). Currently, however, the Director's office is vacant, and the FVRA's time limits for an Acting Director have expired.[4] In that situation,

[4] The Department has acknowledged that USCIS currently has no Director or Acting Director. In its filings with the Government Accountability Office, DHS has reported that Ken Cuccinelli's tenure as Acting Director of USCIS ended on December 28, 2019, which was 210 days after the vacancy began on June 1, 2019. *See* U.S. Government Accountability Office, *Federal Vacancies Reform Act*, https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act (search for the position title of "Director" within the agency "Department of Homeland Security" and the sub-agency "United States Citizenship and Immigration Services"); *see also* DHS, *Leadership*, https://www.dhs.gov/leadership (last visited Aug. 2, 2020) (identifying Cuccinelli as the "Senior Official Performing the Duties of the Director").

the FVRA directs that "only the head of such Executive agency may perform any function or duty of such office." 5 U.S.C. § 3348(b)(2). This road, therefore, leads back to the Secretary.

To resist the application of § 3348, DHS has elsewhere argued (unsuccessfully) that the term "function or duty" in that section "includes only 'non-delegable duties'—that is, only those duties . . . that may not be reassigned." *L.M.-M. v. Cuccinelli*, No. 19-2676, 2020 WL 985376, at *20 (D.D.C. Mar. 1, 2020) (quoting brief). And working from that premise, DHS has put forth the sweeping view that no action performed by anyone in the Department can ever be void under § 3348(d). That view is based on the "vesting and delegation" provision of DHS's organic statute, which vests the Secretary with the functions of all DHS officials and permits the Secretary to delegate those functions to other Department personnel. 6 U.S.C. § 112(a)(3), (b)(1). In other words, as DHS sees it, this vesting-and-delegation statute makes every function of the Department "delegable," which in turn means that no function is assigned by statute to a single officer "and only that officer." 5 U.S.C. § 3348(a)(2)(A)(ii). And that, in turn, means that no action carried out by *any* DHS official can be subject to § 3348's penalties.

The implications do not stop there. "[E]very cabinet-level department has some version of [the Department's] vesting and delegation statutes." *L.M.-M.*, 2020 WL 985376, at *20 (quotation marks omitted); *see id.* n.11 (listing statutes). And so "the logic of this position would cover all (or almost all) departments subject to the FVRA," *id.*, even though "[i]t was the pervasive use of those vesting-and-delegation statutes" to avoid vacancies legislation "that convinced Congress of the need to enact the FVRA" in the first place, *id.* at *23; *see supra* at 4-5. Thus, "the mere fact that a department head is also vested with all functions specifically vested in other department officers and employees cannot, standing alone, defeat the enforcement mechanisms found in the FVRA's vacant-office provision." *Id.* at *21.

In sum, when Chad Wolf approved the new asylum rules, he acted "in the performance of [a] function or duty of a vacant office" to which the FVRA applies, and because he did so without legal authority under the FVRA, his approvals "have no force or effect." 5 U.S.C. § 3348(d)(1).

**B. The Asylum EAD Rules Must Be Set Aside Under the APA.**

Even if the unique penalties set forth in 5 U.S.C. § 3348(d) did not apply here, Wolf's approval of the new asylum rules still violated the substantive restrictions set forth in the previous sections of the FVRA. And when a person's tenure as an acting officer violates the FVRA, agency actions taken by that person are "not in accordance with law" and therefore must be "set aside" under the APA. 5 U.S.C. § 706(2)(A); *see L.M.-M.*, 2020 WL 985376, at *23 ("The Court . . . is also persuaded by Plaintiffs' alternative theory—that, because Cuccinelli was exercising the authority of the USCIS Director in violation of the FVRA, the directives were not issued 'in accordance with law,' and must, accordingly, be set aside under the APA.").

Significantly, therefore, actions taken by an illegally serving official must be set aside under the APA even if the function in question is not assigned exclusively to the vacant office. While 5 U.S.C. § 3348 provides that a "function or duty" of a vacant office is—for *purposes of that section*—limited to those "required by statute [or regulation] to be performed by the applicable officer (and only that officer)," 5 U.S.C. § 3348(a)(2), the meaning of "functions and duties" under the rest of the FVRA is broader. The text makes this clear: Section 3348 explicitly states that its narrower definition of that term applies only "[i]n this section." *Id.* § 3348(a). That definition, therefore, governs the use of this term only for purposes of whether the penalties in § 3348 apply. It does not govern the meaning of "functions and duties" in the rest of the Act.

The FVRA uses phrases like "in this section" with precision and intent, as the Supreme Court has explained:

> Now add "under this section." The language clarifies that subsection (b)(1) applies to all persons serving under § 3345. Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line. Congress used that structure in the FVRA and relied on it to make precise cross-references. When Congress wanted to refer only to a particular subsection or paragraph, it said so.

*SW Gen.*, 137 S. Ct. at 938-39 (citations omitted). By specifying that § 3348's definition of "function or duty" applies only "[i]n this section," Congress "ma[d]e [a] precise cross-reference[]," *SW Gen.*, 137 S. Ct. at 939, to clarify that this definition does not apply elsewhere in the FVRA.

The upshot is that demonstrating a violation of § 3345, § 3346, or § 3347 does not require showing that the challenged action was, by statute or regulation, an action which "only that officer" could take. 5 U.S.C. § 3348(a)(2). This means that the action can be illegal, and therefore grounds for invalidation under the APA, even if it is not an action that is exclusively assigned to the vacant office. Thus, the normal remedies for unlawful agency action under the APA remain available even when the unique penalties of § 3348 do not apply.

The D.C. Circuit explained this point in *SW General*. The court concluded that an official who took a challenged action was illegally serving in violation of the FVRA, but it also concluded that § 3348 did not apply because the office in question was expressly exempt from that section. *See SW Gen., Inc. v. NLRB*, 796 F.3d 67, 78-79 (D.C. Cir. 2015). The court therefore proceeded on the assumption that, "in the event of an FVRA violation," the inapplicability of § 3348 made the challenged action "*voidable*, not void," and therefore subject to invalidation under the APA. *Id.* at 79, 80-81. The only other court of appeals to address the issue has agreed. *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016).

In short, regardless of whether § 3348 applies, it violates the rest of the FVRA when someone performs the functions and duties of a vacant office without complying with the Act's restrictions. Because such actions are "not in accordance with law" and are "in excess of statutory

jurisdiction, authority, or limitations," this Court must "hold [them] unlawful and set [them] aside" under the APA. 5 U.S.C. § 706(2)(A), (C).

Wolf's approval of the Asylum EAD Rules as DHS's Acting Secretary violated 5 U.S.C. § 3345 because he was not eligible to serve as Acting Secretary under that provision. His approval violated 5 U.S.C. § 3346 because, by June 2020, no one could serve as Acting Secretary under that provision. And because Wolf had no right to serve as Acting Secretary under either provision, his approval violated 5 U.S.C. § 3347, which makes those two provisions "the exclusive means" for authorizing someone to exercise the powers of a vacant office, *id.* § 3347(a), unless that person is validly serving under an agency-specific succession statute—which Wolf was not. Under the APA, therefore, Wolf's "unlawful" actions must be "set aside." 5 U.S.C. § 706(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs are likely to succeed on the merits of their claims.

Respectfully submitted,

*/s/ Dayna J. Zolle*
DAYNA J. ZOLLE (Bar No. 19654)

ELIZABETH B. WYDRA
BRIANNE J. GOROD
BRIAN R. FRAZELLE
DAYNA J. ZOLLE
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
dayna@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: August 3, 2020