# Exhibit 1

Proposed

**BRIEF OF NONPROFIT IMMIGRATION ADVOCATES AND LEGAL AND SOCIAL SERVICE PROVIDERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS**

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND SOUTHERN DIVISION

CASA DE MARYLAND, INC., *et al.*,

          Plaintiffs,

      v.

CHAD F. WOLF, *et al.* ,

          Defendants.

Case No. 8:20-cv-2118

Date:  August 3, 2020

## BRIEF OF NONPROFIT IMMIGRATION ADVOCATES AND LEGAL AND SOCIAL SERVICE PROVIDERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

Xiaonan April Hu (*pro hac vice* pending)
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
(202) 220-1100 (phone)
(202) 220-2300 (fax)
April.Hu@mto.com


Keren Zwick (*pro hac vice* pending)
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
(312) 660-1364 (phone)
(312) 660-1505 (fax)
KZwick@heartlandalliance.org

Gabriel Maximilian Moreno
(Bar No. 07234)
KIDS IN NEED OF DEFENSE (KIND)
One South Street, Suite 1100
Baltimore, MD 21202
(443) 914-2899 (phone)
(410) 646-8019 (fax)
gmoreno@supportkind.org

Scott Shuchart (application pending)
KIDS IN NEED OF DEFENSE (KIND)
1201 L Street, NW, Floor 2
Washington, DC 20005
(202) 318-0595 (phone)
(202) 824-0702 (fax)
sshuchart@supportkind.org

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Local Rule 103.3, Amici AsylumWorks, Catholic Legal Immigration Network, Inc. ("CLINIC"), the Center for Gender and Refugee Studies ("CGRS"), the Center for Victims of Torture, Human Rights First, Immigration Equality, Kids in Need of Defense ("KIND"), Public Counsel, Tahirih Justice Center, and World Relief, certify that they do not have a parent corporation and that no publicly held corporation owns ten percent or more of their stock. Amicus National Immigrant Justice Center ("NIJC") is a program under its parent corporation, Heartland Alliance. No publicly held corporation owns ten percent or more of NIJC or Heartland Alliance's stock.

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

CORPORATE DISCLOSURE STATEMENT ..................................................................... ii

INTEREST OF AMICI CURIAE .................................................................................... 1

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.     The Issued Rules Are Arbitrary and Capricious in Violation of the APA .......................... 3

     A.     DHS Violated the APA by Failing to Provide an Adequate Explanation for Imposing New Presumptive Bars to Work Authorization. ..................................... 4

     B.     DHS Violated the APA by Omitting Consideration of Contemporaneous and Closely Related Proposed Rules. ...................................... 8

     C.     DHS Violated the APA by Failing to Consider Important Uses of EADs Beyond Employment. .......................................................... 11

II.    The Asylum EAD Rules Will Cause Irreparable Harm. ........................................... 13

     A.     Harm to Individual Asylum Seekers .................................................. 13

     B.     Harm to Amici's Respective Organizational Missions ........................... 16

CONCLUSION ......................................................................................................... 20

APPENDIX: LIST OF AMICI .................................................................................... 22

CERTIFICATE OF COMPLIANCE ............................................................................ 23

i

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Al Otro Lado v. McAleenan*,
 394 F. Supp. 3d 1168 (S.D. Cal. 2019), 327 F. Supp. 3d 1284 (S.D. Cal. 2018) ...................19

*Boardman v. Pac. Seafood Grp.*,
 822 F.3d 1011 (9th Cir. 2016) .....................................................................................................13

*DHS v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020).................................................................................................................8

*E. Bay Sanctuary Covenant v. Barr*,
 __ F.3d ___, 2020 U.S. App. Lexis 21017 (9th Cir. July 6, 2020)...........................................5

*E. Bay Sanctuary v. Trump*,
 932 F.3d 742 (9th Cir. 2018) ...................................................................................................5, 6

*Encino Motorcars, LLC v. Navarro*,
 136 S. Ct. 2117 (2016).................................................................................................................2

*Gen. Chem. Corp. v. United States*,
 817 F.2d 844 (D.C. Cir. 1987) (per curiam) .........................................................................9, 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)........................................................................................................ 2, passim

*O.A. v. Trump*,
 404 F. Supp. 3d 109 (D.D.C. 2019) ...........................................................................................5

*Portland Cement Ass'n v. EPA*,
 665 F.3d 177 (D.C. Cir. 2011) .............................................................................................9, 10

*Roe v. Dep't of Defense*,
 947 F.3d 207 (4th Cir. 2020) ......................................................................................................3

*Valle del Sol Inc. v. Whiting*,
 732 F.3d 1006 (9th Cir. 2013) ..................................................................................................16

*Winter v. NRDC*,
 555 U.S. 7 (2008)......................................................................................................................13

*Wu Zheng Huang v. INS*,
 436 F.3d 89 (2d Cir. 2006)..........................................................................................................6

# TABLE OF AUTHORITIES
## (Continued)

**Page**

**FEDERAL STATUTES**

5 U.S.C. § 705 ......................................................................................................................2, 8

8 U.S.C. § 1158(a)(1) ...........................................................................................................4, 5

8 U.S.C. § 1158(a)(2)(D) ......................................................................................................4, 6

8 U.S.C. § 1158(d)(2) ..............................................................................................................4

8 U.S.C. § 1158(d)(3) ..............................................................................................................6

8 U.S.C. § 1229b .....................................................................................................................7

Administrative Procedure Act ....................................................................................... 2, passim

**FEDERAL RULES**

Fed R. Civ. P. 65 .....................................................................................................................3

**FEDERAL REGULATIONS**

6 C.F.R. pt. 37 ........................................................................................................................12

8 C.F.R. § 208.4(a)(4) ..............................................................................................................6

8 C.F.R. § 208.4(a)(5) ....................................................................................................6, 8, 17

8 C.F.R. § 208.7 .......................................................................................................................4

59 Fed. Reg. 14779 (Mar. 30, 1994) ........................................................................................5

59 Fed. Reg. 62297 (Dec. 5, 1994) ..........................................................................................5

84 Fed. Reg. 33829 (July 16, 2019) ..........................................................................................5

85 Fed. Reg. 37502 (June 22, 2020) ............................................................................. 3, passim

85 Fed. Reg. 38532 (June 26, 2020) ............................................................................. 3, passim

85 Fed. Reg. ___, federalregister.gov/d/2020-16389 (Aug. 3, 2020) ........................................9

65 Fed. Reg. 76121 (Dec. 6, 2000) ...........................................................................................7

84 Fed. Reg. 62280 (Nov. 14, 2019) .........................................................................................9

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

**STATE REGULATIONS**

Cal. Dept. of Social Servs., All County Letter No. 11-61 (Nov. 4, 2011),
  https://bit.ly/3fgjZF8 ................................................................................................11

**OTHER AUTHORITIES**

Consumer Financial Protection Bureau, https://bit.ly/3fhx29u ......................................12

Ind. BMV, Proving Your Social Security Number Current, https://bit.ly/30lgrNE ...................12

Md. MVA, Online Document Guide, https://bit.ly/3fm8bkQ ......................................12

Social Security Administration, Social Security Numbers for Noncitizens (March
  2018), https://bit.ly/3k1UWJH........................................................................11

U.S. Citizenship & Imm. Servs., Affirmative Asylum Interview Scheduling (Jan
  26, 2018), https://bit.ly/39PwBSP ................................................................18

Univ. System of Georgia, Board of Regents Policy Manual § 4.3.2,
  https://bit.ly/30mUXA6 ................................................................................12

USCIS, RIAO Directorate, Guidance for Adjudicating Lesbian, Gay, Bisexual,
  Transgender, and Intersex (LGBTI) Refugee and Asylum Claims, pp. 64-65
  (December 2019), https://bit.ly/2EM6h0q...............................................................20

Wash. State Dept. of Children, Youth & Families, Extended Foster Care,
  https://bit.ly/3fee3g5 ................................................................................11

YouthCare, YouthBuild, https://bit.ly/31elYEW.........................................................12

## INTEREST OF AMICI CURIAE

Amici curiae are national nonprofit immigration advocates and legal and social service providers that work closely with asylum applicants fleeing persecution and torture.[1]  Most of the Amici commented on one or both of the Rules at issue.  Amici provide critical legal representation and direct services to thousands of indigent asylum seekers each year, including unaccompanied children, women, LGBTQ people, and other particularly vulnerable populations.  These Rules, if allowed to take effect, will force asylum seekers to go for years without employment authorization or a means to support themselves as they wait for their asylum cases to be heard.  The challenged Rules directly threaten the wellbeing of the immigrants and refugees Amici have pledged to assist, have already impaired Amici's ability to guide their clients, and would shift additional demand for assistance onto Amici's respective programs and budgets.

## INTRODUCTION

Under the guise of preventing fraudulent asylum filings, the Department of Homeland Security ("DHS") has issued two rules ("Asylum EAD Rules") that will devastate the ability of asylum seekers to gain the work authorization necessary to support themselves in this country as they await a decision on their asylum cases—a process that often takes years.  These Rules were not the product of reasoned consideration.  Instead, they reflect an abrupt reversal of nearly three decades of policy, which had already struck a workable balance between discouraging frivolous asylum applications filed to obtain Employment Authorization Documents ("EADs") and ensuring that asylum seekers receive the authorization they need to work and access a variety of services

---

[1] Amici are: AsylumWorks, Catholic Legal Immigration Network ("CLINIC"), the Center for Gender and Refugee Studies ("CGRS"), the Center for Victims of Torture, Human Rights First, Immigration Equality, Kids in Need of Defense ("KIND"), the National Immigrant Justice Center ("NIJC"), Public Counsel, Tahirih Justice Center, and World Relief.  A description of each organization is included in the Appendix.

while their applications for asylum make their way through the system.  As a number of Amici's clients' stories make clear, DHS's swift about-face on EADs will threaten the health, safety, and well-being of countless asylum seekers in this country in ways that go beyond employment.

The Administrative Procedure Act ("APA") requires such rule changes to be the product of reasoned analysis. As the Supreme Court has explained time and again, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (emphasizing that agencies must provide a reasoned explanation when changing existing policies).

DHS's reasoning fails in each of those respects.  In its rush to curtail access to EADs, DHS entirely failed to consider several important aspects of the work authorization and asylum application processes, including the unique burdens the challenged Rules will impose on unaccompanied children and other uniquely vulnerable populations.  Instead, it relied on general principles of combatting fraud and promoting efficiency to undermine unrelated aspects of the EAD system.  These failures now threaten to deprive tens of thousands of good-faith asylum seekers each year of gainful employment, health insurance, proof of lawful residence, and access to transit, housing, banking services, and critical physical and mental health treatment.  The challenged Rules have also pulled the rug out from under the many asylum seekers who arranged their support systems in reliance on an upcoming EAD eligibility date guaranteed to them by the superseded rules.  Amici thus join Plaintiffs in urging the Court to issue an order postponing the effective dates of the challenged Rules pursuant to 5 U.S.C. § 705, or, alternatively, an order

preliminarily enjoining Defendants from enforcing the regulations while this case remains pending, *see* Fed R. Civ. P. 65.

## ARGUMENT

### I.     The Issued Rules Are Arbitrary and Capricious in Violation of the APA.

There are two Rules at issue: the first eliminates a prior requirement that DHS adjudicate an EAD application within 30 days of receipt (the "Timeline Repeal Rule"). *See* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants, 85 Fed. Reg. 37502 (June 22, 2020). The second imposes new obstacles to receiving work authorization, including more than doubling the waiting period before an asylum applicant can apply for EADs from 150 to 365 days and presumptively barring asylum applicants from receiving work authorization if they failed to file their underlying asylum application within one year of arriving in the United States or if they entered the United States without inspection at a port of entry ("Broader EAD Rule"). *See* Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38532 (June 26, 2020). Both are the product of arbitrary and capricious decisionmaking and were issued in violation of the APA.

"Agency action is arbitrary and capricious when the agency has . . . entirely failed to consider an important aspect of the problem" or has "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (quoting *State Farm*, 463 U.S. at 43). In this case, DHS offered implausible explanations for specific provisions and entirely failed to consider a plethora of important factors prior to issuing the Asylum EAD Rules. In addition to the gaps identified by Plaintiffs, *see generally* Mem. in Support of Pls' Mot. for a Stay at 10-25, ECF No. 23-1 (July 24, 2020), DHS failed to adequately explain its reasons for imposing new restrictions on receiving work

authorization that are more onerous than the requirements for obtaining asylum itself.  DHS also failed to consider the Asylum EAD Rules in tandem with closely related and concurrent rulemakings to the EAD and asylum application processes.  Accordingly, its final analysis of the impact of the Asylum EAD Rules was fatally flawed.  And lastly, DHS failed to consider the substantial non-pecuniary consequences of restricting access to work authorization.  Each of these alone would be sufficient grounds to postpone the effective date of the Rules.  Together, they suggest a deliberate effort by DHS to deter or punish persecuted individuals from seeking asylum, justified by pretextual reasoning.

> **A.**     **DHS Violated the APA by Failing to Provide an Adequate Explanation for Imposing New Presumptive Bars to Work Authorization.**

For decades, work authorization was broadly available to asylum applicants whose applications had been pending for 180 days, with the narrow exception of individuals who had been convicted of an aggravated felony.  *See* 8 U.S.C. § 1158(d)(2); 8 C.F.R. § 208.7.[2]  The Broader EAD Rule departs from this established practice by expanding the bar on work authorization to presumptively include any applicant who entered between ports of entry as well as any applicant who did not file her asylum application within one year of arrival.  *See* 85 Fed. Reg. at 38532.  These new restrictions do not align with the asylum statute, which permits applicants to apply for asylum "whether or not" they entered "at a designated port of arrival." 8 U.S.C. § 1158(a)(1).  The asylum statute also recognizes exceptions to the one-year filing deadline based on changed or extraordinary circumstances, 8 U.S.C. § 1158(a)(2)(D), a provision whose purpose the Broader EAD Rule does not take into consideration.  The result is that many asylum

---

[2] Unless otherwise indicated, citations to the Code of Federal Regulations refer to the regulations before the Asylum EAD Rules take effect.  Citations to the Asylum EAD Rules are to the Federal Register.

seekers will be ineligible for work authorization while their asylum applications are pending because of factors that will likely be excused as part of the underlying asylum proceedings.

DHS has failed to offer a reasoned explanation justifying this extraordinary departure from both the purpose of the asylum laws and the justifications given in the 1994 regulatory action that created the existing EAD regime.[3]   To begin, the entirety of its explanation for imposing the port of entry restriction rests on just two sentences:  "Asylum is a discretionary benefit reserved for those who establish that they are genuinely in need of the protection of the United States.  It follows that employment authorization associated with a pending asylum application should be similarly reserved."  85 Fed. Reg. at 38553.  But that is precisely the problem.  Even accepting DHS's explanation that employment authorization requirements should mirror those for obtaining asylum, the port-of-entry and filing deadline requirements do not, in fact, mirror the asylum laws at all.

The asylum statute makes clear that "[a]ny alien who is physically present or who arrives in the United States . . . may apply for asylum," regardless of whether the alien arrives at "a designated port of arrival."  8 U.S.C. § 1158(a)(1).  For nearly two years, DHS has tried and failed to add a parallel restriction on asylum eligibility for those who enter outside a port of entry; its attempts have been repeatedly blocked.  *See, e.g.*, *E. Bay Sanctuary Covenant v. Barr*, __ F.3d ___, 2020 U.S. App. Lexis 21017 (9th Cir. July 6, 2020) (affirming injunction against asylum bar interim rule at 84 Fed. Reg. 33829); *O.A. v. Trump*, 404 F. Supp. 3d. 109 (D.D.C. 2019) (vacating same rule under APA).  Because the statute requires DHS "to accept asylum applications from aliens, irrespective of whether or not they arrived lawfully through a port of entry," *E. Bay Sanctuary v. Trump*, 932 F.3d 742, 772 (9th Cir. 2018), adding a port-of-entry restriction on

---

[3] Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 14779 (Mar. 30, 1994) (proposed rule); 59 Fed. Reg. 62297 (Dec. 5, 1994) (final rule).

employment authorization was unnecessary if, as DHS explained, its purpose was simply to impose "similar[]" restrictions found in the asylum process.  85 Fed. Reg. at 38553.

DHS's attempt to reenact the unlawful substantive bar by restricting a collateral benefit makes its stated rationales less, not more, plausible.[4]  Indeed, DHS provides no "rational connection," *State Farm*, 463 U.S. at 56, between the port-of-entry requirement and the Broader EAD Rule's overarching purpose of deterring fraudulent applications for asylum.  In fact, these restrictions will likely punish good-faith asylum applicants.  This is because "an alien entering the United States illegally is wholly consistent with a claim to be fleeing persecution."  *E. Bay Sanctuary*, 932 F.3d at 773 (internal quotation marks omitted); *see also Wu Zheng Huang v. INS*, 436 F.3d 89, 100 (2d Cir. 2006) ("[I]f illegal manner of flight and entry were enough independently to support a denial of asylum . . . virtually no persecuted refugee would obtain asylum.").

The one-year filing bar, *see* 85 Fed. Reg. at 38550, suffers from similar flaws.  The asylum statute exempts asylum seekers from the one-year filing deadline if they can demonstrate "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay."  8 U.S.C. § 1158(a)(2)(D).  The asylum regulations provide a non-exhaustive list of potential circumstances, including "serious illness or mental or physical disability, including any effects of persecution or violent harm suffered in the past"; legal disability, including being an unaccompanied minor or mental impairment; ineffective assistance of counsel, and prior lawful status.  8 C.F.R. § 208.4(a)(4), (a)(5).  Together, the statute and regulations provide a safe harbor for good-faith asylum seekers

---

[4] While it is true that section 1158's substantive provisions do not map exactly onto the requirements for work authorization, *see* 8 U.S.C. § 1158(d)(3), the Broader EAD Rule is problematic in that it claims to harmonize the work and substantive requirements while doing exactly the opposite.

whose circumstances inhibit applying within a year. They also evince a desire not to have individuals apply for asylum prematurely if there are viable alternatives paths to permanent lawful status or safety. *See Asylum Procedures*, 65 Fed. Reg. 76121, 76123 (Dec. 6, 2000) ("The Department does not wish to force a premature application for asylum . . . .").

Notwithstanding these considerations, DHS has now asserted that applying the one-year filing bar to work authorization applications is necessary to deter individuals from filing "skeletal or fraudulent asylum applications to trigger removal proceedings before the immigration court where they can apply for cancellation of removal." 85 Fed. Reg. at 38550. This explanation does not add up. Cancellation of removal is a path to lawful immigration status that is available to some persons who have been in the United States for at least ten years; imposing a one-year filing deadline for a collateral benefit could not logically have any deterrent effect on this group. *See* 8 U.S.C. § 1229b. Moreover, to the extent that there is a problem of skeletal asylum applications by those whose goal is to use the application as a launching pad for cancellation of removal, the problem is that such persons are using the asylum process as a means to be placed in removal proceedings, where cancellation applications are adjudicated. Since EADs are not the reason the applications are being filed, revoking EAD eligibility for such filers would not be a deterrent; and in any event, deterring those applications falls outside the stated justification for the Rules, which is to reduce "frivolous" or "fraudulent" applications for the purpose of obtaining an EAD, not for the purpose of triggering removal proceedings. *See* 85 Fed. Reg. at 38533 (explaining that the Broader EAD Rule was proposed to "reduce incentives for aliens to file frivolous, fraudulent, or otherwise non-meritorious asylum applications to obtain employment authorization").

DHS has also claimed that the one-year filing restriction is necessary to "incentivize bona fide asylum applicants to file sooner, and to reduce the asylum backlog." 85 Fed. Reg. at 38550.

But circumstances such as serious illness, legal disability, and trauma are unlikely to yield to "incentives." The one-year filing bar thus threatens to harm the most vulnerable of asylum seekers, those who have been so traumatized by their experiences that they are unable to timely file an application for asylum—a reality the asylum regulations account for but the Broader EAD Rule does not. *See* 8 C.F.R. § 208.4(a)(5). In addition, the statutory exceptions to the one-year filing deadline protect those who did not file for asylum within one year based on *changed* circumstances. This includes circumstances where the events that give rise to a person's fear of return arise more than one year after their arrival in the United States. Applicants in this situation cannot be "incentivized" to file for asylum before their refugee claims actually arise. This disparity between the way Congress approached the one-year filing deadline for asylum applications and DHS's Broader EAD Rule suggests that the Rule's one-year filing bar was designed, not to deter skeletal or bad-faith asylum applications, but instead to punish and deter qualified applicants.

Because there is strong evidence that DHS failed "to offer the rational connection between facts and judgment required to pass muster under the arbitrary and capricious standard," *State Farm*, 463 U.S. at 56, the Court should postpone the effective dates of the Asylum EAD Rules. *See* 5 U.S.C. § 705.

### B.     DHS Violated the APA by Omitting Consideration of Contemporaneous and Closely Related Proposed Rules.

DHS also violated the APA by issuing the Asylum EAD Rules without considering how these rules will interact with a contemporaneous rule imposing hefty asylum and EAD application fees. An agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *see also DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (finding that DHS's decision to rescind DACA was arbitrary and capricious where the agency failed to consider the costs and benefits of a forbearance-only policy).

This includes failing to consider the existence of "a contemporaneous and closely related rulemaking" that may render the currently contemplated process "irrelevant." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011); *see also Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (per curiam). That is precisely what DHS did here.

The Asylum EAD Rules broadly disrupt the path an asylum applicant must tread. They eliminate longstanding policies regarding the work authorization process—including policies and procedures that actual asylum seekers have already relied upon in the past six months—and more than double the period of time asylum applicants must wait before they can seek work authorization. *See* 85 Fed. Reg. at 38533; 85 Fed. Reg. at 37503. DHS's core justification is that this act of cruelty is necessary to deter individuals from filing "frivolous, fraudulent, or otherwise non-meritorious asylum applications to obtain employment authorization." 85 Fed. Reg. at 38533; *see also* 85 Fed. Reg. at 37502 (eliminating 30-day processing requirement to "reduce opportunities for fraud").

But in arriving at this conclusion, DHS failed to consider a separate DHS rule, first noticed in 2019 on the same day as the Broader EAD Rule and finalized the day of Amici's filing, which will charge asylum applicants $50 to file an asylum application and $550 to file an EAD application, with virtually no waivers available. *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Requirements*, 84 Fed. Reg. 62280, 62299-62300, 62320 (Nov. 14, 2019) (proposing $490 EAD application fee), 85 Fed. Reg. ___, federalregister.gov/d/2020-16389 (Aug. 3, 2020) (final rule requiring $550 EAD application fee) ("Fee Rule"). Much like the Asylum EAD Rules, DHS proposed this rule with an eye towards "safeguarding" the integrity of "the nation's immigration benefits system." 84 Fed. Reg. at 62280. As with the Rules challenged here, these fees are a dramatic departure from prior practices and

subject to separate criticism, but that fact does not insulate the Agency from its obligation to consider these various approaches together to determine if the relevant rule is necessary to achieve the stated goal.

There is every reason to think that the Fee Rule will drastically reduce the number of asylum applications DHS will be required to process, irrespective of any incidence of fraud. As Amici know from experience, many asylum seekers simply will not have the means to afford the $50 asylum application fee, much less the staggering $550 fee for an EAD, nor are Amici resourced to subsidize such fees. Given the substantial overlapping goals and deterrent effects of the Fee Rule and the Asylum EAD Rules, as well as the fact that multiple comments specifically "noted that DHS was already increasing fees for applications for employment authorization and imposing a new fee for filing of asylum applications," 85 Fed. Reg. 38532, 38575, DHS needed to consider the substantive and fee-based deterrence measures in tandem. DHS failed to do so and did not respond to concerns about the interactions between these Rules. *Id.* at 38576.

This is the essence of arbitrary and capricious decisionmaking. As the D.C. Circuit explained in *Portland Cement*, "[i]t is not absurd to require that an agency's right hand take account of what its left hand is doing." 665 F.3d at 187. Agencies are not Janus-faced entities. They cannot rely on one premise to issue a rule and then render that very same premise irrelevant in the same breath. DHS's insistence on considering the Timeline Repeal Rule, the Broader EAD Rule, and the Proposed Fee Rule in separate silos has yielded piecemeal justifications that speak to a lack of reasoned consideration, all while double-counting alleged benefits. *See Gen. Chem. Corp.*, 817 F.2d at 846 (finding agency action arbitrary and capricious where the analysis was "internally inconsistent and inadequately explained"). The Court should postpone the effective dates of the Asylum EAD Rules as a result.

### C.   DHS Violated the APA by Failing to Consider Important Uses of EADs Beyond Employment.

DHS further violated the APA by failing to consider important uses of EADs separate from employment.  The EAD card is the only form of government-issued photo identification many asylum seekers can obtain, and it is a predicate for obtaining a Social Security Number ("SSN").[5]  Because government-issued photo ID and SSNs are often a prerequisite for accessing public programs and services that are essential to asylum seekers' ability to support themselves, integrate into American society, and obtain services needed to recover from past violence, EADs are key for asylum seekers to rebuild their lives as they pursue a permanent immigration status.  In fact, many child asylum seekers who are too young to lawfully undertake paid work apply for EADs exclusively for these non-employment purposes.

In addition, some state programs are unavailable without an EAD or SSN.  For others, an EAD or SSN removes many barriers to accessing these benefits.  Consider, for example, an unaccompanied child who comes to the United States seeking asylum and ends up in foster care in California.  Upon turning 18, continued access to California's Extended Foster Care benefits requires her to remain in high school, participate in vocational education (which requires an EAD), work (which also requires an EAD), or enroll in post-secondary education (financial support for which generally requires an SSN).  Without timely access to an EAD and SSN—and consequently, any state support—this child would face enormous challenges in diligently pursuing an asylum claim, or meeting her basic needs.[6]  Neither of the challenged Rules begins to address this problem.

---

[5] Social Security Administration, Social Security Numbers for Noncitizens (March 2018), https://bit.ly/3k1UWJH (noting SSN is available to holders of I-766 EADs).

[6] Cal. Dept. of Social Servs., All County Letter No. 11-61 (Nov. 4, 2011), https://bit.ly/3fgjZF8. Other states, such as Washington, have similar programs with similar requirements. *See, e.g.*, Wash. State Dept. of Children, Youth & Families, Extended Foster Care, https://bit.ly/3fee3g5.

There are many other important, non-employment uses of an EAD or SSN that the Agency likewise failed to consider, including obtaining a state identity card or driver's license;[7] opening a bank account;[8] accessing vocational training programs;[9] and accessing scholarships or in-state tuition.[10]   Despite receiving comments on this subject, DHS failed to grapple with any non-employment EAD uses in the final versions of the Asylum EAD Rules, beyond its unconscionable suggestion, noted in Plaintiffs' brief, *see* Mem. at 8, that asylum seekers familiarize themselves with homeless shelters.  *See* 85 Fed. Reg. at 38591-92; *id.* at 38565-67 (noting comments and responding only that public education and some social services specifically for immigrants remain regardless of status).  DHS's one substantive response to the issue of EADs for children actually cuts the other way:  the agency admitted that it did not factor into its burden calculation the fact that some EADs go to children too young to work.  *See* 85 Fed. Reg. at 38587-88.  In addition, DHS's suggestion that harms arising from asylum seekers' inability to get state identification "are outside USCIS's purview," 85 Fed. Reg. at 37528, is simply wrong.  The connection between work authorization, SSNs, and government IDs arises in part from federal law that DHS implements. *See* 6 C.F.R. Part 37.  It was therefore arbitrary and capricious for DHS to rely on that specious

---

[7] States have adopted differing approaches to the federal REAL ID Act, which DHS implements, *see* 6 C.F.R. Part 37, including whether an EAD or SSN is required to obtain a state identity card or driver's license.  *Compare, e.g.*, Md. MVA, Online Document Guide, https://bit.ly/3fm8bkQ (no SSN required), *with* Ind. BMV, Proving Your Social Security Number Current, https://bit.ly/30lgrNE (SSN required).

[8] While opening an account with an IRS-issued taxpayer identification number is possible, it adds a substantial additional layer of burden that DHS should have taken into account, particularly for child applicants. *See* Consumer Financial Protection Bureau, "Can I get a checking account without a social security number," https://bit.ly/3fhx29u.

[9] *E.g.*, YouthCare, YouthBuild, https://bit.ly/31elYEW.

[10]   *See, e.g.*, Univ. System of Georgia, Board of Regents Policy Manual § 4.3.2, https://bit.ly/30mUXA6.

reasoning as its sole basis for ignoring the substantial, and in many cases quantifiable, costs that the Asylum EAD Rules will impose on asylum seekers.

## II.     The Asylum EAD Rules Will Cause Irreparable Harm.

In addition to amplifying the ways in which the Asylum EAD Rules are illegal, Amici write to illustrate the various ways in which depriving asylum seekers of access to work authorization present an irreparable harm.  "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'"  *Boardman v. Pac. Seafood Grp*., 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)).  Plaintiffs, Amici, and their respective clients face precisely that injury.  Furthermore, because DHS did not factor these harms into its analysis of the Asylum EAD Rules, these consequences provide yet another basis for rejecting the agency's decisionmaking.  *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action.").

### A.     Harm to Individual Asylum Seekers

First, although the Plaintiffs in this case are organizations, there can be no doubt that the challenged Rules present irreparable harm to actual asylum seekers, including CASA's members, whom the Plaintiffs serve.  That harm comes in both expected and unexpected ways.

***Dangerous working or living situations.***  Lack of access to work authorization can force clients to enter into or remain in dangerous situations.  For example, Alice, an African asylum seeker, fled to the United States after being severely tortured and surviving the murder of several family members in her country of origin.[11]  After arriving in the United States, she was diagnosed with PTSD, Major Depression, and HIV.  In the United States, she has had to live with a distant

---

[11] All names used in this brief are pseudonyms.  Actual client case details are on file with Amici.

family member whom she barely knows.  The family member does not allow her to have a key to the house, so she is required to remain inside at all times or risk being locked out.  Alice sleeps on the floor and has minimal access to food.  This relative has not provided Alice with weather-appropriate attire or access to hygiene and medical care.  Yet, without access to work authorization, Alice is unable to leave this dangerous and unhealthy situation.

These dangerous circumstances extend into the workplace as well.  Take, for example, the experiences of Veronica, who faced this reality as a gender nonconforming woman.  She fled physical and sexual violence in Mexico, and when she arrived in the United States, she needed to work to support herself and her young child.  She accepted a job doing cleaning and maintenance for a property manager but did not have valid work authorization.  Soon after, the manager coerced her into having sex with him multiple times a week, and when she tried to refuse, he would indirectly threaten to terminate her, saying there "was no work for her."  Veronica felt trapped: she felt that she had to have sex to keep her job, that she had to keep her job in order to provide for herself and her daughter, and that she could not find another job because she did not have work authorization.  Depriving individuals with meritorious claims of the protection of a pathway to lawful work, as the Asylum EAD Rules do, will lead to countless more examples of exploitation.

***Lack of access to non-employment based resources.***  As discussed above, the harm that will befall asylum seekers if the Asylum EAD Rules take effect extends beyond employment.  For example, Eduardo fled Nicaragua and is seeking asylum based on fear stemming from his family's affiliation with political opposition groups.  He now resides in Indiana, a state that does not offer a driver's license or any form of state ID without an SSN.  Lacking viable public transportation options, Eduardo was recently charged with driving without a license.  If Eduardo is convicted of this misdemeanor offense, it can be used as a basis to deny his application for asylum.  The

availability of an EAD would have allowed Eduardo to avoid suffering criminal consequences from the routine and essential function of driving.

Lack of access to employment authorization also restricts access to healthcare. For example, Heidy is an asylum seeker from El Salvador who was able to secure private insurance because she has a valid work permit. Her son, however, is with her and also seeking asylum. When Heidy signed up for insurance, her son did not have work authorization, so he could not be included on the insurance policy. Heidy lives in rural Indiana where access to low-cost health clinics is limited. Because her son was not able to be placed on her insurance, Heidy could not afford to take him to a doctor or dentist for a prolonged period of time.

***Lost sense of worth.*** For some, the ability to work is intimately tied to a sense of worth and wellbeing. For example, Yesenia and her husband fled Venezuela after their political activities against President Maduro put their lives in danger. Prior to fleeing, the couple led professional lives in Caracas, with Yesenia working as a respected clinical psychologist. Upon arriving in America, however, neither Yesenia nor her husband had authorization to work while they went through the asylum process. Not only did they struggle to meet their basic needs, but this stress also evolved into depression that impacted Yesenia's daily functioning and limited her capacity to participate in the legal process. On multiple occasions, she questioned whether she would ever get her life "back on track." Yesenia eventually received a work permit in 2018 and was able to find a meaningful job as a counselor shortly thereafter. She was granted asylum two years later. Had she been subject to the Asylum EAD Rules, her access to work would have been delayed further, to the detriment of her wellbeing and that of the clients she has served.

Raj, an asylum seeker from Southeast Asia, had a similar experience. Raj was diagnosed with severe posttraumatic stress disorder and depression from being tortured in his country of

origin.  His symptoms included nightmares, flashbacks, inability to sleep, and significant suicidal ideations.  When he first arrived in the United States and for months before he received a work permit, he experienced high levels of stress and shame because he strongly connected his personal worth to his profession.  Receiving a work permit allowed Raj to work lawfully and led to dramatic improvements in his mental health.  Such a turnaround will be delayed or outright unavailable for many under the Asylum EAD Rules, which more than double the waiting period.

The harm facing these individuals will be all too common for refugees if the Asylum EAD Rules are allowed to take effect. The challenged Rules will inflict harms on good-faith asylum seekers in times of transition where they are already extremely vulnerable, under the guise of eliminating false or fraudulent applications for asylum.

### B.      Harm to Amici's Respective Organizational Missions

In addition to the harms that will befall asylum seekers directly, Amici and plaintiff organizations alike face irreparable harm as a result of the Asylum EAD Rules.  These injuries will occur because Amici are organizations dedicated both to representing asylum seekers in their legal proceedings as well as to promoting their ability to meaningfully participate in American society. If the Rules go into effect, Amici will be required to divert substantial resources, correct information previously given to clients, and commit to serving clients for prolonged periods knowing that those clients will have limited or zero access to meaningful work and social services, all while facing increased demand for financial assistance that Amici's budgets cannot possibly meet.  These Rules will thus cause "ongoing harm to [the] organizational missions" of all refugee-serving organizations. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

***One-Year Deadline Change.***  To begin, the portion of the Broader EAD Rule that categorically excludes those who seek asylum from work authorization more than a year after their entry into the United States stands to disrupt the work of various organizations.  One Amicus

organization represents two clients who are present in the United States on valid student visas: Moses, a blind lawyer from Nigeria, and Safiyyah, a lesbian woman from Iran. Both individuals missed their one-year filing deadlines while lawfully present in the country as students, a circumstance that may qualify them for a recognized exception to the one-year deadline rule. 8 C.F.R. § 208.4(a)(5)(iv). In agreeing to help these individuals apply for asylum, the organization initially advised them that as students who were in lawful status, they could avoid making a hasty filing and instead file for asylum just before their student status was set to expire. This advice was based on the well-recognized fact that having lawful student status supports an exception to the one-year deadline—an established policy the Broader EAD Rule dismantles. The Amicus organization now must scramble to file their applications before the Rule's effective date to preserve these individuals' chances of receiving work authorization. It is bad enough that Moses and Safiyyah will be unable to receive work authorization for a year after applying for asylum under the Asylum EAD Rules; other students will lack access to work permits altogether for the duration of their immigration cases, which could last years.

*__The Rules' Impact on Attorney Preparation.__* The challenged Rules also harm plaintiff organizations and Amici by significantly disrupting the ways in which organizations prioritize cases in terms of urgency and preparation, often leaving attorneys and clients in a lose-lose situation of having to choose between filing for asylum too quickly, before all documentation is prepared, or delaying access to a work permit and all the benefits the permit entails.

For example, one Amicus organization accepted the case of Maria, a Mexican asylum seeker who fled decades of domestic violence at the hands of her husband. She filed for asylum affirmatively in February 2020, but her "asylum clock" was stopped after her attorneys requested additional time to prepare her case. Her attorneys determined that this delay was crucial to ensure

the greatest possible likelihood of success. Maria is now scheduled for her interview in early August, but if her case is referred to immigration court, she will have to wait a full year before she can receive work authorization, which will not include the attorney preparation time that was necessary to diligently prepare the case.

Similarly, Hana came to the United States from Morocco in mid-2019 to escape decades of abuse by her husband, who worked in a government ministry. She came with her teenage son, Ahmed. The family promptly sought out one Amicus's legal services, but Ahmed was diagnosed with cancer and needed treatment. The need for treatment, coupled with the COVID-19 pandemic, meant that Amicus counsel was not able to file their asylum applications until shortly before their one-year deadline. As a result, these applicants will not have accrued 150 days on their work permit clocks prior to the effective date of the challenged Rules, which means they will have to wait an additional six months before they are able to obtain work authorization pursuant to the new 365-day waiting period.

Nathan, a gay man from Uganda, also promptly sought out legal services. An Amicus organization accepted his case for free representation but warned that, due to the organization's waitlist and the USCIS Asylum Office's "last in, first out" policy of reviewing recently filed cases first,[12] the organization would file his case closer to his one-year deadline, after there had been time to prepare his declaration and gather evidence. This reasonable approach for an organization with limited resources serving a large number of clients unable to pay for private counsel will now mean that Nathan will not have accrued 150 days on his asylum clock before the Broader EAD

---

[12] U.S. Citizenship & Imm. Servs., Affirmative Asylum Interview Scheduling (Jan 26, 2018), https://bit.ly/39PwBSP.

Rule's effective date, so his wait for a work permit will double.  Meanwhile, Nathan depends on informal "sponsors" to provide him food and shelter.

   ***Serving Asylum Seekers Who Will Never Have Access to Work Authorization.***  Finally, Amici emphasize the difficulties that the Asylum EAD Rules pose not just for clients but for organizations when it comes to serving those clients who will *never* have access to work authorization under the Rules, due to the chasm between substantive eligibility for asylum under the statute and the newly created EAD eligibility bars, as discussed in Part I.A, *supra*.

   One such population includes those who enter the United States outside of a port of entry. Under the Broader EAD Rule, those people will *never* be eligible for work authorization even though the asylum statute explicitly requires the agency to consider applications for asylum regardless of the applicant's manner of entry.  This population is highly likely to have their asylum cases adjudicated in removal proceedings, which means that, due to the immense backlogs, they face a years-long wait (the opposite of the last-in, first-out policy applicable to affirmative applications by individuals who are not in removal proceedings).

   For example, Jane fled Uganda after she was brutally raped and beaten in that country.  She stayed in Mexico for nearly eight months, waiting for a chance to lawfully present her request for asylum but facing delays related to DHS's "metering" policy that blocks asylum seekers from lawfully presenting their claims at ports of entry.  *See Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019), 327 F. Supp. 3d 1284 (S.D. Cal. 2018).  In Mexico, Jane was robbed, faced violent racism, and fell ill.  In light of these harms, she concluded that her only choice was to enter the United States without inspection.  She did so; was convicted of illegal entry; but established a fear of persecution and was eventually released to go live with a sponsor.  Even so, delays beyond Jane's control relating to the government's transfer of her case file prevented her

from promptly filing her asylum application. She was able to satisfy the one-year deadline, but she will not have reached eligibility for work authorization by the time the challenged Rules take effect. As such, she will not be able to apply for work authorization before then, and once the Broader EAD Rule is in place she will be altogether excluded from access to work authorization.

The same issues arise for applicants who should qualify for an exception to the one-year filing deadline under the statute, but who would be blocked by the absolute one-year bar in the Asylum EAD Rules. Brittany is from Mexico and is in her 50s; within the past year, she came out as transgender, having lived in the United States for many years. She took many important steps immediately after coming out, like starting Hormone Replacement Therapy, changing her name, and applying for asylum. These factors represent a compelling exception to the one-year deadline for asylum eligibility.[13] Yet those same factors will not be considered when it comes to an application for work authorization.

In cases like Brittany's and Jane's, nonprofit organizations like Amici will be faced with difficulties in deciding how best to represent asylum seekers in a legal process that will certainly take years to complete, knowing that these applicants will lack access to legal work and community support. Of particular concern, these organizations are ill-equipped to help clients find long-term solutions to homelessness and food insecurity, and any attempts to do so many diminish their overall capacity to serve the increasingly marginalized population of asylum seekers.

## **CONCLUSION**

For the foregoing reasons, Amici respectfully request that the Court postpone the effective dates of the Asylum EAD Rules. In the alternative, the Court should issue a preliminary injunction.

---

[13] USCIS, RIAO Directorate, Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims, pp. 64-65 (December 2019), https://bit.ly/2EM6h0q.

Dated:  August 3, 2020                    Respectfully submitted,


                                          /s/ Gabriel Maximilian Moreno
                                          Gabriel Maximilian Moreno
                                          (Bar No. 07234)
                                          KIDS IN NEED OF DEFENSE (KIND)
                                          One South Street, Suite 1100
                                          Baltimore, MD 21202
                                          (443) 914-2899 (phone)
                                          (410) 646-8019 (fax)
                                          gmoreno@supportkind.org

                                          Xiaonan April Hu (*pro hac vice* pending)
                                          MUNGER, TOLLES & OLSON LLP
                                          1155 F Street N.W., Seventh Floor
                                          Washington, D.C. 20004-1357
                                          (202) 220-1100 (phone)
                                          (202) 220-2300 (fax)
                                          April.Hu@mto.com

                                          Scott Shuchart (application pending)
                                          KIDS IN NEED OF DEFENSE (KIND)
                                          1201 L Street, NW, Floor 2
                                          Washington, DC 20005
                                          (202) 318-0595 (phone)
                                          (202) 824-0702 (fax)
                                          sshuchart@supportkind.org

                                          Keren Zwick (*pro hac vice* pending)
                                          NATIONAL IMMIGRANT JUSTICE
                                          CENTER
                                          224 S. Michigan Avenue, Suite 600
                                          Chicago, IL 60604
                                          (312) 660-1364 (phone)
                                          (312) 660-1505 (fax)
                                          KZwick@heartlandalliance.org

                                          *Attorneys for Amici Curiae*

## APPENDIX: LIST OF AMICI

Amici are:

- AsylumWorks, the first and only nonprofit exclusively dedicated to serving the estimated 50,000 asylum seekers living in the Washington, D.C. region.

- Catholic Legal Immigration Network, Inc. ("CLINIC"), the largest nationwide network of nonprofit immigration programs, many of which provide representation and advocacy for the just and humane treatment of asylum seekers.

- Center for Gender and Refugee Studies ("CGRS") at UC Hastings College of the Law, which develops refugee and asylum law nationwide through its litigation, scholarship, policy advocacy, and technical assistance.

- Center for Victims of Torture, an independent nongovernmental organization that provides care to, and advocates on behalf of, torture survivors.

- Human Rights First, a non-governmental organization established in 1978, operates one of the largest programs for pro bono legal representation of refugees in the nation, working in partnership with volunteer lawyers at leading law firms to provide legal representation without charge, to thousands of indigent asylum applicants.

- Immigration Equality, a national organization that provides legal services and advocacy for LGBTQ and HIV-positive immigrants.

- Kids in Need of Defense ("KIND"), a national nonprofit organization dedicated to providing free legal representation and protection to unaccompanied immigrant and refugee children in removal proceedings.

- National Immigrant Justice Center ("NIJC"), a program of the nonprofit organization Heartland Alliance, provides direct legal services to, and advocates on behalf of, immigrants, refugees, and asylum seekers including more than 800 asylum seekers each year.

- Public Counsel, a pro bono law firm that provides representation to asylum seekers.

- Tahirih Justice Center, a national, nonpartisan and direct services organization that assists immigrant survivors of gender-based violence.

- World Relief, a global Christian nonprofit organization dedicated to resettling refugees and providing immigration legal services.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations provided by this Court's order of July 27, 2020, because it does not exceed twenty pages exclusive of affidavits and exhibits, table of contents and citations, and addenda containing statues, rules, or regulations.  I further certify that this brief complies with the typeface and type style requirements of the Court's Standing Order 2018-07 regarding amicus briefs and Local Rule 102.2, because it has been prepared in proportionally spaced 12-point Times New Roman font using Microsoft Word.


DATED:  August 3, 2020                         /s/ Gabriel Maximilian Moreno

                                                            Gabriel Maximilian Moreno