UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CASA DE MARYLAND, INC., et al.,

          Plaintiffs,

                                    No. 8:20-cv-2118

          v

CHAD F. WOLF, *in his official capacity as the purported Acting Secretary of Homeland Security*, et al.,

          Defendants.

**BRIEF FOR NEW YORK STATE, THE DISTRICT OF COLUMBIA, THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON, AND TEN CITIES AND COUNTIES AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION**

KARL A. RACINE
*Attorney General*
*District of Columbia*
441 4th Street, NW
Washington, D.C. 20001
(202) 727-3400

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-8020

*(Counsel listing continues on signature pages.)*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION AND INTEREST OF AMICI ........................................................ 1

ARGUMENT ................................................................................................ 4

    I.    THE NEW RULES LIMITING EMPLOYMENT AUTHORIZATION FOR ASYLUM SEEKERS WILL IRREPARABLY HARM STATES AND LOCALITIES. ................................. 4

        A.    The New Rules Will Deprive States and Localities of Substantial Tax Revenue and Economic Growth. ................................................................... 4

        B.    The New Rules Will Increase Amici's Healthcare and Social-Service Costs. .................................................................................................... 8

        C.    The New Rules Will Reduce States' and Localities' Ability to Enforce Their Own Laws. ..................................................................... 12

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE, AMONG OTHER DEFECTS, THE DEPARTMENT OF HOMELAND SECURITY FAILED TO CONDUCT THE REQUIRED FEDERALISM ANALYSIS. ................................................. 15

CONCLUSION ............................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982)................................................................................................................12

*Arias v. Raimondo,*
    860 F.3d 1185 (9th Cir. 2017) ..............................................................................................14

*Maryland v. King,*
    133 S. Ct. 1 (2012)................................................................................................................12

*New York v. DHS,*
    No. 19-cv-7777, 2020 WL 4347264 (S.D.N.Y. July 29, 2020)..........................................7, 10

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)............................................................................................................15, 16

**Statutes**

*Federal*

5 U.S.C. § 706................................................................................................................................16

8 U.S.C. § 1641................................................................................................................................8

*State and Local*

Cal.
    Gov't Code §§ 12900-12996 ................................................................................................12
    Lab. Code §§ 200-1200........................................................................................................12

N.J. Stat. Ann.
    § 10:5-1 et seq......................................................................................................................12
    § 34:11-56a et seq. ...............................................................................................................12

N.Y. Labor Law
    art. 5 .....................................................................................................................................12
    art. 6 .....................................................................................................................................12
    art. 19 ...................................................................................................................................12
    art. 19-A ...............................................................................................................................12

N.Y. Workers' Comp. Law § 17................................................................................................12

D.C. Code
    § 2-220.01 et seq..................................................................................................................12
    § 32-531.01 et seq. ..............................................................................................................12

**Statutes**                                                                                      **Page(s)**

*State and Local (cont'd)*

D.C. Code
    § 32-1001 et seq. .............................................................................................12
    § 32-1301 et seq. .............................................................................................12
    § 32-1331.01 et seq. .......................................................................................12

L.A. Mun. Code
    ch. XVIII .........................................................................................................12
    § 51.03 ............................................................................................................12

N.Y.C. Admin. Code § 8-101 et seq. .......................................................................12

Oakland Mun. Code §§ 5.92.010-5.93.060 ..............................................................12

**Regulations and Executive Orders**

Asylum Application, Interview, and Employment Authorization for Applicants,
    85 Fed. Reg. 38,532 (June 26, 2020) .......................................................... passim

Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765
    Employment Authorization Applicants, 85 Fed. Reg. 37,502 (June 22, 2020) .............. passim

Exec. Order
    No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) ......................................15
    No. 13,132, 64 Fed. Reg. 43,255 (Aug. 10, 1999) ....................................15

**Comments**

Comment Letter of New York State Department of Labor on Asylum Application,
    Interview, and Employment Authorization for Applicants (Jan. 7, 2019),
    https://www.regulations.gov/document?D=USCIS-2019-0011-0613 ....................................13

Comment Letter of 19 State Attorneys General on Removal of 30-Day Processing
    Provision for Asylum Applicant Related Form I-765 Employment
    Authorization Applications (Nov. 8, 2019), https://tinyurl.com/yxzfpon7 ............................16

Comment Letter of 21 State Attorneys General on Asylum Application, Interview,
    and Employment Authorization for Applicants (Jan. 13, 2020),
    https://tinyurl.com/y5bfreau .................................................................................16

**Miscellaneous Authorities**

Am. Immigration Council, *Immigrants in California* (June 4, 2020),
    https://tinyurl.com/ybe2bdpf ...........................................................................4, 7

**Miscellaneous Authorities**                                                          **Page(s)**

Am. Immigration Council, *Immigrants in New York* (June 4, 2020),
    https://tinyurl.com/y4z7qg4e .................................................................................4

Am. Immigration Council, *Immigrants in Virginia* (June 4, 2020),
    https://tinyurl.com/y3ntr5k5 ..................................................................................5

Cal. Ass'n of Pub. Hosps. & Health Sys., *About California's Public Health Care
    Systems*, https://caph.org/memberdirectory/about-californias-public-health-
    care-systems/.............................................................................................................9

Cal. Dep't of Soc. Serv., *Immigration Services Funding*,
    https://www.cdss.ca.gov/inforesources/immigration/immigration-services-funding..............11

Daniel Costa, *California Leads the Way: A Look at California Laws that Help Protect
    Labor Standards for Unauthorized Immigrant Workers*, Econ. Policy Inst.
    (Mar. 22, 2018), https://www.epi.org/publication/california-immigrant-labor-laws/ .............13

Francesc Ortega & Amy Hsin, *Occupational Barriers and the Labor Market
    Penalty from Lack of Legal Status*, IZA Inst. of Labor Econ. (July 2018),
    http://ftp.iza.org/dp11680.pdf ...................................................................................6

*Highland Hospital Human Rights Clinic*, https://tinyurl.com/y5bzdf7b .....................................10

Human Rights Watch, *"At Least Let Them Work": The Denial of Work
    Authorization and Assistance for Asylum Seekers in the United States*
    (Nov. 12, 2013), https://www.refworld.org/docid/5285fc0c4.html........................................13

Inst. on Taxation & Econ. Policy, *Undocumented Immigrants' State & Local Tax
    Contributions* (Mar. 2017), https://itep.org/wpcontent/uploads/immigration2017.pdf............6

Jennifer E. DeVoe, et al., *Receipt of Preventive Care Among Adults: Insurance
    Status and Usual Source of Care*, 93 Am. J. Pub. Health 786 (May 2003),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1447840/ ......................................................9

Julie Hirschfeld Davis & Somini Sengupta, *Trump Administration Rejects Study
    Showing Positive Impact of Refugees*, N.Y. Times (Sept. 18, 2017),
    https://www.nytimes.com/2017/09/18/us/politics/refugees-revenue-cost-
    report-trump.html........................................................................................................8

Nadwa Mossad, Office of Immigration Statistics, Dep't of Homeland Sec.,
    *Annual Flow Report: Refugees and Asylees: 2017* (Mar. 2019),
    https://tinyurl.com/y4kfuclj ........................................................................................2

**Miscellaneous Authorities**                                                   **Page(s)**

Nat'l Conference of State Legislatures, *Immigrant Eligibility for Health Care Programs in the United States* (Oct. 19, 2017), https://www.ncsl.org/research/immigration/immigrant-eligibility-for-health-care-programs-in-the-united-states.aspx ...................................................................9

New Am. Econ., *The Contributions of New Americans in New York* (New York, NY) (Aug. 2016), http://research.newamericaneconomy.org/wp-content/uploads/2017/02/nae-ny-report.pdf.................................................................7

New Am. Econ., *From Struggle to Resilience: The Economic Impact of Refugees in America* (June 2017), https://tinyurl.com/y8u5sflo ..................................................4, 5, 7, 8

New Am. Econ., *Immigrants and the Economy: Map the Impact*, https://www.newamericaneconomy.org/locations/national/........................................4

New Jersey Dep't of Treasury, Office of Mgmt. & Budget, *Appropriations Handbook FY2019-2020*, https://tinyurl.com/yxw256og ........................................11

Nik Theodore et al., *Unregulated Work in Chicago: The Breakdown of Workplace Protections in the Low-Wage Labor Market*, Ctr. for Urban Econ. Dev., Univ. of Ill. at Chicago (2010), https://www.raisethefflooralliance.org/unregulated_work_in_chicago ...................................13

Office of the Mayor, Gov't of D.C., *Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program* (July 12, 2019), https://mayor.dc.gov/release/mayor-bowser-announces-25-million-available-fy-2020-immigrant-justice-legal-services-grant .................................................11

Peng-jun Lu et al., *Impact of Health Insurance Status on Vaccination Coverage Among Adult Populations*, 48 Am. J. Prev. Med. 647 (Apr. 15, 2015), https://tinyurl.com/y5es4yt4 ...........................................................................9

Pew Research Ctr., *Nativity by State (2016)*, https://assets.pewresearch.org/wp-content/uploads/sites/7/2018/09/12103811/PH_2016-Foreign-Born-Statistical-Portraits_Current-Data_45_Nativity-by-state.png.......................................2

Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* (2012), https://tinyurl.com/ybtqdv94 .......................................................14

Press Release, Governor Cuomo and Legislative Leaders Announces 2020 Enacted Budget Includes $10 Million to Support Expansion of the Liberty Defense Project (Apr. 5, 2019), https://www.governor.ny.gov/news/governor-cuomo-and-legislative-leaders-announces-2020-enacted-budget-includes-10-million ............................11

**Miscellaneous Authorities**                                                                    **Page(s)**

Rutgers University, Center for Women and Work, *Fact Sheet: Low Wage Women Workers in New Jersey: Home Health Aides* (Mar. 2020), https://tinyurl.com/y5zngy3e ......................7

Stacey McMorrow, et al., *Determinants of Receipt of Recommended Preventive Services: Implications for the Affordable Care Act*, 104 Am. J. Pub. Health 2392 (Dec. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232157/ ......................9

U.S. Census Bureau, *Nativity and Place of Birth of Resident Population for Cities of 100,000 or More (2009)*, https://www.census.gov/library/publications/2011/compendia/statab/131ed/population.html .................................................................................................3

U.S. Census Bureau, *QuickFacts*, https://www.census.gov/quickfacts/fact/table/chicagocityillinois,losangelescit ycalifornia,newyorkcitynewyork/POP645218 ...........................................................................3

U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., OMB No. 1615-0040, *Instructions for Application for Employment Authorization* (Dec. 2019), https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf...................14

U.S. Gov't Accountability Office, *U.S. Asylum System: Significant Variation Existed in Asylum Outcomes Across Immigration Courts and Judges* (Sept. 2008), https://www.gao.gov/new.items/d08940.pdf ............................................. 10-11

## INTRODUCTION AND INTEREST OF AMICI

New York State, the District of Columbia, the States of California, Colorado, Connecticut, Delaware, Hawaiʻi, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington; the cities of Albuquerque, Chicago, Los Angeles, Madison (WI), Minneapolis, New York City, Oakland (CA), and Seattle; and Cook County (IL) and Howard County (MD), file this amicus brief in support of plaintiffs' motion for a stay pursuant to 5 U.S.C. § 705 or a preliminary injunction (ECF No. 23).

Amici submit this brief to inform the Court of irreparable harms the two new rules at issue in this case will impose on States and localities, and the failure of the U.S. Department of Homeland Security ("DHS") to properly consider those harms in promulgating the rules. The broader of the two rules will limit access to employment authorization for asylum seekers in numerous ways. For instance, it will require asylum seekers to wait a year before applying for employment authorization, and bar many—including asylum seekers who entered the United States without inspection—from obtaining employment authorization at all.[1] The other new rule will eliminate the longstanding requirement that DHS process asylum seekers' employment authorization applications within thirty days, thus allowing such applications to sit indefinitely.[2]

By barring many asylum seekers from employment authorization at any time and indefinitely delaying employment authorization for others, the new rules will impose substantial burdens not only on asylum seekers themselves, but also on the States and localities that receive

---

[1] *See* Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38,532 (June 26, 2020).

[2] *See* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants, 85 Fed. Reg. 37,502 (June 22, 2020).

tax revenue from them and must provide for their health and welfare if they cannot provide for themselves. *First*, by making it impossible for many asylum seekers to legally work, the rules will likely cost States and localities millions, if not billions, of dollars in lost tax revenue and diminished economic growth. *Second*, the inability of asylum seekers to work legally will lead to increased healthcare and other costs shouldered by the States and localities. *Third*, because the rules will drive many asylum seekers into the underground economy, States and localities will face increased difficulty enforcing their own laws, including those designed to protect workers from unfair and abusive conditions of employment.

The new rules will be especially harmful to the States and localities signing this amicus brief. The signatory States are home to more than 26 million immigrants.[3] As of 2017, the most recent year for which data is available, the States signing this brief include five of the top ten—and all of the top three—States of residence for asylum seekers whose affirmative asylum applications were granted.[4] Combined, these five States alone are home to more than 65 percent of the individuals granted asylum in the United States.[5] The signatory cities, for their part, include three of the top four cities of residence for immigrants in the United States—including many

---

[3] Pew Research Ctr., *Nativity by State (2016)*, https://assets.pewresearch.org/wp-content/uploads/sites/7/2018/09/12103811/PH_2016-Foreign-Born-Statistical-Portraits_Current-Data_45_Nativity-by-state.png.

[4] Nadwa Mossad, Office of Immigration Statistics, Dep't of Homeland Sec., *Annual Flow Report: Refugees and Asylees: 2017*, tbl. 13 (Mar. 2019), https://tinyurl.com/y4kfuclj.

[5] *Id.*

asylum seekers.[6] Of the 15 million residents of amici New York City, Los Angeles, and Chicago, more than 5 million are immigrants.[7]

The new rules' detrimental effects on States and localities demonstrate that a stay or preliminary injunction of the new rules while this lawsuit is pending is in the public interest and supported by the balance of the equities. DHS failed to comply with its Administrative Procedure Act ("APA") obligations to consider these harms. This failure underscores that the rules were promulgated in violation of the APA, and that plaintiffs are therefore likely to succeed on the merits of their APA claim. Plaintiffs' likelihood of success on the merits further supports a stay or preliminary injunction.

---

[6] U.S. Census Bureau, *Nativity and Place of Birth of Resident Population for Cities of 100,000 or More (2009)*, https://www.census.gov/library/publications/2011/compendia/statab/131ed/population.html.

[7] U.S. Census Bureau, *QuickFacts*, https://www.census.gov/quickfacts/fact/table/chicagocityillinois,losangelescitycalifornia,newyorkcitynewyork/POP645218 (sum of the cities' 2019 population estimates multiplied by foreign born population percentages).

## ARGUMENT

I. **THE NEW RULES LIMITING EMPLOYMENT AUTHORIZATION FOR ASYLUM SEEKERS WILL IRREPARABLY HARM STATES AND LOCALITIES.**

### A. The New Rules Will Deprive States and Localities of Substantial Tax Revenue and Economic Growth.

States and localities benefit substantially from immigrants—including asylum seekers—being able to work within their borders. Asylum seekers contribute to States and local communities, among other ways, through increased tax revenue and increased purchasing power. In total, immigrant-led households paid $150 billion in state and local taxes and exercised $1.2 trillion in spending power nationwide in 2018.[8] In California, immigrant-led households paid $38.9 billion in state and local taxes and exercised $290.9 billion in spending power in 2018.[9] Refugees alone paid over $1.9 billion in state and local taxes in California and exercised $17.2 billion in spending power in 2015.[10] In New York, immigrant-led households paid $21.8 billion in state and local taxes and exercised $120.5 billion in spending power,[11] and refugees paid $625.4 million in state and local taxes and exercised $4 billion in spending power.[12] In Virginia, immigrants contributed $3.8 billion in state and local taxes and exercised $31.2 billion in spending

---

[8] New Am. Econ., *Immigrants and the Economy: Map the Impact*, https://www.newamericaneconomy.org/locations/national/.

[9] Am. Immigration Council, *Immigrants in California* 4-5 (June 4, 2020), https://tinyurl.com/ybe2bdpf.

[10] New Am. Econ., *From Struggle to Resilience: The Economic Impact of Refugees in America* 15-16 (June 2017), https://tinyurl.com/y8u5sflo.

[11] Am. Immigration Council, *Immigrants in New York* 4 (June 4, 2020), https://tinyurl.com/y4z7qg4e.

[12] New Am. Econ., *From Struggle to Resilience, supra*, at 15-16.

power,[13] and refugees paid $260 million in state and local taxes and exercised $2.6 billion in spending power.[14]

By prohibiting hundreds of thousands of asylum seekers from working for extended periods, or at all, *see* 85 Fed. Reg. at 38,538, the new rules will significantly lower the tax revenue that States and localities receive as a result of asylum seekers' economic activity. DHS itself estimates that the federal government could lose up to $682.5 million in employment tax revenue alone as a result of the broader of the two rules at issue in this case, *id.* at 38,541, and an additional $118.5 million as a result of the rule eliminating the 30-day processing requirement for asylum seekers' employment authorization applications, *id.* at 37,504. Although DHS has not attempted to calculate the tax losses to States or localities of these rules, it recognizes that the rules likely will result in such losses. *Id.* at 37,504, 38,542.

Particularly given the amici States and localities' high populations of asylum seekers affected by the new rules,[15] amici anticipate that the reduction in their tax revenue from the new rules will be substantial. Many asylum seekers who lack work authorization would not work, and thus would contribute no income or employment tax revenue. Other asylum seekers would be forced into the underground economy, where their "off the books" employment would likely result in diminished or nonexistent income and employment tax contributions. Unauthorized workers

---

[13] Am. Immigration Council, *Immigrants in Virginia* 4 (June 4, 2020), https://tinyurl.com/y3ntr5k5.

[14] New Am. Econ., *From Struggle to Resilience, supra*, at 15-16.

[15] *See supra* at 2-3.

also would be less likely to take jobs that match their skills, resulting in substantial productivity loss.[16]

The new rules also will significantly reduce the spending power of asylum seekers, to the detriment of the economies of the States and localities where they reside. DHS itself recognizes that asylum seekers might lose up to $5.3 billion in wages under the rules. *See* 85 Fed. Reg. at 37,504 (elimination of 30-day processing rule might result in $775 million in lost wages); *id.* at 38,624 (broader rule changes might result in $4.5 billion in lost wages). These wages would otherwise have flowed into the economy in the form of increased spending power, and contributed to economic growth.

Further, as DHS has acknowledged, "a portion of the effects" of the new rules will "be borne by companies that would have hired the asylum applicants" or "would have continued to employ asylum applicants had they been in the labor market longer." *Id.* at 38,539. DHS estimates that if those businesses cannot find appropriate labor substitutes, the costs for businesses could reach over $4.4 billion. *Id.* at 38,540. And DHS acknowledges that even if businesses did find replacement labor, "[c]ompanies may also incur opportunity costs by having to choose the next best alternative to the immediate labor the asylum applicant would have provided." *Id.* at 38,539. These costs to businesses will further decrease State and local tax revenue and hinder economic growth.

---

[16] Francesc Ortega & Amy Hsin, *Occupational Barriers and the Labor Market Penalty from Lack of Legal Status*, IZA Inst. of Labor Econ. (July 2018), http://ftp.iza.org/dp11680.pdf; *see also* Inst. on Taxation & Econ. Policy, *Undocumented Immigrants' State & Local Tax Contributions* 3 (Mar. 2017), https://itep.org/wp-content/uploads/immigration2017.pdf (estimating that undocumented immigrants would pay approximately $2.2 billion more in state and local taxes annually if they were given legal status and employment authorization).

While DHS did not inquire into the "wages, occupations, industries, or businesses" that might employ asylum seekers affected by the new rules, *id.* at 38,610, there is substantial evidence that several sectors of the amici States' economies disproportionately employ immigrants and are thus likely to face especially high costs while trying to find labor substitutes. In New York, those sectors include taxi drivers, household workers, chefs, and nursing, psychiatric, and home health aides.[17] In California, those sectors include agriculture, manufacturing, and construction.[18] In New Jersey, over half of home health aides are immigrants.[19] The ongoing COVID-19 pandemic only amplifies the harms of losing substantial numbers of "essential workers" in fields such as health care and food supply. *See New York v. DHS*, No. 19-cv-7777, 2020 WL 4347264, at *11 (S.D.N.Y. July 29, 2020) ("Immigrants make up a substantial portion of workers in essential industries who have continued to work throughout the national emergency.").

In addition, large numbers of asylees and refugees are self-employed, and, through their businesses, create jobs for other state residents. The United States was home to more than 180,000 refugee entrepreneurs in 2015, and 13 percent of refugees were entrepreneurs, compared to just 9 percent of the U.S.-born population.[20] In 2015, businesses owned and operated by refugees

---

[17] New Am. Econ., *The Contributions of New Americans in New York* (New York, NY) 9-10 (Aug. 2016), http://research.newamericaneconomy.org/wp-content/uploads/2017/02/nae-ny-report.pdf.

[18] Am. Immigration Council, *Immigrants in California*, *supra*, at 4; *see also* New Am. Econ., *From Struggle to Resilience, supra*, at 21 (refugees "frequently fill jobs that may hold less appeal to U.S.-born workers" and "can help an employer with hard-to-fill jobs remain viable").

[19] Rutgers University, Center for Women and Work, *Fact Sheet: Low Wage Women Workers in New Jersey: Home Health Aides* (Mar. 2020), https://tinyurl.com/y5zngy3e.

[20] New Am. Econ., *From Struggle to Resilience*, *supra*, at 2.

generated $4.6 billion in income, much of this in the amici States and localities.[21] A draft 2017 report by the U.S. Department of Health and Human Services found that over the past decade, asylees and refugees have contributed $63 billion more in tax revenue than they cost in public benefits.[22] By stifling the ability of entrepreneurial asylum seekers to work and therefore innovate and create jobs for others, the new rules will have a detrimental impact on tax revenue and economic growth in the amici States and localities.

### B.  The New Rules Will Increase Amici's Healthcare and Social-Service Costs.

The new rules' limitations on employment authorization for hundreds of thousands of asylum seekers will deny the asylum seekers access to employer-sponsored healthcare and other services—imposing substantial costs on the States and localities forced to fill the gap. Indeed, DHS admits that "[b]udgets and assistance networks that provide benefits to asylum seekers could be impacted negatively if asylum applicants request additional support" as a result of the rules. 85 Fed. Reg. at 38,542.

While employed asylum seekers and their families often rely on employer-sponsored health insurance, the unemployed—whose ranks will increase dramatically under the new rules—do not have this avenue available for health coverage. Asylum seekers are also ineligible for federally-funded Medicaid, *see* 8 U.S.C. § 1641(b), and often cannot qualify for state-funded health insurance plans. Thus, under the rules, many more asylum seekers will be without healthcare,

---

[21] *Id.*

[22] Julie Hirschfeld Davis & Somini Sengupta, *Trump Administration Rejects Study Showing Positive Impact of Refugees*, N.Y. Times (Sept. 18, 2017), https://www.nytimes.com/2017/09/18/us/politics/refugees-revenue-cost-report-trump.html.

which will harm States and localities in a variety of ways, particularly in the midst of the COVID-19 pandemic.

Without health insurance, individuals are far more likely to skip the preventative care that keeps them healthy.[23] These individuals are then more likely to develop expensive medical conditions that may need to be treated in emergency care settings. The costs of such treatment, in turn, are borne by States and localities, because public hospitals often bear the cost of care for uninsured patients.[24] Some of the amici States—such as New York, California, Massachusetts, Oregon, Washington, and the District of Columbia—also fund health benefits for immigrant children who do not have insurance through their parents' employment.[25]

Asylum seekers' lack of health insurance also will worsen overall public health. For example, the uninsured are less likely to receive treatment, such as vaccinations, that prevent the spread of infectious diseases throughout the community—an issue of particular importance in the context of COVID-19. According to one study, while 44 percent of insured adults received a flu vaccination, only 14 percent of uninsured adults did.[26] The U.S. District Court for the Southern

---

[23] Stacey McMorrow, et al., *Determinants of Receipt of Recommended Preventive Services: Implications for the Affordable Care Act*, 104 Am. J. Pub. Health 2392 (Dec. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232157/; Jennifer E. DeVoe, et al., *Receipt of Preventive Care Among Adults: Insurance Status and Usual Source of Care*, 93 Am. J. Pub. Health 786 (May 2003), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1447840/.

[24] Cal. Ass'n of Pub. Hosps. & Health Sys., *About California's Public Health Care Systems*, https://caph.org/memberdirectory/about-californias-public-health-care-systems/ (public hospitals in California account for 40 percent of hospital care to the uninsured in communities they serve).

[25] Nat'l Conference of State Legislatures, *Immigrant Eligibility for Health Care Programs in the United States* (Oct. 19, 2017), https://www.ncsl.org/research/immigration/immigrant-eligibility-for-health-care-programs-in-the-united-states.aspx.

[26] Peng-jun Lu et al., *Impact of Health Insurance Status on Vaccination Coverage Among Adult Populations*, 48 Am. J. Prev. Med. 647 (Apr. 15, 2015), https://tinyurl.com/y5es4yt4.

District of New York recently found that another DHS rule that would deter immigrants from pursuing COVID-19 testing and treatment impeded public efforts to stem the spread of the virus, thus demonstrating irreparable harm weighing in favor of a preliminary injunction. *See New York v. DHS*, 2020 WL 4347264, at \*10-11.

State and locally funded mental health services are likely to face increased demand under the new rules limiting employment authorization as well, because fewer asylum seekers will have health insurance to cover mental healthcare that may be crucial for traumatized asylees. Many States and localities fund mental health providers that assist asylum seekers who are not otherwise insured. For example, New York provides inpatient psychiatric services to youth and also offers undocumented state residents access to its Community or Crisis Residences regardless of their ability to pay.[27] As another example, a clinic operated by Alameda County, California conducts health assessments of asylum seekers, many of whom need mental health referrals due to abuse and trauma.[28] Increased demand for such services under the new rules will impose yet more costs on States and localities.

The new rules also will increase amici's costs for legal services for asylum seekers. Because legal counsel is often critical to successfully pursuing asylum claims, many States and localities fund nonprofits and other service providers to assist asylum seekers with their legal claims.[29] For example, the California Department of Social Services awarded nearly $43 million

---

[27] *See generally* Decl. of Donna M. Bradbury at 362-368 (Exhibit 60), *Washington v. United States*, No. 18-cv-00939 (W.D. Wash. July 17, 2018), ECF No. 31.

[28] *See Highland Hospital Human Rights Clinic*, https://tinyurl.com/y5bzdf7b.

[29] A U.S. Government Accountability Office study found that asylum claims are three times more likely to be successful if asylum seekers have lawyers. *See* GAO, *U.S. Asylum System:*

for legal-related immigration services in FY 2020.[30] In addition to funding other programs, New York allocated $10 million in its FY 2020 budget for the Liberty Defense Project, a State-led, public-private legal defense fund designed to ensure that immigrants have access to legal counsel.[31] New Jersey allocated $3.1 million in state funds in FY 2020 for legal assistance to individuals in removal proceedings.[32] The District of Columbia allocated $2.5 million in FY 2020 for programs that provide services and resources to its immigrant population, including asylum seekers.[33] But, even with this funding, immigration nonprofits providing legal assistance have limited resources. If many more asylum seekers cannot earn money to pay for private attorneys— the natural result of the new rules—the already scarce resources of legal service organizations will be stretched even thinner, and States and localities may need to contribute more funding.

Moreover, as DHS itself recognizes, some asylum seekers who are unable to make ends meet without working will likely become homeless under the new rules. In fact, DHS expressly instructs asylum seekers "who are concerned about homelessness during the pendency of their employment authorization waiting period" to "become familiar with the homelessness resources

---

*Significant Variation Existed in Asylum Outcomes Across Immigration Courts and Judges* 30 (Sept. 2008), https://www.gao.gov/new.items/d08940.pdf.

[30] Cal. Dep't of Soc. Serv., *Immigration Services Funding*, https://www.cdss.ca.gov/inforesources/immigration/immigration-services-funding.

[31] *See* Press Release, Governor Cuomo and Legislative Leaders Announces 2020 Enacted Budget Includes $10 Million to Support Expansion of the Liberty Defense Project (Apr. 5, 2019), https://www.governor.ny.gov/news/governor-cuomo-and-legislative-leaders-announces-2020-enacted-budget-includes-10-million.

[32] *See* N.J. Dep't of Treasury, Office of Mgmt. & Budget, *Appropriations Handbook FY2019-2020*, B-204, https://tinyurl.com/yxw256og.

[33] Office of the Mayor, Gov't of D.C., *Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program* (July 12, 2019), https://mayor.dc.gov/release/mayor-bowser-announces-25-million-available-fy-2020-immigrant-justice-legal-services-grant.

provided by the state where they intend to reside." 85 Fed. Reg. at 38,567. The costs of these services will fall on the affected States and localities.

### C. The New Rules Will Reduce States' and Localities' Ability to Enforce Their Own Laws.

The new rules also will interfere with States' and localities' ability to enforce their labor, civil rights, and other laws. The States have a fundamental interest in being able to enforce their own laws. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). When rulemaking impinges on that ability, the States suffer an irreparable injury. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). The new rules here will impose just such an irreparable injury on States. As a result of the rules, many asylum seekers who are not authorized to work likely will resort to the underground economy, and will be less willing to report labor and civil rights violations, making it harder for State and local agencies to enforce labor and civil rights laws.

Through labor and civil rights laws, States and localities protect their residents from wage theft, exploitation, hazardous conditions, and discrimination at work.[34] These laws are enforced

---

[34] *See, e.g.*, Cal. Gov't Code §§ 12900-12996 (Fair Employment and Housing Act); Cal. Lab. Code §§ 200-1200 (wage and hour standards); D.C. Code § 32-1301 et seq. (Wage Payment and Collection Law); D.C. Code § 32-1001 et seq. (Minimum Wage Revision Act); D.C. Code § 32-531.01 et seq. (Sick and Safe Leave Act); D.C. Code § 32-1331.01 et seq. (Workplace Fraud Act); D.C. Code § 2-220.01 et seq. (Living Wage Act); N.J. Stat. Ann. § 34:11-56a et seq. (Wage and Hour Law); *id.* § 10:5-1 et seq. (Law Against Discrimination); N.Y. Labor Law articles 5 (labor hours standards), 6 (wage standards), 19 (minimum wage standards), and 19-A (minimum wage standards for farm workers); N.Y. Workers' Comp. Law § 17; L.A. Mun. Code ch. XVIII (employee wages and benefit standards); L.A. Mun. Code § 51.03 (prohibiting employment discrimination based on immigration status); N.Y.C. Admin. Code § 8-101 et seq. (Human Rights Law); Oakland Mun. Code §§ 5.92.010-5.93.060 (minimum wage, sick leave, and working condition standards).

without respect to immigration status, but effective enforcement relies on employees' ability and willingness to report violations.

Despite the significant labor and civil rights abuses that befall unauthorized workers, fear of reprisal and deportation often inhibits unauthorized workers from reporting such abuses.[35] One study found that asylum seekers, in particular, tend not to report labor violations—including working weeks without pay and with physical abuse—because they fear immigration consequences.[36] If unauthorized workers do report violations or otherwise assert their rights, employers often falsely tell them that they do not have a right to labor law protection or threaten them with deportation. The New York State Department of Labor advised DHS of this issue in a comment opposing the new rules.[37] And a study of low-wage workers in Chicago likewise found that unauthorized workers are often threatened with deportation or fired when they report a workplace injury.[38] This retaliation extends to unauthorized workers who make claims in court. For example, in one case challenging labor law violations, an employer's attorney contacted Immigration and Customs Enforcement to take the complainant into custody at a scheduled

---

[35] *See, e.g.*, Human Rights Watch, *"At Least Let Them Work": The Denial of Work Authorization and Assistance for Asylum Seekers in the United States* (Nov. 12, 2013), https://www.refworld.org/docid/5285fc0c4.html; Daniel Costa, *California Leads the Way: A Look at California Laws that Help Protect Labor Standards for Unauthorized Immigrant Workers*, Econ. Policy Inst. (Mar. 22, 2018), https://www.epi.org/publication/california-immigrant-labor-laws/.

[36] Human Rights Watch, *supra*, at 33-35.

[37] Comment Letter of New York State Department of Labor on Asylum Application, Interview, and Employment Authorization for Applicants (Jan. 7, 2019), https://www.regulations.gov/document?D=USCIS-2019-0011-0613.

[38] Nik Theodore et al., *Unregulated Work in Chicago: The Breakdown of Workplace Protections in the Low-Wage Labor Market* 18, Ctr. for Urban Econ. Dev., Univ. of Ill. at Chicago (2010), https://www.raisethefloalliance.org/unregulated_work_in_chicago.

deposition. *See Arias v. Raimondo*, 860 F.3d 1185, 1187, 1192 (9th Cir. 2017). Indeed, DHS itself acknowledges that "[w]orking while not employment authorized increases the risk of labor trafficking and other coercive employment practices, abuse, and wage theft." 85 Fed. Reg. at 38,566.

Finally, by denying many asylum seekers access to employment authorization documents that might otherwise be their only form of government-issued identification, the new rules further impede States and localities' ability to enforce their own laws. An employment authorization document comes in the form of a card issued by U.S. Citizenship and Immigration Services, and includes the recipient's photograph.[39] States and localities therefore often rely on employment authorization documents as identification to support applications for drivers' licenses, enrollment in school, and other services. *See* 85 Fed. Reg. at 37,527. Ready access to such identification also aids law enforcement by permitting officers to verify a person's identity, making it possible, for example, to identify witnesses and victims, investigate potential suspects, and perform critical tasks like searching a criminal history, investigating outstanding warrants, and deciding whether someone poses a threat.[40] If officers stop individuals who do not have verifiable identification, the officers may have no other option than to arrest the individuals, bring them to the station, and obtain fingerprint information in order to identify them.[41] This can result in wasted hours that otherwise could be devoted to more pressing law enforcement concerns.[42]

---

[39] *See* U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., OMB No. 1615-0040, *Instructions for Application for Employment Authorization* (Dec. 2019), https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf.

[40] Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* 15-17 (2012), https://tinyurl.com/ybtqdv94.

[41] *See id.* at 15-16.

[42] *Id.* at 15.

\*      \*      \*

In light of all the harms the new rules will impose on States and localities—in addition to asylum seekers themselves—the public interest and the balance of equities tip heavily in favor of a stay or preliminary injunction of the rules while plaintiffs' challenge to the lawfulness of the rules is pending. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE, AMONG OTHER DEFECTS, THE DEPARTMENT OF HOMELAND SECURITY FAILED TO CONDUCT THE REQUIRED FEDERALISM ANALYSIS.

Amici States and localities agree with plaintiffs that the new rules at issue in this case were promulgated in a manner that violated federal law and the Administrative Procedure Act in several ways. Amici emphasize here one defect in particular: DHS failed to properly address state and local harms when promulgating the new rules. Federal agency rulemaking must comply with several requirements to ensure that any economic and fiscal harm resulting from new rules— particularly economic and fiscal harm to States and localities—is addressed. DHS did not comply with those requirements here.

For instance, under Executive Order 13,132, for policies that have substantial direct effects on the States, agencies must consult with State and local officials "early in the process of developing the proposed regulation" and complete a federalism summary impact statement before issuing a rule. Exec. Order No. 13,132, 64 Fed. Reg. 43,255, 43,257-58 (Aug. 10, 1999). DHS failed to consult with State and local officials or complete a federalism summary impact statement at any time in the rulemaking process.

Likewise, Executive Order 12,866 generally requires that federal agencies assess and "seek to minimize" significant regulatory burdens affecting State, local, or tribal governments. Exec. Order No. 12,866, § 1(b)(9), 58 Fed. Reg. 51,735, 51,736 (Oct. 4, 1993). The amici States informed

DHS in comments that the new rules likely will result in a substantial loss in state and local government revenue and additional costs to state programs.[43] DHS thereafter acknowledged that the new rules likely will result in "a reduction in State taxes" and "additional distributional impacts on states, such as for assistance from state-funded agencies and for healthcare from state-funded hospitals." 85 Fed. Reg. at 38,596; *see also id.* at 37,532. But DHS made no attempt to quantify the costs the new rule would impose on States, much less seek to minimize those costs, as required by Executive Order 12,866. *See id.* at 37,532, 38,622. DHS also failed altogether to assess the potential impacts of some of the rules' most sweeping changes affecting States and localities: for instance, foreclosing work authorization for asylum seekers who entered the country without inspection. While DHS admits that this change "would involve forgone earnings and potentially lost taxes," DHS made no effort to assess either. *Id.* at 38,601.

DHS's failure to conduct the federalism analysis required by law violates the APA, *see* 5 U.S.C. § 706(2)(A), (D), and underscores the likelihood that plaintiffs will succeed on the merits of their APA claims. Plaintiffs' likelihood of success on the merits further supports the issuance of a stay or preliminary injunction. *See Winter*, 555 U.S. at 20.

---

[43] Comment Letter of 21 State Attorneys General on Asylum Application, Interview, and Employment Authorization for Applicants, at 11-18 (Jan. 13, 2020), https://tinyurl.com/y5bfreau; Comment Letter of 19 State Attorneys General on Removal of 30-Day Processing Provision for Asylum Applicant Related Form I-765 Employment Authorization Applications, at 7-14 (Nov. 8, 2019), https://tinyurl.com/yxzfpon7.

## CONCLUSION

For the reasons set forth above and in plaintiffs' motion, this Court should grant the

requested stay pursuant to 5 U.S.C. § 705 or preliminary injunction.


Dated:      New York, New York
            August 3, 2020

                                        Respectfully submitted,


LETITIA JAMES                           KARL A. RACINE
 *Attorney General*                      *Attorney General*
 *State of New York*                     *District of Columbia*

  /s/ Philip J. Levitz*                    /s/ Jimmy R. Rock
Philip J. Levitz                        Jimmy R. Rock
Assistant Solicitor General             Assistant Deputy Attorney General

Barbara D. Underwood                    Office of the Attorney General
 *Solicitor General*                    441 4th Street, NW
Anisha S. Dasgupta                      Washington, DC 20001
 *Deputy Solicitor General*             (202) 741-0770
                                        jimmy.rock@dc.gov
Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6325
philip.levitz@ag.ny.gov


  *Admitted pro hac vice.              *(Counsel listing continues on following pages.)*


17

Xavier Becerra
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814

Philip J. Weiser
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203

William Tong
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

Kathleen Jennings
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

Clare E. Connors
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

Brian E. Frosh
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

Maura Healey
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

Dana Nessel
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

Keith Ellison
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

Aaron D. Ford
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

Gurbir S. Grewal
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor
Trenton, NJ 08625

Hector Balderas
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

Ellen F. Rosenblum
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

Josh Shapiro
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square, 16th Fl.
Harrisburg, PA 17120

Peter F. Neronha
 *Attorney General*
 *State of Rhode Island*
150 South Main Street
Providence, RI 02903

Thomas J. Donovan, Jr.
 *Attorney General*
 *State of Vermont*
109 State Street
Montpelier, VT 05609-1001

Mark R. Herring
 *Attorney General*
 *Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

Robert W. Ferguson
 *Attorney General*
 *State of Washington*
1125 Washington Street SE
P.O. Box 40100
Olympia, WA 98504-0100

Esteban A. Aguilar, Jr.
 *City Attorney*
 *City of Albuquerque*
One Civic Plaza NW
4th Floor, Room 4072
Albuquerque, NM 87102

Mark A. Flessner
 *Corporation Counsel*
 *City of Chicago*
121 North LaSalle Street, Room 600
Chicago, IL 60602

Michael N. Feuer
 *City Attorney*
 *City of Los Angeles*
200 N. Main Street, 800 CHE
Los Angeles, CA 90012

Michael Haas
 *City Attorney*
 *City of Madison*
210 Martin Luther King Jr. Blvd, Room 401
Madison, WI 53703

Erik Nilsson
 *Interim City Attorney*
 *City of Minneapolis*
350 South 5th St., Rm. 210
Minneapolis, MN 55415

James E. Johnson
 *Corporation Counsel*
 *City of New York*
100 Church Street
New York, NY 10007

Barbara J. Parker
 *City Attorney*
 *City of Oakland*
One Frank Ogawa Plaza, Sixth Floor
Oakland, CA 94612

Peter S. Holmes
 *City Attorney*
 *City of Seattle*
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097

Kimberly M. Foxx
 *State's Attorney*
 *Cook County, Illinois*
500 Richard J. Daley Center
Chicago, IL 60602

Gary W. Kuc
 *County Solicitor*
 *Howard County, Maryland*
3450 Court House Drive
Ellicott City, MD 21043

19