**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| CASA DE MARYLAND, INC., *et al.*, <br><br> Plaintiffs, <br><br> – *versus* – <br><br> CHAD F. WOLF, *et al.*, <br><br><br> Defendants. | **Case No. 8:20-cv-2118-PX** |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705 OR, IN THE
ALTERNATIVE, A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

ARGUMENT ............................................................................................................... 1

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.............................. 1

  A.   DHS Likely Violated the APA. ...................................................................... 1

    1.   DHS Impermissibly Restricted the Scope of Comments and Its Analysis. .............. 1

    2.   DHS Failed to Account for Harms to Bona Fide Asylum Seekers.......................... 3

    3.   DHS Failed to Justify Its Policy Choices.................................................... 5

  B.   Defendants Likely Violated the FVRA and the HSA. ....................................... 6

    1.   Defendant Wolf's Service Violates the FVRA's Time Limits. ............................... 6

    2.   Defendant Wolf's Service Violates the HSA and DHS Orders of Succession......... 9

II.   PLAINTIFFS ARE ENTITLED AT MINIMUM TO A POSTPONEMENT OF THE EFFECTIVE DATES OF THE RULES. ................................................................ 11

CONCLUSION........................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*CASA de Md. v. U.S. Dep't of Homeland Sec.*,
  924 F.3d 684 (4th Cir. 2019) ................................................................. 1

*CASA v. Trump*,
  No. 19-2222 (4th Cir. Aug. 5, 2020)................................................. 12, 15

*Clark v. Martinez*,
  543 U.S. 371 (2005)............................................................................... 9

*D.C. v. U.S. Dep't of Agric.*,
  —— F. Supp. 3d ——, No. 20-119 BAH, 2020 WL 1236657 (D.D.C. Mar. 13, 2020). .......... 15

*Defy Ventures, Inc. v. U.S. Small Bus. Admin.*,
  No. CV CCB-20-1736 & CCB-20-1838, 2020 WL 3546873 (D. Md. June 29, 2020)............ 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020)......................................................................... 11

*Equity In Athletics, Inc. v. Dep't of Educ.*,
  639 F.3d 91 (4th Cir. 2011)……………………………………………………………...13

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).............................................................................. 6

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).............................................................................. 7

*Grace v. Barr*,
  __ F.3d __, 2020 WL 4032652 (D.C. Cir. July 17, 2020) ........................ 4

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................ 13

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) .......................................................... 12, 13

*Morton v. Mancari*,
  417 U.S. 535 (1974)............................................................................. 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................. 1, 3, 4, 6

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*,
    918 F.3d 353 (4th Cir. 2019) ...................................................................... 14

*Mowbray v. Kozlowski*,
    914 F.2d 593 (4th Cir. 1990) ........................................................................ 8

*N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ........................................................................ 2

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................ 13

*Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*,
    407 F. Supp. 3d 524 (D. Md. 2019) ............................................................ 13

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................... 15

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) .................................................................................... 8

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ...................................................................... 15

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ...................................................................... 15

*United States v. Borden Co.*,
    308 U.S. 188 (1939) ...................................................................................... 9

*United States v. Smith*,
    962 F.3d 755 (4th Cir. 2020) ........................................................................ 9

*Ward v. Dixie Nat. Life Ins. Co.*,
    595 F.3d 164 (4th Cir. 2010) ........................................................................ 9

*West Virginia v. EPA*,
    136 S. Ct. 1000 (2016) ................................................................................ 15

**Statutes**

5 U.S.C. § 705.................................................................................................................. 15

5 U.S.C. § 706.................................................................................................................. 11

5 U.S.C. § 3345(a)...................................................................................................... 7, 8, 9

5 U.S.C. § 3347(a).......................................................................................................... 6, 7

5 U.S.C. § 3348(d)............................................................................................................. 12

6 U.S.C. § 113(a).................................................................................................................. 7

6 U.S.C. § 113(g)........................................................................................................ 7, 8, 9

Fed. R. Civ. P. 65........................................................................................................ 12, 15

**Other Authorities**

Stephen Migala, *The Vacancies Act and an Acting Attorney General*,
 36 Ga. St. U. L. Rev. 699 (2020)…………………………………………………..8

S. Rep. No. 105-250 (1998)………………………………………………………….9

**ARGUMENT**

Defendants' opposition ("Opp'n", ECF No. 41) does not engage meaningfully with the arguments, case law, or the record in Plaintiffs' motion to stay the Asylum EAD Rules or for a preliminary injunction ("Mot.", ECF No. 23-1). Plaintiffs have shown that they are entitled at minimum to a postponement of the effective dates of the Asylum EAD Rules before August 21, if not partial summary judgment. *See* Mot. at 9 n.7 (arguing that certain legal claims are ripe for summary judgment).

**I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.**

**A. DHS Likely Violated the APA.**

Plaintiffs have shown myriad ways that DHS's issuance of the Asylum EAD Rules violated the APA. Rather than responding substantively, Defendants appear to hope that deference by this Court will save the Asylum EAD Rules, *see* Opp'n at 11-12—but the APA "does not reduce judicial review to a rubber stamp of agency action." *CASA de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 703-05 (4th Cir. 2019) (holding that DHS's rescission of the DACA program was arbitrary and capricious). The APA commands a "strict and demanding" application of its rules so that agencies remain accountable to the public and make informed, rational decisions that are reasonably explained. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 48 (1983) (internal quotation marks omitted).

**1. DHS Impermissibly Restricted the Scope of Comments and Its Analysis.**

Defendants' response to Plaintiffs' first APA argument begins with a red herring: Plaintiffs do not contend that DHS was required to act through one rulemaking process. Rather, DHS was obligated to consider the interrelatedness of the two rules and their cumulative impact, including by soliciting comments on their interaction and addressing such comments. *See* Mot. at 11-17.

Defendants do not dispute these points, *see* Opp'n at 13-16, 20-21, but contend that they met their obligations. They did not.

First, Defendants assert that the agency "did not prohibit the public from providing comment on the impact one rule may have on another," Opp'n at 13, but ignore that DHS imposed de facto content restriction, *see* Mot. at 11-13 (the comment period for Timeline Repeal Rule closed before the Broader EAD Notice issued; the Broader EAD Notice stated that DHS did not consider the proposal to repeal the 30-day adjudication timeline to be within the rulemaking). To the extent Defendants suggest that this defect was cured because "[a]pproximately 10" comments discussing the upcoming Broader EAD Notice were submitted on the Timeline Repeal docket, *see* Opp'n at 13, Defendants ignore that commenters had not seen the actual text of the Broader EAD Notice at the time and that, in any event, the submission of some comments cannot cure an agency's impermissible content restriction, *see N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 769 (4th Cir. 2012) (rejecting argument that opportunity to comment was adequate because of volume of comments submitted).

Second, Defendants contend that DHS responded to significant comments regarding the rules' interactions, but this argument is belied by their concession that DHS dismissed comments to the Timeline Repeal Notice that anticipated the Broader EAD Notice as "out of scope." Opp'n at 13-14. Defendants also fail to respond to Plaintiffs' argument that in issuing the Timeline Repeal Rule, DHS deferred consideration of the rules' interaction to the Broader EAD Rule and then broke that promise when it issued the latter rule, including by ignoring comments that urged against repeal of the 30-day adjudication timeline in light of the broader rulemaking. *See* Mot. at 13-14.

Finally, Defendants argue that DHS considered the interaction between the Asylum EAD Rules, but they conflate acknowledging the fact that the two rules might interact with considering

the impact of that interaction as required by the APA. Defendants' citations show only DHS's passing acknowledgement that the Asylum EAD Rules interact. *See* Opp'n at 13-14, 20-21 (quoting statements from the Timeline Repeal Rule preamble that, in light of the Broader EAD Rule, the Timeline Repeal's identified impacts "could be overstated," that "adjudication may become more complex," and that "some applications could take longer to process"). None of the citations show that DHS analyzed this interaction rationally: for example, even as DHS speculated that EAD adjudication timelines might be affected by the complexity of the Broader EAD Rule, it did not incorporate that complexity into its estimate of adjudication times. *See, e.g.*, 85 Fed. Reg. at 37,525, 37,537-38, ECF No. 24-2 (basing analysis on historical adjudication data); 85 Fed. Reg. at 38,608, 38,612-13, ECF No. 24-3 (same). The APA requires agencies to do more than acknowledge the existence of relevant and important issues—they must take the additional step of considering how such issues bear on its policy. *See State Farm*, 463 U.S. at 43 (requiring "rational connection between the facts found and choices made").

## 2. DHS Failed to Account for Harms to Bona Fide Asylum Seekers.

Defendants' contentions that DHS adequately considered the welfare of bona fide asylum seekers ignore that DHS (1) failed to account for evidence that people fleeing persecution would be deterred from seeking protection; (2) failed to respond to significant comments raising this concern; and (3) irrationally and without support, asserted that bona fide asylum seekers (a term that Defendants use incorrectly to exclude people who have applied in good faith) would not be deterred. *See* Mot. at 17-20. Instead of engaging with these arguments, Defendants rest their case on preamble portions that merely acknowledge that Asylum EAD Rules may harm asylum seekers and assert, without any analysis or evidence, that the harm will not be "overly burdensome [or] cruel." *See* Opp'n at 16 (claiming that Defendants considered harm to asylum seekers by "acknowledg[ing] that the [Timeline Repeal] Rule may delay an applicant's entry into the

workforce" such that "the applicant's support network would be required to provide additional assistance"); *id.* at 21 (quoting passage that professes DHS's "commit[ment]" to "prioritiz[e] bona fide asylum seekers" without explaining who bona fide asylum seekers are or how the Broader EAD Rule will accomplish this); *id.* at 22 (quoting a passage that contends that the 365-day waiting period is not "overly burdensome [or] cruel" because asylum applicants already wait for EADs under existing regulations). Again, these bare acknowledgments do not satisfy the APA's requirement to draw a "rational connection between the facts found and choice made" and they only highlight that DHS has ignored "an important aspect of the problem," *State Farm*, 463 U.S. at 43: the impact that the rules will have on the statutory right of those fleeing danger to seek asylum. *See, e.g.*, *Grace v. Barr*, __ F.3d __, 2020 WL 4032652, at *13-14 (D.C. Cir. July 17, 2020) (holding a policy change to violate the APA where the agency considered the statutory goal of quickly deporting noncitizens without lawful status but failed to consider the statute's "second, equally important goal" of protecting asylum seekers).

In addition, Defendants' argument that the harm to asylum seekers is mitigated because they are eligible for an EAD once they have asylum, *see* Opp'n at 22, is beside the point: the inability to obtain work authorization *while* seeking asylum will impede asylum seekers from pursuing their statutory right to seek asylum. *See* Mot. at 17-20. Moreover, Defendants' citation to an average 166-day processing time for an asylum application to support this argument, Opp'n at 22, is disingenuous given that it is based on an unrepresentative subset of applications, contradicts DHS's own calculation of delays, and conflicts with DHS's argument that lengthy adjudication times justify the Asylum EAD Rules. *See* 85 Fed. Reg. at 38,613 (Table 13, showing that of the subset of affirmative applications (not including defensive applications), 20.5 percent

are adjudicated in under 365 days); Opp'n at 4 n.2 (asserting that the "[c]urrent adjudication time is often beyond two years").

### 3. DHS Failed to Justify Its Policy Choices.

Defendants' rejoinders to Plaintiffs' other APA arguments are no more responsive. Unable to rebut Plaintiffs' argument regarding the irrationality of the reasoning and explanation underpinning the Broader EAD Rule, *see* Mot. at 20-23, Defendants mischaracterize it as a "demand for more exacting proof," Opp'n at 23-25. But Plaintiffs pointed to many ways in which DHS failed to draw a rational connection between the evidence and its overhaul of the asylum EAD system—and the ways in which DHS failed to respond to comments raising these concerns. *See, e.g.*, Mot. at 20-23 (DHS relied on articles that endorse the existing system, cited statistics undermining its economic "analysis," and made conflicting assertions contradicting the rules' premises). Instead of addressing these points, Defendants interpose a non-responsive block quote from the Broader EAD Rule's preamble that does not explain why the supposed need for "strengthened laws" justifies the rule. Opp'n at 23-24. DHS fails to connect the "crisis" it describes with current EAD regulations, and its account is misleading: for example, DHS contends in the quoted portion that "only about twenty percent of . . . applicants are eligible for asylum" based on asylum grant rates, but many bona fide asylum applicants do not succeed in obtaining asylum because they lack the resources to put together their best application or because they are forced to give up—problems that the rules would exacerbate.[1]

---

[1] Defendants falsely assert that Plaintiffs "do not appear to dispute that the ability to obtain work authorization through the asylum system can be an incentive for some individuals to file non-meritorious applications," or "the historical accuracy of the problem that has sought to be mitigated." Opp'n at 24; *cf.* Mot. at 17-23 (disputing Defendants' allegations of problems).

Defendants are equally non-responsive to the argument that, in issuing the Timeline Repeal Rule, DHS failed to provide a reasoned explanation for choosing unfettered "flexibility" and for abandoning the considerations that informed the existing policy of prioritizing initial EAD applications submitted by asylum applicants. *See* Mot. at 24-25. Defendants' citations to the rule's preamble say nothing about the circumstances, including the waiting period that led to the current policy and merely confirm that the agency chose flexibility over countervailing concerns without providing a rational explanation for its choice. *See, e.g.*, Opp'n at 19-20 ("As DHS wrote in the proposed rule, maintaining any adjudication timeframe for this EAD would unnecessarily constrict adjudication workflows."). Defendants failed to meet their obligations under the APA. *See State Farm*, 463 U.S. at 43; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### B.    Defendants Likely Violated the FVRA and the HSA.

Defendants provide little substance in response to arguments that Defendant Wolf's service as putative Acting DHS Secretary violates the time limits set by the Federal Vacancies Reform Act ("FVRA") and the order of succession under the Homeland Security Act ("HSA"). *See* Mot. at 26-31. Defendants' likely violation of either warrants the relief that Plaintiffs seek.

#### 1.    Defendant Wolf's Service Violates the FVRA's Time Limits.

Defendants do not dispute that Defendant Wolf's tenure as putative Acting DHS Secretary began after the FVRA's 210-day limit on acting officials, but they argue that this time limit is inapplicable because the HSA displaces the FVRA in its entirety, allowing Wolf to serve as Acting Secretary "without time limitation," 85 Fed. Reg. at 38,557; Opp'n at 27-28. This is not so.

**First,** the plain text of the FVRA and the HSA make clear that anyone who serves as Acting DHS Secretary does so subject to time limitations. The FVRA states that it is "the exclusive means for temporarily authorizing an acting official" to perform the duties of Executive Offices that require Senate confirmation. 5 U.S.C. § 3347(a). The FVRA allows for a narrow exception to its

authority where an agency-specific statute "expressly" establishes a succession order to "temporarily" designate some other official to serve in an acting capacity. *Id.* § 3347(a)(1)(A)-(B). In enacting the HSA, Congress established the succession order for temporary designations as permitted by the FVRA but did not displace any other aspect of the FVRA, including its time limitations. To the contrary, it explicitly incorporated the time limitation, specifying that the Deputy Secretary is "the Secretary's first assistant for purposes of [the FVRA]." 6 U.S.C. § 113(a)(1)(A); *see* FVRA, 5 U.S.C. § 3345(a)(1) (mandating that "the first assistant . . . shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346 [i.e., 210 days]").

Defendants nevertheless argue that the HSA displaces the FVRA's time limits altogether, citing a provision that states that "[n]otwithstanding" the FVRA, the Secretary may designate a "further order of succession" for Acting Secretary, 6 U.S.C. § 113(g)(2). *See* Opp'n at 28. But Defendants' reading cannot be reconciled with the HSA's explicit incorporation of the FVRA, as described above. Defendants' reading would lead to the absurd result that the Deputy Secretary— the highest-ranking official who could become Acting Secretary—would be subject to time limitations as Acting Secretary, but any lower-ranked official would be free to serve as Acting Secretary indefinitely.[2] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ( "A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into [a] harmonious whole." (quotation and citations omitted)).

---

[2] Other absurdities follow from Defendant's interpretation. Section 113 also incorporates the FVRA by providing that the Under Secretary for Management "shall be first assistant to the Deputy Secretary . . . for purposes of [the FVRA]," 6 U.S.C. § 113(a)(1)(F), and that "[n]otwithstanding" the FVRA, they "shall serve as the Acting Secretary" if "neither the Secretary nor Deputy Secretary is available," 6 U.S.C. § 113(g)(1). When the Under Secretary serves as Acting *Deputy* Secretary, they thus do so subject to the FVRA's time limits, but in Defendants' view the Under Secretary may nevertheless serve as the Acting *Secretary* indefinitely.

Rather than Defendants' tortured reading, the natural reading of HSA's provision regarding the orders of succession is that, consistent with the provision on the Deputy Secretary, it addresses only who may be designated as Acting Secretary and displaces only the President's authority under the FVRA to "direct" who may serve in that role, 5 U.S.C. § 3345(a)(2)–(3), not the FVRA's time limitations. "[N]otwithstanding" clauses in statutes only "show[] which provision prevails in the event of a clash," *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (citation omitted); and here, because § 113(g) is silent on time limitations, it does not clash with the FVRA's time limitations. *See Mowbray v. Kozlowski*, 914 F.2d 593, 598 (4th Cir. 1990) ("when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974))).[3]

**Second,** Defendants' reading of the statute contradicts the purpose and legislative history of the FVRA, which Congress enacted to bar indefinite tenures for acting officials serving under agency statutes, as explained by Amicus Morten Rosenberg—a leading FVRA expert. *See* Br. of Amicus Curiae Morten Rosenberg at 9-12, ECF No. 40-1; *see also SW Gen.,* 137 S. Ct. at 935-37; Stephen Migala, *The Vacancies Act and an Acting Attorney General*, 36 Ga. St. U. L. Rev. 699, 708-10 (2020). Defendants are trying to resurrect the very abuses that the FVRA foreclosed—i.e., allowing the DHS Secretary to designate lower-ranked officers to serve for an "indefinite period . . . without submitting a nomination to the Senate to fill the position on a permanent basis." S. Rep.

---

[3] DHS's official documents reflect that the HSA does not displace the FVRA in its entirety: the form that DHS uses to designate the Acting Secretary in case of a vacancy and the accompanying letter from DHS counsel both recognize that the position is "covered by the [FVRA] of 1998" and that the submission is made "[u]nder the [FVRA]." *E.g.*, Decl. of Neal J. Swartz, Ex. 5 at 44-45, ECF No. 41-2. The form references the HSA only in the box titled "Authority for Acting *Designation* if Other Than Vacancies Act." *Id*. at 45 (emphasis added). This DHS document thus supports Plaintiffs' position that the FVRA covers the Acting Secretary vacancy generally, but that the limited order of designation for filling that position comes from the HSA.

No. 105-250, at 3 (1998). This interpretation would amount to an effective repeal of the FVRA and should be rejected. *See United States v. Borden Co.*, 308 U.S. 188, 198 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible . . . . The intention of the legislature to repeal must be clear and manifest." (quotation and citations omitted)).

**Finally,** Defendants' interpretation of the HSA to allow an Acting Secretary to serve without time limitation would raise serious constitutional concerns. As the Fourth Circuit recently observed in *United States v. Smith*, the use of acting officials is only constitutionally permissible because of the "temporary nature of the[ir] office." 962 F.3d 755, 765 (4th Cir. 2020).[4] The court cautioned, however, that a statute that authorizes a lengthy acting tenure will amount "to a circumvention of the Appointments Clause." *Id.* at 765 n.3. That is what Defendants argue for: that § 113(g)(2) authorizes the Executive to hand select an acting official to serve indefinitely without confirmation. The Court should reject this constitutionally deficient reading of the HSA. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (applying "the reasonable presumption that Congress did not intend the [reading of a statute] which raises serious constitutional doubts"); *accord Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 177 (4th Cir. 2010).

## 2. Defendant Wolf's Service Violates the HSA and DHS Orders of Succession.

Even if the Court found that the HSA effectively displaced the FVRA in its entirety, Wolf's service would still be unlawful under the HSA. Defendants do not dispute that the text of the Orders of Succession in place on April 10, 2019 ("Delegation 00106"), when McAleenan

---

[4] In a footnote, the court cited § 113(g) as an example where Congress intended to displace the FVRA, *see Smith*, 962 F.3d at 763 n.1, but it is clear in context that the court was only addressing the fact that the HSA displaces the President's designation authority under § 3345(a)(2)-(3), not the FVRA in its entirety. As explained above, *Smith* strongly supports Plaintiffs' interpretation that the HSA cannot replace the FVRA's time limits with indefinite acting service and that if a statute did so it would be unconstitutional.

purported to assume office, did not make him next in line as Acting Secretary. *See* Mot. at 28-30; Compl. at ¶¶ 157-210; *see also*, Br. of Constitutional Accountability Center as Amicus Curiae ("CAC Amicus") at 6-10, ECF No. 38-1. Rather, Defendants' only response is the submission of a litigation affidavit by agency counsel asserting—without explanation or support—the legal conclusion that a largely redacted April 9, 2019 Memorandum ("Memorandum") signed by Nielsen superseded the Orders of Succession. *See* Swartz Decl. ¶ 3.

But even by its own terms, the Memorandum does not make McAleenan Nielsen's valid successor. The Memorandum purports to amend Annex A of the Delegation 00106. *See* Swartz Decl. Ex. 1 at 5-6 ("Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended"). Annex A, in turn, only applies in the event the Secretary is unavailable "during a disaster or catastrophic emergency"; it does not apply when the Secretary resigns. *Id.* Ex. 2 at 7; *see also* CAC Amicus at 6-10.

Defendants attempt to avoid the unambiguous text of Delegation 00106 by deriding it as merely an "administrative document" that can be ignored. Opp'n at 26-27. But Delegation 00106 was originally enacted and signed by former-Secretary Jeh Johnson, citing in part the HSA for its authority. *See* Swartz Decl. Ex. 2 at 9. Moreover, when Nielsen and her purported successor, McAleenan, desired to change the order of succession for the Office of the Secretary, they did not issue new, freestanding orders. Instead, they both did so by amending Delegation 00106. *See* Decl. of Juliana Blackwell, Exs. 3 & 4, ECF No. 41-1. Because their succession orders are not freestanding and Defendants themselves rely on Delegation 00106, they cannot now claim that the underlying orders are without legal effect. And Defendants certainly have no support in law or fact for arguing that the text of Delegation 00106 should be written off as "ministerial error," Opp'n at 26 n.10, because Nielsen "explain[ed]" in the Memorandum that she intended to more broadly

revise the order of succession in a manner not reflected in the then-current iteration of Delegation 00106 (she did no such thing as described above), *id.* at 26.

Indeed, any ambiguity regarding the reach of the Memorandum is resolved by the later amendments to the Delegation that McAleenan purported to make on November 8, 2019. *See* Blackwell Decl. Ex. 4 at 71. McAleenan attempted to amend Delegation 00106 to remove the text,

> In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016. . .

*id.* Ex. 1 at 3, and substitute in its place,

> In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is governed by Annex A.

*id.* Ex. 4 at 71. Such an amendment would have been superfluous if Nielsen had already made Annex A the succession list in cases of a Secretary's resignation, as Defendants now claim.

Finally, the April 9 Memorandum and associated April 10 amendments to the Orders of Succession were *ultra vires* because Nielsen made them after her resignation, which was effective on April 7—the date of her resignation letter. Defendants do not dispute that Nielsen submitted her resignation on April 7 and have no response for how Nielsen continued to exercise any authority after she had formally resigned. *See* Opp'n at 25.

## II. PLAINTIFFS ARE ENTITLED AT MINIMUM TO A POSTPONEMENT OF THE EFFECTIVE DATES OF THE RULES.

As an initial matter, Defendants did not oppose Plaintiffs' view that the claims in Parts I.A.1 and B of Plaintiffs' motion require no further factual development, *see* Mot. at 9 n.7, thus opening the possibility for the Court to advance this case to partial summary judgment for Plaintiffs under Fed. R. Civ. P. 65(a)(2) and "set aside" the rules, 5 U.S.C. § 706; *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 n.7 (2020) (finding vacatur to be an appropriate remedy in an APA case); *see also* 5 U.S.C. § 3348(d)(1). Defendants also did not

dispute Plaintiffs' standing, and their notice of supplemental authority regarding *CASA v. Trump*, No. 19-2222 (4th Cir. Aug. 5, 2020), ECF No. 45, changes nothing as that case simply reiterates *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), and bears little resemblance to this case other than the overlap of one plaintiff. In *Lane*, as in *CASA*, the Fourth Circuit held that organizations cannot establish standing by merely demonstrating injury that "results not from any actions taken by the defendant, but rather from the organization's own budgetary choices," such as the decision to engage in general education, research, or public advocacy. *Lane*, 703 F.3d at 675 (quotation marks and alterations omitted); *CASA*, slip op. at 22-23 (applying *Lane* to reject standing based on plaintiff's allegations of injury from need to educate their members of the effects of the new rules). But Plaintiffs' injuries here are not the result of their budgetary choices. First, Defendants *expected* and *relied on* injury to Plaintiffs to mitigate the Asylum EAD Rules' impact on asylum applicants. *See* Mot. at 8 (citing rules' acknowledgment of harm to asylum applicants' support networks, including non-governmental organizations); 85 Fed. Reg. at 38566 (stating that harm to asylum applicants "can be mitigated by organizations that provide . . . services [including legal and health services] without charge"). Second, Plaintiffs cannot avoid these burdens because of the rules' direct impact on their clients and members: for example, Oasis detailed how its ability to stay open as an organization will be jeopardized because clients will no longer be able to pay for their services, Oasis Decl. ¶ 46, ECF No. 24-7; CASA explained how it will risk loss of funding for its workforce program because the rules will affect the ability of its asylum-seeking members to find employment positions, CASA Decl. ¶ 33, ECF No. 24-4; and others explained how the rules will severely impair their ability to provide legal assistance.[5] The rules thus harm Plaintiffs' ability to

---

[5] *See, e.g.*, Pangea Decl. ¶ 17, ECF No. 24-8 (stating clients will be unable to pay for expert testimony they need to support their cases, forcing Pangea to proceed in court without crucial evidence); Centro Decl. ¶¶ 15, 36, ECF No. 24-6 (same, and explaining that some clients will be

operate in the same way as was at issue in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), where the Supreme Court found injury to an organizational plaintiff because the defendant's practices "perceptibly impaired" the organization's ability to provide its services. *See also CASA*, slip op. at 24 (relying on *Havens* for the proposition that "[o]rganizational injury, properly understood, is measured against a group's ability to *operate* as an organization"); *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, 407 F. Supp. 3d 524, 533 (D. Md. 2019) (distinguishing *Lane* because the plaintiffs alleged a need to "expend more resources than usual . . . in a specific fashion that is core to their mission . . . and have asserted that it will be more burdensome to do so"); *Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, No. CV CCB-20-1736 & CCB-20-1838, 2020 WL 3546873, at *5 (D. Md. June 29, 2020) (finding standing where organization has had to expend more resources to provide core services). Plaintiffs also have standing here based on procedural injury and membership standing, neither of which were at issue in *CASA. See Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) (recognizing membership standing); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (recognizing procedural harms as irreparable).

Given what Plaintiffs have established, Plaintiffs are at minimum entitled to an order postponing the effective dates of the Asylum EAD Rules while the case is litigated.[6] In arguing that Plaintiffs have not shown irreparable harm, Defendants ignore Plaintiffs' declarations and

---

forced to abandon their asylum claims); ASAP Decl. ¶¶ 39-41, ECF No. 24-5 (describing how the rules will require ASAP to expend more resources on each EAD application, forcing them to serve fewer clients, which frustrates their mission).

[6] Should the case proceed without summary judgment for Plaintiffs, Plaintiffs will seek the production of the administrative record and discovery relating to Defendants' defenses regarding Defendant Wolf's authority, including the production of the Memorandum without redactions.

cases finding irreparable harm for organizational plaintiffs. *See* Mot. at 31-34.[7] Defendants also

fail to grasp that CASA and ASAP are suing on behalf of their members, who have explained how

they will be immediately harmed by the rules taking effect. *See* CASA Decl. ¶¶ 7-11, 25-27; ASAP

Decl. ¶¶ 6-13, 21-31. In support of their callous disregard for the hardship that asylum applicants

will suffer, Defendants rely only on misleading data regarding the speed of asylum adjudication

that DHS elsewhere disavows and on DHS's projected speed of EAD adjudication that fails to

account for the cumulative impact of all the rule changes, *see* Opp'n at 31; *supra* at 3-4. This is at

bottom not, as Defendants claim, *see* Opp'n at 30, a case where compensatory or other relief could

suffice at a later date—not only are money damages unavailable, enforced poverty for asylum

applicants that jeopardizes the success of their asylum claims is irreparable. *See* Mot. at 34; *see

also Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th

Cir. 2019) (finding economic losses irreparable where loss is not recoverable at end of litigation).

Given this showing of irreparable harm, and the defectiveness of purported justifications for the

Asylum EAD Rules, *compare* Opp'n at 32-34 *with* Mot. at 20-23, 24-25; *supra* at 5-6, public

interest weighs squarely in favor of relief. *See* Mot. at 35.[8]

      Finally, Defendants fail to justify a remedy short of staying the effective dates of the

Asylum EAD Rules. There is no way to sever the illegality identified by Plaintiffs notwithstanding

the agency's insertion of a severability clause, *see* Opp'n at 35; neither is there a way to address

the irreparable harm to Plaintiffs' ability to function—such as the burden of serving more clients,

---

[7] The holding in *CASA* that plaintiff did not establish irreparable harm is inapposite for the same reasons that the decision is inapposite to the standing inquiry in this case.

[8] Defendants include an unexplained reference to potential USCIS furloughs, *see* Opp'n at 34, but if anything it favors a stay: any attempt by DHS to overhaul the regulatory system with reduced staff, particularly in a way that adds complexity, will only add to the burdens on the agency, Plaintiffs, and asylum seekers including Plaintiffs' members and clients.

in a more complex environment, with fewer resources—without a full stay. Moreover, although Defendants oppose the requested remedy under principles of equity, *see* Opp'n at 34-35, they ignore that Plaintiffs' primary request is for a statutory remedy under 5 U.S.C. § 705, in which Congress expressly authorized this Court to take the very action Plaintiffs request. *See D.C. v. U.S. Dep't of Agric.*, —— F. Supp. 3d ——, No. 20-119 BAH, 2020 WL 1236657, at *34 (D.D.C. Mar. 13, 2020) (explaining that § 705 authorizes "relief from agency action for any person otherwise subject to the action, not just as to plaintiffs"); *see also Nken v. Holder*, 556 U.S. 418, 428 (2009) (explaining the difference between a stay that "operates upon the judicial proceeding itself" and a preliminary injunction). Courts have exercised § 705 authority to stay rules, especially where agencies do not articulate a narrower remedy, and this Court should do the same here. *See, e.g.*, *West Virginia v. EPA*, 136 S. Ct. 1000 (2016); *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting § 705 stay because agency did not propose how the court could "craft a limited stay").[9]

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court issue an order postponing the effective dates of the Asylum EAD Rules under 5 U.S.C. § 705, or in the alternative, a preliminary injunction. In the alternative, Plaintiffs request that the Court grant partial summary judgment for Plaintiffs on arguments in Part IA.1 and B of Plaintiffs' Motion and vacate the Asylum EAD Rules before August 21.

---

[9] A preliminary injunction is also appropriate here. *See Roe v. Dep't of Def.*, 947 F.3d 207, 234 (4th Cir. 2020). *But see CASA*, slip op. at 36-40 (in dicta, criticizing the district court's exercise of equitable authority to issue a broad injunction in that case).

Dated:  August 7, 2020

Respectfully submitted,

<table>
<tr><td>

/s/ _____
Mariko Hirose (*pro hac vice*)
Kathryn Austin (*pro hac vice*)
Geroline A. Castillo (*pro hac vice*)
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
One Battery Park Plaza, 4th Floor
New York, New York 10004
Tel: (516) 701-4620
Fax: (929) 999-8115
mhirose@refugeerights.org
kaustin@refugeerights.org
gcastillo@refugeerights.org

Justin B. Cox (Bar No. 17550)
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
PO Box 170208
Atlanta, GA 30317
Tel: (516) 701-4233
Fax: (929) 999-8115
jcox@refugeerights.org

</td><td>

/s/ _____
Dennise Moreno (Bar No. 21358)
(signed by Mariko Hirose
with permission of Dennise Moreno)
Conchita Cruz (*pro hac vice*)
Zachary Manfredi (*pro hac vice*)
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Avenue S. #84810
New York, NY 10003-1502
Tel: (305) 484-9260
Fax: (646) 968-0279
conchita.cruz@asylumadvocacy.org
zachary.manfredi@asylumadvocacy.org
dennise.moreno@asylumadvocacy.org

Richard W. Mark (*pro hac vice*)
Joseph Evall (*pro hac vice*)
Katherine Marquart (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Tel: (212) 351-4000
Fax: (212) 351-4035
RMark@gibsondunn.com
JEvall@gibsondunn.com
KMarquart@gibsondunn.com

</td></tr>
</table>

*Attorneys for Plaintiffs*