

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

*Jane E. Andersen*  *Mailing Address:*  *Office Location:*  DIRECT: 301-344-4516
*Assistant United States Attorney*  *6500 Cherrywood Lane, Suite 200*  *6406 Ivy Lane, 8th Floor*  MAIN: 301-344-4433
*Jane.Andersen@usdoj.gov*  *Greenbelt, MD 20770-1249*  *Greenbelt, MD 20770-1249*  FAX: 301-344-4516

August 21, 2020

Honorable Paula Xinis
United States District Judge
United States District Court, District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Xinis:

Defendants submit this letter in response to the Court's August 14, 2020 Order (ECF No. 53). First, Defendants address standing. Second, Defendants request that the Court not convert Plaintiffs' pending Motion for a Preliminarily Injunction into a Partial Motion for Summary Judgment. Finally, Defendants ask the Court to deny the preliminary injunction motion for the additional reasons addressed below.

### I. The Plaintiff Organizations Lack Article III Standing

For an organization to have Article III standing on its own behalf (rather than on behalf of its members), the organization must satisfy the same Article III standing requirements that apply to individuals. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Standing "requires an injury in fact that is caused by the challenged conduct and is likely to be redressed by a favorable decision." *6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 405 (4th Cir. 2019). Plaintiffs must also show that their purported injury is "fairly traceable to the challenged action of the defendant[s], and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wilflife*, 504 U.S. 555, 560 (alterations and citations omitted). Standing may not be had when the harm alleged is based upon voluntarily decisions made by an organization as to how to allocate their own resources. *CASA de Maryland, Inc. v. Trump*, __F.3d__, 2020 WL 4664820 (4th Cir. Aug. 5, 2020); *see also Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012).

The majority of Plaintiffs' purported harms are nothing more than voluntarily decisions made by the organizations on how to allocate their resources. *See* Ex. 4 at ¶¶ 29-40; Ex. 5 at ¶¶ 36-42; Ex. 6 at ¶¶ 23-37; Ex. 7 at ¶¶ 36-53; Ex. 8 at ¶¶ 12-16.[1] The remaining allegations do not provide an

---

[1] Specifically, Casa de Maryland ("CASA") alleges that it has decided to divert its resources to provide pro se assistance to members completing their asylum applications "due to the complexity of the law around asylum claims." Ex. 4 at ¶ 30. Asylum Seeker Advocacy Program (ASAP), alleges that it has expended, and will continue to expend, significant resources to train staff, outside attorneys, and asylum seekers on the new EAD Rules. Ex. 5 at 36. Centro Legal de la Raza ("Centro Legal"), alleges that they have been required to shift limited resources due to the rules, and will experience a drain on resources in the future. Ex. 6 at 23-37. Oasis Legal Services ("Oasis"), alleges that it will be required to retrain staff on how to determine whether someone is eligible for employment authorization. Ex. 7 at ¶ 39. Pangea Legal Services ("Pangea"), alleges that its attorneys and staff "will have to spend more time collecting evidence and completing EAD applications." Ex. 8 at ¶ 15. These alleged harms are the product of voluntary choices

alternative basis for organizational standing. For example, CASA alleges that it may be harmed from the rules from a loss of grant money. Ex. 4 at ¶ 33 ("If a significant number of CASA members are…unable to obtain an EAD at all, CASA will be less able to place members in long-term employment positions and therefore meet its contract deliverables."). This is the kind of alleged harm that is not the direct result of the challenged rules, but instead a mere possibility from "the independent action of some third part[ies] not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Centro Legal alleges the challenged rules will make their EAD clinics infeasible. Ex. 6 at ¶ ¶ 17-22. Centro Legal bases this assertion on its purported need to invest additional time to ensure that their clients meet the new rules eligibility requirements, such as through FOIA requests to determine where their client entered the U.S.. Ex. 6 at 21. This too is nothing more than a voluntary choice as to how it chooses to allocate its resources. The rules do not prohibit an asylum seeker from submitting an application based upon the applicant's knowledge of when and where they entered the U.S. OASIS alleges that a third of its total budget comes from client revenue, and that if a large percentage of their clients are unable to work, this will affect the fees they can collect. Ex. 7 at ¶ 44-46. This allegation is speculative. First, the declaration fails to provide any specifics about which clients currently pay a fee and which ones do not. Moreover, OASIS asserts that it has made the strategic decision to stop accepting and filing new citizenship and family petition cases and to reduce the number of lawful permanent residency cases. Ex. 7 at ¶ 41. As such, any reduction in fees collected in the future may be the result of OASIS's decision to shift its focus as to the types of cases it chooses to accept, and not as the result of asylum applicant's inability to work. Moreover, OASIS states that it does not require its clients to pay a fee "until they tell us they are able to." Ex. 7 at 44. There is no information in the declaration that permits this Court to assess this claim as it relates to EAD authorizations. For example, it is unknown how often is it that an asylum applicant client begins to pay a fee only once an EAD authorization is granted?

Similarly, Pangea alleges that the EAD eligibility will "frustrate [its] mission of providing high-qualified legal service to asylum seekers with pending charges or convictions." Ex. 8 at 17. Pangea speculates that if its clients are denied work authority, they may not be able to cover costs to hire an expert that may be needed to testify at his or her asylum hearing. Ex. 8 at ¶ 17. This allegation is speculative and too attenuated of a harm to support a finding of Article III standing. *Beck v. McDonald*, 848 F.3d 262, 275-76 (4th Cir. 2017).

## II.   Any Membership Standing Does Not Support a Preliminary Injunction

For an organization to have standing on behalf of its members, the organization must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). The organization must identify a particular affected member, not merely a "statistical probability that some of [its] members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *see also S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (upholding dismissal for

---

made by the organizations and not directed by the new rules. *CASA de Maryland, Inc*, 2020 WL 4664820, at *9 ("[N]othing in the rule directly impairs CASA's ability to provide counseling, referral, or other services to immigrants.").

lack of standing at the pleading stage because the Plaintiff "failed to identify a single *specific member* injured by the [conduct at issue]").

Here, Centro Legal, Oasis, and Pangea are not membership-based organizations, nor do they purport to assert standing based upon any specific client. Exs. 6, 7, 8. Instead, only CASA and ASAP have identified particular members with purported harms. Exs. 4 and 5. As addressed below, however, the harms asserted do not support the issuance of a preliminary injunction.

CASA states that H.V. and MC. entered the U.S. in May 2019 and December 2017 respectively, and that neither have yet to file an asylum application. Ex. 4 at ¶ ¶ 23, 25. First, there is nothing in the rules to prevent H.V or M.C. from filing their asylum applications *prior to* August 25, 2020. Assuming that H.V. or M.C. choose to file an asylum application on or after August 25, 2020, they will be subject to the TimeFrame Rule, the 365-day waiting period, and the one-year filing ban, if applicable. By statute, however, no asylum seeker is eligible for work authorization until 180-days after they submit an asylum application. Thus, even if H.V. or M.C. have sufficient injury for Article III purposes, any harm will not occur, at the earliest, until 180-day from the date they actually file an asylum application. As such, these allegations do not support a preliminary injunction. *Earth Island Inst.,* 555 U.S. 493 ("To seek injunctive relief…the threat must be actual and imminent…."); *see also Winter*, 129 S. Ct. at 375 (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995)("the plaintiff must show that it would likely suffer irreparable harm before a decision on the merits can be rendered."). Should the Court disagree, these facts only support an injunction with respect to the TimeFrame Rule, the 365-day waiting period, and the one-year filing ban and to these members.

ASAP states that W.L. entered the U.S. in April 2019 and filed an asylum application on April 3, 2020; and that N.G. entered the U.S. in May 2019 and filed an asylum application in April 2020. Ex. 5 at ¶ 22, 25. It is alleged that under the old rule, W.L. and N.G. would have been eligible to file an EAD application on August 31, 2020, and in September 2020 respectively. There are no factual allegations, however, to know whether or not W.L. or N.G. have any applicant-caused delays such that the 180-day clock would actually accrue on the date alleged. Assuming it would, it is accurate to state that W.L. and N.G. would have to wait, at a minimum, 7-additional months to obtain work authorization. Of course, whether W.L. or N.G. are actually eligible is unknown. Nevertheless, even assuming that W.L. or N.G. would be granted work authorization, this does not, on its own, constitute an irreparable harm as a matter of law. This is especially true when considering all the facts as alleged. For example, both W.L and N.G. were living in the U.S. for almost a year, presumably without work authorization, prior to filing an asylum application. As such, by statute, neither W.L. nor N.G. could have obtained work authorization (via an asylum application) for approximate 18 months from their entering the U.S. at the earliest. And this 18-months does not include any applicant-caused delays that may have occurred. As such, the new rule, which could add an additional 7-months to an already 18-month period of ineligibility does not constitute irreparable harm as a matter of law. Should the Court disagree, any injunction should be limited to those applicants who submitted asylum applications prior to August 25, 2020, and be limited to the TimeFrame Rule and the 365-day waiting period.

### III. Plaintiffs' Preliminary Injunction Motion Should Not be Converted to a Partial Summary Judgment Motion on the Lawfulness of Acting Secretary Wolf's Service

The Court should not convert Plaintiffs' motion because summary judgment is premature.

3

Plaintiffs filed this case only one month ago. *See* Compl., ECF No. 1 (filed July 21, 2020). Under the Federal Rules, Defendants would have 60 days to respond to the complaint, *see* Fed. R. Civ. P. 12(a)(2), and two weeks to oppose any motion for summary judgment, *see* L.R. 105(2)(a). Here, however, because Plaintiffs moved for a preliminary injunction, Defendants have operated under a truncated briefing schedule that does not allow the parties the typical time to fully develop the legal issues. *See, e.g., Arce v. Douglas*, 793 F.3d 968, 976 (9th Cir. 2015) ("[D]espite the court's power to grant summary judgment *sua sponte*, it is generally inappropriate for a court to issue such a final judgment on the merits of a claim at the preliminary injunction stage, because it is unlikely that the merits of a claim will be fully ventilated at the early stage of a litigation at which a preliminary injunction is normally addressed." (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))). While Defendants appreciate the chance to submit this letter, concurrent letters should not be substituted for a traditional, sequential summary judgment briefing schedule, given the complexity of the issues that arose late in the briefing process.

Plaintiffs challenge Mr. Wolf's service as Acting Secretary based on two grounds: (i) that Secretary Nielsen's April 9, 2019 order did not actually designate an order of succession for the position of Acting Secretary and instead set only an order for delegating the Secretary's authority under limited circumstances; and (ii) that the 210-day time limit for acting service under the Federal Vacancies Reform Act ("FVRA") should apply to service under the Homeland Security Act ("HSA"), despite the absence of any time limit in the HAS itself. Both theories fail.

### A.   Nielsen's April 2019 Order Designated an Order of Succession Under 6 U.S.C. § 113(g)(2) That Applied in the Event of a Vacancy

On April 9, 2019, then-Secretary Nielsen exercised her authority under the HSA, 6 U.S.C. § 113(g)(2), and designated a new order of succession for the office of Secretary of Homeland Security. This order applied to all vacancies in the office, regardless of the reason. Secretary Nielsen's resignation triggered her succession order, and Mr. McAleenan began serving as Acting Secretary. Acting Secretary McAleenan later relied on § 113(g)(2) to amend the succession order. When he resigned, Mr. Wolf began serving as Acting Secretary under the amended succession order.

**i.** Then-Secretary Nielsen's April 2019 order expressly stated *five* times that she was designating a new "order of succession." *See* Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction("Defs.' Opp'n") at 26 & n.9. The order used unqualified language. *Id.* at 25–26. As the Secretary, Ms. Nielsen was the only person within the Department of Homeland Security ("DHS") with the authority to designate an order of succession. *See* 6 U.S.C. § 113(g)(2). Thus, her signed order controlled the order of succession when she resigned. *See* Defs.' Opp'n at 26-27. Although Plaintiffs attempt to manufacture a conflict between Ms. Nielsen's signed order and Revision 8.5 to DHS Delegation 00106, an administrative document that Ms. Nielsen did not sign, that attempt falls short. An administrative document that collects orders from the Secretary cannot override the Secretary's signed order. *See id.* at 26–27. So even if there were a conflict, or even if the administrative document did not accurately implement the Secretary's change, by function of § 113(g)(2), that conflict should be resolved in favor of the Secretary's signed order. *See id.* at 26-27.

Beyond Ms. Nielsen's unqualified language, the statutory authority she relied on—§ 113(g)(2)—shows that she changed more than just the delegation of authority that applied "during a disaster or catastrophic emergency." *See* Plaintiff's Motion for a Preliminary Injunction ("Pls.' Mot.") at 10. Section 113(g)(2) empowers the Secretary to designate an "order of succession" for officers to serve

4

as Acting Secretary in the event of a vacancy. Ms. Nielsen's order expressly cites this statutory authority three times. Crucially, an *order of succession* is different from a *delegation of authority*. The HSA reflects this, and a different provision, 6 U.S.C. § 112(b)(1), empowers the Secretary to delegate her authority to other officials in the agency, even when the Secretary continues to occupy her office. Plaintiffs cannot explain why Ms. Nielsen would have invoked her § 113(g)(2) authority to designate the order of succession and repeatedly stated that she was designating an order of succession if she was actually doing nothing but amending the order for delegated authority during an emergency.

The flaw in Plaintiffs' argument is even clearer when the April 2019 order is read in the context of the earlier revisions to DHS Delegation No. 00106. On December 16, 2016, then-Secretary Jeh Johnson signed Revision 8 to DHS Delegation No. 00106. *See generally DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08 (Dec. 15, 2016) (signed at page 3). This signed revision addressed two different kinds of orders: (1) an order of succession, meaning a list of officials who could become Acting Secretary in the event of a vacancy, and (2) an order for delegation of authority.

*First*, Section II.A of Revision 8 to DHS Delegation No. 0106 explained that, "In case of the Secretary's death, resignation, or inability to perform the functions of the Office," the order of succession would be governed by Executive Order 13753. This was not an order of the Secretary, and did not invoke any authority vested in the Secretary, because under the existing version of the HSA, the Secretary had no authority to designate an order of succession. At that time, only the President had the authority (under the FVRA) to designate an order of succession. *See* 5 U.S.C. § 3345(a)(2)-(3) (allowing the President to designate an acting official). Section II.A thus expressly tracked the FRVA: it noted that the President's order of succession would apply to a vacancy covered by the FVRA. Section II.A even listed the same triggering evets as the FVRA. *Compare* 5 U.S.C. § 3345(a). It was only after Mr. Johnson had signed Revision 8 that Congress gave the Secretary the power to designate an order of succession that would apply "[n]otwithstanding" the FVRA. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016)).

*Second*, in Section II.B, Mr. Johnson separately exercised his own authority under 6 U.S.C. § 112(b)(1)—authority that the Secretary had long possessed—and delegated the authorities of his office to a list of officials in the event that he was temporarily "unavailable to act during a disaster or catastrophic emergency." This was not an order of succession—the circumstances addressed by Section II.B are not the kind of vacancy that would trigger the FVRA, and the Section II.B delegation would not make someone exercising that authority an Acting Secretary.[2] *Cf. English v. Trump*, 279 F. Supp. 3d 307, 322 (D.D.C. 2018) ("Defendants argue, with some force, that [unavailability to act is] commonly understood to reflect a temporary condition, such as not being reachable due to illness or travel," rather than a permanent condition such as a vacancy.). And, as explained, the Secretary had no statutory authority to designate an order of succession at this time.

This context, along with the text of Ms. Nielsen's April 2019 order, shows that, when then-Secretary Nielsen changed Annex A's list of officers, she also provided that Annex A would now

---

[2] The FVRA is generally the "exclusive means for temporarily authorizing an acting official," unless another statute provides otherwise. 5 U.S.C. § 3347(a). Until § 113(g)(2), there was no other statute providing for the designation of an Acting Secretary of Homeland Security.

5

perform two separate roles. It would both (1) designate the agency's first order of succession under § 113(g)(2) and (2) amend the list of officials in the order for delegation of authority.

*First*, Ms. Nielsen established the first order of succession under § 113(g)(2); it would apply in the case of a vacancy that would otherwise have been covered by the FVRA. Before Ms. Nielsen's order, there was no order of succession under § 113(g)(2). Rather, as acknowledged by Section II.A, the President's order of succession under Executive Order 13753 governed when the Secretary's office was vacant, because then-Secretary Johnson lacked the authority to create an order of succession. Thus, when Ms. Nielsen invoked § 113(g)(2)—which she expressly did three times—she exercised the Secretary's authority under that statute and designated an order of succession that applied "[n]otwithstanding chapter 33 of title 5," 6 U.S.C. § 113(g)(2). As a matter of law, that order of succession would supersede the order of succession under Executive Order 13753 when an official on the Secretary's list was able to serve as Acting Secretary.

The text of Ms. Nielsen's order cited § 113(g)(2) and used that authority to "designate the order of succession for the Secretary of Homeland Security as follows." The order that "follows" was the amended list of officials in Annex A. Annex A was also introduced with another clause and title showing that it would simultaneously continue to serve its original function as an order for delegation of authority. But the Annex A's amended list was followed by a new provision that had not appeared in the delegation-only version of Annex A. The new provision noted that "[n]o individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation." That reference to a "*designation*"—rather than a "delegation"—is yet another textual and structural acknowledgment that Annex A had executed the Secretary's new authority under § 113(g)(2). *See* 6 U.S.C. § 113(g)(2) (authorizing the Secretary to "designate such other officers . . . in further order of succession to serve as Acting Secretary").[3] Accepting Plaintiffs' proposed reading would thus require the Court to read *out* of Ms. Nielsen's order all three references to § 113(g)(2), to disregard its structure (what introduces and concludes its list of officials), and to read Mr. Johnson's document as creating an order of succession that he lacked the power to designate.

*Second*, Ms. Nielsen's order changed the order for delegation of authority in the case of a disaster or catastrophic emergency by issuing a new version of Annex A. To do so, Ms. Nielsen did not need to expressly invoke § 112(b)(1), any more than Mr. Johnson had, because Annex A (through Section II.B) already was, by its terms, a delegation of authority. Thus, by changing the officials listed in Annex A, she changed the delegation order. But, given that she expressly invoked § 113(g)(2), Annex A's list was about to serve two different function when Ms. Nielsen resigned: it was both the order of succession and the order for delegation of authority.

The official actions Ms. Nielsen took after signing her order confirm that she did not merely alter Mr. Johnson's delegation order in Section II.B but also designated a new order of succession for vacancies under § 113(g)(2). For example, on her last day as Secretary, Ms. Nielsen sent a farewell email to the agency and issued a press release announcing that Mr. McAleenan "will now lead DHS

---

[3] That additional sentence at the conclusion of Annex A is a mainstay in true orders of succession: "[W]hen Presidents issue orders of succession as an advance exercise of their authority to name acting officials under the [FVRA], they often specify that '[n]o individual who is serving in an office . . . in an acting capacity, by virtue of so serving, shall act as [the agency head] pursuant to this order.'" Office of Legal Counsel, *Designating an Acting Director of National Intelligence*, 43 Op. O.L.C. __, *8 (Nov. 15, 2019), https://www.justice.gov/olc/file/1220586/download; *id.* at *8 nn.3-4 (citing illustrative orders of succession).

as your Acting Secretary."[4] The same day, she personally swore Mr. McAleenan in to that role.[5] Neither of those acts are consistent with Plaintiffs' reading of Ms. Nielsen's order.

Finally, the Court should defer to the DHS's interpretation of Ms. Nielsen's order, which is the agency's own internal document. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (explaining that the Court "ha[s] deferred to 'official staff memoranda'" (citation omitted)).

In sum, Plaintiffs' reading of Ms. Nielsen's order is at odds with the order's express language that designated an unqualified order of succession. It ignores the order's structure, the context provided by the intervening grant of statutory authority, and multiple references to an "order of succession" designated under § 113(g)(2). And it is inconsistent with the official acts Ms. Nielsen took on her last day as Secretary and violates basic deference principles.

**ii.** The Court should not follow the analysis in the Government Accountability Office's Decision ("Decision"),[6] which suffers from at least two fundamental flaws.

*First*, the Decision wrongly assumes that the controlling document is Revision 8.5 to DHS Delegation No. 00106, and hangs its analysis on that administrative document. *See* Decision at 6 & n.10 (christening DHS, *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106, Revision No. 08.5 (Apr. 10, 2019) as "April Delegation"); *id.* at 9 (claiming that Ms. Nielsen "only amended Annex A "[w]hen [she] *issued* the April Delegation" (emphasis added)). The Decision focuses on the "plain language" and the "express terms" of the wrong document. *See id.* at 7, 8, 9. As the Secretary, Ms. Nielsen was the only person in the agency who could designate an order of succession, 6 U.S.C. § 113(g)(2), and she never signed or otherwise issued Revision 8.5 to DHS Delegation No. 00106. But she did sign her April 9 order—and that order controls. More than simply analyzing the wrong document, the Decision explicitly tosses aside the plain language in the memorandum that Ms. Nielsen signed on the line reading "[a]pprove." *See id.* at 9 ("Notwithstanding the General Counsel's statement in the Memorandum asserting the Secretary's intentions in amending the April Delegation, the plain language of the delegation controls, and it speaks for itself."); *see also* GAO Decision on Reconsideration[7] at 2 ("[G]iven that the plain language of the April Delegation is clear, there is no need to refer to the [April 9] Memorandum.").

The Decision similarly errs in concluding that Ms. Nielsen adopted Executive Order 13753 as her own order of succession under § 113(g)(2) in February 2019. *See id.* at 5. To draw this conclusion, the Decision again relies on an internal administrative document (Revision 8.4 to DHS Delegation No. 00106) that Ms. Nielsen never signed. *See id.* at 5 n.7 (citing *DHS Orders of Succession and Delegations of*

---

[4] Email from Kirstjen M. Nielsen, Secretary of Homeland Security (Apr. 10, 2019, 04:35 EST) (attached as Exhibit 1); *see also* Press Release, DHS, Kirstjen M. Nielsen, Secretary of Homeland Security, Farewell Message from Secretary Kirstjen M. Nielsen (Apr. 10 2019), https://www.dhs.gov/news/2019/04/10/farewell-message-secretary-kirstjen-m-nielsen.
[5] *CBP Commissioner Kevin McAleenan sworn-in as the Acting DHS Secretary; Opens New DHS Headquarters*, Border Observer, https://theborderobserver.wordpress.com/2019/04/11/cbp-commissioner-kevin-mcaleenan-sworn-in-as-the-acting-dhs-secretary/ (last visited Aug. 19, 2020).
[6] *In re Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650 (GAO Aug. 14, 2020).
[7] *In re Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security—Reconsideration*, B-332451 (GAO Aug. 21, 2020).

*Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08.4 (Feb. 15, 2019)). But in the February 2019 document the Decision cites, Ms. Nielsen set an order of succession for the *office of Strategy, Policy, and Plans*—not for the office of the Secretary—in Annex U.[8] Based on the faulty assumption that Ms. Nielsen designated her own order of succession for the office of the Secretary in February 2019, the Decision wrongly assumes that Ms. Nielsen needed to say that her order superseded Section II.A. *Cf. id.* at 9. She did not. Rather, Ms. Nielsen's order superseded the Executive Order and Section II.A, which were based entirely on the FVRA, as a matter of law. *See* 6 U.S.C. § 113(g)(2) (Secretary's designated order of succession is the governs in the event of a vacancy, "[n]otwithstanding" the FVRA).

*Second*, the Decision does not grapple with its unusual reading of Ms. Nielsen's order because the Decision confuses orders of succession and delegations of authority. The Decision concludes that Ms. Nielsen designated an order of succession when she amended Annex A because she altered Section II.B and "[e]ach ground," that is, Section II.A and Section II.B, "had its own order of succession." Decision at 5. Thus, the Decision concludes, Ms. Nielsen "effectively established two different orders of succession." *Id.* at 7. But the Decision is only able to reach this conclusion by ignoring the difference between orders of succession and delegations of authority and the different sources of the Secretary's statutory authority for each. *Compare* 6 U.S.C. § 113(g)(2) (order of succession), *with id.* § 112(b)(1) (delegation of authority). As explained, when Ms. Nielsen signed her order, Section II.B in DHS Delegation No. 00106 was not an order of succession—it was a delegation of authority. So if, as the Decision concludes, Ms. Nielsen's order applied only to Section II.B, then she set an order for delegation of authority, not an order of succession. And under that reading, the Decision has no explanation for how—by signing an order to "amend the order of succession" under § 113(g)(2)— Ms. Nielsen *actually* did nothing but amend the order for delegation of authority under § 112(b)(1). In fact, she employed both powers and thus provided that Annex A would serve both succession and delegation purposes.

### B. The Plain Text of the FVRA and the HSA Make Clear That the FVRA's Time Limit Does Not Apply to Designations Under the HSA.

Under the April 2019 order of succession, Mr. McAleenan validly served as Acting Secretary pursuant to the HSA. Under the plain text of both the FVRA and the HSA, his service was not subject to the FVRA's 210-day time limit for acting service, 5 U.S.C. § 3346.

**i.** The FVRA is generally the "exclusive means for temporarily authorizing an acting officer to perform the functions and duties" of a Senate-confirmed office. *Id.* § 3347(a). It recognizes exceptions to this general rule of exclusivity, including for statutes (like § 113(g)(1)) that "expressly designate" an acting officer, 5 U.S.C. § 3347(a)(1)(B), and statutes (like § 113(g)(2)) that "authorize[] the President, a court, or the head of an Executive department, to designate" an acting officer, 5 U.S.C. § 3347(a)(1)(A). When a vacancy arises in an office with an office-specific vacancy statute, that statute provides an alternate means of designating an acting officer. *See Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016) (FVRA and office-specific statute coexist as "statutory alternatives to designate" acting officer); *see also United States v. Smith*, 962 F.3d 755, 763 n.1 (4th Cir. 2020) (same).

---

[8] *See* Memorandum from Kirstjen M. Nielsen, Secretary, DHS, to Claire M. Grady, Under Secretary for Management and Senior Official Performing the Duties of the Deputy Secretary (attached as Exhibit 2).

8

The FVRA imposes an initial 210-day time limit on acting service only on a "person serving as an acting officer *as described under section 3345*." 5 U.S.C. § 3346(a)(1) (emphasis added).[9] Plaintiffs suggest that the Court simply strike this language and apply the 210-day limit not just to acting officers "as described under section 3345" but as to all acting officers serving under or described by *any* statute. When enacting the FVRA, Congress was aware that "[m]ost" office-specific vacancy statutes "do not place time restrictions on the length of an acting officer." S. Rep. No. 105-250, at 17 (1998). Nevertheless, it retained these statutes as an alternative to the FVRA, 5 U.S.C. § 3347(a)(1)(A)-(B). And it limited acting service to 210 days only for those serving under the FVRA. *Id.* § 3346(a)(1). That is, Congress placed no such restriction on acting service under *office-specific vacancy statutes*. *See id.*; *see also Guedes v. ATF*, 356 F. Supp. 3d 109, 142 (D.D.C. 2019) (recognizing that unlike office-specific vacancy statute for Attorney General, acting service under FVRA was subject to "specific time limits"); *United States v. Lucido*, 373 F. Supp. 1142, 1150-51 (E.D. Mich. 1974) (Deputy Attorney General could continue serving as Acting Attorney General under office-specific vacancy statute after time limit in pre-FVRA Vacancies Act expired); Office of Legal Counsel, *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 OLC Op. 60, 66-67 & n.3 (Mar. 22, 1999) (FVRA's time limits "do not apply" to office-specific vacancy statutes).

The HSA is one such office-specific vacancy statute. *See* 6 U.S.C. § 113(g)(1)-(2). By § 3346's unambiguous text, the 210-day time limit does not apply to designations under the HSA. Nor does the HSA's text provide any basis to read that time limit into it. The statute itself contains no express time limit (as the GAO acknowledges, *see* Decision at 4 n.3). Not only that, the Secretary's authority to designate an officer pursuant to § 113(g)(2) applies "*[n]othwithstanding* chapter 33 of title 5," which includes the FVRA. The "notwithstanding" phrase makes clear that § 113(g)(2)—consistent with § 3347(a)(1)(A)—authorizes the Secretary to designate a line of succession for service under the HSA, which is distinct from the FVRA. That phrase thus resolves the purported conflict between the FVRA's 210-day limit and Congress's choice to include no time limit on acting service under the HSA. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) ("The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'" (citation omitted)).

That Congress specifically chose not to impose a time limit in the HSA is confirmed by the broader context of office-specific vacancy statutes. As discussed above, Congress knew when enacting the FVRA that many office-specific vacancy statutes contained no express time limit, and the Senate Report accompanying the bill that became the FVRA even suggested that Congress "may choose in the future to reexamine" whether to retain such statutes. S. Rep. No. 105-250, at 17. Yet, Congress neither superseded these statutes in the FVRA nor included them in § 3346's time limit. It is unsurprising, then, that Congress did the same thing in § 113(g) that it has done in numerous office-specific statutes—provide for acting service outside of the strictures of the FVRA and thus beyond its 210-day initial period of acting service.

What is more, Congress well knew how to include an express time limit in an office-specific vacancy statute. *See, e.g.*, 29 U.S.C. § 153(d) (Acting General Counsel of the NLRB may serve under that office-specific statute only for "forty days when the Congress is in session unless a nomination . . . ha[s] been submitted to the Senate"). But it did not do so in § 113(g)(2). The Court should not read a time limit into § 113(g)(2) that Congress itself chose not to include. *See Jama v. ICE*, 543 U.S.

---

[9] The 210-day period can be extended in the event that the President submits a nomination for the office or there is a change in presidential administrations. *See id.* §§ 3346(a)(2), (b), 3349a(b).

9

335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . .")

    **ii.** Plaintiffs argue that the HSA "incorporates" the FVRA's provisions, including the time limit, in § 113(g)(2) because § 113(a)(1)(A) makes the Deputy Secretary the "first assistant" to the Secretary "for purposes of subchapter III of chapter 33 of title 5." *See also* 5 U.S.C. § 3345(a)(1) (default rule under FVRA that the first assistant to a vacant office shall serve as the acting officer absent a presidential designation of another individual). To be sure, under the plain meaning of § 113, in the event of a vacancy, the Deputy Secretary serves as the Acting Secretary pursuant to the FVRA's first assistant rule and thus is subject to the 210-day limit. But that is because § 113(g) does not itself designate or authorize the designation of the Deputy Secretary under the HSA. Plaintiff argues that the result—that the Deputy Secretary is subject to the 210-day time limit while a subordinate officer designated under the HSA would not be subject to a similar time limit—is "absurd," Pls.' Reply in Supp. of Mot. for Prelim. Inj. at 7, ECF No. 47, but the Court must "interpret the statute as it was written, not to rewrite it as [Plaintiffs] believe Congress *could have* intended to write it." *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 336 (4th Cir. 2008).[10] Nor is there anything necessarily absurd about a subordinate officer serving as an acting official in circumstances where her superior may not. *See, e.g.*, 5 U.S.C. § 3345(a)(3) (allowing designation as acting officer of any senior officer or employee who meet certain tenure requirements); *Smith*, 962 F.3d at 763 n.1 (designation of Chief of Staff to Attorney General as Acting Attorney General was lawful despite availability of Deputy Attorney General and other Senate-confirmed officers). Moreover, Plaintiffs' argument has no explanation for Congress's decision to restrict § 3346's time limit solely to acting service under the FVRA.[11]

    Nor do Plaintiffs have any plausible explanation for what the "notwithstanding" clause in § 113(g)(2) means. They argue that it only displaces the President's authority under §§ 3345(a)(2) and (a)(3) to designate an acting official other than the first assistant, but the text of the notwithstanding clause is not so limited. In any event, § 113(g)(1) and (g)(2) do not override the President's FVRA authority to designate an Acting Secretary. The FVRA authorizes the President to deviate from the default rule that the first assistant—here, the Deputy Secretary—serves as the acting officer by designating any Senate-confirmed officer, 5 U.S.C. § 3345(a)(2), or a senior officer or employee within the agency who meets certain tenure requirements, *id.* § 3345(a)(3). The HSA's designation provisions

---

[10] Congress may have had reasons for imposing the FVRA time limit on the Deputy Secretary but not on other officers serving at a time when the offices of the Secretary and Deputy Secretary were vacant. In such instances, Congress may well have recognized that the absence of the two highest-ranking officials in DHS would justify the need for additional flexibility to ensure the continuing functioning of the department. *Cf.* S. Rep. No. 105-250, at *18 (recognizing that provisions of FVRA would ensure that "[a]ll the normal functions of government . . . could still be performed").

[11] Plaintiffs also claim that it is absurd that the Under Secretary for Management could serve as the Acting Deputy Secretary for only 210 days but could serve as the Acting Secretary for longer. Reply at 7 n.3. But, again, that is the obvious effect of § 3346's plain text. Indeed, that same purported absurdity could occur under any office-specific statute that lists more than one potential acting officer. For example, under 28 U.S.C. § 508(b), which contains no express time limit, the Associate Attorney General serves as the Acting Attorney General when the offices of the Attorney General and the Deputy Attorney General are both vacant. But, if the President were to designate the Associate Attorney General as the Acting Deputy Attorney General, he would need to do so pursuant to the FVRA, 5 U.S.C. § 3345(a)(2), meaning the Associate Attorney General could serve in that capacity for only 210 days. Under Plaintiffs' theory, this "absurd" result would presumably require importing the FVRA's time limit to § 508, a result that would nullify Congress's specific choice in § 3346 not to apply the time limit to office-specific statutes.

apply only when the Secretary and the Deputy Secretary are not "available to exercise the duties of the Office of the Secretary," 6 U.S.C. § 113(g)(1), which would not include instances where the Deputy Secretary is available to serve but the President has designated someone else under the FVRA. Thus, Plaintiffs' explanation for why the HSA applies "notwithstanding" the FVRA, *id.* § 113(g)(1)-(2), fails to afford any meaning to that clause.

Plaintiffs' suggestion that the notwithstanding clause does not apply because there is no conflict between the FVRA's time limit and the HSA, Reply at 8, fares no better. As discussed above, the HSA—like many other office-specific vacancy statutes—has no express time limit. Congress understood when enacting the FVRA that the lack of an express time limit in an office-specific vacancy meant that the statute did "not place time restrictions on the length of an acting officer." S. Rep. No. 105-250, at 17. There is no basis, then, in the HSA or the text and context of the FVRA to read Congress's decision not to include a time limit in the HSA as anything other than a conscious choice.

**iii.** Plaintiffs also point to the *amicus* brief of Morton Rosenberg to argue that reading § 113(g)(2) according to its plain text would conflict with Congress's goal of limiting indefinite service of acting officials. Reply at 8 (citing Br. of *Amicus Curiae* Morton Rosenberg at 9-12, ECF No. 40-1). Mr. Rosenberg's entire argument rests on an erroneous conflation of so-called "agency 'housekeeping statutes,'" and office-specific vacancy statutes. Rosenberg Br. at 10-13.

As the Senate Report explains, in enacting the FVRA, Congress was motivated in part by its concern that, under the pre-FVRA Vacancies Act, the Executive Branch had argued that if "a department's organic act vests the powers and functions of the department in its head and authorizes that officer to delegate such powers and functions," that "authority supersedes the Vacancies Act . . . allowing for designations of acting officials for an indefinite period." S. Rep. No. 105-250, at 3 (1998). Office-specific vacancy statutes are not the agency housekeeping statutes with which Congress was concerned. The latter vest all of an agency's authority in its head and then authorize the head to delegate that authority to other officers and employees. *See, e.g.*, 6 U.S.C. § 112(a)(3) (vesting "[a]ll functions of all officers, employees, and organizational units" of DHS in the Secretary), *id.* § 112(b)(1) (Secretary may delegate functions to "any officer, employee, or organizational unit" of DHS). The former expressly designate or authorize the designation of officials outside of the confines of the FVRA. *See, e.g.*, *id.* § 113(g) (vacancies in office of Secretary); *compare* 28 U.S.C. §§ 509, 510 (vesting authority in Attorney General and authorizing delegations, and cited at S. Rep. No. 105-250, at 3 as example of housekeeping statute), *with id.* § 508 (office-specific statute for Attorney General).

And the FVRA itself distinguishes between these two types of statutes. The FVRA retains office-specific statutes as an exception to its exclusivity, *see* 5 U.S.C. § 3347(a)(1)(A)-(B), while explicitly providing that housekeeping statutes are not an exception, *see id.* § 3347(b) ("Any statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in the agency head to, or to reassign duties among, officers or employees of such Executive agency, is not a statutory provision to which subsection (a)(1) applies.").

**iv.** Finally, the absence of a statutory time limit for acting service under the HSA does not mean that an Acting Secretary can serve indefinitely. Reply at 9. The Supreme Court has recognized that an acting designation must be "temporary." *United States v. Eaton*, 169 U.S. 331, 343 (1898). By definition, acting service cannot be permanent.

11

But neither the Appointments Clause nor any other provision of the Constitution sets forth an express limit on acting service. Nor is there any reason to believe that 210 days has any constitutional valence. Congress has frequently changed the time limit for acting service under the general vacancies statutes. *See, e.g.*, Act of Feb. 13, 1795, 1 Stat. 415 (six months); 5 U.S.C. § 3348(a) (1994) (120 days). Indeed, the first vacancies statute, enacted shortly after the Founding, had no express time limit. *See* Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281; *see also Alden v. Maine*, 527 U.S. 706, 743-44 (1999) ("[E]arly congressional practice . . . provides contemporaneous and weighty evidence of the Constitution's meaning."). For that matter, the FVRA does not always limit acting service to 210 days. Acting officials can continue to serve for substantially longer during the pendency of a Senate nomination, when a nomination is rejected, returned, or even withdrawn by the President, *see* 5 U.S.C. § 3346(b)(1)-(2), or in a Presidential transition, *see id.* § 3349a(b). Without any viable constitutional standard, defining the precise point at which permissible temporary acting service transforms into unconstitutional permanent service is a nonjusticiable political question committed to the political branches. *See Bhatti v. Fed. Hous. Fin. Agency*, 332 F. Supp. 3d 1206, 1218 (D. Minn. 2018) ("[D]etermining whether an otherwise validly appointed acting officer has served for 'too long' is a non-justiciable political question.").

Further, the specific circumstances here belie any concerns that Mr. Wolf has been serving in his position "indefinitely without confirmation." Reply at 9. Mr. Wolf has been Acting Secretary for approximately nine months. He assumed that role by function of his Senate confirmation as the Under Secretary for DHS's Office of Strategy, Policy and Plans, *see* 6 U.S.C. § 113(a)(1)(K), and the duties of the Secretary are indisputably "germane" to that position. *See Weiss v. United States*, 510 U.S. 163, 176 (1994) (Appointments Clause permitted commissioned officers, who had received Senate-confirmation for their positions, to serve as military judges without second confirmation because "the role of military judge is 'germane' to that of military officer"). Prior to his November 13, 2019 confirmation, Mr. McAleenan had already amended the § 113(g)(2) line of succession, and it was widely reported that Mr. Wolf would become Acting Secretary once confirmed.[12] Thus, the Senate confirmed him to the Under Secretary position knowing full well that it was vetting him, in part, for the ability to exercise the Secretary's authority. Nor is there any broader constitutional concern with Mr. Wolf's acting service—in addition to his germane Senate-confirmation, an individual temporarily performing the duties of a principal officer in an acting capacity does not require Senate confirmation. *See Eaton*, 169 U.S. at 343; *Smith*, 962 F.3d at 764 (same).

                Very truly yours,

                Robert K. Hur
                United States Attorney

                _____/s/_____
                Jane E. Andersen
                Assistant United States Attorney

---

[12] *See, e.g.*, Daniel Lippman, Ian Kullgren, & Anita Kumar, *White House plans to name Chad Wolf acting DHS Secretary*, Politico (Oct. 31, 2019), https://www.politico.com/news/2019/10/31/chad-wolf-acting-dhs-secretary-063363; Zolan Kanno-Youngs & Maggie Haberman, *Trump to Name Chad Wolf as Acting Secretary*, N.Y. Times (Nov. 1, 2019), https://www.nytimes.com/2019/11/01/us/politics/trump-chad-wolf-dhs.html.