

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

*Jane E. Andersen*
*Assistant United States Attorney*
*Jane.Andersen@usdoj.gov*

*Mailing Address:*
*6500 Cherrywood Lane, Suite 200*
*Greenbelt, MD 20770-1249*

*Office Location:*
*6406 Ivy Lane, 8th Floor*
*Greenbelt, MD 20770-1249*

*DIRECT: 301-344-4516*
*MAIN: 301-344-4433*
*FAX: 301-344-4516*

September 2, 2020

Honorable Paula Xinis
United States District Judge
United States District Court, District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Xinis:

Defendants write to respond to the Court's Letter Order of August 31, 2020 (ECF No. 64).

**Associational standing limitations—**Plaintiffs' have not established standing to challenge all of the provisions contained within the Broader EAD Rule. Under Article III, a plaintiff must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). To establish associational standing, the plaintiffs must identify the specific applications of the challenged rules "that threatens imminent and concrete harm to the interests of their members." *Summers v. Earth Island Inst.,* 555 U.S. 488, 495 (2009). The Court may not rely upon the "organizations' self-descriptions of their membership" even where the harm appears likely. *Id.* at 499 ("Without individual affidavits, how is the court to assure itself that the Sierra Club, for example, has 'thousands of members' who 'use and enjoy the Sequoia National Forest'?").

In *Summers,* a number of environmental organizations filed a lawsuit seeking to prevent the U.S. Forest Service from enforcing regulations exempting certain small-scale projects from the notice, comment, and appeal process that was applicable to larger-scale projects. After the Forest Service approved the "Burnt Ridge Project", a lawsuit commenced. Associational standing was established through the submission of an affidavit from one of the organization's members related to the Burnt Ridge site. While the case was still pending, the Burnt Ride Project site issue settled. Nevertheless, the district court invalidated five regulations and entered a nationwide injunction, and the Ninth Circuit affirmed. *Id.* at 492. The Supreme Court reversed, holding that the organizations "have identified no other application of the invalidated regulations that threatens imminent and concrete harm to the interests of their members." *Id.* at 495. The organizations' reliance on a second affidavit was insufficient to confer standing, "because it was not tied to application of the challenged regulations" and "because it does not identify any particular site."*Id.* at 495.

Additionally, the ripeness doctrine reflects both "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993). Thus, even where Article III standing may be had, prudence retrains courts from intervening into matters that may be reviewed at another time. *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108-09 (D.C. Cir. 2011). Indeed, the ripeness doctrine "prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (quoting R*escue Army v. Mun. Court of L. A.*, 331 U.S. 549, 584 (1947)). "A case

is fit for adjudication when the action in controversy is final and not dependent on future uncertainties" whereas a claim is not ripe when "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (cleaned up). Fitness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

Here, CASA identifies two members who have not yet filed an asylum application, but will purportedly be harmed by the application of the one-year ban provision, the 365-day waiting period provision, and eventually the TimeFrame Rule, when they do. *See* Ex. 4 at ¶¶ 23, 26. Because they have not yet filed an asylum application, any harm is speculative and otherwise not imminent. By statute, the earliest an asylum applicant can obtain EAD authorization is 180 days after submitting an asylum application. After that time, it is unknown how the rules might operate to harm or to assist them.

ASAP identifies two members who filed asylum applications in April 2020, and assert that they will be harmed by application of the 365-day waiting period provision and the TimeFrame Rule. *See* Ex. 5 at ¶ ¶ 26, 29. Any harm that would be had from the new 365-day waiting period is speculative. For example, it is possible that the identified ASAP members will be granted asylum at any time. If this were to occur, there would be no harm because they would be immediately eligible for employment authorization as mandated by statute. 8 U.S.C. 1158(c)(1)(B). While some asylum applications can take over 2 years to adjudicate, some are completed within 6 months. 85 Fed. Reg. at 38535. It is also unknown how the prior 180-day clock would have operated against the two identified members. As such, it is not appropriate to assume harm from the new rule. Moreover, the Agency has taken additional measures to address the backlog of asylum applications, including the "now-operative LIFO scheduling methodology prioritizes newly-filed applications." *See e.g.* 85 Fed. Reg. at 38597. As such, it cannot be known today whether any of the individual members identified by CASA and ASAP will actually be harmed from the application of the new rules. *See e.g. Delta Air Lines, Inc. v. Exp.-Import Bank*, 85 F. Supp. 3d 250, 266 (D.D.C. 2015)("numerous factual questions remain unresolved and undeveloped, many of which are necessary for determining if and how Plaintiffs might suffer an injury-in-fact from the Bank's allegedly wrongful conduct"); *Sigram Schindler v. Kappos*, 675 F. Supp. 2d 629, 642 (E.D. Va. 2009) (alleged harm based on potential "adverse decision" of Patent Appeal Board was impermissibly "contingent and speculative").

Finally, it would be inappropriate to stay the application of the TimeFrame Rule for a number of reasons, including because it is pure speculation as to whether this rule will cause any irreparable harm to any of the identified members. Once an EAD application is submitted, there is nothing preventing the Agency from acting on that application within 30 days. And while the new rule does not set a mandatory timeframe, the Agency acknowledges that it must act within a "reasonable time." *See* 85 Fed. Reg. 37502 at 37541.

**The distinction between Acting Secretary and "first assistant" for purposes of the HSA and the FVRA**—An "acting" official refers to an individual who is authorized to "temporarily carry out the duties" of a vacant office. *NLRB v. SW. Gen., Inc.*, 137 S. Ct. 929, 934 (2017); *see also United States*

*v. Eaton*, 169 U.S. 331, 343 (1898). The "Acting Secretary," thus, refers to the official who is authorized to perform all of the functions and duties of the office of the Secretary in the event of a vacancy.[1]

The term "first assistant" is a term of art that "has a long history of use" under the general vacancies statutes, S. Rep. No. 105-250, at 12, and "refers to the top deputy of a presidentially appointed, Senate-confirmed officer." *Designation of an Acting Associate Attorney General*, 25 Op. O.L.C. 178, 179 (2001). The occupant of the office of the first assistant may become an acting officer automatically under the current general vacancies statute, the Federal Vacancies Reform Act ("FVRA"), by operation of the FVRA's default provision, 5 U.S.C. § 3345(a)(1). However, the first assistant is not the only individual who may lawfully serve as an acting officer under the FVRA. The President has authority under that statute to designate certain other individuals to fill an office subject to Senate confirmation on an acting basis. *See id.* § 3345(a)(2)-(3). In addition, for certain offices (such as the Secretary of Homeland Security), Congress has provided for alternative means of designating an acting officer through office-specific vacancy statutes. *See id.* § 3347(a)(1) (providing for possibility of such statutes); *see also* 6 U.S.C. § 113(g)(2). The term "first assistant," therefore, refers to just one of several individuals who lawfully may serve as an acting official under the FVRA.

The distinction between the terms "Acting Secretary" and "first assistant" is consistent with the plain text of 6 U.S.C. § 113. Section 113(a)(1)(A) provides that the Deputy Secretary "shall be the Secretary's first assistant for purposes of" the FVRA, confirming that in the event of a vacancy in the office of the Secretary, the Deputy Secretary serves as Acting Secretary under § 3345(a)(1). By contrast, § 113(g) contains no such reference to a "first assistant." It provides, instead, that "[n]otwithstanding" the FVRA, the Under Secretary for Management "shall serve as the Acting Secretary" if both the offices of the Secretary and the Deputy Secretary are vacant, *id.* § 113(g)(1), and that the Secretary may designate "other officers of the Department in further order of succession to serve as Acting Secretary," *id.* § 113(g)(2). Thus, individuals who "serve as Acting Secretary" under either § 113(g)(1) or (2) do not do so as first assistants (nor as Presidential designees) under the FVRA; they serve pursuant to an office-specific statute.

**The import of the language "function or duty" in § 3348**—Under 5 U.S.C. § 3348(d), an action taken by an official whose service is inconsistent with the FVRA or an office-specific vacancy statute "shall have no force or effect" if that action is taken "in the performance of any function or duty of [the] vacant office." Section 3348 narrowly defines "function or duty"—solely for purposes of that section—as "any function or duty" of the office that is "established" by statute or by regulation and "required" by statute or "such regulation" "to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2). In other words, § 3348 renders "void" a limited class of actions taken by an invalidly serving official that are, by statute or regulation, exclusive to the vacant office. *SW. Gen., Inc. v. NLRB*, 796 F.3d 67, 78 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929.

Section 3348(d) has no direct import here for two reasons. First, Defendants do not dispute that if Acting Secretary Wolf were not lawfully serving in an acting capacity under the HSA, the rules challenged here could be set aside under the APA. *See id.* at 79 (citing 5 U.S.C. § 706). Second, the

---

[1] An acting official's authority to perform all of the duties of a vacant office contrasts with the authority of an official who has been delegated duties of a vacant office. The latter may perform only those duties that are lawfully delegable, or "non-exclusive." *Stand Up for California! v. U.S. Dep't of Interior*, 298 F. Supp. 3d 136, 141 (D.D.C. 2018) (quoting *Guidance on Application of the Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 72 (Mar. 22, 1999)).

issuance of the rules was not an action "in the performance of any function or duty" of the office of the Secretary because there is no statute or regulation providing that the issuance of the rules could be done *only* by the Secretary. Rather, the relevant rulemaking authority could be exercised by other officials, including the Deputy Secretary. *See* DHS Delegation No. 0100.2 ¶ II.G (June 23, 2003) (attached as Ex. 1). The definition of "function or duty" applies only to non-delegable functions that are made exclusive to a particular office by statute or regulation. *See Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019) (citing § 3348(d) as "only prohibiting the ratification of nondelegable duties"); *United States v. Harris Cty.*, No. 4:16-CV-2331, 2017 WL 7692396, at *3 n.5 (S.D. Tex. Apr. 26, 2017) (authorization of complaint by Principal Deputy Assistant Attorney General was not "function or duty" under FVRA because "the relevant duties of the [office] are delegable"). That conclusion is compelled by the plain text. If a function or duty is lawfully delegable, then necessarily, the statute or regulation creating that function or duty does not "require" it to be performed only by the vacant office. Rather, the statute or regulation permits *other individuals* to perform that function or duty by delegation. That plain text meaning is confirmed by the Senate Committee Report accompanying the bill that became the FVRA. That Report, addressing a definition of "function or duty" materially identical to that now found in § 3348(a)(2), provides that "functions or duties of the office" are "defined as the *non-delegable* functions or duties of the officer." S. Rep. No. 105-250, at 18 (emphasis added). The narrowness of that definition ensures that "[d]elegable functions of the [vacant] office could still be performed by other officers or employees," such that "[a]ll the normal functions of government thus could still be performed." *Id.*; *accord id.* at 31 (views of supporting Senators); *id.* at 36 (views of opposing Senators). Here, the authority to issue rules regarding the administration of the immigration and nationality laws is not only delegable, *see* 6 U.S.C. § 112(b)(1), it has long been *delegated*.

Notwithstanding the fact that § 3348 does not apply here, that provision confirms that the FVRA's 210-day time limit, 5 U.S.C. § 3346(a), only applies to acting service under the FVRA. As explained, Congress retained office-specific statutes in § 3347(a)(1), while imposing a 210-day time limit only on persons "serving as an acting officer as described under *section 3345*." *Id.* § 3346(a) (emphasis added); *see also* Defs.' Aug. 21, 2020 Ltr. at 8-9. By contrast, when Congress wished to reference acting service under both the FVRA and an office-specific statute, it invoked § 3347, as § 3348 shows. *See* 5 U.S.C. § 3348(d)(1) (applying to actions taken by an official "who is not acting under section 3345, 3346, *or 3347*" (emphasis added)); *see also SW. Gen.*, 796 F.3d at 74 ("Throughout the FVRA, the Congress was precise in its use of internal cross-references.") Section 3346's time limit, however, has no such reference to § 3347.

**Nationwide injunction—**"Article III requires that injunctions be tailored to protect only the plaintiffs in a specific case from the defendants to that suit." *CASA de Maryland, Inc. v. Trump*, No. 19-2222, 2020 WL 4664820, at *24 (4th Cir. 2020)(citation omitted). Equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).[2]

Should the Court find that a preliminary injunction is appropriate, it first must be narrowed to the specific provision(s) that plaintiffs have been able to demonstrate: (1) standing; (2) likelihood of

---

[2] Relief under 5 U.S.C. § 705 is similarly limited by equitable principles. 5 U.S.C. § 705 (Courts "may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review proceedings." (emphasis added)). Nothing in § 705 speaks clearly enough to work "a major departure from the long tradition of equity practice." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

success on the merits; (2) irreparable harm before a decision on the merits can be rendered; and (3) that the balance of equities tips in their favor and that the public interest favors injunction. Second, any injunction should be narrowed to apply only to the specific individuals that have been identified in the affidavits and meet the above standing and irreparable harm requirements. Indeed, any injunction which applied nationally, or even to CASA and ASAP members as a whole, would be inappropriate. Establishing associational standing does not equate to class certification. Indeed, as the Fourth Circuit has explained, such a broad remedy would be "difficult to square with the policy choices embodied in Rule 23" because "[o]nly those who can satisfy the rigorous requirements Congress imposed for class certification are eligible to avail themselves of Rule 23 injunctions. " *CASA de Maryland, Inc. v. Trump*, 2020 WL 4664820, at *26. Moreover, as this Court indicated, an injunction that would apply more broadly to all of CASA and ASAP's unidentified members may not be feasible. This factor, however, favors a narrower injunction and not a broader injunction.

**Authority regarding the effect of Delegation No. 00106—**For the reasons Defendants have explained, Ms. Nielsen's April 2019 order plainly designated a new order of succession applicable to any vacancy in the office of Secretary. *See* Defs.' Aug. 21, 2020 Ltr. at 4-7. While Defendants are not aware of any case law that squarely addresses the issue of the legal effect of Delegation No. 00106, the April 2019 order must control. Under § 113(g)(2), only the Secretary has the authority to designate a line of succession for acting service under the HSA, and, for that matter, only the Secretary has the authority to delegate the functions of the office to other DHS officials, *see id.* § 112(b)(1). Thus, it is the Secretary, and only the Secretary, to whom the Court must look. To the extent that there is a conflict between the Secretary's designation and Delegation No. 00106—which Ms. Nielsen never signed—the former must control. *See* Defs.' Aug. 21, 2020 Ltr. at 4, 7. Moreover, the Secretary's subsequent actions confirm that she designated a line of succession applicable to all vacancies. *Id.* at 6-7. And finally, in the event of ambiguity, the Court should defer to DHS's interpretation of its own internal document. *Id.* at 7.

**Additional information—**The Court expressed concern as to whether the Agency considered the overall harm to bona fide asylum seekers. In addition to the citations previously provided to the Court, the defendants refer the Court to 85 Fed. Reg. at 38549("DHS acknowledges that these reforms will also apply to aliens with meritorious asylum claims, and that these applicants may experience some degree of economic hardship as a result of heightened requirements for an EAD. However, DHS's ultimate goal is to maintain integrity in the asylum process. DHS has determined that sustaining an under-regulated administrative regime is no longer feasible and that it is not unreasonable to impose additional time and security requirements on asylum seekers before they may apply for an EAD.").

                                              Respectfully submitted,

                                              Robert K. Hur
                                              United States Attorney

                                              _____/s/_____
                                              Jane E. Andersen
                                              Assistant United States Attorney