September 2, 2020

Hon. Paula Xinis
U.S. District Court for the District of Maryland
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770

Re:     *CASA v. Wolf*, 8:20-cv-2118-PX

Dear Judge Xinis:

Plaintiffs submit this supplemental brief to respond to the five questions raised by the Court's Letter Order, ECF No. 64.

**1.  Is it sufficient, for purposes of standing, for individual members of Plaintiff organizations to challenge the Broader EAD Rules collectively based on particularized harms resulting from specific changes therein?**

Yes, for three independent reasons.  ***First***, although the final Broader EAD Rule has several subsections, the preamble presents a common justification for all components of the Rule: deterring frivolous, fraudulent, and otherwise non-meritorious asylum applications.  Having been promulgated as a whole, and justified as a whole, the entire rule is the appropriate unit for judicial review even if the Court concludes that Plaintiffs only showed injury from portions of that rule.

***Second***, the statute creating the cause of action is the touchstone for the standing inquiry. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372-74 (1982).  The statute here, the APA, points to the rule as a whole:  it provides that "[a] person suffering legal wrong because of *agency action* . . . is entitled to judicial review thereof," 5 U.S.C. § 702 (emphasis added); it identifies the vacatur of the challenged agency action as the presumed remedy, *id.* § 706; and it defines "agency action" to include "the whole or a part of an agency rule," *id.* § 551(13).  Review of an agency rule is thus proper when plaintiffs show injury from that rule as promulgated.  *See, e.g.*, *CASA v. Trump,* No. 19-2222, 2020 WL 4664820, *10 (4th Cir. Aug. 5, 2020) (individual plaintiffs who had shown only that they were DACA recipients foregoing financial aid and did not show injury with respect to other parts of the rule had standing to challenge the public charge rule in its entirety).[1]

Administrative law works this way because where an agency action causes concrete injuries to plaintiffs, vacatur of that action on the basis of any procedural illegality would redress those injuries.  *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306-07 (D.C. Cir. 2013); *cf. L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 19-21 (D.D.C. 2020) (asylum seekers have standing to challenge the propriety of Cuccinelli's appointment because the redressability requirement is relaxed in procedural-rights cases), *gov't appeal withdrawn*.  A district court cannot "slice[] the

---

[1] Plaintiffs may also challenge only "a part of an agency rule" under the APA.  5 U.S.C. § 551(13).  Plaintiffs here have not challenged the portion of the Timeline Repeal Rule that deletes the language requiring people to renew their EADs at least 90 days before their expiration, which the agency described as a conforming amendment to a 2017 regulatory change. *See* ECF No. 23-1 at 7 n.6.

salami too thin" by limiting plaintiffs to procedural deficiency arguments tied directly to the claimed injuries. *WildEarth,* 738 F.3d at 307. Thus, the Sierra Club had representational standing to challenge an agency order certifying a pipeline project, even though its members showed injury as to only one pipeline segment. *See Sierra Club v. FERC*, 867 F.3d 1357, 1365-66 (D.C. Cir. 2017) (citing *WildEarth* and reasoning that plaintiffs' injuries would be redressed by vacatur of the agency action on any basis). Here, Plaintiffs CASA and ASAP have representational standing to challenge the Broader EAD rule as a whole because their members are injured—with their survival and chance for safety at stake—by at least one aspect of the rule. *See* ECF No. 24-4 ¶¶ 25-28; ECF No. 24-5 ¶¶ 22-29. Vacatur of the entire rule based on any of the procedural deficiencies that Plaintiffs have set forth would address their injuries.[2]

   ***Third,*** even though standing only requires showing injury from one aspect of a challenged rule, CASA and ASAP have shown far more—namely, that the Broader EAD Rule as a whole works harm on its members because its provisions, taken together, delay or deny work authorization to asylum applicants and deprive them of any certainty about when they might be able to start supporting themselves and their families.[3] For example, under the prior EAD system ASAP member W.L. would have been eligible to submit her EAD application this past Monday with an expected response by the end of September. ECF No. 24-5 ¶ 25. Under the new regime, however, W.L. will not be eligible to submit an EAD application for another seven months and will have no certainty about when, if ever, she will receive work authorization, depriving her of her ability to make informed daily decisions about how to allocate her remaining funds. This serious harm to W.L. is not only due to the Timeline Repeal Rule and the 365-day waiting period. *See* ECF No. 60 at 3. Even if those specific rule changes were postponed or vacated, W.L. would still be subject to the drastically changed EAD system wrought by the remainder of the Broader EAD Rule. The new application forms implementing the Broader EAD Rule require *all* asylum seekers submitting EAD applications after August 25 to disclose more potentially prejudicial information, including about their manner of entry into the United States and arrests and convictions, even where such information does not automatically disqualify them from receiving an EAD. *See* USCIS, www.uscis.gov/i-765 (last visited Sept. 2, 2020). This new regime also requires her to pay for biometrics, forces her to make strategic decisions in her asylum proceedings to avoid prejudice to her EAD application, and subjects her to discretionary decisionmaking. It would be error to adopt Defendants' myopic view of the asylum-seeking members' injuries.

   ***Summary Regarding Standing***: In addition to the ***representational*** standing discussed above, each Plaintiff has shown that it has ***organizational*** standing to challenge the Broader EAD Rule in its

---

[2] The presence of a severability clause in 8 C.F.R. § 208.7 is of no moment. *See Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) ("'[T]he ultimate determination of severability will rarely turn on the presence or absence' of a severability clause.") (quoting *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968)). The entire Broader EAD Rule is infected by the procedural improprieties Plaintiffs allege and there is no single "offending portion" that could be severed. *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001).

[3] Some CASA members referenced in its declaration were unable to file their asylum applications prior to the effective date because of CASA's efforts to assist them. That fact is immaterial, however, because those members will still be subject to the changed EAD system regardless of whether they were able to file the asylum application before the effective date.

entirety (as well as the Timeline Repeal) because the rule directly impairs its "ability to *function*." *See CASA*, 2020 WL 4664820, at \*9 (emphasis in original). That is all that is required under *Havens* and *CASA*. *See id.* (affirming the availability of organizational standing under *Havens*). Even though the Broader EAD Rule is not aimed at Plaintiff organizations, it directly impairs them, and that is sufficient for standing. *Cf. Havens*, 455 U.S. at 379 (although not the direct victim of defendants' racial steering practices, plaintiff had standing because it was impaired through the impact on its clients); *see also White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 461 (4th Cir. 2005) (district court's finding that educational organization had no organizational standing reversed because challenged conduct reduced attendance at its event).

Oasis and CASA have gone further, showing through uncontested testimony that they are at risk of financial loss that would impair their ability to function—creating an existential threat for Oasis—because Defendants' actions deprive their clients of income and job opportunities. *See* ECF No. 24-7 ¶¶ 44-46; ECF No. 24-4 ¶¶ 33-34; *La Clinica De La Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 4569462, \*8 n.4 (N.D. Cal. Aug. 7, 2020) (distinguishing *CASA*, where such risk exists). *Havens* requires far less from Plaintiffs; the harm there was based not on threats of such magnitude, but only on the need "to devote significant resources to identify and counteract" the defendants' actions in order to continue to serve clients consistently with its mission. 455 U.S. at 379 (quoting allegation). Each organizational plaintiff has shown this type of harm here. *See* ECF No. 47 at 11-13; ECF No. 54 at 2; ECF No. 59 at 1; ECF No. 62-1 at 1.

## 2. What is the distinction between the terms "first assistant" and "Acting Secretary" for purposes of the HSA and FVRA?

An "Acting Secretary" is the official who temporarily "perform[s] the functions and duties" of the Secretary until someone is nominated and confirmed in that office. *See* 5 U.S.C. § 3347. In the event of a vacancy, the default scheme of the FVRA is for the "first assistant" to assume the vacant office in an acting capacity. 5 U.S.C. § 3345(a); S. Rep. 105-250 at 1, 12. Individuals other than "first assistants," however, may be designated to serve as acting officers by the President or pursuant to an agency-specific statute, like the HSA. *See* 5 U.S.C. §§ 3345(a), 3347(a)(1).

Our prior briefing explained that an Acting Secretary designated under section 113(g)(2) of the HSA is subject to the non-conflicting provisions of the FVRA, including the 210-day time limits. ECF No. 23-1 at 28-31; ECF No. 47 at 6-11; ECF No. 59 at 3-5; ECF No. 62-1 at 1-3. Defendants' position—that the FVRA does not apply to an Acting Secretary designated under the HSA—runs afoul of the statutory scheme. Indeed, section 3347 of the FVRA provides that the succession provisions of the FVRA can only be supplanted by a statute that expressly authorizes the head of a department to "perform the functions and duties of a specified office ***temporarily*** in an acting capacity." 5 U.S.C. § 3347(a)(1)(A) (emphasis added). But under Defendants' view, an Acting Secretary designated pursuant to section 113(g)(2) is not subject to the 210-day limit of the FVRA or any other statutory time limitation. Absent such a limitation, the HSA does not authorize the Acting Secretary to perform the duties of the Secretary "temporarily," and thus cannot supplant the FVRA. Defendants' position creates a conflict between the statutes not present in Plaintiffs' plain reading.

The problems with Defendants' position do not end there. ***First***, stripping the FVRA of effect in circumstances where designations are made under the HSA would recreate the harm that the FVRA intended to fix—*i.e.*, the President could circumvent the Senate through unconfirmed

"acting" cabinet and other officials serving indefinitely. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 936 (2017); *see also* ECF No. 40-1 at 9-13. ***Second***, Defendants' interpretation raises the constitutional question of whether section 113(g)(2) violates the Appointments Clause by permitting officials to serve in an acting capacity "without time limitation." *See United States v. Smith*, 962 F.3d 755, 764 n.3 (4th Cir. 2020). ***Third***, Defendants' reading raises an as-applied constitutional challenge to Acting Secretary Wolf's putative service during a 500-plus day vacancy in the Office of a Secretary. As discussed in our briefing, every court to consider the issue has determined that agency-specific statutes (such as the HSA) apply alongside the FVRA, not in lieu of it. ECF No. 47 at 6-8; ECF No. 62-1 at 2-3. The word "notwithstanding" in the HSA displaces the specifically identified conflicting item—it does not wipe out application of the entirety of Chapter 33, Title 5, to the DHS. ECF No. 47 at 7-8.

**3.   What is the import of the language "functions and duties" in section 3348 of the FVRA in this case?**

The term "function or duty" in section 3348 means ***all*** of the functions and duties that were actually assigned to that office at the time. 5 U.S.C. § 3348(a)(2)(A), (B). It is not limited to non-delegable functions or duties. This argument was analyzed in great detail by Judge Moss in *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 31-34 (D.D.C. 2020), and squarely rejected as contrary to the text, structure, and logic of the FVRA statute. *See also* ECF No. 38-1 at 15-16; ECF No. 59 at 5-6. As Judge Moss concluded, section 3348(d) is not, and could not be, limited to non-delegable functions and duties. Indeed, if it were "all (or almost all) departments subject to the FVRA," which have similar agency-specific delegation statutes, would be immunized from the FVRA's prescribed statutory remedy. *L.M.-M.*, 442 F. Supp. 3d at 31-34. Because the proper reading of "function or duty" includes the rulemaking authority vested in the Secretary, the remedy for Defendant Wolf's putative enactment of the Asylum EAD Rules without the authority to do so is vacatur under section 3348(d).[4]

The Court expressed concern about whether actions that may have been taken by Defendant Wolf such as signing paychecks, or keeping the office lights on, are also void or voidable. First, the breadth of Mr. Wolf's potentially-voidable acts is not at issue in this case; only the EAD Rules are. Second, Defendants have not even suggested that the interpretation of the statute advocated by Plaintiffs, and determined by Judge Moss, would create any such problem.

**4.   Are there any alternatives short of nationwide preliminary relief?**

Defendants have had multiple opportunities to explain how an alternative short of postponement of the Asylum EAD Rules in their entirety would be workable, and they have not been able to do so. The remedy that Plaintiffs have requested is appropriate here especially given that Congress specifically authorized it under 5 U.S.C. § 705. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting § 705 stay because agency did not propose how the court could "craft a limited stay").

---

[4]   The Court need not even interpret the precise boundaries of the term "function or duty" as it is used in section 3348(d), the FVRA's remedy provision, if it grants relief under the APA, because any violation of the FVRA by an acting official without authority is void under the APA—even if section 3348(d) does not apply. ECF No. 59 at 6.

**5.    What force and effect should be given to Delegation 00106?**

Defendants have created a red herring with respect to the DHS Orders of Succession and Delegations for Named Authorities ("Delegation 00106").  Plaintiffs are not seeking to enforce Delegation 00106 as it was issued, and have not argued that the originally-issued order currently has the independent force and effect of law.  What Plaintiffs do argue is that if Nielsen's April 9 Directive is given the force and effect of law—and Defendants rely on this authority alone as the basis for Wolf's service—then the Court must recognize that the Directive itself ratifies Delegation 00106 as the operative scheme, by expressly amending it in certain regards; relying on it for meaning; and otherwise incorporating it.

This conclusion follows directly from the fact that Nielsen's Directive is not a standalone document.  Its plain language expressly purports to amend portions of Delegation 00106, such as Annex A to the Delegation, which governs when the Secretary is "unavailable to act during a disaster or catastrophic emergency"—not after the Secretary's resignation.  Likewise, the Directive relies on the Delegation for meaning, such as specifying when a delegation occurs and when a succession occurs.

Because Nielsen's Directive—including its confirmation of Delegation 00106 as an operational document—and the Delegation itself are all clear on their face, and contain no ambiguity, additional sources should not be used to construe their meaning.  *See Dickenson-Russell Coal Co., LLC v. Sec'y of Labor*, 747 F.3d 251, 257 (4th Cir. 2014) ("[O]ur first task is to determine whether the regulation itself is unambiguous; if so, its *plain language controls*.") (quotation marks omitted) (emphasis in original)); *see also* 8/14/20 Tr. at 62 (Defendants agree no additional facts needed to adjudicate vacancies claim).  Moreover, because the documents are unambiguous, their facial meaning governs; no deference should be given to Defendants for their interpretation.  *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019); *Romero v. Barr*, 937 F.3d 282, 291 (4th Cir. 2019).  That is particularly true where, as here, their interpretation is a post hoc rationalization that appears to be "nothing more than a convenient litigating position."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quotation marks omitted); *see also* ECF No. 51-1 at 9.

Plaintiffs' position here is further borne out by the actions of former Secretary Nielsen's purported successor, McAleenan—all of which preceded this litigation.  When McAleenan wanted to amend the order of succession to make Wolf his successor, he did so by purporting to amend Delegation 00106 so that Annex A would also apply in the event of resignations.  The language of such an amendment would be superfluous if Nielsen's amendment applied in instances of resignation, and the modification of Delegation 00106 would make no sense if Nielsen's Directive had wiped it clean, or if DHS was rejecting Delegation 00106 or doing anything other than confirming it.

Respectfully submitted,

Mariko Hirose*  
Kathryn Austin*  
Geroline Castillo*  
INTERNATIONAL REFUGEE ASSISTANCE  
PROJECT  
One Battery Park Plaza, 4th Floor  
New York, New York 10004  
Tel: (516) 701-4620  
Fax: (929) 999-8115  
mhirose@refugeerights.org  
kaustin@refugeerights.org  
gcastillo@refugeerights.org

   /s/ *Richard W. Mark*       
Richard W. Mark*  
Joseph Evall*  
Katherine Marquart*  
GIBSON, DUNN & CRUTCHER LLP  
200 Park Avenue  
New York, NY 10166-0193  
Tel: (212) 351-4000  
Fax: (212) 351-4035  
RMark@gibsondunn.com  
JEvall@gibsondunn.com  
KMarquart@gibsondunn.com

Justin B. Cox (Bar No. 17550)  
INTERNATIONAL REFUGEE ASSISTANCE  
PROJECT  
PO Box 170208  
Atlanta, GA 30317  
Tel: (516) 701-4233  
Fax: (929) 999-8115  
jcox@refugeerights.org

Conchita Cruz*  
Zachary Manfredi*  
Dennise Moreno (Bar No. 21358)  
ASYLUM SEEKER ADVOCACY  
PROJECT  
228 Park Avenue S. #84810  
New York, NY 10003-1502  
Tel: (305) 484-9260  
Fax: (646) 968-0279  
conchita.cruz@asylumadvocacy.org  
zachary.manfredi@asylumadvocacy.org  
dennise.moreno@asylumadvocacy.org

*Attorneys for Plaintiffs*  
* Admitted *pro hac vice*