# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| CASA DE MARYLAND, INC., *et al.,* | | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:20-cv-02118-PX |
| | * | |
| CHAD F. WOLF, *et al.,* | * | |
| Defendants. | * | |
| | *** | |

## MEMORANDUM OPINION

This case concerns the validity of eighteen final agency rules that overhaul the criteria for issuing work authorization to asylum applicants.  Plaintiffs, five non-profit organizations providing services to immigrant and asylum populations across the country, bring this action against Defendants Chad F. Wolf ("Wolf"), in his official capacity as Acting Secretary of Homeland Security, and the U.S. Department of Homeland Security ("DHS" or "agency").  ECF No. 1.  Plaintiffs mount a full-throated attack on the challenged agency rules, invoking the Administrative Procedure Act ("APA"), the Federal Vacancies Reform Act ("FVRA"), and the Homeland Security Act ("HSA").

Plaintiffs now move to stay or preliminarily enjoin enforcement of the challenged these rules, which went into effect on August 21 and August 25, 2020.   ECF No. 23-1 at 8–9; ECF No. 24-2; ECF No. 24-3.  For the following reasons, the Court grants in part and denies in part the motion.  Until this Court reaches the merits of Plaintiffs' claims, it will preliminarily enjoin Defendants from enforcing a subset of the rule changes as applied to the individual members of Plaintiffs Casa de Maryland, Inc. ("CASA") and Asylum Seeker Advocacy Project ("ASAP").

## I.       Background

For the last forty years, the United States Government has permitted any migrant "physically present" in the United States—regardless of where or under what status they enter— to apply for asylum.[1]  8 U.S.C. § 1158(a)(1)( "Immigration and Nationality Act" or "INA"), (2009); *see also* Refugee Act of 1980, Pub. L. No. 96–212 § 208, 94 Stat. 102, 105 (1980) (amending the INA).  A person is eligible for asylum when unable or unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A).  The United States boasts of a generous tradition of granting asylum seekers a critically important avenue to becoming a lawful permanent resident and ultimately a United States citizen.  *See id.* §§ 1159(b), 1427(a).

This road to asylum, however, is long and winding.  While the INA requires immigration judges and the Department of Homeland Security's Citizenship and Immigration Services office ("USCIS") to adjudicate asylum applications within 180 days, *id.* § 1158(d)(5)(A)(iii), the process often takes years to complete.  *See* Asylum Application, Interview, and Employment Authorization for Applicants ("Broader EAD Rules"), 85 Fed. Reg. 38,532, 38,548 (June 26, 2020) (detailing asylum "backlog" resulting in "years-long wait" to obtain asylum); ECF No. 24-19 at 6 n.14; ECF No. 24-20 at 43; ECF No. 24-4 ¶ 10; ECF No. 24-6 ¶ 13; ECF No. 24-7 ¶ 10.  During this time, asylum applicants are not eligible for a wide variety of social or medical benefits.[2]  ECF No. 24-20 at 42.

---

[1] Among other changes, the Refugee Act of 1980 amended the definition of "refugee" within the INA to conform to the United States' treaty obligations; Congress also for the first time required the Attorney General to enact "procedures for determining eligibility for asylum."  *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 839–40 (9th Cir. 2020).

[2] Plaintiff Centro assists affirmative asylum seekers and juveniles whose asylum applications have been pending since 2014.  ECF No. 24-6 ¶ 13.  Asylum hearings cancelled because of the COVID-19 pandemic have been reset

To mitigate this evident economic hardship on asylum applicants, the agency has historically granted asylum seekers work authorization in the form of an employment authorization document ("EAD"), so that applicants may lawfully support themselves while they await final decision on their asylum applications.  *See* Broader EAD Rules, 85 Fed. Reg. at 38,544.  In addition, an EAD is often the first identification document an applicant receives, which asylum applicants can then use to obtain other critical documents such as a driver's license or social security number.  *See* Timeline Repeal Rule, 85 Fed. Reg. at 37,527.  Also with an EAD, an applicant can more easily enroll in job training programs or college, conduct personal banking, and obtain health insurance.  *See id.*; ECF No. 24-4 ¶¶ 14–16.

For twenty-five years, the EAD application process has largely remained unchanged.  *See* ECF No. 23-1 at 10; ECF No. 41 at 7; Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization ("1994 Reforms"), 59 Fed. Reg. 62,284, 62,289-62,303 (Dec. 5, 1994).  Pertinent to this motion, these rules worked as follows.  Asylees first had to submit a completed application for asylum and then wait 150 days from the date the asylum application was deemed complete before the applicant could also apply for an initial EAD.  *Id.* at 62,289; Broader EAD Rules, 85 Fed. Reg. at 38,598.  To ensure the 150-day clock started ticking, the USCIS deemed any asylum application pending for 30-days without further agency notification as "complete" for purposes of the EAD waiting period.  *Id.*  Thus, functionally, the applicant had to wait a total of 180 days—150 days from the time she submitted a complete asylum application before she could apply for an EAD.  Then, once an applicant submitted an EAD application, the agency had thirty days to grant or deny the initial EAD application.  *See* 1994 Reforms, 59 Fed. Reg. at 62,299; Removal of 30-Day Processing

---

for as late as fall of 2023.  *Id.; see also* ECF No. 24-7 ¶ 10 (of Oasis' 500 clients with pending asylum applications, over half have been waiting more than three years for adjudication).

Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications ("Timeline Repeal Rule"), 85 Fed. Reg. 37,502, 37,505 (June 22, 2020); Broader EAD Rules, 85 Fed. Reg. at 38,545; *see also* ECF No. 41 at 8.

Importantly, these regulations represented a purposeful decision to stagger the asylum and EAD application process to deter asylum applicants from filing boilerplate asylum applications solely to obtain work authorization.  ECF No. 23-1 at 11; ECF No. 23-10 (cited at 85 Fed. Reg. 38,544 n.30).  That said, DHS took great pains to minimize the hardship to asylum seekers, stating unequivocally that the 150-day waiting period represented the time "beyond which it would not be appropriate to deny work authorization to a person whose claim ha[d] not been adjudicated."  *See* Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization ("Notice of 1994 Reforms"), 59 Fed. Reg. 14,779, 14,780 (proposed Mar. 30, 1994).  And in the event the underlying asylum application was not timely resolved, the agency also imposed a backstop in requiring USCIS (then the Immigration and Naturalization Service) to process EAD applications within 30 days. *See* 1994 Reforms, 59 Fed. Reg. at 62,284.  Congress later codified the 180-day waiting period for filing EAD applications to mirror these regulations.  *See* Broader EAD Rules, 85 Fed. Reg. at 38,545; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 208, 110 Stat. 3009-693 (1996).

The challenged rules overhaul the EAD application process entirely.  *See* Timeline Repeal Rule, 85 Fed. Reg. at 37,545-46; Broader EAD Rules, 85 Fed. Reg. at 38,626-28.  DHS maintains the challenged rules are necessary to mitigate the increased strain on the agency's limited resources and to "disincentivize aliens who are not bona fide asylum seekers from exploiting a humanitarian program to seek economic opportunity in the United States."  Broader

4

EAD Rules, 85 Fed. Reg. at 38,546; *see also* Timeline Repeal Rule, 85 Fed. Reg. at 37,502.  The

challenged rules are complex, and in practice they make it substantially harder, if not nearly

impossible, to obtain pre-asylum work authorization.[3]  Below more particularly describes those

changes at the heart of this litigation and their combined impact on asylees' ability to work

lawfully while awaiting a decision on their underlying asylum claims.

      **A.      Changes to the EAD Rules**

On September 9, 2019, DHS began the process of changing the entire EAD scheme by

eliminating 30-day EAD processing rule.  *See* Removal of 30-Day Processing Provision for

Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg.

47148 (proposed Sept. 9, 2019) (to be codified at 8 C.F.R. pt. 208).  Over the sixty-day comment

period, DHS received roughly 3,200 comments.  *See* Timeline Repeal Rule, 85 Fed. Reg. at

37,510.  DHS published the final Timeline Repeal Rule unchanged on June 22, 2020, which took

effect on August 21, 2020.  *Id.* at 37,502.  The Timeline Repeal Rule now eliminates any

deadlines previously imposed on the agency to process EAD applications, allowing the agency

unfettered time to determine whether to grant the asylum applicant an EAD.  *Id.* at 37,505.

The comment period on the Timeline Repeal Rule closed on November 8, 2019.   84 Fed.

Reg. 47,148.  Six days later, on November 14, 2019, the agency issued a second notice of

proposed rulemaking for seventeen additional rule changes, all related to the EAD application

process.  *See* Asylum Application, Interview, and Employment Authorization for Applicants, 84

Fed. Reg. 62,374 (proposed Nov. 14, 2019) (to be codified at 8 C.F.R. pts. 208 and 274a).  The

---

[3] In the last year, the agency has also pursued other rulemakings, which are not the subject of this challenge but would make it more difficult to secure asylum.  *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280 (proposed Nov. 14, 2019); *see also* Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69,640 (proposed Dec. 19, 2019); Procedures for Asylum and Withholding of Removal, Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264 (proposed June 15, 2020).

seventeen proposed additional rule changes are collectively termed the "Broader EAD Rules."
*See* 85 Fed. Reg. 38,598-38,600.  A sixty-day comment period followed, during which the
agency received 1,074 comment submissions.  *See id.* at 38,553.  The agency issued the final
Broader EAD Rules on June 26, 2020, which remained largely unchanged save for clarifying that
the rules, in their entirety, would apply only to those EAD applications submitted after the
effective date of the Broader EAD Rules, August 25, 2020.  *See id.* at 38,536, 38,626–28.

  The Broader EAD Rules alter an array of interlocking substantive and procedural
requirements.  First, the new rules more than double the waiting period before an asylum
applicant may file for EAD—from 150 to 365 days.  *Compare* 8 C.F.R. §§ 208.3(c)(3),
208.7(a)(1)(ii), and 274a.12(c)(8) (effective until Aug. 25, 2020) ("the filing of an incomplete
application shall not commence the 150–day period") *with* Broader EAD Rules, 85 Fed. Reg. at
38,626 (to be codified at 8 C.F.R. §§ 208.3(c)(3), 208.7(a)(1)(ii), and 274a.12(c)(8)) ("Receipt of
a properly filed asylum application will commence the 365-day period after which the applicant
may file an application for employment authorization."); ("An applicant for asylum cannot apply
for initial employment authorization earlier than 365 calendar days after the date USCIS or the
immigration court receives the asylum application.") (discussing work-eligible asylee who has
waited 365-day waiting period).

  Second, the new rules eliminate the "deemed complete rule" that triggers the now 365-
day waiting period.  Where previously agency silence on whether an asylum application was
complete automatically deemed it complete and started the EAD application clock, now the
applicant must wait an unspecified time to receive agency notice that the underlying asylum
application is complete.  *Compare* 8 C.F.R. § 208.3(c)(3) (effective until August 25, 2020)
("[An] incomplete application shall not commence the 150–day period after which the applicant

may file an application for employment authorization.") ("If the [agency] has not mailed the incomplete application back to the applicant within 30 days, it shall be deemed complete.") *with* Broader EAD Rules, 85 Fed. Reg. at 38,626 (to be codified at 8 C.F.R. § 208.3(c)(3)) ("Receipt of a properly filed asylum application will commence the 365–day period after which the applicant may file an application for employment authorization."). The elimination of the "deemed complete" rule could conceivably result in an asylum applicant waiting an indefinite period of time for confirmation that her underlying asylum application is complete before the 365-day EAD clock begins to run.

Third, the Broader EAD rules eliminate automatic EAD authorization where the asylum applicant met preexisting criteria; now such EAD applications may be denied at the discretion of the agency. *Compare* 8 C.F.R. § 274a.13(a)(1) (effective until August 25, 2020) ("The approval of applications filed under 8 CFR 274a.12(c), *except for 8 CFR 274a.12(c)(8)*, are within the discretion of USCIS.") *with* Broader EAD Rules, 85 Fed. Reg. at 38,628 (to be codified at 8 C.F.R. § 274a.13(a)(1)) (eliminating asylee exception and stating that the "approval of applications filed under 8 CFR 274a.12(c) is within the discretion of USCIS."). Fourth and relatedly, the Broader EAD Rules also eliminate the agency's preliminary review process whereby if an applicant received a "notice of recommend approval"—indicating the asylee is likely to secure an ultimate grant of asylum—the applicant could apply for an EAD before the expiration of the waiting period. *Compare* 8 C.F.R. § 208.7(a)(1) (effective until August 25, 2020) ("In the case of an applicant whose asylum application has been recommended for approval, the applicant may apply for employment authorization when he or she receives notice of the recommended approval.") *and* § 274a.12(c)(8)(ii) (asylee is eligible for EAD who "[h]as been recommended for approval, but who has not yet received a grant of asylum or withholding

or deportation or removal") *with* Broader EAD Rules, 85 Fed. Reg. at 38,626-28 (to be codified at 8 C.F.R. § 208.7(a)(1) and § 274a.12(c)(8)) (omitting reference to notice of recommended approval in both provisions); (requiring that asylee wait full 365-day waiting period).

Fifth, any applicant with unresolved, applicant-caused delays in the underlying asylum application will be denied an EAD.  Applicant-caused delays include the applicant's requesting to amend or supplement the pending asylum application; failing to appear to receive and acknowledge receipt of the asylum decision; requesting an extension of time to submit additional evidence; or submitting additional documentary evidence fewer than 14 days before the asylum interview.  *See* Broader EAD Rules, 85 Fed. Reg. at 38,626-27 (to be codified at 8 CFR §§ 208.4, 208.7(a)(1)(iv) and 208.9(e)) ("[A]ny delay in adjudication or in proceedings caused by a request to amend or supplement the application will be treated as a delay caused by the applicant for purposes of § 208.7 and 8 C.F.R. § 274a.12(c)(8)."); ("Any delay requested or caused by the applicant … that is still outstanding or has not been remedied when the initial application for [EAD] … is filed will result in a denial of such application."); ("[T]he asylum officer may consider evidence submitted within the 14–day period prior to the interview date or may grant the applicant a brief extension of time during which the applicant may submit additional evidence.  Any such extension will be treated as a delay caused by the applicant for purposes of § 208.7.").

Sixth, the Broader EAD Rules allow the agency—for the first time—to deem either a failure to appear for an asylum interview or a biometric services appointment, a newly added requirement in the EAD application process, an "applicant-caused delay" for purposes of § 208.7(a)(1)(iv).  *Compare* Broader EAD Rules, 85 Fed. Reg. at 38,627 (to be codified at 8 C.F.R. § 208.10(a)) ("The failure to appear for an interview or biometric services appointment

may result in …. [w]aiver of the right to an interview or adjudication; [d]ismissal of the application for asylum; [r]eferral … to the immigration court; or, [d]enial of employment authorization.") *with id.* at 38,599 (explaining no such penalties in prior rule).  Under the old rules, applicant-caused delays did not result in the agency's *denial* of an EAD application but rather tolled the 180-day EAD clock.  *See* 8 C.F.R. §§ 208.4(c) and 208.9(e) (effective until August 25, 2020) ("[A]ny delay caused by such request shall extend the period within which the applicant may not apply for employment authorization in accordance with § 208.7(a)."); (An "asylum officer may grant the applicant a brief extension of time following an interview during which the applicant may submit additional evidence. Any such extension shall extend by an equivalent time the periods specified by § 208.7 for the filing and adjudication of any employment authorization application.").

Seventh, an EAD will be denied to anyone who has not filed for asylum within one year of entering the United States,[4] unless and until an asylum officer or immigration judge finds applicable one of the statutory exceptions to the one-year filing bar.  *Compare* Broader EAD Rules, 85 Fed. Reg. at 38,626 (to be codified at 8 C.F.R. § 208.7 (a)(1)(iii)(F)) (making ineligible for purposes of EAD an asylee who filed his or her asylum application on or after August 25, 2020 and "filed after the one-year filing deadline, unless and until the asylum officer or immigration judge determines that the applicant meets an exception for late filing … or unless the applicant was an unaccompanied child on the date the asylum application was first filed.") *with* 8 C.F.R. § 208.7 (effective until August 25, 2020) (no such restriction).

Eighth, the Broader EAD Rules require applicants to submit biometric information—including fingerprints, photographs, and signatures—at a scheduled biometric services

---

[4] This new rule does not apply to unaccompanied minors.  *See* Broader EAD Rules, 85 Fed. Reg. at 38,533 (explaining the "the one-year filing deadline does not apply to unaccompanied alien children").

appointment. *See* Broader EAD Rules, 85 Fed. Reg. 38,626 (June 26, 2020) (to be codified at 8 C.F.R. § 208.7) ("The applicant must request employment authorization … in the manner prescribed by USCIS … and must submit biometrics at a scheduled biometrics services appointment."). Applicants will also be required to pay a fee of $85 for this service. *See id.* at 38,576 ("DHS anticipates that the biometrics fee that (c)(8) EAD applicants will pay… at least $30 and no more than $85."). The new biometric rule and fees will apply to *both* the asylum and EAD applications. *See id.* at 38,599 ("no such requirement" but "there is a requirement to submit biometrics with an asylum application.").

The remaining rule changes introduce a host of individual "disqualifying" events that limit access to EAD authorization. They include refusal to grant EAD to any applicant who crosses into the United States anywhere but an authorized port of entry, absent certain exceptions, *see* Broader EAD Rules, 85 Fed. Reg. at 38,626 ((to be codified at 8 C.F.R. § 208.7(a)(1)(iii)(G)); disqualification for having sustained a conviction for a "particularly serious crime" or where there is "serious" evidence suggesting the applicant committed a "serious non-political crime" outside the United States, *id.* (to be codified at 8 C.F.R. § 208.7(a)(1)(iii)(B)-(C)); earlier termination of EAD once the underlying asylum application is denied, *see id.* at 38,599, 38,627-28 (to be codified at 8 C.F.R. § 208.7(b) and § 274a.13(d)(3)); and terminating EAD authorization after two years in all cases, *see id.* at 38,599, 38,627 (to be codified at 8 C.F.R. § 208.7(b)(1)).

### B.    The Plaintiffs

The five organization Plaintiffs take umbrage with the eighteen separate rule changes, and thus ask this Court to enjoin their enforcement wholesale. The named Plaintiff, CASA, is the largest member-driven organization with over 100,000 members and whose mission is to

assist immigrants in relocating to the United States lawfully.  ECF No. 24-4 ¶ 2-3.  Since its

founding in 1985, CASA has provided social, health, job training, employment, and legal

services to immigrant and refugee communities in Maryland, Virginia, and Pennsylvania.  *Id.* ¶¶

3-5.  Most of CASA's services are offered only to members at a reduced cost.  *Id.*  Its members

pay an annual membership fee between $35 and $40, which in turn allows them to take

advantage of CASA's various services.  *Id.* ¶ 8.  CASA members are part of the organization's

leadership and are active participants in the organization's advocacy and development efforts.

*Id.* ¶¶ 7-8.  Thousands of CASA's members have applied for asylum and work authorization.  *Id.*

¶ 9.

ASAP, too, is a member-driven organization.  It currently retains over 4,000 members,

the majority of whom are mothers who sought asylum at the Mexico-U.S. border, were initially

detained by border agents, then released and placed in removal proceedings.  ECF No. 24-5 ¶ 7.

ASAP members live throughout the United States, in over 40 states, and in the District of

Columbia.  *Id.* ¶ 9.  ASAP provides its members with "community support and legal services

regardless of where they are located."  *Id.* ¶ 4.

The remaining three organizations, Centro Legal de la Raza ("Centro Legal"), Oasis

Legal Services ("Oasis"), and Pangea Legal Services ("Pangea"), are non-profit organizations

whose missions include providing to asylum seekers direct legal representation as well as other

social and educational services.  While each organization has a slightly different business model,

they primarily offer pro-bono immigration related legal services.  *See generally* ECF No. 24-6;

ECF No. 24-7; ECF No. 24-8.  Centro Legal provides direct legal services, hosts educational

trainings for lawyers and clients, and engages in advocacy efforts.  ECF No. 24-6 ¶¶ 2, 3, 17-19,

24.  It also partners with local law firms to host single-day workshops for asylum seekers who

need help preparing their asylum or EAD applications.  *Id.* ¶¶ 1-4, 17.  Centro Legal does not charge clients for any of its services.  *Id.* ¶ 25.

Oasis provides direct legal services to clients in the San Francisco Bay area.  ECF No 24-7 ¶¶ 3, 44.  It operates on a "low bono/pro bono model," in which it uses a sliding scale based on a client's income.  *Id.* ¶ 44.  For an asylum case, its fees range from $0 to $4000, and its clients are only expected to pay what they can afford.  *Id.*  Many of its clients can afford Oasis' services once they receive an EAD and find lawful employment.  *Id.*

Pangea is a nonprofit organization focused on direct legal services and advocacy work for immigrant populations, including asylees.  ECF No 24-8 ¶¶ 2, 4.  It provides services to its clients either at a low cost or free of charge.  *Id.*  For clients who do not qualify for free services, Pangea typically charges $200 to prepare an EAD application.  *Id.* ¶¶ 10, 38.

All five Plaintiffs aver that the challenged rules frustrate their missions by requiring diversion of already-precious time and resources to processing as many asylum and EAD applications as possible before the challenged rules took effect.  ECF No. 24-4 ¶¶ 29-30; ECF No. 24-5 ¶¶ 35-36; ECF No. 24-6 ¶¶ 20-23; ECF No. 24-7 ¶¶ 36-38; ECF No. 24-8 ¶ 12.  Plaintiffs also assert that with far stricter rules now in place, each organization will have to devote more time and resources to counsel their clients properly and then prepare their applications.  *See, e.g.*, ECF No. 24-7 ¶ 36.  Oasis specifically maintains that because it derives a third of its revenue from its clients—many of whom only become paying clients once they are work-approved—the challenged rules "jeopardize" its "ability to stay open."  *Id.* ¶ 46.

The Complaint and accompanying declarations identify five individual members—three from CASA and two from ASAP—for whom the Asylum EAD Rules will adversely affect their

prospects of obtaining an EAD.[5]  ASAP member, W.L., fled Guatemala with her eight-year-old son after being raped repeatedly and then threatened with death by a man whose prominence in Guatemala allowed him to evade arrest.  ECF No. 1 ¶ 7.  W.L. currently shares a single room with her children and is supported by family.  *Id.*  W.L. filed her asylum application on April 3, 2020.  *Id.* ¶ 8.  Under the old rules, she would have been eligible to apply for an EAD by August 31 and have her application processed within 30 days.  *Id.*  Also, under the old rules, the agency was required to issue her an EAD provided she is work-eligible.  W.L. planned to work either at a local church, or another stable job once she could do so legally.  *Id.*

Under the challenged rules, W.L. will be forced to wait at least seven more months before she can even apply for an EAD.  *Id.* ¶ 9.  She must then wait an indeterminate length of time for USCIS to process her application.  As a result, W.L. is stripped of opportunity for gainful employment necessary to feed, clothe, and house her children or hire an immigration attorney to pursue her asylum claim.  *Id.*

ASAP member N.G. escaped Honduras with her daughter and entered the U.S. in May 2019.  *Id.* ¶ 134; ECF No. 24-5 ¶ 26.  N.G. filed for asylum in April of this year.  ECF No. 1 ¶ 133.  Under the old rules, N.G. would have been eligible to apply for work authorization this month but will now have to wait at least seven more months to apply and an indeterminate time until she hears back from the agency.  *See id.*; *see also* Broader EAD Rules, 85 Fed. Reg at 38, 626 (to be codified at §§ 208.7(a)(1)(ii) and 274a.13(a)(1)).  In the meantime, N.G. has been unable to work, secure stable housing, alleviate her family's food insecurity, or hire a lawyer to assist with her asylum application.  ECF No. 1 ¶ 134.  N.G. and her daughter have survived on the generosity of others.  *Id.*

---

[5] Four of these individuals are specifically identified in the Complaint, while the fifth, H.V., is discussed only in CASA's submitted declaration.  *See* ECF No. 24-4 ¶ 23.

CASA member, M.C., came to the United States in December 2017 after fleeing Honduras with her eleven-year-old daughter. *Id.* ¶ 131; ECF No. 24-4 ¶ 25. M.C. found a place to live with a man who ended up abusing her and preventing her from applying for asylum within one year after her arrival. *Id.* As of the filing of the Complaint, CASA was helping M.C. prepare and submit her asylum application. *Id.* ¶ 26.

CASA member, H.V., has struggled to find work without an EAD since arriving with her four-year-old daughter in May 2019. *Id.* ¶ 23. That hardship—exacerbated by the lasting effects of the trauma that required her to flee Honduras—has prevented H.V. from finding a lawyer and applying for asylum before the challenged rules went into effect. *Id.* Given that H.V. will submit her asylum application after August 25, 2020, she is now ineligible under the challenged rules to receive pre-asylum work authorization unless and until an immigration judge concludes that she has demonstrated "good cause" for filing beyond the one-year deadline. *See* Broader EAD Rules, 85 Fed. Reg. at 38,626. The practical effect is that H.V. will be deprived any opportunity to receive work authorization timely and in advance of adjudication of her asylum application. ECF No. 24-4 ¶ 23.

A.O., a Venezuelan national who entered the U.S. on a non-immigrant visitor's visa in December 2019, is also a CASA member. ECF No. 1 ¶ 132. A former journalist in Venezuela, A.O. and her family fled Venezuela and are now seeking asylum from protracted physical violence and threats after publicly opposing President Nicolás Maduro. *Id.* CASA is now assisting A.O. with submitting her asylum application. *Id.* She too will have to wait a significantly longer time to obtain an EAD under the new rules. *Id.*

## II.    Procedural Background

On July 21, 2020, Plaintiffs filed their Complaint, attacking the entirety of the challenged rules. ECF No. 1. They soon after moved for a stay of the challenged rules or alternatively for a

nationwide injunction pending resolution on the merits.  ECF No. 23-1.  In support of their requested relief, they make three bold and complicated arguments.

First, they argue that Wolf's appointment and tenure as Acting DHS Secretary violate section 3346 of the Federal Vacancies Reform Act ("FVRA").  *Id.* at 27.  With certain exceptions, the FVRA generally bars acting officials from serving for more than 210 days in a position that requires Presidential appointment and Senate confirmation ("PAS").  *See* 5 U.S.C. § 3346.  The last Senate-confirmed DHS Secretary, Kirstjen Nielsen ("Nielsen"), resigned on April 10, 2019.  ECF No. 41-1 at 44-45.  Acting Secretary Wolf did not assume the role of Acting Secretary until his predecessor, Kevin McAleenan, resigned on November 13, 2019—217 days after Nielsen resigned and the office first became vacant.  ECF No. 23-1 at 34; ECF No. 41-1 at 71.  Thus, according to Plaintiffs, the FVRA timing provision applies to Wolf's designation, Wolf acted beyond the 210-day FRVA time limit when promulgating the challenged rules, and thus the FVRA demands vacatur of the rules.  ECF No. 23-1 at 33.

Second, Plaintiffs assert Wolf's appointment violated the succession provisions of the agency's enabling statute, the Homeland Security Act ("HSA").  6 U.S.C. § 113(g)(2).  The HSA statutorily sets an order of succession in the event of a vacancy, *id.* §§ 113(a)(1)(A), (a)(1)(F) and (g)(1), and if such pre-identified positions are vacant, allows the Secretary to designate a "further order of succession," *id.* § 113(g)(2).  However, because the installation of Wolf's predecessor, Acting Secretary Kevin McAleenan, contravened Secretary Nielsen's order of succession, McAleenan's later amendment of the order was unlawful, as was Wolf's ascension.  ECF No. 23-1 at 34-37.

Third, Plaintiffs contend that the agency's rulemaking process violated the APA.  *Id.* at 16-31.  They challenge the new rules as procedurally deficient and as arbitrary and capricious.

As for the Timeline Repeal Rule, Plaintiffs maintain that the agency's elimination of any processing deadline lacked a reasoned basis and runs counter to the agency's stated rationale for implementing the rules.  *See id.*

With only 28 days from the request for injunctive relief to the effective date of the Timeline Repeal Rule—and the Broader EAD Rules scheduled to go into effect four days after that—the Court put the parties and itself on an expedited briefing schedule.  ECF No. 28.[6] However, as is often the case lately with challenges to executive agency action, the sands shifted in the legal landscape during briefing.

On August 5, 2020, the United States Court of Appeals for the Fourth Circuit issued its decision in *Casa de Maryland, Inc. v. Trump*, No. 19-2222, 2020 WL 4664820 (4th Cir. Aug. 5, 2020), which addressed questions of standing and the propriety of issuing the very nationwide injunction that the Plaintiffs press here.  To complicate matters further, the parties had not briefed standing, a fundamental question invoking this Court's jurisdiction to hear the case at all. *See* ECF Nos. 23-1 & 41.  With five organizations challenging the entirety of eighteen rule changes, it was incumbent upon the Court to require further briefing and argument on standing. ECF No. 53.

Also, on the morning of the first hearing, the U.S. Government Accountability Office ("GAO") issued its advisory opinion that Wolf had taken office as Acting Secretary in violation of the applicable succession order and thus has been acting without lawful authority.  ECF No. 51-1 (U.S. Government Accountability Office Decision, Department of Homeland Security— Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official

---

[6] The Court also permitted the Constitutional Accountability Center (ECF No. 38); Kids in Need of Defense (ECF No. 39); Morton Rosenberg (ECF No. 40); the District of Columbia and State of New York (ECF No. 42); and Oxfam America and the University of Maryland Carey Immigration Clinic (ECF No. 43) to file briefs as Amici Curae.

Performing the Duties of Deputy Secretary of Homeland Security (Aug. 14, 2020)).  The GAO's decision mirrored many of the arguments Plaintiffs had put before the Court, although neither the parties nor the Court had any meaningful opportunity to digest the decision.  Most pertinent to this case, the Government could not yet take a position on its impact.  ECF No. 56 at 16-17.  The Court, therefore, requested additional briefing related to the validity of Wolf's appointment, and thus his authority to promulgate the challenged rules.  *See* ECF Nos. 53 & 64.

Lastly, the Court was mindful that the additional briefing and careful consideration of these fundamental issues would mean that this opinion could not issue prior to the challenged Rules taking effect on August 21 and 25, 2020 respectively.  The Court thus allowed briefing on the Plaintiffs' urgent plea for a "stay" to issue pursuant to section 705 of the APA.  ECF No. 53.  The Government rightly responded that a section 705 stay, in effect, functions similarly to a preliminary injunction and so it would not contest this Court's power to issue such a stay after the effective date of the challenged rules.  ECF No. 55.

The Court conducted a subsequent hearing on August 28, 2020, and allowed further expedited briefing.  ECF No. 64.  Based on a careful consideration of the parties' submissions, and for the following reasons, Plaintiffs' motion for injunctive relief is granted as to some, but not all, of the challenged rules.

### III.   Standing

As a preliminary matter, the Court must determine whether the Plaintiffs have standing to bring this case.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Pursuant to Article III of the United States Constitution, federal courts are of limited jurisdiction, hearing only live "cases" and "controversies."  *Id*. at 559; U.S. Const. art. III, § 2.  A legal action meets the case-or-controversy requirement where the "questions [are] presented in an adversary context."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) (*quoting Flast v. Cohen*, 392 U.S.

17

83, 95 (1968)) (internal quotation marks omitted).  Standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (citations omitted).  "Thus, when a defendant challenges a plaintiff's standing, we analyze the challenge differently depending on the stage of litigation at which the challenge is brought and the substance of the defendant's arguments." *Id.*

Because the Government challenges standing "on the pleadings, [the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.'" *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181–82 (4th Cir. 2013)).  Plaintiffs also have submitted detailed declarations regarding the structure and function of their organizations and the challenged rules' impact on selected members.  The Court construes such facts most favorably to Plaintiffs when assessing whether jurisdiction is proper.  *See Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 479 (D. Md. 2009) (citing *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)).

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Davis v. FEC*, 554 U.S. 724, 733 (2008) (citations omitted).   It requires a plaintiff to have "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," "fairly traceable to the challenged action of the defendant," and "likely . . . [to] be redressed by a favorable decision." *Bishop v. Bartlett,* 575 F.3d 419, 423 (4th Cir. 2009) (quotations omitted).  A plaintiff must have a cognizable and redressable injury as to "each claim" presented and "each form of relief" sought.  *Davis*, 554 U.S. at 734 (citations omitted).   In this way, "the standing inquiry remains focused on whether

the [plaintiff] … ha[s] the requisite stake in the outcome when the suit was filed." *Id.* (citations omitted).

Plaintiffs argue that standing is proper under two alternative yet related theories. They each claim organizational standing to pursue injuries sustained to the organization directly, as well as associational standing to pursue claims on behalf of their members. Each theory, they argue, confers standing as to all claims applicable to all eighteen rules. The Court, therefore, must determine whether any one Plaintiff has sufficiently demonstrated either organizational standing or representational standing to challenge each rule change. *See Casa de Maryland*, 2020 WL 4664820, at *10; *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999) (holding that a case is justiciable if some, but not necessarily all, of the plaintiffs have standing as to a particular defendant); *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,* 547 U.S. 47, 52 n.2, (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article Ill's case-or-controversy requirement.")). The Court concludes that no Plaintiff has organizational standing but two Plaintiffs, CASA and ASAP, maintain representational standing to challenge certain Asylum EAD rules.

### A.   Organizational Standing

Organizational standing is conferred when an organization must show it has suffered an "injury in fact," in that defendant's "actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975). Organizational standing, therefore, derives from injury the organization itself has suffered. In this respect, the Fourth Circuit recently clarified that an organization's "voluntary budgetary" choices or shifts in

priorities do not constitute a constitutionally cognizable injury.  *See Casa de Maryland*, 2020
WL 4664820, at *9.  This is because "[o]rganizational injury … is measured against a group's
ability to operate as an organization, not its theoretical ability to *effectuate* its objectives in its
ideal world."  *Id.*

Plaintiffs respond that they have suffered the same type of direct injury that conferred
standing in *Havens Realty Corp. v. Coleman*.  ECF No. 66 at 2-3.  The Court disagrees.  In
*Havens*, the plaintiff organization, "HOME," provided counseling and referral services to its
minority clients in an effort to promote equal opportunity in housing.  455 U.S. at 368.  The
Supreme Court found that HOME had standing because the defendant's alleged practices
"perceptibly impaired" its "ability to provide counseling and referral services for low and
moderate-income homeseekers."  *Id.* at 379.

Plaintiffs maintain that, like HOME, each has organizational standing because the
challenged rules frustrate their missions.  ECF No. 59 at 1; ECF No. 62-1 at 2.  Each
organization describes the same injury but in different terms: that the rules have already required
them—and will continue to require them—to devote significantly more time and resources to
understanding the rule changes, advising their staff attorneys and clients accordingly, and then
processing asylum and EAD applications at the expense of other clients they serve and other
important services offered.  ECF No. 24-4 ¶¶ 29-30; ECF No. 24-5 ¶ 35; ECF No. 24-6 ¶¶ 20-23;
ECF No. 24-7 ¶ 36; ECF No. 24-8 ¶ 25.  The Rules, in short, put further strain on their already
precious time and resources.

This financial strain, however, does not constitute a cognizable injury.  A "diversion of
resources might harm the organization by reducing the funds available for other purposes, [but]
'it results not from any actions taken by [the defendant], but rather from the [organization's] own

budgetary choices.'" *Lane*, 703 F.3d at 675 (quoting *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)).  As the Fourth Circuit made clear in *Lane*, prioritization of resources to combat a perceived ill does not constitute cognizable injury: "To determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply… that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another." *Lane*, 703 F.3d at 675 (citations omitted).

Any potential doubt as to the proper reading or scope of *Lane* is extinguished by the Fourth Circuit's recent decision in *Casa*.  *See* 2020 WL 4664820, at *9.  There, the Fourth Circuit cautioned that "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy."  *Id.* (internal citations omitted).  It distinguished between "voluntary expenditure of resources to counteract governmental action" and governmental action that "*directly* impairs" an organization's ability to "provide counseling, referral, or other services to immigrants."  *Id.*

In light of this clear guidance, and on the current record, the Court cannot find that any one Plaintiff has organizational standing.  The Plaintiff organizations aver facts that are indistinguishable from those averred in *Casa*: that each will experience the financial impact of choosing to reallocate resources to help its members respond to the challenged rules.  *See id.*  But none aver the kind of direct impairment necessary to confer standing.  Making voluntary choices about redirecting resources does not suffice.  *See id.*  ("CASA's unilateral and uncompelled response to the shifting needs of its members cannot manufacture an Article III injury.").[7]

---

[7] The Court recognizes that as the record currently stands, Plaintiff Oasis has inched substantially farther than the others, given that its business model relies on asylee clients to be able to pay at some point, and that many can only

**B.      Representational Standing**

Representational standing, in contrast, concerns injury suffered by an organization's *members* as opposed to the organization itself.  To establish representational standing, the organization must establish that: "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit."  *S. Walk*, 713 F.3d at 184 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  This requires that the organization put forward facts to make plausible that "at least one identified member had suffered or would suffer harm."  *S. Walk*, 713 F.2d at 184.

On the current record, the Court concludes that Plaintiffs CASA and ASAP have demonstrated representational standing vis-à-vis their individual members.  Specifically, when construing the facts alleged most favorably to the Plaintiffs, the members have alleged injury arising from enactment of the Timeline Repeal Rule[8] and five of the Broader EAD Rules:

- The 365-day waiting period, 85 Fed. Reg. at 38,626-28 (referenced throughout and as codified at 8 C.F.R. § 208.3(c)(3); § 208.7(a)(1)(ii), (a)(1)(iii)(E), and (b)(1)(i); and § 274a.12(c)(8));

- Removal of "deemed-complete" rule, 85 Fed. Reg. at 38,626 (codified at 8 C.F.R. § 208.3) (omitting instruction that if the agency has not "mailed the incomplete application back to the applicant within 30 days, it shall be deemed complete.").

- The discretionary review rule, providing that agency is no longer required to issue EADs to eligible asylees, 85 Fed. Reg. at 38,628 (changes reflected at 8 C.F.R. § 274a.13(a)(1)).

---

do so once they have obtained an EAD.  In this way, Oasis' financial concerns do not relate to voluntary *expenditures* but rather the organization's future revenue streams.  But where *Lane* and *Casa de Maryland* emphasized the difference between the direct and indirect effects of governmental action, the Court finds that Oasis' theory—that it will suffer the downstream effects of the direct, financial injury to its asylee clients—cannot confer standing.

[8] 85 Fed. Reg. at 37,545 (printing parts of the regulations to be codified at 8 C.F.R. § 208.7(a)(1)) (omitting language stating that agency has 30-day processing deadline).

- The one-year filing bar, 85 Fed. Reg. at 38,626 (codified at 8 C.F.R. § 208.7(a)(1)(iii)(F)).

- The rule requiring submission of biometric information as part of EAD applications, 85 Fed. Reg. at 38,626 (codified at 8 C.F.R. § 208.7(a)(1)(i) and (a)(1)(iv)(E); and § 208.10).

The identified members will suffer concrete and particularized injury arising from this subset of the challenged rules which add economic burdens to the application process and indefinitely delay or deny advance work authorization. *See, e.g.*, ECF No. 24-6 ¶¶ 11-12 (explaining how delay or denial of EAD will exacerbate "physical or mental harm" and exacerbate already existent "economic insecurity"). With many asylees waiting years for their underlying asylum claims to be adjudicated—and no assurance under the new rules as to whether or when they will ever hear from the agency regarding their EAD application—these new rules also undermine the applicants' ability to pursue their asylum claims, and may well result in some of them abandoning such claims altogether.

As to the remaining elements of representational standing, both CASA and ASAP easily satisfy them. *See S. Walk*, 713 F.3d at 184. The interest of these individual members squarely within CASA and ASAP's respective missions, and each devote significant time and resources to representing asylees as they navigate the EAD and asylum application process. *See id.* (interests must be "germane" to organization's purpose). As to the third prong, Plaintiffs' legal challenges do not require the participation of individual members in the lawsuit. *Id.* Plaintiffs seek the ultimate remedy of setting aside the rules, not money damages or other remedy that requires the individual member to join the litigation as a party. *See* ECF Nos. 1 & 23. Thus, with each prong satisfied, the Court concludes CASA and ASAP have demonstrated representational standing on the current record.

The Court settled on the above-identified rules after concluding that at least one identified member would have individual standing in her own right to challenge each of these rule changes. *See Casa de Maryland*, 2020 WL 4664820, at *9 (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs., Inc.*, 528 U.S. 167, 183–84 (2000)).  Unsurprisingly, Plaintiffs oppose the Court's winnowing down of their claims.  Instead, they offer a theory of standing that would treat the Broader EAD Rules as a "package" whereby this Court may reach all *seventeen* rule changes, because *some* of them will work a concrete and particularized harm on their five members.  ECF Nos. 64 & 66.  This theory cannot be squared with the well-established requirement that to have standing a plaintiff must state a cognizable and redressable injury as to "each claim" presented and "each form of relief" sought.  *See Davis*, 554 U.S. at 734 (to challenge two different subsections within the same statutory provision, plaintiff needed to show a cognizable injury flowing from the application of each subsection).

Certain rule changes help illustrate the point.  For instance, one of the challenged rules prohibits pre-asylum work authorization for any applicant who enters the United States *on or after* August 25, 2020, at a place other than an authorized port of entry (the "unlawful entry bar").  *See* Broader EAD Rules, 85 Fed. Reg. at 38,626 (to be codified at 8 C.F.R. § 208.7(a)(1)(iii)(G)).  Each of the five members identified entered the U.S. long before August 25, and so they do not appear subject to this prohibition.   Thus, this Court strains to see how this rule change visits any harm on Plaintiffs.  To the extent it does, Plaintiffs have not identified "at least one member" who has or will be harmed by this rule change, as required under the applicable pleading standards.  *S. Walk*, 713 F.2d at 184.

Similarly, another rule change broadens the category of criminal convictions that disqualify an applicant from receiving an EAD.  *See id.* (to be codified at 8 C.F.R. §

24

208.7(a)(1)(iii)(B)-(C)).  But no member appears to have criminal records or pending charges.
This Court cannot divine how this rule change would visit any harms on them.  When
representational standing is the only basis on which this Court has jurisdiction, the Court simply
cannot endorse challenge to a wide swath of rule changes that bear no relation to the harms that
their identified members have suffered.[9]

With standing established as to six identified rules, the Court next turns to the merits of
Plaintiffs motion.  *See Casa de Maryland*, 2020 WL 4664820, at *10 (finding jurisdiction where
only some parties adequately alleged a constitutionally cognizable injury); *see also Casa de
Maryland v. DHS*, 924 F.3d 684, 701 n.14 (4th Cir. 2019) (finding that because certain
individual plaintiffs have standing, Court need not consider whether other plaintiffs also have
standing).

### IV.      Standard of Review for Requested Injunctive Relief

A preliminary injunction "is a stopgap measure, generally limited as to time, and
intended to maintain a status quo or 'to preserve the relative positions of the parties'" pending
final judicial review.  *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ.
of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).  Because a preliminary injunction often issues
on an incomplete record and, in the context of agency rulemaking, compels the defendant to act
or refrain from acting on such rules, the Court must proceed with a healthy appreciation for the
substantial dangers inherent in granting such extraordinary relief.  *See Hughes Network Sys.,
Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (citations omitted).  For
this reason, a preliminary injunctive is warranted only upon "a clear showing that the plaintiff is
entitled to relief."  *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011)

---

[9] Had Plaintiffs carried their burden to demonstrate the Broader EAD rules were non-severable, *see infra* pp. 67-68,
they may have otherwise maintained standing to challenge the rules package entirely.

(quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)) (internal quotation marks omitted).

A preliminary injunction must not issue unless the Plaintiffs demonstrate, by a preponderance of the evidence, four well-established factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that issuing the injunction is in the public interest. *See Winter*, 555 U.S. at 20; *Dewhurst*, 649 F.3d at 290. At this stage, the first factor is the "most important" one. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Where the government is a party, the final two factors merge. *See Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (quoting *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Similarly, pursuant to section 705 of the APA, a reviewing court may stay "agency action" pending judicial review "to prevent irreparable injury." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Dist. of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020), *appeal filed*, No. 20-5136 (D.C. Cir. filed May 15, 2020) (citations omitted); *see Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016); *Humane Soc'y of United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009); *Assoc. Sec. Corp. v. SEC*, 283 F.2d 773, 774–75 (10th Cir. 1960); *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990) ("The standard is the same whether a preliminary injunction against agency action . . . or a stay of that action is being sought."); *see also South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018) (comparing the court's

discretion under section 705 to stay rules pending final review with its mandatory obligation to set aside unlawful agency action under section 706).

With this framework in mind, the Court addresses each of the four *Winter* factors separately.

### A.      Likelihood of Success on Merits

For purposes of this motion, Plaintiffs argue they will succeed on three claims, each of which renders the challenged rules a nullity.  Plaintiffs first argue that because Acting Secretary Wolf promulgated the challenged rules in violation of the FVRA, they "have no force and effect."  ECF No. 23-1 at 33.  Second, and alternatively, the rules are null and void because Wolf's ascension to the position of Acting DHS Secretary violated the agency's succession order.  *Id.* at 34.  Third, the rules are arbitrary and capricious in violation of the APA, U.S.C. § 706(2).  *Id.* at 16.  The Court recognizes that Plaintiffs need only demonstrate success on the merits of one claim.  However, because each claim is one of first, or near first, impression, the Court will address each in turn.

### 1.   Challenge under the FVRA

It is undisputed that the office of the DHS Secretary is one subject to Presidential nomination and Senate Confirmation, otherwise known as a "PAS" position.  6 U.S.C. § 112(a).  The last time the office of DHS Secretary had been occupied by a PAS officer was April 10, 2019, when Secretary Kirstjen Nielsen ("Nielsen") resigned and made way for two successive Acting Secretaries.[10]  ECF No. 41 at 29; ECF No. 41-2 at 45.  First, Customs and Border Patrol Commissioner, Kevin McAleenan ("McAleenan"), assumed the role of Acting Secretary until he

---

[10] The parties dispute whether Nielsen's resignation became effective on April 7, 2019, when she announced her resignation, or whether it occurred on April 10, 2019, when she took her last action in office.  *See* ECF No. 23-1 at 33-34; ECF No. 41 at 29.  The Court does not find it necessary to resolve this factual dispute.

resigned on November 13, 2019.  ECF No. 41-1 at 2.  Next, upon McAleenan's departure, then-Under Secretary of Homeland Security for Strategy, Policy and Plans, Chad Wolf, slotted into the position of Acting Secretary and has served in that capacity ever since.  *Id.* at 71; ECF No. 41 at 32.  All told, as of the writing of this opinion, the DHS has been without a PAS Secretary for 520 days.

As this vacancy underscores, the confirmation process can be less than a model of efficiency.  The Appointments Clause of the U.S. Constitution requires presidentially appointed "Officers of the United States" to receive Senate confirmation, U.S. Const. art. II, § 2, cl. 2.  But where a vacancy arises and "the President and Senate cannot promptly agree on a replacement," the ensuing delay risks that the PAS office remains unfilled and its official acts go "unperformed."  *N.L.R.B. v. S.W. General, Inc.*, 139 S. Ct. 929, 934 (2017).  To avoid an unnecessary standstill, Congress has enacted legislation (collectively referred to as "vacancies acts"), that imports flexibility into an otherwise fixed constitutional requirement.  *See id.*  These vacancy statutes have taken many forms, but they all are animated by a common unifying principle—the Senate ceding limited authority to the Executive Branch to appoint an interim officer so as to maintain orderly administration of agency functions.  *Id.* at 935 (citing Act of July 23, 1868, ch. 227, 15 Stat. 168; Act of Feb. 20, 1863, ch. 45, 12 Stat. 656).

Passed in 1868, the original Vacancies Act generally designated the "first or sole assistant" as the acting official but gave the President the option to appoint someone "already serving in a PAS office."  *Id.* (citing 15 Stat. 168).  By 1891, Congress put time limits on such interim appointments to serve for not more than 30 days.  *Id.* (citing Act of Feb. 6, 1891, ch. 113, 26 Stat. 733).  Later versions of the Act maintained similar features, including time limitations on interim service.  *See* Pub. L. No. 89–554, 80 Stat. 378, 426 (Sept. 6, 1966); Pub. L. No. 100–

398, 102 Stat. 985, 988 (Aug. 17, 1988).  The Acts were amended over time because, as one

Court aptly observed, Presidents did "not always compl[y]."  *SW General, Inc. v. N.L.R.B.,* 796

F.3d 67, 70 (D.C. Cir. 2015) (quoting M. Rosenberg, Congressional Research Service Report for

Congress, 98–892 A., The New Vacancies Act: Congress Acts to Protect the Senate's

Confirmation Prerogative 2–3 (1998)).

By the 1980s, the Executive Branch had taken the position that heads of executive

agencies retained independent authority apart from the Vacancies Act to temporarily fill PAS

offices.  *See S.W. General*, 137 S. Ct. at 935.  To hold agencies accountable, Congress extended

an olive branch by lengthening the period of acting service to 120 days under the Act, with the

period tolled while a nomination for a PAS was pending.  *Id.* at 936 (citing Presidential

Transitions Effectiveness Act, § 7, 102 Stat. 988).  Despite this, "tensions" between timely

appointment and confirmation of PAS offices and lengthy service of acting officers "did not

ease."  *Id.*  In fact, as of the FVRA's enactment in 1998, roughly 20% of PAS positions were

filled by acting officials, many of whom were serving beyond the 120-day limit under the

Vacancies Act.  *Id.*   But a court's "sanctioning this conduct . . . was the straw that broke the

camel's back."  ECF No. 40-1 at 14 (*citing Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift

Supervision*, 139 F.3d 203 (D.C. Cir. 1998)).

In *Doolin,* the United States Court of Appeals for the D.C. Circuit essentially read the

1988 Vacancies Act as permitting seriatim temporary appointments that, taken together, allowed

a PAS office to be filled indefinitely by interim officers.  *Id.* 139 F.3d at 208–09.  In response to

this decision, a Senate Committee Report noted that "this portion of the court's opinion

necessitate[d] legislative action."  S. Rep. No. 105-250, at 6 (1988).  Accordingly, Congress

passed the FVRA in 1998, which totally replaced the former Vacancies Act.  *See* Pub. L. No. 105

-277, Div. C, tit. 1, § 151, 112 Stat. 2681-611-16 (codified at 5 U.S.C.§§ 3345-3349d); *see also*

*S.W. General*, 796 F.3d at 70 (citing 144 Cong. Rec. S6413-14 (daily ed. June 16, 1998)

(statement of Sen. Thompson)).  As promised, the FVRA fixed the timing problem identified in

*Doolin*.  139 F.3d at 208–09.  It made clear that the timing provision—which sets the default

maximum length of acting service at 210 days—begins to run from the date the vacancy arises,

rather than the date when the acting official assumes office.  *See* 5 U.S.C. § 3346(a)(1).

From this change, the Plaintiffs argue quite simply that because Wolf became Acting

Secretary after the 210th day from when the office's vacancy arose, Wolf assumed office in

violation of the FVRA, and thus the challenged rules must be declared "without force and

effect," as mandated by the Act.  ECF No. 23-1 at 33.  If it were only that simple.  To understand

why not requires a careful walk-through of the FVRA.  *See S.W. General*, 796 F.3d at 74.

("Throughout the FVRA, the Congress was precise in its use of internal cross-references.")

(citations omitted).

Section 3345 of the FVRA sets out three avenues for an acting officer to assume a PAS

office when a vacancy arises.  The first, known as the default rule, provides:

> (a) If an officer of an Executive agency ... whose appointment to
> office is required to be made by the President, by and with the advice
> and consent of the Senate, dies, resigns, or is otherwise unable to
> perform the functions and duties of the office—
>
> (1) the first assistant to the office of such officer shall perform the
> functions and duties of the office temporarily in an acting capacity
> **subject to the time limitations of section 3346**;

5 U.S.C. § 3345(a)(1) (emphasis added).  Section 3345 also permits "the President (and only the

President)" to direct a PAS official to "perform the functions and duties of the vacant office

temporarily in an acting capacity subject to the time limitations of section 3346"; or to "direct an

officer or employee of such Executive agency to perform the functions and duties of the vacant

office temporarily in an acting capacity, subject to the time limitations of section 3346," if such

officer of employee meets certain criteria not relevant here.  *Id.* § 3345(a)(2) and (a)(3).

With regard to an acting officer selected under the default rule or by the President under

3345, section 3346 provides:

> (a) Except in the case of a vacancy caused by sickness, the person
> serving as an acting officer as described under section 3345 may
> serve in the office—
>
> (1) for no longer than 210 days beginning on the date the vacancy
> occurs;

5 U.S.C. § 3346(a)(1).  Accordingly, notwithstanding certain exceptions not relevant here, a

person who is tapped to fill a vacant PAS office pursuant to section 3345 of the FVRA may only

serve in that "office" for 210 days as measured from the date of vacancy.  *See id.*

However, Congress enacted the FVRA against the backdrop of several agency-specific

succession statutes applicable to PAS offices.  *See* S. Rep. No. 105-250, at 15-17.  To

accommodate these agency-specific statues, Congress added section 3347.  5 U.S.C. § 3347.

Known as the "exclusivity" provision, section 3347 makes clear that the FVRA is the exclusive

mechanism for temporary appointments of PAS offices, unless an agency-specific statute

provides an alternate method of selection.  Section 3347 states:

> (a) **Sections 3345 and 3346 are the exclusive means for
> temporarily authorizing an acting official to perform the
> functions and duties of any office** of an Executive agency
> (including the Executive Office of the President, and other than the
> Government Accountability Office) for which appointment is
> required to be made by the President, by and with the advice and
> consent of the Senate, **unless**—
>
> (1) a statutory provision expressly—
>
> (A) authorizes the President, a court, or the head of an Executive
> department, to designate an officer or employee to perform the
> functions and duties of a specified office temporarily in an acting
> capacity; or

>      (B) designates an officer or employee to perform the functions and
>      duties of a specified office temporarily in an acting capacity

*Id.* § 3347(a)(1) (emphasis added).  Accordingly, when such an agency-specific succession

statute exists, the FVRA is no longer the "exclusive" means, but rather is "a means" of selecting

a person to serve in an acting capacity for a vacant PAS office.  *See Hooks v. Kitsap Tenant*

*Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016); *see also Guedes v. Bureau of Alcohol,*

*Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 143 (D.D.C. 2019)("Agency-specific

statutes like the AG Act were expected to operate alongside the FVRA, not to displace it"), *aff'd*

*on other grounds*, 920 F.3d 1, 12 (D.C. Cir. 2019) (per curiam); *United States v. Castillo*, 772

Fed. Appx. 11, 13 n.5 (3d Cir. 2019) (collecting cases); *cf. United States v. Smith*, 962 F.3d 755,

762–63 n.1 (4th Cir. 2020).

Critically, section 3347 also makes clear that when the FVRA operates as the exclusive

means for filling a temporary PAS position via section 3345, the 210-day time limit plainly

applies.  *See* 5 U.S.C. § 3347.  Congress took great pains to identify "*Sections 3345 and 3346*" as

the "exclusive means for temporarily authorizing an acting official to perform the functions and

duties of any office … unless" an agency-specific statute authorizes the agency head to designate

an order of succession.  *Id.* § 3347(a)(1)(A) (emphasis added).  Congress thus tied the timing

provision of section 3346 only to offices filled under section 3345, and no others.  *See id.* §§

3346, 3347.

Next, section 3348, known as the "enforcement mechanism" of the FVRA, limits the

sanction for violating the FVRA only to those serving pursuant to its specific provisions.  S. Rep.

105-250, at 17.  Section 3348(b) makes clear that "[u]nless" an officer is performing "in

accordance with sections 3345, 3346, and 3347," then the office "shall remain vacant."  5 U.S.C.

§ 3348(b)(1).  The purpose of 3348(b) is to clarify that any person installed pursuant to the FVRA will be considered in lawful service only if compliant with the provisions of the Act, including the time limitation in section 3346.  After such time, the office is considered vacant. *See id.*

Section 3348(d) also makes clear that as for acts taken by a person selected under the FVRA but in excess of the FVRA's terms have no force and effect.  It states:

> (d)(1) An action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect.

*Id.* § 3348(d)(1).  Thus, where a person selected to serve pursuant to the FVRA exceeds the limits of the FRVA ("not acting" under the relevant provisions) in the performance of a function or duty covered by the act ("to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply"), then their actions "shall have no force or effect."  *Id.*  Importantly, nowhere does this enforcement provision specify that it applies to those acting officials who serve pursuant to an *exception* to the FVRA—one of the agency-specific succession statutes.

Congress passed the HSA in 2003, five years after enacting the FVRA and clearly with the FVRA in mind.  *See* Pub. L. No. 107-296, § 103, 116 Stat. 2144 (2002).  After identifying other PAS officers serving under the Secretary, Congress expressly designated the Deputy Secretary as the official who, for "purposes of subchapter III of chapter 33 of title 5" (the FVRA), "shall be the Secretary's first assistant."  *Id.*; *see also* 6 U.S.C. § 113(a)(1)(A) (the updated provision but containing identical language).  That Congress used the term "first assistant" with reference to the Deputy Secretary is significant.  Historically, each Vacancies Act since 1868 identified the "first assistant" as the most senior and capable official to serve in an

acting capacity as the head of the agency.  *See supra* pp. 28-29.  And the FVRA's default

provision specifies that the "first assistant" is the officer who "shall" assume the office subject to

the time limitations of section 3346.  5 U.S.C. § 3345(a)(1).  Congress, therefore, unambiguously

identified the Deputy Secretary as the officer who will slot into the Secretary position in

accordance with the default provision of the FVRA, section 3345(a)(1).  *See* 6 U.S.C. §

113(a)(1)(A).  In 2016, Congress amended section 113 of the HSA, again with the FVRA as its

beacon.  It added that the Under Secretary for Management "shall be first assistant to the Deputy

Secretary of Homeland Security for purposes of subchapter III of chapter 33 of title 5," (the

FVRA).  *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328,

§1903, 130 Stat. 2000, 2672 (2016) (codified at 6 U.S.C. § 113(a)(1)(F)).  It also added section

113(g) to address the order of succession applicable solely to the office of the Secretary.  The

section reads in its entirety:

> **(g) Vacancies**
>
> **(1) Absence, disability, or vacancy of Secretary or Deputy Secretary**
>
> Notwithstanding chapter 33 of Title 5, the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary.
>
> **(2) Further order of succession**
>
> Notwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary.
>
> **(3) Notification of vacancies**
>
> The Secretary shall notify the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives of any

vacancies that require notification under sections 3345 through 3349d of Title 5 (commonly known as the "Federal Vacancies Reform Act of 1998").

6 U.S.C. § 113(g).  Thus, section 113(g) set a clear order of succession—the Deputy Secretary followed by the Under Secretary for Management—pursuant to the FVRA's default provision, section 3345(a).  But it also established a "further order of succession" as designated by the Secretary, in the event that the predetermined "first assistant" offices are both vacant.  *Id.* § 113(g)(2).  In this respect, the HSA's succession provision is uniquely hybrid.  It, at once, statutorily designates the "first assistant"—as well as the back-up "first assistant"—for purposes of the FVRA's default provision, but then also provides a clear "further order of succession" to designate in advance an "Acting Secretary" to serve where the first assistant positions are vacant. *Id.* § 113(g).

Although this distinction between "first assistant" and "acting" officers vexes academics, practitioners and now judges alike,[11] the use of these terms supports that the *further* order of succession establishes an alternative and non-exclusive means to filling the office of the Secretary.  *Id.* § 113(g)(2).  Congress knew how to designate expressly who will serve as "first assistant," and it did so in rich tradition.  *See id.* § 113(a)(1)(A) and (F); *see also* S. Rep. 105-250, at 12.  This Court must credit that Congress uses such terms of art purposely and consistently.  *See S.W. General*, 796 F.3d at 74.  Had Congress meant to provide a "further order of succession" relative to section 3345(a)'s default provision, it could have easily done so by using the term "first assistant."  It did not.  And this Court cannot rewrite the statute otherwise.

With this statutory backdrop in mind, the Court returns to Plaintiffs' argument.   To begin, Wolf did not assume the position of "Acting Secretary" pursuant to 3345 of the FVRA.

---

[11] *See, e.g.*, Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613 (2020).

ECF No. 41 at 31-32.  As the Under Secretary for Strategy, Policy, and Plans, Wolf was not in one of the statutorily proscribed positions to slot in as "first assistant."  6 U.S.C. § 113(a)(1)(A) & (F).  Nor was he tapped by the President.  5 U.S.C. § 3345(a)(2)-(a)(3).  Rather, he was named in the Secretary's further order of succession.  6 U.S.C. § 113(g)(2) ("Notwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary.").  The parties do not dispute that Wolf was selected pursuant to the HSA's specific succession provision applicable to the office of the Secretary. Accordingly, by the FVRA's terms, the Court cannot generally extend the FVRA's timing provisions to a person serving temporarily and in an acting capacity pursuant to an agency-specific statute.

Here, Wolf's designation pursuant to section 113(g)(2) is no exception.  *See id.*  This provision establishes its own separate mechanism for appointment to be read alongside the FVRA.  But unlike certain other succession statutes, nowhere does this subsection (g)(2) itself establish any length of service for those who assume the position of "Acting Secretary," [12] as opposed to "first assistant."  *Cf.* 5 U.S.C. §§ 3345, 3346.  Nor does the language of the provision permit importing the timing and sanction provisions of the FRVA to the further order of succession.  *See* 6 U.S.C. § 113(g)(2).  Thus, the Court cannot find that Wolf's tenure contravenes the FVRA, despite his serving well past the FVRA's 210-day time frame.

Plaintiffs respond, rightly, that this reading imposes no time limitations for those who

---

[12] Notably in other agency specific succession statutes, Congress has provided time limits on interim service.  *See, e.g.*, 29 U.S.C. § 153(d) (acting officer may not serve in position of General Counsel for the National Labor Relations Board for "more than forty days when the Congress is in session … or after the adjournment sine die of the session of the Senate in which such nomination was submitted."); 28 U.S.C. § 546 (providing that acting U.S. Attorney may serve until the earlier of the "the qualification of a United States attorney for such district appointed by the President …. or the expiration of 120 days after appointment by the Attorney General"); 44 U.S.C. § 304 ("A vacancy occasioned by death or resignation may not be filled temporarily under this section for longer than ten days, and a temporary appointment, designation, or assignment of another officer may not be made except to fill a vacancy happening during a recess of the Senate.").

ascend to the position of Acting DHS Secretary pursuant to § 113(g)(2).  Thus, say Plaintiffs, the Court must apply the FVRA 210-day limit to subsection 113(g)(2), so as to avoid an interpretation that may run afoul of Constitution's Appointments Clause.  ECF No. 66 at 3-4. The Court acknowledges the tension of crediting an agency succession statute as one that provides "temporary" service that can continue indefinitely.  But for several reasons, this tension is not one the Court can or should resolve as Plaintiffs suggest.

      First, the Court disagrees that the doctrine of constitutional avoidance is triggered here. The doctrine applies only where a statute is ambiguous, or subject to more than one meaning. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005).  In such circumstance, the Court should construe the ambiguity in a way that avoids an unconstitutional result.  *See id.*  That is not this case.  Although the FVRA and HSA are complex, and at times maddening, as to the application of the FVRA's timing and sanction provisions, they are not ambiguous.  Sections 3346 and 3348 are cabined to those acting officers serving under section 3345, and neither statute authorizes this Court to extend the FVRA's timing provision to selections made pursuant to the "further order of succession" in section 113(g)(2).  *See* 5 U.S.C. §§ 3345, 3346, 3348; 6 U.S.C. § 113(g)(2).  Nor does section 113 of the HSA include an express timing provision or can be read in a way that imports the FVRA's timing provision to succession under its terms.

      Second, to the extent the statutes are ambiguous, the FVRA's legislative history clarifies that Congress never intended to displace agency-specific succession statutes even if such provisions had no time limitation.  *See* S. Rep. 105-250, at 17.  The Senate Report accompanying the FVRA expressly noted that preexisting agency succession statutes did not "place time restrictions on the length of the acting officer," and that "the various authorizing committees may choose in the future to reexamine whether these positions should continue to be filled through

the existing procedure." *Id.* But nowhere does it articulate an intention to apply the FVRA's timing provision to such statutes. Instead, the Report reaffirmed that "even with respect to the specific positions in which temporary officers may serve under the specific statutes this bill retains, the Vacancies Act would continue to provide an alternative procedure for temporarily occupying the office." *Id.* Simply put, Congress envisioned the FVRA operating alongside agency-specific statutes but not engrafting the FVRA's requirements onto selections made pursuant to such statutes.

Third, the Court is not as convinced as are Plaintiffs that its reading of the HSA raises "serious constitutional doubts," such that the Court must read the FVRA's timing provision into the statute. *Clark*, 543 U.S. at 381. The Vacancies Acts have always represented the Senate's ceding of its confirmation power to the Executive Branch to ensure continuity in agency administration. *See S.W. General*, 137 S. Ct. at 935 ("Since President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval."). This is particularly relevant when reading the succession provision here. Section 113(g) applies solely to the head of the agency, the Secretary. As the chief of DHS, the agency created in the wake of the September 11 attacks to combat terrorism and maintain national security, *see* 6 U.S.C. § 111, it is not unthinkable that Congress would prioritize continuity of service over quick nomination. Stated otherwise, to require the office of Secretary be subject to the FVRA could very well risk that the agency's top office remain "vacant," and acts taken only to be nullified, if eventual nomination for the permanent officer holder falls victim to the delays associated with the nomination process. *See* S. Rep. 105-250 at 30-31 ("We must be sure that the operation of [3348] does not cause an unintended shutdown of the Federal agency within which the vacancy

exists due to administrative paralysis and that the provision is drafted clearly so that its scope, mainly the extent of government functions and duties it would affect, is well understood").

Plaintiffs press that reading section 113(g) exclusive of the FVRA and not applying its timing provisions to the "further order of succession" results in the absurdity of the 210-day limitation applying to the Deputy Secretary or Under Secretary of Management (as the "First Assistant" under the FVRA), but not to inferior officers selected to serve as Acting Secretary under section 113(g)(2).  ECF No. 66 at 3-4.  Although the point is intuitively appealing, it is ultimately unavailing.  The "further order of succession" provision is triggered only if the top three positions at the agency are vacant.  *See* 6 U.S.C. § 113(g)(2).  Where the agency has been stripped of such permanent positions (perhaps because the President has called for their resignations and then chosen not to submit nominations), Congress logically would want to instill continuity in the functioning of the agency.  Relaxation of the timing provisions is certainly one way to do so.

For the above reasons, Plaintiffs are not likely to succeed in establishing that Wolf's promulgation of the challenged rules outside the FVRA's 210-day time limit requires that this Court declare them without force and effect.  Accordingly, as to this theory of relief, Plaintiffs' request for preliminary injunction is denied.

### 2.   Challenge to the Order of Succession

Plaintiffs next argue that because Acting Secretary McAleenan ascended in contravention of Secretary Nielsen's succession order, Delegation Order 01006, McAleenan's subsequent change to Delegation Order 00106 for Wolf to succeed him as Acting Secretary was issued without authority.  ECF No. 23-1 at 34.  Thus, say Plaintiffs, the challenged rules have likewise been enacted "without lawful authority" and must be set aside under section 706 of the APA.  *Id.*

at 36-37.

The Government does not contest that if the Court credits Plaintiffs' argument, the rules were promulgated without authority and must be set aside.  ECF No. 65 at 3 (citing 5 U.S.C. § 706).   Instead, the Government counters, essentially, that Delegation Order 00106 does not mean what it says, and that this Court should deduce Nielsen's true intent to change the succession order so that McAleenan would replace her, as evident from her contemporaneous public statements and DHS press releases.  ECF No. 41 at 30-31; ECF No. 60 at 4-8.  But Delegation Order 00106 is plain, and the Government provides no support for this Court to look beyond the Order itself.  For the following reasons, the Plaintiffs are likely to succeed on the merits of this claim.

Broadly speaking, Delegation Order 00106 has been the DHS' repository for changes to the order of succession for the office of the Secretary and twenty-eight other PAS positions within the agency.  ECF No. 41-1 at 3-68; *see also* ECF No. 41 at 30.  First issued by former Secretary Jeh Johnson in December 2016, Delegation Order 00106 is updated any time the Secretary changes the succession orders.  *See* ECF No. 41-1 at 3-6.  During Nielsen's tenure, she had changed Delegation Order 00106 several times by similarly styled amendments.  *See id.* at 6 (showing changes made during Nielsen's tenure to Annexes G, U, and Z).  However, each change left in place the framework set by Secretary Johnson which had provided succession orders applicable to two different scenarios.  *See id.* at 3-6.  The first covered succession in the event of the Secretary's death, resignation, or inability to perform the functions of the office.  *See id.* at 3.  The second covered succession if the Secretary was unavailable to act during a disaster or catastrophic emergency.  *See id.*

At the time of the April 2019 amendment, Delegation Order 00106 stated that in the

event of the Secretary's death, resignation, or inability to perform the functions of the office, the

order of succession was governed by Executive Order 13753 (E.O. 13753). *See id.* at 3; *see also*

ECF No. 51-1 at 5. But for the Secretary's unavailability during a disaster or catastrophic

emergency, Delegation Order 00106 referred to a different list, entitled "Annex A." *See* ECF

No. 41-1 at 3; *see also* ECF No. 51-1 at 5. As of April 2019, however, both succession lists—

E.O. 13753 and Annex A—happened to list the same offices in the same order. *See* ECF No. 51-

1 at 5.[13]

On Nielsen's last day of service, she amended Annex A of Delegation Order 000106,

which applied only to succession "in the event of disaster or emergency." Delegation Order

00106 now read:

> **Annex A** of DHS Orders of Succession and Delegations of
> Authorities for Named Positions, Delegation No. 00106, **is hereby
> amended** by striking the text of such Annex in its entirety and
> inserting the following in lieu thereof: Annex A. Order for
> Delegation of Authority by the Secretary of the Department of
> Homeland Security.

ECF No. 41-1 at 70 (emphasis added); *see also* ECF No. 51-1 at 5-6.[14] As for the order of

succession triggered by vacancy, it was unchanged and still referred to E.O. 13753. *See* ECF No.

41-1 at 3; ECF No. 51-1 at 6-7.

Yet when Nielsen vacated the office, and McAleenan assumed the position of Acting

Secretary, he was **not** next in line pursuant to E.O. 13753; Director of the Cybersecurity and

Infrastructure Security Agency, Christopher Krebs, was. *See* ECF No. 1 ¶ 179; ECF No. 51-1 at

---

[13] The first four offices to assume the role of Acting Secretary either upon vacancy or emergency were: (1) Deputy
Secretary, (2) Under Secretary for Management, (3) Administrator of the Federal Emergency Management Agency
(FEMA), and (4) Director of CISA. *See* ECF No. 51-1 at 5.

[14] The Order of succession under new Annex A was: (1) Deputy Secretary of Homeland Security; (2) Under
Secretary for Management; (3) Commissioner of U.S. Customs and Border Protection; (4) Administrator of the
Federal Emergency Management Agency.

8 n.11.[15]  McAleenan's leapfrogging over Director Krebs therefore violated the agency's own

order of succession.  From this record, the Court cannot help but conclude that McAleenan

assumed the role of Acting Secretary without lawful authority.

McAleenan next amended Delegation Order 00106 on November 8, 2019.  But unlike

Nielsen's amendment, McAleenan actually changed the order of succession applicable in the

event of a vacancy, such that Wolf—then Under Secretary for Strategy, Policy, and Plans—was

next in line to take over as Acting Secretary.  *Compare* ECF No. 41-1 at 70 *with id.* at 71.

However, McAleenan had not lawfully assumed the office of "Acting Secretary," and because

only the Secretary may designate such "further order of succession," *see* 6 U.S.C. § 113(g)(2),

his changes to the succession order were likewise without authority.  *See also* ECF No. 51-1 at 7-

10.  And because Wolf promulgated the challenged rules without authority, they are likely to be

invalidated under the APA.  *See* 5 U.S.C. § 706 (directing courts to "set aside" agency action that

is "not in accordance with law" or "in excess of … authority"); *see also L.M.-M. v. Cuccinelli*,

442 F. Supp. 3d 1, 35-36 (D.D.C. 2020); *see also* ECF No. 65 at 3 (Government acknowledging

that "if Acting Secretary Wolf were not lawfully serving in an acting capacity under the HSA,

the rules challenged here [can] be set aside under the APA.").

In response, the Government singularly urges the Court to read Nielsen's April 2019

amendment to Delegation Order 00106 to also apply in the case of resignation, despite its clear

---

[15] The position of Under Secretary for National Protection and Programs, as designated in E.O. 13753, refers to the Director of CISA. Since the E.O.'s issuance in December 2016, that agency has been re-designated as the Cybersecurity and Infrastructure Security Agency, and its statute instructs that moving forward, the Under Secretary for NPP is the Director of CISA.  *See* Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, § 2202 132 Stat. 4169 (2018) (codified at 6 U.S.C. § 652) ("Any reference to the National Protection  and Programs Directorate of the Department in any law, regulation, map, document, record, or other paper of the United States shall be deemed to be a reference to the Cybersecurity and Infrastructure Security Agency."); ("Any reference to an Under Secretary responsible for overseeing critical infrastructure protection, cybersecurity, and any other related program of the Department as described in section 103(a)(1)(H) … shall be deemed to be a reference to the Director of Cybersecurity and Infrastructure Security of the Department.").

language limiting application to disaster and emergency.  ECF No. 41 at 29-31; ECF No. 60 at 4-8.  The Government relies on a memorandum from then-General Counsel, John Mitnick, to Nielsen that accompanied Delegation Order 00106.  ECF No. 41 at 30-31; ECF No. 60 at 4-8.  The memorandum states in pertinent part that "[b]y approving the attached document, you will designate your desired order of succession for the Secretary of Homeland Security in accordance with your authority pursuant to Section 113(g)(2) of title 6, United States Code."  ECF No. 41-2 at 5.  That language, says the Government, must be read with the precatory language in Delegation Order 00106 which states: "[b]y the authority vested in me as Secretary . . . I hereby designate the order of succession for the Secretary of Homeland Security as follows."  *Id.* at 6.  Together, the Government says, these preambles support Nielsen's intention to change *both* succession lists, not just Annex A.  ECF No. 41 at 30-31; ECF No. 60 at 4-8.

But this language at best states the obvious—that Nielsen had the authority to change the succession order as applied to the office of the Secretary.  It does not support that Nielsen changed two separate succession lists applicable to each scenario.  *See* ECF No. 41-2 at 5-6.  Minnick's memorandum applies with equal force to the changes that Nielsen *did* make to Annex A in that she made them pursuant to her authority under section 113(g).  The memo does nothing to undermine the basic proposition that "the plain language [of the Order] … controls [and] speaks for itself."  ECF No. 51-1 at 9; *see also Kingdomware Tech., Inc v. United States*, 136 S. Ct. 1969, 1978 (2016) ("prefatory clauses or preambles cannot change the plain meaning of the operative clause."); *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020) (stating agency action "must be viewed critically to ensure that the rescission is not upheld on the basis of impermissible *post hoc* rationalization.") (citations omitted); *see Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 50 (1983) ("[C]ourts may not

accept … *post hoc* rationalizations for agency action.") (citations omitted).

The Government next asserts that Delegation Order 00106 is "administrative" and a "non-binding document" and so the Court should not accord it any real weight.  ECF No. 41 at 30.  But oddly, the Government cites no authority—none—for its position.  *See id; see also* ECF No. 60 at 4-8.  In fact, the parties agree that the Delegation Order 00106 is the only written repository that memorializes Secretary's changes to the succession orders.  *See* ECF No. 41 at 30 n.10; ECF No. 23-1 at 35.

Predictably, the Government next reverts to the April Delegation Order 00106 itself and, embracing its force, attempts to spin its text to its advantage.  ECF No. 41-1 at 70; ECF No. 60 at 4-7.  The Government focuses on the phrase "I hereby designate *the* order of succession," and concludes from it that Nielsen must have meant to change E.O. 13753, because Annex A is an "Order for Delegation of Authority," not a succession order.  ECF No. 60 at 5-6 (discussing ECF No. 41-1 at 70).  Thus, the Government contends, Nielsen's invocation of section 113(g)(2), which applies to the Acting Secretary's further order of succession, reflects that Nielsen had every intention of making the same changes to both lists.  ECF No. 60 at 4-7.  Again, the Government provides no authority for this Court to eschew the plain meaning of Nielsen's order and divine her intent as meaning something else.  Holding senior government officials to their word is not an "idle and useless formality."  *Regents of the Univ. of California*, 140 S. Ct. at 1909 (quotations omitted).  As the Supreme Court recently reminded: "[P]articularly when so much is at stake …. the Government should turn square corners in dealing with the people."  *Id.* (citations omitted).   For the reasons articulated, the Court finds Nielsen's order changed Annex A, and Annex A only.

In sum, the Court concludes that Plaintiffs are likely to demonstrate McAleenan's

appointment was invalid under the agency's applicable order of succession, and so he lacked the authority to amend the order of succession to ensure Wolf's installation as Acting Secretary.  By extension, because Wolf filled the role of Acting Secretary without authority, he promulgated the challenged rules also "in excess of …authority," and not "in accordance with the law."  5 U.S.C. § 706(2)(C) and (a)(2).  On this ground, therefore, Plaintiffs have established their likely success on the merits of this claim.

### 3.  APA violations

The Court lastly turns to the likelihood of success on Plaintiffs' APA claims.  ECF No. 23-1 at 16-31.  The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  While courts are not to "substitute its judgment for that of the agency," *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (quotations omitted), it must ensure the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,"  *State Farm*, 463 U.S. at 43 (quotations omitted).  Courts must "engage in a searching and careful inquiry of the administrative record …. [to] consider whether the agency considered the relevant factors and whether a clear error of judgment was made."  *Casa de Maryland*, 924 F.3d at 703 (quotations omitted).  "An agency action that 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise' is arbitrary and capricious."  *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020) (quoting *State Farm*, 463 U.S. at 43).

The requirement that an agency engage in reasoned decision-making is further reflected

in the APA's three-step process for notice-and-comment rulemaking.  *See Perez v. Mortgage Bankers Assoc'n*, 575 U.S. 92, 96 (2015).  The agency must first "issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register."  *Id.* (citing § 553(b)).  Second, where notice is required, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  *Id.* (citing § 553(c)).  Third, to afford the public meaningful participation, the agency must "consider and respond to significant comments received during the period for public comment."  *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984)).  In promulgating the final rule, the agency "must include in the rule's text 'a concise general statement of [its] basis and purpose.'" *Id.* (citing § 553(c)).  Rules properly enacted through this process have the "force and effect of law."  *Perez*, 575 U.S. at 96 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303 (1979)).

Because this process is designed to ensure the agency engages in reasoned decision-making, *see North Carolina Grower' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (2012) (quoting *Spartan Radiocasting Co. v. FCC*, 619 F.2d 314, 321 (4th Cir. 1980); *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1103 (4th Cir. 1985)), concerns raised by the public can alert the agency to "an important aspect of the problem," for the purposes of arbitrary and capricious review, *Gresham*, 950 F.3d at 103; *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017).  Where a significant concern is raised, the agency must "adequately analyze . . . the consequences" of its actions.  *Id.* at 931.  It cannot "brush[] aside" important facts, *id.* at 932, or offer "conclusory statements" to prove that it "consider[ed] [the relevant] priorities," *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986).  The agency must actually give meaningful consideration to these concerns, lest its action

be deemed arbitrary and capricious.  *See Gresham*, 950 F.3d at 103.

Plaintiffs offer several reasons as to why the challenged rules violate the APA, a number of which are unavailing at this stage.  ECF No. 23-1 at 16-31.  That said, Plaintiffs have shown that in both rulemakings the agency either failed to respond to significant concerns raised or to consider an important aspect of the problem, as more fully explained below.

### i.      Challenge to The Timeline Repeal Rule

The Court begins with Plaintiffs' challenge to the Timeline Repeal Rule.  ECF No. 23-1 at 29–31.  This rule eliminates the agency's twenty-five-year practice of processing asylees' initial EAD applications within thirty days.  Moving forward, the agency provides no timeframe by when it will determine eligibility for an EAD.  *See* Timeline Repeal Rule, 85 Fed. Reg. at 37,545.

Plaintiffs contend that the Timeline Repeal Rule is arbitrary and capricious because its rationale for eliminating this deadline is not only belied by the record but shows that the agency failed to consider the important alternative of a longer processing timeline.  ECF No. 23-1 at 29-30.  In support, Plaintiffs point to numerous comments urging the agency to extend the thirty-day deadline rather than eliminate it outright.   *See* Timeline Repeal Rule, 85 Fed. Reg. 37,512, 37,520-21.  Even the agency itself recognized the wisdom of imposing on itself a 90-day processing deadline, which would provide "more predictability to asylum seekers and [give] USCIS … more time to adjudicate."  *Id.* at 37,521.  But it ultimately concluded that imposing "hard processing deadlines" would be "imprudent," because USCIS cannot reliably predict future workload, processing, and other changes."  *Id.*

The Court agrees with Plaintiffs that the agency's response to this concern likely rendered its decision arbitrary and capricious in two ways: first, the agency's claimed inability to

reliably predict future processing timeline runs counter to the record; and second, the agency's "conclusory" responses to considered commentary reflects a total failure to consider the important alternative of a longer timeframe.  *See State Farm*, 463 U.S. at 43; *Getty*, 805 F.2d at 1057.

To begin, the Court must step back.  In 2017, individual asylum applicants filed a class action in *Rosario v. USCIS*, 365 F. Supp. 3d 1156, 1162 (W.D. Wash. 2017), challenging USCIS' failure to process EAD applications within the 30-day deadline set for itself.  At that time, USCIS was taking as much as 60 or 90 days to process the EAD applications.  *See id.* at 1163.  The *Rosario* plaintiffs sought an injunction requiring USCIS to abide by its own 30-day processing rule.  *Id.* at 1159–60.  The Plaintiffs prevailed, and the Court granted both preliminary and permanent injunctive relief, requiring that USCIS process work applications within the 30-day processing period.  *Id.* at 1158.

The *Rosario* Court, citing to the statement of basis and purpose for the agency's then-existing 30-day rule, explained that a "chief purpose" of the rule was "to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible."  *Id.* at 1160 (quotations omitted).  The Court further noted that the agency had originally selected the 30-day processing rule, in combination with the 150-day waiting period prior to application, because that represented a time "'beyond which it would not be appropriate to deny work authorization to a person whose claim has not been adjudicated.'"  *Id.* at 1161 (quoting Notice of 1994 Reforms, 59 Fed. Reg. 14,779).  Thus, the Court correctly concluded that the agency intended to "cabin what was already—in the agency's view—an extraordinary amount of time to wait for work authorization."  *Id.*

Shortly after *Rosario*, the agency promulgated the Timeline Repeal Rule to "ensure

USCIS has sufficient time to receive, screen and process applications" and "reduce opportunities for fraud." *See* Timeline Repeal Rule, 85 Fed. Reg. at 35702. To afford itself greater flexibility, the agency landed on the solution of completely eliminating the 30-day rule. When pressed as to why a longer timeline would not solve its problem—an alternative that would also ensure agency accountability and a certain level of predictability in the process for asylees—the agency maintained that it "cannot predict" the processing times for future applications. *See id.* at 37,519; 37,520-21.

This response runs counter to the agency's findings elsewhere. In its responses, the agency reassures the public that it "expects to return to the adjudicatory timeframe before *Rosario*" because that timeframe is "sustainable" and in line with future agency expectations. *Id.* at 37,521. The agency cites the pre-*Rosario* processing times as roughly 60 days for 78% of the applications, and 90 days for 92% of all applications. *Id.* at 37,503, 37,513. If the agency is to be believed, it can certainly "predict" processing times, and can therefore implement a timeframe processing rule in line with such predictions. On this basic point, the agency's sole rationale for rejecting this alternative—that it cannot reliably predict future expectations—runs counter to its findings and reassurances elsewhere that it can. *See State Farm*, 463 U.S. at 43. In this respect, the agency's explanation as to why a longer timeframe would not suffice runs counter to the record. *See id.* at 51; Timeline Repeal Rule, 85 Fed. Reg. at 37,521.

The agency's reasoning also reveals its failure to consider an important "policy alternative." *See State Farm*, 463 U.S. at 51; *see also Regents of the Univ. of California*, 140 S. Ct. at 1913. Given the original purpose of the 30-day rule—to limit asylees' waiting time once they became work-eligible, to ensure the application process has some level of predictability, and to hold the agency accountable in its timely processing of these applications—the proposed

alternative of a longer timeframe falls squarely within the "ambit of the existing policy." *See id.* (quoting *State Farm*, 463 U.S. at 51). But rather than giving adequate consideration to this important alternative, the agency provided a half-baked and internally contradictory explanation for rejecting it. Its rationale does not pass muster. *See State Farm*, 463 U.S. at 57.

Nor does the agency's general need for "flexibility" adequately explain its rejection of a longer processing timeline. Timeline Repeal Rule, 85 Fed. Reg. at 37,509. The agency has historically processed 78% of the applications in 60 days, and 92% of all applications within 90-days. *Id.* at 37,503, 37,513. Where the agency has committed itself to returning to this timeframe, the Court cannot see how eliminating any deadlines affords the agency any more flexibility than simply lengthening the processing time to the agency's reasonable satisfaction.

The agency's attempts to respond to this very point are wholly unsatisfactory. The agency first notes the fact made self-evident by *Rosario*—that it has failed to adjudicate applications within the 30-day time frame. *See id.* at 37,513. While the agency's difficulty in complying with the 30-day deadline supports extending the timeline, it hardly explains why there should be no timeline at all. Next, the agency notes that it considered extending the time frame to "60 or 90 days," but rejects that alternative because "it would not be feasible in *all cases*." *Id.* By its own account, DHS can and has predicted how long it will take to process the lion's share of EAD applications. *See id.* at 37,513, 37,521. And to the extent the agency wishes to achieve perfect compliance with any timeframe it selects, it provides no rationale for why it cannot use past as prologue to fashion a longer, sufficient timeline, rather than repeal the rule in total.

The agency further notes that it is unable to plan its workload and staffing needs "with the level of certainty that a binding timeframe may require and has no way of predicting what national security fraud concerns may be or what procedures would be necessary in the future."

*Id.* at 37,513.  As stated above, this response runs counter to the agency's affirmative assurances that it will adhere to the pre-*Rosario* processing timelines, and that such a goal is "sustainable" one.  *Id.* at 37,503.  But even more to the point, accepting this argument would allow agencies to do away with their internal deadlines because of a remote and hypothetical possibility that such a deadline might become unworkable.  This sort of "conclusory" statement falls short of the "reasoned decisionmaking" required under the APA.  *Am. Wild Horse*, 873 F.3d at 932.

Lastly, the agency's attempts to minimize the import of its decision are unavailing.  In rejecting the public's suggestion of a longer deadline, the agency explains that the Timeline Repeal Rule does not "prohibit or otherwise limit an asylum applicant's eligibility for an EAD or to apply for or receive asylum."  Timeline Repeal Rule, 85 Fed. Reg. at 37,513.  The agency utters this talismanic phrase as if saying it makes it true.  *Id*. at 37512, 37520, 37527, 37528. But logic and the record thus far demonstrate otherwise.  Doing away with any processing deadline will likely reduce or even eliminate advance work authorizations because nothing now renders the agency bound to adjudicate them.  And, as more fully discussed below, the Timeline Repeal Rule, in combination with the Broader EAD Rules, will indeed impact an asylee's chances of success on the underlying application.  Accordingly, the Court concludes that on this record, the agency has failed to consider any legitimately raised policy alternatives.  Plaintiffs have demonstrated a likelihood of success on the merits as to their challenge to the Timeline Repeal Rule.

        ii.      **Depriving the Public its Right to Comment via Staggered Rulemaking**

The Court next turns to Plaintiffs' challenges regarding the agency's failure to consider the rules' combined effect.  ECF No. 23-1 at 17-23.  Although Plaintiffs' arguments reach far and wide, the Court focuses solely on those that appear likely to succeed on the merits.

Plaintiffs argue that because DHS staggered the notice and comment period for the Timeline Repeal Rule and the Broader EAD rules, it deprived the public of the right to comment, and ensured no consideration of how the rules together would adversely disadvantage applicants. *See id.*; 5 U.S.C. §§ 553(b), (c); *United Farm Workers*, 702 F.3d at 769-70 (to comply with sections 553(b) and (c), the agency must "receive comments on" and respond to "relevant and significant issues" in the rulemaking); *see also State Farm*, 463 U.S. at 43 (emphasizing that agency action is "normally" arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem"). For the following reasons, the Court agrees with Plaintiffs.

The public comments repeatedly draw the agency's attention to the combined adverse effect of the challenged rules. Yet time and again, the agency sidesteps this fundamental concern. First, in the Timeline Repeal Rule, the agency declines to address the "interaction or overlap" between the rules and notes it *will* address such concerns if it finalizes the broader rule." Timeline Repeal Rule, 85 Fed. Reg. at 37,530. But then in the Broader EAD Rules, the agency acknowledges the "potential interaction[]" of the rules, but concludes that "incorporating such interactions in the impact assessments for this rule would be speculative as it assumes [the Timeline Repeal Rule] will be finalized, and without change." *Id.* at 38,590. The problem for the agency is that the Timeline Repeal Rule *had already been finalized without change*. *Compare* Timeline Repeal Rule, 85 Fed. Reg. at 37,502 (effective August 21, 2020) *with* Broader EAD Rules, 85 Fed. Reg. at 38,532 (effective August 25, 2020). The record reflects that the agency first delayed, then denied, any meaningful consideration of the rules' interaction. Indeed, the agency only refers to the Timeline Repeal Rule twice in the proposed Broader EAD Rules, neither of which constitutes a discussion of their interplay. *See* Broader EAD Rules, 84 Fed. Reg. 62,389, 62,392 (proposed Nov. 14, 2019). Because the agency never meaningfully

addressed the interaction of these rules, it also never accounted for those comments cutting to the heart of the adverse impact the rules visit in combination.  ECF No. 23-1 at 18.

That said, if the agency's only sin was to stagger the notice and comment period of the rules, that alone may not support a finding that the agency violated the APA.  *See United Farm*, 702 F.3d at 770.  However, when considering the agency's circular deferral of assessing the combined impact of the rules, the force of the claim is strengthened when also considering the cumulative impact of the rules on bona fide asylum seekers.  *See id.*  (finding the agency's staggered rulemakings violate notice-and-comment procedures and precluded consideration of important issues); *see also Perez*, 575 U.S. at 96 (stating the agency must "consider and respond to significant comments received during the period for public comment" to comply with the APA's procedural requirements).  The Court next addresses this impact as part of the Plaintiffs' third argument—that the agency failed to consider the impact of the rules on such applicants. ECF No. 23-1 at 23–24.

### iii.    Agency Failure to Consider Harms to Bona Fide Asylum Seekers

The Court agrees with Plaintiffs that consideration of the effects on bona fide asylum seekers is of paramount importance.  *See Judulang v. Holder*, 565 U.S. 42, 55 (2011); *see also Regents of Univ. of California*, 140 S. Ct. at 1913 (identifying policy alternatives that fell within "ambit" of  previous regulation as important concerns that must be considered).   The Government does not dispute this proposition.  ECF No. 41 at 20, 25-27 (arguing agency gave adequate consideration, not that concern was unimportant for purposes of arbitrary and capricious review).  But so long as the agency considered, and rationally responded to, this relevant and important issue, this Court cannot "substitute its own analysis [or Plaintiffs' analysis] for the agency's."  *State v. United States Nuclear Regulatory Comm'n*, 824 F.3d 1012,

1022 (D.C. Cir. 2016) (quotations omitted); *see also Regents of the Univ. of California*, 190 S.

Ct. at 1905 (quoting *Volpe*, 401 U. S. at 416) (asking whether the agency's decision was "based

on a consideration of the relevant factors and whether there has been a clear error of judgment").

Even with this appropriate deference, the Court finds little evidence that the agency

addressed the clear economic harm the rule changes will visit on bona fide asylum seekers. The

commenters highlighted that the rules work together to erect a series of procedural and financial

barriers that render nearly impossible pre-asylum work authorization. *See* Broader EAD Rules,

85 Fed. Reg. at 38,558 (the combined effect of the rules making pre-asylum work authorization

"virtually unattainable"). Yet the agency responded with a series of non-sequiturs and

generalized "understandings" of the commenters' positions that cannot substitute as reasoned

responses. *See Mayor and City Council of Baltimore v. Azar*, No. 19-1614 & No. 20-1215, 2020

WL 5240442, at *10 (4th Cir. Sept. 3, 2020).

As to the several changes to the EAD timing provisions, the new rules first eliminate the

30-day default period after which a pending asylum application is deemed complete—a critical

change because now applicants do not have any way of knowing whether their EAD clock has

actually started. *See* Broader EAD Rules, 85 Fed. Reg. at 38,626 (to be codified at 8 C.F.R. §

208.3(c)(3)). Second, after the agency deems the asylum application complete, the applicant

must wait a full 365 days before applying for an EAD. *See id.* (to be codified at 8 C.F.R. §§

208.3, 208.7(a)(1)(ii), and 274a.12(c)(8)). Third, once the EAD application can finally be

submitted, the agency is no longer bound to process the application by any specified time. *See*

Timeline Repeal Rules, 85 Fed. Reg. at 37545-46. On these timing changes alone, an applicant

no longer has any safeguards to prevent the agency from delaying and deferring any advance

adjudication of an EAD application. The Court's understanding of how these timing provisions

intersect is further confirmed by another one of the agency's rule changes, in which it clarifies that asylees are not entitled to pre-asylum work authorization, and that the agency's review of these applications is purely discretionary.  *See* Broader EAD Rules, at 38,599, 38,628 (to be codified at 8 C.F.R. § 274a.13(a)(1)).

In response, DHS simply paid lip service to a certain "degree of economic hardship" that the new rules inflict.  *See id*. 38,549 ("DHS acknowledges that these reforms will also apply to aliens with meritorious asylum claims, and that these applicants may experience some degree of economic hardship as a result of heightened requirements for an EAD."); *see also* Timeline Repeal Rule, 85 Fed. Reg. at 37,526.  DHS declared the rule changes necessary to "maintain integrity in the asylum process" and that "it is not unreasonable to impose additional time and security requirements on asylum seekers before they may apply for an EAD."  Broader EAD Rules, 85 Fed. Reg. at 38,549.  But the agency never addressed how it can maintain "integrity" in a system that will now foreclose advance work authorization for legitimate asylum seekers as a means to address non-specific fraudulent applications.  Stated differently, the agency has not "display[ed] awareness" of the *extent* to which it is "changing position," and so its responses do not provide a "reasoned" basis for departing from the "circumstances that underlay … the prior policy."  *F.C.C. v. Fox Tel. Station, Inc.*, 556 U.S. 502, 515 (2009).

Of greatest concern to Plaintiffs is the agency's failure to address how the new rules will "actually discourage and reduce legitimate claims for asylum."  ECF No. 23-1 at 24 (citing Broader EAD Rules, 85 Fed. Reg. at 38,564-65; Timeline Repeal Rule, 85 Fed. Reg. at 37,520). It is axiomatic that without being able to work, asylum applicants lack the resources to pursue their claims.  *See* ECF Nos. 24-19 & 24-25.  Indeed, the denial of work hits an already destitute population," many of whom are "relying on limited savings to survive."  Broader EAD Rules, 85

Fed. Reg. at 38,575.  Several public comments brought to the agency hard evidence that having the means to pay for legal counsel can "triple asylum seekers' odds of success," and the lack of resources can mean utter failure.  *Id.* at 38,585, 38,591.  Not to mention a host of other hidden costs necessary to pursue valid asylum claims, such as hiring an interpreter for the initial "credible fear" interview (a new agency-imposed requirement); biometric information fees; fees for FOIA requests; and transportation costs.  *Id.* at 38,576, 38,591; 38,627; *see also* Timeline Repeal Rule, 85 Fed. Reg. at 37,525.

The agency, in response, completely sidestepped this critical impact of the new rules. The DHS merely noted that these rules do not "change the eligibility requirements or process by which asylum seekers obtain employment authorization or asylum status." *Id.* at 37,527-28; *see also id.* at 37,520; Broader EAD Rules, 85 Fed. Reg. 38,591, 38,592 ("Asylum applicants will not be impacted in their pursuit of their asylum claims because this rule does not change any eligibility criteria for asylum.").  This non sequitur is not a meaningful answer.  *See Azar*, 2020 WL 5240442, at *10.  The issue is not whether the rules visit substantive changes on the asylum criteria for those who apply; it is whether the new rules make it substantially harder, if not impossible, to apply in the first place.

In the end, the agency never wrestled with the fundamental implications of deferring or denying advance work authorization.  Substantially limiting approval of work authorization for bona fide asylees will inevitably affect their ability to afford the costs of seeking asylum, including hiring legal counsel.  *See* ECF Nos. 24-19 & 24-25; *see also* Timeline Repeal Rule, 85 Fed. Reg. at 37,520, 37,525 (citing studies that even with pro bono legal representation, applicants cannot afford the "other costs inherent" to the application process without work authorization); Broader EAD Rules, 85 Fed. Reg. at 38,591 (citing "reports and research … on

monetary and qualitative impacts to asylum applicants").  By glossing over the above comments,
the agency failed to address this important concern or explain why, notwithstanding this cost to
bona fide asylum seekers, the rule changes were justified.  *See F.C.C. v. Fox Tel. Stations, Inc.*,
556 U.S. 502, 537 (2009) ("An agency cannot simply disregard . . . inconvenient facts[.]").

The agency's failure to consider the impact on bona fide applicants is made more
indefensible when considering that the agency's stated impetus for the Broader EAD Rules was
to reduce the asylum backlog for the long-term benefit of bona fide asylum seekers.  *See* 85 Fed.
Reg. at 38,554; *see also Bedford Cty.*, 769 F.2d at 1022 (explaining the agency's rationale for a
rule change is an "important issue" for purposes of reviewing agency action).  Taking the
agency's stated goal at face value, it was irrational to not also consider whether the same rules
visit substantial hardship on those the agency claims to protect.  *See State Farm*, 463 U.S. at 43.
Moreover, where the old rules "engendered serious reliance interests," if anything the agency
was required to provide a "*more* detailed justification" for its changes.  *Fox. Tel. Stations Inc.*,
556 U.S. at 515; *see also Regents of the Univ. of California*, 140 S. Ct. at 1913 ("When an
agency changes course … it must be cognizant that longstanding policies may have engendered
serious reliance interests that must be taken into account.") (citations omitted).  At the very least,
it was required to give a "reasoned explanation" for "disregarding … [its] prior policy," which
granted work authorization to asylees as they navigated the protracted and costly asylum process.
*F.C.C. v. Fox. Tel. Stations*, 556 U.S. at 516.

In sum, the Plaintiffs have demonstrated that they are likely to succeed in showing that
the challenges rules for which they have standing are not the product of reasoned
decisionmaking.  *See Regents of Univ. of California*, 140 S. Ct. at 1913 (citations omitted); *see*

*also State Farm*, 463 U.S. at 43.  Having found that Plaintiffs are likely to succeed on the merits as to two of their three liability theories, the Court next turns to the remaining *Winter* factors.

    **B.**    **Irreparable Harm**

    The Court considers next whether Plaintiffs have shown a likelihood of irreparable harm. To succeed, Plaintiffs must establish they will suffer harm that is "'neither remote nor speculative, but actual and imminent.'"  *Direx Israel, Ltd. v. Breakthrough Med. Group,* 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).  "Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'"  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)); *see also Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)) (explaining injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

    Plaintiffs have met their burden.  Plaintiffs CASA and ASAP have established representational standing based on five of their members.  Since the rules took effect on August 21, and August 25, 2020, Plaintiffs, by way of their individual members, have suffered and will continue to suffer a concrete harm—one that cannot simply be rectified at final judgment.  *See Diaz. v. I.N.S.*, 648 F. Supp. 638, 647-48 (E.D. Cal. 1986) (quoting *Nat'l Center for Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1369 (9th Cir. 1984) ("The hardship [to aliens] from being unable to work to support themselves and their dependents ... is beyond question.")).

    ASAP's members, W.L. and N.G., only became eligible to apply for work authorization under the old 180-day rule shortly after these rules went into effect.  ECF No. 1 ¶¶ 8, 133.  Under the old rules, each could have applied for EAD immediately and have their applications

processed within thirty days.  Now they must wait an additional 215 days to apply and then indefinitely for a decision.  ECF No. 23-1 at 39.  Moreover, nothing suggests that either would be ineligible to work.  Meanwhile, H.V. is in an even worse predicament; absent exceptional circumstances, she is now disqualified from receiving pre-asylum work authorization under the one-year filing bar.  ECF No. 24-4 ¶ 23.  Thus, every additional day these individuals wait will visits on them crippling dependence on the charity and good will of others.[16]  ECF No. 24-5 ¶¶ 23-29; ECF No. 24-25 at 3; Broader EAD Rules, 85 Fed. Reg. at 38,501 (acknowledging "there could be monetary and qualitative impacts to applicants and their support networks, including numerous types of hardships.");

Further, any potential form of relief at the merits stage cannot retroactively repair the ongoing and concrete harm that will befall bona fide asylees whose EAD applications are delayed or denied.  *See Ramos v. Thornburgh*, 732 F. Supp. 696, 699 (E.D. Tex. 1989) ("It cannot validly be disputed that an unreasonable denial of work authorization, or … delay … in work authorization, results in a substantial threat of harm to plaintiffs, by preventing them from working to support themselves pending resolution of their claims for asylum."); ("Monetary damages at some future time can never adequately compensate aliens living at or below the poverty line, for the hardships they must endure as a result of presently existing unlawful denials of employment authorization.") (citations omitted).  Most irreparable is the damage to bona fide applicants' ability to seek asylum in the first instance.  Plaintiffs have demonstrated that the rules strip such applicants of lawful employment and likewise of the ability to pay the myriad costs inherent to the asylum process.  *See supra* pp. 54-56.  While adjudication times for asylum applications vary, they are consistently long; applicants wait years to learn whether they have

---

[16] Plaintiffs' argument is well taken that "[t]hese harms will only be more severe in the context of the current pandemic, which makes access to medical care and stable housing especially vital."  ECF No. 23-1 at 39-40.

received asylum.  *See* Broader EAD Rules, 85 Fed. Reg. at 38,548 (agency describing the "years-long wait"); ECF No. 24-4 ¶ 10; ECF No. 24-6 ¶ 13; ECF No. 24-7 ¶ 10; ECF No. 24-19 at 6 n.14; ECF No. 24-20 at 43.  What is more, the fees and costs associated with pursuing the claim are steep.  And without any ability to work for at least a year and likely far longer, it is plain that legitimate asylum claims may be abandoned altogether.  *See* ECF No. 23-1 at 40 (citing ECF No. 24-5 ¶ 31; ECF No. 24-6 ¶ 15); *Ramos*, 732 F. Supp. at 700 ("[T]he inability to work for the extended period … may compel an applicant to abandon his or her asylum application … [and] subject the applicant to even more severe persecution upon return to the country he or she has attempted to flee."); *see also Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007) (attributing irreparability to the intangible nature of the injury, and that calculating such injury at the merits stage would "entail a substantial amount of speculation and guesswork").

In response, the Government points to supposed alternative "avenues to address excessive delays" such as "case status inquiries, expedite requests when circumstances warrant, and even judicial redress through filing a mandamus action to compel a decision." ECF No. 41 at 34 (citing 85 Fed. Reg. at 37,511).  These avenues are dead ends.  The challenged rules eliminate any timeline on the agency and render the adjudication of EADs entirely discretionary.  So any claimed "redress" within the application process itself is illusory.  Nor can the Court take seriously any reference to "mandamus" as an available path to redress.  Legitimate asylum applicants seek refuge under dire circumstances and will be stripped under the new rules of affording the necessities to apply for asylum in the first instance.  How the same population would be expected to pursue the extraordinary judicial remedy of *mandamus* is confounding, if even available as a matter of law.  *See* 5 U.S.C. §§ 555(b) and 706(1); *cf. Norton v. S. Utah*

*Wilderness Alliance*, 542 U.S. 55, 64 (2004) (explaining a "claim under § 706(1) [of the APA]

can proceed only when a plaintiff asserts that an agency failed to take a discrete agency action

that it is required to take") (emphasis in original).  The delay inherent in mandamus actions alone

underscores the absurdity of this position.  *See Telecomm. Research & Action Center v. FCC*,

750 F.2d 70, 80-81 (D.C. Cir. 1984) (delay of five years did not warrant grant of mandamus);

*Debba v. Heinauer*, 366 Fed. Appx. 696, 699 (8th Cir. 2010) (delay of ten years found

reasonable); *In re City of Virginia Beach*, 42 F.3d 881, 886 (4th Cir. 1994) (despite four-and-a-

half year delay on the city's application for a water pipeline, mandamus unwarranted where

agency has "promise[d] to adhere to a tight[er] schedule").

     The Court accordingly concludes that the kind of harm identified to the members of

Plaintiffs CASA and ASAP is indisputably irreparable.

### C.      Balance of Equities and the Public Interest

     Finally, Plaintiffs must establish that "the balance of equities" tips in its favor and that

"an injunction is in the public interest."  *Winter*, 555 U.S at 20.  Because the Government is a

party in this case, these factors merge.  *See Kravitz*, 366 F. Supp. 3d at 755 (quoting *Pursuing

Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

     The balance of equities tips in favor of granting Plaintiffs' preliminary relief.  The Court

balances on the one hand the Plaintiffs irreparable harms against the Government's asserted

harms that arise from temporarily enjoining the enforcement of the challenged rules against two

of the parties, until the Court can reach final judgment on the merits.  ECF No. 41 at 36-37.

     For the Timeline Repeal Rule, the Government contends that the agency will be

irreparably harmed because such relief will require it to continue devoting more resources than it

would like to meet its 30-day processing deadline.  *Id.* at 36.  Where the agency has functioned

with this deadline since 1995, the Court does not find this argument persuasive.  Further, because the Court must draw injunctive relief narrowly, it will not at present require the agency to set aside the new rule for all applicants.  Considering that the scope of the injunctive relief afforded will reach only those members of the Plaintiff organizations with representational standing, *see Trump*, 137 S. Ct. at 2087-88 (accounting for the scope of relief granted when balancing the equities), the Government has offered no reason to believe it will suffer irreparable harm that outweighs that visited on the members of the Plaintiff organizations.

As to the Broader EAD Rules, the Government maintains that preliminary relief—in whatever form and of whatever scope—is contrary to the public interest, because it will delay the agency's ability to "address the crisis at the Southern border," as well as "strain [its] sovereignty, [the] rule of law, and [its] resources."  ECF No. 41 at 36-37.  Again, in light of the narrowly drawn relief this Court will issue, such sweeping pronouncements are unpersuasive.  *See Trump*, 137 S. Ct. at 2087-88.[17]   As for the Government's larger philosophical concerns about strain on the "rule of law," the agency would do well to look inward.  The agency cannot itself violate those principles, then claim irreparable harm because it is held to account for such violations.

**D.      Remedy**

Finally, all that is left for this Court to decide is the scope of preliminary relief.  While this decision "rests within the sound discretion" of this Court, *see South Carolina v. United States*, 907 F.3d 742, 753 (4th Cir. 2018) (quotations omitted), the relief granted should "carefully address[] … the circumstances of the case," *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by Real Truth About Abortion,*

---

[17] Indeed, if Plaintiffs ultimately succeed on its APA claims, the Government will have to likely revert to the previous rules.  *See Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (the "ordinary result" for agency action found in violation of the APA is vacatur).

*Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012), and "should be no more burdensome … than

necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512

U.S. 753, 765 (1994).  For this reason, a court "need not grant the total relief sought by the

applicant but may mold its decree to meet the exigencies of the particular case."  *Trump*, 137 S.

Ct. at 2087 (citations omitted).

      Plaintiffs seek a stay or alternatively a nationwide injunction as to all the challenged

rules.  ECF No. 23-1 at 41; ECF No. 59 at 7.  The Government asks the Court to limit relief to

the five individual organization members whom CASA and ASAP have identified in support of

associational standing, and only as to the Timeline Repeal Rule, the 365-day waiting period, and

the one-year filing ban.  ECF No. 60 at 3; ECF No. 65 at 5.  The Court cannot credit either

argument.

      Turning first to the Plaintiffs argument, the Court recognizes that section 705 of the APA

grants to the Court, as it does to the agency itself, the power to "issue all necessary and

appropriate process" to "preserve status or rights pending conclusion of the review proceedings."

5 U.S.C. § 705.   Section 705 operates broadly to allow the agency to postpone enactment of a

rule for a host of reasons, or for a Court to suspend enforcement or enjoin its application.  *See,

e.g.*, *Dept' of Agric.*, 444 F. Supp. 3d at 48.  And although the standard for a preliminary

injunction and a stay pursuant to 5 U.S.C. § 705 are the same, *see e.g.*, *Texas v. EPA*, 829 F.3d at

435, section 705 is a congressionally conferred remedy exclusive in the APA context and

available to the Court when necessary to "prevent irreparable injury," *Mexichem Specialty

Resins, Inc. v. EPA*, 787 F.3d 544, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part); *see

also In re GTE Service Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (recognizing that § 705

supplies "statutory authority to stay agency orders pending review in this court."); *Nken v.*

*Holder*, 556 U.S. 418, 428 (2009) (An injunction "direct[s] the conduct of a particular actor, [whereas] a stay operates upon the judicial proceeding itself … by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability."); *id.* (citing Black's Law Dictionary 1413 (6th ed.1990) (defining "stay" as "a suspension of the case or some designated proceedings within it")); *Washington v. DHS*, 408 F.Supp.3d 1191, 1212 (E.D. Wash. 2019) ("Section 705 and preliminary injunctions under Rule 65, although determined by application of similar standards, offer different forms of relief.")  (quotations omitted).

Employing this authority to afford uniform preliminary relief seems especially warranted here, to avoid running "'afoul of the constitutional and statutory requirements for uniform immigration law and policy.'"  *Regents of Univ. of California v. DHS*, 279 F. Supp. 3d 1011, 1049 (N.D. Cal. 2018) (quoting *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017)), *aff'd*, 908 F.3d 476 (9th Cir. 2018); *see also Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights.").  At the same time, the Court is bound to draw such preliminary relief, even in the APA context, narrowly, and to avoid issuance of nationwide injunctions absent the most extraordinary circumstances not present here.  *See Casa v. Trump*, 2020 WL 4664820, at *26.  The Court so concludes, especially in light of the Fourth Circuit's recent pronouncement on this very issue.

In *Casa*, the Fourth Circuit was called upon to review the issuance of a nationwide injunction as applied to DHS' changed definition of the "public charge" rule.  *Id.* at *1.  The Court not only reversed on the merits but took the opportunity to offer a stinging and lengthy rebuke of implementing a nationwide injunction to prohibit enforcement of the challenged public charge rule.  *See id.* at *23.  In so doing, the Fourth Circuit expressly rejected the propriety of

injunctive relief even though such nationwide application would promote uniform enforcement of immigration regulations over haphazard and patchwork application.  *Cf. Casa de Maryland, Inc. v. Trump*, 414 F. Supp. 3d 760, 785 (D. Md. 2019) (quoting *Int'l Refugee Assistance Project v. Trump,* 857 F.3d 554, 605 (4th Cir.), *as amended* (June 15, 2017), *vacated and remanded on other grounds sub nom.*, *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017)).

Relatedly, the Fourth Circuit concluded that the district court erred in not limiting preliminary relief to only the two individual Plaintiffs with standing, and so effectively rejected the well-established principle that in the APA context, a district court retains discretion to accord the same preliminary relief that would be available at the merits stage.  *See Nken*, 556 U.S. at 425-26; *Sierra Club v. United States Army Corps of Eng'rs*, 909 F.3d 635, 647 (2018) (vacatur as available form of final relief); *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 189 (D.C. Cir. 2011).

Nor did the Fourth Circuit address whether the APA's specific statutory power codified in section 705 to "stay" enforcement of a challenged rule reflects considerations beyond those invoked in the exercise of the Court's general equitable powers to grant injunctive relief.  *See Casa v. Trump*, 2020 WL 4664820, at *24 (quotations and citations omitted) ("Our power to grant equitable remedies is commensurate with this duty"); ("It is, to put it mildly, hard to see how the court could still be acting in the judicial role of resolving cases or controversies when it issues such a far-reaching and pervasive equitable remedy"); ("Nationwide injunctions also run afoul of the prescribed scope of our equitable power."); ("Any inherent equitable authority that the courts possess under Article III is likely bounded by the same").

That said, this Court cannot meaningfully distinguish this case from *Casa*.  The Plaintiffs in *Casa* sought the same injunctive relief under 705 and the Court's equitable powers to stave off

application of an immigration rule which, in its view, likely violated the APA. *See Casa v. Trump*, 414 F. Supp. 3d at 788. And the Plaintiffs here have done little to set this case apart from the reach of *Casa*. Accordingly, even though this Court remains concerned about "slicing and dicing"[18] application of the rules in a manner contrary to the uniform administration of immigration laws, the Court believes itself bound to follow the Circuit's binding precedent.[19] The Court will limit the injunctive relief to the members of CASA and ASAP, the two organizational plaintiffs who have demonstrated associational standing at this stage. *See Casa v. Trump*, 2020 WL 4664820, at *25; *see also Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 ("[T]he purpose of preliminary equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward.").

Finally, this Court must make clear that the scope of the relief is limited to the rules for which Plaintiffs have standing. Plaintiffs view the challenged rules as a "package," which are interconnected and "infected by the same procedural improprieties." ECF No. 66 at 2 n.2. Thus, according to Plaintiffs, *all* the rules must be enjoined. *Id.* Conversely, the Government contends that because the rules are severable, each rule stands alone, and any challenges are limited to those rules for which the Plaintiffs have standing and otherwise meet the *Winter* factors. ECF No. 60 at 3. The Government has the better argument.

The doctrine of severability arises where, as here, a subset of the rule changes within a broader rule are found invalid or unlawful. In deciding whether to enjoin enforcement of the

---

[18] *See District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d at 37.

[19] The dissent in *Casa v. Trump* views the decision on remedy as dicta in light of its reversal on the merits. 2020 WL 4664820, at *47. This Court is not as convinced when considering that if the panel decision on the merits is reversed en banc or by the Supreme Court, the scope of the remedy remains a live controversy. *See, e.g.*, *United States v. Ford*, 703 F.3d 708, 711 n.2 (4th Cir. 2013) (citations omitted) ("Where a court makes alternative holdings to support its decision, each holding is binding precedent."); *Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008) (same); *United States v. Wright*, 496 F.3d 371, 375 n.10 (5th Cir. 2007) (same).

entire rule, including the non-offending provisions, courts must ascertain the "intent of the agency and … whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (Unless "it is evident that the [lawmaking body] would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."); *see also Azar*, 2020 WL 5240442, at *24.  Thus, the Court must determine whether the rules for which Plaintiffs clearly have standing are severable from the remaining broader package of rules, either because the remaining provisions cannot function on their own, or because the agency would not have wanted them to.  *See MD/DC/DE Broadcasters*, 236 F.3d at 22.

As clear evidence of agency intent, the Government points to the severability provision in the Broader EAD Rules, which states: "[t]he provisions in this section are intended to be independent severable parts.  In the event that any provision in this section is not implemented, DHS intends that the remaining provisions be implemented as an independent rule."  85 Fed. Reg. at 38,627 (codified at 12 C.F.R. § 208.7(c)).  This provision creates a presumption that the agency "did not intend the validity of the [remaining rules] …. to depend on the validity of the . . . offensive provision."  *Azar*, 2020 WL 5240442, at *24 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987)).  Therefore, unless Plaintiffs marshal "strong evidence" to the contrary, the "objectionable provision[s]" are to be "excised" from the remaining provisions within the Broader EAD Rules.  *Azar*, 2020 WL 5240442, at *24 (quoting *Brock*, 480 U.S. at 686).

Plaintiffs have not overcome this presumption.  Nor have they explained how the remaining rules are unable to "function independently" from the enjoined rules.  *See MD/DC/DE Broadcasters*, 236 F.3d at 22.  Without any help from Plaintiffs, the Court does not see how an injunction limited to the rules that Plaintiffs have standing to challenge will interfere with, for instance, the agency's continued enforcement of the unlawful entry rule, the criminal bar rule, or the rules governing when EADs terminate following a denial of asylum.  *See* Broader EAD Rules, 85 Fed. Reg. at 38626-28.  Thus, at least at this stage, Plaintiffs have not shown how the "whole structure" of the Broader EAD Rules would be undermined were the Court to enjoin only those rules for which Plaintiffs have demonstrated standing and success on the merits.  *See MD/DC/DE Broadcasters*, 236 F.3d at 22.

Therefore, the Court will preliminarily enjoin enforcement of the following rule changes against CASA and ASAP's members:

- The Timeline Repeal Rule, 85 Fed. Reg. at 37,545 (printing parts of the regulations to be codified at 8 C.F.R. § 208.7(a)(1));

- The 365-day waiting period, 85 Fed. Reg. at 38,626-28 (referenced throughout and as codified at 8 C.F.R. § 208.3(c)(3); § 208.7(a)(1)(ii), (a)(1)(iii)(E), and (b)(1)(i); and 8 C.F.R. § 274a.12(c)(8));

- Removal of "deemed-complete" rule, 85 Fed. Reg. at 38,626 (codified at 8 C.F.R. § 208.3);

- The discretionary review rule, providing that agency is no longer required to issue EADs to eligible asylees, 85 Fed. Reg. at 38,628 (changes reflected at 8 C.F.R. § 274a.13(a)(1));

- The one-year filing bar, 85 Fed. Reg. at 38,626 (codified at 8 C.F.R. § 208.7(a)(1)(iii)(F)); and

- The rule requiring submission of biometric information as part of EAD applications, 85 Fed. Reg. at 38,626 (codified at 8 C.F.R. §§ 208.7(a)(1)(i) and (a)(1)(iv)(E), 208.10).

V.     **Conclusion**

The Court is convinced that preliminary injunctive relief limited to the members of

Plaintiff organizations CASA and ASAP is both proper and necessary to avoid irreparable harm.

Accordingly, the Court GRANTS in part and DENIES in part Plaintiffs' motion for a stay or a

preliminary injunction.  ECF No. 23-1.  A separate order follows.


9/11/2020                                                                  /S/
Date                                                    Paula Xinis
                                                        United States District Judge