IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CASA DE MARYLAND, INC., ET AL.

          *Plaintiffs*,

– versus –

ALEJANDRO MAYORKAS, ET AL.

          *Defendants*.

Case No. 8:20-cv-02118-PX

SECOND DECLARATION OF JEHAN LANER

I, Jehan Laner, declare under the pains and penalty of perjury as follows:

1. I make this declaration based on my personal knowledge and information provided to me by colleagues at Pangea Legal Services ("Pangea") whom I believe to be reliable.

2. I am an immigration attorney and Co-Director of Pangea.

3. Pangea's mission is to stand with immigrant communities and to provide services through legal representation, especially in the area of deportation defense. In addition to providing direct legal services, we are committed to advocating on behalf of noncitizens through policy advocacy, education, and legal empowerment efforts.

4. I submitted a declaration in support of Plaintiffs' motion for a stay of effective dates under 5 U.S.C. § 705, or in the alternative, preliminary injunction. *See* ECF No. 24-8. In this declaration, I am providing additional information about the impact on Pangea of the two rules ("asylum EAD rules") that Pangea and other Plaintiffs challenged in this case.

1

5. In the service of Pangea's mission, Pangea assists our asylum seeking clients with their applications for work authorization (EADs). *See* ECF No. 24-8 ¶¶ 4-5, 9. This assistance has been our practice since 2013, if not before.

6. Since the asylum EAD rules took effect, staff at Pangea have filed approximately 30 EAD applications for asylum seeking clients.

7. As anticipated, the asylum EAD rules have forced us to devote significantly more resources to EAD applications, including training staff, counseling clients about their eligibility under the new and more complicated standards, collecting additional records, printing more documents, responding to more Requests for Evidence, and crafting more involved cover letters setting out legal arguments why our clients are eligible for and should be granted work authorization under the new rules.

8. Given our finite resources, in order to continue to assist asylum seeking clients with applications for EADs, we have been forced to move resources away from other legal representation and advocacy programs.

9. For example, as a result of the new rules, we've had to reduce the number of prospective clients—most of whom are asylum seekers in removal proceedings—that we can accept for representation. In the seven-and-a-half months before the new rules went into effect we took on 45 new clients. In the seven-and-a-half months since, we have been able to take on only 35 new clients—nearly 25% fewer.

10. Our capacity to take on new clients is becoming increasingly strained as the effects of the rule changes continue to compound. Since the beginning of 2021, we have been able to take on only 15 new clients, which puts Pangea on pace to take even less clients overall in 2021.

11. Our reduced capacity to take on new clients also hurts Pangea financially, which in turn further reduces our capacity, as our grant money is typically tied to deliverables for applications for relief other than EADs.

12. Before the rule changes went into effect, our staff devoted significant time to client and community outreach. We hosted community forums, created educational fliers and infographics, and presented know your rights presentations.

13. Our capacity to engage in this type of work has been greatly reduced.

14. For example, before the rules went into effect but after the start of the pandemic, our staff participated in three virtual community forums. Community forums include presentations on immigration law or news, opportunities to ask questions, and immigration legal consultations. They enable us to stay up-to-date on the needs of the communities we serve, to connect our clients with resources, and to identify potential clients for legal representation.

15. Since the rules went into effect, we have not participated in these types of community forums at all. Staff that previously organized these forums are so busy with additional administrative tasks related to the new EAD rules that they do not have enough time to organize or participate in community forums. One staff member who previously did client communications work now devotes twice as much time as she did before the rule changes to EAD applications.

16. These changes have been painful for Pangea and the people we are committed to serving because they limit our ability stand with immigrant communities and provide services through legal representation.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of April 2021 in Berkeley, California.

Jehan Laner