**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| CASA de MARYLAND, INC., ET AL.<br><br>*Plaintiffs*,<br><br>– *versus* –<br><br>ALEJANDRO MAYORKAS, ET AL.<br><br>*Defendants*. | Case No. 8:20-cv-02118-PX |

**SECOND DECLARATION OF SWAPNA C. REDDY**

I, Swapna Reddy, declare:

1. I am a Co-Executive Director of the Asylum Seeker Advocacy Project (ASAP).

2. I make this sworn statement based upon personal knowledge, files and documents of ASAP that I have reviewed (such as case files, reports, and collected case metrics), and information supplied to me by employees of ASAP whom I believe to be reliable (including ASAP's management, attorneys, paralegals, and administrative staff). These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting ASAP business.

**ASAP's Mission and Programming**

3. ASAP's mission is to build a future where the United States welcomes individuals fleeing violence. ASAP works alongside its thousands of members to make this vision a reality

1

by providing critical information to members about the U.S. immigration system, connecting members to legal support, and engaging in member-led nationwide systemic reform through litigation, press, and other advocacy.

4. ASAP attorneys represent a limited number of ASAP members in their immigration proceedings. Some ASAP members secure immigration legal representation from non-ASAP attorneys, while many others do not have immigration legal representation.

5. In furtherance of ASAP's mission and as capacity permits, ASAP staff provides *pro se* assistance to unrepresented members to ensure they are able to meaningfully pursue their immigration cases, including assistance in preparing and filing applications for work authorization documents ("EADs").

6. ASAP also provides daily support to members Monday through Friday. ASAP staff produce original educational materials about how to navigate the immigration system that are shared with members every week and host live video sessions to answer members' questions about asylum, the immigration process, work, access to health care, education, and other topics.

7. ASAP members also have continuous access to ASAP-created guidance and resources shared online and receive relevant updates by text message and email on a regular basis.

**The Impact of the EAD Rules on ASAP Members**

8. The Department of Homeland Security ("DHS") issued two rules in August 2020 that substantially limited asylum seekers' eligibility for work authorization and made the process for applying for an EAD much more difficult. *See* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148 (proposed September 9, 2019) ("Timeline Repeal Rule"); Asylum Application, Interview,

and Employment Authorization for Applicants, 84 Fed. Reg. 62374 (proposed November 14, 2019) ("Broader EAD Rule," together with Timeline Repeal Rule, "Asylum EAD Rules").

9. It is my understanding that these rules seriously impact many ASAP members, who without an EAD are unable to work legally in the United States to provide stable housing, food, medical care, or other basic necessities for themselves and their families, or to pay for representation to meaningfully pursue their asylum claims.

10. Recognizing that harm, the Court issued a preliminary injunction enjoining the government from applying the Timeline Repeal Rule and five provisions of the Broader EAD Rule to ASAP and CASA members.

11. ASAP members, however, continue to be harmed by provisions of the Broader EAD Rule that are not enjoined. I am aware that many members face significant hurdles or delays in receiving EADs or are altogether barred from eligibility under the Asylum EAD Rules.

12. <u>Applicant-caused delays.</u> As I know from ASAP's experience in preparing EAD applications, prior to the Broader EAD Rule, an asylum applicant's eligibility for an EAD was based on the "Asylum EAD Clock." That clock begins running after an applicant submits their asylum application. The clock may stop running if USCIS determines there are certain delays in an applicant's asylum case, and begins running again once those delays are resolved. Asylum seekers were previously eligible to *apply* for an EAD after their "Asylum EAD Clock" reached 150 days. Asylum seekers would then be eligible to *receive* an EAD after their clock reached 180 days, even if a subsequent delay in their case stopped their clock.

13. While immigration courts continue to operate a clock for asylum cases, the Broader EAD Rule replaced the clock system for EAD applications in favor of two changes: extending the waiting period before asylum seekers may apply for an EAD to 365 calendar days, and making

applicants with ongoing "applicant-caused delays" in their asylum cases ineligible for an EAD. Although the 365-day timeline has been enjoined, ASAP members have reported to ASAP staff that their EAD applications have been denied and the denial notices have cited ongoing "applicant-caused delays," even where they have the requisite number of clock days.

14. For example, M.M.R. is an ASAP member who reports that she applied for an EAD after she accumulated more than 180 days on her Asylum EAD Clock. USCIS nevertheless denied her EAD application, citing her timely appeal to the Board of Immigration Appeals ("BIA") as an unresolved "applicant-caused delay." In ASAP's experience, under the regulations in place before the Broader EAD Rule took effect, M.M.R. would have been eligible for an EAD during the pendency of her BIA appeal because, even though her clock may have stopped when the immigration judge (IJ) decided her asylum application, her clock had already reached more than 180 days. Under the new rules, however, because USCIS considers timely filed appeals ongoing "applicant-caused delays," M.M.R. will remain ineligible for an EAD for the months or even years that her case remains pending before the BIA. *See* 8 C.F.R. §§ 208.7(a)(1)(iv)(A)-(J).

15. ASAP member E.T.N. has been similarly impacted by the applicant-caused delay provision. E.T.N. reported that he applied for asylum after fleeing political persecution in Cuba. He applied for an EAD in February 2021, after accumulating over 200 days on his Asylum EAD Clock. Under the old rules, E.T.N. would have been eligible for an EAD. But under the new rules, USCIS denied his EAD application based on an ongoing "applicant-caused delay," citing E.T.N.'s motion to change the venue of his case to an immigration court closer to him.

16. <u>Termination of EAD following denial by Asylum Officer.</u> Under the Broader EAD Rule, an asylum applicant's EAD automatically terminates if an asylum officer ("AO") denies the asylum application. *See* 8 C.F.R. § 208.7(b)(2). M.A.S is an ASAP member who filed an

4

affirmative asylum application in April 2019 and is still waiting for her asylum interview to be scheduled. M.A.S. currently has a (c)(8) EAD based on her pending asylum application and is not eligible for an EAD on other grounds. Because M.A.S. is currently on an F1 student visa, if the asylum officer reviewing her case does not grant her application, instead of being referred to an IJ for removal proceedings, M.A.S.'s asylum application will be denied. M.A.S.'s EAD may, therefore, be subject to one of the new automatic termination provisions of the Broader EAD Rule. It is my understanding that if M.A.S. were unable to maintain her work authorization, she would be unable to pay her rent and her school tuition.

17.     <u>Termination of EAD following denial by IJ.</u> The Broader EAD Rule also provides that an asylum seeker's EAD will automatically terminate 30 days after an IJ denies their asylum application, unless the person files a timely appeal with the BIA. *See* 8 C.F.R. § 208.7(b)(2). ASAP has many members in defensive removal proceedings before an IJ who may be negatively impacted by this provision. First, if a member with an EAD has their asylum case denied by an IJ, and the member is unable to file a timely appeal before the BIA, the member's EAD may be automatically terminated. In my experience, this scenario is particularly likely for ASAP members who are unrepresented. ASAP has many such members, including Z.B.A.C, a mother of three who recently received an EAD and is currently unrepresented in her removal proceedings.

18.     And second, this auto-termination provision also does not account for the fact that under current law, an individual is permitted to file a motion to reopen their asylum case within 90 days after an IJ denial or 180 days if the denial was issued *in absentia*. As a result of the automatic termination provision, ASAP members may lose their EADs, even where they will ultimately be able to reopen their asylum cases and prevail on their asylum claims. ASAP has

helped dozens of asylum seekers to reopen their asylum cases after receiving *in absentia* removal orders.

19. <u>Termination of automatically extended EADs.</u> The Broader EAD rule also specifies that the termination provisions apply to EADs that have been automatically extended for 180 days based on a timely filed renewal application*, see* 8 C.F.R. § 274a.13(d)(3), which may affect many ASAP members who are currently within their 180-day extension period. S.G.L., for example, filed an application to renew her EAD that was set to expire in January 2021. She received a receipt notice for her renewal application from USCIS on December 28, 2020. Because she filed a timely renewal application and received a receipt notice, her current EAD was automatically extended for 180 days. But if her asylum application is denied during this period, she will be susceptible to the termination provision and she will lose her employment authorization.

20. <u>Auto-termination of EAD following BIA affirming denial.</u> The final auto-termination provision of the Broader EAD rules provides that an asylum applicant's EAD will be automatically terminated if the BIA affirms an IJ's decision denying their asylum application, regardless of whether the asylum seeker seeks federal court review. *See* 8 C.F.R. § 208.7(b)(2). One of ASAP's current members and clients, D.B.M., currently relies on her EAD to provide for her six children while her case is pending appeal before the BIA. If the BIA affirms the IJ's denial of D.B.M.'s asylum application, the automatic termination will apply and D.B.M. will no longer have work authorization that she needs to support her family while she continues to pursue her claim through federal court review.

21. Relatedly, ASAP members who have already petitioned federal courts for review following the BIA's denial of their asylum claims are also harmed by the Broader EAD Rule.

Previously, these members would have remained eligible to apply for and renew their EADs while their federal petitions are pending.

22. ASAP member M.A.I.C., an asylum seeker from El Salvador who is currently pursuing federal court review before the Fourth Circuit, for example, was granted an EAD based on his pending asylum application, but the EAD expired after the Broader EAD Rule went into effect and while his petition for review was pending. Because of the Broader EAD Rule, M.A.I.C. is not eligible to renew his EAD, leaving him without work authorization.

23. <u>Ineligibility following denial of asylum case by IJ.</u> Before the Broader EAD Rule went into effect, asylum seekers were able to apply for an EAD in the first instance while their asylum case was on appeal as long as they had accumulated 180 days or more on their Asylum EAD Clocks before the IJ issued a decision on their asylum application. Before the Asylum EAD rules went into effect, ASAP helped some individuals apply for their first EAD while their administrative appeal was pending before the BIA.

24. Under the Broader EAD Rule, however, USCIS has denied members' EAD application where an IJ has denied the asylum application, even where the member has a pending BIA appeal and has accumulated the requisite number of days for EAD eligibility. *See* 8 C.F.R. § 208.7(a)(1)(iii)(e).

25. ASAP member I.A.L., for example, reached 180 days on her Asylum EAD clock in August 2017. However, her prior attorney never filed her EAD application, despite telling her he would. I.A.L. recently found a new attorney who is helping her pursue ineffective assistance of counsel claims against her prior attorney, and also helped her file an EAD application. However, by the time she applied for an EAD, an IJ had already denied I.A.L.'s asylum claim, and her case was on appeal before the BIA. USCIS denied I.A.L.'s EAD application, stating she was no longer

eligible to apply for an initial EAD because her case had been denied by the IJ. ASAP has heard directly from at least three additional members who have been denied on this same basis.

26.     Parole bar. Previously, asylum seekers who received parole were immediately eligible to apply for an EAD under the (c)(11) category. The Broader EAD Rule, however, made asylum seekers who are paroled into the United States after establishing a credible or reasonable fear of persecution or torture ineligible for (c)(11) EADs. *See* 8 C.F.R. § 274a.12(c)(11). ASAP has members who, under the prior rules, would have been immediately eligible for a (c)(11) EAD, but now must wait a minimum of 180 days from the filing of their asylum applications before they are eligible for work authorization.

27.     ASAP member M.C.G.R., for example, received a positive credible fear determination after entering the United States with her minor child in October 2020. She and her child were paroled from ICE custody pursuant to § 212(d)(5) of the Immigration and Nationality Act ("INA") in December 2020. Her parole is valid for one year, and she previously would have been permitted to apply for an EAD immediately. However, she is no longer eligible to immediately apply for an EAD under the (c)(11) category. It is my understanding that M.C.G.R. intends to file an asylum application, but that she has not done so yet. Therefore, she will not be eligible for an EAD under the (c)(8) category for at least 180 days.

28.     EWI bar. The Broader EAD Rule makes asylum seekers who entered between ports of entry without being inspected by an immigration official on or after August 25, 2020, ineligible for an EAD, unless they satisfy certain narrow exceptions. *See* 8 C.F.R. § 208.7(a)(1)(iii)(G). ASAP member W.A.A. reports that he fled El Salvador after his father was murdered in front of him. He entered the United States without inspection in September 2020 (when most asylum seekers were being expelled at the border with little to no process) with the intent to seek asylum

8

and reunite with his family who had previously entered the United States to seek asylum. W.A.A. applied for asylum in November 2020, and he will have 180 days on his asylum clock in the coming weeks. However, W.A.A. does not meet the narrow exceptions to the new eligibility bar for entering without inspection. As a result of the asylum EAD rules, he will remain categorically ineligible for an EAD. It is my understanding that without an EAD, he is unable to support his family.

29. <u>Criminal bars.</u> The Broader EAD Rule also created additional and complex criminal bars to EAD eligibility, making asylum seekers ineligible for EADs if they are convicted of a "particularly serious crime" on or after August 25, 2020 or if USCIS has "serious reasons for believing" that the applicant committed a serious non-political crime outside of the United States on or after August 25, 2020. *See* 8 C.F.R. §§ 208.7(a)(1)(iii)(A)-(D). ASAP has members with pending criminal charges impacted by these provisions. For example, ASAP member J.I.A.B. (who is also a client of plaintiff Pangea) is an asylum seeker with pending criminal charges for driving under the influence. J.I.A.B.'s attorneys fear that USCIS is likely to determine these charges constitute a "particularly serious crime," such that if she is convicted, the Broader EAD Rule could render her ineligible for an EAD.

30. <u>14-day evidence rule.</u> Under the Broader EAD rule, asylum applicants are now required to submit documentary evidence in support of their asylum application at least 14 calendar days in advance of their asylum interview date. *See* § 8 C.F.R. 208.9(e). ASAP has members who have been and continue to be impacted by this rule. For example, S.R.S., who is both an ASAP member and a client of Plaintiff Oasis, applied for asylum in August 2019. His asylum interview was scheduled for December 10, 2020. Ten days before his interview, his sister provided him a letter that is important to his asylum case. His attorney reports that under the old San Francisco

9

Asylum Office procedure, S.R.S. could have submitted this letter to the Asylum Office and the AO would have considered it in reviewing his case. But as a result of the 14-day requirement of the new rules, S.R.S. postponed his asylum interview to ensure the document would be considered as part of his asylum case. S.R.S.'s interview has yet to be rescheduled and he has no control over when it is rescheduled. He therefore must wait an unknown amount of time before his asylum claim is adjudicated. Many of ASAP's other members in affirmative proceedings will face similar harms in the future.

31. <u>Recommended Approval.</u> The Broader EAD Rule eliminates USCIS's prior policy of granting "Recommended Approval" to certain asylum seekers based on the strength of their asylum cases and the likelihood that they would be granted asylum. Before the new rules, asylum seekers who were granted Recommended Approvals became immediately eligible for EADs. Previously, ASAP members in affirmative proceedings with strong asylum claims would have been able to obtain EADs prior to 180 days from the filing of their asylum case by receiving Recommended Approvals; now, many of ASAP members will have to wait significantly longer.

32. For example, V.M.T.G. is an ASAP member (and a client of Plaintiff Oasis) who applied for asylum in December of 2020. V.M.T.G. had his asylum interview on February 16, 2021. His asylum claim is based on his past persecution in Colombia due to his status as a gay man. According to his attorneys, in the past, V.M.T.G. may have received a Recommended Approval about two weeks after his asylum interview (approximately the end of February of 2021). Instead, he had to wait for an EAD until he was either granted asylum or reached 180 days after filing his asylum application. V.M.T.G. was ultimately granted asylum on April 14, 2021 (more than one month after he would have been eligible for an EAD if he had received a Recommended Approval, and over a month before he would have been eligible for an EAD absent the grant of

asylum). The elimination of Recommended Approvals continues to harm other ASAP members with strong asylum claims who have had their asylum interview, await a final decision, and have not accumulated 180 days since filing their asylum application.

33. <u>Limited validity periods.</u>  The Broader EAD Rule creates a maximum validity period for EADs of two years. *See* 8 CFR § 274a.12(c)(8). Previously, there was no limit on USCIS's discretion to set the validity period of an EAD. This provision has impacted ASAP members who have applied for and received EADs that were issued with this express limitation in place, like Z.B.A.C., *see supra* ¶ 17, as well as the many ASAP members currently in the process of applying for an initial or renewal EAD.

**Impact of EAD Rules on ASAP**

34. The sweeping impacts of the EAD Rules on ASAP members have significantly impacted ASAP's ability to fulfill its mission and to meet its programming obligations and commitments.

35. As capacity permits, ASAP provides limited-scope legal assistance to its unrepresented members. Because having an EAD is critical to ASAP members' ability to pursue their asylum claims, ASAP's pro se assistance has historically included helping members prepare and file EAD applications.

36. As described in the preceding paragraphs, the asylum EAD rules are significantly more complex than the prior rules.  As a result, ASAP staff must expend significantly more time and resources on individual EAD applications in order to continue to operate ASAP's pro se assistance program as it previously had.

37. Given the new eligibility bars, for example, ASAP staff members must screen cases to assess how and when ASAP members entered the United States and whether they have any criminal offenses that have become disqualifying under the new rules.

38. Moreover, the new "applicant-caused delay" provision makes it harder for ASAP staff to determine whether a member is eligible to apply for an EAD. Previously, ASAP was able to simply check the Asylum EAD Clock calculations provided by the Executive Office for Immigration Review's ("EOIR") automated hotline to evaluate whether a member in removal proceedings was eligible for an EAD. After the asylum EAD rules went into effect, however, some members who have more than 180 days on their clock may be ineligible for work authorization if USCIS determines that they have an ongoing "applicant-caused delay." Therefore, ASAP staff must spend additional time to determine whether such a delay exists and whether it can be resolved.

39. Even when members' applications for EADs are approved, ASAP staff must also take additional time to explain the Broader EAD Rule's termination provisions to our short-term pro se assistance clients, so they know that their EAD may not be valid until the listed expiration date depending on developments in their case.

40. Given all of these changes, on average, it takes ASAP staff 10 hours longer to complete and close a pro se EAD application assistance case than was necessary before the EAD rules went into effect.

41. Because the length of time associated with completing EAD cases has grown so significantly, ASAP has been forced to reallocate staff time and decrease other forms of pro se assistance that it would have previously provided members in furtherance of its mission, including

helping members avoid *in absentia* removal orders by assisting them in preparing and filing motions to change the venue of their cases, or helping members file motions to reopen.

42. Another central part of ASAP's member-based mission is keeping members informed about important legal changes to empower them to take control of their own immigration cases. Prior to the implementation of the Asylum EAD rules, ASAP had committed to providing its members detailed legal updates on any changes in work authorization eligibility for asylum seekers. ASAP provided this programming because many members informed ASAP that work authorization was important to them.

43. To that end, before the Asylum EAD rules went into effect, ASAP created resources that members can access online, including written resources, example pro se filings, and videos explaining the process for applying for a work permit as an asylum seeker.

44. After the Asylum EAD Rules took effect, some of ASAP's written pro se resources, including a toolkit informing members how they could prepare and file pro se EAD applications and videos explaining work permits, became obsolete. As a result, ASAP was required to spend significant time and resources to re-make and update those videos and written resources in order to continue to provide this programming to its members. In total, ASAP staff has spent more than 150 staff hours adapting its resources to ensure they are accurate after the effective date of the asylum EAD Rules.

45. Furthermore, because the EAD rules are more complex than the pre-existing rules, ASAP staff has had to create more detailed resources in order to ensure that those resources continue to be useful for members, particularly members applying for EADs pro se. This staff time would otherwise have been allocated to developing new resources addressing other topics that are

important to members, such as resources explaining how as how to prepare and submit an asylum application or how to prepare for an asylum interview or hearings in immigration court.

46. ASAP staff also provide daily support to our members Monday through Friday and answer questions about the asylum process. Legal assistants and paralegals have historically taken a large role in helping address member inquiries at ASAP. After the EAD Rules took effect, however, ASAP received a greater proportion of questions relating specifically to EADs and the new rules. Given the volume and complexity of the inquiries, they often could not be addressed by paralegals and legal assistants, and instead required legal analysis from ASAP attorneys in order for ASAP to be able to continue to offer this same service to its members.

47. ASAP attorneys have answered more than 1,100 EAD-related inquiries since the Asylum EAD rules took effect, which has required approximately 500 hours of attorney time. ASAP continues to receive dozens of questions relating to the new EAD Rules every day from members and will continue having to devote significant staff time and resources to responding to those inquiries.

48. All of the additional time and resources ASAP has been forced to devote to the EAD process and to responding to member inquiries about the new rules has diverted and will continue to divert resources from ASAP's other mission-critical programming, including engaging with members on other advocacy efforts such as advocating for the expansion of Temporary Protected Status for asylum seekers from specific countries or for other reforms of the immigration system.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 20, 2021
      Chicago, Illinois

_____
Swapna Reddy
Co-Executive Director
Asylum Seeker Advocacy Project