

**ON HUMAN RIGHTS**, the United States must be a beacon. Activists fighting for freedom around the globe continue to look to us for inspiration and count on us for support. Upholding human rights is not only a moral obligation; it's a vital national interest. America is strongest when our policies and actions match our values.

Human Rights First is an independent advocacy and action organization that challenges America to live up to its ideals. We believe American leadership is essential in the struggle for human rights so we press the U.S. government and private companies to respect human rights and the rule of law. When they don't, we step in to demand reform, accountability, and justice. Around the world, we work where we can best harness American influence to secure core freedoms.

We know that it is not enough to expose and protest injustice, so we create the political environment and policy solutions necessary to ensure consistent respect for human rights. Whether we are protecting refugees, combating torture, or defending persecuted minorities, we focus not on making a point, but on making a difference. For over 30 years, we've built bipartisan coalitions and teamed up with frontline activists and lawyers to tackle issues that demand American leadership.

*Human Rights First is a nonprofit, nonpartisan international human rights organization based in New York and Washington D.C. To maintain our independence, we accept no government funding.*

© 2016 Human Rights First All Rights Reserved.
**This report is available online at humanrightsfirst.org**

## ACKNOWLEDGEMENTS

The principle author and researcher of this report was B. Shaw Drake, Equal Justice Works Fellow, sponsored by Morgan Stanley and Simpson Thacher & Bartlett LLP, at Human Rights First. Olga Byrne and Eleanor Acer contributed additional drafting and editing support, and oversee Mr. Drake's fellowship. Vanessa Allyn, Managing Attorney, provided additional comments. Whitney Viets, ACE Rule of Law and Human Rights Fellow, provided editing and research support. Paige Diner, Social Work Intern, provided extensive support on mental health research and analysis. Interns Maya Elcheikh, Natsumi Paxton, Geerthana Narendren, and Sophia Genovese-Halvorson provided additional research. David Mizner, Senior Writer/Editor, edited the report and Sarah Graham, Art Director, designed the report. We are particularly thankful to the Bellevue/NYU Program for Survivors of Torture, the Human Rights Initiative of North Texas, and the Tahirih Justice Center for their support in organizing interviews with asylum seekers and for providing other valuable information. We are grateful for the invaluable support of Equal Justice Works fellowship sponsors Morgan Stanley and Simpson Thacher & Bartlett LLP, and for the input of the Association of Pro Bono Counsel (APBCo), an organization of pro bono leaders of many of the nation's leading law firms. Human Right First expresses its appreciation to all practitioners, service providers, current and former government officials, and experts who provided information for this report. Particularly, we thank the numerous asylum seekers and refugees who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States of America.

WHERE TO FIND US

75 Broad Street, 31st Floor
New York, NY 10004

Tel: 212.845.5200
Fax: 212.845.5299

www.humanrightsfirst.org

805 15th Street, N.W., #900
Washington, DC 20005

Tel: 202.547.5692
Fax: 202.543.5999

1303 San Jacinto Street, 9th Floor
at South Texas College of Law, Houston, TX 77002

Tel: 713.955.1360
Fax: 713.510.1935

AR004234

# Contents

Executive Summary ................................................................................................. i

Recommendations ................................................................................................. iv

Introduction ........................................................................................................... 1

The Backlogs–A Ballooning Problem ..................................................................... 3

    The Asylum Division ........................................................................................ 3

    The Immigration Court ..................................................................................... 5

How We Got Here: Causes and Challenges .......................................................... 7

    Chronic Underfunding ...................................................................................... 7

    Expanded Use of Expedited Removal .............................................................. 8

    Priorities Adjustments ...................................................................................... 9

    Hiring and Staffing Challenges ........................................................................ 9

The Human Impact .............................................................................................. 10

    Separated Families Face Ongoing Danger ...................................................... 10

    Prolonged Separation Destroys Familial Relationships .................................. 12

    Delays have Mental Health Consequences ..................................................... 13

    Delays Complicate Work Authorization ........................................................ 14

    Access to Education is Impeded by Long Delays ............................................ 16

Delays Impair Access to Representation .............................................................. 17

Addressing the Backlogs ..................................................................................... 18

    The Asylum Division ...................................................................................... 18

    The Immigration Court ................................................................................... 19

    Improving System Effectiveness and Measures to Advance Pressing Humanitarian Cases .......... 20

Maintaining the Integrity of the Immigration Removal and Asylum Systems ....... 22

Domestic and International Legal Implications ..................................................... 23

Conclusion .......................................................................................................... 25

Appendix I: Methodology ..................................................................................... 26

Appendix II: Asylum Division Backlog Calculations ............................................ 26

Appendix III: Immigration Court Backlog Calculations ....................................... 31

Endnotes ............................................................................................................. 34

AR004235

AR004236

# Executive Summary

As the world faces the greatest refugee crisis since World War II, the need for effective, timely, and fair processing of asylum claims could not be greater. But the U.S. asylum and immigration court systems are failing refugees. Chronic underfunding, hiring challenges, and shifting enforcement strategies have left the asylum office and the immigration courts in a state of crisis. More than 620,000 removal and asylum cases are pending, and many asylum seekers are waiting three to six years for resolution of their claims. The growing backlogs threaten to undercut the integrity of the U.S. immigration system and expose vulnerable people and their families to prolonged separation and anguish as they wait.

"I left my home and lost my home over there, nobody knows when the bombs [will] come," says one asylum seeker from Syria. Delays have left him—like thousands of others—stranded in legal limbo and unable to bring his family to safety in the United States until his asylum request is granted. "When you hear every day from your daughters that 'we want to come,' and they start to cry when they hear the bomb noises, it's horrible."

Since 1978, Human Rights First has represented refugees seeking asylum in the United States in partnership with pro bono attorneys at law firms. With offices in New York, Washington, D.C., and Houston, Human Rights First has a national, on-the-ground perspective of the challenges faced by asylum seekers. Staff attorneys and pro bono partners alike identify the backlogs as the number one problem facing their asylum clients today. Human Rights First currently represents, with its pro bono partners, more than 550 asylum seekers stuck in the backlogs.

As detailed in this report, there is strong and diverse support for addressing the backlogs. The

Bipartisan Policy Center, American Bar Association, the Association of Pro Bono Counsel (APBCo), editorial boards from Texas to Los Angeles, and bipartisan Congressional leaders have all called for additional resources. Representative John Culberson (R-TX) said additional funding "will help reduce the growing backlog of cases that are holding up our courts and compromising the rule of law."

The report examines the impact that systemic delays in both the Asylum Division of the United States Citizenship and Immigration Service (USCIS) and the immigration courts have on the integrity of the U.S. immigration system and on asylum seekers and their families. It also offers solutions for eliminating the backlogs and lessening delays.

Informed by in-depth interviews with asylum seekers and legal service providers, detailed analysis of data, a survey of pro bono managers at law firms, meetings with current and former government officials, and consultation with numerous experts, Human Rights First finds the following:

## Backlog in the Asylum Division

- **The number of backlogged cases at the Asylum Division has more than quadrupled since 2013.** The number of cases before the nation's eight asylum offices has ballooned from 32,560 in 2013 to some 144,500 in March 2016. This growth is largely due to an increase in the number of credible fear and reasonable fear interviews—which are part of the expedited removal and reinstatement of removal procedures that have been increasingly employed by DHS over the years—along with an increase in affirmative asylum applications. Since 2013, credible fear interviews have nearly quadrupled and reasonable fear interviews have nearly doubled.

AR004237

- **Average wait times for initial affirmative asylum interviews exceed two years.** Six of the eight asylum offices are scheduling interviews for asylum applications filed more than two years ago. As of February 2016, the asylum office in Los Angeles was scheduling interviews for applications filed in August of 2011. All offices are scheduling initial interviews over the statutory requirement of 45 days for initial interview and 180 days for complete initial adjudication. For many years, the Asylum Division had typically scheduled most interviews within two months of filing, a time period that provided timely protection to many and safeguarded the integrity of the system by promptly referring those who were not granted asylum into immigration court removal proceedings.

- **Additional asylum officers are needed as the number of backlogged affirmative asylum applications will continue to grow even if the Asylum Division fills all 533 currently funded positions**. Some 144,500 applications were pending in March 2016. The total number of backlogged affirmative asylum cases grew by over 40,000 in the first six months of FY 2016 alone. The Asylum Division is on track to complete about one third of new asylum applications in FY 2016, given the credible fear and reasonable fear workload.

- **Despite extensive hiring efforts, the Asylum Division of USCIS lacks the funding for sufficient asylum officers.** Additional funding will be required to grow the asylum corps to a size—700 to 800 officers—sufficient to eliminate the backlog and adjudicate all applications in a timely fashion. Moreover, the Asylum Division expects to lose 58 officers to refugee resettlement details in 2016.

### Backlog in the Immigration Court System

- **Without additional judges the backlog in the immigration courts will top 500,000 by the end of FY 2016 and reach 1 million in FY 2022**. As of February 2016, 480,815 removal cases were pending before the immigration courts—nearly double the number of cases pending in 2009. About 20 percent of incoming immigration court removal cases are applications for asylum.

- **The immigration courts are woefully understaffed.** In February 2016 the court was staffed with just 254 judges. But 524 (and corresponding support staff) are needed to eliminate the backlog and adjudicate new cases within an average of one year. Congress recently appropriated funding for an additional 55 immigration judge teams—a welcome but insufficient step.

- **Hundreds of thousands of immigrants are stuck in legal limbo for years**. On average, people whose cases are before the immigration courts can expect to wait over three years. In many courts, the wait time can be much longer, five or six years. In Texas, for example, immigrants and asylum seekers must wait on average over 1,700 days—nearly five years.

- **An asylum seeker who files an affirmative asylum application today could wait more than six years**. Asylum seekers wait well over two years on average for an initial interview at the Asylum Division. When the Asylum Division does not grant a case, it refers it to the immigration court removal process. (Human Rights First often takes on asylum cases for legal representation at this stage, and many are ultimately granted by the immigration courts.) Those seeking relief before the immigration court now face a three and a half year wait on average. These combined delays can total more than six years.

AR004238

- **The Executive Office of Immigration Review (EOIR) faces challenges hiring judges promptly enough to combat attrition.** On February 1, 2015, EOIR swore in nine judges, bringing the total to 254 – four fewer than began 2015. According to recently retired judges and the National Association of Immigration Judges, the huge caseloads lead many to retire. At the end of FY 2015, some 130 judges were eligible for retirement.

### The Human Impact of the Backlogs

- **Family separation leaves children and spouses in danger and strains family relationships**. Many asylum seekers with strong protection claims remain separated for prolonged periods from family members who face ongoing persecution and imminent danger.

  - **Joshua, a Christian missionary recently granted asylum,** feared for his family's lives for over three years while they hid from Boko Haram. Joshua fled to the United States in 2013 and waited in the backlog until he was granted asylum in March 2016, but his wife and children are still in hiding.

  - **Diana, from Honduras**, was subjected to years of violent domestic abuse in front of her young daughter. She fled to the United States, where her case has been pending more than three years. In 2015, the court cancelled her latest hearing and gave her a new date in 2017. Threatened by Diana's ex-partner and abuser, her daughter remains in hiding.

- **Delays harm asylum seekers' mental health**. Mental health professionals report that many asylum seekers stuck in the backlog are unable to fully recover from past trauma and struggle with worsened symptoms.

  - **Ibrahim, a comedian and political activist from the Ivory Coast,** had his immigration court hearings canceled twice, resulting in a five-year delay. Tortured in his home country for his political beliefs, Ibrahim says, "I feel like I am in prison waiting for my sentence."

- **Employment and education are often put on hold while asylum seekers wait**. Many asylum seekers struggle to support themselves and their families in the many months before they receive work authorization. Even once they do, they face barriers—an unreliable work authorization renewal system, for example—to sustainable employment. Education, too, is difficult to access for a variety of reasons, including the requirement in most states that immigrants have permanent status to qualify for in-state tuition and other financial aid options.

### Impact on Pro Bono Representation

- **Years of delays undercut pro bono legal representation**. According to a survey by Human Rights First in February 2016, nearly 75 percent of pro bono coordinators at many of the nation's major law firms indicated that delays at the immigration court are a significant or very significant negative factor in their ability to take on a pro bono case. More than 60 percent also say delays at the Asylum Office hurt their ability to take on affirmative asylum cases pro bono. Representation can make the difference between deportation or relief—and between life or death. Given the lack of government funding for legal representation of indigent asylum seekers, the backlog's effect on pro bono representation is particularly concerning.

AR004239

# Recommendations

Both executive and legislative leaders should take straightforward steps to ensure the U.S. asylum and immigration court systems are an embodiment of U.S. ideals, advancing both the rule of law and the protection of individual rights. Providing these systems with the necessary staffing levels constitutes a smart investment in the effectiveness of the asylum system and the immigration court removal system—minimizing unnecessary expenditures caused by the backlogs, preventing potential abuse of these systems and allowing refugees to contribute to this country sooner without years of delay. To these ends Human Rights First recommends:

**To the United States Congress:**

- **Authorize and appropriate funds for an additional 150 judges—over two years—in order to reach the recommended level of 524 immigration judges.** To do so, Congress should fund 75 immigration judge teams for fiscal year 2017, and an additional 75 for fiscal year 2018.

- **Allocate requisite funding to EOIR to expedite the hiring process of immigration judge positions.** All currently funded immigration judge positions, 374 total, should be filled as soon as possible through the allocation of resources to conduct prompter background checks. Such resources should also be allocated to ensure all 150 newly funded judges can be hired as soon as possible.

- **Support efforts to expand and expedite the hiring of additional USCIS asylum officers.** Without additional staffing, the backlog at the Asylum Division will continue to balloon even when all 533 current positions are filled.

**To the Department of Justice and its Executive Office of Immigration Review (EOIR):**

- **Redouble efforts to fill all currently funded immigration judge positions.** The Department of Justice and EOIR should improve the pace of hiring and immediately direct the necessary resources, including resources needed to conduct prompter background checks, towards hiring all currently funded immigration judge positions as quickly as possible—while assuring the integrity and fairness of the hiring process.

- **Create an effective process for advancing cases due to humanitarian considerations and issue guidance to immigration judges on pre-trial communication and pre-trial conferencing.** Such guidance could narrow the issues requiring time at hearings, reducing the length of some hearings. EOIR must create a reliable and fair system through which asylum seekers who have urgent or humanitarian needs can request and receive an early hearing date.

**To the Department of Homeland Security's U.S. Citizenship and Immigration Services (USCIS) and its Asylum Division:**

- **Increase the total number of asylum officer positions to 700-800, which requires adding 167 to 267 positions.** Even after the Asylum Division fills the 533 currently funded asylum officer positions, the backlog will continue to grow at a rate of around 20,000 cases per year. At 700 total officers the Asylum Division would begin to reduce the backlog and could eliminate it by FY 2025. With 800 officers on board by FY 2019, the division would eliminate the backlog by FY 2022. Under both scenarios the Asylum Division could adjudicate all new incoming asylum applications within 60 days of receipt after eliminating the backlog. Normal attrition rates would allow the Asylum Division to level off, after the backlog is eliminated.

AR004240

■ **Create an effective process to advance asylum interviews for those with humanitarian or urgent concerns.** Current mechanisms, including "short lists" and requests for expedited interviews, are insufficient and often unreliable. A fair and uniform process for scheduling cases that need prompt interviews is needed to ensure that cases with urgent humanitarian concerns are considered by the Asylum Division without delay.

**To the Department of Homeland Security:**

■ **Limit the use of expedited removal against Central American families and other populations with high percentages of asylum seekers.** The significant increase in the use of expedited removal in areas beyond ports of entry has greatly impacted the Asylum Division as it conducts the protection component of expedited removal and reinstatement of removal. Based on FY 2016 projections for credible fear interviews (expedited removal) and reasonable fear interviews (reinstatement of removal), 272 officers must be devoted solely to protection screening requests. UNHCR has recognized a growing refugee crisis in the Northern Triangle (El Salvador, Guatemala, and Honduras). The use of summary proceedings against known refugee populations diverts substantial asylum office staffing, resources, and time to screen a population that will ultimately be largely entitled to apply for asylum.

■ **Issue guidelines to DHS trial attorneys establishing steps to narrow issues, preserving limited court time for vital issues**. Guidelines for trial attorneys, including requiring pre-trial conferencing to reduce unnecessary hearing time, by narrowing the issues for trial, where appropriate, could increase the efficiency of the court system and help free up some court time to complete more cases.

**To the Executive Office of the President:**

■ **Request funding to grow the immigration court to adequate size.** Despite the positive step to request 55 new immigration judge teams in FY 2016, a request granted by Congress, the Obama Administration did not request funding to increase the number of immigration judges and support staff for fiscal year 2017. The next administration must request the necessary appropriations and prioritize the hiring of immigration judges.

AR004241

AR004242

# Introduction

*"I feel like waiting for this long ruined my life. I feel like I ran from the rain and fell into the sea."*

**–Marcel, a political activist and survivor of torture, waited three years for an asylum interview and struggles to maintain hope.**

This report analyzes backlogs in two distinct systems: the U.S. Asylum Division, a division of U.S. Citizenship and Immigration Services (USCIS) within the Department of Homeland Security (DHS), and the immigration court system, managed by the Executive Office for Immigration Review (EOIR) within the U.S. Department of Justice (DOJ). While the Asylum Division exclusively handles asylum and other protection claims, the immigration courts handle all types of immigration removal cases. Asylum cases have made up approximately 20 percent of incoming immigration court caseloads in recent years. With more than 620,000 removal and asylum cases pending and total wait times topping six years, asylum seekers hang in legal limbo—separated from families, struggling to recover from trauma, and unable to rebuild their lives.

Seeking asylum in the United States is a complex process. Asylum seekers must demonstrate that they meet the legal definition of a "refugee"—a person unable or unwilling to return to their country of origin because of persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. They must present evidence to support their case and convince the decision maker of their credibility, often while suffering from trauma and other effects of persecution. The government does not provide legal counsel to indigent asylum seekers, and many go through this complex process without a lawyer, even as studies show that, more than any

other variable, whether they have a lawyer determines the outcome of their cases. Asylum law has become even more complex in recent years, further exacerbating the need for counsel.

People present in the United States can make an "affirmative" application for asylum to the USCIS Asylum Division, voluntarily coming forward to file an application. An officer at the Asylum Division will interview the applicant and if the officer grants the application, the person—who is now an "asylee"—can petition for a spouse and children to join him or her in the United States.

If the officer does not grant the asylum application, the case will be "referred" to the immigration court, where an attorney from U.S. Immigration and Customs Enforcement (ICE) will argue for the person's removal from the United States and an immigration judge will consider the asylum case or other available forms of relief from removal. While some affirmative cases referred to the immigration court are ultimately denied, a significant number are granted by immigration judges. Thus, referrals to the court do not necessarily indicate an unmeritorious claim.

If a person is already in active immigration removal (deportation) proceedings, the asylum application must be filed directly with the immigration judge, a process known as a "defensive" application for asylum. An exception to this rule exists for unaccompanied immigrant children. If an unaccompanied child is subject to removal proceedings and files an application for asylum, the Asylum Division will hear that asylum case initially. During this time, the immigration judge may adjourn the hearing to allow time for the Asylum Division to issue a decision. The judge will consider the merits of the unaccompanied child's asylum case only if the case is not granted by the asylum officer and "referred" to the court.[1]

Backlogs in both systems are getting worse. The backlog at the Asylum Division is growing at a rate

AR004243

of approximately 20,000 cases every three months, and the pending caseload at the immigration court has grown by more than 50,000 each year since 2013. The courts will soon have more than 500,000 pending removal cases. Without action, the immigration court backlog will grow to more than 1 million by 2022. The Asylum Division is on track to have more than 200,000 pending cases by December 2016.

Chronic underfunding has caused the immigration court backlog to grow at a steady pace since 2008, spiking slightly in 2014 and 2015. Despite the increasingly complex caseloads and demands on judges, the number of immigration judges hearing cases grew only from 223 to 254 since 2008. Sequestration caused a DOJ hiring freeze from 2011 to 2014, which stymied growth in the number of immigration judges. EOIR has recognized the need to improve its hiring process to get judges on the bench more quickly, and recently issued a request for proposals (RFP) for an in-depth case processing study that would produce an objective and standardized measure of judicial workloads.[2]

Numerous groups, editorial boards, and bipartisan leaders have called for increased funding of the immigration courts. The Bipartisan Policy Center argues, "Funding immigration courts should not be controversial." The U.S. Conference of Catholic Bishops contends, "The U.S. immigration court system should increase by an order of magnitude." The Houston Chronicle recently explained, "The backlog hurts almost everyone." Representative John Culberson (R-TX) expressed his support for increased resources in connection to the FY 2016 budget bill: "The funding in this bill will help reduce the growing backlog of cases that are holding up our courts and compromising the rule of law."

In conjunction with the FY 2017 budget the Association of Pro Bono Counsel (APBCo), which consists of the pro bono leaders of many of the nation's leading law firms, issued a letter to Congress requesting adequate funding to eliminate the backlog in the immigration courts.

At the same time, the United States is seeing an increase in the number of people seeking asylum. Global displacement has reached record highs as wars, conflict, and persecution have caused more people to flee their homes. The targeted violence of transnational criminal organizations in Central America's Northern Triangle—Guatemala, El Salvador, and Honduras—has led to a significant increase in protection requests in the United States, as well as in other countries. EOIR's decision to prioritize cases of recently arrived unaccompanied children and families has exacerbated the backlog, causing greater delays for asylum seekers already awaiting their hearing.

The expansion in the use of expedited removal beyond ports of entry over the years has also added to the backlog. While in 2004 51,014 people were removed via expedited removal, in 2013 there were 193,032 expedited removals.[3] DHS has also increased its use of reinstatement of removal, another form of summary removal. Since 2005, the number of removals based on a reinstatement of a final order has increased every year.[4]

Asylum Division officers are responsible for conducting protection screening interviews— known as credible fear interviews (CFI) and reasonable fear interviews (RFI)—with people subject to expedited removal or reinstatement of removal who have indicated a fear of return. In a credible fear interview the asylum officer must determine if there is a "significant possibility" that the person could establish an asylum or withholding of removal claim before an immigration judge.[5] In a reasonable fear interview the officer must determine if there is a "reasonable possibility" of future persecution based on one of the five protected grounds under the refugee definition.[6]

AR004244

Since 2009, credible fear and reasonable fear interviews have gone up nine and seven fold, respectively. While a tripling of affirmative asylum applications has also contributed to the backlog, the Citizenship and Immigration Services Ombudsman reports that the Asylum Division backlog is "largely" a result of the increase in these protection-screening interviews.

This report first examines the growing backlogs at both the Asylum Division and the immigration courts. Projections show that backlogs will continue to balloon, causing lengthening waits for all immigrants with cases pending before either system. Second, the report explains the underlying causes of the backlogs and the challenges impeding progress. Third, the report examines the impact of these delays on asylum seekers and pro bono representation. Finally, the report proposes solutions for eliminating the backlogs in both systems and steps for increasing efficiency.

# The Backlogs–A Ballooning Problem

## The Asylum Division

The Asylum Division of USCIS is facing a growing crisis. Over the last three years, the backlog of affirmative asylum applications has more than quadrupled, from 32,560 at the end of fiscal year 2013 to some 144,500 as of March 2016.[7]

The number of new affirmative asylum applications grew from 44,446 in 2013 to nearly 57,000 in FY 2014 and 83,254 in 2015, which, according to UNHCR, is part of a global trend that reflects the increase in displaced people fleeing persecution, war, and deteriorating security.[8] The Asylum Division is on track to receive more than 100,000 affirmative asylum applications in FY 2016.[9] There have been notable increases in applications from asylum seekers fleeing the Northern Triangle. While applications from El Salvador, Guatemala, and Honduras totaled less than 1,900 in FY 2013 (or about 4 percent of the total number), the Northern Triangle countries accounted for more than 20,000 affirmative applications in FY 2015 (or about 25 percent of total applications). At the same time, an increase in the use of expedited removal and reinstatement and the increase in CFI and RFI requests have syphoned Asylum Division resources and undercut its ability to adjudicate affirmative asylum claims.

A confluence of factors has contributed to the increase in the number of credible fear and reasonable fear interviews. The escalation of immigration enforcement, the significant expansion in the use of expedited removal beyond ports of entry, and the increased violence pushing people to flee are all putting pressure on U.S. protection screening and adjudication systems. The violence in Central America has affected a wide range of people, including women targeted for murder, rape, and domestic violence, LGBT persons, journalists, police officers, and others terrorized by transnational criminal organizations that sometimes have close ties to government.

Figure 1 depicts the number of reasonable fear interviews, credible fear interviews, and affirmative applications filed each fiscal year, along with the number of pending cases that

AR004245

**Figure 1: The Asylum Office Backlog**[10]



remained at the end of each year.[11] In FY 2013 the number of CFIs more than tripled, and RFIs went up by more than 50 percent. CFIs and RFIs continued to grow in 2014 and 2015, peaking at 51,001 and 9,084 respectively. The Asylum Division is on track to receive more than 80,000 credible fear interviews and more than 8,000 reasonable fear interviews in FY 2016.[12] (These are only a portion of overall CBP apprehensions.)

As a result of the increasing demands on the Asylum Division that stem from the expedited removal process and increasing affirmative applications, the number of pending cases doubled in FY 2013 from 15,526 to 32,560, doubled again during FY 2014, and nearly doubled in FY 2015, with 108,749 cases pending at the end of that year. By March 2016, some 144,500 affirmative cases were pending before the Asylum Division.[13]

By the end of FY 2015, the Asylum Division had 375 asylum officers, and a budget to grow to 533 officers.[14] This includes a significant increase in the number of authorized positions since the beginning of 2015, when funding provided for just 448 officer positions.[15] At current staffing levels, the number of pending cases continues to increase by approximately 20,000 every three months; by the end of 2016 the Asylum Division could face over 180,000 pending asylum applications. Even if it is fully staffed at 533 asylum officers, the backlog will grow at a rate of approximately 20,000 cases per year.[16]

As a result of the growing backlog, most people who file an affirmative asylum application wait two years, and many longer, before USCIS asylum officers adjudicate their cases. As of February 2016, the asylum office in Los Angeles was scheduling interviews for asylum applications filed in August of 2011—more than four years ago. Six of the eight asylum offices across the country are scheduling interviews for applications filed more than two years ago.[17] For example, the asylum office in Miami scheduled interviews in February 2016 for people who had applied for asylum in May 2013. With the remaining two asylum offices scheduling interviews for applications filed well over one year ago, all asylum offices are processing cases well over the 45-day statutory

AR004246

**Figure 2: Ballooning Backlog without Increase in Immigration Judges** [18]



requirement for initial interviews and well over the 180-day statutory requirement for final adjudication of an asylum claim at the Asylum Division.[19]

From April 2015, when USCIS began posting information related to the backlog in an online bulletin, to March 2016, asylum offices in Arlington, Chicago, Houston, Los Angeles, Miami, and Newark have made little to no progress in adjudicating affirmative asylum claims. For example, between April 2015 and February 2016 the asylum office in Houston was scheduling interviews with applicants who had filed in April or May 2014. USCIS notes this on the asylum bulletin by explaining, "Offices that do not appear to be progressing by filing date […] may have diverted resources to credible and reasonable fear interviews, or be experiencing high volumes in the first two affirmative priority categories, or may have large numbers of pending category three [affirmative asylum] cases with filing dates from that particular month."[20]

The New York asylum office is the only location making consistent progress on backlogged cases.

New York happens to be the only asylum office with minimal responsibilities over immigration detention facilities that hold asylum seekers, meaning it is receives little to no requests to conduct credible fear and reasonable fear interviews.[21]

## The Immigration Court

The backlog in the U.S. immigration court system also continues to grow. Beginning in FY 2007, the number of cases pending before the immigration courts began to rise (in previous years it had hovered between 150,000 and 200,000), with the greatest spikes in FY 2014 and 2015. But the number of immigration judges on the bench increased only slightly, from 210 in FY 2007 to 256 at the end of FY 2015.

Unable to keep up with the growing demands, judges' caseloads continued to grow, and as of February 2016, 480,815 cases were pending.[22] Based on data provided by Syracuse University's Transactional Records Access Clearinghouse (TRAC), Human Right First calculates the number

AR004247

**Figure 3: Predicted Backlog Expansion at Current Prosecutorial, Case Completion, and Staffing Rates**



of cases pending before the court will soon exceed 500,000. The immigration courts in Texas and California have the largest caseloads, with 89,000 and 81,000 respectively. The number of cases pending in the Houston court grew from 6,423 to 36,136 between 2010 and 2016. In Baltimore, pending cases nearly tripled between 2013 and 2016. The Atlanta court, which hears nearly all cases of immigrants residing in Georgia and Alabama, has experienced more than 100 percent growth, from 6,297 to 12,408 cases in the past four years. Six judges in Atlanta handle 12,408 cases. In Phoenix, only four immigration judges handle nearly 10,000 cases.

At current prosecutorial, case completion, and staffing levels, the number of pending cases will increase to 504,394 by the end of FY 2016 and will continue to expand unless the federal government takes action. As shown in Figure 3, if the corps of immigration judges remains at its current size of 254 judges, the number of pending cases would reach over 1 million in FY 2022.

As a result of the ballooning backlogs at the immigration courts, hundreds of thousands of immigrants are in a state of legal limbo for more than three years on average. The most delayed courts have wait times of four to five years. For example, it will take the Newark court more than five years to hear currently pending cases.[23] In Texas, immigrants and asylum seekers must now wait on average over 1,700 days—nearly five years—for their cases to be resolved. In Maryland they wait nearly two years, in Georgia and Alabama three and a half years, in Arizona more than three years, and in California nearly three years. Since 2014 alone, wait times have grown by 34 percent in Houston, 28 percent in Dallas, 20 percent in Newark, and 15 percent in Baltimore. Immigrants in New York can expect to wait at least two and a half years for the court to consider their case.

# How We Got Here:
# Causes and Challenges

This section provides a more in-depth analysis of the underlying reasons for the backlogs, beginning with the chronic underfunding that has plagued the immigration court for years. The expanded use of expedited removal and increased demand for protection screening interviews have added substantially to the Asylum Division's workload. Finally, shifting docketing and scheduling priorities and hiring and staffing challenges have further exacerbated the problem and undercut the systems' ability to stem growing backlogs.

## Chronic Underfunding

Congress has continually increased immigration enforcement budgets to widen the administration's capacity to apprehend and prosecute immigrants, but has not proportionately increased the budget for systems charged with handling the resulting cases.[24] Over the last five years, resources for immigration enforcement, including Customs and Border Protection (CBP) and ICE, have more than quadrupled—from $4.5 billion in 2002 to $20.1 billion in fiscal year 2016.[25] Funding and staffing for the immigration courts lagged far behind, increasing by only 74 percent.[26] Moreover, the increase in asylum applications associated with rising violence and persecution in Central America and a global refugee crisis call for more, not less, funding for the bodies that adjudicate these life-saving claims for protection.

A wide variety of experts and former government officials have expressed concern about this funding imbalance. In a 2015 op-ed, former George W. Bush Administration ICE Assistant Secretary Julie Myers Wood noted that the backlog undermines both immigration enforcement and due process. She stated, "Adequate immigration court staffing is an essential component of enforcement. With an appropriate number of judges and staff, cases will be decided in a timely and fair manner."[27] A Georgetown University report concluded: "Immigration courts remain chronically underfunded, particularly so in comparison to increased funding given to other enforcement activities. This has led to a court system that is unable to keep pace with heightened demand and extensive backlogs." David Martin, a law professor at the University of Virginia who worked for two Democratic presidents, recently explained: "You fund more investigators, more detention space, more border patrol; almost all of these are going to produce some kind of immigration court case." He further pointed out, "You are putting a lot more people into the system. It's just going to be a big bottleneck unless you increase the size of that pipeline."[28]

Former Attorney General Alberto Gonzalez believes that investing in the immigration courts makes fiscal sense. In an August 2014 piece in *USA Today*, he emphasized that investing in our immigration court system along with broader immigration reforms would save money in the long run as well as "adhere to our principles of fairness and justice."[29]

A report issued by the American Bar Association's Commission on Immigration in 2010, authored by pro bono attorneys at the law firm Arnold & Porter LLP, concluded: "The EOIR is underfunded and this resource deficiency has resulted in too few judges and insufficient support staff to competently handle the caseload of the immigration courts." The Administrative Conference of the United States (ACUS) confirmed in June 2012 that the immigration court backlog and "the limited resources to deal with the caseload" present significant challenges. In 2014 two expert roundtables convened by Georgetown University's Institute for the Study of International Migration called for increased resources for the

AR004249

immigration court system to reduce the growing backlog.[30]

Beyond chronic underfunding, the automatic spending cuts, known as sequester, that Congress passed in August 2011 as part of the Budget Control Act led to a hiring freeze at EOIR from 2011 to 2014. During this period the number of cases before the court grew by 100,000 while the number of immigration judges dropped from 265 to 240.

The Asylum Division, on the other hand, does not receive *any* congressional allocation. Its resources derive entirely from fees charged by USCIS on other immigration applications.[31] This largely remained the case even as USCIS was faced with the escalating demands stemming from the increased use of expedited removal. In 2011, Congress appropriated $25 million to the Asylum Division after USCIS eliminated surcharges on other immigration applications, which had previously supported the Asylum Division. But the following year, Congress made no allocation and the Asylum Division returned to a system that relied solely on USCIS fees, without a surcharge.[32] Additional funding, whether from Congress or USCIS, will be required to grow the Asylum Division to a sufficient size to begin to address the backlog.

## Expanded Use of Expedited Removal

According to the USCIS Ombudsman, "Spikes in requests for reasonable and credible fear determinations, which have required the agency to redirect resources away from affirmative asylum adjudications, along with an uptick in new affirmative asylum filings, are largely responsible for the backlog and processing delays."[33] This increase in credible fear and reasonable fear interviews stems from the Obama Administration's increased use of expedited removal, particularly against families traveling with children, and from the escalating violence and persecution in the

Northern Triangle, which has led to increased asylum filings in other countries in the region as well. In the first three months of 2015, 23 percent of the credible fear interviews conducted by the Asylum Division were for families detained at family detention centers.[34]

Established by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, expedited removal is a process by which immigration enforcement officers, rather than judges, order the deportation of certain individuals. Those potentially subjected to expedited removal include people arriving at ports of entry, people arriving by sea, and non-citizens apprehended within 100 miles of any land border.[35] Originally, expedited removal was implemented only at ports of entry, but in 2004, DHS began to expand its use to areas between ports of entry. Some people may be subject to reinstatement of removal if they have had a prior order of deportation. The charging officer may invoke either process at their discretion.[36] In recent years, the Department of Homeland Security has increased its use of expedited removal and reinstatement of removal. [37]

Many groups, including Human Rights First, have recommended that the administration refrain from using expedited removal and reinstatement against populations largely fleeing persecution, both for humanitarian and efficiency purposes.[38] Likewise, UNHCR has called upon the administration to recognize that the majority of Central American families and children seeking protection in the United States are part of a growing regional refugee crisis[39] and eligible for relief. In 2015, 88 percent of families who had been placed in expedited removal proceedings and expressed a fear of return passed their initial credible fear screenings.[40] Thus, most of the families placed in expedited removal were ultimately docketed for a hearing before an

AR004250

immigration judge, arriving where some families and people had been placed immediately.

The use of expedited removal and reinstatement also impacts the immigration courts. Immigration judges review negative fear determinations and hold custody determinations for those subjected to detention (and people in summary removal proceedings are normally held in detention, at least until sometime after fear is established).[41] For example, the number of credible fear and reasonable fear reviews completed by the immigration court increased from 1,126 and 385 in FY 2010 to 6,345 and 1,710 in FY 2014.[42]

## Priorities Adjustments

Modifications to docketing priorities and asylum interview scheduling have also impacted asylum seekers' wait times. In July 2014 the Department of Justice announced new docketing procedures to address the "surge of migrants crossing into the U.S."[43] EOIR re-prioritized its dockets to focus on cases involving unaccompanied children and adults with children.[44] This decision, coupled with the pre-existing backlog, led the immigration courts to re-calendar other non-priority cases for as late as November 2019.[45] An EOIR spokesperson indicated that these delays were a direct result of the decision to shift priorities and that many cases will be given a different hearing date, some sooner and some later.[46] If current rates remain the same and EOIR does not significantly expand its corps of immigration judges, many cases will still not be heard by 2019.

The Asylum Division followed suit in December 2014 by reprioritizing the order in which it adjudicates all affirmative asylum claims, including claims on behalf of unaccompanied children.[47] The Asylum Division now first adjudicates rescheduled cases, then cases filed by children, then other pending affirmative asylum applications in the order they were received. With respect to this third category, the Asylum Division shifted from a "last in first out" to a "first in first out" order. Although reprioritization guaranteed that the longest pending cases would be heard first, the overwhelming number of fear screening interviews has largely prevented any progress whatsoever on affirmative asylum cases.

## Hiring and Staffing Challenges

Both systems face hiring and staff turnover challenges. The Asylum Division is authorized to employ 533 asylum officers. As of March 2016, it had only 447. The Asylum Division indicated that it aims to fill 90 percent, or 480, of the 533 funded positions by the end of FY 2016. However, the Division will lose the equivalent of 58 officers to refugee resettlement details in coming months, adding to the challenge of creating and sustaining a robust corps of asylum officers.[48]

Several challenges face EOIR as it works to increase the number of immigration judges. At the end of FY 2015, some 130 immigration judges were eligible for retirement. Due to worsening working conditions attributable to huge caseloads, some experts predict that many will accept the opportunity to retire.[49] Since 2010, EOIR has not hired more than 39 judges in any given year.[50] With only moderate hiring and regular turnover, the corps of immigration judges has not increased. On February 1, 2015, EOIR swore in nine new judges, bringing the total number to 254. But there were 253 judges in 2010.[51] Due to lengthy hiring procedures and trainings, it generally takes EOIR 10 months, at the very least, to process a new judge.[52] Without extensive improvements to the hiring process, new hires will largely fill positions of retired judges.[53]

AR004251

# The Human Impact

*"It's not easy to wait. It's not a little thing, it's your life."*

**–Tural, a refugee from Azerbaijan, waited over two years for an asylum office interview. He was recently granted asylum.** [54]

Nearly every asylum seeker interviewed for this report invoked the refrain "stuck in limbo." Representing twenty-two different countries and a range of socio-economic backgrounds, those interviewed discussed the devastating effects on their families, the harm to their mental health, and their inability to move forward with their lives.

Diana, an asylum seeker from Honduras, has had her hearing cancelled three times by the court. "I continue in limbo," Diana says, "I don't know if I am beginning or ending, because my next court date is not until 2017." [55] Augustin, a torture survivor from the Congo (Brazzaville), says, "I feel like what immigration is doing is mental torture. When I first arrived I was told it would take two weeks to get an interview, it took two years and two months." [56]

Carlos and Iris, pro-democracy political leaders from Venezuela, are stuck in the backlog at the Houston asylum office. "It is very difficult to speak about the future here, because we don't know what will come," they explain. A successful business owner and a lawyer, the couple now struggles to support themselves and their young daughter. Having spent their life savings to flee Venezuela, Carlos and Iris struggle to rebuild. "If you had asked my daughter what she wanted for Christmas she would have answered, 'Mommy I just want them to give you your papers.'" [57]

## Separated Families Face Ongoing Danger

*"They feel like it is a prison, because it is not safe at all to go outside the home, go to the city… Every day we worry until my daughter makes it home from school."*

**–Ammar, a Syrian refugee, seeking asylum in Texas.** [58]

Asylum seekers often point to family separation as one of the most devastating consequences of being stuck in the backlog. When granted asylum, asylees can immediately petition for their spouse and children to join them in the United States. [59] The family is a protected and fundamental unit of society under international law. [60] In a paper prepared for UNHCR, researchers found that "although the right to seek and enjoy asylum in another country is an individual human right, the individual refugee should not be seen in isolation from his or her family." [61]

Family members often face persecution in their home countries while awaiting the result of their loved one's asylum claim. Some are forced into hiding, others may endure torture by authorities seeking information about their loved one.

■ **Ammar, a Syrian refugee, waits for his asylum case as his wife and daughters remain trapped in Syria, seeking shelter from bombs.** Ammar fled to the United States in October 2013 fearing persecution due to his refusal to take part in the Syrian war. His wife and two daughters went into hiding and his youngest daughter cannot go to school because it is not safe. His older daughter goes to school on occasion but he constantly worries about her safety. "When you hear every day from your daughters that 'we want to come.' And they start to cry when they hear the bomb noises, and it's … horrible." Without a lawyer, the Asylum Division referred his case to the

AR004252

immigration court, where he was scheduled for his first court hearing in 2019. His new pro bono lawyers are fighting to get an earlier date.[62]

■ **Jonathan, a Christian pastor in Dallas, TX, is stuck in the backlog while his family is terrorized in the Democratic Republic of Congo (DRC).** Jonathan arrived in the United States and sought protection in 2014. He was placed in removal proceedings and filed his application for asylum with the immigration court, where the first hearing was scheduled for 2015. Two weeks prior to the scheduled hearing, it was canceled and rescheduled for 2017. "Since I got the letter from the court I have not told [my family], because if I tell them it will not be good for them," says Jonathan. His wife and five children are still in the DRC where they have been terrorized by security forces.[63]

■ **Khanh, a Vietnamese journalist, is stuck in the Los Angeles backlog while his family faces ongoing persecution.** After promptly filing his asylum application upon arrival in the United States in 2014, Khanh finds himself in the four-year backlog of affirmative asylum cases at the Los Angeles asylum office. A prominent journalist in Vietnam, Khanh formed an organization for journalists reporting on stories censored or banned by state-controlled media. "Due to my work while I was in Vietnam my family had a lot of repression," says Khanh. Security forces have threated to attack his son, who has been repeatedly arrested and beaten, and his children are monitored both at work and at school. His youngest daughter was followed and assaulted in front of the family's apartment building. Absent the successful expediting of Khanh's claim, a rare occurrence in Los Angeles, he can expect to wait years for the asylum office to hear his claim and give his family the possibility of relief.[64]

■ **Joshua, a Christian missionary recently granted asylum, feared for his family's lives for over three years while they hid from Boko Haram.** Joshua is a Christian missionary and social outreach worker from Nigeria, a husband and the father of young children. Boko Haram militants targeted him and his family because of his religious activities and because he provided information about Boko Haram crimes to the police. Joshua fled to the United States in 2013 after a period in hiding. At his first hearing in immigration court in late 2013, Joshua was scheduled for a hearing on the merits of his case in March 2016, where he was granted asylum. Joshua's wife and children are still in hiding. He continues to fear for their safety as he begins the process of petitioning to bring them to safety in the United States.[65]

■ **Elisa, a female police officer in El Salvador for sixteen years, fled severe domestic violence but her child remains at risk in her home country.** To avoid her own death from her brutal abuser, Elisa was forced to leave her two young sons and daughter in El Salvador with relatives. Soon after arriving in the United States in 2013, just fifteen minutes after her children had been dismissed from school at the end of the day, the director of their school was killed by gang members. Elisa's children no longer attend school because of the violence and avoid going outside for fear of forced gang recruitment. Elisa was scheduled for a hearing in 2015, which the court cancelled. She has been in the backlog for three years, uncertain when she will see her children again.[66]

AR004253

## Prolonged Separation Destroys Familial Relationships

*"As long as my family is not here I am not free."*

–Richard, an asylum seeker from Togo whose case began in 2013.[67]

Long waits can be destructive to asylum seekers' relationships with family members left behind. Rogers, an asylum seeker from Uganda, explains how not receiving an interview date from the asylum office, despite applying in 2013, has impacted his relationship with his children:

> They miss me, I miss them, and every time I talk to any of them they question when I am coming. "Next year...next year…" I tell them. Sometimes, you cannot explain all these things on [the] phone to kids so I try to tell them "don't worry I will come ...concentrate … go to school… I'll come for you." Every day you have to find something to tell them. Not to keep disappointing them and to keep them motivated. They are young. Like any parent I have to see them, be with them, talk to them, be in their life. I want to be in their life as well. Influence what they become. I want to see them grow. I want to be a factor in their life."[68]

Thousands of asylum seekers stuck in the backlogs want nothing more than to reunite with their children and spouses. As explained by Dr. Asher Aladjem, Chief Psychiatrist at the Bellevue/NYU Program for Survivors of Torture, asylum seekers struggle with "the sense that their own lives aren't only in limbo, but the whole family and the children and the whole [familial] system that they're part of is impacted."[69] Whether a wife and child hiding from further persecution or a daughter longing for the love and support of her father, the innocent victims of excessive delays are commonly those left behind—and the family unit itself.

■ **Marcel, a political activist and survivor of torture, waited three years for an asylum interview and struggles to maintain hope**. Marcel was forced to leave his wife and children in Cameroon after he was tortured on account of his political opinions. His family left the capital city and is in hiding in a remote village. "My daughter told me two years ago that if my father doesn't come get me, he is no longer my father." Marcel does all he can to reassure his family that he is still fighting for them to be together. Unfortunately, his weekly calls with them have become less frequent. "Whenever I call them, they're crying. I cry, the children cry, and it's really hard to bear that." After waiting three years for an interview, the Asylum Division referred his case to the New York immigration court, where he will likely wait several more years for a hearing.[70]

■ **Muzi, a father of two and political activist from Zimbabwe, sees his relationship with his daughters deteriorate.** Muzi fled Zimbabwe after being persecuted for his activities in a political party. Speaking of his first born daughter, Muzi says, "We were like very good friends ever since she was young, we were always together. It just hit her hard because she never expected that I would leave, so after I left it just hurt her heart." Muzi fears that his emotional bond to his daughter is slowly breaking while he is stuck in limbo. Muzi filed for asylum in August 2014 with the Houston asylum office, which has been scheduling interviews for applications filed in April and May 2014 for the past 10 months, so it is unclear when he can expect his initial interview.[71]

■ **Richard, an asylum seeker from Togo, has been separated from his wife and children since his case began in 2013**. Richard was forced to flee Togo due to threats of violence resulting from his political activities. His child was just ten months old at the time. Now she is

AR004254

almost four. "I don't know my child and my child does not know me," says Richard, whose relationship with his wife is also affected. Authorities have arrested Richard's wife several times and mistreated her as they questioned her about his whereabouts. "She says if the threats continue, she will have to leave me. Everything is very confusing to her, she does not know how long it's going to take, how long until we see each other again."[72]

## Delays have Mental Health Consequences

*"[Waiting] is non-stop pain that cannot be treated with medicine. We are in a blind spot in the system."*

**– Kashif, a human rights lawyer fighting for rights of persecuted Christians**[73]

Many asylum seekers endured severe persecution and frequently endure further trauma during dangerous journeys to the United States. At their destination, they may experience still more suffering resulting from family separation, the inability to work, or discrimination while waiting for the outcome of their asylum case.[74]

Delays impede asylum seekers' ability to overcome trauma, and may compound it. Several studies have shown that extended delays in adjudicating claims—and the resulting uncertainty in asylum seekers' futures—are associated with psychological distress "above and beyond the impact of traumatic events."[75] Dr. Melba Sullivan, Staff Psychologist at the Bellevue/NYU Program for Survivors of Torture, observes that prolonged delays in the adjudication of asylum claims is an "ongoing stressor," causing asylum seekers to experience prolonged exposure to the trauma trigger of uncertainty of future protection. This prolonged exposure impedes all phases of trauma recovery.[76] Kristina Jones M.D., Clinical Assistant Professor of Psychiatry at the Bellevue/NYU Program for Survivors of Torture explained that

she often struggles to keep her clients hopeful in the face of delays. "It's hard to show someone a path with a light at the end of the tunnel when you don't know how long the tunnel is."

Dr. Jones explains that the lack of certainty created by extensive delays causes an "acute stressor" for asylum seekers remaining in limbo. As she states:

> Some people who have been actively shot at, or burnt, or raped feel safer. But it's relative. It's great they're not going to kill me, rape me, or burn me, but what if they send me back? Because "what if they send me back" is an idea that is very corrosive to the mind and we're asking them to hold onto that idea for longer. So they don't feel permanently safe here—they feel quite insecure.[77]

This insecurity undermines asylum seekers' ability to begin the process of trauma recovery, and instead causes some asylum seekers to develop mental health symptoms they otherwise may not have experienced.[78] "[The] delay is causing new episodes of depression that weren't there before – definitely," says Dr. Jones.

Several mental health professionals at the Bellevue/NYU Program for Survivors of Torture observed distinct changes in patients' mental health after they received asylum. "The level of stress diminishes once you get granted asylum," Dr. Asher Aladjem explains, "They go to school, they bring their family, they have jobs."

■ **Emanuel, an Ethiopian political activist, lost nearly 30 pounds waiting for his hearing.** Emanuel fled Ethiopia after authorities threatened his life for his support of a political party. He is scheduled for his first master calendar hearing in May 2016 after filing for asylum in 2013, and struggles to manage his emotions in the meantime. "I don't even talk to my friends, I don't really talk to people that remind me [of what I am going through]. I barely

AR004255

sleep, I've lost like 20 to 30 pounds and lost my appetite for food. I feel like I'm in some kind of punishment here."[79]

- **Zahra, who fled Iran after being persecuted for converting to Christianity, struggles with depression and memory problems.** Zahra's case has been pending for six years before the Dallas immigration court. Zahra goes to school but struggles with the mental health consequences of years in legal limbo. "I am going to school, I know the material, but I forget. I cannot think really well." Zahra continues to struggle with depression due to years of separation from her children resulting from her prolonged wait in the backlog.[80]

- **Lionel, a political opposition leader in Cameroon, experiences memory loss due to trauma and extended delays.** Lionel said his friends used to say he had "an elephant memory," an assertion supported by Lionel's fluency explaining complex topics. "Now, I can't remember things I said yesterday," says Lionel. Lionel's case has been pending before the New York immigration court for three years, with three hearings canceled by the court. His next hearing is scheduled for October 2016. Lionel's wife left him and his brother was killed as a result of his political activities, leaving him with debilitating guilt and mental health challenges, exacerbated by his four-year wait.[81]

- **Patrick, a survivor of severe torture on account of his political opinions, struggles with the emotional consequences of three years in the backlog.** Patrick fled to the United States in 2013 after suffering torture at the hands of his country's government. Patrick was not scheduled for an interview at the Asylum Division for over two years. At times he struggles with suicidal ideation. "I am thinking everyday if I can just go and kill myself and be free and have nobody talk about me anymore," Patrick says. "If there was not people

surrounding me, yes I could commit suicide."[82] Patrick also suffers from sleep disturbance and migraines around thoughts of his current situation and past traumas.[83]

- **Ibrahim, a comedian and political activist from the Ivory Coast, had his immigration court hearings canceled twice due to the court backlogs, resulting in a five-year delay.** Imprisoned and tortured in his home country for his political beliefs, Ibrahim explains, "Every time I wake up all I think about is my situation with immigration… I feel like I am in prison waiting for my sentence."[84]

## Delays Complicate Work Authorization

*"It is like you want to move forward but everyone is pushing you back."*

−**Komi has waited for an asylum office interview since August 2013.**[85]

Asylum seekers are entitled to work authorization after their case has been pending for 180 days.[86] The inability to work for at least six months after applying for asylum leaves many asylum seekers, already vulnerable and traumatized, in precarious situations. Those without means to survive must rely on friends, family, or local communities for support. But many lack support networks and face further abuse and other difficulties in informal or illicit labor markets and tenuous housing.[87] Many become homeless, live in overcrowded or unsafe conditions, and lack basic needs like food and clothing.

Sixty percent of the asylum seekers interviewed for this report experienced problems either obtaining their work authorizations or renewing their work permits. For example, a complex system of coding sometimes causes the so-called "asylum clock" to stop counting toward the required 180 days.[88] Sometimes asylum seekers' "asylum clocks" are erroneously stopped and they might not be able to rectify it until their next

AR004256

hearing. Moreover, while statute requires the adjudication of the work authorization application within 90 days, many asylum seekers and immigrants have to wait much longer. [89]

The renewal process also creates financial burdens, challenges with employers, and additional possibilities for administrative errors. Asylum seekers must renew their work permits every year while their cases are pending. Each renewal costs $380 and permits the applicant to apply three months before their current work authorization expires, ostensibly so that a renewed permit can be delivered before the other lapses.[90] With cases pending for multiple years, asylum seekers must navigate this process several times.

Even those who receive their work permits are sometimes unable to work due to administrative errors. Augustin, a survivor of torture from the Congo (Brazzaville), was granted a work permit containing the wrong country of origin. It took nine months for a correction to be made, leaving Augustin without work authorization for more than a year after he became eligible.

Lack of work authorization for extended periods causes various challenges for asylum seekers as they attempt to survive. Some who were professionals and leaders in their home countries may be relegated to low-skilled jobs for employers more willing to accept temporary work authorizations that expire each year and often lapse due to delays in the renewal process. Asylum seekers with tenuous work authorization may also be affected by workplace violations, particularly in low-wage sectors.[91]

Finally, work authorization provides an asylum seeker the ability to obtain a Social Security number and a state-issued identification card, such as a driver's license. Many states set license expiration dates as the same date the work authorization expires.[92] Social Security cards

include a notation that they are only valid in combination with a valid work permit.[93] Without valid work authorization, particularly in cities that have more restrictive laws on issuing identification, asylum seekers face obstacles to accessing transportation and other services, further undermining their ability to survive and rebuild their lives.

■ **Eric, a refugee who fled Rwanda due to persecution on account of his sexual orientation, struggled to sustain himself despite his professional experience**. Eric is a statistician and has experience working for international organizations. He applied for asylum in 2013 and was granted asylum in March 2016, after a three-year delay at the Asylum Division. He attempted to find a job using his work authorization, but some employers turned him away due to the uncertainty of his future immigration status. "It is hard for any employer to give you a job offer because they need to know you will be there more than one year," he said. "They are not sure what's going to happen after the current work permit expires."[94]

■ **Mohammed, a student leader from Sudan, survived from donations for more than two years without a work permit**. Mohammed applied for his work authorization after the required 180 days. For reasons never explained to Mohammed or his attorneys, his asylum clock was stopped at nine days. Despite their extensive efforts, Mohammed and his attorneys could not rectify the mistake prior to his hearing some two years later. Mohammed received his work authorization only after his application for protection was granted. For two years he struggled to survive, often having to take donations from people in the Sudanese community where he lives in Texas.[95]

AR004257

- **Laura, persecuted on account of her profession in Colombia, remains unable to reestablish her career while her asylum case is pending**. A trained nutritionist in Colombia, Laura worked for a major international organization running a center for malnourished children in war-torn areas. Due to her efforts to provide care to children on both sides of the conflict, she was forced to flee the country and seek protection in the United States. Without permanent immigration status, she was unable to get certified as a nutritionist in the United States, so she went to cosmetology school and worked in a beauty salon instead. However, her work at the beauty salon ended due to problems with her work permit renewal. Despite applying on time, Laura's work permit was not adjudicated within the 90-day statutory period and expired three months ago.[96]

- **Emanuel, Ethiopian political activist, struggles to survive in Dallas.** Emanuel struggles to survive while awaiting word on his next immigration court hearing. Several employers turned him away because his work permit expires after a year and renewal is difficult. "Even after I got my work permit, it's really hard to survive because there are some jobs I went to apply [for] and they see my work permit and they tell me, they don't hire with a work permit."[97]

## Access to Education is Impeded by Long Delays

More than half of the asylum seekers interviewed for this report expressed a desire to pursue higher education. But thirty-two states do not provide in-state tuition rates to certain categories of immigrants.[98] Without permanent status, many asylum seekers are unable to access in-state tuition or financial aid.

- **Christian, who fled persecution due to his sexual orientation, has waited seven years for protection in the United States.** Christian fled Cameroon in 2009 seeking protection from persecution based on his sexual orientation. The Asylum Division referred his case to the immigration court. Two days before the scheduled hearing, the court informed Christian that his hearing was cancelled, and his next hearing was scheduled for December 2018. Christian had dreams of opening his own business in the United States, but his ability to rebuild his life has been stunted by the backlog and the resulting lack of access to higher education.[99]

- **Rogers, a Ugandan social worker, wishes he could again contribute to the lives of others through his profession**. The Ugandan government persecuted Rogers due to his political opinion. Despite his desire to continue his education in social work in the United States, two community colleges in Massachusetts declined to offer him in-state tuition without permanent immigration status. Massachusetts has not passed legislation extending in-state tuition to immigrants without permanent status.[100]

- **Richard, trained as an accountant in Togo, faces roadblocks when attempting to go back to school in Maryland.** Maryland does not extend in-state tuition at community colleges to immigrations without permanent status who have not attended or graduated from a Maryland high school.[101] "I was interested in going to school but they told me I will not receive any financial aid because I [only] have a work permit," says Richard. "My dream job would be like what I did in my country: being an accountant."[102]

AR004258

■ **Komi**, **a political activist from Togo, applied for asylum in 2013 and remains stuck in the backlog**. Komi lost his father in 2005 because there was no doctor available to care for him. Determined to ensure that others do not endure such tragedy, Komi decided to pursue a career in medicine. "I made a decision to go back to school," Komi explains. However, because he does not yet have asylum status, he must work nights as a store attendant to afford the tuition.[103]

# Delays Impair Access to Representation

*"Without my lawyers I would have died."*

**–Judith, from Cameroon, was granted asylum in Dallas, Texas after a three and half year delay.[104]**

Legal representation can vastly improve asylum seekers' chances of receiving protection. One study found that the grant rate at the asylum office nearly tripled when people were represented, and that it went up to nearly 90 percent when asylum seekers were represented by Georgetown University's clinical program, one of many law school clinics that take on asylum cases.[105] A recent analysis of cases involving women with children—largely asylum seekers—demonstrated that legal representation made them seventeen times more likely to get a favorable ruling.[106]

Despite the undisputed importance of legal counsel in asylum proceedings, the government does not generally fund legal representation in asylum and immigration proceedings.[107] Recent studies have shown that only 37 percent of immigrants in immigration court proceedings are able to secure legal representation.[108] Indigent asylum seekers must rely on the limited resources of nonprofit organizations, law school clinics, and law firm pro bono programs.

Long delays in the immigration courts and the Asylum Division have impaired pro bono legal providers' ability to accept cases for representation. In a survey of 24 pro bono coordinators at major law firms conducted by Human Rights First, nearly 75 percent of pro bono professionals indicated that delays at the immigration court are a significant or very significant negative factor in their ability to accept a case. Attorneys at these law firms represent asylum seekers pro bono at their offices across the country including in Baltimore, Atlanta, San Francisco, Chicago, Los Angeles, Philadelphia, San Antonio, Seattle, New York, Newark, and Washington, D.C. Over 60 percent also see recent delays at the Asylum Division as a negative factor in their firm's ability to take on cases. Pro bono leaders pointed to the standard turnover of attorneys, combined with long wait times for asylum interviews and final hearings, as the main impediment to taking asylum cases.[109]

In conducting research for this report, Human Rights First interviewed pro bono lawyers and pro bono partners at a number of major law firms. One pro bono leader, Harlene Katzman, former president of the Association of Pro Bono Counsel (APBCo) and director of pro bono at Simpson Thacher Bartlett LLP, described how asylum delays are a major threat to the pro bono model of representation. Steven Schulman, Partner at Akin Gump Strauss Hauer & Feld LLP, also noted the negative impact and re-traumatization on clients as they are prepped multiple times when hearings are postponed or cancelled. Katzman found the greatest challenge to be taking on cases with hearing dates several years away. Associates at major law firms generally do not remain at the firm for more than a few years, so cases delayed for three to five years must be reassigned.[110]

Moreover, many attorneys who take on a pro bono case will not take on other pro bono matters until the pending case is resolved. Fewer cases are being placed, and fewer asylum seekers are receiving the legal representation necessary to properly present their claims.[111] Nonprofits have felt the impact of the backlogs on their case management model as well. With fewer cases placed with pro bono attorneys, some nonprofits are managing larger caseloads in house without the additional capacity often provided by firms.

Private immigration attorneys also face new obstacles due to the backlog and extended wait times. "It makes it very hard to practice both financially, and ethically and morally," explains prominent private immigration attorney Cheryl David. Managing cases has become challenging for private lawyers who must keep in contact with their clients without being able to take any concrete steps on their case for many years.[112] Law school clinics also report wasted resources and concerns about clients' re-traumatization when they repeat their stories to new students.[113]

# Addressing the Backlogs

First and foremost, the United States immigration and asylum systems require an injection of resources to protect the integrity of the system and the rights of those seeking asylum. Recognizing the problem, leaders from both parties, including Senators Richard Shelby (R-AL) and Barbara Mikulski (D-MA), and Representatives John Culberson (R-TX) and Michael Honda (D-CA), passed the FY 2016 budget that funded an additional 55 immigration judge teams. But additional resources will be needed to eliminate the backlogs and promptly adjudicate cases. The Asylum Division also needs increased staffing. In addition to increasing the resources of the immigration courts and the Asylum Division, the Department of Homeland Security (DHS) and the courts should implement practical measures, such as pre-trial conferences and enhanced case management systems, to improve efficiency.

## The Asylum Division

Human Rights First estimates a total of 700 to 800 asylum officers are required to eliminate the affirmative asylum backlog and adjudicate all incoming cases within 60 days, if incoming caseloads remain the same. The Asylum Division is on track to meet its goal of filling 90 percent, or 480, of the available 533 positions. At 2016 CFI, RFI, and affirmative application rates, 272 asylum officers would be needed to adjudicate CFI and RFI protection screenings alone.[114] Based on a case completion rate of 328 affirmative asylum interviews per year per officer, if the Asylum Division were fully staffed at 533 positions (leaving 261 officers available for affirmative asylum interviews), the Division could complete 85,608 cases per year. With new affirmative asylum applications predicted at 105,000 for FY 2016, the backlog will continue to grow by approximately 20,000 cases per year unless additional asylum officers are added.

The Asylum Division should hire 53 additional asylum officers in FY 2017, growing its corps of officers to the fully funded 533 positions. In the meantime, the backlog will grow to over 210,000 by the end of FY 2017. If funding for 117 additional positions were added in FY 2018 and those positions were filled bringing the total to 650 officers, the backlog would begin to decrease by some 8,000 cases per year. If an additional 50 officers were added in FY 2019, bringing the total to 700, the backlog would be eliminated by FY 2025. Or, if 150 new officers were funded and added in FY 2019 bringing the total to 800 officers, the backlog would be eliminated by FY 2022, and all new cases would be adjudicated

AR004260

within 60 days. A detailed breakdown of these calculations is provided in Appendix II.

Beyond increasing the number of asylum officers at the Asylum Division, the Obama Administration should consider reducing the use of expedited removal against families or other populations that have high percentages of asylum seekers. The Asylum Division recently indicated that absent the increase in credible fear and reasonable fear interviews, at FY 2013 staffing levels, a backlog would have still developed "but nowhere close to the size of the current backlog."[115]

## The Immigration Court

Human Rights First estimates that 524 immigration judges are needed to eliminate the current backlog and adjudicate new cases within an average of one year.[116] As of February 2016, there were 254 judges employed by EOIR, and funding allocated for 374 judges.[117] Filling the 120 vacant positions and allocating funds for an additional 150 judges would produce the 524 judges needed to eliminate the backlog and promptly adjudicate incoming cases.

Expectations related to the rate at which judges adjudicate or complete cases—called "case completion rates"—are a determining factor in predicting the right court size. In FY 2015 judges, on average, completed some 777 cases. However, this completion rate remains higher than that of any other comparable judge. Experts indicate that current caseloads are untenable for immigration judges and lowering judicial caseloads would lessen judge turnover.[118] A case completion rate of 500 cases per judge per year has been recommended by experienced immigration judges. The National Association of Immigration Judges (NAIJ) recommends this rate based on the experiences of judges and administrators, the need for available docket space within eight to twelve months, the need for immigration judges to have sufficient time off the bench to consider and decide cases. NAIJ also points to the caseloads of district court judges, social security judges, and Veterans Affairs Appeals Board members to support their assertion that 500 cases completed per year is the more appropriate workload for immigration judges.[119]

If Congress funds and EOIR staffs an immigration court with 524 judges by the end of FY 2019, and immigration judges incrementally move toward the recommended 500 case completion rate per judge, the court will be free from the backlog, adequately staffed, and adjudicating incoming cases within one year on average.[120] As shown in Figure 4, the backlog will begin to decrease in FY 2018 and will be eliminated by FY 2023. Appendix III provides a complete explanation of this calculation. Assuming immigration prosecutions, case completion rates, and other factors remain the same, after FY 2024 EOIR would be well equipped to avoid a backlog, process cases in a timely fashion, and deal with moderate fluctuations in new cases without developing a new backlog.[121] Working conditions of judges would also improve, potentially leading to longevity and efficiency. Appendix III provides a detailed description of the calculations behind this three-step recommended course of action: hiring all currently funded immigration judge positions by the end of FY 2017, allocating funding for and hiring an additional set of 75 judges in FY 2018 and again in FY 2019, and incrementally lowering judges' average case completion rate to 500 cases per year.

AR004261

**Figure 4: Recommendation for Eliminating Backlog by FY 2023**



## Improving System Effectiveness and Measures to Advance Pressing Humanitarian Cases

To eliminate the current backlogs and establish capable asylum and immigration systems, additional funding and increased staffing are required. Adequately staffed systems with proportionate workloads will maximize effective resource allocation, promote a fair and efficient process, and limit staff turnover. A number of additional steps are also necessary to improve efficiency, supporting the progress resulting from the injection of resources and further expediting a fair and robust review of each case. These steps are not, however, a substitute for adequate staffing levels. Human Rights First is preparing more detailed recommendations for needed administrative adjustments.

*Humanitarian Priorities*: Because backlogs are likely to persist while Congress appropriates necessary resources, it is important for effective humanitarian mechanisms to be in place to facilitate timely hearing dates and interview dates in cases involving pressing circumstances—such as when a spouse and children are stranded abroad in dangerous circumstances. The Asylum Division employs, in some of its offices, a "short

list" allowing for prepared applicants to be called when other interviews are cancelled. While challenging for pro-bono counsel to be available on short notice, this mechanism provides a means for some asylum seekers to receive a more timely interview. It is not used in all offices. However, the Asylum Division has indicated that the short list could be implemented across the country. Short lists are also efficient, ensuring that no available interview slot is left empty.

Immigration courts could institute an approach similar to the short list across all immigration courts. Such a list would include any person whose counsel has requested an earlier merits hearing for humanitarian purposes and has prepared and filed all evidence. When cancellations occur, those on the list can be offered an earlier hearing. However, any such process should assure adequate notice of hearing dates to allow for case preparation.

EOIR currently has no effective mechanism for seeking and receiving an expedited hearing even in cases where humanitarian hardships are clear and well-documented. Motions to advance often go un-decided or judges simply do not have docket space to grant such motions. EOIR should establish a fair and efficient process for deciding

AR004262

cases with serious and imminent humanitarian concerns. Such a process might include designating certain judges to decide motions for humanitarian expedition or a separate magistrate to hear motions to advance hearing dates.

*Pre-Trial Conferences:* With regard to the immigration courts, in 2014 the National Immigrant Justice Center (NIJC) released a study on ways to improve the efficiency and fairness of the immigration court system. NIJC calls for changes that would increase immigration judges' ability to make decisions with sufficient time and information, thus capitalizing fully on resources. NIJC and other groups have called for increased use of pre-hearing conferencing and other mechanisms for narrowing the issues for trial, thus taking up less hearing time and leaving more time for the adjudication of additional cases.[122] Immigration judges have the legal authority to require pre-hearing stipulation of facts through pre-hearing conferences.[123]

A 2009 memorandum from EOIR headquarters reminded immigration judges of their ability to require such conferences and stated that judges should "encourage pre-hearing conferences between the parties to narrow the issues and to prompt the timely submission of evidence, which fosters more efficient proceedings and more efficient use of limited pro bono resources."[124] A 2009 study and 2012 follow-up report issued by the Appleseed Network also called on EOIR to require counsel to "meet and confer before a hearing, and file a joint pre-hearing statement demonstrating how they have narrowed the issues."[125] The Administrative Conference of the United States (ACUS) also recommended a pilot project to evaluate the effectiveness and feasibility of mandatory pre-hearing conferences to be convened in specified categories of cases.[126]

*DHS Attorney Responsibility:* One obstacle to the use of pre-hearing conferences is the length of time DHS trial attorneys remain unassigned to a case. Current practices in most courts do not allow pre-hearing discussions to occur until a few weeks prior to the hearing when a DHS attorney is assigned to the case. Adjustment in DHS policy to ensure a trial attorney is assigned to every case at all times would facilitate additional opportunities for pre-hearing stipulations and agreements.[127] Appleseed suggests that DHS should "re-define the mission of Trial Attorneys to seek justice, not only removal [and] [h]old Chief Counsel Offices accountable for implementation of prosecutorial discretion in every context."[128] ACUS has also recommended amending the Immigration Court Practice Manual to "explicitly include best practices for the activities of trial counsel in immigration removal proceedings."[129] Such adjustments would further facilitate the use of mechanisms for humanitarian prioritization in that the trial attorney would be assigned to the case for a longer period and therefore be more likely to limit issues requiring judicial review, meaning that trail attorneys would be more ready and able to prepare for "short list" cases.

*EOIR Case Management System:* EOIR and stakeholders also point to the need to modernize the immigration courts' case management system and implement an electronic document filing system.[130] Electronic filings and calendaring improvements would facilitate the reallocation of staff and resources away from organizational tasks more efficiently managed by technology upgrades. In his December 2015 testimony before Congress, EOIR Director Juan Osuna stated, "EOIR is actively evaluating how to best update our case management and other electronic databases to enable the agency's adjudicatory components to manage their workload in a more efficient manner."[131]

*Asylum Division:* The attrition rate of asylum officers may lessen the efficiency of the division. The USCIS Ombudsman recognizes that "even as newly authorized officers are hired and trained,

AR004263

the departure of more seasoned officers compromises USCIS capacity to efficiently meet its caseload and reduce the affirmative asylum backlog."[132] The Asylum Division's hiring philosophy has long been to get the most capable and promising applicants. However, this hiring practice means many officers quickly move on to higher positions with the government, leaving less experienced officers on the front line of case adjudication. Despite the potential inefficiency inherent in staff turnover, the Asylum Division has proved its hiring can keep up, as the Division had significantly expanded its corps in the past year. Further investigation is required to fully measure the impact staff turnover may have on the overall efficiency of the Asylum Division, and multi-year planning to ensure hiring rates keep up with attrition will be key.

# Maintaining the Integrity of the Immigration Removal and Asylum Systems

A number of experts have expressed concerns that unaddressed backlogs could undermine the integrity of the immigration removal system. Russell Wheeler and Lenni Benson, retained by the Administrative Conference of the United States to study the immigration court system, described a number of ways in which immigration court understaffing and delays can undermine the integrity of the immigration enforcement system. In a 2012 report, they point out, "Excessive delay degrades adjudication as memories fade," and, "delay becomes a goal for some with no legitimate claims to legal status, because it lets them remain in the country for up to several years while their cases wait in the court queue."

A 2014 report by experts at the Georgetown University Institute for the Study of International Migration also identified the immigration court backlog as a challenge for the removal system, stating: "Some unauthorized migrants may benefit from the delays and remain longer in the country than they should, but those with legitimate grounds for relief from removal, such as many asylum seekers, remain in limbo for unnecessarily long periods." Wheeler and Benson concluded, "There can be no effective and fair enforcement of our immigration laws if the immigration courts cannot keep up."[133]

In a 2015 article, the Bipartisan Policy Center concluded, "More judges would reduce the backlog, which would allow the enforcement system to function more efficiently and help migrants receive a fairer hearing."[134] Former ICE Assistant Secretary Julie Myers Wood wrote, in a 2015 op-ed, "People who have no legitimate claim for relief languish in the system—and in the country—at taxpayer expense. At the same time, people with strong claims—including those fleeing persecution—now often wait years for their day in court."[135]

If the backlogs in the asylum and immigration court systems are not addressed, they could leave these systems vulnerable to abuse. In the early 1990s, the asylum system was under-resourced and under-staffed. The number of asylum filings, prompted by civil wars and human rights abuses in Central America, increased. With the settlement of a class-action lawsuit and continued insufficient staffing, a large backlog of asylum cases grew. Seeing an opportunity to exploit the system, some ill-intentioned lawyers and others advised people that they could simply sign a form that would immediately give them work authorization and allow them to stay in the United States for years. The backlog that grew was devastating to those with bona fide asylum applications, who were left in limbo and separated from their children and families for years. According to statistics issued by the former Immigration and Naturalization Service

AR004264

(INS), there were some 425,000 asylum cases pending by the end of fiscal year 1994.[136]

In response, INS revamped the system. Under the new procedures, asylum officers adjudicated cases within a few months of affirmative asylum filings (rather than after years of waiting in the backlog), and those not granted protection were promptly referred into immigration court deportation proceedings. To enable this timely adjudication, the number of asylum officers was doubled and the number of immigration judges was increased through the 1994 Violent Crime Control and Law Enforcement Act.[137] The new procedures also took away the provision of automatic work authorization immediately upon the filing of an asylum application, blocking access to work authorization for at least six months.[138] This move has left many legitimate asylum seekers and their families in dire circumstances, struggling to survive for months while they await adjudication of their cases.[139]

Government officials believed this reform was necessary to protect the asylum system from abuse. Several years later, INS officials documented the success of these reforms.[140] Yet, even after the problems had been rectified, the impression that the system was in disarray was hard to correct, and this ultimately contributed, along with other developments, to the push for harsh legislation passed in 1996 that dramatically affected access to asylum for legitimate asylum seekers with well-founded fears of persecution. These experiences suggest that prompt action should be taken to tackle backlogs before they can make systems vulnerable to abuse.

# Domestic and International Legal Implications

Article 14 (1) of the Universal Declaration of Human Rights states, "Everyone has the right to seek and to enjoy in other countries asylum from persecution."[141] The cornerstone of the refugee protection regime is the principle of "non-refoulement," which prohibits the return of refugees to persecution. This obligation is contained in the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol. The United States is a party to the Protocol and has committed to comply with the Convention's protections for refugees.[142] UNHCR has stated that asylum applications should be processed in a timely manner, condemning nations that do not have a just and efficient asylum processing system.[143]

The International Covenant on Civil and Political Rights (ICCPR), which the United States has signed and ratified, preserves the right of access to the court in Article 14. The United Nations Human Rights Committee (HRC), established to monitor implementation of the ICCPR, says, "an asylum seeker must be allowed sufficient time to lodge their claim and conversely access to asylum procedures must be granted within a reasonable time."[144] Relatedly, the committee also states, "An important aspect of the fairness of a hearing is its expeditiousness."[145]

Applying the importance of expeditiousness to civil proceedings, which encompass civil immigration matters, the committee says, "delays in civil proceedings that cannot be justified by the complexity of the case or the behavior of the parties detract from the principle of a fair hearing."[146] It further clarified that where "delays [in civil cases] are caused by a lack of resources and chronic under-funding, to the extent possible supplementary budgetary resources should be

AR004265

allocated for the administration of justice."[147] The application of these principles is illustrated by the committee's 2003 review of Russia, when it concluded that the two-year delays in asylum adjudications were of particular concern.[148]

Other countries that receive high numbers of asylum seekers have time limits to adjudicate claims. In 2013, the European Parliament and the Council of the European Union issued a directive of common procedures for granting and withdrawing international protection.[149] Member states were instructed to "ensure that examination procedures are concluded within six months of the lodging of the application."[150] Under limited circumstances, the state is allowed to extend the processing time to "a period not exceeding a further nine months."[151] Furthermore, the directive sets an absolute maximum limit for adjudication of 21 months from the lodging of the application.[152]

U.S. asylum law developed from international law instruments, primarily the 1967 Protocol which the United States embraced in 1968. To fulfill its international obligations under the 1967 Protocol, Congress enacted the Refugee Act of 1980, which incorporated key provisions of the Refugee Convention into the Immigration and Nationality Act. Importantly, the Refugee Act incorporated the refugee definition from the Convention and established uniform procedures for the treatment of asylum claims in the United States.[153]

U.S. law provides two indications of time limitations on the initial adjudications of asylum claims. First, initial interviews or hearings on asylum applications "shall commence no later than 45 days after the date an application is filed," in the absence of exceptional circumstances.[154] Statute also dictates that in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed."[155]

According to the U.S. Government Accountability Office (GAO), as of September 2015, 61 percent of the over 100,000 pending applications at the asylum office have exceeded the 180-day requirement.[156] From 2010 to 2014 the number of affirmative asylum applications adjudicated past the 180-day requirement nearly doubled.[157]

For asylum cases adjudicated before the immigration courts, there is no statutorily imposed timeline. However, constitutional due process rights may demand the need for additional resources for the immigration courts, such that cases can be afforded adequate consideration by judges with caseloads that allow for fair and meaningful adjudication. The Immigration and Nationality Act includes a guarantee that "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government."[158] The Seventh Circuit indicates that immigration court procedures "must satisfy currently prevailing notions of fairness."[159] That court has also characterized the due process rights of immigrants to include the right to "meaningfully present" evidence in a "meaningful way."[160] Scholars argue that in order for judicial fact-finding to be conducted in a meaningful way, immigration judges must have sufficient time to review documentation and access witnesses. In an interview conducted by Dr. Alicia Triche and published in 2015, Judge Dana Marks, president of the National Association of Immigration Judges, indicated the following:

> A typical workweek includes 36 hours on the bench and a meager four hours of time spent in chambers. That is four hours to review documentation for every individual case occurring that week—a total that, especially if a law school or large firm is involved, can span hundreds or even thousands of pages.[161]

AR004266

Limited time to review complex cases with often life threatening implications leads Judge Marks to characterize immigration court as "death penalty cases in a traffic court setting."[162] Ballooning backlogs cause immigration judges to face a growing number of pending cases, and increased pressure to examine them as expeditiously as possible. The large caseloads threaten the fundamental fairness required by due process.

## Conclusion

Protecting refugees is a core American ideal, central to the country's identity and history. As the asylum and immigration court systems struggle with large backlogs, those who need America's protection suffer in a state of perpetual limbo. For thousands of asylum seekers, permanent protection in the United States is key to security and freedom from future persecution—protection now on hold for hundreds of thousands.

Uprooted by persecution, asylum seekers in the United States fully expect to struggle as they rebuild their lives. Yet extended delays in their cases make this struggle at times insurmountable. Unable to reunite with their family or work or pursue an education or overcome the trauma of their persecution, asylum seekers must simply subsist for years—their lives hanging in limbo.

Continued and strengthened bipartisan support will be essential to secure the vital resources needed to reduce and ultimately eliminate the growing backlogs at the Asylum Division and immigration courts. The human rights of asylum seekers and the very integrity of the United States immigration system are at stake. ■

AR004267

# Appendix I: Methodology

This report compiles research and analysis conducted by Human Rights First on the backlogs and delays in the U.S. asylum and immigration court system. It draws from Human Rights First's 40 years of experience providing legal representation through a vast pro bono network to tens of thousands of people fleeing persecution. Currently Human Rights First, along with its pro bono partners, represents over 300 asylum seekers in the immigration court, and 255 asylum seekers before the Asylum Division of USCIS.

Human Rights First conducted in-depth, in-person interviews between September 2015 and January 2016 with 34 asylum seekers who had experienced delays in the courts and/or the Asylum Division. The study participants were identified through outreach to Human Rights First's Refugee Representation staff, as well as attorneys at other leading nonprofit organizations that work with refugees, including the Bellevue/NYU Program for Survivors of Torture, the Human Rights Initiative of North Texas, and the Tahirih Justice Center. Attorneys were asked to identify clients who had waited at least one year for an asylum interview or hearing. Of the 34 asylum seekers interviewed, 18 had been waiting more than three years. Study participants lived in different parts of the United States, with 13 in Texas, eight in the Washington, D.C. area, nine in the New York City area, two in Los Angeles, one in Boston, and one in Pennsylvania. Countries of origin included Afghanistan, Azerbaijan, Cameroon, Colombia, Congo (Brazzaville), Democratic Republic of Congo, El Salvador, Ethiopia, Honduras, Iran, Iraq, Ivory Coast, Pakistan, Rwanda, Sudan, Syria, Togo, Uganda, Venezuela, Vietnam, Yemen, and Zimbabwe.

Human Rights Frist conducted interviews with 17 practitioners who provide services to asylum seekers, including mental health professionals, law firm attorneys, law school clinical instructors, and private attorneys. Practitioners were asked to comment on the impact of the backlogs on asylum seekers and their own practices. To further investigate the impact of delays on pro bono representation models, Human Rights First worked with Simpson Thacher & Bartlett LLP to distribute a survey to pro bono professionals across the United States, and received 24 responses.

The authors of this report also reviewed a wide range of literature, including government and news reports, statistical reports, and academic and law review articles. Experts in refugee law, immigration policy, federal legislation, mental health and physical health, and government officials were consulted throughout the research and drafting of the report. The report also includes an analysis of public source data and information received through direct communications with agency leadership.

# Appendix II: Asylum Division Backlog Calculations

## About the Data: Assumptions and Gaps

Calculations regarding the backlog at the Asylum Division are based on data provided by the Asylum Division at quarterly stakeholder meetings, which are publicly available on the USCIS website. Human Rights First sought additional information related to asylum officer caseloads, case completion rates, and hiring challenges in a meeting with Asylum Division senior leadership.

The total number of asylum officers required to deal with current caseloads is likely higher than predicted by this report. For simplicity Human Rights First assumes full production from each asylum officer based on ideal case completion

AR004268

rates provided by the Asylum Division. In reality, the Asylum Division takes into account a number of factors that likely reduce the projected output of an asylum officer. These factors include staffing unavailability, including attrition rates, trainings, union duties, special projects, and refugee details. Therefore, the Asylum Division will require additional officers to account for the difference in case completion and availability of officers as a result of these factors.

*Defining the Backlog:* This report refers to the number of pending cases before the Asylum Division as the "backlog." However, the Asylum Division is expected to have a number of cases pending based on normal circulation of cases through the system. The calculations in this report assume that the Asylum Division should interview affirmative asylum applicants within 60 days of receiving their application.[163] Therefore, the Asylum Division should never have more cases pending than it can complete within 60 days (assuming a rate of 8 cases per week per officer working 41 weeks a year). This number will fluctuate depending on the number of asylum officers available to complete affirmative asylum applications. For example, in FY 2016, an estimated 103 officers will be available for affirmative asylum adjudications; at this size the Asylum Division can complete around 6,500 cases in 60 days, meaning all other pending applications are considered backlogged.

### Incoming Credible Fear and Reasonable Fear Workloads and Completion Rates:

The calculations in this report assume the Asylum Division will receive 80,000 CFI requests and 9,000 RFI requests each year, based on 2016 projections provided by senior Asylum Division leadership. Human Rights First requested information related to case completion rates from Asylum Division senior leadership and was provided such information at a meeting on March 25, 2016. All calculations in this report are based

on a case completion rate of 353 credible fear interviews per officer per year and a case completion rate of 200 reasonable fear interview per officer per year. To determine the number of asylum officers needed to handle all CFI and RFI requests, the following calculation was used: (annual number CFI requests) / (CFI completion rate per officer) + (annual number of RFI requests) / (RFI completion rate per officer) = total number of asylum officers required to complete all CFI and RFI requests for the year.

### Incoming Affirmative Asylum Application Workloads and Completion Rates:

The calculations in this report assume a steady incoming affirmative asylum application rate of 105,000 per year, based on FY 2016 first quarter statistics and information provided by senior Asylum Division leadership. Case completion rates for affirmative asylum applications are eight cases per week over 41 weeks per year, or 328 cases per year. This report calculates the number of asylum officers needed to complete affirmative asylum interviews with the following formula: (annual number of affirmative asylum applications) / (affirmative case completion rate) = total number of asylum officers needed to adjudicate affirmative asylum applications.

### Calculating Pending Affirmative Asylum Applications:

Human Rights First predicts the number of pending cases at the end of the fiscal year by adding the number of pending affirmative asylum applications at the end of the prior fiscal year to the number of new applications received that year, minus the number of completed affirmative asylum applications. Completed affirmative asylum applications are calculated based on the total number of asylum officers on staff, minus the number of asylum officers required to complete CFIs and RFIs, multiplied by the affirmative case completion rate. The formula used is: (pending at

AR004269

end of prior FY) + (new applications received) - (cases completed) = pending cases at end of FY. To arrive at cases completed during the year, the formula used is: (total number of asylum officers on staff) - (total number of asylum officers required to complete all CFI and RFI requests for the year) x (328 cases per year) = Number of affirmative asylum applications completed.

AR004270

**Figure 5: Projected Asylum Division Data based on Recommended Increase in Asylum Officers**

| | Additional Asylum Officers (AOs) | Total AOs at Beginning of Fiscal Year | Total AOs at End of Fiscal Year | New CFI Requests Per Year | New RFI Requests Per Year | # Officers Required for CFI/RFI Requests | # AOs Available for Affirmative Cases | Affirmative Cases Completed | New Affirmative Asylum Applications | Pending Affirmative Asylum Cases at End of FY * |
|---|---|---|---|---|---|---|---|---|---|---|
| FY 2015 | 0 | 350 | 375 | 80,000 | 9000 | 272 | 78 | 25,706 | 105,000 | 108,749 |
| FY 2016 | 105 | 375 | 480 | 80,000 | 9000 | 272 | 103 | 33,906 | 105,000 | 179,843 |
| FY 2017 | 53 | 480 | 533 | 80,000 | 9000 | 272 | 208 | 68,346 | 105,000 | 216,498 |
| FY 2018 | 117 | 533 | 650 | 80,000 | 9000 | 272 | 261 | 85,730 | 105,000 | 235,768 |
| FY 2019 | 150 | 650 | 800 | 80,000 | 9000 | 272 | 378 | 124,106 | 105,000 | 216,662 |
| FY 2020 | 0 | 800 | 800 | 80,000 | 9000 | 272 | 528 | 173,306 | 105,000 | 148,356 |
| FY 2021 | 0 | 800 | 800 | 80,000 | 9000 | 272 | 528 | 173,306 | 105,000 | 80,051 |
| FY 2022 | 0 | 800 | 800 | 80,000 | 9000 | 272 | 528 | 173,306 | 105,000 | 11,745 |

**If the Asylum Division grows to 700 asylum officers by the end of FY 2019 the backlog will be eliminated in FY 2025**

| | Additional Asylum Officers (AOs) | Total AOs at Beginning of Fiscal Year | Total AOs at End of Fiscal Year | New CFI Requests Per Year | New RFI Requests Per Year | # Officers Required for CFI/RFI Requests | # AOs Available for Affirmative Cases | Affirmative Cases Completed | New Affirmative Asylum Applications | Pending Affirmative Asylum Cases at End of FY * |
|---|---|---|---|---|---|---|---|---|---|---|
| FY 2019 | 50 | 650 | 700 | 80,000 | 9000 | 272 | 378 | 124,106 | 105,000 | 216,662 |
| FY 2020 | 0 | 700 | 700 | 80,000 | 9000 | 272 | 428 | 140,506 | 105,000 | 181,156 |
| FY 2021 | 0 | 700 | 700 | 80,000 | 9000 | 272 | 428 | 140,506 | 105,000 | 145,651 |
| FY 2022 | 0 | 700 | 700 | 80,000 | 9000 | 272 | 428 | 140,506 | 105,000 | 110,145 |
| FY 2023 | 0 | 700 | 700 | 80,000 | 9000 | 272 | 428 | 140,506 | 105,000 | 74,639 |
| FY 2024 | 0 | 700 | 700 | 80,000 | 9000 | 272 | 428 | 140,506 | 105,000 | 39,133 |
| FY 2025 | 0 | 700 | 700 | 80,000 | 9000 | 272 | 428 | 140,506 | 105,000 | 3,628 |

*The backlog will be eliminated when the number of pending cases falls below the number of affirmative asylum applications available officers can complete within 60 days.

AR004271

# Appendix III: Immigration Court Backlog Calculations

All data related to the immigration court backlog came from the Transactional Records Access Clearinghouse (TRAC) of Syracuse University, which analyses and publishes immigration court data received from the Executive Office for Immigration Review (EOIR) through Freedom of Information Act (FOIA) requests. TRAC data provides national statistics on cases pending before the court, the average number of days cases have been pending, and the number of cases completed each year by the immigration courts. TRAC data does not disaggregate detained and non-detained cases, meaning averages for non-detained cases are likely much higher given EOIR's policy of prioritizing detained caseloads. Thirty-seven percent of cases handled by the immigration court in 2013 and 2014 were detained cases. For this report, Human Rights First utilized TRAC national averages and current trends, with respect to incoming caseloads and case completion rates, to predict the growth of the backlog, when the backlog will be eliminated, and recommended increases in immigration judges.

***Defining the Backlog:*** Throughout this report the number of pending cases is referred to as "the backlog." However, the immigration courts should always have a certain number of cases pending at any given time. If the recommended average case completion time is one year, than the courts should never have more cases pending than they could complete within one year. The recommended 524 judges should be completing 262,000 cases per year, meaning the backlog is any number of pending cases above 262,000. For example, in 2015, the immigration court had 456,216 cases pending at the end of the fiscal year. Therefore, FY 2015 resulted in a backlog of 194,216 cases. Based on our projections, including recommended hiring of additional

judges, the backlog would be eliminated by the end of FY 2023 when the pending cases drop below 262,000 for the first time. This presumes incoming caseloads do not dramatically increase and case completion rates are adjusted as illustrated in Figure 6.

***Incoming Caseloads:*** Human Rights First calculates that since FY 2000 the immigration court has averaged approximately 238,000 new cases per year. TRAC data does not provide the exact number of new cases each year.[164] Human Rights First found that in FY 2014 and FY 2015 the court received 248,429 and 247,090 cases, respectively. Given the stability of incoming caseloads over the past 15 years, Human Rights First predictions utilize the number of new cases in FY 2015 as a constant for future predictions. If the immigration court system receives an increased number of cases, the backlog will persist for longer, delay time will lengthen, and, ultimately, more judges will be required to handle the court's caseload. The calculation used is: (pending cases at end of fiscal year) - (pending cases at end of prior fiscal year) + (number of cases completed within fiscal year) = number of incoming cases.

***Case Completion Time:*** The calculations in this report assume that immigration courts should complete cases within an average of one year.[165] Therefore, at any given time the immigration court should not have more cases pending than it can complete within one year. Thus, any cases pending at the end of a given fiscal year over the number of cases the court completed that year are considered backlogged cases. Prior to 2010, EOIR maintained case completion goals, focused on the timely adjudication of each type of removal case. In 2010 EOIR abandoned case completion goals involving non-detained cases, except for asylum cases, which carry a statutory 180 day requirement for final administrative adjudication absent exceptional circumstances and not

AR004272

including administrative appeal.[166] However, recent prioritization of border arrival cases has pushed most non-detained, non-prioritized defensive asylum cases deeper into the backlog.

***Case Completion Rates per Judge:*** The number of cases completed per immigration judge each year has a dramatic effect on backlog predictions. Human Rights First calculates national average case completion rates per judge by dividing the total number of cases completed per year, as reported by TRAC, by the number of immigration judges on the bench that year, as reported by the Bipartisan Policy Center. Case completion rates have fluctuated significantly over the past 15 years from over 1,300 per judge in FY 2005 to 777 per judge in FY 2015. Experts indicate that a case completion rate of 500 would be ideal; this would allow immigration judges to allot adequate time to each case and respect the due process rights of each immigrant. Human Rights First's predictions for eliminating the backlog incorporate a slow trend toward a case completion rate of 500 cases per judge by FY 2024.

### Predicting Future Pending Immigration Court Cases

Human Rights First predicts the number of pending cases at the end of the fiscal year by adding the number of pending cases at the end of the prior fiscal year to the number of new cases received that year, to get a total number of cases handled by the court in that fiscal year. The total number of cases completed that fiscal year is subtracted from this total to arrive at the number of pending cases at the end of the year. The calculation used is: (pending at end of prior fiscal year) + (new cases received) - (cases completed) = pending cases at end of fiscal year.

### Predicating Future Number of Cases Completed Each Year

Human Rights First predicts the number of cases completed each year by multiplying the number of immigration judges at the beginning of the fiscal year by the average case completion rate per judge. The calculation used is: (total number of judges at beginning of fiscal year) x (recommended case completion rate) = cases completed per fiscal year.

### Expected Delays for Currently Backlogged Cases

Human Rights First estimates the time it will take the immigration court system to complete the number of cases currently pending by dividing the number of cases pending by the number of cases completed during the same year. This is a reasonable prediction based on the fact that the court has, on average, completed some 217,000 cases per year for the past 15 years.

In February 2016, TRAC calculated that the average case had already been pending for 666 days. Given current pending caseloads and case completion levels, Human Rights First estimates that the immigration court will likely complete the nearly 500,000 cases currently pending in approximately three years and six months from the time they were filed.

These averages are likely significantly lowered by the inclusion of detained cases, which made up 37 percent of cases in 2013 and 2014. The immigration court system prioritizes and completes detained cases more quickly due to the legal restraints placed on keeping people in detention for long periods without a hearing. People who are not detained could expect significantly longer delays.

AR004273

**Figure 6: Projected Immigration Court Data based on Recommended Increase in Immigration Judges**

| | Additional Judges* | Total Judges at Beginning of Fiscal Year | Total Judges at End of Fiscal Year | Case Completion Rate Per Judge | Cases Completed Per Year | New Cases Per Year | Pending at End of FY | Backlogged Cases |
|---|---|---|---|---|---|---|---|---|
| FY 2015 | 16 | 240 | 256 | 777 | 186,480 | 247,090 | 456,216 | 194,216 |
| FY 2016 | 59 | 256 | 315 | 777 | 198,912 | 247,090 | 504,394 | 242,394 |
| FY 2017 | 59 | 315 | 374 | 700 | 220,500 | 247,090 | 530,984 | 268,984 |
| FY 2018 | 75 | 374 | 449 | 675 | 252,450 | 247,090 | 525,624 | 263,624 |
| FY 2019 | 75 | 449 | 524 | 650 | 291,850 | 247,090 | 480,864 | 218,864 |
| FY 2020 | 0 | 524 | 524 | 625 | 327,500 | 247,090 | 400,454 | 138,454 |
| FY 2021 | 0 | 524 | 524 | 600 | 314,400 | 247,090 | 333,144 | 71,144 |
| FY 2022 | 0 | 524 | 524 | 575 | 301,300 | 247,090 | 278,934 | 16,934 |
| FY 2023 | 0 | 524 | 524 | 550 | 288,200 | 247,090 | 237,824 | 0 |
| FY 2024 | 0 | 524 | 524 | 500 | 262,000 | 247,090 | 222,914 | |
| FY 2025 | 0 | 524 | 524 | 500 | 262,000 | 247,090 | 208,004 | |

*Recommended number of judges that should be hired within each fiscal year. Fifty-nine judges added in FY 2016 and FY 2017 are intended to be judges for which EOIR already has funding. Seventy-five additional judges in FY 2018 and FY 2019 will require additional Congressional funding, ideally in FY 2017 and FY 2018 respectively.

AR004274

# Endnotes

[1] U.S. Citizenship and Immigration Services (USCIS), Memorandum: Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children, (Washington, D.C.: U.S. Department of Homeland Security, May 28, 2013), available at http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Minor%20Children%20Applying%20for%20Asylum%20By%20Themselves/determ-juris-asylum-app-file-unaccompanied-alien-children.pdf.

[2] Executive Office for Immigration Review (EOIR), Statement of Objectives for Case Processing Study of EOIR (on file with Human Rights First).

[3] U.S. Department of Homeland Security Office of Immigration Statistics, Annual Report: Immigration Enforcement Actions: 2010, June 2011; U.S. Department of Homeland Security Office of Immigration Statistics, Annual Report: Immigration Enforcement Actions: 2013, September 2014.

[4] Ibid.

[5] Sec. 302 of Illegal Immigration Reform and Immigrant Responsibility Act of 1996, September, 30, 1996, available at http://www.uscis.gov/iframe/ilink/docView/PUBLAW/HTML/PUBLAW/0-0-0-10948.html; see also, United States Citizenship and Immigration Services (USCIS), Credible Fear and Reasonable Fear Workload Report Summary—FY 09-14, October 28, 2014, available at http://www.uscis.gov/sites/default/files/USCIS/Outreach/Upcoming%20National%20Engagements/PED_Credible_Fear_and_Reasonable_Fear_FY14_Q4.pdf.

[6] USCIS Asylum Division, Questions & Answers: Reasonable Fear Screenings, June 18, 2013, available at https://www.uscis.gov/humanitarian/refugees-asylum/asylum/questions-answers-reasonable-fear-screenings.

[7] Human Rights First meeting with Asylum Division senior leadership, March 25, 2016 (notes on file with Human Rights First).

[8] United Nations High Commissioner for Refugees (UNHCR), "Worldwide displacement hits all-time high as war and persecution increase," news release, June 18, 2015, available at http://www.unhcr.org/558193896.html.

[9] Human Rights First meeting with Asylum Division senior leadership, March 25, 2016 (notes on file with Human Rights First).

[10] FY 2016 represents projected totals based on first quarter reported numbers and information provided by Asylum Division leadership. Reasonable Fear Interview and Credible Fear Interview numbers are compiled from USCIS Asylum Division Credible Fear and Reasonable Fear Workload Report Summaries. Pending case totals are pulled from USCIS Asylum Division Asylum Office Workload Summaries for September of each fiscal year, indicating the number of cases pending at the end of that month. The number of affirmative asylum applications filed for FY 2011 through FY 2015 were provided by the USCIS Asylum Division, while the number of affirmative applications filed for FY 2009, FY 2010, and the first quarter of FY2016 were derived from the Asylum Office Workload monthly summaries.

[11] USCIS Asylum Division, Affirmative Application Filed Report, April 11, 2014, available at http://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from%20Previous%20Engagements/AdditionalStatisticRequestedApril2014AsylumStakeholderEngagement.pdf; see also, U.S. Citizenship and Immigration Services (USCIS), supra note 5.

[12] Human Rights First meeting with Asylum Division senior leadership, March 25, 2016 (notes on file with Human Rights First).

[13] USCIS Credible Fear Workload Report Summary, FY 2015, available at http://www.uscis.gov/sites/default/files/USCIS/Outreach/PED-Credible_Fear_Workload_Report_Summary_POE_and_Inland_Caseload_through_2015-09.pdf; USCIS Reasonable Fear Workload Report Summary, FY 2015, available at http://www.uscis.gov/sites/default/files/USCIS/Outreach/PED-Reasonable_Fear_Caseload_and_Monthly_Report_by_Office_through_2015-09.pdf; Human Rights First meeting with Asylum Division senior leadership, March 25, 2016 (notes on file with Human Rights First).

[14] USCIS Asylum Division Stakeholder Meeting, December 11, 2015 (notes on file with Human Rights First).

[15] USCIS Processing of Asylum Cases, ILW.com, February 9, 2015, available at http://discuss.ilw.com/content.php?4036-News-USCIS-Processing-of-Asylum-Cases.

[16] See Appendix II.

[17] In April 2015, USCIS began publishing a monthly bulletin to report on the progress of scheduling interviews for affirmative asylum applications. For each asylum office, the bulletin reports in which month and year the individuals currently being scheduled for interviews applied for asylum. U.S. Citizenship and Immigration Services, "Affirmative Asylum Scheduling Bulletin," U.S. Department of Homeland Security, last updated February 5, 2016, available at http://www.uscis.gov/humanitarian/refugees-asylum/asylum/affirmative-asylum-scheduling-bulletin.

[18] The number of cases pending per judge varies among immigration courts. Judges in San Antonio, Chicago, and Phoenix have more than 3,000 pending case each. The Newark immigration court averages over 4,500 cases pending per judge, while Houston

AR004275

and Arlington average over 5,500 cases per judge. New Orleans tops the chart with over 7,000 cases pending per immigration judge.

[19] See 8 U.S.C. § 1158(d)(5)(A)(iii) (in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed).

[20] See U.S. Citizenship and Immigration Services, supra note 17. Every month the Asylum Division publishes an "Affirmative Asylum Scheduling Bulletin" listing the delay in interviews being conducted at each asylum office. The Asylum Division prioritizes cases in three categories. First, applications scheduled for an interview that were rescheduled either by the applicant or by USCIS. Second, any application filed by a child. Third, all other pending affirmative asylum applications in the order they were received, with oldest cases scheduled first. *See also* USCIS Asylum Division Stakeholder Meeting, February 5, 2016 (notes on file with Human Rights First). For example, in January 2016 the Miami asylum office adjudicated 87 cases in the first category, 78 in the second and 64 affirmative asylum cases were added to the backlog.

[21] USCIS Asylum Division Quarterly Stakeholder Meeting, February 5, 2016 (notes on file with Human Rights First).

[22] Immigration Court Backlog Tool, Transactional Records Access Clearinghouse (TRAC) of Syracuse University, available at http://trac.syr.edu/phptools/immigration/court_backlog/.

[23] *See* Appendix III.

[24] Joshua Breisblatt, "The President's FY 2016 Budget," *Immigration Forum*, February 6, 2015, available at https://immigrationforum.org/blog/the-presidents-fy-2016-budget-department-homeland-security/.

[25] See Department of Homeland Security, Budget in Brief Fiscal Year 2017, p. 25, available at https://www.dhs.gov/sites/default/files/publications/FY2017_BIB-MASTER.pdf.

[26] See Mark Noferi, DHS Funding Controversy Over, but Enforcement-First Approach Remains, March 6, 2015.

[27] Julie Myers Wood, "Courts could be a step forward in immigration debate," *Houston Chronical*, April 30, 2015, available at http://www.chron.com/opinion/outlook/article/Wood-Courts-could-be-a-step-forward-in-6234283.php.

[28] Institute for the Study of International Migration, *Detention and Removal: What now and What Next?* (Washington, D.C.: Institute for the Study of International Migration, Georgetown University, Oct. 2014). available at https://isim.georgetown.edu/sites/isim/files/files/upload/Detention%26Removalv10%20%281%29.pdf. The roundtable discussion included current and former government officials as well as academic and non-governmental experts. See Seth Robbins, "Immigrants See Court Dates Canceled as Justice Department is Overwhelmed with Cases," *Christian Science Monitor*, Feb. 1, 2015, available at http://www.csmonitor.com/USA/Latest-News-Wires/2015/0201/Immigrants-see-court-dates-cancelled-as-Justice-Department-is-overwhelmed-with-cases.

[29] Alberto Gonzales, "Obama's time for immigration action," *USA Today*, August 12, 2014, available at http://www.usatoday.com/story/opinion/2014/08/12/border-children-action-obama-executive-action-column/13921133/.

[30] Arnold & Porter LLP, *Reforming the Immigration System: Proposal to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases* (Washington, D.C.: American Bar Association Commission on Immigration, 2010); Administration Conference of the United States, *Immigration Removal Adjudication* (Washington, D.C.: Administration Conference of the United States, June 2012); Georgetown University, *Institute for the Study of International Migration, Detention and Removal: What now and What Next?, Report on expert's roundtable held in October 2014* (Washington, D.C.: Georgetown University, 2014), available at https://isim.georgetown.edu/sites/isim/files/files/upload/Detention %26Removalv10%20%281%29.pdf; Georgetown University, Institute for the Study of International Migration, Refugee, Asylum and Other Humanitarian Policies, *Challenges for Reform, Report on an experts' roundtable held on October 29, 2014* (Washington, D.C. Georgetown University, 2014) available at https://isim.georgetown.edu/sites/isim/files/files/upload/Asylum%20%26%20Refugee%20Meeting%20Report.pdf.

[31] Asylum Division Stakeholder Meeting, December 11, 2015 (notes on file with Human Rights First).

[32] H.R.1473 - Department of Defense and Full-Year Continuing Appropriations Act, April 15, 2015 Became Public Law No: 112-10, 112th Congress (2011-2012), available at https://www.congress.gov/bill/112th-congress/house-bill/1473/text.

[33] Citizenship and Immigration Services Ombudsman, *Annual Report 2015* (Washington, D.C.: U.S. Department of Homeland Security, June 2015), p. 59., available at http://www.dhs.gov/sites/default/files/publications/2015%20CISOMB%20Annual%20Report_508.pdf.

[34] USCIS Asylum Division, Credible Fear and Reasonable Fear Family Facilities, May 8, 2015, available at https://www.uscis.gov/sites/default/files/USCIS/Outreach/PED-CF-RF-familiy-facilities-FY2015Q2.pdf.

[35] American Civil Liberties Union, *American Exile: Rapid Deportations That Bypass the Courtroom* (New York: American Civil Liberties Union, December 2014), p. 15., available at https://www.aclu.org/files/assets/120214-expeditedremoval_0.pdf.

[36] See Matter of E-R-M & L-R-M, 25 I&N Dec. 520 (BIA 2011). Finding that "Congress' use of the term 'shall' in section 235(b)(1)(A)(i) of the Act does not carry its ordinary meaning, namely, that an act is mandatory. It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch of Government on whether to charge an individual and on what charges to bring."

[37] American Civil Liberties Union, supra note 35.

AR004276

[38] "Necessary to End Family Detention & Reform Procedures, Agree 188 Organizations," Women's Refugee Commission, May 14, 2015, available at https://www.womensrefugeecommission.org/news/press-releases-and-statements/2256-family-detention-sign-on-2015-05; Human Rights First, *U.S. Detention of Families Seeking Asylum: A One-Year Update* (New York: Human Rights First, 2015), p. 1-2. https://www.humanrightsfirst.org/sites/default/files/hrf-one-yr-family-detention-report.pdf; American Civil Liberties Union, supra note 35.

[39] See UNHCR, "UNHCR warns of looming refugee crisis as women flee Central America and Mexico," press release, October 28, 2015, available at http://www.unhcr.org/5630c2046.html; see also UNHCR, "U.S. announcement on Central America refugees highlights seriousness of situation," press release, January 14, 2016, available at http://www.unhcr.org/5697d35f6.html.

[40] USCIS Asylum Division, "Family Facilities Reasonable Fear—FY 2015 2nd Quarter," USCIS, April 27, 2015, available at www.uscis.gov/sites/default/files/USCIS/Outreach/PED-CF-RF-family-facilities-FY2015Q2.pdf.

[41] 8 CFR 1003.42 - Review of credible fear determination.

[42] Executive Office for Immigration Review, "FY 2014 Statistics Yearbook," March 2015, available at https://www.justice.gov/sites/default/files/eoir/pages/attachments/2015/03/16/fy14syb.pdf.

[43] U.S. Department of Justice, "Department of Justice Announces New Priorities to Address Surge of Migrants Crossing into the U.S.," press release, July 9, 2014, available at http://www.justice.gov/opa/pr/department-justice-announces-new-priorities-address-surge-migrants-crossing-us.

[44] U.S. Department of Justice, "Department of Justice Actions to Address the Influx of Migrants Crossing the Southwest Border in the United States Fact Sheet," July 9, 2014, available at http://www.justice.gov/iso/opa/resources/214201479112444959.pdf.; see also Brian M. O'Leary, Chief Immigration Judge, "Memorandum: Docketing Practices Relating to Unaccompanied Children Cases in Light of the New Priorities," EOIR, September 10, 2014, available at https://www.justice.gov/sites/default/files/eoir/legacy/2014/09/30/Docketing-Practices-Related-to-UACs-Sept2014.pdf.

[45] Statement of Juan P. Osuna, Director of Executive Office for Immigration Review, Before the United States House of Representatives Committee on the Judiciary, December 3, 2015, available at http://judiciary.house.gov/_cache/files/467e5f9e-e9e9-4141-99be-5c24cac1db55/osunatestimony.pdf.

[46] Devlin Barrett, U.S. Delays Thousands of Immigration Hearings by Nearly 5 Years, The Wall Street Journal, January 28, 2015, available at http://www.wsj.com/articles/justice-department-delays-some-immigration-hearings-by-5-years-1422461407.

[47] U.S. Citizenship and Immigration Services, supra note 17.

[48] Human Rights First meeting with Asylum Division senior leadership, March 25, 2016 (notes on file with Human Rights First).

[49] Molly Hennessy-Fiske, "As immigration judges' working conditions worsen, more may choose retirement," *LA Times*, August 18, 2015, available at http://www.latimes.com/nation/la-na-immigration-judges-20150818-story.html.

[50] Statement of Juan P. Osuna, supra note 45.

[51] Executive Office for Immigration Review, "Executive Office for Immigration Review Swears in Nine Immigration Judges," press release, February 1, 2016, available at http://www.justice.gov/eoir/pr/executive-office-immigration-review-swears-nine-immigration-judges.

[52] See Executive Office for Immigration Review, "American Immigration Lawyers Association EOIR Fall 2014 Liaison Meeting October 23, 2014 – Minutes," U.S. Department of Justice, October 23, 2014, available at http://www.justice.gov/sites/default/files/pages/attachments/2015/06/24/eoir-aila-meeting-minutes-fall2014.pdf.

[53] Molly Hennessy-Fiske, supra note 49.

[54] Human Rights First Interview, November 2, 2015.

[55] Human Rights First Interview, October 15, 2015.

[56] Human Rights First Interview, November 5, 2015.

[57] Human Rights First Interview, November 12, 2015.

[58] Human Rights First Interview, November 10, 2015.

[59] U.S. Citizenship and Immigration Services, "Family of Refugees and Asylees," U.S. Department of Homeland Security, last updated: July 14, 2015, http://www.uscis.gov/family/family-refugees-asylees.

[60] Art. 16(3), Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 at 71 (1948); Art. 23(1) International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171; Art. 17(1), American Convention on Human Rights, Nov. 21, 1969, 1144 U.N.T.S. 143.

[61] Kate Jastram and Kathleen Newland, *Family Unity and Refugee Protection*, (Washington, D.C.: UNHCR and Migration Policy Institute, 2003), available at http://www.unhcr.org/3bd3d4a14.pdf.

[62] Human Rights First Interview, November 10, 2015.

[63] Human Rights First Interview, November 13, 2015.

[64] Follow up email communications with research participant, November 18, 2015.

[65] Human Rights First client case review, March 30, 2016.

[66] Human Rights First Interview, November 12, 2015.

[67] Human Rights First Interview, October 15, 2015.

AR004277

[68] Human Rights First Interview, October 15, 2015.

[69] Human Rights First Interview, December 17, 2015.

[70] Human Rights First Interview, November 05, 2015.

[71] U.S. Citizenship and Immigration Services, supra note 17; Human Rights First Interview, November 11, 2015.

[72] Human Rights First Interview, October 15, 2015.

[73] Human Rights First Interview, November 12, 2015.

[74] Jessica Carlsson, et. al., "From pioneers to scientists: challenges in establishing evidence-gathering models in torture and trauma mental health services for refugees," The Journal of nervous and mental disease, vol. 202, no. 9 (2014), p. 630-637.

[75] Emily Sachs, et. al., "Entering exile: Trauma, mental health, and coping among Tibetan refugees arriving in Dharamsala, India," Journal of traumatic stress vol. 21, no. 2 (2008), p. 200.; see also Brian L. Isakson, et. al., "Adapting and Implementing Evidence-Based Interventions for Trauma-Exposed Refugee Youth and Families," Journal of Contemporary Psychotherapy vol. 45, no. 4 (2015), p. 246 (Dr. Derrick Silove, Director of Psychiatry Research & Teaching at Liverpool Hospital, indicates that during the "post-migration phase" refugees often experience stressors that preclude their ability to address their mental health needs. Stressors include "poverty, unfamiliar systems, separation from loved ones, language barriers, racism, alienation from their host community," among others); see also Derrick Silove, "The psychosocial effects of torture, mass human rights violations, and refugee trauma: Toward an integrated conceptual framework," The Journal of nervous and mental disease vol. 187, no. 4 (1999), p. 200-207. (Beiser et al., 1993; Chung and Kagawa-Singer, 1993; Gorst-Unsworth and Goldenberg, 1998; Hinton et al., 1997; Lavik et al., 1996; Silove et al., 1997) (The fear associated with waiting for the outcome of a case—a potentially negative outcome—can negatively affect an individual's ability to recover from PTSD and other forms of psychosocial distress); see also Jessica Carlsson, et. al., "From pioneers to scientists: challenges in establishing evidence-gathering models in torture and trauma mental health services for refugees," The Journal of nervous and mental disease , vol. 202, no. 9 (2014), p. 630-637. (Fazel et al., 2005; Steel et al., 2009) (Studies have found that a significant subset of asylum seekers, ranging from 12 to 34 percent, have diagnosable PSTD).

[76] Human Rights First Interview, September 29, 2015.

[77] Human Rights First Interview, November 19, 2015.

[78] Michael Savic, et. al., "'We don't have to go and see a special person to solve this problem': Trauma, mental health beliefs and processes for addressing 'mental health issues' among Sudanese refugees in Australia," International Journal of Social Psychiatry (2015): p. 1-8.

[79] Human Rights First Interview, November 13, 2015.

[80] Human Rights First Interview, November 13, 2015.

[81] Human Rights First Interview, November 5, 2015.

[82] Human Rights First Interview, October 14, 2015.

[83] Human Rights First Interview, October 14, 2015.

[84] Human Rights First Interview, November 4, 2015.

[85] Human Rights First Interview, December 3, 2015.

[86] 8 U.S.C. § 1158 (d)(2), available at https://www.law.cornell.edu/uscode/text/8/1158.

[87] See Human Rights Watch and Seton Hall University School of Law's Center for Social Justice, At Least Let Them Work: The Denial of Work Authorization and Assistance for Asylum Seekers in the United States (New York: Human Rights Watch, November 2013).

[88] Executive Office for Immigration Review and U.S. Citizenship and Immigration Services, "The 180-day Asylum EAD Clock Notice," December 2, 2013, available at https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Asylum_Clock_Joint_Notice.pdf.

[89] 8 C.F.R. § 274a.13(d). If not adjudicated within 90 days the law requires issuance of an interim authorization to all initial and renewal applicants. In May 2015, immigrant rights groups filed a class action law suit on behalf of individuals denied timely adjudication of work authorization under these legally mandated guidelines, seeking to compel government agencies' compliance with this statutory requirement. USCIS responded by proposing to eliminate this 90-day requirement from the statute altogether.

[90] U.S. Citizenship and Immigration Services, I-765, "Application for Employment Authorization," last updated December 30, 2015, available at https://www.uscis.gov/i-765.

[91] Annette Bernhard, et. al., Broken Law, Unprotected Workers, Violations of Employment and Labor Laws in America's Cities (2009), available at http://nelp.3cdn.net/e470538bfa5a7e7a46_2um6br7o3.pdf.

[92] U.S. Immigration and Customs Enforcement (ICE), Applying for a Driver's License or State Identification Card, September 5, 2012, available at https://www.ice.gov/doclib/sevis/pdf/dmv_factsheet.pdf.

[93] Social Security Administration, "Types Of Social Security Cards," March 2016, available at https://www.ssa.gov/ssnumber/cards.htm.

[94] Human Rights First Interview, October 14, 2015.

AR004278

95 Human Rights First Interview, November 12, 2015.

96 Human Rights First Interview, December 16, 2015.

97 Human Rights First Interview, November 13, 2015.

98 National Conference of State Legislatures, "Undocumented Student Tuition: Overview," October 29, 2015, available at http://www.ncsl.org/research/education/undocumented-student-tuition-overview.aspx.

99 Human Rights First Interview, December 10, 2015.

100 Human Rights First Interview, October 14, 2015; see also "Massachusetts Policy," uLEAD Network, last update: January 28, 2016, available at http://uleadnet.org/map/massachusetts-policy.

101 "Maryland Policy," uLEAD Network, last update: November 11, 2015, available at http://uleadnet.org/map/maryland-policy.

102 Human Rights First Interview, October 15, 2015.

103 Human Rights First Interview, December 3, 2015.

104 Human Rights First Interview, November 12, 2015.

105 Jaya Ramji-Nogales, et. al., *Refugee roulette: Disparities in asylum adjudication*, 60 Stanford L. Rev. 295, 341 (2007).

106 Transactional Records Access Clearinghouse (TRAC), "Representation is Key in Immigration Proceedings Involving Women with Children," Syracuse University, February 18, 2015, available at http://trac.syr.edu/immigration/reports/377/.

107 Kate M. Manuel, *Aliens' Right to Counsel in Removal Proceedings: In Brief* (Washington, D.C: Congressional Research Service, June 2014), available at https://www.fas.org/sgp/crs/homesec/R43613.pdf.

108 Ingrid V. Eagly and Steven Shafer, *A National Study of Access to Counsel in Immigration Court,* 164 PA L. Rev. 1 (2016).

109 Twenty-four pro-bono professionals responded to a survey circulated by Human Rights First. Respondents included pro bono partners at major law firms across the country, as well as pro bono directors at some of the nation's largest law firms.

110 Human Rights First Interview, October 19, 2015.

111 Human Rights First Interview, December 22, 2015.

112 Human Right First Interview, November 23, 2015.

113 Human Rights First Interview with Professor Susham Modi, Adjunct Professor & Clinical Supervising Attorney, University of Houston Immigration Clinic, November 10, 2015; Human Rights First Interview with Philip Schrag, Director, Center for Applied Legal Studies and Delaney Family Professor of Public Interest Law, and Jean Han, Second Year Fellow, Center for Applied Legal Studies, February 05, 2016.

114 In addition to attempts to increase the number of asylum officers, the Asylum Division has begun pilot programs aimed at better handling the high number of credible fear and reasonable fear interview requests. In Arlington, VA, the Asylum Division opened a new office of 60 officers dedicated exclusively to conducting credible fear and reasonable fear interviews that would have otherwise been the responsibility of the Arlington or Los Angeles Asylum Offices. This new program does not change the overall calculation that 272 officers, whether dedicated full time to CFI and CFI screenings or not, will be required to handle current CFI and RFI requests.

115 See USCIS Asylum Division Stakeholder Meeting, February 5, 2016 (notes on file with Human Rights First).

116 See Appendix III.

117 Executive Office for Immigration Review, supra note 51 (319 immigration judges were authorized through FY 2015). In FY 2016, Congress allocated funding for an additional 55 judges, bringing the total to 374.

118 Written Statement of Hon. Dana Leigh Marks, President, National Association of Immigration Judges before the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law of the House Committee on the Judiciary on Oversight Hearing on the Executive Office for Immigration Review, June 17, 2010, available at http://judiciary.house.gov/_files/hearings/pdf/Marks100617.pdf.

119 Communication with the National Association of Immigration Judges (notes on file with Human Rights First).

120 Human Rights First suggests the ideal adjudication timeline for cases before the immigration court be one year on average. This average would still allow some complex cases to be adjudicated beyond one year, but would ensure the majority of cases be completed in a timely fashion, while respecting the due process rights of each individual.

121 *See* Appendix III.

122 Charles Roth and Raia Stoicheva, Order in the Court: Common Sense Solutions to Improve Efficiency and Fairness in the Immigration Court (Chicago: National Immigrant Justice Center, October 2014), available at https://www.immigrantjustice.org/publications/orderinthecourt.

123 8 CFR §1003.21.

124 Hon. David L. Neal, "Memorandum: Operating Policies and Procedures Memorandum 08-0, Guidelines for Facilitating Pro Bono Legal Services," Executive Office of Immigration Review, U.S. Department of Justice, March 10, 2008, available at http://www.justice.gov/sites/default/files/eoir/legacy/2008/04/24/08-01.pdf.

125 Betsy Cavendish and Steven Schulman, *Reimagining the Immigration Court Assembly Line: Transformative Change for the Immigration Justice System* (Washington, D.C.: Appleseed Network, 2012), available at http://www.appleseednetwork.org/wp-content/uploads/2012/03/Reimagining-the-Immigration-Court-Assembly-Line.pdf.

AR004279

[126] Administrative Conference of the United States, "Administrative Conference Recommendation 2012-3: Immigration Removal Adjudication," adopted June 15, 2012, available at https://www.acus.gov/sites/default/files/downloads/2012/06/Recommendation-2012-3-Immigration-Removal-Adjudication.pdf.

[127] Betsy Cavendish and Steven Schulman, supra note 125.

[128] Ibid.

[129] Administrative Conference of the United States, supra note 125.

[130] Betsy Cavendish and Steven Schulman, supra note 125.

[131] Statement of Juan P. Osuna, supra note 45.

[132] Citizenship and Immigration Services Ombudsman, supra note 33, p.61.

[133] Institute for the Study of International Migration, *Detention and Removal: What now and What Next?* (Washington, D.C.: Institute for the Study of International Migration, Georgetown University, Oct. 2014), p. 13; Russell Wheeler and Lenni Benson, "Immigration courts would benefit with more staff," *Houston Chronicle*, November 14, 2013, available at http://www.chron.com/opinion/outlook/article/Wheeler-Benson-Immigration-courts-would-benefit-4983968.php.

[134] Matt Graham, "Funding Immigration Courts Should Not be Controversial," *Bipartisan Policy Center*, May 20, 2015, available at http://bipartisanpolicy.org/blog/funding-immigration-courts-should-not-be-controversial/.

[135] Julie Myers Wood, supra note 27.

[136] U.S. Department of Justice, "Asylum Reform: Five Years Later—Backlog Reduced and Number of Non-Meritorious Claims Drops," press release, February 1, 2000, available at http://www.uscis.gov/sites/default/files/files/pressrelease/Asylum.pdf.

[137] Ibid.

[138] Serious concerns have been raised regarding the issue of work authorization waiting periods; see Human Rights Watch and Seton Hall University School of Law's Center for Social Justice, supra note 87.

[139] Immigration Policy Center, *Removal Without Recourse: The Growth of Summary Deportations from the United States* (Washington, D.C.: American Immigration Council, April 2014), available at http://www.immigrationpolicy.org/just-facts/removal-without-recourse-growth-summary-deportations-united-states.

[140] U.S. Department of Justice, supra note 136.

[141] Nash, Alan Eric, and John P. Humphrey, *Human rights and the protection of refugees under international law* (Halifax: The Institute for Research on Public Policy, 1987), p. 4; Roman Boed, *The State of the Right of Asylum in International Law*, 5 DUKE J. COMP. & INT'L L. 5: 1, 6-7 (1994), available at http://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1342&context=djcil.

[142] The Refugee Convention Relating to the Status of Refugees, July 28, 1951 189 U.N.T.S. 137; Optional Protocol to the 1951 Convention Relating to the Status of Refugees, January 31, 1967, 606 U.N.T.S. 267.

[143] See Human Rights Committee, General Comment No. 32, Article 14: Right to equality before courts and tribunals and to a fair trial, U.N. Doc. CCPR/C/GC/32 (2007); see also UNHCR, Procedural Standards for Refugee Status Determination under UNHCR's Mandate, available at http://www.unhcr.org/4317223c9.pdf; see also UNHCR, UNHCR monitoring visit to the Republic of Nauru, November 26, 2013, available at http://www.refworld.org/docid/5294a6534.html.

[144] Santhosh Persaud, *Protecting refugees and asylum seekers under the International Covenant on Civil and Political Rights*, UNHCR Paper No. 132, November 2006, p. 16, available at http://www.unhcr.org/4552f0d82.pdf (citing Latvia (CCPR/CO/79/LVA), November 6, 2003, para. 9.).

[145] Human Rights Committee, General Comment No. 32, Article 14: Right to equality before courts and tribunals and to a fair trial, U.N. Doc. CCPR/C/GC/32 (2007).

[146] Ibid.

[147] Ibid.

[148] UN Human Rights Committee (HRC), *UN Human Rights Committee: Concluding Observations: Russian Federation*, 1 December 2003, CCPR/CO/79/RUS, available at: http://www.refworld.org/docid/3fdc68914.html.

[149] Eur. Parl. Ass., *Directive 2013/32/EU of the European Parliament and of the Council of 26 June 2013 on common procedures for granting and withdrawing international protection* (June 26, 2013), http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32013L0032. Article 12 of the directive both ensures that asylum seekers be informed of the time frame for the adjudication of their application and that they be "given notice in reasonable time of the decision by the determining authority on their application." (Art. 12 (1)(a) and (e)).

[150] Ibid at (Art. 31 (3)).

[151] Ibid at (Art. 31 (3) (a)-(c))) (These circumstances include instances where complex issues of fact and/or law are involved, where a large number of application are received simultaneously, or where the delay can be clearly attributed to the applicant's own failure to comply with the procedure.) See UN High Commissioner for Refugees (UNHCR), *Comments on the European Commission's Amended Proposal for a Directive of the European Parliament and of the Council on common procedures for granting and withdrawing international protection status (Recast) COM (2011) 319 final* (Geneva: UNHCR, 2012), p. 23, available at http://www.unhcr.org/4f35256c9.pdf.

[152] Eur. Parl. Ass., supra note 149 at (Art. 31 (3)(5)).

AR004280

[153] Ruth Ellen Wasem, *U.S. Immigration Policy on Asylum Seekers* (Washington, D.C.: Congressional Research Service, May 2005), p. 7, available at https://fas.org/sgp/crs/misc/RL32621.pdf.

[154] 8 U.S.C. § 1158(d)(5)(A)(ii).

[155] 8 U.S.C. § 1158(d)(5)(A)(iii).

[156] U.S. Government Accountability Office (GAO), *Asylum: Additional Actions Needed to Assess and Address Fraud Risks* (Washington, D.C.: GAO, December 2015), p. 28, available at http://www.gao.gov/assets/680/673941.pdf.

[157] Ibid.

[158] Immigration and Nationality Act, section 240(b).

[159] *Podio v. INS*, 153 F.3d 506, 509 (7th Cir. 1998), citing *Batanic v. INS*, 12 F.3d 662, 666 (7th Cir. 1993).

[160] *Drobny v. INS*, 947 F.2d 241, 245 (7th Cir. 1991).

[161] Alicia Triche, "Due Process in a Deluge: Minimum Procedures for Meaningful Fact-Finding on an Overloaded Docket," *The Federal Lawyer*, August 2015, available at http://naij-usa.org/wp-content/uploads/2015/08/FederalLawyer-ImmigratiionUpdate-August2015-Due-process-in-a-Deluge.pdf.

[162] Ibid.

[163] In 2013, the Asylum Division established its own timeliness goal of 60 days for full adjudication of asylum applications, in line with timeliness goals of asylum reform. Internal systems establish a "60-day referral clock" from the time a complete application is received.

[164] EOIR yearly statistical yearbook data departs slightly from the number of incoming new cases calculated by Human Rights First. This discrepancy of approximately eight percent likely results from the way TRAC and EOIR count and report completed cases. Utilizing the slightly higher number derived from TRAC data may provide a slight buffer given increased numbers of new cases in recent years.

[165] Human Rights First suggests the ideal adjudication timeline for cases before the immigration court be one year on average. This average would still allow some complex cases to be adjudicated beyond one year, but would ensure the majority of cases be completed in a timely fashion, while respecting the due process rights of each individual.

[166] U.S. Department of Justice Office of the Inspector General, Management of Immigration Cases and Appeals by the Executive Office of Immigration Review, October 2012, p. 6, available at https://oig.justice.gov/reports/2012/e1301.pdf.

AR004281



American ideals. Universal values.

AR004282

# FOOTNOTE 18



Mater Sociomed. 2017 Jun; 29(2): 92–96.		PMCID: PMC5544462
doi: 10.5455/msm.2017.29.92-96		PMID: 28883769

# Influence of Unemployment on Mental Health of the Working Age Population

Olivera Batic-Mujanovic,[1,2] Samir Poric,[3] Nurka Pranjic,[4,5] Enisa Ramic,[6] Esad Alibasic,[7] and Enisa Karic[6]

[1]Family Medicine Teaching Center, Public Health Center Tuzla, Tuzla, Bosnia and Herzegovina
[2]Department of Family Medicine, Faculty of Medicine, University of Tuzla, Tuzla, Bosnia and Herzegovina
[3]School of Health Studies, University of Bihac, Bihac, Bosnia and Herzegovina
[4]Teaching Department for Professional Pathology and Toxicology, Public Health Center Tuzla, Tuzla, Bosnia and Herzegovina
[5]Department of Occupational Health Faculty of Medicine, University of Tuzla, Tuzla, Bosnia and Herzegovina
[6]Family Medicine, Public Health Center Tuzla, Tuzla, Bosnia and Herzegovina
[7]Family Medicine, Public Health Center Kalesija, Kalesija, Bosnia and Herzegovina

**Corresponding author:** Olivera Batic-Mujanovic, MD, MSc, PhD, Family Medicine Teaching Center, Public Health Center Tuzla, Tuzla, Bosnia and Herzegovina; Department of Family Medicine, Faculty of Medicine, University of Tuzla, Tuzla, Bosnia and Herzegovina, ORCID ID: http://www.orcid.org/0000-0002-1002-0692. E-mail: oliverabaticmujanovic@yahoo.com

Received 2017 Apr 21; Accepted 2017 Jun 5.

Copyright : © Olivera Batic-Mujanovic, Samir Poric, Nurka Pranjic, Enisa Ramic, Esad Alibasic, Enisa Karic

This is an Open Access article distributed under the terms of the Creative Commons Attribution Non-Commercial License (http://creativecommons.org/licenses/by-nc/4.0/) which permits unrestricted non-commercial use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Abstract

### Introduction:

Bosnia and Herzegovina has one of the highest unemployment rates in the Balkan region (43.2%), so unemployment is one of the most serious public concerns in our country.

### Aim:

To analyze the influence of unemployment on mental health of the working age population who attend primary care center.

### Material and Methods:

The study was carried out in the municipality of Bosanska Krupa, which has the highest unemployment rate in the Federation of Bosnia and Herzegovina (56%), and included 510 randomly selected working age patients (aged 23-65 years). We used the General Health Questionnaire-28 (GHQ-28) to evaluate mental health of the working age population.

AR004284

**Results:**

There were significantly more women than men (53.5% vs. 46.5%; p=0.02). The mean age of participants was 51.04±12.84 years. The experimental group included 318 (62.35%) unemployed working age participants: 160 (50.3%) had been unemployed for more than 5 years and had had no work experience, while 158 (49.7%) unemployed participants had had a previous work experience of more than five years. The control group included 192 (37.65%) employed working age participants. Unemployment had a significant influence on mental health of the working age population. The unemployed participants had a significantly poorer mental health compared to the employed (p=0.0003). A predictor of impaired mental health was a job loss. A significantly greater mental health impairment occured in the group of unemployed participants with previous work experience of more than five years compared to the unemployed participants who had had no work experience (p=0.001) and employed (p=0.000).

**Conclusion:**

Unemployment has a negative impact and leads to impaired mental health of the working age population in Bosnia and Herzegovina. A job loss has a predictive role. It indicates that social and health policies must be developed in order to improve well-being of the working age population.

**Keywords:** unemployment, mental health, working age population

## 1. INTRODUCTION

Job insecurity, job loss and lack of work opportunities have characterized the Bosnian labor market in the last two decades, making unemployment one of the most serious public concerns in our country. Bosnia and Herzegovina still has one of the highest unemployment rates in the Balkan region (43.2%). The unemployment rate in Bosnia and Herzegovina is three times higher than the European rate. Most of EU member states recorded a lower unemployment rate in 2015 compared to the previous years. The unemployment rates in states of the Balkan region showed a similar trend. In contrast, Bosnia and Herzegovina recorded a slight increase in the surveyed unemployment rate in 2015 compared to 2014 (27.5% vs. 27.7%) with 514.800 unemployed working age individuals ([1]). Current and past adverse situations (the 1992-95 war) in Bosnia and Herzegovina can have a lasting negative effect on mental health of people, often resulting in depression, anxiety, and somatization. These psychological disorders continue to be aggravated by economic instability in the country ([2]).

The consequences of unemployment are not only intra-personal, such as an impact on subjective well-being and common mental health problems. Unemployment also leads to inter-personal consequences, that is, the hidden and often overlooked social processes that affect unemployed people's social well-being ([3]). The harmful effects of unemployment, especially long-term unemployment, on health are well documented. Numerous studies showed that the unemployed have poorer health than the employed ([4-6]). The available empirical evidences suggest that there is a negative correlation between long-term unemployment, health status and mortality risk ([7]). There is growing evidence of the deleterious effects on mental health of the current recession which started in 2008. Overall, the financial crisis in Europe seemed to have had heterogeneous effects on health outcomes, with the evidence being most consistent for suicides and mental health ([8]). Results of studies showed that unemployed individuals were more likely to have depressive symptoms ([9]), more stress ([6]) and lower well-being ([5]) compared to employed individuals. Unemployment was associated with an increased mortality risk for those in their early and middle careers, but less for those in their late career ([10]), but also with poor self-rated health ([11]), a significantly higher cardiovascular risk ([12]), and with a significant all-cause mortality risk ([13]). Unemployed people who comitted suicides were 10 times more likely to have had poor social support,

AR004285

and 16 times more likely to have had any stressful life events in the past 12 months compared to living unemployed controls (14). Long-term unemployed individuals have poorer physical and mental health in relation to people who are short-term unemployed. Long-term unemployment is related to elevated all-cause mortality and mortality risk increases with the duration of unemployment among men and women (15). Meta-analysis by Milner et al. suggests that long-term unemployment is associated with greater incidence of suicide. Risk is greatest in the first five years, and persists at a lower but elevated level up to 16 years after unemployment (16). The long-term unemployed carry a markedly higher burden of disease, particularly mental illness, than employed persons and those who have been unemployed only for a short time. The burden of disease increases with the duration of unemployment. Long-term unemployed have at least twofold risk of mental illness, particularly depression and anxiety disorders, compared to employed persons. Their mortality is 1.6-fold higher. Unemployment seems to be not only an effect of illness, but also its cause (17).

Relationship between unemployment and a consequent increase of mental health disorders is obvious in primary care settings where it often remains unrecognized in most cases. The aim of this study was to analyze the influence of unemployment on mental health of the working age population attending primary care setting.

## 2. MATERIAL AND METHODS

This cross-sectional study was carried out in the municipality of Bosanska Krupa, which has the highest unemoloyment rate in the Federation of Bosnia and Herzegovina (56%). The study included 510 randomly selected working age patients (aged 23-65 years) who attended the primary care center between July–December 2013. Exclusion criteria were: working age population younger than 23 and older than 65 years, established diagnosis of mental health disorders, cancer, neurological diseases (Parkinson's disease, multiple sclerosis, stroke) and endocrine diseases (hyperthyreosis, hypothyreossis, hyper and hypofunction of suprarenal gland), or taking medications which can cause depression or anxiety (beta blockers, corticosteroids, ephedrin, aminophyllin, antihistamines, thyroid hormones, etc). The participants were divided into groups: 192 participants who were employed for more than 5 years (control group) and 318 unemployed participants (experimental group): 160 participants who had been unemployed for more than 5 years and had had no work experience and 158 unemployed participants with previous work experience of more than 5 years. The study was conducted in accordance with the code of ethics for this type of research (18).

To collect data about demographic characteristics and employment status of the participants (age, gender, duration of unemployment and previous work experience) we used the questionnaire created for this study. The General Health Questionnaire-28 (GHQ-28), translated into the Bosnian language, was used to evaluate mental health of the working age population (19). The reliability of GHQ-28 was tested by Cronbach alpha coefficient consistency and had satisfactory reliability equal to α=0.89 (Cronbach's alpha). Developed as a screening tool to detect those likely to have or to be at risk of developing mental health disorders, the GHQ-28 is a 28-item measure of emotional distress in medical settings. The GHQ-28 has been divided into four subscales: somatic symptoms (items 1–7), anxiety/insomnia (items 8–14), social dysfunction (items 15–21), and severe depression (items 22–28). Each subscale consisted of seven questions with offered answers (1–not at all; 2–not more than usual; 3–some more than usual; 4–a lot more than usual). Evaluation of responses was provided according to the Likert scale. Scores by Likert scale were converted into binary values (0, 0, 1, 1) and the sum of scores was used to interpret severity of psychological distress. Total score (sum of four observed subscales) was used to determine mental health status which was considered as a dependent variable, while employment status was considered as an independent variable. Total score, which represented mental health status, varied between 28 and 112. The higher score indicated poorer mental health status of participants.

AR004286

All data were analyzed using the statistical software package SPSS 20.0 (SPSS Inc., Chicago, IL, USA). We used standard tests of descriptive statistics. The chi-squared test with significance $p<0.05$ and independent samples t-test respectively were used for comparing proportions and arithmetic means between groups. To determine significance of arithmetic means differences between three or more groups we used univariate analysis of variance (ANOVA), and to test the impact of two or more variables to another variable we used Two Factor ANOVA. We expressed effect size as the difference between groups with a 95% confidence interval.

## 3. RESULTS

The study population comprised 510 randomly selected working age participants: 237 men and 273 women. There were significantly more women than men (53.5% vs. 46.5%; p=0.02). The mean age of participants was 51.04±12.84 years. The experimental group included 318 (62.35%) unemployed working age participants: 160 (50.3%) participants had been unemployed for more than 5 years and had had no work experience, and 158 (49.7%) unemployed participants who had had previous work experience of more than 5 years. The control group included 192 (37.65%) employed working age participants who had been employed for more than 5 years. Demographic characteristics of participants related to employment status are shown in Table 1.

### Table 1

Demographic characteristics of participants related to employment status

| Demographic characteristics | | Employment status | | | | | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | Unemployed > 5 years | | Employed > 5 years | | Unemployed (previous work experience > 5 years) | | | |
| | | N | % | N | % | N | % | N | % |
| Gender | male | 67 | 28.3 | 98 | 41.4 | 72 | 30.4 | 237 | 46.5 |
| | female | 93 | 34.1 | 94 | 34.4 | 86 | 31.5 | 273 | 53.5 |
| Age | 23 − 33 year | 105 | 66.0 | 47 | 29.6 | 7 | 4.4 | 150 | 31.2 |
| | 34 − 44 year | 24 | 27.9 | 48 | 55.8 | 14 | 16.3 | 86 | 16.9 |
| | 45 − 55 year | 21 | 14.8 | 65 | 45.8 | 56 | 39.4 | 142 | 27.8 |
| | 56 − 65 year | 10 | 8.1 | 32 | 26.0 | 81 | 65.9 | 123 | 24.1 |
| Total | | 160 | 31.4 | 192 | 37.6 | 158 | 31.0 | 510 | 100.00 |

Unemployment was associated with worsening of mental health. The unemployed participants had poorer mental health status compared to the employed participants. The difference of mean mental

AR004287

health scores between unemployed and employed participants was statistically significant ($52.64\pm13.38$ vs. $48.43\pm10.97$; $t=3.65919$; [95% CI: 1.852365-6.147635]; $p=0.0003$).

The unemployed participants with previous work experience had the highest mean mental health score for GHQ-28 (M=55.30), and consequently the highest impairment of mental health status. The employed participants had the lowest mean mental health score (M=48.43), while the unemployed participants with no work experience had the mean mental health score ranging between the values of the other two groups (M=49.97). The highest individual differences, measured by standard deviations, were observed in the group of unemployed participants with previous work experience (SD=13.957). The lowest individual differences were found in the employed participants group (SD=10.968) (Table 2 ).

### Table 2

Mean mental health score of participants related to employment status

| Employment status | N | M | SD | Standard Error |
|---|---|---|---|---|
| Unemployed with previous work experience › 5 years | 158 | 55.30 | 13.957 | 1.110 |
| Employed › 5 years | 192 | 48.43 | 10.968 | 0.792 |
| Unemployed › 5 years | 160 | 49.97 | 12.797 | 1.012 |
| Total | 510 | 51.04 | 12.844 | 0.569 |

The differences of the mean mental health status between groups of participants related to employment status were significant and can be generalized to the population represented by this sample (F=13.907; p=0.000). Data are shown in Table 3.

### Table 3

Significance of mean mental health scores differences between groups related to employment status

|  | Sum of squares | df | Mean Square | F | p |
|---|---|---|---|---|---|
| Between groups | 4366.895 | 2 | 2183.447 | 13.907 | 0.000 |
| Within groups | 79599.241 | 507 | 157.000 |  |  |
| Total | 83966.135 | 510 |  |  |  |

AR004288

Table 4. shows significant differences of mean mental health status between: a) the group of unemployed participants with previous work experience and the group of employed participants (the mean difference was the highest: MD=-6.877; p=0.000); b) the group of unemployed participants with previous work experience and group of unemployed participants with no work experience (MD=-5.335; p=0001). It indicated that unemployed individuals with previous work experience of more than 5 years had the poorest mental health status compared to the other two groups. The difference of the mean mental health status between the group of unemployed participants with no work experience and the group of employed participants was the lowest (MD=-1.542) and was not significant (p=0.517). It indicated that a job loss had the predictive role for mental health impairment of the working age population.

## Table 4

Comparisons of mean differences of mental health scores between groups related to employment status

| (I) Employment status | (J) Employment status | Mean Difference MD (I-J) | Standard Error | p | 95% CI | |
|---|---|---|---|---|---|---|
| | | | | | Lower limit | Upper limit |
| Unemployed > 5 years | Employed > 5 years | 1.542 | 1.341 | 0.517 | -1.75 | 4.83 |
| | Unemployed with previous work experience > 5 years | -5.335 | 1.405 | 0.001 | -8.79 | -1.88 |
| Employed > 5 years | Unemployed > 5 years | -1.542 | 1.341 | 0.517 | -4.83 | 1.75 |
| | Unemployed with previous work experience > 5 years | -6.877 | 1.346 | 0.000 | -10.18 | -3.57 |
| Unemployed with previous work experience > 5 years | Unemployed > 5 years | 5.335 | 1.405 | 0.001 | 1.88 | 8.79 |
| | Employed > 5 years | 6.877 | 1.346 | 0.000 | 3.57 | 10.18 |

## 4. DISCUSSION

Economic recessions and crises have a negative impact on mental health. Global unemployment remains very high, particularly among developed economies, with the situation in Europe being the most challenging ([20]). Our findings indicate a different effect of the economic crisis on mental health according to employment status and show that unemployment has been associated with worsening of mental health of the working age population. We found that unemployment had a significant negative impact on mental health of the working age population. The unemployed working age participants had significantly poorer mental health compared to the employed participants. The participants who were

AR004289

unemployed with previous work experience of more than 5 years had the highest mean mental health score for GHQ-28 (M=55.30), and consequently the highest impairment of mental health status. The participants who had been employed for more than 5 years had the lowest mean mental health score (M=48.43). Similar to our results, Córdoba-Doña et al. concluded that current economic recession was associated with poorer mental health differentially according to labour market status (21). SESPAS report 2014 suggested that economic difficulties contributed to poorer mental health. The most important risk factor for this increase was unemployment (22). Our results showed that mental health status of unemployed participants with previous work experience of more than 5 years was significantly worsened compared to the unemployed with no work experience and employed participants. The difference of mean mental health status among unemployed with no work experience and employed participants can not be expected in the population. It indicated that a job loss had predictive role for mental health impairment of the working age population.

This research has confirmed a positive correlation between unemployment and poorer mental health of the working age population. Differences of mean mental health status between groups of participants related to employment status were significant and can be generalized to the population represented by this sample. Similar results were from cross-sectional study, carried out at the primary health care level in Australia, which showed that unemployed patients had a higher average score for GHQ-12 questionnaire in relation to the employed (3.8 vs. 2.4; p <0.001) (23). A study about health-related quality of life (HRQL) and economic downturns found that an increase in the average state unemployment rate worsened an individual's HRQL (24). Most prospective studies, in which unemployment was assumed to cause health disorders, confirmed that job loss and long-term lack of salaries, especially for long periods of time, can result in a deterioration of mood and self-assessment of health with appearance of mental and somatic disorders in the initially healthy people. A preliminary analysis of unemployed population of Warsaw indicated that the unemployed perceived their health, physical and mental well-being as worse compared to the employed (25, 26).

## 5. CONCLUSION

Unemployment has a significant influence on mental health of the working age population in Bosnia and Herzegovina. Unemployed individuals have a markedly higher impairment of mental health than the employed. Job loss has a predictive role. Impaired mental health that occurs as a result of unemployment in working age population represents a serious challenge for public health and family medicine teams in Bosnia and Herzegovina. Results of this study suggest the need for generally available health care, rapid special health-promoting measures for unemployed patients and social interventions. With one of the highest unemployment rates in the Balkan region, Bosnia and Herzegovina must develop social and health policies in order to improve well-being of its population.

## Footnotes

• **Conflict of interest:** The authors have no conflict of interest to declare.

## REFERENCES

1. Council of ministers. Economic trends. Annual report 2015 [Internet] Sarajevo: Directorate for economic planning; 2016. Bosnia and Herzegovina. Available at: http://www.dep.gov.ba /dep_publikacije/ekonomski_trendovi/?id=1754 . [Google Scholar]

2. Broers T, Hodgetts G, Batic-Mujanovic O, Petrovic V, Hasanagic M, Godwin M. Prevalence of mental and social disorders in adults attending primary care centers in Bosnia and Herzegovina. Croat Med J. 2006 Un;47:478–84. [PMC free article] [PubMed] [Google Scholar]

AR004290

3. Giuntoli G, Hughes S, Karban K, South J. Towards a middle-range theory of mental health and well-being effects of employment transitions: Findings from a qualitative study on unemployment during the 2009-2010 economic recession. Health (London) 2015;19(4):389–412. doi:10.1177/1363459314554314. [PubMed] [Google Scholar]

4. Van Hal G. The true cost of the economic crisis on psychological well-being: a review. Psychol Res Behav Manag. 2015 Jan;8:17–25. doi:10.2147/PRBM.S44732. [PMC free article] [PubMed] [Google Scholar]

5. Oliffe JL, Han CS. Beyond workers' compensation: men's mental health in and out of work. Am J Mens Health. 2014 Jan;8(1):45–53. doi:10.1177/1557988313490 786. [PubMed] [Google Scholar]

6. Pelzer B, Schaffrath S, Vernaleken I. Coping with unemployment: The impact of unemployment on mental health, personality, and social interaction skills. Work. 2014;48(2):289–95. doi:10.3233/WOR-131626. [PubMed] [Google Scholar]

7. Minelli L, Pigini C, Chiavarini M, Bartolucci F. Employment status and perceived health condition: longitudinal data from Italy. BMC Public Health. 2014 Sep;14:946. doi:10.1186/1471-2458-14-946. [PMC free article] [PubMed] [Google Scholar]

8. Parmar D, Stavropoulou C, Ioannidis JP. Health outcomes during the 2008 financial crisis in Europe: systematic literature review. BMJ. 2016 Sep;354:4588. doi:10.1136/bmj.i4588. [PMC free article] [PubMed] [Google Scholar]

9. Kim SS, Muntaner C, Kim H, Jeon CY, Perry MJ. Gain of employment and depressive symptoms among previously unemployed workers: a longitudinal cohort study in South Korea. Am J Ind Med. 2013 Oct;56(10):1245–50. doi:10.1002/ajim. 22201. [PMC free article] [PubMed] [Google Scholar]

10. Roelfs DJ, Shor E, Davidson KW, Schwartz JE. Losing life and livelihood: a systematic review and meta-analysis of unemployment and all-cause mortality. Soc Sci Med. 2011 Mar;72(6):840–54. doi:10.1016/j.socscimed.2011.01.005. [PMC free article] [PubMed] [Google Scholar]

11. Giatti L, Barreto SM, César CC. Unemployment and self-rated health: neighborhood influence. Soc Sci Med. 2010 Aug;71(4):815–23. doi:10.1016/j.socscimed.2010. 05.021. [PubMed] [Google Scholar]

12. Noelke C, Avendano M. Who suffers during recessions? Economic downturns, job loss, and cardiovascular disease in older Americans. Am J Epidemiol. 2015 Nov;182(10):873–82. doi:10.1093/aje/kwv094. [PMC free article] [PubMed] [Google Scholar]

13. Clemens T, Popham F, Boyle P. What is the effect of unemployment on all-cause mortality? A cohort study using propensity score matching. Eur J Public Health. 2015 Feb;25(1):115–21. doi:10.1093/eurpub/cku136. [PMC free article] [PubMed] [Google Scholar]

14. Pompili M, Innamorati M, Di Vittorio C, Baratta S, Masotti V, Badaracco A, et al. Unemployment as a risk factor for completed suicide: a psychological autopsy study. Arch Suicide Res. 2014;18(2):181–92. doi:10.1080/13811118.2013.803449. [PubMed] [Google Scholar]

15. Garcy AM, Vågerö D. The length of unemployment predicts mortality, differently in men and women, and by cause of death: A six year mortality follow-up of the Swedish 1992–1996 recession. Soc Sci Med. 2012 Jun;74(12):1911–20. doi:101016/j.socscimed.2012.01.034. [PubMed] [Google Scholar]

16. Milner A, Page A, LaMontagne AD. Long-term unemployment and suicide: a systematic review and meta-analysis. PloS One. 2013 Jan;8(1):e51333. doi:101371/journal.pone.0051333. [PMC free article] [PubMed] [Google Scholar]

AR004291

17. Herbig B, Dragano N, Angerer P. Health in the long-term unemployed. Dtsch Arztebl Int. 2013 Jun;110(23-24):413–9. doi:10.3238/arztebl.2013.0413. [PMC free article] [PubMed] [Google Scholar]

18. World Medical Association Declaration of Helsinki. Recommendations guiding physicians in biomedical research involving human subjects. Cardiovasc Res. 1997 Jul;35(1):2–3. doi: https://doi.org /10.1016/S0008-6363(97)00109-0. [PubMed] [Google Scholar]

19. Goldberg DP, Gater R, Sartorius N, Ustun TB, Piccinelli M, Gureje O, et al. The validity of two versions of the GHQ in the WHO study of mental illness in general health care. Psychol Med. 1997 Jan;27(1):191–7. [PubMed] [Google Scholar]

20. United Nations. World economic situation and prospects 2013 [Internet] New York: United Nations; 2014. Available at: http://www.un.org/en/development/desa/policy/wesp/wesp_current/wesp2014.pdf . [Google Scholar]

21. Córdoba-Doña JA, Escolar-Pujolar A, San Sebastián M, Gustafsson PE. How are the employed and unemployed affected by the economic crisis in Spain? Educational inequalities, life conditions and mental health in a context of high unemployment. BMC Public Health. 2016 Mar;16:267. doi:10.1186/s12889-016-934-z. [PMC free article] [PubMed] [Google Scholar]

22. Gili M, García Campayo J, Roca M. Economic crisis and mental health SESPAS report 2014. Gac Sanit. 2014 Jun;28(Suppl 1):104–8. doi:10.1016/j.gaceta.2014.02. 005. [PubMed] [Google Scholar]

23. Comino EJ, Harris E, Chey T, Manicavasagar V, Penrose Wall J, Powell Davies G, et al. Relationship between mental health disorders and unemployment status in Australian adults. Aust N Z J Psychiatry. 2003 Apr;37(2):230–5. [PubMed] [Google Scholar]

24. Davalos ME, French MT. This recession is wearing me out!Health-related quality of life and economic downturns. J Ment Health Policy Econ. 2011 Jun;14(2):61–72. [PubMed] [Google Scholar]

25. Carlier BE, Schuring M, Lotters FJ, Bakker B, Borgers N, Burdorf A. The influence of re-employment on quality of life and self-rated health: a longitudinal study among unemployed persons in the Netherlands. BMC Public Health. 2013 May;13:503. doi:10.1186/1471-2458-13-503. [PMC free article] [PubMed] [Google Scholar]

26. Supranowicz P. Occupational activity and health of Warsaw inhabitants. Part I. Unemployment: a preliminary analysis. Przegl Epidemiol. 2014;68(3):481–6. 583-6. [PubMed] [Google Scholar]

Articles from Materia Socio-Medica are provided here courtesy of **The Academy of Medical Sciences of Bosnia and Herzegovina**

AR004292

# FOOTNOTE 19

AR004293

6,762 views | Jun 27, 2018, 05:00am

# 3 Vicious Cycles: Links Among Financial, Physical And Mental Health



**Brett Whysel** Contributor ⓘ

Leadership Strategy

*I cover behavioral economics, decision-making, finance and philosophy.*



AR004294



The Russell Glacier. Landscape close to the Greenland Ice Sheet near Kangerlussuaq. America. North... [+]

Feedback loops are powerful forces of nature. Melting polar ice caps reduce the earth reflectivity, causing it to absorb more heat from the sun, which accelerates the melting. The cumulative, accelerating aspects of such loops make it imperative to break the cycle before it gets out of control. Below, I identify three feedback loops among financial and physical and mental health and some ideas for breaking these vicious cycles.

### Financial Stress

Let's begin with stress. Stress is the body's response to any demand made on it. It affects almost every system of the body, including heartbeat, breath, muscles and our brains. A little stress can be a good thing, if it motivates us to respond constructively a threat or opportunity and if it doesn't last too long.

Unfortunately, stress resulting from financial challenges is often chronic, affecting 26% of Americans most or all of the time. Unexpected expenses, the need to save for retirement and out of pocket health care expenses are major culprits.

### Stress Spiral No. 1: Physical Health

**Today In:** Leadership                                                          ⌄

Chronic stress is linked to physical health issues. High stress causes a fight-or-flight reaction, releasing adrenaline and cortisol. These hormones can suppress immune, digestive, sleep and reproductive systems, which, if sustained, may cause them to stop working normally.

Employees with high financial stress are twice as likely to report poor health overall and are more than four times as likely to complain of headaches, depression, or other ailments. The chart below shows how much sicker people with "debt stress" were during the depths of the financial crisis.

AR004295



Financial stress is associated with health challenges.   CHART BY BRETT WHYSEL FROM DATA AT HTTP://WWW.NBCNEWS.COM /ID/25060719/NS/HEALTH-MENTAL_HEALTH/T/DEBT-STRESS-CAUSING-HEALTH-PROBLEMS-POLL-FINDS/#.WZJGUQDKGWV

Stress is also associated with high-risk behavior including alcohol and drug abuse; overeating, sedentary behaviors like web surfing and TV watching. These behaviors can worsen one's health and finances.

The potential feedback loop then is financial challenges leading to poor health, direct and indirectly via unhealthy behaviors. Poor health can worsen money challenges and financial stress by increasing medical expenses, reducing productivity at work and making it harder to make good financial and medical decisions:



AR004296



Vicious Cycle No. 1: Financial stress associated with high-risk behaviors and poor health, which can... [+]   CHART: BRETT WHYSEL

### Stress Spiral No. 2: Delayed Healthcare

Financial stress can also harm health when lack of financial resources causes people to delay necessary medical treatment. One in four Americans has trouble paying medical bills, with some delaying treatment. Cost-related non-adherence may be most important for people with chronic conditions such as high blood pressure, asthma and diabetes. Fifty-six percent of Americans with common chronic diseases say they've have missed medication because of cost.

This leads to the second feedback loop: a medical condition results in unexpectedly high out of pocket costs, increasing stress, which worsens the condition directly and indirectly as the patient delays needed medical care and medication. This spiral may become more widespread as more employers switch to high-deductible health plans, which put a greater financial risk on patients:



AR004297

Vicious Cycle No. 2: Poor health is expensive to treat, so people delay needed care, which can... [+]    CHART: BRETT WHYSEL

### Stress Spiral No. 3: Mental Health

Of course, we experience financial stress mentally as well as physically. People with debt are three times more likely to have a mental health issue, especially depression, anxiety and psychotic disorders. Financial stress is the second most common cause of suicide, after depression. According to Therapist Rachel Mickenberg, humiliation among the financially stressed makes it harder to seek help as it worsens mental health.

Mental health challenges can impair financial (and medical) decision making, self-control and employment possibilities. Those with dealing with scarcity suffer from greater cognitive loads from managing the various challenges of making limited means work, impairing executive functioning including creativity, empathy, planning for the future and problem-solving.

So we have our third vicious cycle. Financial stress is associated with mental health challenges, which impair financial decision making and employment, further worsening the financial situation. This can increase stress, which may then worsen the mental health condition:



AR004298

Vicious Cycle No. 3: Financial stress associated with poor mental health, impaired decision making,... [+]  CHART: BRETT WHYSEL

### Breaking the Chain

Left to themselves, vicious cycles like these can spiral out of control, with grave consequences for individuals, employers and societies. Fortunately, there are things individuals and organizations can do to break these loops.

Individuals can take steps to improve their financial behaviors, by better controlling spending and increasing savings. This begins with empathetically planning for one's future and creating a budget designed to make you happier. Others may benefit from the advice of a financial advisor or credit counselor. We can also work on developing "pride in good money habits - instead of money itself," exercising, using relaxation techniques such as yoga and meditation, and obtaining support from friends, family and, perhaps, a therapist.

Governments, healthcare providers and businesses have a moral responsibility and a direct interest in breaking these loops which destroy welfare, social capital and shareholder value. They should sponsor financial (as well as general and mental) wellness programs to help people control their spending, attain resiliency with emergency funds, and plan for the future. Financial institutions need to support such programs and provide products and services more appropriate to low and middle-income consumers.

In short, the status quo for millions of Americans is not sustainable. The typical American is stressed because she lives paycheck-to-paycheck, saves nothing for retirement, has little financial literacy and is increasingly being asked to shoulder the costs and uncertainties of healthcare and retirement. The resulting stress can cause physical and mental health to spiral along with financial health. It's time we do something about it.

*Follow me on Twitter or LinkedIn. Check out my website.*

AR004299

 **Brett Whysel**

I am a recovering investment banker, community college teacher and social entrepreneur who co founded Decision Fish LLC in 2016 to help people make better decisions. I ... **Read More**

AR004300

# FOOTNOTE 22

# Mental Disorders in Asylum Seekers

## The Role of the Refugee Determination Process and Employment

*Debbie C. Hocking, DPsych,\*† Gerard A. Kennedy, PhD,‡ and Suresh Sundram, MBBS, MMed, FRANZCP, PhD\*§*

**Abstract:** The refugee determination process (RDP) and social factors putatively impact on the psychiatric morbidity of adult asylum seekers (ASs) living in the community. Clinical and sociodemographic data relevant to AS experience in the RDP were collected using self-report measures to assess posttraumatic stress (Harvard Trauma Questionnaire–Revised) and depressive and anxiety symptoms (25-item Hopkins Symptom Checklist), and the Mini-International Neuropsychiatric Interview 6.0 psychiatric interview was used to establish a cutoff for caseness. The prevalence of major depressive disorder (MDD) and posttraumatic stress disorder (PTSD) was 61% and 52%, respectively. Unemployment and greater numbers of both potentially traumatic events and RDP rejections were predictors of symptom severity. Unemployed ASs were more than twice as likely to have MDD (odds ratio, 2.61; 95% confidence interval [CI], 1.11– 6.13; $p = 0.03$), and ASs with at least one RDP rejection were 1.35 times more likely to develop PTSD for each additional rejection (95% CI, 1.00–1.84; $p = 0.05$). Reducing the asylum claim rejection rate and granting work rights are likely to reduce the rate of PTSD and MDD in community-based ASs.

**Key Words:** Asylum seekers, refugee determination, posttraumatic stress, depression, employment status

*(J Nerv Ment Dis 2015;203: 28–32)*

R efugees and asylum seekers living in Western countries experience a high prevalence of mental disorders, particularly posttraumatic stress disorder (PTSD), major depressive disorder (MDD), and other anxiety disorders (Fazel et al., 2005; Steel et al., 2009), with asylum seekers being more vulnerable than settled refugees (Macleod and Reeve, 2005; Silove et al., 1998; Steel et al., 2009). However, most research on mental health in asylum seeker populations has focused on the prearrival context and refugees whose status was established before arrival in the host country (Ryan et al., 2008). Less consideration has been given to the circumstances encountered in host countries (Gerritsen et al., 2006; Watters, 2001) and to those living in the community, which is the case for most asylum seekers in Australia (Department of Immigration and Border Protection, 2014). Most asylum seekers in Australia are ultimately granted protection visas and permanent residency; however, low rates of successful primary determination (*e.g.*, 33% for nonirregular maritime arrivals) result in a protracted refugee determination process (RDP) for most asylum seekers (Department of Immigration and Border Protection, 2013).

Few studies have investigated the association between mental health and the RDP itself. Internationally, a long asylum process has been found to be associated with psychiatric disorders (Hallas et al., 2007; Heeren et al., 2012; Laban et al., 2004; Mueller et al., 2010;

Ryan et al., 2008), with one study finding that a long RDP waiting time combined with rejection of asylum claims to be associated with suicidality (Staehr and Munk-Andersen, 2006). In an Australian study (Silove et al., 2007), posttraumatic stress, depressive, and anxiety symptoms in a small cohort of asylum seekers were measured 3.8 months after their initial application. Only those whose applications were successful showed a reduction in symptom severity, whereas those whose applications were rejected continued to demonstrate a high level of psychiatric morbidity and functional impairment. Similar findings were reported in a prospective Canadian study of asylum claimants (Davis, 2006), with prevalence of PTSD decreasing from 100% to 10% for those who received a positive RDP decision; conversely, 89% of those who received a negative decision retained a PTSD diagnosis. PTSD has also been associated with self-reported delays in processing refugee applications in asylum seekers and greater exposure to premigration trauma (Silove et al., 1997). Thus, it has been suggested that Australia's procedures for processing asylum claims may contribute to high levels of stress and psychiatric symptoms in people who are already traumatized (Silove et al., 1997).

## Research Aims

The present study aimed to cross-sectionally investigate the association between psychiatric morbidity in community-based asylum seekers and number of asylum claim rejections and time in the RDP. Sociodemographic variables were also explored as potential predictive factors for psychiatric morbidity.

## METHODS

### Participants

A convenience sample of 98 adult asylum seekers were recruited through the casework program of the Asylum Seeker Resource Centre (ASRC) in Melbourne, between September 2008 and October 2010. Because of database inaccuracies and the transient population, it was not possible to randomly sample participants, and thus, a convenience sample reflecting the current asylum seeker trends based on country of origin was used. All participants had lodged an application for asylum and were residing in the community while their cases were being determined. An opt-in approach was applied to potential participants who were not from clinical services and came to the ASRC for nonhealth reasons (*e.g.*, for legal support or material aid). Caseworkers canvassed the study with eligible clients to determine their interest in participating and obtained verbal consent for the researcher to contact them directly.

### Ethics

Approval for the research study was granted by the Victoria University Human Research Ethics Committee.

### Instruments

Two questionnaires were used to assess levels of depression, anxiety, and posttraumatic stress.

\*Department of Psychiatry and Neuropsychology, Florey Institute of Neuroscience and Mental Health, Parkville; †School of Psychology, Victoria University, St. Albans; ‡School of Psychology, Cairnmillar Institute, Camberwell; and §Department of Psychiatry, University of Melbourne, Victoria, Australia.
Send reprint requests to Debbie C. Hocking, DPsych, Florey Institute of Neuroscience and Mental Health, 30 Royal Parade (Cnr Genetics Lane), Parkville, Victoria, 3052, Australia. E-mail: Debbie.hocking@florey.edu.au.
Copyright © 2014 by Lippincott Williams & Wilkins
ISSN: 0022-3018/15/20301–0028
DOI: 10.1097/NMD.0000000000000230

*The Journal of Nervous and Mental Disease* • Volume 203, Number 1, January 2015

AR004302

Copyright © 2014 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

**TABLE 1.** Sociodemographic Characteristics of the Sample (*n* = 98[a])

| | *n* | % |
|---|---|---|
| **Sex** | | |
| Male | 87 | 88.8 |
| Female | 11 | 11.2 |
| **Mode of arrival** | | |
| Plane | 87 | 94.6 |
| Boat | 5 | 5.4 |
| **Speaks English** | | |
| Yes | 12 | 12.2 |
| No | 86 | 87.8 |
| **Country of origin** | | |
| Sri Lanka | 39 | 39.8 |
| Pakistan | 30 | 30.6 |
| Zimbabwe | 12 | 12.2 |
| Iraq | 8 | 8.2 |
| Afghanistan | 6 | 6.1 |
| Iran | 2 | 2.0 |
| Lebanon | 1 | 1.0 |
| **Immigration detention** | | |
| Yes | 8 | 8.2 |
| No | 89 | 91.8 |
| **Number of PTEs[b]** | | |
| <5 | 2 | 2.2 |
| 5–10 | 34 | 37.0 |
| 11–26 | 56 | 60.9 |
| **Number of RDP rejections** | | |
| 0 | 51 | 52.6 |
| 1–2 | 23 | 23.7 |
| ≥3 | 23 | 23.7 |
| **Education** | | |
| Tertiary | 59 | 60.8 |
| Finished secondary | 26 | 26.8 |
| Other | 12 | 12.4 |
| **Previous occupation** | | |
| Professional | 31 | 31.6 |
| Administration/self-employed | 27 | 27.6 |
| Skilled/trade | 16 | 16.3 |
| Unskilled/student/unemployed | 24 | 24.5 |
| **Employment status** | | |
| Not working/nil work rights | 55 | 57.3 |
| Working/students | 41 | 42.7 |
| **Health cover** | | |
| Yes | 61 | 65.6 |
| No | 32 | 34.4 |

[a]Totals less than 98 are because of missing data.

[b]Refers to different categories of PTEs, not the number of individual PTEs experienced.

The Harvard Trauma Questionnaire–Revised (HTQ) (Mollica et al., 2004) is a cross-cultural instrument designed to assess trauma and torture and their sequelae. A 16-item subscale of the HTQ measured PTSD symptoms, whereas anxiety and depressive symptoms were measured by the 25-item Hopkins Symptom Checklist (HSCL) (Mollica et al., 1987). The range for both instruments is 1 to 4, with higher scores indicating greater severity, and the scaled score is ascertained by dividing the total score by the number of items.

The HSCL and HTQ have demonstrated efficacy in the identification of mental illness and psychological distress in culturally diverse populations. Both instruments have widespread acceptance in the assessment of traumatized populations (Mollica et al., 1987) and are the most widely used instruments in populations of forced migrants who have experienced premigration and postmigration trauma (Steel et al., 2009). Back-translated versions of the HTQ and HSCL were used for participants who were not conversant in English. Interpreters were used for interviews as necessary.

The *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition* American Psychiatric Association, 2000) diagnoses of MDD and PTSD were established using cutoff scores from the HSCL (2.29) and HTQ (2.50) (Mollica et al., 2004), respectively, using the Mini-International Neuropsychiatric Interview 6.0 (MINI) (Lecrubier et al., 1997). The cutoff for MDD was higher than that previously reported (1.75; Mollica et al., 2004) and was based on our follow-up study (Hocking et al., submitted for publication).

Data were also collected on a range of sociodemographic variables and information relevant to participants' status in the RDP, Medicare (free public health care) access, work rights, and employment status.

Because of symptom measures being scales for neurotic disorders, three cases with psychotic disorders as assessed by the MINI were excluded from analyses examining anxiety, depressive, and posttraumatic stress symptoms.

## Statistical Analyses

Data were analyzed using the Statistical Package for the Social Sciences for Windows, Version 20.

Because of the data being nonnormally distributed, Spearman's rho analyses were performed to examine the associations between demographic variables and symptom scores. Post hoc nonparametric tests (Mann-Whitney and Fisher's exact test) investigated relationships between diagnoses of MDD and/or PTSD and categorical sociodemographic variables. For multiple regression analyses, the number of RDP rejections was logarithmically transformed ($\log_{10}$) to establish normality. Logistic and multiple regression analyses were conducted to determine RDP and sociodemographic predictors of psychiatric diagnoses and symptom severity, respectively.

## RESULTS

The sociodemographic characteristics of the sample are shown in Table 1. The sample had a mean (SD) age of 34.6(10.63) years, with the mean (SD) time spent in the RDP being 29.4(49.3) months. The mean (SD) number of RDP rejections and potentially traumatic events (PTEs) experienced was 1.64 (2.39) and 13.1 (5.48), respectively.

Most of the sample (52.6%) had yet to receive a refugee status decision, whereas 23.7% had received one or two rejections. The same number (23.7%) had received between 3 and 11 rejections. The time spent in the RDP was positively skewed, with a median of 6 months (interquartile range, 2–19 months).

**TABLE 2.** Depression, Anxiety, and PTSD Symptom Scores and Caseness

| | *n* | Symptom Score, Median (IQR) | Caseness, % (*n*) |
|---|---|---|---|
| Depression | 95 | 2.67 (1.93–3.13) | 61.1 (58) |
| Anxiety | 95 | 2.10 (1.50–2.80) | N/A |
| Posttraumatic stress | 94 | 2.50 (1.88–3.00) | 52.1 (49) |

IQR indicates interquartile range.

© 2014 Lippincott Williams & Wilkins

AR004303

Copyright © 2014 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

The prevalence of psychiatric morbidity is shown in Table 2. Sixty-one percent of the sample met the cutoff score for a diagnosis of MDD (≥2.29) and 52% for PTSD (≥2.50), as validated against the MINI.

Correlations were performed between symptom scores and sociodemographic variables (Table 3). There was a significant association between number of PTEs and anxiety, depression, and posttraumatic stress. In addition, there was a moderate negative association between employment status and both anxiety and depressive symptoms. Mann-Whitney tests confirmed that being employed was associated with reduced severity of anxiety ($U = 793$, $p = 0.03$, $n = 95$) and depressive ($U = 807$, $p = 0.04$, $n = 95$) symptoms. Those who were not employed were 2.61 times more likely to be diagnosed with MDD (95% confidence interval [CI], 1.11– 6.13; $p = 0.03$, $n = 95$).

No other significant relationships were observed between the psychiatric indices and the remaining sociodemographic variables.

A logistic regression was performed to explore whether a diagnosis of PTSD and MDD could be predicted by the number of RDP rejections for those who had received at least one rejection. This was significant for PTSD ($\chi_1^2$, $n = 44 = 4.56$, $p = 0.03$), indicating that the model was able to distinguish between asylum seekers who did and asylum seekers who did not incur a diagnosis of PTSD. One or more RDP rejections explained between 9.8% (Cox and Snell $R^2$) and 13.2% (Nagelkerke $R^2$) of the variance in PTSD status and correctly classified 63.6% of cases. The odds ratio for one or more RDP rejections indicated that asylum seekers were 1.35 (95% CI, 1.00–1.84; $p = 0.05$) times more likely to develop PTSD for every additional rejection received. One or more rejections did not predict a diagnosis of MDD ($\chi_1^2 = 0.51$, $p = 0.48$, $n = 44$).

Lastly, three multiple regression analyses were conducted with the 11 sociodemographic variables (see Table 1) entered simultaneously as predictors of anxiety, depressive, and posttraumatic stress symptoms, with missing values deleted pairwise.

An initial regression analysis for each of the symptom scores as outcome variables indicated that the 11 sociodemographic variables accounted for 21.5% of variance in anxiety symptoms ($F_{11, 72} = 1.79$, $p = 0.07$), 23.5% of variance in depressive symptoms ($F_{11, 72} = 2.02$, $p = 0.04$), and 26.9% of variance in posttraumatic stress symptoms ($F_{11, 72} = 2.41$, $p = 0.01$).

Because of the large number of independent variables for the sample size, a second regression analysis was performed for each symptom scale. Predictor variables that resulted in a $p$ value below 0.1 for the initial analyses were included in subsequent regression analyses. These final results are presented in Table 4.

**TABLE 3.** Correlation Between Symptom Scores and Sociodemographic Variables

|  | Anxiety | Depression | Posttraumatic Stress |
|---|---|---|---|
| Sex | −0.03 | −0.15 | −0.03 |
| Mode of arrival | 0.08 | 0.00 | 0.02 |
| Speaks English | −0.10 | −0.07 | 0.05 |
| Country of origin | −0.08 | −0.10 | 0.11 |
| Detention | −0.04 | −0.14 | −0.17 |
| Number of PTEs | 0.27* | 0.26* | 0.31** |
| Education | 0.00 | −0.08 | −0.03 |
| Previous occupation | −0.07 | −0.03 | −0.04 |
| Employment status | −0.23* | −0.22* | −0.15 |
| Medicare | −0.08 | 0.04 | −0.10 |

*Significant at the 0.05 level.
**Significant at the 0.01 level.

**TABLE 4.** Sociodemographic Predictors of Anxiety, Depression, and PTSD Symptoms

| Symptoms | $R^2$ | Statistic | Part Correlation |
|---|---|---|---|
| Anxiety | 0.150 | $F_{4, 82} = 3.62$** |  |
| Number of PTEs |  | $t = 2.72$* | 0.28 |
| Employment status |  | $t = −2.01$* | −0.20 |
| Number of RDP rejections |  | $t = 1.88$ | 0.19 |
| Speaks English |  | $t = −1.42$ | −0.14 |
| Depression | 0.195 | $F_{5, 81} = 3.94$** |  |
| Number of PTEs |  | $t = 2.82$** | 0.28 |
| Employment status |  | $t = −2.79$** | −0.28 |
| Detention |  | $t = −1.61$ | −0.16 |
| Number of RDP rejections |  | $t = −1.51$ | 0.15 |
| Sex |  | $t = −1.51$ | −0.15 |
| PTSD | 0.231 | $F_{4, 82} = 6.17$*** |  |
| Number of PTEs |  | $t = 3.31$** | 0.32 |
| Number of RDP rejections |  | $t = 2.84$** | 0.28 |
| Employment status |  | $t = −2.38$* | −0.23 |
| Detention |  | $t = −2.20$* | −0.21 |

*Significant at the 0.05 level.
**Significant at the 0.01 level.
***Significant at the 0.001 level.

Twenty-three percent of the variance in posttraumatic stress symptom scores was accounted for by number of RDP rejections, number of PTEs, employment status, and experience of immigration detention. Number of PTEs, employment status, number of RDP rejections, detention experience, and sex accounted for 19.5% of depressive symptom scores, and number of PTEs, employment status, number of RDP rejections, and an inability to speak English accounted for 15% of anxiety symptom scores.

Number of PTEs was the most important predictor of anxiety, depression, and posttraumatic stress symptom scores, independently accounting for up to 10% of the variance for each symptom scale. Unemployment and number of RDP rejections both contributed to the models for all symptom scales and made unique contributions to posttraumatic stress symptoms of 5.3% and 7.8%, respectively.

Curiously, an experience of immigration detention ($n = 7$) was associated with lower symptom scores on depression and posttraumatic stress.

The only psychosocial predictor of psychiatric symptoms was employment status. Unemployment (with or without work rights) accounted for 4% to 7.8% of all symptom scores and was the equal biggest predictor of self-reported depressive symptoms.

## DISCUSSION

The present research represents a large Australian cross-sectional study of community-based asylum seekers. This is pertinent given the comparatively large numbers of asylum seekers currently residing in the community on bridging visas (approximately 24,000 in Australia) (Department of Immigration and Border Protection, 2014). We sought to investigate the influence of time and number of rejections in the RDP, as well as a range of psychosocial factors on the mental health of community based asylum seekers.

Psychiatric morbidity was high, in keeping with other studies of asylum seeker populations (Hallas et al., 2007; Maier et al., 2010; Silove et al., 2006), with the prevalence of PTSD and MDD being 52.1% and 61.1%, respectively. The RDP was a significant predictor of PTSD for those with one or more rejections, with increased odds of 1.35 of developing PTSD for each additional rejection received. This is a preventable risk factor given that the majority of asylum seekers are

© 2014 Lippincott Williams & Wilkins

Copyright © 2014 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

AR004304

ultimately granted protection (Department of Immigration and Citizenship, 2011, 2013).

No relationship emerged between duration in the RDP and psychiatric symptoms. There have been mixed findings with respect to length of time in the RDP and psychological distress, with some studies reporting an association (Hosking et al., 1997) and others finding no relationship (Silove et al., 1997, 2007). A Swiss study (Toscani et al., 2007) considered a reduction in posttraumatic stress symptoms of Kosovar asylum seekers living in the host country for more than six months to be suggestive of an adaptation to the stress of asylum seeking. Although recuperative living conditions during asylum seeking may influence the degree to which symptoms remit over time, the vicissitudes inherent in the RDP—particularly asylum claim rejections—may impede or disrupt adaptation.

RDP rejections may trigger fears of repatriation and, hence, a recapitulation of traumatic memories (Aron, 1992). Thus, RDP rejections may themselves function as a trauma that reaches disorder proportions as the number of rejections increase. It is well established that a central requisite for recovery from PTSD is a safe and secure environment (Herman, 1992), which appears to be undermined by RDP rejections. As noted by others (Silove et al., 2000), this finding raises important questions about the degree to which the RDP may compound stress and distress for asylum seekers caused by past trauma. Furthermore, this has particular significance for individuals exposed to high levels of trauma in their homeland, given that such individuals may be more sensitized to the effects of postmigration stress (Silove et al., 1998). Thus, our data indicate that RDP decisions have far greater relevance to PTSD than does time alone and that posttraumatic stress symptoms are likely mediated by rejections.

In contrast to RDP rejections potentially increasing an individual's vulnerability to posttraumatic symptoms, employment ameliorated psychiatric symptoms and thus served a protective function. This finding is consistent with previous research demonstrating the protective role of employment on psychological health through work's capacity to reduce stress and anxiety and increase a sense of self-agency (Paul and Moser, 2009). Furthermore, it may provide financial capacity to continue with RDP appeals and thus maintain hope. This finding is also consonant with employment potentially being more effective in restoring the mental health of asylum seekers than psychological interventions (Eastmond, 1998). It must be noted, however, that the association between unemployment and MDD may be due to impairment secondary to MDD, which may preclude sufferers from being able to work. Nevertheless, this finding has implications for policy changes associated with asylum seekers being denied work rights (Beiser and Hou, 2001; Hollander et al., 2013).

There are a number of limitations to the present research. First, being a cross-sectional study, causality of findings cannot be assumed. Second, regarding recruitment, asylum seekers are a difficult population to research, with sampling posing a particular challenge. The recruitment process attempted to maximize external validity by recruiting participants through the ASRC to reflect the broader asylum-seeking population by country of origin. The nationalities represented by the total sample comprised 37% of the total ASRC population by nationality. Between 52% and 90% of asylum seekers from the largest five "country" groups were recruited, reflecting a good representation of these five nationalities within the broader ASRC population. The ASRC member base by sex was approximately 70:30 (male:female), which was not reflected by the study sample, being 89% men. This may have introduced a sex bias into the findings.

Third, potential bias may have been introduced by individuals who agreed to participate in the hope that doing so would assist their legal case. This is unlikely given that all participants were informed from the outset that the research was independent of legal processes and that participating would neither help nor hinder their asylum case. Fourth, although it is possible that selection bias may have resulted in a higher

rate of mentally ill individuals participating in the study, the prevalence of PTSD found in this sample is similar to that reported in other studies (Hallas et al., 2007; Mueller et al., 2010; Silove et al., 2006), and comparable or higher rates of MDD in cross-sectional studies have been found elsewhere (Gerritsen et al., 2006; Mueller et al., 2010; Silove et al., 2006). Furthermore, the MINI was used because of the risk of self-report measures inflating psychiatric prevalence (Steel et al., 2009), although it is acknowledged that symptom scores were not directly validated against the MINI.

Finally, unfortunately, corroborating information regarding the number of rejections and timeframes of these was not available in every case. Although a rigorous attempt was made to verify all responses in relation to RDP status and visa conditions, data were not comprehensively vetted through immigration lawyers.

Future studies should address the aforementioned limitations through prospective study designs incorporating random sampling and psychiatric interviews to establish caseness. Samples should include equal numbers of men and women where possible.

## CONCLUSION

The relationship between mental health, time in the RDP, and number of rejections is complex. This is the first study to highlight the association between cumulative RDP rejections and sustained levels of psychiatric symptoms in community-based asylum seekers. The findings indicate that negative asylum decisions may be a better predictor of mental health than duration of the RDP. Although previous research has shown that an asylum claim rejection at the primary stage is associated with persisting high levels of psychiatric morbidity, no study has demonstrated the cumulative deleterious impact of RDP rejections on mental health beyond the primary stage and into the appeals process. The protective role of gainful employment was demonstrated by the reduced symptom severity in anxiety, depression, and posttraumatic stress in those who were working and a decreased risk of developing major depression. Hence, these data indicate that the high prevalence of psychiatric morbidity in asylum seekers may be potentially reduced through the granting of work rights and reducing the RDP rejection rate.

## ACKNOWLEDGMENTS

*The authors acknowledge the asylum seekers who participated in the study, as well as the caseworkers at ASRC for their assistance in the recruitment process.*

## DISCLOSURES

*This research was made possible by the generous financial support of EastWeb, MinterEllison Lawyers, the Myer Foundation, and the Nordia Foundation.*

*The authors declare no conflict of interest.*

## REFERENCES

American Psychiatric Association (2000) *Diagnostic and statistical manual of mental disorders* (4th, Text Revision ed). Washington, DC: American Psychiatric Publishing Inc.

Aron A (1992) Applications of psychology to the assessment of refugees seeking political asylum. *Appl Psychol.* 41:77–91.

Beiser M, Hou F (2001) Language acquisition, unemployment and depressive disorder among Southeast Asian refugees: A 10-year study. *Soc Sci Med.* 53:1321–1334.

Davis R (2006) PTSD symptom changes in refugees. *Torture.* 16:10–19.

Department of Immigration and Border Protection (2013) Asylum Trends: Australia. Retrieved from http://www.immi.gov.au/media/publications/statistics/immigration-update/asylum-trends-aus-2012-13.pdf.

Department of Immigration and Border Protection (2014) Immigration Detention and Community Statistics Summary. Retrieved from http://www.immi.gov.au/managing-australias-borders/detention/_pdf/immigration-detention-statistics-march2014.pdf.

AR004305

Copyright © 2014 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Department of Immigration and Citizenship (2011) Asylum Trends: Australia 2010–11. Retrieved from http://www.immi.gov.au/media/publications/statistics/asylum/_files/asylum-trends-aus-annual-2010-11.pdf.

Department of Immigration and Citizenship (2013) Annual Report. Retrieved from http://www.immi.gov.au/about/reports/annual/2012-13/pdf/2012-13-diac-annual-report.pdf.

Eastmond M (1998) Nationalist discourses and the construction of difference: Bosnian Muslim refugees in Sweden. *J Refug Stud*;11:161–181.

Fazel M, Wheeler J, Danesh J (2005) Prevalence of serious mental disorder in 7000 refugees resettled in western countries: A systematic review. *Lancet*. 365:1309–1314.

Gerritsen AA, Bramsen I, Devillé W, van Willigen LH, Hovens JE, van der Ploeg HM (2006) Physical and mental health of Afghan, Iranian and Somali asylum seekers and refugees living in the Netherlands. *Soc Psychiatry Psychiatr Epidemiol*. 41:18–26.

Hallas P, Hansen AR, Staehr MA, Munk-Andersen E, Jorgensen HL (2007) Length of stay in asylum centres and mental health in asylum seekers: A retrospective study from Denmark. *BMC Public Health*. 7:288–293.

Heeren M, Mueller J, Ehlert U, Schnyder U, Copiery N, Maier T (2012) Mental health of asylum seekers: A cross-sectional study of psychiatric disorders. *BMC Psychiatry*. 12:114–121. BioMed Central.

Herman J (1992) *Trauma and recovery: The aftermath of violence—From domestic abuse to political terror*. New York: HarperCollins.

Hollander A-C, Bruce D, Ekberg J, Burström B, Ekblad S (2013) Hospitalisation for depressive disorder following unemployment—differentials by gender and immigrant status: a population-based cohort study in Sweden. *J Epidemiol Community Health*. 67:875–881.

Hosking P, Murphy K, McGuire S (1997) *Asylum seekers in Australia*, Sydney, Australia: Jesuit Social Justice Centre.

Laban CJ, Gernaat H, Komproe IH, Schreuders BA, De Jong JTVM (2004) The impact of a long asylum procedure on the prevalence of psychiatric disorders in Iraqi asylum seekers in the Netherlands. *J Nerv Ment Dis*. 192:843–851.

Lecrubier Y, Sheehan DV, Weiller E, Amorim P, Bonora I, Harnett Sheehan K, Janavs J, Dunbar GC (1997) The Mini International Neuropsychiatric Interview (MINI). A short diagnostic structured interview: Reliability and validity according to the CIDI. *Eur Psychiatry*. 12:224–231.

Macleod AD, Reeve M (2005) The health status of quota refugees screened by New Zealand's Auckland Public Health Service between 1995 and 2000. *N Z Med J*. 118:1–17.

Maier T, Schmidt M, Mueller J (2010) Mental health and healthcare utilisation in adult asylum seekers. *Swiss Med Wkly*, 140, w13110. Retrieved from http://www.smw.ch/content/smw-2010-13110/ doi:10.4414/smw.2010.13110.

Mollica RF, McDonald LS, Massagli MP, Silove D (2004) *Measuring trauma, measuring torture: Instructions and guidance on the utilization of the Harvard Program in Refugee Trauma's versions of the Hopkins Symptom Checklist-25 (HSCL-25) & the Harvard Trauma Questionnaire (HTQ)*. Cambridge, MA: Harvard Program in Refugee Trauma.

Mollica RF, Wyshak G, de Marneffe D, Khuon F, Lavelle J (1987) Indochinese versions of the Hopkins Symptom Checklist-25: A screening instrument for the psychiatric care of refugees. *Am J Psychiatry*. 144:497–500.

Mueller J, Schmidt M, Staeheli A, Maier T (2010) Mental health of failed asylum seekers as compared with pending and temporarily accepted asylum seekers. *Eur J Pub Health*. 21:184–189.

Paul KI, Moser K (2009) Unemployment impairs mental health: Meta-analyses. *J Vocat Behav*. 74:264–282.

Ryan DA, Benson C, Dooley B (2008) Psychological distress and the asylum process: A longitudinal study of forced migrants in Ireland. *J Nerv Ment Dis*. 196:37–45.

Silove D, Sinnerbrink I, Field A, Manicavasagar VL, Steel Z (1997) Anxiety, depression and PTSD in asylum-seekers: Associations with pre-migration trauma and post-migration stressors. *Br J Psychiatry*. 170:351–357.

Silove D, Steel Z, McGorry P, Mohan P (1998) Trauma exposure, postmigration stressors, and symptoms of anxiety, depression and post-traumatic stress in Tamil asylum-seekers: Comparison with refugees and immigrants. *Acta Psychiatr Scand*. 97:175–181.

Silove D, Steel Z, Susljik I, Frommer N, Loneragan C, Brooks R, le Touze D, Manicavasagar VL, Coello M, Smith M, Harris E (2006) Torture, mental health status and the outcomes of refugee applications among recently arrived asylum seekers in Australia. *Int J Migration Health Soc Care*. 2:4–14.

Silove D, Steel Z, Susljik I, Frommer N, Loneragan C, Chey T, Brooks R, Le Touze D, Ceollo M, Smith M (2007) The impact of the refugee decision on the trajectory of PTSD, anxiety, and depressive symptoms among asylum seekers: A longitudinal study. *Am J Disaster Med*. 2:321–329.

Silove D, Steel Z, Watters C (2000) Policies of deterrence and the mental health of asylum seekers. *JAMA*. 284:604–611.

Staehr M, Munk-Andersen E (2006) Suicide and suicidal-behavior among asylum seekers in Denmark during the period 2001–2003. A retrospective study. *Ugeskr Laeger*. 168:1650–1653.

Steel Z, Chey T, Silove D, Marnane C, Bryant RA, van Ommeren MH (2009) Association of torture and other potentially traumatic events with mental health outcomes among populations exposed to mass conflict and displacement: A systematic review and meta-analysis. *JAMA*. 302:537–549.

Toscani L, DeRoo L, Eytan A, Gex-Fabry M, Avramovski V, Loutan L, Bovier P (2007) Health status of returnees to Kosovo: Do living conditions during asylum make a difference? *Public Health*. 121:34–44.

Watters C (2001) Emerging paradigms in the mental health care of refugees. *Soc Sci Med*. 52:1709–1718.

*© 2014 Lippincott Williams & Wilkins*

AR004306

Copyright © 2014 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

View publication stats

# FOOTNOTE 24

AR004307



**Report** National Coalition *for the* Homeless

December, 2018

# Vulnerable to Hate:

## A Survey of Bias-Motivated Violence against People Experiencing Homelessness in 2016-2017

AR004308



# VULNERABLE TO HATE:
# A Survey of Bias-Motivated Violence against People Experiencing Homelessness in 2016-2017

## A report by the National Coalition for the Homeless
### Edited by Annie Leomporra and Megan Hustings

National Coalition for the Homeless

2201 P Street, NW

Washington, D.C. 20037-1033

www.nationalhomeless.org

info@nationalhomeless.org

202-462-4822

AR004309

Cover Photo by Bryan Dozier (2014)

# Table of Contents

Executive Summary — pg. 4

Purpose — pg. 5

Methodology — pg. 5

Homelessness as Structural Violence — pg. 7

Case Summaries — pg. 10

  Lethal Attacks — pg. 11

  Non-lethal Attacks — pg. 13

Discussion — pg. 16

Conclusion — pg. 19

Appendices — pg. 21

  Appendix A: Hate Crimes vs. Vulnerable Victim Status — pg. 22

  Appendix B: Protecting the Homeless under Vulnerable Victim Status — pg. 25

  Appendix C: Legislation — pg. 27

  Appendix D: All Attacks by State — pg. 40

  Appendix E: How NCH Estimates the Total Number of Deaths — pg. 63

Acknowledgements — pg. 64

AR004310

# Executive Summary

The National Coalition for the Homeless (NCH) has documented 1,769 acts of violence against homeless individuals by housed perpetrators over the past 19 years (1999-2017). These crimes are believed to have been motivated by the perpetrators' biases against people experiencing homelessness or by their ability to target homeless people with relative ease. The crimes include an array of atrocities such as murder, beatings, rapes, and even mutilations.

NCH has found compelling data regarding the number and severity of attacks. However, the true calamity may be even worse than these reports imply. The Bureau of Justice Statistics found that "less than half (44%) of violent victimizations were reported to police in" 2016[1]. Because the homeless community is treated so poorly in our society, many attacks go unreported, and people who are homeless are far more likely to be the victim of violent crime than the general population[2]. Therefore, we do not know the full scope of these abuses. The issue of anti-homeless violence highlights the structural and economic violence served to those who have housing insecurity. The severity of these crimes necessitates policy changes, enhanced services, and legislative reforms that include homelessness in both vulnerable victim and hate crime laws.

Over the last 18 years, NCH has determined the following:

- **1,758** reported acts of violence have been committed against homeless individuals

- **476** of the victims have lost their lives as a result of the attacks

- Reported violence has occurred in **48** states, Puerto Rico, and Washington, DC

- Perpetrators of these attacks were generally male and under the age **30**

Specifically, in 2016:

- There were **83** anti-homeless attacks

- **37** of the victims of these attacks lost their lives

In 2017:

- There were **29** anti-homeless attacks

- **11** of the victims of these attacks lost their lives



*Photo by Bryan Dozier (2014)*

[1] "Criminal Victimization, 2016: Revised." *Bureau of Justice Statistics (BJS)*, 24 Oct. 2018, www.bjs.gov/index.cfm?ty=pbdetail&iid=6427.

[2] "Myths and Facts of Homelessness in Washington State." *Toolkit to Combat the Criminalization of Homelessness*, Washington Low Income Housing Alliance, www.wliha.org/toolkit.

# Purpose Statement

The main objective of this report is to educate lawmakers, advocates, and the general public about hate crimes and violence committed against the homeless community in order to bring about change and ensure the protection of civil rights for everyone, regardless of economic circumstances or housing status. As part of its mission, the National Coalition for the Homeless is committed to creating the systemic and attitudinal changes necessary to end homelessness. In order to build healthy and compassionate communities, the civil and human rights of poor people and people experiencing homelessness must be protected and enforced. At this time, there must be commitment by our lawmakers to combat bias-motivated violent acts against people who experience homelessness.

# Methodology

The data presented in this report on violent acts committed against the homeless population were gathered from a variety of sources. NCH staff collected stories from published national and local news reports. Homeless advocates and local service providers across the country provided information about incidents in their local communities. Finally, this report relied on the voices of homeless individuals and formerly homeless people, who self-reported incidents they experienced firsthand.

Every reported incident was subjected to a rigorous fact-checking process, designed to evaluate and verify the accuracy of the reported events. This process entailed follow-up discussions with those closely involved with the incident. Cross-comparisons were also made with other news sources reporting the incident.

While the motive for each attack was not always evident from the information available, in many cases, there was confirmation that these violent acts were perpetrated because of a bias against the victim's housing status. Other acts were deemed opportunistic and committed merely because the victim, due to their lack of housing, was in a vulnerable position. Only attacks perpetrated by housed individuals against un-housed individuals were evaluated. Crimes committed by persons experiencing homelessness against another houseless person were excluded from this report.

Although NCH has made every effort to verify the facts regarding each incident included in this report, new information about cases may become available after its publication. For this reason, NCH constantly researches and reviews all facts related to the included data. As additional evidence emerges about prior, new, or previously unknown cases, it is the policy of NCH to adjust tabulations based on the new information.

# FBI vs. NCH Defined Hate Crime Homicides

**TABLE 1** DECLARED HATE CRIME DEATHS VS. UNDECLARED HATE CRIME DEATHS OF HOMELESS INDIVIDUALS

| Year | Homicides Classified as Hate Crimes (FBI Data) | Fatal Attacks on Homeless Individuals (NCH Data) |
|---|---|---|
| 1999 | 17 (9 racially, 2 religiously, 3 sexual orientation, 3 ethnically motivated) | 49 |
| 2000 | 19 (10 racially, 1 religiously, 2 sexual orientation, 6 ethnically motivated) | 43 |
| 2001 | 10 (4 racially, 1 sexual orientation, 5 ethically motivated) | 18 |
| 2002 | 13 (4 racially, 3 religious, 4 sexual orientation, 2 ethnically motivated) | 14 |
| 2003 | 14 (5 racially, 6 sexual orientation, 2 ethnically, 1 anti-disability motivated) | 8 |
| 2004 | 5 (3 racially, 1 religiously, 1 sexual orientation motivated) | 25 |
| 2005 | 6 (3 racially, 3 ethnically motivated) | 13 |
| 2006 | 3 (3 racially motivated) | 20 |
| 2007 | 9 (5 sexual orientation, 2 racially, 2 ethnicity motivated) | 28 |
| 2008 | 7 (5 sexual orientation, 1 racially, 1 ethnically motivated) | 22 |
| 2009 | 8 (6 racially, 1 sexual orientation, 1 ethnically motivated) | 43 |
| 2010 | 7 (1 racially, 3 religiously, 1 ethnically, 2 sexual orientation motivated) | 24 |
| 2011 | 4 (1 racially, 3 sexual orientation) | 32 |
| 2012 | 10 (1 racially, 8 religiously, 1 sexual orientation) | 18 |
| 2013 | 5 (2 racially, 2 sexual orientation, 1 ethnically motivated)) | 18 |
| 2014 | 4 (4 racially motivated) | 26 |
| 2015 | 18 (11 racially, 4 religiously, 1 sexual orientation, 2 other motivation) | 27 |
| 2016 | 9 (7 racially, 1 sexual orientation, 1 other motivation) | 37 |
| 2017 | 15 (11 racially, 1 religiously, 2 sexual orientation, 1 anti-disability) | 11 |
| **TOTAL** | **183** | **476** |

*Chart compiled with data from the Center for the Study of Hate & Extremism (California State University, San Bernardino): Analysis of Data from the F.B.I. and the National Coalition for the Homeless.*

AR004313

# Homelessness as Structural Violence

> A hate crime is defined by the U.S. Department of Justice's Federal Bureau of Investigation (FBI) as a "criminal offense committed against a person, property, or society that is motivated, in whole or in part, by the offender's bias." [3]

The Federal Bureau of Investigation (FBI) does not currently recognize a protected sta-tus for people experiencing homelessness. Over the past 18 years, NCH has recorded 1,769 incidents of crimes committed against this unprotected group. Across 2016-2017, NCH became aware of 112 attacks, 48 of which resulted in death. While this report provides alarming statistics, it is important to note that people experiencing homelessness are often treated so poorly by society that attacks are forgotten or unreported.

Hate crimes reported to police in America's ten largest cities rose 12.5 percent in 2017[4]. The increase was the fourth consecutive annual rise in a row and the highest total in over a decade according to an analysis by the Center for the Study of Hate & Extremism at California State University, San Bernardino. Coincidentally, the numbers of attacks reported against people experiencing homelessness have decreased during this time. It is likely that as political views have bifurcated, bias against federally-protected classes has become more accepted or promoted in the mainstream culture. As a result, people who are homeless, who were formally one of the only groups that it was culturally acceptable to hate, are no longer the most dehumanized of communities. Still, the data collected by NCH demonstrates that bias-motivated violence against homeless persons continues to be highly prevalent in our communities.

> In the U.S., hate crimes are committed against a group of vulnerable people who are at constant risk because they live in public spaces. Many of our local communities do not have shelter space or adequate affordable housing to meet their needs.

There is an ongoing myth that homelessness has always existed. But the current era of homelessness came to be after severe cuts to federal affordable housing programs in the 1970's and 1980's. Around the same time, the Reagan Administration deinstitutionalized residential mental health facilities, without providing for the housing and health care needs of those needing assistance to re-enter their communities. This kind of de-investment in social support systems is commonly referred to as Structural Violence.

[3] U.S. Department of Justice Federal Bureau of Investigation. "Hate Crime" http://www.fbi.gov/about-us/investigate/civilrights/hate_crimes/overview.

[4] Levin, Brian, and John David Reitzel. *Report to the Nation: Hate Crimes Rise in U.S. Cities and Counties in Time of Division & Foreign Interference.* 2018, csbs.csusb.edu/sites/csusb_csbs/files/2018 Hate Final Report 5-14.pdf.

AR004314

> According to D.D. Winter and D.C. Leighton, structural violence, "… occurs whenever people are disadvantaged by political, legal, economic or cultural traditions. Because they are longstanding, structural inequities usually seem ordinary, they way things are and always have been… structural violence is the result of societal systems, such a social stratification, that have been in place for years – systems that create situations where people don't have access to the things required to fulfill their basic human needs." [5]

Homelessness didn't just happen, we as a society chose not to ensure that all residents had access to housing. People aren't choosing to be homelessness - we are making it impossible for all people to earn a living wage and to be able to afford adequate health care. There are structures in place that have created an epidemic of income inequality and homelessness.

In its 2017 annual Point-In-Time Count, the U.S. Department of Housing and Urban Development (HUD) estimated that on any given night there were 553,742 men women and children who were homeless[6].  Another 500,000 or so formerly homeless individuals and families reside in supportive housing through HUD's homeless programs.

According to HUD's counts, almost 200,000 people are unsheltered on any given night. The National Law Center on Homelessness and Poverty has estimated 187 cities have laws that criminalize daily acts of survival for people who are forced to live outdoors[7]. These laws push a cycle of structural violence that leads to negative perceptions of people who are homeless, that further relays a general lack of compassion and action to invest in the housing and other systemic solutions to endemic poverty.

Furthermore, structural violence has not only created homelessness, but has allowed for our homeless brothers and sisters to die at an alarming rate. A growing number of cities have been releasing annual reports on the number of community members who have died while homeless. This report only documents a fraction of these deaths. The most common causes of death among people experiencing homelessness are trauma, medical conditions, and "natural causes" - most of which could be reduced with appropriate housing.



| A more accurate count? | : | 553,742 people experiencing homelessness via 2017 Point-In-Time Count | + | 503,473 recently homeless people staying in supportive housing | = | 1,057,215 people being served (or who could be served) by homeless programs |

5  Engard, Brian. "Recognizing and Addressing Structural Violence | CU Online." *Campbellsville University Online*, 30 June 2017, online.campbellsville.edu/social-work/structural-violence/.

6  Henry, Meghan, et al. "The 2017 Annual Homeless Assessment Report (AHAR) To Congress." *Department of Housing and Urban Development*, Dec. 2017, https://Www.hudexchange.info/Resources/Documents/2017-AHAR-Part-1.Pdf.

7  "Housing Not Handcuffs: Ending the Criminalization of Homelessness in U.S. Cities, *National Law Center on Homelessness and Poverty*, https://www.nlchp.org/documents/Housing-Not-Handcuffs.

AR004315

As the National Health Care for the Homeless Council points out, life expectancy for someone who is homeless can be 20-30 years younger than the general population[8]. The National Coalition for the Homeless has estimated that annually, there are 13,000 individuals who die on our streets from either direct violence, or the structural violence our society perpetrates by not ensuring they have a place to call home[9].  D.D. Winter and D.C. Leighton state that, "structural violence is problematic in and of itself… but is also dangerous because it frequently leads to direct violence…"

In this report, *Vulnerable to Hate: A Survey of Bias-Motivated Violence against People Experiencing Homelessness in 2016-2017*, we analyze the direct violence people experiencing homelessness face from the housed community. This report includes descriptions of reported occurrences of bias-motivated violence; all of which can be found in the Appendix, listed by location. This report will provide solutions for advocates and community members to help mitigate violence against our most vulnerable. Lastly, it will provide policy solutions for our lawmakers to prevent violence against homeless individuals.

**TABLE 2:  NUMBER OF INCIDENCES RECORED**



| | '99 | '00 | '01 | '02 | '03 | '04 | '05 | '06 | '07 | '08 | '09 | '10 | '11 | '12 | '13 | '14 | '15 | '16 | '17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lethal | 49 | 43 | 18 | 14 | 8 | 25 | 13 | 20 | 28 | 22 | 43 | 24 | 32 | 18 | 18 | 26 | 27 | 37 | 11 |
| Non-Lethal | 12 | 23 | 61 | 21 | 61 | 80 | 73 | 123 | 132 | 79 | 74 | 89 | 73 | 70 | 91 | 96 | 50 | 46 | 18 |
| Total | 61 | 66 | 79 | 35 | 69 | 105 | 86 | 142 | 160 | 101 | 117 | 113 | 105 | 88 | 109 | 122 | 77 | 83 | 29 |

8  "The Hard, Cold Facts About the Deaths of Homeless People," *National Health Care for the Homeless Council*, December 2016, http://www.nhchc.org/wp-content/uploads/2011/09/HardColdFacts.pdf.
9  See Appendix 1.

AR004316

# Geographical Distribution of Hate Crimes

The 112 attacks committed against individuals experiencing homelessness in 2016 and 2017 occurred across 30 states and the District of Columbia. Over the last 18 years, anti-homeless attacks have been reported in 48 states, Puerto Rico and the District of Columbia.

An astonishing 33% of attacks reported in 2016-2017 took place in California. For the first time in many years, Florida did not report one of the highest number of attaks. These two states have consistently seen high rates of violence and abuse towards their homeless populations. Over the last 18 years, NCH has recorded over 600 attacks collectively across these two states, where homeless folks tend to be more visible.

It is likely that much of the decreases in this report are due to an overall increase in the number of hate crimes against federally protectd classes since the 2016 election.

**GRAPH 1** LOCATIONS OF HATE CRIMES COMMITTED AGAINST HOMELESS INDIVIDUALS IN 2016-2017



| CALIFORNIA | 37 | GEORGIA | 3 | MICHIGAN | 2 | HAWAII | 1 |
| NEW YORK | 8 | ILLINOIS | 3 | NEW JERSEY | 2 | LOUISIANA | 1 |
| WASHINGTON | 7 | MASSACHUSETTS | 3 | NEVADA | 2 | MINNESOTA | 1 |
| OREGON | 5 | ALABAMA | 2 | OHIO | 2 | NEW MEXICO | 1 |
| TEXAS | 5 | ARKANSAS | 2 | PENNSYLVANIA | 2 | SOUTH CAROLINA | 1 |
| FLORIDA | 4 | ARIZONA | 2 | TENNESSEE | 2 | WISCONSIN | 1 |
| OKLAHOMA | 4 | INDIANA | 2 | ALASKA | 1 | | |
| COLORADO | 3 | MARYLAND | 2 | D.C. | 1 | | |

NO VIOLENT ACTS AGAINST INDIVIDUALS EXPERIENCING HOMELESSNESS WERE REPORTED IN OTHER STATES

**GRAPH 2** LOCATIONS OF HATE CRIMES COMMITTED AGAINST HOMELESS INDIVIDUALS FROM 1999-2017



| CALIFORNIA | 371 | PENNSYLVANIA | 41 | INDIANA | 25 | SOUTH CAROLINA | 15 | KANSAS | 9 | MONTANA | 5 |
| FLORIDA | 252 | NEVADA | 39 | NEW JERSEY | 25 | HAWAII | 14 | MISSISSIPPI | 9 | UTAH | 3 |
| TEXAS | 98 | MASSACHUSETTS | 36 | ALASKA | 23 | WASHINGTON, DC | 13 | NEW HAMPSHIRE | 9 | WYOMING | 3 |
| OHIO | 87 | MICHIGAN | 36 | VIRGINIA | 21 | LOUISIANA | 13 | NEBRASKA | 8 | DELAWARE | 2 |
| ILLINOIS | 61 | ARIZONA | 33 | PUERTO RICO | 20 | OKLAHOMA | 13 | RHODE ISLAND | 8 | NORTH DAKOTA | 1 |
| NEW YORK | 60 | NORTH CAROLINA | 28 | ARKANSAS | 19 | NEW MEXICO | 12 | IOWA | 7 | | |
| OREGON | 60 | TENNESSEE | 28 | MINNESOTA | 16 | SOUTH DAKOTA | 12 | WISCONSIN | 7 | | |
| COLORADO | 57 | GEORGIA | 26 | MAINE | 15 | ALABAMA | 11 | KENTUCKY | 6 | | |
| WASHINGTON | 55 | MARYLAND | 26 | MISSOURI | 15 | CONNECTICUT | 11 | WEST VIRGINIA | 6 | | |

# Demographics of Victims and Perpetrators

Victims of homeless hate crimes are most commonly middle-aged men. Between 1999 and 2017, on average, 69% of the victims were over the age of 40. Over these 18 years of tracking, 87% of victims of anti-homeless attacks were male. As we are seeing more individuals forced to live unsheltered in our communities, in 2016 and 2017, there were slightly higher numbers of female victims (17%) and victims under the age of 40 (35%).



**GRAPH 3:** VICTIM GENDER DISTRIBUTION 2016-2017

■ Male Victims  ■ Female Victims

In contrast to the victims, perpetrators of hate crimes against homeless individuals have been overwhelmingly young men, with the attacker being male 96% of the time over the last 18 years. Additionally since 1999, 72% of the perpetrators have been under the age of thirty. In 2016 and 2017, with 67% of the perpetrators being under 30-years-old, it is clear that the perpetrators of anti-homeless attacks are continuing to act at young ages.



**GRAPH 4:** PERPETRATOR AGE DISTRIBUTION 2016-2017

■ Under 30 years  ■ Over 30 years

## Summary of cases in 2016 and 2017: Lethal Attacks

In 2016 and 2017, out of 112 documented attacks, 48 victims lost their lives. These are the most egregious, and most difficult to understand acts of senseless violence, where perpetrators use weapons of all sorts to take the lives of people who were vulnerable due to their housing status. These are the most shocking of the incidents tracked over the last two years, a full summary of reported cases can be found in the Appendix.



**GRAPH 4:** LETHAL VS. NON-LETHAL INCIDENCES

AR004318

## San Francisco, California [10]
2 More Suspects Arrested in Beating Death of Homeless Man

May 22, 2016: The lifeless body of an elderly homeless man was found floating in a pond in Golden Gate Park, after having suffered a brutal, three-day-long beating before being left to die. Steven Billingsley, 19, Nikki Lee Williams, 36, Samantha Rundstrom, 19, and Michael Grasso, 26, have been charged in connection to the case.

## San Diego, California [11]
Man Attacked With Hammer in Latest Crimes Against Homeless

July 3, 2016: Angelo De Nardo, 53 and homeless, was found dead and burned in an open area of Bay Park. Police believe De Nardo was killed prior to being set on fire. Investigators initially suspected Anthony Padgett, 36 , seen on surveillance video buying gasoline at a convenience store. Padgett was arrested and later released due to lack of evidence. John D Guerrero was later arrested for a spree of violence against the homeless population in San Diego.

## Corona, California [12]
Corona Homeless Woman Killed in Brutal Attack with Knife, Bat

September 22, 2016: A homeless woman was brutally attacked in broad daylight at a store parking lot. The victim was first stabbed and then beaten to death with a bat. Steven Loia, 54, has been arrested and charged with homicide. Witnesses say that the victim did nothing to provoke Loia, as she was just standing in front of the store where Loia began stabbing her. Loia then ran away, returned with a bat, and beat her over the head repeatedly.

## Albuquerque, New Mexico [13]
Man Found Decapitated Outside ABQ Wal-Mart Was Homeless

December 21, 2016: Clifford Miller, 42, was found naked, decapitated, and missing his genitals behind a Wal-Mart by a security guard. Miller's head was not found. The police have no suspects.

## Riverside, California [14]
Homeless man hit by car to receive military funeral

February 3, 2017: A homeless man whom police say was intentionally hit by a car was buried with military honors. Raymond John Cool, a 60 year-old Navy veteran, lived in a corner of a parking lot where he was struck and killed on Feb. 3rd, 2017. The driver, 55, Lawrence Aaseng has plead not guilty to murder and assault with a deadly weapon. Authorities say Aaseng intentionally hit Cool, who was standing near a tree, then backed up and intentionally hit another car as he tried to flee.

## Portland, Oregon [15]
Homeless man killed struggled with mental illness

February 20, 2017: Jason Peterson, 32, was shot and killed when confronted by the owner of Golden Key Insurance Agency about property he had left in front of the business. Charlie Chan, the business owner who reportedly shot Jason, hasn't been charged.

## Adelphi, Maryland [16]
Boys, 13 and 14, Accused of Killing Homeless Man in Maryland

July 27, 2017: Elias Portillo, 14, and a 13 year-old boy from Prince George's County have been charged in the July 27th death of Francisco Sagastizado. On the morning of July 27th, someone found Sagastizado unresponsive with multiple stab wounds. The officers pronounced him dead. He was 47 years old. According to preliminary investigation, the boys stabbed Sagastizado when he refused to give them money.

10   Associated Press, Two More Suspects arrested in Beating Death of Homeless Man, The Washington Times, August 24, 2016, https://www.washingtontimes.com/news/2016/aug/24/2-more-suspects-arrested-in-beating-death-of -homel/

11   Arcega-Dunn, Maria, Man Attacked With Hammer In Latest Crime Against Homeless, Fox 5, July 13, 2016, http://fox5sandiego.com/2016/07/13/homeless-man-attacked-with-hammer-in-east-village/

12   Juarez, Leticia, Corona Homeless Woman Killing in Brutal Attack with Knife, Bat, ABC 7, September 22, 2016, http://abc7.com/news/corona-homeless-woman-killed-in-brutal-attack-with-knife-bat/1523337/

13   Kaplan, Elsie, Friend: Man Found Decapitated Outside ABQ Wal-Mart Was Homeless, Albuquerque Journal, December 21, 2016, https://www.abqjournal.com/913907/friend-man-found-decapitated-outside-ne-abq-walmart-was-homeless.html

14   Associated Press. "Homeless Veteran Hit by Car to Receive Military Funeral." Military.com, CodyUnderwood, www.military.com/daily-news/2017/03/01/homeless-man-hit-car-receive-military-funeral.html

15   Button, Hannah. "Homeless Man Killed Struggled with Mental Illness." KOIN, KOIN, 22 Feb. 2017, www.koin.com/news/homeless-man-killed-struggled-with-mental-illness_20171130084823341/870070909

16   Person. "Boys, 13 and 14, Accused of Killing Homeless Man in Adelphi." NBC4 Washington, NBC4 Washington, 11 Aug. 2017, www.nbcwashington.com/news/local/Boys-13-and-14-Accused-of-Killing-Homeless-Man-in-Adelphi-439680223.html

### Tulsa, Oklahoma [17]
Man Charged With Killing Homeless Tulsa Man

September 5, 2017: Jeremy Thacker ran over a group of homeless people behind the John 3:16 Mission. Shawn Birdo was killed, and in a court document a witness claims Thacker told him he saw a black man and white woman sleeping together and he "did what his brain told him to do, run them over."

## Summary of cases in 2016 and 2017: Non-Lethal Attacks

In 2016 and 2017, out of 112 documented attacks, 64 victims fortunately did not lose their lives,

many were scarred in deeper ways. Daily, people who are visibly unhoused experience harassment at the hands of housed people, city and law enforcement personnel, even by social service personnel. The non-lethal attacks reported here highlight the endemic discrimination and dehumanization of people experiencing homelessness. A full summary of reported non-lethal cases can be found in the Appendix.

## Sexual Assault

### Queens, New York [18]
Homeless man robbed, sexually abused while looking for scrap metals in Queens

February 8, 2017: Four thieves robbed a 58-year old homeless man looking for scrap metal in Queens, and then molested their victim with a soda bottle. The four thieves demanded the homeless man's property. The victim said that he was just looking for scrap metal and meant no harm, but the suspects grabbed him and took his wallet. Then – in an act of sadism- they pulled the man's pants and underwear down and abused him with a Coca-Cola bottle. The victim passed out from the pain, he told police. When he woke up, the thieves who stole his wallet and his money, which amounted to $15, were gone.



### Cleveland, Ohio [19]
Homeless Woman Found in Cleveland Home Was a Victim of Forced Prostitution, Policy Say

July 5, 2016: A missing woman, 18, was held captive for four days and forced into prostitution. The unnamed woman told police she was homeless when she met a man in mid-June at a hospital in Lorrain, who she started dating. He offered to give her a room at an apartment building and she was initially concerned but eventually accepted. However, after she moved in, her boyfriend and Tangelica Ray (18 and another resident of the apartment) forced her into prostitution, trapping her in the apartment when she tried to leave. The group arranged for men to come in to have sex with the woman over the next five days. The first time it happened, the group locked the man into the room with her, where he proceeded to rape her after her refusal. On July 9th, she grabbed money from the apartment and tried to leave, but the group detained her, slamming her head into the wall, picking her up, throwing her down the stairs, and punching her repeatedly. The woman eventually escaped and ran to a mail carrier, who called 911. She was taken to the hospital for her injuries including a dislocated jaw. The group ran off before police arrived. Tangelica Ray has been charged with promoting prostitution, but no arrests have been made.

17 NewsOn6.com. "Man Charged With Killing Homeless Tulsa Man, Wants A Charge Dismissed." Oklahoma's Own News On 6, 26 Mar. 2018, www.newson6.com/story/37806668/man-charged-with-killing-homeless-tulsa-man-wants-a-charge-dismissed

18 Parascandola, Rocco, and Thomas Tracy. "Homeless Man Robbed, Sexually Abused While Looking for Scrap Metal in Queens - NY Daily News." Nydailynews.com, New York Daily News, 8 Feb. 2017, www.nydailynews.com/new-york/nyc-crime/homeless-man-robbed-sexually-abused-queens-article-1.2967401

19 Ferrise, Adam, Homeless Woman Found in Cleveland Apartment was Victim of Forced Prostitution, Police Say, Cleveland.com, September 2, 2016, http://www.cleveland.com/metro/index.ssf/2016/09.homeless_woman_found_in_cleveland.html

# Police Brutality

## San Antonio, Texas [20]
Fired San Antonio Officer Admits To Giving Poop Sandwich to Homeless Person

December 6, 2016: Matthew Luckhurst, a former San Antonio police officer, found dog poop, bread, and a container on the ground, put it in together, and set it by a homeless man as a joke to entertain his colleagues. The officer came back and threw away the poop sandwich himself. He was later fired as a result of the incident.

## Denver, Colorado [21]
Activist say video shows DPD using excessive force on an unarmed homeless man

January 18, 2017: Activists are outraged over a Denver Police body camera video that shows an officer using a Taser on an unarmed homeless man. In the video, the officer fires his Taser less than ten seconds after his first command.

# Assaults with a Deadly Weapon

## Yuma, Arizona [22]
Homeless Man Set on Fire While Sleeping

July 12, 2016: An unidentified homeless man woke up to find both of his legs set on fire during the early morning hours. The victim says he saw three men watching him when he woke up. His injuries were non-life threatening. Police are investigating.

## Nashville, Tennessee [23]
Woman shoots homeless man who asked her to move Porsche

August 26, 2017:  26 year-old Katie Quackenbush was charged with shooting 54 year-old Gerald Melton near Music Row. Metro Nashville police say Melton was disturbed by exhaust fumes and loud music coming from Quackenbush's Porsche SUV while trying to sleep at 3:00am, and asked her to move the vehicle. Police say the two began yelling at each other, and that is when Quackenbush exited the vehicle and shot Melton twice before running up the street.

# Beatings

## Pahoa, Hawaii [24]
Alleged Assailant Pleads Not Guilty in Homeless Attack

June 7, 2016: Christopher Mohrlang, 35, attacked John Hartley, 57 and homeless, while he sat in his wheelchair. Mohrlang poured ice water on a sleeping Hartley, sprayed him with mace, and punched him in the face several times. The attack was caught on video, and following public uproar, Mohrlang turned himself in. Hartley plans to pursue litigation against his attacker, who is also facing charges for attacking Kevin Jenkins, 61 and homeless, on September 23rd, 2015.

## Melbourne, Florida [25]
Melbourne police investigate homeless street beating

March 8, 2017:  a countywide alert was issued for two men who Melbourne police report struck a homeless man with their truck before beating him in broad daylight. Witnesses told police that at least two people were involved in the beating which left the man, who suffered head and leg injuries, badly bleeding in the street.

# Abduction

## Oklahoma City, Oklahoma [26]
Oklahoma City Police Looking to Identify Suspects Who Allegedly Robbed, Assaulted Homeless Man

October 12, 2016: An unnamed homeless man was walking when two men and two women pulled up in a green truck and offered him a ride. After he accepted, they took the man to a motel parking lot, where they proceeded to rob and assault him. The four suspects have not been identified.

20 Farmer, Liz, Fired San Antonio Officer Admits Giving Poop Sandwich to Homeless Person, Dallas Morning News, December, 2016, http://www.dallasnews.com/news/texas/2016/12/07/fired-san-antonio-officer-admits-giving-poop-sandwich-homeless-person
21 Kovaleski, Jennifer. "Activist Say Video Shows DPD Using Excessive Force on an Unarmed Homeless Man." 7NEWS, 19 Jan. 2017, www.thedenverchannel.com/front-range/denver/activist-say-video-shows-dpd-using-excessive-force-on-an-unarmed-homeless-man
22 Golightly, Chase, Homeless Man Set on Fire While Sleeping, July 13, 2016, KYMA, available at https://kyma.dg.te/homeless-man-set-on-fire-while-sleeping/
23 Robinson, Chelsea. "Police: Woman Shot Homeless Man Who Asked Her to Move Porsche." KOAT, KOAT, 9 Oct. 2017, www.koat.com/article/police-woman-shot-homeless-man-who-asked-her-to-move-porsche/12226540
24 Johnson, Kristen, Alleged Assailant Pleads Not Guilty IN Homeless Attack, West Hawaii Today, July 22, 2016, http://westhawaiitoday.com/news/local-news/alleged-assailant-pleads-not-guilt-homeless-attack
25 Gallop, J.D. "Melbourne Police Investigate Homeless Street Beating." Florida Today, Florida Today, 8 Mar. 2017, www.floridatoday.com/story/news/2017/03/08/melbourne-police-investigate-homeless-street-beating/98896212
26 Franklin, Dallas, Oklahoma Police Looking to Identify Suspects Who Allegedly Robbed Assaulted Homeless man, Oklahoma News 4, October 12, 2016 http://kfor.com/2016/10/12/police-looking-to-identify-suspects-who-allegedly-robbed-assalted-homeless-man/

## Harassment

Deland, Florida [27]
Woman Accused of Allowing Sons to Shoot BBs at Homeless Man

August 7, 2016: Amina El-Zayat, 36, is facing charges for allowing her sons to shoot BBs at a homeless man. The victim claims the two boys cursed him before shooting at him as he picked through a garbage can at a gas station. The boys then returned later and shot at him again. Police found the airsoft rifles in El-Zayat's vehicle. She told police that she was having trouble with homeless people rummaging through her trash at the carwash her family owns. El-Zayat was arrested for aggravated battery, contributing to delinquency of minors, and child neglect charges.

Pleasanton, California [28]
Sleeping homeless man attacked under Pleasanton overpass

August 13, 2017: A man sleeping under an overpass was injured after being shot more than once with a BB gun. The 51 year-old injured man is expected to survive, but suffered several injuries after being shot in the back and arm more than one. The assailants also hit him with a hockey stick. The police searched the area but were unable to find any suspects. They say three people were involved in the attack.

## Multimedia Exploitation

Columbus, Ohio [29]
Man Punches Homeless Man, Posts Video on Instagram

July 22, 2016: Terrance E. Pyfrom, 19, posted a video on Instagram showing him punching a 65-year-old homeless man. After the attack, the victim was taunted by a group of men including Pyfrom. Pyfrom pleaded guilty on one count of felony assault and was sentenced to four years in prison. The assistant prosecutor argued the heftier sentence was appropriate due to the nature of the unprovoked attack on a vulnerable man.

Location; uncertain [30]
Infuriating Video Shows Meek Mill Making Homeless Man Do Pushups For $20

February 25, 2017: Meek Mills, Philadelphia rapper used Instagram's Stories feature to post a series of videos showing a homeless man asking for some change. Next it shows the 29-year-old rapper telling the homeless man to do pushups for $20. The rapper stated, "We ain't going to give out no free money." The next video shows the man doing 20 pushups as Meek Mill counts.

### MULTI MEDIA EXPLOITATION: AN EXPLANATION

Multimedia exploitation of the homeless population is a severe growing problem, just as digital bullying is becoming more common among the entire population.

A decade ago, NCH mounted a campaign against a group of videos that were released under the name, "Bum Fights." These videos included homeless men beating each other up and performing dangerous stunts like banging their heads through glass windows and going down stairs in a shopping cart. The un-housed people who participated were compensated with a few dollars or a six pack of beer, and suffered severe injuries as a result of the videos. These videos degrade and stigmatize homeless persons by perpetuating the stereotype that people living in a state of homelessness are "bums" and that they have no other worth than to provide entertainment to the rest of society by causing themselves or others bodily harm. "Bum Fights," has now been viewed more than 7.7 million times, garnering about 6,490 likes by YouTube users.

It is the decision of the National Coalition for the Homeless to include multimedia exploitation in a report on hate crimes and violence against the homeless, as there have been documented cases that show the immediate correlation between watching videos that display violence toward homeless individuals, and committing "copycat" crimes against that population. These videos are foul, hateful, and unbecoming of a modern progressive society.

27   Associated Press, Woman Accused of Allowing Sons to Shoot BBs at Homeless Man, WSVN.com, August 9, 2016, http://wsvn.com/news/local/woman-accused-of-allowing-sons-to-shoot-bbs-at-homeless-man/

28  Hurd, Rick. "Sleeping Homeless Man Attacked under Pleasanton Overpass." The Mercury News, The Mercury News, 14 Aug. 2017, www.mercurynews.com/2017/08/13/homeless-man-attacked-while-sleeping-under-pleasanton-overpass/

29  Futty, John, Man Punches Homeless Man, Posts Video on Instagram, Columbus Dispatch, July 22, 2016, http://www.dispatch.com/content/stories/local/2016/07/21/man-sentenced-for-assault-on-homeless-man.html

30  Herreria, Carla. "Infuriating Video Shows Meek Mill Making Homeless Man Do Pushups For $20." The Huffington Post, TheHuffingtonPost.com, 26 Feb. 2017, www.huffingtonpost.com/entry/meek-mill-homeless-man-pus-ups_us_58b2164ae4b0780bac2a035f.

# Discussion

Structural violence, as described in the introduction, has created growing income inequality and homelessness in the United States. This ongoing structural violence can lead to direct violence when a community is thoroughly dehumanized.

There are many reasons why an individual or family becomes homeless. But whatever the circumstances, once someone begins their time on the street or in a shelter, they are or quickly become separated from the people they are most familiar with. This segregation continues as the homeless are assumed to be a "class apart". This assumption becomes a reality as those experiencing homelessness begin to receive daily survival services, such as getting clothes and food, from the same place or places which leads the housed population to perceive that all homeless people begin to look like each other.

This isolation, segregation, and feeling of being a "class apart" leads to a fear of the homeless population because they are different. The lack of education and understanding of how people become homeless helps create a distinct "otherness", which leads to an individual reaction of fear and disgust when housed individuals come across a person experiencing homelessness.

| How People Experiencing Homelessness are Dehumanized[31] |
|---|
| 1. Segregation |
| 2. Fear |
| 3. Illegal to be Poor |
| 4. The Criminal Label |
| 5. Attacked by Police |
| 6. Refused a Place to Sleep |
| 7. Property Stolen Legally |
| 8. Denied Food, Bathrooms, Health Care |
| 9. Existence Denied |
| 10. Verbally abused |
| 11. Attacked |

This fear and disgust of people experiencing homelessness has led cities and states to criminalize people without a home. In their most recent report, "Housing Not Handcuffs: Ending the Criminalization of Homelessness in U.S. Cities", The National Law Center on Homelessness & Poverty surveyed 187 cities and assessed the number of types of municipal codes that criminally or civilly criminalize life-sustaining behaviors of people experiencing homeless-ness.

31 "How Are the Homeless Dehumanized?" Anawim Christian Community, anawimcc.org/how-are-the-homeless-dehumanized/

AR004323

## CRIMINALIZING THE HOMELESS COMMUNITY

There is a documented relationship between the appearance of criminalization of homelessness laws, and the increase of hate crimes or violent acts against homeless people. In order to prove this, Florida and California will be used as case studies. Historically, many cities in these two states have enacted severe anti-camping, anti-panhandling, and anti-food sharing laws, as well as other regulations that criminalize activities related with homelessness. A high number of cities that were mentioned in NCH's periodic criminalization of homelessness reports, also have some of the most elevated numbers of incidents of hate crimes against homeless people. In fact, four of the ten meanest cities identified in 'Homes Not Handcuffs' were located in Florida and three were in California.[32] The legislative scenario constitutes one of the factors that explains why these two states hold the highest amounts of bias-motivated crimes against homeless individuals, far surpassing their closest competitors.

One possible explanation for this is the message that criminalizing homelessness sends to the general public: "Homeless people do not matter and are not worthy of living in our city." This message is blatant in the attitudes many cities have toward homeless people and can be used as an internal justification for attacking someone.

[32] The National Law Center on Homelessness & Poverty and The National Coalition for the Homeless. Homes Not Handcuffs: The Criminalization of Homelessness in U.S. Cities. July 2009.

### Examples of municipal codes that criminalize life sustaining behavior include:

- Laws that prohibit sleeping in public city-wide
- Laws that prohibit sleeping in a particular public place
- Laws that prohibit camping in public city-wide
- Laws that prohibit camping in a particular public space
- Laws that prohibit sitting/lying in a particular public space
- Laws that prohibit lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/living accommodation)
- Laws that prohibit loitering/loafing/vagrancy city-wide
- Laws that prohibit loitering/loafing in particular public places
- Laws that prohibit begging in public places
- Laws that prohibit food sharing city-wide or in particular public places (i.e. ban)

In the 187 cities surveyed by the National Law Center on Homelessness and Poverty, there are 735 of these ordinances on the books that criminalize the situation of being homeless.

Now that it is illegal to be without a home, it has been made clear that law enforcement and the motto "protect and serve" is not granted to the homeless population because they are not "truly" part of the community. This leaves a homeless individual as an easy target for police brutality and inhumane treatment from the community.

In many communities across this country it is illegal to sleep on public or private land. So on a monthly, weekly, and sometimes even daily basis someone who is homeless is woken up and told to "move along, you can't sleep here". This might not seem like a big deal, but when you have to constantly pack up your life, it wears on you. You have a high risk of losing your license, social security card, or any form of legal documentation that proves your existence. You might lose personal items such pictures of loved ones and the things that kept you safe at night, such as a tent or a sleeping bag.

Moreover, in many communities it is illegal to share food with people experiencing homelessness, and bathrooms are hard to come by. As human beings, sleep, food and personal hygiene are all life sustaining activities that we need to do to survive as a species, but are not granted to the most vulnerable, our homeless population.

As a society, we have isolated and segregated people who are experiencing homelessness, which leads to a culture of fear and disgust when encountering a person who is homeless. Culturally, we have branded the population of people who are un-housed as criminals, and in turn, denied them access to life-sustaining activities such as sleeping, access to food, and bathrooms. In other words, we have dehumanized our most vulnerable to no longer being people; but instead, easy targets, and in many cases, denying their very existence. The more we criminalize, the more we dehumanize, and the more the direct violence this vulnerable population faces on a daily basis is socially acceptable by third party community members and our municipal, county, state and federal governments.



# Conclusion

Over the past 18 years the National Coalition for the Homeless has documented over 1,700 bias-motivated violent crimes committed against homeless people by housed individuals. These attacks have cost 476 un-housed people their lives.

In this 2016-2017 report, NCH has documented 112 violent attacks against homeless individuals. 48 of these incidents resulted in death. 65% fewer attacks were reported in 2017, compared to 2016. Nationally, hate crimes against all protected and vulnerable populations have increased. It is likely that this increase has shifted news reporting away from attacks against people experiencing homelessness towards bias-motivated violence against other protected and marginalized groups.

Specific policy solutions are discussed at length in the Appendix. NCH advocates for both including people experiencing homelessness as a protected class under hate crimes statutes, or implementing vulnerable victims sentencing guidelines. Either type of initiatives would both find justice for victims and promote the humanity of all who experience homelessness.

NCH also advocates for federal, state, and city governments to conduct data collections to track violence against against homeless individuals. Arrest reports could include a box indicating if a victim was homeless, or HUD could add a victimization survey to its annual Point In Time count and service intake surveys.

Although some communities are taking positive steps toward protecting homeless individuals, NCH believes that violence against people who are homeless is a trend that will continue to grow unless there is true accountability for crimes committed, established effective methods of prevention, and positive action taken by advocates, legislators, and community members. Policy alone will not change the institutionalized fear and disgust for people experiencing homelessness that our communities have cultivated over the last 40 years. Legislative protections must be married with a cultural shift.

Cultural shift starts with daily interaction between housed and un-housed community members. We must begin to acknowledge our un-housed neighbors, and affirm our shared humanity. Try to smile and say hello as you pass someone you believe to be homeless. Ask the person their name and share your's. Recognizing a person who may have been invisible for an extended amount of time can have huge ramifications on their health and well-being.

It is critically important that we acknowledge the existence of our most marginalized community members. With compassionate and just policy change, we can end the direct violence our homeless community faces on a daily basis and begin to correct the structural violence that created endemic homelessness.



# APPENDICES

**Appendix A: Hate Crimes vs. Vulnerable Victim Status**

**Appendix B: Protecting the Homeless under Vulnerable Victim Status**

**Appendix C: Legislation**

**Appendix D: All Attacks by State**

**Appendix E: How NCH Estimates the Total Number of Deaths**

# Appendix A: Hate Crimes vs. Vulnerable Victim Status

**Hate Crime Status vs. Vulnerable Victims Status**

Brian Levin, J.D., Calif. State Univ., San Bernardino, Blevin8@aol.com

**Introduction: Hate Crime**

Beginning in the late 1970s major metropolitan areas and various states began to address hate violence not only through new criminal laws but also through the formation of data collection, specialized police units, and new policies starting with Massachusetts.

In recent years, a debate has intensified about whether the criminal law should include targeted violence against the homeless in state and federal hate crime statutes and data collection efforts. Currently, almost half a dozen states include homeless status in their hate crime laws, although attempts at the federal level and in other states have stalled (Stoops, 2014). Hate crimes are discriminatory criminal acts committed because of an individual's actual or perceived membership in a particular socially identifiable status group. Status characteristics are those material attributes, like race or sexual orientation, common to a socially identifiable class of people. While hate crime laws and other modern legal protections on the basis of status are relatively recent enactments, their roots extend to the post–civil war era constitutional amendments.

**Federal Law**

The federal government does not protect the homeless in hate crime law (18 U.S.C. 249) or enumerate anti-homeless bias incidents in its related annual hate crime data collection, it does have a definition of homelessness and a numerical estimate of people affected by it. In its 2014 Annual Homeless Assessment Report to Congress, the Department of Housing and Urban Development estimates that there are 578,424 homeless individuals nightly, with 31% of those or 177,373 being unsheltered, compared with 69% residing in shelters (Henry, Cortes, Shivji, & Buck, 2014). The U.S. population is 319 million (U.S. Census Bureau, 2015).

Federal law has defined homelessness in part as those without a "fixed, regular and adequate nighttime residence" that may include shelters and hotels as well as vehicles or public places not designed for housing,

such as campsites, parks, or transportation facilities (The McKinney-Vento Homeless Assistance Act, 2009).

The overall rate of criminal victimization for these homeless Americans is staggering, far exceeding that of other groups. A series of state and local studies and surveys cited in Senate testimony showed annual criminal victimization rates for the homeless between 34% and 81.9% ("Crimes Against America's Homeless," 2010). In contrast, in 2013 the National Crime Victimization Survey showed the overall housed population 12 years and older faced an annual rate of victimization of 1.2% for violent crime and 0.4% for serious violent crimes (Truman & Langton, 2014).

### Vulnerable Victim and Hate Crime Approaches

While there is little debate about the fact that the homeless face targeted violence, there are vastly differing views about how to address the problem. The NCH and other homeless advocates in the past promoted the inclusion of the homeless as a protected and enumerated category in hate crime laws and data collection initiatives, while others believe such efforts are misplaced. Prejudice and stereotypes against the homeless, and the apparent role these biases play in many violent attacks, are a strong foundational argument for their inclusion in hate crime laws, supporters contend.

Oppression and prejudice against them as a socially identifiable class Identical offenders such as bigoted skinheads, neighborhood defenders protecting their turf, as well as young male thrill offenders who share identifiable characteristics and motivations Identical methods of attack that revolve around personal or imprecise weapons that cause substantial suffering frequently hostile or ineffective legal response to protect them. Steiner (2009), observes,

> Thus assuming homelessness were included as a prohibited bias motivation, the prosecutor would be required to show that the victimization occurred not merely because the victim was homeless, but rather because of a pre-existing negative attitude toward homelessness, a high standard to be sure. (p. 38)

In contrast, federal vulnerable victim sentencing law's broad range arguably could already cover homelessness:

"Vulnerable victim" means a person (A) who is a victim of the offense of conviction . . . and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. (U.S.S.G. § 3A1.1, comment, [n.2])

Still, the most legally unambiguous wording would be a specific statutory enumeration of homelessness as a protected status in vulnerable victim law. Such inclusion only requires a showing that the victim was homeless when targeted, without the necessity of delving into motive at all. Alaska is the only state to address the issue in this way:

5) the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, disability, ill health, homelessness, or extreme youth or was for any other reason substantially incapable of exercising normal physical or mental powers of resistance . . . (Alaska Stat. § 12.55.155)

*Author Bio:*

*Brian Levin is a professor of criminal justice at California State University, San Bernardino, where his the director of the Center for the Study of Hate and Extremism. He has testified before both houses of Congress and various state legislatures on hate and extremism. He is also the principal author of various United States Supreme Court amicus briefs on hate crimes. He received his JD from Stanford Law School where he was awarded the Block Civil Liberties Award and his BA summa cum laude from the University of Pennsylvania with honors in American History.*

# Appendix B: Protecting the Homeless Under Vulnerable Victim Sentencing Guidelines

**Protecting the Homeless Under Vulnerable Victim Sentencing Guidelines**

Katherine B. O'Keefe (from William and Mary Law Review, Vol. 52, Issue 1)

Enhanced punishments are a useful tool in communicating society's condemnation of a particular type of crime. Hate crime statutes and vulnerable victim sentencing guidelines both offer enhanced punishments based on the criminal's choice of victim. Hate crimes protect self-identifying groups based on either an immutable characteristic or a characteristic that applies to everyone equally. By contrast, vulnerable victim sentencing guidelines protect those within society who are deemed more vulnerable based on a particular trait that is either set forth in the statute or delineated by the court.

The homeless deserve the extra protection of enhanced punishment. With the downturn in the economy, the flurry of housing foreclosures, and the wars in Iraq and Afghanistan, it seems likely that the homeless population is due to increase, at least in the near future. Along with this growth in population comes the increased threat of violence against the homeless. In addition to being attacked by individual members of society, the homeless are also subject to laws that criminalize their livelihood. Enhanced punishment laws reflect the notion that the homeless are not second-class citizens, and they condemn the unusually brutal crimes committed against the homeless. Although homeless advocates tend to champion the addition of the homeless to hate crime statutes, protection under vulnerable victim sentencing guidelines is a better alternative.

Protection of the homeless is better suited to a more flexible standard than that which hate crime legislation provides. Homelessness is a mutable trait that does not apply to everyone, and society is constantly trying to find ways to shrink the homeless population. In addition, the status of homelessness makes an individual physically more vulnerable to crimes than the general population. Because of these reasons, homelessness, at least on a theoretical level, is better suited to vulnerable victim sentencing guidelines.

Homelessness is better suited to protection under the vulnerable victim sentencing guideline on a practical level as well. Certain courts have already found that homelessness is a factor in rendering a victim vulnerable for purposes of the federal statute. Other factors also exist, such as whether the victim was asleep, and the victim's age, physical condition, and mental health. In addition to the homelessness of the victim, consideration of these factors would strengthen the case for applying the sentencing enhancement when the court is weighing whether to apply the standard. In jurisdictions where the catchall vulnerable victim's phrase is utilized, courts can currently begin applying the vulnerable victim sentencing guidelines. In all jurisdictions, especially those without the catchall phrase, legislatures must take steps to write new statutes that include the homeless as a protected category, or amend existing statutes. Either way, it is imperative that the legal system act to protect the most vulnerable and unfortunate in society from violent crimes. Covering the homeless under vulnerable victim sentencing guidelines is an excellent beginning to achieving that goal.

*Katherine B. O'Keefe's full article can be found at:* http://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=3362&context=wmlr

# Appendix C: Hate Crimes Legislation

> "A hate crime is one of the most despicable and prejudicial acts done onto another human being by a human being and surprisingly these acts affect homeless people in great proportions. It is imperative that we give this issue the serious attention that it deserves by including homeless people in hate crime statistics."
>
> -Congresswoman Eddie Bernice Johnson, H.R. 1136 Sponsor

## PROPOSED FEDERAL LAW

The issue of homeless hate crimes is not without hope. In addition to fighting societal beliefs and bias against homeless individuals, federal and state legislation can both bring awareness to and decrease violence against homeless individuals. Federal legislation on hate crimes against the homeless has a long history and continues to be fought for today:

### Federal Legislation Proposed in '13/'14 - H.R. 1136

The purpose of this bill is to compel the Department of Justice to grant protected status to the homeless population in the original Hate Crimes Statistics Act. If done, the Department of Justice would be obligated to acquire data from law enforcement agencies across the country on crimes committed against people experiencing homelessness. An annual summary of the findings would then be published in order to disseminate the information to the public and discourage such attacks from occurring further. H.R. 1136 is a reintroduction of H.R. 3528 (2011), H.R. 3419 (2009) and H.R. 2216 (2007).

## CURRENT FEDERAL LAWS

**The 1968 Civil Rights Act** establishes a number of criminal penalties for the use of force or intimidation to prevent the free exercise of civil rights on the basis of race, color, religion or national origin. The Act provides penalties for whoever, "by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with" another (1) "because of" that person's "race, color, religion or national origin," and (2) "because [that person] is or has been" attending a public school, serving as a juror in state court, traveling in a facility of interstate commerce, making use of a public accommodation, seeking or taking employment, or making use of the benefits of any state program. Id. § 245(b) (2). The Act also establishes penalties for whomever, "by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with" another person for (1) "participating" in federal programs or civil duties "without discrimination on account of race, color, religion or national origin," or (2) "affording another person or class of persons opportunity or protection to so participate." Id. §245(4) (A), (B).

AR004334

State and local law enforcement agencies are expressly authorized to enforce the Act. Federal prosecutions are also permitted, although these require "the certific tion in writing of the Attorney General, the Deputy Attorney General, the Associate Attorney General, or any Assistant Attorney General specially designated by the Attorney General that in his judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice…." 18 U.S.C. §245(1).

The **1990 Hate Crime Statistics Act**[33] requires the Attorney General to collect data on certain "crimes that manifest evidence of prejudice based on race, religion, disability, sexual orientation, or ethnicity, including where appropriate the crimes of murder, non-negligent manslaughter; forcible rape; aggravated assault, simple assault, intimidation; arson; and destruction, damage or vandalism of property." The Act also directed the Attorney General to establish guidelines for the collection of such data. The Attorney General delegated this task to the F.B.I., which has defined a hate crime as a "bias crime"— that is, a crime "committed against a person or property which is motivated, in whole or in part, by the offender's bias against a race, religion, disability, sexual orientation, or ethnicity/national origin."[34] Under these guidelines, crimes based on bias should be reported to the FBI by local law enforcement agen-cies if there is objective evidence that the crime was motivated wholly or partially by bias.[35]

**The Violent Crime Control and Law Enforcement Act of 1994**[36], codified as a note to 28 U.S.C. § 994, directed the United States Sentencing Commission to "promulgate guidelines or amend existing guidelines to provide sentencing enhancements of not less than three offense levels for offenses that the finder of fact at trial determines beyond a reasonable doubt are hate crimes." Under guidelines issued under this statute, a "hate crime" is defined as a "crime in which the defendant intentionally selects a victim, or in the case of a property crime, the property that is the object of the crime because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person."[37]

This is a far narrower definition than applies in the context of the data collection statute. In order for the enhancement to apply, the court or, in a jury trial, the jury, must find beyond a reasonable doubt that the defendant intentionally selected his or her victim because of the race, color, religion, national origin, ethnicity,

[33] Pub. L. No. 101-275, Apr. 23, 1990, 104 Stat. 140, as amended Pub. L. No. 103-322, 320926, Sept. 13, 1994, 108 Stat. 2131 (inserting "disability"); Pub. L. No. 104-155, 7, July 3, 1996, 110 Stat. 1394 (reautho-rizing the Act). The Act directs the Attorney General to use authority granted under 28 U.S.C. 534 to acquire hate crime data.

[34] U.S. Dept. of Justice, Fed. Bureau of Investigation, Hate Crime Data Collection Guidelines 2 (1999) [hereinafter Hate Crime Data Collection Guidelines]. Notably, the Act itself refers only to "ethnicity," however the Depart-ment of Justice has interpreted ethnicity to include both ethnicity and national origin.

[35] Hate Crime Data Collection Guidelines, supra note 2, at 4.

[36] Pub. L. No. 103-322, 280003, Sept. 13, 1994, 108 Stat. 2096.

[37] United States Sentencing Guidelines Manual 3A1.1(a) (2006). Note, however, that the Sentencing Guidelines only apply in federal court, where the defendant has committed a federal crime, a crime on federal land (including on Indian reservations), or is otherwise subject to penalties under federal law.

gender, disability, or sexual orientation of the victim or another person. If the defendant pleads guilty or no contest, the Sentencing Guidelines recommend that the court finds such facts beyond a reasonable doubt before applying the enhancement.

As the Supreme Court has recently made clear, the Guidelines are only advisory and federal sentencing judges are required to take into account other factors when sentencing defendants.[38] The impact of the sentencing enhancement law going forward may therefore be reduced.

The Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act was passed by Congress on October 22, 2009 and signed into law by President Obama on October 28, 2009. The name of the law is named after victims of hate crimes, Matthew Shepard and James Byrd. Matthew Shepard was a student who was tortured and murdered because he was gay. Since Wyoming did not recognize homosexuals as a protected population, neither perpetrator was charged with a hate crime. James Byrd, an African American, was tied to a truck and beheaded by two white supremacists. Texas did not recognize hate crimes at that time.

The bill elaborates on the 1969 Federal Civil Rights "Hate Crime" Law to include crimes motivated by a bias towards the victim's gender, sexual orientation, gender identity, or disability. The 1969 law only protected individuals traveling or participating in federally protected activaties such as going to school or voting. The Matthew Shepard Act removed this parameter, making the jurisdiction of the law far more expansive. Through a fi e million dollar allocation, federal agents are more adequately funded to assist and independently investigate hate crimes that are too complex for local authorities. Additionally, the bill mandates that the FBI track hate crimes committed against transgender individuals.

## CURRENT STATE AND CITY LAWS

Numerous jurisdictions across the country have passed Homeless Hate Crimes legislation. This section includes an analysis of a select few from around the country to present differing approaches, as well as innovative ideas for other jurisdictions to replicate in the pursuit of hate crime prevention.

### ALASKA

Courts in Alaska, from 2008 onwards, may take into account whether a defendant knew or reasonably should have known that the victim of an offense was particularly vulnerable or incapable of resistance ,due to homelessness, during sentencing. Much like Maine (pg. 27), homelessness is not categorized un-

[38] See United States v. Booker, 543 U.S. 220, 245-46 (2005) (declaring unconstitutional the statute creating mandatory Guidelines and holding Guidelines should only be applied in an advisory fashion as one of several factors to consider at sentencing); see also Gall v. United States, __ S. Ct. __, 2007 WL 4292116, at *7 (Dec. 10, 2007) (holding the Guidelines' sentencing range is a starting point for deter-mining a defendant's sentence, but the district court should not presume the range is reasonable). The factors the sentencing court must consider are enumerated in 18 U.S.C. 3553(a)(1)-(7).

der hate crime protection and therefore including homelessness as a motivating factor does not automatically result in harsher sentencing. Punishments vary depending on what degree the judge finds the victim's homelessness contributes as a factor in the crime.

*Analysis*

This law is similar to that of the Maine law (pg. 27) in that sentencing courts are granted discretion to take a hate crime against a homeless person into account when determining punishments; homelessness is not categorized under hate crime protection, and therefore including homelessness, as a motivating factor does not automatically result in harsher sentencing. Furthermore, it does not required that the state collect data on the frequency of occurance.

## CALIFORNIA

Senate Bill 1234, which was introduced in February of 2004 by State Senator Kuehl, became public law in September of the same year and went into effect in July of 2005. It is now California Penal Code 13519.64.


*Photo by Bryan Dozier (2014)*

California Penal Code 13519.64 :

*(a) The Legislature finds and declares that research, including "Special Report to the Legislature on Senate Resolution 18: Crimes Committed Against Homeless Persons" by the Department of Justice and "Hate, Violence, and Death: A Report on Hate Crimes Against People Experiencing Homelessness from 1999-2002" by the National Coalition for the Homeless demonstrate that California has had serious and unaddressed problems of crime against homeless persons, including homeless persons with disabilities.*

*(b) (1) By July 1, 2005, the Commission on Peace Officer Standards and Training, using available funding, shall develop a two-hour telecourse to be made available to all law enforcement agencies in California on crimes against homeless persons and on how to deal effectively and humanely with homeless persons, including homeless persons with disabilities. The telecourse shall include information on multimission criminal extremism, as defined in Section 13519.6. In developing the telecourse, the commission shall consult subject-matter experts including, but not limited to, homeless and formerly homeless persons in California, service providers and advocates for homeless persons in California, experts on the disabilities that homeless persons commonly suffer, the California Council of Churches, the National Coalition for the Homeless, the Senate Office of Research, and the Criminal Justice Statistics Center of the Department of Justice.*

*(2) Every state law enforcement agency, and every local law enforcement agency, to the extent that this requirement does not create a state-mandated local program cost, shall provide the telecourse to its peace officers.*

The Los Angeles Board of County Supervisors unanimously passed a resolution in March 2009 requesting that the Human Relations Commission (1) incorporate awareness of homelessness into high school and youth programs to encourage respect and humanization of homeless people; (2) create trainings for law enforcement to investigate crimes against the homeless with an eye out for evidence of bias or

discrimination against the victim due to disability; (3) track crimes of hate against the homeless in the Commissions database and monitor trends to educate the community; (4) encourage the Sheriff, District Attorney, and city/county prosecutors to track and report crimes against homeless people to help in developing actions to prevent and stop these violent acts; and (5) to work with all human relations commissions across the county to create better practices and data collection.

*Analysis*

This law is unique in requiring the Human Rights Commission to educate high school students on homelessness and coordinate local service providers. In addition, it requires law enforcement training and data collection.[39]

In FLORIDA, "homeless status" has been added to state hate crime legislation. On May 11, 2010 Governor Charlie Crist signed into law Florida House Bill 11, the Crimes against Homeless Persons Act, which reclassified offenses targeting homeless persons as hate crimes and permits perpetrators to receive stricter penalties.

*Analysis*

As with Maryland's law (pg. 28), this law utilizes the older definition of homelessness, includes homelessness as a hate crime, and enacts criminal sanc-

tions. It does not, however, require prevention plans, law enforcement training, or high school awareness education.

> "Nobody is more vulnerable. If the sole reason you beat them was because they were homeless and sleeping on a bench then that deserves extra protection."
> - Florida State Representative Ari Porth, Chairman of the Broward Legislative Delegation

MAINE added protection for homeless residents, but did not formally add homelessness as a contributing factor, under state hate crime statutes. Instead, Maine statutes allow judges to enhance sentences for crimes against certain recognized populations based on race, religion, and homelessness (aggravating factors). A judge is permitted to consider these aggravating factors but is not required to increase punishments. In addition to making homelessness an aggravating factor in sentencing, Maine has required the Board of Trustees of the Maine Criminal Justice Academy to provide law enforcement training programs specifically targeted toward dealing with the unique challenges associated with homelessness. The above changes are to be monitored by the Commissioner of Public Safety and the Attorney General.

*Analysis*

Maine paved the way for states like Maryland and Florida to add the homeless status to hate crimes legislation. Maine, unlike other states, does not require punishment for the commission of a hate crime. It

[39] Yaroslavsky and Knabe. Motion By Yaroslavsky and Knabe. Homelessness and Human Relations Committee. AGN. NO. 11. March 24, 2009.

AR004338

merely grants judges the discretion to impose stronger sentences for a hate crime. It fails to require data collection, prevention plans, law enforcement training, or high school awareness education.

MARYLAND law now recognizes homeless individuals as a protected class under enacted hate crime statutes. On May 07, 2009 Governor Martin O'Malley signed into law Maryland Senate Bill 151, the brainchild of Republican Senator Alex Mooney. The legislation protects homeless individuals from damage to their self or real property. If a crime is motivated by the race, color, religious beliefs, sexual orientation, national origin, or homeless status, the offense is punishable under the state hate crimes statute. If a perpetrator is convicted of a hate crime, a harsher punishment is imposed.

In OHIO, Cleveland passed a city ordinance in August 2008 dictating that repercussions would be elevated one degree higher than the offense for "intimidating" or harassing a homeless person due to his or her housing status.[40]

*Analysis*
Cleveland's law highlights another type of criminal sanction. Unlike laws that explicitly state sanctions for criminal behavior, this law incrementally increases fines and prison sentences based on the degree of the crime committed.

PUERTO RICO passed legislation in 2007 that was designed to give much-needed support to its homeless population. The law recognizes that on a daily basis homeless people are being exposed to insensible and abusive treatment.[41] A section of this law emphasizes the fact that people experiencing homelessness should not be discriminated against for any reason. Further, anti-discrimination will be addressed through the creation of the Multi-Sector Homeless Population Support Council, which will take action to support homeless individuals.[42] Additionally, in 2010 PS 1477 was signed into law. This bill amended Article 72 (q) of Law 149 (18 June 2004), the Penal Code of Puerto Rico, "so as to establish as an aggravating circumstance the commission of a crime motivated by prejudice towards and against the victim for being a homeless person."

RHODE ISLAND added homelessness, as a protected class under hate crime statutes, but only for reporting purposes. House Bill 7490, and companion Senate Bill 2323, were introduced on February 11, 2010 and became effective without the governor's signature on June 25, 2010. The new law requires state police to report and monitor crimes against the homeless. It also adjusted the definition of hate crimes to include that these act may be "motivated

---

[40] FindLaw. City of Cleveland Codified Ordinance No. 830-08
[41] Law 130. Concilio Multisectorial en Apoyo a la Poblacion sin Hogar. Approved September 27, 2007.
[42] *Ibid.*

AR004339

by prejudice against a person who is homeless or perceived to be homeless.

*Analysis*

Most notably, Rhode Island recognizes hate crimes against the homeless, as well as those who are perceived to be homeless. This law also goes further than those in Maryland and Florida in requiring the compilation of data regarding hate crimes against the homeless, procedures for their distribution, and data analysis. It does not, however, specify a requirement for the submittal of recommendations on how to prevent hate crimes from occurring. It further fails to require law enforcement trainings or high school awareness education.

WASHINGTON law now recognizes homelessness as a protected status under recently enacted state hate crimes legislation. On April 15, 2011, Governor Christine Gregoire signed Senate Bill 5011 into law, which adds homelessness to a list of aggravating factors for hate crime analysis, permitting a judge to impose harsher sentences. Democrat Scott White sponsored this law in response to the brutal murder of a homeless man named David Ballenger in 2000.

*Analysis*

Washington's new law will allow judges to increase the perpetrator's sentence because the victim was experiencing homelessness. Police and prosecutors, who will hold the responsibility of responding to and investigating cases, will enforce the law. The state recognizes more needs to be done before hate crimes against homeless individuals are reduced.

In Seattle, the City Council amended the city's malicious harassment statute in December 2007 to criminalize particular acts, including malicious and intentional injury or threat against a person, or destruction/damage of the person's property, because of the perception that the person is homeless.

*Analysis*

The ordinance focuses on including perceived homelessness in the criminalization of harassment. The law, however, does not include preventive methods to protect homeless individuals against such attacks or measures to educate the public on safety for the homeless population.

In WASHINGTON, D.C. legislation, passed by the City Council in 2009, clearly defines homeless individuals as a protected class from "bias-related crime."[43] Homeless individuals are protected from criminal acts, as well as attempts or conspiracies to commit assault, injury to property, murder, rape, theft, and robbery. Homelessness is defined in the ordinance using similar language to that contained in the Maryland legislation. The statute further requires the Mayor to collect and compile data on the incidence of bias-related crimes, annually publish a summary of the data, transmit the summary, and make recom-

mendations to the Council. The statute also states that the summaries may not contain information that reveals the victims' identities. Criminal sanctions in the form of fines and imprisonment are outlined in the law. Victims may also pursue relief through a civil action and may receive an injunction, reason-able, actual, or nominal damages for economic or non-economic loss, such as emotional distress, puni-tive damages, or attorney's fees.

*Analysis*

The Washington, D.C. legislation, like that of Rhode Island, includes crimes based on the actual or perceived homeless status of an individual. The law also covers "attempting…or conspiring to commit" a crime against a person or their property, and provides both criminal and civil remedies. This language broadens protections against the homeless. Furthermore, this ordinance requires the collection of data without revealing victim identities and making recommendations to the city council.

# Resource Guide

## ENACTING EFFECTIVE HATE CRIME LEGISLATION IN YOUR COMMUNITY

### i. Goals to Achieve

Hate crime legislation serves many purposes. Primarily, it seeks to punish and deter individuals from committing bias-motivated crimes. In the naming a vulnerable group, hate crime legislation makes a statement to the community that this group has the full protection of the law and is deserving of such protection. Such legislation also ensures the recognition of fundamental human rights.

While there is a clear need to include and protect homeless individuals in hate crimes legislation, cities and states across the country differ in their approaches towards accomplishing this goal. NCH believes certain concepts are essential for comprehensive and effective hate crimes legislation. This guide will begin by outlining those concepts. It continues by explaining and analyzing enacted legislation in order to understand their strengths and weakness. It also evaluates unsuccessful attempts to amend hate crimes legislation and possible reasons for those failures. Finally, this guide will pose arguments raised in opposition to the inclusion of homeless status in hate crimes legislation, as well as possible counter-arguments. In understanding these models, other jurisdictions can create their own comprehensive hate crimes legislation to ensure maximum protection for individuals experiencing homelessness.

## ii. Recommendations for Hate Crimes Legislation

NCH recognizes that different localities are governed by different laws and have varying needs. For this reason, it is important for state and local communities to determine what protections are already in place and what their goals are for proposing hate crimes legislation to protect the homeless.  NCH also believes however, that the homeless population is due certain fundamental protections and has identified concepts that are key to comprehensive hate crimes legislation at any level.  These concepts include:

1.  Recognition of the homeless or a person of "homeless status" as a protected class, thus, targeting a person due to their homeless status or perceived homeless status would qualify as violation of the law.[44]

2.  Use of a definition of homelessness in line with 42 USC § 11302 (2012) as  evised by the HEARTH Act.

3.  Inclusion of both committed hate crimes and attempts or conspiracies to commit a hate crime against a person or their property.

4.  Criminal and civil sanctions (including injunctions, reasonable actual or nominal damages for economic or non-economic loss, punitive damages, or attorney's fees) for violations of hate crime laws.

5.  Development of procedures that facilitate the data collection by law enforcement and local organizations and the distribution of the data to governing bodies while maintaining the privacy of the victims. This data should be used to create strong, supported recommendations to present to lawmakers.

6.  Requirement of law enforcement to complete trainings on how to interact effectively and respectfully with homeless populations.

7.  Coordination between law enforcement and local service providers to ensure homeless individuals receive necessary services.

8.  Awareness campaigns amongst high school students and other young people about homelessness.

[44] Most homeless hate crimes legislation that has been enacted has utilized the 2009 HUD definition of homelessness found in 42 USC 11302.  NCH advocates for the utilization of the 2012 HUD definition, which was declared in the HEARTH Act. The 2009 definition is much narrower and recognizes fewer people as homeless.

## COMMUNITY POLICY AND EDUCATION RECOMMENDATIONS

The National Coalition for the Homeless advocates for the following:

**1.** "Homeless status" to be included in the federal hate crimes statistics statute. Doing so would require the Federal Bureau of Investigation to collect data on hate-motivated violence targeted against individuals who are homeless.

In the 113th Session of Congress H.R. 1136 was introduced by U.S. Representative Eddie Bernice Johnson, seeking to add "homeless status" to the federal hate crimes statistics statute. H.R. 1136 is identical to three bills introduced in previous sessions of Congress.

2.  States with hate crime statutes to include "homeless status" within their current hate crimes framework.

3.  The U.S. Department of Justice to issue a public statement acknowledging that hate crimes and/or violence against people experiencing homelessness are a serious national problem.

4.  The U.S. Department of Justice to issue guidelines for law enforcement agencies on how to investigate and prosecute bias-motivated crimes against people experiencing homelessness.

5.  Law enforcement agencies to provide awareness training for trainees and officers about the causes and solutions to homelessness and how to deal effectively and respectfully with people experiencing homelessness in their communities.

6.  Advocates and homeless service providers to provide opportunities for people who have experienced homelessness and survived bias-motivated violence to tell their stories. The Faces of Homelessness Speakers' Bureaus (composed of homeless and formerly homeless people), which visit both public and private schools in communities for the purposes of information and education, would be one method of providing opportunities for survivors to share their stories.

7.  Federal, state, and local governments to assure adequate affordable housing and services to bring an end to homelessness in our communities, and thus create safe alternatives to living in homeless situations.

**MODEL LANGUAGE FOR ALL LEGISLATION AND RESOLUTIONS**

The following is proposed language to be used in whole or in part by local advocates to propose their own forms of homeless hate crime legislation. Local advocates are encouraged to use the whole body or the pieces of the model they deem most necessary. The model language was prepared by the National Coalition for the Homeless (NCH) and the National Law Center on Homelessness and Poverty (NLCHP). Advocates who have questions are encouraged to contact the National Coalition for the Homeless at info@nationalhomeless.org.

Whereas, hate crimes and violence against homeless persons has become a nationwide trend, 1,437 reported cases of violence against homeless people over the past 15 years (1999-2013), resulting in 375 deaths;

Whereas, the scope of prohibitions against the commission of hate crimes against certain groups of persons should include homeless persons;

Whereas, understanding violent crimes committed against homeless persons and adequate punishment for such crimes play key roles in preventing and managing violence against homeless persons; and

Whereas, law enforcement needs proper training to handle and prevent violent crimes against homeless persons;

Be it enacted:

(1) For the purposes of this legislation, a "homeless person" means an individual or member of a family as defined in 42 .S.C. § 11302 (2009) and any regulations promulgated thereafter.

(2) The state hate crimes statute shall be expanded to include homeless persons as a protected class.

(3) Prohibition on Hate Crimes against Homeless Persons – The following acts shall be deemed a hate crime and prohibited when carried out against a person on the basis that person's status as a homeless person:

(A) Assault, aggravated assault, battery, or aggravated battery upon the person; or

(B) Acts that deface, damage, or destroy or attempt to deface, damage, or destroy the personal property of the person; or

(C) Acts that result in the death of the person; or

(D) Any other crime against the person.

AR004344

(4)   Punishments for Hate Crimes against Homeless Persons –

(A)  A person convicted of aggravated assault or aggravated battery upon a homeless person based on the victim's status as a homeless person shall be sentenced to a minimum term of 3 years and fined not more than $10,000.  The person shall be ordered by the sentencing judge to make any restitution to the victim of the offense and to perform 500 hours of community service work.  Restitution and community service work shall be in addition to any fine or sentence that may be imposed and shall not be in lieu thereof.

(B)  Whenever a person is charged with committing an assault or aggravated assault or a battery or aggravated battery upon a homeless person based on the victim's status as a homeless person, the offense for which the person is charged shall be reclassified as ollows:

(1)   In the case of aggravated battery, from a felony of the second degree to a felony of the first degree.

(2)   In the case of aggravated assault, from a felony of the third degree to a felony of the second degree.

(3)   In the case of battery, from a misdemeanor of the first degree to a felony of the third degree.

(4)   In the case of assault, from a misdemeanor of the second degree to a misdemeanor of the first de ree.

(5)   State Office of the Attorney General Study -

(A) The Office of the Attorney General shall assess the extent of the problem of crimes against homeless persons and develop a plan to prevent these crimes and apprehend and prosecute the perpetrators of these crimes.

(B)  In developing the assessment and plan, the Office of the Attorney General shall consult homeless persons, service providers and advocates for homeless persons and law enforcement agencies with experience investigating crimes against homeless persons.

(6)   Law Enforcement Training on Hate Crimes against Homeless Persons –

(A)  The lead state law enforcement agency shall develop a telecourse that shall be made available to all law enforcement agencies in the state.  Every state, local, and correctional law enforcement agency shall certify that each of its officers has taken the course.  The telecourse shall address crimes against homeless persons and methods of dealing effectively and humanely with homeless per-

sons. The course shall include instruction on each of the following topics:

(1)   Information about homelessness, including causes of homelessness, its impact, and solutions to homelessness.

(2)  Indicators of hate crimes.

(3)  The impact of these crimes on the victim, the victim's family, and the community.

(4)  The assistance and compensation available to victims.

(5)   The laws dealing with hate crimes and the legal rights of, and the remedies available to, victims of hate crimes.

(6)  Law enforcement procedures, reporting, and documentation of hate crimes.

(7)  Techniques and methods to handle incidents of hate crimes.

(8)  The special problems inherent in hates crimes against homeless persons and techniques on how to deal with these special problems.

(B) The lead state law enforcement agency shall develop a protocol that law enforcement personnel are required to follow, including, but not limited, to the following:

(1)  Preventing likely hate crimes by, among other things, establishing contact with persons and communities that are likely targets, and forming and cooperating with community hate crime prevention and response networks.

(2)   Responding to reports of hate crimes, including reports of hate crimes committed under color of legal authority.

(3)  Providing victim assistance and follow up, including community follow up.

(4)  Reporting methods and procedures to track hate crimes against homeless persons.

(C) In developing the telecourse, the lead state law enforcement agency shall consult subject matter experts including, but not limited to, the following:

(1)  Homeless and formerly homeless individuals;

(2)  The National Coalition for the Homeless

(3)  Other local homeless service providers and advocates for homeless people;

(4)  Experts on the disabilities homeless persons commonly experience; and

(5)   Law enforcement agencies with experience in investigating hate crimes against homeless people.

AR004346

# Appendix D: All recorded hate crimes from 2016 and 2017 by state

(Incidents marked with a * appear earlier in the report, references from 45-136 are listed starting on page 60)

**Total Lethal Attacks: 48**

**Lethal 2016: 37**
**Lethal 2017: 11**

**Total Non-lethal: 64**

**Non-lethal attacks in 2016: 46**

**Assaults With Deadly Weapons: 18**
**Police Brutality: 5**
**Beatings: 8**
**Harassment: 8**
**Rapes/Sexual Assaults: 5**
**Media Exploitation: 1**
**Abductions: 1**

**Non-lethal attacks in 2017: 18**

**Assaults with a deadly weapon: 8**
**Police Brutality: 1**
**Beatings: 7**
**Harassment: 1**
**Rapes/Sexual Assaults 2017: 1**
**Media Exploitation: 1**

**Alaska: 1 non-lethal**

**Assaults with a deadly weapon:**

Anchorage, Alaska[45]
Man Wanted in Machete Attack at Midtown Homeless Camp Still at Large

August 22nd, 2016: Jonathan Anaruk, 19, severely injured an unarmed a homeless woman during an attempted robbery. Anaruk was attempting to steal $900 worth of another man's possessions at a homeless encampment when the woman attempted to step in. Anaruk then struck her with a machete, punched her in the face, and strangled her. The victim was severely injured and Anaruk remains at large, the subject of a police search and investigation.



GRAPH 7: DISTRIBUTION OF TYPES OF NON-LETHAL ATTACKS

**Alabama: 1 lethal, 1 non-lethal**

**Lethal:**

Birmingham, Alabama[46]
Homicide Victim Found Dead in Birmingham Homeless Camp Now Identified

August 19th, 2016: James William Griffin, 58, was found by the local police lying in a field that makes up a homeless encampment. Griffin had been shot in the arm and was pronounced dead at the scene. No arrests have been made.

**Assaults with a Deadly Weapon:**

Birmingham, Alabama[47]
Homeless Woman Stabbed in Birmingham Was Victim of Another Cruel Attack

October 7th, 2016: Ms. Alice, a homeless woman, was stabbed multiple times by a suspect that has since been taken into custody for attempted murder. Weeks earlier, someone used a mop to paint Ms. Alice's face, arms and back white while she slept. She is currently in stable condition following the knife attack. It is unclear if the incidents were linked.

**Arkansas: 2 non-lethal**

**Beatings:**

Little Rock, Arkansas[48]
2 punch homeless veteran near Little Rock gas station, steal shoes off his feet

January 9th, 2017: A homeless veteran's shoes were stolen off his feet while he was near a gas station in downtown Little Rock. The 53 year old victim told investigators he was walking down the street shortly after 5:30pm when a person approached and hit him in the face. Surveillance footage show two men in dark hoodies coming at the 53 year old before one punches the veteran in the face and the other punches him in the back. While the victim was on the ground, the two men took his black Nike shoes off his feet.

North Little Rock, Arkansas[49]
Homeless man robbed near North Little Rock Burger King by 3 assailants

January 18th, 2017: The 47 year-old homeless victim told police that robbers walked up to him as he was walking and they demanded his cellphone. When he didn't comply, the robbers punched him in the face and took his phone as well as a prepaid Visa card.

**Arizona: 1 lethal, 1 non-lethal**

**Lethal:**

Phoenix, Arizona[50]
Homeless Man Set On Fire While Sleeping

July 12th, 2016: An unidentified homeless man woke up to find both of his legs set on fire during the early morning hours. The victim says he saw three men watching him when he woke up. His injuries were non-life threatening. Police are investigating.

**Assaults with a Deadly Weapon:**

Yuma, Arizona *
Homeless Man Set On Fire While Sleeping

July 12, 2016: An unidentified homeless man woke up to find both of his legs set on fire during the early morning hours. The victim says he saw three men watching him when he woke up. His injuries were non-life threatening. Police are investigating.

**California: 26 lethal, 11 non-lethal**

**Lethal:**

San Jose, California[51]
79-Year-Old Arrested in Fatal San Jose Hit –And-Run Now Classified as Homicide

January 15, 2016: An unidentified homeless man, 62, was struck and killed by a pickup truck driven by Ernest Cervantes, 79. Cervantes it thought to have known the victim and has been arrested for homicide.

**San Francisco, California[52]**
"The Life and Death of Luis Gongora: The Police Killing Nobody Noticed"

April 7th, 2016: Luis Gongora, 45, known as "the homeless guy with the soccer ball," was shot seven times and killed by police in the Mission District. Gongora held a kitchen knife and was told by Sergeant Nate Seger and Officer Mike Mellone to, "Get on the ground!" and "Put that down!" He died from a bullet entering through the top of his skull. After police reform advocates and family members spoke out, in July Sergeant Seger voluntarily agreed to leave his position at the committee on use-of-force recommendations.

**San Francisco, California***
"2 More Suspects Arrested In Beating Death of Homeless Man"

May 22nd, 2016: The lifeless body of an elder homeless man was found floating in a pond in Golden Gate Park, after having suffered a brutal three day long beating before being left to die. Steven Billingsley, 19 Nikki Lee Williams, 36 Samantha Rundstrom, 19, and Michael Grasso 26 have been charged in connection to the case.

**San Jose, California[53]**
"Man Found Dead in San Jose Trash Can Was Killed: Police"

May 22nd, 2016: Randy Ruiz, 37 and homeless, was stabbed to death and found in a trashcan by police. Police are investigating.

**San Diego, California: ***
"Man Attacked With Hammer in Latest Crimes Against Homeless"

July 3rd, 2016: Angelo De Nardo, 53 and homeless, was found dead and burned in an open area in Bay Park. Police believe De Nardo was killed prior to being set on fire. Investigators initially suspected Anthony Padgett, 36, seen on surveillance video buying gasoline at a convenience store. Padgett was arrested and later released due to lack of evidence. John D. Guerrero was later arrested for a spree of violence against the homeless population in San Diego.

**San Diego, California[54]**
"Man Arrested in San Diego in Killings of Homeless People"

July 4th, 2016: Shawn Longley, 41, was brutally murdered by a suspect police believed had killed another homeless man the day prior. Investigators initially arrested Anthony Padgett, 36, but was later released due to lack of evidence. On July 15th, John D. Guerrero was taken into custody and charged with Longley's murder, as well as for other related incidents.

**San Diego, California[55]**
"Man Attacked With Hammer in Latest Crime Against Homeless"

July 6th, 2016: Dionicio Derek Vahidy, 23, died four days after being found in critical condition with extensive damage to his upper body and a towel covering his head that had been set on fire. Witnesses describe a man spraying an accelerant on Vahidy, igniting him, and then fleeing the scene. On July 15th John D. Guerrero was arrested in Vahidy's death, as well as for incidents involving three other homeless men.

**San Jose, California[56]**
"San Jose Police Investigating Man's Fatal Stabbing"

July 17th, 2016: Gilberto Garcia, 49 and homeless, was stabbed to death and found by police on a report of a person deceased. This follows the killing of two other homeless people in San Jose. Police are investigating the incident.

## Santa Ana, California[57]
"Homeless Man Shot by Santa Ana Police Dies From Injuries"

August 1st, 2016: Richard Gene Swihart, 32, was shot by police after they approached him while he was riding a bicycle with no shirt on, according to witnesses. Santa Ana police claimed that Swihart became hostile and entered into a physical altercation with one of the officers, later trying to grab their gun, which prompted the officer to fire multiple rounds. Swihart was struck in the upper torso and taken to a nearby hospital, where he remained in critical condition until he died of his wounds on August 14th. The Orange County District Attorney's office is investigating the incident.

## Los Angeles, California[58]
"Deputy Shoots and Kills Unarmed Homeless Man, Prompting Investigation"

August 2nd, 2016: William Bowers, 51, was fatally shot in the chest by an LA County sheriff's deputy after they attempted to stop him from questioning. Bowers was riding his bike down the street, but fled on foot when police stopped him. It is unknown why the officer used deadly force during the encounter, but the incident is under investigation.

## Fresno, California[59]
"Popular Homeless Man Killed in Hit and Run"

August 9th, 2016: A well-known homeless man was found dead after being hit by a car around 11 pm. There was no word on whether the driver would face charges.

## San Jose, California[60]
"SJ Police Seeking Answers in Rash of Homeless Slayings"
August 12th, 2016: Alejandro Sacarias, 41 and homeless, was found dead as result of blunt force trauma on a freeway connector ramp. This follows the killing of three other homeless people in San Jose. No arrests have been made.

## San Jose, California[61]
"San Jose Investigate 34th Homicide of 2016"

August 25th, 2016: Victor Trejo, 44 and homeless, was found suffering from visible injuries by the police. He was pronounced dead at the scene. This follows the killing of four other homeless people in San Jose. No arrests have been made.

## San Jose, California[62]
"Police Investigating Fourth San Jose Homicide in One Week"

August 27th, 2016: Ricardo Michel, 24 and homeless, was found suffering from a stab wound when police responded to a disturbance call. Michel was declared dead at the scene. This follows the killing of five other homeless people in San Jose. No suspects have been identified.

## Huntington Park, California[63]
"Homeless Man Shot Killed After Confrontation with Huntington Park Police: LASD"



September 1st, 2016: An unidentified, 35-40 year-old man experiencing homelessness was shot and killed after a confrontation with Huntington Park Police. Police responded to a call about a homeless man refusing to leave the area while a work crew was attempting to clear railroad tracks. The officers initially tried to use a stun gun to subdue the man, but he picked up a five-foot lead pipe while an officer attempted to handcuff him. The second officer fired his weapon and shot the man, supposedly fearing for his partner's life. There will be a routine investigation.

### San Jose, California[64]
"Body Found on Driveway Near San Jose Golf Course as Homicide Rate Surged: PD"

September 20th, 2016: Brandin Gaviola, 25 and homeless, was found by police in a driveway near a large homeless encampment, dead of at least one gunshot wound. This follows the killing of six other homeless people in San Jose. The Police have no suspects.

### Corona, California: *
"Corona Homeless Woman Killed in Brutal Attack with Knife, Bat"

September 22nd, 2016: A homeless woman was brutally attacked in broad daylight in a store parking lot. The victim was first stabbed and then beaten to death with a bat. Steven Loia, 54, has been arrested and charged with homicide. Witnesses say that the victim did nothing to provoke Loia, as she was just standing in front of the store when Loia began stabbing her. Loia then ran away, returned with a bat, and beat her over the head repeatedly.

### San Jose, California[65]
"Stabbing Victim is 8th Homeless Man Slain This Year in San Jose"

September 27th, 2016: Valentine Cortesosguera, 61, was found stabbed to death in a field by police. This follows the killings of seven other homeless people in San Jose, but the police do not suspect the incidents are related. There have been no arrests made in any of these cases.

### Milpitas, California[66]
"Homeless Man Shot to Death in Milpitas"

September 29th, 2016: Police discovered a homeless man, 47, suffering from a gunshot wound on the street after responding to reports of shots fired. He was taken to the hospital where he later died from his wounds. Authorities have not identified any suspects.

### San Jose, California[67]
"38th Homicide Reported in San Jose Near Homeless Encampment"

October 10th, 2016: A homeless man was found dead in the parking lot of a Lowe's store about 200 yards from a large homeless encampment. Police searched for the assailant but no suspects were found. The murder was part of a series of attacks on the homeless population in San Jose, during which eight other people lost their lives in 2016.

### Anaheim, California[68]
"Homeless Man Found Stabbed to Death in Anaheim"

October 27th, 2016: A homeless man was found fatally stabbed behind a restaurant in Anaheim during the early morning hours. When officers arrived to the scene, they performed CPR but the man was pronounced dead at the scene. An investigation is underway.

### Fresno, California[69]
"Known homeless man found dead in dumpster remembered"

January 18th, 2017: A homeless man who was well known in the community, but no one knew his name, was found dead near a Fresno dumpster. The man was found with trauma to his upper body by a security guard.

### Anaheim, California[70]
"Homeless man found stabbed to death near Anaheim bus stop"

January 25th, 2017: Anaheim police are investigating the stabbing death of a man whose body was found near a bus stop at a busy intersection. The man was stabbed at least once. Officers and paramedics performed CPR but the man was pronounced dead at the scene. The victim has been identified as a 49 year-old homeless man who frequented the area.

**Riverside, California \***
"Homeless man hit by car to receive military funeral"

February 3rd, 2017: A homeless man whom police say was intentionally hit by a car will be buried with military honors. Raymond John Cool, a 60 year-old Navy veteran, lived in a corner of a parking lot where he was struck and killed on Feb. 3rd, 2017. The driver, 55, Lawrence Aaseng has plead not guilty to murder and assault with a deadly weapon. Authorities say Aaseng intentionally hit Cool, who was standing near a tree, then backed up and intentionally hit another car as he tried to flee.

**Fresno, California**[71]
"Fresno Police Believe The Death Of A Homeless Woman And Knife Attack On A Homeless Man May Be Related"

February 17th, 2017: A middle aged homeless woman was found in the doorway of the Mission Life Church, bleeding from head wounds; she died before paramedics arrived.

**Fresno, California**[72]
"Downtown Fresno Homicide Highlights Disturbing Trend of Violence Against Homeless"

February 27th, 2017: The death of a homeless man who was attacked in downtown Fresno appears to be middle-aged and to have been beaten to death. Police say the man appears to be Hispanic and in his mid 50's, and has died from trauma to his upper body.

## Police Brutality:

**Santa Ana, California**[73]
"Police Shoot and Wound Homeless Man During Struggle Outside Santa Ana Civic Center"

August 1st, 2016: Police confronted Richard Gene Swihart, 32 and homeless, outside of the Santa Ana Civic Center near a homeless encampment. The encounter escalated into a physical fight, and the officers fired at least two bullets when Swihart made to grab one of the officer's guns. Swihart was struck in the upper torso and remains in critical condition following surgery. The officers were not injured. The incident follows many complaints by city officials about homeless individuals and encampments near the courthouse.

## Assault with a Deadly Weapon:

**San Francisco, California**[74]
"BART Fighting to Fire Station Agent Accused of Beating Homeless Man with Stick"

March 2nd, 2016: Surveillance video has revealed BART station attendant, Paul Bailey, stepping out of his booth as a homeless man approached during the early morning hours. As the homeless man blocked the emergency exit, Bailey took a 2-foot rod from the agent booth and beat the homeless man repeatedly. Bailey then called officers and reported to them that he had first been hit with a stick by the homeless man. Bailey has since been charged with misdemeanor brandishing and battery.

**San Diego, California**[75]
"Man Severely Wounded in Crime Against Homeless"

July 4th, 2016: Manuel Mason, 61 and homeless, was severely wounded during the early morning hours by a suspect though to have murdered three other local homeless men. This string of attacks was initially pinned on Anthony Padgett, 36, but was later attributed to John D. Guerrero.

**San Diego, California**[76]
"Man Attacked With Hammer In Latest Crime Against Homeless"

July 13th, 2016: A homeless man was attacked while he walked down the sidewalk by an unidentified male with a hammer. He was struck in the head, but his injuries were non-life threatening. The attack came during a spree of violence towards the San Diego homeless population during early July, however, the San Diego police tweeted that the attack did not seem to be connected to the other attacks.

## Beatings:

### Berkeley, California[77]

"Video Shows Berkley Homeless Man Attacked by 'Hospitality Ambassador'"

March 27th, 2016: Two homeless men were harassed and beaten in an alley by two hospitality ambassadors for a downtown business association. The two homeless men were charged with misdemeanor battery charges. Video footage of the incident emerged days later, however, revealing that the ambassador was the true aggressor, repeatedly punching one of the homeless men while the other ambassador restrained the victim's friend. The ambassador has since been fired and the second ambassador has been suspended.

### San Diego, California[78]

"Transient Believes Murder Spree Suspect Attacked Him in Hillcrest Canyon"

July 7th, 2016: A homeless man, Phillip Petrina, claims he awoke to a man smashing his hand with a rock. They had an altercation and exchanged blows before the attacker took off on a bike. Petrina suffered a crushed eye socket, fractured hand, and broken jaw. He believes this may have been an attack by serial killer John D. Guerrero. Although Petrina is convinced his attacker was Guerrero, others believe it may have been Petrina's drug dealer.

July 15th, 2016: An unidentified homeless man, 55, was found badly beaten on July 15, the last in a string of violence against the homeless in San Diego. John D. Guerrero, the suspected perpetrator of most if not all of the concentrated attacks on the homeless in San Diego, was arrested later that morning.

## Harassment:

### Buena Park, California[79]

"2 Homeless People Hurt in BB Gun Drive-By Shooting"

July 17th, 2016: Two homeless men were shot with BB guns during two separate drive by shootings. One man was shot in the face twice and taken to the hospital with non-life threatening injuries, while the other man was shot in the face while sitting at a bus stop. Authorities believe the incidents to be connected.

### San Jose, California[80]

"San Jose: Homeless Say 'Machete Jack' Slashing Their Tents"

August 11th, 2016: A small homeless population located under an overpass in San Jose have been experiencing vandalism of their personal belongings. They say that they would leave for a small amount of time and come back to their tents slashed, belongings sprawled around, and even their bike tires slashed. The attacks have happened in at least three locations in recent weeks. The victims are calling the suspect "Machete Jack" but have not reported the incidents to the police due to a lack of trust in authority.

### Los Angeles, California[81]

"L.A. Homeless Woman Posts Video Protecting Trump Walk of Fame Star"

October 27th, 2016: A video posted to YouTube shows an unidentified homeless woman being harassed and falling to the ground as she protected Donald Trump's star on the Hollywood Walk of Fame. After seeing the video , many people complained that the police didn't intervene. LAPD Officer Tony Im said the woman incited the crowd with racial slurs. LAPD had filed a battery report but has been unable to find the woman.

### Los Angeles, California[82]

"Video: Homeless Man-Sucker-Punched at Hollywood Metro Station"

December 13th, 2016: A man recording live video captured a homeless man, potentially dealing with mental illness, being suddenly punched from behind by an unknown suspect at a Metro station. The man called the police, but both the suspect and the victim had fled the scene.

### Pleasanton, California *
"Sleeping homeless man attacked under Pleasanton overpass"

August 13th, 2017: A man sleeping under an overpass was injured after being shot more than once with a BB gun. The 51 year-old injured man is expected to survive but suffered several injuries after being shot in the back and arm more than one. The assailants also hit him with a hockey stick. The police searched the area but were unable to find any suspects. They say three people were involved in the attack.

## Colorado: 1 lethal, 2 non-lethal

### Lethal:

### Denver, Colorado[83]
"Denver Prosecutors Charge Suspect with Murder in Homeless Man's Slaying"

November 5th, 2016: Mikhail Anthony Purpura, 29, shot and killed Wayland Busby, 54 and homeless, during an attempted theft. Busby had been living in a tent and was discovered there by a park ranger during a routine check of the area. Purpura has been charged with first-degree murder and aggravated robbery.

### Police Brutality:

### Denver, Colorado *
"Activist say video shows DPD using excessive force on an unarmed homeless man"

January 18th, 2017: Activists are outraged over a Denver Police body camera video that shows an officer using a Taser on an unarmed homeless man. In the video, the officer fires his Taser less than ten seconds after his first command.

### Beatings:

### Colorado Springs, Colorado[84]
"Two youths severely beat homeless man in random Colorado Springs attack"

February 9th, 2017: Colorado Springs police have arrested an 18 year-old man and a juvenile boy after they allegedly randomly attacked a homeless man found sleeping next to a woman outside a business. Raphael Woodridge, 18 was arrested for investigation of second-degree assault and attempt to influence a public servant. The homeless man was taken to a hospital with serious, but not life-threatening injuries.

## District of Columbia: 1 lethal

### Lethal:

### Washington, DC[85]
"Mourning a Brother, Family Asks for Help Solving D.C.'s First Homicide of the Year"

October 2nd, 2016: Richard Lewis, 57, was attacked early in the morning while sleeping outside of Union Station. The suspect kicked him repeatedly in the head until he passed out, and Lewis never regained consciousness, dying on January 6th, 2017. The police released a video of the person of interest, but the suspect was never found.

## Florida: 4 non-lethal

### Police Brutality:

#### Gainesville, Florida[86]
"Deputy Fired After Dash Cam Records Abuse of Homeless Man"

September 29th, 2016: Francis Dreessen, 50 and homeless, was petting his dog along a highway when a resident called in to report a "suspicious" man on the road. A police officer, Dominic Bevilacqua, arrived on the scene. As Dreessen attempted to procure his ID for the officer, the officer slammed his head on the hood of the police car and shoved him to the ground. None of his information was known until authorities reviewed dash cam footage, which recorded the brutal abuse. The officer was later fired.

### Assaults with Deadly Weapons:

#### Fort Lauderdale, Florida[87]
"Woman Stabs Homeless Woman With Box Cutter After Smoking Flakka, BSO Says"

September 7th, 2016: Marsha Lee Boothe, 25, was arrested after she smoked flakka on a bus bench and then stabbed a homeless woman with a box cutter. She has been charged with aggravated battery with a deadly weapon. Sonja King was sitting on a bus bench when Boothe sat down and started smoking flakka, a synthetic drug. When King got up and left, Boothe followed her. King asked Boothe why she was following her, but Boothe did not respond and instead began cutting King with a box cutter. She left gashes on King's arms, chest, and breast before fleeing the scene. King spent three days in the hospital where she underwent surgery for a wound on her right arm that had been cut to the bone and received two stitches across her chest. King later spotted Boothe in pubic and reported her to a deputy who arrested her.

### Harassment:

#### Deland, Florida *
"Woman Accused of Allowing Sons to Shoot BBs at Homeless Man"

August 7th, 2016: Amina El-Zayat, 36, is facing charges for allowing her sons to shoot BBs at a homeless man. The victim claims the two boys cursed him before shooting at him as he picked through a garbage can at a gas station. The boys then returned later and shot at him again. Police found the airsoft rifles in El-Zayat's vehicle. She told police that she was having trouble with homeless people rummaging though her trash at the carwash her family owns. El-Zayat was arrested for aggravated battery, contributing to delinquency of minors, and child neglect charges.

### Beatings:

#### Melbourne, Florida *
"Melbourne police investigate homeless street beating"

March 8th, 2017: a countywide alert was issued for two men who Melbourne police report struck a homeless man with their truck before beating him in broad daylight. Witnesses told police that at least two people were involved in the beating, which left the man, who suffered head and leg injuries, badly bleeding in the street.

## Georgia: 3 non-lethal

### Rape/Sexual Assault:

#### Albany, Georgia[88]
"Police Investigate Rape of Homeless Woman"

August 6th, 2016: An unnamed homeless woman sleeping outside of a motel awoke to an unknown man raping her during the early morning hours. When she attempted to resist him, he beat her with a baseball bat. Unfortunately, while this woman reported her rape to the police, another woman treated at the hospital for a similar incident would not report the attack. Police are investigating.

### Smyrna, Georgia[89]

"Georgia Pastor Charged With Alleged Sexual Abuse of 10-Year-Old Girl Staying at Homeless Shelter"

September 18th, 2016: Pastor Danny Wells was arrested and charged for rape and aggravated child molestation. An unnamed homeless girl, 10, told police she had been abused in her bed at The Garden, a recovery center for the homeless in Smyrna, Georgia. Wells was held in prison without bond.

### Assault with a Deadly Weapon:

### Cobb County, Georgia[90]

"2 Teens accused of shooting Cobb homeless man"
January 1st, 2017: Two 18 year-olds, Blake Sergel and Cody Gaines, were arrested for the alleged robbery of Robert Rodriguez a homeless man. The two 18 year-olds allegedly robbed Roberto Rodriguez for cigarettes while he was sleeping under a bridge. Sergel allegedly used a .357 magnum to demand cash. Rodriguez was left paralyzed from the waist down after a bullet hit his spine.

## Hawaii: 1 non-lethal

### Beatings:

### Pahoa, Hawaii *

"Alleged Assailant Pleads Not Guilty in Homeless Attack"

June 7th, 2016: Christopher Mohrlang, 35, attacked John Hartley, 57 and homeless, while he sat in his wheelchair. Mohrlang poured ice water on a sleeping Hartley, sprayed him with mace, and punched him in the face several times. The attack was caught on video, and following public uproar, Mohrlang turned himself in. Hartley plans to pursue litigation against his attacker, who is also facing charges for attacking Kevin Jenkins, 61 and homeless, on September 23rd, 2015.

## Ilinois: 1 lethal, 2 non-lethal

### Lethal:

### Rockford, Illinois[91]

"Homeless Man Found Beaten, Dead in Rockford 'Tent City'"

September 7th, 2016: A homeless man was found dead in a "tent city," appearing to have been severely beaten. Two people living at the camp called police and directed them to the tent of man in his late 40's who appeared unresponsive and was subsequently pronounced dead at the scene. A death investigation was launched.

### Assaults with Deadly Weapons:.

### Naperville, Illinois[92]

"Fire at Naperville Homeless Man's Camp Might Be Arson"

July 18th, 2016: Scott Huber, 66 and homeless, lost both of his tents and all of his possessions in an act of arson, including food, clothes, and data related to his many political battles with the city. Huber believed the suspect was attempting to injure him. James R. Povolo, 72 and a retired Chicago police sergeant, was arrested two weeks later for lighting the tent on fire with a cigarette.

### Chicago, Illinois[93]

"3 Charged With Stabbing Homeless Man in South Loop"

November 23rd, 2016: Officers saw Jerry Teran, 22, Julio Chavez, 22, and Francisco Arroyo, 23, beating up a homeless man, 57, and broke up the fight. The victim had been stabbed 4 times and robbed. The three men were charged with robbery and battery, and one with resistance to police. The victim was taken to the hospital in serious condition.

## Indiana: 1 lethal, 1 non-lethal

### Lethal:

Indianapolis, Indiana[94]
"IMPD Makes Arrest in Homeless Woman's Death"

November 18th, 2016: Margaret A. Means, 65, was in the process of finding affordable housing with counselors at the John Boner Neighborhood center in Indianapolis when she was found dead, bloody and wrapped in a blanket at her usual campsite. Means had suffered from multiple stab wounds. Carolyn Young, 59, was arrested in connection with the death.

### Assaults with Deadly Weapons:

Hammond, Indiana[95]
"Homeless Man Tells Police He Was Shot In Leg In Hammond"

July 27th, 2016: An unidentified homeless man, 60, thought he heard firecrackers, but realized he had been shot in the leg. A woman picked him up in her vehicle and dropped him off at a hospital around 4:30am. His injuries were non-life threatening. Police have no suspects.

## Louisiana: 1 non-lethal

### Assault with a Deadly Weapon:

New Orleans, Louisiana[96]
"Homeless man says he was shot by occupants of a gray car"

August 16th, 2017: A homeless man standing at a neighborhood bus stop said he was shot Wednesday night. The victim and witnesses said a gray car with two or three people inside pulled up and opened fire ate the man, striking him in the shoulder, and drove away. The victim refused medical treatment.

## Massachusetts: 3 non-lethal

### Assaults with Deadly Weapons:

Bridgewater, Massachusetts[97]
"Homeless Man Stabbed at Bridgewater Apartment Complex"

July 11th, 2016: Christopher Hays, 30 and homeless, was stabbed by three unidentified white males in their late-teens or early-twenties on a basketball court at 8:30pm. Hays was stabbed near his chest and armpit. His girlfriend called the police and he was transported to the hospital. Hays survived the incident. The police investigated the crime, but the suspects were not found and the motive is unknown.

Salem, Massachusetts[98]
"3 teens rob, use stun gun on homeless man, police say"

February 21st, 2017: Three teenagers are facing robbery and assault charges after attacking a homeless man. The teens ranged from 16 to 17. One of the teens put a stun gun to the man's face, and sparks could be seen while a second teen punched the man, who fell into a wall. The teens are charged with delinquency by armed robbery, larceny from a person and assault and battery on a person over 60. The 16year-old is also charged with illegal possession of a stun gun.

## Beatings:

### Salem, Massachusetts[99]
"3 arrested in connection to beating of homeless man"

January 16th, 2017: The police were called to a bridge near 1400 block of Glade Street to find 59 year-old Arthur Bloxham Jr. Bloxham Jr. told police that he was sleeping under the bridge when three people started beating him. He was taken to the hospital and placed in intensive care. On January 25th, Tremayne Jaquan Butler, was arrested on complaint of felonious assault in inflicting serious bodily injury. The investigation is ongoing.

## Maryland: 2 lethal

### Lethal:

### Baltimore, Maryland[100]
"Baltimore City Police's 'Public Enemy NO. 1' Arrested Accused of Fatally Stabbing Homeless Man"

December 7th, 2016: A homeless man, 73, was walking along a highway when he was suddenly stabbed multiple times in the abdomen. The man immediately died from his wounds. Christopher Straham, 19, was arrested after the incident and faces charges for murder, assault, robbery and dangerous weapon with intent to injure. The two are thought to have a pre-existing connection.

### Adelphi, Maryland *
"Boys, 13 and 14, Accused of Killing Homeless Man in Maryland"

July 27th, 2017: Elias Portillo, 14, and a 13 year old boy from Prince George's County have been charged in the July 27th death of Francisco Sagastizado. On the morning of July 27th, someone found Sagastizado unresponsive with multiple stab wounds. The officers pronounced him dead. He was 47 years old. According to preliminary investigation, the boys stabbed Sagastizzado when he refused to give them money.

## Michigan: 2 non-lethal

### Beatings:

### Traverse City, Michigan[101]
"Two Men Identified in Homeless Assaults Case"

July 6th, 2016: Maayingan Brauker, 19 and Timothy Boomer, 19, had been arrested and charged with aggravated assault and battery for two separate incidents levied against a group of homeless people. Brauker, Boomer, and two to three other young men threw fireworks and gravel at six sleeping homeless people during the early morning hours, injuring one, one man's eye. The following day during the early morning. Brauker and Boomer kicked, pushed and shoved a group of four homeless people aged 44-62 in the same location. One person was taken to the hospital.

### Harassment:

### Kalamazoo, Michigan[102]
"Juveniles Shoot Homeless Man in the Face With Pellet Gun After Attempted Robbery"

September 1st, 2016: An unarmed homeless man was sleeping when a group of juvenile suspects attempted to rob him. The suspects then shot him in the face multiple times with a pellet gun and ran off. The victim was treated and released from the hospital. No arrests have been made.

## Minnesota: 1 non-lethal

### Rape/Sexual Assault:

Minneapolis, Minnesota[103]
"Man Charged With Raping, Robbing Woman Near Uptown Bus Shelter

October 23rd, 2016: Elonge Akale, 21, has been arrested and charged in connection with the robbery and sexual assault of an unidentified homeless woman, 67. Akale approached the woman in the middle of the night, stole the two backpacks containing her belongings, and dragged her out of the bus shelter to a nearby wooded area. There, Akale forced the victim to perform oral sex on him for about an hour. She was later treated for injuries to her ribs and face. Akale has since been arrested and charged with first-degree criminal sexual conduct and first-degree robbery.

## New Jersey: 2 non-lethal

### Assaults with Deadly Weapons:

Clifton, New Jersey[104]
"Teen Tried to Rob Homeless Woman, Slashed Man Who Came to Her Aid, Cops Say"

July 25th, 2016: A male in his late-teens tried to rob an unidentified homeless woman, 59, attempting to steal her cell phone and cigarettes. The woman's friend, a 49-year-old homeless man, came to help her. The teen, armed with a handgun and knife, slashed the man with the knife and ran away without any of the woman's items. The victims were both treated at the scene. Police are searching for the suspect.

### Beatings:

Jersey City, New Jersey[105]
"Homeless Man, Girlfriend 'Jumped' in Jersey City: Police"

August 27th, 2016: An unnamed homeless man, 53, was found by police lying on the pavement with blood dripping from his face. The victim and his girlfriend, 40, report to have been stomped on and jumped by a group of assailants. They were taken to the hospital for treatment. No arrests were made.

## New Mexico: 1 lethal

### Lethal:

Albuquerque, New Mexico *
"Friend: Man Found Decapitated Outside ABQ Wal-Mart Was Homeless"

December 21st, 2016: Clifford Miller, 42 and homeless, was found naked, decapitated, and missing his genitals behind a Wal-Mart by a security guard. Miller's head was not found. The police have no suspects.

## Nevada: 2 lethal

### Lethal:

Las Vegas, Nevada[106]
"Mannequin sting catches suspect in Las Vegas homeless murders"

March 7th, 2017: It was 3am when a figure strode back and forth, his attention drawn to a motionless form under some blankets. The man identified by police was Shane Schindler, 30 years-old, who lifted a four-pound hammer with both hands to "generate maximum force" according to police, and brought it down on the recumbent shape "with the intent to kill".  At the same location there have been two murders of homeless men since the beginning of 2017. Daniel Aldape, 46 was found dead on January 6th still wrapped in his blankets and was a victim of blunt force trauma. David Dunn, 60, was murdered on the opposite corner on February 3rd, who also suffered extreme head trauma.  Shane Schilnder plead guilty to one count of attempted murder. He faces up to 20 years in prison.

AR004359

## New York: 2 lethal 6 non-lethal

### Lethal:

Harlem, New York[107]

"Lawyer For Store Clerk Accused of Fatally Stabbing Homeless Man, 18, in Harlem Claims Self-Defense"

October 20th, 2016: Ashton Niles, 18 and homeless, was stabbed to death with a box cutter by Cheikh Fall, 33, a local shop clerk. Fall is charged with murder, but claims his actions were out of self-defense. He is held without bail.

Manhattan, New York[108]

"Gunman Wandered Into Manhattan Deli After Bryant Park Slaying"

December 17th, 2016: Terrance Walker, 27 and homeless, was fatally shot during a dispute in Bryant Park. Walker was shot in the chest and back after exchanging punches with the gunman. The suspect lingered near the crime scene and was caught on a security camera, but remains at large.

### Rape/Sexual Assault:

New York, New York[109]

"Creep Busted for Sexually Assaulting Homeless Woman As She Slept in Financial District"

August 28th, 2016: An unnamed homeless woman, 39, awoke while sleeping outside a subway station to find an unknown man's penis in her mouth. After screaming for help, cops arrived and arrested Floriberto Chavez-Garcia, 25. He has since been charged with sexual misconduct, public lewdness, and a criminal sexual act.

### Assaults with Deadly Weapons:

Queens, New York[110]

"Police Shoot Knife-Wielding Maniac Who Killed Man, Slashed Woman, Set Homeless Person on Fire in Queens"

March 7th, 2016: A homeless man was set on fire by a deranged slasher who killed a liquor store owner, knifed a mother of four, and burned two cops with caustic liquid before he was shot, ending his rampage. James Dillon, 23, splashed the owner of the liquor store with a chemical and stabbed him before turning on Julio Bolanos, 61 and homeless. Bolanos, who helped out in the store, was doused with the liquid and set on fire. He was listed in critical condition, with a police source saying his burns were severe and had caused his skin to "peel off".

New York, New York[111]

"Homeless man stabbed in chest while playing chess in Union Square"

August 21st, 2017: A violent trio attacked and stabbed a homeless man who was playing chess in Union Square. The three men approached the 39-year-old victim who was taken to the hospital and was reported in stable condition.

"Man Repeatedly Stabs Homeless Couple on Two Bridge Waterfront, Police Say"[112]

August 21st, 2017: A man stabbed a homeless couple repeatedly on the Two Bridges waterfront. The attacker walked up to the male and female victims, both 32, and stabbed them multiple times in the torso before fleeing. The couple was taken to the hospital and in stable condition. The attacker was described as a man in his 20's, no arrests have been made.

## Beatings:

### Harlem, New York[113]

"Homeless Man Slams Harlem Shelter After Two Workers Attacked Him for Complaining About Grungy Living Conditions"

August 26th, 2016: Alexis Fleming, 34, was attacked by two workers at The Dawn family shelter after complaining for months about the facility's moldy bathrooms and cockroach-infested rooms. Efrain Echevarria, 42, and Erick Jimenez, 40, were charged with misdemeanor assault and issued desk appearance tickets, police said. Officials said that the suspects are not city workers and a new provider had been chosen to run the shelter.

## Rape/Sexual Assault:

### Queens, New York*

"Homeless man robbed, sexually abused while looking for scrap metals in Queens"

February 8th, 2017: Four thieves robbed a 58 year-old homeless man looking for scrap metal in queens-then molested their victim with a soda bottle. The four thieves demanded the homeless man's property. The victim said that he was just looking for scrap metal and meant no harm, but the suspects grabbed him and took his wallet. Then, in an act of sadism, they pulled the man's pants and underwear down and abused him with a Coca-Cola bottle. The victim passed out from the pain, he told police. When he woke up, the thieves, his wallet and his money, which amounted to about $15, were gone.

## Ohio: 2 non-lethal

## Rape/Sexual Assault:

### Cleveland, Ohio *

" Homeless Woman Found in Cleveland Home Was a Victim of Forced Prostitution, Policy Say"

July 5th, 2016: A missing woman, 18, was held captive for four days and forced into prostitution. The unnamed woman told police she was homeless when she met a man in mid-June at a hospital in Lorrain, who she started dating. He offered to give her a room at an apartment building and she was initially concerned but eventually accepted. However, after she moved in, her boyfriend and Tangelica Ray (18 and another resident of the apartment) forced her into prostitution, trapping her in the apartment when she tried to leave, the group arranged for men to come in to have sex with the woman over the next five days. The first time it happened, the group locked the ma into the room with her, where he proceeded to rape her after her refusal. On July 9th, she grabbed money from the apartment and tried to leave, but the group detained her, slamming her head into the wall, picking her up, throwing her down the stairs, and punching her repeatedly. The woman eventually escaped and ran to a mail carrier, who called 911. She  was taken to the hospital for her injuries including a dislocated jaw. The group ran off before police arrived. Tangelica Ray has been charged with promoting prostitution, but no arrests have been made.

## Multimedia Exploitation:

### Columbus, Ohio *
"Man Punches Homeless Man, Posts Video on Instagram"

July 22nd, 2016: Terrance E. Pyfrom, 19, posted a video on Instagram showing him punching a 65-year-old homeless man. After the attack, the victim was taunted by a group of men including Pyfrom. Pyfrom pleaded guilty on one count of felony assault and was sentenced to four years in prison. The assistant prosecutor argued the heftier sentence was appropriate due to the nature of the unprovoked attack on a vulnerable man.

## Oklahoma: 2 lethal, 2 non-lethal

### Lethal:

Oklahoma City, Oklahoma[114]
"Homeless Woman Dies Days After Being Shot in the Head in S.E. Oklahoma City"

October 22nd, 2016: Two people jumped out of a car and demanded cash and valuables from two homeless individuals, Beth Ann Jordan, 45, and Alexander Irvin Paton, 57. When Jordan and Payton had nothing to give, the suspects shot them. On October 26th, Jordan passed away in the hospital from her injuries. Paton was wounded and the extent of his injuries are unknown. No suspects have been identified.

Tulsa, Oklahoma *
"Man Charged With Killing Homeless Tulsa Man, Wants A Charged Dismissed"

September 5th, 2017: Jeremy Thacker ran over a group of homeless people behind the John 3:16 Mission. Shawn Birdo was killed, and in a court documents a witness claims Thacker told him he saw a black man and white woman sleeping together and he "did what his brain told him to do, run them over."

### Abductions:

Oklahoma City, Oklahoma *
"Oklahoma City Police Looking to Identify Suspects Who Allegedly Robbed, Assaulted Homeless Man"

October 12th, 2016: An unnamed homeless man was walking when two men and two women pulled up in a green truck and offered him a ride. After he accepted, they took the man to a motel parking lot, where they proceeded to rob and assault him. The four suspects have not been identified.

### Harassment:

Tulsa, Oklahoma[115]
"Tulsa Police: Homeless Man Shot in Neck with BB Gun"

July 12th, 2016: An unidentified homeless man, 48, was walking down a street when a young man shot him in the neck with a BB gun several times. The victim was taken to the hospital to treat his injuries. It is possible the attack is connected to a series of BB gun shootings that occurred a month earlier, when a group of young men shot three homeless men in one week. One man was taken to the hospital.

## Oregon: 1 lethal, 4 non-lethal

### Lethal:

Portland, Oregon *
"Homeless man killed struggled with mental illness"

February 20th, 2017: Jason Peterson, 32 was shot and killed when confronted by the owner of Golden Key Insurance Agency about property he had left in front of the business. Charlie Chan, the business owner who reportedly shot Jason, hasn't been charged.

## Police Brutality:

### Ashland, Oregon[116]
"Ashland Arrest Video: Proper Policing or Excessive Force?"

May 19th, 2016: A video posted to Facebook depicted five Ashland police officers piling on top of Charles Albert Colenaty, 31 and homeless, who is autistic. Colenaty allegedly attempted to explain to the police that their actions towards another homeless man—harassing and ticketing his friend for having an unvaccinated disability service dog in public – violated federal law. The bystander began recording video when the Ashland cop approached Colenaty and physically confronted him. A statement released by Ashland police say that the homeless man aggressively approached officers, but the video shows the police muscling Colenaty to the ground while he says he is autistic and that they were hurting him. Body camera video has been released within the police department, but has not been released to the public because it is part of a pending court case. The homeless man in question, Charles Albert Colenaty, pleaded not guilty to misdemeanor resisting arrest, interfering with a police officer, and second degree disorderly conduct charges.

## Harassment:

### Portland, Oregon[117]
"Harassed Homeless Woman: I Was Ridiculed, Yelled At"

August 24th, 2016: Korey and John Hoekstra, homeless and living in an RV, have been routinely harassed by Jeremy Kidwell, a man living nearby. Upon parking in an area with numerous other homeless residents, Kidwell threatened them, set off fireworks, and eventually left a homemade improvised pipe bomb near their RV. Kidwell was arrested and faces three felony charged. During his arrest, he admitted he was tired of the transient population.

## Assault with Deadly Weapons:

### Portland, Oregon[118]
"Man angry with homeless tosses homemade bomb under dilapidated RV, avoids jail time"

January 23rd, 2017: A 46-year-old man was upset with homeless people living in his Portland neighborhood and took action into his own hands. He made a homemade bomb under a homeless woman's dilapidated RV. Jeremy Patrick Kidwell plead guilty to unlawful manufacture of a destruction device and was sentenced to 2 years of probation.

## Beatings:

### Portland, Oregon[119]
"A Homeless Portland Student is Suing Security at Safeway for Allegedly Interrupting His Panhandling With a Beating"

April 5th, 2017: In April, Westley Foster, 19 and homeless, was beaten by Safeway security while panhandling. He was there for about 15 minutes, when two security guards dressed in blue uniforms came out to confront him. Chris Templeton approached Foster and told him he couldn't stay in front of the store. Foster says he responded that he had a right to be on the public sidewalk. During their conversation a second security guard, 19 year old Ibrahim Seraphin walked up to Foster and pushed him off the curb and into a busy street.  When Foster turned around to pick up his backpack which was used to carry his school books is when Seraphic started beating him with a baton. Seraphin and Templeton handcuffed Foster. Foster had bruises on his ribs and back from being shoved and beaten.

## Pennsylvania: 1 Lethal 1 Non-Lethal

### Lethal:

#### Coatesville, Pennsylvania[120]
"Police: Homeless Man Shot and Killed in Coatesville"

August 26th, 2016: Police discovered a man with several gunshot wounds after responding to reports of shot fired in the area. The man was pronounced dead on the scene. The victim was identified as a man experiencing homelessness, "materially and mentally lost", from a nearby county who occasionally stayed in Coatesville shelters. The perpetrator has not been identified.

### Multimedia Exploitation:

#### Location; uncertain *
"Infuriating Video Shows Meek Mill Making Homeless Man Do Pushups For $20"

February 25th, 2017: Meek Mills, Philadelphia rapper used Instagram's Stories feature to post a series of videos showing a homeless man asking for some change. Next it showed the 29 year-old rapper telling the homeless man to do pushups for $20. The rapper stated, "We ain't going to give out no free money." The next video shows the man doing 20 pushups as Meek Mill counts.

## South Carolina: 1 non-lethal

### Beating:

#### Anderson, South Carolina[121]
"Homeless 'Man on Main Street' Jessie Alexander beaten and robbed in Anderson County"

September 5th, 2017: Alexander, 74, has been homeless off and on for more than a decade. Alexander asked a resident at the Red Roof Inn (where he is also staying) to drive him to do a few errands. Alexander stated, "It started out fine, but then he sprayed mace in my eyes and hit me in the head with something and knocked me down. I tried to fight back, but I couldn't see with that mace in my eyes. I had a bag strapped on me and he cut them off. The he stole my car. He got $233 and my ID and my pills and my heart and high blood pressure". The suspect is still at large.

## Tennessee: 2 non-lethal

### Assaults with Deadly Weapons:

#### Nashville, Tennessee[122]
"Robber Uses Rock to Steal from Homeless Man in Nashville"

October 31st, 2016: An unnamed homeless man was approached from behind by an unknown stranger and hit on the head with a rock. His possessions were then stolen. The victim's injuries were minor. The police have not released any further information.

#### Nashville, Tennessee[123]
"Woman shoots homeless man who asked her to move Porsche: cops"

August 26th, 2017: Twenty Six year old Katie Quackenbush was charged with shooting 54 year-old Gerald Melton near Music Row. Metro Nashville police say Melton was disturbed by exhaust fumes and loud music coming from Quackenbush's Porsche SUV while trying to sleep at 3:00am, and asked her to move the vehicle. Police say the two began yelling at each other, and that is when Quackenbush exited the vehicle and shot Melton twice before running up the street.

## Texas: 5 non-lethal

### Police Brutality:

#### Houston, Texas[124]

"Video Released of Houston Police Beating Homeless Man"

September 15th, 2016: Daniel Reynoso and Jarius Warren, two police officers, approached Darrell Giles, a homeless man, at a light rail station. Warren hit Giles with a baton multiple times. Reynoso stopped Warren, but later helped him pin Giles to the ground. Warren pulled Giles' underpants down. Later, the two officers arrested Giles, charging him with criminal trespassing and resisting arrest. The charges were dismissed and Giles was released from jail. A surveillance video of the beating was released to the public. Following the release, Warren resigned from his position but Reynoso returned to service after additional training.

#### San Antonio, Texas[125]

"Fired San Antonio Officer Admits To Giving Poop Sandwich to Homeless Person"

December 6th, 2016: Matthew Luckhurst, a former San Antonio police officer, found dog poop, bread, and a container on the ground, put it in together, and set it by a homeless man as a joke to entertain his colleagues. The officer came back and threw away the poop sandwich himself. He was later fired as a result of the incident.

### Assaults with a Deadly Weapons:

#### San Antonio, Texas[126]

"Homeless Man Stabbed; Police Searching for Attacker"

September 6th, 2016: An unnamed homeless man was stabbed at a car wash during the middle of the night. The victim sought out a friend and was taken to the hospital in critical condition, suffering from multiple stab wounds. Police said the attacker ran away from the scene toward the parking lot of a nearby Wal-Mart and has not yet been located.

#### Amarillo, Texas[127]

"Homeless Woman Stabbed Stopping Personal Robbery"

September 17th, 2016: An unnamed homeless woman was sleeping in an alley when she felt her purse being taken away. Her boyfriend pushed the suspect away, but the suspect began swinging a knife before stabbing the woman's leg. The victim was taken to the hospital with non-life threatening injuries. Police are investigating.

#### Houston, Texas[128]

"HPD: Property owner shoots homeless person in Museum District"

August 22nd, 2017: Police say tempers flared when a homeless person stepped onto the man's property. The homeowner then opened fire, shooting the homeless person. Suspect still at large.

## Washington: 5 lethal, 2 non-lethal

### Lethal:

#### Seattle, Washington[129]

"Two dead in 'very target' shooting at camp for homeless people in Seattle"

January 26th, 2016: Two people were killed and three were injured during a shooting at "The Jungle" homeless encampment. Police believe the incident was "very targeted" and have identified two "persons of interest". One unidentified woman died on the scene, while a man died later at the hospital.

#### Auburn, Washington[130]
"Auburn Police Investigating Death of Homeless Man as a Homicide"

July 19th, 2016: An unidentified homeless man in his mid-twenties was found dead in Fenster Park. He was thought to have been living in a tent near Green River. The police believe the death was homicide and have opened an investigation.

#### Kent, Washington[131]
"Kent Police Search for Suspects After 2 Homicides at Homeless Encampment"

August 13th, 2016: Kent police discovered two homeless individuals shot to death at a local homeless encampment. The first, a woman, had been shot several times, and they found the body of a man at the same location a day later. While police did not release a possible motive, they suspect that the homicides were related, and are looking for a male suspect.

#### Seattle, Washington[132]
"Driver Accused of Killing Homeless Man in Tent Booked on Vehicular Homicide, Felony Hit-And-Run"

September 12, 2016: A homeless man was killed by a car traveling north on Interstate 5. Oscar Gutierrez-DeJesus ran over a tent where Walter L. Burton, 19 was asleep inside, then taking off on foot. Gutierrez-DeJesus, was later arrested and booked on vehicular homicide and felony hit-and-run charges.

#### Seattle, Washington[133]
"Man Fatally Shot by Officer Near Homeless Camp Identified"

October 12th, 2016: Police officers discovered two men in a knife fight during a homeless encampment sweep. When the officer tried to separate the two men, one of the police officers, Sgt. Heidi Tuttle, fired and wounded Michael L. Taylor, 41. He later died in the hospital from multiple gunshot wounds.

### Assaults with Deadly Weapons:

#### Seattle, Washington[134]
"Two Dead in 'very targeted' shooting at camp for homeless people in Seattle"

January 26th, 2016: Two people were killed and three were injured during a shooting at "The Jungle" homeless encampment. Police believe the incident was "very targeted" and have identified two "persons of interest." Two women and one man, ages ranging from 25-45, received surgery for injuries to the chest, abdomen, and back.

#### Seattle, Washington[135]
"Woman Charged with Shooting of Homeless Man in South Seattle"

June 23rd, 2016: Chrystina Atkeson approached a homeless man working at a car-detailing shop and shot the man in the stomach. Atkeson then fled the scene and the man was taken to the hospital with serious injuries. Court records state that the shooting occurred because the man owed Atkeson $100. Atkeson was charged with first-degree assault.

## Wisconsin: 1 non-lethal

### Beatings:

Madison, Wisconsin[136]
"Madison Man Arrested After Attacking Homeless Man"

August 27th, 2016: Philip McDonald, 33, was arrested for attacking a homeless man. McDonald claimed that the man provoked him, and the homeless victim suffered a broken nose and cuts that required stitches.

References for incidents in this section:

45  Klint, Chris, Man Wanted in Machete Attack in Midtown Homeless Camp Still At Large, Anchorage Daily News, August 22n 2016, available at https://www.adn.com/alaska-news/crime-/courts/2016/08/22/man-wanted-in-machete-attack-at-midtown-homeless-camp-still-at-large/

46 Robinson, Carol, Homicide Victim Found Dead in Birmingham Homeless Camp Now Identified, Al.com, August 19, 2016, available at http://www.al.com/news/birmingham/index.ssf/2016/08/homicide_victim_found_dead_in.html

47 Robinson, Carol, Homeless Woman Stabbed in Birmingham was Victim of Another cruel Attack, Al.com, October 8, 2016, available at http://www.al.com/news/birmingham/index.ssf/2016/10/homeless_woman_stabbed_in_birm.html

48 McNeary, Maggie. "Police: 2 Punch Homeless Veteran near Little Rock Gas Station, Steal Shoes off His Feet." Police: 2 Punch Homeless Veteran near Little Rock Gas Station, Steal Shoes off His Feet, 9 Jan. 2017.

49 Riddle, Brandon. "Police: Homeless Man Robbed near North Little Rock Burger King by 3 Assailants." Arkansas Online, 18 Jan. 2017, www.arkansasonline.com/news/2017/jan/18/police-homeless-man-robbed-cellphone-prepaid-visa-/.

50 Padilla, Vivian. "Phoenix Police Investigating after Homeless Man Killed, Bike Stolen." KNXV, 19 Feb. 2017, www.abc15.com/news/region-phoenix-metro/west-phoenix/police-investigating-after-homeless-man-shot-bike-stolen.

51 Bay City News, 79-Year-Old Arrested in Fatal Hit-And-Run Now Classified as a Homicide, January 22, 2016, available at https://www.nbcbayarea.com/news/local/79-Year-Old-Arrested-in-Fata-San-Jose-Hit-And-Run-Now-Classified-as-Homicide-366261401.html

52 Associated Press, Two More Suspects arrested in Beating Death of Homeless Man, The Washington Times, August 24, 2016, available at https://www.washingtontimes.com/news/2016/aug/24/2-more-suspects-arrested-in-beating-death-395181321.html

53 Mahbubani, Rhea, Man Found Dead in San Jose Trash Can Was Killed: Police, NBC Bay Area, May 22, 2016 available at https://www.nbcbayarea.com/news/local/Man-Found-Dead-in-San-Jose-Trash-Can-was-Killed-Police-380434281.html

54 Clark, Crystal, Pinellas Park mother learns son was killed in attacks on homeless in CA, Fox 13, July 8, 2016, available at: http://www.fox13news.com/news/local-news/pinellas-park-mother-learns-son-was-killed-in-attacks-on-homeless-in-ca

55 Arcega-Dunn, Maria, Man Attacked With Hammer in Latest Crime Against Homeless, Fox 5, July 13, 2016, available at http://fox5sandiego.com/2016/07/13/homeless-man-attacked-with-hammer-in-east-village/

56 NBC Bay Area Staff, San Jose Police Investigating Man's Fatal Stabbing, NBC Bay Area, July 17, 2016, available at https://www.nbcbayarea.com/news/local/San-Jose-Police-Investigating-Mans-Fatal-Stabbing-387188311.html

57 Puente, Kelly, Homeless Man Shot by Santa Ana Police Dies from Injuries, Orange County Register, September 1, 2016, available at https://www.ocregister.com/2016/09/01/homeless-man-shot-by-santa-ana-police-dies-from-injuries/

58 Winton, Richard and Branson-Potts, Hailey, Deputy Shoots and Kills Unarmed Homeless Man, Prompting Investigation, LA Times, August 3, 2016, available at http://beta.latimes.com/local/lanow/la-me-ln-castic-deputy-shooting-20160803-snap-story.html

59 Popular Homeless Man Killed In Hit and Run, Your Central Valley, August 9, 2016, available at http://www.yourcentralvalley.com/news/popular-homeless-man-killed-in-hit-and-run/528766547

60 Trujillo, Damien, and Ellison, Stephen, SJ Police Seeking Answers in Rash of Homeless Slayings, NBC Bay Area, September 28, 106 available at https://www.nbcbayarea.com/news/local/SJ-Police-Seeking-Answers-in-Rash-of-Homeless-Killings-395181321.html

61 NBC Bay Area Staff, San Jose Police Investigate 34th Homicide of 2016, NBC Bay Area, August 26, 2016 available at https://www.nbcbayarea.com/news/local/San-Jose-Police-Investigate-34th-Homicide-of-2016-391398471.html

62 Weber, Brendan, Police Investigate 4th San Jose Homicide in One Week, NBC Bay Area, August 27, 2016, available at https://www.nbcbayarea.com/news/local/Police-Investigating-Fourth-San-Jose-Homicide-in-One-Week-391501801.html

63 Turner, Mariel, and von Quednow, Cindy, Homeless Man Shot, Killed after Confrontation with Park Police: LASD, KTLA 5, September 1, 2016, available at http://ktla.com/2016/09/01/man-shot-by-huntington-park-police-condition-unknown/

64 Handa, Robert, and Redell, Bob, Body Found on Driveway Near San Jose Golf Course as Homicide Rate Surges: PD, NBC Bay Area, September 20, 2016, available at https://www.nbcbayarea.com/news/local/Body-Found-in-sidewalk-of-San-Jose-Home-Near-Encampment-Golf-Course-394139361.html

65 Ravan, Sarah, Stabbing Victim is 8th Homeless man Slain This Year in San Jose, SFGate, September 29, 2016, available at http://www.sfgate.com/crime/article/Stabbing-victim-is-8th-homeless-main-slain-this-9440931.php

66 Lyons, Jenna, Homeless Man Shot to Death in Milpitas, SFGate, September 29, 2016, available at http://www.sfgate.com/crime/article/Homeless-man-shot-to-death-in-Milpitas-9472851.php

67 Bodley, Michael, 38th Homicide Reported in San Jose Near Homeless Encampment, San Francisco Chronicle, October 11, 2016, available at http://www.sfgate.com/crime/article/38th-homicide-reported-in-San-Jose-near-homeless-9962448.php

68 DeSocio, Jeffrey Thomas, Homeless Man Found Stabbed to Death in Anaheim, Fox 11, October 27, 2016, available at http://www.foxla.com/news/local-news/homeless-man-found-stabbed-to-death-in-anaheim

69 Brise, Andrea Figueroa. "Vigil for J.D.: Homeless Man Found Dead behind Dumpster Deserved Better, Activists Say." Fresnobee, The Fresno Bee, 22 Jan. 2017, www.fresnobee.com/news/local/article128151794.html.

70  Branson-Potts, Hailey. "Homeless Man Found Stabbed to Death near Anaheim Bus Stop." Los Angeles Times, Los Angeles Times, 25 Jan. 2017, www.latimes.com/local/lanow/la-me-ln-anaheim-stabbing-20170125-story.html.

71 Haagenson, Gene. "Fresno PD Believe the Death of a Homeless Woman and Knife Attack on a Homeless Man Related." ABC30 Fresno, 18 Feb. 2017, http://abc30.com/news/fresno-pd-believe-the-death-of-a-homeless-woman-and-knife-attack-on-a-homeless-man-related/1760946/

AR004367

72 Haagenson, Gene. "Downtown Fresno Homicide Highlights Disturbing Trend of Violence against Homeless." ABC30 Fresno, 28 Feb. 2017, http://abc30.com/news/downtown-fresno-homicide-highlights-disturbing-trend-of-violence-against-homeless/1775493/.

73 Branson-Potts, Hailey, and Hamilton, Matt, Police Shoot and Wound Homeless Man During Struggle Outside Santa Ana Civic Center, LA Times, August 1, 2016, available at http://beta.latimes.com/local/lanow/la-me-ln-santa-ana-ois-20160801-snap-story.html

74 Bay City News Service, BART Fighting to Fire Station Agent Accused of Beating homeless Man With Stick, SFGate, August 17, 2016, available at http://www.sfgate.com/news/bayarea/article/Bart-Fighting-To-Fire-Station-Agent-Accused-Of-9152745.php

75 Arcega-Dunn, Maria, Man Attacked with Hammer in Latest Crime Against Homeless, Fox 5, July 13, 2016, available at http://fox5sandiego.com/2016/07/13/homeless-man-attacked-with-hammer-in-east-village/

76 Arcega-Dunn, Maria, Man Attacked with Hammer in Latest Crime Against Homeless, Fox 5, July 13, 2016, available at http://fox5sandiego.com/2016/07/13/homeless-man-attacked-with-hammer-in-east-village/

77 Gambino, Lauren, Video Shows Homeless Man Attacked By Hospitality Ambassador, The Guardian, March 27, 2015, available at https://www.theguardian.com/us-news/2015/march/27/berkeley-homeless-man-attacked-video

78 Bianco, Rachel, Transient Believes Murder Spree Suspect Attacked Him in Hillcrest Canyon, 10news.com, July 18, 2016, available at https://www.10news.com/news/homeless-man-believes-guerrero-attacked-him-with-rock-in-hillcrest-area-canyon-july-7-071816

79 Arreola, Annette, 2 Homeless people Hurt in BB Gun Drive-By Shooting, NBC 4 Los Angeles, July 18, 2016, available at https://www.nbclosangeles.com/news/local/2-Homeless-People-Hurt-in-BB-Gun-Drive-By-Shooting-387303922.html

80 Kurhi, Eric, San Jose: Homeless Says 'Machete Jack' Slashing Their Tents, Mercury News, July 14, 2016, available at https://www.mecurynews.com/2016/07/14/san-jose-homeless-say-machete-jack-slashing-their-tents/

81 Associated Press, LA Homeless Woman Posts Video Protecting Trump Walk of Fame Star, CBS News, October 29, 2016, available at https://www.cbsnews.com/news/los-angeles-homeless-woman-posts-video-protecting-trump-walk-of-fame-star/

82 KABC, Homeless Man Sucker Punched at Hollywood Metro Station, ABC 7, December 13, 2016, available at http://abc7.com/news/video-homeless-man-sucker-punched-at-hollywood-metro-station/1655271/

83 Paul, Jesse, Denver Prosecutors Charge Suspect with Murder in Homeless Man's Slaying, Denver Post, December 1, 2016, available at https://www.denverpost.com/2016/12/01/denver-prosecutors-charge-suspect-with-murder-in-homeless-mans-slaying/

84 Mitchell, Kirk. "Two Youths Severely Beat Homeless Man in Random Colorado Springs Attack." The Denver Post, The Denver Post, 9 Feb. 2017, www.denverpost.com/2017/02/09/homeless-man-colorado-springs-attack/.

85 Zausmer, Julie, and Erickson, Andee, Mourning a Brother, Family asks for Help Solving DC's First Homicide of the Year, Washington Post, January 18, 2016, available at https://www.washingtonpost.com/local/public-safety/mourning-a-brother-family-asks-for-help-solving-dcs-first-homicide-of-the-year/2017/01/18/592d7a50-d9c9-11e6-b8b2-cb5164beba6b_story.html?utm_term=.28529e30d24a

86 Swirko, Cindy, Deputy Who Abused Homeless Man Fired, Gainesville.com, December 14, 2016, available at http://www.gainesville.com/news/20161214/deputy-who-abused-homeless-man-fired

87 Burke, Peter, Woman Stabs Homeless Woman with Box Cutter after Smoking Flakka, BSO Says, Local10.com, September 22, 2016, available at https://www.local10.com/news/crime/woman-stabs-homeless-woman-with-box-cutter-after-smoking-flakka

88 WALB News Team, Police Investigate Rape of Homeless Woman, WTVM.com, August 18, 2016, available at http://www.wtvm.com/story/32794218/police-investigate-rape-of-homeless-woman

89 Feldman, Kate, George Pastor Charged with Alleged Sexual Abuse of 10-year-old Girl Staying at Homeless Shelter, NY Daily News, September 18, 2016, available at http://www.nydailynews.com/news/crime/ga-pastor-charged-alleged-sexual-abuse-10-year-old-girl-article-1.2797040

90 Eldridge, Ellen. "2 Teens Accused of Shooting Cobb Homeless Man ." Ajc, The Atlanta Journal-Constitution, 20 Jan. 2017, www.ajc.com/news/crime--law/teens-accused-shooting-cobb-homeless-man/tTIOKNEm0PQb5evoRHVqbL/.

91 Kolkey, Jeff, Homeless Man Found Beaten, Dead in Rockford 'Tent City', rrstar.com, September 7, 2016, available at http://www.rrstar.com/news/20160907/homeless-man-found-beaten-dead-in-rockford-tent-city

92 Bird, Bill, and Bookwalter, Genevive, Fire at Naperville Homeless Man's camp might Be Arson, Naperville Sun, July 19, 2016, available at http://www.chicagotribune.com/suburbs/naperville-sun/ct-nvs-naperville-huber-tent-fire-st-0720-20160718-story.html

93 Hendrickson, Matthew, 3 Charged with Stabbing Homeless man in South Loop, Chicago Sun Times, November 24, 2016, available at https://chicago.suntimes.com/news/three-charged-with-stabbing-homeless-man-in-south-loop/

94 Ryckaert, Vic, IMPD Makes Arrest in Homeless Woman's Death, Indy Star, December 5, 2016, available at https://www.indystar.com/story/news/crime/2016/12/05/man-arrested-homeless-womans-death/94993096/

95 Reese, Sarah, Homeless man Tells Police He Was Shot in Leg in Hammond, nwi.com, July 27, 2016, available at http://www.nwitimes.com/news/local/crime-and-courts/homeless-man-tells-police-he-was-shot-in-leg-in/article_44a4b19f-4603-52bb-9fe8-44b7ef647c59.html

96 Staff, FOX8Live.com. "Homeless Man Says He Was Shot by Occupants of Gray Car." New Orleans News, Weather, Saints - FOX 8, WVUE, fox8live.Com, Weather, App, News, Saints, 16 Aug. 2017, www.fox8live.com/story/36154192/homeless-man-says-he-was-shot-by-occupants-of-gray-car.

97 Homeless man Stabbed At Bridgewater Apartment Complex, The Enterprise, July 11, 2016, available at http://www.enterprisenews.com/news/20160711/homeless-man-stabbed-at-brdigewater-apartment-complex

98 Manganis, Julie. "Teens Charged in Attack on Homeless Man." Salem News, 28 Feb. 2017, www.salemnews.com/news/local_news/teens-charged-in-attack-on-homeless-man/article_869957ea-0300-5fea-a443-1e4335b56653.html.

99 Engel, Samina, and Hearst Television Inc. "Homeless Man Still Hospitalized a Month after Severe Beating." WXII, WXII, 8 Oct. 2017, www.wxii12.com/article/homeless-man-still-hospitalized-a-month-after-severe-beating/8958489.

100 Strainer, Maria, Baltimore City Police's 'Public Enemy No.1' Arrested Accused of Fatally Stabbing Homeless Man, Washington Times, December 8, 2016, https://www.washingtontimes.com/news/2016/dec/8/christopher-straham-baltimore-murder-suspect-accuse/

101 Two Men Identified in Homeless Assaults Case, Up North Live, July 6, 2016, available at http://upnorthlive.com/news/local/two-men-identified-in-homeless-assaults-case

102 Vanbergen, Steve, Juveniles shoot homeless man in face with pellet gun after attempted robbery, Fox 17, September 1, 2016, available at http://fox17online.com/2016/09/01/juveniles-shoot-homeless-man-in-face-with-pellet-gun-after-attempted-robbery/

103 Libor Janey, Man Charged with Raping, Robing Woman Near Uptown Bush Shelter, Star Tribune, January 10, 2017, available at http://www.startribune.com/man-charged-with-rapping-robbing-woman-near-uptown-mpls-bus-shelter/410300255

104 Zaremba, Justin, Teen Tries to Rob Homeless Woman, Slashes Man Who Came To Her Aid, Police Say, NJ.com, July 26, 2016, available at http://www.nj.com/passaic-county/index.ssf/2016/07/man_tried_to_rob_homeless_woman_slashed_man_who_ca.html

105 Mota, Caitlin, Homeless man, Girlfriend, Jumped in Jersey City: Police, NJ.com, August 29, 2016, available at http://www.nj.com/hudson/index.ssf/2016/08/homeless_man_girlfriend_jumped_in_jersey_city_figh.html

106 Hernandez, Dan. "Mannequin Sting Catches Suspect in Las Vegas Homeless Murders." The Guardian, Guardian News and Media, 7 Mar. 2017, www.theguardian.com/us-news/2017/mar/07/homeless-murders-las-vegas-police-arrest-mannequin-plot.

107 Jacobs, Shayana, McLaughlin, Aidan, and Rayman Graham, Lawyer for Store Clerk Accused of Fatally Stabbing Homeless Man, 18, in Harlem Claims Self-Defense, NY Daily News, October 20, 2016, available at http://www.nydailynews.com/new-york/nyc-crime/suspect-arrested-stabbing-homeless-man-death-harlem-article-1.2838069

108 Hensley, Nicole, Gunman Wanders Into Manhattan Deli after Slaying Homeless Man in Bryant Park, NY Daily News, December 19, 2016, available at http://www.nydailynews.com/new-york/manhattan/gunman-wandered-manhattan-deli-bryant-park-slaying-article-1.2915604

109 Rayman, Graham, Creep Busted for Sexually Assaulting Homeless Woman as She Slept in Financial District, NY Daily News, August 29, 2016, available at http://www.nydailynews.com/new-york/nyc-crime/creep-busted-sexually-assaulting-homeless-woman-slept-article-1.2770192

110 Reyna, Rikki, Mai, Andy, Annese, John, and Slattery, Denis, Police Shoot Knife-Wielding Maniac who Killed Man, Slashed Woman, Slashed Homeless Person on Fire in Queens, NY Daily News, March 7, 2016, available at http://www.nydailynews.com/new-york/nyc-crime/maniac-stabbed-man-set-homeless-person-fire-queens-article-1.2554814

111 Dimon, Laura. "Homeless Man Stabbed in Chest While Playing Chess in Union Square - NY Daily News." Nydailynews.com, New York Daily News, 22 Aug. 2017, www.nydailynews.com/new-york/nyc-crime/homeless-man-stabbed-playing-chess-union-square-article-1.3430611.

112 Hobbs, Allegra. "Man Repeatedly Stabs Homeless Couple on Two Bridges Waterfront, Police Say." DNAinfo New York, DNAinfo New York, 21 Aug. 2017, www.dnainfo.com/new-york/20170821/lower-east-side/homeless-couple-stabbing/.

113 Rose Marcius, Chelsia, and Rayman, Graham, Homeless man slams Harlem shelter after two workers attacked him for complaining about grungy living conditions, NY Daily News, August 30, available at http://www.nydailynews.com/new-york/manhattan/homeless-man-slams-harlem-shelter-workers-attacked-article-1.2772118

114 Franklin, Dallas, Homeless Woman Dies Days after Being Shot in the Head in S.E. Oklahoma City, KFOR.com, October 26, 2016, available at http://kfor.com/2016/10/26/homeless-woman-dies-after-being-shot-in-the-head-in-s-e-oklahoma-city/

115 Davis, Dave, Homeless man Shot In Neck With BB Gun, NEwsOn6.com, July 12, 2016, http://www.newson6.com/story/32423607/tulsa-police-homeless-man-shot-in-neck-with-bb-gun

116 Ryan, Jim, Ashland Arrest Video: Proper Policing or Excessive Force?, The Oregonian, August 7, 2016, available at http://www.oregonlive.com/pacific-northwest-news/index.ssf/2016/08/ashland_arrest_video_proper_po.html

117 Homstrom, Chris, Harrassed Homeless Woman, I was Ridiculed, Yelled At, KOIN.com, August 24, 2016, available at http://koin,com/201608/24/woman-says-someone-harassed-her-for-being-homeless

118 Green, Aimee. "Man Angry with Homeless Tosses Homemade Bomb under Dilapidated RV, Avoids Jail Time." OregonLive.com, OregonLive.com, 24 Jan. 2017, www.oregonlive.com/portland/index.ssf/2017/01/resident_fed_up_with_homeless.html.

119 Shepherd, Katie, et al. "A Homeless Portland Student Is Suing Security at Safeway for Allegedly Interrupting His Panhandling With a Beating." Willamette Week, www.wweek.com/news/2017/08/09/a-homeless-portland-student-is-suing-security-at-safeway-for-allegedly-interrupting-his-panhandling-with-a-beating/.

120 Hogan, Alexandra, Police: Homeless Man Shot and Killed in Coatesville, WFMZ-TV, August 26, 2016, available at http://www.wfmz.com/news/southeastern-pa/police-homeless-man-shot-and-killed-in-coatesville_20160929025858736/99876136

121 Mayo, Nikie. "Homeless 'Man on Main Street' Jessie Alexander Beaten and Robbed in Anderson County." Independent Mail, Anderson, 6 Sept. 2017, www.independentmail.com/story/news/crime/2017/09/05/homeless-man-main-street-jessie-alexander-beaten-and-robbed-anderson-county/633962001/.

122 WKRN Webb Staff, Robber Uses Rock to Steal from Homeless Man in Nashville, WKRN.com, October 21, 2016, available at http://wkrn.com/2016/10/31/robber-uses-rock-to-rob-homeless-man-in-nashville/

123 Robinson, Chelsea. "Police: Woman Shot Homeless Man Who Asked Her to Move Porsche." KOAT, KOAT, 9 Oct. 2017, www.koat.com/article/police-woman-shot-homeless-man-who-asked-her-to-move-porsche/12226540.

124 Encalada, Debbie, Video Released of Houston Police Beating Homeless Man, Complex.com, September 26, 2016, available at http://www.complex.com/life/2016/09/video-released-houston-police-officers-baton-beating-homeless-man

125 Farmer, Liz, Fired San Antonio Officer Admits Giving Poop Sandwich to Homeless Person, Dallas Morning News, December, 2016, available at http://www.dallasnews.com/news/texas/2016/12/07/fired-san-antonio-officer-admits-giving-poop-sandwich-homeless-person

126 Webber, Katrina, Homeless Man Stabbed, Police Searching for Attacker, KSAT.com, September 6, 2016, available at https://www.ksat.com/news/homeless-man-stabbed-police-searching-for-attacker

127 Wemhoener, Karl, Homeless Woman Stabbed Stopping personal Robbery, My High Plains, Sept 19, 2016 available at http://www.myhighplains.com/news/homeless-woman-stabbed-stopping-personal-robbery/550093271

128 "HPD: Property Owner Shoots Homeless Person in Museum District." KHOU, KHOU, 22 Aug. 2017, www.khou.com/article/news/crime/hpd-property-owner-shoots-homeless-person-in-museum-district/285-466315353.

129 Associated press, Two Dead in 'Very Targeted' shooting at Camp for Homeless people in Seattle, The Guardian, January 27, 2016, available at https://www.theguardian.com/us-news/2016/jan/27/shooting-camp-homeless-people-seattle

130 Q13 Fox News Staff, Auburn police Investigating Death of Homeless Man as Homicide, Q13 Fox, July 21, 2016, available at http://q13fox.com/2016/07/21/auburn-police-investigating-death-of-homeless-man-as-a-homicide/

131 KOMO News Staff, Kent Police Search For Suspect after 2 Homicides at Homeless Encampment, KOMO News, August 12, 2016, available at http://komonews.com/news/local/kent-police-search-for-suspect-after-2-homicides-at-homeless-encampment

132 Padula, Andrew, Driver Accused of Killing Homeless Man in Tent Booked on Vehicular Homicide, Felony Hit-And-Run, Q13 Fox, September 13, 2016, available at http://q13fox.com/2016/09/12/mayor-calls-for-taxpayers-to-help-after-homeless-man-killed-in-tent-along-i-5

133 Associated Press, Man Fatally Shot by Officer Near Homeless Camp Identified, AP News, October 13, 3016, available at https://apnews.com/37ff475733844a9392e6f714308dbb78

134 Associated press, Two Dead in 'Very Targeted' Shooting at Camp for Homeless people in Seattle, The Guardian, January 27, 2016, available at https://www.theguardian.com/us-news/2016/jan/27/shooting-camp-homeless-people-seattle

135 Coleman, Vernal, Woman Charged in Shooting of Homeless Man in South Seattle, Seattle Times, July 14, 2016, available at https://www.seattletimes.com/seattle-news/crime/woman-charged-in-shooting-of-homeless-man-in-south-seattle

136 Madison man Arrested After Attacking Homeless Man, NBC15.com, Agust 29, 2016, available at http://www.nbc15.com/content/news/Madison-man-arrested-after-attacking-homeless-man-391631611.html

## Appendix E: How NCH Estimates the Total Number of Deaths

Our researchers compared published homeless deaths reports and data collection from Homeless Persons' Memorial Day events to HUD Point-In-Time Count total and unsheltered numbers. On average in 2016, homeless deaths were 1.3% of the Point-In-Time Count numbers and 6.3% of the unsheltered population. In 2017, homeless deaths were 1.5% of the total Point-In-Time count numbers and 6.8% of the unsheltered population.

If we use the alternative count suggestion (found on page 8) of 1 million people experiencing homelessness, 1.3% would be 13,000 deaths in a year, meaning 36 die every day.



# Acknowledgements

The National Coalition for the Homeless would like to recognize the individuals and organizations that made it possible to  complete this report.

Annie Leomporra, *Principal Author & Editor*

Megan Hustings*, Principal Author & Editor*

Elizabeth Brown, *Researcher*

Eleanor Gamble*, Editor*

Brian Levin, *Editor*

National Health Care for the Homeless Council

National Law Center on Homelessness & Poverty

Bryan Dozier Photography

Adam C. Sloane, Esq,  MAYER BROWN LLP

Thank you to the millions who have experienced housing instability. Your ongoing strength, determination, and kindness, in the face of hate for your situation, inspire us daily. If you have experienced violence because of your housing status, and your story is not printed, please know you are not forgotten. Your health and safety are our top concerns. Please consider reporting violence to local law enforcement.

This report is dedicated to Michael Stoops (1950 - 2017) and Rufus Hannah (1954 - 2017).

# FOOTNOTE 31

AR004372

☰ **Economic Policy Institute**

# California leads the way

A look at California laws that help protect labor standards for unauthorized immigrant workers

**Report** • By **Daniel Costa** • March 22, 2018

# Executive summary

California is the U.S. state that hosts the largest total number of immigrants as well as the largest number of unauthorized immigrants, and the largest number of immigrants who participate in the workforce (both authorized and unauthorized). Unauthorized immigrants make up 5 percent of the U.S. labor force and 9 percent of California's labor force. Unauthorized immigrant workers across the United States, including in California, are often subject to workplace abuse and retaliation by their employers that is based on and/or facilitated by those workers' lack of an authorized immigration status.

Unauthorized immigrants contribute to the economy in vital industries, pay billions of dollars in taxes, and contribute billions to California's economy. But unauthorized immigrant workers, who on paper have labor and employment law protections,[1] in practice are often restrained from complaining about unpaid wages and substandard working conditions because of fears—or actual threats—that their employers will retaliate by reporting their immigration status to federal immigration enforcement authorities. In California, reports of instances of such retaliation have been on the rise. From January 1 to December 22, 2017, workers in California "filed 94 immigration-related retaliation claims" with the California Labor Commissioner's Office, "up from 20 in all of 2016 and only seven" in 2015 (Khouri 2018). The threat of retaliation gives employers extraordinary power to exploit and underpay unauthorized immigrants. This power dynamic also undercuts the bargaining power of U.S. workers who work side by side with unauthorized immigrants.

The ideal solution to this problem would be federal immigration reform that provides legalization and a path to citizenship for the 11.3 million unauthorized immigrants in the United States. This would level the playing field in terms of labor standards for all workers. However, in the absence of such nationwide reform, the government of the state of California has taken measures to improve labor standards for

AR004373

vulnerable immigrant workers present in the state. Between 2013 and 2017 the California legislature considered and passed seven laws designed to protect workers in the state from retaliation and discrimination related to their immigration status: AB 263 (2013), SB 666 (2013), AB 524 (2013), AB 2751 (2014), AB 622 (2015), SB 1001 (2016), and AB 450 (2017). Another law, SB 54 (2017), includes a provision that may improve access to justice for immigrant workers seeking redress for labor violations. All were signed into law by Governor Jerry Brown and each went into effect on January 1 of the year following their passage by the legislature.

This report analyzes these laws and finds that they have provided California's labor commissioner and attorney general with new tools to combat retaliation and exploitation based on immigration status and that they have provided immigrant workers with new causes of actions for civil lawsuits to enforce their rights and recover monetary damages from employers who violate labor and employment laws. The penalties provided by the laws may also act to deter employers from engaging in unscrupulous behavior in the first place. Other states should follow California's lead and pass laws that protect immigrant workers from retaliation, wage theft, and other workplace abuses that are facilitated by virtue of their immigration status—and they should enforce those laws vigorously.

These laws are summarized below.

- **California's AB 263 (2013) prohibits employers from using threats related to immigration status to retaliate against employees who have exercised their labor rights.** For example, if an employee complains to an employer about wages owed to her, and if the employer retaliates with threats related to the worker's immigration status as an excuse to discharge or not pay the worker, the California Division of Labor Standards Enforcement (DLSE) can investigate and fine the employer, or the worker can bring a civil lawsuit against the employer. Employers guilty of retaliation based on immigration status may be subject to a civil penalty of up to $10,000 and the employer's business license may be temporarily suspended.

- **California's SB 666 (2013) is similar and complementary to AB 263, but expands the options for penalizing bad actors and also makes it easier for immigrant workers to sue employers for damages when they are retaliated against for exercising their workplace rights.** Under SB 666, an employer's business license may be revoked (not just suspended temporarily) if the employer is found to have retaliated against an employee based on immigration status. In addition, a lawyer who participates in retaliatory activities on behalf of an employer may be suspended or disbarred. Further, while AB 263 waived the requirement to exhaust administrative remedies before filing a lawsuit for claims specifically related to unlawful discharge or discrimination, under SB 666 that requirement is waived for nearly all claims related to labor code violations.

- **California's AB 2571 (2014) modifies and clarifies provisions in AB 263** by specifying that (1) an "unfair immigration-related practice" also includes filing or threatening to file "a false report or complaint with any state or federal agency" (not just a police report, as AB 263 prohibits),

AR004374

and that (2) the $10,000 civil penalty for retaliation from AB 263 be awarded to the employee who suffered the violation rather than the penalty being awarded to the state of California.

- **California's AB 524 (2013) expands the definition of "criminal extortion" to include threats related to immigration status and provide for possible criminal penalties** —imprisonment for up to one year and/or a fine of up to $10,000—for employers who make threats related to an employee's immigration status.

- **California's SB 1001 (2016) and AB 622 (2015) narrowly specify what constitutes lawful use of the employment authorization process, making it more difficult for employers to use this process to retaliate against unauthorized immigrant workers.** California's SB 1001 and AB 622 specifically prohibit employers from using the employment authorization process in ways that are not required under federal law, with penalties up to $10,000 per violation. Under these laws, complainants don't have to prove that the employer's action was specifically retaliatory (as would be required under AB 263, for example).

- **California's AB 450 (2017) can provide due process for workers in the face of an I-9 worksite audit and discourage employers from using the I-9 audit process to retaliate against employees.** Under AB 450, employers are prohibited from providing Immigration and Customs Enforcement (ICE) with access to nonpublic areas of the workplace and employment records when ICE has not obtained a warrant or subpoena, and AB 450 requires employers to notify workers when ICE plans to conduct an audit and inform workers about the details of the audit. Employers can be fined $2,000 to $5,000 for the first violation, and $5,000 to $10,000 for each additional violation. In addition, employers are prohibited from requiring their existing employees to reverify their work authorization at a time or manner not required by federal immigration law, and may face penalties of up to $10,000 for each violation.

- **California's SB 54 (2017), also known as the California Values Act, includes a provision that has the potential to make courts and government buildings more accessible to unauthorized workers (by decreasing the risk of detention by ICE agents while pursuing claims for workplace violations by employers).** In light of increasing immigration enforcement activities at courthouses and state government buildings by ICE, unauthorized immigrant workers will face significant difficulties accessing the judicial system and due process. SB 54 provides for the upcoming publication (by October 2018) of model policies for ensuring that public facilities "remain safe and accessible to all California residents, regardless of immigration status." These model policies have the potential to provide unauthorized immigrant workers with greater certainty that ICE agents will not be present in California courtrooms, thus creating a safer environment for immigrants to access the legal system and obtain due process.

AR004375

# Background: Immigrant workers make up a significant share of California's workforce and are an integral part of many American families and communities

Immigrants—defined as all foreign-born persons and including all immigration statuses (temporary, permanent, and unauthorized)—are a significant and important part of California's population and workforce. A total of 43.7 immigrants live in the United States, representing 13.5 percent of the U.S. population (Zong, Batalova, and Hallock 2018); 10.7 million of those immigrants live in California, representing 27.3 percent of the state's population. And 6.6 million immigrants are part of California's workforce, accounting for a third of California's total workforce (AIC 2017).

Of the 43.7 million immigrants living in the United States, approximately 11.3 million are unauthorized (Krogstad, Passel, and Cohn 2017); these unauthorized immigrants account for one-quarter of all immigrants in the country (López and Bialik 2017). Most unauthorized immigrants are not newcomers, but are long-term residents of the United States. Two-thirds have resided in the United States for over 10 years, while only 14 percent have resided in the United States for less than 5 years; their median duration of residence was 13.6 years in 2014, nearly double what it was in 1995 (Passel and Cohn 2016a). The Pew Research Center estimated that in 2012 there were approximately 4.5 million U.S.-born children who were younger than 18 and living with their unauthorized immigrant parents, meaning that millions of American children are in mixed-status households (Passel and Cohn 2015a).

California is the state that hosts the largest population of unauthorized immigrants by far—2.3 million, which accounts for 6 percent of California's total population (Pew 2016). The vast majority of unauthorized immigrants in California are employed—1.7 million, which is 9.0 percent of the total labor force in the state (Passel and Cohn 2016b);[2] this is second only to Nevada in terms of the unauthorized *share* of the labor force, but Nevada has less than a tenth of the *number* of total unauthorized immigrants that California has (210,000 vs. 2.3 million) (Pew 2016).

# Why we need to protect labor standards for unauthorized immigrant workers

## Unauthorized immigrant workers contribute to the American economy

AR004376

Unauthorized immigrants contribute to the economy in many industries vital to the U.S. economy (Passel and Cohn 2015b) and pay billions in state and local taxes (Gee, Gardner, and Wiehe 2016). According to California State Controller Betty Yee, unauthorized immigrants' labor "is worth more than $180 billion per year to California's economy" (Hamilton 2017). Despite these contributions, unauthorized immigrants are often subjected to workplace abuse and retaliation by their employers that is based on, or facilitated by, their lack of an authorized immigration status—as is illustrated by numerous anecdotes reported in the media and by immigrant worker advocates.

# Fear of retaliation means workers don't report lawbreaking employers

Although on paper unauthorized immigrant workers have labor and employment law protections—state labor laws and the federal Fair Labor Standards Act require that all workers be paid no less than the federal minimum wage and for overtime hours (if applicable) regardless of their immigration status—in practice, they are typically unable to complain about unpaid wages and substandard working conditions because employers can retaliate against them by taking actions that can lead to their removal by federal immigration authorities. In California, instances of this—employer retaliation against workers based on their immigration status—have been on the rise. From January 1 to December 22, 2017, workers in California "filed 94 immigration-related retaliation claims" with the California Labor Commissioner's Office, "up from 20 in all of 2016 and only seven" in 2015 (Khouri 2018).

As a result, in practice unauthorized immigrant workers have little access to labor and employment law protections under U.S. law. When unauthorized workers complain about substandard conditions or unpaid wages, or engage in protected activities like organizing to join or form a union, their employers can and often do retaliate by using their immigration status as an excuse to fire them, by threatening to call federal immigration authorities, or by actually calling immigration authorities. In some cases, employers may threaten to report (or actually report) not only an employee but also members of the employee's family. The employer's actions could ultimately lead to the removal of the unauthorized immigrant employee and/or his or her family from the United States. This obviously has a chilling effect on employees when they are considering whether to seek redress in courts for workplace violations or to report violations to state or federal labor standards enforcement agencies. The fear of deportation also strongly discourages unauthorized immigrant employees from organizing to join or form a union.[3] And even absent employer threats, unauthorized immigrant employees may be afraid to avail themselves of help from state or federal labor agencies or law enforcement out of fear that their personal information will be shared with immigration enforcement agencies like U.S. Immigration and Customs Enforcement (ICE), which is responsible for removing unauthorized immigrants from the interior of the United States.

AR004377

# Unauthorized immigrant workers are victims of workplace violations at a higher rate than other workers

Research, surveys, and other anecdotal evidence have established that workplace violations are common occurrences for unauthorized immigrant workers. For example, a 2009 landmark study and survey by Annette Bernhardt, Ruth Milkman, Nik Theodore, and a number of other scholars, titled *Broken Laws, Unprotected Workers*, found that 37.1 percent of unauthorized immigrant workers had been victims of minimum wage violations in the week prior to their being surveyed—meaning they had not been paid the legally required minimum wage for hours worked that week—compared with 21.3 percent for authorized immigrants and 15.6 percent for U.S.-born citizens. In terms of overtime law violations —cases where workers were not paid the legally required time-and-a-half rate for the hours worked in a week beyond 40 hours—the statistics are even more disturbing, with all workers suffering extremely high rates of violations and unauthorized workers topping the list. Among full-time unauthorized immigrant workers who reported working more than 40 hours for a single employer during the previous workweek, an astounding 84.9 percent reported not being paid time-and-a-half for their overtime hours, compared with 67.2 percent for authorized immigrants and 68.2 percent for U.S.-born citizens (Bernhardt et al. 2009).

In addition, labor inspections at the state and federal levels are infrequent, and even when workers who have been victims of wage theft succeed in winning a judgment to recover lost wages, a significant share of these victims are unable to recover the back pay they are entitled to (Levine 2018).

# Workplace violations based on or facilitated by immigration status degrade labor standards for all workers

The end result of all this is that U.S. employers benefit by having an extraordinary amount of power to exploit and underpay unauthorized immigrants with impunity. This also undercuts the bargaining power of U.S. workers who work side by side with unauthorized immigrants who are easily exploitable. When the wages and labor standards of unauthorized immigrants in the U.S. labor market are degraded, so are the wages and labor standards of U.S. workers in similar jobs.

AR004378

# California is leading the way in passing laws to deter employers from retaliating against unauthorized immigrant workers

In the absence of federal immigration reform that provides legalization and a path to citizenship for the 11.3 million unauthorized immigrants in the United States—which would level the playing field in terms of labor standards for all workers—the state of California has taken measures to improve labor standards for the 9.0 percent of its labor force composed of workers who lack an authorized immigration status. It is important to note that the state of California cannot stop ICE from lawfully arresting and removing any unauthorized immigrant who is present in the state. Nevertheless, in order to combat some of the most common workplace abuses that unauthorized immigrant workers face, and therefore improve labor standards for all workers, the California legislature has considered and passed seven laws designed and intended to protect all immigrant workers from retaliation and discrimination related to their immigration status. These laws are AB 263 (2013), SB 666 (2013), AB 524 (2013), AB 2751 (2014), AB 622 (2015), SB 1001 (2016), and AB 450 (2017).

# California laws passed in 2013 and 2014

In 2013 and 2014, the California legislature considered and passed four laws designed and intended to protect unauthorized immigrant workers from threats related to their immigration status: AB 263, SB 666, AB 524, and AB 2751.[4] Governor Jerry Brown signed AB 263, SB 666, and AB 524 in 2013 and the laws went into effect on January 1, 2014. AB 2751 was signed in 2014 and went into effect on January 1, 2015. This section offers a brief synopsis of the main components of these four laws.

## AB 263 and SB 666

Both AB 263 and SB 666 provide workers with certain protections against retaliation by their employers that is related to their immigration status. AB 263 prohibits "unfair immigration-related practices" by an employer or any other person who takes any number of listed actions against any person for exercising a right protected in the California Labor Code (Labor Code) or any local ordinance applicable to employees. AB 263 protects persons who file a complaint against an employer, persons who investigate whether an employer has broken the law, or persons who inform others about their rights or help them assert those rights under the Labor Code. An unfair immigration-related practice can include requesting more or different documents to verify employment authorization than are required under federal law, or refusing to honor documents to verify work authorization that on their face reasonably appear to be genuine; using the federal E-Verify system (the federal government's web-based electronic employment authorization system)[5] to check the employment authorization status of a person at a time or in a manner not required under federal law or not authorized under any memorandum of understanding

AR004379

governing the use of the federal E-Verify system; threatening to file or actually filing a false police report; or threatening to contact or actually contacting immigration authorities. AB 263 also establishes that an employer who engages "in an unfair immigration-related practice against a person within 90 days of the person's exercise of rights" creates a rebuttable presumption that the employer retaliated against a person for exercising their rights.

AB 263 provides a private right of action for the aggrieved worker or person who has been retaliated against and waives the requirement that the worker exhaust any administrative remedies before filing a lawsuit for claims related to unlawful discharge or discrimination. AB 263 also allows the plaintiff to recover attorney's fees and authorizes a civil penalty of up to $10,000. If an employer has been found to have committed an unfair immigration-related practice, the business associated with the workplace violation may have its business license temporarily suspended.

SB 666 is similar and complementary to AB 263. Under SB 666, employers are prohibited from reporting or threatening to report the citizenship or immigration status of any employee or the citizenship or immigration status of an employee's family member in retaliation for exercising a right or engaging in protected conduct. If the California Division of Labor Standards Enforcement (DLSE) or a court finds that an employer retaliated in this manner against an employee for exercising a right in the Labor Code, an employer's business license may be revoked or suspended. In addition, if the employer's attorney (or any other attorney) engages in this activity—e.g., reports the citizenship or immigration status of an employee or employee's family member, or of a witness or party to a civil or administrative action to a federal, state, or local agency, for exercising a protected right—it will be "cause for suspension, disbarment, or other discipline" by the State Bar of California. SB 666 also includes a broader standard than AB 263 in terms of the exhaustion of administrative remedies: it establishes that individuals are not required to exhaust available administrative remedies or procedures before they may bring a civil action under any provision of the Labor Code (unless the section requires exhaustion of an administrative remedy).

Both AB 263 and SB 666 expand protected conduct to include a written or oral complaint by an employee that he or she is owed unpaid wages, as well as prohibit retaliation by any person acting on behalf of an employer. Under both laws, employers may face penalties of up to $10,000 for each instance of retaliation, per employee.

## AB 2571

AB 2571, signed into law a year after AB 263, modifies and clarifies provisions in AB 263. These modifications and clarifications include specifying that (1) an "unfair immigration-related practice" also includes filing or threatening to file "a false report or complaint with any state or federal agency" (not just a police report, as AB 263 prohibits), and that (2) the $10,000 civil penalty for retaliation from AB 263 be awarded to the employee who suffered the violation rather than the penalty being awarded to the state of California. (AB 263 did not specify who would receive the funds.)

AR004380

## AB 524

AB 524 expands the definition of criminal extortion to include threats related to immigration status. This law makes it criminal to threaten to report any individual's immigration status or suspected immigration status, or that of an individual's relative or a member of his or her family, in order to obtain property from the individual (which could include wages owed to a worker, for example). The penalty for criminal extortion under California Penal Code Section 524 is imprisonment of up to one year and/or a fine of up to $10,000.

## How AB 263, SB 666, AB 2751, and AB 524 are operating in practice

AB 263, SB 666, AB 2751, and AB 524 can be used either by DLSE in an investigation or enforcement action or by an individual worker who brings a civil lawsuit.

In general, if a worker has been the victim of a labor violation by a California employer, he or she may file a complaint with DLSE. DLSE's Bureau of Field Enforcement (BOFE) reviews the complaint and decides whether to begin an investigation of the employer. If an inspection is undertaken by BOFE, a BOFE deputy may interview the employer about the suspected violation and review the employer's records that are pertinent to the case as well as interview workers about wages and working conditions. If BOFE finds that a legal violation has occurred, it can penalize the guilty employer by issuing a citation that requires the employer to pay back wages or civil penalties or to remedy other violations.[6]

If a worker has filed a complaint with DLSE and the worker's employer retaliates—for example, by withholding wages or threatening to file a report with federal immigration authorities—in response to the worker engaging in a protected activity (which includes cooperating with a DLSE investigation regarding a labor violation), then the worker may file a claim to DLSE alleging retaliation in violation of the law.[7] The claim is then investigated by the Retaliation Complaint Investigation Unit (RCI).[8] An RCI investigator will contact the employer and witnesses, if necessary, and may facilitate a discussion between the employer and employee to discuss a possible settlement; in the course of this, the investigator has the authority to issue subpoenas to obtain relevant evidence. If no settlement is reached between the employer and employee, the case is submitted to the labor commissioner, who reviews the case and makes a determination as to whether the employer violated the law and what is the appropriate remedy. The employer may appeal, but if the employer ultimately fails to comply with the terms of the labor commissioner's determination, the labor commissioner may then file a court action to enforce the remedy (DLSE 2013).

As part of this process, if the RCI investigator determines that an employer retaliated against an employee with an unlawful immigration-status-related threat, the investigator may, as part of the settlement negotiations, point to the provisions of the Labor Code put in place by AB 263, SB 666, and/or AB 524 that were violated and specify what are the appropriate remedies and fines are for the violation or violations. If no settlement is reached and the case rises to the level of the labor

AR004381

commissioner, the labor commissioner may issue a determination to fine the employer and/or suspend or terminate their business license as allowed by law if the facts of the case warrant such fines or suspensions.

According to California Labor Commissioner Julie Su, the most common labor violation that precedes employer retaliation via threats related to immigration status is wage theft, which occurs after an employee asks to be paid wages owed to him or her, or after filing a complaint with DLSE.[9] The ability of DLSE to threaten lawbreaking employers with a $10,000 fine for each violation gives DLSE a significant amount of leverage in settlement negotiations and helps level the playing field in terms of power between employers and immigrant workers. The fact that the $10,000 fine goes to the employee (as specified by AB 2751) means workers have a much better chance of recouping lost wages, because suing for lost wages and recovering them in a private civil action is much costlier, may take years, and may ultimately be unsuccessful even when a worker wins the case (for example, if an employer is unable to pay).

Workers in California who are victims of unlawful retaliation based on threats related to immigration status may also file a private lawsuit against their employer, even if they have not exhausted all of their possible administrative remedies through DLSE (unless they are seeking to enforce a claim that specifically requires exhaustion by law). While a private civil lawsuit is expensive and may take years, the attorneys who represent workers who have been the victims of retaliation may first send letters to employers notifying them of their obligations under AB 263 and SB 666, for example, and the possible fines and penalties they may be liable for if they lose in court or if the labor commissioner determines they have violated the laws. According to one attorney who spoke with the author and is familiar with California's anti-retaliation laws, such letters have acted as a valuable deterrent to further unlawful conduct by the employer and have sometimes succeeded in obtaining remedies for workers.

# Additional laws passed in 2015–2017

California laws passed in 2015, 2016, and 2017 create additional barriers for employers who are attempting to retaliate against workers through means related to their immigration status.

## SB 1001 and AB 622

California's SB 1001 and AB 622 further proscribe what is appropriate employer use of the employment authorization process. Employers using the system outside of these proscribed uses can be penalized without the need to prove that retaliation was the motive.

SB 1001 was signed into law in 2016 and went into effect on January 1, 2017.[10] SB 1001 makes it unlawful for employers to (1) request from the employee more or different documents than are required under Section 1324a(b) of Title 8 of the United States Code; (2) refuse to honor documents tendered that

AR004382

on their face reasonably appear to be genuine; (3) refuse to honor documents or work authorization based upon the specific status or term of status that accompanies the authorization to work; or (4) attempt to reinvestigate or reverify an incumbent employee's authorization to work using an unfair immigration-related practice. Employees or job applicants can complain to DLSE if SB 1001 has been violated or sue the employer. Any person who violates SB 1001 is subject to penalties of up to $10,000 that can be imposed by DLSE and are liable for equitable relief.

AB 622 was signed into law in 2015 and went into effect on January 1, 2016.[11] AB 622 relates to E-Verify, and expands the definition of an unlawful employment practice in the California Labor Code to prohibit an employer or any other person or entity from using E-Verify at a time or in a manner not required by federal law, or in a manner that is not required by a memorandum of understanding between an employer and the federal government, to check whether an incumbent employee or a new job applicant is authorized to be lawfully employed. Under AB 622, employers can check only the status of job applicants to whom they've offered a job but who have not yet begun working, and employers must notify job applicants promptly if E-Verify does not confirm that they are authorized to be employed. The penalty for each violation of AB 622 is $10,000.

SB 1001 and AB 622 prohibit employers from forcing employees whom they suspect to be unauthorized immigrants from establishing whether they are authorized to be employed lawfully in the United States in retaliation for those workers asserting their labor and employment rights or engaging in any other protected activity (for example, if a worker requests an employer pay her any owed but unpaid wages, or files a complaint for unpaid wages with DLSE). Together, SB 1001 and AB 622 can deter employers from using the employment authorization process to retaliate against unauthorized immigrant workers who try to exercise their rights. The laws also provide aggrieved workers with a monetary remedy.

## AB 450

AB 450, also known as the Immigrant Worker Protection Act, was signed into law in 2017 and went into effect on January 1, 2018.[12] AB 450 mandates new guidelines and requirements for all public and private employers in California when dealing with an audit of I-9 Employment Eligibility Verification forms[13] or investigation of other employee records. AB 450 prohibits employers from permitting federal immigration enforcement agents to enter any "nonpublic areas of a place of labor"[14] without a judicial warrant, and it prohibits employers from providing employment records to immigration enforcement agents without a judicial warrant or subpoena, unless a Notice of Inspection (NOI) has been provided to the employer by ICE.

AB 450 also requires that employers notify their employees and any applicable union of an upcoming immigration audit by ICE within 72 hours of receiving an NOI from ICE, and employers must also provide a copy of the NOI to any affected employee. Employers must also provide each affected employee with written notice of the obligations of the employer and the affected employee arising from the results of the inspection of I-9 forms or other employment records. Employers who fail to comply

AR004383

with the requirements of AB 450 can be fined $2,000 to $5,000 for the first violation, and $5,000 to $10,000 for each additional violation.

AB 450 also includes a provision that prohibits employers from requiring their existing employees to reverify their work authorization at a time or manner not required by federal immigration law. Federal law at Section 1324a of Title 8 of the United States Code requires employers to verify employment authorization at time of hire, and Department of Homeland Security (DHS) regulations outline the specific circumstances in which employers are required to reverify,[15] such as when an employment authorization document or temporary work visa has expired, or when an employer has "constructive knowledge" that an employee is not authorized to work.[16] Federal law and regulations also describe specific instances in which an employer is *not* deemed to have "hired" someone, and therefore the employer is not required to reverify whether the employee is authorized to work.[17] DLSE may fine employers who violate this provision up to $10,000 for each time they reverify the employment eligibility of an incumbent employee at a time or in a manner not required by federal law.

Both DLSE and the California attorney general have authority to enforce the provisions of AB 450, and California Attorney General Xavier Becerra has stated publicly his intention to prosecute employers who do not comply with AB 450 (Hart 2018).

Thomas Homan, the Trump administration's acting director of ICE, has recently stated his intention to increase the number of I-9 audits conducted by ICE by 400 percent (Kavilanz 2018), saying that the state of California will "see a lot more special agents, a lot more deportation officers" (Fox News 2018) and that ICE will "have no choice but to conduct at-large arrests in local neighborhoods and at worksites" (ICE 2017) in retaliation for California passing sanctuary city laws. Acting Director Homan's comments, which reflect his intentions to focus enforcement efforts in California, combined with the fact that numerous I-9 audits have already been conducted in California by ICE in 2018 (Emslie, Small, and Muñoz 2018), makes it likely that AB 450 will be an important and useful tool to help protect labor standards for unauthorized immigrant workers and provide them with more due process protections than they currently have when their worksite is facing an ICE audit. AB 450 can do this by protecting the rights of unauthorized immigrant workers at their place of employment, especially in the case of an I-9 audit that ICE may attempt to conduct without an adequate level of reasonable suspicion that would justify the issuance of a warrant (for example, if ICE agents attempt to conduct an audit that is based on an anonymous tip, racial profiling, or any other reason not substantiated by enough evidence to justify a warrant).

In addition, as described by California Labor Commissioner Julie Su (Khouri 2018), employers sometimes go to extremes to carry out retaliation by calling ICE on themselves and requesting an I-9 audit in order to retaliate against their own workers; AB 450's penalties may also help protect unauthorized immigrant workers by making it less likely that an employer will call ICE to request an audit as a form of retaliation against workers the employer suspects are unauthorized. AB 450 can be beneficial for employers, too, because it provides them with clear procedures to follow in the course of a

AR004384

visit from ICE agents.

# Access to justice and due process for unauthorized immigrant workers and the potential of the California Values Act (SB 54)

Unauthorized immigrant workers who seek to enforce their rights under California or federal labor and employment laws may either file a complaint with the federal U.S. Department of Labor or, as discussed above, file a complaint with the California labor commissioner at DLSE. Alternatively, they may file a private lawsuit. In California, the ability of unauthorized immigrant workers to access DLSE offices and courthouses is therefore of crucial importance to being able to recover stolen wages or seek redress for other legal violations and ultimately hold lawbreaking employers accountable. If unauthorized immigrant workers are too afraid to access DLSE offices or federal, state, and local courthouses, then they will not be able to access the legal system that is in place to protect the labor standards of all workers, and they will be deprived of due process.

## ICE activity at courthouses

In 2017, a number of cases were reported in the media describing immigration enforcement actions taken by ICE at courthouses in the United States, including in California, where ICE was seeking unauthorized immigrants who were involved in legal proceedings in order to detain them.[18] Some of the immigrants ICE has pursued in courtrooms had no criminal record and were accessing family court (Allyn 2017; Coll 2017) or seeking a restraining order against a spouse (Queally 2017), for example. The Immigrant Defense Project estimated that in New York there were 110 ICE courthouse arrests in 2017, compared with 11 arrests in 2016—a 900 percent increase (Immigrant Defense Project 2017). An increase in ICE courthouse arrests led California's chief justice to publish an open letter to U.S. Attorney General Jeff Sessions and then-Secretary of DHS John Kelly in March 2017, urging them to refrain from pursuing and arresting immigrants in California courts (Queally 2017; Medina 2017; Cantil-Sakauye 2017).

ICE responded to the public outcry for its visits to courthouses in January 2018 by issuing new formal guidance detailing the circumstances under which agents may enter courthouses to pursue and arrest unauthorized immigrants (Rosenberg 2018). It was an addition to ICE's "sensitive locations" policy, which did not originally include courthouses (Quesenberry 2017). The new guidance on ICE operations in courthouses allows ICE to continue targeting unauthorized immigrants in courthouses but narrows the scope of its operations. The policy states ICE should make arrests "discreetly to minimize their impact on court proceedings" and "generally avoid" making arrests in noncriminal courts. It also states that ICE enforcement actions will focus on "targeted aliens with criminal convictions, gang members,

AR004385

national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have reentered the country illegally after being removed" and that family members or friends of the targeted alien will not be arrested "absent special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions" (ICE 2018). The implications of the new ICE policy are ultimately unclear: it is better than the status quo—*if* ICE complies with its terms—but the policy puts no real binding restrictions on ICE agents in courthouses, nor does it create a private right of action for individuals to sue ICE if agents fail to comply with it (Hallman 2018; Martelle 2018).

## ICE activity at DLSE offices

ICE agents have also shown up twice at DLSE labor dispute proceedings in California, seeking to arrest unauthorized immigrant workers who brought claims against their employers. The agents "arrived [at DLSE] within a half hour of when the meetings with employers were supposed to begin," according to Labor Commissioner Julie Su (Kitroeff 2017). The *Los Angeles Times* reporter who broke this story pointed out that "the timing of wage hearings isn't public, and generally the worker and employer are the only ones who know that information outside of the agency." This suggests the employers may have notified ICE about their workers' unauthorized status and called ICE to inform them where the workers would be at the time of the meeting in the labor commissioner's office. Commissioner Su elaborated further, noting that "we should not enable unscrupulous employers who use immigration status as a vulnerability to retaliate unlawfully against a worker who is seeking our protection"—which is what results if ICE agents are able to operate freely in DLSE offices where workers are seeking redress for wage theft and other workplace violations. These incidents led to a memo being sent to state officials "instructing staff members to refuse entry to ICE agents who visit its offices to apprehend immigrants who are in the country without authorization" (Kitroeff 2017). Commissioner Su told the *Los Angeles Times* in January 2018 that ICE agents have not returned since the two incidents that were reported in the *Los Angeles Times* in August of 2017 (Khouri 2018). However, there is no agreement between ICE and the California state government, nor is there any ICE policy statement or regulation, that would prevent ICE agents from attempting to enter state offices to pursue and arrest unauthorized immigrants.

## How SB 54's "model policies" may improve access to justice for immigrant workers

ICE arrests or attempted arrests at government offices and courthouses undermine a key element of American democracy and the ability of the government and the U.S. judicial system to protect residents from abuses by corporations, employers, or other private individuals. If immigrants do not feel safe and are too afraid to attend mediated discussions with employers in government offices or to visit courtrooms in order to seek protection or testify against someone who has harmed them or stolen their wages, the only beneficiaries will be criminals and lawbreaking employers. The impact of this is not theoretical. For example, in Denver, prosecutors were forced to drop four domestic violence cases

AR004386

because the victims were too afraid to testify in court for fear of deportation (Stern 2017). And a nationwide survey from the Tahirih Justice Center found that three out of four advocates "report[ed] that immigrant survivors have concerns about going to court for a matter related to the abuser/offender" (Tahirih 2017). Workers who have been the victims of wage theft and other workplace violations or retaliation may similarly fear visiting government offices or courthouses in person to hold their employers accountable.

A number of state laws that are often referred to as "sanctuary" laws have been passed and enacted in California to help protect the rights of immigrants and unauthorized immigrants, including SB 54, the Values Act; AB 4, the TRUST Act; and AB 2792, the TRUTH Act.[19] Since many of the provisions in sanctuary laws are not focused on issues related to labor violations that affect immigrant workers (rather, they primarily outline the conduct required of state and local law enforcement vis-à-vis federal immigration enforcement authorities), these provisions are not discussed in depth in this report. One provision in SB 54, however—which was signed into law in 2017 and went into effect on January 1, 2018—may have a significant impact on the ability of unauthorized immigrant workers to be able to access the court system and labor agencies in order to seek redress for workplace violations, such as wage theft, that they have suffered at the hands of employers.

SB 54 adds a new provision, numbered 7284.8, to Chapter 17.25 of Division 7 of Title 1 of California's Government Code, which reads:

> The Attorney General, by October 1, 2018, in consultation with the appropriate stakeholders, shall publish model policies limiting assistance with immigration enforcement to the fullest extent possible consistent with federal and state law at public schools, public libraries, health facilities operated by the state or a political subdivision of the state, courthouses, Division of Labor Standards Enforcement facilities, the Agricultural Labor Relations Board, the Division of Workers Compensation, and shelters, and ensuring that they remain safe and accessible to all California residents, regardless of immigration status. All public schools, health facilities operated by the state or a political subdivision of the state, and courthouses shall implement the model policy, or an equivalent policy. The Agricultural Labor Relations Board, the Division of Workers' Compensation, the Division of Labor Standards Enforcement, shelters, libraries, and all other organizations and entities that provide services related to physical or mental health and wellness, education, or access to justice, including the University of California, are encouraged to adopt the model policy.

The state attorney general's new model policies "limiting assistance with immigration enforcement to the fullest extent possible," which will be published by the fall of 2018 and must be implemented by courthouses, have the potential—if adhered to—to provide unauthorized immigrant workers with greater certainty that ICE agents will not be present in courtrooms and create a safer environment for workers to access the legal system and obtain due process. The same goes for DLSE offices if DLSE adopts the model policies, which it will have the option to do.

AR004387

It is unclear so far what substantive provisions the state attorney general's model policies will contain, but one piece of proposed legislation from State Senator Ricardo Lara may provide a hint (Ulloa 2018). Senator Lara's legislation, SB 183 (which passed the California State Senate in January 2018), would prohibit officials at California schools, courthouses, and other state buildings from allowing federal immigration authorities to enter the premises "to perform surveillance, effectuate an arrest, or question an individual therein, without a valid federal warrant." In addition, the activities of officials who possess a federal warrant and enter one of the listed locations in the bill "shall be limited to the individual who is subject of the warrant."[20] It is also unclear whether the attorney general's guidelines could go as far as SB 183 by strictly prohibiting access to courthouses without a warrant, but they are nevertheless likely to be a massive improvement on the status quo.

# Conclusion: Other states should follow California's lead

The Trump administration ushered in a new immigration enforcement regime in 2017 that has broken with the latter years of the Obama administration. The Obama administration had adhered to a prioritization scheme it had developed for the removal of unauthorized immigrants, focusing on those with criminal records and recent arrivals (DHS 2014). The Trump administration's cancellation of the Obama DHS's removal priorities (reflected in Trump's January 2017 Executive Order on interior enforcement [White House 2017]), along with the stated priorities of Acting ICE Director Tom Homan, represent a shift toward an increased focus on federal immigration enforcement in the interior of the United States.

As ICE ramps up its enforcement under Trump's and Homan's leadership, we are likely to see many more worksite raids and audits, as well as more removals of unauthorized immigrants, regardless of the extent of their ties to the United States and regardless of whether they have a clean criminal record.[21] At the same time, complaints by immigrant workers who say "their bosses are threatening to have them deported" are on the rise (Khouri 2018). It's possible that the Trump administration's statements and actions and a simultaneous increase in worker complaints about deportation threats are not a coincidence, since employers who have unauthorized immigrant employees may be emboldened to use an increase in immigration enforcement as a tool to keep wages low and workers in fear of reporting legal violations to labor standards enforcement agencies (Mansfield 2017).

Numerous members of the Trump administration, including President Trump himself and U.S. Attorney General Jeff Sessions, have expressed their displeasure with California's immigration policies and sanctuary laws (Fuller and Yee 2018; Koseff 2018). On March 6, 2018, the U.S. Department of Justice (DOJ) filed a complaint against California Governor Jerry Brown and Attorney General Xavier Becerra in federal district court, seeking to overturn three California laws related to immigration on constitutional grounds (Benner and Medina 2018), including two of the laws discussed in this report, AB

AR004388

450 and SB 54, claiming that they interfere with federal immigration enforcement efforts and conflict with federal law. The dispute between the federal and California governments is likely to take months, if not years, to resolve, and it is far too early to make predictions about the outcome.

California's laws intended to protect unauthorized workers from retaliation and other abuses based on immigration status are relatively new innovations; together, they constitute a groundbreaking experiment that has the capability to reduce some of the inherent vulnerabilities workers face when they are employed without work authorization. California's efforts in this area are especially valuable in an era of increased immigration enforcement at the federal level.

While it is too early to judge the success of California's laws that protect immigrant workers—or to guess how the DOJ's lawsuit against California will be resolved—these laws are a promising beginning for addressing immigration-related labor standards issues and reveal a willingness on the part of the California legislature and the Brown administration to think outside the box in order to grapple with a new, ramped-up version of immigration enforcement during the Trump era. Other states should follow California's lead and innovate with new laws that protect workers from retaliation, wage theft, and other workplace abuses that are facilitated by virtue of their immigration status—and then enforce those laws vigorously.

# Acknowledgment

This publication was made possible by a grant from the Carnegie Corporation of New York. The statements made and views expressed are solely the responsibility of the author.

# About the author

**Daniel Costa** joined the Economic Policy Institute in 2010 and is currently the director of immigration law and policy research. An attorney, his current areas of research include a wide range of labor migration issues, including the management of temporary foreign worker programs, both high- and less-skilled migration, immigrant workers' rights, and forced migration, including refugee and asylum issues and the global migration crisis. He has testified on immigration before the U.S. Congress, has been quoted by a number of news outlets, has appeared on radio and television news, and his commentaries have appeared in various publications. He received his LL.M in International and Comparative Law from Georgetown University and his J.D. in International Law from Syracuse University.

# Endnotes

**1.** State labor laws and the federal Fair Labor Standards Act do not distinguish between workers by immigration

AR004389

status.

**2.** The share of unauthorized immigrants in California's labor force has declined to 9.0 percent in 2014 from 9.7 percent in 2010 (Passel and Cohn 2011).

**3.** See, for example, Greenhouse and Yaccino 2012.

**4.** The text of these bills is available at leginfo.legislature.ca.gov: **AB-263 Employment: retaliation: immigration-related practices (2013–2014)**; **SB-666 Employment: retaliation (2013–2014)**; **AB-524 Immigrants: extortion (2013–2014)**; **AB-2751 Retaliation (2013–2014)**.

**5.** For more on E-Verify, see the "**E-Verify**" webpage on the U.S. Citizenship and Immigration Services website at **www.uscis.gov/e-verify**.

**6.** For more background on reporting a labor violation in California, see DLSE 2014.

**7.** For more background on filing a retaliation complaint in California, see DLSE 2013.

**8.** For more background and information about retaliation complaints and investigations, see the "**Retaliation Complaint Investigation Unit (RCI)**" webpage on the California Labor Commissioner's Office website at **www.dir.ca.gov/dlse/dlseRetaliation.html**.

**9.** Conversation between the author and California Labor Commissioner Julie Su.

**10. SB-1001 Employment: unfair practices (2015–2016)** (text available at leginfo.legislature.ca.gov).

**11. AB-622 Employment: E-Verify system: unlawful business practices (2015–2016)** (text available at leginfo.legislature.ca.gov).

**12. AB-450 Employment regulation: immigration worksite enforcement actions (2017–2018)** (text available at leginfo.legislature.ca.gov).

**13.** For more background on I-9 forms, see the "**I-9, Employment Eligibility Verification**" webpage on the U.S. Citizenship and Immigration Services website at **www.uscis.gov/i-9**.

**14.** For more background on AB 450 and the definition of "nonpublic areas of a place of labor," see California Labor Commissioner and California Attorney General 2017.

**15.** See 8 C.F.R. § 274a.2. Verification of identity and employment authorization.

**16.** "Constructive knowledge" means the employer has positive information such as a notice from DHS that an employee is not authorized to work. For a further discussion of constructive knowledge in the employment context, see ***Aramark Facility Svs. v. SEIU Local 1877*, No. 06-56662 (9th Cir. June 16, 2008)**.

**17.** For example, when an employee is reinstated after being suspended or disciplined, he or she is continuing employment and is not considered a new hire. For a further discussion about employment verification and determining whether an employee is continuing employment or is a new hire, see ***Santillan v. USA Waste of California, Inc.*, No. 15-55238 (9th Cir. April 7, 2017)** (discussing 8 C.F.R. § 274a.2).

AR004390

**18.** See, for example, García Hernández 2017, Queally 2017, Meltzer 2017, Hurowitz and de la Hoz 2017, *World* staff 2017, and Coll 2017.

**19.** The text of these bills is available at leginfo.legislature.ca.gov: **SB-54 Law enforcement: sharing data (2017–2018)**; **AB-4 State government: federal immigration policy enforcement (2013–2014)**; **AB-2792 Local law enforcement agencies: federal immigration policy enforcement: ICE access (2015–2016)**. For additional background, see the **ICE Out of California** website at **www.iceoutofca.org**.

**20. SB-183 State buildings: federal immigration agents (2017–2018)** (text available at leginfo.legislature.ca.gov).

**21.** The most recent data on I-9 audits shows that the number of audits increased only slightly in fiscal 2017 compared with fiscal 2016, from 1,279 to 1,360 (Francis 2018). However, fiscal 2017 included the final four months of the Obama administration, and it generally takes time for a new administration to establish new policies and implement them. As a result, it is likely that these numbers will begin to increase considerably in 2018 and throughout the remaining years of the Trump administration.

# References

Allyn, Bobby. 2017. "**In Philly Halls of Justice, Feds Seizing More Immigrants with No Criminal Past**." *WHYY News*, December 20.

American Immigration Council (AIC). 2017. *Immigrants in California* (fact sheet). September 15.

Benner, Katie, and Jennifer Medina. 2018. "**Trump Administration Sues California over Immigration Laws**." *New York Times*, March 6.

Bernhardt, Annette, Ruth Milkman, Nik Theodore, Douglas Heckathorn, Mirabai Auer, James DeFilippis, Ana Luz González, Victor Narro, Jason Perelshteyn, Diana Polson, and Michael Spiller. 2009. *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities*. Center for Urban Economic Development, National Employment Law Project, and UCLA Institute for Research on Labor and Employment.

California Labor Commissioner and California Attorney General. 2017. "**Immigrant Worker Protection Act (Assembly Bill 450): Frequently Asked Questions**." Office of the Attorney General, California Department of Justice, and California Department of Industrial Relations.

Cantil-Sakauye, Tani. 2017. "**Chief Justice Cantil-Sakauye Objects to Immigration Enforcement Tactics at California Courthouses**." California Courts Newsroom, March 16.

Cho, Eunice Hyunhye, and Monica Guizar. 2014. *Toolkit: California's New Immigrant Worker Protections Against Employer Retaliation*. National Employment Law Project and Weinberg, Roger & Rosenfeld, May 2014.

Coll, Steve. 2017. "**When a Day in Court Is a Trap for Immigrants**." *New Yorker*, November 8.

Department of Homeland Security (DHS). 2014. "**Policies for the Apprehension, Detention and Removal of**

AR004391

**Undocumented Immigrants**.” DHS Memorandum, November 20.

Division of Labor Standards Enforcement (DLSE). 2013. “**Retaliation and Discrimination Complaints: A Summary of Procedures**.” State of California, Department of Industrial Relations, February.

Division of Labor Standards Enforcement (DLSE). 2014. *Report a Labor Violation to the California Labor Commissioner's Bureau of Field Enforcement*. Bureau of Field Enforcement, June.

Emslie, Alex, Julie Small, and JoeBill Muñoz. 2018. “**ICE Audits Nearly 80 Northern California Companies: Lawmakers, Advocates Respond**.” *The California Report*, KQED News, February 2.

Fox News. 2018. “**Acting ICE Director: California Made a Foolish Decision.**” Transcript of interview of Acting ICE Director Tom Homan by Neil Cavuto on *Your World*, January 2.

Francis, Laura. 2018. “**ICE Work-Site Enforcement Likely to Borrow from Obama, Bush**.” *Bloomberg Law*, February 5.

Fuller, Thomas, and Vivian Yee. 2018. “**Jeff Sessions Scolds California in Immigration Speech: 'We Have a Problem.'**” *New York Times,* March 7.

García Hernández, César Cuauhtémoc. 2017. “**ICE's Courthouse Arrests Undercut Democracy**.” *New York Times*, November 26.

Gee, Lisa Christensen, Matthew Gardner, and Meg Wiehe. 2016. *Undocumented Immigrants' State and Local Tax Contributions*. The Institute on Taxation & Economic Policy, February.

Greenhouse, Steven, and Steven Yaccino. 2012. “**Fight over Immigrant Firings**.” *New York Times*, July 27.

Guizar, Monica. 2017. “State and Federal Protections for Immigrant Worker Whistleblowers, Witnesses, or Other Victims of Discrimination or Retaliation: A Summary of Protections under California Law and the Interagency Working Group for the Consistent Enforcement of Federal Labor, Employment and Immigration Laws.” Paper presented at the California State Bar Labor and Employment Section Annual Meeting, July 14.

Hallman, Hunter. 2018. “**Mixed Verdict on ICE's New Courthouse Guidance**.” Bipartisan Policy Center, February 6.

Hamilton, Valerie. 2017. “**California's Undocumented Workers Help the Economy Grow—But May Pay the Cost**.” PRI's *The World*, March 6.

Hart, Angela. 2018. “**'We Will Prosecute' Employers Who Help Immigration Sweeps, California AG Says**.” *Sacramento Bee*, January 18.

Hurowitz, Noah, and Felipe de la Hoz. 2017. “**Legal Aid Lawyers Stage Walkout after Yet Another ICE Court Arrest**.” *Village Voice*, November 28.

Immigrant Defense Project. 2017. “**ICE Courthouse Arrests in New York by the Numbers**.” November 17.

Immigration and Customs Enforcement (ICE). 2017. “**Statement from ICE Acting Director Tom Homan on California Sanctuary Law**.” Department of Homeland Security, October 6.

AR004392

Immigration and Customs Enforcement (ICE). 2018. *Directive Number 11072.1: Civil Immigration Enforcement Actions inside Courthouses*. January 10.

Kavilanz, Parija. 2018. "**ICE Pledges Immigration Crackdown on Businesses. Here's What It Looks Like**." *CNN Money*, January 15.

Khouri, Andrew. 2018. "**More Workers Say Their Bosses Are Threatening to Have Them Deported.**" *Los Angeles Times*, January 2.

Kitroeff, Natalie. 2017. "**Officials Say Immigration Agents Showed Up at Labor Dispute Proceedings. California Wants Them Out.**" *Los Angeles Times*, August 3.

Koseff, Alexei. 2018. "**Trump Runs for Reelection against California: 'The Place Is Totally Out of Control.'**" *Sacramento Bee*, March 13.

Krogstad, Jens Manuel, Jeffrey S. Passel and D'Vera Cohn. 2017. *5 Facts about Illegal Immigration in the U.S.* Pew Research Center, April 27.

Levine, Marianne. 2018. "**Behind the Minimum Wage Fight, a Sweeping Failure to Enforce the Law.**" *Politico*, February 18.

López, Gustavo, and Kristen Bialik. 2017. *Key Findings about U.S. Immigrants*. May 3.

Mansfield, Christina. 2017. "**Business and ICE Collaborate to Keep Workers Down.**" *Sacramento Bee*, August 4.

Martelle, Scott. 2018. "**A New ICE Directive Limiting Arrests in Courthouses Is a Small Silver Lining in a Dark Cloud.**" *Los Angeles Times*, February 1.

Medina, Jennifer. 2017. "**Immigration Agents Should Not 'Stalk' Courts, California Justice Says.**" *New York Times*, March 16.

Meltzer, Erica. 2017. "**Denver Asks ICE to Stay Away from Courthouses, Schools and Other 'Sensitive Areas.'**" *Denverite*, April 6.

Passel, Jeffrey, and D'Vera Cohn. 2011. *Unauthorized Immigrant Population: National and State Trends, 2010*. Pew Research Center, February 1.

Passel, Jeffrey, and D'Vera Cohn. 2015a. *Number of Babies Born in U.S. to Unauthorized Immigrants Declines*. Pew Research Center, September 11.

Passel, Jeffrey, and D'Vera Cohn. 2015b. *Share of Unauthorized Immigrant Workers in Production, Construction Jobs Falls since 2007: In States, Hospitality, Manufacturing and Construction Are Top Industries*. Pew Research Center, March 26.

Passel, Jeffrey S., and D'Vera Cohn. 2016a. *Overall Number of U.S. Unauthorized Immigrants Holds Steady since 2009*. Pew Research Center, September 20.

Passel, Jeffrey S., and D'Vera Cohn. 2016b. *Size of U.S. Unauthorized Immigrant Workforce Stable after*

AR004393

*the Great Recession*. Pew Research Center, November 3.

Pew Research Center. 2016. ***U.S. Unauthorized Immigration Population Estimates***. November 3.

Queally, James. 2017. "**ICE Agents Make Arrests at Courthouses, Sparking Backlash from Attorneys and State Supreme Court.**" *Los Angeles Times*, March 16.

Quesenberry, Raven. 2017. "**Immigration Enforcement and Sensitive Locations: Where Can ICE Make Arrests?**" (blog post). Bipartisan Policy Center website, December 14.

Rosenberg, Mica. 2018. "**U.S. Immigration Agency Clarifies Policy on Courthouse Arrests.**" *Reuters*, January 31.

Stern, Mark Joseph. 2017. "**Bad for Undocumented People, a Gift to Domestic Abusers: An Interview with the Denver City Attorney on the Consequences of the Trump Administration's Immigration Crackdown.**" *Slate*, March 8.

Tahirih Justice Center. 2017. ***Survey Reveals Impact of New Immigration Enforcement Policies on Survivors of Violence***. May 19.

Ulloa, Jazmine. 2018. "**Federal Immigration Agents Would Need Warrants to Enter Schools and Courthouses under This State Bill**." *Los Angeles Times,* January 30.

White House. 2017. "**Executive Order: Enhancing Public Safety in the Interior of the United States**." January 25.

*World* staff. 2017. "**NYC Lawyers Protest after ICE Agents Arrest Immigrant at Brooklyn Courthouse**." PRI's *The World*, December 1.

Zong, Jie, Jeanne Batalova, and Jeffrey Hallock. 2018. ***Frequently Requested Statistics on Immigrants and Immigration in the United States***. Migration Policy Institute, February 8.

See related work on **Immigration | Wage hour and safety laws**

See more work by **Daniel Costa**

AR004394

FOOTNOTE 33

AR004395



# Billions Are Lost to Wage Theft Every Year—New Jersey Must Act to Protect Workers' Paychecks and Level Playing Field for Employers

*More money is lost every year to wage theft than to shoplifting, resulting in billions of dollars in losses to the economy and wreaking havoc in the lives of millions of workers. The failure to enforce wage laws encourages unscrupulous employers to exploit workers in low-wage jobs,* **unwittingly subsidizing abusive business models at the expense of honest, law-abiding employers***. According to an analysis by the* **Economic Policy Institute** *of existing survey data,* **an estimated $15 billion is lost just to minimum wage violations every year***.*

*States and cities have been starting to fight back with improved enforcement measures and dedicating more resources to ensure that workers are compensated for the hard work they do.* **New Jersey legislators are currently considering Senate bill S1790/A2903***, which would strengthen protections for workers in several ways—increasing the penalties that wage violators face (including escalating penalties for repeat violators), providing liquidated damages worth 200 percent of unpaid wages, providing remedies for workers who are retaliated against for filing complaints, and allowing for community-based organizations to do outreach in support of enforcement. With New Jersey's minimum wage set to increase to $15 by 2024, it is crucial that these gains are not siphoned off by employer wage theft, which has been called a "national emergency."*

## Workers Lose Billions Every Year to Wage Theft in the United States

Every year, workers lose billions to wage theft. The Economic Policy Institute studied survey data in the ten largest states (representing over half of the country's working population) and found that $8 billion had been lost to wage theft resulting just from minimum wage violations (not counting overtime and other violations).[1] Adjusted for the entire country, that would mean $15 billion is lost to wage theft every year, more than the $14.7 billion that is estimated to be lost to shoplifting.[2] For the average worker, that can be thousands of dollars lost each year—money that could go towards paying rent, buying clothes and food for children, making necessary repairs to cars, and spending money in the local economy. Workers who experience wage theft are also more likely to be living in poverty and reliant on public assistance to make ends meet.[3]

Wage theft occurs when workers do not receive their promised and legally required wages. It can result from various different violations: Failure to pay minimum wage or overtime,

asking workers to work off the clock, meal break violations, illegal deductions, tipped minimum wage violations, and employee misclassification.[4] And yet wage theft receives far less attention from the media and law enforcement, partly because employers have a great deal more power and influence with lawmakers. The problem is so acute that M. Patricia Smith, NELP senior counsel and the former Solicitor of the federal Department of Labor, called wage theft an "epidemic" and a "national emergency" in a recent op-ed in *The American Prospect*.[5] Good Jobs First and Jobs with Justice found that since 2000, from large employers alone, $9.2 billion in penalties had been collected—clearly only a fraction of annual losses due to wage theft.[6]

| Table 1. 2.4 million workers lose $8 billion annually to minimum wage violations in 10 most populous states | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total number of minimum-wage-eligible workers | Workers suffering wage violations | Share of eligible low-wage workers | Average weekly under-payment | Average weekly wages received | Average annual under-payment if full-year | Share of earned wages not paid | Total earned annual wages not paid to workers |
| *Total* | 59,014,000 | | | | | | | |
| *California* | 14,569,000 | 590,000 | 19.2% | $64 | $224 | $3,400 | 22.3% | $1,979,000,000 |
| *Florida* | 5,515,000 | 404,000 | 24.9% | $54 | $213 | $2,800 | 20.1% | $1,124,000,000 |
| *Georgia* | 3,769,000 | 82,000 | 9.4% | $71 | $203 | $3,700 | 25.9% | $301,000,000 |
| *Illinois* | 5,185,000 | 243,000 | 22.1% | $53 | $205 | $2,800 | 20.6% | $675,000,000 |
| *Michigan* | 2,861,000 | 130,000 | 17.2% | $63 | $169 | $3,300 | 27.3% | $429,000,000 |
| *New York* | 6,047,000 | 300,000 | 19.4% | $62 | $210 | $3,200 | 22.8% | $965,000,000 |
| *North Carolina* | 3,111,000 | 84,000 | 12.3% | $72 | $179 | $3,800 | 28.8% | $316,000,000 |
| *Ohio* | 3,915,000 | 217,000 | 22.7% | $53 | $185 | $2,800 | 22.4% | $601,000,000 |
| *Pennsylvania* | 4,299,000 | 107,000 | 10.4% | $80 | $164 | $4,200 | 32.9% | $448,000,000 |
| *Texas* | 9,743,000 | 265,000 | 10.8% | $85 | $182 | $4,400 | 31.7% | $1,165,000,000 |

**Note:** Full-year annual wages are calculated by multiplying weekly wages by 52 weeks per year. Numbers may not add due to rounding. Shares are computed based on unrounded numbers. "Eligible low-wage workers" includes all minimum-wage-eligible workers in the bottom quintile of wage earners in each state. New Jersey was not included in this survey but table is provided as indication of scope of issue in states with large populations.
**Source:** EPI analysis of Current Population Survey Outgoing Rotation Group data, 2013–2015

## S1790/A2903 Would Strengthen Protections for Workers Who Are Cheated Out of Their Paychecks by Unscrupulous Employers

New Jersey legislators are in the process of considering a bill, S1790/A2903, that could vastly improve workers' chances of recovering unpaid wages and deter dishonest actors from taking advantage of workers in low-wage jobs who are ill-equipped to fight powerful, deep-pocketed employers.[7] The bill would make several important changes in the law that would help to bring New Jersey in line with surrounding states, by removing obstacles to workers filing complaints and increasing penalties for employers who evade the law. Workers would now be able to file a complaint with the Department of Labor and Workforce Development if they experienced retaliation for exercising their right to complain about

AR004397

unpaid wages. In the event of a finding of unpaid wages, workers would be able to receive 200 percent of the amount of unpaid wages in liquidated damages.

At present, the law is skewed towards employers, making it difficult for employees to speak up for fear of retaliation. These and other provisions would give workers better standing to pursue justice and ensure that law-abiding employers are not disadvantaged by employers who rely on abusive business models to pay their employees less than they are owed.

## S1970/A2903 Helps Businesses by Leveling the Playing Field – Weak Enforcement Rewards Unscrupulous Employers and Skews Competition

Too often, unscrupulous businesses try to gain an advantage over law-abiding employers by exploiting workers, knowing that the likelihood that they will get caught – or even that an employee will speak out – may be small. Underpaying workers has sadly become the business model for too many irresponsible companies. That means that employers paying higher wages and providing decent working conditions may bear a higher cost for operating ethically and within the law. The result is that economic competition, particularly in industries with tight profit margins, is often skewed in favor of those businesses willing to skirt the law by underpaying their employees when they see the risk as small.

S1970 helps to change that by raising the costs of illegal practices. Good employers would no longer be disadvantaged by a weak law that rewards non-compliance. **Better enforcement is, in other words, good for business.** Nor would those same unprincipled employers be able any longer to pass on the costs of their dodgy business practices to society, in the form of employees' greater reliance on public benefits, decreased purchasing power, the costs of legal enforcement itself, and a weaker, lower-wage economy. Leveling the playing field will strengthen New Jersey's economy and bring it in line with regional leaders.

## Wage Theft Hurts the Most Vulnerable Workers, Further Destabilizing Those Who Rely the Most on Their Paychecks to Survive

Wage theft is a crime of opportunity, most often found in industries with high concentrations of workers in low-wage jobs who, living paycheck to paycheck, are especially vulnerable to retaliation. A 2009 landmark study, "Broken Laws, Unprotected Workers" of thousands of workers in low-wage jobs in New York, Chicago, and Los Angeles found that two-thirds had been the victim of wage theft in their previous work week, including 76% who were not paid required overtime, and a quarter who were not even paid the minimum wage.[8] One recent survey of fast food workers in the ten most populous U.S. metropolitan areas found that 9 out of 10 had been victims of wage theft.[9]

Immigrants and workers of colors, who are overrepresented in low-wage industries like food services and retail, are particularly vulnerable to wage theft.[10]  The Broken Laws study found that 37 percent of undocumented immigrants surveyed reported being victims of wage theft, comparted to 24 percent of immigrants with work authorization, and 16 percent of U.S.-born workers.[11] The current federal administration's callous and xenophobic policies have only engendered more fear among immigrant communities.

## Retaliation Against Workers Who Speak Up About Stolen Wages Is Rampant and Must Be Curbed to Ensure Effective Enforcement

Too many workers fear speaking up or filing a complaint about wage theft because of how rampant retaliation is, compounding the problem and allowing unscrupulous employers to go undetected, sometimes for years. Retaliation against workers who assert their rights is a significant challenge for the enforcement of employment laws. Termination, hours reduction, and harassment are just a few of the tools that employers use to retaliate against workers who speak up for their rights, wreaking havoc on their lives and making it even harder for them to cover their bills. Last month, the National Employment Law Project, the Center for Popular Democracy, SEIU 32BJ, and Fast Food Justice released a report with the results of a survey of 539 New York City fast food workers, finding that fifty percent had lost a job because their employers had made conditions intolerable.[12]

A forthcoming analysis by NELP of retaliation laws across the country finds that New Jersey is among a third tier of states that provide some process for wage recovery, yet still falls short of truly protecting workers.[13] At present, New Jersey does allow workers to file private lawsuits for retaliation.[14] However, workers who make a complaint for retaliation with the state's Commissioner of Labor do not have a clear right to recover damages, likely leading most workers to find legal representation in an environment that is increasingly hostile for workers in low-wage jobs seeking their day in court, thanks to numerous setbacks at the U.S. Supreme Court and elsewhere.[15] As NELP noted in its *Winning Wage Justice* report: "The high cost of legal representation is a significant barrier to workers achieving redress for wage theft by means of a lawsuit."[16]

Workers need and deserve retaliation protection laws that both contain the essential elements for adequate compensation and deterrence and that do not place the burden exclusively on workers to ensure employer compliance with the law.

## Conclusion and Recommendations

Wage theft is an endemic problem in our society, costing billions every year to workers and the economy. Experience and research have shown that some businesses come to rely on it as almost part of their business model. The result is an uneven playing field for law-abiding businesses and havoc in the lives of working people who depend on their paychecks to survive. New Jersey can improve its ability to combat wage theft by approving S1790/A2903, a measure that will bring the state's laws in line with the most advanced states in fighting wage theft.

# Endnotes

1. David Cooper & Teresa Kroeger, "Employers steal billions from workers' paychecks every year," Economic Policy Institute, May 10, 2017.

2. Amy Traub, "Wage Theft vs. Shoplifting: Guess Who Goes to Jail?" *Demos*, June 13, 2017.

3. Cooper, op. cit.

4. Wagetheft.org, "What is Wage Theft?" Accessed March 13, 2019.

5. Michael Felsen & M. Patricia Smith, "Wage Theft is a National Emergency," *The American Prospect*, March 5, 2019.

6. Good Jobs First et al, "Grand Theft Paycheck: The Large Corporations Shortchanging Their Workers' Wages," June 2018.

7. New Jersey Legislature, "S1790 Concerns law regarding failure to pay wages." Accessed March 13, 2019.

8. Annette Bernhardt et al, "Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities," September 2009.

9. Hart Research Associates, "Key Findings for Survey of Fast Food workers," April 1, 2014.

10. Cooper, op. cit.

11. Bernhardt, op. cit.

12. National Employment Law Project et al, "Fired on a Whim: The Precarious Existence of Fast Food Workers," February 13, 2019.

13. Forthcoming NELP analysis.

14. *See* N.J. Stat. Ann. § 34:19-3; N.J. Stat. Ann. § 34:19-5.

15. *See* N.J. Stat. Ann. § 34:11-56a24.

16. National Employment Law Project, "Winning Wage Justice: An Advocate's guide to State and City Policies to Fight Wage Theft," January 2011.

# FOOTNOTE 42

# New American Economy

Select Location ▶

Overview
Demographics
Entrepreneurship
Taxes & Spending Power
Workforce
Science, Technology, Engineering, and Math
Healthcare
Housing
International Students
Voting Power
Undocumented Immigrants
The DACA-Eligible Population
Temporary Protected Status Holders

**Share:**

AR004402



Immigrants and the economy in:

# New Jersey  Choose a District ▼

Immigrant Residents
**2,048,953**

Immigrant Share of Population
**22.8%**

Immigrant Taxes Paid
**$24.2B**

Immigrant Spending Power
**$60.9B**

AR004403

Immigrant Entrepreneurs
**121,459**

Employees at Immigrant-Owned Firms
**389,580**

## Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group
**0-15**

Foreign-Born Population Share
**5.0%**

U.S.-Born Population Share
**23.5%**

Age Group

**16-64**

Foreign-Born Population Share

**79.1%**

U.S.-Born Population Share

**60.8%**

Age Group

**65+**

Foreign-Born Population Share

**16.0%**

U.S.-Born Population Share

**15.6%**

SHARE DEMOGRAPHICS

## Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

AR004405

## People employed by immigrant-owned firms

**389,580**

## Immigrant entrepreneurs

**121,459**

## Total sales of immigrant-owned firms

**$63.8B**

**This British Immigrant Entrepreneur Calls Immigration "The Ultimate Entrepreneurial Act"**

SHARE ENTREPRENEURSHIP

## Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

AR004406

# Immigrant Household Income

## $85.1B

# Taxes Paid

## $24.2B

— State & Local Taxes

## $7.4B

— Federal Taxes

## $16.8B

# Total Spending Power

## $60.9B

# Net economic benefit of immigrants

## $9.7B

Hispanic Chamber of Commerce Chairman Explains Why Immigrant Entrepreneurs Help New Jersey Make $10 Billion Each Year

SHARE TAXES & SPENDING POWER

## Workforce

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education
### Less Than High School

Foreign-Born Population
**17.7%**

U.S.-Born Population
**6.5%**

Workforce Education

# High School & Some College

Foreign-Born Population

**42.2%**

U.S.-Born Population

**53.9%**

Workforce Education

# Bachelor's Degree

Foreign-Born Population

**23.1%**

U.S.-Born Population

**24.7%**

Workforce Education

# Graduate Degree

Foreign-Born Population

**17.0%**

U.S.-Born Population

**14.9%**

# Top Industries with Highest Share of Foreign-Born Workers

Drycleaning and laundry services

69.3%

Nail salons and other personal care services

64.2%

Private households

60.3%

Taxi and limousine service

59.3%

Not specified manufacturing industries

56.3%

## Top Occupations with Highest Share of Foreign-Born Workers

Maids and Housekeeping Cleaners

71.7%

AR004410

## Software Developers, Applications and Systems Software

**61.6%**

## Packers and Packagers, Hand

**61.5%**

## Computer Programmers

**58.2%**

## Other production workers including semiconductor processors and cooling and freezing equipment operators

**55.6%**

SHARE WORKFORCE

## Science, Technology, Engineering, and Math

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers increase rapidly in the future.

AR004411

## STEM workers who are immigrants

**42.9%**

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

## Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.-born to work as home health aides, but also twice as likely to be physicians and surgeons.

## Nurses who are foreign-born

**30.3%**

## Health aides who are foreign-born

**45.7%**

SHARE HEALTHCARE

AR004412

# Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.

## Immigrant homeowners

**423,133**

## Share of recent homebuyers who were foreign-born

**26.4%**

## Housing wealth held by immigrant households

**$175.1B**

## Amount paid by immigrant-led households in rent

**$6.2B**

SHARE HOUSING

## International Students

AR004413

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

## Students at New Jersey colleges and universities who are international students

### 5.0%

## Economic contribution of international students

### $823.7M

## Jobs supported by international students

### 9,993

SHARE INTERNATIONAL STUDENTS

## Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

# Immigrants eligible to vote

## 1,077,966

SHARE VOTING POWER

## Undocumented Immigrants

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

## Undocumented immigrants

## 500,567

## Share of undocumented immigrants, working age

## 86.5%

## Undocumented Entrepreneurs

## 26,245

AR004415

## Undocumented Household Income

**$11.3B**

## Taxes Paid

**$1.5B**

— State & Local Taxes

**$505.0M**

— Federal Taxes

**$955.0M**

## Total Spending Power

**$9.8B**

**Deportation and Lack of Occupational Licensing Takes Toll on Families and the Economy**



**Immigrants and Labor Unions are "Natural Allies," According to Cornell Union Leadership Institute Co-Director**

AR004416

SHARE UNDOCUMENTED IMMIGRANTS

## The DACA-Eligible Population

DACA-eligible people contribute billions of dollars to the U.S. economy. Clawing back the protections afforded to DACA recipients will likely upset local economies, communities, and schools, hurting employers and businesses dependent these young immigrants as workers and customers.

### Number of DACA Eligible Residents

**47,511**

### Share of DACA Eligible Population in Labor Force that is Employed

**94.1%**

### DACA-Eligible Household Income

**$910.6M**

### Taxes Paid

**$157.8M**

— State & Local Taxes

**$68.2M**

— Federal Taxes

**$89.7M**

**Total Spending Power**

**$752.7M**

SHARE THE DACA-ELIGIBLE POPULATION

## Temporary Protected Status Holders

Recipients of Temporary Protected Status (TPS) have made enormous contributions to various industries and paid a significant amount in federal, state, and local taxes in the United States. Forcing them to leave the country not only risks putting these individuals in danger, but also threatens significant disruption to local economies.

## Number of TPS Holders

**14,765**

AR004418

## Share of TPS Holders, Working Age

**97.0%**

## Share of TPS Holders in Labor Force, Employed

**92.9%**

## TPS Holders' Household Income

**$350.7M**

## Taxes Paid

**$76.8M**

— State & Local Taxes

**$44.7M**

— Federal Taxes

**$32.1M**

## Total Spending Power

**$273.9M**

AR004419

SHARE TEMPORARY PROTECTED STATUS HOLDERS

**Issue:** All ▶

**Type:** All ▶

View All States & Districts

**Feature**
New Jersey

**The Philadelphia Inquirer Opinion: A long walk to a new life: Ragged sneakers remind Cherry...**

**Feature**
New Jersey

**USA Today Opinion: Why voters abandoned anti-immigrant Republicans: Coleman**

**Video**
New Jersey

**Watch: U.S. Senator Cory Booker Joins the iMarch**

**Video**
New Jersey

**Watch: Jason Groupp's Reason for Reform**

**Video**
New Jersey

## Watch: Elizabeth Lewis' Reason for Reform

**Feature**
New Jersey

Meet the New Jersey Entrepreneur Helping 90,000 Children Eat Healthier

**Feature**
New Jersey

## Colombian-American Student Helps U.S. Immigrants Gain Acceptance

**Feature**
New Jersey

## Bangladeshi Uses an Overseas Education to Fight for Worker Rights in U.S.

**Feature**
New Jersey

AR004421

**A Stowaway's Son Uses Business Acumen to Help New Jersey Elders**

**Rather Than Innovate in U.S., Foreign Students Now Consider Leaving**

Feature
New Jersey

Feature
New Jersey

**Smuggled Across the Border, Mexican Entrepreneur a Testament to Hard Work**

**New Jersey Town Re-elects — and Re-elects and Re-elects — its Muslim Immigrant Mayor**

Prev

1

2

Next

**About NAE**

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

**The Latest**

OCTOBER 30, 2019

## New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth

OCTOBER 18, 2019

## New American Economy on the RELIEF Act of 2019

OCTOBER 17, 2019

## New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival

How does NAE define an immigrant?

**Learn More**

FOOTNOTE 43

AR004424

# New American Economy

☰

♂

Select Location ▶

Overview

Demographics

Entrepreneurship

Taxes & Spending Power

Workforce

Science, Technology, Engineering, and Math

Healthcare

Housing

International Students

Voting Power

Undocumented Immigrants

The DACA-Eligible Population

Temporary Protected Status Holders

**Share:**

AR004425



Immigrants and the economy in:

# California  Choose a District ▼

Immigrant Residents
**10,620,982**

Immigrant Share of Population
**26.9%**

Immigrant Taxes Paid
**$105.1B**

Immigrant Spending Power
**$282.8B**

AR004426

Immigrant Entrepreneurs

**818,323**

Employees at Immigrant-Owned Firms

**1,893,843**

## Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group

**0-15**

Foreign-Born Population Share

**3.1%**

U.S.-Born Population Share

**26.6%**

AR004427

Age Group
**16-64**

Foreign-Born Population Share
**79.3%**

U.S.-Born Population Share
**60.8%**

Age Group
**65+**

Foreign-Born Population Share
**17.6%**

U.S.-Born Population Share
**12.6%**

**Watch: Jason Aguilar's Reason for Reform**

SHARE DEMOGRAPHICS

# Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

## People employed by immigrant-owned firms

**1,893,843**

## Immigrant entrepreneurs

**818,323**

## Total sales of immigrant-owned firms

**$310.0B**

**Watch: Venky Ganesan's Reason for Reform**



**Read: Indian Immigrant Starts New VC Fund**

SHARE ENTREPRENEURSHIP

## Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and

AR004429

public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

## Immigrant Household Income

**$387.9B**

## Taxes Paid

**$105.1B**

— State & Local Taxes

**$31.5B**

— Federal Taxes

**$73.5B**

## Total Spending Power

**$282.8B**

## Net economic benefit of immigrants

**$38.7B**

**Watch: Jasmine Martinez's Reason for Reform**

AR004430

SHARE TAXES & SPENDING POWER

## Workforce

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education
### Less Than High School

Foreign-Born Population
**32.3%**

U.S.-Born Population
**7.7%**

Workforce Education

# High School & Some College

Foreign-Born Population

**38.7%**

U.S.-Born Population

**56.1%**

Workforce Education

# Bachelor's Degree

Foreign-Born Population

**17.8%**

U.S.-Born Population

**22.9%**

Workforce Education

# Graduate Degree

Foreign-Born Population

**11.3%**

U.S.-Born Population

**13.3%**

# Top Industries with Highest Share of Foreign-Born Workers

Cut and sew apparel manufacturing

74.8%

Crop production

68.0%

Private households

67.8%

Landscaping services

67.3%

Support activities for agriculture and forestry

66.3%

## Top Occupations with Highest Share of Foreign-Born Workers

Sewing Machine Operators

86.0%

AR004433

## Maids and Housekeeping Cleaners

**81.1%**

## Graders and Sorters, Agricultural Products

**80.6%**

## Agricultural workers, nec

**77.7%**

## Personal Appearance Workers, nec

**72.3%**

Read: Immigrant Chef Brings New Food to Central CA



Watch: Kyle Cherryholmes' Reason for Reform

SHARE WORKFORCE

AR004434

## Science, Technology, Engineering, and Math

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers increase rapidly in the future.

## STEM workers who are immigrants

## 40.4%

**Read: Immigrants Help Start Ups Make Billions**



**Watch: Tim Wong's Reason for Reform**

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

## Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.-born to work as home health aides, but also twice as likely to be physicians and surgeons.

AR004435

## Nurses who are foreign-born

**35.6%**

## Health aides who are foreign-born

**43.7%**

SHARE HEALTHCARE

## Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.

## Immigrant homeowners

**2,093,481**

## Share of recent homebuyers who were foreign-born

**29.8%**

## Housing wealth held by immigrant households

AR004436

$1.4T

## Amount paid by immigrant-led households in rent

$34.6B

SHARE HOUSING

## International Students

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

## Students at California colleges and universities who are international students

5.2%

## Economic contribution of international students

$6.6B

AR004437

## Jobs supported by international students

**74,086**

**Read: Immigrant Entrepreneur May Take His Business Abroad**

SHARE INTERNATIONAL STUDENTS

## Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

## Immigrants eligible to vote

**5,296,146**

SHARE VOTING POWER

## Undocumented Immigrants

AR004438

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

## Undocumented immigrants

**2,171,155**

## Share of undocumented immigrants, working age

**92.2%**

## Undocumented Entrepreneurs

**174,769**

## Undocumented Household Income

**$48.6B**

## Taxes Paid

**$5.9B**

— State & Local Taxes

**$2.0B**

AR004439

— **Federal Taxes**

**$3.9B**

**Total Spending Power**

**$42.7B**

Watch: Juan-Daniel Espitia's Reason for Reform



Watch: Raquel Toledo's Reason for Reform

SHARE UNDOCUMENTED IMMIGRANTS

## The DACA-Eligible Population

DACA-eligible people contribute billions of dollars to the U.S. economy. Clawing back the protections afforded to DACA recipients will likely upset local economies, communities, and schools, hurting employers and businesses dependent these young immigrants as workers and customers.

AR004440

# Number of DACA Eligible Residents

287,971

## Share of DACA Eligible Population in Labor Force that is Employed

93.3%

# Number of DACA-Eligible Entrepreneurs

8,789

# DACA-Eligible Household Income

$5.9B

# Taxes Paid

$999.9M

— State & Local Taxes

$418.6M

— Federal Taxes

$581.3M

## Total Spending Power

**$4.9B**

SHARE THE DACA-ELIGIBLE POPULATION

## Temporary Protected Status Holders

Recipients of Temporary Protected Status (TPS) have made enormous contributions to various industries and paid a significant amount in federal, state, and local taxes in the United States. Forcing them to leave the country not only risks putting these individuals in danger, but also threatens significant disruption to local economies.

## Number of TPS Holders

**57,554**

## Share of TPS Holders, Working Age

**97.0%**

## Share of TPS Holders in Labor Force, Employed

**93.5%**

AR004442

# TPS Holders' Household Income

## $1.2B

# Taxes Paid

## $257.2M

— State & Local Taxes

## $152.6M

— Federal Taxes

## $104.6M

# Total Spending Power

## $988.0M

SHARE TEMPORARY PROTECTED STATUS HOLDERS

Issue:   All

Type:   All

AR004443

**View All States & Districts**

**Press Release**
California

**No Immigrants No Spice and New American Economy Host "BBQ Without Borders" in Oakland, California**

**Feature**
California

**The Los Angeles Daily News Opinion: The continuing cost of the Trump Muslim ban**

**Feature**
California

**Times of San Diego Opinion: Trump's Border Wall Fixation Drives Voters Away from GOP**

**Press Release**
California

**New data shows San Jose's immigrant household income increased by more than $4 billion in...**

**Feature**
California

**The U.S. Needs Science Teachers — Ending the H-4 EAD Pushes This One Out**

**Feature**
California

**St. Louis Tribune Commentary: Two years after Muslim ban, Utah remains a bright spot of...**

AR004444

**Feature**
California

# Los Angeles Daily News Opinion: Two years later, the continuing cost of the Muslim ban

**Feature**
California

**Feature**
California

Salvadorian Immigrant Gives Back through Community Leadership

**Feature**
California

**Video**
California

**After a Career in Computer Science, Cambodian Immigrant Focuses on Community**

**Video**
California

**Mexican Immigrant Turns a Single Taqueria into a $25M Restaurant Group**

**Watch: Dean Saunders' Reason for Reform**

**Watch: Tayde Aburto's Reason for Reform**

Prev 1 2 3 4 5 6 7 8 9 … 15 Next

## About NAE

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

## The Latest

AR004446

OCTOBER 30, 2019

## New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth

OCTOBER 18, 2019

## New American Economy on the RELIEF Act of 2019

OCTOBER 17, 2019

## New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival

How does NAE define an immigrant?

**Learn More**

FOOTNOTE 44

AR004448

New
American
Economy

Select Location ▶

Overview
Demographics
Entrepreneurship
Taxes & Spending Power
Workforce
Science, Technology, Engineering, and Math
Healthcare
Housing
International Students
Voting Power
Undocumented Immigrants
The DACA-Eligible Population

**Share:**



Immigrants and the economy in:

# Michigan  Choose a District ▶

Immigrant Residents
**705,183**

Immigrant Share of Population
**7.1%**

Immigrant Taxes Paid
**$6.7B**

Immigrant Spending Power
**$18.2B**

AR004450

Immigrant Entrepreneurs

**33,713**

Employees at Immigrant-Owned Firms

**167,079**

## Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group

**0-15**

Foreign-Born Population Share

**6.8%**

U.S.-Born Population Share

**20.0%**

AR004451

Age Group
**16-64**

Foreign-Born Population Share
**78.1%**

U.S.-Born Population Share
**63.1%**

Age Group
**65+**

Foreign-Born Population Share
**15.1%**

U.S.-Born Population Share
**16.8%**

SHARE DEMOGRAPHICS

# Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

AR004452

## People employed by immigrant-owned firms

**167,079**

## Immigrant entrepreneurs

**33,713**

## Total sales of immigrant-owned firms

**$27.3B**

In Immigrants, Michigan's Business Community Sees a Way to Grow the Economy, Says Entrepreneur



US Immigration System Isn't Designed for Competition in a Globalized Marketplace, Warns Immigrant CEO of Mavin Global

SHARE ENTREPRENEURSHIP

## Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and

AR004453

public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

## Immigrant Household Income

### $24.9B

## Taxes Paid

### $6.7B

— State & Local Taxes

### $1.9B

— Federal Taxes

### $4.8B

## Total Spending Power

### $18.2B

## Net economic benefit of immigrants

### $1.9B

**This Immigrant is Bringing Billions in Investments and Tens of Thousands of Jobs to Michigan**

AR004454

**Why Republican Governor Rick Snyder Calls Immigrants "Job Generators"**



SHARE TAXES & SPENDING POWER

## Workforce

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education

### Less Than High School

Foreign-Born Population

**20.6%**

U.S.-Born Population

**8.1%**

Workforce Education

# High School & Some College

Foreign-Born Population

**38.0%**

U.S.-Born Population

**64.0%**

Workforce Education

# Bachelor's Degree

Foreign-Born Population

**20.2%**

U.S.-Born Population

**17.1%**

Workforce Education

# Graduate Degree

Foreign-Born Population

**21.2%**

U.S.-Born Population

**10.8%**

# Top Industries with Highest Share of Foreign-Born Workers

**Computer systems design and related services**

25.8%

**Nail salons and other personal care services**

22.5%

**Warehousing and storage**

21.3%

**Services incidental to transportation**

16.1%

**Colleges, universities, and professional schools**

15.5%

**Top Occupations with Highest Share of Foreign-Born Workers**

**Software Developers, Applications and Systems Software**

38.4%

AR004457

## Physicians and Surgeons

**26.3%**

## Mechanical Engineers

**25.8%**

## Computer Programmers

**25.6%**

## Postsecondary Teachers

**22.6%**

Cherry Farm's Ad for American Workers Fails to Get a Single Reply



**Watch: Steve Bardenhagen's Reason for Reform**

SHARE WORKFORCE

## Science, Technology, Engineering, and Math

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers increase rapidly in the future.

## STEM workers who are immigrants

## 18.5%

**Miss Michigan 2016 Just Happens to Be an Automotive Designer–and a Chinese Immigrant**

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

## Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.-born to work as home health aides, but also twice as likely to be physicians and surgeons.

## Nurses who are foreign-born

## 8.1%

AR004459

## Health aides who are foreign-born

5.9%

SHARE HEALTHCARE

## Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.

## Immigrant homeowners

181,647

## Share of recent homebuyers who were foreign-born

8.2%

## Housing wealth held by immigrant households

$44.7B

AR004460

# Amount paid by immigrant-led households in rent

## $1.2B

SHARE HOUSING

# International Students

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

## Students at Michigan colleges and universities who are international students

### 5.6%

## Economic contribution of international students

### $1.2B

## Jobs supported by international students

### 14,385

**Immigration Policy Has a Real Impact on Employers' Bottom Lines in Michigan Says Immigration Lawyer**

AR004461

**Founder of Aspiring Americans Wants to Help Other Undocumented Students Excel**



SHARE INTERNATIONAL STUDENTS

## Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

## Immigrants eligible to vote

### 330,524

SHARE VOTING POWER

## Undocumented Immigrants

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

AR004462

## Undocumented immigrants

### 136,158

## Share of undocumented immigrants, working age

### 84.7%

## Undocumented Household Income

### $2.8B

## Taxes Paid

### $352.6M

— State & Local Taxes

### $114.8M

— Federal Taxes

### $237.8M

## Total Spending Power

### $2.4B

**One of Western Michigan's Most Respected Lawyers Says Deporting Undocumented Immigrants Will Hurt American Workers**



**Watch: Saleem Usmani's Reason for Reform**

SHARE UNDOCUMENTED IMMIGRANTS

## The DACA-Eligible Population

DACA-eligible people contribute billions of dollars to the U.S. economy. Clawing back the protections afforded to DACA recipients will likely upset local economies, communities, and schools, hurting employers and businesses dependent these young immigrants as workers and customers.

## Number of DACA Eligible Residents

**11,747**

## Share of DACA Eligible Population in Labor Force that is Employed

**97.0%**

AR004464

# DACA-Eligible Household Income

## $201.9M

## Taxes Paid

## $32.6M

— State & Local Taxes

## $14.4M

— Federal Taxes

## $18.2M

## Total Spending Power

## $169.3M

SHARE THE DACA-ELIGIBLE POPULATION

Issue: All

Type: All

AR004465

## View All States & Districts

**Feature**
Michigan

**Feature**
Michigan

Immigrant Engineer Driven By a Call to Serve His Country and Community

Immigrant Entrepreneur Opens Doors for Innovation and Design in Wayne County

**Press Release**
Michigan

**Press Release**
Michigan

New Report Shows Immigrants in Genesee County Paid More than $100 Million in Taxes in...

New Data: Wayne County Immigrants Contributed More Than $10.5B to GDP

AR004466

Michigan

Michigan

Immigrant Entrepreneur Helps the City of Flint Pilots Soar with Innovative Training Programs

Immigrant Opens Family-Centered Daycare for Flint Families

**Press Release**
Michigan

**Video**
Michigan

## Launch of Looking for America: Detroit, part of a new dialogue and art initiative that...

## Baobab Fare: The Fighter & The Hustler

**Press Release**
Michigan

**Press Release**
Michigan

## New data shows immigrants in Detroit paid

## New data shows Grand Rapids' immigrants

AR004467

more than $4.4 billion in taxes in 2017,...

earned close to $2 billion in household income in...

**In the News**
Michigan

**Press Release**
Michigan

## Grand Rapids Business Journal: Report documents immigrant contributions

Foreign-Born Residents Contributed $3.3 Billion to Kent County GDP in 2016

Prev    1   2   3   4   5   6    Next

**About NAE**

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

**The Latest**

OCTOBER 30, 2019

**New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth**

OCTOBER 18, 2019

**New American Economy on the RELIEF Act of 2019**

OCTOBER 17, 2019

**New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival**

How does NAE define an immigrant?

**Learn More**

FOOTNOTE 45

AR004471



New American Economy

Select Location ▸

Overview
Demographics
Entrepreneurship
Taxes & Spending Power
Workforce
Science, Technology, Engineering, and Math
Healthcare
Housing
International Students
Voting Power
Undocumented Immigrants
The DACA-Eligible Population

**Share:**



Immigrants and the economy in:

# Illinois Choose a District ▶

Immigrant Residents

**1,824,508**

Immigrant Share of Population

**14.3%**

Immigrant Taxes Paid

**$17.6B**

Immigrant Spending Power

**$46.6B**

AR004473

Immigrant Entrepreneurs

**118,055**

Employees at Immigrant-Owned Firms

**390,685**

## Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group

**0-15**

Foreign-Born Population Share

**3.3%**

U.S.-Born Population Share

**22.7%**

AR004474

Age Group
**16-64**

Foreign-Born Population Share
**81.0%**

U.S.-Born Population Share
**62.2%**

Age Group
**65+**

Foreign-Born Population Share
**15.7%**

U.S.-Born Population Share
**15.1%**

**Watch: Cliff Williams' Reason for Reform**



**Read: Immigrants Teach the Value of Community**

SHARE DEMOGRAPHICS

AR004475

# Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

## People employed by immigrant-owned firms

**390,685**

## Immigrant entrepreneurs

**118,055**

## Total sales of immigrant-owned firms

**$63.9B**

**Read: Real Estate Tycoon, Philanthropist, Immigrant**

SHARE ENTREPRENEURSHIP

# Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and

AR004476

public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

## Immigrant Household Income

### $64.1B

## Taxes Paid

### $17.6B

— State & Local Taxes

### $6.0B

— Federal Taxes

### $11.5B

## Total Spending Power

### $46.6B

## Net economic benefit of immigrants

### $8.0B

**Watch: Lincoln Lounsbury's Reason for Reform**

AR004477



**Read: A Meatpacker with a Master's Degree**

SHARE TAXES & SPENDING POWER

## Workforce

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education
### Less Than High School

Foreign-Born Population
**26.7%**

U.S.-Born Population
**7.3%**

AR004478

Workforce Education

# High School & Some College

Foreign-Born Population

**41.4%**

U.S.-Born Population

**57.7%**

Workforce Education

# Bachelor's Degree

Foreign-Born Population

**18.7%**

U.S.-Born Population

**21.5%**

Workforce Education

# Graduate Degree

Foreign-Born Population

**13.2%**

U.S.-Born Population

**13.5%**

# Top Industries with Highest Share of Foreign-Born Workers

AR004479

Nail salons and other personal care services

57.3%

Animal slaughtering and processing

53.0%

Taxi and limousine service

45.8%

Services to buildings and dwellings

45.3%

Private households

44.7%

## Top Occupations with Highest Share of Foreign-Born Workers

Personal Appearance Workers, nec

69.3%

AR004480

## Painters, Construction and Maintenance

**51.5%**

## Food preparation and serving related workers, nec

**48.3%**

## Maids and Housekeeping Cleaners

**47.7%**

## Packaging and Filling Machine Operators and Tenders

**46.9%**

Watch: Eric Wu's Reason for Reform



Read: A Diversity Visa Success Story

SHARE WORKFORCE

## Science, Technology, Engineering, and Math

AR004481

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their needs for high-skilled STEM workers increase rapidly in the future.

## STEM workers who are immigrants

## 24.1%

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

## Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.-born to work as home health aides, but also twice as likely to be physicians and surgeons.

## Nurses who are foreign-born

## 16.7%

## Health aides who are foreign-born

## 15.2%

**Read: A Peoria Doctor Praises Immigrants**

AR004482

SHARE HEALTHCARE

## Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.

## Immigrant homeowners

468,137

## Share of recent homebuyers who were foreign-born

17.3%

## Housing wealth held by immigrant households

$132.1B

## Amount paid by immigrant-led households in rent

$3.7B

SHARE HOUSING

## International Students

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

### Students at Illinois colleges and universities who are international students

5.6%

### Economic contribution of international students

$1.8B

### Jobs supported by international students

24,330

Read: Republican Prof Says Our Economy Needs Immigrants

SHARE INTERNATIONAL STUDENTS

# Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

## Immigrants eligible to vote

**884,726**

SHARE VOTING POWER

# Undocumented Immigrants

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

## Undocumented immigrants

**488,873**

## Share of undocumented immigrants, working age

**91.7%**

AR004485

## Undocumented Entrepreneurs

**27,396**

## Undocumented Household Income

**$10.5B**

## Taxes Paid

**$1.3B**

— State & Local Taxes

**$539.1M**

— Federal Taxes

**$720.9M**

## Total Spending Power

**$9.2B**

Watch: Nancy Long's Reason for Reform

AR004486

SHARE UNDOCUMENTED IMMIGRANTS

## The DACA-Eligible Population

DACA-eligible people contribute billions of dollars to the U.S. economy. Clawing back the protections afforded to DACA recipients will likely upset local economies, communities, and schools, hurting employers and businesses dependent these young immigrants as workers and customers.

## Number of DACA Eligible Residents

**62,511**

## Share of DACA Eligible Population in Labor Force that is Employed

**94.1%**

## DACA-Eligible Household Income

**$1.2B**

## Taxes Paid

**$209.0M**

— State & Local Taxes

**$105.9M**

— Federal Taxes

**$103.1M**

**Total Spending Power**

**$947.9M**

SHARE THE DACA-ELIGIBLE POPULATION

Issue:  All

Type:  All

View All States & Districts

**Feature**
Illinois

**Religion News Service Opinion: The refugee**

**Feature**
Illinois

**Crain's Chicago Business Opinion: Illinois job**

AR004488

**crisis broke my heart, but refugees mended it**

Feature
Illinois

**Communications of the ACM Opinion: Immigrants Help Solve the Looming STEM Worker Shortage**

Feature
Illinois

After 23 Years of Waiting, Rohingya Refugee Builds New Life in Chicago

Feature
Illinois

**Chicago Tribune Commentary: I helped refugees working in Iraq. Now I'm a refugee working in the...**

Press Release
Illinois

**Immigrants Accounted for One-Third of Chicago's Entrepreneurs in 2016**

**Feature**
Illinois

An Indian Entrepreneur's Unexpected Exercise Innovation

**Feature**
Illinois

Chicago Business Leader, Grandson of Italian Immigrant, Advocates for Restaurant Workers Across Illinois

**In the News**
Illinois

**The Daily Inni: Champaign County immigration impact report shows need for inclusive community**

**In the News**
Illinois

**WILL: New Report Shows Immigrants Contribute $1.4 Billion To Champaign County Economy**

**In the News**
Illinois

**FOX Illinois: New study shows immigrants**

**In the News**
Illinois

**The News-Gazette: Immigration panelists:**

AR004490

contribute $1.4B to Champaign County's economy

## Integration requires bridging culture-shock gap

Prev    1   2   3   4   5   6   7   8    Next

## About NAE

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

## The Latest

OCTOBER 30, 2019

### New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth

OCTOBER 18, 2019

AR004491

# New American Economy on the RELIEF Act of 2019

OCTOBER 17, 2019

## New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival

How does NAE define an immigrant?

**Learn More**

AR004492

FOOTNOTE 46

AR004493



New
American
Economy

Select Location ▶

Overview
Demographics
Entrepreneurship
Taxes & Spending Power
Workforce
Science, Technology, Engineering, and Math
Healthcare
Housing
International Students
Voting Power
Undocumented Immigrants
The DACA-Eligible Population

**Share:**

AR004494

Immigrants and the economy in:

# Hawaii  Choose a District ▸

Immigrant Residents
**258,997**

Immigrant Share of Population
**18.1%**

Immigrant Taxes Paid
**$2.2B**

Immigrant Spending Power
**$5.8B**

Immigrant Entrepreneurs
**18,698**

Employees at Immigrant-Owned Firms
**42,169**

## Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group
**0-15**

Foreign-Born Population Share
**3.7%**

U.S.-Born Population Share
**22.6%**

AR004496

Age Group
**16-64**

Foreign-Born Population Share
**73.1%**

U.S.-Born Population Share
**60.9%**

Age Group
**65+**

Foreign-Born Population Share
**23.2%**

U.S.-Born Population Share
**16.6%**

SHARE DEMOGRAPHICS

## Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

## People employed by immigrant-owned firms

**42,169**

## Immigrant entrepreneurs

**18,698**

## Total sales of immigrant-owned firms

**$6.9B**

**Read: Immigrant-Run Franchises Rarely Fail**

SHARE ENTREPRENEURSHIP

## Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

AR004498

## Immigrant Household Income

**$8.0B**

## Taxes Paid

**$2.2B**

— State & Local Taxes

**$774.0M**

— Federal Taxes

**$1.5B**

## Total Spending Power

**$5.8B**

## Net economic benefit of immigrants

**$805.6M**

# Workforce

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education
### Less Than High School

Foreign-Born Population
**19.8%**

U.S.-Born Population
**4.8%**

Workforce Education
### High School & Some College

Foreign-Born Population
**53.2%**

U.S.-Born Population
**60.6%**

Workforce Education

## Bachelor's Degree

Foreign-Born Population

**18.8%**

U.S.-Born Population

**22.8%**

Workforce Education

## Graduate Degree

Foreign-Born Population

**8.1%**

U.S.-Born Population

**11.8%**

# Top Industries with Highest Share of Foreign-Born Workers

## Traveler accommodation

**38.0%**

## Restaurants and other food services

**30.2%**

Grocery stores

26.1%

Real estate

25.7%

Colleges, universities, and professional schools

23.6%

## Top Occupations with Highest Share of Foreign-Born Workers

Janitors and Building Cleaners

41.8%

Chefs and Cooks

37.3%

Cashiers

31.6%

AR004502

## Office Clerks, General

**26.1%**

## Accountants and Auditors

**24.7%**

SHARE WORKFORCE

## Science, Technology, Engineering, and Math

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers increase rapidly in the future.

## STEM workers who are immigrants

**19.5%**

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

AR004503

# Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.-born to work as home health aides, but also twice as likely to be physicians and surgeons.

## Nurses who are foreign-born

**23.8%**

## Health aides who are foreign-born

**37.8%**

SHARE HEALTHCARE

# Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.

AR004504

# Immigrant homeowners

**50,033**

## Share of recent homebuyers who were foreign-born

**22.3%**

## Housing wealth held by immigrant households

**$35.8B**

## Amount paid by immigrant-led households in rent

**$613.7M**

SHARE HOUSING

# International Students

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

AR004505

## Students at Hawaii colleges and universities who are international students

**6.2%**

## Economic contribution of international students

**$114.2M**

## Jobs supported by international students

**970**

SHARE INTERNATIONAL STUDENTS

## Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

## Immigrants eligible to vote

**148,701**

AR004506

SHARE VOTING POWER

## Undocumented Immigrants

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

## Undocumented immigrants

**45,473**

## Share of undocumented immigrants, working age

**86.1%**

## Undocumented Household Income

**$503.0M**

## Taxes Paid

**$61.3M**

AR004507

— State & Local Taxes

**$28.4M**

— Federal Taxes

**$32.9M**

**Total Spending Power**

**$441.8M**

SHARE UNDOCUMENTED IMMIGRANTS

## The DACA-Eligible Population

DACA-eligible people contribute billions of dollars to the U.S. economy. Clawing back the protections afforded to DACA recipients will likely upset local economies, communities, and schools, hurting employers and businesses dependent these young immigrants as workers and customers.

## Number of DACA Eligible Residents

**5,035**

## DACA-Eligible Household Income

AR004508

$97.5M

## Taxes Paid

$18.0M

— State & Local Taxes

$9.5M

— Federal Taxes

$8.4M

## Total Spending Power

$79.6M

SHARE THE DACA-ELIGIBLE POPULATION

Issue:   All

Type:   All

AR004509

View All States & Districts

**Video**
Hawaii

## Watch: Eddie Flores' Reason for Reform

**Video**
Hawaii

## Watch: Donovan De La Cruz's Reason for Reform

**Feature**
Hawaii

## DACA Recipient Wants to Give Her All to Only Country She Knows

**In the News**
Hawaii

## KHon2: Hawaii one of top 10 states benefiting economically from immigration

**In the News**
Hawaii

## KHON: Analysis: Hawaii one of top 10 states benefiting economically from immigration

**Research**
Hawaii

AR004510

The Contributions of New Americans in Hawaii

**Feature**
**Hawaii**

Successful Foreign-Born CEO Explains Why Immigrant-Run Franchises
Almost Never Fail

**About NAE**

AR004511

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

**The Latest**

OCTOBER 30, 2019

**New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth**

OCTOBER 18, 2019

**New American Economy on the RELIEF Act of 2019**

OCTOBER 17, 2019

**New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival**

How does NAE define an immigrant?

**Learn More**

AR004512

# FOOTNOTE 47

AR004514



New
American
Economy

Select Location ▶

Overview
Demographics
Entrepreneurship
Taxes & Spending Power
Workforce
Science, Technology, Engineering, and Math
Healthcare
Housing
International Students
Voting Power
Undocumented Immigrants
The DACA-Eligible Population
Temporary Protected Status Holders

**Share:**

AR004515



Immigrants and the economy in:

# New York  Choose a District ▾

Immigrant Residents
**4,525,241**

Immigrant Share of Population
**22.8%**

Immigrant Taxes Paid
**$51.6B**

Immigrant Spending Power
**$117.8B**

AR004516

Immigrant Entrepreneurs

**316,244**

Employees at Immigrant-Owned Firms

**825,557**

## Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group

**0-15**

Foreign-Born Population Share

**3.9%**

U.S.-Born Population Share

**22.8%**

AR004517

Age Group
**16-64**

Foreign-Born Population Share
**77.1%**

U.S.-Born Population Share
**62.1%**

Age Group
**65+**

Foreign-Born Population Share
**18.9%**

U.S.-Born Population Share
**15.1%**

SHARE DEMOGRAPHICS

# Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

AR004518

## People employed by immigrant-owned firms

825,557

## Immigrant entrepreneurs

316,244

## Total sales of immigrant-owned firms

$135.1B

SHARE ENTREPRENEURSHIP

## Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

## Immigrant Household Income

$169.4B

AR004519

## Taxes Paid

### $51.6B

— State & Local Taxes

### $18.5B

— Federal Taxes

### $33.1B

## Total Spending Power

### $117.8B

## Net economic benefit of immigrants

### $18.1B

SHARE TAXES & SPENDING POWER

## Workforce

AR004520

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education
### Less Than High School

Foreign-Born Population
**24.6%**

U.S.-Born Population
**8.8%**

Workforce Education
### High School & Some College

Foreign-Born Population
**44.7%**

U.S.-Born Population
**52.8%**

Workforce Education

## Bachelor's Degree

Foreign-Born Population

**17.4%**

U.S.-Born Population

**21.5%**

Workforce Education

## Graduate Degree

Foreign-Born Population

**13.3%**

U.S.-Born Population

**16.9%**

## Top Industries with Highest Share of Foreign-Born Workers

### Taxi and limousine service

**79.1%**

### Private households

**66.3%**

AR004522

Home health care services

**64.4%**

Cut and sew apparel manufacturing

**61.5%**

Services to buildings and dwellings

**59.9%**

## Top Occupations with Highest Share of Foreign-Born Workers

Taxi Drivers and Chauffeurs

**77.0%**

Personal Appearance Workers, nec

**71.0%**

Maids and Housekeeping Cleaners

**64.7%**

AR004523

## Nursing, Psychiatric, and Home Health Aides

### 63.0%

## Construction Laborers

### 55.1%

**Upstate, a Fourth Generation Farmer Makes Passionate Plea for Immigration Reform**

 **Watch: Derrick De Lise's Reason for Reform**

SHARE WORKFORCE

## Science, Technology, Engineering, and Math

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers increase rapidly in the future.

AR004524

# STEM workers who are immigrants

## 26.7%

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

## Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.-born to work as home health aides, but also twice as likely to be physicians and surgeons.

## Nurses who are foreign-born

## 28.0%

## Health aides who are foreign-born

## 59.0%

SHARE HEALTHCARE

# Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.

## Immigrant homeowners

**770,781**

## Share of recent homebuyers who were foreign-born

**22.4%**

## Housing wealth held by immigrant households

**$463.1B**

## Amount paid by immigrant-led households in rent

**$17.5B**

SHARE HOUSING

# International Students

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

## Students at New York colleges and universities who are international students

### 8.2%

## Economic contribution of international students

### $5.0B

## Jobs supported by international students

### 58,095

**Immigration Policy Is Preventing This New York Family From Fully Contributing to U.S. Economy**

SHARE INTERNATIONAL STUDENTS

## Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

## Immigrants eligible to vote

**2,409,827**

SHARE VOTING POWER

## Undocumented Immigrants

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

## Undocumented immigrants

**794,832**

## Share of undocumented immigrants, working age

**92.3%**

## Undocumented Entrepreneurs

**69,280**

AR004528

## Undocumented Household Income

**$21.5B**

## Taxes Paid

**$3.2B**

— State & Local Taxes

**$1.2B**

— Federal Taxes

**$2.0B**

## Total Spending Power

**$18.3B**

SHARE UNDOCUMENTED IMMIGRANTS

## The DACA-Eligible Population

AR004529

DACA-eligible people contribute billions of dollars to the U.S. economy. Clawing back the protections afforded to DACA recipients will likely upset local economies, communities, and schools, hurting employers and businesses dependent these young immigrants as workers and customers.

## Number of DACA Eligible Residents

**76,262**

## Share of DACA Eligible Population in Labor Force that is Employed

**93.0%**

## Number of DACA-Eligible Entrepreneurs

**2,816**

## DACA-Eligible Household Income

**$1.8B**

## Taxes Paid

**$359.3M**

— State & Local Taxes

**$156.3M**

AR004530

— Federal Taxes

$203.0M

## Total Spending Power

$1.4B

SHARE THE DACA-ELIGIBLE POPULATION

## Temporary Protected Status Holders

Recipients of Temporary Protected Status (TPS) have made enormous contributions to various industries and paid a significant amount in federal, state, and local taxes in the United States. Forcing them to leave the country not only risks putting these individuals in danger, but also threatens significant disruption to local economies.

## Number of TPS Holders

27,347

## Share of TPS Holders, Working Age

97.0%

AR004531

# Share of TPS Holders in Labor Force, Employed

**94.9%**

## TPS Holders' Household Income

**$739.1M**

## Taxes Paid

**$188.2M**

— State & Local Taxes

**$104.9M**

— Federal Taxes

**$83.2M**

## Total Spending Power

**$551.0M**

SHARE TEMPORARY PROTECTED STATUS HOLDERS

AR004532

https://www.newamericaneconomy.org/locations/new-york/#taxes-&-spending-power.

**Issue:** All    ▶

**Type:** All    ▶

View All States & Districts

**Press Release**
New York

**New American Economy Announces Complete Schedule of Events For Inaugural New American Festival, a Celebration...**

**Press Release**
New York

**New American Economy Launches Ticket Sales and Announces Additional Talent for the New American Festival**

**Video**
New York

**Cookbook Author Julia Turshen and the Unifying Power of Food**

**Press Release**
New York

**New data shows that immigrant household income in the New York metro area grew by...**

**Feature**
New York

**Feature**
New York

**Utica Observer Dispatch Guest View: Trump could learn from Utica's refugees**

**Press-Republican In My Opinion: Let international students stay**

Press Release
New York

Video
New York

**New American Economy and Off Ramp Films Debut Mahira Patkovich: A Refugee Rises**

**Trailer for Mahira Patkovich: A Refugee Rises**

Video
New York

Feature
New York

**Mahira Patkovich: A Refugee Rises**

Rwandan Refugee Expands Immigrant-Focused Newspaper into Buffalo-Based Non-Profit

AR004534

**Feature**
New York

**In the News**
Illinois

**World Affairs Council of Pittsburgh: The Role of Immigrants in Reviving the Great Lakes Region**

New York State Assemblyman Reflects on Immigrant Legacy in New York City

Prev

1   2   3   4   5   6   7

Next

**About NAE**

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

**The Latest**

OCTOBER 30, 2019

**New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth**

OCTOBER 18, 2019

**New American Economy on the RELIEF Act of 2019**

OCTOBER 17, 2019

**New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival**

How does NAE define an immigrant?

**Learn More**

AR004536

https://www.newamericaneconomy.org/locations/new-york/#taxes-&-spending-power.

FOOTNOTE 48

AR004538



New
American
Economy

Select Location ▶

Overview
Demographics
Entrepreneurship
Taxes & Spending Power
Workforce
Science, Technology, Engineering, and Math
Healthcare
Housing
International Students
Voting Power
Undocumented Immigrants
The DACA-Eligible Population

**Share:**



Immigrants and the economy in:

# Connecticut  Choose a District ▼

Immigrant Residents
**525,813**

Immigrant Share of Population
**14.7%**

Immigrant Taxes Paid
**$5.9B**

Immigrant Spending Power
**$14.5B**

AR004540

Immigrant Entrepreneurs

**37,285**

Employees at Immigrant-Owned Firms

**95,177**

# Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group

**0-15**

Foreign-Born Population Share

**5.1%**

U.S.-Born Population Share

**20.4%**

AR004541

Age Group
**16-64**

Foreign-Born Population Share
**78.2%**

U.S.-Born Population Share
**62.8%**

Age Group
**65+**

Foreign-Born Population Share
**16.6%**

U.S.-Born Population Share
**16.7%**

SHARE DEMOGRAPHICS

## Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

AR004542

# People employed by immigrant-owned firms

## 95,177

## Immigrant entrepreneurs

## 37,285

# Total sales of immigrant-owned firms

## $15.6B

SHARE ENTREPRENEURSHIP

# Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

# Immigrant Household Income

AR004543

**$20.5B**

## Taxes Paid

**$5.9B**

— State & Local Taxes

**$1.9B**

— Federal Taxes

**$4.0B**

## Total Spending Power

**$14.5B**

## Net economic benefit of immigrants

**$1.9B**

SHARE TAXES & SPENDING POWER

AR004544

# Workforce

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education

### Less Than High School

Foreign-Born Population

**19.9%**

U.S.-Born Population

**7.1%**

Workforce Education

### High School & Some College

Foreign-Born Population

**45.8%**

U.S.-Born Population

**53.6%**

AR004545

Workforce Education
## Bachelor's Degree

Foreign-Born Population
**17.9%**

U.S.-Born Population
**22.1%**

Workforce Education
## Graduate Degree

Foreign-Born Population
**16.5%**

U.S.-Born Population
**17.2%**

## Top Industries with Highest Share of Foreign-Born Workers

### Services to buildings and dwellings

**49.5%**

### Landscaping services

**35.5%**

Computer systems design and related services

31.9%

Construction

27.3%

Nursing care facilities

27.3%

## Top Occupations with Highest Share of Foreign-Born Workers

Maids and Housekeeping Cleaners

70.3%

Chefs and Cooks

46.7%

Carpenters

42.8%

AR004547

## Grounds Maintenance Workers

**40.6%**

## Construction Laborers

**40.5%**

SHARE WORKFORCE

## Science, Technology, Engineering, and Math

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers increase rapidly in the future.

## STEM workers who are immigrants

**23.1%**

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

AR004548

## Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.–born to work as home health aides, but also twice as likely to be physicians and surgeons.

### Nurses who are foreign-born

15.7%

### Health aides who are foreign-born

34.6%

SHARE HEALTHCARE

## Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.–born residents.

AR004549

## Immigrant homeowners

**120,651**

### Share of recent homebuyers who were foreign-born

**14.3%**

### Housing wealth held by immigrant households

**$44.1B**

### Amount paid by immigrant-led households in rent

**$1.3B**

SHARE HOUSING

## International Students

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

AR004550

## Students at Connecticut colleges and universities who are international students

**5.9%**

## Economic contribution of international students

**$583.6M**

## Jobs supported by international students

**6,409**

**Watch: Ryan Yeh's Reason for Reform**

SHARE INTERNATIONAL STUDENTS

## Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

## Immigrants eligible to vote

**255,940**

AR004551

SHARE VOTING POWER

## Undocumented Immigrants

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

## Undocumented immigrants

**135,999**

## Share of undocumented immigrants, working age

**88.1%**

## Undocumented Entrepreneurs

**13,332**

## Undocumented Household Income

**$3.8B**

AR004552

## Taxes Paid

### $522.6M

— State & Local Taxes

### $172.8M

— Federal Taxes

### $349.8M

## Total Spending Power

### $3.2B

**Read: Former Yale Dean Says Immigrants Make America Unique**

SHARE UNDOCUMENTED IMMIGRANTS

## The DACA-Eligible Population

DACA-eligible people contribute billions of dollars to the U.S. economy. Clawing back the protections afforded to DACA recipients will likely upset local economies, communities, and schools, hurting employers and businesses dependent these young immigrants as workers and customers.

AR004553

## Number of DACA Eligible Residents

**11,753**

## Share of DACA Eligible Population in Labor Force that is Employed

**88.1%**

## DACA-Eligible Household Income

**$207.9M**

## Taxes Paid

**$34.1M**

— State & Local Taxes

**$15.8M**

— Federal Taxes

**$18.3M**

## Total Spending Power

**$173.8M**

SHARE THE DACA-ELIGIBLE POPULATION

Issue:  All  ▶

Type:  All  ▶

View All States & Districts

**Feature**
Connecticut

**Undocumented for Years, Republican Immigrant Runs for State House**

**Video**
Connecticut

**Watch: Art Feltman's Reason for Reform**

**Video**
Connecticut

**Watch: Kovey Kovalan's Reason for Reform**

**Feature**
Connecticut

**After Fleeing Pinochet, Family Endures the Long Wait of U.S. Policy**

AR004555

**In the News**
Connecticut

## Hartford Business (CT): Visa delay adds uncertainty for CT immigrant- entrepreneurs

**In the News**
Connecticut

## CT Post: Study shows value of undocumented immigrants

**In the News**
Connecticut

## WTNH: Senator Richard Blumenthal Outlines Contributions of Immigrants

**Video**
Connecticut

**In the News**
Connecticut

## Hartford Courant (CT): Study Shows Immigrant Labor Essential For The Night Shift

**In the News**
Connecticut

## Connecticut Mirror: English Learners: Other Places Are Showing What Works

**In the News**
Connecticut

## CT News Junkie: Report Finds Immigrants Are A Powerful Economic Force In Connecticut

**In the News**
Connecticut

AR004556

# Hartford Courant: Advocates: Immigrants Contribute To Connecticut Economy

Prev

1 | 2

Next

**Watch: Ryan Yeh's Reason for Reform**

## About NAE

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

## The Latest

AR004557

OCTOBER 30, 2019

## New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth

OCTOBER 18, 2019

## New American Economy on the RELIEF Act of 2019

OCTOBER 17, 2019

## New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival

How does NAE define an immigrant?

**Learn More**

AR004558

FOOTNOTE 49

AR004559



# New American Economy

≡  ♂

Select Location  ▶

Overview
Demographics
Entrepreneurship
Taxes & Spending Power
Workforce
Science, Technology, Engineering, and Math
Healthcare
Housing
International Students
Voting Power
Undocumented Immigrants

**Share:**

AR004560



Immigrants and the economy in:

# District of Columbia

Immigrant Residents
**103,730**

Immigrant Share of Population
**14.9%**

Immigrant Taxes Paid
**$1.5B**

Immigrant Spending Power
**$3.3B**

AR004561

Immigrant Entrepreneurs

—

Employees at Immigrant-Owned Firms

**20,143**

## Demographics

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

Age Group

**0-15**

Foreign-Born Population Share

**4.4%**

U.S.-Born Population Share

**18.4%**

AR004562

Age Group
**16-64**

Foreign-Born Population Share
**85.4%**

U.S.-Born Population Share
**69.1%**

Age Group
**65+**

Foreign-Born Population Share
**10.2%**

U.S.-Born Population Share
**12.4%**

**Read: Reform Gives Young People a Voice**

SHARE DEMOGRAPHICS

## Entrepreneurship

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

AR004563

## People employed by immigrant-owned firms

### 20,143

## Total sales of immigrant-owned firms

### $3.3B

**Watch: Ramon Cornejo's Reason for Reform**



**Read: An Immigrant Creates Jobs**

SHARE ENTREPRENEURSHIP

## Taxes & Spending Power

Immigrant households contribute hundreds of billions of dollars in federal income, state, and local taxes nationwide and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents in the United States regardless of where they were born, immigrants make use of public services like education, healthcare, and public safety. Even with these costs, however, immigrants' economic contributions far outweigh the extra cost of additional public services they incur.

## Immigrant Household Income

### $4.8B

## Taxes Paid

### $1.5B

— State & Local Taxes

### $410.6M

— Federal Taxes

### $1.1B

## Total Spending Power

### $3.3B

Watch: Raul Herrera's Reason for Reform

SHARE TAXES & SPENDING POWER

AR004565

## Workforce

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. Uniquely, this allows them to fill critical shortages at both ends of the skill spectrum, from high-tech fields to agriculture, hospitality, and service industries.

## Educational Attainment by Nativity, Age 25+

Workforce Education
### Less Than High School

Foreign-Born Population
**20.4%**

U.S.-Born Population
**7.0%**

Workforce Education
### High School & Some College

Foreign-Born Population
**26.5%**

U.S.-Born Population
**34.8%**

AR004566

Workforce Education
## Bachelor's Degree

Foreign-Born Population
**16.9%**

U.S.-Born Population
**25.0%**

Workforce Education
## Graduate Degree

Foreign-Born Population
**36.2%**

U.S.-Born Population
**33.2%**

## Top Industries with Highest Share of Foreign-Born Workers

## Restaurants and other food services

**43.7%**

## National security and international affairs

**27.8%**

AR004567

Scientific research and development services

**22.8%**

Computer systems design and related services

**21.7%**

Colleges, universities, and professional schools

**15.1%**

## Top Occupations with Highest Share of Foreign-Born Workers

**Managers, nec (including Postmasters)**

**15.5%**

**Lawyers, and judges, magistrates, and other judicial workers**

**14.3%**

**Management Analysts**

**10.5%**

AR004568

New ACEO's Fill Depends on Reform

SHARE WORKFORCE

## Science, Technology, Engineering, and Math

Jobs in fields related to science, technology, engineering, and math—or "STEM"—fields are some of the most productive jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, they will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers increase rapidly in the future.

## STEM workers who are immigrants

## 22.7%

**Watch: Roman Holton's Reason for Reform**

SHARE SCIENCE, TECHNOLOGY, ENGINEERING, AND MATH

## Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling with finding enough workers, and in some rural areas, shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the

AR004569

U.S.–born to work as home health aides, but also twice as likely to be physicians and surgeons.

## Health aides who are foreign-born

### 26.0%

SHARE HEALTHCARE

## Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants collectively in the country increased U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.

## Immigrant homeowners

### 15,281

## Share of recent homebuyers who were foreign-born

### 17.3%

## Housing wealth held by immigrant households

### $12.7B

AR004570

# Amount paid by immigrant-led households in rent

## $486.8M

SHARE HOUSING

## International Students

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

## Students at District of Columbia colleges and universities who are international students

## 11.3%

## Economic contribution of international students

## $557.3M

## Jobs supported by international students

## 5,901

SHARE INTERNATIONAL STUDENTS

## Voting Power

As more immigrants naturalize and become eligible to vote, they continue to gain power at the voting booth. The number of immigrant voters is only projected to rise in the next decade, but already in some states, foreign-born voters are already capable of deciding elections.

## Immigrants eligible to vote

## 36,590

SHARE VOTING POWER

## Undocumented Immigrants

The presence of the significant number of undocumented immigrants in the United States, the vast majority of whom have lived in the country for more than five years, poses many legal and political challenges. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are working across the country, collectively contributing billions to the U.S. economy.

## Undocumented immigrants

## 24,617

AR004572

## Share of undocumented immigrants, working age

89.8%

## Undocumented Household Income

$721.4M

## Taxes Paid

$110.1M

— State & Local Taxes

$31.4M

— Federal Taxes

$78.6M

## Total Spending Power

$611.3M

Watch: Dakar Lanzino's Reason for Reform

AR004573



**Watch: Pablo Manriquez's Reason for Reform**

SHARE UNDOCUMENTED IMMIGRANTS

Issue: All

Type: All

View All States & Districts

**Press Release**
**District of Columbia**

**New data shows the number of immigrant entrepreneurs in the Washington, D.C. metro area grew...**

**Video**
**District of Columbia**

**Watch: Alexis Miller's Reason for Reform**

**Video**
**District of Columbia**

**Watch: Dale Moore's Reason for Reform**

**Video**
**District of Columbia**

**Watch: Chuck Rocha's Reason for Reform**

**Video**
**District of Columbia**

**Watch: MSNBC Contributor Maria Teresa Kumar Joins the iMarch**

**In the News**
**District of Columbia**

**Washington Post: Region's demand for bilingual workers is booming. Should D.C. schools offer more dual-language...**

**Feature**
**District of Columbia**

**Video**
**District of Columbia**

**Entrepreneur from New Zealand Creates Jobs while Helping Americans Give Back**

**Watch: Ricardo Villaba's Reason for Reform**

AR004575

**Video**

**District of Columbia**

**Video**

**District of Columbia**

Watch: Ofelia Ramirez's Reason for Reform

Watch: Kony Serrano's Reason for Reform

**Feature**
**District of Columbia**

**Video**
**District of Columbia**

**'Just Give Them a Meal,' Says Pakistani-American Whose Restaurant Feeds the Homeless**

AR004576

Watch: Roman Holton's Reason for Reform

Prev
1    2
Next

## About NAE

New American Economy is a bipartisan research and advocacy organization fighting for smart federal, state, and local immigration policies that help grow our economy and create jobs for all Americans. More...

## The Latest

OCTOBER 30, 2019

## New Data Shows Cedar Rapids' Immigrants Accounted for Nearly Half of the County's Total Population Growth

OCTOBER 18, 2019

## New American Economy on the RELIEF Act of 2019

AR004577

OCTOBER 17, 2019

## New American Economy and the Tennessee Immigrant and Refugee Rights Coalition launch the Nashville New American Festival

How does NAE define an immigrant?

**Learn More**

AR004578

# FOOTNOTE 50

AR004579

# Undocumented Immigrants' State & Local Tax Contributions

## Institute on Taxation & Economic Policy

*Updated March 2017*

Lisa Christensen Gee

Matthew Gardner

Misha E. Hill

Meg Wiehe

### About The Institute on Taxation & Economic Policy

The Institute on Taxation and Economic Policy (ITEP) is a non-profit, non-partisan 501 (c) 3 organization that produces timely, accessible, and sound analyses on federal, state, and local tax policy issues. ITEP's research helps inform policy makers, advocates, the media and general public about the fairness, adequacy, and sustainability of existing tax structures and how proposed tax changes would impact revenues and taxpayers across the income spectrum.

### Acknowledgments

ITEP extends special thanks to David Dyssegaard Kallick at the Fiscal Policy Institute, Michael Leachman at the Center on Budget and Policy Priorities, Jeanne Batalova at the Migration Policy Institute, and Tanya Broder and Kamal Essaheb at the National Immigration Law Center for their guidance on this report.

THE INSTITUTE ON TAXATION AND ECONOMIC POLICY (ITEP)
1616 P. Street NW, Suite 200 ● Washington, DC 20036 ● 202.299.1066 ● www.itep.org

AR004580

Public debates over federal immigration reform, specifically around undocumented immigrants, often suffer from insufficient and inaccurate information about the tax contributions of undocumented immigrants, particularly at the state level. The truth is that undocumented immigrants living in the United States pay billions of dollars each year in state and local taxes. Further, these tax contributions would increase significantly if all undocumented immigrants currently living in the United States were granted a pathway to citizenship as part of a comprehensive immigration reform. Or put in the reverse, if undocumented immigrants are deported in high numbers, state and local revenues could take a substantial hit.

Accurate information about the tax contributions of undocumented immigrants is needed now more than ever. Divisive and objectionable rhetoric has not tempered in the early months of the Trump administration. Policies adopted and supported by the new administration are haphazard in design and impact; they characterize undocumented families as criminals and encourage indiscriminate deportations. Good policy is informed policy. Just like the

## Who Are Undocumented Immigrants?
*Undocumented Immigrants are:*

➢ **Diverse**—Not all undocumented immigrants are from Mexico. While most are from the Americas, many parts of the U.S. are home to immigrants from Asia and the Pacific Islands, Africa, and Europe.

➢ **Families**—Most families have mixed legal status, such as one parent with legal immigration status, one parent without documentation, and a child with U.S. citizenship.

➢ **Concentrated**—Although there are undocumented populations in each state, 1 in 6 live in just 20 metro areas. California, Florida, New Jersey, New York, and Texas are the states with the largest populations.

➢ **Contributing to our Communities**—Over 60% have lived in the U.S. for more than a decade. Labor force participation is high and crime rates are lower than that of U.S. born residents.

➢ **Not Stealing Jobs**—Undocumented immigrants largely work in the positions that an aging and more educated U.S. workforce is unable to fill.

➢ **DREAMers**—Many undocumented immigrants were brought to the U.S. as children. DREAMers must meet education requirements and pass an extensive background screening. They were raised in the U.S., and represent the potential of the next generation.

horrendous impact of breaking up families should not be ignored, neither should the lost tax contributions from isolating or deporting undocumented immigrants.

To better inform the ongoing debates on immigration policy reform, this report provides state-by-state and national estimates on the current state and local tax contributions of the 11 million undocumented immigrants living in the United States as of 2014, and the increase in contributions if all these taxpayers were granted legal status as part of comprehensive reform.[1]

# Key Findings:

● Undocumented immigrants contribute significantly to state and local taxes, collectively paying an estimated **$11.74 billion** a year.[2] Contributions range from just over $550,000 in Montana with an estimated undocumented population of 1,000 to more than $3.1 billion in California, home to more than 3 million undocumented immigrants.

● Undocumented immigrants nationwide pay on average an estimated 8 percent of their incomes in state and local taxes (this is their effective state and local tax rate). To put this in perspective, the top 1 percent of taxpayers pay an average nationwide effective tax rate of just 5.4 percent.[3]

● Granting legal status to all undocumented immigrants in the United States as part of a comprehensive immigration reform and allowing them to work legally would increase their state and local tax contributions by an estimated **$2.18 billion** a year. Their nationwide effective state and local tax rate would increase to 8.6 percent.

AR004581

# Undocumented Immigrants Pay State and Local Taxes: Current Contributions

Like other people living and working in the United States, undocumented immigrants pay state and local taxes. They pay sales and excise taxes when they purchase goods and services (for example, on utilities, clothing and gasoline). They pay property taxes directly on their homes or indirectly as renters. Many undocumented immigrants also pay state income taxes. The best evidence suggests that at least 50 percent of undocumented immigrant households currently file income tax returns using Individual Tax Identification Numbers (ITINs), and many who do not file income tax returns still have taxes deducted from their paychecks.[4]

Collectively, undocumented immigrants in the United States pay an estimated total of $11.74 billion in state and local taxes a year (see Table 1 for state-by-state estimates). This includes more than $7 billion in sales and excise taxes, $3.6 billion in property taxes, and $1.1 billion in personal income taxes.

Another way to measure the state and local taxes that undocumented immigrants pay is through their effective tax rate, which is the share of total income paid in taxes. The effective tax rate is useful for more accurate state-to-state comparisons because it accounts for differences between states' tax structures and population size. Undocumented immigrants' nationwide average effective tax rate is an estimated 8 percent. To put this in perspective, the top 1 percent of taxpayers pay an average nationwide effective tax rate of just 5.4 percent.[5]

## Table 1: Undocumented Immigrants' State and Local Tax Contributions
*Current vs. Full Legal Status for All Undocumented Immigrants*

| State | Current State and Local Taxes | State and Local Taxes if Granted Full Legal Status | Tax Change | State | Current State and Local Taxes | State and Local Taxes if Granted Full Legal Status | Tax Change |
|---|---|---|---|---|---|---|---|
| Alabama | $62,312,000 | $80,061,000 | +$17,749,000 | Montana | $548,000 | $762,000 | +$213,000 |
| Alaska | $4,043,000 | $4,448,000 | +$404,000 | Nebraska | $39,800,000 | $48,177,000 | +$8,376,000 |
| Arizona | $213,574,000 | $252,958,000 | +$39,384,000 | Nevada | $86,101,000 | $94,712,000 | +$8,610,000 |
| Arkansas | $62,767,000 | $77,166,000 | +$14,399,000 | New Hampshire | $7,236,000 | $8,005,000 | +$770,000 |
| California | $3,199,394,000 | $3,653,985,000 | +$454,591,000 | New Jersey | $587,415,000 | $661,130,000 | +$73,716,000 |
| Colorado | $139,524,000 | $172,250,000 | +$32,726,000 | New Mexico | $67,743,000 | $75,756,000 | +$8,013,000 |
| Connecticut | $124,701,000 | $145,284,000 | +$20,583,000 | New York | $1,102,323,000 | $1,349,476,000 | +$247,153,000 |
| Delaware | $13,532,000 | $19,694,000 | +$6,162,000 | North Carolina | $277,402,000 | $370,780,000 | +$93,378,000 |
| Dist. of Col. | $31,765,000 | $38,731,000 | +$6,966,000 | North Dakota | $2,844,000 | $3,263,000 | +$419,000 |
| Florida | $598,678,000 | $658,546,000 | +$59,868,000 | Ohio | $83,247,000 | $108,786,000 | +$25,538,000 |
| Georgia | $351,718,000 | $455,581,000 | +$103,863,000 | Oklahoma | $84,765,000 | $104,648,000 | +$19,884,000 |
| Hawaii | $32,343,000 | $42,750,000 | +$10,408,000 | Oregon | $80,775,000 | $119,365,000 | +$38,590,000 |
| Idaho | $28,613,000 | $34,557,000 | +$5,944,000 | Pennsylvania | $134,872,000 | $186,244,000 | +$51,372,000 |
| Illinois | $758,881,000 | $917,370,000 | +$158,490,000 | Rhode Island | $31,154,000 | $37,564,000 | +$6,410,000 |
| Indiana | $92,200,000 | $120,900,000 | +$28,701,000 | South Carolina | $67,753,000 | $86,195,000 | +$18,442,000 |
| Iowa | $36,728,000 | $45,570,000 | +$8,842,000 | South Dakota | $5,338,000 | $5,872,000 | +$534,000 |
| Kansas | $67,843,000 | $78,897,000 | +$11,054,000 | Tennessee | $107,465,000 | $118,251,000 | +$10,786,000 |
| Kentucky | $36,629,000 | $52,702,000 | +$16,073,000 | Texas | $1,560,896,000 | $1,716,985,000 | +$156,090,000 |
| Louisiana | $67,991,000 | $83,188,000 | +$15,197,000 | Utah | $69,770,000 | $91,255,000 | +$21,485,000 |
| Maine | $4,367,000 | $5,525,000 | +$1,158,000 | Vermont | $2,936,000 | $3,411,000 | +$475,000 |
| Maryland | $332,248,000 | $425,779,000 | +$93,531,000 | Virginia | $255,965,000 | $355,924,000 | +$99,959,000 |
| Massachusetts | $184,605,000 | $240,773,000 | +$56,168,000 | Washington | $316,624,000 | $348,287,000 | +$31,662,000 |
| Michigan | $86,692,000 | $113,910,000 | +$27,217,000 | West Virginia | $5,112,000 | $6,811,000 | +$1,699,000 |
| Minnesota | $83,192,000 | $102,646,000 | +$19,453,000 | Wisconsin | $71,792,000 | $91,691,000 | +$19,899,000 |
| Mississippi | $22,684,000 | $28,028,000 | +$5,344,000 | Wyoming | $4,165,000 | $4,582,000 | +$417,000 |
| Missouri | $48,897,000 | $63,435,000 | +$14,538,000 | **All States** | **$11,739,961,000** | **$13,912,665,000** | **+$2,172,703,000** |

AR004582

# Granting Legal Status to All Undocumented Immigrants Would Boost Their State and Local Tax Contributions

Creating a pathway to citizenship for the 11 million undocumented immigrants living in the United States and allowing them to work here legally would boost their current state and local tax contributions by more than $2.18 billion a year (see Table 1). Personal income tax collections would increase by $1.1 billion a year. Sales and excise taxes would increase by $702 million, and property taxes would grow by $362 million. As a result, the overall state and local taxes paid by undocumented immigrants as a share of their income would increase from 8 percent to 8.6 percent.

The most significant revenue gain would come from the personal income tax, due to both increased earnings and full compliance with the tax code.[6] Multiple studies have shown that legal immigrants have higher wages than undocumented immigrants, thus gaining legal status could lead to a boost in wages. The wage boost is in part due to better job opportunities that would be made available to workers with legal status and also in part to an increased access to higher-level skills and better training. Most comprehensive reform measures to date have included strong incentives or requirements for undocumented immigrants granted legal status to fully comply with tax law.

## Conclusion

Undocumented immigrants make considerable tax contributions. Like other immigrants and U.S. citizens they purchase goods and services, work, and live across the country. Proposals to remove immigrants ignore their many contributions. In a time when most states are facing revenue shortages, the potential budgetary impacts of mass deportation merits careful consideration. States could lose an estimated $11.74 billion in revenue if all undocumented immigrants were removed. In addition to the many humanitarian, public health, and moral arguments for a pathway to legal citizenship and against mass deportations, there is also a state fiscal component that should not be ignored.

See Appendix 1 for state-by-state estimates of the current and post-reform state and local tax contributions of the total undocumented immigrant population. The appendix includes effective tax rates and totals for sales and excise, personal income, and property taxes.

## Methodology

While the spending and income behavior of undocumented immigrant families is not as well documented as that of US citizens, the estimates in this report represent a best approximation of the taxes families headed by undocumented immigrants likely pay.

The ITEP methodology used to calculate the current and potential tax contribution of undocumented immigrants uses five main data points:

1. Estimated undocumented immigrant population in each state
2. Average size of undocumented immigrant families/taxpaying units
3. Range of annual undocumented immigrant family/taxpayer income in each state
4. Estimated number of undocumented immigrants who are homeowners
5. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by low- and moderate-income families in each state

AR004583

Additional assumptions are made (and described below) about the change in tax contributions that would occur if all 11 million undocumented immigrants were granted legal status under comprehensive immigration reform.

See Appendix 2 for state-by-state details on data used to assist in calculating the state and local tax contributions.

## 1. Estimated undocumented immigrant population in each state

Estimates of each state's undocumented immigrant population are from the Migration Policy Institute (MPI).[7] According to MPI, an estimated 11,090,000 undocumented immigrants resided in the U.S. as of 2014 (an estimate that is only 13,000 lower than MPI's estimate from 2013 data).

## 2. Average size of undocumented immigrant families/taxpaying units

The Pew Research Center calculated a nationwide estimate of the number of people per undocumented immigrant family. The most recent estimate, 2.29, is used to find an estimated number of undocumented families (or taxpaying units) by state.[8] ITEP divided population estimates for each state by the average family size to find an estimated number of undocumented families/taxpaying units living in each state.

## 3. Range of annual undocumented immigrant family/taxpayer income in each state

Estimates of the income distribution of undocumented families are from MPI data on the number of undocumented immigrants in five discrete income groups based on the 2014 federal poverty level.[9] ITEP used the midpoint of the income ranges in each group as an estimate of average income within each group and multiplied by the number of families/taxpaying units in each group to calculate aggregate income in these groups.

## 4. Estimated number of undocumented immigrants who are homeowners

ITEP used MPI data on undocumented families' homeownership rates for each state. We then calculated separate property tax incidence analyses for homeowners and renters in each state. Applying the homeowner effective tax rates to the homeowner population and the renter tax rates to the renter population yielded a combined property tax estimate for all undocumented families in each state.[10]

## 5. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by low- and moderate-income families in each state[11]

ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels. This report applies effective tax rates calculated in the 2015 *Who Pays?* report to the undocumented population with one exception. The effective tax rates in seven states: California, Colorado, Maine, Massachusetts, New Jersey, Oklahoma, and Rhode Island were slightly modified for the analysis to include the enactment, enhancement, or reduction of state EITCs in 2015 and 2016 (this change applies only to the analysis granting legal status and does not impact the current tax contributions).

AR004584

***The following assumptions were made to calculate the sales, income, and property taxes of the undocumented immigration population:***

• **Sales tax:** Sales taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that undocumented immigrants pay sales tax at similar rates to U.S. citizens and legal immigrants with similar incomes. This analysis adjusts the estimated annual incomes for each state downward by 10 percent for purposes of calculating the sales tax paid to account for remittances. Research shows that undocumented immigrants send about 10 percent of their income to families in their countries of origin, so this portion of undocumented taxpayers' income is unavailable for taxable consumption.[12]

• **Income tax:** Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes using either false social security (SSN) or individual tax identification (ITIN) numbers.[13] This analysis assumes a 50 percent compliance rate for current taxes and 100 percent post-reform granting legal status to all undocumented immigrants.

• Undocumented immigrants are currently ineligible to receive the federal Earned Income Tax Credit (EITC) and state versions of the credit because they lack the legal authority to work in the U.S. Accordingly, the impact of state EITCs has been removed from the current personal income tax estimates. This has the effect of increasing the effective income tax rates paid by these undocumented taxpayers under current law.

• **Property tax:** The first step in calculating property taxes was to identify the share of undocumented immigrant families who are homeowners or renters in each state. This analysis used state-by-state data from the MPI to estimate homeownership rates for undocumented immigrants in each state. The model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

***Additional indicators used to make calculations for anticipated state and local tax changes if legal status is granted as part of comprehensive immigration reform:***

• **Wage boost:** This study assumes that having the authority to work legally in the United States would increase undocumented immigrants' wages and thus increase the taxes paid by those same immigrants, based on research by the Fiscal Policy Institute. Examining a number of studies on immigrant wages, this research consistently found that legal immigrants had higher wages than undocumented immigrants and gaining legal status could boost wages anywhere between 6 and 15 percent.[14] A Congressional Budget Office report on the economic impact of immigration reform estimated the eventual wage boost to be 12 percent.[15] This study assumes a conservative estimate of a 10 percent wage hike by granting legal status to all 11 million undocumented immigrants. An increase in income would also contribute to a slight increase in the sales, income, and property tax payments of the currently undocumented immigrant population.

• **Personal income tax compliance:** As explained above, current estimates of undocumented immigrants' income tax compliance rates range from 50 to 75 percent. To calculate the anticipated income tax gain from allowing undocumented immigrants to work in the U.S. legally, this analysis assumes full compliance with state personal income tax laws post-reform given the strong incentives for tax compliance likely to be included in a comprehensive reform measure. It is important to note that the same tax rules and provisions that apply to the general population will apply to undocumented immigrants filing income taxes.

• **Earned Income Tax Credit eligibility:** Post-reform, the study assumes that working immigrants granted the legal right to live and work in the U.S. and who are otherwise eligible for the EITC will claim the credit. This analysis also assumes that working immigrants meeting EITC eligibility criteria and granted the legal right to work under comprehensive immigration reform will

claim the state versions of the credit. The states with permanent EITCs included in this report are: California, Colorado, Connecticut, District of Columbia, Delaware, Iowa, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Nebraska, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Rhode Island, Virginia, Vermont, and Wisconsin. This study includes the impact of the newly enacted EITCs in California and Colorado, improvements made to EITCs in Maine, Massachusetts, New Jersey, and Rhode Island in 2015 and 2016, and a cut in Oklahoma's EITC.

# Changes from ITEP's February 2016 Undocumented Immigrants' State & Local Tax Contributions Report

The analysis presented in this report is an update to an ITEP report published in 2016. The 2017 report uses 2014 estimates on the undocumented immigrant population (size, income, homeownership, and population impacted by the executive actions) whereas the 2016 report used 2013 data. Most notably, the number of undocumented immigrants remained relatively flat. It declined by only about 13,000 between 2013 and 2014, however the amount of estimated income rose slightly. The steady population and slight changes in income led to a small increase in the total amount of state and local taxes undocumented immigrants pay in the 2017 study compared to the 2016 study.

---

[1] Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the 2010-2014 ACS pooled, and the 2008 Survey of Income and Program Participation (SIPP) by Colin Hammar and James Bachmeier of Temple University and Jennifer Van Hook of Pennsylvania State University, Population Research Institute.

[2] See the methodology section for more information on the calculation of estimated undocumented immigrant state and local tax payments.

[3] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States." Who Pays?, 5th ed., Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

[4] See this report's methodology section for more information about current personal income tax compliance.

[5] Institute on Taxation and Economic Policy (see footnote 3).

[6] See this report's methodology for a detailed description of wage boost and tax compliance assumptions applied to the change in state and local tax contributions post-reform.

[7] Migration Policy Institute (see footnote 1)

[8] Passel, Jeffrey S., and D'Vera Cohn. "Unauthorized Immigrant Population, National and State Trends, 2010." Pew Hispanic, Pew Research Center, 1 Feb. 2011, www.pewhispanic.org/2011/02/01/unauthorized-immigrant-population-brnational-and-state-trends-2010/.

[9] Migration Policy Institute (see footnote 1)

[10] Ibid.

[11] Institute on Taxation and Economic Policy (see footnote 3)

[12] See among others: Orozco, Manuel. "Remittances to Latin America and the Caribbean: Issues and Perspectives on Development." Summit of the Americas, Organization of American States, Sept. 2004, www.summit-americas.org/Panels/Panel_on_Remittances/INF5_Remesas_Orozco_ENG.pdf.

[13] See among others: Feinleib, Joel, and David Warner. "Issue Brief #1: The Impact of Immigration on Social Security and the National Economy." Social Security Advisory Board, Social Security Advisory Board, Dec. 2005, www.ssab.gov/Portals/0/OUR_WORK/REPORTS/Impact%20of%20Immigration%20on%20Social%20Security%20Brief_2005.pdf; Singer, Paula, and Linda Dodd-Major. "Identification Numbers and U.S. Government Compliance Initiatives." Tax Analysts, 20 Sept. 2004; and Cornelius, Wayne, and Jessica Lewis. Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities, La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007.

[14] Kallick, David Dyssegaard. "Three Ways Immigration Reform Would Make the Economy More Productive." Fiscal Policy Institute, Fiscal Policy Institute, 4 Jun., 2013, fiscalpolicy.org/wp-content/uploads/2013/06/3-ways-reform-would-improve-productivity.pdf (see Appendix A: A Review of the Literature on Legalization and Earnings, and also this report's methodology section for more information on the wage effects of granting legal status to the entire undocumented population).

[15] "Economic Impact of S. 744, Border Security, Economic Opportunity, and Immigration Modernization Act." Congressional Budget Office, Congressional Budget Office, Jun. 2013, www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/44346-Immigration.pdf

AR004586

# Appendix 1: Detailed State and Local Tax Contributions of Total Undocumented Immigrant Population

*Current vs. Full Legal Status for All Undocumented Immigrants*

| | | Sales and Excise Tax Total | Personal Income Tax Total | Property Tax Total | Total State and Local Taxes | Undocumented Immigrant Effective Tax Rate | Top 1% Effective Tax Rate (All Taxpayers)[1] |
|---|---|---|---|---|---|---|---|
| **Alabama** | *Current* | $45,311,000 | $10,471,000 | $6,530,000 | **$62,312,000** | 7.2% | |
| | *Full Legal Status* | $49,842,000 | $23,036,000 | $7,183,000 | **$80,061,000** | 8.4% | 3.8% |
| **Alaska** | *Current* | $1,877,000 | No Income Tax | $2,167,000 | **$4,043,000** | 4.3% | |
| | *Full Legal Status* | $2,064,000 | | $2,383,000 | **$4,448,000** | 4.3% | 2.5% |
| **Arizona** | *Current* | $144,232,000 | $16,388,000 | $52,954,000 | **$213,574,000** | 8.0% | |
| | *Full Legal Status* | $138,655,000 | $36,054,000 | $58,250,000 | **$252,958,000** | 8.6% | 4.6% |
| **Arkansas** | *Current* | $47,382,000 | $7,384,000 | $8,002,000 | **$62,767,000** | 9.1% | |
| | *Full Legal Status* | $52,120,000 | $16,244,000 | $8,802,000 | **$77,166,000** | 10.1% | 5.6% |
| **California** | *Current* | $1,970,679,000 | $157,883,000 | $1,070,833,000 | **$3,199,394,000** | 8.0% | |
| | *Full Legal Status* | $2,167,746,000 | $308,322,000 | $1,177,916,000 | **$3,653,985,000** | 8.3% | 8.7% |
| **Colorado** | *Current* | $82,211,000 | $21,429,000 | $35,883,000 | **$139,524,000** | 6.6% | |
| | *Full Legal Status* | $90,433,000 | $42,346,000 | $39,471,000 | **$172,250,000** | 7.4% | 4.6% |
| **Connecticut** | *Current* | $58,469,000 | $15,551,000 | $50,682,000 | **$124,701,000** | 7.6% | |
| | *Full Legal Status* | $64,316,000 | $25,219,000 | $55,750,000 | **$145,284,000** | 8.0% | 5.3% |
| **Delaware** | *Current* | $4,794,000 | $4,662,000 | $4,076,000 | **$13,532,000** | 3.9% | |
| | *Full Legal Status* | $5,274,000 | $9,937,000 | $4,483,000 | **$19,694,000** | 5.1% | 4.8% |
| **Dist. of Col.** | *Current* | $19,467,000 | $6,647,000 | $5,651,000 | **$31,765,000** | 7.3% | |
| | *Full Legal Status* | $21,414,000 | $11,101,000 | $6,216,000 | **$38,731,000** | 8.1% | 6.4% |
| **Florida** | *Current* | $463,955,000 | No Income Tax | $134,722,586 | **$598,677,875** | 7.3% | |
| | *Full Legal Status* | $510,351,000 | | $148,195,000 | **$658,540,000** | 7.3% | 1.9% |
| **Georgia** | *Current* | $214,416,000 | $62,447,000 | $74,856,000 | **$351,718,000** | 7.3% | |
| | *Full Legal Status* | $235,857,000 | $137,383,000 | $82,341,000 | **$455,581,000** | 8.6% | 5.0% |
| **Hawaii** | *Current* | $20,571,000 | $6,521,000 | $5,251,000 | **$32,343,000** | 8.9% | |
| | *Full Legal Status* | $22,628,000 | $14,347,000 | $5,776,000 | **$42,750,000** | 10.7% | 7.0% |
| **Idaho** | *Current* | $17,056,000 | $2,802,000 | $8,754,000 | **$28,613,000** | 7.0% | |
| | *Full Legal Status* | $18,762,000 | $6,165,000 | $9,630,000 | **$34,557,000** | 7.7% | 6.4% |
| **Illinois** | *Current* | $351,926,000 | $95,945,000 | $311,009,000 | **$758,881,000** | 10.3% | |
| | *Full Legal Status* | $387,119,000 | $188,141,000 | $342,110,000 | **$917,370,000** | 11.3% | 4.6% |
| **Indiana** | *Current* | $55,396,000 | $19,802,000 | $17,001,000 | **$92,200,000** | 8.1% | |
| | *Full Legal Status* | $60,936,000 | $41,263,000 | $18,701,000 | **$120,900,000** | 9.7% | 5.2% |
| **Iowa** | *Current* | $21,333,000 | $5,974,000 | $9,420,000 | **$36,728,000** | 7.9% | |
| | *Full Legal Status* | $23,466,000 | $11,741,000 | $10,362,000 | **$45,570,000** | 8.9% | 6.0% |
| **Kansas** | *Current* | $43,049,000 | $6,473,000 | $18,322,000 | **$67,843,000** | 8.2% | |
| | *Full Legal Status* | $47,354,000 | $11,390,000 | $20,154,000 | **$78,897,000** | 8.7% | 3.6% |
| **Kentucky** | *Current* | $20,136,000 | $11,282,000 | $5,211,000 | **$36,629,000** | 6.9% | |
| | *Full Legal Status* | $22,150,000 | $24,821,000 | $5,732,000 | **$52,702,000** | 9.0% | 6.0% |
| **Louisiana** | *Current* | $52,210,000 | $8,536,000 | $7,244,000 | **$67,991,000** | 7.8% | |
| | *Full Legal Status* | $57,431,000 | $17,788,000 | $7,969,000 | **$83,188,000** | 8.7% | 4.2% |

# Appendix 1: Detailed State and Local Tax Contributions of Total Undocumented Immigrant Population

*Current vs. Full Legal Status for All Undocumented Immigrants*

| State | | Sales and Excise Tax Total | Personal Income Tax Total | Property Tax Total | Total State and Local Taxes | Undocumented Immigrant Effective Tax Rate | Top 1% Effective Tax Rate (All Taxpayers)[1] |
|---|---|---|---|---|---|---|---|
| Maine | Current | $2,605,000 | $681,000 | $1,081,000 | $4,367,000 | 6.5% | 7.5% |
| | Full Legal Status | $2,865,000 | $1,470,000 | $1,190,000 | $5,525,000 | 7.5% | |
| Maryland | Current | $168,717,000 | $77,970,000 | $85,561,000 | $332,248,000 | 8.2% | 6.7% |
| | Full Legal Status | $185,589,000 | $146,073,000 | $94,118,000 | $425,779,000 | 9.5% | |
| Massachusetts | Current | $81,821,000 | $42,471,000 | $60,313,000 | $184,605,000 | 7.0% | 4.9% |
| | Full Legal Status | $90,003,000 | $84,426,000 | $66,344,000 | $240,773,000 | 8.3% | |
| Michigan | Current | $46,699,000 | $18,499,000 | $21,495,000 | $86,692,000 | 6.9% | 5.1% |
| | Full Legal Status | $51,368,000 | $38,897,000 | $23,645,000 | $113,910,000 | 8.3% | |
| Minnesota | Current | $49,713,000 | $14,796,000 | $18,684,000 | $83,192,000 | 7.3% | 7.5% |
| | Full Legal Status | $54,684,000 | $27,409,000 | $20,552,000 | $102,646,000 | 8.2% | |
| Mississippi | Current | $17,180,000 | $2,796,000 | $2,708,000 | $22,684,000 | 7.4% | 5.3% |
| | Full Legal Status | $18,898,000 | $6,152,000 | $2,978,000 | $28,028,000 | 8.4% | |
| Missouri | Current | $28,660,000 | $8,771,000 | $11,466,000 | $48,897,000 | 6.8% | 5.5% |
| | Full Legal Status | $31,526,000 | $19,297,000 | $12,613,000 | $63,435,000 | 8.0% | |
| Montana | Current | $168,000 | $144,000 | $237,000 | $548,000 | 4.1% | 4.7% |
| | Full Legal Status | $185,000 | $316,000 | $260,000 | $762,000 | 5.2% | |
| Nebraska | Current | $21,557,000 | $4,778,000 | $13,465,000 | $39,800,000 | 8.3% | 6.3% |
| | Full Legal Status | $23,713,000 | $9,652,000 | $14,812,000 | $48,177,000 | 9.1% | |
| Nevada | Current | $65,830,000 | No Income Tax | $20,271,000 | $86,101,000 | 5.0% | 1.4% |
| | Full Legal Status | $72,413,000 | | $22,298,000 | $94,712,000 | 5.0% | |
| New Hampshire | Current | $1,987,000 | No Income Tax on Wages | $5,207,000 | $7,236,000 | 6.0% | 2.6% |
| | Full Legal Status | $2,186,000 | | $5,727,000 | $8,005,000 | 6.1% | |
| New Jersey | Current | $265,945,000 | $49,148,000 | $272,322,000 | $587,415,000 | 7.7% | 7.1% |
| | Full Legal Status | $292,540,000 | $69,036,000 | $299,554,000 | $661,130,000 | 7.9% | |
| New Mexico | Current | $50,098,000 | $3,956,000 | $13,689,000 | $67,743,000 | 9.1% | 4.8% |
| | Full Legal Status | $55,108,000 | $5,590,000 | $15,058,000 | $75,756,000 | 9.3% | |
| New York | Current | $564,962,000 | $182,675,000 | $354,686,000 | $1,102,323,000 | 8.9% | 8.1% |
| | Full Legal Status | $621,458,000 | $337,864,000 | $390,154,000 | $1,349,476,000 | 9.9% | |
| North Carolina | Current | $163,163,000 | $59,671,000 | $54,568,000 | $277,402,000 | 6.8% | 5.3% |
| | Full Legal Status | $179,479,000 | $131,276,000 | $60,025,000 | $370,780,000 | 8.3% | |
| North Dakota | Current | $2,214,000 | $123,000 | $507,000 | $2,844,000 | 7.1% | 3.0% |
| | Full Legal Status | $2,435,000 | $270,000 | $558,000 | $3,263,000 | 7.4% | |
| Ohio | Current | $47,540,000 | $15,649,000 | $20,059,000 | $83,247,000 | 7.8% | 5.5% |
| | Full Legal Status | $52,294,000 | $34,427,000 | $22,064,000 | $108,786,000 | 9.3% | |
| Oklahoma | Current | $57,647,000 | $10,935,000 | $16,183,000 | $84,765,000 | 7.8% | 4.3% |
| | Full Legal Status | $63,411,000 | $23,436,000 | $17,801,000 | $104,648,000 | 8.7% | |
| Oregon | Current | $15,292,000 | $29,831,000 | $35,652,000 | $80,775,000 | 5.5% | 6.5% |
| | Full Legal Status | $16,821,000 | $63,327,000 | $39,217,000 | $119,365,000 | 7.4% | |

# Appendix 1: Detailed State and Local Tax Contributions of Total Undocumented Immigrant Population

*Current vs. Full Legal Status for All Undocumented Immigrants*

| | | Sales and Excise Tax Total | Personal Income Tax Total | Property Tax Total | Total State and Local Taxes | Undocumented Immigrant Effective Tax Rate | Top 1% Effective Tax Rate (All Taxpayers)[1] |
|---|---|---|---|---|---|---|---|
| Pennsylvania | Current | $64,545,000 | $34,440,000 | $35,887,000 | $134,872,000 | 7.2% | 4.2% |
| | Full Legal Status | $71,000,000 | $75,769,000 | $39,475,000 | $186,244,000 | 9.0% | |
| Rhode Island | Current | $17,615,000 | $3,887,000 | $9,652,000 | $31,154,000 | 7.4% | 6.3% |
| | Full Legal Status | $19,377,000 | $7,571,000 | $10,617,000 | $37,564,000 | 8.1% | |
| South Carolina | Current | $43,859,000 | $10,606,000 | $13,288,000 | $67,753,000 | 5.5% | 4.5% |
| | Full Legal Status | $48,245,000 | $23,333,000 | $14,616,000 | $86,195,000 | 6.4% | |
| South Dakota | Current | $4,302,000 | No Income Tax | $1,036,000 | $5,338,000 | 8.0% | 1.8% |
| | Full Legal Status | $4,732,000 | | $1,140,000 | $5,872,000 | 8.0% | |
| Tennessee | Current | $91,169,000 | No Income Tax on Wages | $16,260,000 | $107,465,000 | 7.4% | 3.0% |
| | Full Legal Status | $100,286,000 | | $17,886,000 | $118,251,000 | 7.4% | |
| Texas | Current | $1,067,260,000 | No Income Tax | $493,636,000 | $1,560,896,000 | 8.6% | 2.9% |
| | Full Legal Status | $1,173,985,000 | | $543,000,000 | $1,716,985,000 | 8.6% | |
| Utah | Current | $40,863,000 | $13,189,000 | $15,718,000 | $69,770,000 | 6.7% | 4.8% |
| | Full Legal Status | $44,950,000 | $29,015,000 | $17,290,000 | $91,255,000 | 8.0% | |
| Vermont | Current | $1,515,000 | $326,000 | $1,094,000 | $2,936,000 | 7.3% | 7.7% |
| | Full Legal Status | $1,667,000 | $540,000 | $1,204,000 | $3,411,000 | 7.7% | |
| Virginia | Current | $121,514,000 | $71,310,000 | $63,142,000 | $255,965,000 | 6.0% | 5.1% |
| | Full Legal Status | $133,665,000 | $152,803,000 | $69,456,000 | $355,924,000 | 7.6% | |
| Washington | Current | $243,047,000 | No Income Tax | $73,577,000 | $316,624,000 | 10.7% | 2.4% |
| | Full Legal Status | $267,352,000 | | $80,935,000 | $348,287,000 | 10.7% | |
| West Virginia | Current | $3,531,000 | $1,080,000 | $901,000 | $5,112,000 | 6.4% | 6.5% |
| | Full Legal Status | $3,884,000 | $2,376,000 | $551,000 | $6,811,000 | 7.7% | |
| Wisconsin | Current | $36,367,000 | $13,230,000 | $22,195,000 | $71,792,000 | 7.5% | 6.2% |
| | Full Legal Status | $40,004,000 | $27,273,000 | $24,414,000 | $91,691,000 | 8.7% | |
| Wyoming | Current | $3,442,000 | No Income Tax | $723,000 | $4,165,000 | 5.2% | 1.2% |
| | Full Legal Status | $3,787,000 | | $795,000 | $4,582,000 | 5.2% | |
| All States | Current | $7,025,296,000 | $1,131,236,000 | $3,583,429,000 | $11,739,961,000 | 8.0% | 5.4% |
| | Full Legal Status | $7,727,826,000 | $2,243,067,000 | $3,941,771,000 | $13,912,665,000 | 8.6% | |
| | Change | +$702,530,000 | +$1,111,831,000 | +$358,343,000 | +$2,172,703,000 | | |

1 Institute on Taxation and Economic Policy, A Distributional Analysis of the Tax Systems in All Fifty States, 5th Edition, January 2015, www.whopays.org

## Appendix 2: Data Used to Estimate State and Local Tax Contributions of Undocumented Immigrants

| | Estimated Total Undocumented Immigrant Population[1] | Est. Share of Undocumented Immigrant Population who are Homeowners[2] | Average Undocumented Family Income[3] | | Estimated Total Undocumented Immigrant Population[1] | Est. Share of Undocumented Immigrant Population who are Homeowners[2] | Average Undocumented Family Income[3] |
|---|---|---|---|---|---|---|---|
| Alabama | 71,000 | 29% | $28,000 | Montana | 1,000 | 31% | $30,600 |
| Alaska | 7,000 | 31% | $30,600 | Nebraska | 38,000 | 37% | $29,000 |
| Arizona | 244,000 | 36% | $25,200 | Nevada | 129,000 | 32% | $30,600 |
| Arkansas | 56,000 | 37% | $28,400 | New Hampshire | 9,000 | 31% | $30,600 |
| California | 3,019,000 | 27% | $30,300 | New Jersey | 498,000 | 24% | $35,100 |
| Colorado | 163,000 | 33% | $29,600 | New Mexico | 68,000 | 45% | $25,000 |
| Connecticut | 105,000 | 24% | $35,900 | New York | 850,000 | 19% | $33,300 |
| Delaware | 23,000 | 32% | $34,800 | North Carolina | 338,000 | 33% | $27,500 |
| Dist. of Col. | 27,000 | 23% | $37,000 | North Dakota | 3,000 | 31% | $30,600 |
| Florida | 610,000 | 33% | $30,700 | Ohio | 83,000 | 26% | $29,300 |
| Georgia | 377,000 | 33% | $29,200 | Oklahoma | 85,000 | 38% | $29,400 |
| Hawaii | 21,000 | 40% | $39,600 | Oregon | 116,000 | 30% | $28,900 |
| Idaho | 33,000 | 44% | $28,200 | Pennsylvania | 137,000 | 30% | $31,400 |
| Illinois | 519,000 | 39% | $32,500 | Rhode Island | 29,000 | 20% | $33,300 |
| Indiana | 94,000 | 40% | $27,700 | South Carolina | 98,000 | 29% | $28,700 |
| Iowa | 36,000 | 39% | $29,500 | South Dakota | 5,000 | 31% | $30,600 |
| Kansas | 63,000 | 44% | $30,100 | Tennessee | 120,000 | 27% | $27,900 |
| Kentucky | 45,000 | 21% | $27,000 | Texas | 1,470,000 | 41% | $28,200 |
| Louisiana | 66,000 | 20% | $30,100 | Utah | 81,000 | 38% | $29,300 |
| Maine | 5,000 | 31% | $30,600 | Vermont | 3,000 | 31% | $30,600 |
| Maryland | 253,000 | 32% | $36,700 | Virginia | 272,000 | 32% | $36,100 |
| Massachusetts | 173,000 | 21% | $34,800 | Washington | 219,000 | 32% | $30,900 |
| Michigan | 97,000 | 40% | $29,500 | West Virginia | 6,000 | 31% | $30,600 |
| Minnesota | 85,000 | 32% | $30,500 | Wisconsin | 71,000 | 32% | $30,800 |
| Mississippi | 25,000 | 23% | $27,900 | Wyoming | 6,000 | 31% | $30,600 |
| Missouri | 57,000 | 37% | $28,900 | | | | |
| | | | | **All States** | **11,009,000** | **31%** | **$30,700** |

[1] Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the 2010-2014 ACS pooled, and the 2008 Survey of Income and Program Participation (SIPP) by Colin Hammar and James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute.

[2] Ibid.

[3] Ibid.

[4] Ibid

AR004590

FOOTNOTE 57

AR004591



# Immigrants in California

California has long been home to the largest number of immigrants in the United States, having accepted early settlers along their seaports as far back as the 17th century. Immigrants now account for over one quarter of the state's population and comprise nearly 34 percent of the entire labor force. As workers, business owners, taxpayers, and neighbors, immigrants are an integral part of California's diverse and thriving communities and make extensive contributions that benefit all.

**More than a quarter of California residents are immigrants, while nearly one in four residents is a native-born U.S. citizen with at least one immigrant parent.**

- In 2015, 10.7 million immigrants (foreign-born individuals) comprised 27.3 percent of the population.[1]

- California was home to 5.3 million women, 4.9 million men, and 449,878 children who were immigrants.[2]

- The top countries of origin for immigrants were Mexico (40 percent of immigrants), the Philippines (8 percent), China (5.9 percent), Vietnam (4.8 percent), and India (4.5 percent).[3]

- In 2016, 9.3 million people in California (23.8 percent of the state's population) were native-born Americans who had at least one immigrant parent.[4]

**Nearly half of all immigrants in California are naturalized U.S. citizens.**

- 5.3 million immigrants (49.7 percent) had naturalized as of 2015,[5] and 2.2 million immigrants were eligible to become naturalized U.S. citizens in 2015.[6]

- Two-thirds (66.7 percent) of immigrants reported speaking English "well" or "very well."[7]

AR004592

**Immigrants in California are distributed across the educational spectrum.**

- More than a quarter of adult immigrants had a college degree or more education in 2015, while over a third had less than a high school diploma.[8]

| Education Level | Share (%) of All Immigrants | Share (%) of All Natives |
|---|---|---|
| College degree or more | 27.4 | 35.1 |
| Some college | 18.6 | 35.3 |
| High school diploma only | 19.6 | 21.5 |
| Less than a high-school diploma | 34.4 | 8.0 |

**Two million U.S. citizens in California live with at least one family member who is undocumented.**

- 2.4 million undocumented immigrants comprised 22 percent of the immigrant population and 6 percent of the total state population in 2014.[9]

- 4.7 million people in California, including 2 million born in the United States, lived with at least one undocumented family member between 2010 and 2014.[10]

- During the same period, nearly one in five children in the state was a U.S.-citizen living with at least one undocumented family member (2.4 million children in total).[11]

**Nearly 200,000 Deferred Action for Childhood Arrivals (DACA) recipients live in California.**

- As of 2016, 64 percent of DACA-eligible immigrants in California, or 242,339 people, had applied for DACA.[12]

- An additional 120,000 residents of the state satisfied all but the educational requirements for DACA, and another 62,000 would be eligible as they grew older.[13]

**Immigrants make up more than a third of the labor force in California and are integral to a range of industries.**

- 6.6 million immigrant workers comprised 33.9 percent of the labor force in 2015.[14]

AR004593

- Immigrant workers were most numerous in the following industries:

| Industry | Number of Immigrant Workers |
|---|---|
| Manufacturing | 930,261 |
| Health Care and Social Assistance | 874,169 |
| Accommodation and Food Services | 691,552 |
| Retail Trade | 663,977 |
| Construction | 524,665 |

Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council.

- The largest shares of immigrant workers were in the following industries:[15]

| Industry | Immigrant Share (%) (of all industry workers) |
|---|---|
| Agriculture, Forestry, Fishing & Hunting | 66.9 |
| Manufacturing | 45.6 |
| Administrative & Support; Waste Management; and Remediation Services | 43.2 |
| Other Services (except Public Administration) | 39.7 |
| Accommodation and Food Services | 39.2 |

Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council.

**Immigrants are an integral part of the California workforce in a range of occupations.**

- In 2015, immigrant workers were most numerous in the following occupation groups:[16]

| Occupation Category | Number of Immigrant Workers |
|---|---|
| Office and Administrative Support | 675,184 |
| Sales and Related | 641,880 |
| Production | 596,157 |
| Management | 587,525 |
| Building and Grounds Cleaning & Maintenance | 580,164 |

Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council.

AR004594

- The largest shares of immigrant workers were in the following occupation groups:[17]

| Occupation Category | Immigrant Share (%) (of all workers in occupation) |
|---|---|
| Farming, Fishing, and Forestry | 77.1 |
| Building and Grounds Cleaning & Maintenance | 61.7 |
| Production | 53.3 |
| Construction and Extraction | 43.0 |
| Computer and Mathematical Sciences | 41.3 |

Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council.

- Undocumented immigrants comprised 9 percent of the state's workforce in 2014.[18]

## Immigrants in California have contributed tens of billions of dollars in taxes.

- Immigrant-led households in the state paid $56.5 billion in federal taxes and $26.4 billion in state and local taxes in 2014.[19]

- Undocumented immigrants in California paid an estimated $3.2 billion in state and local taxes in 2014. Their contribution would rise to $3.7 billion if they could receive legal status.[20]

- DACA recipients in California paid an estimated $534.1 million in state and local taxes in 2016.[21]

## As consumers, immigrants add hundreds of billions of dollars to California's economy.

- California residents in immigrant-led households had $238.7 billion in spending power (after-tax income) in 2014.[22]

## Immigrant entrepreneurs in California generate billions of dollars in business revenue.

- Nearly 880,000 immigrant business owners accounted for 38.2 percent of all self-employed California residents in 2015 and generated $21.8 billion in business income.[23]

- In the following California metropolitan areas in 2015, at least one in six business owners was an immigrant. Immigrants accounted for:
  - 40.2 percent of business owners in the Los Angeles/Long Beach/Anaheim metro area,
  - 24.1 percent in Riverside/San Bernardino,
  - 17.4 percent in Sacramento/Arden/Arcade/Roseville,
  - 34.3 percent in San Diego/Carlsbad/San Marcos,
  - 31.2 percent in San Francisco/Oakland/Fremont, and
  - 42.4 percent in San Jose/Sunnyvale/Santa Clara.[24]

AR004595

## Endnotes

1. "Foreign born" does not include people born in Puerto Rico or U.S. island areas or U.S. citizens born abroad of American parent(s). U.S. Census Bureau, 2015 American Community Survey 1-Year Estimates. The American Immigration Council elected to use data from the 2015 ACS 1-Year estimates wherever possible to provide the most current information available. Since these estimates are based on a smaller sample size than the ACS 5-year, however, they are more sensitive to fluctuations and may result in greater margins of error (compared to 5-year estimates).
2. Children are defined as people age 17 or younger. Men and women do not include children. Ibid.
3. Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council.
4. Analysis of data from the 2016 Current Population Survey by the American Immigration Council, using IPUMS-CPS. Sarah Flood, Miriam King, Steven Ruggles, and J. Robert Warren, *Integrated Public Use Microdata Series, Current Population Survey: Version 5.0* [dataset] (Minneapolis, MN: University of Minnesota, 2017).
5. 2015 ACS 1-Year Estimates.
6. Augmented IPUMS-ACS data, as published in "State-Level Unauthorized Population and Eligible-to-Naturalize Estimates," Center for Migration Studies data tool, accessed August 2017, data.cmsny.org/state.html.
7. Figure includes immigrants who speak only English. Data based on survey respondents age 5 and over. Analysis of 2015 ACS 1-Year Estimates by the American Immigration Council.
8. Data based on survey respondents age 25 and older. Ibid.
9. Pew Research Center, "U.S. unauthorized immigration population estimates," November 3, 2016, www.pewhispanic.org/interactives/unauthorized-immigrants/.
10. Silva Mathema, "State-by-State Estimates of the Family Members of Unauthorized Immigrants," University of Southern California's Center for the Study of Immigrant Integration and the Center for American Progress, March 2017, www.americanprogress.org/issues/immigration/news/2017/03/16/427868/state-state-estimates-family-members-unauthorized-immigrants/.
11. American Immigration Council analysis of data from the 2010-2014 ACS 5-Year, using Silva Mathema's "State-by-State Estimates of the Family Members of Unauthorized Immigrants" and IPUMS-USA. Steven Ruggles, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek, *Integrated Public Use Microdata Series: Version 7.0* [dataset] (Minneapolis, MN: University of Minnesota, 2017).
12. "DACA-eligible" refers to immigrants who were immediately eligible to apply for DACA as of 2016. Migration Policy Institute analysis of U.S. Census Bureau data from the 2014 American Community Survey (ACS), 2010-14 ACS pooled, and the 2008 Survey of Income and Program Participation (SIPP), as cited in "Deferred Action for Childhood Arrivals (DACA) Data Tools," accessed June 2017, www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.
13. Ibid.
14. Analysis of 2015 ACS 1-year PUMS data by the American Immigration Council. Categories are based on the 2012 North American Industry Classification System (NAICS), www.census.gov/eos/www/naics/index.html.
15. Ibid.
16. Analysis of 2015 ACS 1-year PUMS data by the American Immigration Council. Categories are based on the 2010 Standard Occupational Classification (SOC) system, www.bls.gov/soc/major_groups.htm.
17. Ibid.
18. Pew Research Center, "U.S. unauthorized immigration population estimates," 2016.
19. New American Economy, *The Contributions of New Americans in California* (New York, NY: August 2016), 5, http://www.newamericaneconomy.org/research/the-contributions-of-new-americans-in-california.
20. Institute on Taxation & Economic Policy (ITEP), *Undocumented Immigrants' State & Local Tax Contributions* (Washington, DC: March 2017), 3, www.itep.org/undocumented-immigrants-state-local-tax-contributions-2/.
21. ITEP, *State & Local Tax Contributions of Young Undocumented Immigrants* (Washington, DC: April 2017), Appendix 1, https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants/.
22. New American Economy, *The Contributions of New Americans in California*, 4.
23. "Business owners" include people who are self-employed, at least 18 years old, and work at least 15 hours per week at their businesses. Analysis of 2015 ACS 1-year PUMS data by the American Immigration Council.
24. American Immigration Council analysis of 2016 CPS data. Flood, King, Ruggles, and Warren, *IPUMS CPS* dataset.

AR004596

# FOOTNOTE 58

# Illinois' Undocumented Immigrant Population:
# A Summary of Recent Research
# by Rob Paral and Associates



**By Fred Tsao**
**Illinois Coalition for Immigrant and Refugee Rights**
**February 2014**

*This report is made possible through the generous support of the Polk Bros. Foundation,*
*the John D. and Catherine T. MacArthur Foundation, the Illinois Funders DACA Relief*
*Initiative, and the Chicago Community Trust*



**ICIRR**
Illinois Coalition for Immigrant and Refugee Rights

55 E. Jackson Blvd,
Suite 2075
Chicago, IL 60604
312 332-7360
www.icirr.org

AR004598

# Illinois' Undocumented Immigrant Population:
# A Summary of Recent Research by Rob Paral and Associates

*The numbers included in this report are based on estimates; the results should be used as a guide to understand the general characteristics of the community.  Information regarding the methodology behind these figures is available at this link.  More detailed data is available from Rob Paral and Associates, rob@robparal.com.*

**More than half of Illinois' undocumented immigrants live in suburban Chicago**

Roughly 511,000 undocumented immigrants live in the state of Illinois.  While concentrated in metro Chicago, these immigrants live in counties throughout the state.



**Geographic Distribution of Illinois Undocumented Immigrants**

- 36% Chicago
- 24% Suburban Cook County
- 30% 7 collar counties
- 10% 94 downstate counties

Suburban Chicago is home to about 54% percent of the state's undocumented population, compared to 36% who live in the city.  DuPage, Kane, Lake, and Will Counties are each home to more than 10,000 undocumented residents, as are Aurora Township (Kane County), Waukegan Township (Lake), Elgin Township (Kane), and Cicero, Hanover, and Elk Grove Townships in Cook County.

In Chicago, South Lawndale (Little Village) is the community area with the largest number of undocumented immigrants (20,000).  Recent movements of immigrants have created large undocumented populations in Belmont Cragin, Gage Park, Albany Park, and Brighton Park that now outnumber the undocumented in Pilsen (Lower West Side).

| Undocumented populations in selected Illinois regions | | |
|---|---|---|
| | Estimated undocumented population | Share of total population that is undocumented |
| Illinois | 511,000 | 4% |
| Chicago | 183,000 | 7% |
| Suburban Cook County | 125,000 | 5% |
| Collar counties (DuPage, Grundy, Kane, Kendall, Lake, McHenry, Will) | 151,000 | 4.5% |
| Downstate (94 counties) | 53,000 | 1% |



AR004599

| Undocumented populations in selected Illinois regions ||
|---|---|
| **Selected Illinois counties** | **Estimated undocumented population** |
| Kane County | 43,000 |
| Lake County | 39,000 |
| DuPage County | 36,000 |
| Will County | 22,000 |
| Champaign County | 11,000 |
| McHenry County | 8,000 |
| Winnebago County | 7,000 |



### Undocumented populations in Chicago and surrounding communities

A more detailed on-line map of undocumented immigrant residential patterns throughout the state of Illinois is available at this link.

**Illinois Undocumented**

- 0 - 1,239
- 1,240 - 4,144
- 4,145 - 8,203
- 8,204 - 13,621
- 13,622 - 23,924



www.icirr.org

AR004600

| Undocumented populations in selected Illinois regions | |
|---|---|
| **Selected townships** | **Estimated undocumented population** |
| Aurora (Kane County) | 23,000 |
| Cicero (Cook) | 18,000 |
| Waukegan (Lake) | 14,000 |
| Hanover (Cook) | 11,000 |
| Elgin (Kane) | 10,000 |
| Elk Grove (Cook) | 10,000 |
| Joliet (Will) | 9,000 |
| Addison (DuPage) | 9,000 |
| Wheeling (Cook) | 9,000 |
| Leyden (Cook) | 8,000 |
| Proviso (Cook) | 8,000 |
| Avon (DuPage) | 7,000 |
| Palatine (Cook) | 7,000 |
| Maine (Cook) | 7,000 |
| Winfield (DuPage) | 6,000 |
| Bloomingdale (DuPage) | 6,000 |
| Schaumburg (Cook) | 6,000 |
| Dundee (Kane) | 6,000 |
| Du Page (Will) | 5,000 |
| Lyons (Cook) | 5,000 |
| Berwyn (Cook) | 5,000 |

| **Selected Chicago community areas** | **Estimated undocumented population** |
|---|---|
| South Lawndale (Little Village) | 20,000 |
| Belmont Cragin | 12,000 |
| Gage Park | 11,000 |
| Albany Park | 10,000 |
| Brighton Park | 9,000 |
| Lower West Side (Pilsen) | 8,000 |
| Avondale | 7,000 |
| Logan Square | 7,000 |
| New City (Back of the Yards) | 7,000 |
| West Ridge | 6,000 |
| West Lawn | 6,000 |
| Chicago Lawn | 6,000 |
| Rogers Park | 5,000 |
| Irving Park | 5,000 |



www.icirr.org

AR004601

**Illinois' undocumented are largely from Latin America, but immigrants from Asia and Europe make up significant portions**

Latin American immigrants make up approximately 84% of Illinois' undocumented population. Mexicans alone account for 77%. Asians make up approximately 9% of the undocumented population in Illinois, but make up 12% of the undocumented population in the collar counties and 21% of the undocumented downstate. The most significant Asian countries of origin are the Philippines, India, Korea, and China. Another 5% are from Europe, mostly from Poland, the former Soviet Union, and elsewhere in Eastern Europe.

| Country/ region of origin of Illinois undocumented population | | | | |
|---|---|---|---|---|
| | Number (share) from Mexico | Number (share) from Latin America | Number (share) from Asia | Number (share) from Europe |
| Illinois | 392,000 (77%) | 430,000 (84%) | 48,000 (9%) | 25,000 (5%) |
| Chicago | 138,000 (75%) | 155,000 (85%) | 12,000 (7%) | 11,000 (6%) |
| Suburban Cook | 95,000 (76%) | 102,000 (82%) | 15,000 (12%) | 6,000 (5%) |
| Collar counties | 125,000 (83%) | 136,000 (90%) | 9,000 (6%) | 4,000 (3%) |
| Downstate 94 counties | 34,000 (64%) | 37,000 (70%) | 11,000 (21%) | 3,000 (5%) |

**Illinois' undocumented immigrants are largely younger adults**

Three out of every five undocumented immigrants in Illinois are between the ages of 25 and 44. The age distribution of the undocumented are consistent across the state, except that downstate the undocumented skew slightly younger.



| Age distribution of Illinois undocumented population | | | | |
|---|---|---|---|---|
| | Number (share) under 18 | Number (share) age 18-24 | Number (share) age 25-44 | Number (share) age 45 or older |
| Illinois | 58,000 (11%) | 78,000 (15%) | 298,000 (58%) | 77,000 (15%) |
| Chicago | 19,000 (10%) | 28,000 (16%) | 106,000 (58%) | 29,000 (16%) |
| Suburban Cook | 15,000 (12%) | 17,000 (14%) | 72,000 (58%) | 21,000 (17%) |
| Collar counties | 18,000 (12%) | 21,000 (14%) | 91,000 (61%) | 21,000 (14%) |
| Downstate 94 counties | 7,000 (13%) | 12,000 (23%) | 28,000 (53%) | 6,000 (11%) |



AR004602

**Illinois' undocumented immigrants skew slightly more male than the overall population,**
Compared to the general population of Illinois, which is split 49%-51% male-female, undocumented immigrants skew slightly more male, particularly in the collar counties and downstate.  In suburban Cook, women outnumber men among the undocumented.

| Gender distribution of Illinois undocumented population | | |
|---|---|---|
| | Number (share) male | Number (share) female |
| Illinois | 265,000 (52%) | 246,000 (48%) |
| Chicago | 95,000 (52%) | 87,000 (48%) |
| Suburban Cook | 62,000 (50%) | 63,000 (50%) |
| Collar counties | 79,000 (53%) | 71,000 (47%) |
| Downstate 94 counties | 28,000 (54%) | 24,000 (46%) |

**Illinois' undocumented immigrants live overwhelmingly in families, many of which are mixed-status families that include U.S. citizen spouses and children**
Undocumented immigrants in Illinois live overwhelmingly in family households.  Throughout the Chicago area, roughly nine in ten undocumented immigrants live in family households.

| Illinois undocumented immigrants living in family households | | | |
|---|---|---|---|
| | Total undocumented population | Undocumented immigrants living in family households | Share of undocumented immigrants who live in family households |
| Illinois | 511,000 | 454,000 | 89% |
| Chicago | 183,000 | 160,000 | 88% |
| Suburban Cook | 125,000 | 114,000 | 91% |
| 7 collar counties | 151,000 | 140,000 | 93% |
| Downstate 94 counties | 53,000 | 40,000 | 75% |

Among the undocumented immigrants in Illinois, nearly half are heads of households that include their spouse or minor children:
- 29% are married and living with their own minor children
- 10% are married with no children
- 8% are single parents living with their own minor children.
- 3% are single heads of households who do not live with their own children, but who live with other relatives.
- 11% are the undocumented minor children living with a parent.
- 20% live in family households as relatives of the head of the household; these individuals include adult children, parents, siblings, and other individuals who are related to the heads of household by birth, marriage, or adoption.
- 8% live in family households but are unrelated to the head of household.  These persons include boarders, roommates, unmarried partners, and unrelated foster children.
- 11% of undocumented immigrants do not live in family households—that is, they do not live in a household in which any members are related to the head of the household.



AR004603



## Relationship and household type among Illinois undocumented immigrants



- ■ Married householder with own children — 29%
- ■ Single householder with own children — 8%
- ■ Married householder without own children — 10%
- ■ Single family householder without own children — 3%
- ■ Minor children living with parent — 11%
- ■ Other relative in family household — 20%
- ■ Nonrelative in family household — 8%
- ■ In non-family household — 11%

| Relationship and household type among Illinois undocumented immigrants | | | | |
|---|---|---|---|---|
| | Married householder with own minor children | Single householder with own minor children | Married householder without own children | Single family householder without own minor children |
| Illinois | 149,000 | 43,000 | 53,000 | 14,000 |
| Chicago | 48,000 | 15,000 | 19,000 | 6,000 |
| Suburban Cook | 38,000 | 11,000 | 15,000 | 4,000 |
| 7 collar counties | 50,000 | 13,000 | 14,000 | 3,000 |
| Downstate 94 counties | 13,000 | 4,000 | 6,000 | 1,000 |



6

AR004604

| Relationship and household type among Illinois undocumented immigrants | | | | |
|---|---|---|---|---|
| | Minor children living with parent | Other relatives living in family household | Nonrelatives living in family household | In non-family household or group quarters |
| Illinois | 54,000 | 100,000 | 41,000 | 57,000 |
| Chicago | 18,000 | 41,000 | 13,000 | 23,000 |
| Suburban Cook | 14,000 | 25,000 | 8,000 | 11,000 |
| 7 collar counties | 16,000 | 29,000 | 16,000 | 10,000 |
| Downstate 94 counties | 6,000 | 6,000 | 5,000 | 13,000 |

Roughly 5% of all Illinois households, and 6% of family households, include at least one undocumented immigrant. In Chicago alone, more than 8% of total households and more than 12% of family households include at least one undocumented immigrant.

| Illinois households that include undocumented immigrants | | | |
|---|---|---|---|
| | Total households | Households with at least one undocumented member | Share of total households that have at least one undocumented member |
| Illinois | 4,745,000 | 237,000 | 5% |
| Chicago | 1,015,000 | 85,000 | 8% |
| Suburban Cook | 904,000 | 59,000 | 6% |
| 7 collar counties | 1,130,000 | 69,000 | 6% |
| Downstate 94 counties | 1,696,000 | 25,000 | 1% |

| Illinois family households that include undocumented immigrants | | | |
|---|---|---|---|
| | Total family households | Family households with at least one undocumented member | Share of total family households that have at least one undocumented member |
| Illinois | 3,121,000 | 198,000 | 6% |
| Chicago | 559,000 | 68,000 | 12% |
| Suburban Cook | 619,000 | 51,000 | 8% |
| 7 collar counties | 839,000 | 61,000 | 7% |
| Downstate 94 counties | 1,104,000 | 18,000 | 2% |

Of those Illinois family households that include at least one undocumented immigrant, 87% are mixed-status--that is, they also include at least one U.S. citizen or immigrant with lawful status-and 74% include a native-born U.S. citizen. In the collar counties surrounding Chicago, 90% of family households are mixed-status, and 79% include at least one native-born U.S. citizen.



| Illinois family households that include both undocumented immigrants and U.S. citizens | | | |
|---|---|---|---|
| | Family households that include at least one undocumented immigrant | Number (share) of such households that also include a legal immigrant or a U.S. citizen | Number (share) of such households that also include a native-born U.S. citizen |
| Illinois | 198,000 | 172,000 (87%) | 146,000 (74%) |
| Chicago | 68,000 | 57,000 (84%) | 47,000 (70%) |
| Suburban Cook | 51,000 | 46,000 (89%) | 38,000 (74%) |
| 7 collar counties | 61,000 | 55,000 (90%) | 48,000 (79%) |
| Downstate 94 counties | 18,000 | 15,000 (83%) | 13,000 (70%) |

Approximately 886,000 Illinois residents live with relatives in family households that include at least one undocumented immigrant. (This count includes the immigrants themselves and all other relatives in the family household, regardless of the status of those relatives.) Of these residents, roughly 799,000 (90%) live in mixed-status households that also include a family member who is a U.S. citizen or has lawful immigration status. Roughly 711,000 (80%) live in a household with at least one native-born U.S. citizen and one undocumented immigrant.

| Related persons in Illinois living in family households that include at least one undocumented immigrant | | | |
|---|---|---|---|
| | Related persons in family households that include at least one undocumented immigrant | Number (share) of these Individuals in households that also a legal immigrant or a U.S. citizen | Number (share) of these individuals in households that also include a native-born citizen |
| Illinois | 886,000 | 799,000 (90%) | 711,000 (80%) |
| Chicago | 301,000 | 266,000 (88%) | 233,000 (77%) |
| Suburban Cook | 238,000 | 217,000 (91%) | 190,000 (80%) |
| 7 collar counties | 273,000 | 252,000 (92%) | 230,000 (84%) |
| Downstate 94 counties | 74,000 | 65,000 (88%) | 58,000 (78%) |

About 145,000 Illinois families with children include at least one undocumented parent, making up 36% of all immigrant families with children. Among these families, 126,000 (88%) include at least one native-born child, and 107,000 (74%) include *only* native-born children.

| Illinois family households with undocumented parents and U.S.-born children | | | |
|---|---|---|---|
| | Families with children that include at least one undocumented parent | Number (share) of these families with *at least one* U.S.-born child | Number (share) of these families with *only* U.S.-born children |
| Illinois | 145,000 | 126,000 (87%) | 107,000 (74%) |
| Chicago | 48,000 | 42,000 (87%) | 35,000 (74%) |
| Suburban Cook | 38,000 | 33,000 (86%) | 29,000 (76%) |
| 7 collar counties | 46,000 | 41,000 (88%) | 34,000 (73%) |
| Downstate 94 counties | 13,000 | 11,000 (84%) | 9,000 (72%) |



www.icirr.org

AR004606

In 55% of all Illinois married couples with at least one undocumented spouse, the other spouse is lawfully present (either native-born, naturalized, or lawful permanent resident). In 37% of these couples, the other spouse is a U.S. citizen.

| Illinois married couples with at least one undocumented spouse | | | |
|---|---|---|---|
| | Married couples with at least one undocumented spouse | Number (share) of these couples in which one spouse is lawfully present | Number (share) of these couples in which one spouse is a US citizen |
| Illinois | 141,000 | 78,000 (55%) | 53,000 (37%) |
| Chicago | 46,000 | 25,000 (54%) | 17,000 (38%) |
| Suburban Cook | 38,000 | 23,000 (61%) | 15,000 (38%) |
| 7 collar counties | 44,000 | 23,000 (53%) | 16,000 (37%) |
| Downstate 94 counties | 13,000 | 7,000 (54%) | 5,000 (36%) |

**Illinois' undocumented immigrants largely speak Spanish, but significant numbers speak Asian/Pacific languages**

More than four-fifths of Illinois' undocumented immigrants speak Spanish. Roughly 20% of undocumented immigrants in downstate Illinois speak an Asian or Pacific Island language—a figure that corresponds to the 21% share of downstate undocumented immigrants who came to the U.S. from Asia.

| Languages spoken by Illinois undocumented immigrants | | | |
|---|---|---|---|
| | Undocumented persons 5 years old or older | Number (share) who speak Spanish | Number (share) who speak an Asian/Pacific language |
| Illinois | 505,000 | 415,000 (82%) | 44,000 (9%) |
| Chicago | 181,000 | 151,000 (83%) | 10,000 (5%) |
| Suburban Cook | 123,000 | 99,000 (81%) | 15,000 (12%) |
| 7 collar counties | 150,000 | 131,000 (88%) | 9,000 (6%) |
| Downstate 94 counties | 52,000 | 34,000 (66%) | 11,000 (20%) |

**Roughly half of Illinois' undocumented immigrants have limited English proficiency**

Half of Illinois' undocumented immigrants (254,000) have difficulty with English; 93,000 speak no English. About 57% of the undocumented in Chicago have limited English proficiency.

| English proficiency among Illinois undocumented immigrants | | | |
|---|---|---|---|
| | Undocumented persons 5 years old or older | Number (share) who speak English not well | Number (share) who speak no English |
| Illinois | 505,000 | 161,000 (32%) | 93,000 (19%) |
| Chicago | 181,000 | 63,000 (35%) | 41,000 (23%) |
| Suburban Cook | 123,000 | 38,000 (31%) | 22,000 (18%) |
| 7 collar counties | 150,000 | 45,000 (30%) | 25,000 (17%) |
| Downstate 94 counties | 52,000 | 15,000 (28%) | 6,000 (11%) |



AR004607

**Nearly half of Illinois' undocumented immigrants have not completed high school, though a significant share have earned a college degree**

Approximately 47% of Illinois' undocumented population (176,000) have not earned a high school diploma. About 30% (113,000) have never attended high school. On the other hand, 29% (109,000) have a high school diploma but never attended college, 8% (29,000) have attended college but have not earned a degree, and 16% (61,000) have earned at least an associate's degree. In downstate Illinois, 20% of undocumented immigrants have earned at least a bachelor's degree.



**Educational Attainment Among Illinois Undocumented Immigrants**

- No high school
- Some high school, no diploma
- High school diploma, no college
- Some college, no degree
- At least Associate's Degree

| Educational attainment among Illinois undocumented immigrants | | | | | |
|---|---|---|---|---|---|
| | Undocumented persons 25 years old or older | Did not attend high school | Attended high school, no diploma | Completed high school, no college | Attended college, no degree | Completed at least associate's degree |
| Illinois | 375,000 | 113,000 | 63,000 | 109,000 | 29,000 | 61,000 |
| Chicago | 135,000 | 43,000 | 21,000 | 41,000 | 10,000 | 21,000 |
| Suburban Cook | 93,000 | 27,000 | 13,000 | 29,000 | 8,000 | 17,000 |
| 7 collar counties | 112,000 | 35,000 | 22,000 | 30,000 | 9,000 | 16,000 |
| Downstate 94 counties | 34,000 | 9,000 | 6,000 | 9,000 | 3,000 | 7,000 |

**Roughly one-third of Illinois' undocumented immigrants live below the federal poverty line**

Approximately 29% of Illinois' undocumented immigrants (146,000) live below 100% of the federal poverty level ($23,550 for a household of four). Another 34% (171,000) are between 100% and 200% of the poverty line. In Chicago alone, 33% (60,000) are below 100% of the federal poverty level, and 67% (122,000) are below 200% of the poverty line.



AR004608

| Income among Illinois undocumented immigrants | | | |
|---|---|---|---|
| | Undocumented persons for whom poverty status is determined | Number (share) with income below 200% of federal poverty level | Number (share) with income below 100% of federal poverty level |
| Illinois | 503,000 | 316,000 (63%) | 146,000 (29%) |
| Chicago | 181,000 | 122,000 (67%) | 60,000 (33%) |
| Suburban Cook | 124,000 | 70,000 (57%) | 30,000 (24%) |
| 7 collar counties | 149,000 | 89,000 (60%) | 38,000 (25%) |
| Downstate 94 counties | 48,000 | 35,000 (72%) | 18,000 (37%) |

Under the Senate immigration reform bill, legalizing immigrants must either maintain regular employment or average income of at least 100% of the federal poverty level to renew their provisional status. To gain lawful permanent resident (green card) status, they must maintain regular employment or income of average income of at least 125% of the poverty line.

**Illinois' undocumented immigrants participate in the state labor force at high rates, working in a broad range of industries and occupations**

Roughly 68% of undocumented immigrants participate in the Illinois labor force—a slightly higher participation rate than that of the general population (66%). The labor force participation rate is particularly high in the collar counties (75%).

| Labor force participation among Illinois undocumented immigrants | | | | |
|---|---|---|---|---|
| | Undocumented persons 16 years old or older | Number (share) civilian employed | Number (share) civilian unemployed | Number (share) not in the labor force |
| Illinois | 465,000 | 286,000 (62%) | 33,000 (7%) | 145,000 (31%) |
| Chicago | 168,000 | 99,000 (59%) | 14,000 (9%) | 54,000 (32%) |
| Suburban Cook | 112,000 | 69,000 (61%) | 7,000 (6%) | 37,000 (33%) |
| 7 collar counties | 138,000 | 93,000 (68%) | 10,000 (7%) | 35,000 (25%) |
| Downstate 94 counties | 47,000 | 25,000 (53%) | 3,000 (6%) | 19,000 (41%) |

Roughly one-fifth of Illinois' undocumented immigrants work in manufacturing, while another one-fifth work in accommodations and food services. Approximately 11% work in administrative and support services (including waste management), and another 10% work in construction.

| Common industries of employment among Illinois undocumented immigrants | | | | |
|---|---|---|---|---|
| | Manufacturing | Accommodations and food services | Administrative and support services | Construction |
| Illinois | 63,000 (22%) | 59,000 (21%) | 31,000 (11%) | 28,000 (10%) |
| Chicago | 22,000 (23%) | 21,000 (21%) | 8,000 (8%) | 12,000 (12%) |
| Suburban Cook | 13,000 (19%) | 12,000 (18%) | 8,000 (12%) | 8,000 (12%) |
| Collar counties | 21,000 (22%) | 22,000 (23%) | 12,000 (13%) | 6,000 (7%) |
| Downstate 94 counties | 7,000 (27%) | 5,000 (19%) | 2,000 (7%) | 1,000 (5%) |



AR004609

The most common occupations among Illinois' undocumented immigrants are in production and in food preparation and service. Other common occupations involve sales and office work; transportation and material moving; building and grounds cleaning and maintenance; management, business, science, and arts professional work, and construction.

| Common occupations among Illinois undocumented immigrants | | | | |
|---|---|---|---|---|
| | Civilian employed undocumented persons 16 years old or older | Production | Food preparation and serving related | Sales and office | Transportation and material moving |
| Illinois | 286,000 | 52,000 (18%) | 50,000 (18%) | 38,000 (13%) | 36,000 (13%) |
| Chicago | 99,000 | 18,000 (18%) | 18,000 (18%) | 13,000 (13%) | 13,000 (13%) |
| Suburban Cook | 69,000 | 12,000 (17%) | 11,000 (16%) | 10,000 (14%) | 8,000 (12%) |
| Collar counties | 93,000 | 18,000 (19%) | 17,000 (19%) | 12,000 (13%) | 12,000 (13%) |
| Downstate 94 counties | 25,000 | 5,000 (19%) | 4,000 (15%) | 3,000 (12%) | 3,000 (11%) |

| Common occupations among Illinois undocumented immigrants (continued) | | | | |
|---|---|---|---|---|
| | Civilian employed undocumented persons 16 years old or older | Building and grounds cleaning and maintenance | Management, business, science, and arts professional | Construction |
| Illinois | 286,000 | 33,000 (12%) | 28,000 (10%) | 26,000 (9%) |
| Chicago | 99,000 | 10,000 (10%) | 8,000 (9%) | 11,000 (11%) |
| Suburban Cook | 69,000 | 7,000 (11%) | 7,000 (10%) | 8,000 (11%) |
| Collar counties | 93,000 | 13,000 (14%) | 8,000 (8%) | 7,000 (7%) |
| Downstate 94 counties | 25,000 | 3,000 (10%) | 5,000 (20%) | 1,000 (4%) |

## Implications for immigration reform
The characteristics of Illinois' undocumented immigrants bear several significant implications for any potential reform of our immigration system, such as that outlined in the Senate immigration bill.

Undocumented immigrants are **increasingly present in the Chicago suburbs**, with more than half living there compared to 36% in the city. Immigration service infrastructure in the suburbs, however, is still limited compared to that which serves immigrants living in the city of Chicago. Should immigration reform legislation that includes legalization win passage, this **suburban infrastructure will need significant additional investment** in order to adequately serve all those suburban immigrants who seek legalization.

Since Illinois' undocumented population overwhelmingly hails from Latin America and speaks Spanish, **any effective outreach to the undocumented must therefore be conducted primarily in Spanish**. However, significant undocumented populations hail from Asia (the Philippines, India, Korea, and China) and from Eastern Europe. **Organizations that serve Asian and Eastern**


ICIRR
ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS

www.icirr.org

AR004610

**European communities must therefore be included** in any informational outreach and direct service should immigration reform win enactment.

Illinois' undocumented immigrants live predominantly in **mixed-status families**, often with a U.S. citizen spouse or child. This finding is contrary to the common image of undocumented immigrants as single and unattached. On the contrary, undocumented immigrants have strong equities in this country, a fact that provides a **powerful argument against enforcement policies that separate these immigrants from their lawfully present spouses and children**. Indeed, the fact that 78,000 undocumented immigrants in Illinois are married to a U.S. citizen or lawfully present immigrant spouse further suggests that **any immigration reform legislation should fix the unlawful presence bars and other obstacles that currently block the undocumented spouses from gaining lawful status** through sponsorship of the lawfully present spouses. Such fixes would remove the threat of deportation and separation for these couples, and offer a simpler and quicker alternative to legalization, which, if the Senate bill offers any indication, would involve a long and rigorous process.

Undocumented immigrants will also **need significant assistance to meet any educational, language, and work requirements** that legalization might impose. Half of the state's undocumented immigrants have difficulty with English, and roughly half have not earned a high school diploma. And while the undocumented have strong rates of labor force participation, nearly two-thirds have incomes below 200% of the federal poverty level. To have a fair opportunity to gain lawful status through a legalization program, our state's undocumented immigrants will need to have available to them English language and vocational training programs that would enable them to enhance their education and job skills. Such programming would enable legalizing immigrants to not only meet the requirements of legalization but also to contribute even more to our state's economic and civic life.



www.icirr.org

AR004611

FOOTNOTE 59

AR004612



New American Economy

# The Contributions of
# New Americans in New York



AR004613

# Partners

 

  

  

  

  

AR004614

# The Contributions of New Americans in New York

## CONTENTS

Demographics................................................................**1**

The Role of Immigrants as Entrepreneurs................**2**

    Spotlight On: Shan-Lyn Ma........................................**4**

Income and Tax Contributions ................................**6**

The Role of Immigrants in the Broader Workforce........**8**

Science, Technology, Engineering, and Math............**12**

    Spotlight On: Ragy Thomas......................................**14**

Healthcare....................................................................**16**

Agriculture....................................................................**18**

    Spotlight On: Brian Reeves......................................**20**

Housing..........................................................................**21**

Visa Demand................................................................**22**

Naturalization..............................................................**25**

International Students ..............................................**26**

Voting Power................................................................**27**

Undocumented Population......................................**28**

Methodology................................................................**34**

Endnotes........................................................................**41**

Endnotes: Methodology............................................**45**

AR004615

# Demographics

**N**ew York, our country's third largest state by population, is a giant among even the most immigrant-rich states. From the 1960s to the 1990s, New York was one of seven states that as a group attracted between 60 to 75 percent of all the immigrants arriving in America each year.[1] Today, New York is home to nearly 4.5 million immigrants, the third largest number of foreign-born residents in the country, surpassed only by California and Texas.

Even today, the number of immigrants in the state continues to rise. From 2010 to 2014, New York's immigrant population grew by more than 160,000 people, allowing New York to increase its already sizable immigrant population by almost 4 percent. In 2014, more than one out of every 5 New Yorkers was born in another country. New York's large immigrant community and its historical ties to America's immigration history are just two reasons why the Empire State is known as a place where people from all over the world come to build new lives and grab a piece of the American Dream.

Today, New York is home to nearly **4.5 million immigrants**, the **third largest** number of foreign-born residents in the country, surpassed only by California and Texas.

## 4,462,737

New York residents were born abroad.

## 161,579

people immigrated to New York between 2010 and 2014.



**23%**

Share of New York residents born abroad

**13%**

Share of U.S. residents born abroad



**3.8%**
Growth in immigrant population, NY

**5.8%**
Growth in immigrant population, U.S.

2010                                                    2014

AR004616

# The Role of Immigrants as Entrepreneurs

## 288,737

immigrants in New York are self-employed

Immigrant-owned businesses generated **$6.13B** in business income in 2014.



**33%**

Share of entrepreneurs in New York who are immigrants

**496,928** people in New York are employed at firms owned by immigrants.

\* This is a conservative estimate that excludes large, publicly owned firms.

Given that the act of picking up and moving to another country is inherently brave and risky, it should be little surprise that immigrants have repeatedly been found to be more entrepreneurial than the U.S. population as a whole.[2] According to The Kauffman Foundation, a nonprofit group that studies entrepreneurship, immigrants were almost twice as likely to start a new business in 2015 than the native-born population.[3] The companies they founded ranged from small businesses on Main Street to large firms responsible for thousands of American jobs. Recent studies, for instance, have indicated that immigrants own more than half of the grocery stores in America and 48 percent of nail salons.[4] Foreign-born entrepreneurs are also behind 51 percent of our country's billion dollar startups, and a substantial share of our Fortune 500 firms.[5]

The super-charged entrepreneurial activity of immigrants provides real and meaningful benefits to everyday Americans. In 2010, roughly one in 10 American workers with jobs at private firms were employed at immigrant-founded companies. Such businesses also generated more than $775 billion in annual business revenue that year.[6] In New York, like the country as a whole, immigrants are currently punching far above their weight class as entrepreneurs. Foreign-born workers currently make up 32.7 percent of all entrepreneurs in the state, despite accounting for 22.6 percent of New York's population. Their firms generated $6.13 billion in business income in 2014. New York firms with immigrant owners also provided jobs to roughly 497,000 Americans in 2007.[7]

Immigrant entrepreneurship was also important to New York's recovery after the Great Recession. From 2007

2

AR004617

to 2011, immigrants founded 42.0 percent of all new businesses in the state.[8]

## In 2010, roughly **1 in 10** American workers with jobs at private firms were employed at immigrant-founded companies.

Immigrant entrepreneurs have long been a critical part of New York's economic success story. Ralph Lauren, the founder of the New York City-based Fortune 500 fashion company of the same name, was the child of two immigrants from Belarus.[9] Lauren, born Ralph Lifshitz, claims that his upbringing as a child of two European Jews in the Bronx informed his brand, which is strongly identified with Old World glamour and a desire to achieve wealth and success.[10] Thirty other Fortune 500 firms based in the state—including banks like Goldman Sachs and media giants like NewsCorp and CBS—had at least one founder who either immigrated to the United States or was the child of immigrants. Together, those 31 companies employ almost 1.8 million people globally and bring in more than $797 billion in revenues each year.

All told, immigrants and their children have played a larger role founding Fortune 500 firms in New York than they have nationwide. Of the 55 Fortune 500 firms based in New York, 56.4 percent of firms had at least one founder who was an immigrant or the child of an immigrant. For the country as a whole, the equivalent figure is 41.4 percent.

Currently, there is no visa to come to America, start a company, and create jobs for U.S. workers—even if an entrepreneur already has a business plan and has raised hundreds of thousands of dollars to support his or her idea. Trying to exploit that flaw in our system, countries around the world—from Canada to Singapore, Australia to Chile—have enacted startup visas, often with the explicit purpose of luring away entrepreneurs who want to build a U.S. business but cannot get a visa to do so.[11] Here in the United States, many individuals have gone to great lengths to circumnavigate the visa hurdles. Many

entrepreneurs sell a majority stake in their company and then apply for a visa as a high-skilled worker, rather than the owner of their firm. And a few enterprising venture capitalists, led by Jeff Bussgang in Boston and Brad Feld in Colorado, have launched programs that bring over foreign-born entrepreneurs to serve as "entrepreneurs in residence" at colleges and universities. Because nonprofit academic institutions are exempt from the H-1B cap, such entrepreneurs can secure their visas by working as mentors at a school, and then build their startups in their free time.

These innovative programs, which are currently available at 13 colleges and universities across the country, are already resulting in meaningful economic contributions. As of mid-2016, 23 entrepreneurs had secured visas through these programs nationally. The companies they founded had created 261 jobs and raised more than $100 million in funding.[12]



# 56%

of **Fortune 500** companies based in New York were founded by immigrants or their children.

Those firms generate **$797.2B** in annual revenue, and employ **1,771,183** people globally.

AR004618

# Shan-Lyn Ma

## Co-founder & CEO of Zola

S han-Lyn Ma, the co-founder and CEO of Zola, a $40 million dollar modern wedding registry business, says she would have started her business much earlier if not for the limitations posed by U.S. immigration laws.

Ma, who was born in Singapore but grew up in Australia, moved to America in 2004 to pursue an MBA at Stanford University. After graduating, she took a job at Yahoo!, where she worked for two years. While Ma loved her experience at Yahoo!, she soon, as she puts it, "started craving a startup experience." In 2008, she moved to New York City to join the newly founded Gilt Groupe, an online shopping startup. Ma was the creator and general manager of Gilt Taste, an arm of the larger group that sold gourmet wine and food. After her time at Gilt, Ma felt ready to branch out on her own. "I finally had the experience under my belt to take the plunge," she says.

Inspiration came when many of Ma's friends started getting married. "I was going to a lot of weddings and all the newlyweds expressed a frustration with the classic gift registry system," she explains. "They would say: 'I loved my wedding but I hated my registry.'" So, in 2013, Ma, along with Kevin Ryan and Nobu Nakaguchi, founded Zola, a company that would "transform wedding registries from the most frustrating part of wedding planning to the most enjoyable aspect." Geared toward tech-savvy millennials, Zola offers a mobile app that allows couples to build customized registries with ease. And, unlike traditional wedding registries, Zola allows wedding guests to gift experiences, like a hot-air balloon ride or a winery tour, as well as cash for down payments or other expenses.



Zola has been wildly successful. The New-York-City-based company has raised over $16 million in venture capital funding and is the fastest-growing wedding registry company in the United States. It also grossed $40 million in 2015. In the last two and a half years, the team has grown from three co-founders to 40 employees—38 of whom are American-born.

Zola grossed **$40M** in 2015 and, in the last 2.5 years, its team has grown from three co-founders to **40 employees**—38 of whom are American-born.

But despite this success, the immigration system slowed the company's progress. "Until I got my green card, I felt like my place in the United States was very precarious," she says, "like I could be asked to leave the country at any time." She adds that for an inherently risky field like entrepreneurship, the uncertainty around immigration status can be prohibitive. Although Ma and her team eventually figured out a way for Zola to sponsor her green card, "it took a lot of work to figure out how to do so in a way that would allow me to work for my own company," she says.

Still, Ma considers herself one of the lucky ones. "There are many immigrants in this country who would start companies and create jobs if there was an easier way for them to do so," she says, "but the current system stifles this entrepreneurial spirit and hurts the American economy in the process."

AR004620

# Income and Tax Contributions

Immigrants in New York play an important role contributing to the state as both taxpayers and consumers. In 2014, immigrant-led households in New York earned $ 145.8 billion dollars—or 23.2 percent of all income earned by New Yorkers that year. With those earnings, the state's foreign-born households were able to contribute more than one in every five dollars paid by New York residents in state and local tax revenues, payments that support important public services such as public schools and police. Through their individual wage contributions, immigrants also paid almost $ 17.4 billion into the Social Security and Medicare programs that year.

By spending the money they earn at businesses such as hair salons, grocery stores, and coffee shops, immigrants also support small business owners and job creation in the communities where they live. In New York immigrants held $ 103.3 billion in spending power in 2014, defined in this brief as the net income available to a family after paying federal, state, and local taxes. Some specific ethnic groups within the immigrant community had particular power as consumers, such as Asians and immigrants from the Middle East and North Africa.

**INCOME AND TAX CONTRIBUTIONS OF KEY GROUPS WITHIN NEW YORK'S IMMIGRANT POPULATION, 2014**

**Asian**

**$40.9B**
Total Income in 2014
**$12.4B**
Total amount paid in taxes

**Hispanic**

**$31.4B**
Total Income in 2014
**$8.3B**
Total amount paid in taxes

**Middle Eastern & North African**

**$5.9B**
Total Income in 2014
**$1.8B**
Total amount paid in taxes

**Sub-Saharan African**

**$4.6B**
Total Income in 2014
**$1.3B**
Total amount paid in taxes



$40.9B $8B $4.4B

$31.4B $4.7B $3.5B

$5.9B $1.2B $634.3M

$4.6B $811.0M $509.4M

■ Total income   ■ Amount paid in federal taxes   ■ Amount paid in state and local taxes

AR004621

# In 2014, immigrants in New York earned $145.8B.



**$15.9B**—went to state and local taxes…

**$26.5B**—went to federal taxes…

Leaving them with **$103.3B** in remaining spending power.

## ENTITLEMENT CONTRIBUTIONS

New York's immigrants also contribute to our country's entitlement programs. In 2014, through taxes on their individual wages, immigrants contributed **$3.7B** to Medicare and **$13.7B** to Social Security.



$3.7B

**Medicare**

$13.7B

**Social Security**

AR004622

# The Role of Immigrants in the Broader Workforce



**23%**
Immigrants made up 23% of New York's population in 2014...

**28%**
But they made up 28% of the employed population in the state.

Because they tended to be working-age,

## Immigrants were **32%** more likely to work than native-born New Yorkers.

**58.4%**
of immigrants of all ages worked in 2014.

**44.3%**
of the native-born population worked.

P eople who come to the United States often come here to work. Because of that, they often have skills that make them a good fit for our labor force—and a strong complement to American workers already here. In the country as a whole, immigrants are much more likely to be working-age than the U.S.-born. They also have a notably different educational profile. The vast majority of Americans – more than 79 percent of the U.S.-born population – fall into the middle of the education spectrum by holding a high school or bachelor's degree. Immigrants, by contrast, are more likely to gravitate toward either end of the skill spectrum. They are more likely to lack a high school diploma than the native born, but also more likely to have an advanced degree. This makes them good candidates for labor-intensive positions, such as housekeeping, that many more educated U.S.-born

workers are less interested in pursuing, as well as high-level positions that allow innovation-driven firms to expand and add jobs for Americans at all skill levels.

## In New York, **71%** of the foreign-born population is of working age—defined in this brief as falling between the ages of 25 and 64—compared to less than **50%** of the native-born population.

Immigrants in New York in many ways resemble the trend in the country as whole. In New York, 71.0 percent of the foreign-born population is working aged, defined in this brief as falling between the ages 25 and 64, while

AR004623

AGE BREAKDOWN OF NEW YORK'S FOREIGN-BORN AND
NATIVE-BORN POPULATIONS, 2014

EDUCATIONAL ATTAINMENT OF NEW YORK'S FOREIGN-
BORN AND NATIVE-BORN POPULATION (AGES 25+), 2014



FOREIGN-BORN

WORKING AGE

12%    71%    17%

NATIVE-BORN

WORKING AGE

37%    49%    14%

■ 0-24    ■ 25-64    ■ 65+



FOREIGN-BORN

26%    44%    18%    12%

NATIVE-BORN

9%    54%    21%    16%

■ Less than High School        ■ Bachelor's Degree

■ High School/Some College     ■ Graduate Degree

only 49.0 percent of the native-born population is. That 22.0-percentage point gap has major implications for the state's workforce. In 2014, immigrants in the state were 31.8 percent more likely to be actively employed than the state's native-born residents—a reality driven largely by the fact that a larger than average portion of the native-born population was under the age of 25. Foreign-born individuals punched above their weight class as workers in the state as well: In 2014, they made up 27.8 percent of all employed individuals in the state, despite accounting for 22.6 percent of the New York's overall population.

When it comes to education, however, New York differs from the national pattern. Immigrants here are less likely to have either a bachelor's degree or graduate level training than native-born residents. Instead, they are considerably more likely to have less than a high-school education: More than one in four of the state's immigrants fall into that category, compared to 9.3 percent of natives.

The immigrants who are working in New York contribute to a wide range of different industries in the state—many of which are growing and important parts of the local economy. Foreign-born residents make up more than three out of five workers in New York's home health care sector. They also account for 44.7 percent of the

state's workers in traveler accommodation, contributing to New York's sizeable tourism industry, which added $62.5 billion to the state's Gross Domestic Product (GDP) in 2014.[13] Immigrants also frequently gravitate toward sectors where employers may struggle to find enough interested U.S.-born workers. Immigrants in New York, for instance, make up 68.3 percent of workers in private households, an industry that includes maids, housekeepers, and nannies.

In recent decades, immigrants have also played an important role in New York's manufacturing industry. Studies have found that the arrival of immigrants to a community can have a powerful impact creating or preserving manufacturing jobs. This is because foreign-born workers give employers access to a large and relatively affordable pool of laborers, making it less attractive for firms to move work to cheaper locations offshore. One study by the Partnership for a New American Economy and the Americas Society/ Council of the Americas, for instance, found that every time 1,000 immigrants arrive in a given U.S. county, 46 manufacturing jobs are preserved that would otherwise not exist or have moved elsewhere.[14] The more than 4.3 million immigrants who were living in the state in 2010 were responsible for creating or preserving nearly 198,000 manufacturing jobs.

AR004624

Aside from just looking at overarching industry groups, our work also examines the share of workers that are foreign-born in specific occupations and jobs. Reflecting their unique educational profile, immigrants in New York are often overrepresented in particularly labor-intensive positions. While foreign-born workers make up 27.8 percent of the state's employed population, they account for 71.4 percent of taxi driver and chauffeurs. They also make up 57.9 percent of those working as chefs and head cooks, and 57.3 percent of nursing, psychiatric, and home health aides.

**INDUSTRIES WITH LARGEST SHARE OF FOREIGN-BORN WORKERS, 2014**

■ Share of workers who are immigrants

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| **Taxi and Limousine Service** | **Private Households** | **Home Healthcare Services** | **Services to Buildings and Dwellings** | **Traveler Accommodation** |







| 75% | 68% | 60% | 55% | 45% |
|---|---|---|---|---|
| **63,768 immigrant workers** | **69,471 immigrant workers** | **112,637 immigrant workers** | **63,931 immigrant workers** | **42,682 immigrant workers** |
| 85,387 total workers | 101,685 total workers | 186,812 total workers | 116,894 total workers | 95,561 total workers |

AR004625

OCCUPATIONS WITH LARGEST SHARE OF FOREIGN-BORN WORKERS, 2014

**1**
**Taxi Drivers and Chauffeurs**



66,327 immigrant workers
92,914 total workers

**2**
**Maids and Housekeeping Cleaners**



273,324 immigrant workers
352,093 total workers

**3**
**Chefs and Head Cooks**



32,131 immigrant workers
295,203 total workers

**4**
**Nursing, Psychiatric, and Home Health Aides**



170,502 immigrant workers
297,591 total workers

**5**
**Construction Laborers**



79,759 immigrant workers
160,298 total workers

**6**
**Painters, Construction and Maintenance**



21,461 immigrant workers
44,900 total workers

**7**
**Misc. food preparation and serving-related workers**



15,700 immigrant workers
35,917 total workers

**8**
**Cooks**



62,581 immigrant workers
151,595 total workers

**9**
**Personal Care Aides**



40,552 immigrant workers
100,815 total workers

**10**
**Janitors and Building Cleaners**



105,237 immigrant workers
268,244 total workers

■ Share of workers who are immigrants

AR004626

# Science, Technology, Engineering, and Math

Between 2014 and 2024, science, technology, engineering, and math—or "STEM"—fields are projected to play a key role in U.S. economic growth, adding almost 800,000 new jobs and growing 37.0 percent faster than the U.S. economy as a whole.[15] Immigrants are already playing a huge part ensuring that New York remains a leading innovator in STEM fields like healthcare and biotechnology. Despite making up 22.6 percent of the state's population, foreign-born New Yorkers made up 26.5 percent of STEM workers in the state in 2014. Our outdated immigration system, however, makes it difficult for STEM employers to sponsor the high-skilled workers they need to fill critical positions. This is problematic because it can slow the ability of firms to expand and add jobs for U.S.-born workers. It also makes little sense, given the country's ongoing shortage of STEM talent—an issue that heavily impacts employers here. In 2014, 11.2 STEM jobs were advertised online in New York for every one unemployed STEM worker in the state.

In 2011, Cornell University earned almost **91 patents**, placing it among the top 10 most productive in the country. Almost **2 out of every 3** of those patents had at least one foreign-born inventor.

Immigrants, however, are not just a crucial piece of New York's STEM workforce now—they are also likely to power it in the future. In 2014 students on temporary visas made up roughly one out of every 3 students earning a STEM Master's degree at New York's universities, and 40.7 percent of students earning a PhD-level degree in STEM. Even after America's universities invest in their education, however, many of those students struggle to remain in the country after graduation. Creating visa pathways that would make it easier for them to stay would have a major economic benefit to New York. A study by the Partnership for a

# 164,854

available STEM jobs were advertised online in 2014, compared to **14,673** unemployed STEM workers.

The resulting ratio of open jobs to available workers was

# 11.2 to 1



AR004627

If half of New York's **7,479** advanced level STEM grads on temporary visas stayed in the state after graduation…

# 9,797

jobs for U.S.-born workers would be created by 2021.



**35%** Share of students earning STEM Master's degrees who are foreign-born.

**41%** Share of students earning STEM PhDs who are foreign-born.

New American Economy and the American Enterprise Institute found that every time a state gains 100 foreign-born STEM workers with graduate-level STEM training from a U.S. school, 262 more jobs are created for U.S.-born workers there in the seven years that follow.[16] For New York, that means that retaining even half of the 7,479 graduates earning advanced-level STEM degrees in 2014 could result in the creation of almost 9,800 new positions for U.S.-born workers by 2021.

New York's immigrants also contribute to the state's economic growth and competitiveness by earning patents on cutting-edge research and products. In 2011, Cornell University earned almost 91 patents, placing it among the top 10 most productive in the country. Almost two out of every three of those patents had at least one foreign-born inventor. Such patents are licensed to existing companies or used as foundations for new companies, creating American jobs and revenue along the way.[17]

**UNIVERSITY PATENTS WITH FOREIGN-BORN INVENTORS, 2011**

**Cornell University**



91

65%

■ Share of patents with at least one foreign-born inventor

▫ Total number of patents produced

AR004628

# Ragy Thomas

## Founder & CEO of Sprinklr

R agy Thomas, founder and CEO of the social media platform Sprinklr, believes that an open, streamlined immigration policy is vital to the economic future of America. As a technology entrepreneur, investor, and visionary, who has founded four startups and created thousands of jobs, Thomas' own story reveals how drawing global talent to America can fuel innovation, build businesses, and multiply job opportunities for other Americans.

Thomas was born and educated in India and received an undergraduate degree in computer science engineering from Pondicherry University. At 22, he came to the United States for a computer-programming job in Wisconsin. After six months in Wisconsin, he moved to the East Coast and advanced his career in leaps and bounds over the next 20 years. After getting his MBA in finance and information systems from New York University, he launched a series of successful startups, including an email marketing business that sold for $120 million. Today, Thomas runs Sprinklr, where he employs 1,200 people around the world.



Photo Credit: David Yellen

After getting his MBA in finance and information systems from New York University, Thomas launched a series of successful startups, including an email marketing business that sold for **$120M**.

Sprinklr helps more than 1,000 brands reach customers through various channels of social media and provides them with tracking and analytical data for improved targeted marketing. Thomas' clients include some of the biggest global brands and half of the largest U.S. companies, such as Nike, McDonald's, and Verizon. According to Forbes, Sprinklr surpassed $100 million in annualized revenue in 2015, up 150 percent from a year earlier. In a sector where marketers are known to change their preferences at the drop of a hat, Sprinklr has an impressive client retention rate of close to 95 percent. This is partly due to the level of customization and nimbleness that the firm provides each of its clients. An organizational culture that places the client at the center of all decisions and Thomas' personal commitment to instantly fix any customer complaints have played a contributing role in the success of the firm.

AR004629

"History is such a beautiful guide of what happens when you come together instead of stay apart," Thomas says.

This is the type of economic gain that America attains by attracting the best talent, Thomas says. And yet he knows how difficult bringing and retaining that talent can be. His path toward citizenship was sluggish. It took Thomas about six years to receive his green card and nearly a dozen before he was able to become a citizen. He supports immigration policies that would eliminate hurdles for newcomers, offer security to immigrant families, and make it easier to attract talented minds to the country. To him, immigrant innovation is what makes America great. "History is such a beautiful guide of what happens when you come together instead of stay apart," he says. "For countries to function, you need the rules and you need a structure. But as a country, we are blessed by being able to attract amazing people. We have to preserve the DNA [of the United States] by encouraging that."

AR004630

# Healthcare

In the coming years, the American healthcare industry is projected to see incredibly rapid growth—adding more new positions from 2014 to 2024 than any other industry in our economy.[18] Already, caregivers are facing near unprecedented levels of demand. Between 2013 and 2015, the number of Americans with health insurance rose by almost 17 million, opening the door for many patients to receive more regular care.[19] The country's 76.4 million baby boomers are also aging rapidly—at a major cost to our healthcare system. Studies have found that elderly Americans spend three times more on healthcare services than those of working age each year.[20]

## Only two other states have a higher share of foreign-educated physicians than New York.

Immigrants are already playing a valuable role helping New York meet some of its healthcare workforce gaps. In 2016 more than one in three physicians in New York

---

**NEW YORK HAS A SHORTAGE OF HEALTHCARE WORKERS**

# 91,911

available healthcare jobs were advertised online in 2014, compared to **31,897** unemployed healthcare workers.

The resulting ratio of open jobs to available workers was

# 2.9 to 1

---

Additional number of psychiatrists needed now: **1,614**

Shortage of occupational therapists by 2030: **1,048**

Shortage of dentists projected by 2025: **1,024**

AR004631

**FOREIGN-BORN AND FOREIGN-EDUCATED PROFESSIONALS HELP FILL HEALTHCARE LABOR GAPS**

**Foreign-Educated**

**Foreign-Born**

**Doctors**
28,845 graduates of foreign medical schools

**Psychiatrists**
2,546 graduates of foreign medical schools

**Nurses**
59,785 foreign-born workers

**Nursing, Psychiatric, and Home Health Aides**
169,575 foreign-born workers

**37%**

**43%**

**28%**

**55%**

graduated from a foreign medical school, a likely sign they were born elsewhere. Only two other states in the country have a higher share of foreign-educated physicians. Immigrant healthcare practitioners also made up 28.4 percent of the state's nurses in 2014, as well as 54.9 percent of those working as nursing, psychiatric, or home health aides.

17

AR004632

# Agriculture

## 55%

of farms in New York produced
fresh fruits and vegetables in 2014.



**23%** ······ Share of miscellaneous agriculture
workers on farms who are immigrants.
(This is the occupation made up largely of
laborers who hand pick crops in the field.)

## $3.5B

Amount agriculture contributes to
New York's GDP annually.



**21%** ····· Share of hired
farmworkers in the state
who are immigrants.

One sector of the economy of particular importance to New York is agriculture. In 2014, the agriculture industry contributed $3.5 billion to New York's GDP. It also provided jobs to almost 50,000 New Yorkers. Within that large industry, fresh fruits and vegetables played a prominent role. In 2014, 55.5 percent of farms in New York grew fresh fruits and vegetables, a far higher share than the 33.4 percent that did nationally. New York—the Big Apple—also grew more apples, as measured in farm receipts, than any state in the country that year except Washington.

New York's leading role as a produce producer makes the state's agriculture industry inherently reliant on immigrants. Fresh fruits and vegetables—unlike commodity crops such as corn, soybeans, and wheat—almost always must be harvested by hand. And the so-called "field and crop workers" that perform that work are overwhelmingly immigrant: From 2008-2012, foreign-born workers made up 72.9 percent of field and crop laborers in the country as a whole. In New York, that reality means that even when managers, packers,

and equipment managers are included, immigrants are still a huge part of the state's overall agricultural workforce. In 2014, more than one in five agriculture workers in the state were born abroad.

The current visa system for agriculture presents many problems for states like New York. The H-2A visa program, which is designed to bring in temporary farm laborers, is too expensive and burdensome for many U.S. farms.[21] Growers frequently complain that delays issuing H-2A visas result in workers arriving weeks late, which can lead to crop loss. The visa's lack of portability also means that growers must often commit to pay workers for a longer period than they actually need them. For New York growers, the lack of a workable visa—coupled with a huge drop-off in the number of farmworkers who have immigrated in recent years—has led to a labor picture that is increasingly untenable. Between 2002 and 2014, the number of field and crop workers in the Northeast decreased by 17.9 percent.[22] Wage trends indicate that caused a major labor shortage on New York farms: From 2002 to 2014, the real wages of New York's

AR004633

# $737.9M

## Sale receipts generated from the sale of fruits, vegetables, and nuts in 2014.

New York's leading agricultural exports include dairy products, plant products (including sweeteners and planting seeds), processed vegetables.

**TOP FOUR FRESH PRODUCE ITEMS PRODUCED IN THE STATE, AS MEASURED BY FARM RECEIPTS**



Apples — $240.4M
Beans — $79.7M
Cabbage — $72.4M
Grapes — $69.4M

---

field and crop workers increased, while they fell for the broader population of workers in the state with a high school education or less.

## If labor shortages had not been an issue, the country would have had an **additional 24,000** jobs by 2012, including **17,000** in fields outside agriculture like transportation and irrigation.

The shortage of qualified field and crop workers has made it difficult for many farmers in New York to keep pace with rising consumer demand for fresh fruits and vegetables. Between the 1998-2000 and 2010-2012 time periods, for instance, the share of produce consumed by Americans that was imported from other countries grew by 79.3 percent. Labor issues explain an estimated 27 percent of that market share loss. Many farmers say a shortage of manpower has forced them to either cut back on the acres devoted to labor intensive crops or abandon expansion plans altogether.[23] Such moves, in New York and elsewhere, have cost the U.S. economy in recent years. If labor shortages had not been an issue, the country would have had an additional 24,000 jobs by 2012, including 17,000 in fields outside agriculture like transportation and irrigation. The U.S. economy would have had $1.3 billion in additional farm income by 2012 as well.

**THE SUPPLY OF FIELD AND CROP WORKERS IN NEW YORK IS DECREASING, LEADING TO LABOR SHORTAGES**



■ 2002  ■ 2014

Number of field and crop workers
17.9% ▼

Wages of field and crop workers
3.3% ▲

# 5,027 ▼

## Decline in the number of field and crop workers in NY, CT, ME, MA, NH and VT from 2002-2014

When farms lack enough field and crop workers, they often are unable to complete their harvest, leading to crop loss in the fields. Wages go up as well, as growers struggle to compete for the small pool of workers remaining.

AR004634

# Brian Reeves

## Co-owner & Operator of Reeves Farms

Brian Reeves has a hiring problem. In order to bring immigrants over on the H-2A visa program--the way farmers legally solicit seasonal labor from abroad—Reeves must first advertise these job openings in the local media. But Reeves, who sells his produce to both national chains and mom and pop groceries, says he almost never gets any takers.

Employees start picking at 6 am and the labor is physical and hard. It is also seasonal, so he can't promise his employees year-round employment. "When [local residents] have expressed interest," he says, "it's with these conditions. Like they will have to leave the job by July to go to lacrosse camp." As a result, overseas workers are the only people who will commit.

"When [local residents] have expressed interest, it's with these conditions," Reeves says, "Like they have to leave the job by July to go to lacrosse camp."

As Reeves points out, there's already a lot of uncertainty in the agricultural sector. "You are at the mercy of Mother Nature," he says. Add to this the stress of navigating a Byzantine and arduous visa program, and Reeves is constantly worried that his berries, peppers, organic broccoli and the other vegetables that he supplies to major stores like Walmart, will rot in the fields. To ensure a full harvest, he needs approval to bring approximately 50 workers from Mexico. But doing so requires Reeves to seek approvals from local and state labor departments and the Department of Homeland Security and to coordinate consular interviews for his applicants.

"The United States has **zero population growth**, and we are aging out," he points out. "We need immigrants."

The sort of worries Reeves has about getting enough labor each year are common in states like New York. In 2014, agriculture contributed $3.5 billion to New York's overall GDP. The state was also produced $240.7 million worth of apples, a crop that often is picked by hand. Local dairy operations and fresh produce farms are frequently in the media for the many challenges they've faced in recent years finding enough labor.

For his part, Reeves says a guest worker program that didn't require so much red tape could cut down on his costs and introduce more certainty to his business. But beyond his own financial wellbeing, Reeves is also concerned about his community. He's in his late 50s, and has lived in upstate New York almost all of his life. He sometimes hears people asking questions about his workers. "Is that guy here legally?" he says, "Is he one of us?" By bringing people out of the shadows, Reeves believes much of that speculation would be eliminated and help engender more support for newcomers. "The United States has zero population growth, and we are aging out," he points out. "We need immigrants."

AR004635

# Housing

Immigrant families have long played an important role helping to build housing wealth in the United States. One study released by the Partnership for a New American Economy and Americas Society/Council of the Americas, for instance, found that in recent decades the country's more than 40 million immigrants collectively raised U.S. housing wealth by $3.7 trillion. Much of this was possible because immigrants moved into neighborhoods once in decline, helping to revitalize communities and make them more attractive to U.S.-born residents.[24]

In New York, immigrants are actively strengthening the state's housing market. In 2014, immigrant-led households held more than $378 billion in housing wealth in New York or more than one out of every four dollars concentrated in real estate that year. They also paid 35.4 percent of the money New Yorkers spent on rent, despite making up 25.8 percent of the state's households. Because New York's immigrants are more likely to be working age, they help address another major concern of housing experts as well— that the large wave of baby boomers retiring in the coming years could result in more homes going up for sale than there are buyers to purchase them. In a state where seniors already own 29.6 percent of homes, immigrant families made up more than one in four new homebuyers from 2010 to 2014.

Immigrants are **bolstering the housing market** by buying the wave of homes coming on the market as the baby boomers retire.



**30%** ....... Share of homeowners who are already elderly.

**21%** ....... Share of homebuyers in the last four years who were foreign-born.

## 713,013
Number of immigrant homeowners in 2014

## $378.1B
Amount of housing wealth held by immigrant households

**25%** OF TOTAL

## $1.5B
Amount paid by immigrant-led households in rent

**35%** OF TOTAL

AR004636

# Visa Demand

**O**ne key measure of the demand for immigrant workers involves the number of visas requested by employers in a given state. Before an employer can formally apply for many types of visas, however, it must first obtain "certification" from the Department of Labor—essentially a go-ahead from the DOL that the employer can apply for a visa to fill a given job or role. For the H-1B visa, which is used to sponsor high-skilled workers with at least a bachelor's degree, an employer gains certification by filing what's known as a Labor Condition Application, or LCA. In the LCA the employer must detail the position the foreign national would fill, the salary he would be paid, and the geographic location of the job. Firms must also attest that hiring an immigrant will not adversely impact similarly situated American workers. For two other large work visa categories—the H-2A for agricultural laborers and the H-2B for seasonal or temporary needs—employers file what is known as a Labor Certification application, or a "labor cert" for short. To get a labor cert approved, the employer must demonstrate that it is

## H-1B

Number of positions:

# 76,105

**Top jobs:**

Computer Systems Analysts

Software Developers, Applications

Computer Programmers

## GREEN CARD

Number of positions:

# 5,142

**Top jobs:**

Software Developers, Applications

Computer Systems Analysts

Financial Analysts

## H-2A

Number of positions:

# 4,680

**Top crops or jobs:**

Apple

Squash

Cabbage

## H-2B

Number of positions:

# 3,218

**Top jobs:**

Landscaping and Groundskeeping Workers

Nonfarm Animal Caretakers

Waiters and Waitresses

### CERTIFIED POSITIONS BY VISA TYPE, 2014



H-1B: 76,105

GREEN CARD: 5,142    H-2A: 4,680    H-2B: 3,218

\* This includes only employment-based green cards

### IF ALL APPROVED LCAS HAD TURNED INTO VISAS...

**76,105 LCAs** for H-1B workers could have created **139,272 jobs**.



76,105

139,272

■ Approved LCAs

■ Potential jobs created by 2020

AR004637

unable to locate an American worker that is available, willing, and able to fill the job.

In fiscal year 2014, New York employers received DOL certification for more than 89,000 positions, including jobs across a wide variety of occupations and geographies within the state. This included more than 76,100 positions for potential workers on H-1B visas, as well as roughly 4,700 temporary agriculture workers on the H-2A visas. Federal officials also issued more than 3,200 certifications for H-2B visas. Employers frequently use the H-2B to staff places like hotels, fisheries, and stables. Given that it is expensive and cumbersome for employers to obtain labor certs—and daunting to formally apply for an H-1B visa—the large interest in all these visa categories indicates New York employers likely were having real trouble finding the workers they needed on U.S. soil.

Applying for certification, however, is not the same as receiving a visa. The H-1B program is currently capped at 85,000 visas a year for private sector employers. In the country as a whole, this resulted in almost half of all such applications being rejected in fiscal year 2014 alone. The H-2B program is similarly limited to just 66,000 visas per year. Even permanent immigrants get ensnared in the limitations of our outdated immigration system. Only seven percent of all green cards can go to nationals of any one country in a given year—resulting in backlogs lasting years for many Indian, Chinese, Mexican, and Filipino workers.[25]

When companies are denied the visas they need, company expansion is commonly slowed—often at a real and meaningful cost to the U.S.-born population. One study by the Partnership for a New American Economy and the American Enterprise Institute estimated that when a state receives 100 H-2B visas, 464 jobs are created for U.S.-born workers in the seven years that follow.[26] The fact that H-1B visa holders actually create—not take away—jobs from Americans has also been widely supported in the literature. A 2013 paper written by professors at Harvard University looking at the 1995 to 2008 period found that 1 additional young, high-skilled immigrant worker hired by a firm created 3.1 jobs

## CITIES ARE DEMANDING VISAS ALL OVER THE STATE

### H-1B

**Top cities:**
1. New York
2. Brooklyn
3. Albany

### H-2B

**Top cities:**
1. Montauk
2. Elmont
3. Garden City

### H-2A

**Top cities:**
1. Peru
2. Elba
3. Wolcott



AR004638

for U.S.-born workers at that same company during the period studied.[27] Other academics have tied each H-1B visa award or labor request with the creation of four[28] or five[29] American jobs in the immediate years that follow.

In this brief, we rely on a more conservative estimate of the impact of the H-1B program on the American workforce. Specifically, we use the estimate that every 1 additional H-1B visa awarded to a state was associated with the creation of 1.83 more jobs for U.S.-born workers there in the following seven years.[30] On the previous page, we show the number of jobs that would have been created for U.S.-born workers in New York by 2020 if all the fiscal year 2014 LCAs for H-1Bs had turned into actual visas.

We also show how the large number of H-1B visas denied to New York and Albany metropolitan areas in 2007 and 2008 cost U.S.-born tech workers in those cities in the two years that followed.[31]

## HOW THE SMALL SUPPLY OF H-1B VISAS HURTS TECH WORKERS IN NEW YORK CITIES

### NY-NORTHEASTERN NJ'S METRO AREA

**34,208 H-1B denials** for tech workers in the metro area cost computer workers there…

# 28,055 ⬇

Potential new jobs and **$470.5M** in aggregate wage growth in the two years that followed.

### ALBANY-SCHENECTADY-TROY METRO AREA

**376 H-1B denials** for tech workers in the metro area cost computer workers there…

# 545 ⬇

Potential new jobs and **$5.3M** in aggregate wage growth in the two years that followed.

### DUTCHESS COUNTY'S METRO AREA

**156 H-1B denials** for tech workers in the metro area cost computer workers there…

# 171 ⬇

Potential new jobs and **$3.4M** in aggregate wage growth in the two years that followed.

AR004639

# Naturalization

New York's immigrants are not only living in the state, they are also laying down roots in the state as well. Our analysis found that immigrants in New York are naturalizing, or becoming citizens, at considerably higher rates than they are in the country overall. In 2014, 54.6 percent immigrants in New York were already U.S. citizens. Nationally, the equivalent figure was 47.3 percent.

Like almost all parts of the country, however, New York is also home to a population of immigrants who are eligible to naturalize, but haven't yet done so. Embracing public policies that would help those individuals navigate the naturalization process could have an important economic impact on the state. Studies have found that immigrants who become citizens seek out

higher education at greater rates than non-citizens.[32] Because citizenship allows immigrants to pursue a greater range of positions, including public and private sector jobs requiring a security clearance, it also has been found to raise a person's annual wages.[33] One study by researchers at the University of Southern California pegged the size of that wage increase at 8 to 11 percent.[34] If the average non-citizen in New York saw a wage boost at the low end of that range, or 8 percent, she would earn more than $3,000 more per year—money that could be reinvested in the state's economy through her spending at local businesses. Multiplied by the roughly 1 million non-citizens in New York currently eligible to naturalize, such policy initiatives could collectively boost wages in the state by $3.0 billion.

# 996,507

Number of non-citizens eligible to naturalize in 2014



**49%** Share of non-citizen population eligible to naturalize.

The average non-citizen in New York earns **$37,758** per year. If they naturalized, they each could earn an average of **$3,021 more** per year.

# $3.0B

Aggregate additional earnings if eligible non-citizens naturalized.



**55%** Share of immigrants in New York who are citizens.

**47%** Share of immigrants in the U.S. as a whole who are citizens.

AR004640

# International Students

Policymakers are increasingly realizing that international students provide huge benefits to the communities where they live and study. The World Bank has found that an increase in the number of international graduate students studying at American schools leads to large boosts in the number of patents awarded to local research universities in the years that follow.[35] Through their tuition payments and day-to-day spending, international students in the broader United States also contributed more than $30.5 billion to the U.S. economy in the 2014-2015 school year and supported more than 370,000 jobs.[36]

In New York, the roughly 100,000 international college students studying on temporary visas make up just 7.8 percent of all college students in the state. Still, their economic contribution is enormous. They support almost 41,000 jobs in the state, including positions in transportation, health insurance, and retail.

Through their tuition payments and day-to-day spending, international students in the broader United States also contributed **more than $30.5B** to the U.S. economy in the 2014-2015 school year and supported more than **370,000 jobs**.

International students represent a very small portion of all students in New York, but they make a big impact...



**8%**

International students make up only **8%** of all students in New York.

**$3.5B**

Economic contribution of international students to the state, 2015.

**40,985**

Jobs supported by international students, 2015.

26

AR004641

# Voting Power

Immigrants in New York do not only make a difference to the state's economy, they also play a large role at the voting booth. In 2014, New York was home to more than 2.3 million foreign-born residents who were eligible to vote—a group that made up more than one in 5 of the state's eligible voters. An estimated almost 1.3 million foreign-born New Yorkers had also taken the step of formally registering. Although few would call New York a swing state, the sheer size of the immigrant voting population here means it has a powerful impact on the way the state votes in both national and state elections.  In 2012, for instance, Barack Obama won New York by roughly 2 million votes—a smaller margin than the number of eligible foreign-born voters in the state.

The power of immigrant voters is likely to continue to be a large factor in upcoming elections. Based on participation patterns in recent years, we would expect more than 976,000 million foreign-born voters to cast formal ballots in the presidential election this year. An additional roughly 474,000 more immigrants will either naturalize or turn 18 by 2020, expanding the estimated pool of eligible new American voters in New York to more than 2.6 million people.

## 2,339,969
Number of immigrants eligible to vote.



**18%** ..... Share of eligble voters who are immigrants.

## 1,299,978
Number of immigrants registered to vote.

## 1,995,310
Margin of victory in the 2012 presidential election.

### THE GROWING POWER OF THE IMMIGRANT VOTE



■ Immigrants who will become eligible to vote by turning 18

■ Immigrants who will become eligible to vote through naturalization

**2016**
144,910
17,130

**2020**
434,729
39,719

### PROJECTED POOL OF ELIGIBLE IMMIGRANT VOTERS, 2014-2020



**1,995,310**
Margin of victory in the 2012 presidential election

2,339,969        2,438,771                    2,618,070

2014            2016                         2020

AR004642

# Undocumented Population

The United States is currently home to an estimated 11.4 million undocumented immigrants, the vast majority of whom have lived in the United States for more than five years. The presence of so many undocumented immigrants in our country for such a long time presents many legal and political challenges that are beyond the scope of this report. But while politicians continue to debate what to do about illegal immigration without any resolution, millions of undocumented immigrants are actively working across the country, and collectively, these immigrants have a large impact on the U.S. economy. One recent study found that 86.6 percent of undocumented males in the country were employed in 2012 and 2013, suggesting that most immigrants who come here illegally do so because of work opportunities.[37] And because employers are required by law to gather Social Security numbers for all their hires, many undocumented individuals are paying into our tax system as well—often under falsified or incorrect Social Security numbers.[38] These undocumented immigrants generally lack access to federal aid programs such as Medicaid, food stamps, and Temporary Assistance for Needy Families, so they also draw down far less from these programs than their native-born counterparts.[39]

One recent study found that **86.6%** of undocumented males in the country were employed in 2012 and 2013, suggesting that most immigrants who come here illegally do so because of work opportunities.

## 886,983

Estimated number of undocumented immigrants in New York.



**5%**

Share of New York's population made up of undocumented immigrants.

**UNDOCUMENTED IMMIGRANTS ARE MORE LIKELY TO BE WORKING-AGED THAN NATIVES OR OTHER IMMIGRANTS**

Share of population ages 25-64, 2014



Undocumented immigrants — 86%

All immigrants — 71%

Native-born — 49%

AR004643

# 86,503

Estimated number of undocumented entrepreneurs in New York.



**11%**

Rate of entrepreneurship among undocumented population (ages 25-64).

# $1.6B

Total business income of self-employed entrepreneurs.

# 9.8%

Share of all working-age entrepreneurs in New York who are undocumented immigrants.

**THE NEW YORK INDUSTRIES WHERE UNDOCUMENTED IMMIGRANTS MAKE UP THE LARGEST SHARE OF THE WORKFORCE, 2014**



**Accommodation and food services**

**22%** 100,463 undocumented workers

■ Share of workforce that is undocumented

▢ Total number of workers

**Construction**

**17%** 80,792 undocumented workers

**Other Services**

**14%** 55,018 undocumented workers

**Administrative, support, waste management services**

**14%** 40,555 undocumented workers

**Transportation**

**9%** 33,380 undocumented workers

**Mining**

**8%** 582 undocumented workers

**Retail trade**

**8%** 55,426 undocumented workers

Of course, there are many compelling reasons that having a large undocumented population is a problem for a society. It undermines law and order, permits a shadow economy that is far harder to regulate, and is simply unfair to the millions of people who have come here legally. But as the undocumented immigration problem has gone largely unaddressed for the past 30 years, undocumented workers in the country have begun to play an increasingly integral role in many U.S. industries. In some sectors, such as agriculture, undocumented immigrants account for 50 percent of all hired crop workers, making them a critical reason why the industry is able to thrive on U.S. soil.[40] Many studies have also indicated that these undocumented workers are not displacing the U.S.-born, but rather, taking jobs few Americans are interested in pursuing. Economists have found that low-skilled immigrants, the group that most undocumented immigrants fall into, tend to pursue different jobs than less-skilled natives. While U.S.-born workers without a high school degree are often overrepresented in forward-facing roles like cashiers, receptionists, and coffee shop attendants, many less-skilled immigrants pursue more labor-intensive work requiring less human interaction, filling jobs as meat processors, sewing machine operators, or nail salon workers.[43] This phenomenon exists within

AR004644

industries as well. In construction, for instance, less-skilled immigrants often work as painters and drywall installers, allowing natives to move into higher paying positions requiring more training, such as electricians, contractors, and plumbers.[42]

The challenge of undocumented immigration is particularly evident in New York, which is home to one of the largest undocumented populations in the country. But just as with the nation as a whole, as these immigrants spend years and decades in America, they get further integrated into our economy. In New York, there is evidence that undocumented immigrants are playing an important role in the workforce. In this section, we estimate the size and the characteristics of the undocumented population in New York by conducting a close analysis of the American Community Survey from the U.S. Census. This work uses a series of variables to identify immigrants in the survey who are likely to lack legal status—a method that has recently emerged in the academic literature on immigration.[43] (See the Methodology Appendix for more details.)

Using this technique, we estimate that New York is home to almost 887,000 undocumented immigrants. These individuals are far more likely than the native-born

population—or even the broader foreign-born one—to be in the prime of their working years, or ranging in age from 25-64. They also contribute to a range of industries that could not thrive without a pool of workers willing to take on highly labor-intensive roles. In 2014, for instance, undocumented immigrants made up 13.5 percent of all employees in New York's administrative, support, and waste management services industry, a sector that includes grounds maintenance workers, janitors and building cleaners, and security guards. They also made up more than one in five workers employed in the accommodation and food services sector, as well as .86 percent of workers in the mining industry. In New York, a state that grows a large amount of fresh produce, many agriculture positions require workers to handpick crops in the field.

Large numbers of undocumented immigrants in New York have also managed to overcome licensing and financing obstacles to start small businesses. In 2014, an estimated 11.4 percent of the state's working-age undocumented immigrants were self-employed—meaning New York was one of roughly two dozen states where unauthorized immigrants boasted higher rates of entrepreneurship than either legal permanent

**MEASURES OF ASSIMILATION AMONG NEW YORK'S UNDOCUMENTED POPULATION, 2014**



**Time in the United States**

**79%**

Share of undocumented immigrants who have been in the U.S. for five years or more.

**English Proficiency (population ages 5+)**

18%
21%
20%
29%
12%

- ■ Speaks only English
- ■ Speaks English very well
- □ Speaks English well
- □ Does not speak English well
- □ Does not speak any English

AR004645

# In 2014, undocumented immigrants in New York earned **$18.3B**.

**$1.0B** — went to state and local taxes...
**$1.6B** — went to federal taxes...

Leaving them with **$15.8B** in remaining spending power.

## ENTITLEMENT CONTRIBUTIONS

Undocumented immigrants also contribute to our country's entitlement programs. In 2014, through taxes on their individual wages, undocumented immigrants contributed **$359.2M** to Medicare and **$1.3B** to Social Security.



$359.2M

**Medicare**

$1.3B

**Social Security**

AR004646

residents or immigrant citizens of the same age group. Almost 87,000 undocumented immigrants in New York were self-employed in 2014, many providing jobs and economic opportunities to others in their community. Undocumented entrepreneurs in the state also earned an estimated $1.6 billion in business income that year.

The larger political debate around the economic cost or benefits of undocumented immigration tends to focus on the expense of educating immigrant children or the healthcare costs associated with increased use of emergency rooms and other services. These costs are real and can be substantial, but taken alone they paint an incomplete picture of the impact of undocumented immigration. This is because the debate infrequently recognizes that since most undocumented immigrants are working, they make large federal and state tax contributions and frequently are net contributors to many of our most important—and most imperiled—benefits programs. Social Security's Chief Actuary, for example, has credited unauthorized immigrants with contributing $100 billion more to Social Security than they drew down in benefits during the last decade.[44] Several in-depth studies at the state level have similarly come to the conclusion that undocumented immigrants represent a net benefit to the states in which they live. One paper, from researchers at Arizona State University, estimated that undocumented immigrants in that state pay $2.4 billion in taxes each year—a figure far eclipsing the $1.4 billion spent on the law enforcement, education, and healthcare resources they use.[45] Another study estimated that, on a per capita basis, Florida's undocumented immigrants pay $1,500 more in taxes than they draw down in public benefits each year.[46]

Although we are currently unable to calculate the amount spent on any public benefits or services used by undocumented immigrant families, we can gain a fairly clear sense of the amount they are paying in taxes each year. A variety of studies have estimated that anywhere from 50 to 80 percent of households led by undocumented immigrants file federal income taxes annually.[47] Federal government officials have also estimated that 75 percent of undocumented workers have taxes withheld from their paychecks.[48] In this paper, we make the assumption that 50 percent of the country's undocumented households paid income taxes in 2014. Although many experts would call this share highly conservative, it has been modeled in several academic papers, and also by think tanks that specialize exclusively in the study of U.S. tax policy.[49]

## In 2014, we estimate that New York households led by undocumented immigrants earned **more than $18.3B** in income.

In 2014, we estimate that New York households led by undocumented immigrants earned more than $18.3 billion in income. Of that, they paid an estimated $1.6 billion in federal taxes. They also contributed more than $1.3 billion directly to the Social Security program through taxes on their individual wages. New York's undocumented immigrants also made an important impact through their state and local tax contributions— money that many localities use to pay for police forces, public education, and city services like garbage collection and recycling. We estimate that New York's undocumented immigrants paid more than $1 billion in state and local taxes in 2014.

Giving legal status to undocumented immigrants would increase their access to a variety of public benefits— resulting in potentially higher costs for federal, state, and local governments. But because legalization is expected to raise the earning power of undocumented immigrants and give them access to a wider array of jobs and educational opportunities, it would have the opposite effect as well, potentially allowing them to spend more as consumers and pay more in taxes each year.[50] Provisions within immigration reform requiring

AR004647

that undocumented immigrants pay any back taxes before normalizing their status would temporarily boost U.S. tax revenues still further.

But while the debate over legalization continues without resolution, the data suggests that the undocumented immigrants in New York have largely assimilated into the United States, making it less likely that mass deportation will ever be a realistic option. We estimate that 78.5 percent of the state's undocumented population has been in the United States for five or more years. More than 58.4 percent speak English well, very well, or fluently. Studies show that when immigrants with limited English proficiency learn the language, they see a substantial wage benefit and become less isolated in their communities.[51] The labor market outcomes and educational levels of their children increase with time as well.[52]

AR004648

# Methodology

The vast majority of data that appears in this brief was calculated by the Partnership for a New American Economy research team, using a variety of publicly available data sources. Our work relied most heavily on the 2014 American Community Survey (ACS) 1-year sample using the Integrated Public Use Microdata Series (IPUMS) database.[1] Unless otherwise noted this data is weighted using the person weight for analysis at the individual level, and is weighted using the household weight for analysis at the household level.

## Demographics

The data points on the foreign-born population in the demographics section are calculated using both the 2010 and 2014 ACS 1-year sample.

## Entrepreneurship

The data on self-employed immigrants and the business income generated by immigrant entrepreneurs come from the 2014 ACS 1-year sample. We define immigrants as foreign-born individuals (excluding those that are children of U.S. citizens or born on U.S. territories).

The number of employees at immigrant-owned firms is estimated by using the 2007 Survey of Business Owners (SBO) Public Use Microdata Sample (PUMS),[2] which is the most recent microdata on business owners currently available. The estimates are weighted using the tabulation weights provided in the dataset. We define immigrant-owned businesses as firms with at least one foreign-born owner. For confidentiality, the data exclude businesses classified as publicly owned firms because they can be easily identified in many states. Based on our own analysis, we believe that many of the publicly owned firms excluded from this data are companies with 500 employees or more. As a result, the final number of employees at immigrant-owned companies in this report is a conservative estimate, and is likely lower than the true value.

Fortune magazine ranks U.S. companies by revenue and publishes a list of top 500 companies and their annual revenue as well as their employment level each year. To produce our estimates, we use the 2015 Fortune 500 list.[3] Our estimates in this section build on past work done by PNAE examining each of the Fortune 500 firms in the country in 2011, and determining who founded them.[4] We then use publicly available data, including historical U.S. Census records and information obtained directly by the firms, to determine the background of each founder. In the rare cases where we could not determine a founder's background, we assumed that the individual was U.S.-born to be conservative in our estimates. Some firms created through the merger of a large number of smaller companies or public entities were also excluded from our analysis. These included all companies in the utilities sector and several in insurance.

To produce the Fortune 500 estimates for each state, we allocate firms to the states where their current headquarters are located. We then aggregate and report the annual revenue and employment of the firms in each state that we identify as "New American" Fortune 500 companies. These are firms with at least one founder who was an immigrant or the child of immigrants.

## Income and Tax Contributions

Using the 2014 ACS 1-year data, we estimate the aggregate household income, tax contributions, and spending power of foreign-born households.

34

AR004649

To produce these estimates, a foreign-born household is defined as a household with a foreign-born household head. Immigrant sub-groups are defined as follows: 1) Asian immigrants refer to the foreign-born persons who self identify as Chinese, Taiwanese, Japanese, Filipino, Asian Indian, Korean, Native Hawaiian, Vietnamese, Bhutanese, Mongolian, Nepalese, Cambodian, Hmong, Laotian, Thai, Bangladeshi, Burmese, Indonesian, Malaysian, Pakistani, Sri Lankan, Samoan, Tongan, Guamanian/Chamorro, Fijian, or other Pacific Islanders; 2) Hispanic immigrants include those foreign-born persons who report their ethnicity as Hispanic; 3) Immigrants grouped under Sub-Saharan Africa originate from African countries, excluding the North African countries of Egypt, Libya, Tunisia, Algeria, and Morocco ; 4) Middle Eastern and North African immigrants are foreign-born persons from North Africa as well as the following Middle Eastern countries: Iran, Iraq, Bahrain, Israel, Jordan, Kuwait, Lebanon, Oman, Palestine, Qatar, Saudi Arab, Syria, United Arab Emirates, and Yemen.

In this brief, mirroring past PNAE reports on this topic, we use the term "spending power."[5] Here and elsewhere we define spending power as the disposable income leftover after subtracting federal, state, and local taxes from household income. We estimate state and local taxes using the tax rates estimates produced by Institute on Taxation and Economic Policy by state income quintiles.[6] For federal tax rate estimates, we use data released by the Congressional Budget Office in 2014 and calculate the federal tax based on the household income federal tax bracket.[7]

Social Security and Medicare contributions are drawn from taxes on an individual's wage earnings.[8] This is far different from a household's overall income, which may include other revenue streams such as rental income and returns on investments. To account for this difference between overall federal taxes and Social Security and Medicare contributions, we estimate Medicare and Social Security contributions based on wage and salary data provided at the individual level in the ACS. For self-employed individuals, we use the self-employment income as the income base. The amount of earnings that can be taxed by the Social Security

program is capped at $117,000, while there no such limit for the Medicare program.[9] We use a flat tax rate of 12.4 percent to estimate Social Security contributions and 2.9 percent for to capture Medicare contributions. This estimates the total amount that immigrants and their employers contributed in 2014.[10]

It is also worth noting that half of the amount contributed to Social Security and Medicare (6.4 percent of Social Security tax rate and 1.45 percent of Medicare tax rate) comes from individual workers, while the other half comes directly from their employers. Self-employed workers have to pay the full tax themselves. When estimating Social Security and Medicare contributions, we include all individual wage earners in the households and aggregate the amount paid by state.

## Workforce

We use the 2014 ACS 1-year sample to estimate all data points in the workforce segment of the report. We define the working age population as those 25 to 64 years old. When estimating how much more foreign-born persons are likely to be employed than native-born persons, however, we calculate the percentage of native-born and foreign-born residents of all ages who were employed in 2014. The reason why we choose a more inclusive population for that estimate is because we want to make the point that the increased likelihood of being working aged that we see among immigrants leads to higher employment in the vast majority of states.

Because the employment status of people who are 16 years old or younger is not available in the ACS, we assume that these young people are not employed. The employed population also does not include those in the Armed Forces.

To estimate how much more likely immigrants are to be employed than natives, we calculate the percent difference between the immigrant and native-born employment rates. Our estimates on the share of immigrants and natives of different education levels only take into consideration individuals aged 25 or older.

AR004650

The North American Industry Classification System, or NAICS Industry code, is used to estimate the industries with the largest share of foreign-born workers. All individuals 16 years old and above are included in these calculations. The total number of workers for certain industries in some states is extremely small, thus skewing results. In order to avoid this, we calculate the percentile distribution of the total number of workers per industry per state and drop the industries in each state that fall below the lowest 25th percentile. Estimated occupations with the largest share of foreign-born workers per state also follow the same restrictions—the universe is restricted to workers age 16 and above, and the occupations per state that fall under the 25th percentile benchmark are not included.

Our estimates on the number of manufacturing jobs created or preserved by immigrants rely on a 2013 report by the Partnership for a New American Economy and the Americas Society/Council of the Americas. That report used instrumental variable (IV) strategy in regression analysis and found that every 1,000 immigrants living in a county in 2010 created or preserved 46 manufacturing jobs there.[11] We use that multiplier and apply it to the 2010 population data from the ACS to produce our estimates.

## Agriculture

We access the agriculture GDP by state from Bureau of Economic Analysis, which includes GDP contributions from the agriculture, forestry, fishing, and hunting industry.[12] The share of foreign-born agricultural workers is estimated using 2014 ACS 1-year sample. Additional data on agriculture output, top three crops per state, and leading agricultural exports come from United State Department of Agriculture (USDA)'s state fact sheets.[13] When displayed, data on sales receipts generated by the top fresh produce items in each state come the Farm and Wealth Statistics cash receipts by commodity tables available from the USDA's Economic Research Service.[14]

The agriculture section uses the Quarterly Census of Employment and Wage (QCEW) to estimate the percentage of crop farms producing fresh fruits and vegetables, and change in real wage of agricultural workers between 2002 and 2014. The QCEW data uses the North American Industry Classification System (NAICS) to assign establishments to different industries. We identify the following farms as fresh fruits and vegetable farms: other vegetable and melon farming, orange groves, citrus, apple orchards, grape vineyards, strawberry farming, berry farming, fruit and tree nut combination farming, other non-citrus fruit farming, mushroom production, other food crops grown under cover, and sugar beet farming.

The decline in the number of field and crop workers comes from the quarterly Farm Labor Survey (FLS) administered by USDA.[15] Stephen Bronars, an economist with Edgeworth Economics, previously analyzed and produced these estimates for the PNAE report, "A Vanishing Breed: How the Decline in U.S. Farm Laborers Over the Last Decade has Hurt the U.S. Economy and Slowed Production on American Farms" published in 2015. Additional information on those calculations can be found in the methodology section of that paper.[16]

Finally, for a small number of states, we also produce estimates showing how growers in the state are losing market share for specific produce items consumed each year by Americans, such as avocados or strawberries. Those estimates originate in a 2014 report produced by PNAE and the Agriculture Coalition for Immigration Reform.[17] The author used data from the USDA's annual "yearbook" for fresh fruits and vegetables, among other sources, to produce those estimates. More detail can be found in the methodology of that report.

## Science, Technology, Engineering, and Math

We use the STEM occupation list released by U.S. Census Bureau to determine the number and share of foreign-born STEM workers as well as the number of unemployed STEM workers from 2014 ACS 1-year data.[18] Per U.S. Census classification, healthcare workers such as physicians and dentists are not counted as working in

AR004651

the STEM occupations. All unemployed workers who list their previous job as a STEM occupation are counted as unemployed STEM workers.

To capture the demand for STEM workers, we use the Labor Insight tool developed by Burning Glass Technologies, a leading labor market analytics firm. Burning Glass, which is used by policy researchers and academics, scours almost 40,000 online sources daily and compiles results on the number and types of jobs and skills being sought by U.S. employers. This search includes online job boards, individual employer sites, newspapers, and public agencies, among other sources. Burning Glass has an algorithm and artificial intelligence tool that identifies and eliminates duplicate listings—including ones posted to multiple job boards as part of a broad search.[19]

The data on STEM graduates are from the 2014 Integrated Postsecondary Education Data System (IPEDS) completion survey.[20] A study by the Partnership for a New American Economy and the American Enterprise Institute found that every time a state gains 100 foreign-born STEM workers with graduate-level STEM training from a U.S. school, 262 more jobs are created for U.S.-born workers in the seven years that follow.[21] We use this multiplier and the number of STEM advanced level graduates on temporary visas to estimate the number of jobs created for U.S.-born workers.

The last part of the STEM section presents data on patents with at least one foreign-born inventor. The data is originally from a study by Partnership for a New American Economy in 2012, which relied on data from U.S. Patent and Trademark Office's database as well as LinkedIn, direct correspondence, and online profiles to determine the nativity of individual inventors.[22]

## Healthcare

We estimate the number of unemployed healthcare workers using the 2014 ACS 1-year sample. Healthcare workers are healthcare practitioners and technical occupations, or healthcare support occupations as defined by U.S. Census Bureau.[23]

Unemployed healthcare workers are individuals who report their previous job as a healthcare occupation, and their employment status as currently not working but looking for work. We took the number of job postings for healthcare workers from the Burning Glass Labor Insight tool, a database that scours online sources and identifies the number and types of job postings. We describe this resource in detail in the section on STEM methodology.

We then delve into specific occupations within the broader healthcare industry. To produce the figures on the total number of physicians and psychiatrists and the share born abroad, we use American Medical Association (AMA) Physician Masterfile data. To give a sense of the supply and demand of physicians and psychiatrists, we also calculate the physician and psychiatrist density in each state by dividing the total number of physicians or psychiatrists by the population estimates in 2015 for each state.[24] As for the share of foreign-born nurses and home health aides, we use the 2014 ACS 5-year sample data because data from the 1-year sample is too small to make reliable estimates.

We estimate the shortage of psychiatrists, dentists, and occupational therapists using data from the various U.S. government offices. For example, the shortage of psychiatrists refers to the current lack of psychiatrists per the U.S. government's official definition of a mental health shortage area (1/30,000 residents) in each county, aggregated within each state.[25] The shortage of dentists is from an analysis by U.S. Department of Health and Human Services,[26] and the shortage of occupational workers is from a journal article published by PM&R, the official scientific journal of the American Academy of Physical Medicine and Rehabilitation.[27] For psychiatrists, we project future shortages by accounting for individuals in these occupations as they reach the retirement age of 65.

## Housing

The data in the housing section comes from the 2014 ACS 1-year sample. Immigrant homeowners are defined as foreign-born householders who reported living in

AR004652

their own home. We estimate the amount of housing wealth held by immigrant households by aggregating the total housing value of homes owned by immigrant-led households. We also estimate the amount of rent paid by immigrant-led households by aggregating the rent paid by such families. We then calculate the share of housing wealth and rent that immigrant households held or paid compared to the total population. For characteristics of homeowners, a foreign-born new homebuyer is defined as a household with a foreign-born household head who owned and moved to the current residence within the last five years.

## Visa Demand

The data on visa demand are drawn primarily from the 2014 Annual Report produced by the Office of Foreign Labor Certification within the U.S. Department of Labor.[28] Our figures on the number of visa requests authorized for each state—as well as the occupations and cities those visas are tied to—originate directly from that report.

In this section, we also present estimates on the number of jobs that would have been created if all the visas authorized in 2014 had resulted in actual visa awards. The multipliers we use to produce these estimates originate in a 2011 report released by PNAE and the American Enterprise Institute. That report, written by the economist Madeline Zavodny, used a reduced-form model to examine the relationship between the share of each state's population that was immigrant and the employment rate of U.S. natives. More detail on Zavodny's calculations and the multipliers produced for each visa type can be found in the methodology appendix of that report.[29]

For purposes of these briefs, we use Zavodny's finding that the award of 100 additional H-1B visas in a state is tied to 183 additional jobs for natives there in the 7 years that follow. The award of 100 additional H-2B visas creates 464 additional jobs for natives in the state during that same time period. We apply these multipliers to the number of visas in those categories authorized for each state in 2014.

In many of the state reports, we also present figures showing how visa denials resulting from the 2007 and 2008 H-1B lotteries cost the tech sectors of metropolitan areas both employment and wage growth in the two years that followed. The economists Giovanni Peri, Kevin Shih, and Chad Sparber produced these estimates for a PNAE report on the H-1B visa system that was released in 2014. That report relied on Labor Condition Application and I-129 data that the authors obtained through a Freedom of Information Act request, as well as American Community Survey data from 2006 and 2011. The authors did regressions that examined the causal relationship between a "shock" in the supply of H-1B computer workers and computer employment in subsequent years for more than 200 metropolitan areas. More information on those estimates can be found in the methodology appendix of that report.[30]

## Naturalization

Using the ACS 2014 1-year sample, non-citizens eligible to naturalize are defined as non-citizens who are 18 years or above, can speak English, and have continuous residence in the United States for at least five years.

Researchers at the University of Southern California's Center for the Study of Immigrant Integration published a report in 2012, "Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy," which concluded that immigrants experience an 8 to 11 percent gain in their individual wages as a result of becoming naturalized. Because this earnings gain phases in over time—and we want to be conservative in our estimates—we model a wage increase of just 8 percent when discussing the possible gains that could accrue due to naturalization.[31] We use this multiplier and the mean individual wages of non-citizens in each state to estimate the additional earnings that non-citizens would earn if they naturalized. Finally, we calculate the aggregate wage earnings boost by multiplying the total number of non-citizens who are eligible for naturalization by the average increase in wage income per person.

AR004653

# International Students

We obtain the size and share of postsecondary students who are international in each state from the 2014 Integrated Postsecondary Education Data System (IPEDS) fall enrollment data. Those figures are then applied to preexisting work previously done by NAFSA, an organization representing professionals employed in the international offices of colleges and universities across the United States. NAFSA has developed an economic value tool and methodology that estimates the total economic benefit and jobs created or supported by international students and their dependents in each state.[32] The economic contributions include the costs of higher education along with living expenses minus U.S.-based financial support that international students receive.

Because the enrollment data from IPEDS that we use in this brief is different from the underlying data used by NAFSA, our figures differ slightly from the NAFSA estimates of the economic contributions made by international students in the 2014-2015 school year.

# Voting

The estimates for the number of registered and active voters who are foreign-born are calculated from the Voter Supplement in the Current Population Survey (CPS) for the years 2008, 2010, 2012, and 2014 using the IPUMS database. The sample in CPS includes civilian non-institutional persons only. Foreign-born individuals who stated having voted between 2008 and 2014 are termed active voters.

Using data from the 2014 ACS 1-year sample, we estimate the number and share of foreign-born eligible voters. We define them as naturalized citizens aged 18 or older who live in housing units. Persons living in institutional group quarters such as correctional facilities or non- institutional group quarters such as residential treatment facilities for adults are excluded from the estimation. We also estimate the number of new foreign-born voters who will become eligible to vote in 2016 and 2020, either by turning 18 or through

naturalization, as well as the total number of foreign-born voters in these years. The estimates of newly eligible voters for 2016 include naturalized citizen ages 16 and 17 as of 2014 (thereby becoming of voting age by 2016). Those eligible to vote in 2020 include all naturalized citizens ages 12-17 in 2014. Applicable mortality rates are also applied.[33] In addition, we estimate newly naturalized citizens using data from the Department of Homeland Security, which show the two-year average of new naturalized citizens by state.[34] We discount from these numbers the percentage of children below 18 in households with a naturalized householder by state. Estimates of total foreign-born voters include naturalized citizens aged 18 or older in 2014, discounted by average U.S. mortality rates by age brackets, summed to the pool of newly eligible foreign-born voters.

Margin of victory in 2012 refers to President Barack Obama's margin of victory over Republican candidate Mitt Romney in terms of popular vote. The margins are negative in states that Romney won in 2012.[35]

# Undocumented

Using data from the 2014 ACS, we applied the methodological approach outlined by Harvard University economist George Borjas[36] to arrive at an estimate of the undocumented immigrant population in the overall United States and individual states. The foreign-born population is adjusted for misreporting in two ways. Foreign-born individuals who reported naturalization are reclassified as non-naturalized if the individual had resided in the United States for less than six years (as of 2014) or, if married to a U.S. citizen, for less than three years. We use the following criteria to code foreign-born individuals as legal U.S. residents:

- Arrived in the U.S. before 1980
- Citizens and children less than 18 year old reporting that at least one parent is native-born
- Recipients of Social Security benefits, SSI, Medicaid, Medicare, Military insurance, or public assistance

AR004654

- Households with at least one citizen that received SNAP
- People in the armed forces and veterans
- People attending college and graduate school
- Refugees
- Working in occupations requiring a license
- Government employees, and people working in the public administration sector
- Any of the above conditions applies to the householder's spouse

The remainder of the foreign-born population that do not meet this criteria is reclassified as undocumented. Estimates regarding the economic contribution of undocumented immigrants and the role they play in various industries, and tax contributions are made using the same methods used to capture this information for the broader immigrant population in the broader brief. When estimating the aggregate household income, spending power, and tax contributions, we are not able to make reliable estimates for undocumented-led households in Alaska, Maine, Montana, North Dakota, South Dakota, Vermont, and West Virginia due to the small sample size of undocumented-led households in ACS. Finally, the variables giving a sense of the undocumented population's level of assimilation—including their English proficiency and time in the United States—are estimated by examining the traits of the undocumented population in the 1-year sample of the ACS.

AR004655

# Endnotes

**1** Aaron Terrazas, "Immigrants in New-Destination States," Migration Policy Institute, 2011, http://www.migrationpolicy.org/article/immigrants-new-destination-states.

**2** Robert Fairlie, "Open For Business: How Immigrants Are Driving Small Business Creation In The United States," Partnership for a New American Economy, 2012, http://www.renewoureconomy.org/research/open-for-business-how-immigrants-are-driving-small-business-creation-in-the-united-states-2/; Vivek Wadhwa et al., "America's New Immigrant Entrepreneurs: Part I," SSRN Scholarly Paper (Rochester, NY: Social Science Research Network, 2007), http://papers.ssrn.com/abstract=990152.

**3** Arnobio Morelix et al., "The Kauffman Index 2015: Startup Activity | State Trends," SSRN Scholarly Paper (Rochester, NY: Social Science Research Network, June 4, 2015), http://papers.ssrn.com/abstract=2614598.

**4** David Dyssegaard Kallick, "Bringing Vitality to Main Street: How Immigrant Small Businesses Help Local Economies Grow," New York: Fiscal Policy Institute and Americas Society/Council of the Americas, 2015, http://www.as-coa.org/articles/bringing-vitality-main-street-how-immigrant-small-businesses-help-local-economies-grow.

**5** Stuart Anderson, "Immigrants and Billion Dollar Startups," NFAP Policy Brief March, 2016, http://nfap.com/wp-content/uploads/2016/03/Immigrants-and-Billion-Dollar-Startups.NFAP-Policy-Brief.March-2016.pdf.

**6** Fairlie, "Open For Business."

**7** This is the most recent year for which data on employment is available.

**8** Fairlie, "Open For Business."

**9** Suzy Menkes, "Ralph Lauren Returns to His Russian Roots," The New York Times, 2007, http://www.nytimes.com/2007/05/14/style/14iht-fralph.3.5699783.html.

**10** Rebecca Willis, "Ralph Lauren: Brand Aid," The Economist, 2015, https://www.1843magazine.com/content/features/rebecca-willis/brand-aid.

**11** Somini Sengupta, "Countries Seek Entrepreneurs From Silicon Valley," The New York Times, 2013, http://www.nytimes.com/2013/06/06/technology/wishing-you-and-your-start-up-were-here.html?_r=0.

**12** Craig Montuori, email message to author, June 23, 2016.

**13** "The Economic Impact of Tourism in New York, 2014 Calendar Year" (Tourism Economics, n.d.), accessed July 6, 2016.

**14** Jacob Vigdor, "Immigration and the Revival of American Cities," 2013, http://www.renewoureconomy.org/issues/american-cities/.

**15** "Employment Projections: 2014-24 Summary," Bureau of Labor Statistics Economic News Release, 2015, http://www.bls.gov/news.release/ecopro.nr0.htm.

**16** Madeline Zavodny, "Immigration and American Jobs," The Partnership for a New American Economy and the American Enterprise Institute, 2011, http://www.renewoureconomy.org/sites/all/themes/pnae/img/NAE_Im-AmerJobs.pdf.

AR004656

17   "Patent Pending: How Immigrants Are Reinventing The American Economy," Partnership for a New American Economy, June 26, 2012, http://www.renewoureconomy.org/research/patent-pending-how-immigrants-are-reinventing-the-american-economy-2/.

18   "Employment Projections."

19   Katherine Grace Carman, Christine Eibner, and Susan M. Paddock, "Trends in Health Insurance Enrollment, 2013-15," Health Affairs, 2015, http://www.rand.org/pubs/external_publications/EP50692.html.

20   Sean P. Keehan et al., "Age Estimates in the National Health Accounts," Health Care Financing Review 26, no. 2 (2004): 1–16.

21   Patrick O'Brien, John Kruse, and Darlene Kruse, "Gauging the Farm Sector's Sensitivity to Immigration Reform via Changes in Labor Costs and Availability -," WAEES and the American Farm Bureau Federation, 2014, http://oppenheimer.mcgill.ca/Gauging-the-Farm-Sector-s.

22   Stephen Bronars, "A Vanishing Breed: How the Decline in U.S. Farm Laborers Over the Last Decade Has Hurt the U.S. Economy and Slowed Production on American Farms," Partnership for a New American Economy, 2015, http://www.renewoureconomy.org/research/vanishing-breed-decline-u-s-farm-laborers-last-decade-hurt-u-s-economy-slowed-production-american-farms/.

23   Stephen Bronars and Angela Marek Zeitlin, "No Longer Home Grown: How Labor Shortages Are Increasing America's Reliance on Imported Fresh Produce and Hampering U.S. Economic Growth," Partnership for a New American Economy, 2014, http://www.renewoureconomy.org/wp-content/uploads/2014/03/no-longer-home-grown.pdf.

24   Vigdor, "Immigration and the Revival of American Cities."

25   "Visa Bulletin for May 2016," U.S. Department of State, 2016, https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2016/visa-bulletin-for-may-2016.html.

26   Zavodny, "Immigration and American Jobs."

27   Sari Pekkala Kerr, William R. Kerr, and William F. Lincoln, "Skilled Immigration and the Employment Structures of U.S. Firms," Working Paper (National Bureau of Economic Research, 2013), http://www.nber.org/papers/w19658.

28   Matthew J. Slaughter, "Job Clocks Backgrounder," Hanover, NH, 2013, http://faculty.tuck.dartmouth.edu/images/uploads/faculty/matthew-slaughter/jobs_clock.pdf.

29   "NFAP Policy Brief: H-1B Visas by the Numbers," National Foundation for American Policy, 2009, http://www.nfap.com/pdf/1003h1b.pdf.

30   Zavodny, "Immigration and American Jobs."

     These positive benefits have been documented despite well-known problems regarding the H-1B visa system. The safeguards to protect American workers have not been updated since 1998, opening the door to increased use of the visa by a small number of outsourcing firms. This has left many U.S. companies with no reliable avenue to bring in the top talent they need to grow. PNAE has long advocated for legislation that would reform the H-1B program, including the recently introduced Protect and Grow American Jobs Act. Read more here: http://www.renewoureconomy.org/uncategorized/press-release-statement-of-partnership-for-a-new-american-economy-on-the-protect-and-grow-america-jobs-act/.

31   Giovanni Peri et al., "Closing Economic Windows: How H-1B Visa Denials Cost U.S.-Born Tech Workers Jobs and Wages During the Great Recession," Partnership for a New American Economy, 2014, http://www.renewoureconomy.org/research/h1b-report/.

32   Jacob L. Vigdor, From Immigrants to Americans: The Rise and Fall of Fitting In (Rowman & Littlefield, 2010).

AR004657

33    Bernt Bratsberg, James F. Ragan, Jr., and Zafar M. Nasir, "The Effect of Naturalization on Wage Growth: A Panel Study of Young Male Immigrants," Journal of Labor Economics 20, no. 3 (2002): 568–97, doi:10.1086/339616.

34    Manuel Pastor and Justin Scoggins, "Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy," 2012, http://www.immigrationre-search-info.org/report/university-southern-california/citizen-gain-economic-benefits-naturalization-immi-grants-and-e.

35    Aaditya Mattoo, Gnanaraj Chellaraj, and Keith E. Maskus, "The Contribution of Skilled Immigration and International Graduate Students to U.S. Innovation" (The World Bank, 2005), http://documents.world-bank.org/curated/en/2005/05/5800523/contribu-tion-skilled-immigration-international-graduate-stu-dents-innovation.

36    "NAFSA International Student Economic Value Tool | NAFSA," accessed June 28, 2016, http://www.nafsa.org/Explore_International_Education/Impact/Data_And_Statistics/NAFSA_International_Student_Eco-nomic_Value_Tool/.

37    George J. Borjas, "The Labor Supply of Undocument-ed Immigrants," NBER Working Paper (National Bu-reau of Economic Research, Inc, 2016), https://ideas.repec.org/p/nbr/nberwo/22102.html.

38    Lisa Christensen Gee, Matthew Gardener, and Meg Wiehe, "Undocumented Immigrants' State & Local Tax Contributions," The Institute on Taxation and Economic Policy, 2016, http://www.immigrationre-search-info.org/report/other/undocumented-immi-grants%E2%80%99-state-local-tax-contributions.

39    Ryan Honeywell, "How Language Fits Into the Immi-gration Issue," Governing, 2012, http://www.governing.com/topics/public-workforce/gov-how-language-fits-into-the-immigration-issue.html.

40    Thomas Hertz Zahniser Steven, "USDA Economic Research Service - Immigration and the Rural Work-force," United States Department of Agriculture Economic Research Service, 2013, http://www.ers.usda.gov/topics/in-the-news/immigration-and-the-ru-ral-workforce.aspx.

41    Maria E. Enchautegui, "Immigrant and Native Work-ers Compete for Different Low-Skilled Jobs," Urban Institute, 2015, http://www.urban.org/urban-wire/immigrant-and-native-workers-compete-different-low-skilled-jobs.

42    Scott A. Wolla, "The Economics of Immigration: A Story of Substitutes and Complements," Page One Economics Newsletter, 2014, 1–5.

43    Borjas, "The Labor Supply of Undocumented Immi-grants."

44    Roy Germano, "Unauthorized Immigrants Paid $100 Billion Into Social Security Over Last Decade," VICE News, 2014, https://news.vice.com/article/unautho-rized-immigrants-paid-100-billion-into-social-secu-rity-over-last-decade.

45    Judith Gans, "Immigrants in Arizona: Fiscal and Economic Impacts" (Udall Center for Studies in Public Policy, University of Arizona, 2008), http://udallcenter.arizona.edu/immigration/publications/impactofimmi-grants08.pdf.

46    Emily Eisenhauer et al., "Immigrants in Florida: Char-acteristics and Contributions," Research Institute on Social and Economic Policy, Florida International University, 2007, https://risep.fiu.edu/research-pub-lications/immigration/immigration-in-florida/2007/immigrants-in-florida-characteristics-and-contribu-tions/immigrants_spring_2007_reduced.pdf.

47    Laura E. Hill and Hans P. Johnson, "Unauthorized Im-migrants in California: Estimates for Counties," Public Policy Institute of California, 2011, http://www.ppic.org/main/publication.asp?i=986.

AR004658

48 Eduardo Porter, "Illegal Immigrants Are Bolstering Social Security With Billions," The New York Times, 2005, http://www.nytimes.com/2005/04/05/business/illegal-immigrants-are-bolstering-social-security-with-billions.html.

49 Aaron Williams and Michael Cassidy, "Undocumented, But Not Untaxed," The Commonwealth Institute, (2016), http://www.thecommonwealthinstitute.org/2016/01/08/undocumented-but-not-untaxed/; Leah Zallman et al., "Unauthorized Immigrants Prolong the Life of Medicare's Trust Fund," Journal of General Internal Medicine 31, no. 1 (June 18, 2015): 122–27, doi:10.1007/s11606-015-3418-z; Gee, Gardener, and Wiehe, "Undocumented Immigrants' State & Local Tax Contributions."u

50 Sherrie A. Kossoudji and Deborah A. Cobb-Clark, "Coming out of the Shadows: Learning about Legal Status and Wages from the Legalized Population," Journal of Labor Economics 20, no. 3 (2002): 598–628; Raul Hinojosa-Ojeda, "Raising the Floor for American Workers: The Economic Benefits of Comprehensive Immigration Reform," Center for American Progress and American Immigration Council, 2010, https://www.americanprogress.org/issues/immigration/report/2010/01/07/7187/raising-the-floor-for-american-workers/.

51 Barry R. Chiswick and Paul W. Miller, "Immigrant Earnings: Language Skills, Linguistic Concentrations and the Business Cycle," Journal of Population Economics 15, no. 1 (2002): 31–57; Hoyt Bleakley and Aimee Chin, "Age at Arrival, English Proficiency, and Social Assimilation Among U.S. Immigrants," American Economic Journal. Applied Economics 2, no. 1 (2010): 165, doi:10.1257/app.2.1.165.

52 Jill H. Wilson, "Investing in English Skills: The Limited English Proficient Workforce in U.S. Metropolitan Areas," The Brookings Institution, 2014, http://www.brookings.edu/research/reports2/2014/09/english-skills.

AR004659

# Endnotes: Methodology

**1** Steven Ruggles, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek. Integrated Public Use Microdata Series: Version 6.0 [Machine-readable database]. Minneapolis: University of Minnesota, 2015.

**2** U.S. Census Bureau, Survey of Business Owner and Self-Employed Persons Data Sets. http://www.census.gov/programs-surveys/sbo/data/data-sets.html

**3** "Fortune 500," Fortune, 2015, http://fortune.com/fortune500/2015/.

**4** "The 'New American' Fortune 500," Partnership for a New American Economy, 2011, http://www.renewoureconomy.org/wp-content/uploads/2013/07/new-american-fortune-500-june-2011.pdf.

**5** "The Power of the Purse: The Contributions of Hispanics to America's Spending Power and Tax Revenues in 2013," Partnership for a New American Economy, 2014, http://www.renewoureconomy.org/research/page/2/.

**6** "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States (5th edition)," Institute on Taxation and Economic Policy, 2014, http://www.itep.org/whopays/full_report.php.

**7** "The Distribution of Household Income and Federal Taxes, 2011", Congressional Budget Office, Washington, D.C., 2014, https://www.cbo.gov/publication/49440#title0.

**8** Office of Retirement and Disability Policy U. S. Social Security Administration, "OASDI and SSI Program Rates & Limits," 2014, https://www.ssa.gov/policy/docs/quickfacts/prog_highlights/RatesLimits2014.html.

**9** Ibid.

**10** Ibid.

**11** Jacob Vigdor, "Immigration and the Revival of American Cities," Partnership for a New American Economy, 2013, http://www.renewoureconomy.org/issues/american-cities/.

**12** Bureau of Economic Analysis, http://www.bea.gov/regional/index.htm

**13** United States Department of Agriculture, "State Fact Sheets, Economic Research Service" 2016, http://www.ers.usda.gov/data-products/state-fact-sheets.aspx

**14** United States Department of Agriculture, Economic Research Service, "Cash Receipts by Commodity, 2010-2015," http://www.ers.usda.gov/data-products/farm-income-and-wealth-statistics/cash-receipts-by-commodity.aspx.

**15** United State Department of Agriculture, "Farm Labor Survey", https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/

**16** Stephen Bronars, "A Vanishing Breed: How the Decline in U.S. Farm Laborers Over the Last Decade has Hurt the U.S. Economy and Slowed Production on American Farms," Partnership for a New American Economy, 2015, http://www.renewoureconomy.org/wp-content/uploads/2015/08/PNAE_FarmLabor_August-3-3.pdf.

AR004660

**17**  Stephen Bronars, "No Longer Home Grown: How Labor Shortages are Increasing America's Reliance on Imported Fresh Produce and Slowing U.S. Economic Growth", Partnership for a New American Economy, 2014, http://www.renewoureconomy.org/wp-content/uploads/2014/03/no-longer-home-grown.pdf.

**18**  U.S. Census Bureau, "STEM, STEM-related, and Non-STEM Occupation Code List 2010," 2010, https://www.census.gov/people/io/files/STEM-Census-2010-occ-code-list.xls

**19**  "About Us," Burning Glass, accessed July 1, 2016, available here: http://burning-glass.com/labor-insight/.

**20**  National Center for Education Statistics, "Integrated Postsecondary Education Data System," http://nces.ed.gov/ipeds/

**21**  Madeline Zavodny, "Immigration and American Jobs," The Partnership for a New American Economy and the American Enterprise Institute, 2011, http://www.renewoureconomy.org/sites/all/themes/pnae/img/NAE_Im-AmerJobs.pdf.

**22**  "Patent Pending: How Immigrants Are Reinventing The American Economy," Partnership for a New American Economy, 2012, http://www.renewoureconomy.org/research/patent-pending-how-immigrants-are-reinventing-the-american-economy-2/.

**23**  U.S. Census Bureau. "2010 Occupation Code List," https://www.census.gov/people/io/files/2010_OccCodeswithCrosswalkfrom2002-2011nov04.xls

**24**  U.S. Census Bureau, "Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2015," http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2015_PEPANNRES&prodType=table

**25**  U.S. Department of Health and Human Services, "Shortage Designation: Health Professional Shortage Areas and Medically Underserved Areas/Populations," http://www.hrsa.gov/shortage/

**26**  National Center for Health Workforce Analysis, U.S. Department of Health and Human Services, "National and State-Level Projections of Dentists and Dental Hygienists in the U.S., 2012-2025", 2015, http://bhpr.hrsa.gov/healthworkforce/supplydemand/dentistry/nationalstatelevelprojectionsdentists.pdf.

**27**  Vernon Lin, Xiaoming Zhang, and Pamela Dixon, "Occupational Therapy Workforce in the United States: Forecasting Nationwide Shortages," PM & R: The Journal of Injury, Function, and Rehabilitation 7, No. 9, 2015: 946–54, doi:10.1016/j.pmrj.2015.02.012.

**28**  "2014 Annual Report," Office of Foreign Labor Certification, Employment and Training Administration, United States Department of Labor, 2014, https://www.foreignlaborcert.doleta.gov/pdf/oflc_annual_report_fy2014.pdf.

**29**  Madeline Zavodny, "Immigration and American Jobs," The Partnership for a New American Economy and the American Enterprise Institute, 2011, http://www.renewoureconomy.org/sites/all/themes/pnae/img/NAE_Im-AmerJobs.pdf.

**30**  Giovanni Peri, Kevin Shih, Chad Sparber, and Angela Marek Zeitlin, "Closing Economic Windows: How H-1B Visa Denials Cost U.S.-Born Tech Workers Jobs and Wages During the Great Recession," 2014, http://www.renewoureconomy.org/wp-content/uploads/2014/06/pnae_h1b.pdf.

**31**  Manuel Pastor and Justin Scoggins, "Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy," 2012, http://www.immigrationresearch-info.org/report/university- southern-california/citizen-gain- economic-benefits- naturalization-immigrants- and-e.

**32**  NAFSA, "International Student Economic Value Tool," http://www.nafsa.org/Explore_International_Education/Impact/Data_And_Statistics/NAFSA_International_Student_Economic_Value_Tool/#stateData

AR004661

**33** U.S. Department of Health and Human Services, "National Vital Statistics Reports, Deaths: Final Data for 2013", 2016, http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf

**34** Department of Homeland Security, "Yearbook of Immigration Statistics: 2014 Naturalizations, Table 22 - Persons Naturalized by State or Territory of Residence: FY 2005 to 2014", https://www.dhs.gov/yearbook-immigration-statistics-2014-naturalizations

**35** Federal Election Commission. "Federal Elections 2012: Elections for the President, the U.S. Senate and the U.S. Representatives", 2013, http://www.fec.gov/pubrec/fe2012/federalelections2012.pdf.

**36** George J. Borjas, "The Labor Supply of Undocumented Immigrants," NBER Working Paper (National Bureau of Economic Research, Inc, 2016), https://ideas.repec.org/p/nbr/nberwo/22102.html.

AR004662

ABOUT

# New American Economy

The Partnership for a New American Economy
brings together more than 500 Republican,
Democratic and Independent mayors and business
leaders who support sensible immigration reforms
that will help create jobs for Americans today. Visit
**www.renewoureconomy.org** to learn more.



AR004663

FOOTNOTE 60

AR004664



# Immigrants in Connecticut

Connecticut has a sizable community of immigrants, much of which hails from India and Poland. Nearly 15 percent of the state's population was born in another country, and over 14 percent of residents are native-born Americans who have at least one immigrant parent. Immigrants support Connecticut's economy across sectors, comprising more than 25 percent of all computer and math sciences employees and one third of residents working in building and grounds cleaning and maintenance. As workers, business owners, taxpayers, and neighbors, immigrants are an integral part of Connecticut's diverse and thriving communities and make extensive contributions that benefit all.

**More than one in seven Connecticut residents is an immigrant, while another one in eight is a native-born U.S. citizen with at least one immigrant parent.**

- In 2015, 519,648 immigrants (foreign-born individuals) comprised 14.5 percent of the state's population.[1]

- Connecticut was home to 250,118 women, 236,720 men, and 32,810 children who were immigrants.[2]

- The top countries of origin for immigrants were India (6.6 percent of immigrants), Poland (6.4 percent), Jamaica (6.3 percent), the Dominican Republic (5.1 percent), and Mexico (4.8 percent).[3]

- In 2016, 480,001 people in Connecticut (13.5 percent of the state's population) were native-born Americans who had at least one immigrant parent.[4]

**Nearly half of all immigrants in Connecticut are naturalized U.S. citizens.**

- 253,505 (48.8 percent) immigrants had naturalized as of 2015,[5] and 98,652 immigrants were eligible to become naturalized U.S. citizens in 2015.[6]

- More than four in five immigrants (82.3 percent) reported speaking English "well" or "very well."[7]

**Immigrants in Connecticut are distributed across the educational spectrum.**

- One in three adult immigrants had a college degree or more education in 2015, while one in five had less than a high-school diploma.[8]

AR004665

| Education Level | Share (%) of All Immigrants | Share (%) of All Natives |
|---|---|---|
| College degree or more | 34.0 | 39.3 |
| Some college | 20.4 | 25.4 |
| High school diploma only | 25.8 | 27.8 |
| Less than a high-school diploma | 19.8 | 7.6 |

**Nearly 60,000 U.S. citizens in Connecticut live with at least one family member who is undocumented.**

- 120,000 undocumented immigrants comprised 24 percent of the immigrant population and 3.4 percent of the total state population in 2014.[9]

- 143,784 people in Connecticut, including 47,220 born in the United States, lived with at least one undocumented family member between 2010 and 2014.[10]

- During the same period, 5 percent of children in the state were U.S. citizens living with at least one undocumented family member (40,931 children in total).[11]

**Nearly 4,000 Deferred Action for Childhood Arrivals (DACA) recipients live in Connecticut.[12]**

- As of 2016, half of DACA-eligible immigrants in Connecticut, or 5,676 people, had applied for DACA.[13]

- Another 2,000 residents of the state satisfied all but the educational requirements for DACA, and up to 2,000 others would be additionally eligible as they grew older.[14]

**One in six workers in Connecticut is an immigrant, together making up a significant part of the state's labor force across industries.**

- 341,718 immigrant workers comprised 17.6 percent of the labor force in 2015.[15]

- Immigrant workers were most numerous in the following industries:

| Industry | Number of Immigrant Workers |
|---|---|
| Health Care and Social Assistance | 53,245 |
| Manufacturing | 46,357 |
| Retail Trade | 38,514 |
| Construction | 34,518 |
| Educational Services | 29,782 |
| Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council. | |

AR004666

- The largest shares of immigrant workers were in the following industries:[16]

| Industry | Immigrant Share (%) (of all industry workers) |
|---|---|
| Construction | 26.3 |
| Administrative & Support; Waste Management; and Remediation Services | 24.8 |
| Other Services (except Public Administration) | 21.4 |
| Manufacturing | 20.6 |
| Accommodation and Food Services | 20.6 |
| Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council. | |

**Immigrants are an integral part of the Connecticut workforce in a range of occupations.**

- In 2015, immigrant workers were most numerous in the following occupation groups:[17]

| Occupation Category | Number of Immigrant Workers |
|---|---|
| Building and Grounds Cleaning & Maintenance | 34,020 |
| Sales and Related | 32,916 |
| Management | 31,764 |
| Production | 31,588 |
| Construction and Extraction | 31,506 |
| Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council. | |

- The largest shares of immigrant workers were in the following occupation groups:[18]

| Occupation Category | Immigrant Share (%) (of all workers in occupation) |
|---|---|
| Building and Grounds Cleaning & Maintenance | 36.6 |
| Construction and Extraction | 29.1 |
| Production | 28.6 |
| Farming, Fishing, and Forestry | 26.9 |
| Computer and Mathematical Sciences | 26.5 |
| Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council. | |

- Undocumented immigrants comprised 4.7 percent of the state's workforce in 2014.[19]

AR004667

## Immigrants in Connecticut have contributed billions of dollars in taxes.

- Immigrant-led households in the state paid $3.3 billion in federal taxes and $1.8 billion in state and local taxes in 2014.[20]

- Undocumented immigrants in Connecticut paid an estimated $124.7 million in state and local taxes in 2014. Their contribution would rise to $145.3 million if they could receive legal status.[21]

- DACA recipients in Connecticut paid an estimated $17.6 million in state and local taxes in 2016.[22]

## As consumers, immigrants add billions of dollars to Connecticut's economy.

- Connecticut residents in immigrant-led households had $13.8 billion in spending power (after-tax income) in 2014.[23]

## Immigrant entrepreneurs represent nearly one in four Connecticut business owners.

- More than 46,351 immigrant business owners accounted for 23.7 percent of all self-employed Connecticut residents in 2015 and generated $1.2 billion in business income.[24]

AR004668

## Endnotes

[1] "Foreign born" does not include people born in Puerto Rico or U.S. island areas or U.S. citizens born abroad of American parent(s). U.S. Census Bureau, 2015 American Community Survey 1-Year Estimates. The American Immigration Council elected to use data from the 2015 ACS 1-Year estimates wherever possible to provide the most current information available. Since these estimates are based on a smaller sample size than the ACS 5-year, however, they are more sensitive to fluctuations and may result in greater margins of error (compared to 5-year estimates).

[2] Children are defined as people age 17 or younger. Men and women do not include children. Ibid.

[3] Analysis of the U.S. Census Bureau's 2015 American Community Survey 1-year PUMS data by the American Immigration Council.

[4] Analysis of data from the 2016 Current Population Survey by the American Immigration Council, using IPUMS-CPS. Sarah Flood, Miriam King, Steven Ruggles, and J. Robert Warren, *Integrated Public Use Microdata Series, Current Population Survey: Version 5.0* [dataset] (Minneapolis, MN: University of Minnesota, 2017).

[5] 2015 ACS 1-Year Estimates.

[6] Augmented IPUMS-ACS data, as published in "State-Level Unauthorized Population and Eligible-to-Naturalize Estimates," Center for Migration Studies data tool, accessed August 2017, data.cmsny.org/state.html.

[7] Figure includes immigrants who speak only English. Data based on survey respondents age 5 and over. Analysis of 2015 ACS 1-Year Estimates by the American Immigration Council.

[8] Data based on survey respondents age 25 and older. 2015 ACS 1-Year Estimates.

[9] Pew Research Center, "U.S. unauthorized immigration population estimates," November 3, 2016, www.pewhispanic.org/interactives/unauthorized-immigrants/.

[10] Silva Mathema, "State-by-State Estimates of the Family Members of Unauthorized Immigrants," University of Southern California's Center for the Study of Immigrant Integration and the Center for American Progress, March 2017, https://www.americanprogress.org/issues/immigration/news/2017/03/16/427868/state-state-estimates-family-members-unauthorized-immigrants/.

[11] American Immigration Council analysis of data from the 2010-2014 ACS 5-Year, using Silva Mathema's "State-by-State Estimates of the Family Members of Unauthorized Immigrants" and IPUMS-USA. Steven Ruggles, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek, *Integrated Public Use Microdata Series: Version 7.0* [dataset] (Minneapolis, MN: University of Minnesota, 2017).

[12] The "Deferred Action for Childhood Arrivals" (DACA) initiative began in 2012 and provides certain immigrants (those who were brought to the United States as children and meet specific requirements) with temporary relief from deportation, or deferred action. American Immigration Council, "Deferred Action for Childhood Arrivals: A Q&A Guide," August 17, 2012, www.americanimmigrationcouncil.org/research/deferred-action-childhood-arrivals-qa-guide. The number of DACA recipients reflects USCIS' estimate of those with active DACA grants as of September 4, 2017. U.S. Citizenship and Immigration Services CLAIMS3 and ELIS Systems, *Deferred Action for Childhood Arrivals: Population Data* (Washington, DC: Dept. of Homeland Security, September 20, 2017), Approximate Active DACA Recipients: State of Residence as of September 4, 2017 [dataset], https://www.uscis.gov/daca2017.

[13] "DACA-eligible" refers to immigrants who were immediately eligible to apply for DACA as of 2016. Migration Policy Institute analysis of U.S. Census Bureau data from the 2014 American Community Survey (ACS), 2010-14 ACS pooled, and the 2008 Survey of Income and Program Participation (SIPP), as cited in "Deferred Action for Childhood Arrivals (DACA) Data Tools," accessed June 2017, www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

[14] Ibid.

[15] Analysis of 2015 ACS 1-year PUMS data by the American Immigration Council. Categories are based on the 2012 North American Industry Classification System (NAICS), www.census.gov/eos/www/naics/index.html.

[16] Ibid.

[17] Analysis of 2015 ACS 1-year PUMS data by the American Immigration Council. Categories are based on the 2010 Standard Occupational Classification (SOC) system, www.bls.gov/soc/major_groups.htm.

[18] Ibid.

[19] Pew Research Center, "U.S. unauthorized immigration population estimates," 2016.

[20] New American Economy, *The Contributions of New Americans in Connecticut* (New York, NY: August 2016), 5, http://www.newamericaneconomy.org/research/the-contributions-of-new-americans-in-connecticut.

[21] Institute on Taxation & Economic Policy (ITEP), *Undocumented Immigrants' State & Local Tax Contributions* (Washington, DC: March 2017), 3, https://itep.org/undocumented-immigrants-state-local-tax-contributions-2/.

[22] ITEP, *State & Local Tax Contributions of Young Undocumented Immigrants* (Washington, DC: April 2017), Appendix 1, https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants/.

[23] New American Economy, *The Contributions of New Americans in Connecticut,* 5.

[24] "Business owners" include people who are self-employed, at least 18 years old, and work at least 15 hours per week at their businesses. Analysis of 2015 ACS 1-year PUMS data by the American Immigration Council.

AR004669

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/259184011

# Unregulated Work in Chicago: The Breakdown of Workplace Protections in the Low-Wage Labor Market

**Article** · January 2010

CITATIONS
0

READS
173

**13 authors**, including:


Douglas D Heckathorn
Cornell University
**97** PUBLICATIONS   **8,053** CITATIONS

SEE PROFILE


James Defilippis
Rutgers, The State University of New Jersey
**40** PUBLICATIONS   **754** CITATIONS

SEE PROFILE


Ana Luz González
University of California, Los Angeles
**8** PUBLICATIONS   **47** CITATIONS

SEE PROFILE


Michael W Spiller
Centers for Disease Control and Prevention
**25** PUBLICATIONS   **116** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:


"Model-based and Design-based Inference: Reducing Bias Due to Differential Recruitment in Respondent-Driven Sampling." Shi, Yongren, Christopher J. Cameron, and Douglas D. Heckathorn. Sociological Methods and Research, in press, 2016. View project

All in-text references underlined in blue are linked to publications on ResearchGate,
letting you access and read them immediately.

Available from: Michael W Spiller
Retrieved on: 10 November 2016

AR004670

# Unregulated Work in Chicago

## The Breakdown of Workplace Protections in the Low-Wage Labor Market

**Nik Theodore, Mirabai Auer, Ryan Hollon, and Sandra Morales-Mirque**

With Annette Bernhardt, Ruth Milkman, Douglas Heckathorn, James DeFilippis, Ana Luz González, Victor Narro, Jason Perelshteyn, Diana Polson, and Michael Spiller



Center for Urban Economic Development, University of Illinois at Chicago

April 2010

AR004671

## National Advisory Committee

Eileen Appelbaum, Rutgers University
Jennifer Gordon, Fordham Law School
Mark Handcock, University of Washington
Marielena Hincapie, National Immigration Law Center
Martin Iguchi, UCLA/Rand
Manuel Pastor, University of Southern California
Cathy Ruckelshaus, National Employment Law Project

## Chicago Advisory Committee

ARISE Chicago!
Centro Romero
Chicago Community and Workers Rights Center
Chicago Workers Collaborative
Korean American Resource and Cultural Center
Latino Union
North Lawndale Employment Network
Restaurant Opportunity Center of Chicago (ROC-Chicago)
West Humboldt Park Family and Community Development Council
Women Employed
Working Hands Legal Clinic

## Acknowledgements

We incurred numerous debts in conducting this study. Most of all, we would like to thank the 1,140 workers who participated in our survey. We also are grateful to the members of our four advisory boards who assisted us at many stages in the project's development, and to the many organizations that provided space for us to conduct the surveys. In addition, our colleagues at Cornell University, the National Employment Law Project, Rutgers University, and the UCLA Institute for Research on Labor and Employment provided vital support for our efforts.

For their invaluable comments on earlier drafts of the national report, we thank Pablo Alvarado, Eileen Appelbaum, Ana Avendaño, Jennifer Gordon, Mark Handcock, Janet Herold, Jon Hiatt, Martin Iguchi, Saru Jayaraman, Raj Nayak, Chris Newman, Chris Owens, Manuel Pastor, and Cathy Ruckelshaus. We also benefited from the legal expertise of Nathan Barksdale, Laurie Burgess, Michael Ettlinger, Natalia Garcia, Tsedeye Gebreselassie, E. Tammy Kim, Kevin Kish, Samuel Krinsky, Sarah Leberstein, Becky Monroe, Raj Nayak, Oscar Ospino, Luis Perez, Cathy Ruckelshaus, Paul Sonn, Jennifer Sung, and Chris Williams, as well as the many lawyers who responded to our queries to NELP's National Wage and Hour Clearinghouse. For advice on the intricacies of workers' compensation we are grateful to Danielle Lucido, Jeremy Smith, and Tom Rankin. Thanks also go to Nina Martin, Jamie Peck, and Noah Zatz for their input on the survey design, and to Terri Zhu for her assistance at the analysis stage.

AR004672

## Acknowledgements continued...

Mark Handcock, Martin Iguchi, and Lawrence Ouellet offered helpful advice about the intricacies of RDS fielding and data analysis. Christine D'Onofrio, Michael Ettlinger, Mark Levitan, and Jeremy Reiss provided us expert advice about payroll tax deductions. On health and safety issues we relied heavily on Garrett Brown, Linda Delp, Eric Frumin, Danielle Lucido, Luis Mireles, Bruce Nissen, Jim Platner, Jackie Nowell, Joel Shufro, Scott Schneider, Fran Schreiberg, and Juliann Sum. Jeffrey Passel and John Schmitt provided invaluable analysis of demographic and wage data from the Current Population Survey.

We would like to thank the people at St. Anthony's in Cicero, St. Pascal's in Portage Park, St. Sylvester's in Logan Square, and World Relief in Albany Park, as well as Tim Bell, Tom Hansen, B. Loewe, Vinay Ravi, Reverend Sergio Solis, Ebonee Stevenson, Deborah Taylor, and Peggy Valdez for their contributions to the development and fielding of the Chicago survey. Anne Marie Castleman, Adam Kader, Alex Linares, and Chris Williams contributed their expertise to drafts of this report. We depended on Yibing Li for project administration during all phases of this study.

We relied on an extraordinary team of interviewers and translators in Chicago.  Ryan Hollon directed the fielding of the survey with the help of Sandra Morales-Mirque. Both conducted interviews along with Reola Avant, Louisa Bigelow, Alison Dickson Quesada, Carlos Ginard, Hannaan Joplin, Kasia Kornecka, Tom McCormack, Meghan Mattingly, James Pfluecke, Kristi Sanford, Lucinda Scharbach, Lian Sze, Cecil Thomas, Tiffany Traylor, and Ada Utah. Martha Glas served as a Polish translator.

Madonna Camel, Yuteh Cheng, Jay Fraser, and Bob Lee of the Survey Research Center at the University of California, Berkeley provided expert assistance with interviewer training and the programming of the survey instrument. The survey instrument was translated into Spanish by Juanita Norori, and Alfredo Burgos created the pictographs we used in our recruitment documents.

This research was generously funded by the Ford Foundation, the John Randolph Haynes and Dora Haynes Foundation, the Institute for Policy and Civic Engagement of the University of Illinois at Chicago, the Joyce Foundation and the Russell Sage Foundation. We greatly appreciate the support we received from Whitney Smith, Diane Cornwell and Héctor Cordero-Guzmán, and Joseph Hoereth. We are especially indebted to Eric Wanner, Aixa Cintrón-Veléz and Katherine McFate, without whom this project would not have been possible. The views expressed in this report are solely those of the authors.

**Center for Urban Economic Development**
**University of Illinois at Chicago**
**400 S. Peoria St, Suite 2100 (M/C 345)**
**Chicago, IL 60607**
**312.996.6336**
**www.urbaneconomy.org**

## About the Authors

**Nik Theodore**, Ph.D., is the Director of the Center for Urban Economic Development and Associate Professor in the Department of Urban Planning and Policy at the University of Illinois at Chicago. He has published widely on economic development, labor markets, and urban policy.

**Mirabai Auer**, M.U.P.P., is a Research Associate at the Center for Urban Economic Development at the University of Illinois at Chicago. Her interests include community economic development strategies and the informal economy.

**Ryan Hollon** is a doctoral student in Urban Planning at the University of Illinois at Chicago. His research explores the intersection of the labor market, urban education systems, and the criminal justice system.

**Sandra Morales Mirque,** M.U.P.P., is a Research Associate at the Center for Urban Economic Development. Her work involves applied research around immigrants and women's economic issues, and the informal economy. She also works closely with community organizations on capacity building and participatory research.

AR004674

# Contents

Executive Summary ..............................................................................................................i

1. Introduction.................................................................................................................1

2. A Landmark Survey of the Low-Wage Labor Market.....................................................4

3. The Prevalence of Workplace Violations......................................................................9

4. The Role of Job and Employer Characteristics...........................................................20

5. The Role of Worker Characteristics............................................................................32

6. Wage Theft in Chicago..............................................................................................38

7. Strengthening Worker Protections.............................................................................40

Appendix A: Data and Methods....................................................................................44

References...................................................................................................................49

Endnotes.....................................................................................................................55

AR004675

# Executive Summary

This report exposes a world of work in which core employment and labor laws are failing significant numbers of workers. These protections—the right to be paid at least the minimum wage, the right to be paid for overtime hours, the right to take meal breaks, access to workers' compensation when injured, and the right to advocate for better working conditions—are being violated at alarming rates in the low-wage labor market. The sheer breadth of the problem, spanning key industries in the economy, as well as its profound impact on workers and their communities, entailing significant economic hardship, demands urgent attention.

In 2008, along with our colleagues in Los Angeles and New York City, we conducted a landmark survey of 4,387 workers in low-wage industries, 1,140 of whom are employed in Chicago and suburban Cook County. We used an innovative, rigorous methodology that allowed us to reach vulnerable workers who are often missed in standard surveys, such as unauthorized immigrants and those paid in cash. Our goal was to obtain accurate and statistically representative estimates of the prevalence of workplace violations. All findings are adjusted to be representative of front-line workers (i.e. excluding managers, professional or technical workers) in low-wage industries—a population of about 310,205 workers employed in Cook County.

**Finding 1**
**Workplace violations are severe and widespread in the low-wage labor market**

We found that employment and labor laws are regularly and systematically violated, impacting a significant part of the low-wage labor force in Chicago and suburban Cook County.

**Minimum wage violations:**

- Fully 26 percent of workers in our sample were paid less than the legally required minimum wage in the previous work week.
- Minimum wage violations were not trivial in magnitude: over 60 percent of workers were underpaid by more than $1 per hour.

**Overtime violations:**

- One-quarter of our respondents worked more than 40 hours during the previous week. Of those, 67 percent were not paid the legally required overtime rate by their employers.
- Like minimum wage violations, overtime violations were of substantial magnitude. The average worker with a violation had put in 8 hours of overtime in the previous week—hours that were either underpaid or not paid at all.

i

AR004676

**"Off-the-clock" violations:**

❏ Nearly one-quarter (23 percent) of the workers in our sample came in early and/or stayed late after their shift during the previous work week. Of these workers, 69 percent did not receive any pay at all for the work they performed outside of their regular shift.

**Meal break violations:**

❏ Three-quarters of our respondents worked enough consecutive hours to be legally entitled to at least one meal break during the previous week. Of these workers, 43 percent received no break at all, had their break shortened, were interrupted by their employer, or worked during the break—all of which constitute a violation of meal break law.

**Pay stub violations and illegal deductions:**

❏ In Illinois, workers are required to receive documentation of their earnings and deductions, regardless of whether they are paid in cash or by check. However, 45 percent of workers in our sample did not receive this mandatory documentation in the previous work week.

❏ Employers are generally not permitted to take deductions from a worker's pay for damage or loss, work-related tools or materials or transportation. But 44 percent of respondents who reported deductions from their pay in the previous work week were subjected to these types of illegal deductions.

**Tipped job violations:**

❏ Of the tipped workers in our sample, 15 percent were not paid the tipped worker minimum wage (which in Illinois is lower than the regular state minimum wage).

**Illegal employer retaliation:**

We found that when workers complained about their working conditions or tried to organize a union, employers often responded by retaliating against them. Just as important, many workers never made complaints in the first place, often because they feared retaliation by their employer.

❏ Over one-quarter (26 percent) of workers in our sample reported that they had made a complaint to their employer or attempted to form a union in the last year. Of those, 35 percent experienced one or more forms of illegal retaliation from their employer or supervisor. For example, employers fired or suspended workers, threatened to call immigration authorities, or threatened to cut workers' hours or pay.

AR004677

- Another 15 percent of workers reported that they did not make a complaint to their employer during the past 12 months, even though they had experienced a serious problem such as dangerous working conditions or not being paid the minimum wage. Over half were afraid of losing their job, 12 percent were afraid they would have their hours or wages cut, and 36 percent thought it would not make a difference.

**Workers' compensation violations:**

We found that the workers' compensation system is not functioning for workers in the low-wage labor market.

- Of the workers in our sample who experienced a serious injury on the job, only 9 percent filed a workers' compensation claim.
- When workers told their employer about the injury, 20 percent experienced an illegal employer reaction—including firing the worker, calling immigration authorities, or instructing the worker not to file for workers' compensation.
- Nearly half of workers injured on the job had to pay their bills out-of-pocket (41 percent) or use their health insurance to cover the expenses (8 percent). Workers' compensation insurance paid (all or part) medical expenses for only 3 percent of the injured workers in our sample.

## Finding 2
## Job and employer characteristics are key to understanding workplace violations

Workplace violations are ultimately the result of decisions made by employers – whether to pay the minimum wage or overtime, whether to give workers meal breaks, and how to respond to complaints about working conditions. We found that workplace violation rates are strongly influenced by job and employer characteristics.

- Minimum wage violation rates varied significantly by industry. Violations were most common in private households and in personal and repair services, where more than 60 percent of workers were paid less than the minimum wage. Other high violation industries include, retail and drug stores, social assistance and education, and grocery stores.

- Minimum wage violation rates also varied by occupation. For example, child care workers, many of whom work in private households, had a violation rate of 75 percent. Sixty percent of personal services and repair workers also had a minimum wage violation. Other high-violation occupations include, building services and grounds workers; cashiers, retail salespersons and tellers and home healthcare workers.

AR004678

- Workers who were paid a flat weekly rate or paid in cash had much higher violation rates than those paid a standard hourly rate or by company check.

- Workers at businesses with less than 100 employees were at greater risk of experiencing violations than those at larger businesses.  But workers in big companies were not immune: nearly one in six had a minimum wage violation in the previous week, and of those who worked overtime, 52 percent were not paid time and a half.

## Finding 3
## All workers are at risk of workplace violations

Immigrants and people of color are disproportionately likely to be employed in low-wage industries, and therefore are at greater risk of workplace violations.  But violations are not limited to immigrant workers or other vulnerable groups in the labor force—everyone is at risk, although to different degrees.

We found that a range of worker characteristics were correlated with higher minimum wage violation rates:

- Foreign-born workers were 1.5 times more likely than their U.S.-born counterparts to have a minimum wage violation.

- Among U.S.-born workers, there was a significant difference by race:  the violation rate for African-American workers was triple that of their Latino counterparts and 27 times that of their white counterparts (who had by far the lowest violation rates in the sample).

- Higher levels of education and English proficiency (for immigrants) each offered some protection from minimum wage violations.

- Overtime, off-the-clock and meal break violations generally varied little by worker characteristics.  On the whole, job and employer characteristics were more powerful predictors of the workplace violations considered in this study.

iv

AR004679

**Finding 4**
**Wage theft**

Wage theft not only depresses the already meager earnings of low-wage workers, but also adversely impacts their communities and the local economies of which they are a part.

❑ *Workers:* Nearly half (47 percent) of our sample experienced at least one pay-related violation in the previous work week. The average worker lost $50, out of average weekly earnings of $322. That translates into wage theft of 16 percent of earnings. Assuming a full-time, full-year work schedule, we estimate that these workers lost an average of $2,595 annually due to workplace violations, out of total earnings of $16,753.

❑ *Communities:* We estimate that in a given week, approximately 146,300 workers in Chicago and suburban Cook County have at least one pay-based violation. Extrapolating from this figure, front-line workers in low-wage industries lose more than $7.3 million *per week* as a result of employment and labor law violations.

**Strengthening worker protections**

Everyone has a stake in addressing the problem of workplace violations. When impacted workers and their families struggle in poverty and constant economic insecurity, the strength and resiliency of local communities suffers. When unscrupulous employers violate the law, responsible employers are forced into unfair competition, setting off a race to the bottom that threatens to bring down standards throughout the labor market. And when significant numbers of workers are underpaid, tax revenues are lost.

Policy reforms are needed at the federal level, but state and local governments have a significant role to play as well. The policy agenda to protect the rights of workers in Illinois should be driven by two core principles:

**Strengthen state and city enforcement of employment and labor laws:** Illinois is well-placed to tackle the problem of workplace violations, given the state's commitment to enforcement and its energized community advocates. In recent years, state enforcement has been improved substantially through the use of proactive investigations and outreach to community groups, but recent budget cuts have strained resources and slowed progress. Illinois must recommit resources toward enforcement, institutionalize recent successes and enact new legislation to strengthen enforcement tools. City and county governments must do their part by enforcing the labor standards that fall under their authority, while also dedicating resources to public education campaigns and to support enforcement efforts by community-based organizations, worker centers and legal services providers.

AR004680

**Update legal standards for the 21st century labor market:** Strong enforcement is important, but so are strong legal standards that recognize the changing organization of work in the United States.  The strength of laws and the strength of their enforcement are deeply intertwined— weak employment and labor laws send the wrong signal, opening the door to low-road business strategies to cut labor costs.  Raising the minimum wage, closing loopholes that exclude workers from key protections and ensuring state and city resources are used to create living- wage jobs are all key improvements that would raise compliance in the workplace and improve the competitive position of employers who play by the rules.

AR004681

# Introduction

Last year in Illinois, a large temporary staffing agency settled a class action lawsuit with over 25,000 workers, totaling $11 million.  For more than seven years, the agency had an unlawful vacation policy denying employees vested vacation time and pay.   Workers were not allowed to accrue vacation time proportionally as they worked throughout the year; moreover, company policy stipulated that an employee need be on payroll in December in order to receive their vacation pay.  The company also failed to provide workers with an itemized statement of earnings.[1]

Another temporary staffing agency settled a class action suit with over 3,300 workers, totaling nearly half a million dollars.  Usually hired by the day, workers were placed in minimum-wage jobs doing assembly, packaging and janitorial work.  But when they accumulated more than 40 hours in a week working for different client companies, they didn't receive overtime—instead, the temp agency "split" their checks to avoid triggering mandatory overtime pay.  Workers also reported that regardless of the actual amount of hours they worked in a given day, their time was rounded down to eight hours by the agency.[2]

And earlier this year, the owner of a small grocery store reached a settlement with a dozen workers, agreeing to a code of conduct after admitting to paying workers below the minimum wage and denying workers full overtime pay.  Employees reported often working in excess of 60 hours a week for less than the minimum wage and no overtime.[3]

Unfortunately, these cases are not unusual, nor are they limited to small businesses or temp agencies.  In 2008, for example, Wal-Mart announced it would settle 63 cases in 42 states charging that the company forced its employees to work "off the clock"—that is, requiring unpaid work after employees had clocked out at the end of their official shifts.  The settlement totaled $352 million in unpaid wages and involved hundreds of thousands of current and former employees.[4]

∎ ∎ ∎

Increasingly, it is clear that there has been a breakdown in the enforcement of core employment and labor laws in the United States.  These are laws that most of us consider absolute and inviolate, and that date back to the New Deal.  Employers must pay workers at least the minimum wage, and time and a half for overtime.  They must follow regulations to

1

AR004682

protect workers' health and safety, and carry workers' compensation insurance to cover on-the-job injuries.  They may not discriminate against workers on the basis of age, race, religion, national origin, gender, sexual orientation or disability.  And they must respect workers' right to organize and bring complaints about working conditions.  Yet there is growing evidence that employers are breaking these bedrock laws.   The many workplace violations documented by community organizations and government agencies in recent years, as well as a growing body of research, suggest the need to take a closer look at the state of worker protections.

To date, very few studies have been able to look across a broad set of industries to estimate the proportion of workers experiencing workplace violations, or the proportion of employers committing them.  As a result, we lack robust data on the extent of the problem, the industries that are the biggest offenders, or the workers who are most affected.  The limited data, in turn, hamper effective policy responses to substandard employment conditions.

This report presents new research findings to fill this gap.  Drawing on a survey of 4,387 workers in low-wage industries in the three largest U.S. cities—Chicago, Los Angeles, and New York—it focuses on the results for Chicago and suburban Cook County, where 1,140 workers were surveyed between January and June 2008.  A national report on our findings, *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities,* combined data from all three cities and was released in 2009.[5]  Here, we present findings for Chicago and suburban Cook County, in order to document the extent to which employers in the Chicago area are complying with state and federal laws.

Using a rigorous survey methodology that allowed us to reach vulnerable workers who are often missed in standard surveys, we attempted to answer the following questions:

- How common are workplace violations, such as the percentage of workers earning less than the minimum wage or working overtime without pay?
- Which industries and occupations have especially high concentrations of violations?
- Who are the workers most affected?

We think of this survey as a "census of the invisible" because, from the standpoint of public policy, these jobs are all too often off the radar screen.

This report exposes significant, pervasive violations of core employment and labor laws in low-wage industries in the Chicago area.  Workers are being paid less than the minimum wage and

2

AR004683

are not receiving overtime pay.  They are working off the clock without pay, and are not getting meal breaks.  When workers are injured, they are not receiving workers' compensation.  And when they try to assert their rights or attempt to organize, workers often face illegal retaliation from their employers.

These problems are not limited to the underground economy or to a few "bad apple" employers; rather, violations occur in a wide variety of industries that are the core of the regional economy.  Nor are these abuses limited to a narrow segment of the labor force.  Although immigrants and people of color are disproportionately affected by workplace violations, we found that all workers in the low-wage labor market are at risk of experiencing workplace violations.  It must be noted, however, that not all employers violate the law.  Our research suggests that, even within high-violation industries, there are responsible employers that manage to be competitive while complying with core employment and labor laws.[6]  Both those employers, and the workers who regularly experience workplace violations, urgently need a renewed commitment to the full enforcement of labor standards.

But better enforcement alone is not enough.  Our system of employment and labor laws is badly out of date and riddled with weak standards.  Some occupations and industries are either partly or completely exempted from coverage.  Health and safety protections have not been substantially updated in years.  And many employers are treating workers as independent contractors or hiring them through subcontractors, straining a legal framework predicated on a traditional employment relationship.

The high rates of workplace violations that we document in this report raise an urgent, resounding warning that even existing protections are failing workers in the Chicago area—and as the region struggles to emerge from a protracted economic downturn, there are reasons to believe that the conditions we document in this report have worsened.  Community groups and legal assistance organizations are reporting that the recession has intensified workplace abuses, as employers are ever more focused on cost cutting and workers feel increased pressure to accept subminimum wages and unpaid overtime in the face of high unemployment rates.

Rebuilding our economy on the back of illegal working conditions is not only morally but also economically untenable.  When unscrupulous employers break the law and drive down labor standards, they rob workers of hard-earned income needed to support their families.  They rob communities of spending power.  They rob state and local governments of vital tax revenues.  And they rob Chicago, Cook County and Illinois of the good jobs and workplace standards needed to compete in the 21st century economy.

3

AR004684

# 1. A Landmark Survey of the Low-Wage Labor Market

Studying violations of workplace laws is a challenging task. Employers are unlikely to admit that they are paying workers less than the minimum wage, denying workers meal breaks, or otherwise breaking the law. Businesses with the worst conditions may be operating underground and thus difficult to find. Workers who need to support their families are understandably reluctant to talk to researchers about their employers, because of fears of retaliation, worries about their immigration status, or because they are employed "off the books." As a result, existing data are inadequate to assess the current state of employer compliance with employment and labor laws.

In this study, we build on an emerging body of research that has established the viability of gathering reliable data on workplace practices directly from workers.[7] In 2008, we conducted a representative survey of low-wage workers in Chicago and suburban Cook County as part of the larger *2008 Unregulated Work Survey Project* (which consisted of coordinated surveys in Chicago, Los Angeles and New York City). We adopted two key methodological innovations to overcome the inadequacies of previous studies. First, we used a cutting-edge sampling methodology that allowed us to reach the full range of workers in the low-wage labor market, including unauthorized immigrants and workers who are employed "off the books." Second, we developed an extensive questionnaire that allowed us to rigorously assess whether employment and labor laws were being broken, without relying on workers' own knowledge of these laws. The result is a landmark survey that offers policymakers, regulatory agencies, community groups, legal services lawyers and researchers a window into the current state of worker protections in the low-wage labor markets of major U.S. cities.

**The low-wage labor force**

From January through June of 2008, we completed valid surveys of 1,140 workers in Chicago and suburban Cook County. To qualify for the survey, workers had to be:

- Age 18 or older.
- Currently working for an employer in Cook County, including having worked at least eight hours in the week before the interview.
- A "front-line" worker—that is, not a manager, professional or technical worker.
- Employed in a low-wage industry as their primary job (see Appendix A for the detailed list of eligible jobs).

4

AR004685

We designed the survey to be broad enough to capture a range of industries and occupations across the urban economy, yet targeted enough to exclude upper-level occupations such as lawyers or stock brokers (most of which are not covered by many of the laws of interest here).

A note on timing: We fielded the survey at the start of the recession in 2008, when unemployment rates were still relatively low.  Our assessment, therefore, is that the workplace violation rates documented in this study were not significantly influenced by the recession, and that they represent "business as usual" in the region's low-wage industries.

**Respondent-Driven Sampling (RDS)**

Our goal was to obtain accurate, statistically representative estimates of the prevalence of workplace violations.  One key challenge we faced was how to reach the workers.  Surveys that rely on telephone interviews or Census-style home visits are unlikely to gain the participation of the full  population of low-wage workers, many of whom are missing from official databases, vulnerable because of their immigration status, and/or reluctant to take part in a survey because of fear of retaliation by their employers.  Trust is also an issue when asking for details about a worker's job, the wages they receive, and whether or not they are paid off the books.

These problems have recently received significant attention from statisticians and social scientists.  In this survey we use an innovative sampling strategy that was developed to overcome the barriers of surveying "hidden" or "hard-to-reach" populations:  Respondent-Driven Sampling (RDS), originally developed by Cornell University sociologist and collaborator Douglas Heckathorn, and subsequently elaborated along with other scholars.

Appendix A provides a detailed description of the RDS method and how we implemented it in this survey, but the basic concept is straightforward:  sampling is done through social networks. Recruiting started with a small number of workers who fit the study criteria.  After they were interviewed they recruited other workers in their existing social networks; those workers completed the survey and then recruited others, and so on.  Through successive waves of recruitment, the sample increased over time.  A key advantage of this method is that workers are recruited by trusted friends and acquaintances who already have participated in the survey and can vouch for its confidentiality.  This provides a powerful way to overcome the barriers of fear and disclosure.

We took several steps to ensure that our sample is representative of the larger population of front-line workers in low-wage industries.  First, by collecting data on the social networks of the respondents, and in particular taking into account the size and interconnectivity of those

AR004686

networks, RDS adjusts for the fact that some individuals have more social connections than others, and thus are more likely to be recruited into the survey. Second, RDS adjusts for the fact that different groups of workers have patterns of recruitment that vary both in the type of workers they recruit and in the effectiveness of their recruitment efforts. Finally, we also included an adjustment to ensure that the distribution of industries and occupations in our sample fully reflected the composition of the region's low-wage labor market.

Surveys were conducted at six sites in Chicago and suburban Cook County, including community-based organizations, churches, and a university. The same survey instrument was used at the various sites, and the RDS methodology was implemented in the same way, with detailed fielding protocols to ensure full comparability. All outreach materials were translated into multiple languages, and the surveys were conducted in English, Polish and Spanish. Including surveyors, translators, field coordinators and researchers, a total of 18 staff fielded this survey (see Appendix A for more details on the fielding and methodology). Interviews typically lasted between 60 and 90 minutes. In addition to the survey, we conducted 87 in-depth, semi-structured interviews with low-wage workers. In-depth interviews were used to better understand workers' experiences in the low-wage labor market.

**Measuring workplace violations**

The survey is unique in that it uses an original series of detailed, in-depth questions to measure a range of violations of employment and labor law. The survey instrument was designed to gather information that would allow us to detect violations of laws guaranteeing the minimum wage and overtime pay; full and timely payment of wages owed; provision of legally required meal and rest breaks; protection against retaliation by employers for complaints about working conditions or attempting to organize; and access to workers' compensation insurance in the case of an on-the-job injury.

The questionnaire did *not* rely on workers having any direct knowledge about their rights under employment and labor law, or about whether they had experienced a workplace violation. Instead, our strategy was to gather raw "inputs" from workers—the necessary data about their hours, earnings and working conditions, as well as relevant employer actions. We then used these data to determine whether or not a law had been violated.

For example, we did not ask workers whether they were being paid the minimum wage. Instead, we gathered day-by-day data on exactly how many hours the respondent worked the week before the survey, the amount of money he or she received, whether the employer made any deductions (e.g. for uniforms or meals), and whether the respondent worked off the clock.

AR004687

We then calculated the worker's effective hourly wage, and determined whether or not it was below the minimum wage. This approach—gathering raw data and then calculating whether a workplace violation occurred—was used for the majority of the measures that we report. In calculating the various violation measures, we were careful never to double-count violations. For example, if a respondent worked five overtime hours but was not paid for those hours, we recorded an overtime violation; once these five hours were "tagged" as unpaid, they did not contribute to any other violation (for example, they could not also trigger a minimum wage violation).

**Respondent characteristics**

We close this section with an initial look at the 1,140 workers in our sample. Table 2.1 presents an overview of key demographic and employment characteristics. Like the low-wage workforce in cities across the United States, our sample has more women than men; significant numbers of persons of color, especially Latino workers;[8] and a range of age groups and education levels. Consistent with recent trends in the low-wage labor market, immigrants comprise a large part of our sample—50 percent of the sample was U.S.-born, with the remainder comprised of naturalized citizens, and authorized and unauthorized immigrants. The sizeable number of the latter category in our sample is an indicator of our success in capturing this hard-to-reach part of the labor market.

Given that our focus was on employment practices in low-wage industries, it is not surprising that workers in our sample earned very low wages. The median wage (in 2008 dollars) for our sample was $7.75 an hour, with few respondents earning significantly more than this amount: more than three-quarters of our sample earned less than $10.00 an hour. The sample represents a range of industries (types of businesses) and occupations (job tasks or functions). Reflecting the larger economy, most workers in our sample are employed in the service sector—in industries such as restaurants, retail stores, and home health care—but there is also a sizable segment employed in residential construction, manufacturing and warehousing. Similarly, many of the occupations in our sample are service jobs, such as cashiers, cooks, childcare workers, waiters and sales workers, but construction laborers and factory workers are also well represented. In short, our sample represents a rich and diverse mix of the industries and occupations that comprise the regional economy. All of the workplace violation prevalence rates and other findings reported in the following sections have been weighted so that they are representative of the larger population of front-line workers in low-wage industries in Cook County in 2008. By our estimate, that population includes about 310,205 workers, which is 25 percent of all front-line workers and 12 percent of all workers in Cook County, a significant portion of the regional labor market (see Table A.2 in Appendix A).

AR004688

| Table 2.1: | Characteristics of Workers in the 2008 Unregulated Work Survey, Chicago and Suburban Cook County | |
|---|---|---|
| | | Percent of workers |
| **Gender** | Male | 38.2 |
| | Female | 61.8 |
| | | |
| **Age** | 18-25 | 24.0 |
| | 26-35 | 34.4 |
| | 36-45 | 18.8 |
| | 46+ | 22.8 |
| | | |
| **Race** | Latino/Latina | 56.7 |
| | Black | 26.1 |
| | Asian/other | 6.6 |
| | White | 10.6 |
| | | |
| **Education** | Less than high school, no GED | 38.0 |
| | High school graduate or GED | 35.6 |
| | Some college or higher | 26.5 |
| | | |
| **Nativity and legal status** | U.S.-born citizen | 50.3 |
| | Foreign-born authorized (includes naturalized citizens) | 18.8 |
| | Foreign-born unauthorized | 31.0 |
| | | |
| **Main industry during previous work week** | Other (finance & other health care) | 2.8 |
| | Home health care | 3.0 |
| | Residential construction | 4.3 |
| | Grocery stores | 5.8 |
| | Retail & drug stores | 6.3 |
| | Personal & repair services | 7.8 |
| | Security, building & grounds services | 9.3 |
| | Social assistance & education | 9.6 |
| | Private households | 11.9 |
| | Manufacturing, transportation & warehousing | 18.9 |
| | Restaurants & hotels | 20.2 |
| | | |
| **Main occupation during previous work week** | Teacher assistants | 0.7 |
| | Security guards | 2.6 |
| | General construction | 3.9 |
| | Waiters, cafeteria workers & bartenders | 4.1 |
| | Stock & office clerks | 4.5 |
| | Home health care workers | 4.8 |
| | Maids & housekeepers | 5.6 |
| | Personal & repair services workers | 6.6 |
| | Cashiers, retail salespersons & tellers | 11.3 |
| | Building services & grounds workers | 11.8 |
| | Child care workers | 12.8 |
| | Cooks, dishwashers & food preparers | 15.1 |
| | Factory & packaging workers | 16.2 |
| | | |
| **Hourly wage during previous work week (2008$)** | Median hourly wage | **$7.75** |
| | | |
| **Total number of workers in the sample** | | **1,140** |
| | | |

Source: Authors' analysis of 2008 Unregulated Work Survey.

AR004689

# 3.    The Prevalence of Workplace Violations

The American workplace is governed by a core set of employment and labor laws that establish minimum standards for wages, health and safety on the job, fair treatment, and the right to organize.  But our findings show that these laws are systematically violated, significantly impacting the low-wage labor force in Chicago and suburban Cook County.  As we show in the following pages, workers in low-wage industries regularly experience violations of laws mandating minimum wage and overtime pay, and they are frequently forced to work off the clock or during their breaks.

Table 3.1 summarizes the workplace violations experienced by survey respondents.  We computed these violation rates using two distinct measures.  The first is designed to specify what proportion of all workers in our survey sample who experienced a violation, whereas the second measure specifies the proportion of workers experiencing a violation who were "at risk" for that violation.  For example, in the case of weekly overtime pay laws, a worker is only at risk of a violation if she or he works more than 40 hours in a week.  Table 3.1 shows, in separate columns, both the percentage of all workers surveyed who experienced each violation and the percentage of "at risk" workers who experienced each violation.  In this section, we present both violation measures; later sections focus on the risk-set measures alone.[9]

> *Raul and his wife Maribel lost their jobs when the factory where they worked for almost twenty years closed its doors.  Raul says: "The company informed us about it one week before the closing.  They said to us, 'On Friday, when you've finished your job you'll get paid and I'll thank you for the work you've done.'"  Maribel inquired about the vacation time workers had accrued: "We won't pay it," the manager responded, "We don't have money."  Raul was surprised by the situation: "We didn't know the company didn't have any money because we had been working seven days a week."*
>
> *The employer had denied them due wages in the past as well.  "They treated us poorly," Raul says. "The supervisor would ask us to work overtime but the company wouldn't pay that time.  They would claim that the supervisor didn't have the power to authorize overtime work."  Raul filed a complaint and the union sent a letter requesting the overtime payment.  "The supervisor told me that he could fire me for having complained," Raul says.  "I told them, 'if you think you can fire me for standing up for my rights, go ahead.  I know my rights.'"*

AR004690

**Table 3.1: Workplace Violation Rates**

| Violation | Percent of workers with violations | |
| --- | --- | --- |
| | All workers surveyed* | Workers at risk of a violation** |
| **Minimum wage violations in week prior to survey** | | |
| Worker was paid below the minimum wage | 25.5 | same |
| | | |
| **Overtime violations in week prior to survey** | | |
| Worker had unpaid or underpaid overtime | 15.3 | 67.1 |
| | | |
| **Off-the-clock violations in week prior to survey** | | |
| Worker not paid for off-the-clock work | 16.7 | 68.8 |
| | | |
| **Meal break violations in week prior to survey** | | |
| Worker had any of the below meal break violations | 28.3 | 43.0 |
| Worker was denied meal break | 12.0 | 17.3 |
| Meal break was interrupted by employer or supervisor | 8.1 | 13.6 |
| Worker worked through meal break | 10.1 | 17.3 |
| Meal break was shorter than legally required | 8.2 | 12.7 |
| | | |
| **Other pay violations in week prior to survey** | | |
| Worker was paid late | 3.0 | same |
| Worker did not receive a paystub | 44.8 | same |
| Worker was subjected to an illegal pay deduction | 3.3 | 43.9 |
| Tips were stolen by employer or supervisor | 0.6 | 4.6 |
| | | |
| **Violations in the 12-month period prior to survey** | | |
| Worker had any of the below pay violations in last 12 months | 45.2 | same |
| Worked off-the-clock without pay in last 12 months | 28.7 | same |
| Paid late in last 12 months | 22.9 | same |
| Paid less than owed in last 12 months | 16.9 | same |
| Not paid at all in last 12 months | 4.2 | same |
| Regular and repeated verbal abuse on the basis of a protected category in last 12 months | 2.0 | same |
| | | |
| **Retaliation violations for most recent complaint or organizing effort** | | |
| Worker experienced retaliation by employer for making complaint or organizing a union | 5.0 | 35.1 |
| | | |
| **Workers' compensation violations for most recent on-the-job injury** | | |
| Worker experienced an illegal action by employer | 2.1 | 19.6 |
| | | |
| **Tipped worker minimum wage violations in week prior to survey** | | |
| Tipped worker did not receive the tipped minimum wage | 2.4 | 15.2 |
| | | |

Source: Authors' analysis of 2008 Unregulated Work Survey.
 * Calculated as a percent of all workers in our sample.
 ** Calculated as a percent of workers who were at risk of a violation.

AR004691

**Minimum wage violations**

Minimum wage laws have been the basic standard of pay for front-line workers in the U.S. labor market since 1938, when the Fair Labor Standards Act was passed into law. Employers are required to pay covered workers at or above the minimum wage as set by federal or state law, whichever is higher.[10] Minimum wage laws apply to workers regardless of whether they are employed full- or part-time, or whether they are paid by the hour, by the piece or in some other manner. Minimum wage laws also cover unauthorized immigrant workers, as do all of the other laws considered in this study. At the time of our survey, the Illinois minimum wage was $7.50.

As Table 3.1 shows, 26 percent of the workers in our sample were paid less than the minimum wage in the previous work week. Moreover, these minimum wage violations were not trivial in magnitude: over 60 percent of workers in our sample were underpaid by more than $1 per hour (Figure 3.1), and the median underpayment was $1.45 below the State of Illinois minimum wage.



**Figure 3.1: Amount Paid Below the Hourly Minimum Wage for Workers with a Minimum Wage Violation**

More than $4 per hour
$3.01 to $4 per hour — 13.1%
$2.01 to $3 per hour — 10.0%
$1.01 to $2 per hour — 11.5%
$1 per hour or less — 36.5%
28.8%

Source: Authors' analysis of 2008 Unregulated Work Survey.

AR004692

As noted in Section 2, we did not rely on our respondents' knowledge of employment and labor laws to measure the prevalence of workplace violations.  Instead, we gathered detailed information from each worker regarding the work week immediately prior to his or her interview.  We calculated each respondent's hourly wage rate for the job(s) in which he or she worked that week, dividing total weekly earnings by the number of hours worked, after taking into account bonuses, taxes, deductions and overtime pay.  We then compared this calculated hourly wage rate to the Illinois minimum wage to determine whether or not there was a minimum wage violation.[11]

**Overtime violations**

Federal law requires that covered employees must be paid "time and a half" (1.5 times their regular rate of pay) for all hours worked over 40 during each week for a single employer.  One quarter of our respondents worked more than 40 hours during the previous work week for a single employer and therefore were eligible for overtime pay, and 67 percent of these "at risk" workers were not paid the legally required overtime rate by their employers (Table 3.1).[12]

Nonpayment or underpayment for overtime work takes a variety of forms.  Sixty-three percent of respondents who had an overtime violation were paid only their regular hourly rate for the hours they worked over 40, another 30 percent were not paid at all for those hours, and 7 percent were paid less than their usual hourly rate or were promised "comp time" in lieu of overtime pay.  Like minimum wage violations, overtime violations were far from trivial in magnitude.  Among those workers with an overtime violation, the average respondent had worked eight overtime hours in the previous week, and 11 percent had worked more than 20 overtime hours (see Figure 3.2).

AR004693



Figure 3.2: Number of Hours Worked Overtime (Beyond 40 Hours) for Workers with an Overtime Violation

More than 20 hours — 11.1%

10 to 20 hours — 16.3%

5 to 10 hours — 25.6%

5 hours or less — 50.7%

Source: Authors' analysis of 2008 Unregulated Work Survey.

**"Off-the-clock" violations:  unpaid time before or after a regular shift**

In addition to unpaid overtime, many front-line workers in the low-wage labor market perform work that is unpaid.  This is "off the clock" work that takes place before or after a regularly scheduled shift and for which no pay is provided.[13]  Off-the-clock work is technically a type of minimum wage violation, but we chose to measure it separately in this study because it involves employees not being paid at all for time worked.  By law, employees must be paid for all of the hours they work, and therefore any work performed before or after official start and end times must be compensated in accordance with minimum wage laws.  In our survey, we asked workers whether they began work before their official shift was to begin or if they worked after their official ending time and, if so, whether or not they received payment for this time on the job.  If workers came in early and/or stayed late *and* were not paid at all for work they performed during those time periods, they had experienced an off-the-clock violation.

13

AR004694

Nearly one-quarter of workers surveyed (23 percent) stated that they had worked before and/or after their regular shifts in the previous work week. Of these "at risk" workers, 69 percent did not receive any pay at all for the work they performed outside of their regular shift. Respondents who experienced this violation typically worked an average of two hours per week without pay.

**Meal break violations**

Illinois law requires employers to provide workers an uninterrupted meal break during shifts of 7.5 hours or longer. The law does not require the employer to pay workers during the meal break, but if the employee works during the break, he or she must be compensated. We determined whether workers received all of their required meal breaks and if these breaks were of the required length.

Seventy-five percent of our respondents worked enough consecutive hours to be legally entitled to a meal break. However, as Table 3.1 indicates, 43 percent of these "at risk" workers experienced a meal break violation in the previous work week. Meal break violations took a variety of forms. One in six workers (17 percent) with this violation received no meal break at all at some point during the previous week, while 13 percent had a meal break that was shorter than required by law. Workers also reported being interrupted by their employer during their meal break (14 percent) and working during part of their meal break (17 percent).

**Other pay violations**

In addition to minimum wage, overtime, off-the-clock, and meal break violations, we collected data on several other pay-related violations. We asked workers if they had received a pay stub or other documentation of their earnings and deductions. According to Illinois law, all workers—regardless of whether they are paid in cash or by check—are required to receive documentation of their earnings and deductions. However, 45 percent of workers in our sample did not receive this mandatory documentation. We also asked about any deductions that were made during the previous work week. In Illinois, employers are generally not permitted to take deductions from a worker's pay for damage or loss, work-related tools, materials or transportation, or uniforms.[14] Among respondents who reported deductions from their pay, 44 percent were subjected to illegal deductions.

We also examined pay-related violations affecting tipped workers. Under Illinois law, there is a special provision for workers who receive tips as a regular part of their wages. In addition to the tips they receive from customers, tipped workers must be paid at least a minimum base wage by their employer for the hours they work; however, this base wage is less than the

14

AR004695

minimum wage for non-tipped workers. We calculated the tipped minimum wage violation rate by comparing each tipped worker's base wage to the legally required wage rate. Fourteen percent of workers in our sample received tips in the previous week. These tipped workers were employed in a variety of jobs, the most common being restaurant workers, carwash workers, housekeepers, and other personal service workers. Of these tipped workers, 15 percent experienced violations of the tipped worker minimum wage. It is also illegal for employers or managers to appropriate any portion of the tips given by customers in restaurants or other businesses where tips are customary. Nevertheless, 5 percent of tipped workers in our sample reported such "tip stealing" during the previous work week.

---

*Last year Evan worked in the restaurant industry as a waiter and experienced tip stealing. His employer stole tips from numerous paychecks. "I hated getting credit card tips because that's where she would take it," says Evan. "I calculated the percentage and I remember it was close to $50 to $100 dollars per paycheck."*

*"We actually confronted her about this at one point and she said that, when processing a credit card, there's usually a 2-3 percent fee that they pay. But she passed more than the fee on to us. I sat down with all of my credit card receipts at the end of the day, tallied it up, and was like 'well, this is more than 3 percent taken out of my paycheck for the month.' … I think it was close to 10 percent. There were no excuses for her to take money out of my paycheck."*

---

**Workplace violations during the last 12 months**

For all of the violation rates discussed so far, we calculated whether or not a violation occurred during the week prior to the interview, based on information collected about each worker's hours and earnings. In addition, we asked workers a series of questions about their experiences over the previous 12 months. The purpose of these questions was to measure the prevalence of workplace violations that occur relatively infrequently and thus might be missed by questions limited to a single work week.

Forty-five percent of respondents experienced at least one pay-related violation (off-the-clock work, late payment, being paid less than owed, or not being paid at all) in the 12-month period prior to their interview:

- 29 percent had worked off-the-clock without pay at least once in the last year. When workers experienced this violation, they did so frequently, on average 20 times in the last year.

- 23 percent of workers had been paid late at some point in the last year; on average, this group experienced four incidents of late payment over the year.

15

AR004696

- 17 percent of workers had been paid less than they were owed by their employers at least once in the last 12 months; on average, this took place four times for those who experienced such underpayment.

- 4 percent of workers in our sample were not paid at all for work they had performed at least once in the previous year; among these workers, nonpayment of wages occurred an average of two times in the last year.

**Illegal retaliation by employers**

The law protects workers from employer retaliation if they complain to their employer or to a government agency about their working conditions; retaliation against workers who attempt to organize a union is also illegal.[15] Threatening to fire a worker, actually firing or suspending workers, cutting hours or pay, harassing or abusing workers, or giving workers a worse work assignment—all are illegal forms of employer retaliation if they occur as a direct result of a complaint or union organizing effort.

We asked respondents whether they had made a complaint in the last year to their employer, to their supervisor or to a government agency. If they had, we then gathered information about the most recent complaint. If they had not complained, we asked if they had any problem(s) on the job and, if so, why they chose not to complain about the problem(s).

Overall, 25 percent of workers in our sample either made a complaint or attempted to form a union in the last year. Complaints were made regarding a number of workplace issues, including: dangerous working conditions (20 percent), not being paid for all hours worked (9 percent), being paid below the minimum wage (6 percent), not being paid on time (4 percent), and not being paid for overtime (1 percent). Of those workers who made a complaint, 35 percent reported experiencing retaliation from their employer or supervisor as a direct result of their most recent complaint or organizing effort. Figure 3.3 shows the various ways in which employers illegally retaliated against workers—including actions such as cutting workers' hours and pay, threatening to call immigration authorities, firing workers, and increasing workloads.

Despite the existence of legal protections from retaliation, many workers chose not to make complaints to their employers, even when they encountered substandard conditions in the workplace. In our sample, 15 percent of workers indicated that they did not make a complaint during the past 12 months even though they had experienced a serious problem such as dangerous working conditions, discrimination or not being paid the minimum wage. Over half (52 percent) of these workers indicated that they did not make a complaint because they were

AR004697

afraid of losing their job, 12 percent were afraid they would have their hours or wages cut, and 36 percent thought it would not make any difference if they complained. Fear of retaliation and expectations of employer indifference, then, figure strongly in workers' decisions about whether or not to make a complaint.



**Figure 3.3: Types of Illegal Retaliation by Employers***

Source: Authors' analysis of 2008 Unregulated Work Survey.
* Calculated only for workers who had experienced illegal retaliation for making a complaint or organizing a union during the year previous to the survey. Workers could report more than one type of retaliation.

## Workers' compensation

With very few exceptions, workers' compensation law stipulates that employers are obligated to carry workers' compensation insurance in order to cover costs incurred when an employee is injured or becomes sick on the job for work-related reasons. These costs include medical bills as well as wages lost due to time away from work because of the injury or illness.

AR004698

Fifteen percent of our respondents experienced a serious on-the-job injury[16] during the previous three years of work. For these workers, we gathered information about the most recent work-related injury, and about the employer's response to that injury, in order to determine whether a violation of workers' compensation law had occurred. We found that the workers' compensation system is very rarely used by our respondents. Only 9 percent of the workers in our sample who experienced a serious injury during the previous three years had filed a workers' compensation claim for their most recent injury. This finding clearly indicates that the workers' compensation system is not functioning as intended for front-line workers in the low-wage labor market.

The survey data suggest that employers frequently fail to observe the requirements of workers' compensation law when responding to on-the-job injuries. Fully 38 percent of seriously injured respondents reported that they were required to work despite their injury; an additional 25 percent said their employer refused to help them with the injury; 18 percent were fired shortly after the injury; 8 percent said their employer made them come into work and just sit there all day; 5 percent were threatened with deportation or notification of immigration authorities; and 2 percent were told by their employers not to file a workers' compensation claim. Only 8 percent of employers instructed injured workers to file a workers' compensation claim.

Not all of the employer responses to on-the-job injuries reported above are illegal. Table 3.1 shows workers' compensation violation rates, but only for illegal employer actions such as: firing or threatening to fire an injured worker, calling immigration authorities in response to an on-the-job injury of an unauthorized worker, or instructing an injured worker not to file for workers' compensation insurance.[17] Twenty percent of those respondents who suffered an injury in the past three years experienced a violation of workers' compensation law for their most recent injury.

We also gathered information on who paid for injured workers' medical expenses. Fifty-five percent of respondents who experienced a serious injury at work sought medical attention for that injury, but within this group, only 44 percent indicated that their employers paid for all or part of their medical bills. About half of the workers who sought medical attention after an on-the-job injury had to pay their bills out-of-pocket (41 percent) or used their health insurance to cover the expenses (8 percent). Workers' compensation insurance paid the medical expenses for only 3 percent of the workers in our sample who visited a doctor for an on-the-job injury or illness.

18

AR004699

*Ana worked for a cleaning company for five years, where she earned $8 an hour and was paid regular time when she worked overtime. Ana comments: "One time I worked for 22 hours in a row and I got paid only $120. My boss told me that was all he could give me." She is owed about $1,800 from bounced checks, plus wages she should have received if her employer had abided by overtime laws.*

*She was fired from her cleaning job after she developed carpal tunnel syndrome. Ana says the debilitating illness was caused by the strenuous work she had been doing: "I got carpal tunnel in my hands from the repetitive motion. My sister had to help me do everything during that time. I went to Cook County Hospital and I covered my medical expenses. But I couldn't afford to go to therapy. I'm lucky because I live with my sister—that is how I have been able to survive. I fell behind on my school payments, and now I even owe the IRS because my employer was not deducting money from my check."*

**Summary**

Front-line workers in Chicago and suburban Cook County frequently are paid below the minimum wage, not paid for overtime, work off-the-clock without pay, and have their meal breaks denied, interrupted or shortened. In fact, nearly half (47 percent) of the workers in our sample experienced at least one type of pay-related violation in their previous week of work.[18] More than one-quarter of the workers in our sample were paid less than the minimum wage for their previous work week, and among workers who worked more than 40 hours in their previous work week, more than two-thirds were not paid the legally required overtime rate. Our data also show that employer retaliation is common: among those workers in our sample who made complaints or attempted to organize a union, 35 percent experienced retaliation from their employer or supervisor. In addition, we found that the workers' compensation system is not functioning for workers in the low-wage labor market. The system is very seldom used by injured workers and (likely not unrelated) many employers either directly or indirectly discourage workers from filing claims. In short, the core workplace laws established during the last century are being regularly violated by employers in the low-wage labor market. In the rest of this report we explore these violations in more detail, examining the industries and occupations in which they most often are found, as well as the workers who are most affected.

AR004700

# 4.    The Role of Job and Employer Characteristics

Workplace violations ultimately are the result of decisions made by employers—whether to pay the minimum wage or overtime, whether to give workers meal breaks, or how to respond to complaints about working conditions.  For this reason, we explore some key characteristics of our respondents' employers in this section of the report, asking:  Which types of businesses tend to violate employment and labor laws the most?  Which occupations are hardest hit?  Do violation rates vary by the size of the business?  And are there specific employer practices that are associated with or enable workplace violations?  This section examines workplace violations through the lens of job and employer characteristics, analyzing differences in workplace violation rates by industry, occupation, company size, as well as by pay arrangement (Table 4.1).[19]

| Table 4.1: Workplace Violation Rates by Job and Employer Characteristics | | Percent of workers with violations | | | |
|---|---|---|---|---|---|
| | | Minimum wage violation rate | Overtime violation rate* | Off-the-clock violation rate* | Meal break violation rate* |
| **Pay Type** | Hourly | 16.4 | 58.5 | 60.0 | 35.3 |
| | Non-hourly | 53.1 | 82.1 | 91.0 | 64.6 |
| **Pay Method** | Cash | 42.5 | 70.1 | 70.8 | 54.1 |
| | Company check | 15.8 | 60.1 | 68.2 | 36.3 |
| **Company Size** | Less than 100 employees | 33.1 | 84.5 | 73.9 | 54.0 |
| | 100 employees or more | 15.5 | 52.0 | 64.3 | 29.1 |

Source: Authors' analysis of 2008 Unregulated Work Survey.
*Calculated as a percentage of all workers who were at risk for a violation during the previous work week.

**Minimum wage violations**

Minimum wage violation rates vary significantly by industry, as shown in Figure 4.1.[20] Violations were most common in private households and in personal and repair services, where more than 60 percent of workers were paid less than the minimum wage.  Other high violation industries include, retail and drug stores, social assistance and education, and grocery stores.[21]

AR004701



**Figure 4.1: Minimum Wage Violation Rates by Industry**

| Industry | Violation Rate |
|---|---|
| Private households | 61.3% |
| Personal & repair services | 60.1% |
| Retail & drug stores | 32.0% |
| Social assistance & education | 30.2% |
| Grocery stores | 25.9% |
| Home health care | 22.5% |
| Restaurants & hotels | 22.3% |
| Residential construction | 21.2% |
| Manufacturing, transportation & warehousing | 21.1% |
| Security, building & grounds services | 19.7% |
| Other (finance & other health care) | 5.8% |

Source: Authors' analysis of 2008 Unregulated Work Survey.

As Figure 4.2 shows, minimum wage violation rates also vary by occupation. Child care workers, many of whom work in private households, had a violation rate of 75 percent. Sixty percent of personal services and repair workers also had a minimum wage violation. Other high-violation occupations include, building services and grounds workers; cashiers, retail salespersons and tellers; and home healthcare workers.

21

AR004702



Figure 4.2: Minimum Wage Violation Rates by Occupation

| Occupation | Violation Rate |
|---|---|
| Child care workers | 74.6% |
| Personal & repair services workers | 60.1% |
| Building services & grounds workers | 35.8% |
| Cashiers, retail salespersons & tellers | 33.0% |
| Home health care workers | 29.8% |
| Cooks, dishwashers & food preparers | 24.7% |
| Stock & office clerks | 24.0% |
| General construction | 22.6% |
| Maids & housekeepers | 19.9% |
| Factory & packaging workers | 18.1% |
| Security guards | 8.2% |
| Waiters, cafeteria workers & bartenders | 2.4% |

Source: Authors' analysis of 2008 Unregulated Work Survey.

Although many employers in low-wage industries pay their workers a regular hourly wage, others use weekly, daily or other pay types.[22] Many workers are paid on a flat weekly basis, so that their pay does not increase with the number of hours they work. A prep cook, for example, might be paid $300 weekly and be expected to work between 35 and 50 hours each week, depending on how busy the restaurant is and how the manager schedules work shifts. Other workers are paid on a flat daily basis. In the residential construction industry, a day laborer might receive $80 for a day's work, regardless of the number of hours involved. In apparel and textile manufacturing, workers are often paid by the piece—for example, a garment worker might be paid seven cents for each shirt sleeve she sews. Overall, 74 percent of our sample was paid an hourly wage; of the remaining 26 percent, most were paid either a flat weekly or a flat daily amount.

AR004703

As Table 4.1 shows, workers in our sample who had non-hourly pay types had substantially higher minimum wage violation rates (53 percent) than those who were paid an hourly wage (16 percent). This is not surprising, since when employers use non-hourly pay types, workers' wages are only loosely tied to the number of hours they work and any increase in hours can result in wages falling below the legal minimum. In our sample, higher minimum wage violation rates for non-hourly workers are evident within (as well as across) industries and occupations.

Minimum wage violation rates also vary sharply depending on whether workers are paid in cash or by company check.[23] Although it is not illegal for employers to pay employees in cash, the law requires that employees be provided an itemized statement of earnings and deductions for each pay period. As noted in the previous section, 45 percent of workers in our sample did not receive the required statement from their employer—and among workers who were paid in cash, fully 94 percent did not receive such a statement. Without the transparency afforded by pay statements, workers often are unable to determine whether they have received the wages they are due. As Table 4.1 shows, workers who were paid in cash had nearly triple the minimum wage violation rate of those paid by company check (43 percent and 16 percent, respectively).

Pay type (hourly versus non-hourly) and pay method (cash versus company check) are related but not the same. One might expect that workers who were paid a regular hourly wage would generally be paid by company check, but nearly one-quarter of hourly workers in our sample were paid in cash. That said, when both pay type and pay method were nonstandard, minimum wage violations were especially high for workers in our sample. As Figure 4.3 shows, workers who were paid on an hourly basis and by company check had the lowest minimum wage violation rate, at 13 percent. By contrast non-hourly workers who were paid in cash had a violation rate over four times this level (60 percent).

Finally, company size has a significant relationship to minimum wage violation rates. As Table 4.1 shows, workers employed in companies with less than 100 employees had a violation rate more than double that of workers in larger companies (33 percent and 16 percent, respectively).

23

AR004704



Figure 4.3: Minimum Wage Violation Rates by Pay Arrangement

Violation Rate

- Worker paid hourly by company check: 13.3%
- Worker paid hourly in cash: 24.8%
- Worker paid non-hourly by company check: 28.8%
- Worker paid non-hourly by cash: 60.1%

Source: Authors' analysis of 2008 Unregulated Work Survey.

As a former restaurant and cleaning services employee, Mercedes has experienced wage theft numerous times. In both industries she worked long hours for little pay. Mercedes says: "I took my last job at a restaurant because I had a great economic need. The employer offered to pay me $300 for six days of work, working 12 hours every day. I worked from 11 a.m. to 11 p.m. At work we couldn't eat or we would have to eat standing, there was not time…there was too much work to be done." The employer also withheld three days of wages from Mercedes as a deposit when she began working, which she never recovered. "They never paid me the three days of work that they kept as deposit when I started working. They never paid me minimum wage or overtime. They owe me $10,000 not including the three days of deposit," she says.

Mercedes quit her job at the restaurant and found another job at a cleaning company. "At first, the guy in charge told me that there were no set wages, and that they divided the money they made equally among everyone in the team and that they paid monthly," says Mercedes. "I decided to give it a try because, again, I needed to work. The first time I got paid was for a week worth of work. I got paid $250 for nine days working 12 hours a day! I asked him about it and he tried to explain. He gave me some mumble-jumble that didn't make any sense. We agreed that from then on he was going to pay me $30 a day, and when we had fewer people in the team he would pay me $50. I worked 22 days and received $500. I was expecting at least $700. Although it doesn't sound like much, I need that money. I'm not making enough money to pay my bills right now, and I have debts to pay. All this time I've been turning to friends to borrow money to be able to pay rent."

AR004705

**Overtime violations**

Overtime violations can occur in a number of ways.[24]  Some employers only pay workers their regular hourly rate—or "straight time"—for overtime hours, rather than the time-and-a-half rate required by law.  Other employers fail to pay employees anything at all for their overtime hours.  For example, a full-time child care worker might be paid $400 a week to care for small children and to perform various light housekeeping duties.  She routinely may be expected to extend those hours beyond the 40-hour threshold when family members return home late, though her salary remains the same.  Still other employers may give workers small amounts of pay for overtime—say, an extra $20 for five additional hours on Saturday, after a full week's work.  As we saw in the previous section, 67 percent of respondents in our sample who worked more than 40 hours during the previous work week for a single employer did not get paid for overtime as required by law.  Figure 4.4 shows that overtime violation rates are high across all the industries in our sample, ranging from 52 percent in the grocery, retail, and drug store industry, to 89 percent for workers in the private household industry.



Figure 4.4:  Overtime Violation Rates by Industry*

Source: Authors' analysis of 2008 Unregulated Work Survey.

*Calculated as a percent of workers who worked more than 40 hours for a single employer during the previous work week.

25

AR004706

Figure 4.5 shows that overtime violation rates are high across all the occupations in our sample, but there also is substantial variation in violation rates. Rates are particularly high for child care workers and teacher assistants, with a violation rate of fully 92 percent among those who worked more than 40 hours during the previous work week.



**Figure 4.5: Overtime Violation Rates by Occupation***

Source: Authors' analysis of 2008 Unregulated Work Survey.

*Calculated as a percent of workers who worked more than 40 hours for a single employer during the previous work week.

Table 4.1 shows the relationship between pay type and overtime violations. As was the case for minimum wage violations, non-hourly workers in our sample experienced disproportionately high overtime violation rates. Among those who worked more than 40 hours during the previous work week for a single employer, 82 percent of non-hourly workers had an overtime pay violation. This high violation rate is not surprising, since flat weekly or flat daily pay rates, by definition, do not vary with hours worked. But hourly workers also face very high overtime violation rates: 59 percent were not paid or were underpaid for their overtime hours in the

26

AR004707

previous work week. Overtime violation rates also vary with company size. As Table 4.1 shows, front-line workers in companies with less than 100 employees had an overtime violation rate of 85 percent.[25] By contrast, workers in companies with 100 or more employees had a violation rate of 52 percent.

**Off-the-clock violations**

A large majority (69 percent) of workers in our sample who worked before and/or after their shift in the previous work week were not paid for that part of their working time. Figures 4.6 and 4.7 show these off-the-clock violation rates by industry and occupation.



**Figure 4.6: Off-the-clock Violation Rates by Industry***

Source: Authors' analysis of 2008 Unregulated Work Survey.
* Calculated as a percent of workers who worked before or after their official shift during the previous work week.

AR004708



**Figure 4.7:  Off-the-clock Violation Rates by Occupation***

| Occupation | Violation Rate |
|---|---|
| Cashiers, retail salespersons, tellers, stock & office clerks | 75.5% |
| Maids, housekeepers & home health care workers | 72.9% |
| Security, construction, and building services workers | 67.6% |
| Cooks, waiters, dishwashers & food preparers | 65.8% |
| Personal & repair services workers | 64.9% |

Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who worked before or after their official shift during the previous work week.

As Table 4.1 shows, workers with non-hourly pay type (such as flat daily or weekly pay) had higher off-the-clock pay violation rates than those paid by the hour.

> *Three years ago Eduardo joined the staff of a newly-opened restaurant on the North Side of Chicago.  He was offered a weekly pay rate of $750 and worked five days a week from 3 p.m. to midnight.   He was in charge of the kitchen and responsible for opening the restaurant.  Eduardo says: "Everything was going well at the beginning but after about eight months my checks began to bounce.  When we confronted the employer she would say 'I don't have money,' and she would ask us to wait until the next pay period.  And every time she would replace the check that had bounced but she kept on staying behind on the new payment.  She also began to pay us with personal checks and was no longer deducting taxes."*
>
> *He also accrued substantial amounts of off-the-clock time.  "I prepared the food and I even went shopping for the products with her (employer) at 7 or 8 a.m.  I didn't get paid for those hours.  My responsibilities and my hours increased.  … I was working 12 or 13 hours, seven days a week.  I didn't have any time for my family.  I felt bad because I didn't have money to take the kids out, or even to buy them shoes and winter jackets."*

AR004709

**Meal break violations**

Figures 4.8 and 4.9 show meal break violation rates by industry and occupation. Among respondents who worked enough hours to qualify for a meal break, 43 percent had their breaks denied, shortened or interrupted. Violation rates were especially high for workers in care-giving industries and occupations (private households and child care workers).



**Figure 4.8: Meal Break Violation Rates by Industry***

Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who were legally entitled to at least one meal break during the previous work week.

AR004710



**Figure 4.9: Meal Break Violation Rates by Occupation***

| Occupation | Violation Rate |
|---|---|
| Child care workers | 88.7% |
| Security guards | 64.0% |
| Waiters, cafeteria workers & bartenders | 63.0% |
| Home health care workers | 62.8% |
| Personal & repair services workers | 51.1% |
| Cooks, dishwashers & food preparers | 48.7% |
| Maids & housekeepers | 40.8% |
| Cashiers, retail salespersons & tellers | 36.0% |
| General construction | 26.1% |
| Stock & office clerks | 24.6% |
| Building services & grounds workers | 20.4% |
| Factory & packaging workers | 7.3% |

Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who were legally entitled to at least one meal break during the previous work week.

Finally, Table 4.1 shows that meal break violations rates vary by pay arrangement. Sixty-five percent of non-hourly workers and 54 percent of workers paid in cash reported a meal break violation.

Violation rates also vary by company size. Over half of those employed by companies with less than 100 workers had a meal break violation, compared with less than one third of those employed by larger companies.

**Summary**

Job and employer characteristics are strong determinants of workplace violations—and in fact, have a much greater impact on violation rates than do worker characteristics, as we will see in Section 6 below. Specifically:

AR004711

- Workplace violation rates vary significantly by industry and occupation.  For example, minimum wage violation rates ranged from as little as 6 percent in some industries to as much as 61 percent in others, and the range across occupations is similarly wide.

- Some industries and occupations are rife with multiple violations, suggesting that non-compliance with employment and labor laws may have become a standard business practice.  For example, over 60 percent of all personal and repair services workers in our sample had a minimum wage violation and 77 percent had an overtime violation.  High violation rates were also typical of the private household industry.

- Employers can disguise pay-related violations by using non-hourly pay arrangements and/or paying workers in cash without providing a statement of earnings and deductions.  Workers paid a flat weekly rate or paid in cash had much higher violation rates than those paid a standard hourly rate and paid by company check.  Informal pay systems may facilitate minimum wage and other violations, while making it harder for workers to claim their rights under the law.

- Workers employed by companies with less than 100 employees were at greater risk of experiencing violations than those employed by larger companies.  But the problem of workplace violations is by no means limited to small firms.  In our sample, nearly one out of six workers at large companies had a minimum wage violation in the previous week, and among those who worked overtime, over half were underpaid or not paid at all for the extra hours.

AR004712

# 5.   The Role of Worker Characteristics

Workplace violations are not evenly distributed throughout the low-wage labor market, as we have seen, but vary with industry, occupation and other job and employer characteristics. These variations have a demographic dimension as well.  Worker characteristics play a role in two important ways: some groups of workers are more likely to hold jobs in the low-wage labor market than others (e.g. women, immigrants and people of color), and within the low-wage labor market, some groups of workers are more likely to experience violations than others, as we will see in this section.  Specifically, we examine workplace violations in relation to gender, race/ethnicity, education, age and nativity; and among the foreign-born, by date of arrival in the U.S., English-language proficiency and immigration status.

**Minimum wage violations**

As Table 5.1 shows, minimum wage violation rates varied with race and ethnicity:  35 percent of black and 30 percent of Latino workers in our sample experienced minimum wage violations, compared to 5 percent of white respondents.  Nativity is also a salient factor here:  31 percent of foreign-born workers had minimum wage violations, compared to 20 percent for their U.S.-born counterparts.  We did not find statistically significant differences in minimum-wage violation rates between women and men.[26]

U.S.-born workers in our sample had lower minimum-wage violation rates than foreign-born workers.  But here too the story is more nuanced, as shown in Table 5.1.  For example, foreign-born Latinos had an especially high minimum-wage violation rate of 32 percent, nearly triple the rate of U.S.-born Latinos and more than 24 times the rate of U.S.-born whites.  And race plays an important role among U.S.-born respondents, where African-American workers had a violation rate 27 times that of white workers (and triple that of U.S.-born Latino workers).

Education plays an important role in predicting minimum wage violation rates.  Workers without a high-school degree or GED have violation rates that are significantly higher than those of workers with a high-school degree or who have attended college (see Table 5.1).  That said, higher education does not completely insulate workers from minimum wage violations.  In addition, violation rates are lower for workers who had vocational training.  This suggests that training and placement providers have been successful in placing workers into "better" jobs where labor standards are, in general, higher.

AR004713

| Table 5.1: Minimum Wage Violation Rates by Worker Characteristics | | | | |
|---|---|---|---|---|
| | | **Percent of workers with violations** | | |
| | | **All workers** | **U.S.-born** | **Foreign-born** |
| **All respondents** | | 25.5 | 20.3 | 30.8 |
| | | | | |
| **Gender** | Male | 18.8 | 17.7 | 20.0 |
| | Female | 28.1 | 22.3 | 34.0 |
| | | | | |
| **Race/ethnicity** | Latino/Latina | 30.0 | 11.8 | 31.8 |
| | Black | 34.7 | 34.8 | N/A |
| | Asian/other | 15.2 | 17.3 | N/A |
| | White | 4.5 | 1.3 | N/A |
| | | | | |
| **Education** | Less than high school, no GED | 37.7 | 28.1 | 47.4 |
| | High school graduate or GED | 21.5 | 20.5 | 22.5 |
| | Some college or higher | 13.3 | 12.4 | 14.2 |
| | | | | |
| **Age** | 18-25 | 27.2 | 24.5 | 29.9 |
| | 26-35 | 24.4 | 11.3 | 37.7 |
| | 36-45 | 21.8 | 18.8 | 24.9 |
| | 46+ | 24.7 | 23.9 | 25.6 |
| | | | | |
| **Vocational training** | None | 28.7 | 23.1 | 34.3 |
| | Completed training program | 18.0 | 16.0 | 19.9 |
| | | | | |
| **Job tenure** | Less than 3 years | 28.7 | 24.7 | 32.8 |
| | 3-4 years | 16.2 | 10.2 | 22.2 |
| | 5+ years | 20.5 | 11.4 | 29.7 |
| | | | | |
| **Foreign-born respondents** | | | | |
| | | | | |
| **Legal status** | Authorized | | | 28.9 |
| | Unauthorized | | | 38.1 |
| | | | | |
| **Years since arrival in the U.S.** | Less than 6 years | | | 28.0 |
| | 6+ years | | | 32.8 |
| | | | | |
| **English proficiency** | Speaks very well or well | | | 13.3 |
| | Speaks not well or not at all | | | 34.2 |

Source: Authors' analysis of 2008 Unregulated Work Survey.

N/A indicates that the data were insufficient to permit reliable estimates.

Immigrants who speak English "well" or "very well" (as self-reported) had significantly lower minimum wage violation rates than those who speak "not well" or "not at all" (see Table 5.1). Table 5.1 also shows that foreign-born respondents who had lived in the U.S. six or more years at the time of the survey had a minimum wage violation rate similar to that of newcomers.

Job tenure and age are often strong predictors of labor market outcomes, such as higher wages, benefits, promotions, and the like. But in our sample of workers, neither variable was a good predictor of violation rates (see Table 5.1).[27]

AR004714

**Overtime violations**

Overtime violations vary much less among demographic groups than do minimum wage violations.  For respondents who worked more than 40 hours for a single employer during the previous work week, the prevalence of overtime violations is very high across virtually all demographic groups, as Table 5.2 shows.

| Table 5.2:  Overtime Violation Rates by Worker Characteristics | | | |
|---|---|---|---|
| | **Percent of workers with violations*** | | |
| | **All workers** | **U.S.-born** | **Foreign-born** |
| **All respondents** | 67.1 | 61.4 | 72.9 |
| | | | |
| **Gender** | Male | 64.4 | 60.2 | 68.5 |
| | Female | 71.6 | 69.5 | 73.7 |
| | | | |
| **Race/ethnicity** | Latino/Latina | 68.8 | N/A | 69.3 |
| | Black | 58.7 | 58.8 | N/A |
| | Asian/other | N/A | N/A | N/A |
| | White | N/A | N/A | N/A |
| | | | |
| **Education** | Less than high school, no GED | 76.8 | 49.3 | 83.8 |
| | High school graduate or GED | 69.4 | 63.9 | 76.0 |
| | Some college or higher | 63.5 | 64.9 | 63.4 |
| | | | |
| **Age** | 18-25 | 54.9 | 53.8 | 56.1 |
| | 26-35 | 67.8 | 62.8 | 72.8 |
| | 36-45 | 67.1 | 62.8 | N/A |
| | 46+ | 73.5 | 71.9 | N/A |
| | | | |
| **Vocational training** | None | 64.4 | 57.6 | 71.2 |
| | Completed training program | 72.9 | 66.4 | N/A |
| | | | |
| **Job tenure** | Less than 3 years | 65.8 | 66.2 | 65.3 |
| | 3-4 years | 54.7 | 52.9 | N/A |
| | 5+ years | 73.2 | N/A | N/A |
| | | | |
| **Foreign-born respondents** | | | |
| | | | |
| **Legal status** | Authorized | | | 73.5 |
| | Unauthorized | | | 66.2 |
| | | | |
| **Years since arrival in the U.S.** | Less than 6 years | | | 75.2 |
| | 6+ years | | | 68.4 |
| | | | |
| **English proficiency** | Speaks very well or well | | | 67.2 |
| | Speaks not well or not at all | | | 73.8 |

Source:  Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who worked more than 40 hours for a single employer during the previous work week.

N/A indicates that the data were insufficient to permit reliable estimates.

34

AR004715

## Off-the-clock violations

The patterns for off-the-clock violations are similar to those for overtime, as Table 5.3 shows, with off-the-clock violation rates varying little across demographic groups.

| Table 5.3: Off-the-clock Violation Rates by Worker Characteristics | | | | |
|---|---|---|---|---|
| | | Percent of workers with violations* | | |
| | | All workers | U.S.-born | Foreign-born |
| **All respondents** | | 68.8 | 68.8 | 68.9 |
| | | | | |
| **Gender** | Male | 60.2 | 67.9 | 52.4 |
| | Female | 69.2 | 69.4 | 69.0 |
| | | | | |
| **Race/ethnicity** | Latino/Latina | 68.2 | N/A | N/A |
| | Black | 75.5 | N/A | N/A |
| | Asian/other | N/A | N/A | N/A |
| | White | N/A | N/A | N/A |
| | | | | |
| **Education** | Less than high school, no GED | 79.9 | 85.7 | 73.9 |
| | High school graduate or GED | 56.9 | 52.9 | 61.0 |
| | Some college or higher | 75.4 | 74.9 | 75.9 |
| | | | | |
| **Age** | 18-25 | 53.3 | 68.0 | 38.5 |
| | 26-35 | 61.2 | 43.1 | 79.5 |
| | 36-45 | 72.3 | 82.9 | N/A |
| | 46+ | 76.5 | 87.9 | N/A |
| | | | | |
| **Vocational training** | None | 68.0 | 67.1 | 68.9 |
| | Completed training program | 70.1 | 70.5 | 68.3 |
| | | | | |
| **Job tenure** | Less than 3 years | 64.7 | 70.4 | 58.9 |
| | 3-4 years | 84.3 | 80.7 | N/A |
| | 5+ years | 73.3 | N/A | N/A |
| | | | | |
| **Foreign-born respondents** | | | | |
| | | | | |
| **Legal status** | Authorized | | | 71.2 |
| | Unauthorized | | | 59.9 |
| | | | | |
| **Years since arrival in the U.S.** | Less than 6 years | | | 65.6 |
| | 6+ years | | | 72.0 |
| | | | | |
| **English proficiency** | Speaks very well or well | | | 57.7 |
| | Speaks not well or not at all | | | 72.4 |

Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who worked before or after their official shift during the previous work week.

N/A indicates that the data were insufficient to permit reliable estimates.

AR004716

**Meal break violations**

Meal break violations also show very limited variation across demographic categories. Meal break violation rates were higher for whites than for Latinos, and for unauthorized immigrant workers than for authorized immigrant workers, as Table 5.4 shows. There were no other statistically significant differences among demographic groups for this violation.

| Table 5.4: Meal Break Violation Rates by Worker Characteristics | | | | |
|---|---|---|---|---|
| | | Percent of workers with violations* | | |
| | | All workers | U.S.-born | Foreign-born |
| **All respondents** | | 43.0 | 47.6 | 38.3 |
| | | | | |
| **Gender** | Male | 38.7 | 42.3 | 35.0 |
| | Female | 47.5 | 55.1 | 39.7 |
| | | | | |
| **Race/ethnicity** | Latino/Latina | 35.1 | N/A | N/A |
| | Black | 43.1 | N/A | N/A |
| | Asian/other | 36.7 | N/A | N/A |
| | White | 64.4 | N/A | N/A |
| | | | | |
| **Education** | Less than high school, no GED | 46.7 | 54.1 | 39.3 |
| | High school graduate or GED | 48.4 | 52.9 | 43.8 |
| | Some college or higher | 35.7 | 39.1 | 32.3 |
| | | | | |
| **Age** | 18-25 | 42.4 | 49.0 | 35.8 |
| | 26-35 | 51.8 | 63.3 | 40.2 |
| | 36-45 | 38.4 | 39.7 | 37.2 |
| | 46+ | 36.1 | 33.8 | 38.4 |
| | | | | |
| **Vocational training** | None | 45.4 | 50.0 | 40.8 |
| | Completed training program | 38.0 | 43.2 | 32.7 |
| | | | | |
| **Job tenure** | Less than 3 years | 44.2 | 50.1 | 38.1 |
| | 3-4 years | 47.6 | 47.3 | 48.0 |
| | 5+ years | 37.1 | 37.0 | 37.3 |
| | | | | |
| **Foreign-born respondents** | | | | |
| | | | | |
| **Legal status** | Authorized | | | 53.6 |
| | Unauthorized | | | 25.8 |
| | | | | |
| **Years since arrival in the U.S.** | Less than 6 years | | | 28.9 |
| | 6+ years | | | N/A |
| | | | | |
| **English proficiency** | Speaks very well or well | | | 50.2 |
| | Speaks not well or not at all | | | 34.9 |

Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who were legally entitled to at least one meal break during the previous work week.
N/A indicates that the data were insufficient to permit reliable estimates.

AR004717

**Summary**

Nativity, race and ethnicity each play a role in shaping the patterns of workplace violations reported here. But these dimensions are deeply intertwined, and need to be examined together in order to understand which groups of workers are most at risk of a violation.

- Foreign-born workers were more likely than their U.S.-born counterparts to have a minimum-wage violation.

- Among U.S.-born workers, there was a significant difference by race: the violation rate for African-American workers was triple that of their Latino counterparts and 27 times that of their white counterparts (who had by far the lowest violation rates in the sample).

- Higher levels of education and proficiency in English (for immigrants) were each associated with lower minimum-wage violation rates. That said, even college-educated workers and those who had been with their employers for five or more years were still at significant risk of a violation.

- Two factors had a surprisingly weak impact on violation rates: the worker's age and, for immigrants, number of years in the U.S.

- In contrast to minimum wage violations, overtime, off-the-clock, and meal break violations varied little across the various demographic categories.

AR004718

# 6.   Wage Theft in Chicago

In this report, we have documented that violations of core employment and labor laws are pervasive in Chicago and suburban Cook County.  Minimum wage, overtime, meal break and other violations are not confined to the periphery of the economy or to marginal employers.  On the contrary, violations are prevalent in key industries and occupations that are at the heart of Chicago's regional economy.

**Assessing the role of job and worker characteristics**

As we have seen, a range of job and worker characteristics are correlated with workplace violations.  Further analysis (see Appendix A for details) reveals that job and worker characteristics have *independent effects* on the violations we have documented in this report.  Both matter, but they are not of equal importance.  In the low-wage industries examined here, job and employer characteristics are far more powerful predictors of violation rates than are worker characteristics—especially when it comes to minimum wage, overtime and meal break violations.  Our findings suggest that employers' business strategies shape their decisions about whether or not to comply with the law.

**The high cost of workplace violations**

The extensive violations of employment and labor laws documented in this report directly impact the earnings of low-wage workers.  The various forms of nonpayment and underpayment of wages take a heavy monetary toll on these workers and their families.  For the workers in our sample who experienced a pay-based violation in the previous week, the average amount of lost wages was $50, out of average weekly earnings of $322.  That amounts to wage theft of 16 percent.  Assuming a full-year work schedule, we estimate that these workers lost an average of $2,595 annually due to workplace violations, out of total annual earnings of just $16,753.

Furthermore, we estimate that in a given week, approximately 146,300 workers in Chicago and suburban Cook County experience at least one pay-based violation.  Extrapolating from this figure, front-line workers in low-wage industries lose more than $7.3 million *per week* as a result of employment and labor law violations.  The largest portion of these lost wages is due to minimum wage violations (71 percent), followed by overtime violations (16 percent), and off-the-clock violations (9 percent).

AR004719

Wage theft not only depresses the already meager earnings of low-wage workers, it also adversely impacts their communities and the local economies of which they are part. Low-income families spend the large majority of their earnings on basic necessities, such as food, clothing and housing. Their expenditures circulate through local economies, supporting businesses and jobs. Wage theft robs local communities of this spending, and ultimately limits economic growth.

> *Ramon and his son work in the construction industry. Last summer they worked for a contractor who offered an hourly rate of $25 to Ramon and $14 to his son. After the first two weeks of work, they received payment only after demanding it. However, the contractor refused to pay for the following two weeks of work. Ramon and his son are owed $3,550.*
>
> *This is not the only incident of wage theft that Ramon and his son have experienced. A few months later, they worked for a different employer who failed to pay them $800 for work completed. Both employers cited family illness as the reason for non-payment.*
>
> *"We feel like thirsty people begging for water. We need that money so badly," says Ramon. "Everything is so difficult these days; everything has been affected at home. We eat only because our daughter (who had to quit school) is working. They should not employ workers if they know that they are in a bad situation or can't pay … [but] they know they can get away with it."*

> *Jim works in the construction industry. He has been trying to recover wages for a job he completed last year. Although he worked from March through September, his employer refused to pay him for his last month of work. "He was late for the first payment but then he was paying on time. It wasn't until the last month that he decided not to pay," comments Jim. "I asked him to give me at least enough money to pay rent." The employer sent him a partial payment, only $500 out of $2,100 that he was owed. Jim has yet to recover the remaining $1,600.*
>
> *Jim filed a lawsuit against the employer and is waiting for a decision on the case. Jim is not optimistic that he'll be able to recover the money and doesn't know what to do if the court doesn't help. "This is not an isolated case (of wage theft). I hear stories from the workers everyday," says Jim.*
>
> *Jim's two children, ages 3 and 13, live in the Ukraine with his parents. They rely on Jim and his wife, for financial help, but extra money is scarce these days. Because of his financial needs, Jim continues to go to a day labor corner everyday hoping to be picked up for work. "That's life. You don't know what is going to happen to you. One day you can fall of the ladder. I can only hope for the best," he says.*

AR004720

# 7.  Strengthening worker protections

This report exposes a world of work in which the core protections that many Americans take for granted—the right to be paid at least the minimum wage, the right to be paid for overtime hours, the right to take meal breaks, access to workers' compensation when injured, the right to advocate for better working conditions—are failing significant numbers of workers.  The sheer breadth of the problem, spanning key industries, as well as its profound impact on workers, entailing significant economic hardship, demands urgent attention and action.

What, then, can be done?  Our starting point is that everyone has a stake in addressing the problem of workplace violations.  When low-wage workers and their families struggle in poverty and face constant economic insecurity, the strength and resilience of local communities suffers.  When responsible employers are forced to compete with unscrupulous employers who violate core workplace laws by paying subminimum wages or cost-cutting on worker safety, the result is a race to the bottom that threatens to bring down standards throughout the labor market.  And when significant numbers of workers are illegally underpaid, tax revenues are lost to the wider community.

In short, public policy has a fundamental role to play in protecting the rights of workers.  Drawing on our own study as well as research and policy analysis by other organizations working in this area, we have identified three key principles that should drive the development of a strong policy agenda at the federal, state and local levels.[28]

## 1.  Strengthen Government Enforcement of Employment and Labor Laws

Government enforcement is the cornerstone of any viable response to workplace violations.  Policymakers must recognize the significant resources that reside with the various agencies responsible for enforcing wage and hour, health and safety, prevailing wage, anti-discrimination, and right-to-organize laws.  Tapping the often unrealized potential of these agencies will require additional funding to increase staffing, but even more important, a new set of strategies to address the reality that workplace violations are becoming standard practice in many low-wage industries.[29]  Government enforcement agencies should:

- ❑ **Move toward proactive, "investigation-driven" enforcement in low-wage industries, rather than simply reacting to complaints.** This means identifying industries where violations are systemic, conducting strategic, repeated and well-publicized workplace

AR004721

audits, and cracking down on employers who are repeat offenders as well as those who misclassify their workers. The goal should be to send industry-wide signals that the government will pursue violations, and that the likelihood of inspection is tangible. Data such as those contained in this report on the industries and occupations most at risk of violations can help agencies in targeting their proactive enforcement efforts.[30]

❑ **Increase the reach and effectiveness of enforcement by partnering with immigrant worker centers, labor unions, social service providers, legal advocates and, where possible, responsible employers.[31]** Government alone will never have enough staff and resources to monitor every workplace in the country on a regular basis. Community partnerships can provide the vital information about where workplace violations are most concentrated, as exemplified by recent innovative state-level collaborations with community organizations.[32]

❑ **Restore funding levels for enforcement agencies to increase the number of investigators and other staff.** Between 1980 and 2007, the number of inspectors enforcing federal minimum wage and overtime laws declined by 31 percent, even as the labor force grew by 52 percent.[33] Similarly, the budget of the U.S. Occupational Safety and Health Administration has been cut by $25 million in real dollar terms between 2001 and 2007; at its current staffing and inspection levels, it would take the agency 133 years to inspect each workplace just once.[34] While the U.S Department of Labor has recently added investigator staff, significantly more are needed to match the growth in the number of workplaces that has occurred over the past several decades. The State of Illinois, too, should increase its funding to the Illinois Department of Labor so that the agency can expand its enforcement efforts in high-violation industries.

❑ **Strengthen penalties for violations.** Currently, penalties for many workplace violations are so modest that they fail to deter many employers. For example, the savings to employers from paying their workers less than the minimum wage often outweighs the costs, even for those few who are apprehended. Enforcement agencies therefore need to fully pursue existing penalties for violations of wage and hour laws, health and safety regulations, and other established legal standards. But even more important, those penalties require significant strengthening and updating, to better ensure compliance and more effective deterrence.

AR004722

## 2. Update Legal Standards for the 21st Century Workplace

Strong enforcement is important, but so are strong legal standards that recognize the changing organization of work in the United States. Specifically, changes are needed on three fronts:

- ❑ **Strengthen legal standards.** The strength of laws and the strength of their enforcement are deeply intertwined: weak employment and labor laws send the wrong signal, opening the door to low-road business strategies to cut labor costs by violating employment and labor laws. When the bar is set too low, employers have little or no incentive to comply. Raising the minimum wage, updating health and safety standards, expanding overtime coverage, and strengthening the right of workers to organize through labor law reform—all are key improvements that will raise compliance in the workplace and improve the competitive position of employers who play by the rules.

- ❑ **Close coverage gaps.** Some employers exploit historical "coverage gaps" that exclude certain categories of workers from protection; these gaps must be closed once and for all. For example, home health care and domestic workers are not fully covered by employment and labor laws.

- ❑ **Hold employers responsible for their workers.** Employment and labor laws must be updated when unscrupulous employers devise new strategies for evading their legal obligations—such as misclassifying workers as independent contractors and subcontracting work to fly-by-night operators who break the law. The principle should be that employers are responsible for the workplace standards they control, whether directly or indirectly.

## 3. Establish Equal Status for Immigrants in the Workplace

The best inoculation against workplace violations is workers who know their rights, have full status under the law to assert them, have access to sufficient legal resources, and do not fear exposure or retaliation when bringing claims against their employers. Achieving this is always a substantial challenge, but for unauthorized immigrant workers, it can be a near impossibility. While in theory, unauthorized immigrants are covered by most employment and labor laws, in practice, they are effectively disenfranchised in the workplace, by the lack of legal status, fear of deportation, and the willingness of all too many employers to exploit their vulnerability. The result is the high prevalence of workplace violations among unauthorized immigrants that we

42

AR004723

document in this report.  Any policy initiative to reduce workplace violations must therefore act on two fronts:

- ❑ **Prioritize equal protection and equal status in national immigration reform.**
  Immigration reform legislation without close attention to labor market impacts and workers' rights threatens to push more workers into the informal economy, leading to greater insecurity for immigrant families and less economic integration.  A guiding principle for reform must be that immigrant workers receive equal protection and equal status in the workplace.  Any immigration reform that creates a second class of workers will only worsen the problems exposed in this report, ultimately hurting all U.S. workers.

- ❑ **Ensure status-blind enforcement of employment and labor laws by maintaining a strong firewall between workplace and immigration inspections.**  Agencies enforcing minimum wage, prevailing wage, overtime, and other workplace laws can and should create a firewall between themselves and immigration authorities, so that workers do not fear deportation when bringing a wage claim or workplace grievance.  Without this protection, unauthorized workers will be driven further underground, too fearful to claim their rights to workplace protections.

■ ■ ■

Government enforcement is only part of the solution.  Just as important is that public policy helps to foster the efforts of immigrant worker centers and unions to represent and organize low-wage workers, enhances the capacity of legal services organizations to support workers in claiming their rights, and facilitates the efforts of private attorneys to advance strategic litigation.  Public policies also need to support responsible employers.  Above all, strong, vibrant employment and labor laws must be integrated into the broader policy agenda to rebuild good jobs and economic opportunity in 21st century America.

AR004724

*A group of six workers who performed electrical work for a single-room-occupancy hotel were denied wages for the hours they worked (both regular and overtime hours). The workers were owed back pay for between six to 13 weeks of work. The project they worked on included public financing. Not only were they underpaid, but the workers were also not provided proper health and safety information or training. In addition, the workers were told to report to city inspectors that they were unionized, when, in fact, they were not. The workers joined ARISE Chicago! (a worker center) and arranged a series of meetings with city and state officials as well as the project's general contractor. The workers' testimony, along with the assistance of ARISE Chicago!, pressured the contractor to pay the wages and they recovered over $21,000 in unpaid wages.*

44

AR004725

# Appendix A:  Data and Methods

An exhaustive, in-depth technical report describing the methods used in this study is available upon request from the authors.  In this appendix we give a non-technical overview of our survey methodology.

**Defining the survey population**

Our goal in this study was to survey workers in low-wage industries in Cook County.[35]  More precisely, in order to be included in our study, workers had to be:

a.  age 18 or older, and currently working for an employer within the limits of Cook County (Chicago);

b.  "front-line" workers, i.e. not managers, professionals or technical workers (many of these groups are not covered by key laws such as those regarding minimum wage and overtime); and

c.  working in a low-wage industry as their primary job.

To determine which industries to include in our sampling universe, we used an analysis of the 2006 Current Population Survey (CPS) conducted by the Center for Economic Policy Research, to identify the median hourly wage for all workers age 18 or older who were not self-employed. In Chicago the median was $14.85 (in 2006 dollars).  We then defined "low-wage industries" as those whose median wage for front-line workers was less than 85 percent of the median wage, which corresponded to an hourly wage of $12.62 (in 2006 dollars).  This 85 percent threshold is one of several commonly used measures used to identify low-wage industries or jobs.[36]

The sample size used in the CPS is too small to allow estimates of median wages at the detailed industry level.  We therefore used 2000 Census data to generate a list of industries that fell below 85 percent of the median hourly wage; the resulting industry and occupation distribution for our sample is shown in Table 2.1.

**Sampling methodology**

As described in Section 2, standard surveying techniques, such as phone interviews or Census-style door-to-door interviews, rarely are able to fully capture the population that we are most interested in:  low-wage workers who may be hard to identify from official databases, who may be vulnerable because of their immigration status, or who are reluctant to take part in a survey because they fear retaliation from their employers.  Trust is also an issue when asking for the

45

AR004726

details about a worker's job, the wages they receive, whether they are paid off the books or not, and their personal background.

In light of these difficulties, we adopted an innovative sampling method that operates through respondents' own social networks. All of the workers in the low-wage worker population have friends, family, or co-workers that they come into regular contact with and rely on for support; thus our approach relied on a system in which survey respondents recruited people they already knew into the survey, a recruitment technique known as chain-referral sampling. The best known sampling method using this form of recruitment is snowball sampling, an approach that yields only convenience samples which are not representative of the target population. Snowball sampling cannot replicate the desirable properties of probability sampling methods that allow one to make inferences about the population based on sample data. This method therefore would not have fulfilled the aims of our study. To overcome this limitation, we adopted a newer form of chain-referral sampling, developed by co-author Douglas Heckathorn in the late 1990s.[37] This method was subsequently further developed in collaboration with other scholars. Called *Respondent-Driven Sampling* (RDS), it is based on a mathematical model of the social networks that connect survey respondents. Since some individuals or groups tend to have more social connections than others, they are more likely to be recruited into a survey. To make the results of an RDS-based survey representative of the whole population (and not just workers with large social networks), we weighted our data based on respondents' social network size—that is, based on their probability of being captured by our survey technique—as well as other features of the network which can affect the sampling process.

In addition, RDS features an important difference from snowball and other traditional chain-referral methods: it employs a dual-incentive structure. This approach involves compensating respondents not only for the time they spend responding to the survey, but also for each eligible population member they recruit into the sample. To increase the breadth of the social network captured by the sample (and to prevent a cottage industry of survey recruitment), the number of recruitments that each respondent can make is limited through a coupon-based quota system.

Our RDS survey began with an initial set of population members to be surveyed, which we located through our contacts in Cook County. These "seeds" were then given a fixed number of uniquely numbered dollar-bill sized coupons to pass on to other eligible population members. These recruits then brought the coupons to one of several survey sites, where the number on the coupon was recorded, the recruit was surveyed, and then the respondent was given a fixed number of coupons with which to recruit other workers.[38] This process was repeated over a

AR004727

period of several months, yielding large numbers of respondents (see Table A.1).  As the recruitment progressed, the sample became increasingly diverse, eventually becoming independent of the initial sample of "seeds."

| Table A.1: Summary of Survey Fielding | |
|---|---|
| | **Chicago** |
| Fielding period | January—June 2008 |
| Number of sites | 6 |
| Number of interviewers, translators and researchers on staff | 18 |
| Monetary incentive for being surveyed | $30 |
| Number of valid surveys completed | 1,140 |

Source: Authors' analysis of 2008 Unregulated Work Survey.

An important part of the RDS method is clearly communicating to recruiters which types of workers are eligible for the survey.  We converted the list of industries being sampled into simple job titles to use as criteria for recruitment into the survey.  This information was communicated to respondents with flyers in multiple languages that included drawings of the target jobs that were distributed to all recruiters along with their coupons.

**Respondent-driven sampling in the field**

The research team identified interview sites that were well recognized and welcoming to low-wage workers.  Our sites included spaces in community-based organizations, churches, and a university—spaces that offered privacy and anonymity to workers.  As shown in Table A.1, Chicago entered the field in January 2008 and exited at the end of June 2008.  This was a firm deadline since Illinois increased its state minimum wage on July 1, 2008; we wanted to avoid having our survey straddle a minimum wage increase, since many of our core violation measures are linked to that legal standard.  We completed 1,140 surveys.

**Post-stratification adjustments to the data**

One feature of the RDS methodology is the ability to conduct detailed tracking of recruitment patterns throughout the entire sampling period, in order to identify and adjust for deviations from pure random recruitment from respondents' social networks.  For example, recruitment might be driven by strong social identities, such as race, ethnicity or age, so that respondents recruit disproportionately within their own group.  The RDS methodology anticipates that personal networks are not randomly distributed, and therefore adjusts for small to moderate levels of network clustering (people having ties to others like them), in the form of post-sampling weights.  For example, if the sample contained more members of a given group than

47

AR004728

would be expected under purely random sampling, then cases in that group are given less weight in analyses of the data. However, if network clustering becomes pronounced on one or more dimensions, then it is necessary to use additional, external sources of data in order to weight the final sample to be representative of the intended population.

In our study, we identified high levels of non-random recruitment among several racial/ethnic groups, as well as between US-born and foreign-born workers. (We did not find high levels of non-random recruitment on other dimensions, such as the workers' industry and occupation, employer, or most important, the experience of workplace violations.) This meant that RDS generated representative samples *within* the various race/ethnic/nativity groups, but not across the sampling universe as a whole – in effect, our study generated multiple sub-samples. To address this problem, we generated RDS violation rate estimates within each of the sub-samples (which are representative), and then recombined them using a weighting system based on estimates of the relative sizes of the race/ethnic/nativity groups in order to generate an overall estimate. Specifically, we adjusted the sample to match the racial/ethnic and nativity distribution of the 2007 American Community Survey (ACS), with one modification.[39] Since standard government surveys tend to undersample unauthorized immigrants,[40] we developed an adjustment to the ACS race/ethnicity/nativity distribution drawing on estimates of the number of unauthorized workers in Illinois in 2005.[41] These adjustments, combined with the success of the RDS methodology in capturing hard-to-reach populations, are designed to ensure that our sample is representative of front-line workers in low-wage industries in Chicago and suburban Cook County. Such post-stratification adjustments are standard in complex social surveys; all surveys are subject to sampling error, and thus are almost universally adjusted using demographic distributions generated by the Census or other large surveys. This is a mechanism to enable the extra information available in supplementary surveys (in our case the ACS) to be incorporated in the estimates, improving accuracy.

In Table A.2, we summarize our estimates of the number of workers that our sample represents—approximately 310,205 workers, or roughly 25 percent of the front-line labor force, and 12 percent of all workers in Cook County.

| Table A.2: City Profile | |
|---|---|
| | **Chicago** |
| Estimated number of front-line workers in low-wage industries | 310,205 |
| Percentage of all front-line workers | 25.1 |
| Percentage of all workers | 12.2 |

Source: Authors' analysis of 2008 Unregulated Work Survey.

AR004729

**Modeling the impact of worker and job characteristics on violation rates**

In Section 6, we discussed the relative importance of job/employer characteristics compared to worker characteristics in accounting for the overall variation in workplace violation rates. That discussion is based on a series of logistic regression models we used to estimate the effects of selected independent variables on minimum wage, overtime, off-the-clock, and meal break violation rates. Specifically, we considered two sets of independent variables. The job characteristics group consisted of industry, occupation, pay arrangement, company size, whether or not the employer was a temp agency, and whether or not the worker belonged to a union. The worker characteristics group consisted of gender, race, nativity, documentation status, education, age, job tenure, and whether or not the worker had received vocational training.

Our strategy was to estimate (a) the unique contribution of the group of job characteristics variables, above and beyond the impact of worker characteristics, and (b) the unique contribution of the group of worker characteristics variables, above and beyond the job characteristics. Both groups of variables were generally significant.[42] But the strength of their impact differed substantially. Job characteristics were 3.0 times stronger than worker characteristics in predicting minimum wage violation rates; 4.6 times stronger in predicting overtime violation rates; 1.9 times stronger in predicting off-the-clock violation rates; and 4.2 times stronger in predicting meal break violation rates.[43]

49

AR004730

# References

American Federation of Labor-Congress of Industrial Organizations-Safety and Health Office. 2007. *Death on the Job: The Toll of Neglect—A National and State-by-State Profile of Worker Safety and Health in the United States*. Washington, DC: AFL-CIO. Found at: http://www.aflcio.org/issues/safety/memorial/doj_2007.cfm.

Asian American Legal Defense and Education Fund and YKASEC. 2006. *"Forgotten Workers": A Study of Low-Wage Korean Immigrant Workers in the Metropolitan New York Area*. New York: AALDEF and YKASEC. Found at: http://www.aaldef.org/docs/KWP_2006WorkerSurvey_analysis.pdf.

Associated Press. 2009. "States Address Immigrant Wage Theft." *CBS News,* December 17, 2009.  Found at: http://www.cbsnews.com/stories/2009/12/17/national/main5989497.shtml

Associated Press. 2010.  "Workers Reach Agreement with Chicago Grocery Store Owner on Wage Theft Claims." *WGNTV,* March 16, 2010.  Found at: http://www.wgntv.com/news/sns-ap-il--immigrants-wagetheft,0,2404381.story

Bernhardt, Annette, Heather Boushey, Laura Dresser and Chris Tilly, eds. 2008. *The Gloves-off Economy: Workplace Standards at the Bottom of America's Labor Market.* Ithaca, NY: Cornell University Press.

Bernhardt, Annette, Siobhán McGrath and James DeFilippis. 2007. *Unregulated Work in the Global City:  Employment and Labor Law Violations in New York City.*  New York: Brennan Center for Justice at New York University School of Law.

Annette Bernhardt, Ruth Milkman, Nik Theodore, Douglas Heckathorn, Mirabai Auer, James DeFilippis, Ana Luz González, Victor Narro, Jason Perelstheyn, Diana Polson, and Michael Spiller.  2009.  *Broken Laws, Unprotected Workers:  Violations of Employment and Labor Laws in America's Cities.* Center for Urban Economic Development, University of Illinois at Chicago; National Employment Law Project; and Institute for Research on Labor and Employment, UCLA. Found at: www.unprotectedworkers.org

Bobo, Kim. 2008. *Wage Theft in America: Why Millions of Working Americans Are Not Getting Paid - And What We Can Do About It*. New York: The New Press.

Cordero-Guzmán, Hector R., Robert C.  Smith and Ramon Grosfoguel, eds. 2001. *Migration, Transnationalization, and Race in a Changing New York*. Philadelphia: Temple University Press.

Domestic Workers United & Datacenter. 2006. *Home Is Where The Work Is: Inside New York's Domestic Work Industry*. New York: Domestic Workers United & Datacenter.

AR004731

Fine, Janice. 2006. *Workers Center: Organizing Communities at the Edge of the Dream*. Ithaca, NY: Cornell University Press.

Fiscal Policy Institute. 2007. *The Underground Economy in the New York City Affordable Housing Construction Industry: Its Fiscal and Economic Costs*. New York: Fiscal Policy Institute.

Flaming, Daniel, Brent Haydamack and Pascale Joassart. 2005. *Hopeful Workers, Marginal Jobs: LA's Off-The-Books Labor Force*. Los Angeles: Economic Roundtable. Found at: http://www.economicrt.org/summaries/hopeful_workers_marginal_jobs_synopsis.htm.

Freeman, Richard B. and Ronald Schettkat. 2000. "Low Wage Services: Interpreting the US-German Difference." National Bureau of Economic Research Working Paper No. 7611, 2000. Found at: http://www.nber.org/papers/w7611.

Gordon, Jennifer. 2005. *Suburban Sweatshops: The Fight for Immigrant Rights*. Cambridge, MA: The Belknap Press of Harvard University Press.

Greenhouse, Steven. 2008. *The Big Squeeze: Tough Times for the American Worker*. New York: Alfred A. Knopf.

Greenhouse, Steven and Stephanie Rosenbloom. 2008. "Wal-Mart Settles 63 Lawsuits Over Wages." *New York Times*, December 23, 2008, Business section. Found at: http://www.nytimes.com/2008/12/24/business/24walmart.html.

Hale, Angela and Jane Wills, eds. 2005. *Threads of Labour: Garment Industry Supply Chains from the Workers' Perspective*. London: Blackwell.

Heckathorn, Douglas D. 1997. "Respondent-Driven Sampling: A New Approach to the Study of Hidden Populations." *Social Problems* 44(2):174-199.

---. 2002. "Respondent-Driven Sampling II: Deriving Valid Population Estimates from Chain-Referral Samples of Hidden Populations." *Social Problems* 49(1):11-34.

---. 2007. "Extensions of Respondent-Driven Sampling: Analyzing Continuous Variables and Controlling for Differential Recruitment," *Sociological Methodology* 37(1):151-207.

Hondagneu-Sotelo, Pierrette. 2001. *Doméstica: Immigrant Workers Cleaning and Caring in the Shadows of Affluence*. Berkeley and Los Angeles: University of California Press.

Hoefer, Michael, Nancy Rytina and Bryan Baker. 2008. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2007." Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security. Found at: http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2007.pdf.

AR004732

Illinois Circuit Court. 2009. *Notice of Certification of Class, Proposed Settlement, Preliminary Court Approval of Settlement, and Hearing Date for Final Court Approval.* March 5, 2009. Found at: http://staffingnetworksettlement.com/uploads/10126_WEB_COMPLETE_NOTICE.pdf.

Jayaraman, Sarumathi and Immanuel Ness, eds. 2005. *The New Immigrant Workforce: Innovative Models for Labor Organizing*. Armonk, NY: M.E. Sharpe.

Levin, Rebekah and Robert Ginsburg. 2000. *Sweatshops in Chicago: A Survey of Working Conditions in Low-Income and Immigrant Communities*. Chicago: Center for Impact Research Sweatshop Working Group.

Make the Road by Walking and Retail, Wholesale and Department Store Union. 2005. *Street of Shame: Retail Stores on Knickerbocker Avenue*. New York: Department Store Union (RWDSU/UFCW) and Make the Road by Walking.

Martin, Nina, Sandra Morales and Nik Theodore. 2007. "Migrant Worker Centers: Contending with Downgrading in Low-Wage Labor Markets*." GeoJournal* 68:155-165.

McGrath, Siobhàn. 2005. *A Survey of Literature Estimating the Prevalence of Employment and Labor Law Violations in the U.S*. New York: Brennan Center for Justice at New York University School of Law. Found at: http://brennancenter.org/dynamic/subpages/download_file_8418.pdf.

Mehta, Chirag, Nik Theodore, Iliana Mora and Jennifer Wade. 2002. *Chicago's Undocumented Immigrants: An Analysis of Wages, Working Conditions, and Economic Contributions*. Chicago: Center for Urban Economic Development, University of Illinois at Chicago.

Milkman, Ruth. 2006. *L.A. Story: Immigrant Workers and the Future of the U.S. Labor Movement*. New York: Russell Sage Foundation.

National Employment Law Project. *Rebuilding a Good Jobs Economy: A Blueprint for Recovery and Reform.* New York: National Employment Law Project.

Narro, Victor. 2005. "Impacting Next Wave Organizing: Creative Campaign Strategies of the Los Angeles Worker Centers." *New York School Law Review* 50(2):465-513.

---. 2009. "¡Sí Se Puede! Immigrant Workers and the Transformation of the Los Angeles Labor and Worker Center Movements." *Los Angeles Public Interest Law Journal* 1:65-106.

Ness, Immanuel. 2005. *Immigrants, Unions, and the New U.S. Labor Market*. Philadelphia: Temple University Press.

AR004733

New York Jobs with Justice and Queens College Labor Resource Center. 2005. *Is Your Gourmet Grocery a Sweatshop? A Report on Working Conditions at Upscale Groceries in New York City.* New York: New York Jobs with Justice and Queens College Labor Resource Center. Found at: http://brennancenter.org/dynamic/subpages/download_file_9916.pdf.

New York Taxi Workers Alliance. 2003. *An Analysis of Taxi Industry Fare and Lease Cap Proposals*. New York: New York Taxi Workers Alliance.

Organisation for Economic Co-operation and Development. 1994. *The OECD Jobs Study: Evidence and Explanations*. Paris: Organisation for Economic Co-operation and Development.

---. 1996. *OECD Employment Outlook: July 1996*. Paris: Organisation for Economic Co-operation and Development.

Restaurant Opportunities Center of New York and the New York City Restaurant Industry Coalition. 2005. *Behind the Kitchen Door: Pervasive Inequality in New York City's Thriving Restaurant Industry*. New York: Restaurant Opportunities Center of New York and New York City Restaurant Industry Coalition.

---. 2006. *Dining Out, Dining Healthy: The Link Between Public Health and Working Conditions in New York City's Restaurant Industry*. New York: Restaurant Opportunities Center of New York and the New York City Restaurant Industry Coalition.

---. 2009. *The Great Service Divide: Occupational Segregation & Inequality in the New York City Restaurant Industry.* New York: Restaurant Opportunities Center of New York and the New York City Restaurant Industry Coalition.

Ruckelshaus, Catherine and Bruce Goldstein. 2002. *From Orchards to the Internet Confronting Contingent Work Abuse*. New York: National Employment Law Project and Farmworker Justice Fund. Found at: http://www.farmworkerjustice.org/Immigration_Labor/ContingentDOCS/OrchardstoInternet.pdf.

Ruckelshaus, Catherine. 2008. "Labor's Wage War." *Fordham Urban Law Journal* 35(2):373-408.

Salganik, Matthew J. 2006. "Confidence intervals, design effects, and sample size calculation for respondent-driven sampling." *Journal of Urban Health* 83:98-111.

Southern Poverty Law Center. 2009. *Under Siege: Life for Low-Income Latinos in the South*. Montgomery, Alabama: Southern Poverty Law Center.

53

AR004734

Theodore, Nik, Abel Valenzuela and Edwin Meléndez. 2006. "*La Esquina* (The Corner): Day Laborers on the Margins of New York's Formal Economy." *Working USA* 9:407-423.

---. 2009. "Defending Labor Standards for Migrant Workers in the Informal Economy." *International Journal of Manpower*, forthcoming.

United States Bureau of the Census, American Community Survey. Found at: http://factfinder.census.gov/home/saff/main.html?_lang=en accessed July 31, 2009.

United States Department of Labor. 2001. *1999-2000 Report on Low-Wage Initiatives*. Washington, D.C.: United States Department of Labor Employment Standards Administration Wage and Hour Division.

United States District Court. 2007. *Notice of Removal, Arrez and Alonso vs. Kelly Services, Inc. March 7, 2007.*

United States District Court. 2009. *Final Approval Order, Arrez and Alonso vs. Kelly Services, Inc.* October 8, 2009.

United States General Accountability Office. 2006. *Employment Arrangements: Improved Outreach Could Help Ensure Proper Worker Classification*. Report to the Ranking Minority Member, Committee on Health, Education, Labor, and Pensions, U.S. Senate. Washington, D.C.: United States General Accountability Office.

---. 2009. *Department of Labor: Wage and Hour Division Needs Improved Investigative Processes and Ability to Suspend Statute of Limitations to Better Protect Workers Against Wage Theft*. Washington, D.C.: United States General Accountability Office. Found at: http://www.gao.gov/new.items/d09629.pdf.

Valenzuela, Abel, Nik Theodore, Edwin Meléndez and Ana Luz González. 2006. *On the Corner: Day Labor in the United States*. Los Angeles: Center for the Study of Urban Poverty. Found at: http://www.sscnet.ucla.edu/issr/csup/uploaded_files/Natl_DayLabor-On_the_Corner1.pdf.

Wial, Howard. 1999. *Minimum-Wage Enforcement and the Low-Wage Labor Market*. Harrisburg, PA: Keystone Research Center. Found at: http://mitsloan.mit.edu/iwer/tfwial.pdf.

Weil, David. 2005. "Public Enforcement / Private Monitoring: Evaluating a New Approach to Regulating the Minimum Wage." *Industrial and Labor Relations Review* 58(2):238-257.

---. 2007. *Crafting a Progressive Workplace Regulatory Policy: Why Enforcement Matters*. Boston, MA: Boston University School of Management: Harvard University-John F. Kennedy School of Government.

AR004735

Weil, David and Amanda Pyles. 2005. "Why Complain? Complaints, Compliance, and the Problem of Enforcement in the U.S. Workplace." *Comparative Labor Law and Policy Journal* 27(1):59-92.

---. 2007. "Exploring the Complaints and Compliance Gap Under U.S. Workplace Policies." *Proceedings of the 2007 Annual Meetings of the Labor and Employment Relations Association.* Found at: http://www.press.uillinois.edu/journals/irra/proceedings2007/.

Workers Defense Project. 2009. *Building Austin, Building Injustice: Working Conditions in Austin's Construction Industry*. Austin, TX: Workers Defense Project.

AR004736

# Endnotes

[1] United States District Court (2007, 2009).

[2] Illinois Circuit Court (2009).

[3] Associated Press (2009, 2010).

[4] Greenhouse and Rosenbloom (2008).

[5] Portions of this report are adapted from the national report. See Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities, available at http://www.unprotected workers.org.

[6] Bernhardt et al. (2009).

[7] See Asian American Legal Defense and Education Fund and YKASEC (2006), Bernhardt et al. (2008), Bernhardt, McGrath and DeFilippis (2007), Bobo (2008), Cordero-Guzmán, Smith and Grosfoguel (2001), Domestic Workers United & Datacenter (2006), Fiscal Policy Institute (2007), Flaming, Haydamack and Joassart (2005), Gordon (2005), Greenhouse (2008), Hale and Wills (2005), Hondagneu-Sotelo (2001), Levin and Ginsburg (2000), Make the Road by Walking and Retail, Wholesale, and Department Store Union (2005),McGrath (2005), Mehta et al. (2002), Milkman (2006), Ness (2005), New York Taxi Workers Alliance (2003), Restaurant Opportunities Center of New York and New York City Restaurant Industry Coalition (2005, 2006, 2009), Southern Poverty Law Center (2009), Theodore, Valenzuela and Meléndez (2006), Valenzuela et al. (2006), Weil and Pyles (2005, 2007), and Workers Defense Project (2009).

[8] Respondents self-identified their race/ethnicity to the interviewers, and could choose multiple races/ethnicities. All respondents who listed Latino/Latina in combination with other races/ethnicities were coded as Latino/Latina; therefore, the remaining categories are all non-Hispanic. In addition, because our sample includes only small numbers of Pacific Islanders, American Indians, Native Hawaiians, Alaska Natives, and people of mixed race, we included these groups, along with self-identified Asians, in the "Asian/other" category shown in the table.

[9] All of the violation rates reported in this section are statistically significant, meaning they are significantly different from zero. In the RDS method, the level of significance is determined using a special form of bootstrapping process (see Heckathorn (2002) and Salganik (2006)).

[10] Employers are legally required to pay their non-exempt workers at least the minimum wage. Not all workers are covered, and some aspects of coverage vary by state. For example, Illinois' minimum wage law exempts domestic workers, but they are covered by the federal minimum

AR004737

wage.  For more details on exemptions from the minimum wage, see the Unregulated Work Survey Technical Report (available upon request from the authors).

[11] Nearly every worker we surveyed was at risk of a minimum wage violation, with the exception of child care workers who work in their own homes.

[12] If workers worked more than 40 hours in the previous week, we asked how much they were paid for those hours.  If the stated amount was less than time and a half their regular wage, they were counted as having an overtime violation.  For more details on the laws governing overtime, see the Unregulated Work Survey Technical Report (available upon request from the authors).

[13] Off-the-clock work can be defined more broadly than how we have defined it here, and can happen during the middle of a workday when workers are instructed to "punch out" but continue to work.  Our survey only captures off-the-clock work that occurred before or after a shift.

[14] For more details about deductions, see the Unregulated Work Survey Technical Report (available upon request from the authors).

[15] Legal protections vary depending on the subject of a worker's complaint and whether they complained alone or with co-workers.  For more details about retaliation law and our measures, see the Unregulated Work Survey Technical Report (available upon request from the authors).

[16] We defined a serious injury as one that needed medical attention, whether or not the worker actually received such attention.

[17] For more information, see the Unregulated Work Survey Technical Report (available upon request from the authors).

[18] This measure includes the following violations:  minimum wage, tipped minimum wage, overtime, off-the-clock, being paid in tips only, illegal deductions and rest-break violations.

[19] This study is not able to provide an accurate estimate of the impact of unionization on the prevalence of workplace violations.  Many unionized industries were excluded from our sample because they had median wages that were higher than our low-wage threshold, and were therefore not included in our sample from the outset (see Appendix A for details on our sampling universe).  In addition, the small number of unionized workers who made it into our sample were concentrated in a very small set of industries, which resulted in a skewed industry distribution.  Therefore, any analysis of differences in violation rates between unionized and non-union workers in our sample would yield statistically biased results that could not be used to infer conclusions about the impact of unionization on workplace violations.

[20] When interpreting estimates in the tables and graphs in this section, the reader should refer to the text for guidance regarding which differences are statistically significant.  In particular,

57

AR004738

the reader should be aware that differences of a few percentage points are very likely not statistically significant, and instead may result from stochastic variation in the sampling process. In the RDS method, the level of significance is determined using a special form of bootstrapping process (see Heckathorn (2002) and Salganik (2006)). As is customary, we interpret differences in violation rates between two or more groups or categories as statistically significant when $p \leq 0.05$. In such cases, the estimates' 95 percent confidence intervals fail to overlap, a procedure that is equivalent to a Student's $t$-test. For Figures 4.1, 4.2, 4.4, 4.5, 4.6, 4.7, 4.8 and 4.9, we only showed results for industries and occupations whose sample size was greater than or equal to 50.

[21] In order to obtain a large enough sample size for analysis, two versions of the industry and occupation variables were created. A less-collapsed version of the variables was used in the analysis of minimum wage and meal break violation rates, for which we had larger risk sets. A more-collapsed version of the variables was used in the analysis of overtime and off-the-clock violation rates, for which we had smaller risk sets.

[22] See Bernhardt, McGrath and DeFilippis (2007), Hondagneu-Sotelo (2001), New York Jobs with Justice and Queens College Labor Resource Center (2005), and Valenzuela et al. (2006).

[23] The cash category also includes those paid by personal check and those paid in both cash and by check. The company check category also includes those paid by direct deposit. Both categories contain small numbers of workers who reported being paid by other methods.

[24] For example, see the detailed industry profiles in Bernhardt, McGrath and DeFilippis (2007).

[25] This difference is not explained entirely by the pay types used by these firms. Although small firms are more likely to pay non-hourly, pay type explains only part of the discrepancy between the violation rates of small and large firms.

[26] When interpreting estimates in the tables and graphs in this section, the reader should refer to the text for guidance regarding which differences are statistically significant. In particular, the reader should be aware that differences of a few percentage points are very likely not significant, and instead may result from stochastic variation in the sampling process. In the RDS method, the level of significance is determined using a special form of bootstrapping process (see Heckathorn (2002) and Salganik (2006)). As is customary, we interpret differences in violation rates between two or more groups or categories as statistically significant when $p \leq 0.05$. In such cases, the estimates' 95 percent confidence intervals fail to overlap, a procedure that is equivalent to a Student's $t$-test.

[27] This may be partly because workers who do advance in the labor market as they get older leave our sampling universe, which only includes low-wage jobs. However, in other parts of the labor market, age is often a good predictor of better outcomes, even for workers who remain in front-line occupations for their entire careers.

58

AR004739

[28] Pieces of this section are adapted from Bernhardt, McGrath and DeFilippis (2007) and National Employment Law Project (2008). It also draws on Ruckelshaus (2008).

[29] For in-depth analyses of public enforcement, see Wial (1999), Weil (2005, 2007), and Weil and Pyles (2005, 2007).

[30] In addition, agencies such as the U.S. Department of Labor should institute annual compliance surveys for the full range of low-wage industries. Such surveys were conducted by the U.S. Department of Labor in the late 1990s, testing for violations of minimum wage and overtime laws, and still constitute some of the most robust data available. For example, in 1999 only 35 percent of apparel plants in New York City were in compliance with wage and hour laws; in Chicago, only 42 percent of restaurants were in compliance; in Los Angeles, only 43 percent of grocery stores were in compliance; and nationally, only 43 percent of residential care establishments were in compliance (United States Department of Labor 2001).

[31] For in-depth analyses of immigrant worker centers, see Fine (2006), Gordon (2005), Jayaraman and Ness (2005), Martin, Morales and Theodore (2007), Ness (2005), Narro (2005, 2009), and Theodore, Valenzuela and Meléndez (2009).

[32] In a similar vein, government agencies that enforce workers' rights need to better coordinate their efforts to achieve maximum impact, given that unscrupulous employers often violate multiple laws.

[33] National Employment Law Project (2008).

[34] The American Federation of Labor and Congress of Industrial Organizations (2007).

[35] We wrestled with the question of whether or not to include independent contractors such as taxi drivers and street vendors in our survey. In the end we decided to constrain the sample to include employees only; opening the sampling frame to any type of independent contractor would have made it almost impossible to construct a manageable questionnaire (that is, one that would work for both employees with wage income, as well as independent contractors, who we would need to ask detailed questions about both business income and costs). However, we hope that future surveys will focus on low-wage independent contractors, such as taxi drivers and port truckers, who are effectively in an employment relationship and whose working conditions are very similar to the population of workers we surveyed here.

[36] The Organisation for Economic Co-operation and Development has used both the measure of 85 percent of the median wage (Organisation for Economic Co-operation and Development 1994) and the measure of two-thirds of the median wage (Organisation for Economic Co-operation and Development 1996); see also Freeman and Schettkat (2000), who use two-thirds of the mean wage.

[37] Heckathorn (1997, 2007).

59

AR004740

The number of coupons given to respondents varied over the course of the survey; on average, respondents recruited two other workers into the sample.

[39] These adjustments were made within major occupation groups, in order to ensure a high level of accuracy in the weighting.

[40] For example, see Hoefer, Rytina and Baker (2008), who estimate a nonimmigrant undercount rate of 10 percent.

[41] Data on the number and characteristics of unauthorized immigrants in our three cities were generously provided by Jeffrey Passel of the Pew Center for Hispanic Research.

[42] The one exception is that worker characteristics as a group were not significant in predicting overtime violations.

[43] We measured the significance and the size of the effect of each group of variables by recording the change in the deviance statistic (-2 log likelihood measure) when a group of variables was added into the models.  We assessed significance at the .05 level using a chi-square test.  We assessed the relative strength of the effects of the two groups of variables by forming the ratio of the change in deviance.  Full results are available upon request from the authors.



**UIC** Center for Urban
UNIVERSITY OF ILLINOIS AT CHICAGO Economic Development
COLLEGE OF URBAN PLANNING & PUBLIC AFFAIRS

Center for Urban Economic Development
University of Illinois at Chicago
400 S. Peoria St. (M/C 345)
Chicago, IL 60607
312.996.6336
www.urbaneconomy.org



AR004742

AR004743

Home

Share to:

# Center for Latin American Studies

## UNIVERSITY OF CALIFORNIA, BERKELEY

# Berkeley Review of Latin American Studies, Fall 2013



A solitary woman works in an orchard. (Photo by Andrés Cediel.)

IMMIGRATION

## Rape in the Fields

*by Bernice Yeung and Andrés Cediel*

- Read this article on ISSUU

- Download as printed (.pdf)

- More about this event

To Guadalupe Chávez, the roads that snaked around the endless acres of farmland in California's Lost Hills had begun to take on a cruel similarity. Almond orchards gave way to yet more almond orchards, which bled into unending stands of pistachio trees, their branches a blur of leafy green as she drove.

As a recently widowed mother of two from Mexico with no papers and little English, farm work was how Chávez supported her family. But she did not know these orchards.

In the red pickup truck ahead was the man who stood between her and an overdue paycheck. He was a supervisor with a local farm labor contractor, and when they met near the farm, he had told her the missing check was with his brother, and they needed to find him, he said.

She thought of her unpaid bills and two sons. She started the car engine. He led her down one road, then another before directing her into the orchards themselves. As she drove deeper into the grove, she became befuddled by its symmetry. She began to feel scared.

It was here that the man sexually assaulted her, as Chávez later told authorities. She could scream, she remembered the supervisor telling her, but "it's not going to make any difference, because nobody can hear you way out here."

At the end of it all — as she sat battered by fear and shame — he gave her the $245 paycheck she had earned for a week of picking pomegranates.

Stories like Chávez's are emblematic of what we discovered through "Rape in the Fields," a yearlong, multi-platform reporting project. They're why some of the 556,000 female farmworkers in the United States have taken to calling their workplaces the *fils de calzón* or the fields of panties.

AR004744



A woman works rows of table grapes. (Photo by Andrés Cediel.)

From the cantaloupe fields of California to the egg processing plants of Iowa, the stories we heard were as chilling as they were consistent.

We learned of cases where workers said they were isolated in distant fields or packing plants so they could be sexually harassed, assaulted, and even raped on the job. It's a commonplace occurrence, agricultural worker advocates told us, and it's happening everywhere.

A hidden phenomenon like this makes for a shocking story, but it's a difficult one to report out, which is part of the reason it has gone overlooked for so long. Rape and sexual assault in America's fields and packing plants is an entrenched problem in a distant and dusty world beyond the view of most consumers, powerbrokers, policymakers, technologists, and journalists.

But the Investigative Reporting Program at UC Berkeley's Graduate School of Journalism and The Center for Investigative Reporting decided to commit to telling this story. Both organizations dedicated numerous reporters and researchers to investigate the issue for a year, in collaboration with PBS Frontline and Univision, as well as various public radio and newspaper outlets.

AR004745

Despite pledging serious time and resources to the project, it was not an easy one to execute. As soon as we began reporting, we were confronted with two significant challenges: quantifying the problem and convincing sexual assault victims to discuss what had happened to them publicly.

The majority of agricultural workers are undocumented, and they tend to keep silent, hoping to keep their jobs and to avoid deportation. That Guadalupe Chávez went to the authorities was an anomaly. Law enforcement only got involved because she went to the hospital after the incident, and a nurse called the police. Chávez said she was scared and nervous about talking to the police, but the nurse told her, "Honey, you shouldn't stay quiet."



An Iowa chicken farm where female workers alleged rampant sexual abuse. (Photo by Vicente Franco.)

This hesitancy to report the crime ultimately creates a dynamic where a bilingual supervisor with a paycheck or a job to hand out is in a position where he can extract just about anything from his workers.

So while anecdotes are abundant, official statistics are scarce. Sexual assault is notoriously underreported, and undocumented farmworkers are less likely than citizens to complain to their bosses or to law enforcement.

AR004746

Data and documentation are the lynchpins of sound investigative journalism, but none of the existing datasets on farmworkers or workplace violence addressed this issue directly. We became aware of a UC Santa Cruz study of 150 California female farmworkers that found that 40 percent reported experiencing sexual harassment that ranged from verbal advances to on-the-job rape. We also obtained access to 100 surveys on the sexual harassment of female agricultural workers conducted by a nonprofit in Iowa. Forty-one percent of the women said they had experienced unwanted physical contact, and 30 percent said they had been sexually propositioned at work, according to our analysis of the surveys. Recent national polls of women workers put the rate of workplace sexual harassment at about 25 percent.

We also decided to look at a specific sample of lawsuits to empirically identify trends. By analyzing all of the civil sexual harassment lawsuits filed against agricultural businesses by the federal government — 41 cases in all — we found that more than 85 percent of the cases involved what would be considered sexual assault or rape. The vast majority of cases involved supervisors who had been accused of harassing or assaulting multiple workers. None resulted in criminal prosecutions.

This detailed look at the federal lawsuits confirmed what we were hearing anecdotally from the workers and advocates we interviewed: in the agricultural industry, sexual harassment at the hands of recidivist supervisors can be extreme and violent.

Although it is impossible to identify precisely how many farmworkers have been sexually assaulted or raped at work — as it would be for any population — the survey and lawsuit analysis enabled us to provide numerical detail to a specific universe of cases. In a space where very few had cared to count and quantify, it was a start.

Quantifying the scope of the issue was a major challenge, but as reporters, we faced another significant problem: very few people wanted to speak publicly about this topic.

Accused supervisors were understandably hesitant to address the issue, though we were able to include the perspectives of two foremen who had allegedly assaulted or raped female workers. Meanwhile, growers were wary of discussing the subject because they said they feared that the industry would be misrepresented; some told us that sexual harassment and assault exist in every industry, and farming is no different.

But those most averse to being interviewed were the women who had been victimized. We nevertheless needed to find a way to convince women to talk openly about a traumatizing and painful experience.

So we traveled to far-flung farming communities to find the person who could put a human face on the issue. We drove across California — to towns like Huron, Santa Paula, Arvin, and Woodland. We also visited agricultural regions across the country, from Sunnyside, Washington, to Clarion, Iowa, to Immokalee, Florida.

Predictably, it was hard to find people who were willing to go on camera or to use their full names. But in the process, we spoke with dozens of women, shared meals together, and met with their lawyers, counselors, and families. In some cases, we

AR004747

were among the first people, aside from their lawyers, with whom they had talked about the abuse they had experienced at work.

Over the course of many months and miles, we met courageous women and heard enough stories to convince us that we were onto a topic with wide reach. Some of the women agreed to tell us their stories anonymously by appearing in shadow or by releasing only their first names. But more than halfway into our reporting, we still had not found the woman who would lend her face and full name to the story.

Of course, these women had every reason not to make their stories public. They were worried about deportation, about losing their jobs, and in some cases, about their personal safety. Speaking out also meant exposing themselves to more shame and ridicule. Some even said they were afraid that their husbands or boyfriends would blame them for what had happened. And they feared that they would not be believed.

And yet, as journalists, there were few things we could promise our sources to allay their fears. All we could promise was that we would tell their stories truthfully and respectfully.

It was some seven months into the project before the chance to capture the experiences of female farmworkers without obscuring their faces presented itself. We believed it was the payoff for spending many months developing relationships within a distrustful community. After multiple visits to the area, a half-dozen women who said they had been sexually harassed or assaulted at an apple orchard in Washington state finally agreed to go on camera. A three-member team flew up almost immediately.

But soon after we landed, we learned that the women had changed their minds — they decided it would be too risky to the lawsuits that the federal government and some of the women had filed against the company or the orchard foreman.

Two days later, we flew back home, beyond disappointed. But the experience was instructive: when it comes to asking vulnerable and potentially victimized sources to participate in a media project, we have to be both patient and persistent in finding the right people in the right moment of their lives to share their experience.

We would never have guessed that we would find that person the day after returning from our fraught trip to Washington state. We left early in the morning to make the two-hour drive to California's Central Coast for an interview with Maricruz Ladino, a Salinas farmworker who said she had been raped by her supervisor at a lettuce farm in 2006.

We had been in touch with Ladino and her attorney over the course of the reporting process, but we had not been able to connect with her. We assumed that it was because she, like so many other women we had encountered, was simply not interested in being interviewed.

AR004748

But as it turns out, we did not initially hear back from Ladino for an entirely different and more mundane reason: she had changed her cell phone number.



Maricruz Ladino in Salinas. (Photo by Andrés Cediel.)

Her interview that brilliant spring morning was memorable and moving. She was honest and human. She was someone with whom both farmworkers and non-agricultural workers in faraway cities could relate. She was the substance of good journalism: through her, we could clearly and viscerally understand the human impact of a problem and why it needs to stop.

And Ladino understood this. We asked her why she was willing to tell her story so publicly. "I didn't say anything for many years because of my job, to make money to support my daughters," she told us. "But there came a time when I told myself, 'No more.' I am seeing that this type of thing did not only happen to me...and if I stay quiet then it is going to continue happening. That is why I now prefer to talk about it."

Since the release of our reporting, we have been back on the road, this time screening the film in agricultural communities throughout California. Audience members have told us they feel outraged, surprised, and unnerved by the film. They have also said that they are glad that we have told a story that has remained hidden for generations.

Each screening seems to spawn more events and dialogue. A wide range of organizations have hosted screenings, including farmworker groups, the California Department of Public Health, the Mexican Consulate in Fresno, and community colleges along the Central Coast.

Lawmakers have taken notice as well. California state legislators have begun the process of exploring legislation to address the issue, and Monterey County law enforcement officials said the film inspired them to improve outreach to the farmworker community in hopes of building better connections with a populace that is wary of them.

The public's interaction with the project continues to grow. What seemed like the end goal — finding women, growers, and supervisors who would speak about rape in the fields — has turned out to be only a beginning.

Bernice Yeung is a reporter with The Center for Investigative Reporting. She spent a year reporting on "Rape in the Fields." Andrés Cediel is the producer of "Rape in the Fields" and a lecturer in the Investigative Reporting Program at UC Berkeley's Graduate School of Journalism. They both spoke at the CLAS screening of the film on September 4, 2013.

AR004750

AR004751



From left: Lowell Bergman, Bernice Yeung, Harley Shaiken, and Andrés Cediel lead discussion after a screening of the film. (Photo by Jim Block.)

## WE'VE BEEN TELLING STORIES THAT CHANGE LAWS AND LIVES FOR MORE THAN 40 YEARS. AND WE'RE JUST GETTING STARTED.

Sign up for our newsletter.

Email Address

**SUBMIT**

≡

(https://www.revealnews.org/)



AR004753

# Under cover of darkness, female janitors face rape and assault

By Bernice Yeung (https://www.revealnews.org/author/bernice-yeung/) / June 23, 2015

Leer en español (https://www.revealnews.org/article/bajo-la-oscuridad-trabajadoras-de-limpieza-enfrentan-violaciones-y-acoso/).

It was the isolation that made Erika Morales most wary of her job as a night shift janitor. The solitude had begun to feel like a trap.

Then one fall evening, after everyone else had gone home, she arrived to clean a Bank of America branch. In the binding silence of the empty building, she scrubbed toilets and vacuumed hallways. She'd catch her



distorted reflection in the window, though she knew there was only darkness on the other side of the glass.

"There's no one to ask for help when certain things happened and you screamed," she said. "No one can hear. And there are certain places where there are no cameras. There's no sound. There's nobody."

During her shift, the only person she'd often come into contact with was her supervisor. It was his job to drive around town to check on Morales and other janitors who worked for a subsidiary of ABM Industries Inc., the largest cleaning company in the country. The janitors he oversaw mostly worked solo, at low-slung offices and health clinics across Bakersfield, in California's Central Valley.

These were conditions that Morales said her supervisor, a broad-shouldered man with salt-and-pepper hair named José Vasquez, chose to abuse.

As she cleaned, she'd spot him in the window watching her from outside. He'd sneak up behind her to grab her breasts, she said, and stare at her while saying things like, "You are so delicious." Morales regularly pleaded with him to stop, and he laughed at her.

She had appealed to another supervisor. He turned out to be Vasquez's cousin. "He would always tell me, 'I don't know what you're talking about,'" Morales said.

AR004754

Morales frequently thought about quitting. She constantly was running the numbers in her head, but without a steady paycheck, she didn't see how she could manage. At the time, she was 29 with two kids.

"In that moment, my children's father wasn't there," she said. "I didn't have another income for myself and my two children. So I hoped it would change."

That warm September night in 2005, Morales was vacuuming the first floor of the bank when Vasquez appeared like a ghost, she said. He asked her to help him put away paper towels in the supply closet.

Morales steeled herself as she entered. This time, nothing was going to happen, she told herself.

Once inside, she said Vasquez cornered her and unbuttoned her pants. She fought him, which seemed to make him angry. He started to take off her shirt and bra. Morales said the next part was a blur.

"He knew there weren't any cameras," she said. "I would yell and nobody would hear me, nobody could see me."

He groped her and grabbed her by the hair. "Don't do this to me," she said.

Vasquez laughed and left suddenly before he got her shirt completely off. To this day, she's not sure how she defended herself. But what had happened in the supply closet was the limit of what she could bear.

AR004755



Former janitor Erika Morales filed a complaint with the Equal Employment Opportunity Commission stating that her supervisor, José Vasquez, had harassed her. "There's no one to ask for help when certain things happened and you screamed," she said.

CREDIT: FRONTLINE

"That's when I said: 'No more. I can't stand this,'" Morales said. A few days later, she turned in her keys and quit.

When Vasquez's cousin wanted to know why she was leaving the job, Morales told him that Vasquez was "doing things that he shouldn't be doing and you know it."

In fact, it wasn't just his cousin who had been warned about Vasquez's behavior. Company officials had reason to believe they had a predator on their hands. They even had the rarest of things in a sexual abuse complaint – a willing and credible witness. Someone had come forward three months before to report that Vasquez had assaulted another female janitor at a nearby church.

They had a chance to stop the abuse that Morales said she endured. Instead, company officials let Vasquez go back to work, where it was his job to drive an ABM-issued truck to visit women as they cleaned buildings alone at night.

* * *

AR004756

Sexual assault can happen anywhere: in the military and on college campuses, in the Catholic church and at world-renowned yoga studios.

But the way the problem has played out in the workplace largely has escaped public attention. About 50 people a day are sexually assaulted or raped while they're on the clock, according to the U.S. Department of Justice. Any statistic about sexual violence, though, is a farce – only a fraction of victims ever come forward to report the crime.

*This story is part of Rape on the Night Shift (/nightshift), a collaboration between Reveal, FRONTLINE, the Investigative Reporting Program at UC Berkeley, Univision and KQED.*

 (//www.revealnews.org).

 (http://www.pbs.org/wgbh/pages/frontline/).

 (http://investigativereportingprogram.com/).

AR004757



DOCUMENTALES
UNIVISION

(http://www.univision.com/).

KQED (https://kqed.org)

When they do, companies can hide complaints from the public by settling them secretly before a lawsuit is filed. The results of cases that do make it to court often are cloaked by confidentiality agreements.

"It is a black box," said Laura Beth Nielsen, a professor at Northwestern University who has studied employment discrimination lawsuits. "No one can talk about it."

The night shift janitor is an easy target for abuse. She clocks in after the last worker has flipped off the lights and locked the door. It's tough work done for little pay in the anonymity of night, among mazes of empty cubicles and conference rooms. She's even less likely to speak up if she's afraid of being deported or fired.

AR004758

Across the country, janitors at companies large and small say their employers have compounded the problem by turning a blind eye to complaints and attacking their credibility when they report abuse at the hands of their supervisors or co-workers.

In the janitorial world, ABM is the largest. It employs the most cleaners in the country and has a history of facing charges that it failed to prevent sexual violence. It's among a rare group of 15 American corporations to have been targeted multiple times by the federal government for sexual harassment.

The U.S. Equal Employment Opportunity Commission has sued ABM three times since 2000 for mishandling complaints of sexual harassment or worse. Two of those cases involved allegations of rape, which is striking considering how rare it is for people to make these types of allegations publicly. In all three cases, the company settled and agreed to make improvements.

AR004759

Before the 1980s, most businesses had their own janitorial staff. Then building owners and stores began outsourcing the work to cut costs.

AR004760

CREDIT: FRONTLINE

Anna Park, a government attorney who eventually would pick up Erika Morales' complaint, said ABM's response in that case was one of the worst she'd seen. Troubling violence wasn't investigated. Victims or eyewitnesses were not interviewed.

"I think that's what shocked us the most. As large as they were, the lack of action, lack of attention, lack of a sense of responsibility," Park said.

We found 42 lawsuits from the past two decades in which ABM janitors said they had been sexually harassed, assaulted or raped at work. An unknown number of cases have been hidden from public view through confidential settlements. And despite government-imposed reform plans, similar accusations continue to crop up. In Los Angeles, two lawsuits filed in the past year say women who complained about explicit comments (https://www.documentcloud.org/documents/2105930-marquez105acomplaint.html) or sexual assault (https://www.documentcloud.org/documents/2107856-maria-vasquez-complaint.html) were ignored.

After more than a year of correspondence, ABM officials declined to be interviewed. The company instead provided a statement (https://www.documentcloud.org/documents/2105871-miranda-tolar-statement.html) from its lawyer, Miranda Tolar. It said the way ABM handles the issue is the "gold standard" for the industry.

AR004761

*Have questions about this story? Join a live chat (https://www.revealnews.org/article/join-our-live-chat-about-rape-on-the-night-shift/) with our reporters at 11 a.m. PT/2 p.m. ET Wednesday, June 24. You can send questions ahead of time by using #TheNightShift on Twitter and Facebook.*

"In some cases, we've been made aware of inappropriate behavior and taken action. In other cases, allegations of wrongdoing have proven to be false and even malicious, often by individuals previously in consensual relationships that ended," she said. "Sometimes, there are other motivations."

ABM cleans high-rises, airports, universities and government buildings across the country. It has anti-harassment policies (https://www.documentcloud.org/documents/2105900-abm-policies.html) and training. It has a human resources department. About half of its nearly 65,000 janitors are unionized.

By contrast, most janitorial companies are tiny mom-and-pop operations that might not be worth taking to court. Or they're off-the-books, fly-by-night operations that could disappear before a complaint can even be filed.

So ABM is one of the few janitorial companies with a paper trail. It is professional enough to respond to lawsuits. It turns large enough profits that aggrieved workers can file suit with the hope of a financial payoff at the end.

And among the larger, licensed businesses, ABM hardly is alone in being accused of botching sexual assault claims.

AR004762

In Massachusetts, seven female janitors cleaning universities and office buildings for a company called UGL Unicco sued their employer after they said their supervisor touched and harassed them. The case settled in 2002 for $1 million; the company did not admit wrongdoing. Janitors have sued the company five times in federal courts since then.

In Minnesota, a janitor filed a lawsuit in 2009 that claimed she was raped repeatedly by her boss while on the clock cleaning a shopping mall. When it got notice of her complaint, cleaning company Service Management Systems asked the accused manager to gather evidence for the case. The company settled the case and later said this was against its protocol. The janitor now works uneventfully for ABM.

Operations like these do the thankless work of keeping everyone's office space clean and humming. The very fact that their workers are supposed to remain unseen in an industry that takes all comers means that when it comes to sexual violence on the job, almost everything that could go wrong does.

***

AR004763

AR004764

CREDIT: MATT ROTA

Before Erika Morales came forward, ABM already had been put on notice about José Vasquez.

Out of a bit of serendipity, Scott Stevenson had stayed late one night in June 2005 to clean the kitchen of the Valley Bible Fellowship in Bakersfield. Most evenings, large sections of the megachurch are dark and vacant.

As he wiped down the counters, he asked a couple of his 12-year-old helpers to take a box of trash to a gated dumpster. A few minutes later, the kids came back still holding the garbage. Someone's being hurt, one of the boys said.

Stevenson rushed out to where the dumpsters were enclosed by brick walls and a chain-link fence. The scene that was playing out stunned him into silence.

Under the glow of parking lot bulbs, Stevenson said he watched as an ABM supervisor he recognized as Vasquez pinned a worker against a brick wall behind the trash bins. Vasquez seized at the woman's breasts and crotch as she tried to break free.

Helping others is a compulsion for Stevenson. He has fostered dozens of kids and runs a religious ministry for truck drivers passing through the loneliest stretches of Nevada. But in that moment, Stevenson didn't know

AR004765

what to do. He hefted the box of trash into the dumpster with a deep bang.



Scott Stevenson says he saw ABM supervisor José Vasquez assault a female janitor in June 2005 at the Valley Bible Fellowship in Bakersfield, Calif.

CREDIT: FRONTLINE

Vasquez pivoted to face the church volunteer, looking nonchalant while his open belt buckle jingled. "Almost like it happens all the time," Stevenson said.

He called the police. When the officers arrived, the female janitor was hesitant. Her situation was similar to that of Morales. She had kids to support, and she wanted to keep the job she had. Vasquez was her supervisor. She eventually told detectives that Vasquez had scared her by trapping her near the dumpster for about two minutes, where he had tried to touch her chest. (We're not naming the woman because we couldn't locate her to get her permission.)

A few days later, Vasquez was called to the police department to give his side of the story. He showed up with the woman Stevenson had seen him groping. She recanted, and the police closed the case.

But the church didn't drop the issue. The day after the dumpster incident, Stevenson drafted a letter to church leaders explaining what he'd seen. Before the church canceled its contract with ABM, one of the pastors

AR004766

reported the incident to the company.

Figuring out what had happened fell to Tom Cazale, who was the head of ABM's regional human resources. Cazale no longer works for ABM and declined to comment for this story. But he later told government attorneys that if the allegations against Vasquez were correct, he'd be "extremely embarrassed."

It's standard practice for a company to dispatch a trained investigator to get to the bottom of a severe sexual harassment claim. That investigator should conduct all of the interviews in person to weigh credibility, take good notes and talk to all potential witnesses.

Watch the *Rape on the Night Shift* (*http://www.pbs.org/wgbh/pages/frontline/rape-on-the-night-shift/*) documentary Tuesday, June 23 at 10/9c on FRONTLINE (PBS)

In Cazale's investigation into the church incident, these industry standards were all but ignored. In the rush to respond quickly, he asked an untrained administrative assistant to interview the victim. The assistant spoke to the janitor by phone.

Later, another ABM employee interviewed Vasquez. He said they'd been "playing around."

Based on the interviews with Vasquez and the cleaner, Cazale said he was unable to confirm an assault. Cazale gave the supervisor a written warning because he'd admitted to touching the female janitor's arm.

AR004767

It's easy to get lost in the nuances of sexual assault claims. Each one is a wild turn through what she said and then what he said, between what can be remembered and what can be proven.

But this wasn't one of those cases.

Eyewitnesses to a sexual assault claim such as Stevenson are rare to the point of exceptional. But Cazale did not talk to him. To this day, Stevenson said, no one from ABM has contacted him.

\*\*\*

In late August 2005, two months after ABM found out about Scott Stevenson's report, the company got another clue that it had a problem on its hands. An anonymous letter (https://www.documentcloud.org/documents/2104820-spanish-anonymous-letter.html) written in Spanish arrived at the ABM office in San Francisco.

José Vasquez had harassed someone at the Valley Bible Fellowship, it said. Also, the letter continued, Javier Vasquez, another Bakersfield supervisor and José Vasquez's relative, was abusing his authority by hiring relatives and forcing ABM janitors to work for his side business on company time.

"Please take this seriously," the author wrote. "Some employees with a need to work are asking you to put a stop to these people without respect for the employees."

AR004768

A week passed and another note



CREDIT: MATT ROTA

(https://www.documentcloud.org/documents/2104819-english-anonymous-letter.html) arrived, this time in English. "First of all, we hope you take this letter seriously," it began. The last complaint had been forwarded to Javier Vasquez. The author wrote: "He just laughed and told me, 'You see, nothing was done.'"

AR004769

Written in careful script, the letter reiterated José Vasquez's offenses at the Bakersfield church. It also described a new victim. At Clinica Sierra Vista, he "grabbed another ABM worker by the breast and ask 'Are they Real?' Her name is Erica. She got so nervous and just left."

The letter reported that José Vasquez had served time for "sexual harassment." The author closed the letter with a postscript: "This is not gossip, it is all true. Please help us."

The company started another investigation, again putting Tom Cazale in charge. He asked a regional supervisor to look for Erica by checking the payroll records for that month. The supervisor spent about 15 minutes (https://www.documentcloud.org/documents/210484-ric-steiner-depo-excerpt.html) looking at a printout but couldn't find anyone with that name.

Cazale sent a note on company letterhead in both English and Spanish to the return address on the anonymous letter. It said ABM was aware of the sexual harassment allegation at the church and had dealt with it according to company policies. Cazale closed the letter by saying that unless someone gave him more information, he couldn't move forward with a detailed investigation.

Then Cazale failed to do the obvious. He did not have an investigator talk to anyone at the clinic to find out whether they knew anyone who'd worked there named Erica. Nor did he check to see if the letter's return address matched that of any ABM employees.

AR004770

Days and weeks passed. Cazale heard nothing more.

It would take another year for ABM to discover that José Vasquez was a convicted rapist.

\*\*\*





CREDIT: MATT ROTA

About eight months after ABM received the anonymous letters at its San Francisco office, the company found the elusive "Erica," though it didn't locate her on its own.

A complaint had come into the U.S. Equal Employment Opportunity Commission, the federal agency responsible for policing on-the-job discrimination and harassment.

A cleaner named Erika Morales said her supervisor, José Vasquez, had harassed her.

AR004772

Once it received Morales' complaint, the commission sent a team to investigate. Its lawyers found 11 more janitors willing to publicly share their stories about being harassed or assaulted by Vasquez. This included Maria Magaña, who said she'd been raped by Vasquez while cleaning a Rabobank branch one night.

Tiny and tough, Magaña already had fought back a few times by hitting him with a duster or shoving him with a broom. The night she says she was raped, he summoned her to a conference room – where there were no security cameras – by telling her that the customer had complained about her work there. Once inside, he pushed her to the ground. Before she hit her head, she said she remembers thinking that there was nothing she could use to protect herself.

"I would have defended myself if I had been on guard," she said recently. "That day, I was not on guard."

Magaña lives with her son and elderly mother in Bakersfield, in a neighborhood at the intersection of farm fields and modest houses. She doesn't mind working the night shift, but day or night, she is careful to avoid the bank where she said Vasquez raped her.



Maria Magaña says she was raped by supervisor José Vasquez while cleaning a branch one night in Bakersfield, Calif. "Every time I come to this bank, I remember what happened," she said.

CREDIT: FRONTLINE

AR004773

"Every time I pass by this bank, I remember what happened," she said. "That's why I try not to travel on this street. I take a turn."

Until the commission came to her, Magaña had not reported the problem to the company or police.

"I was silent because of shame," she said. "He would laugh and say that they weren't going to believe me anyway."

The government investigators found male co-workers who witnessed Vasquez's behavior. One said he had personally seen Vasquez's behavior. One said he had personally seen (https://www.documentcloud.org/documents/2104822-pluma-declaration.html) Vasquez assault or harass female workers about a half-dozen times.

The commission also did what the company had not: It ran a basic background check on Vasquez and quickly discovered that he'd been convicted of rape in 1987 and sentenced to eight years in prison.

The commission notified ABM of Vasquez's criminal record in December 2006, more than two years after he started working for the company. For the first time, someone at the company



José Vasquez, shown in a deposition video for the Equal Employment Opportunity Commission case, quit his job at ABM after the company learned of his 1987 rape conviction.

typed Vasquez's name into California's online sex offender registry. If company officials had pulled the criminal records, they would have learned that when Vasquez worked at a small Bakersfield movie theater, he raped his boss's 18-year-old daughter at her home after a night of drinking.

On his job application, Vasquez hadn't answered the question about whether he had ever been convicted of a crime. If he had, he would've had to include more than the rape. Not long before filling out the application, he'd been released from prison after serving a four-year sentence for possessing drugs he planned to sell.

Once ABM discovered the rape conviction, the company planned to put Vasquez on unpaid suspension until it completed its own investigation. Instead, he quit on the spot. His cousin, Javier, kept his position and wasn't disciplined. He couldn't be reached for comment.

José Vasquez now lives in a one-story house in Lamont, just outside Bakersfield. Cars share the driveway with a display of outdated appliances and spilled garbage.

When we knocked on his door one afternoon, he emerged shirtless and pulling on a pair of dark green trousers. At 60, his chest is still broad, if sunken. One arm bears a tattoo of a she-devil with the words "JV Hot Stuff" surrounding it.

CREDIT: EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

AR004775

We asked him about the claims that had been made against him when he worked at ABM. The women were "money hungry," he said as his young kids ran in and out of the front hallway. "They were doing it all for the money. I didn't even know some of the women."

He's never been charged with any crimes based on claims from the Equal Employment Opportunity Commission lawsuit. Morales never went to the police.

The ABM allegations were hard on him, he said. After he left the company, no one wanted to hire him. He ended up starting his own business called R&B Cleaning Co. with his girlfriend, a janitor he met at ABM. Together, they have four young kids with a fifth who was on the way.

Before José Vasquez fell on the job and started receiving disability payments, the couple had bought a truck and begun cleaning houses that had been foreclosed by banks. The company isn't registered with the state.

Although Vasquez had decided to strike out on his own, his departure didn't resolve ABM's problems.

The federal government sued the company in 2007 for failing to prevent sexual harassment. Anna Park, the government attorney, saw systemic breakdowns at ABM, and it's her job to hold employers – not perpetrators – accountable. The case she put together went well beyond Vasquez, growing to include 21 women who said they'd been sexually harassed by 14 men across California's Central Valley.

AR004776



CREDIT: FRONTLINE

Anna Park served as the government's attorney when the U.S. Equal Employment Opportunity Commission sued ABM in 2007 for failing to prevent sexual harassment.

The company responded to the Equal Employment Opportunity Commission in court filings by saying that few of the women's claims met the legal definition of sexual harassment, which must be sustained and serious. ABM also said the women had received copies of the company's sexual harassment policies, but not everyone had reported what was happening.

\*\*\*

Before the 1980s, most businesses had their own janitorial staff. Then building owners and stores began outsourcing the work to cut costs. This created an explosion in contract cleaning companies.

In janitorial work, there's a low barrier to entry – you need little beyond a mop and bucket to get a business off the ground – so many companies are tiny enterprises. About 93 percent of the 780,000 companies in the United States are registered as one-person outfits, according to the Census Bureau.

Much of the industry functions on a convoluted system of subcontracting. Some companies land cleaning gigs with big-box retailers or high-end high-rises but subcontract the actual cleaning to a different company.

AR004777



CREDIT: MATT ROTA

Some of the subcontractors might then subcontract the work to yet another business. This creates layers under which exploitation can thrive.

To stay competitive, cleaning companies of all sizes have to keep prices low. According to what's reported to the federal government, janitors earn about $25,500 a year. The primary expense is labor, so wages are the first place where they cut corners.

"The way you make money in this industry is to cheat because the profit margin is so thin," said Stephen Lerner, who led the first national effort to organize janitors for the Service Employees International Union in the 1980s.

Janitors have claimed that they were forced to clock in using two different names to avoid racking up overtime, Lerner said. They say unscrupulous contractors call them independent contractors so they don't have to follow labor laws. Segments of the workforce aren't authorized to work in the U.S., a scenario that makes workers vulnerable to abuses and puts companies at risk for legal problems.

AR004778



Lilia Garcia-Brower is the executive director of the Maintenance Cooperation Trust Fund, which is partially funded by ABM to ferret out labor violations among nonunionized companies.

CREDIT: FRONTLINE

Another part of the industry operates completely on the black market. The outfits go unregistered with the government to avoid paying taxes or insurance. These off-the-grid companies can charge far less than their competitors, said Lilia Garcia-Brower of the Maintenance Cooperation Trust Fund, which is partially funded by ABM to ferret out labor violations among nonunionized companies.

A recent study

(http://ann.sagepub.com/content/653/1/65.abstract) of 826 low-wage employees working illegally in San Diego County found that 64 percent of the janitors surveyed had been cheated out of pay or suffered some other labor violation. About one-third said they'd been forced to work against their will, and 17 percent of that group said they'd experienced some kind of physical threat, including sexual violence, according to the study from Cornell University and San Diego State University professors.

In one of the most horrific displays of what can go awry, a band of brothers from Ukraine trafficked about 70 people from their home country to Philadelphia and forced them to work as cleaners

(http://www.fbi.gov/news/stories/2015/january/human-trafficking-ring-

AR004779

dismantled/human-trafficking-ring-dismantled) after winning subcontracting gigs at companies such as Target and Wal-Mart from 2000 to 2007. Two women told prosecutors that they'd been raped by one of the traffickers.

At the other end of the spectrum is ABM, which has a long history of enviable success and expansion. American Building Maintenance Co., as it initially was called, was started in 1909 by Morris Rosenberg, who volunteered to clean the windows of San Francisco hardware stores and pharmacies. Pay me whatever you feel the job is worth, he'd tell owners. Soon, he was working for major department stores and theaters.

One of his first big contracts was for a bank run by his childhood friend, an Italian immigrant named Amadeo Giannini who started an outfit now known as Bank of America.

Today, ABM is a publicly traded company headquartered in New York with $5 billion in annual revenue. Its workers clean 2 billion square feet each day. It has expanded its offerings to security, parking and facility maintenance of all kinds. It handles sustainable energy projects for high-rises, operations support for military bases and maintenance that keeps golf courses pristine.

Despite growth into other areas, the bulk of ABM's revenue still comes from its janitorial business, and cleaners make up 57 percent of its workforce. Its market share is five times larger than that of its janitorial competitors.

AR004780

Like other larger and unionized outfits, ABM has human resources departments that distribute written policies on wages, breaks and workplace conduct. ABM's policies say it does not tolerate sexual harassment. Those written policies instruct workers that it's their responsibility to immediately report a problem to human resources. Workers also can call a 24-hour complaint hotline in 100 languages.

From there, the company promises to do a swift and effective investigation. A document (https://www.documentcloud.org/documents/210737-blue-letter.html) handed to investigators, called a "blue letter," gives them two missions: Address the worker's concerns and help defend the company in possible legal actions.

And while written policies are critical for companies, they're only a starting point, said Louise Fitzgerald, a renowned sexual harassment researcher at the University of Illinois at Urbana-Champaign. From there, a responsible company should publicize the policies to its workers and make it easy for them to complain. And if the company believes something has happened, it needs to take action.

"That's one of the things we do know: If a company sends a strong message that it does not tolerate this behavior, there will be less sexual harassment," she said.

\*\*\*

AR004781



To stay competitive, cleaning companies of all sizes have to keep prices low. On average, janitors earn about $25,500 a year.

AR004782

CREDIT: FRONTLINE

Over the course of more than a year, we reached out to more than a dozen ABM board members, ex-employees and shareholders to ask them about the sexual assault claims brought by workers such as Erika Morales and Maria Magaña. Most did not want to talk – and some hung up on us – but others told us anonymously about the inherent challenges that come with addressing sexual harassment in the janitorial industry and how ABM has the best policies in the business. But they wouldn't go on the record.

To truly get an insider's view, we traveled some 2,000 miles from the company's New York headquarters to eastern Washington state to talk to Mary Schultz, a lawyer who consulted for the company for three years.

ABM had hired Schultz after she successfully sued it for gender discrimination on behalf of a former ABM manager. As part of her consulting work for the company, Schultz traveled the country to talk to employees from all ranks.

What Schultz learned during her time with ABM was that the company was trying to address sexual harassment,



Mary Schultz, an attorney who consulted for ABM from 2006 to 2009, said the company was trying to address sexual harassment, but the issue had gotten away from it at some branches. "It's a huge undertaking and will continue to be," she said.

AR004783

CREDIT: FRONTLINE

but there were hot spots at different branches across the country where the issue had gotten away from them.

"When I got involved with the company, I certainly understood and believed that there was a definite intent to address these issues," she said. "But it's a huge undertaking and will continue to be."

She said it's a point of pride for the company that ABM offers an on-ramp to the American dream. At ABM job sites, people show up to work from China, Mexico and the Caribbean. They bring with them different customs, expectations and languages.

"You have a very diverse employee base, spread out across the country," Schultz said. "You have a lot of really good people, and you have some really bad people. And the dilemma for the company is to try and identify and contain."

When her three-year term ended in 2009, she left believing that both companies and workers have a responsibility to prevent harassment. Bosses needed to create policies, show vigilance and make it clear that there are consequences. And workers needed to report the problem.

This was the crux of a case Schultz helped ABM litigate in Minnesota, where eight women made claims in 2006 that they'd been harassed or assaulted by their superiors.

AR004784

Miriam Pacheco was among them. Wearing a red sweater and velvet pants to ward off the winter chill, Pacheco told us not long ago that she'd been raped repeatedly by her co-worker in a conference room and a private office she cleaned. He had terrorized her by pulling all of the telephone wires so she couldn't call for help, then blamed her for breaking the cords, she said.

Schultz took Pacheco's deposition in 2007, at a moment when the ex-janitor was living in a homeless shelter with her two kids. Pacheco didn't get much of an education before she came to the United States from Mexico, and she was in the country without immigration papers.

At the deposition, Schultz grilled Pacheco on the fact that she'd signed documents acknowledging receipt of ABM's sexual harassment and workplace policies but didn't use them to bring forward her complaint. Pacheco said she didn't understand them, and she had taken the papers home and thrown them away.

At the time, Schultz was unrelenting, but now she acknowledges that workers like Pacheco are in a tough position.

"Everyone goes home to sleep. These folks are out there working," she said. "What happens in that environment can be confusing, and if something happens, where do they turn? The question for the company becomes, 'How can we get at those incidents? How do we protect?' And there are limited ways of doing it. I mean, you can't post a federal marshal at the door."

AR004785

After four years of litigation, the Minnesota case was thrown out in 2010. The judge said that in some cases, the women did not properly complain about the problem, and in others, the company had dealt appropriately with the issue. The judge also said some of the women's complaints didn't meet the legal definition of sexual harassment.

Looking back on that case, Schultz recognizes that workplace sexual harassment cases often hinge on what laypeople might consider a technicality.

"The law is the law," Schultz said, and "some of that has little to do with what actually happened."

"The company is not saying, nor has it ever, that these things don't happen," she added.

Schultz said civil lawsuits are a necessary but imperfect way to demand accountability, forcing companies into a position where they need to fight them.

"Do companies just start opening the wallet, paying out money to people whose circumstances they believe?" she said. "I think that would be horribly risky for any company. You would end up getting complaints from every angle. You would end up with varying motivations for complaints. You would be overwhelmed with trying to sort out the good from the bad."

AR004786

A year after Schultz left the company, ABM agreed to settle (http://www.eeoc.gov/eeoc/newsroom/release/9-2-10.cfm) the case sparked by Erika Morales' complaint. It paid $5.8 million but didn't admit any wrongdoing.

ABM promised (https://www.documentcloud.org/documents/2104825-amended-eeoc-abm-consent-decree.html) to improve sexual harassment training, ensure its policies are distributed in both English and Spanish and conduct on-site audits for sexual harassment. It also pledged to train its investigators, hire bilingual human resources staff and create a centralized database of worker complaints. Some of the provisions were national; others were specific to California's Central Valley. Finally, it agreed to have the government's expert witness oversee its progress through 2013.

ABM's attorneys said the company has updated its policies and training since the government lawsuit.

"They did comply with the terms that we laid out, which we felt addressed some of it. Does that speak to the national practice?" said Anna Park, the government attorney. "I can't say. We hope."

Today, ABM continues to face sexual harassment cases in court. Since the beginning of 2010, the company has been sued seven times in federal court and at least nine times in California courts.

AR004787

Most of the time, the company settles the cases without admitting guilt. Sometimes, the company prevails.

Its next test could come this fall. The company is slated to go to trial (https://www.documentcloud.org/documents/2104826-davila-2nd-amended-complaint.html) in a case in which three Southern California women allege that they were harassed, assaulted or raped by the same ABM floor waxer. The women have a familiar charge: They say their complaints to ABM management were ignored.

For months, they said, the abuse escalated. One woman said she was raped in fall 2009, and several months later, another woman said she was sexually assaulted by the same man. When she immediately reported it to a manager, she said she was told to go back to work. The manager told her that she should not contact security and that he'd call the police.

Eventually, the woman got tired of waiting for a response, she said, and went to the authorities on her own. The floor waxer ended up pleading guilty to sexual battery. He served one year in jail and got five years of probation.

ABM argues in court documents that it took immediate action once it received a complaint, firing the floor waxer, and that the women should be barred from bringing the lawsuit because they had settled workers' compensation claims with the company based on these same allegations.

In the end, few win at trial against ABM. Maria Bojorquez is one of them.

AR004788

She accused a supervisor of raping her while she cleaned a law office in San Francisco's iconic Ferry Building in 2004. After she complained, she said she was fired. ABM's investigator had decided Bojorquez's claims were inconclusive, but when the case went to trial in 2012, the jury found that ABM had failed to prevent harassment and had fired her for making the claims. Bojorquez was awarded more than $800,000 in damages (https://www.baycitizen.org/news/courts/sexual-harassment-suit-settlement-brings/). The company appealed.

In a recent hearing in that case, ABM's lawyer argued that workplace violence cases involving other janitors shouldn't have been brought up at trial. Standing before a panel of judges, he noted that the company has "tens of thousands of employees located across the United States and internationally, many who work in remote locations at night with minimal supervision."

"Bad things sometimes happen," he said.

\*\*\*

For the past six years, Erika Morales has become known to the masses as DJ Bunny for Ligera FM, a shoebox of a station inside a bustling Bakersfield mercado.

After she quit her job at ABM, Morales managed a restaurant and nightclub. Her boss eventually tapped her to plug events on the local radio station. She discovered that even though she's not the showy type, her

AR004789

voice becomes irresistibly golden once it meets a microphone.

Watching her transition from Erika to Bunny is like seeing an ember catch flame. At the station, she puts on headphones and effortlessly reads the horoscopes or promotes rock en Español concerts. Between news bits, she gives throaty shoutouts to the people who have written to her on Facebook from California, Argentina or Peru.

In the boundless Internet radio landscape, Morales is especially beloved because she has been willing to talk candidly about hard topics. Teary callers have sought her advice on how to file a police report for sexual assault or how to leave an abusive relationship.

Until a day in late February, she never had let on that she spoke on these topics with her own kind of tragic authority. But she found herself on the edge of a moment. She had one of her regular guests lined up, a California Highway Patrol officer, and she'd promised her listeners a program about workplace problems.

When the music stopped, she leaned into the mic and the words spilled out: "This is something delicate, and personally, I've never told this part of my life on air. Very few people know about this period, but I want this to serve as ..."

Morales' voice became uncharacteristically shaky. "And sorry if I may get a little emotional, but it's still a question that I am trying to overcome," she said.

AR004790



Erika Morales is now known to the masses as DJ Bunny for Ligera FM, a radio station inside a Bakersfield mercado. She is beloved for her willingness to talk candidly about hard topics.

CREDIT: FRONTLINE

Morales told her listeners that she'd been sexually harassed at work and that she knows it's hard to come forward. She never did make it to the police herself. She just couldn't summon the courage at the time. She told her listeners that in her case, she and others had tried to tell their bosses, but nothing was done.

"The problem is when they don't believe you," Morales said.

Nevertheless, she exhorted her listeners to report the problem. She reminded them that it wasn't right and that it was never their fault.

"That's not right," she said. "You go to work and keep your head down, make your money and stay out of trouble."

For nearly half an hour, Morales and the California Highway Patrol officer went back and forth on how to deal with sexual harassment. Then it was time for the rock music hour. She said farewell to the officer, put on a song with a bracing backbeat and turned off her mic before exhaling deeply.

AR004791

Her phone was blazing with messages. "We are with you," one said. Another read: "Continue fighting." She was surprised by the response. She had expected to be judged.

Back on the mic, she thanked everyone for their support as she prepared to play Guns N' Roses' "Sweet Child O' Mine." Her upbeat cadence and rich delivery had begun to return. She let the song rage.

A decade has passed since Morales quit her job at ABM. She said she had set aside her fears to file a complaint because she was thinking of her daughter, her mother and the other women who were not yet ready to come forward.

When Morales had handed over her keys and tried one final time to tell a supervisor what was going on and he had dismissed her, she remembers spitting out her words. "There will be someone. Someone will speak out, and they are going to come and tell you that what you are doing is wrong," she had said.

Morales still is amazed by the way her voice can carry. "I never imagined that I would be the one to speak out," she said.

**We've been telling stories that change laws and lives for more than 40 years. And we're just getting started.**

Sign up for our newsletter.

AR004792

Email Address

**SUBMIT**

*Daffodil Altan of Reveal, Sasha Khokha of KQED and Andrés Cediel and Lowell Bergman of IRP reported for this story. Nadine Sebai of IRP also contributed. It was edited by Andrew Donohue and Robert Salladay and copy edited by Sheela Kamath and Nikki Frick.*

*Bernice Yeung can be reached at byeung@revealnews.org (mailto:byeung@revealnews.org). Follow her on Twitter: @bmyeung (https://twitter.com/bmyeung).*

REPUBLISH THIS CONTENT

## Related



**Nation's largest janitorial company faces new allegations of rape**



**How janitors banded together to fight rape on the night shift**



**#MeToo: Rape on the Night Shift**

About Us (https://www.revealnews.org/about-us/).
Contact Us (https://www.revealnews.org/about-us/contact-us/).

AR004793

AR004794

Privacy Policy (https://www.revealnews.org/privacy-policy/).

Terms of Use (https://www.revealnews.org/terms-of-use/).

Brand Assets (https://www.revealnews.org/about-us/brand-assets/).

Corrections (https://www.revealnews.org/corrections)

Where to Hear Reveal (https://www.revealnews.org/where-to-hear-reveal/).

Newsletter (https://www.revealnews.org/newsletter/).

StoryWorks (http://storyworks.revealnews.org).

Facebook (https://www.facebook.com/ThisIsReveal).

Twitter (https://twitter.com/reveal).

YouTube (https://www.youtube.com/reveal).

iTunes (https://itunes.apple.com/us/podcast/reveal/id886009669).

RSS (http://www.revealnews.org/feed/).

Audio RSS (http://feeds.revealradio.org/revealpodcast)

1400 65th St., Suite 200
Emeryville, CA 94608
510-809-3160 | info@revealnews.org
(mailto:)

*© Copyright 2019, The Center for Investigative Reporting*



DONATE

INVESTIGATIONS

# They Got Hurt At Work — Then They Got Deported

August 16, 2017 · 5:00 AM ET
Heard on All Things Considered

 MICHAEL GRABELL

 HOWARD BERKES

FROM **P**

**12-Minute Listen**

PLAYLIST

Download

Transcript

At age 31, Nixon Arias cut a profile similar to many unauthorized immigrants in the
United States. A native of Honduras, he had been in the country for more than a
decade and had worked off and on for a landscaping company for nine years. The
money he earned went to building a future for his family in Pensacola, Fla. His
Facebook page was filled with photos of fishing and other moments with his three
boys, ages 3, 7 and 8.

https://www.npr.org/2017/08/16/543650270/they-got-hurt-at-work-then-they-got-deportedhttps://www.nelp.org/publication/unintended-consequences-limiting-workers-comp-benefits-undocumented-work... 1/40



AR004796

https://www.npr.org/2017/08/16/543650270/they-got-hurt-at-work-then-they-got-deportedhttps://www.nelp.org/publication/unintended-consequences-limiting-workers-comp-benefits-undocumented-work...



Nixon Arias worked off and on for a Florida landscaping company for nine years before a legitimate injury at work resulted in his arrest, prosecution and deportation to Honduras.

*Courtesy of Nixon Arias*

But in November 2013, that life began to unravel.

The previous year, Arias had been mowing the median of Highway 59 just over the Alabama line when his riding lawnmower hit a hole, throwing him into the air. He slammed back in his seat, landing hard on his lower back.

Arias received pain medication, physical therapy and steroid injections through his employer's workers' compensation insurance. But the pain in his back made even walking or sitting a struggle. So his doctor recommended an expensive surgery to implant a device that sends electrical pulses to the spinal cord to relieve chronic pain. Six days after that appointment, the insurance company suddenly discovered that Arias had been using a deceased man's Social Security number and rejected not only the surgery but all of his past and future care.

Desperate, Arias hired an attorney to help him pursue the injury benefits that Florida law says all employees, including unauthorized immigrants, are entitled to receive.

AR004797

Then one morning after he dropped off two of his boys at school, Arias was pulled over and arrested, while his toddler watched from his car seat.

Arias was charged with using a false Social Security number to get a job and to file for workers' comp. The state insurance fraud unit had been tipped off by a private investigator hired by his employer's insurance company.

With his back still in pain from three herniated or damaged disks, Arias spent a year and a half in jail and immigration detention before he was deported.



In partnership:

This story was reported in partnership between NPR and ProPublica, an investigative journalism organization. A version of this story is posted on ProPublica's website in English and Spanish.

However people feel about immigration, judges and lawmakers nationwide have long acknowledged that the employment of unauthorized workers is a reality of the American economy. From nailing shingles on roofs to cleaning hotel rooms, some 8 million immigrants work with false or no papers nationwide, and studies show they're more likely to be hurt or killed on the job than other workers. So over the years, nearly all 50 states, including Florida, have given these workers the right to receive workers' comp.

But in 2003, Florida's lawmakers added a catch, making it a crime to file a workers' comp claim using false identification. Since then, insurers have avoided paying for

injured immigrant workers' lost wages and medical care by repeatedly turning them in to the state.

Workers like Arias have been charged with felony workers' comp fraud even though their injuries are real and happened on the job. And in a challenging twist of logic, immigrants can be charged with workers' comp fraud even if they've never been injured or filed a claim, because legislators also made it illegal to use a fake ID to get a job. In many cases, the state's insurance fraud unit has conducted unusual sweeps of worksites, arresting a dozen employees for workers' comp fraud after merely checking their Social Security numbers.

What's quietly been happening to workers in Florida, unnoticed even by immigrant advocates, could be a harbinger of the future as immigration enforcement expands under President Trump.

One of Trump's first executive orders broadened Immigration and Customs Enforcement's priorities to include not just those convicted of or charged with a crime but any immigrant suspected of one. The order also targets anyone who has "engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency." That language could sweep in countless injured unauthorized workers because state workers' comp bureaus and medical facilities typically request Social Security numbers as part of the claims process.

In the past few months, a Massachusetts construction worker who fractured his femur when he fell from a ladder was detained by ICE shortly after meeting with his boss to discuss getting help for his injury. In Ohio, Republican lawmakers pushed a bill that

AR004799

would have barred undocumented immigrants from getting workers' comp. It passed the state's House of Representatives before stalling in the Senate in June.

To assess the impact of Florida's law on undocumented workers, ProPublica and NPR analyzed 14 years of state insurance fraud data and thousands of pages of court records. We found nearly 800 cases statewide in which employees were arrested under the law, including at least 130 injured workers. An additional 125 workers were arrested after a workplace injury prompted the state to check the personnel records of other employees. Insurers have used the law to deny workers benefits after a litany of serious workplace injuries, from falls off roofs to severe electric shocks. A house painter was rejected after she was impaled on a wooden stake.

Flagged by insurers or their private detectives, state fraud investigators have arrested injured workers at doctor's appointments and at depositions in their workers' comp cases. Some were taken into custody with their arms still in slings. At least 1 in 4 of those arrested were subsequently detained by ICE or deported.

State officials defended their enforcement, noting that the workers, injured or not, violated the law and could have caused financial harm if the Social Security numbers they were using belonged to someone else. Moreover, the law requires insurers to report any worker suspected of fraud.

"We don't have the authority or the responsibility to go out and start analyzing the intent of an insurance company or anybody else when they submit a complaint to us," said Simon Blank, director of the Florida insurance fraud unit. "It would be

unfortunate," he said, if insurers turned in injured workers "just to do away with claims."

Blank insisted that his investigators' efforts have nothing to do with immigration. But ProPublica and NPR's review found that more than 99 percent of the workers arrested under the statute were Hispanic immigrants working with false papers.

While Florida's statute is unique, insurers, hard-line conservatives and some large employers have been battling across the country for the past 15 years to deny injury benefits to unauthorized immigrants, with occasional success. In a little-noticed ruling last fall, an international human rights commission criticized the United States for violating the rights of unauthorized immigrants, including a Pennsylvania apple picker who was forced to settle his case for a fraction of the cost of his injury and a Kansas painter who was unable to get the cast removed from his broken hand until he was deported to Mexico.

In Florida, cases against such workers have become standard practice for a group of closely affiliated insurers and employers. The private investigative firm they employ has created a wall of shame, posting the arrests it has been involved in on its website. Critics say the arrangement encourages employers to hire unauthorized immigrants, knowing they won't have to pay for their injuries if they get hurt on the job.

"It's infuriating to think that when workers are hurt in the United States, they're essentially discarded," said David Michaels, the most recent head of the federal Occupational Safety and Health Administration. "If employers know that workers are too afraid to apply for workers' compensation, what's the incentive to work safely?"

AR004801

The law's real-life ramifications came as a surprise to one of the lawyers who helped draft it and who had no idea it had been used to charge hundreds of workers who had never been hurt on the job.

"How is there insurance fraud if there's no comp claim?" asked Mary Ann Stiles, a longtime business lobbyist and attorney for insurers. "That would not be what anybody intended it to be."

In Arias' case, records show he never wrote the false Social Security number on any of the various forms related to his claim. It was printed automatically by the insurance carrier, using information from his employer. But that didn't stop the state attorney from charging him with 42 counts of insurance fraud — one for every form the number appeared on.

As part of the prosecution, investigators demanded Arias pay back $38,490.51 to Normandy Harbor Insurance for the medical care and benefits checks he had already received for his injury. The insurer declined to comment. Back in Honduras, Arias, who struggles with chronic back pain, has been unable to find more than odd jobs. And he hasn't seen his three U.S.-born sons in more than two years.

The whole time in detention, "I was always asking, 'Why? What's the reason I'm here? I haven't done anything, I haven't stolen anything; I haven't killed anyone,'" Arias said by phone from his rural village in the state of Copán. "I was just working for my kids."

## A company's control over injury claims

AR004802

The website of Command Investigations, located just outside Orlando, boasts of its success in hunting down workers' comp fraud, posting like trophies a gallery of mug shots of mostly Hispanic men and women. But most of those pictured weren't nabbed jet-skiing with a fake knee injury. They are legitimately injured workers whom Command investigators caught using false Social Security numbers.

Command, which tipped off the state to Arias, opened up shop in 2012 and quickly rose to prominence in Florida by catering to the lucrative employee leasing industry. Unlike temp agencies, which find workers and task them to businesses, employee leasing companies promise to lower businesses' overhead by hiring their employees on paper and then leasing them back. The basic premise is that by pooling the risk of several small businesses, leasing companies can bargain for better insurance rates. Such a setup is especially attractive to mom and pop firms in dangerous industries, such as construction.

One of Command's first big clients was Lion Insurance, whose affiliate SouthEast Personnel Leasing serves as the employer of record for more than 200,000 employees nationwide. According to its website, SouthEast generates $2.3 billion in annual revenue — about as much as clothing retailer J. Crew or the restaurant chain Red Lobster.

Since 2013, nearly 75 percent of the injured immigrants arrested in Florida for using false IDs were turned in by Command — and half worked for SouthEast, ProPublica and NPR found. SouthEast has had 43 injured workers arrested for using false Social Security numbers — more than any other company.

One reason: SouthEast, as well as its insurance carrier, Lion, and its claims processor, Packard Claims, are all owned by the same person. The unusual arrangement gives the company more control over injury claims and a consistency other firms specializing in high-risk industries can't provide. But critics say it benefits SouthEast in more pernicious ways: Knowing that Lion and Packard can deny the claims of unauthorized workers allows SouthEast to offer discounts to contractors that other leasing firms can't.

"They sign up these companies knowing full well that 95 percent of the employees are immigrant workers," said Cora Cisneros Molloy, who recently began representing injured workers after two decades defending employers and insurers. "Only after an accident occurred do they determine they're going to do an investigation and check that Social Security number."

Controlling the empire from a six-story office building surrounded by palm trees in Holiday, Fla., is John Porreca, 68, who grew up in Philadelphia and worked in the leasing business before buying SouthEast with his wife in 1995. Despite owning one of the largest private companies in Florida, Porreca has managed to stay out of the public eye, showing up in the local press only rarely, such as when he donated the money for a baseball field for disabled children or bought a $4 million beachfront mansion, the size of which rankled neighbors.

Porreca didn't respond to multiple messages left at his office or home over the course of a month. In an email, Brian Evans, an attorney for SouthEast, said Porreca declined to comment other than to say that SouthEast "strictly adheres" to the law and is not

AR004804

responsible for what happened to its workers, even though the company's investigators reported them to the state.

Command's president, Steve Cassell, also declined interview requests, citing confidentiality agreements with his clients.

Bram Gechtman, a Miami attorney who has represented several injured SouthEast workers, said the sheer number of cases in which Lion and Packard discovered workers' false IDs only after they were injured raises the question of why SouthEast doesn't do more to screen its hires.

"If I had a situation where I had all these people defrauding my company over and over and over again, allegedly, I would do something to try to stop it," he said, "unless there was another reason why I didn't want it to stop."

Command and SouthEast have recently expanded to other states. Last year, a woman in Georgia was arrested for identity theft after a cart ran over her foot at a meatpacking plant and Command turned her in to the state workers' comp bureau. In California, two staffing agencies sued SouthEast, saying its claims processor routinely denied workers' comp claims based on immigration status, leading to litigation that increased the cost of the claims.

For workers, welcomed without question until they get hurt, getting caught in Command and SouthEast's dragnet can upend otherwise quiet lives.

Berneth Javier Castro originally came to the United States on a tourist visa in 2005 searching for the woman he had loved and lost during the war in Nicaragua in the

AR004805

1980s. Unable to find her and facing debts back home for his house and his daughter's school, Castro, now 52, overstayed his visa and found work at a St. Augustine roofing company in 2007. Initially, he was paid in cash under the table. But after a few months, the company said he needed a Social Security number to continue working. So he bought one. It was the only way he could get work, he said.

In 2011, Castro finally reconnected with Lucía Escobar using modern technology — he found her on Facebook. Escobar, 48, who had received asylum and is now a U.S. citizen, was going through a divorce. They began talking every day and planned to be together once the divorce was final.

AR004806



Lucía Escobar flew to Nicaragua from Miami to marry Berneth Javier Castro, her childhood sweetheart. Castro, an undocumented worker, faced deportation and voluntarily left the U.S. after suffering an injury at work and seeking workers' compensation benefits.

*Scott McIntyre for ProPublica*

Like many unauthorized workers, Castro feared he would be deported if he reported an injury. So when he sliced his pinkie on some copper sheeting and got nine stitches, he stayed quiet and kept working. But a few months later, when he wrenched his back passing a load of tiles to a coworker on a roof, the company sent him to a clinic.

There, a company representative filled out the form since it was in English, Castro said. He didn't recall the Social Security number he'd used, so the representative got it from the company and put it on the form.

The clinic gave Castro some pills for the pain. But when he returned for the follow-up appointment, he was told there was a problem with his Social Security number. Castro never returned and treated his back with heating pads and pain relief balms. He figured that was the end of it and continued working for the company for nearly a year.

Then in November 2013, state investigators turned up at his home and arrested him for insurance fraud. He had been turned in by a Command investigator working for Lion.

The workers' comp fraud charges were eventually dropped, but Castro pleaded no contest to fraudulently using someone else's identity. He spent five months in jail and was facing deportation before a judge granted him a voluntary departure to Nicaragua.

"The fake number, I understood because I needed it to work, but I didn't understand the fraud," Castro said by phone from Managua. "I'm not an irrational man. I'm not a criminal. So I didn't understand where I might have committed fraud. It didn't make sense to me. I never filled out a document asking for anything looking for compensation."

Escobar sensed something was wrong when she suddenly stopped hearing from him.

Then his phone was disconnected. "Every day, I went on Facebook, hoping and writing to him," she said.



Escobar speaks with her husband, Castro, by phone from outside Miami. Escobar is caring for her grandson while Castro hopes to return to the U.S. despite being charged with insurance fraud after filing a legitimate workers' comp claim.

*Scott McIntyre for ProPublica*

Months later, when he finally called her from Nicaragua, she was at once relieved and despondent. In 2015, after her divorce was final, she flew to Nicaragua and married him. But they still live separately, Castro in Nicaragua and Escobar outside Miami, where she cares for her grandson. They are applying for Castro to return, but the conviction could stand in his way.

"It's sad because when you get married, you want to be with your husband," Escobar said. "We waited for so long to be together."

## New tactics from employers and insurers

Over the years, numerous courts have upheld the rights of unauthorized workers to receive compensation for workplace injuries, the minimum wage and protection from retaliation for joining unions. The rights stem from their status as employees regardless of their status as immigrants.

A Florida appeals court, for example, ruled in 1982 that "an alien illegally in this country" is entitled to workers' comp benefits.

That presumption was thrown into doubt in 2002 when the U.S. Supreme Court ruled that a group of undocumented plastics workers fired for union activities weren't entitled to back pay because of their immigration status. Insurers and large employers immediately flooded the courts with petitions designed to claw back labor protections

AR004810

for unauthorized immigrants. Leading the fight in Florida were employee leasing firms.

The petitioners argued that undocumented immigrants weren't entitled to workers' comp since their employment was obtained illegally. Lawmakers in several states, from Colorado to North Carolina, introduced bills to block claims by unauthorized workers.

As state courts and legislatures rejected that argument, insurers began pushing to deny immigrants disability benefits, arguing that once their unauthorized status was known, they couldn't return, like other workers, to less intensive jobs. That reasoning succeeded in Michigan and Pennsylvania, but not in Delaware and Tennessee.

In the past few years, employers and insurers have begun using a new tactic, arguing that they should only be responsible for paying lost wages based on what the immigrant would have made in his or her home country. In Nebraska, for example, meatpacker Cargill tried to cut off benefits to Odilon Visoso, who was injured when a 200-pound piece of beef fell on his head, saying it was too difficult to determine what he could earn in Chilpancingo, Mexico, a crime-ridden city controlled by drug cartels near his rural, mountainous village. Nebraska's Supreme Court told the company to use Nebraska wages.

Florida's 2003 law was part of a sweeping overhaul aimed at lowering costs for employers. According to a state Senate review, the division of insurance fraud had pushed for the provision, arguing that "many times illegal aliens are in league with unethical doctors and lawyers who bilk the workers' compensation system." It was

easier to prove that immigrants had lied about their identities, the agency said, than to prove their injuries were fabricated.

In recent interviews, however, representatives from the state fraud unit and insurance industry couldn't identify a single case where immigrants had worked with doctors and lawyers to defraud workers' comp. Instead, they noted that false Social Security numbers impede insurers' ability to investigate claims. In addition, they said, those claims could prevent the people whose identity was stolen from getting benefits if they are injured in the future.

Stiles, the attorney who was a key architect of the law, said the state's construction industry was rife with fraud at the time and there was a lot of concern about illegal immigration. She said even immigrants who are "truly injured" should be denied benefits if they're using illegal documents for their claim and "they shouldn't be here in the first place."

"I think we're a nation of laws and we ought to be able to enforce those laws," she said. "And if the federal government won't do it, sometimes the state has to help itself."

Within months of the provision passing, though, the state Senate's banking and insurance committee recommended reconsideration, raising concerns that legitimately injured workers could be disqualified. But that advice was never heeded. The first criminal cases under the law showed up in 2006. The law netted laborers, farmworkers, roofers and landscapers. Several, like Arias, were hurt while working on public projects — renovating schools or pouring concrete at the zoo. But ProPublica

AR004812

and NPR also found arrested workers who had been injured at McDonald's and Best Western and turned in by major insurers like Travelers, The Hartford and Zurich.

In one case, state investigators found that more than 100 workers were all using a Social Security number belonging to a 10-year-old girl.

One of SouthEast's first cases involved a hotel housekeeper at the Comfort Suites in Vero Beach. Yuliana Rocha Zamarripa was cleaning a hotel room in 2010 when she slipped on a bathroom floor and slammed her knee on the bathtub, leaving her with pain and swelling so severe she was unable to walk.

Lion sent her to a doctor but quickly denied her claim based on a false Social Security number.

Rocha's mother had brought her to the United States from Mexico when she was 13, and when she turned 17, her father bought her the fake ID so she could work.

With few options, Rocha, now 32, settled her workers' comp case for less than $6,000 plus attorney fees. But she never got the medical care she needed. The week before she was to receive the check, she was arrested while making breakfast for her 4-year-old son.



Yuliana Rocha Zamarripa's workers' comp claim for a serious knee injury at work prompted her arrest. She was shuffled from county to immigration jails for a year and blames the sexual abuse of her daughter on her inability to protect her at home.

*Scott McIntyre for ProPublica*

Rocha spent the next year cycling through jail and immigration detention, separated from her three children. She couldn't sleep, worrying what would happen to them if she were deported.

"I said the Lord's Prayer all the time, and I would end by asking, 'God, give me a chance to return to my children. Don't let anything bad happen to them,'" she said. "I had a feeling that something was not right."

Rocha's instincts were correct. While she was in jail, the father of her children started sexually assaulting their 10-year-old daughter, according to his arrest warrant. "I was left shattered," Rocha said tearfully, "because I didn't know what was happening."

With the help of an attorney, Rocha pleaded to a lesser charge — "perjury not in an official proceeding" — and was finally released. Because of what happened to Rocha's daughter, the attorney was able to get Rocha's deportation canceled and help her obtain a green card.

Rocha eventually received her settlement but had to spend all of it securing her release and dealing with immigration. She now walks with a limp because her injury didn't heal correctly.

"I think it's an injustice what happened to me," she said. "All because I fell, I slipped."

## Using workers' comp law to engage in immigration enforcement

The sting had been meticulously planned for weeks. The day before, detectives had scoped out the site — a two-story office building resembling a Spanish colonial

AR004815

mansion near downtown Fort Myers. Before the arrest, they ducked out of sight to surveil the building's back entrance from across the street, according to the detective's case report.

The time and manpower weren't to nab a gang member or drug dealer, but a coordinated effort with Command to snare a 27-year-old roofer who was at a court reporter's office to testify in a deposition for his workers' comp case. A year earlier in 2014, Erik Martinez was working on a roof when a nail ricocheted and hit him in the left eye. He was seeking medical care and lost wages, but like many construction workers, he was using a false Social Security number.

Though it was ostensibly a Florida Department of Financial Services operation, a state detective had worked closely with an attorney for Lion on a plan to alert officers in the final minutes of the deposition. In between questions, the attorney emailed the detective, at one point providing a description of Martinez's clothing.

"We moved our position to the back parking lot," the detective wrote in his report, "where we awaited word that the deposition was nearing an end." Upon receiving confirmation, the detectives moved in, arresting Martinez as he exited the office.

Despite the extensive effort, the state attorney declined to prosecute. But the detective's narrative reveals a larger story: In most of the injury cases reviewed by ProPublica and NPR, state fraud detectives were handed a packet from private investigators with nearly all the information needed to make an arrest.

During an hourlong interview in Tallahassee, Simon Blank, who heads the department's Division of Investigative and Forensic Services, said his detectives

AR004816

conduct their own investigations and make their own decisions. Arrests at depositions, he said, only occur when they have a hard time locating somebody.

"The thing that you need to keep mind is these people are committing identity theft," Blank said. "They're taking somebody else's Social Security number or somebody else's personal information to obtain the work."

While Blank repeatedly expressed compassion for immigrant workers who are legitimately injured, he noted that people whose Social Security numbers are used could face problems with their credit or getting medical care if a claim that wasn't theirs showed up in their records.

The widow of the Mississippi man whose Social Security number Arias was using, Carolyn Lasseter, said it hadn't affected her, but she doesn't "feel sorry for people that are over here illegally." When she bought a house after her husband's death, the bank informed her that a different man had used his number to take out, and pay on, a loan, but it was easily fixed.

Blank's office has been accused by some attorneys of unconstitutionally using the workers' comp law to engage in immigration enforcement. "The real intent behind what they're doing is to regulate immigration," said Florida immigration attorney Jimmy Benincasa, "because they don't feel the federal government is doing enough."

He and others point to a 2012 U.S. Supreme Court ruling that shot down a series of Arizona immigration statutes, including one that made it a crime for unauthorized immigrants to apply for, solicit or perform work.

AR004817

"Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment," the court wrote. "It follows that a state law to the contrary is an obstacle to the regulatory system Congress chose."

The court noted that while federal law makes it a crime to obtain employment through fraudulent means, the forms and documents that workers submit to get jobs can only be used for federal prosecution — not for state enforcement.

"Our agency is not in the business of going after illegal people," Blank said. "There's quite a lot of other circumstances why people use fake names and IDs and Social Security numbers aside from immigration. You have people who might have other legal problems. You have people who are wanting to stay off the books for specific reasons, whether its divorces or liens put against them."

Among the nearly 800 cases that ProPublica and NPR identified, only five fit the reasons Blank cited. Blank seemed unaware that earlier this year, his own office's annual report noted that "nearly 100 percent" of the suspects investigated under the statute were undocumented workers.

"It appears that it's being applied in a discriminatory fashion," said Dennis Burke, the former U.S. attorney in Arizona who challenged that state's immigration statutes. "How do you justify your enforcement being 99 percent Latino surnames?"

Burke predicted Florida would have a tough time defending the law if it's ever heard on constitutional grounds. After the Arizona ruling in 2012, one attorney challenged the Florida statute's constitutionality, but both Florida and U.S. supreme courts declined to take the appeal. Unlike Arizona's law, the statute doesn't mention

immigrants specifically. But Burke said the enforcement data and the stated intent to target immigrant fraud rings are problematic.

Told of what had happened to some of the arrested workers, Blank said he felt for those people but reiterated his agency's obligation to protect the workers' comp system.

"I guess that is a question that our legislature should maybe look into," he said. "What is the balance between the harm and the benefit that's being accomplished?"

**"My son was watching. He saw when they put the handcuffs on me"**

Juvenal Dominguez Quino worries what will happen to his 8-year-old son with special needs if he gets deported. Dominguez, 43, has lived in the United States for 19 years. But his life was thrown into uncertainty in 2014 when a construction trench he was working in collapsed, burying him in dirt and causing him to sprain his knee.

A month later, Command turned him in to state investigators after he provided a false Social Security number to an insurance adjuster. Dominguez said he told the adjuster he didn't have papers and had made the number up in order to work — details that by themselves wouldn't preclude him from receiving workers' comp. But Dominguez said the adjuster insisted she needed the number to pay him benefits. Sunz Insurance and North American Risk Services, which handled the claim, declined to comment.

AR004819



Juvenal Dominguez Quino, 43, has lived in the United States for 19 years. In 2014 a construction trench he was working in collapsed, burying him in dirt and causing him to sprain his knee. Dominguez's attorney has argued for a judge to cancel his deportation because of the harmful effect it would have on his U.S.-born son, Alan.

*Scott McIntyre for ProPublica*

Dominguez was arrested in January 2015 as he was getting his son ready for school.

"My son was watching" from a window, he said, choking up. "He saw when they put the handcuffs on me."

At the time, Dominguez still couldn't bend his knee, so he had to sit with his legs extended across the back seat of the police car.

Dominguez pleaded no contest, and the judge sentenced him to two years' probation and ordered him to pay back nearly $19,000 in restitution to the insurance company. He was detained by ICE and put into deportation proceedings.

Michael DiGiacomo, owner of Platinum Construction, which employed Dominguez, was surprised to hear what had become of him. DiGiacomo said Dominguez was a reliable worker, and he didn't know his documents were fake. After Dominguez got hurt, he said, his injury was in the hands of the leasing company and their insurer.

"It really sucks for him because, you know, you come and you want to work; it sucks to have to deal with that after you got hurt," he said. "They should have at least paid for his medical bills since he was hurt on the job."

Dominguez's attorney has argued for a judge to cancel his deportation because of the harmful effect it would have on his U.S.-born son. His attorney is hopeful he will get a visa to stay.

Even if he does, the insurance company scored a victory — it got Dominguez and his medical costs to go away. "I didn't want to do any more of anything," he said of his

AR004821

physical therapy. "I didn't want to claim anything else. I just wanted to live with it because I knew that it would only bring me more problems."

Arias' attorney Brian Carter said what the state and insurance companies are doing amounts to entrapment and ethnic profiling.

"Nobody looks at whether or not the Social Security number is valid for an individual named Tom Smith," he said. "The insurance companies are using this little issue over a Social Security number to avoid any financial responsibility, and in my opinion, ethical responsibility to take care of these individuals."

In the end, turning in Arias didn't get the insurer off the hook. Because the state attorney offered a plea deal, Normandy would have had to convince a workers' comp judge that Arias had not only used a fake Social Security number but that he had done so to obtain benefits. If it couldn't, it would have had to pay for medical treatment and lost wages potentially totaling hundreds of thousands of dollars, Carter said. So with Arias in Honduras, Normandy offered $49,000 plus attorney's fees.

Sent back to a country he hadn't lived in for 15 years, Arias felt he had no choice but to take the offer. "I arrived empty-handed," he said. "I didn't have means to put a roof over my head or feed myself or buy medications."

Despite having the settlement money, Arias said he doesn't trust the doctors in Honduras to perform a delicate back surgery. "Here, they're more likely to send you to the cemetery," he said. He hopes the United States might allow him to re-enter for humanitarian reasons, just to let him get the operation — and perhaps see his kids.

AR004822

*Research contributed by Meg Anderson and Graham Bishai of NPR and Sarah Betancourt of ProPublica.*

*Do you have information about how immigrant workers are being treated in the age of Trump? Contact Michael at michael.grabell@propublica.org.*

workers compensation     immigration

# Sign Up For The NPR Daily Newsletter

Catch up on the latest headlines and unique NPR stories, sent every weekday.

What's your email?

**SUBSCRIBE**

By subscribing, you agree to NPR's terms of use and privacy policy.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

More Stories From NPR

AR004823

INVESTIGATIONS

Guantánamo Has Cost Billions; Whistleblower Alleges 'Gross' Waste



AR004824



AR004825

ENERGY

Mines No Safer Despite $1 Billion In Fines, Federal Audit Says

## Popular on NPR.org



GLOBAL HEALTH

Scrubbing Your House Of Bacteria Could Clear The Way For Fungus

AR004826



ABC News Defends Its Epstein Coverage After Leaked Video Of Anchor



AR004828

34/40

https://www.npr.org/2017/08/16/543650270/they-got-hurt-at-work-then-they-got-deportedhttps://www.nelp.org/publication/unintended-consequences-limiting-workers-comp-benefits-undocumented-wo…

LATIN AMERICA

Mormon Family Mourns Their Dead In Mexico, Calls For U.S. To Rein In Its Guns



POLITICS

Aide From Pence Office Testifies In Impeachment Probe

# NPR Editors' Picks



POLITICS

Ukraine Pressure Campaign Undermined 'Rule Of Law,' Top State Dept Official Says

AR004830



Colorado Highway Expansion Routed Over Ancient Native American Sites

RACE



MUSIC NEWS
'Hittin' The Ramp' Traces Nat King Cole's Early Artistic Development



HISTORY

Western Individualism May Have Roots In The Medieval Church's Obsession With Incest

READ & LISTEN

Home

News

Arts & Life

CONNECT

Newsletters

Facebook

Twitter

AR004833

**Music**

**Podcasts**

**Programs**

ABOUT NPR

**Overview**

**Finances**

**People**

**Press**

**Public Editor**

**Corrections**

**Instagram**

**Contact**

**Help**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**Visit NPR**

terms of use

privacy

your privacy choices

text only

© 2019 npr

AR004834

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-ynni
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2359
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

This proposed regulation change is not only counterintuitive for the USCIS but also harmful to asylum seekers. As someone who works in the immigration field, there are a few logistic errors that need to be reassessed. Similarly, there are other options to ensure both the USCIS and asylum seekers are equally benefited.

The main error in this proposal is that omitting the 30-day adjudication period is a contrast to national security interests. Most asylum seekers already reside in the United States, which proves that a speedier process- not an indefinite delay- would be more in tune with maintaining national security. Furthermore, USCIS has proven its ability to decide on EADs within the 30-day time frame (99% of EADs had decisions last year). A faster process to cover all EADs is the logical conclusion for maintaining national security. An undefined review period runs against the agency's (and the government's) stated interests. In essence, USCIS will have an even more inefficient work authorization process. Another error can be seen in the tax revenue for the government. USCIS admitted that all levels of government would lose tax revenue if this proposed rule change is taken into effect. This loss is anywhere between $39.15 million and $118.54 million per year. Asylum seekers and their employers would not be contributing to Medicare nor social security.

The harm this rule change will cause asylum seekers is obvious. Asylum seekers and their families will lose income, which will lead to them not being able to afford food, housing, medical treatment, health insurance, and/or legal representation. Arguably worse, those without a valid ID (which is needed for many social services) will be vulnerable to exploitation, trafficking, and underground economic risks.

From all of the previously stated logistics, this proposed rule change is not an acceptable solution to the interests of USCIS nor the interests of our free country. If USCIS is adamant about changing the 30-day responding period, then a solution of doubling or perhaps tripling the period would be a better option. A 60-day or even 90-day period would alleviate the pressures on USCIS while ensuring the importance of national security and asylum seeker well-being.

AR004835

# Attachments

USCIS EAD Processing Sheet 2014-2019

AR004836

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2359.html[9/15/2020 4:14:17 PM]

| | | Processing Times | | | | | Compliance Percentage | |
|---|---|---|---|---|---|---|---|---|
| **Fiscal Year** | **Month** | **0-30 Days** | **31-60 Days** | **61-90 Days** | **91-120 Days** | **121+ days** | **Grand Total** | **% Completed within 30 Days** | **% Completed within 60 Days** |

United States Citizenship and Immigration Services (USCIS)
I-765 - Application for Employment Authorization
Eligibility Category: C08, Pending Asylum
Initial Permission to Accept Employment
Completions by Processing Time Buckets
FY15 - FY19 (Through June 30, 2019)
Aggregated by Fiscal Year and Month

| Fiscal Year | Month | 0-30 Days | 31-60 Days | 61-90 Days | 91-120 Days | 121+ days | Grand Total | % Completed within 30 Days | % Completed within 60 Days |
|---|---|---|---|---|---|---|---|---|---|
| **2015** | OCT | 2,323 | 2,538 | 1,071 | 230 | 35 | 6,197 | 37.5% | 78.4% |
| | NOV | 1,583 | 2,727 | 921 | 132 | 35 | 5,398 | 29.3% | 79.8% |
| | DEC | 1,331 | 2,746 | 941 | 157 | 79 | 5,254 | 25.3% | 77.6% |
| | JAN | 1,188 | 2,993 | 1,765 | 316 | 39 | 6,301 | 18.9% | 66.4% |
| | FEB | 1,827 | 1,677 | 1,532 | 598 | 110 | 5,744 | 31.8% | 61.0% |
| | MAR | 1,478 | 3,461 | 2,743 | 1,167 | 166 | 9,015 | 16.4% | 54.8% |
| | APR | 1,205 | 6,131 | 3,136 | 896 | 190 | 11,558 | 10.4% | 63.5% |
| | MAY | 2,539 | 6,907 | 1,120 | 251 | 115 | 10,932 | 23.2% | 86.4% |
| | JUN | 3,873 | 4,083 | 1,083 | 265 | 91 | 9,395 | 41.2% | 84.7% |
| | JUL | 3,428 | 3,633 | 1,636 | 252 | 71 | 9,020 | 38.0% | 78.3% |
| | AUG | 3,322 | 4,378 | 1,958 | 448 | 82 | 10,188 | 32.6% | 75.6% |
| | SEP | 2,730 | 5,179 | 1,387 | 254 | 69 | 9,619 | 28.4% | 82.2% |
| **2015 Total** | | **26,827** | **46,453** | **19,293** | **4,966** | **1,082** | **98,621** | **27.2%** | **74.3%** |
| **2016** | OCT | 2,896 | 3,917 | 1,250 | 244 | 96 | 8,403 | 34.5% | 81.1% |
| | NOV | 2,763 | 4,729 | 2,001 | 465 | 98 | 10,056 | 27.5% | 74.5% |
| | DEC | 2,497 | 3,161 | 2,626 | 438 | 147 | 8,869 | 28.2% | 63.8% |
| | JAN | 2,281 | 6,043 | 3,370 | 550 | 107 | 12,351 | 18.5% | 67.4% |
| | FEB | 5,483 | 3,780 | 3,063 | 2,071 | 97 | 14,494 | 37.8% | 63.9% |
| | MAR | 5,715 | 2,333 | 3,466 | 905 | 213 | 12,632 | 45.2% | 63.7% |
| | APR | 4,588 | 3,054 | 2,538 | 320 | 112 | 10,612 | 43.2% | 72.0% |
| | MAY | 4,392 | 2,709 | 1,262 | 3,376 | 80 | 11,819 | 37.2% | 60.1% |
| | JUN | 5,436 | 4,038 | 1,686 | 4,707 | 338 | 16,205 | 33.5% | 58.5% |
| | JUL | 6,932 | 1,882 | 4,928 | 4,684 | 612 | 19,038 | 36.4% | 46.3% |
| | AUG | 8,478 | 6,600 | 6,159 | 902 | 382 | 22,521 | 37.6% | 67.0% |
| | SEP | 9,001 | 9,268 | 988 | 282 | 169 | 19,708 | 45.7% | 92.7% |
| **2016 Total** | | **60,462** | **51,514** | **33,337** | **18,944** | **2,451** | **166,708** | **36.3%** | **67.2%** |
| **2017** | OCT | 7,567 | 6,273 | 579 | 108 | 84 | 14,611 | 51.8% | 94.7% |
| | NOV | 7,781 | 8,823 | 728 | 111 | 72 | 17,515 | 44.4% | 94.8% |
| | DEC | 9,895 | 7,840 | 545 | 53 | 41 | 18,374 | 53.9% | 96.5% |
| | JAN | 9,592 | 8,987 | 671 | 95 | 63 | 19,408 | 49.4% | 95.7% |
| | FEB | 15,107 | 4,214 | 566 | 99 | 48 | 20,034 | 75.4% | 96.4% |
| | MAR | 13,735 | 4,875 | 530 | 144 | 74 | 19,358 | 71.0% | 96.1% |
| | APR | 8,027 | 7,336 | 717 | 113 | 72 | 16,265 | 49.4% | 94.5% |
| | MAY | 12,193 | 5,190 | 2,273 | 156 | 90 | 19,902 | 61.3% | 87.3% |
| | JUN | 12,864 | 1,884 | 5,048 | 340 | 99 | 20,235 | 63.6% | 72.9% |
| | JUL | 11,404 | 1,742 | 4,221 | 1,340 | 155 | 18,862 | 60.5% | 69.7% |
| | AUG | 12,130 | 5,294 | 9,219 | 5,685 | 1,341 | 33,669 | 36.0% | 51.8% |
| | SEP | 13,900 | 14,737 | 5,076 | 2,618 | 843 | 37,174 | 37.4% | 77.0% |
| **2017 Total** | | **134,195** | **77,195** | **30,173** | **10,862** | **2,982** | **255,407** | **52.5%** | **82.8%** |
| **2018** | OCT | 12,021 | 9,710 | 1,428 | 535 | 336 | 24,030 | 50.0% | 90.4% |
| | NOV | 17,031 | 6,092 | 474 | 119 | 171 | 23,887 | 71.3% | 96.8% |
| | DEC | 18,145 | 5,920 | 372 | 132 | 204 | 24,773 | 73.2% | 97.1% |
| | JAN | 18,305 | 4,787 | 341 | 73 | 167 | 23,673 | 77.3% | 97.5% |
| | FEB | 17,697 | 2,516 | 219 | 124 | 193 | 20,749 | 85.3% | 97.4% |
| | MAR | 22,077 | 2,308 | 121 | 56 | 90 | 24,652 | 89.6% | 98.9% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | APR | 20,176 | 2,790 | 123 | 39 | 49 | 23,177 | 87.1% | 99.1% |
| | MAY | 24,595 | 3,115 | 156 | 33 | 48 | 27,947 | 88.0% | 99.2% |
| | JUN | 18,622 | 2,629 | 141 | 45 | 53 | 21,490 | 86.7% | 98.9% |
| | JUL | 17,375 | 3,625 | 167 | 49 | 60 | 21,276 | 81.7% | 98.7% |
| | AUG | 19,859 | 2,376 | 247 | 77 | 87 | 22,646 | 87.7% | 98.2% |
| | SEP | 15,425 | 1,673 | 106 | 48 | 82 | 17,334 | 89.0% | 98.6% |
| **2018 Total** | | **221,328** | **47,541** | **3,895** | **1,330** | **1,540** | **275,634** | **80.3%** | **97.5%** |
| | OCT | 17,192 | 1,392 | 114 | 47 | 86 | 18,831 | 91.3% | 98.7% |
| | NOV | 13,512 | 1,297 | 77 | 37 | 55 | 14,978 | 90.2% | 98.9% |
| | DEC | 15,802 | 452 | 81 | 26 | 51 | 16,412 | 96.3% | 99.0% |
| | JAN | 17,892 | 1,001 | 257 | 159 | 60 | 19,369 | 92.4% | 97.5% |
| | FEB | 16,478 | 190 | 28 | 34 | 32 | 16,762 | 98.3% | 99.4% |
| | MAR | 17,923 | 129 | 17 | 37 | 21 | 18,127 | 98.9% | 99.6% |
| | APR | 19,043 | 112 | 18 | 30 | 15 | 19,218 | 99.1% | 99.7% |
| | MAY | 18,588 | 109 | 25 | 27 | 27 | 18,776 | 99.0% | 99.6% |
| | JUN | 17,924 | 114 | 11 | 27 | 20 | 18,096 | 99.0% | 99.7% |
| **2019 Total** | | **154,354** | **4,796** | **628** | **424** | **367** | **160,569** | **96.1%** | **99.1%** |
| | | **597,166** | **227,499** | **87,326** | **36,526** | **8,422** | **956,939** | **62.4%** | **86.2%** |

*1)  The report reflects the most up-to-date data available at the time the database is queried.*

*2)  The data reflect the initial decision only.  Subsequent decisions are excluded.*

*3)  Processing time is represented by the elapsed number of days between receipt date to initial decision date.*

*4)  Applications with a request for initial evidence will reset their processing time to 0 upon receiving the evidence.*

*5)  Applications with a request for additional evidence will have the processing time paused and resumed upon receiving the evidence.*

*Database Queried: July 3, 2019*
*Report Created: July 3, 2019*
*System: C3 Consolidated*
*Office of Performance and Quality (OPQ), Performance Analysis and External Reporting (PAER), SN*

*Parameters*
*Form(s): I-765*
*Class Preference(s): C08*
*Initial RFE Codes: FBA, FBC*
*Additional RFE Codes : FBB*
*RFE Received Codes: HA*
*Time Period(s): October 1, 2014 - June 30, 2019*
*Data Type(s): Processing Time*

AR004838

| | United States Citizenship and Immigration Services (USCIS) I-765 - Application for Employment Authorization Eligibility Category: C08, Pending Asylum Initial Permission to Accept Employment Pending by Processing Time Buckets FY15 - FY19 (Through June 30, 2019) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Data Type** | **Processing Times** | | | | | | **Compliance Percentage** | |
| | **0-30 Days** | **31-60 Days** | **61-90 Days** | **91-120 Days** | **121+ days** | **Grand Total** | **% Pending 0- 30 Days** | **% Pending 0- 60 Days** |
| Pending | 6,649 | 5 | 0 | 5 | 2 | 6,661 | 99.8% | 99.9% |

1)  The report reflects the most up-to-date data available at the time the database is queried.

2)  Reopened applications are excluded from this report.

3)  Processing time is represented by the elapsed number of days between receipt date to the report date.

4)  Applications with a request for initial evidence will reset their processing time to 0 upon receiving the evidence.

5)  Applications with a request for additional evidence will have the processing time paused and resumed upon receiving the evidence.

Database Queried: July 3, 2019

Report Created: July 3, 2019

System: C3 Consolidated

Office of Performance and Quality (OPQ), Performance Analysis and External Reporting (PAER), SN

Parameters

Form(s): I-765

Class Preference(s): C08

Initial RFE Codes: FBA, FBC

Additional RFE Codes : FBB

RFE Received Codes: HA

Time Period(s): June 30, 2019

Data Type(s): Processing Time

AR004839

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-h6dr
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2360
Comment Submitted by Stefan Harvey

## Submitter Information

**Name:** Stefan Harvey
**Address:**
  904 Pamplona Avnue
  Davis,  CA,  95616
**Email:** Stefh2002@yahoo.com
**Phone:** 530 792-1130

## General Comment

Good Morning.

I strongly oppose this proposed rule. Individuals who come to our country ought to be able to work: to support their families and to support their community through taxes.

Working is part of the American fabric; it allows people to have self respect, give to their neighborhoods and mentor their children.

AR004840

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-pgjq
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2361
Comment Submitted by NA NA

---

## Submitter Information

**Name:** NA NA
**Address:**
　　Not available
　　Not available
　　Not available,  00000
**Email:** dawgmuse@aol.com
**Phone:** 555-555-5555

---

## General Comment

Hello,

In preventing asylum seekers from working while awaiting decision, we lose their taxable income, and increase dependency on social services.

Instead, if they are allowed to work, we receive the benefit of their taxed income, decrease dependency, and hasten their assimilation into American society.

This process is what has made us great, and should continue!

Best regards,

JF Brown

AR004841

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-8i04
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2362
Comment Submitted by Tom Murray

---

## Submitter Information

**Name:** Tom Murray

---

## General Comment

This is to support President Trumps effort to remove bureaucratic deadlines so that illegal immigrants can be properly vetted.

AR004842

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-291w
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2363
Comment Submitted by Robin Young

---

## Submitter Information

**Name:** Robin Young

---

## General Comment

I write to oppose the removal of the thirty-day processing provision for asylum applicants. This change is harmful both for asylum-seekers, who are legally able to request asylum if they have the reasonable expectation of experiencing certain deleterious conditions in their own country. It is also harmful for the United States, both because it changes the character of the US as a refuge for the endangered and persecuted in other countries and because it deprives our country of the talent and labor of an entire group upon which the US has traditionally depended and from which it has benefited. Work authorization is the entry point for other necessary activites on the part of asylum-seekers: work, medical services, housing, and the ability to earn a salary. Without such authorization, asylum-seekers can suffer from exploitation, just as they suffered from dangers in their home countries.
If an extension is needed, then a 60-day period would be much more workable.

AR004843

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-7lwt
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2364
Comment Submitted by Pamela Wandzel

---

## Submitter Information

**Name:** Pamela Wandzel

---

## General Comment

I oppose this rule as I feel strongly that it will destroy families and put a burden on community services, and will disrupt businesses ability to schedule workers.

AR004844

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-atbx
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2365
Comment Submitted by Megan Curran

---

## Submitter Information

**Name:** Megan Curran
**Address:** United States,
**Email:** meganeosullivan@gmail.com

---

## General Comment

I strongly oppose the proposed change in the work authorization processing deadline. As an attorney, I have seen how important work authorizations have been to my clients. If the rule were changed, asylum seekers may never receive their work authorizations. This would have the effect of denying the asylum seekers their ability to sustain themselves, but what's more, it would deprive the United States the benefit of the work these people could contribute to our country. I firmly believe that DHS should decide not to amend this rule. Thank you for your consideration.

AR004845

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-mki0
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2366
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I have worked closely with asylum seekers for the past four years and the proposed removal of the 30-day processing time for work authorization for asylum seekers will harm some of the most traumatized yet resilient individuals in our country. Inability to obtain lawful employment will not only put their lives in danger as they may not be able to provide for themselves, but will also put their families in danger. Many asylum seekers make the dangerous journey to the US alone, leaving their families in insecure situations back in their home countries. Often, they are the breadwinners in their family and their families are at risk if they are unable to help support them. Many asylum seekers come to the US with their children and not being able to work puts their whole family in danger here in the US. The agency itself admits that the government would lose approximately $39 to $118 million per year if this regulation is passed. USCIS has been sued numerous times regarding their failure to comply with deadlines required by law and they should not be "rewarded" for their ineptitude by removing lawful regulations that prioritize efficiency, safety, and national security.

AR004846

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-h6v8
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2367
Comment Submitted by Shirley Woodward

---

## Submitter Information

**Name:** Shirley Woodward

---

## General Comment

I writing regarding DHS Docket No. USCIS-2018-0001. I am an immigration attorney. It is essential for my clients to be able to work legally to support themselves and their children while their cases are being adjudicated. This rule would keep them from doing so. Preventing immigrants from working legally is also detrimental to the United States - it eliminates a valuable pool of workers, entrepreneurs and tax payers that could be contributing to our economy.

AR004847

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-ssu4
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2368
Comment Submitted by Lora Adams

---

## Submitter Information

**Name:** Lora Adams

---

## General Comment

DHS Docket No. USCIS-2018-0001
84 F.R. 47148

November 8, 2019

To Whom It May Concern:

I respectfully submit this comment to the Department of Homeland Securitys Notice of Proposed Rulemaking on Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications, DHS Docket No. USCIS-2018-0001, issued September 9, 2019.

I have worked with asylum seekers in the U.S. to connect them with resources and ensure their right to due process and access to a productive life in the United States. This rule is particularly worrying to me, as we expect new arrivals to our country to be self-sufficient and not a burden to the government while also allowing for this nearly indefinite delay in allowing them to make a living. DHS has been able to comply with this 30 day deadline for a work permit for a year now even in light of the Rosario case, and it should continue to do its job and process people in a timely manner. If the work load is too high, DHS needs to hire the appropriate staff to accomodate the influx. This will cost money, but it pales in comparison to the potential loss of earnings, loss of revenue to small businesses that employ refugees, economic loss to communities that have been revitalized by the influx of refugees into the workforce, and losses to federal, state, and local government in the form of lost income tax.

Thank you,

Lora Adams

AR004848

AR004849

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-3lsm
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2369
Comment Submitted by Susan Hill

---

## Submitter Information

**Name:** Susan Hill

---

## General Comment

Keep work authorization for asylum seekers- cases can take years to adjudicate, it makes no sense to keep these people in an underclass that will be forced to rely on public emergency funds. Asylum is a humane protection, extend humane treatment by allowing applicants to work and support themselves and serve as functioning members of society

AR004850

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-8ltn
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2370
Comment Submitted by Kathleen Murphy

---

## Submitter Information

**Name:** Kathleen Murphy

---

## General Comment

Please STOP your abusive treatment of asylum seekers!!!

ABIDE by the July 2018 court mandated timeline of 30 -days for the USCIS to process work authorization applications.

Thank You!!!
Kathleen Murphy

AR004851

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-6acd
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2371
Comment Submitted by Frank Garibaldi

---

## Submitter Information

**Name:** Frank Garibaldi

---

## General Comment

Arbitrary deadlines to screen asylum seekers is a danger and threat to American citizens. Cartels, criminals and other human traffickers know how to take advantage of flaws in the process. Please show you care about the well being of innocent people and allow time for the necessary processes to work.

AR004852

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-thyq
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2372
Comment Submitted by Tom Howarth, House of Hope

---

## Submitter Information

**Name:** Tom Howarth
**Address:**
  1 Lazy Livin Lange
  Front Royal,  VA,  22630
**Email:** tom.howarth67@gmail.com
**Phone:** 3015384410
**Organization:** House of Hope

---

## General Comment

The Trump Administration immigration policies are based on the belief that if you can make asylum seekers more miserable, they will not come to our borders seeking asylum.

Those seeking asylum want and need to work. The 30 day deadline gives a person the right to work, pay taxes and avoid being a ward of the state to the extent that they are eligible for services. The rule cost the US government money.

The change to the 30 day processing provision does accomplish one goal of the Administration. it reduces a person's chances of finding work and adds to the many other changes in the asylum system that reduces the sense of hope a person has of contributing to American society as so many of our people have done in the past. It reduces hope and extends misery.
The rule should be rejected.

AR004853

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-b38i
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2373
Comment Submitted by James Cradock

## Submitter Information

**Name:** James Cradock
**Address:**
219 Walton Street
Portland,  ME,  04103
**Email:** seamus@cradock.net
**Phone:** 2078388678

## General Comment

Work is a human right.

I believe it is a violation of the rights of asylum seekers, who have a legal right to be in the US and who have done as we ask when they submit applications for asylum, to prevent them from working.

150 day prohibition is too long. 30 days for issuance of the work permit on top of the 150 day prohibition is inhumane.

Removing the 30 day cap on the issuance of the work permit, and making this indefinite, is wrong.

People want to work. Please acknowledge that truth and let people work.

Thank you.

AR004854

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-c8ad
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2374
Comment Submitted by Kathy Robertson

## Submitter Information

**Name:** Kathy Robertson
**Address:**
  849 Malaga Ave.
  Davis,  CA,  95616
**Email:** robertsonkt@sbcglobal.net
**Phone:** 916-812-1408

## General Comment

Asylum seekers should be allowed to work as soon as possible. Please, no delays.

AR004855

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-eq4j
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2375
Comment Submitted by Diana Olivas

---

## Submitter Information

**Name:** Diana Olivas

---

## General Comment

I oppose the removal of the 30 day processing provision for asylum applicants. Passing this proposal will create lost of compensation in wages and benefits to asylum applicants.

AR004856

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-ttkt
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2376
Comment Submitted by Jennifer Burk

---

## Submitter Information

**Name:** Jennifer Burk

---

## General Comment

We must keep the 30-day requirement in place for USCIS to adjudicate Employment Authorization Documents for asylum seekers within 30 days.

Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge.

USCIS has reported that it has been able to decide over 99% of EADs within the 30-day timeframe for over the past year. Therefore, USCIS has proven its ability to adequately vet the amount of requests in a timely fashion.

AR004857

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-41dp
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2377
Comment Submitted by Angela Fernandez, New York State Division of Human Rights

## Submitter Information

**Name:** Angela Fernandez
**Address:**
  One Fordham Plaza
  4th Floor
  Bronx,  NY,  10458
**Email:** angela.fernandez@dhr.ny.gov
**Phone:** 1-888-392-3644
**Submitter's Representative:** Angela Fernandez
**Organization:** NYS Division of Human Rights
**Government Agency Type:** State
**Government Agency:** NYS Division of Human Rights

## General Comment

The New York State Division of Human Rights (NYSDHR) has reviewed the Proposed Rule, published in the Federal Register on September 9, 2019, proposing changes regarding Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications Docket No. USCIS-2018-0001 Docket RIN1615-AC19. NYSDHR opposes the Rule for the reasons set forth fully in the attached letter comment. New York State is home to the second largest population of asylum seekers in the United States. In 2017, more than half of individuals granted affirmative asylum resided in California or New York. NYSDHR opposes the Proposed Rule because it will have an adverse impact on protected classes covered by the New York State Human Rights Law. Given that asylum seekers are fleeing violence, persecution and political unrest across the world, the Proposed Rule will potentially discriminate against people seeking to integrate themselves into New York on the basis of race/color, national origin, familial status, and sex. NYSDHR was created to encourage programs designed to insure that every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the state; to encourage and promote the development and execution by all persons within the state of such state programs; to eliminate and prevent discrimination . . . in employment . . . [and] housing. N.Y. Exec. L. 290.3. The Proposed Rule will serve to prevent asylum seekers from obtaining equal opportunity in employment and housing and from fully participating in the economic, cultural and intellectual life of New York State.

AR004858

# Attachments

DHS Removal of 30-Day Processing Provision comment

AR004859



**ANDREW M. CUOMO**
Governor

**ANGELA FERNANDEZ**
Commissioner

November 8, 2019

Samantha Deshommes, Chief
Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
 20 Massachusetts Avenue NW, Mailstop #2140
Washington, DC 20529-2140

**Re:** U.S. Citizenship and Immigration Services and the Department of Homeland Security Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications; Docket No. USCIS-2018-0001 **Docket RIN1615-AC19**

Dear Chief Deshommes:

The New York State Division of Human Rights (NYSDHR) submits the following comments in response to the notice in the Federal Register soliciting comments on the Proposed Rules regarding "Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications."

Thank you for the opportunity to comment.

Very Truly Yours,

Commissioner Angela Fernandez
New York State Division of Human Rights

**Proposed Rulemaking: Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications Docket No. USCIS-2018-0001 Docket RIN1615-AC19**

The New York State Division of Human Rights (NYSDHR) has reviewed the above-referenced notice (the Proposed Rule), published in the Federal Register on September 9, 2019, proposing changes regarding "Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications" Docket No. USCIS-2018-0001 Docket RIN1615-AC19.

The Proposed Rule, if adopted, will remove a regulatory provision stating that U.S. Citizenship and Immigration Services (USCIS) has 30 days from the date an asylum applicant files the initial Form I-765, Application for Employment Authorization to grant or deny that initial employment authorization application.  Currently, an asylum applicant must wait at least six months before receiving employment authorization if their asylum application has not already been decided. The 30-day rule allows an asylum applicant to apply for work authorization once their asylum application has been pending for 150 days and to receive a decision authorizing or denying the right to work.  However, under the Proposed Rule, there is no limitation for the time it would take USCIS to render a decision on the work authorization. If this Proposed Rule goes into effect, asylum seekers will not be able to support themselves or their families for extended periods of time which will put already vulnerable people at a high risk for homelessness and prolonged unemployment. The Proposed Rule serves little purpose but to harm and discriminate against an already vulnerable population seeking to integrate themselves into American society.

NYSDHR is the agency in charge of enforcing the New York State Human Rights Law. The law ensures equal opportunity in employment and housing in New York State. The Human Rights Law is enforced through investigation and adjudication of complaints filed by individuals as well as NYSDHR-initiated complaints; the creation of studies, programs, and campaigns designed to inform and educate the public on the effects of discrimination and their rights and obligations under the law; and the development of human rights policies and proposed legislation for the State.

New York State is home to the second largest population of asylum seekers in the United States. In 2017, more than half of individuals granted affirmative asylum resided in California or New York.[1] NYSDHR opposes the Proposed Rule because it will have an adverse impact on protected classes covered by the New York State Human Rights Law. Given that asylum seekers are fleeing violence, persecution and political unrest across the world, the Proposed Rule will potentially discriminate against people seeking to integrate themselves into New York on the basis of race/color, national origin, familial status, and sex.  NYSDHR was created "to encourage programs designed to insure that every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the state; to encourage and promote the development and execution by all persons within the state of such state programs; to eliminate and prevent discrimination . . . in employment  . . . [and] housing. N.Y. Exec. L. § 290.3.   The Proposed Rule will serve to prevent asylum seekers from obtaining equal opportunity in

---

[1] Mossaad, Nadwa, Office of Immigration Statistics (OIS) Annual Flow Report, Refugees and Asylees 2017, March 2019.  Available at https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

AR004861

employment and housing and from fully participating in the economic, cultural and intellectual life of New York State.

## I. The Proposed Rule is a Pretext for Discrimination Against Individuals Based on Their National Origin and Race.

NYSDHR has an obligation to deter discrimination in housing. The Proposed Rule undermines that obligation. By extending the period of joblessness, thousands of immigrant families may become homeless. These families will be left scrambling to find housing in a market rife with discrimination. Over the past few years, the leading countries of nationality for persons granted asylum were China, El Salvador, and Guatemala. However, the number of affirmative asylum applications from Venezuelans increased by thirteen times between 2014 and 2017 and applications from El Salvadorians, Guatemalans, and Hondurans rose almost 800% in the last 5 years. [2] The Proposed Rule seeks to stem the tide of asylum seekers from Central and South America by making the process difficult to survive.

The Proposed Rule will have an adverse impact on these higher number of Central and South Americans asylum seekers. The Proposed Rule will exacerbate existing discrimination in housing based on national origin and race/color by promoting joblessness and poverty among this group.

## II. The Proposed Rule Will Adversely Impact Families with Children.

The difficulties families with children face in obtaining housing without discrimination are well known. The problem is so significant that Congress amended the FHA in 1988 to add families with children under the age of 18 as a protected class. Familial status is also a protected class under the Human Rights Law.

"Familial status" means "(a) any person who is pregnant or has a child or is in the process of securing legal custody of any individual who has not attained the age of eighteen years, or (b) one or more individuals (who have not attained the age of eighteen years) being domiciled with: (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent." N.Y. Exec. L. § 292.26. It is an unlawful discriminatory practice to refuse to sell, rent or lease or otherwise to deny to or withhold from any person or group of persons such housing accommodations or to discriminate against any person in the terms, conditions or privileges housing accommodations or in the furnishing of facilities or services in connection therewith because of familial status. N.Y. Exec. L. §§ 296.2-a, 296.5. The same protections are afforded under the FHA. 42 USC § 3604.

---

[2] Mossaad, Nadwa, Office of Immigration Statistics (OIS) Annual Flow Report, Refugees and Asylees 2017, March 2019. Available at https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

AR004862

Almost one-third of asylum grantees are children under the age of 18. [3] The Proposed Rule will compound the problem of discrimination in housing against families with young children. When asylum-seeking parents have no income, they face little to no opportunity to provide safe housing for their families.

### III.  The Proposed Rule Will Adversely Impact Women

Women suffer pay inequity. This inequality is exacerbated by race or national origin.  For example, Hispanic women's median weekly earnings in 2018 were only 61.6 percent of White men's median weekly earnings. [4]  These factors can also be compounded by women's status as the predominate single heads of households with children.  Additionally, women will be adversely impacted by the Proposed Rule because they are the primary victims of domestic violence and sexual assault. Women who are ineligible to work for extended periods of time under the Proposed Rule will have more difficulty finding new housing.

### IV.  Asylum Seekers Will Be Exposed to Abuses Without Legal Employment Authorization

Asylum seekers living in the United States while their applications are pending cannot live without income for extended periods of time. The Proposed Rule would promote targeting asylum seekers for underground employment which might leave them vulnerable to unsafe workplace conditions and human trafficking.

Any employee working under these conditions could be subject to abuse, wage and hour violations and health and safety risks.  Although most illegal employees enjoy protection under state and federal labor laws, asylum seekers who are not authorized to work may be afraid to speak up about workplace abuses for the fear of being reported and risking their asylum application.

---

[3]  Mossaad, Nadwa, Office of Immigration Statistics (OIS) Annual Flow Report, Refugees and Asylees 2017, March 2019.  Available at https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

[4] Institute for Women's Policy research The Gender Wage Gap: 2018 Earnings Differences by Race and Ethnicity, March 2019.  Available at https://iwpr.org/wp-content/uploads/2019/03/C478_Gender-Wage-Gap-in-2018.pdf.

AR004863

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-shtw
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2378
Comment Submitted by Kathryn Burke

## Submitter Information

**Name:** Kathryn Burke

## General Comment

Allowing asylum applicants to work helps everyone: their families, their communities and the U.S. taxpayers.

Making it more difficult for asylum applicants to work seems to serve only the purpose of of punishing them for coming to the U.S. for safety.

Many asylum applicants work very hard in menial jobs far below their education level, jobs that US Citizens do not do.

AR004864

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2378.html[9/15/2020 4:14:19 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** k2q-fu8p-af2y
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2379
Comment Submitted by Michael Urbanowich

## Submitter Information

**Name:** Michael Urbanowich
**Address:**
  Pearland,  TX,  77581
**Email:** mike@sunitakapoor.com
**Phone:** 7137823332

## General Comment

I am an immigration attorney and I work with asylum seekers. My clients rely on the EAD in order to begin supporting themselves and their families while their cases remain pending. If the 30-day deadline is removed, my clients will lose the ability to support themselves. This would hurt them, the community, and reduce tax revenues for the government.

AR004865

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2379.html[9/15/2020 4:14:19 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-7udq
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2380
Comment Submitted by Jaesa McGee

---

## Submitter Information

**Name:** Jaesa McGee

---

## General Comment

Allowing asylum seekers access to a work permit will reduce the burden on the American people and reduce fraud. Do not remove the 30 day processing provision for asylum applicants! They need to be able to support themselves rather than rely on public sources of financial support. If they are legally allowed to work this only helps the American people and the American economy.

AR004866

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-wgju
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2381
Comment Submitted by Jennifer Smith

---

## Submitter Information

**Name:** Jennifer Smith

---

## General Comment

I seek to request that the 30 day adjudication of employment authorization documents not be removed. Without this 30 day requirement, there will be unpredictable delays and it will cause serious harm to asylum seekers. Other applicants for work authorization are already seeing
delays in excess of 10 months for a work permit, even when it is a simple renewal. Delays in asylum seekers getting their work authorization can cause, serious food and housing insecurity. Where I live and practice we have a shortage of housing and a very high cost of living. Delaying the ability of a person to work with a valid application pending leads to very serious economic harm.
The is compounded by the asylee's inability to secure a valid ID. A work permit and a social security number (SSN) are often necessary requirements to applications for a state ID.
Where I live and practice we have the highest health costs in the country. Many asylum seekers need access health insurance (most state ACA health exchanges require a SSN and work authorization materials to qualify) to treat the trauma of their persecution and avoid additional medical issues, such as feelings of fear, desperation, and overall mental health concerns that will burden our communities.
If we cannot welcome asylum seekers fully into our communities and economies, we miss out on the contributions to local businesses and we risk making our communities less safe. A person without valid ID and ability to work must turn underground and fear the government and police.
This is not helpful for anyone.
USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community and our communities who seek to welcome them.

USCIS has reported that it has been able to decide over 99% of EADs within the 30-day timeframe for over the past year.
Therefore, USCIS has proven its ability to adequately vet the amount of requests in a timely fashion.
Moreover, its argument regarding increased threats serves only to prompt the need for a speedier process to properly protect national security, rather than its request to delay the process further. This need for a speedier

AR004867

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2381.html[9/15/2020 4:14:19 PM]

process is further compounded by the fact that the EAD applicants are asylum-seekers already residing in the United States. If vetting must be done to prevent security risks, then having unvetted people in the U.S. subjected to a potentially indefinite review period seems contrary to the departments stated interests and the interests of my community.

AR004868

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-gqx9
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2382
Comment Submitted by Anonymous, International Rescue Committee

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I work in Employment services for the International Rescue Committee. My job is to work with refugees and asylees to secure their first job placement. With my asylees, the biggest barrier to employment and self-sufficiency is often documentation. Without work, clients are dependent on cash assistance, despite the fact that many are eager to work. Our clients want to support their families and use their skills obtained from previous employment in their home country. One of my clients fled Sri Lanka because of ethnic persecution--he will show you his scars from being tortured. He traveled through almost 10 countries to get to the United States, overcoming unthinkable challenges. Once he arrived in the US, he then had to navigate the asylum process. The entire time his goal has been to work so he can live in his own apartment and bring his wife and daughters to safety. Removing the 30-day processing deadline would hurt people like my client.

AR004869

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-axap
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2383
Comment Submitted by Megan Pinney

---

## Submitter Information

**Name:** Megan Pinney

---

## General Comment

People rely heavily on their ability to quickly obtain work authorization through the I-765 application. Please do not remove the 30 day processing limit! Asylum seekers are desperate to work legally in the US. Please do not delay things!

AR004870

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-7efb
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2384
Comment Submitted by Anna Eissenova

---

## Submitter Information

**Name:** Anna Eissenova
**Address:**
  7 Hamlin St
  Acushnet,  MA,  02743

---

## General Comment

This rule seems to only take a bit of pressure off of immigration services. However, the effect on immigrants seeking asylum could be catastrophic. People fleeing their home country are already made to wait for working permits, dwindling whatever funds or resources they may have brought with them to this country. Lengthening the time that it takes for them to get a work permit or other legal documentation would only put more stress on their already dire situation. It would also likely lead to further people's exploitation of immigrants for unlawful employment for cheap labor, and a possible increase in homelessness, uninsured drivers and people searching for emergency medical care who are not able to support themselves or have medical insurance because of a lack of legal means to work. Please consider taking the time to hire more people to review and process these applications rather than keeping asylum seekers waiting for even longer to attain a means to work.

AR004871

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-joyq
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2385
Comment Submitted by Randall Decker

---

## Submitter Information

**Name:** Randall Decker

---

## General Comment

Our country is less safe today because of arbitrary bureaucratic timelines.

Its true! Instead of giving the Trump Administration enough time to thoroughly check the background of every asylum seeker, theyre being forced to cut corners and make America less safe, just because some bureaucrats wrote a ridiculous timeline.

Thankfully President Trump is fighting to undo this nonsense. But the radical Left is pushing back. Why?

They dont care that these radical restrictions jeopardize our national security or that they punish LEGAL immigrants for obeying our laws. They just want to keep them in place, all so they can keep our immigration system broken and undermine Donald Trumps presidency.

These people on the left are traitors to our constitutional republic and the rue of law. It is obvious that the safety of American citizens are not there priority. They want votes and power to keep America from exceptionalism and to turn us into a third world country so as not to be a major roadblock to their global agenda. These people are sick and evil. Follow the rule of law and keep America secure from this wicked attempt to over throw our great constitution and citizens freedoms and rights that are afforded only to them.

AR004872

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2385.html[9/15/2020 4:14:20 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-2ev0
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2386
Comment Submitted by Mallory Vogel

---

## Submitter Information

**Name:** Mallory Vogel

---

## General Comment

I am writing to oppose the Removal of the 30-day processing provision for asylum applicants. Of this provision is removed, an asylum seeker may be left indefinitely without authorization to work. I believe that we should respect the rights of asylum seekers and support them in integrating into society. The ability to hold a job is a vital part of this process, and should therefore not be held up indefinitely.

AR004873

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-whm8
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2387
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I welcome the opportunity to submit a comment on the proposed rule to end the 30-day adjudication timeframe for EADs for those with pending asylum applications. As a U.S. Citizen, I have a vested interest in our communities and as an engaged citizen am concerned about the impact this rule will have on asylum seekers and our communities.

One justification for this rule from USCIS is that they need to be able to properly vet EAD applicants. This is inconsistent with their authority as it is well within their ability to request additional evidence for someone they suspect of fraud. In addition, they are able to take adequate measures to properly vet and background check applicants. Removing the timeframe for adjudication does not mean a more thorough vetting process there is no proposal to change the process. It does, however, allow USCIS to be less efficient. As a U.S. Citizen, this is concerning as our government agencies should be held accountable for their efficient work products. In addition, lengthening the time to properly vet an applicant increases the risk that fraud will go undetected for a longer period of time. This poses increased risk for the community as well as for the asylum system.

This rule would strain community resources. Asylum seekers often have limited or no financial support. Their being able to work means that they do not become a burden on community food banks, nonprofit organizations, churches, and other organizations that assist indigent individuals and families. These individuals need to work in order to eat and live while their applications for asylum are being processed by the U.S. government. They are allowed to stay in the U.S., and should not burden local resources in the local economy. Therefore, they need to be able to work legally. Furthermore, without income, asylum seekers are at risk of homelessness, which puts them at increased risk for abuse, and contributes to social problems in local communities. Local communities should not bear a greater burden and increased social issues because the federal government won't timely adjudicate applications for EADs from asylum seekers.

AR004874

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-1wmk
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2388
Comment Submitted by Jeraline Edwards, Law Offices of Jeraline Singh Edwards

## Submitter Information

**Name:** Jeraline Edwards
**Address:**
  7960 B Soquel Drive, Ste 171
  Aptos, CA, 95003
**Email:** Attorney@EdwardsImmigration.com
**Phone:** 8312048656
**Organization:** Law Offices of Jeraline Singh Edwards

## General Comment

Let Asylum Seeker get EAD in a timely manner as asylum application processing is on hold for many people and for new filers as well. This 30 day deadline needs to stay in place as long as Asylum processing is taking longer than one month.

AR004875

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-hsar
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2389
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

As a US Citizen and therefore tax payer, I oppose the suppression of the 30 day rule as it would increase the length of time where asylum seekers
Having volunteered at a social help facility for asylum seekers in a country in which such a rule is not in effect, I have witnessed the consequences of not having such a rule in place. Without a job, an asylum seeker relies on public help (hello ER visits!) and charity, which increases the taxpayer's financial burden. Whereas if asylum seekers work, they are able to provide for themselves, and do not have to rely on outside help (or if they do, it's minimal). Therefore, the longer asylum seekers wait to have their worker's permit, the longer I and other taxpayers have to pay for their support. The 30 day rule at least insures that the time it takes to get a permit is limited. In my opinion, they should even have the right to work as soon as their asylum petition is filed and received by the administration.

AR004876

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-36zm
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2390
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am writing to urge you not to eliminate the 30 day requirement because immigrants to this country deserve the right to work while they are waiting for asylum. Immigrants have contributed greatly to this country and will continue to do so, adding tax dollars, economic growth, and culture to our communities. The president's own family benefits from their right to work, and asylum seekers deserve no less.

AR004877

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-urn1
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2391
Comment Submitted by Alexandra Streiff

---

## Submitter Information

**Name:** Alexandra Streiff

---

## General Comment

While asylum seekers are pursuing their claim for safety, they are apart of the fabric of our communities. The limbo this new law would cause would not only harm the families - parents and children - but entire communities. People seeking asylum are the most resilient people my community in San Diego knows. We all benefit from their ability to obtain employment and achieve self-sufficiency, and recognizing humanitarian principles that the US represents as a beckon of hope they deserve every opportunity to thrive because they are human beings. I implore our government to recognize human dignity, as well as honor the reality that we do better as a country when we uphold values of freedom.

AR004878

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-v675
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2392
Comment Submitted by Katarina Rost

---

## Submitter Information

**Name:** Katarina Rost

---

## General Comment

Food insecurity, ability to take care of themselves - all important considerations for families running from persecution. Risk of homelessness/housing insecurity, Vulnerability to exploitation, trafficking, and underground economy risks.

AR004879

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-clw4
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2393
Comment Submitted by Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Asylee applicants should have the ability to work while their case is pending to support themselves and their families.

AR004880

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-etea
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2394
Comment Submitted by Lindsay Harris, Immigration and Human Rights Clinic at the University of the District
of Columbias David A. Clarke School of Law

## Submitter Information

**Name:** Lindsay Harris
**Address:**
   4340 Connecticut Avenue
   Washington,  DC,  20008
**Email:** LINDSAY.HARRIS@UDC.EDU
**Phone:** 2022747326

## General Comment

The Immigration and Human Rights Clinic at the University of the District of Columbias David A. Clarke
School of Law submits this comment. Every semester, we work with students engaged in providing supervised
representation to asylum seekers. We represent both affirmative asylum seekers filing before the USCIS asylum
office and individuals who are appearing before the immigration court. Most of our clients are survivors of
torture or trauma and struggle to survive in the U.S. pending the adjudication of their claims. Most wait for
several years for their claim to be adjudicated due to extreme backlogs at the asylum office and the court. Earlier
this year, one of our clients was granted asylum at his very first merits hearing in court, 9 years after he first
arrived in the U.S.

Many of our clients struggle, before obtaining an EAD, to pay public transportation costs to make it to legal
appointments. Although legal services are provided on a pro bono basis, we do not have funds to cover other
client needs. Being able to rely upon EADs in the interim is vital to ensuring that during that waiting period, they
can be productive and self-reliant members of society.

Several of our clients are single mothers providing for 1 or more children. One young Central American mother
was able to work cleaning houses with an EAD while her asylum claim was pending, allowing her to support her
young daughter and pay for housing and transportation to legal appointments. Without this, the family would
have been homeless. Another client, a disabled man from South America, has been able to work with a tax
service preparer and as a customer relations specialist with a technology company to pay his rent in a shared
apartment. Another East African client has been waiting 4 years for her asylum interview but has been working

AR004881

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2394.html[9/15/2020 4:14:20 PM]

as a Certified Nurses Assistant in elder care in various facilities. She contributes to our community and fills vacancies in an industry that struggles to find workers.

Without the ability to work, or with any delay in their cases, several of our clients, or, in fact the vast majority, would be homeless. There is no interest served by adding to the homeless population a population of individuals who have survived violence and are experiencing symptoms of PTSD.

The asylum seekers that we work with are law-abiding and conscientious individuals who have high levels of anxiety around working without an EAD, and yet, forcing them to wait longer for an EAD may leave some asylum seekers with no other option. Working under the table not only jeopardizes the employee rights of asylum seekers, but lowers the standards of labor treatment for American workers as a whole.

Some of our clients desperately need to access mental health services. Not being able to work would make it even more difficult for them to pay transportation and other costs associated with weekly therapy. Given that these individuals are living within our communities, we want them to be as healthy and stable as possible while they await adjudication. Taking away EADs will increase instability and homelessness among asylum seekers, making them vulnerable to targeting by criminals and others who would take advantage of them.

DHS reports that it is now deciding over 99% of EADs within the 30-day processing timeline; this clearly demonstrates that DHS is generally able to address fraud and security concerns within the current timeframe and process.

Without an EAD and associated access to employment, asylum-seekers will have difficulty obtaining drivers licenses, banking services, healthcare, and legal counsel for their asylum applications. Although this may in fact be the goal of this proposed rule, none of these things actually benefit American citizens or residents. Asylum seekers should have access to healthcare to control the spread of communicable diseases. Asylum seekers should have access to legal counsel studies have shown that lawyers make the system more efficient. Asylum seekers should have access to banking services and drivers licenses, both of which enhance safety for the general population.

Local, state, and federal governments will lose income tax revenue from asylum-seekers who are delayed in entering the job market or forced to work in the shadow economy. DHS estimates that the annual Medicare and social security revenue loss to the government to be between $39.15 to $118.54 million dollars. DHS estimates the rule will cause asylum-seekers to annually lose $255.88 to $774.76 million in income.

Given the above concerns, we strongly urge reconsideration of this proposed rule. America must live up to its history as a safe haven for asylum seekers fleeing violence. Eradicating a deadline for the processing of asylum seeker work permits not only puts asylum seekers at risk, but Americans as a whole.

AR004882

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-3y5s
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2395
Comment Submitted by Judith Flahavan

---

## Submitter Information

**Name:** Judith Flahavan
**Address:**
  22 B Kilburn St.
  Watsonville,  CA,  95076
**Email:** srjudy1963@gmail.com
**Phone:** 8056376101

---

## General Comment

Removal of the 30-Day Processing Provision for Asylum Applicants for Employment Authorization Applications will put such applicants in a very dangerous situation. Without the possibility of employment they will lack the ability to sustain themselves and their families with basic necessities, such as food and shelter. They will not be able to obtain health insurance. They will not have access to community service agencies. They could be denied a SSN and work permit to obtain a state ID. I urge that the 30-Day Processing Provision for asylum applicants seeking employment authorization applications be maintained.
.

AR004883

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-8zmu
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2396
Comment Submitted by Riley McMahon

---

## Submitter Information

**Name:** Riley McMahon
**Address:**
    27333 N 90th St
    Scottsdale,  AZ,  85262
**Email:** rkm76@nau.edu
**Phone:** 6232617009

---

## General Comment

Asylum Seekers have already spent years in limbo, do not extend this by removing the 30 day processing.

AR004884

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-lrt3
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2397
Comment Submitted by Laura Glass-Hess

---

## Submitter Information

**Name:** Laura Glass-Hess

---

## General Comment

This regulation is harmful; instead of allowing people who want to work and support themselves to do so, it will burden relatives and other family members. Why would we delay granting work permits to people who want to work, and are legally entitled to do so while their cases are pending?

AR004885

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-o6ad
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2398
Comment Submitted by Jessica Eber, New York State Office of Mental Health

---

## Submitter Information

**Name:** Jessica Eber

---

## General Comment

Attached please find comments on behalf of the New York State Office of Mental Health for your consideration.

---

## Attachments

DHS Asylum EAD rule change comment_executed

AR004886



| ANDREW M. CUOMO | ANN MARIE T. SULLIVAN, M.D. | J. MARK NOORDSY |
| Governor | Commissioner | General Counsel/Deputy Commissioner |

November 8, 2019

Samantha Deshommes, Chief
Regulatory Coordination Division
Office of Policy and Strategy
United States Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW, Mailstop #2140
Washington, DC 20529-2140

Re: DHS Docket No. USCIS-2018-0001

Dear Ms. Deshommes:

The New York State Office of Mental Health (OMH) is the oversight agency for the mental health care system in New York State. OMH operates psychiatric centers and licenses, regulates and oversees more than 4,500 programs operated by local governments and nonprofit agencies, combining to provide comprehensive emergency, inpatient, outpatient, residential and supportive mental health services to more than 750,000 individuals across New York State each year. OMH opposes the proposed rule change as outlined in the Department of Homeland Security (DHS) Notice of Proposed Rulemaking, Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications[1] because of the negative impacts it will have on asylum seekers in New York State, especially those with psychiatric disabilities. In addition, by depriving qualified individuals of the ability to work within an expedient and predictable timeframe after they have submitted a completed application for asylum, the proposed rule also exacerbates workforce shortages within the mental health system.

OMH is deeply concerned about the impact of the proposed rule on the mental health and well being of asylum seekers in New York State who will be forced to endure additional delays in obtaining their work authorization. New Yorkers with psychiatric disabilities already face enormous employment and economic disparities. The unemployment and poverty rates of people with disabilities are almost three times of those without disabilities. Two out of three people with disabilities are unemployed and one out of three people with disabilities live in poverty. These disparities are even greater for those with psychiatric disabilities, who have the highest levels of unemployment and poverty among all disability groups. In addition to the evident economic consequences of the employment gap, research has demonstrated that unemployment has harmful effects on the physical and mental health of people with psychiatric disabilities. Financial

---

[1] Docket No. USCIS-2018-0001; RIN 1615-AC19; Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (proposed Sep. 9, 2019) ("proposed rule").

pressures increase inactivity and social isolation. Unemployment often comes with a decrease in social supports and increased risk of alcohol and tobacco use as ways of dealing with stress. Furthermore, research shows that employment is beneficial and instrumental to achieving and maintaining recovery from psychiatric illnesses. Employment can also help to increase self-esteem, lessen psychiatric symptoms, and reduce the potential for relapse in those with severe psychiatric disabilities. Employment also promotes beneficial community inclusion and fosters independence.  For these reasons, OMH rejects any effort by DHS to unreasonably delay the issuance of work authorization documents to asylum seekers.

In addition, as an equal opportunity employer with its own unique hiring challenges, OMH opposes the proposed rule because it will make it more difficult for OMH to hire a diverse and talented workforce to meet the needs of individuals with psychiatric disabilities and require additional expenditures to recruit otherwise authorized employees. OMH constantly struggles to recruit employees to fill many types of positions within our psychiatric centers, including both maintenance and direct care, for which asylum seekers may be qualified and willing to apply. As DHS notes in its own notice of proposed rulemaking, the proposed rule, in conjunction with a separate rulemaking entitled "Asylum Application, Interview, and Employment Authorization for Applicants,"  may drastically reduce the number of available workers and impact employer productivity. DHS inappropriately skirts computing the financial impacts of this change on employers in the notice of proposed rulemaking. This effect will be even more acute in New York state where up to 10% of the nation's approved asylum seekers live, according to federal statistics.  OMH implores DHS to more fully research and reconsider these impacts in the promulgation of this regulation.

In conclusion, individuals seeking asylum must be empowered and encouraged to regain some semblance of stability, attain self-sufficiency, and avoid the harmful effects of prolonged unemployment, which can be especially dire for individuals with psychiatric disabilities. OMH is also concerned about staffing shortages and firmly opposes any attempt by DHS to prevent individuals who possess skills in high demand and the motivation to apply those skills to the benefit of the public sector, from obtaining their work authorizations within a reasonable, but expedient and predictable timeframe. The attempt to further delay their ability to do so is an affront to both the mission statement and economic interests of the New York State Office of Mental Health.

Sincerely,

Ann Marie T. Sullivan, MD
Commissioner

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-tueg
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2399
Comment Submitted by Kirk Samelson

---

## Submitter Information

**Name:** Kirk Samelson

---

## General Comment

The change in this regulation would not only negatively impact a persons ability to support himself/herself but would also reduce collected taxes. There is no valid reason to change the regulation

AR004889

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-y646
**Comments Due:** November 08, 2019
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2400
Comment Submitted by Jacquelyn Bradford

## Submitter Information

**Name:** Jacquelyn Bradford

## General Comment

It is vitally important for asylum seekers to have access to a work permit as soon as possible. I am a licensed
attorney in Florida. I work at a non-profit, primarily with survivors of human trafficking. Asylum are incredibly
vulnerable to exploitation and human trafficking. Without work permits, they have no lawful way to support
themselves. They also are vulnerable if they do not have a valid form of identification. My clients who have
experienced incredible trauma often experience increased mental health and physical symptoms due to the stress
of waiting for applications to be decided and the stress of not being able to afford food or safe shelter.

Delaying adjudications means asylum seekers would lose wages and benefits as a result of delayed entry into the
U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost
compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year.
The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable
community. A lack of income means not being able to afford food, housing, medical treatment, health insurance,
or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social
services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack
of ability to work and correlating lack of income also vastly increases the risk that people coming to the United
States will become a public charge.

This proposal will lead to all levels of government will lose tax revenue as a result of the proposed rule change.
USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will
prevent asylum seekers and their employers from contributing to Medicare and social security.

In the notice, USCIS makes frequent reference to a rise in national security threats as a reason to spend more
time and resources on each decision. However, USCIS has reported that it has been able to decide over 99% of
EADs within the 30-day time frame for over the past year. Therefore, USCIS has proven its ability to adequately
vet the amount of requests in a timely fashion. Moreover, its argument regarding increased threats serves only to
prompt the need for a speedier process to properly protect national security, rather than its request to delay the

AR004890

process further. This need for a speedier process is further compounded by the fact that the EAD applicants are asylum-seekers already residing in the United States. If vetting must be done to prevent security risks, then having unvetted people in the U.S. subjected to a potentially indefinite review period seems contrary to the departments stated interests.

Proposed Alternative: As the law is currently written, asylum seekers must wait 180 days before they may be granted authorization to work. They are permitted to submit their application after 150 days, giving USCIS the 30-day time frame in question to process the requests. If USCISs goal is to have more time to process each request in order to increase flexibility and free up resources to work on other applications, then it could easily shorten the waiting time before asylum-seekers are allowed to submit their application. If USCIS feels that a 60-day time frame would be more beneficial, then it may allow applications to be submitted after 120 days, rather than 150. Allowing asylum-seekers to submit their applications earlier could allow the department to have up to 180 days to process and properly vet each individual while reducing the risk of harm to each applicant.

AR004891

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d75-e005
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2401
Comment Submitted by Jenna Ripke

---

## Submitter Information

**Name:** Jenna Ripke

---

## General Comment

I am strongly opposed to removing the 30-day processing provision for asylum applicants applying for EADs. I am an immigration attorney with a nonprofit organization which regularly represents asylum seekers in both affirmative and defensive asylum claims. As such, I daily see the struggles of asylum seekers who are unable to work while waiting until they can apply for an EAD, and removing the 30-day processing provision would further harm them and the United States as a whole.

Asylum seekers come to the United States because they are fleeing persecution in their home countries. Many of them come with nothing other than the clothes on their backs. Once they arrive in the United States and apply for asylum, they simply want to be able to support themselves and their families, and contribute to the country that they would like to become their home. Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community. A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge.

Furthermore, removal of the 30-day processing provision would cost the United States tax revenue since anyone who is working is required to pay taxes. USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security. The government frequently complains that it does not have sufficient revenue to carry out its obligations, which makes one question why they would want to delay or lose valuable tax dollars from asylum seekers working.

AR004892

It is also impossible to avoid the evidence that this proposed rule change is part and parcel of this administrations effort to make the U.S. a hostile destination for individuals fleeing persecution in their countries of origin. This is evidenced by this rule change as well as the third-country transit bar, the proposed wide-sweeping public charge rule, and the institution of the so-called Migrant Protection Protocols. By removing the ability of asylum seekers to gain meaningful employment within a short and predictable timeframe, the Trump Administration effectively turns asylum seekers into the very public charges it seeks to exclude. Additionally, this policy change would make the work authorization process more unpredictable and inefficient by removing the ability to hold USCIS accountable to any deadline.

Finally, as the law is currently written, asylum seekers must wait 180 days before they may be granted authorization to work. They are permitted to submit their application after 150 days, giving USCIS the 30-day timeframe in question to process the requests. If USCISs goal is to have more time to process each request in order to increase flexibility and free up resources to work on other applications, then it could easily shorten the waiting time before asylum-seekers are allowed to submit their application. If USCIS feels that a 60-day timeframe would be more beneficial, then it may allow applications to be submitted after 120 days, rather than 150. Allowing asylum-seekers to submit their applications earlier could allow the department to have up to 180 days to process and properly vet each individual while reducing the risk of harm to each applicant.

It is also worth noting that asylum applicants are permitted to apply for EADs only if their asylum applications are not adjudicated within the 180-day statutory timeframe for adjudicating asylum applications. Perhaps the administration could better use its time to figure out how to speed up the asylum process - while still maintaining constitutionally-required norms of due process, of course - rather than drafting rules that prevent people from working and contributing to the United States economy.

Based on my experiences as an immigration attorney working with individuals whose only desire is to be safe from persecution and be good members of society, I once again reiterate that I am strongly opposed to the proposed regulation, and I request that you leave the 30-day processing provision in place and unchanged.

AR004893

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-od7n
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2402
Comment Submitted by Keith Schaeffer

---

## Submitter Information

**Name:** Keith Schaeffer
**Address:**
    2755 N. Montezuma Avenue
    Tucson,  AZ,  85712
**Email:** kschaeff@theriver.com
**Phone:** 520/325-9071

---

## General Comment

I am writing in opposition to the Trump Administrations proposal to eliminate the 30-day timeframe for approving or denying work authorizations for asylum seekers. The cruel proposal would leave asylum seekers with no legal means to support themselves while their asylum applications are pending, leaving them at risk of hunger, homelessness, exploitation and trafficking. It also would deny our government tens of millions of dollars in tax revenues from wages earned by asylum seekers. I grew up believing that America is a beacon of hope for victims of persecution. The Trump Administrations proposal betrays that American tradition and is part of a long pattern of cruelty against societys most vulnerable by an illegitimate president. Please protect the right to asylum by preserving the 30-day deadline for granting work authorizations.

AR004894

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-ry2m
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2403
Comment Submitted by Basima Hafiz

---

## Submitter Information

**Name:** Basima Hafiz

---

## General Comment

The government needs to keep processing work authorization applications within 30 days. Asylum seekers have a right to work and attain social services and to have a speedy determination of their cases.

AR004895

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-if1r
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2404
Comment Submitted by Janice Dysinger

---

## Submitter Information

**Name:** Janice Dysinger

---

## General Comment

Please support President Trumps Immigration reforms to allow for common sense laws in dealing with people who just show up at our borders. We need time to assess each situation. We can not absorb the worlds population- PERIOD.

AR004896

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d74-161m
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2405
Comment Submitted by Erin Williams

---

## Submitter Information

**Name:** Erin Williams

---

## General Comment

This proposed rule will harm asylum seekers and their families, and lead to $100s of millions of lost tax revenue. All actually effected individuals are already in the system. These individuals are seeking to become part of society. They want to work and to provide for their own families. To stop expedited processing only worsens the problems that so many who support the proposed rule are seeking to impact such as public assistance, integration and assimilation.

AR004897

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-a61r
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2406
Comment Submitted by Jocelyn Jenks

---

## Submitter Information

**Name:** Jocelyn Jenks
**Address:**
   Denver,  CO,  80205
**Email:** jenksest@gmail.com

---

## General Comment

My name is Jocelyn Jenks, and I live in Denver, Colorado. I oppose this rule change. I think it will have a negative impact not just on individuals, but on the US and our economy. In my capacity as a concerned US citizen, I think it is very important that USCIS continue processing asylum EAD applications within 30 days. If people are residing in the United States, I think it is important that they are able to lawfully work and contribute to our society, the community and the US economy. When people live here, waiting, sometimes for years, to finally have their cases heard by an immigration judge, and are unable to work, they are vulnerable to exploitation and homelessness. That exploitation has a negative impact not just on individuals but on the communities they live in. Asylum seekers are lawfully applying for status in the United States based on their well-founded fear of return to their home country. Once here, and after they have applied for asylum, they already must wait six months before receiving work authorization. This means that they come to the United states fleeing violence and persecution, often with little to no money, and live in limbo, lawfully applying for status, but barely scrapping by to pay for rent or food. The proposed rule could mean that they are waiting a year or longer to receive authorization to work. This is not beneficial to anyone, and USCIS itself states that it could cost the government over $38 million dollars a year in lost tax revenue because people will not be able to enter the work force and they and their employers will therefore not be paying taxes. If USCIS does not have the capacity to adjudicate the work authorization applications in a timely manner, I suggest they allow applicants to apply for their work authorization earlier so that they have additional time to process the applications, but the applicant can still receive their work permit within 180 days. Thank you for your consideration.

AR004898

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d76-l0rd
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2407
Comment Submitted by Brittany Brown

## Submitter Information

**Name:** Brittany Brown
**Address:**
   46 Cambridge Place
   Brooklyn,  NY,  11238
**Email:** brittanysbrown@gmail.com
**Phone:** 9175447920

## General Comment

It would be a grave mistake for USCIS to remove the 30-day processing provision. As an immigration attorney, I know that asylum seekers often must wait months or years for their applications to be adjudicated. In order to support themselves and their families, they must be able to lawfully work. In addition to being the morally correct thing to do, this work also generates tax dollars and improves the economy.

AR004899

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d7a-axyi
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2408
Comment Submitted by Christopher Strawn on Behalf of the Plaintiffs' Litigation Team in Rosario v. U.S.
Citizenship & Immigration Servs., No. 2:15-cv-00813

---

## Submitter Information

**Name:** Christopher Strawn
**Address:**
  NWIRP, 615 2nd Ave.
  Suite 400
  Seattle,  WA,  98104
**Email:** chris@nwirp.org
**Phone:** 206-957-8628

---

## General Comment

Please find the attached comment submitted on behalf of the Plaintiffs' litigation team in Rosario v. U.S.
Citizenship & Immigration Servs., No. 2:15-cv-00813.

---

## Attachments

Comment with attachments

AR004900

  

  

November 8, 2019

Samantha Deshommes
Chief, Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW
Mailstop #2140
Washington, D.C. 20529-2140

RE:    Opposition to Removal of 30-Day Processing Provision of Asylum Application-Related
       Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (Sept. 9, 2019)
       DHS Docket No. USCIS-2018-0001

Dear Ms. Deshommes:

Counsel in *Rosario v. U.S. Citizenship & Immigration Servs.*, No. 2:15-cv-00813 (W.D. Wash.),
write in response to DHS Docket No. USCIS-2018-0001, the Department of Homeland
Security's Notice of Proposed Rulemaking on Removal of 30-Day Processing Provision for
Asylum Applicant-Related Form I-765 Employment Authorization Applications (Sept. 9, 2019)
(hereinafter, "Proposed Rule").

The Proposed Rule will have immediate and harmful effects on asylum seekers and their families
as well as the U.S. economy. The Proposed Rule - by delaying adjudication and completion of
background checks – would serve only to exacerbate any fraud or national security concerns
cited as justification by the Department of Homeland Security ("DHS") U.S. Citizenship and
Immigration Services ("USCIS").

Counsel represent a certified nationwide class of asylum applicants seeking initial employment
authorization documents ("EADs") pursuant to 8 C.F.R. § 208.7(a)(1). *Rosario v. U.S.
Citizenship & Immigration Servs.*, No. 2:15-cv-00813, 2017 WL 3034447 (W.D. Wash. July 17
18, 2017). Faced with lengthy agency delays in adjudicating initial asylum EAD applications, on
May 22, 2015, Plaintiffs filed a class action lawsuit seeking to compel U.S. Citizenship and

AR004901

Immigration Services ("USCIS") to comply with the 30-day regulatory deadline to adjudicate EAD applications. Plaintiffs sought relief in federal court because they were suffering significant harm as a result of the agency's delay. Despite their eligibility for an EAD, Plaintiffs A.A. and Machic Yac were each forced to rely on family and friends for financial support because they were unable to obtain employment. Without evidence of lawful status, Plaintiff Machic Yac was unable to obtain a driver's license and Plaintiff W.H. was unable to renew his driver's license. The harms suffered by the named Plaintiffs were a consequence of USCIS's failure to timely issue initial asylum EADs and are indicative of the harms suffered by members of the class. Attorney Declarations, *Rosario v. U.S. Citizenship & Immigration Servs.*, No. 2:15-cv-00813 (W.D. Wash. Mar. 11, 2016), ECF Nos. 59-3, 59-13.

To remedy these harms and ensure that USCIS complies with the law, on July 26, 2018, the District Court enjoined USCIS from further failing to adhere to the 30-day deadline for adjudicating initial asylum EAD applications. *Rosario v. U.S. Citizenship & Immigration Servs.*, 365 F. Supp. 3d 1156, 1163 (W.D. Wash. 2018). Following the District Court's July 2018 order, USCIS's compliance rate has steadily risen from 81.7% in July 2018, to 91.7% in October 2018, 96.3% in December 2018, and 99% in May 2019. Thus, notwithstanding the agency's repeated claims that it could not comply with the 30-day deadline, *Rosario* class members are no longer unable to financially support themselves or their loved ones because of delays in adjudicating their EAD applications.

Through the Proposed Rule, DHS now seeks to undo the success of the *Rosario* litigation without good cause. In support of the Proposed Rule, DHS repeats and relies on the exact argument rejected by the District Court in *Rosario*—that USCIS cannot adjudicate EAD applications in 30 days or less without undue strain on agency resources. *See Rosario,* 365 F. Supp. 3d at 1163 n.6. Yet again, just as before the District Court, DHS fails to provide adequate support for this assertion. In short, DHS has not shown that the Proposed Rule is necessary to agency functioning.

The harm that would be caused by the Proposed Rule, in contrast, is supported by the record in *Rosario* and the Proposed Rule itself. The Proposed Rule will cause significant and long-lasting negative effects on the ability of *Rosario* class members to support themselves and their loved ones while they are waiting for their asylum claims to be heard.

The Proposed Rule is not in the economic interest of the United States which benefits greatly from the contributions of refugees and asylum seekers. It compounds the impact of the already lengthy 180-day waiting period before asylum seekers are eligible for employment authorization, and is unnecessary given that DHS has shown itself capable of near complete compliance with the 30-day adjudication requirement.

Further, DHS's argument that the Proposed Rule is due, in part, to fraud or national security concerns contradicts the manner in which it desires to process future EAD applications. DHS should want to expedite EAD determinations and quickly vet applications, *as it currently does*, to detect and investigate any fraud-related concerns, rather than create extensive delays.

AR004902

*The Current System Works for 99% of Applicants*

The Proposed Rule is a misguided and extreme response to the District Court's ruling in *Rosario*. Since the District Court's Order took effect, USCIS has demonstrated that it *is* able to comply with the existing regulation's deadline. USCIS reports that it is now deciding approximately 99% of EAD applications within the 30-day processing timeline, demonstrating that USCIS is generally able to address fraud and security concerns within the current timeframe and process.

USCIS explains that it seeks to eliminate the 30-day processing deadline because the regulatory deadline does "not provide sufficient flexibility" to address (1) the "increased volume of affirmative asylum applications and accompanying Applications for Employment Authorization"; (2) "changes in intake and EAD document production" over the last two decades; and (3) "the need to appropriately vet applicants for fraud and national security concerns." 84 Fed. Reg. at 47155. Notably, the changes identified by USCIS in intake and document production have been in place for more than a decade and a half—these changes began in 1997 and were fully implemented by 2006. 84 Fed. Reg. at 47154 and n.17. The additional fraud and national security vetting cited by the government were implemented after September 11, 2001, with the creation of the Office of Fraud Detection and National Security (FDNS) in 2004. 84 Fed. Reg. at 47154-55. Despite the existence of these production and vetting changes, and the increase in affirmative asylum applications, USCIS has complied for more than a year with the *Rosario* Court's order requiring it to process initial asylum EAD applications in 30 days.

Furthermore, USCIS's regulations already provide the flexibility to adequately vet each EAD application within the mandatory timeframe. *See* 8 C.F.R. § 103.2(b)(10)(i). The EAD application, USCIS Form I-765, collects information necessary to determine eligibility. If the EAD application is missing required evidence, however, the 30-day clock does not begin to run until the applicant provides the evidence. 8 C.F.R. § 103.2(b)(10)(i). In addition, if USCIS requires additional information, the 30-day clock stops running at the time of any request for additional evidence and only resumes once the agency receives the requested evidence. *Id.* The 30-day deadline, in combination with regulations governing the processing of applications, is sufficiently flexible to permit the agency to obtain the information it needs and make the two discrete eligibility determinations necessary to properly adjudicate EAD applications. *See* 8 C.F.R. § 103.2(b)(10)(i); 8 C.F.R. § 208.7(a)(1).

As such, the Proposed Rule does not provide sufficient justification for abandoning the current, functional process and replacing it with one that permits indefinite delay and only serves to harm asylum seekers, their families, and the community.

*Harm to Asylum Seekers*

Asylum seekers generally are individuals who flee to the United States for protection after having suffered grave harm, including torture and sexual violence, on account of a statutory protected ground. 8 U.S.C. § 1158. In many cases, asylum seekers are forced to flee their country of origin with few possessions and little support or financial resources. The Proposed Rule will undermine the ability of asylum seekers, including members of the *Rosario* Class, to sustain

AR004903

themselves and their families. Without the 30-day adjudication deadline, asylum seekers face significant, indefinite delay on their applications. Outside of the initial asylum EAD context, to illustrate, USCIS reports that EADs may be delayed nearly six months. USCIS, Automatic Employment Authorization Extension, https://www.uscis.gov/working-united-states/automatic-employment-authorization-document-ead-extension (last visited Nov. 2, 2019). USCIS reports that the National Benefits Center is taking up to 11 months to process some EADs. https://egov.uscis.gov/processing-times (last visited Nov. 8, 2019).

Without EADs, asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. 84 Fed. Reg. at 47163-64. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community A lack of income means not being able to afford food, housing, medical treatment, health insurance, banking services, or legal representation. Legal representation is necessary even in the strongest of cases. Vulnerable asylum seekers – many who do not speak English – may not able to successfully navigate the complicated immigration bureaucracy alone, even if their applications merit approval. Furthermore, individuals will be unable to secure valid identification, leaving them unable to obtain many social services and increasingly vulnerable to exploitation, trafficking, and underground economic risks.

*Lost Tax Revenue for the Government and Increased Strain on Community Resources.*

USCIS estimates that all levels of government will lose tax revenue as a result of the proposed rule change. 84 Fed. Reg. at 47152-53. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and Social Security. 84 Fed. Reg. at 47157-58.

The Proposed Rule would burden and stretch the capacity of charities and non-profit service providers: if asylum-seekers are unable to obtain an EAD in a timely manner, they would be forced to rely on other forms of support, including organizations that provide financial, housing, medical, legal, or other forms of assistance.

This is far too high a cost to be justified in the name of purported agency "flexibility."

*The Proposed Rule Underestimates the Economic Harm*

The cost of the Proposed Rule is certain to be higher than USCIS estimates. First, USCIS's estimated cost assumes that average EAD processing times would increase only by about 30 days if the deadline were eliminated, reflecting average timelines of Fiscal Year ("FY") 2017. However, initial asylum EAD applications have grown significantly, year after year, and since FY2017. Also, EAD processing time for other applicants has ballooned to over six months or more. If this Proposed Rule is enacted, asylum seekers will likely see delays well beyond the 60 days estimated by USCIS, and the costs therefore will be significantly higher than estimated.

AR004904

Secondly, USCIS suggests that lost tax revenue might be replaced by other workers, assuming that others would be hired in place of asylum seekers. However, with unemployment at a historic low of about 3.5% this assumption is questionable. It is possible, if not probable, that employers may simply not hire for these positions.

Finally, USCIS's analysis appears to consider only employment taxes, ignoring income taxes at the federal, state and local levels. By ignoring significant tax revenue loss at the local, state, and federal level, USCIS significantly underestimates the tax loss the Proposed Rule would cause.

Based on incorrect assumptions and incomplete analysis, USCIS has significantly underestimated the negative economic impact of this Proposed Rule.

*Increased Delay Contrary to National Security Interests*

USCIS's expressed concern about fraud and national security should favor prompt decisions on EADs, rather than endlessly delayed resolution that will be the result if the proposed regulation is finalized. In the notice, USCIS makes frequent reference to a rise in national security threats as a reason to spend more time and resources on each decision, but fails to address the fact that it is able to commence these fraud/national security checks as soon as the asylum application is filed, 150 days before the application for work authorization can be filed. *See* 84 Fed. Reg. at 47150, 47153, 47154-55. In addition, USCIS has reported that it has been able to decide over 99% of EADs within the 30-day timeframe for over the past year. *Rosario v. U.S. Citizenship & Immigration Servs.*, No. 2:15-cv-00813 (Dkt. No. 146). Therefore, USCIS has proven its ability to adequately vet and adjudicate the requests in a timely fashion. Moreover, in urging that more time and resources are needed to ensure that fraud is not perpetrated, USCIS ignores its own belief that permitting cases to linger and create a backlog undermines national security and the integrity of the system. USCIS, *USCIS To Take Action to Address Asylum Backlog* (Jan. 31, 2018), https://www.uscis.gov/news/news-releases/uscis-take-action-address-asylum-backlog (last visited Nov. 2, 2019). The agency already has sufficient time to complete any background checks because it can initiate these checks upon the filing of the asylum application five months before the application for work authorization is filed. Were consistency and thorough processing an actual priority for USCIS, it would utilize a procedure that more efficiently decides EAD application, as opposed to one that enables endless delay that is not justified by individualized facts.

*Proposed Alternatives*

Current law mandates that asylum seekers wait 180 days before USCIS may grant their applications for employment authorization. By regulation, asylum seekers cannot submit an initial EAD application until 150 days have lapsed since the filing of their asylum application. 8 C.F.R. § 208.7(a)(1). If USCIS's goal is to gain additional time to process each request so that it may increase flexibility and free up resources to work on other applications, then it could instead propose a change to the regulation that would permit asylum applicants to submit their EAD applications earlier. For example, if USCIS seeks 60 days to adjudicate EAD applications, then it should allow applications to be submitted after 120 days, rather than 150.

AR004905

In addition, USCIS could immediately begin the necessary background checks for EADs on receipt of the asylum application. USCIS already begins background checks soon after an asylum application is filed. If any separate or additional background checks are delayed until an EAD is filed, then USCIS could initiate such checks on the filing of the asylum application. USCIS can and should immediately start the requisite background checks on receipt of the asylum application, thereby relaxing the impact of the 30-day deadline for EAD adjudication.

USCIS significantly underestimates the economic cost of the Proposed Rule. The Proposed Rule relies on incorrect assumptions as to how quickly USCIS would adjudicate initial asylum EADs without a deadline, fails to consider the impact of low unemployment, and ignores the impact on federal, state, and local tax income tax revenue. USCIS should revise its economic analysis so that it is accurate and enables a full and fair consideration of the true economic cost of the Proposed Rule.

*   *   *   *   *

For the aforementioned reasons, DHS should not implement the Proposed Rule, and USCIS should continue to adjudicate initial asylum EAD applications in accordance with the *Rosario* Court's order. Please do not hesitate to contact us if you have questions regarding our comments. Thank you for your consideration.

Respectfully submitted,

/s/ *Christopher Strawn*
Christopher Strawn
Northwest Immigrant Rights Project 615
Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8628

Trina Realmuto
Emma Winger
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
(857) 305-3600

Devin Theriot-Orr
Open Sky Law, PLLC
20415 72nd Ave. S., Ste. 110
Kent, WA 98032
(206) 962-5052

Marc Van Der Hout
Johnny Sinodis
Van Der Hout LLP
180 Sutter Street, Suite 500
San Francisco, CA 94104
(415) 981-3000

Scott D. Pollock
Christina J. Murdoch
Kathryn R. Weber
Scott D. Pollock & Associates, P.C.
105 W. Madison, Suite 2200
Chicago, IL 60602
(312) 444-1940

Robert H. Gibbs
Robert Pauw
Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104-1003
(206) 682-1080

# EXHIBIT A

AR004907

| | | Processing Times | | | | | Compliance Percentage | |
|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Month | 0-30 Days | 31-60 Days | 61-90 Days | 91-120 Days | 121+ days | Grand Total | % Completed within 30 Days | % Completed within 60 Days |

**United States Citizenship and Immigration Services (USCIS)**
**I-765 - Application for Employment Authorization**
**Eligibility Category: C08, Pending Asylum**
**Initial Permission to Accept Employment**
**Completions by Processing Time Buckets**
**FY15 - FY19 (Through June 30, 2019)**
**Aggregated by Fiscal Year and Month**

| Fiscal Year | Month | 0-30 Days | 31-60 Days | 61-90 Days | 91-120 Days | 121+ days | Grand Total | % Completed within 30 Days | % Completed within 60 Days |
|---|---|---|---|---|---|---|---|---|---|
| 2015 | OCT | 2,323 | 2,538 | 1,071 | 230 | 35 | 6,197 | 37.5% | 78.4% |
| | NOV | 1,583 | 2,727 | 921 | 132 | 35 | 5,398 | 29.3% | 79.8% |
| | DEC | 1,331 | 2,746 | 941 | 157 | 79 | 5,254 | 25.3% | 77.6% |
| | JAN | 1,188 | 2,993 | 1,765 | 316 | 39 | 6,301 | 18.9% | 66.4% |
| | FEB | 1,827 | 1,677 | 1,532 | 598 | 110 | 5,744 | 31.8% | 61.0% |
| | MAR | 1,478 | 3,461 | 2,743 | 1,167 | 166 | 9,015 | 16.4% | 54.8% |
| | APR | 1,205 | 6,131 | 3,136 | 896 | 190 | 11,558 | 10.4% | 63.5% |
| | MAY | 2,539 | 6,907 | 1,120 | 251 | 115 | 10,932 | 23.2% | 86.4% |
| | JUN | 3,873 | 4,083 | 1,083 | 265 | 91 | 9,395 | 41.2% | 84.7% |
| | JUL | 3,428 | 3,633 | 1,636 | 252 | 71 | 9,020 | 38.0% | 78.3% |
| | AUG | 3,322 | 4,378 | 1,958 | 448 | 82 | 10,188 | 32.6% | 75.6% |
| | SEP | 2,730 | 5,179 | 1,387 | 254 | 69 | 9,619 | 28.4% | 82.2% |
| **2015 Total** | | **26,827** | **46,453** | **19,293** | **4,966** | **1,082** | **98,621** | **27.2%** | **74.3%** |
| 2016 | OCT | 2,896 | 3,917 | 1,250 | 244 | 96 | 8,403 | 34.5% | 81.1% |
| | NOV | 2,763 | 4,729 | 2,001 | 465 | 98 | 10,056 | 27.5% | 74.5% |
| | DEC | 2,497 | 3,161 | 2,626 | 438 | 147 | 8,869 | 28.2% | 63.8% |
| | JAN | 2,281 | 6,043 | 3,370 | 550 | 107 | 12,351 | 18.5% | 67.4% |
| | FEB | 5,483 | 3,780 | 3,063 | 2,071 | 97 | 14,494 | 37.8% | 63.9% |
| | MAR | 5,715 | 2,333 | 3,466 | 905 | 213 | 12,632 | 45.2% | 63.7% |
| | APR | 4,588 | 3,054 | 2,538 | 320 | 112 | 10,612 | 43.2% | 72.0% |
| | MAY | 4,392 | 2,709 | 1,262 | 3,376 | 80 | 11,819 | 37.2% | 60.1% |
| | JUN | 5,436 | 4,038 | 1,686 | 4,707 | 338 | 16,205 | 33.5% | 58.5% |
| | JUL | 6,932 | 1,882 | 4,928 | 4,684 | 612 | 19,038 | 36.4% | 46.3% |
| | AUG | 8,478 | 6,600 | 6,159 | 902 | 382 | 22,521 | 37.6% | 67.0% |
| | SEP | 9,001 | 9,268 | 988 | 282 | 169 | 19,708 | 45.7% | 92.7% |
| **2016 Total** | | **60,462** | **51,514** | **33,337** | **18,944** | **2,451** | **166,708** | **36.3%** | **67.2%** |
| 2017 | OCT | 7,567 | 6,273 | 579 | 108 | 84 | 14,611 | 51.8% | 94.7% |
| | NOV | 7,781 | 8,823 | 728 | 111 | 72 | 17,515 | 44.4% | 94.8% |
| | DEC | 9,895 | 7,840 | 545 | 53 | 41 | 18,374 | 53.9% | 96.5% |
| | JAN | 9,592 | 8,987 | 671 | 95 | 63 | 19,408 | 49.4% | 95.7% |
| | FEB | 15,107 | 4,214 | 566 | 99 | 48 | 20,034 | 75.4% | 96.4% |
| | MAR | 13,735 | 4,875 | 530 | 144 | 74 | 19,358 | 71.0% | 96.1% |
| | APR | 8,027 | 7,336 | 717 | 113 | 72 | 16,265 | 49.4% | 94.5% |
| | MAY | 12,193 | 5,190 | 2,273 | 156 | 90 | 19,902 | 61.3% | 87.3% |
| | JUN | 12,864 | 1,884 | 5,048 | 340 | 99 | 20,235 | 63.6% | 72.9% |
| | JUL | 11,404 | 1,742 | 4,221 | 1,340 | 155 | 18,862 | 60.5% | 69.7% |
| | AUG | 12,130 | 5,294 | 9,219 | 5,685 | 1,341 | 33,669 | 36.0% | 51.8% |
| | SEP | 13,900 | 14,737 | 5,076 | 2,618 | 843 | 37,174 | 37.4% | 77.0% |
| **2017 Total** | | **134,195** | **77,195** | **30,173** | **10,862** | **2,982** | **255,407** | **52.5%** | **82.8%** |
| 2018 | OCT | 12,021 | 9,710 | 1,428 | 535 | 336 | 24,030 | 50.0% | 90.4% |
| | NOV | 17,031 | 6,092 | 474 | 119 | 171 | 23,887 | 71.3% | 96.8% |
| | DEC | 18,145 | 5,920 | 372 | 132 | 204 | 24,773 | 73.2% | 97.1% |
| | JAN | 18,305 | 4,787 | 341 | 73 | 167 | 23,673 | 77.3% | 97.5% |
| | FEB | 17,697 | 2,516 | 219 | 124 | 193 | 20,749 | 85.3% | 97.4% |
| | MAR | 22,077 | 2,308 | 121 | 56 | 90 | 24,652 | 89.6% | 98.9% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | APR | 20,176 | 2,790 | 123 | 39 | 49 | 23,177 | 87.1% | 99.1% |
| | MAY | 24,595 | 3,115 | 156 | 33 | 48 | 27,947 | 88.0% | 99.2% |
| | JUN | 18,622 | 2,629 | 141 | 45 | 53 | 21,490 | 86.7% | 98.9% |
| | JUL | 17,375 | 3,625 | 167 | 49 | 60 | 21,276 | 81.7% | 98.7% |
| | AUG | 19,859 | 2,376 | 247 | 77 | 87 | 22,646 | 87.7% | 98.2% |
| | SEP | 15,425 | 1,673 | 106 | 48 | 82 | 17,334 | 89.0% | 98.6% |
| **2018 Total** | | **221,328** | **47,541** | **3,895** | **1,330** | **1,540** | **275,634** | **80.3%** | **97.5%** |
| | OCT | 17,192 | 1,392 | 114 | 47 | 86 | 18,831 | 91.3% | 98.7% |
| | NOV | 13,512 | 1,297 | 77 | 37 | 55 | 14,978 | 90.2% | 98.9% |
| | DEC | 15,802 | 452 | 81 | 26 | 51 | 16,412 | 96.3% | 99.0% |
| | JAN | 17,892 | 1,001 | 257 | 159 | 60 | 19,369 | 92.4% | 97.5% |
| | FEB | 16,478 | 190 | 28 | 34 | 32 | 16,762 | 98.3% | 99.4% |
| | MAR | 17,923 | 129 | 17 | 37 | 21 | 18,127 | 98.9% | 99.6% |
| | APR | 19,043 | 112 | 18 | 30 | 15 | 19,218 | 99.1% | 99.7% |
| | MAY | 18,588 | 109 | 25 | 27 | 27 | 18,776 | 99.0% | 99.6% |
| | JUN | 17,924 | 114 | 11 | 27 | 20 | 18,096 | 99.0% | 99.7% |
| **2019 Total** | | **154,354** | **4,796** | **628** | **424** | **367** | **160,569** | **96.1%** | **99.1%** |
| | | **597,166** | **227,499** | **87,326** | **36,526** | **8,422** | **956,939** | **62.4%** | **86.2%** |

*1) The report reflects the most up-to-date data available at the time the database is queried.*

*2) The data reflect the initial decision only.  Subsequent decisions are excluded.*

*3) Processing time is represented by the elapsed number of days between receipt date to initial decision date.*

*4) Applications with a request for initial evidence will reset their processing time to 0 upon receiving the evidence.*

*5) Applications with a request for additional evidence will have the processing time paused and resumed upon receiving the evidence.*

*Database Queried: July 3, 2019*

*Report Created: July 3, 2019*

*System: C3 Consolidated*

*Office of Performance and Quality (OPQ), Performance Analysis and External Reporting (PAER), SN*

*Parameters*

*Form(s): I-765*

*Class Preference(s): C08*

*Initial RFE Codes: FBA, FBC*

*Additional RFE Codes : FBB*

*RFE Received Codes: HA*

*Time Period(s): October 1, 2014 - June 30, 2019*

*Data Type(s): Processing Time*

AR004909

| | Processing Times | | | | | | Compliance Percentage | |
|---|---|---|---|---|---|---|---|---|
| **United States Citizenship and Immigration Services (USCIS)** | | | | | | | | |
| **I-765 - Application for Employment Authorization** | | | | | | | | |
| **Eligibility Category: C08, Pending Asylum** | | | | | | | | |
| **Initial Permission to Accept Employment** | | | | | | | | |
| **Pending by Processing Time Buckets** | | | | | | | | |
| **FY15 - FY19 (Through June 30, 2019)** | | | | | | | | |
| **Data Type** | **0-30 Days** | **31-60 Days** | **61-90 Days** | **91-120 Days** | **121+ days** | **Grand Total** | **% Pending 0- 30 Days** | **% Pending 0- 60 Days** |
| Pending | 6,649 | 5 | 0 | 5 | 2 | 6,661 | 99.8% | 99.9% |

1)  The report reflects the most up-to-date data available at the time the database is queried.

2)  Reopened applications are excluded from this report.

3)  Processing time is represented by the elapsed number of days between receipt date to the report date.

4)  Applications with a request for initial evidence will reset their processing time to 0 upon receiving the evidence.

5)  Applications with a request for additional evidence will have the processing time paused and resumed upon receiving the evidence.

Database Queried: July 3, 2019

Report Created: July 3, 2019

System: C3 Consolidated

Office of Performance and Quality (OPQ), Performance Analysis and External Reporting (PAER), SN

Parameters

Form(s): I-765

Class Preference(s): C08

Initial RFE Codes: FBA, FBC

Additional RFE Codes : FBB

RFE Received Codes: HA

Time Period(s): June 30, 2019

Data Type(s): Processing Time

AR004910

## SWORN DECLARATION OF TERESA A. STATLER

I, Teresa A. Statler, declare under penalty of perjury and in accordance with 28 U.S.C. §1746 as follows:

1. I am an attorney admitted to practice law in Oregon. I am admitted to practice before all courts in the state of Oregon, the United States District Court for the District of Oregon, and the United States Court of Appeals for the Ninth Circuit. I graduated from Northwestern School of Law at Lewis & Clark College in Portland, Oregon in 1991. My business address is: 522 SW 5th Avenue, Suite 1125, Portland, Oregon 97204.

2. I have represented Antonio Machic Yac since June 3, 2015, and have personal knowledge of all the information contained in this declaration. Prior to completing this declaration, I reviewed relevant documents and notes in my case file to refresh my memory and verify dates and other specifics.

3. Mr. Machic Yac filed his application for asylum on Form I-589 with the USCIS and it was received on July 17, 2015. Mr. Machic Yac filed his EAD application on Form I-765 on December 31, 2015, more than 150 days after the USCIS received his asylum application. He has an interview scheduled with an Asylum Officer from the USCIS San Francisco Asylum Office on March 21, 2016.

4. Mr. Machic Yac has not received a Request for Evidence (RFE) from the USCIS on either his application for asylum or his EAD application for employment authorization. He has had his biometrics taken twice: in early August 2015 and again on February 26, 2016.

5. Mr. Machic Yac's EAD application remains pending with USCIS. Although the EAD application has been pending for more than 30 days, USCIS did not grant interim employment authorization to Mr. Machic Yac.

6. Mr. Machic Yac is eighteen years old and is attending high school. He currently resides with his aunt and uncle, who are pressuring him to financially contribute to the household expenses or find another place to live. USCIS' failure to grant Mr. Machic Yac employment authorization has caused him financial hardship in that he is unable to obtain employment without an EAD and therefore cannot contribute to paying for rent or other living expenses. In addition, he is unable to obtain a driver's license without an EAD.

Executed on March 7, 2016.

TERESA A. STATLER,
Oregon State Bar #914407

## SWORN DECLARATION OF ROBERT PAUW

I, Robert Pauw, declare under penalty of perjury and in accordance with 28 U.S.C. §1746 as
follows:

1.  I am an attorney admitted to practice law in Washington State. I am admitted to practice
    before the Federal District Court in the Western District of Washington, the Ninth Circuit
    Court of Appeals, and the United States Supreme Court. I graduated from Harvard Law
    School in 1983. My business address is: Gibbs Houston Pauw, 1000 Second Ave., Suite
    1600, Seattle, WA 98104.

2.  I have represented A████ A██ since June 2015 and have personal knowledge of all
    the information contained in this declaration. Prior to completing this declaration, I
    reviewed relevant documents and notes in his case file to refresh my memory and verify
    dates and other specifics.

3.  Mr. A██ filed an Application for Asylum (Form I-589) on August 19, 2015. He filed
    an Application for Employment Authorization (EAD) on Form I-765 on January 19,
    2016, more than 150 days after USCIS received the asylum application.

4.  Mr. A██ has not received a Request for Evidence (RFE) from USCIS on either his
    asylum or EAD application. Mr. A██ had his biometrics taken for his pending asylum
    application on August 27, 2015, as originally scheduled by USCIS.

5.  Mr. A██'s EAD application remains pending with USCIS. Although the EAD
    application has been pending for more than 30 days, USCIS did not grant interim
    employment authorization to Mr. A██.

6.  Because Mr. A██ has not received an EAD document, he is unable to obtain
    employment. This causes a substantial hardship on him because he has no other means of

support while he is pursuing his application for asylum. He currently gets by only

because he has some friends who have been willing to support him while his application

for asylum is pending.


Executed on ___March 9_____, 2016.


_Robert Pauw_____

Robert Pauw

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-juxw
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2409
Comment Submitted by Anne Marie Wolf

---

## Submitter Information

**Name:** Anne Marie Wolf
**Address:**
   P.O. Box 869
   Farmington, ME, 04938
**Email:** wolf0180@umn.edu

---

## General Comment

I do some volunteer work related to this humanitarian crisis that is unfolding at our southern border right now, and I don't think most people out there understand the realities. They have been brainwashed into thinking that these people who are trying to come here and build a life are somehow threatening to us. They are NOT. I have met the most wonderful, warm, resilient, gracious, loving, grateful people who are fleeing unimaginable horrors. They are go-getters and hard workers. They want to work, to provide for themselves and their families, to not be a burden on anyone. It serves NO PURPOSE to make it harder for them to do this, and it is yet another way this administration has contrived to be as cruel as possible to vulnerable, traumatized people.

Quite apart from the cruelty that such a rule would bring, even those unmoved by any compassion should consider that there are many businesses across the United States that cannot find enough workers. I live in Maine, and we have a regular and ongoing problem here with not having enough workers to staff businesses related to our seasonal tourist industry. There are hotels and restaurants that had to close or cut back hours early this year because when the school year started, they couldn't staff their businesses effectively.

Absolutely no good would be achieved by making it even harder for these people who are coming here to flee violence, drugs, and persecution to work. The only people who would gain by this would be the white supremacists, who could then feel gleeful at how harsh they'd been. But decent, sane people will not support this.

AR004915

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-uz9g
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2410
Comment Submitted by Judith Clemens

---

## Submitter Information

**Name:** Judith Clemens
**Address:**
  701 East Columbia Avenue
  CINCINNATI, OH, 45215
**Email:** judith.clemens@sndden.org

---

## General Comment

As someone who accompanied an asylum petitioner through his entire process and was able to give credible evidence before an immigration judge I know the traumatic cost of arrival in the US. Today this man and his family are productive citizens of this country and add to tax revenue the country needs. Had he not been granted asylum he would have had no income, no way to support his family and be forced to seek public services and benefits to survive. I know there are humanitarian ways to process asylum petitions and meet the needs of those who have already suffered persecution and death threats in their home countries. I support any way we, as a country, can fulfill our promise to welcome the tired and weary of our world.

AR004916

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-8d4t
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2411
Comment Submitted by Pat Moore-Pickett

## Submitter Information

**Name:** Pat Moore-Pickett
**Address:**
  2792 Briscoe Ct
  Woodland,  CA,  95776

## General Comment

Asylum seekers should be able to apply for work without further delay. They already must wait 180 days. Further delay, without cause, places undue burdens on people who have already suffered enormous hardship to reach this country and qualify for asylum. Forcing these people to continue to be unable to work also places economic burden on communities they are in. Further delay violates due process. Please maintain the current schedule and deadlines.

AR004917

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-g0g1
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2412
Comment Submitted by Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I disagree with this law change. Asylum seekers should be allowed to work as soon as possible. This law change is abhorrent, racist, and designed only to hurt immigrants.

AR004918

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-2pov
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2413
Comment Submitted by Hannah Lieberman

---

## Submitter Information

**Name:** Hannah Lieberman

---

## General Comment

People should be able to work as they fight for their asylum case. They are devoted, incredible people who have every right to work in this country. Let them have their work authorization and allow them to contribute and support themselves!

AR004919

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-h15e
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2414
Comment Submitted by Jennifer Chang

---

## Submitter Information

**Name:** Jennifer Chang

---

## General Comment

Allowing asylees to bring their cases for asylum is not a risk to our borders, but is rather a humanitarian imperative and fundamental to the core values of our country. These applicants should be allowed to financially support themselves while their cases are pending, the alternative would put more burden on our system. Giving them timely access to work authorization allows the government to collect more taxes and USCIS has been able to adjudicate these applications within the required 30 days. It takes pressure off of the immigrants, the community and adds money to the government-- this is a win win. This is part of the government's systematic attempt to deter a legal path of immigration.

AR004920

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-9f0v
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2415
Comment Submitted by Molly Verhey

---

## Submitter Information

**Name:** Molly Verhey
**Address:**
   1801 N B St.
   Ellensburg,  WA,  98926
**Email:** Mollyverhey@gmail.com

---

## General Comment

My name is Molly, and I am 24 year old Washingtonian. I hold a BA in Environmental Studies and Politics from Whitman College. During my time at Whitman, I participated in a field studies seminar that gave me a glimpse into to some of the harsh realities faced by immigrants and asylum seekers. I strongly oppose the proposed removal of the 30 day processing provision.

The proposal to remove the 30 day processing provision for asylum applicants employment authorization applications is unnecessary and poses serious threats to asylum seekers personal wellbeing and safety. Most cases are easily processed within the 30 day period, and there is no evidence of actual need to lift this provision. There is already a 150 day stay before asylum seekers can submit requests to work, and if more time is needed, it makes much more sense to allow asylum seekers to submit their applications sooner than 150 days, at least keeping the overall timeline the same while allowing more time for application processing if that is whats required. In fact, if USCIS is concerned about public charges, removing the 30 day provision is likely to increase the number of people reliant on services to survive by limiting wages that could be earned by asylum seekers already in the U.S. who want to work and contribute to the economy. This would actually result in a loss of tax revenue for government programs like social security and Medicare. The (lack of) logic here is nonsensical, and reinforces an apparent systematic push to discourage often desperate people from exercising their right to seek asylum in the U.S.

Not being able to work means potentially not being able to afford food, medical services/insurance, transportation, legal services, housing, and other social services that can help asylum seekers in their transition to U.S. life. This increases the chances that asylum seekers may be forced to experience homelessness or housing insecurity, be exploited, preyed upon by traffickers and underground economies, and experience detrimental

AR004921

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2415.html[9/15/2020 4:14:22 PM]

affects to their mental and physical health when they are already vulnerable. These things, in turn, may be used against them as apparent evidence that asylum seekers dont contribute or are burdens, when the system has given them no other option. USCIS must be able to be held accountable to a predictable timeline because there is so much at risk for asylum seekers.

During the field studies program, I spoke to someone held in immigration detention who was seeking asylum in the U.S. because she was experiencing increasing threats on her life. She told me of the visceral fear she had experienced every day in her home country as a result of state-sanctioned violence that sought to extort her and her family for money. She told me that she missed her home and had not wanted to leave, but the uncertain and dangerous journey to the U.S. was better than certain death if she remained, increasingly unable to comply with demands for money by those targeting her and her family. Upon arrival, she was not greeted as a human being fleeing violence and extortion, but rather thrown into a convoluted and contradictory immigration system that dehumanized her.

Removing the 30 day provision would further erode the already limited humanity extended to asylum seekers by causing real harm to individuals and families. It is imperative that USCIS remember there are lives and livelihoods at stake in its proceedings.

AR004922

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-7qhn
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2416
Comment Submitted by Alexus Sham

---

## Submitter Information

**Name:** Alexus Sham
**Address:**
    1531 HEARTWOOD DR
    CONROE,  77384-1419
**Email:** apsham38@gmail.com
**Phone:** 9174989009

---

## General Comment

Please maintain the 30 day processing provision for asylum applicant because in many cases the work permit allows the applicant to provide for his/her family and be a productive member in our society. It is important that these applications be expedited in order to allow asylum applicants the knowledge that there will not be a gap where they will not be allowed to work. I urge USCIS to keep in place the 30 day processing provision.

AR004923

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2416.html[9/15/2020 4:14:23 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-yadd
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2417
Comment Submitted by Maureen Sweeney, Immigration Clinic at the University of Maryland Carey School of Law

---

## Submitter Information

**Name:** Maureen Sweeney

---

## General Comment

My name is Maureen Sweeney and I direct the Immigration Clinic at the University of Maryland Carey School of Law. I have worked with asylum seekers for over 30 years.

The 30-day processing requirement for asylum seekers is vitally important for the integrity of our humanitarian protection system. People already have to wait nearly 6 months before they can apply for work authorization, and they and their families are often destitute in the meantime. This harms adults and children alike, and is an unconscionable stressor on traumatized people who are seeking protection that our immigration laws offer them.

Delaying the processing of work authorizations makes these vulnerable people more vulnerable still. The government should keep - and keep complying with - the 30-day limit.

AR004924

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-7qb3
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2418
Comment Submitted by John Katonah, Yolo Interfaith Immigration Network

## Submitter Information

**Name:** John Katonah
**Address:**
  1512 Midway Drive
  Woodland,  CA,  95695
**Email:** Jckatonah@icloud.com
**Phone:** 530-668-7944
**Organization:** Yolo Interfaith Immigration Network

## General Comment

Asylum seekers should be allowed to work - I am completely against this inhuman proposal.

John Grindler Katonah

AR004925

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-qu79
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2419
Comment Submitted by Bernice Funk

---

## Submitter Information

**Name:** Bernice Funk

---

## General Comment

I am writing to oppose the Administration's proposal to remove the 30-day rule for processing asylum seekers Form I-765 for employment authorization.

I am an immigration lawyer working in asylum law in the last 35 years, representing noncitizens from all over the world who have fled their country of nationality to save their life and lives of their family members. Persons who have fled horror in their home country need the right to work lawfully, and there is already a wait, and a long wait in many cases while asylum applicants struggle to present their best arguments to a now-hostile bureaucracy. It is inhumane to not allow persons who have fled past and future persecution, the right to work. It's demonstrated that hard-working immigrants of all descriptions contribute to make America strong.

It is critically important that asylum applicants, like refugees, have the right to work when they are new in the country, primarily for supporting themselves and their family, and contributing to the public common good as taxpayers.
Thank you for your attention to my views.
Bernice Funk, J.D.
WA State Bar Assn #14349

AR004926

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-pafc
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2420
Comment Submitted by Gabriele Eissner, St. Francis Community Services

---

## Submitter Information

**Name:** Gabriele Eissner
**Address:**
   4222 Delor St.
   St. Louis,  MO,  63116
**Email:** geissner@ccstl.org
**Phone:** 920-627-5996
**Submitter's Representative:** Gabriele Eissner
**Organization:** St. Francis Community Services

---

## General Comment

As an agency that offers bilingual mental health counseling, we worry about the mental health consequences of this regulation. There is clear evidence that not being able to work has a negative impact on mental health. By removing the ability to gain meaningful employment within a short and predictable time frame, asylum seekers will experience increased feelings of fear, desperation, and other mental health consequences. Article 23 of the Universal Declaration of Human Rights establishes that everyone has the right to work. This right must be upheld in order to uphold human dignity.

This regulation will also leave asylum seekers without the ability to provide for their families. According to the USCIS, asylum seekers would lose wages and benefits of up to $774.76 million in taxable income per year as a result of delayed entry into the U.S. labor force. This loss of income will exacerbate harm to an already-vulnerable community. Asylum seekers could experience food insecurity, housing insecurity, and insufficient healthcare as a result of delays in their work authorization approval. Those that are fleeing persecution in their home countries should not have to face further instability in the United States. Instead, they should be given the opportunity to provide for themselves and their families.

Currently, asylum seekers have to wait 150 days before submitting their work authorization application. The USCIS has a 30 day time frame to process any requests. If the USCIS needs more time to process each request, then it should shorten the waiting time before asylum seekers are allowed to submit their application rather than removing the deadline altogether. If a 60 day time frame would offer flexibility and free up resources, then

AR004927

asylum seekers should be able to submit applications after 120 days. Allowing asylum-seekers to submit their applications earlier would give the USCIS more time to process and properly vet each individual while reducing the risk of harm to asylum seekers.

AR004928

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-xd0x
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2421
Comment Submitted by Matthew Corso

---

## Submitter Information

**Name:** Matthew Corso
**Address:**
   60625
**Email:** mcorso77@gmail.com

---

## General Comment

As a volunteer who has worked directly with LGBTQ asylum seekers coming from countries that are hostile to their ability to live as human beings, I am writing to express my concern for this proposed rule change. The ability for asylum seekers to receive an Employment Authorization Document (EAD) in a timely manner, while they are waiting for their asylum case to be adjudicated, is crucial for their well-being and survival. As there is no government support for asylum seekers, they often rely on the kindness of strangers and local community organizations that try to help make a difference. These individuals have in many cases fled their home countries in order to survive, one of the most basic human instincts. They often arrive here with just the clothes on their backs, seeking a safe haven and a better life. To remove the 30-day processing provision would greatly delay their ability to receive an EAD, so that they may find temporary work to survive and thrive in their adopted country.

In working with many LGBTQ asylum seekers over a 6 year period from 2012-2018 when I lived in Washington, DC, I saw first hand how important this document was. It affords them the ability to support themselves, instead of having to rely on handouts from strangers or community groups. It allows them to earn an income, pay taxes and give back to the communities they live in and that are supporting them. It also allows them to become self-sufficient so they are not relying exclusively on what little local public assistance there may be out there. By definition of U.S. immigration law, asylum seekers are not here illegally. They funded their own way to get here, seeking refuge from death threats, discrimination, and lack of family or community support in their home countries. To change this rule would be a detriment to the thousands of asylum seekers who are seeking refuge and a way to meaningfully contribute to their own success and integration into the American way of life.

I strongly urge that this rule not be adopted and USCIS continue to review and provide EAD's within the 30 day

AR004929

window as mandated by law and the courts. I've seen first hand how delays in asylum seekers getting their work authorization approval can lead to: inability to buy food and sustain themselves, often requiring them to rely on food banks and strangers for support; inability to secure a valid ID - as a work permit and a social security number (SSN) are often necessary requirements to applications for a state ID; risk of homelessness or inability to secure housing - no one wants to live on the streets or in shelters that are not friendly to LGBTQ people; vulnerability to exploitation and trafficking; loss of ability to support themselves; and feelings of fear, desperation, and overall mental health concerns.

Maintaining the 30-day processing provision is in the long-term interests of the country, as many of the LGBTQ asylum seekers I've personally worked with wanted nothing more than to be productive, law-abiding citizens of this country. They gave up everything, including their friends and what family may have supported them to seek a better life. And as a country and within our own communities, we are better for it. They often bring new talent, good work ethics, and a real zeal to be productive members of society. They bring their culture to share with us, so that we may learn from them as well. The economic, social and cultural benefits far out weigh a short-sighted desire to make the asylum process more difficult and hostile, just to keep people from coming to this country. It is un-American, and not in keeping with the spirit and principles this country was founded on to harm those who are seeking refuge on our shores. All they want is the opportunity to give back and become productive members of our society. Please, do not adopt this rule and continue to provide this necessary work authorization in a timely manner to ensure those who have the least can provide for themselves.

AR004930

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-qyrb
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2422
Comment Submitted by Amber Qureshi, National Immigration Project of the National Lawyers Guild (NIPNLG)

## Submitter Information

**Name:** Amber Qureshi
**Organization:** National Immigration Project of the National Lawyers Guild (NIPNLG)

## General Comment

The National Immigration Project of the National Lawyers Guild (NIPNLG) writes in response to Docket No. USCIS-2018-0001, the Department of Homeland Security (DHS) request for comments on Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications. NIPNLG strongly opposes this proposed rule and we urge DHS to withdraw the proposed rule immediately.

Please see attached file for NIPNLG's full comment.

## Attachments

2019.11.08 NIP EAD Asylum Comment

AR004931



November 8, 2019

Via Federal e-Rulemaking Portal

Samantha Deshommes
Chief, Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW, Mailstop #2140
Washington, DC 20529-2140

**RE:    DHS Docket No. USCIS-2018-0001**
**Removal of 30- Day Processing Provision for Asylum Applicant**
**Related Form I-765 Employment Authorization Applications**

Dear Chief Deshommes:

The National Immigration Project of the National Lawyers Guild (NIPNLG) writes in response
to Docket No. USCIS-2018-0001, the Department of Homeland Security (DHS) request for
comments on "Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-
765 Employment Authorization Applications" (hereinafter, the Proposed Rule).

NIPNLG is a national, nonprofit organization dedicated to providing legal assistance and support
to immigrant communities and advocating on behalf of noncitizens. Members and supporters of
NIPNLG include attorneys, legal workers, law students, judges, jailhouse lawyers, grassroots
advocates, community organizations, and others seeking to defend and expand the rights of
immigrants in the United States. NIPNLG has represented, and assisted countless attorneys who
represent, asylum seekers inside the United States. The Proposed Rule directly affects our work
and our clients, who rely on access to employment as quickly as possible so that they can support
themselves and their families inside the United States while they await adjudication of their
asylum claims.

The Proposed Rule removes the regulatory requirement that Employment Authorization
Document (EAD) applications for asylum applicants be adjudicated within 30 days of
submission. If the Proposed Rule goes into effect in its current form, it will deprive asylum
seekers of the ability to support themselves and their families. In conjunction with this
administration's other assaults on asylum seekers fleeing persecution, the Proposed Rule would

AR004932

cause lasting harm to vulnerable people seeking refuge in the United States. DHS has not stated any justifiable reason to implement a rule change that would increase economic hardships for asylum seekers and their families, the employers they work for, and the communities in which they live. There are clear alternative regulatory changes that DHS could implement, which would both satisfy DHS's unsupported justifications and provide asylum seekers with the ability to work as soon as possible.

NIPNLG strongly opposes the Proposed Rule. We urge DHS to withdraw the Proposed Rule and, to the extent necessary, implement the alternative we have recommended in this comment.

## 1.   The Proposed Rule will cause significant and irreparable harm to asylum seekers.

If the Proposed Rule goes into effect, as stated, asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. By DHS's own estimates, lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year.[1]

The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community. Many of our asylum-seeking clients have fled their countries with little or no resources.[2] Those who are more fortunate often do not have enough to survive while they await adjudication of their asylum claims. They often rely on obtaining EADs as soon as they are able so that they can pay for basic necessities such as food and shelter, which the United States government does not provide.

A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Every day that passes without income can result in lasting, irreparable harm to asylum seekers and their families. Furthermore, individuals will be unable to secure a valid ID, needed for many social services, and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge, which conflicts with the priorities of this administration.[3]

## 2.   Combined with other draconian immigration policies implemented by the Trump Administration, the Proposed Rule seeks to deter asylum seekers from ever becoming full and equal members of our country.

The Proposed Rule is part and parcel of this administration's effort to make the United States a hostile destination for individuals fleeing persecution in their countries of origin. In the past two years, asylum seekers have faced unprecedented restrictions on their ability to exercise their right to seek safety in the United States. The government has sought to bar anyone who enters the

---

[1] *See* 84 FR 47150.
[2] *See e.g.*, Human Rights Watch, "We Can't Help You Here. U.S. Returns Asylum Seekers to Mexico," July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico.
[3] *See* 84 FR 41292. Although the final rule on Inadmissibility on Public Charge Grounds does not apply to asylees, it is still inherently inconsistent with the Proposed Rule.

United States without inspection from seeking asylum;[4] prevent those who have transited through a third-country on the way to the United States-Mexico border from applying for asylum;[5] and forced vulnerable asylum seekers to wait in life-threatening conditions in Mexico while their cases are pending in the United States.[6] Finally, the government has announced its intentions to charge a fee for asylum applications.[7]

These policies, combined with the Proposed Rule, are simply this administration's unlawful efforts to deter those fleeing persecution from seeking shelter in this country. By removing the ability of asylum seekers to gain meaningful employment within a short and predictable timeframe, the Trump Administration is effectively turning asylum seekers into the very public charges it seeks to exclude. Instead of providing asylum seekers the opportunity to meaningfully contribute to the country, the government continues to alienate, otherize, and endanger their lives and communities to which they belong.

### 3. DHS's reason for the Proposed Rule is unreasonable, arbitrary, capricious, and not based on fact.

DHS's primary justification cited for the Proposed Rule is that the agency needs more time and resources on each EAD application decision, referencing a rise in unspecified "threats to national security." This justification is simply inadequate.

USCIS has already proven its ability to adequately vet the number of requests in a timely fashion. USCIS's own data shows that the agency is currently deciding over 99 percent of EAD applications within the 30-day timeframe.[8] Moreover, its argument regarding increased threats serves only to prompt the need for a speedier process to properly protect national security, rather than its request to delay the process further. This need for a speedier process is further compounded by the fact that the EAD applicants are asylum-seekers already residing in the United States. If vetting must be done to prevent security risks, then having unvetted people in the U.S. subjected to a potentially indefinite review period seems contrary to the agencies' stated interests.

---

[4] EOIR Docket No. 18-0501, A.G. Order No. 4327-2018, RIN 1125-AA89, 1615-AC34, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, Procedures for Protection Claims, https://www.federalregister.gov/documents/2018/11/09/2018-24594/alienssubject-to-a-bar-on-entry-under-certain-presidential-proclamations-procedures-for-protection.

[5] EOIR Docket No. 19-0504, A.G. Order No. 4488-2019, RIN 1125-AA91, 1615-AC44, 84 Fed. Reg. 33829, Asylum Eligibility and Procedural Modifications, https://www.federalregister.gov/documents/2019/07/16/2019-15246/asylum-eligibility-and-procedural-modifications.

[6] "Migrant Protection Protocols" https://www.ice.gov/factsheets/migrantprotection-protocols-mpp.

[7] Presidential Memorandum for the Attorney General and Secretary of Homeland Security on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (April 29, 2019), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-additional-measures-enhance-bordersecurity-restore-integrity-immigration-system/.

[8] Compliance Report, Rosario Litigation: USCIS I-765 – Application for Employment Authorization Eligibility, Category: CO8, Pending Asylum Initial Permission to Accept Employment Completions by Processing Time Buckets, FY15-FY19 (Through June 30, 2019), https://www.americanimmigrationcouncil.org/sites/default/files/litigation_documents/nirp_v_uscis_defendants_july_2019_compliance_report.pdf.

**4. DHS can both ensure that asylum seekers obtain employment authorization in a timely manner and allow additional time for the agency to process EAD applications.**

Although by its own admissions, USCIS does not need additional time to process over 99 percent of applications, a reasonable alternative exists to ensure the agency is allowed additional time and issuance of EADs to asylum seekers is not unreasonably delayed.

Under current law, asylum seekers must wait 180 days before they may be granted authorization to work.[9] Regulations allow asylum seekers to submit their application after 150 days, giving USCIS the 30-day timeframe in question to process the requests.[10] However, nothing in the INA prevents USCIS from accepting EAD applications immediately and conducting necessary security checks immediately upon receiving an asylum application.

If USCIS's goal is to have more time to process each request, then it could easily shorten the waiting time before asylum-seekers are allowed to submit their application. Allowing asylum-seekers to submit their applications earlier could allow the department to have up to 180 days to process and properly vet each individual while reducing the risk of harm to each applicant.

* * * *

For the reasons stated in this comment, we urge DHS to rescind the Proposed Rule, which removes the 30-day adjudication requirement for EADs. To address any of the unsupported justifications DHS has used for the Proposed Rule, DHS can simply allow asylum seekers to submit EAD applications concurrently with the asylum application, thereby giving DHS the full 180 days to perform any necessary security checks. This will ensure that asylum seekers have a right to support themselves, their families and their communities, and be active members of the United States workforce during the pendency of their asylum cases.

Thank you for your consideration.

Sincerely,

Amber Qureshi
Yale Law Journal – Justine Wise Polier Fellow
National Immigration Project of the National Lawyers Guild
Email: amber@nipnlg.org

---

[9] Immigration and Nationality Act ("INA") § 208(d)(2).
[10] 8 CFR § 208.7(a)(1).

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-q5lb
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2423
Comment Submitted by Steve Burns

---

## Submitter Information

**Name:** Steve Burns
**Address:**
    2792 Briscoe Ct.
    Woodland,  CA,  95776

---

## General Comment

Preventing asylum seekers from any employment while they wait for their hearing is counterproductive, and there are low level jobs going unfilled in every community. Please decrease the non-working period, not increase. Thanks

AR004936

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-i808
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2424
Comment Submitted by Commissioner/CEO RuthAnne Visnauskas, NYS Homes and Community Renewal

## Submitter Information

**Name:** Commissioner/CEO RuthAnne Visnauskas
**Organization:** NYS Homes and Community Renewal
**Government Agency Type:** State
**Government Agency:** NYS Homes and Community Renewal

## General Comment

New York State Homes and Community Renewal (NYSHCR) submits the following comments in response to the Notice in the Federal Register (Document ID: USCIS-2018-0001-0001) soliciting comments on the Proposed Rule regarding "Removal of the 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications." NYSHCR is a consolidated leadership platform of associated New York State executive agencies and public benefit corporations with the shared mission to build, preserve, and protect affordable housing and increase home ownership across New York State.

## Attachments

NYSHCR Comment to DHS NPRM Signed

AR004937



November 8, 2019

Samantha Deshommes, Chief Regulatory Coordination Division
Office of Policy and Strategy
United States Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW, Mailstop #2140
Washington, DC 20529-2140

Re: DHS Docket No. USCIS-2018-0001

To Whom it May Concern:

New York State Homes and Community Renewal (NYSHCR) has reviewed the Department of Homeland Security's Notice of Proposed Rulemaking, "Removal of the 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications" published in the Federal Register on September 9, 2019. We respectfully submit the following comments in opposition to the Proposed Rule.

Thank you for the opportunity to comment.

Very Truly Yours,

Commissioner/CEO RuthAnne Visnauskas
New York State Homes and Community Renewal

AR004938

**Executive Summary**

New York State Homes and Community Renewal (NYSHCR) reviewed the above-referenced notice (the Proposed Rule), published in the Federal Register on September 9, 2019.[1] NYSHCR provides the following comments in opposition to the Proposed Rule.

NYSHCR is a consolidated leadership platform of associated New York State executive agencies and public benefit corporations with the shared mission to build, preserve, and protect affordable housing and increase home ownership across New York State. NYSHCR administers funding received by New York State from the U.S. Department of Housing and Urban Development (HUD) through several grant programs, including Section 8. Through these and other programs, NYSHCR works to fulfill its mission to provide New York State residents with access to safe and affordable housing.

The Department of Homeland Security's (DHS) proposed changes would increase the amount of time that asylum applicants must wait to receive an Employment Authorization Document (EAD). The Proposed Rule, if implemented, would make it far more difficult for asylum applicants to earn income while awaiting a decision on their asylum application. The inability to earn income will, in turn, place many New York State asylum seekers at increased risk of homelessness. Housing instability of this sort, particularly in childhood, can cause lifelong adverse consequences on an individual's physical, psychological, and economic well-being. For these reasons, we urge that the Proposed Rule be withdrawn.

**The Proposed Rule Will Increase Homelessness and Housing Instability Among New York State Asylum Seekers**

The Proposed Rule delays asylum seekers from being able to obtain employment authorization. Therefore, asylum seekers in New York State will not be able to obtain steady employment while they wait for approval of their applications. Without employment, asylum seekers will not have access to reliable incomes. This will naturally result in an increase in housing instability and homelessness. The risk of homelessness will be particularly acute in New York State, known for its highly competitive and expensive housing market. The Proposed Rule would also likely increase the amount of time that asylum seekers remain homeless, as it would extend the amount of time that applicants must wait to receive an EAD and earn income.

**The Collateral Consequences to Individuals**

The homelessness and housing instability caused by the Proposed Rule will result in devastating collateral consequences, particularly for displaced families with children. Social research provides clear evidence linking childhood homelessness with lifelong health problems. Homelessness and other forms of housing instability are associated with increased hospital visits

---

[1] Docket No. USCIS-2018-0001; RIN 1615-AC19; Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (proposed Sep. 9, 2019).

AR004939

and mental health problems, such as depression and anxiety.[2] Child poverty and housing instability also cause severe stress. This type of stress in children "disrupts normal brain and organ development and, consequently, damages brain architecture and neurocognitive systems."[3] These health consequences may be felt by these children for the rest of their lives.

A lack of access to safe and affordable housing can also limit a child's educational opportunities and exacerbate child poverty. Statistically, homeless children have lower passing rates across a number of academic subjects, have higher rates of absenteeism, and are more likely to face disciplinary action than children who live in stable housing.[4] Additionally, children who lack safe and secure housing will suffer long-term negative economic consequences.[5] Housing instability can also lead directly to employment insecurity among adults.[6]

**Administrative Burden on New York State and Municipalities**

The Proposed Rule would also place significant new costs and administrative burdens on New York State and municipal governments within the State. Most significantly, New York State and local governments would be required to cover the substantial costs of providing emergency shelter for asylum seekers unable to afford stable housing under the Proposed Rule. This will place a significant burden on the State, as it is very expensive to house a family in an emergency shelter. In New York City, for example, it cost nearly $6,000 per month in 2018 to house a family in a temporary shelter. The Proposed Rule will also increase costs for the healthcare system. According to research published by Children's Healthwatch based at Boston Medical Center, unstable housing among families with children will cost the U.S. health care system an estimated $111 billion in expenditures through 2027.[7] Increased housing instability caused by the Proposed Rule would only exacerbate these numbers.

**Conclusion**

For the foregoing reasons, it is NYSHCR's hope that the Proposed Rule will be withdrawn. This Proposed Rule will make it much more difficult for asylum seekers to maintain stable employment and, as a result, will result in an increase in housing instability. This will create a host of negative collateral consequences for asylum seekers and their families. Finally, New York State and municipal governments within the state would be required to bear the significant costs of providing emergency shelter for individuals displaced by the Proposed Rule.

---

[2] Meredith Horowki, *Housing Instability and Health: Findings from the Michigan Recession and Recovery Study,* National Poverty Center Policy Brief #29 (March 2012), http://www.npc.umich.edu/publications/policy_briefs/brief29/NPC%20Policy%20Brief%20-%2029.pdf.
[3] Heather Sandstrom et al., *The Negative Effects of Instability on Child Development: A Research Synthesis*, Urban Institute, 13 (September 2013), https://www.urban.org/sites/default/files/publication/32706/412899-The-Negative-Effects-of-Instability-on-Child-Development-A-Research-Synthesis.PDF.
[4] Anne Ray et al. *Homelessness and Education in Florida: Impacts on Children and Youth*, Shimberg Center for Housing Studies, University of Florida, and Miami Homes for All (December 2017), http://www.shimberg.ufl.edu/publications/homeless_education_fla171205RGB.pdf.
[5] Will Fisher, *Research Shows Housing Vouchers Reduce Hardship and Provide Platform for Long-Term Gains Among Children*, Center on Budget and Policy Priorities (October 7, 2015), https://www.cbpp.org/sites/default/files/atoms/files/3-10-14hous.pdf.
[6] Matthew Desmond and Carl Gersheson, *Housing and Employment Security Among the Working Poor*, Soc. Problems 1 (2016), https://academic.oup.com/socpro/article/63/1/46/1844105.
[7] Ana Poblacion et al., *Stable Homes Make Healthy Families*, Children's HealthWatch (July 2017), https://bit.ly/2hDjRE2.

AR004940

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-yhvz
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2425
Comment Submitted by Ellen Daniels

---

## Submitter Information

**Name:** Ellen Daniels

---

## General Comment

Asylum seekers are by definition people of very limited resources. They are fleeing from horrific conditions, and usually arrive to the United States with few belongings and little money. It is essential that these people be able to work to support themselves as soon as possible. By removing the 30-day provision, these people will run out of the few resources they have and end up depending on charity. They will be at risk of homelessness and health problems - so potentially costing taxpayers more money in emergency care. It is most humane and the best for all involved to allow these people to work while their cases are being processed.

I strongly encourage you to keep and enforce the 30-day Processing Provision for Asylum Applicants.

AR004941

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-3fk0
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2426
Comment Submitted by Elizabeth Saft

---

## Submitter Information

**Name:** Elizabeth Saft
**Address:**
   835 N Campus Way
   Davis, CA, 95616
**Email:** lizsaft@yahoo.com

---

## General Comment

Asylum seekers must already wait 180 days for work authorization. THey need to be allowed to work as soon as possible.

AR004942

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-ek57
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2427
Comment Submitted by Kris Lin-Bronner, Dr. Bronner's Magic Soaps

## Submitter Information

**Name:** Kris Lin-Bronner

## General Comment

See attached

## Attachments

IMG_20191108_0001

AR004943

Samantha Deshommes, Chief
Regulatory Coordination Division,
Office of Policy and Strategy
U.S. Citizenship and Immigration Services, Department of Homeland Security
20 Massachusetts Avenue NW, Mailstop #2140
Washington, D.C. 20529-2140

DHS Docket No. USCIS-2018-0001
84 F.R. 47148

November 8, 2019

### Re: Notice of Proposed Rulemaking and Request for Comment on Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications

**To Whom It May Concern:**

Dr. Bronner's Magic Soaps respectfully submits the following comments to the Department of Homeland Security's Notice of Proposed Rulemaking and Request for Comment on Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications (NPRM), DHS Docket No. DHS-2018-0001, 84 F.R. 47148, issued September 9, 2019.

**Interest in the Proposed Rule:**

Dr. Bronner's is a family business committed to honoring the vision of founder Emanuel Bronner by making socially and environmentally responsible products of the highest quality, and by dedicating profits to help make a better world. Dr. Bronner's commitment to social justice, environmental sustainability and progressive business practices is part of the company's mission to put into practice the principles that inform the philosophy printed on the company's iconic soap labels written by founder Emanuel Bronner. The company is the top-selling natural soap maker in North America and a major brand worldwide. Based on 2018 sales, a bottle of Dr. Bronner's soap was sold, on average, every 2.2 seconds throughout the year. Dr. Bronner's is a fast-growing company with more than 250 employees and employ many workers from the diverse immigrant and asylum-seeker communities in San Diego County. In honor and appreciation of the contributions that these workers made to our company's success, we champion the rights of immigrants, asylum-seekers, and refugees to lead safe, peaceful and productive new lives in our country.

**Substance of the Proposed Rule:**

The Proposed Rule from the U.S. Department of Homeland Security would remove the existing regulatory requirement that an initial employment authorization application be

AR004944

adjudicated within 30 days of when the asylum-seeker files the Form I-765, Application for Employment Authorization. The Proposed Rule would also remove a provision requiring that an application for renewal be received by USCIS 90 days prior to expiration of the employment authorization.[1] The Proposed Rule suggests that after waiting a minimum of 150 days to be eligible to file an EAD application,[2] the majority of asylum-seekers' applications would not be adjudicated until an additional 60 days had passed and nearly one-quarter of EAD applications would still be pending for more time still.[3] Indeed, the Proposed Rule fails to substitute any timeframe for adjudicating EAD applications, and declines to adopt a 90-day deadline for adjudication, demonstrating that the agency believes the Proposed Rule would significantly delay many asylum-seekers' work authorization for more than even 90 days after filing.

**Comments on the Proposed Rule:**

Because the Proposed Rule would significantly delay the process by which asylum-seekers receive their work permits, Dr. Bronner's Magic Soaps will likely lose significant profit and potential growth opportunities. Our company's global competitiveness depends on our ability to draw quality workers from our region. Our manufacturing company is based in San Diego County, California, which has a high and growing number of asylum-seekers.[4] If our company is unable to employ the many asylum-seekers that reside in our region and choose our new hires from a competitive pool of some of the most hardworking and loyal workers, as a business we will lose our competitive edge, and lose out on the significant profit and growth potential that asylum-seeker employees would be able to contribute to our company.

Additionally, this Proposed Rule will negatively impact our company's workplace culture and community. Dr. Bronner's Magic Soaps was founded with the goal to create a diverse and inclusive workplace. Our asylum-seeking employees play an integral part in our company's workplace culture and mission and significantly help our company thrive as a business. Indeed, our workforce in San Diego County is predominantly made up of immigrants, many of whom are asylum-seekers themselves and others who have close family and community ties to asylum-seekers in our region. Therefore, by delaying the process by which asylum-seekers will be able to obtain employment authorization, the Proposed Rule will have the practical effect of excluding asylum-seekers from our employment pool which will therefore have a profound adverse effect on our company's mission, culture, and overall workforce morale.

---

[1] Notice at p. 47148.

[2] Under the current regulations, asylum-seekers whose asylum cases have been pending without a decision for at least 150 days are eligible to apply for a work permit. Notice at p. 47160.

[3] Notice at p. 47162, Table 9.

[4] Because of the growing number of asylum-seekers in our community, the San Diego Rapid Response Network opened a migrant shelter in a vacant courthouse in order to provide services to the nearly 50-60 asylum-seeking families that needed assistance per day. *See* Max Rivlin-Nadler, "Shelter for Asylum-Seeking Migrants Opens in Vacant San Diego Courthouse, March 31, 2019, https://www.kqed.org/news/11736409/shelter-for-asylum-seeking-migrants-opens-in-vacant-san-diego-courthouse; San Diego Rapid Response Network, http://www.rapidresponsesd.org.

AR004945

**Conclusion:**

For the above reasons, Dr. Bronner's Magic Soaps urges the Department of Homeland Security to retain the current 30-day processing requirement for initial asylum employment authorization applications.

Thank you for your time and consideration.

Sincerely,

Kris Lin-Bronner
Director & Chief Grants Officer
P.O. Box 1958
Vista, CA 92085

AR004946

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-o0aa
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2428
Comment Submitted by Katherine Flannery

---

## Submitter Information

**Name:** Katherine Flannery

---

## General Comment

I am an immigration attorney, and it is essential that asylum seekers continue to have access to work
authorization in a timely and meaningful way. Asylum seekers are already, by definition, vulnerable as people
with uncertain status in the US. Denying access to work authorization leaves them open to labor exploitation and
human trafficking, and leaves them dependent on charity and unable to lead dignified loves where they
contribute contribute the US economy and the care of their own families. The only.possible motivation for
delaying work authorization to asylum seekers is cruelty, in a way that cuts off the nose to spite the face. It's bad
for the US economy, communities, and immigrants to cut off access to legal employment for asylum seekers. I
have seen firsthand how gaining access to employment authorization can transform lives and stabilize vulnerable
individuals in crisis. It is absolutely essential to continue allowing access to work authorization to asylum seekers
and process their EAD applications in a timely way.

AR004947

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-fc7k
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2429
Comment Submitted by Jamie Cheever

---

## Submitter Information

**Name:** Jamie Cheever

---

## General Comment

I work with survivors of sex and human trafficking, some of which are refugees. The refugees I work with have been through extensive trauma, often in their home country and here. Once they are able to escape their situation, there needs to be as few barriers as possible between them setting up an independent, stable, and healthy life. An additional barriers make it more likely a survivor will return to an abusive situation in order to get their and their children's basic needs met.

AR004948

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-3o4z
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2430
Comment Submitted by Dawn Bashara

---

## Submitter Information

**Name:** Dawn Bashara

---

## General Comment

Please do not remove the 30-day provision on processing asylum work permits. In NEBRASKA and other states, unemployment is low and entry-level jobs are hard to fill. Small companies, and even large companies, cannot find enough people to hire. Lifting the 30-day provision would have a negative impact on businesses ability to continue to stay open.
Thanks.

AR004949

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-rnc4
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2431
Comment Submitted by Roberta Reardon, New York State Department of Labor

## Submitter Information

**Name:** Roberta Reardon
**Address:**
   Harriman State Office Campus, Building 12
   1220 Washington Ave.
   Albany,  NY,  12240
**Email:** roberta.reardon@labor.ny.gov
**Phone:** 518-457-2746
**Organization:** New York State Department of Labor
**Government Agency Type:** State
**Government Agency:** New York State Department of Labor

## General Comment

The New York State Department of Labor has reviewed the Department of Homeland Securitys Notice of Proposed Rulemaking, Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications published in the Federal Register on September 9, 2019. We respectfully submit the following comments in opposition to the Proposed Rule which will make asylum applicants ineligible for employment services and make them vulnerable to workplace exploitation including wage theft, potentially hazardous working conditions, retaliatory threats based on immigration status, and forced labor (labor trafficking). Please see attached file.

## Attachments

Asylum Work Authorization NPRM-DOL_Final

AR004950



November 8, 2019


Samantha Deshommes
Chief Regulatory Coordination Division Office of Policy and Strategy
United States Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW, Mailstop #2140
Washington, DC 20529-2140


Re: DHS Docket No. USCIS-2018-0001


To Whom It May Concern:

The New York State Department of Labor has reviewed the Department of Homeland Security's Notice of Proposed Rulemaking, Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications published in the Federal Register on September 9, 2019. We respectfully submit the following comments in opposition to the Proposed Rule which will make asylum applicants ineligible for employment services and make them vulnerable to workplace exploitation including wage theft, potentially hazardous working conditions, retaliatory threats based on immigration status, and forced labor (labor trafficking).




Sincerely,

Roberta Reardon

I. **Executive Summary**

The New York State Department of Labor (NYSDOL) opposes the proposed rule change as outlined in the Department of Homeland Security's (DHS's) Notice of Proposed Rulemaking, Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications.[i]

DHS's proposed changes would increase the amount of time that asylum applicants must wait in order to receive an Employment Authorization Document (EAD). Asylum applicants must already wait a significant period of time to receive an EAD because their application must have been pending for at least 150 days before they even become eligible to apply for an EAD. By removing the 30-day processing time-period for an EAD, asylum applicants will wait even longer periods of time before receiving an EAD. The new rule would limit asylum applicant's ability to obtain NYSDOL employment services and employment, and to earn an income while awaiting a decision on their asylum application. Most concerning, the lack of employment authorization may create an exploitable vulnerability to unscrupulous employers that engage in wage theft, maintain hazardous working conditions, and engage in retaliatory threats due to immigration status, or even forced labor (labor trafficking).

II. **Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications Will Impede Workforce Innovation and Opportunity Act (WIOA) Services.**

The NYSDOL oversees the Workforce Innovation and Opportunity Act (WIOA) Title I Adult, Dislocated Worker and Youth Programs, and Title III Wagner-Peyser program in New York State (NYS). These programs are delivered through the One-Stop Career Center System (Career Centers), which provides services to both individuals and businesses. Career Centers provide individuals with basic career services, individualized career services, and training services. Career Centers also provide job development and recruitment services to businesses. While NYS does not deny access to basic career services based on citizenship or authorization to work, the services offered to individuals, who are not yet authorized to work, would be limited. For example, unauthorized individuals would not be eligible for job-matching and placement services, training opportunities, nor would these individuals be invited to participate in job fairs/recruitments. By removing the 30-day processing provision for asylum applicants, access to the full suite of WIOA services will be delayed leading to longer term unemployment. The removal will also reduce the labor pool available to businesses in NYS looking to meet immediate hiring needs by delaying authorization to work.

III. **Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications Will Increase the Likelihood of These Individuals Being Victims of Employment Exploitation and Labor Trafficking.**

The NYSDOL enforces New York State Labor Laws including those that govern minimum wage, overtime, payment for all hours worked, and regular pay periods. In 2018, the NYSDOL collected nearly $35 million and returned that money to approximately 35,000 workers victimized by wage theft and public work violations. Since 2011, NYSDOL has recovered nearly $300 million in stolen wages and returned it to more than 280,000 workers who were cheated by their employers.[ii]

Employers may use lack of valid employment authorization as a means of threatening workers to not report workplace safety violations, creating a dangerous workplace environment that can result in injury and even death.[iii]  While asylees have been protected from these types of threats due to  valid employment authorization, this rule change will place them in the extremely vulnerable position of being threatened with disclosure of employment without authorization, resulting in detainment and deportation.

 The lack of employment authorization creates a vulnerability that unscrupulous employers can exploit through wage theft, hazardous working conditions, retaliatory threats based on immigration status, and forced labor (labor trafficking).  The NYSDOL has often seen cases where employers falsely and unlawfully tell workers that they do not have a right to minimum wage or any labor law protection because they do not have employment authorization.  NYSDOL also has seen cases where employers threaten workers with calls to Immigration and Customs Enforcement (ICE) and deportation if they assert their rights or file claims with the NYSDOL. This unlawful tactic is common and often achieves the desired goal of compelling a worker to refrain from asserting a lawful claim or to withdraw an existing complaint, [iv] in violation of anti-retaliation sections of the New York Labor Law.[v]

NYSDOL investigations are greatly aided by the continued cooperation and availability of workers who file claims and who are the primary witnesses to labor law violations.  Claimants are asked to provide evidence of the labor law violations through personal statements, and in contested actions, through testimony at a Compliance Conferences and/or District Meetings.   If an employer appeals the resulting Order to Comply, claimants are then asked to be witnesses at an administrative hearing of the Industrial Board of Appeals.  Without the claimants continued cooperation and availability, these cases are often unable to be pursued. With the ability to threaten claimants based on their immigration status, the number of cases prosecuted will decrease, and the number of incidents will more than likely increase.

Labor trafficking victims are often induced to stay in unfavorable working conditions due to threats of disclosure of their lack of valid employment authorization to immigration authorities.    Labor trafficking involves the use of force, fraud, or coercion to compel an individual to work.  An employer who threatens a worker with calling ICE and having them deported to coerce the worker into performing work, may be guilty of labor trafficking under both federal and New York State Penal Law.[vi]   A 2014 study by the Urban Institute of 122 trafficking victims found that 70.5% experienced "use or threatened use of law" as a method of exploitation. [vii]  If an asylum applicant does not have valid employment authorization, they become vulnerable to this type of threat.  Asylees are a population already vulnerable to potential exploitation due to their prior traumatic experiences, [viii] and a decrease in services such as lack of employment authorization can greatly impact their resilience and ability to successfully adapt and recover, and unequivocally makes them vulnerable to further exploitation.[ix]

## IV.   Conclusion

On March 25, 1911, a fire at the Triangle Shirtwaist factory in New York City killed 146 workers in half an hour, most of whom were recent Italian and Jewish immigrant women and girls aged 14 to 23.  From this tragedy the Committee on Public Safety was formed, which became the New York State Department of Labor.  The role of the NYSDOL has always been to protect the most vulnerable workers, which are often

immigrants. The removal of the thirty-day processing provision, will make it far more difficult for asylum applicants to earn income while awaiting a decision on their asylum application. The lack of valid employment authorization will result in their inability to access employment services from the NYSDOL and make them vulnerable to workplace exploitation, including: wage theft, hazardous working conditions, retaliatory threats based on immigration status, and forced labor (labor trafficking). The NYSDOL strongly urges DHS to withdraw the proposed rule.

---

[i] Docket No. USCIS-2018-0001; RIN 1615-AC19; Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (proposed Sep. 9, 2019) ("proposed rule").

[ii] See: https://www.labor.ny.gov/pressreleases/2019/august-13-2019.shtm.

[iii] See: https://www.dol.gov/newsroom/releases/osha/osha20190301-2 : "The U.S. Department of Labor has filed a lawsuit against Boston, Massachusetts-based contractor Tara Construction Inc. and its chief executive officer, Pedro Pirez." The article details that an employee sustained a serious injury when he fell from a ladder on March 29, 2017. He reported his injury to the defendants. The Department alleges that shortly after the employee engaged in protected activities, the defendants initiated a law enforcement investigation and facilitated the employee's detainment by U.S. Immigration and Customs Enforcement."

[iv] See: https://www.wnyc.org/story/undocumented-restaurant-worker-arrested-ice-during-deposition-against-his-employer/.

[v] NYS Labor Law § 215 which defines retaliation as an action taken against an employee to punish that employee for complaining about labor law violations, providing information to the Department of Labor, or participating in proceedings at the Department of Labor.

[vi] 18 U.S.C. § 1581, 1584, 1589 "Whoever knowingly provides or obtains the labor or services of a person--. . (3) by means of the abuse or threatened abuse of law or the legal process"; and Penal Law § 135.35 "A person is guilty of labor trafficking if he or she compels or induces another to engage in labor . . (d) accuse some person of a crime or cause criminal charges or deportation proceedings to be instituted against such person."

[vii] https://www.urban.org/sites/default/files/publication/33821/413249-Understanding-the-Organization-Operation-and-Victimization-Process-of-Labor-Trafficking-in-the-United-States.PDF ; pg. 80 "Chapter 6: Labor Trafficking Victimization and Labor Exploitation Experiences." A study of 122 trafficking victims found that 70.5% experienced Use or threatened use of law as a method of exploitation.

[viii] International Organization on Migration, "Migrants and Their Vulnerability to Human Trafficking, Modern Slavery and Forced Labour" (https://publications.iom.int/system/files/pdf/migrants_and_their_vulnerability.pdf). See pg. 28, quoting Hannah Lewis and Louise Waite, 'Asylum, Immigration Restrictions and Exploitation: Hyper-Precarity as a Lens for Understanding and Tackling Forced Labour', Anti-Trafficking Review, 5 (2015).

[ix] Siriwardhana, et al. Conflict and Health 2014, 8:13 http://www.conflictandhealth.com/content/8/1/13 : "Conflict-driven forced migration has been shown to have a strong association with higher levels of mental disorders among affected migrant populations" and that "Factors such as individual and/or community resilience and social support have been highlighted as key potential mediators between forced migration experience and subsequent mental health impact."

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-zd2t
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2432
Comment Submitted by Susan Nelson-Kluk

## Submitter Information

**Name:** Susan Nelson-Kluk
**Address:**
    3033 Boulder Place
    Davis,  CA,  95618
**Email:** susankluk@gmail.com
**Phone:** 5309020588
**Submitter's Representative:** Garamandi

## General Comment

Asylum seekers should be allowed to work to support themselves as soon as possible.
Susan Nelson-Kluk

AR004955

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-p0eo
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2433
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

We must allow everyone in our soil to work to earn a living. Give them those authorizations to work; we want hard-working people, not free-loaders.

AR004956

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2433.html[9/15/2020 4:14:24 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-fqcx
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2434
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

This proposal would be extremely harmful to asylum seekers. They are human and have the right to create a life for themselves and their family, where ever it may be. By delaying applications for work authorization, this will cause food insecurity for them and their family. They will be unable to regain power and control of their future. Being unable to work causes higher risk for exploitation and trafficking. With no proof of income, they will lose services. By allowing asylum seekers to apply earlier will give the department more time to process the applications and give them an opportunity to regain control of their lives and offer safety and health to their families.

AR004957

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2434.html[9/15/2020 4:14:24 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-oqxd
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2435
Comment Submitted by Roberta Millstein

---

## Submitter Information

**Name:** Roberta Millstein
**Address:**
　562 Reed Dr
　Davis,　CA,　95616
**Email:** petition@rlm.net

---

## General Comment

Asylum seekers should be allowed to work as soon as possible. This proposed rule is unnecessary and cruel.

AR004958

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-q1tx
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2436
Comment Submitted by Aaron Reichlin-Melnick

---

## Submitter Information

**Name:** Aaron Reichlin-Melnick

---

## General Comment

This comment is submitting in opposition to RIN 1615-AC19 (USCIS-2018-0001-0001), "Removal of 30-Day Processing
Provision for Asylum Applicant-Related Form I765 Employment Authorization Applications."

USCIS should not eliminate the 30-day processing regulation for initial asylum employment authorization documents (EADs). The current regulation enforces the promise of rapid adjudication of work authorization that is inherent in the 180 day timelines set by Congress in 8 U.S.C. 1158(d)(5) and 8 U.S.C. 1158(d)(2). USCIS's claim that the 30-day limit in 8 C.F.R. 208.7(a)(1) "is outdated" by nature of its age misunderstands the history surrounding the creation of the statutory timeframes in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). In addition, USCIS has not adequately calculated the costs to third parties who will be forced to bear the costs of asylum seekers who are no longer eligible to work because they have to wait longer as a result of delayed adjudication of EADs.

1) Affirmative Asylum Applications Peaked in 1995, the year after the 30-day limit was created.

Throughout the Notice of Proposed Rulemaking (NPRM), USCIS asserts that the 30-day limit for adjudicating asylum EAD applications should be eliminated because of "The growth of asylum receipts" in recent years. But as the NPRM itself acknowledges briefly in a footnote, the 30-day regulation was implemented at a time when affirmative asylum applications were at record levels. In 1995, affirmative asylum applications peaked at over 140,000, a record which still has not been matched. INS was well acquainted with the difficulties of processing a significant volume of asylum applicant EADs at the time it imposed the 30-day timeline, and moved forward with it anyway.

Thus, to the extent that DHS argues in the NPRM that the 30-day limit "is outdated," USCIS has failed to grapple with the history of the regulation. USCIS now faces a lower level of asylum applications than when INS instituted the 30-day time limit; it cannot rely on history to argue for a need for change.

AR004959

2) Congress intended asylum applications to be adjudicated within 180 days, and for work authorization to be provided after 180 days if adjudication had not been completed.

USCISs decision to authorize the further delay of asylum applicant EADs is contrary to Congressional intent in passing IIRIRA. First, in 8 U.S.C. 1158(d)(5)(A)(iii), Congress instructed that INS (now USCIS) should adjudicate all asylum applications in the absence of exceptional circumstances within 180 days after the date an application is filed. Then, in 8 U.S.C. 1158(d)(2), Congress provided that An applicant for asylum may be provided an EAD which shall not be granted prior to 180 days after the date of filing of the application for asylum.

These two statutes, taken together, make clear that Congress intended asylum seekers to obtain work authorization as expeditiously as possible; either before 180 days if INS/USCIS adjudicated the application in that time frame, or as soon as possible after 180 days if the application was still pending at that time.

The NPRM entirely fails to grapple with the statutory scheme provided in 8 U.S.C. (d)(2) and (d)(5)(A)(iii). Its sole reference to the underlying statutory scheme comes in a footnote at 84 Fed Reg. 47,153 which declares that the general humanitarian goal of the 30-day time limit has been supported through re-instituting the Last In, First Out model (LIFO) for asylum processing.

But expedited processing through LIFO does not address Congresss intent to ensure that asylum applicants are not left without work authorization if application process takes more than 180 days. As a result, the NPRM entirely fails to consider the connection between the 180-day timelines in 8 U.S.C. (d)(2) and (d)(5)(A)(iii), in violation of Congressional intent.

3) USCIS has entirely failed to calculate key costs to third parties of revoking the 30-day time limit on asylum applicant EADs

Asylum applicants inside the United States who lack an EAD must care for themselves somehow. It is likely that the majority of asylum applicants reside with a family member, relative, or acquaintance who is providing financial support during the time in which an asylum seeker is awaiting an EAD. Eliminating the 30-day limit on asylum applicant EAD processing will require these third parties to provide significantly more support than in the past.

But despite this increased burden, USCIS says it "cannot determine how much monetary or other assistance is provided to such applicants through support networks, and requests that data from the public. This is clearly inadequate; USCIS must calculate these costs itself.

Given the above listed concerns, USCIS should not revoke the 30-day asylum applicant time limit. It is unsupported by historical precedent, violates Congresss statutory scheme, and ignores key costs.

AR004960

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-6pyk
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2437
Comment Submitted by Caroline Sennett

---

## Submitter Information

**Name:** Caroline Sennett

---

## General Comment

If this proposed rule is approved, it will result in incredible disadvantages to asylum seekers, who must already wait six months to receive employment authorization after filing an application for asylum. In 2016, the 90-day processing timeline for employment authorization was eliminated in spite of public opposition. The result was that processing times ballooned and the government was no longer accountable to the public.

Asylum seekers are already vulnerable as a consequence of being forced from their countries, experienced trauma, and the lack of governmental protection. Many wait in limbo for years before their cases are decided. Without the ability to support themselves, they are more likely to experience homelessness, food insecurity, and vulnerability to victimization. A lack of income can prevent them from securing legal assistance in their case and prevent them from representing themselves successfully.

In situations of homelessness or lack of address stability, an asylum-seeker will not receive critical notifications to appear for interview, biometrics, or other information concerning their case - all of which is sent by mail. This can result in the denial of the benefit in even the most meritorious of cases.

AR004961

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-s0cv
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2438
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am a paralegal at an immigration law firm. Anything that would make it more difficult for people already fleeing harm and exploitation to obtain protection, even if only while their application is pending, is harmful, inhumane, and the antithesis of what this country stands for. It benefits our country to have the people that are here able to work and take care of themselves to any degree, be off the streets, and adjust to this country. If Asylum seekers are unable to work, they are unable to better their situation or contribute to this country. They would be unable to feed themselves or their family or afford shelter, all of which would make them much more susceptible to exploitation and trafficking in this country. A time limit is necessary for asylum seekers to better their lives and plan. If the wait is indefinite, they could fall victim to homelessness, trafficking, exploitation, and psychological issues. Please keep the 30-day timeframe!

AR004962

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-4xgk
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2439
Comment Submitted by Kim Fritz

---

## Submitter Information

**Name:** Kim Fritz
**Address:**
   2116 sw 35th pl
   Redmond, OR, 97756
**Email:** kcfritz57@gmail.com
**Phone:** 5413506670
**Fax:** O000000000
**Submitter's Representative:** N/a
**Organization:** N/a
**Government Agency Type:** State
**Government Agency:** N/a

---

## General Comment

We need to ONLY bring in good, honest workers to our country and protect our citizens. The time period for vetting should be however long it takes to do a thorough job and not rush work visas through.

AR004963

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-x5v9
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2440
Comment Submitted by Nickole Miller

---

## Submitter Information

**Name:** Nickole Miller

---

## General Comment

Delays in asylum seekers getting their work authorization (Employment Authorization Document or "EAD") approval can have determinental consequences for vulnerable individuals such as inability to lawfully work, food insecurity, and lack of ID. Do not adopt this new regulation

AR004964

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-mrpy
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2441
Comment Submitted by Charlie Martel

## Submitter Information

**Name:** Charlie Martel
**Address:**
    Annapolis, MD, 21401
**Email:** fannanmartel@gmail.com
**Phone:** 01 703 635 5585

## General Comment

My name is Charlie Martel. I am a national security and human rights lawyer, and I formerly served with the U.S. Senate Homeland Security and Government Affairs Committee. Over the last two years I have worked extensively as a volunteer with immigrants and asylum seekers. Based on this experience, I am writing to oppose the rule that would extend the time period during which asylum seekers are ineligible to work.

For one, this would severely undermine the legal rights of asylum seekers, who are allowed under law to enter the country but are often subject to long periods before their cases are heard. If they cannot work for a long time, they will not be able to sustain themselves. This would potentially be dangerous for the asylum seekers, and could increase homelessness and other problems that would burden the communities they find themselves in.

Second, allowing aslyum seekers to work more immediately benefits them and their communities by allowing the asylum seekers to work, providing tax revenue to the communities, and increasing the workforce available to local employers.

Effectively prohibiting asylum seekers from working is a lose-lose proposition. It hurts asylum seekers who are here legally and seek to apply for the legal right to stay, it undermines their legal rights, and it hurts employers and communities where asylum seekers are. Allowing them to work sooner is win-win, as it helps those legally here, builds ties to their communities, and helps the workforce and tax base of communities with asylum seekers.

AR004965

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-cbl2
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2442
Comment Submitted by Karin Anderson Ponzer, Neighbors Link

## Submitter Information

**Name:** Karin Anderson Ponzer
**Address:**
  23-25 Spring Street, Suite 201
  Mount Kisco,  NY,  10549
**Email:** kanderson@neighborslink.org
**Phone:** 9145023378
**Fax:** 9147522035
**Submitter's Representative:** Karin Anderson Ponzer
**Organization:** Neighbors Link

## General Comment

Neighbors Link is a holistic organization located in Westchester County that utilizes education, empowerment and employment in our mission, to strengthen the whole community through the healthy integration of immigrants. Our strategies to educate, empower and employ families include a Worker Center, English as a Second Language (ESL) education, workforce development, parent education, early childhood programs, academic support for school-age children of immigrants and legal services and advocacy. Our legal department, the Neighbors Link Community Law Practice, provides direct representation for individuals and families in all aspects of immigration relief. We have hundreds of clients that are utilizing U.S. asylum laws to seek protection in the United States. These clients leave everything behind, fleeing violence and persecution. In order to pursue their asylum cases, which can take years in a backlogged court system, they must be able to support themselves and their families.

Limiting the ability of law-abiding asylum seekers to work and pay taxes in the US hurts our economy and all of us. Westchester is a great place to live because of the dynamism and diversity of our workforce; we need all our residents to be able to do the work that makes our county so desirable a destination, to pay taxes along with everyone else and to support their families. This new proposed rule acknowledges that the lost compensation to asylum applicants could range from $255.88 million to $774.76 million annually depending on the wages the asylum applicant would have earned. Moreover, this proposed rule would result in employment tax losses to the government ranging from $39.15 million to $118.54 million. The combination of lost wages and subsequent lost

AR004966

tax revenue would cause subsequent difficulties both to asylum applicants as well as to state and local governments that would be required to provide services to asylum applicants who are not authorized to work. This proposed regulation seeks to take away the ability of asylum seekers to support themselves and their families. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge.

This rule is part of a systematic effort to deter asylum seekers. By removing the ability of asylum seekers to gain meaningful employment within a short and predictable timeframe, the Trump Administration effectively turns asylum seekers into the very public charges it seeks to exclude. In the experience of Neighbors Link, asylum seekers did not come to the United States in order to become public charges. Rather, they have fled persecution in their countries of origin. Once in the United States, they look forward to rebuilding their lives by contributing to the local economy and community fabric. This proposed rule is an effort to keep asylum seekers on the outskirts of society by excluding them from the cities, towns, and neighborhoods where they seek to be integrated.

AR004967

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-7brg
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2443
Comment Submitted by Helen McDonaugh

---

## Submitter Information

**Name:** Helen McDonaugh

---

## General Comment

Shoddy immigration policies are a great contributor to loss of national security!

AR004968

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-aec9
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2444
Comment Submitted by Stephanie Conners

## Submitter Information

**Name:** Stephanie Conners
**Address:**
630 Victory Boulevard
Staten Island,  NY,  10301
**Email:** SConners@nycds.org
**Phone:** 9082510475

## General Comment

Asylum seekers are by definition people in need of protection. They are fleeing oppressive conditions and have bought into the idea that America is the place for acceptance and freedom. Stop allowing Trump to put a lie to the democracy we hold up as beacon to the world. The rule change is ridiculous. People should be allowed to work and support themselves.

AR004969

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-6k5p
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2445
Comment Submitted by Ana Sol Gutierrez

## Submitter Information

**Name:** Ana Sol Gutierrez
**Address:**
    3317 Turner Lane
    Chevy Chase,  MD,  20815
**Phone:** 301-718-0707

## General Comment

As a former state legislator and an advocate for universal human rights and social justice, I oppose the removal of the 30-day processing timeframe for Asylum applicants seeking Employment Authorization Documents or EADs, as required by current regulations. I work as a volunteer with a non-profit organization that provides assistance to newly arriving Central American and Caribbean immigrant families seeking asylum. I personally can attest to the great barriers these families must face as soon as they arrive in our communities as they seek adequate housing, funds to feed the family, schools for their children, health care in emergencies, etc. Requesting and receiving their EADs asap within the current limits allows them to work legally for urgently needed funds to cover all their expenses while awaiting their asylum hearings.

I oppose the proposed delay in processing because of the long list of significantly negative consequences to families of individuals seeking EADs, some of which are listed below:
--Lost income to the asylum seeker and their family;
--Food insecurity;
--Inability to secure a valid ID. A work permit and a social security number (SSN) are often necessary requirements to applications for a state ID.
--Risk of homelessness/housing insecurit; Inability to access health insurance
--Vulnerability to exploitation, trafficking, and underground economy risks
--Lack of access to community service agencies, shelters, and social service programs (many of whom require some form of valid ID, proof of residency, or proof of income)
--Feelings of fear, desperation, and overall mental health concerns

I support the recommendations from several organizations which have a long history and extensive experience in

AR004970

supporting immigrant families seeking asylum in the US. Please consider the serious consequences of implementation of the UCIS proposal:

Harm Caused to Asylum Seekers. Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income will cause an outsized amount of harm to this already-vulnerable community; lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation.

Lost Tax Revenue for the Government. USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

Increased Delay Contrary to National Security Interests. In the notice, USCIS makes frequent reference to a rise in national security threats as a reason to spend more time and resources on each decision. However, USCIS has reported that it has been able to decide over 99% of EADs within the 30-day timeframe for over the past year. Therefore, USCIS has proven its ability to adequately vet the amount of requests in a timely fashion.

Part of a Systematic Effort to Deter Asylum Seekers. This proposed rule change is part and parcel of this administrations effort to make the U.S. a hostile destination for individuals fleeing persecution in their countries of origin. This is evidenced by this rule change as well as the third-country transit bar, the proposed wide-sweeping public charge rule, and the institution of the so-called Migrant Protection Protocols.

Proposed Alternative:
As per current law, asylum seekers must wait 180 days before being granted authorization to work. They are permitted to submit their application after 150 days, giving USCIS the 30-day timeframe in question to process the requests. If USCISs goal is to have more time to process each request in order to increase flexibility and free up resources to work on other applications, then it could easily shorten the waiting time before asylum-seekers are allowed to submit their application. If USCIS feels that a 60-day timeframe would be more beneficial, then it may allow applications to be submitted after 120 days, rather than 150. Allowing asylum-seekers to submit their applications earlier could allow the department to have up to 180 days to process and properly vet each individual while reducing the risk of harm to each applicant.

AR004971

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-rhxy
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2446
Comment Submitted by Maude Myers

## Submitter Information

**Name:** Maude Myers

## General Comment

This proposes regulation is non-sensical and clearly part of the administration's hostility toward asylum seekers.

Many of those seeking asylum obviously need to financially support themselves and their families through employment. Even under the current system, they must wait too long for an employment authorization document.

Further delay will lead to unnecessary hardship including housing instability, food vulnerability, lack of health care, etc, thus exposing seekers and their families to poverty, hunger, exploitation, and a litany of other horrors. Of course, it also increases the risk that asylum seekers and their families will become public charges. It will necessarily mean a loss of tax revenue and financial pressure on the seekers' communities.

Moreover, a convenient, simple alternative exists. If USCIS needs more time to process EAD applications, then asylum seekers should be permitted to submit their applications earlier, perhaps 120 days after submission of their asylum claims. Then USCIS can have 60 days to process the EAD application.

AR004972

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-me4y
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2447
Comment Submitted by Eleanor B

---

## Submitter Information

**Name:** Eleanor B
**Address:**
    MN,

---

## General Comment

I am an informed US citizen who is commenting on this rule as a part of my civic duty. This rule change would have a negative effect on the tax revenue and is also contrary to the nation's security.

USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

In the notice, USCIS makes frequent reference to a rise in national security threats as a reason to spend more time and resources on each decision. However, USCIS has reported that it has been able to decide over 99% of Employment Authorization Documents (EADs) within the 30-day timeframe for over the past year. Therefore, USCIS has proven its ability to adequately vet the amount of requests in a timely fashion. Moreover, its argument regarding increased threats serves only to prompt the need for a speedier process to properly protect national security, rather than its request to delay the process further.

As the law is currently written, asylum seekers must wait 180 days before they may be granted authorization to work. They are permitted to submit their application after 150 days, giving USCIS the 30-day timeframe in question to process the requests. If USCISs goal is to have more time to process each request in order to increase flexibility and free up resources to work on other applications, then it could easily shorten the waiting time before asylum-seekers are allowed to submit their application. If USCIS feels that a 60-day timeframe would be more beneficial, then it may allow applications to be submitted after 120 days, rather than 150. Allowing asylum-seekers to submit their applications earlier could allow the department to have up to 180 days to process and properly vet each individual

AR004973

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-13gd
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2448
Comment Submitted by Emily Green

---

## Submitter Information

**Name:** Emily Green
**Address:**
  8558 Butte Street
  La Mesa,  CA,  91941
**Email:** Emilygreensd@gmail.com
**Phone:** 407-394-4310

---

## General Comment

Asylum seeking people should be allowed to earn a living while awaiting their hearings! Earning a living is an American right!

AR004974

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-flvd
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2449
Comment Submitted by Aaron Brusso

---

## Submitter Information

**Name:** Aaron Brusso

---

## General Comment

Once someone has passed a credible fear interview and demonstrated that they have a legitimate reason to be seeking asylum we are acknowledging that this person has a compelling reason to be in the country. To compound the trauma they have been through by preventing them from sustaining themselves and forcing them to subsist on charity is cruel to the person and places an unnecessary burden on the community.

To extend the wait time any longer is to prolong that cruelty.

If USCIS thinks it needs more time, then the review process should begin during the waiting period in order to allow the person to work as soon as possible.

The review may be deemed necessary but it need not prolong the wait before someone can work. These are two separate things and should be treated that way.

AR004975

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d77-tde4
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2450
Comment Submitted by Desiree McGunagle, Verity

---

## Submitter Information

**Name:** Desiree McGunagle
**Submitter's Representative:** C. Castillo
**Organization:** Verity
**Government Agency Type:** State
**Government Agency:** Multiple

---

## General Comment

Here at Verity we value asylum seekers and would like to fight for their right to work and provide for themselves in our country. Asylum seekers would potentially lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. Poverty can make people vulnerable to all manner of crime and lack of stability will take away from feeling safe when that is what they need most during a time of seeking asylum. Thank you.

AR004976

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-cdfl
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2451
Comment Submitted by Lorena McGill

---

## Submitter Information

**Name:** Lorena McGill

---

## General Comment

DO NOT REMOVE THOSE 30 DAYS; ASYLUM SEEKERS GOTTA EARN THEIR LIVING! ASYLUM SEEKERS ARE NOT ILLEGALS UNLESS A JUDGE DENIES THEM ASYLUM. WE ARE A COUNTRY OF LAWS AND A COMPASSIONATE COUNTRY. TIME TO ACT THAT WAY.

AR004977

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-7m50
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2452
Comment Submitted by Klari Tedrow

---

## Submitter Information

**Name:** Klari Tedrow
**Address:**
   2907 Central Ave, suite 109
   Birmingham, AL, 35209
**Email:** ktedrow@usimmigrant.net
**Phone:** 205-871-8084

---

## General Comment

I am against the removal of the 30-day processing provision for asylum applicants processing of Form I-765. As a former refugee, it is imperative that these people receive work authorization as soon as possible. These individuals are already under incredible stress coming from horrible conditions and economically stressed situations. To make these people wait longer to work and begin their lives only exacerbates an already bad situation. Typically, asylum seekers have little to no funds. I strongly oppose this provision and recommend possibly a compromise of 60 days at the most. To make people wait longer than a maximum of 60 days to work legally is inhumane.

Respectfully submitted,

Klari B Tedrow (Hungarian Revolution, 1956)

AR004978

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-mtva
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2453
Comment Submitted by Mary Lang

## Submitter Information

**Name:** Mary Lang
**Address:**
   192 Melrose Street
   Auburndale,  MA,  02466
**Email:** marystuartlang@gmail.com

## General Comment

To whom it may concern:

I would like to voice my disapproval of the Removal of the 30-Day Processing Provision for Asylum Applicants.
For two years I volunteered at the Refugee and Immigrant Health Clinic at Boston Medical Center, helping both
recent refugees and asylum seekers accessing medical care. The asylum seekers' stories were heart-rending, yet
every one of them showed such resilience. Most were working, many were living wherever they could, sharing
rooms with others from their country, far from their jobs, but where they could afford to live. They had families,
and often children back in their country of origin. They left because they had no choice - it was a matter of
survival.

To put roadblocks and delays for these traumatized, yet brave and resilient individuals is cruel and not who we
are as a country. We are stronger for welcoming asylum seekers to our country. I am better for having known
these asylum seekers.

Please do not remove the 30-Day Processing Provision.

Sincerely,

Mary Lang

AR004979

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-1cd3
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2454
Comment Submitted by Anonymous Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Hello,
As an asylum applicant, it took me around 7 months to get my EAD. I applied in May 2017 and I obtained it in January 2018. It will expire in January 2020 (after 2 years). I applied for renewal in July 2019. Since then, I have been waiting for my new EAD to be issued. This lengthy waiting time combined with uncertainty is happening while the 30-Day requirement is in place. Imagine if that requirement is removed., we could end up waiting for years without being able to live and participate in the economy. And this brings up another problem; those asylum applicants who are not authorized to work will be public charge as they will need to get every possible help from the State. And I think no one wants that.

Another factor to think about is that those asylum applicants are already in the country and they are human resources. So why not engage them in the work force as long as they can do something useful to the economy. A lot of them are skilled and/or professional workers with degrees in technology. So it is of interest to the United States to let those skillful workers 'work'. This will benefit everyone; 1) the economy will get more workers, 2) the asylum applicant will be able to work and pay taxes, pay bills and rent, buy goods and services, etc. 3) lowering the number of people who would otherwise seek State help like food stamp, cash benefit, medicaid, etc. This will greatly help the states, 4) make illegal (unauthorized) employment less incentive, if one can work legally, why would they risk to work under the table and face serious charges. But asylum applicants are not authorized to work, they will be less immune to illegal employment (where they get paid cash and they do not pay their taxes).

file:///C:/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2454.html[9/15/2020 4:14:26 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-volj
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2455
Comment Submitted by Whitney Haruf

---

## Submitter Information

**Name:** Whitney Haruf
**Address:**
   320 W. Pasadena Ave.
   Apt. 19
   Phoenix,  85013-2358
**Email:** whitney.haruf@gmail.com
**Phone:** 6026329686

---

## General Comment

Hello. I work as a behavioral health counselor and I am against the removal of the 30-day processing provision for asylum seekers applying for employment. I have worked with clients who are asylum seekers from many different countries and the one thing they have in common is an uncertain future. This feeling of uncertainty causes my clients feelings of anxiety, fear, desperation, and other mental health concerns. If I put myself in my clients' shoes, I would struggle to cope with this reality, too.
No one likes an unknown future, especially when you have no legal way to support yourself and your family financially for an indefinite period of time. I am requesting that the work authorization process be kept to 30 days for the sake of my clients' mental health and to aid their ability to cope with life's significant stressors.

AR004981

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-8n82
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2456
Comment Submitted by Thomas Smith

---

## Submitter Information

**Name:** Thomas Smith

---

## General Comment

It's about time that Congress stops wasting time by trying to get 2016 election turned and get USMCA DONE! And get the wall built. How Nancy Schiff Nadler st al sleep at night I'll never know. Get infrastructure done. And work for we the people/voters. They should be ashamed. I live in VA where blue dominates. Gov black face or KKK and murdering unborn all the way to birth. The SWAMP IS NAUSEATING. CROOKED LIARS ALL OF THEM

AR004982

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-5tap
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2457
Comment Submitted by Sonia Mistry

---

## Submitter Information

**Name:** Sonia Mistry

---

## General Comment

The removal of the 30-day processing provision would have extremely detrimental impacts not only for asylum seekers, but also for Americans. People must be able to work and access services to survive and thrive. Asylum seekers who cannot work legally will still find ways to support themselves and their families, leaving them extremely vulnerable to exploitation, which drives down working and living standards for all working Americans.

AR004983

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-kxse
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2458
Comment Submitted by Jennifer Wachtel

---

## Submitter Information

**Name:** Jennifer Wachtel

---

## General Comment

Asylum seekers should be allowed to work as soon as possible. Asylum seekers must already wait 180 days before they can apply for work authorization. Keep the 30-day processing provision in place as-is; do not extend the processing provision.

AR004984

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-5i3p
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2459
Comment Submitted by Steve Theis

## Submitter Information

**Name:** steve theis

## General Comment

we need reform asap way past dew i want to see most all of congresses taxes and lets see what happens when you join congress

AR004985

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-93sn
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2460
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

This rule change would endanger families and hurt our economy, making immigrants food and housing-insecure, leaving them open to exploitation, and delaying their contributions to our communities. This is a cruel proposal meant to further isolate and threaten already vulnerable people who deserve fair and steady treatment from our government.

AR004986

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-piws
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2461
Comment Submitted by Derrick Hensley

## Submitter Information

**Name:** Derrick Hensley
**Address:**
   401 Meadowlands Drive
   Suite 201
   Hillsborough, NC, 27278
**Email:** INFO@LODJH.com
**Phone:** 9194801999
**Fax:** 9196366018

## General Comment

I am an attorney in private practice who represents many immigrants, in particular children and families seeking humanitarian immigration relief, including asylum.

The USCIS has occasionally had very serious delays/backlogs for renewing various categories EAD's/processing I-765's, and by prioritizing the processing of a class of applications that are among the most vulnerable - asylum applicants, many of whom have come to the US with no resources and few or no relatives or support network - the current rule enables them to become more self-sufficient more quickly. That is a net benefit to society, who would otherwise support these individuals through charity/nonprofits, or state welfare services for any minors/dependents. Because there's already a 150 day waiting period to apply for the EAD in the first place, it's also more fair to prioritize their applications, compared with other categories of aliens who can usually apply in advance or at the same time as their other applications.

The proposed rule would be very disruptive to many vulnerable children by delaying or depriving their parents/other caretakers of the ability to work and provide support for them during their lengthy wait. This not only leads to deprivation in their homes, but it drains public and nonprofit resources, instead of allowing those same individuals to attain self-sufficiency.

Lastly, individuals who are unable to work legally, but still have economic needs, may resort to working 'under the table' out of desperation. Those kinds of working situations often lead to labor abuses. They also lead to the

AR004987

omission of tax revenue, particularly FICA, which is important for the ability of all of us to retire or obtain social security benefits. By depriving aliens of the ability to work in jobs that will contribute to our public safety net, especially aliens who may only be here temporarily, or who may otherwise not draw retirement/social security benefits, we are pointlessly depriving citizens from that revenue stream.

Not only should Asylum applicants' EAD applications be processed promptly, as has been required for many years, the USCIS should ensure that resources are allocated to promptly process requests for initial EAD's from as many categories as possible so as to make sure work is above the table, so that it is properly taxed to benefit the common good.

AR004988

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-qp97
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2462
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am the President of a non profit group in Maryland. Our organization feels very strongly that removing the 30 day processing provision will bring about more insecurity and more vulnerability to an already vulnerable population. No good will come from removing the 30 day processing provision and we strongly urge you to not do this. The work permit is essential to those seeking asylum and a right to due process.

Best regards,
Anonymous

AR004989

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-rjse
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2463
Comment Submitted by Lauren Bier

---

## Submitter Information

**Name:** Lauren Bier
**Address:**
   8889 Promenade North Place
   San Diego,  CA,  92123

---

## General Comment

I am writing to comment strongly against this proposal. It makes no sense to further delay an individual seeking asylums ability to support themselves while they are waiting for due process. I work with asylum seekers as an attorney and human rights advocate. These people come here fleeing bad situations to make new lives for themselves. Most want nothing more than to be independent, self-supporting, and free from fear. Delaying their ability to do this seems like a cynical attempt to further the false narrative that they are here to take rather than contribute. This is rarely the case. It defeats our interests as well as theirs to keep them from starting to show how they, too, can contribute to what really makes America great: our vibrant, multi-cultural coexistence.

AR004990

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-ltcf
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2464
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

The 30-day processing requirement for processing asylum applicant-related Form I-765 Employment Authorizations should not be removed. I have spoken with a number of asylum-seeking mothers with young children and their first priority is to find work to support their family. It is not in the best interest of these families--or our country--to allow for delay of their authorization to work. Indeed, if the U.S. is truly worried about immigrants becoming a "public charge," then we should be encouraging work and self-sufficiency, not delaying it.

AR004991

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-v9gj
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2465
Comment Submitted by Eli Putnam

---

## Submitter Information

**Name:** Eli Putnam

---

## General Comment

My name is Eli Putnam, and I write to urge you to not establish this proposed rule. For the past year and a half, I have volunteered supporting asylum seekers in the applying for asylum. The asylum seekers I know desperately want to be able to work legally, both to support themselves and their families, and to contribute to the US economy and the country as a whole. There are so many ways that they feel excluded from US society after arriving to the United States, including being denied the ability to work with authorization. Waiting six months or more to be able to receive work authorization is very difficult for them. It makes it hard for them to get an apartment or maintain a stable living situation, to access health care, to keep their kids in school -- in other words, to take care of themselves and their families at the most basic levels. Not having work authorization immobilizes asylum seekers in many ways, and takes away their agency once again. Asylum seekers have survived so much violence and persecution before I have met them. I see them endure further discrimination and persecution here in the United States. I hope USCIS will not make them wait even longer to receive work authorization. The way USCIS, DHS, law enforcement, and immigration courts treat immigrants is unconscionable, and this senseless, cruel rule is another in a ceaseless slew of policies that are used to (and intended to) harm people. If USCIS leadership is concerned that the agency's employees need more time to process work authorization applications, a straight-forward rule change that would effectively resolve this issue is to allow aslyum seekers to apply for work authorization sooner than 150 days after their case is pending. USCIS can instead let asylum seekers submit their applications after only 120 days, which would allow employees for more time to review and grant work authorization to each applicant, without causing further harm to asylum seekers. As a US citizen and as a person whose dignity is intricately tied to the dignity of every other person around me, I am in fervent opposition to this rule change.

file:///C:/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2465.html[9/15/2020 4:14:27 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-9jw8
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2466
Comment Submitted by Amelia Fischer

---

## Submitter Information

**Name:** Amelia Fischer
**Address:**
    114 South Pecan Street
    Nacogdoches,  TX,  75961
**Email:** arf@fischerfischerlaw.com
**Phone:** 9365642222
**Fax:** 9365641346

---

## General Comment

I am an immigration attorney and also serve on the Nacogdoches City Council in Texas. Firsthand in both of these roles, I have witnessed how delays in asylum seekers getting their work authorization (Employment Authorization Document or "EAD") approval can lead to:

-Lost income to the asylum seeker and their family
-Food insecurity
-Inability to secure a valid ID.
-Risk of homelessness/housing insecurity
-Inability to access health insurance
-Vulnerability to exploitation, trafficking, and underground economy risks
-Lack of access to community service agencies, shelters, and social service programs
-Loss of ability to support themselves and their families
-Feelings of fear, desperation, and overall mental health concerns

Removing the 30-day processing provision for asylum-based I-765s would have a devastating impact on my clients, but also on their families, and our overall local economy and community health. I urge you to not adopt this rule.

AR004993

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-7ial
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2467
Comment Submitted by Carlos Sandoval

---

## Submitter Information

**Name:** Carlos Sandoval

---

## General Comment

Many people come from other countries fleeing persecution in their countries. These people are victims who are protected under our current laws. They need to be able to support themselves while their cases are pending. The current administration is very concerned with immigrants not becoming a public charge. The only way for this people not to become a public charge is if they are able to work. Therefore delaying the issuance of their employment authorization actually goes against the administration goals by preventing people to be gainfully employed while their cases are adjudicated, which will increase the chances that they become a public charge. Therefore I request that the 30-day processing provision for the employment authorization of asylum applicants don't be removed.

AR004994

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-y563
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2468
Comment Submitted by Alexandra Roedder

## Submitter Information

**Name:** Alexandra Roedder
**Address:**
  12624 Princeton Dr.
  Auburn,  95603

## General Comment

Asylum seekers should be allowed to work while awaiting their hearings.

AR004995

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-52oq
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2469
Comment Submitted by Kathi Timmons

---

## Submitter Information

**Name:** Kathi Timmons
**Address:**
    410 Paula Way
    woodland,  CA,  95695-5250
**Email:** timmonskathi7@gmail.com

---

## General Comment

We want asylum seekers to support themselves while they await a decision. They should work as soon as possible.

AR004996

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-64ga
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2470
Comment Submitted by Carole Montgomery

---

## Submitter Information

**Name:** Carole Montgomery

---

## General Comment

Instead of giving the Trump Administration enough time to thoroughly check the background of every asylum seeker, theyre being forced to cut corners and make America less safe, just because some bureaucrats wrote a ridiculous timeline. These radical restrictions jeopardize our national security and they punish LEGAL immigrants for obeying our laws. Please secure Americas safety by removing this arbitrary bureaucratic timeline. Thank you and God Bless!

AR004997

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2470.html[9/15/2020 4:14:28 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-ds8v
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2471
Comment Submitted by Conchita Cruz. Asylum Seeker Advocacy Project

---

## Submitter Information

**Name:** Conchita Cruz
**Address:**
    228 Park Ave., S. #84810
    New York,  NY,  10003-1502
**Email:** conchita.cruz@asylumadvocacy.org
**Phone:** 305.484.9260
**Fax:** 646.968.0279

---

## General Comment

See attached

---

## Attachments

Asylum Seeker Advocacy Project_EAD Comment

AR004998

Samantha Deshommes
Chief, Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services, Department of Homeland Security
20 Massachusetts Avenue NW
Mailstop #2140
Washington, D.C. 20529-2140

DHS Docket No. USCIS-2018-0001
84 F.R. 47148

November 8, 2019

**To Whom It May Concern:**

The Asylum Seeker Advocacy Project (ASAP) respectfully submits this comment to the Department of Homeland Security's Notice of Proposed Rulemaking on Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications, DHS Docket No. USCIS-2018-0001, issued September 9, 2019.

**Interest in the Proposed Rule:**

ASAP provides legal services to individuals seeking asylum in the United States regardless of where they live. Since its establishment, ASAP has provided over 3,500 asylum seekers with critical legal information and prevented over 650 deportations using its unique remote representation model. While ASAP has provided assistance to individuals in defensive asylum proceedings in 40 states, our outreach focuses on supporting individuals in areas with little to no pro bono legal services. ASAP routinely assists asylum applicants in defensive proceedings with the filing of employment authorization (EAD) forms. Since the start of 2019, ASAP has assisted in the preparation and filing of over 40 EADs for asylum applicants.

AR004999

Department of Homeland Security Notice:

On September 9, 2019, the Department of Homeland Security (DHS) published a [Notice of Proposed Rulemaking](#) ("the Notice") on Removal of the 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, DHS Docket No. USCIS-2018-0001, in the Federal Register at 84 F.R. 47148.

Currently, asylum seekers whose asylum applications have been pending without a decision for at least 150 days ("asylum applicants") are eligible to apply for an EAD unless the asylum applicant has caused delays in their immigration case, in which case they must wait longer. Pursuant to a regulation that has been in place for more than two decades, U.S. Citizenship and Immigration Services (USCIS) is required to adjudicate the I-765, Employment Authorization application ("EAD application") of an asylum applicant within 30 days of receiving it. Nonetheless, USCIS routinely failed to meet the deadline until July 2018, when a federal court in the case *Rosario v. USCIS* ordered USCIS to comply with the deadline.[1]

This proposed rule ("the Rule") would remove the existing regulatory requirement that USCIS grant or deny an initial employment authorization application within 30 days of when an asylum applicant files an EAD application. The Rule would also remove a provision requiring that an application for renewal be received by USCIS no more than 90 days prior to expiration of the employment authorization.

*Summary of Arguments*

First, the Notice fails to address the Rule's potential impact on individuals in defensive asylum proceedings. Notably, much of the analysis in the Notice appears to consider only the impact to affirmative asylum applicants, while the proposed changes would also impact individuals in defensive asylum proceedings. Failure to explain and consider how the Rule impacts defensive asylum applicants specifically and differently implicates all of the Notice's analysis, from its impact on individual asylum seekers to its impact on other government agencies.

Second, it is clear the Rule would also adversely affect asylum applicants, legal service providers, and local communities beyond the loss of wages discussed in the Notice. Without work authorization, asylum applicants will be at increased risk of

---

[1] *See Gonzalez Rosario v. USCIS*, 365 F. Supp. 3d 1156 (W.D. Wash. 2018) (enjoining USCIS from further failing to adhere to the 30- day deadline for adjudicating EAD applications for asylum applicants).

AR005000

homelessness and face difficulties in securing healthcare and legal representation. Local communities and service providers will face substantially greater burdens in trying to provide support for asylum applicants, which will place strain on already limited resources.

Third, the economic analysis in DHS's Notice fails to consider a number of variables and, in the absence of additional information, cannot be trusted as an adequate assessment of the Rule's likely impact. Significantly, the Notice inaccurately estimates the likely lost wages of asylum seekers by assuming the period of delay for EAD processing will be unrealistically low. Moreover, DHS provides no rationale for why it bases all of its analysis as to economic loss on this faulty assumption regarding processing times. Additionally, DHS fails to fully consider the impact of the Rule on businesses and native workers, while omitting altogether analysis of losses as it relates to tax revenue that municipal, city and state governments will incur. Without further research, the true economic impact of the Rule cannot be adequately assessed.

Fourth, the Notice also fails to consider how the new Rule will create additional burdens on other agencies, in particular, how it will impact the work of both the Executive Office of Immigration Review (EOIR), the Internal Revenue Service (IRS), and the Department of Labor (DOL). Removing the 30-Day deadline will result in substantial increases in requests for continuances and create additional backlogs for U.S. immigration courts, which are housed within EOIR. Loss of tax revenue as well as likely increases in unauthorized work will likely create additional investigatory work for the IRS. The increase in unauthorized work will also likely result in a higher incident of wage theft and dangerous work sites, which will require additional investigations and adjudication by the DOL.

Fifth, significantly, the Notice fails to consider a number of viable alternative solutions that could potentially avoid the negative consequences of the Rule. Numerous alternatives, including increased timeframes for EAD processing and e-filing of EAD applications provide reasonable, cost-efficient alternatives that avoid substantial injury to asylum applicants, legal service providers, business and state governments. Notably, DHS even fails to consider the possibility of adopting any of the recommendations on the EAD process within the 2019 USCIS Ombudsman Report.

Sixth, in making it more difficult for asylum applicants to integrate and adjust to life in their new communities, the Rule diverges from both the congressional intent in creating EADs and from international norms concerning the rights of asylum seekers and refugees. Congress granted DHS the ability to issue asylum applicants work authorization in order to help facilitate integration into local communities. The Rule departs from this

AR005001

intent by making it more difficult for asylum seekers to assimilate successfully and imposing additional barriers for them as they pursue their immigration cases. The Rule also breaks with international law and norms that protect asylum seekers right to work.

Finally, the stated purposes for the regulatory change in the Notice do not support implementing the Rule. Both the changes in EAD document production, and the vetting and national security concerns stated in the Notice have been in place for years, and never previously generated a need for the agency to eliminate the processing timeline. Additionally, the failure to fully consider the viability of either a 60-day or 90-day timeline, therefore, gives cause to doubt that the ostensible reason for the regulatory change — "efficiency" — is stated in good faith. Indeed, when viewed in light of the administration's clear stated goals of deterring asylum seekers from entering the United States, it is more plausible that the rule change is motivated by a deliberate effort to limit access to asylum in the United States.

I.     The Rule Fails to Adequately Consider its Impact on Asylum Applicants in Defensive Proceedings

While the Rule would impact asylum applicants in both affirmative and defensive proceedings, DHS does not clarify whether its analysis of the impact of the Rule includes both affirmative and defensive asylum applicants. DHS includes data on defensive asylum applicants to show the volume of I-765 applications (initial, renewal and total) in Table 8.[2] However, the remaining analysis in the Notice seems devoted to affirmative asylum applicants. In fact, the only mention of defensive asylum applicants is in the footnotes, where DHS states that there is an ongoing backlog of pending defensive asylum cases at EOIR, "which as of late 2017 had approximately 650,000 cases."[3] The failure to assess the impact on defensive asylum applicants is significant given that EAD applications from defensive asylum applicants likely make up a significant portion of the total EAD applications filed by asylum applicants. In a 2019 Report DHS stated that EOIR received 119,303 defensive asylum cases in Fiscal Year 2017, making defensive asylum cases nearly half of all new asylum cases filed for the year.[4] By giving short thrift to defensive asylum applicants, the Notice thus fails to adequately address the impact of the Rule.

---

[2] *See* Notice at 47154 n. 15.

[3] *See id.*

[4] *See* DHS Office of Immigration Statistics, *Annual Flow Report: Refugees and Asylees: 2017* (March 2019) at 7-8 (stating that 119,303 defensive asylum cases were received by EOIR in Fiscal Year 2017, whereas as USCIS received a total of 139,801 affirmative asylum filings).

4

Because the Notice fails to address such a substantial portion of the affected asylum applicants, its analysis does not accurately reflect the full impact of the Rule. In order to provide reasonable justification for the new Rule, DHS must therefore provide further analysis of (1) any differences in the impact of this rule change on defensive asylum applicants versus those in affirmative proceedings, (2) the impact of the Rule on the additional government agencies implicated in defensive asylum proceedings, as well as (3) a breakdown of how many of the EAD applications from asylum applicants come from those in affirmative proceedings versus defensive proceedings.

## II.     The Notice Fails to Consider the Rule's Impact on Asylum Seekers and Local Communities

The Notice fails to consider how the Rule would impact asylum seekers and their local communities beyond lost wages: the Rule would make it more difficult for asylum applicants to pursue their immigration cases, negatively impact asylum applicants' well-being, health and safety, and create significant hardship for the communities where asylum applicants live.

### *An Asylum Applicant Explains That Employment Authorization is Key to Integration*

The current 30-day adjudicatory deadline has been essential for asylum applicants seeking to integrate successfully into local communities. The story of ASAP's client, Adriana[5], showcases the significance of employment authorization for asylum applicants.

Adriana entered the United States in 2015. She has not yet had an individual hearing on her asylum claim before an immigration judge. Shortly after arriving in the United States, Adriana received a hearing notice from EOIR scheduling her first hearing for 2016. However, during her intake process with ASAP in early 2016, calling the EOIR hotline uncovered that Adriana had missed a hearing and had been deported *in absentia*. Ultimately it became clear that the EOIR notice had been sent with the wrong date – and thus the government's error caused Adriana to receive an *in absentia* deportation order. ASAP filed a motion to reopen on Adriana's behalf, which was granted, vacating the *in absentia* removal order. After reopening her case, EOIR scheduled an individual hearing, which is now still more than a year away.

Through no fault of her own, it has taken Adriana years to get this far in her asylum case. Like many asylum seekers, Adriana was forced to accept unlawful employment in order to support herself and her children. Had she not secured her EAD soon after the 180 days her asylum application was pending, she and her family would have faced even

---

[5] The name Adriana is a pseudonym used to protect the identity of ASAP's client.

AR005003

greater obstacles to integration, such as a lack of health insurance and greater financial instability.

When asked how she felt about the proposed change to the 30-day processing requirement and the possibility of greater delays in the approval of EAD applications for asylum applicants, Adriana stated:

> "For me, having work authorization while my asylum case is pending has made a huge difference, not only in my life, but for the lives of my children. There are children that depend on the work of their parents who came to this country to bring them to safety. Before I had work authorization, I worked at a restaurant where I was treated poorly. I couldn't do anything about it because I wasn't working legally. Now, I have a good job and feel l can support my family. Having work authorization also gave me an identity document that helped me be able to get health insurance, not only for me, but for my family as well. And now that I am thinking about moving and renting a new apartment, it helps as well to have an identity document from the United States, without which I would have to pay a much larger deposit."

Many of the asylum seekers ASAP works with have stories similar to Adriana's. For thousands of asylum applicants, the expeditious adjudication of their EADs makes it possible for them to integrate successfully into their local communities and begin their lives in the United States. The Rule, however, will cause significant delays that make integration difficult, if not impossible, with serious consequences for asylum applicants and their local communities.

*Impact on Asylum Applicants' Ability to Obtain Immigration Counsel*

DHS fails to address how the Rule would impact the ability of asylum applicants to obtain immigration counsel. ASAP provides asylum seekers in defensive proceedings with pro se assistance filing I-589's and EAD applications. For many of the asylum seekers ASAP works with, obtaining work authorization allows them to save sufficient funds to hire private immigration counsel. In ASAP's experience, the 30-day EAD processing requirement for asylum applicants is critical in order to ensure that asylum applicants have the ability to hire private counsel. Without access to rapidly adjudicated work

6

authorization, it is likely that asylum applicants will have a more difficult time finding private immigration counsel.[6]

The net result of the regulatory change will be that asylum applicants are simply less likely to find and hire counsel for their immigration cases. Access to immigration counsel is particularly important in the defensive asylum context, in which applicants find themselves in an adversarial proceeding before an immigration judge. Nationwide, only 10% of unrepresented defensive asylum applicants win relief, while thousands of pro se litigants receive deportation orders despite having strong claims.[7]

*The Rule's Impact on Asylum Applicants' Well-Being, Safety, and Health*

The inability to legally work will destabilize the financial situation of people already traumatized by the threats and persecution that led them to apply for asylum. The significant collateral consequences of the Rule on asylum seekers will be seen in the areas of health, food security, and housing stability, as evidenced by Adriana's story.[8]

The financial destabilization created by the delay in work authorization will also put asylum applicants at greater risk by increasing the likelihood that they will remain in abusive living situations and predatory employment relationships.[9] ASAP has worked with many asylum seekers who find themselves in vulnerable situations upon arrival in the United States because their access to financial resources is limited. Receiving an EAD is often the key to independence and stability: the ability to work allows an asylum applicant to pay for housing, buy food, pay for medical care, and otherwise participate in their local communities.

Without the ability to work lawfully, however, asylum seekers may be forced to endure dangerous living conditions or abuse in order to be able to live in the United States while awaiting the adjudication of their asylum applications.[10] Human Rights Watch conducted a series of interviews that illustrate this point:

---

[6] *See* Human Rights Watch, *At Least Let Them Work*, (Nov. 12, 2013) [available at: https://www.hrw.org/report/2013/11/12/least-let-them-work/denial-work-authorization-and-assistance-asylum-seekers-united] [hereinafter Human Rights Watch, *Let them Work*].

[7] *See*, Transactional Records Access Clearinghouse (TRAC), Asylum Representation Rates Have Fallen Amid Rising Denial Rates, (Nov. 12, 2017) [available at https://trac.syr.edu/immigration/reports/491/].

[8] *See* Human Rights Watch, *Let them Work* at 26–34 (detailing how lack of work authorization causes "physical and emotional harm," to asylum seekers, impacts their ability to secure housing and food, and increases their "vulnerability to exploitation.").

[9] *See id.* at 33–34.

[10] *See id.* at 34.

AR005005

Forcing asylum seekers to rely on others for subsistence permits, and even encourages, abusive and exploitive relationships. Amina Esseghir, a former caseworker at the International Institute of New Jersey, said that one of her clients, a 21-year-old female asylum seeker, was taken in by a family who provided for her well-being. But this situation created an "odd power dynamic" between family members and the dependent asylum seeker. Members of the family told the asylum seeker that they were going to prostitute her out to make money. Esseghir noted that the client "was in a situation where if she didn't do what the [family] wanted, she would be homeless.

[…]

Asylum seeker Isabel C.'s boyfriend is physically, verbally, and psychologically abusive. He confines her within his home and away from her cousins. She is afraid to leave because she does not want her daughter to go hungry or live on the streets. She said that she will not be able to support herself and her daughter because she cannot work. Isabel's lack of work authorization as an asylum seeker is one factor keeping her in a situation of domestic violence. "I am scared for myself and my daughter. There is no place for us. I wonder if I will ever be able to provide a better life for her."[11]

The ability to work makes it easier for asylum seekers to extricate themselves from dangerous living situations — including situations involving domestic violence.[12]

Further, the Rule threatens the health and wellbeing of asylum seekers while placing an unnecessary strain on the healthcare system.[13] Asylum seekers have no documentation of their authorization to remain in the United States during the pendency of their asylum case, nor do they have a way to seek basic primary health care before the adjudication of their EAD application.[14] As is mentioned above by ASAP's client Adriana, obtaining an EAD gave her access to private health insurance for herself and her family. Delays in the adjudication of EAD applications could therefore lead to an increase in the number of asylum applicants forced to seek medical care primarily through overburdened emergency room systems. This reliance on emergency medical services

---

[11] *Id.* at 33-34.

[12] *See id.* at 34–35.

[13] *See id.* at 15–16 ("[Lack of work authorization] prevents asylum seekers from accessing affordable health care while their claims are pending.").

[14] *Immigration Status and the Marketplace,* Healthcare.gov, [available at: https://www.healthcare.gov/immigrants/immigration-status/].

8

raises healthcare costs for everyone and denies asylum applicants access to preventive primary care.

*The Rule's Impact on Local Communities*

The impact on individuals will also be felt across local communities: it is likely that rates of homeless will increase and resources of community service providers will consequently be stretched thin. Asylum applicants, barred from employment for prolonged and indeterminate lengths of time, will likely be forced to rely on greater community support, including assistance from family members, food banks, shelters, and other local charities. Delays in obtaining work authorization will likely increase the risk of violence and victimization of asylum applicants in the United States; this in turn could lead to greater expenditure of local law enforcement resources to investigate and prosecute instances of violence against asylum applicants. Additionally, public schools may have to shift resources to providing counseling and other psychological services to traumatized children who have witnessed or suffered domestic violence. The Notice also fails to address these potential societal impacts on U.S. citizens and other community members, nor does it address the subsequent financial costs incurred by local communities where asylum applicants reside.

In order to provide reasonable justification for the new Rule, DHS must therefore provide further analysis of how the rule will impact (1) the ability of asylum applicants to integrate; (2) the ability of asylum seekers to obtain immigration counsel, (2) the well-being, health and safety of asylum seekers, and (3) the possible drain on local community resources asylum applicants may turn to while waiting for their work authorization.

III.   **The Notice Fails to Consider the Economic Losses to Asylum Applicants, Businesses, Legal Service Providers, as well as State and Local Governments**

ASAP consulted with multiple economists in order to better assess the likely costs of the Rule.  The discussion below reflects ASAP's conclusions about the economic costs in light of those discussions.

*Unrealistic Processing Times Lead to Significant Underestimating of Economic Losses*

DHS bases its estimate of economic losses on the unrealistic and unlikely assumption "that if this Rule is adopted, adjudications will align with DHS processing times achieved in FY 2017 (before the *Rosario v. USCIS* court order)." It is unlikely and unreasonable to estimate that the Rule will result in a return to pre-*Rosario* processing times. First, because DHS rejects a 90-day alternative as not giving USCIS enough flexibility to

9

adjudicate EADs, it is reasonable to assume processing times will regularly exceed 90 days under the Rule. Second, current EAD processing times can be as high as 570 days[15] (19 months) depending on the category and the service center.[16] Without any required processing timeline there is no guarantee that the processing of asylum applicant EADs will not mirror the longer timeframes of other EAD categories. Third, according to USCIS's own estimates, the processing time of EADs (presumably renewals not covered under *Rosario*) for asylum applicants can be as much as 180 days at the Nebraska Service Center, 135 days at the Potomac Service Center, and 90 days at the Texas Service Center.[17] As such, DHS's calculation of economic losses relies on unrealistic processing timelines, grossly underestimating lost wages and losses to social security and Medicaid.

DHS must either provide a basis for calculating economic loss using pre-*Rosario* processing times or provide a more realistic prediction of processing times under the Rule. Additionally, DHS should provide the following data needed to better judge the reasonableness of estimated processing times under the Rule: average processing times for all EADs (with the exception of those initial EADs filed by asylum applicants), and average processing times for renewals of EADs based on pending asylum applications.

*Economic Losses for Companies, Native Workers, and State and Local Governments*

DHS underestimates the impact of the Rule on the private sector. Under the Rule, companies may have insufficient access to labor or bear the costs of attracting and hiring alternative labor. As noted by 1,470 economists in an open letter in 2017, immigrants provide a "significant competitive advantage" to the U.S. economy, heightening levels of innovative and flexibility within industry.[18] The Rule would unnecessarily deny businesses and organizations these advantages provided by asylum seekers' timely involvement in the local economy.

---

[15] This calculation assumes 30 days in each month.

[16] As of November 7, 2019, the processing time at the Vermont Service Center for EADs based on category (c)(33) – for those with an approved and concurrently filed I-821D – is between 14.5 and 19 months. Information is searchable on USCIS's website here: https://egov.uscis.gov/processing-times/home.

[17] As of November 7, 2019, the processing times for EADs based on category (c)(8) – for those with a pending I-589 – is between 4 and 6 months at the Nebraska Service Center, 2.5 and 4.5 months at the Potomac Service Center, and 3 weeks to 3 months at the Texas Service Center. Information is searchable on USCIS's website here: https://egov.uscis.gov/processing-times/home.

[18] New American Economy, *Open Letter from 1,470 Economists on Immigration* (Apr. 12, 2017) [available at https://www.newamericaneconomy.org/feature/an-open-letter-from-1470-economists-on-immigration/].

AR005008

DHS fails to consider that asylum seekers bring a wide and deep range of professional experience to their work, which cannot always be replaced by a native workforce. Recent empirical immigration research suggests that native and immigrant labor are complements, rather than substitutes.[19] Accordingly, the extended delay of asylum applicants from the labor market might actually lead to adverse impacts on native worker prospects,[20] which is not contemplated in DHS's assessment of costs.

DHS estimates of lost wages do not capture the full scope of "lost profits" to companies caused by a delay or shortage of asylum applicant labor. It is reasonable to assume that companies earn profits from the value of asylum applicant labor in excess of wages paid to those workers.[21] As such, calculating lost wages associated with reduced employment will not capture associated profit losses, which is critical to assessing the economic cost of the Rule.

Additionally, the Notice does not attempt to estimate the cost of the Rule as it relates to lost income tax revenue. Local, state, and federal governments will lose income tax revenue from asylum applicants who are delayed in entering the job market or forced to work in the shadow economy. DHS acknowledges that tax losses would vary according to the jurisdiction.[22] However, DHS fails to consider tax revenue lost not only as a result of lost wages, but from corresponding lost profits as well as losses from sales and other consumption-based taxes.

In order to accurately assess the cost of the Rule, DHS must (1) fully consider the cost to the private sector, including estimating loss in profits, (2) address the potential negative impact to a native workforce, (3) attempt to calculate lost income tax revenue, and (4) provide analysis of how the loss in tax revenue would impact federal, state, and local government.

---

[19] *See, e.g.*, Jongkwan Lee, Giovanni Peri, Vasil Yasenov, *The Labor Market Effects of Mexican Repatriations: Longitudinal Evidence from the 1930s*, NBER WORKING PAPER, (Oct. 2019) [available at https://www.nber.org/papers/w26399].

[20] *See* G. I. P. Ottaviano & G. Peri, *Rethinking the Effect of Immigration on Wages*, 10 J. EUR. ECON. ASS'N 152 (2012).

[21] *See* David Card et al., *Firms and Labor Market Inequality: Evidence and Some Theory*, 36 J. LAB. ECON. S13 (2018) (indicating that workers are not paid the marginal value of their labor contribution, which means firms are earning additional profits from their labor).

[22] *See* Notice at 47150.

AR005009

IV.    The Notice Fails to Consider the Rule's Impact on EOIR, the IRS, and the DOL

DHS has not properly considered or evaluated the additional burden that the Rule will place on various federal agencies. This is particularly clear as it relates to defensive asylum applicants, who are in proceedings before EOIR, not USCIS.

*Increased Backlogs in Immigration Court*

The Rule could inadvertently increase the backlogs in immigration court. Without reliably quick processing of an EAD, a higher number of asylum applicants in defensive proceedings will be unable to pay for private immigration counsel and increasingly forced to seek out pro bono representation. As such, reasonable continuances are more likely to be requested to allow asylum applicants to look for pro bono counsel. Additionally, for those applicants who are forced to proceed pro se, immigration courts will be required to expend more time and resources in eliciting testimony and evaluating evidence in their cases. [23]

Defensive asylum applicants are also currently dissuaded from seeking continuances, because if they do so, they become ineligible for an EAD.[24] The promise of an EAD being processed for asylum applicants within 30 days has likely served as a deterrent to requesting continuances and increasing delays in immigration proceedings. Without the guarantee of a specific adjudication timeline, it seems defensive asylum applicants could weigh the possibility of an EAD at some point in the future as insufficient justification to foreclose seeking a continuance. Moreover, if defensive asylum applicants pursued continuances in greater numbers, it would result in an even longer backlog for an already overburdened immigration court system.

The Notice does not address whether the Rule could result in a higher volume of continuances, nor does it consider how increased continuances could strain EOIR's

---

[23] *See* The Vera Institute, THE CASE FOR UNIVERSAL REPRESENTATION, (Dec. 2018) [available at https://www.vera.org/advancing-universal-representation-toolkit/the-case-for-universal-representation-1.] (highlighting how having counsel on both sides increases efficiency of immigration proceedings); *see also*, Ingrid Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PA. L. REV. 1, 48–50 & 71 (2015) (detailing the significance of legal representation in immigration proceedings for case outcomes); New York Immigrant Representation Study, *Accessing Justice: The Availability and Adequacy of Counsel in Immigration Proceedings*, 33 CARDOZO L. REV. 357, 363–64 (2011) (discussing the consequences of lack of adequate legal representation in immigration cases).
[24] *See* EOIR, *The 180-Day Asylum EAD Clock Notice* [available at: https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Asylum_Clock_Joint_Notice_-_revised_05-10-2017.pdf].

limited resources and capacity to timely adjudicate cases. Before implementing the Rule, DHS must consider whether the Rule would negatively impact EOIR, and specifically address the potential for an increased backlog at the immigration courts and the subsequent cost incurred by EOIR.

*Additional IRS Investigatory Work*

The Rule would also create additional burdens on the IRS, both as a result of a reduction on taxable income, and increased investigations of tax liability for unauthorized employment. The IRS stands to lose income revenue for asylum applicants who would otherwise be eligible for employment and taxation. Unauthorized work may also result in tax evasion by employers and individuals, requiring additional investigations by the IRS. DHS has not fully considered the tax revenue that would be lost, or the additional investigatory work of the IRS that will follow as a result of limiting taxable work opportunities for asylum applicants. Therefore, DHS must assess the additional burdens the Rule would create for the IRS before implementation.

*Higher Levels of Unauthorized Work and Additional Investigatory Burdens for DOL*

The Rule could also create additional burdens for DOL by forcing it to investigate higher incidents of wage theft, and other unsafe working conditions monitored by its agency, the Occupational Health and Safety Administration (OSHA).[25]

DHS does not acknowledge the impact of unauthorized work on DOL. With delays in the adjudication of employment authorization, many asylum applicants will be forced to join the unauthorized workforce in order to support themselves and their families. Studies have shown that immigrants without work authorization are at a higher risk of labor exploitation and wage theft by employers who are more likely to violate federal and state minimum wage and overtime requirements.[26] DOL investigations are also made significantly more difficult as a result of fear among individuals working without

---

[25] *See* Jack Herrera, *What Will Happen if Trump Cancels Work Permits for Asylum Seekers?*, PACIFIC STANDARD (Apr. 30 2019) [available at https://psmag.com/news/what-will-happen-if-trump-cancels-work-permits-for-asylum-seekers].

[26] *See, e.g.*, Douglas Massey & Kerstin Gentsch, *Undocumented Migration to the United States and the Wages of Mexican Immigrants*, 48 INT'L MIGRATION REV. 482 (2014); Sally C. Moyce & Marc Schenker, *Migrant Workers and Their Occupational Health and Safety*, 351, 357 (Jan. 24, 2018) [available at: https://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-040617-013714] ("[R]esearchers found that undocumented workers were more than two times as likely to experience wage violations compared with documented workers.").

13

AR005011

EADs, which makes it easier for employers to mistreat and underpay workers; notably this difficulty has also been found to lower morale of DOL investigators.[27]

The DOL is also required to investigate reported instances of wage theft and expends considerable resources investigating cases where unauthorized immigrant laborers are victimized. Unauthorized workers are subject to many of the protections of the Fair Labor Standards Act, including federal minimum wage guarantees, which are enforced by the Wage and Hour Division of DOL.[28] As such, the delay in EAD processing is likely to force a greater volume of asylum applicants into precarious work situations, and in turn, generate a higher incident of wage theft claims that the DOL will investigate.

Additionally, persons without work authorization are more likely to work in unhealthy and dangerous conditions that violate the parameters of the Occupational Safety and Health Act, which is enforced by OSHA.[29]  The Rule will therefore likely also result in an increased need for on-site OSHA inspections, and greater allocation of resources within the DOL to this work.

DHS failed to consider the meaningful impact of the Rule on the DOL as it relates to wage theft and work-site safety inspections. DHS must therefore consider the increased investigatory burden and resource cost the Rule will impose on DOL.

---

[27] *See* Sam Levin, *Immigration Crackdown Enables Worker Exploitation, Labor Depart Staff Say*, *The Guardian* (Mar. 30. 2017) [available at https://www.theguardian.com/us-news/2017/mar/30/undocumented-workers-deportation-fears-trump-administration-department-labor].

[28] *See, e.g.*, *Lucas v. Jerusalem Cafe,* 721 F.3d 927, 934 (8th Cir. July 29, 2013) (noting that "FLSA's sweeping definitions of 'employer' and 'employee' unambiguously encompass unauthorized aliens"); *Colon v. Major Perry St. Corp.*, 987 F. Supp. 2d 451, 454 (S.D.N.Y. 2013) (collecting cases) (noting that "[c]ontemporary courts…have continued to conclude that" FLSA's definition of employee extends to unauthorized immigrant workers); *see also* U.S. Dep't of Labor, Wage and Hour Div., "Fact Sheet # 48: Application of U.S. Labor Laws to Immigrant Workers: Effect of *Hoffman Plastics* decision on laws enforced by the Wage and Hour Division" (rev. July 2008) [*available* at: https://www.dol. gov/whd/regs/compliance/whdfs48.pdf] ("The Department's Wage and Hour Division will continue to enforce the FLSA ... without regard to whether an employee is documented or undocumented.").

[29] Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. REV. 667, 677 & n. 51 (2003).

14

AR005012

## V.     DHS Fails to Consider Possible Alternatives

DHS is required to consider feasible and readily identifiable alternatives to the proposed action.[30] At the very least, it must should consider a no-action alternative, leaving the 30-day adjudication timeline in place, and investigate alternative, feasible timelines such as a 60 or 90 day processing requirement. DHS should consider the alternatives presented in this comment, as they are each a reasonable way to further Congress's objectives in creating work authorization for asylum applicants, without the additional costs that would accrue with increased delays.

The Notice also notably fails to consider any of the alternative recommendations that the 2019 DHS Ombudsman Report suggests for addressing EAD processing times.[31] The failure to adequately consider at the very least a few of these alternative actions ignores existing regulations directing agencies to consider the cost and benefits of regulatory alternatives, including their potential benefits and drawbacks.[32]

*Possible Alternatives*

DHS has proposed no alternative timeline to the 30-day adjudication of EADs filed by asylum applicants. DHS rejects a 90-day timeframe to replace the 30-day timeframe for adjudicating EADs without very little explanation.[33] Even though a 90-day deadline would already be three times the current timeframe, DHS proposes to instead remove a timeframe entirely, suggesting that the agency anticipates these applications being significantly delayed beyond 90 days.

### *90-day deadline*

DHS is wrong to dismiss a 90-day deadline without meaningful consideration. A 90-day deadline would be a reasonable alternative, but DHS asserts only that "it would not provide USCIS with the certainty and flexibility it needs to fulfill its core mission."[34]

---

[30] *See* 5 U.S.C. § 553 (establishing minimum requirements for agency rule making).

[31] *See* U.S. Citizenship and Immigration Services Ombudsman, *Annual Report 2019* (Jul. 12, 2019) [hereinafter Ombudsman Report] [available at https://www.dhs.gov/sites/default/files/publications/dhs_2019_ombudsman_annualreport_verified.pdf].

[32] Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if a regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity).

[33] Notice at 47166-47167.

[34] Notice at 47167.

AR005013

In the Notice itself, DHS states that in FY 2017, prior to the *Rosario* court order, USCIS adjudicated 92% of asylum applicants' EADs within 90 days.[35]

*60-day deadline*

DHS has shown by its past conduct that the agency is capable of adjudicating a majority of EAD applications for asylum applicants within 60 days of submission. In the Notice, DHS states that in FY 2017, prior to the *Rosario v. USCIS* court order, USCIS adjudicated approximately 78% of applications within 60 days.[36] Relying on DHS's assumption that under the new Rule, pre-*Rosario* processing times will be the norm, this statistic demonstrates that, even without the external court-ordered pressure to adjudicate applications within the 30-day deadline, USCIS is capable and able to adjudicate the majority of applications within 60 days.

*Alternative deadlines for cases that don't require additional security vetting*

If DHS is not able to meet a 30, 60, or even 90-day deadline in all cases, it could institute a tiered or alternative system of deadlines for cases that require additional security vetting. DHS already uses a similar alternative deadline process when it requests additional documentation from an asylum applicant, stopping the clock on the 30-day processing timeframe.[37] A stop-time mechanism for cases that require additional vetting would be a feasible way to maintain a fixed processing deadline (which would maintain agency accountability and EAD access) without sacrificing the agency's flexibility.

*Failure to Consider Recommendations from the 2019 USCIS Ombudsman Report*

The 2019 USCIS Ombudsman Report recommends that the agency take a number of steps to ensure timely adjudication of EADs, including : (1) augmenting USCIS' staff resources to enable Service Centers to devote more production hours to EAD processing; (2) accelerating the incorporation of the Form I-765 into eProcessing; (3) implementing a public education campaign to encourage applicants to file I-765 renewal applications up to 180 days before the expiration of current EADs and verify the addresses provided; (4) establishing a uniform process to identify and expedite processing of Form I-765 resubmissions filed due to "service error."[38] The Notice, however, fails to consider any of these possible recommendations, and does not assess

---

[35] Notice at 47167.
[36] Notice at 47149.
[37] Notice at 47153, ft. nt. 9.
[38] Ombudsman Report at 83.

16

how their implementation might ameliorate any need to remove the 30-day adjudication requirement.[39]

In the Notice, DHS admits it "has not estimated the hiring costs that might be avoided if this proposed rule were adopted,"[40] and thus does not know whether hiring costs would constitute a substantial financial burden. Instead, DHS argues that hiring new employees would not solve their application overload. However, the temporary delay between hiring new employees and their ability to process applications does not require a permanent elimination of a fixed processing timeframe. Furthermore, the promulgation of the Rule will almost certainly yield increased delay times longer than those that could result from any new employee onboarding. Moreover, the 2019 Ombudsman Report rejects concerns that onboarding would cause significant delays, and instead suggests that the hiring of additional staff would be pivotal for DHS to increase its processing times.[41] DHS fails to meaningfully engage in this analysis, providing little to no cost-benefit analysis.

DHS also did not adequately consider the possibility of reassigning existing employees. These reassigned employees could help process application while new employees trained. Even if the possibility of hiring new employees was rejected, DHS should have considered whether reassigning existing employees constituted a feasible and readily available alternative, including by estimating the associated costs of hiring more staff.

One particularly glaring omission from the Notice, is DHS's decision to ignore the Ombudsman's recommendation of implementing eProcessing procedures and new technologies in order to expedite the review process and improve review for purposes of fraud and national security concerns.[42] The 2019 Ombudsman Report notes that taking these steps would reduce processing times and improve overall efficiency.[43] DHS fails to seriously consider reasonable alternatives, including those recommendations coming from within DHS.  The Rule cannot be implemented until these reasonable alternatives have been fully considered and weighed against the costs of the proposed change.

---

[39] *See generally* Notice.
[40] *Id.* at 47149.
[41] *See* Ombudsman Report at 82–83.
[42] *See id.*
[43] *See id.* at 84.

AR005015

Congress created a statute to allow for asylum applicants to receive work authorization pending the adjudication of their cases.[44] This rule change, however, creates the possibility of an indefinite delay in processing the EADs of asylum applicants. Thus, making integration substantially more difficult. Because of this, the Rule is in tension with the underlying Congressional intent allowing for asylum applicant work authorization.

Additionally, the Rule diverges from the international norms protecting the employment rights of asylum seekers and would constitute a departure from these commitments for the United States. This both damages the United States' international standing and undermines the architecture of the international system for the protection of refugees and asylum seekers.

### A Rule Change Diverges from both Congressional Intent Authorizing EAD Applications and International Norms

DHS argues that it has the authority under the INA to determine of its own volition how long it needs to adjudicate EAD applications.[45] However, this logic is undermined by the rest of the statute. Importantly, one of the "chief purposes" of the 30-day deadline was "to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible."[46]  As noted in *Rosario*, "although Congress has not included a timetable specific to EAD applications, it has stated that the final adjudication of the asylum application 'shall be completed within 180 days after the date an application is filed.'"[47] This timetable syncs up with the regulatory requirements—that after the asylum application has been pending for 150 days, the EAD application should be resolved in 30 days."[48] Congress plainly wrote this statute with the understanding that a reasonable time limit would be placed on the adjudication period, something the agency understood when they promulgated the regulation that the Rule will replace. "The purpose of promulgating the 30-day deadline on top of that 150-day waiting period was to cabin what was already—in the agency's view—an extraordinary amount of time to wait for work authorization."[49]

---

[44] *See* 8 U.S.C. § 1158(d)(2); *see also* Notice at 47153 n. 11 (acknowledging this as the underlying purpose of the statutory scheme at issue).

[45] Notice at 47149.

[46] Notice at 47153 n. 11.

[47] *Gonzalez Rosario*, 365 F. Supp. 3d at 1162 (quoting 8 U.S.C. § 1158(d)(5)(A)(iii)).

[48] *Id.* at 1162-3.

[49] *Id.* at 1161.

18

DHS must therefore explain how the Rule conforms with the congressional intent authorizing the creation of EADs for asylum applicants before it can be implemented.

*The Rule Departs from International Norms Concerning the Rights of Asylum Seekers to Employment*

Additionally, the Rule is out of sync with the commitments and policies of our peer nations in the international community  Articles 17 and 18 of the 1951 Refugee Convention recognizes that asylum-seekers have a right to self-employment access opportunities that is at least as favorable as the access enjoyed by similarly situated foreigners.[50] The United States has historically maintained policies that mirrored the requirements of the Convention.[51] Our peer nations continue to honor their commitments to the international norms of the Convention. Canada — with whom the United States has signed a Safe Third Country Agreement formed under mutual recognition of the two nations' "generous systems of refugee protection" and "both countries' traditions of assistance to refugees"— maintains a system significantly more generous than that of the Rule.[52] Concretely, Canada allows eligible asylum seekers (and their families) who cannot pay for basic needs to access open work permits.

Canada's more humanitarian commitment, for instance, is mirrored by our peer nations globally.  At least 14 nations in the European Union grant asylum-seekers with work authorization before 6 months (and several upon filing).[53] Furthermore at least nine nations in Latin America allow for immediate work authorization upon filing of asylum application.[54] The Rule drives the United States further from international norms and practices, undermining the nation's commitment to the protection of the asylum-seeker rights and dignity.

---

[50] *See* Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, adopted July 28, 1951, entered into force April 22, 1954, chap. III, http://www.unhcr.org/3b66c2aa10.html (accessed Nov. 5, 2019). By acceding to its 1967 Protocol, the United States has bound itself to these provisions of the Refugee Convention; *See also*, James C. Hathaway, *The Rights of Refugees Under International Law*, (New York: Cambridge University Press, 2005).

[51] *See* American Immigration Council, *An Overview of U.S. Refugee Law and Policy* (Jun. 18, 2019) [available at https://www.americanimmigrationcouncil.org/research/overview-us-refugee-law-and-policy].

[52] *See* Government of Canada, *Types of work permits: You've filed a claim for refugee protection,* [available at: http://www.cic.gc.ca/english/work/apply-who-permit-result.asp?q1_options=1i&q2_options=2h].

[53] UNHCR, *A guide to international refugee protection and binding state asylum systems*  at 102, https://www.unhcr.org/3d4aba564.pdf.

[54] *Id.* at 102; *see also* Directive 2013/33/EU, https://www.refworld.org/docid/51d29db54.html.

19

DHS should consider the ramifications of a regulatory change that diverges from international norms before implement implementing the Rule.

## VII. The Stated Justifications in the Notice Do Not Support Adopting the Rule

DHS's stated justifications for a rule change do not support adopting the Rule as it stands. First, the scope of proposed regulatory changes does not correspond to the reasons given for the Rule in the Notice. Both the changes in EAD document production and vetting and national security concerns stated in the Notice have been in place for years, and never previously generated a need from the agency to eliminate the processing timeline. Second, despite DHS's own stated belief that it will be able to process the vast majority of EAD applications on a 60-day timeline, the new Rule would eliminate any processing timeline all together. The failure to fully consider the viability of either a 60-day or 90-day timeline, therefore, gives reason to doubt the ostensible motivations stated for the regulatory change. Last, if DHS was really concerned with efficiency, it could have considered adopting the proposed recommendations of the 2019 USCIS Ombudsman's Report.

*The Notice's Stated Purposes for the Rule Do Not Make Sense*

The stated reasons for the rule change do not make sense. DHS explains that it seeks to eliminate the 30-day processing deadline because it does "not provide sufficient flexibility" to the agency to address (1) "[the] increased volume of affirmative asylum applications and accompanying Applications for Employment Authorization"; (2) "changes in intake and EAD document production" over the last two decades; and (3) "the need to appropriately vet applicants for fraud and national security concerns."[55]

Notably, however, the changes DHS identified in intake and document production have been in place for more than a decade and a half: these changes began in 1997 and were fully implemented by 2006.[56] Also, of note, the additional fraud and national security vetting DHS identified as necessary was implemented after September 11, 2001 and the creation of the Office of Fraud Detection and National Security (FDNS) in 2004.[57] Despite the existence of these production and vetting changes, USCIS has been able to comply for more than a year with the *Rosario* court's order requiring it process initial EAD applications in 30 days. Also, if the agency requires additional documentation from the applicant, USCIS can and does send a request for evidence

---

[55] Notice at 47155.
[56] *See id* 47154 n.17.
[57] *See id*. 47154-55.

(RFE), which pauses the 30-day timeframe clock until the requested additional documentation is received.

DHS's rejection of a 90-day alternative timeline is confusing and undermines confidence in DHS's assertion that the rule change would return processing times to pre-*Rosario* timeframes. In the Notice, DHS states that "[w]ith the removal of the 30-day adjudication timeline, DHS anticipates similar outcomes to those achieved in FY 2017 [prior to *Rosario* order]."[58] Prior to the court's ruling in *Rosario*, USCIS adjudicated 47% of initial EAD applications within 30 days, an additional 31% of applications within 60 days, and 22% of applications in more than 60 days. However, DHS then rejects the 90-day timeline as inflexible, suggesting that, in fact, it anticipates processing delays well-beyond the pre-*Rosario* timeframes.

Furthermore, DHS's rejection of any timeline does not promote its goal of increased efficiency. Processing times under *Rosario* suggest that mandatory timelines lead to increased efficiency and expedited processing times, forcing the agency to coordinate resources more effectively to meet deadlines. Refusing to establish any alternative deadline therefore removes the incentive for increased agency efficiency. As such, the proffered justifications in the Notice, do not support the changes to the rule.

Instead, the Rule should be viewed in light of both the Administration's stated goals of making it more difficult to pursue asylum in the United States, and its open hostility towards immigrants more generally.

*The Lack of Reasoned Justifications Implies Other Motivation*

Because the rule change diverges from congressional intent, and the stated justifications for the Rule do not make sense, it is necessary to consider other potential motivations for the rule change. The third-country transit bar,[59] Migrant Protection

---

[58] *Id.* at 47162.
[59] *See* Human Rights First, *Trump Administration Third-Country Bar is An Asylum Ba that Will Return Refugees to Danger*, (Sept. 2019) [available at https://www.humanrightsfirst.org/sites/default/files/Third-Country-Transit-Ban.pdf]

AR005019

Protocols (MPP)[60] and expedited processing for "family unit" asylum cases[61] are evidence that this Administration is attempting to make it harder for individuals who seek safe haven at the Mexico-U.S. border to win asylum and get on a path to citizenship.[62] Indeed, journalists have reported that the Administration is also considering issuing an outright ban on asylum applicant work authorization.[63] As such, the rule change could be viewed as part and parcel of these same efforts.

VIII.    Conclusion

Asylum applicants reside in the United States legally; that is, they are in the country with the knowledge and acquiescence of the federal government. In recognition of this fact, Congress granted work authorization to asylum applicants so they would be able to integrate and assimilate into local communities expeditiously. The Rule diverges from this purpose, and instead, creates the possibility of indefinite waiting periods for asylum applicants to receive work authorization.

For the reasons listed above, it is in the interest of asylum applicants, and in the interest of the United States that asylum applicants are not delayed from entering the documented workforce.  As such, ASAP strongly recommends that DHS withdraw the portion of the Rule that would eliminate the 30-day processing requirement for USCIS to adjudicate initial EAD applications from asylum applicants.

---

[60] *See* Human Rights Watch, *We Can't Help You Here: US Returns Asylum Seekers to Mexico*, (2019) ( "The Trump administration has pursued a series of policy initiatives aimed at making it harder for people fleeing their homes to seek asylum in the United States, separating families, limiting the number of people processed daily at ports of entry, prolonging detention, and narrowing the grounds of eligibility for asylum. In January 2019, the administration expanded its crackdown on asylum with a wholly new practice: returning primarily Central American asylum seekers to several border towns in Mexico where they are expected to wait until their US asylum court proceedings conclude, which could take months and even years.") [available at https://www.hrw.org/sites/default/files/report_pdf/us_mexico0719_web2.pdf].

[61] *See* Jeffery S. Chase, *EOIR Creates More Obstacles for Families*, (Dec. 13, 2018) (A former immigration judge stating that the FAMU docket is an effort at "gaming of the system to deny more asylum claims for [the Administration's ] own political motives") [available at https://www.jeffreyschase.com/blog/2018/12/13/eoirs-creates-more-obstacles-for-families].

[62] *See* Nicole Narea, *The Demise of America's Asylum System Under Trump, Explained*, Vox (Nov. 5, 2019) [available at https://www.vox.com/2019/11/5/20947938/asylum-system-trump-demise-mexico-el-salvador-honduras-guatemala-immigration-court-border-ice-cbp].

[63] *See* Julia Ainsley, *Trump Administration Weighs Restricting Asylum-Seekers from Working,* NBC News (Nov. 4, 2019) [available at https://www.nbcnews.com/politics/donald-trump/trump-administration-weighs-restricting-asylum-seekers-working-n1076146].

AR005020

Thank you for your time and consideration.

Sincerely,

Conchita Cruz
Co-Executive Director
Asylum Seeker Advocacy Project (ASAP)

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 12, 2019
**Tracking No.** 1k3-9d78-crbc
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2472
Comment Submitted by Kelly Ann Whelan, U.S. Committee for Refugees and Immigrants

## Submitter Information

**Name:** Kelly Ann Whelan
**Address:**
  2231 Crystal Drive
  USCRI, Suite 350
  Arlington,  VA,  22202
**Email:** kwhelan@uscrimail.org
**Phone:** (703) 310-1130

## General Comment

Dear Chief Deshommes:

The U.S. Committee for Refugees and Immigrants (USCRI) respectfully submits these comments in response to the Department of Homeland Securitys (DHS) Notice of Proposed Rulemaking (NPRM) entitled Removal of 30-day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications published on September 9, 2019. USCRI appreciates the opportunity to submit comments regarding the proposed rule.

USCRI, established in 1911, is a nongovernmental, not-for-profit international organization dedicated to addressing the needs and rights of refugees and immigrants. USCRI provides legal representation to asylum seekers at its four legal services offices. We believe the proposed rule would increase economic hardships for our asylum-seeking clients and their families, their potential employers, and their communities. As such, USCRI opposes the proposed amendments to 8 CFR 208.7 and requests that DHS withdraw the proposed rule. Our specific comments are below.

Opposition to Removal of Adjudication within 30 Days

DHS proposed rule removes the requirement that the initial Employment Authorization Document (EAD) be processed within 30 days of submission.

AR005022

Asylum seekers already face financial hardship under the requirement that they must wait 150 days after submission of an asylum application to seek an EAD by submitting an I-765 pursuant to the ABT Settlement Agreement. Under the current rule, this makes an asylum seekers wait 180 days total. Asylum seekers are currently dependent on family, friends, and organizations such as USCRI for their livelihoods. Without an EAD and work authorization, asylum seekers have difficulty obtaining drivers licenses, banking services, and health care. At the same time, businesses and communities lose workers, and federal and state governments lose income taxes.

Adding time to an already lengthy and unforgiving process is both discriminatory and adverse to Congressional intent. Congress adopted the 150 day waiting period as it was a period beyond which it would not be appropriate to deny work authorization to a person whose claim had not been adjudicated.

Moreover, courts have consistently concluded that any wait beyond 180 days for an EAD creates humanitarian harm for asylum seekers. Most recently, the United States District Court for the Western District of Washington in the case Gonzalez Rosario v. United States Citizenship and Immigration Services (USCIS) found that USCIS must adhere to the 30-day deadline due to the negative impact on human welfare. The Rosario court stated that,

Asylum seekers are unable to obtain work when their EAD applications are delayed and consequently, are unable to financially support themselves or their loved ones This negative impact on human welfare is further compounded by the length of USCISs delay.

Thus, maintaining the 30-day EAD deadline (180 day total) is consistent with established Congressional intent and court decisions, such as Rosario. Access to an EAD within 180 days is an important economic and humanitarian protection for vulnerable asylum seekers.

Lack of Hardship and Security Concerns for DHS

In Table 1, DHS cites the motivation for removal of the 30-day processing provision for EADs on the grounds that the provision presents both a hardship to process within 30 days and a security concern for the agency.

First, DHS states in the proposed rule that USCIS needs more time to process EAD applications due to increased background checks required by the government since 2004 in response to the September 11, 2001, terror attacks. However, the current processing time of 30 days was fully implemented by 2006, two years after such security checks were implemented. Further, the Rosario court, cited above, also stated that the security concerns of the government were too vague to justify a longer waiting period than 30 days.

Second, DHS has been able to process 99 per cent of EAD applications within the 30 day deadline in the last fiscal year. Therefore, it is unclear why DHS requires more time to do so.

In consideration of the above comments regarding hardship to asylum seekers as well as concerns that the proposed rule would be antithetical to both clear Congressional intent and established court decisions, USCRI respectfully requests that DHS withdraw the proposed rule, Removal of 30-day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications.

USCRI thanks DHS for the opportunity to submit comments regarding this proposed rule.

Sincerely,

Eskinder Negash
President and CEO

file:///C|/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2472.html[9/15/2020 4:14:28 PM]

# Attachments

USCRI_Comments_EAD

AR005024