weeks. This allowed them to be able to work, to open bank accounts, to apply for driver licenses, and therefore to move forward with creating stable lives for themselves and their children.

In closing, The Legal Project represents dozens of asylum seekers who rely on obtaining EADs in order to work to support themselves and their families; to obtain driver licenses, Social Security numbers, and health insurance; and otherwise rebuild their lives. If DHS refuses to adjudicate EADs within a reliable and quick timeframe, individuals who have already experienced immense trauma may be unable to gain or maintain self-sufficiency. Since the *Rosario* order, we have seen an enormous improvement in the adjudication of EAD applications for asylum seekers. This change has had a tangible impact on their lives. One client, who escaped severe persecution in his home country of Uganda, works as a case manager in a non-profit organization, helping other vulnerable individuals. He is concerned that if his EAD expires, he could lose the job that he worked hard to find. Currently, we can reassure him that DHS is processing EAD applications expeditiously and that his renewal falls under the 180-day automatic extension policy. However, if DHS removes the 30-day processing requirement and, as we have seen before, fails to adjudicate an EAD renewal application within the 180-day extension, he will lose his work authorization. This would be financially devastating for him, destabilizing for the people he counsels at his job, and it would require his employer to expend resources to hire and train a replacement for him.

The proposal to remove the 30-day processing time for asylum seekers' work permits creates uncertainty and instability in the lives of already-traumatized people. When forced by the federal court in *Rosario* to comply with this regulation, DHS has shown that it was able to do so 99% of the time for the past year. DHS should be proud of this. But rather than taking pride in a job well done, this proposed regulation shows that the agency does not wish to continue complying and would prefer to shift resources away from allowing asylum seekers to work to support themselves and their families. The Legal Project vociferously opposes this proposed change because it creates additional hardship and uncertainty for vulnerable individuals, their families, and our communities.

Respectfully submitted,

Michele Pollock Rich
Executive Director
The Capital District Women's Bar Association, Legal Project, Inc.
24 Aviation Rd., Ste. 101
Albany, NY 12205
518-435-1770

AR005471

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6m-aqxd
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2706
Comment Submitted by Carlos Whetten

---

## Submitter Information

**Name:** Carlos Whetten

---

## General Comment

I am an immigration attorney representing immigrants in Las Vegas, Nevada, including those seeking asylum. The vast majority of my clients asking for asylum have a genuine fear of returning to their country because of past persecution and the threat of future persecution. Under current U.S. and international law, they have the right to seek asylum in our country. This proposed rule change is part and parcel of this administrations effort to make the U.S. a hostile destination for individuals fleeing persecution in their countries of origin. This is evidenced by this rule change as well as the third-country transit bar, the proposed wide-sweeping public charge rule, and the institution of the so-called Migrant Protection Protocols. By removing the ability of asylum seekers to gain meaningful employment within a short and predictable timeframe, the Trump Administration effectively turns asylum seekers into the very public charges it seeks to exclude. Additionally, this policy change would make the work authorization process more unpredictable and inefficient by removing the ability to hold USCIS accountable to any deadline.Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community. A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge.

AR005472

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6n-9lxw
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2707
Comment Submitted by Christine Hollister

---

## Submitter Information

**Name:** Christine Hollister

---

## General Comment

The Left is supporting a system that jeopardizes our national security just because some bureaucrat came up with an arbitrary timeline. This has to change and it must change now.

AR005473

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6n-os9q
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2708
Comment Submitted by Lina Shayo, Mesa Law

---

## Submitter Information

**Name:** Lina SHAYO
**Address:**
    15 Stark Street
    Manchester, NH, 03101
**Organization:** Mesa Law

---

## General Comment

DHS Docket No. USCIS-2018-0001.
Asylum seekers turn to the U.S. for a safe haven and protection. This rule to eliminate the 30-day processing time for work authorization will undermine asylum seekers abilities to sustain themselves. The proposed rule change will allow DHS to have unlimited time to decide if and when asylum seekers will be issued work authorization, during which time asylum seekers would have no means of supporting themselves and be forced to wait and survive on the charity of others. The Rule will only compound the devastating delays that many asylum seekers face. DHS, which suffers backlogs in almost every benefit category, will have no incentive to issue a prompt decision. Further, as described below, the Rule is not in the economic interest of the United States which benefits greatly from the contributions of refugees and asylum seekers. It compounds the impact of the already lengthy 180-day waiting period before asylum seekers are eligible for work authorization and is unnecessary given that DHS has shown itself capable of near-complete compliance with the 30-day adjudication requirement. DHSs argument that the proposed rule is due in part to fraud concerns is contradictory since DHS should want to expedite EAD determinations and quickly vet applications, as it currently does, to detect and investigate any concerns about applications rather than create extensive delays.

Preventing asylum seekers from securing lawful employment is not in the United States economic interest Ensuring that asylum seekers can secure lawful employment as soon as possible is in the economic interest of the United States. According to the Department of Health and Human Services, refugees and their family members contributed more than $343 billion in revenue to federal, state and local coffers. On balance, refugees contributed $63 billion more than they received in benefits from various programs. The U.S. economy benefits greatly from this population that works so hard when given a chance and permission to work. According to the Brookings Institute, refugees and asylum seekers engage in entrepreneurship at much higher rates than U.S. born

AR005474

individuals. In the U.S., for example, while immigrants are 15 percent of the population, they represent 25 percent of entrepreneurs. Small businesses and the jobs they create are the engines of growth, innovation, and economic stability of the United States. Given the fact that asylum seekers are fleeing persecution in their home countries, the vast majority do not have sufficient resources to support themselves and their families for the duration of their immigration proceedings. The rule to eliminate the 30-day adjudication requirement would impose additional hardship on asylum seekers because they would face uncertainty and inconsistency in DHS processing. The proposed Rule would prevent asylum seekers from being able to support themselves and their loved ones through lawful employment.

Eliminating the 30-day adjudication requirement would result in extensive waiting periods for asylum seekers to be issued employment authorization Asylum seekers already bear the burden of government back-logs and adjudication delays. Even with a return to the Asylum Offices processing of First in, First out, asylum applicants face great difficulties in getting their cases heard. When a decision on an asylum seekers' case is delayed, it negatively impacts their ability to provide for themselves, support family, and build a life here in the United States. Many asylum seekers wait months, if not years, for their cases to be heard and then adjudicated. Asylum seekers are already required to wait a lengthy period of 180-days before they are eligible for work authorization. During this time, as mentioned above, they rely on others for support to survive. Removing the 30-day processing time requirement would cause significant harm to already vulnerable individuals. Without a time limit for processing initial applications, DHS would have no incentive to adjudicate these cases on time and asylum seekers who are statutorily eligible to work would be unable to do so for an unknowable period. We already see asylum seekers face significant barriers while waiting for the employment documents to be renewed. Eliminating the 30-day processing requirement would place initial EAD eligible asylum seekers in the same uncertain waiting period as renewal applicants, but it would be far worse for asylum seekers who were applying for work authorization for the first time as they would not have the ability to sustain themselves. At least for asylum seekers who are renewing work authorization, they have the benefit of the 180-day auto-extension while DHS manages its backlog and processing delays. The ability to obtain an EAD within 30 days of filing is life-changing for asylum seekers who have already waited 150 days to apply. This rule should not be changed.

AR005475

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6n-qjre
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2709
Comment Submitted by Barbara Schrubbe

---

## Submitter Information

**Name:** Barbara Schrubbe

---

## General Comment

Please help President Trump secure Americas safety by removing the arbitrary bureaucratic timeline.

AR005476

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6o-717s
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2710
Comment Submitted by Lea Phillips

---

## Submitter Information

**Name:** Lea Phillips

---

## General Comment

Please support immigration reform.

AR005477

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6o-zf7f
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2711
Comment Submitted by Clair Evans

---

## Submitter Information

**Name:** clair evans

---

## General Comment

Tell Washington to Support President Trump's Immigration Reforms!

AR005478

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6o-ali1
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2712
Comment Submitted by Janet Hutson

---

## Submitter Information

**Name:** Janet Hutson

---

## General Comment

We stand behind you President Trump

AR005479

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6p-ui59
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2713
Comment Submitted by Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I am an immigration lawyer in both private and non-profit practice. My interest in the proposed rule is to see that asylum seekers and the US economy are not needlessly harmed.

Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community. A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge.

Further, USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

Finally, this proposed rule should never be implemented because the government handles these work authorizations within 30 days pursuant to a court order.

AR005480

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6q-f9ze
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2714
Comment Submitted by Nora Searle

---

## Submitter Information

**Name:** Nora Searle

---

## General Comment

I am deeply disturbed and concerned by this proposed rule. I work in the immigration field and I know the
enormous impact that employment authorization has on the lives of asylum seekers.

Delays in asylum seekers getting their work authorization (Employment Authorization Document or "EAD")
approval can lead to:

Lost income to the asylum seeker and their family
Food insecurity
Inability to secure a valid ID. A work permit and a social security number (SSN) are often necessary
requirements to applications for a state ID.
Risk of homelessness/housing insecurity
Inability to access health insurance (most state ACA health exchanges require a SSN and work authorization
materials to qualify)
Vulnerability to exploitation, trafficking, and underground economy risks
Lack of access to community service agencies, shelters, and social service programs (many of whom require
some form of valid ID, proof of residency, or proof of income)
Loss of ability to support themselves and their families
Feelings of fear, desperation, and overall mental health concerns

AR005481

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6r-c79l
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2715
Comment Submitted by Cynthia Mazariegos

---

## Submitter Information

**Name:** Cynthia Mazariegos
**Address:**
  2527 North menard Ave
  Chicago, IL, 60639

---

## General Comment

Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community. A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge. Lost Tax Revenue for the Government. USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

AR005482

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6r-nv3w
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2716
Comment Submitted by Rebecca Sosa

---

## Submitter Information

**Name:** Rebecca Sosa

---

## General Comment

Please consider keeping the 30-day deadline for USCIS to adjudicate work authorizations. Allowing asylum seekers to obtain work authorization quickly benefits all Americans from the American worker to the individual asylum seeker, and reduces risk of exploitation to the most vulnerable among us.

Harm Caused to Asylum Seekers. Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community. A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge.

Lost Tax Revenue for the Government. USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

thank you

AR005483

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6s-edqh
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2717
Comment Submitted by Andrea Duron

---

## Submitter Information

**Name:** ANDREA DURON

---

## General Comment

Lost Tax Revenue for the Government. USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

AR005484

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 07, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6s-84z2
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2718
Comment Submitted by Gen Kimura

---

## Submitter Information

**Name:** Gen Kimura
**Address:**
  12910 Memorial Dr
  Houston,  77079-7303
**Email:** gkimura@outlook.com
**Phone:** 8322476932

---

## General Comment

In the notice, USCIS makes frequent reference to a rise in national security threats as a reason to spend more time and resources on each decision. However, USCIS has reported that it has been able to decide over 99% of EADs within the 30-day timeframe for over the past year. Therefore, USCIS has proven its ability to adequately vet the amount of requests in a timely fashion. Moreover, its argument regarding increased threats serves only to prompt the need for a speedier process to properly protect national security, rather than its request to delay the process further. This need for a speedier process is further compounded by the fact that the EAD applicants are asylum-seekers already residing in the United States. If vetting must be done to prevent security risks, then having unvetted people in the U.S. subjected to a potentially indefinite review period seems contrary to the departments stated interests.

AR005485

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6t-jgv8
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2719
Comment Submitted by Richard Wheeler

---

## Submitter Information

**Name:** Richard Wheeler

---

## General Comment

As a citizen of the United States it is of the most importance that we protect &amp; secure our borders and to vet
all who wish to enter our country.

AR005486

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6t-a825
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2720
Comment Submitted by Dale Mahaffey

---

## Submitter Information

**Name:** Dale Mahaffey

---

## General Comment

Washington needs to support President Trumps immigration reforms.

AR005487

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6t-9jvz
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2721
Comment Submitted by Evelyn Snow

---

## Submitter Information

**Name:** evelyn snow

---

## General Comment

Please tell Washington to support president Trump's immagration reforms! Evelyn

AR005488

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d6u-i7br
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2722
Comment Submitted by Danny Maness

---

## Submitter Information

**Name:** Danny Maness

---

## General Comment

Please support Trump with immigration reform. God has told us to protect our lands. Praise God and support our president

AR005489

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d71-u4r2
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-2723
Comment Submitted by Tracie Klinke

---

## Submitter Information

**Name:** Tracie Klinke

---

## General Comment

Lost Tax Revenue for the Government. USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

Increased Delay Contrary to National Security Interests. In the notice, USCIS makes frequent reference to a rise in national security threats as a reason to spend more time and resources on each decision. However, USCIS has reported that it has been able to decide over 99% of EADs within the 30-day timeframe for over the past year. Therefore, USCIS has proven its ability to adequately vet the amount of requests in a timely fashion. Moreover, its argument regarding increased threats serves only to prompt the need for a speedier process to properly protect national security, rather than its request to delay the process further. This need for a speedier process is further compounded by the fact that the EAD applicants are asylum-seekers already residing in the United States. If vetting must be done to prevent security risks, then having unvetted people in the U.S. subjected to a potentially indefinite review period seems contrary to the departments stated interests.

AR005490

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d73-592m
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2724
Comment Submitted by Juan Mendez

---

## Submitter Information

**Name:** Juan Mendez

---

## General Comment

DHS Docket No. USCIS-2018-0001 ("The Rule") will have significant and long-lasting negative effects on the ability of PAIRs asylum clients to support themselves and their loved ones while they are waiting for their claims to be heard. By definition, an asylum seeker is an individual who has suffered grave harm, including torture and sexual violence on account of a statutory protected ground, and who flees his or her home country with very few possessions and little support or financial resources. Asylum seekers turn to the U.S. for a safe haven and protection. This rule to eliminate the 30-day processing time for work authorization will undermine asylum seekers abilities to sustain themselves. The Rule will allow DHS to decide if and when asylum seekers will be issued work authorization, during which time asylum seekers would have no means of supporting themselves and be forced to wait and survive on the charity of others. The Rule will only compound the devastating delays that many asylum seekers face. DHS, which suffers backlogs in almost every benefit category, will have no incentive to issue a prompt decision. Further, the Rule is not in the economic interest of the United States which benefits greatly from the contributions of refugees and asylum seekers. It compounds the impact of the already lengthy 180-day waiting period before asylum seekers are eligible for work authorization and is unnecessary given that DHS has shown itself capable of near complete compliance with the 30-day adjudication requirement. DHSs argument that the proposed rule is due in part to fraud concerns is contradictory since DHS should want to expedite EAD determinations and quickly vet applications, as it currently does, to detect and investigate any concerns about applications rather than create extensive delays. Preventing asylum seekers from securing lawful employment is not in the United States economic interest Ensuring that asylum seekers can secure lawful employment as soon as possible is in the economic interest of the United States.

According to the Department of Health and Human Services, refugees and their family members contributed more than $343 billion in revenue to federal, state and local coffers. On balance, refugees contributed $63 billion more than they received in benefits from various programs. The U.S. economy benefits greatly from this population that works so hard when given a chance and permission to work. According to the Brookings Institute, refugees and asylum seekers engage in entrepreneurship at much higher rates than U.S. born individuals. In the U.S., for example, while immigrants are 15 percent of the population, they represent 25

AR005491

percent of entrepreneurs. Small businesses and the jobs they create are the engines of growth, innovation, and economic stability of the United States. Given the fact that asylum seekers are fleeing persecution in their home countries, the vast majority do not have sufficient resources to support themselves and their families for the duration of their immigration proceedings. The rule to eliminate the 30-day adjudication requirement would impose additional hardship on asylum seekers because they would face uncertainty and inconsistency in DHS processing. It would prevent asylum seekers from being able to support themselves and their loved ones through lawful employment. Eliminating the 30-day adjudication requirement would result in extensive waiting periods for asylum seekers to be issued employment authorization Asylum seekers already bear the burden of government back-logs and adjudication delays. Even with a return to the Asylum Offices processing of First in, First out, asylum applicants face great difficulties in getting their cases heard. When a decision on an asylum seekers case is delayed, it negatively impacts their ability to provide for themselves, support family, and build a life here in the United States. Many asylum seekers wait months, if not years, for their cases to be adjudicated. Asylum seekers are already required to wait a lengthy period of 180-days before they are eligible for work authorization. During this time, they rely on others for support to survive. Removing the 30-day processing time requirement would cause significant harm to already vulnerable individuals. Without a time limit for processing initial applications, DHS would have no incentive to adjudicate these cases in a timely manner and asylum seekers who are eligible to work would be unable to do so for an unknowable period of time. Asylum seekers already face significant barriers while waiting for the employment documents to be renewed. Eliminating the 30-day processing requirement would place initial EAD eligible asylum seekers in the same uncertain waiting period as renewal applicants, but it would be far worse for those applying for work authorization for the first time as they would not have the ability to sustain themselves.

AR005492

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d74-i530
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2725
Comment Submitted by Diana McFarland

---

## Submitter Information

**Name:** Diana McFarland

---

## General Comment

USCIS admits that all levels of government will lose tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security.

AR005493

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d75-f8ff
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2726
Comment Submitted by Nayeli Luna

---

## Submitter Information

**Name:** Nayeli Luna

---

## General Comment

I write to you to express my comments on the new proposed rule to eliminate the 30-day processing times for initial employment authorization documents for asylum seekers. This rule does not appear to be in the spirit of humanitarian assistance to those fleeing persecution.

Because asylum seekers are not employment eligible until their application has been pending for 180 days, many meritless cases are adjudicated before this time and generally cases that have been pending for 180 days have merit. The proposed rule change appears to be part of this administrations efforts to make the US a hostile destination for families fleeing persecution.

Many individuals seeking asylum are families and the lack of income that this rule intents to inflict means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, allowing individuals to apply for employment authorization allows them to obtain drivers licenses, insurance and other necessary documents. This in turn protects US citizens by insuring that all drivers are properly vetted and insured.

This proposed regulation is not in the best interest of American citizens or immigrants and it appears to further the anti-immigrant sentiment that has sadly become a characteristic of this administration.

AR005494

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d76-htif
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2727
Comment Submitted by Lee Halverson

---

## Submitter Information

**Name:** Lee HALVERSON

---

## General Comment

Support our President on Immigration reform

AR005495

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d77-gghq
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2728
Comment Submitted by Laura Sanchez

---

## Submitter Information

**Name:** Laura Sanchez

---

## General Comment

My name is Laura Sanchez and I am an immigration attorney at a non-profit in San Francisco, CA. I am submitting my comment against this proposed rule change.

This proposed rule change is part and parcel of this administrations effort to make the U.S. a hostile destination for individuals fleeing persecution in their countries of origin. This is evidenced by this rule change as well as the third-country transit bar, the proposed wide-sweeping public charge rule, and the institution of the so-called Migrant Protection Protocols. By removing the ability of asylum seekers to gain meaningful employment within a short and predictable timeframe, the Trump Administration effectively turns asylum seekers into the very public charges it seeks to exclude. Additionally, this policy change would make the work authorization process more unpredictable and inefficient by removing the ability to hold USCIS accountable to any deadline.

AR005496

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d78-p5ne
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2729
Comment Submitted by Rebecca P.

---

## Submitter Information

**Name:** Rebecca P.

---

## General Comment

I oppose this proposed rule. This proposed rule will harm asylum seekers and their families, and USCIS even estimates it will lead to $100s of millions of lost tax revenue.

AR005497

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d78-m5jv
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2730
Comment Submitted by Curtis Erdmann, CJ Lake, LLC on behalf of Alameda County Board of Supervisors

---

## Submitter Information

**Name:** Curtis Erdmann
**Submitter's Representative:** Curtis Erdmann
**Organization:** CJ Lake, LLC
**Government Agency Type:** Local
**Government Agency:** Alameda County Board of Supervisors

---

## General Comment

See attached file(s)

---

## Attachments

The Alameda County Board of Supervisors in California

AR005498



# BOARD OF SUPERVISORS

November 8, 2019

Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue
Washington, DC 20529

**RE:** **OPPOSE Proposed Rule: Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications RIN 1615-AC19 DHS Docket No. USCIS-2018-0001**

Dear Sir/Madam:

The Alameda County Board of Supervisors in California appreciates the opportunity to comment on the above-referenced proposed rule published in the Federal Register on September 9, 2019. The County strongly objects to this Notice of Proposed Rule Making (NPRM) that would eliminate any timely processing requirement of an Employment Authorization Document (EAD application) submitted by applicants for asylum. The County believes the U.S. Citizenship and Immigration Services (USCIS) neglected to complete a thorough analysis of the impact of the proposed action, and requests that USCIS withdraw the NPRM.

Alameda County is home to 1.67 million residents and is the seventh most populous county in California. Alameda is the most diverse county in the Bay Area and the fourth most diverse in the United States, and is home to over half a million immigrants who live, work, attend school, vote and engage in everyday activities in our communities. Nearly 1 in 3 Alameda County residents (32%) is an immigrant. In 2016, Alameda County was designated as a "Welcoming County" for immigrants and refugees. We recognize and strongly believe that communities are the most equitable when all residents are fully able to participate in the region's economic vitality, contribute to the region's readiness for the future, and connect to the region's assets and resources. The Alameda County Social Services Agency (ACSSA) and the Alameda County Health Care Services Agency (ACHCSA) administer eligibility for services designed to enhance the wellbeing of refugees and asylees, and work in partnership with community-based organizations throughout the county to ensure their successful integration in our communities. In California, a county that has had 400 or more refugee or asylee arrivals in the last five-year period is designated by the California Department of Social Services (CDSS) as a "Refugee Impacted County." Services available to refugees and asylees in Refugee Impacted Counties include economic assistance, culturally appropriate employment service and social adjustment services, vocational English as a

AR005499

Second Language (ESL) programs, translation and interpreter services, and referrals to community resources as needed. The Refugee Health Assessment Program provides screening for communicable diseases and mental health needs, assessment of immunization status, and referrals to health providers for necessary treatment. Children and youth in two county school districts are eligible for the Refugee School Impact Program and the California Newcomer Education & Well-Being Project, which provide tutoring, mentoring, counseling, enrichment activities, and activities for parents. Additionally, refugees and asylees may be eligible for CalFresh, California's Supplemental Nutrition Assistance Program (SNAP), and Medi-Cal (Medicaid).

ACSSA serves approximately 200 individuals annually through refugee services, about two thirds of whom are asylees. Asylees in the last year came from 26 countries, with the most frequent countries of origin being Eritrea and Afghanistan. The vast majority enter the programs with little to no income – an economic reality that is in alignment with their inability to work prior to receiving authorization. Those that do have income are far below the federal poverty level.

The programs available to refugees and asylees through ACSSA services are funded through Refugee Social Services (RSS) Funds through the State Refugee Programs Bureau from the Office of Refugee Resettlement (ORR). At the Federal level, ORR, of the Administration of Children and Families/Health and Human Services, administers the RSS programs. CDSS's Refugee Program Bureau (RPB) is the state agency responsible for the administration of Refugee Programs. In Alameda County, ACSSA is responsible for the administration of the RSS programs. Federal and state objectives for RSS Program funds include orienting toward family self-sufficiency and focusing on the achievement of employment within a year of receiving services.

The programs and services designated for refugees and asylees are only available to asylees once they are granted asylum. Very few services, beyond state and local nutrition and medical support programs, are available for individuals and families with pending asylum applications. Applicants for asylum may apply for an Employment Authorization Document (EAD application) using Form I-765, 150 days after the date on which the asylum application was filed. Once received, USCIS has a 30-day processing requirement for the EAD – meaning an applicant may begin working 180 days (6 months) after they file their application for asylum. The 180-day waiting period is a relatively new formulation in immigration law. Before 1994, applicants could file for asylum and work authorization concurrently, and asylum officers could authorize employment for up to one year even if asylum was not granted at the interview. Two years later, Congress codified the 180-day waiting period for employment authorization for asylum applicants in the Immigration and Nationality Act (INA). The proposed removal of any timeframe for EAD processing runs afoul of Congressional intent. If Congress intended the waiting period to be longer than 180 days, or to be fully at the discretion of the Secretary, this would have been included in the law. However, the INA specifically notes a 180-day waiting period, and delegates authority for the establishment of procedures within this construct to the Attorney General.

The NPRM repeatedly refers to the extensive backlog of applications for those pending asylum adjudication or processing of EADs. Similarly, the imposition of a 180-day waiting period in the mid-1990s came as a result of a marked increase in asylum and EAD applications. At the time, the length of time was considered sufficient to deter those with unmeritorious claims of asylum from seeking an EAD. A six-month waiting period puts considerable strain on individuals and families

who cannot achieve self-sufficiency due to their inability to receive legal authorization to work. In fact, a six-month gap in employment is recognized as contributing to *microeconomic scarring*, or the damage a period of unemployment inflicts on an individual's or household's future economic health even after the spell of joblessness ends.[i] The Bureau of Labor Statistics (BLS) notes that long term unemployment – defined as a gap just over six months – leads to a depletion of savings, increases in debt, and adverse effects in the physical and mental health of the unemployed, and negative effects on children's educational outcomes.[ii] Additionally, the Pew Research Center notes that long term unemployment negatively impacts relationships, self-respect, career goals, and leads to workers accepting jobs with substandard pay or benefits.[iii] That said, applicants for asylum are those fleeing persecution and violence so severe that they can no longer live in their home country – the burden of waiting longer than six months to gain the right to legally work in the United States will compound the difficulties many face as they escape traumatic circumstances and attempt to integrate into their new home communities.

As noted in the NPRM, this backlog and an accompanying failure on the part of USCIS to adjudicate EADs within the 30-day regulatory timeframe led to <u>Rosario v. USCIS, Case No. C15-0813JLR (W.D. Wash. 7/26/2018)</u>. In 2017, the court ordered USCIS to follow the law and timely adjudicate initial EAD asylum applications. In addition to reaching beyond Congressional intent, this proposal to remove any time standard at all to the processing of EADs can be interpreted as an attempt to circumvent a court order through administrative action. The system that is in place for adjudicating asylum cases and EADs has been in place since the last significant surge of applications occurred in the mid-1990s. The reforms at that time took place when a backlog of nearly 500,000 cases needed to be addressed. While we appreciate the many pressures faced by USCIS as an administrative agency during a period of heightened utilization of services, the evidence presented in the NPRM is insufficient to support the claim that removing a timeframe for EAD adjudication would serve any other purpose than to leave asylum applicants with no reasonable avenue to legal employment. To claim that operational realities necessitate a shift away from the expectation of timeliness, given a time period that has seen significant technological advances at best. The NPRM repeatedly considers only the last five years to illustrate an increase in applications – a fuller analysis of the last twenty would provide a more realistic illustration of immigration trends. After the peak of immigration flows in the mid-1990s, the number of asylum applications did not reach even half the volume of 1995 until more than 20 years later.[iv] The USCIS decision to use 2017 data for future planning, and to defend the removal of a timeline for processing EADs, does not have merit given historical trends.

As noted in the NPRM, in 2017, at the time of the lawsuit, USCIS failed to meet the timeliness standard 53 percent of the time. In the discussion of a potential 90-day processing timeline in the NPRM, it is noted that 14 percent of late cases took longer than 90 days – meaning that even in its most challenged performance in a year whose outcome led to a court order, only 7 percent of all cases took longer than 90 days to adjudicate. USICS considers the 90-day option, when it could process 93 percent of all EADs even in the most challenged of circumstances, but rejects it due to the lack of "certainty and flexibility [needed] to fulfill its core mission." The mission of USCIS includes "efficiently and fairly adjudicating requests for immigration benefits," a clause which is threatened by this proposal. USCIS simply states it "does not want" to continue to follow the <u>Rosario v. USCIS</u> ruling, and that a reduction in application volume to what could be seen as having considerably less pressures on processing operations would not "serve as a sufficient basis

AR005501

to leave the 30-day adjudication timeframe in place", which would indicate this is a rule intended only to serve a policy goal to restrict opportunities for applicants of asylum, rather than being a reflection of operational need in a time of high volume.

The LIFO (last in, first out) model for processing affirmative asylum applications does not have a counterpart in the adjudication of EADs. The 180-day timeframe for processing recognizes that while applicants are awaiting the outcome of their claims to asylum, they cannot wait indefinitely while restricted from the ability to legally work. Our concern is that though USICS claims the 2017 processing outcomes may be similar to those in the future, absent any requirement of timeliness, it is possible that all or nearly all applicants will wait considerably longer than six months to receive the authority to work. With no promise of a timeframe, some applicants may never receive the authority to work.

In the NPRM, USCIS repeatedly relies on inadequate analysis to support its claims and minimize the impact of this proposal. The Costs and Benefits analysis is faulty on two premises: 1) that removing a requirement of any timeframe for expected adjudication of EADs would result in processing timelines similar to those seen in 2017; and, 2) that the lost compensation to the number of improperly estimated asylee applicants would be the only quantifiable impact worth consideration. The quantitative analysis throughout the NPRM repeatedly uses the number of late EAD adjudications in 2017 to estimate the impact of the proposal. It is misleading to assume that, absent a regulatory timeframe of any kind, USCIS would adjudicate 47 percent of EADs within 30 days, as it did in 2017. The range of economic impact, if measured only by lost compensation to asylum applicants, should be bounded by the total number of applicants per year, as it is possible that most or all EAD applications could take longer than six months to adjudicate. The ten-year discount of the incomplete analysis indicates this proposal could cost asylee applicants, and their communities, is estimated at $5.4 billion over the next decade. If the analysis were to factor in a higher proportion of applicants, as is highly feasible with no timeframe for adjudication, additional billions of dollars would be removed from immigrant households and their broader communities over the next ten years.

To the second faulty premise, USCIS notes that the distributional impacts would fall on the asylum applicants who would be delayed in entering the U.S. labor force, and uses only the lost compensation to applicants as a measure of the overall economic impact of the rule – even noting the upper bound of its analysis as the "maximum monetized impact of this rule." Table 1 provides a Summary of Proposed Provisions and Impacts, which includes the following "Qualitative" impact: "There may be additional distributional impacts for those in an applicant's support network – if applicants are unable to work legally, they may need to rely on resources from family members, friends, non-profits, or government entities for support." We disagree with the premise that these impacts are purely "qualitative" and cannot be determined and factored into the quantitative analysis to better reflect the impact of this proposed rule.

As discussed above, Alameda County provides an array of supportive services to refugees and asylees, which are only available to asylum seekers once their applications have been approved. Until approved, we cannot serve asylum applicants with these programs, which are centered on the effort to assist vulnerable immigrants with achieving self-sufficiency. Asylee applicants must rely only on their families and networks for economic support while they cannot work, and have

only limited services available to them in the interim. The longer an applicant remains unable to work, the more assistance they will likely need once they are granted asylum. The *microeconomic scarring* referenced above is a phenomenon not limited to U.S. citizens. If we were to use the prevailing wage analysis in the NPRM, which is limited due to multiple jurisdictions' higher minimum wage, it would be more appropriate to assume that the cost of the proposal would be at least twice that estimated in the proposal. Not only would asylum applicants have the opportunity cost of lost potential wages, but their family members or others in their support network would have to use their existing economic resources to support the applicant(s) and their family members. The NPRM does note that these increased costs may be a factor: "DHS assumes the longer an asylum applicant's EAD is delayed, the longer the applicant's support network is providing assistance to the applicant," but then claims "DHS cannot determine how much money or other assistance is provided to such applicants." Given the significant potential impact of this proposal, the claim that DHS "cannot" determine or even attempt to estimate costs in this arena indicates a lack of willingness rather than a lack of capacity. If we assume that the cost of providing for an individual is roughly equivalent to the prevailing wage (which is an assumption that is significantly lower than the calculations offered by various self-sufficiency calculators), then the actual cost of the proposed rule only to applicants and their support networks would be at least twice that calculated, or more than $10.8 billion over the next decade.

The other cost component that USCIS fails to consider is the cost to local governments as a result of the proposal. Both Table 1 and Table 3, OMB A-4 Accounting Statement, Category: Effects on state, local, and/or tribal governments, find either only qualitative or "no" impact from the proposal. The only quantitative impact discussed is the potential loss of tax revenue due to the lost opportunity for employment by asylum applicants. Alameda County currently works with community partners to provide the services discussed above to refugees and asylees. While these services are critical, the funding available is already insufficient to provide for the many needs of vulnerable immigrant communities. If asylum applicants and their support networks are at an increased economic disadvantage when they are eligible to access services, it is very likely that they will need more intensive services for a more extended amount of time. Once they are eligible, they may need non-asylee specific programs, such as CalFresh/SNAP and Medi-Cal/Medicaid for longer periods of time than they would have had they not experienced the economic scarring that comes from extended unemployment. It is possible to estimate this impact by calculating the length of time households receive support from these programs following a period of extended lack of income, and even to narrow the query to only immigrant or only asylee recipients. USCIS chose to not even attempt analysis of these impacts.

In one discussion of impact as it relates to application volume, the NPRM notes that "USCIS anticipates updating its data in the analysis of the accompany rule." It is not sufficient to provide only a limited analysis in an NRPM, and not offer an estimate of an impact even USCIS desires to reflect only in the Final Rule, when there is no longer an ability for the public to comment. There are multiple other instances in the NPRM where USCIS notes they "have not estimated [these] costs" or "is not certain of the actual cost." It is the responsibility of an agency proposing a new regulation – particularly one that expands beyond Congressional intent and circumvents a court order – to present a clear and accurate picture of the impact of the proposal. This NRPM fails to do so in the areas mentioned above, with a reasonable expectation of an impact reaching much farther than discussed in the proposal. Because these impacts would directly affect Alameda

AR005503

County residents, communities, economy, service providers, and the provision of services administered by the County, we respectfully request that the NPRM be withdrawn, and that USCIS continue to meet the court-ordered requirements of <u>Rosario v. USCIS</u> and the timeframe presented by Congress in the INA.

---

[i] Bivens, Josh. "Long-Term Unemployment Has Not Damaged the Productivity of Workers." Economic Policy Institute, September 29, 2014. https://www.epi.org/publication/long-term-unemployment-scarring/

[ii] Monthly Labor Review, Bureau of Labor Statistics, July 2016. "An Analysis of Long-Term Unemployment." https://www.bls.gov/opub/mlr/2016/article/an-analysis-of-long-term-unemployment.htm

[iii] Taylor, Paul, Rich Morin, Rakesh Kochhar, Kim Parker et al. "The Impact of Long-Term Unemployment." Pew Research Center, July 22, 2010. https://www.pewresearch.org/wp-content/uploads/sites/3/2010/11/760-recession.pdf

[iv] Meissner, Doris, Faye Hipsman, and T. Alexander Aleinikoff, "The U.S. Asylum System in Crisis: Charting a Way Forward." Migration Policy Institute, September 2018. https://www.migrationpolicy.org/research/us-asylum-system-crisis-charting-way-forward

Sincerely,

Keith Carson
Vice-President, Board of Supervisors, District 5
Chair, Personnel, Administration, and
Legislation (PAL) Committee

cc:     Members, Alameda County Congressional Delegation
        Members, Alameda County Board of Supervisors
        Colleen Chawla, Director, Alameda County Health Care Services Agency
        Lori Cox, Director, Alameda County Social Services Agency
        CJ Lake

AR005504

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d79-61s4
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2731
Comment Submitted by David Annicchiarico

---

## Submitter Information

**Name:** David Annicchiarico

---

## General Comment

I strongly oppose this. This proposed rule will harm asylum seekers and their families, and USCIS even estimates it will lead to $100s of millions of lost tax revenue. Bad for America.

AR005505

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d79-z0bw
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2732
Comment Submitted by Julia Dietz

---

## Submitter Information

**Name:** Julia Dietz

---

## General Comment

I am an immigration attorney who has been working with asylum seekers and other immigrants for approximately 8 years. I write to strongly oppose the proposed rule. As the situation stands, the 30-day adjudication timeline provides some measure of security and predictability to asylum seekers who are already some of the most vulnerable members of our communities. There is absolutely no benefit to further delaying receipt of employment authorization documents (EADs) by asylum seekers. Any spurious concerns that people are simply filing I-589s to get work permits has already been addressed by the 150-day wait period to apply. Introducing further delays and increased unpredictability into the process of obtaining a work permit only increases the time asylum-seeking families must rely on charity or other outside support (or worse, are barely able to get by, facing food insecurity, homelessness, etc.). Lack of work permits prevents them from gaining employment, supporting themselves, and spending into their local economies and the national tax base (note: USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year). Lack of a work permit also often means inability to gain a state ID or license, which can cause access issues for health care, community services, homeless shelters, and other necessary social supports.

My clients have fled horrific situations in their homelands. For many, the decision to flee was one of life or death. Following the trauma they have endured, being able to work legally is even more important: it allows them to build some stability, feel productive and provide for their families and themselves.

Furthermore, obtaining an EAD and a job is usually the only way asylum-seeking immigrants can afford to hire a lawyer for their asylum case. It is already unconscionable that non English-speaking asylum seekers - who have often gone through very minimal schooling if any - are forced to fend for themselves against a trained government lawyer just to seek protection. But to create further barriers to obtaining representation threatens the minimal due process afforded to immigrants in our immigration courts.

Lastly, I think it's important as a nation that we turn away from the disgusting, hateful anti-immigrant agenda

AR005506

advanced by the Trump Administration. This proposed rule is plainly part of the administration's inhumane plan to deter asylum seekers from seeking protection in the United States. This is evidenced by this proposed rule change as well as, e.g., the third-country transit bar, the proposed public charge rule, the cruel and unjust Migrant Persecution Protocols ("MPP"), family separation policies, and many other efforts this administration has made to deter the lawful human right to seek asylum. Ironically, by removing the ability of asylum seekers to gain meaningful employment within a short and predictable timeframe, the Trump Administration effectively turns asylum seekers into the very public charges it seeks to exclude.

As an alternative to this proposed rule, and if the issue is that USCIS claims to need more than 30 days to adjudicate applications and vet applicants, then USCIS should simply allow applications to be submitted further in advance of the 180-day mark, such as at 120 days, which would allow 60 days for adjudication and vetting.

AR005507

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d79-mzs4
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2733
Comment Submitted by Dillon Colucci

## Submitter Information

**Name:** Dillon Colucci
**Address:**
    1840 Century Park East
    19th Floor
    Los Angeles,  CA,  90067
**Email:** coluccid@gtlaw.com
**Phone:** 3105867749

## General Comment

The government and the economy will lose valuable tax revenue as a result of the proposed rule change. USCIS projects a loss of $39.15 million to $118.54 million per year because delayed work authorization will prevent asylum seekers and their employers from contributing to Medicare and social security. That is unjustifiable from a regulatory perspective.

As the law is currently written, asylum seekers must wait 180 days before they may be granted authorization to work. They are permitted to submit their application after 150 days, giving USCIS the 30-day timeframe in question to process the requests. If USCISs goal is to have more time to process each request in order to increase flexibility and free up resources to work on other applications, then it could easily shorten the waiting time before asylum-seekers are allowed to submit their application. If USCIS feels that a 60-day timeframe would be more beneficial, then it may allow applications to be submitted after 120 days, rather than 150. Allowing asylum-seekers to submit their applications earlier could allow the department to have up to 180 days to process and properly vet each individual while reducing the risk of harm to each applicant.

This proposed rule change is part and parcel of this administrations effort to make the U.S. a hostile destination for individuals fleeing persecution in their countries of origin. This is evidenced by this rule change as well as the third-country transit bar, the proposed wide-sweeping public charge rule, and the institution of the so-called Migrant Protection Protocols. By removing the ability of asylum seekers to gain meaningful employment within a short and predictable timeframe, the Trump Administration effectively turns asylum seekers into the very public charges it seeks to exclude. Additionally, this policy change would make the work authorization process

AR005508

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2733.html[9/15/2020 4:16:11 PM]

more unpredictable and inefficient by removing the ability to hold USCIS accountable to any deadline.

AR005509

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d79-odai
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2734
Comment Submitted by Vilda Mayuga, New York Department of State

## Submitter Information

**Name:** Vilda Mayuga

## General Comment

The New York Department of State (DOS) opposes the proposed rule change as outlined in the Department of Homeland Security (DHS) Notice of Proposed Rulemaking (NPRM), Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications.

DOS oversees the Office for New Americans (ONA), the nations first statutorily-created state-level immigrant services office dedicated to helping immigrants successfully integrate into New Yorks communities and fully participate in New York States civic and economic life. ONA offers a variety of programs and tools to welcome immigrants and facilitate their success. Since its inception, ONA has fostered the economic, social, and cultural integration of immigrants through access to English-for-Speakers-of-Other-Languages (ESOL) training, preparation for the naturalization process, connections to business resources, and development and leveraging of employment enhancing opportunities and professional skills. ONAs programs have allowed over 350,000 immigrants, including asylees/refugees, to participate in and contribute to the economic and social well-being of New York State.

DHSs proposed changes would increase the amount of time that asylum applicants must wait in order to receive an Employment Authorization Document (EAD). Asylum applicants must already wait a significant period of time to receive an EAD because their application must have been pending for at least 150 days before they are eligible to apply for an EAD. By removing the 30-day processing time period for an EAD, asylum applicants will wait even longer periods of time before receiving work authorization. Given the vulnerable position this puts them in, asylum applicants who are desperate to earn an income may be more likely to become or remain homeless for a longer period of time and to be victimized by perpetrators of labor trafficking while waiting for their EAD.

The proposed rule change will cause irreparable harm to ONA and the people of the State of New York by significantly limiting the ability of asylum seekers to earn an income, which would have severe consequences in their day-to-day lives and their abilities to perform tasks such as paying their rent, heating, and electricity;

AR005510

purchasing healthy food for their children, including children who are U.S. citizens; and forgoing the use of necessary health and well-being life items. In addition, the rule change would impact ONAs ability to fulfill its obligations under State law and would require ONA and its partners to expend costs and take on other burdens it cannot recoup.

As explained in detail below, we are concerned that the NPRM:

Negatively impacts immigrants and their families in NYS by increasing the amount of time that asylum applicants must wait in order to receive an EAD, thus making it difficult for asylum applicants to earn an income while awaiting a decision on their application, and making them vulnerable for homelessness, labor trafficking, and other health impacts.

Creates an administrative burden and interferes with ONAs ability to carry out its statutory obligation to provide new Americans with services to help them contribute to their community.

Affects the ability of ONAs partners to provide assistance as outlined under their current state contracts, particularly in those service areas where they have demonstrated expertise, such as workforce development, ESOL training, etc.

Compounds the chilling effect the change to the public charge rule published on August 14, 2019, has had on our community. Even during its current legal challenge, asylum seekers, while not affected by the changes to the public charge rule, because of a lack of income, may need to seek public benefits but may instead choose to forgo any type of assistance due to fear and misunderstanding about their eligibility for public benefits.
For these reasons, we urge you to withdraw the proposed rule.

---

# Attachments

DOS-ONA comments on NPRM I-765 Asylum Applicants

AR005511

STATE OF NEW YORK
**DEPARTMENT OF STATE**
123 WILLIAM STREET
NEW YORK, NY 10038-3804
WWW.DOS.NY.GOV

ANDREW M. CUOMO
GOVERNOR

ROSSANA ROSADO
SECRETARY OF STATE

November 8, 2019

Samantha Deshommes
Chief, Regulatory Coordination Division, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW
Mailstop #2140
Washington, DC 20529-2140

Re: DHS Docket No. USCIS-2018-0001

Dear Ms. Deshommes:

The New York State Department of State (DOS) submits the following comments in response to the notice in the Federal Register (84 FR 47148) soliciting comments on the proposed rule regarding "Removal of 30-day Processing Provision for Asylum Application-Related Form I-765 Employment Authorization Applications." DOS oversees many programs impacting the state's residents, including the Office for New Americans that is statutorily charged with ensuring our state's immigrants access to services and integrating them into our society in the most effective way.

Thank you for the opportunity to comment.

Sincerely,

Rossana Rosado
Secretary of State

1

AR005512

**Comments from the New York State Office for New Americans in Response to the U.S.
Department of Homeland Security Notice of Proposed Rulemaking**

The New York Department of State (DOS) opposes the proposed rule change as outlined
in the Department of Homeland Security (DHS) Notice of Proposed Rulemaking (NPRM),
Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment
Authorization Applications.[1]

DOS oversees the Office for New Americans (ONA), the nation's first statutorily-created
state-level immigrant services office dedicated to helping immigrants successfully integrate into
New York's communities and fully participate in New York State's civic and economic life. ONA
offers a variety of programs and tools to welcome immigrants and facilitate their success. Since
its inception, ONA has fostered the economic, social, and cultural integration of immigrants
through access to English-for-Speakers-of-Other-Languages (ESOL) training, preparation for the
naturalization process, connections to business resources, and development and leveraging of
employment enhancing opportunities and professional skills. ONA's programs have allowed over
350,000 immigrants, including asylees/refugees, to participate in and contribute to the economic
and social well-being of New York State.

DHS's proposed changes would increase the amount of time that asylum applicants must
wait in order to receive an Employment Authorization Document (EAD). Asylum applicants must
already wait a significant period of time to receive an EAD because their application must have
been pending for at least 150 days before they are eligible to apply for an EAD.[2] By removing the
30-day processing time period for an EAD, asylum applicants will wait even longer periods of
time before receiving work authorization. Given the vulnerable position this puts them in, asylum
applicants who are desperate to earn an income may be more likely to become or remain homeless
for a longer period of time and to be victimized by perpetrators of labor trafficking while waiting
for their EAD.

The proposed rule change will cause irreparable harm to ONA and the people of the State
of New York by significantly limiting the ability of asylum seekers to earn an income, which
would have severe consequences in their day-to-day lives and their abilities to perform tasks such
as paying their rent, heating, and electricity; purchasing healthy food for their children, including
children who are U.S. citizens; and forgoing the use of necessary health and well-being life items.
In addition, the rule change would impact ONA's ability to fulfill its obligations under State law
and would require ONA and its partners to expend costs and take on other burdens it cannot recoup.

As explained in detail below, we are concerned that the NPRM:

- Negatively impacts immigrants and their families in NYS by increasing the amount of time
  that asylum applicants must wait in order to receive an EAD, thus making it difficult for

---

[1] Docket No. USCIS-2018-0001; RIN 1615-AC19; Removal of 30-Day Processing Provision for Asylum Applicant-
Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (proposed Sep. 9, 2019) ("proposed
rule").
[2] https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Asylum_Clo
ck_Joint_Notice_-_revised_05-10-2017.pdf

AR005513

asylum applicants to earn an income while awaiting a decision on their application, and making them vulnerable for homelessness, labor trafficking, and other health impacts.

- Creates an administrative burden and interferes with ONA's ability to carry out its statutory obligation to provide new Americans with services to help them contribute to their community.

- Affects the ability of ONA's partners to provide assistance as outlined under their current state contracts, particularly in those service areas where they have demonstrated expertise, such as workforce development, ESOL training, etc.

- Compounds the "chilling effect" the change to the public charge rule published on August 14, 2019, has had on our community. Even during its current legal challenge, asylum seekers, while not affected by the changes to the public charge rule, because of a lack of income, may need to seek public benefits but may instead choose to forgo any type of assistance due to fear and misunderstanding about their eligibility for public benefits.

For these reasons, we urge you to withdraw the proposed rule.

## I.  Impact on New Americans and Their Families in New York State

DHS's proposed changes would increase the amount of time asylum applicants wait to receive an EAD. The rule, if implemented, would make it far more difficult for asylum applicants to earn an income while awaiting a decision on their asylum application. The inability to earn an income will have a detrimental impact on immigrant families with an asylum applicant member, who, without a source of income, are likely to face insecurity in a number of areas including employment, housing, and their overall health and well-being.

Having to wait several months in order to get a work permit means that asylum seekers will have to choose between not working for many months or, out of desperation, being forced to seek illicit forms of employment. In these instances, they could become victimized by perpetrators of labor trafficking. Immigrants fall victim to labor trafficking because of language barriers, misunderstanding about their rights, and desperation to help their families and themselves.[3] By indefinitely extending the time it may take to receive an EAD, asylum seekers who correctly seek to support themselves their families and provide for their basic needs may seek out informal employment opportunities such as domestic work or restaurant work, industries in New York State with reportedly high numbers of trafficking victims.[4]

This proposed rule impacts not only the individual asylum seeker but entire families and communities, including U.S. citizen children. Not all asylum seekers have recently entered the country, many cross the border as an undocumented individual and do not seek asylum at the time of entering the United States but instead reside in the country for some time before filing an asylum claim within the permitted time. As a result, they may have U.S. citizen children who they must

---

[3] https://www.aclu.org/other/human-trafficking-modern-enslavement-immigrant-women-united-states
[4] https://humantraffickinghotline.org/state/new-york

AR005514

support. Any rule that creates a barrier to employment and limits a parent's ability to support a child impacts both children in intact households and children where the parents are separated. Because any delay in obtaining employment authorization could impact a parent's ability to support their child, this rule, if implemented could also reduce child support collections.

Without the ability to earn an income, asylum seekers are more likely to become or remain homeless for a longer period of time since they will be unable to pay rent and utilities such as heating and electricity. The consequences of housing instability are especially acute for children. "Housing instability has both immediate and long-term consequences for children. These consequences extend across multiple domains, including physical and mental health, learning and cognition, and academic achievement."[5] One report found that children experiencing housing instability are "more than twice as likely as others to repeat a school grade, be expelled or suspended, or drop out of high school."[6] "Homeless children have three times the rate of emotional and behavioral problems, such as anxiety, depression, sleep problems, withdrawal and aggression."[7] Homeless individuals are at an increased risk of suffering detrimental physical and mental health effects.[8] The more frequent the housing instability, the greater the health risks posed to the child(ren) and caregiver(s).[9]

This proposed rule also compounds the already difficult situation facing asylum seekers, who are some of the most vulnerable immigrants dealing with trauma as a result of the violence or persecution they faced in their home country and the stress of seeking protection in the United States. The current backlog in the processing of all immigration applications, also impacts asylum applications, many of which are complex in nature.[10] Denying work authorization to an asylum seeker within a reasonable time would make the already precarious situation many families and individuals are facing even less tenable.

To demonstrate the difficulties facing asylum applicants and the stresses that families in New York State are already dealing with, which this rule would only further exacerbate, ONA submits the following examples of families referred to our office in the past year for assistance with their asylum claims:

- January 1, 2019: family from El Salvador who lives near Albany, NY. The mother was being detained in the federal immigration detention center in Batavia. The husband and wife had filed an affirmative asylum case, however, the background check revealed the

[5] Kate Marcal and Patrick J. Fowler, Housing and Child Well-Being, Center for Social Development at the George Warren Brown School of Social Work, Washington University in St. Louis (Sept. 2015), https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1805&context=csd_research.
[6] Marci McCoy-Roth, Bonnie B. Mackintosh, and David Murphey, When the Bough Breaks: The Effects of Homelessness on Young Children, Early Childhood: Child Trends (Feb. 2012), http://www.buildinitiative.org/WhatsNew/ViewArticle/tabid/96/ArticleId/120/When-the-Bough-Breaks-The-Effects-of-Homelessness-on-Young-Children.aspx.
[7] Id.
[8] See id.; MM Jones, Does Race Matter in Addressing Homelessness? A Review of the Literature, 8 World Med Health Policy 139 (June 2016), https://onlinelibrary.wiley.com/doi/abs/10.1002/wmh3.189.
[9] Id.; David R Williams, Harold W Neighbors, James S Jackson, Racial/Ethnic Discrimination and Health: Findings from Community Studies, 93 American Journal of Public Health 200 (2003).
[10] https://immigrationforum.org/article/fact-sheet-u-s-asylum-process/

AR005515

wife had a prior order of removal filed in Atlanta from when she entered the country unlawfully at the age of 17. The family has three children - the oldest is a DACA recipient, the younger two are U.S. citizens. They were receiving legal assistance, but the children were having a difficult time coping with their mother in detention and the uncertain asylum status of their father.

- April 21, 2019: family originally from India now living in New York City who applied for political asylum in 2017. The husband was granted his work permit in the process, but the family had not heard anything about their asylum application, and they contacted ONA to look into their case progress because they have three young children (two 4-year-olds and one 5-year-old) and they were worried about their case. The family was referred to an attorney who confirmed the wait time on their asylum application could be 2-3 years.

- July 31, 2019: mother-daughter family from Mexico with 8-year-old daughter raped by father who is in Mexico. The father had threatened to kill them, so the mother fled with her daughter. They sought refuge at a church in Manhattan and were being cared for by the community but were unable to access legal services to file an asylum claim. After learning about this case, one of ONA's partners assisted them with their legal claim.

- October 10, 2019: woman from Honduras living in New York City and was seeking an attorney to help her file an application for political asylum. She came to the U.S. in 2017 with her 10-year-old son. As a single mother business owner, gangs targeted her and her business, extorting money from her. Also, when she was 16 years old, her father was murdered by gangs. She is terrified that she will be deported back to Honduras. ONA referred her to a local legal services provider.

- October 10, 2019: woman from Honduras living near Monticello, NY. During her last court appearance in August, the judge stated that the evidence provided in her asylum petition was not strong enough and offered that she voluntarily depart the country. The judge said she could appeal the decision but did encourage her to take the voluntary departure offer. The woman had an attorney but did not feel that the attorney was fighting for her case. She has four children: two she brought with her from Honduras (who were included in her asylum petition) and two U.S. citizen children. ONA assisted with connecting her with a legal services provider to help with her case.

## II.     Impact on ONA's Ability to Assist New Americans

The proposed rule interferes with ONA's ability to carry out its statutory obligation to provide new Americans with services to help them contribute to their community through the ability to access employment and facilitate their path to citizenship. The rule also causes significant administrative burdens on ONA.

ONA was created in 2013 by New York State Governor Andrew M. Cuomo, who directed DOS to coordinate with neighborhood-based immigration service providers in communities across the State to serve as "Opportunity Centers" for non-citizen residents. The Opportunity Centers offer free assistance and programming to immigrants, including naturalization support and access to vital information through community workshops.

AR005516

In 2014, the New York State Legislature codified ONA as an executive agency, explaining that "[i]t is of utmost importance to the state that . . . new Americans be given the tools to assist them in making a better life for themselves, particularly through programs that help develop and leverage their skills and strengthen their connections with their communities and through programs to reduce exploitation of vulnerable immigrant populations."[11]

To fulfill its mandate, ONA delivers its services through its statewide network of community-based organizations (ONA community partners). While they may each focus on a specific region of the state and/or on individualized issue areas affecting New York's new Americans, through the leadership of ONA, these community partners form a comprehensive and integrated network working towards the goal of helping new Americans participate fully in their community. These community partners include but are not limited to, Opportunity Centers, Immigrant Community Navigators ("Navigators"), Liberty Defense Project attorneys, and Legal Counsels. Through our community partners, ONA provides the following services:

- Remote ESOL instruction through Cell-Ed, which allows participants to improve workplace communication skills to become more effective at their jobs, or to seek better paying employment (2,500 active users in 2018);
- Community workshops on topics including but not limited to, Know Your Rights, information on public charge, health/wellness, workers' rights, and mental health (more than 5,000 individuals served in 2018);
- Naturalization and Deferred Action for Childhood Arrivals application assistance (more than 4,800 individuals served in 2018);
- A toll-free, multi-lingual hotline (New Americans Hotline) operated through a contract with Catholic Charities Community Services Archdiocese of New York since 2012, to refer immigrants to services and provide accurate information regarding issues of concern in the immigrant community (more than 20,000 individuals served in 2018);
- Access to legal services by immigration attorneys across the state to help immigrants navigate the naturalization process (more than 2,100 individuals served in 2018);
- Access to urgent legal assistance for immigrants, including those in detained and non-detained removal proceedings (close to 30,000 individuals served in 2018);
- Linking immigrant families to mental health support groups and other free resources through the Golden Door Program; and
- Access to services for intellectually and/or developmentally disabled immigrants through the new Ramirez June Developmental Disabilities Navigator.

Additionally, ONA has 11 Navigators across the state who are also based out of community-based organizations. These Navigators provide critical programming, information, and outreach to low-income immigrants and refugees. The work of the Navigators ensures that low-income immigrants and refugees have access to accurate and reliable information, public services, employment development programs, and opportunities that new Americans need to maintain and facilitate their well-being.

---

[11] N.Y. Exec. Law § 94-b (1).

AR005517

Through the Navigator program, ONA has served more than 5,000 low-income immigrants and refugees through stakeholder roundtable meetings, community conversations, outreach impact days, trainings, and workforce development workshops. ONA's Navigator program has been recognized by the National Skills Coalition as an effective example of how a state may support immigrants and refugees in workforce development.[12]

Asylum seekers in New York State are increasingly in need of ONA's services. Through its various programs, ONA has seen an increase in the number of asylum applicants seeking services from local partners. According to data from the New York State New Americans Hotline, there was an increase in calls to the New Americans Hotline between 2018 and 2019, with double the calls in the January to May 2019 period as compared to the January to May 2018 period from individuals identifying themselves as asylum applicants.

Given the increasing number of asylum applicants in need of support, the proposed rule would affect the ability of ONA to provide the services and assistance that it is mandated to offer. The proposed rule would make it difficult for asylum seekers to contribute to the well-being of their families and their community. ONA would have to redirect its resources from providing programming focused on civic and community engagement and workforce development, to providing information and outreach to address immigrant fear and confusion. In addition, ONA anticipates that if this rule were to go into effect, ONA will need to dramatically shift its programming to address its grave consequences for new Americans in New York. ONA staff would need to redirect their focus and resources towards providing additional referrals and develop programs that relate to unemployment, public benefits, and other life-saving assistance that asylum applicants and their families may require as a result of the proposed rule change.

For example, ONA includes a constituency team which fields calls and requests for assistance through Governor Cuomo's office and referrals from the New Americans Hotline. As reflected above with the calls received through the New Americans Hotline, in 2019, ONA's constituency team has already seen triple the number of asylum applicants seeking legal services from ONA staff. ONA expects if this proposed rule is implemented, staff would be fielding an increase in requests for employment assistance for at-risk families. As a result, in addition to making numerous referrals related to legal services, ONA staff will need to provide referrals for preventing homelessness, accessing public benefits, and providing emotional support. ONA staff time and resources that were previously utilized to provide comprehensive case management of constituency needs and follow up would need to be allocated towards making these additional referrals, an allocation that would also imply time and financial costs related to training ONA staff on these very services. Thus, implementation of the proposed rule would add significantly to the administrative burden already facing the ONA constituent team.

### III. Impact on ONA's Partners' Ability to Deliver Services

In light of this proposed rule, ONA's community partners, especially those that focus on the provision of legal services (i.e. Legal Counsels and Liberty Defense Project attorneys), will need to dedicate time to conduct evaluations on a case-by-case basis to assist new Americans in

---

[12] https://www.nationalskillscoalition.org/resources/publications/file/At-the-intersection-of-immigration-and-skills-policy_web.pdf.

AR005518

weighing their options for alternative means of support, since employment authorization will not be granted in a timely manner. This time-intensive process will result in time spent outside of other efforts, such as naturalization assistance.

ONA attorneys will also need to: spend time familiarizing themselves with the change to this rule, and devise plans to provide legal screenings and assistance to new Americans directly affected by or fearful of its implications; devote substantial resources assisting families in reviewing alternative options for employment; take time to train in this area of employment options as it is not one in which ONA attorneys are currently trained for but recognize they must as they serve as a front line to these families and are a main source of trust; and screen families and provide accurate advice and referrals, resulting in additional hours and related travel.

In addition to the impact on its legal partners, ONA's Navigators would be negatively impacted by the proposed rule. ONA's Navigators currently provide outreach and organize events on various topics. They have a focus on workforce development but would have to shift this focus to look at unemployment for this population. This would require an undue burden on their time and capacity, as they would need to create new outreach materials and familiarize themselves with an area they do not currently focus on, but which will be critical for those immigrant communities they serve, if asylum seekers will not be granted work authorization promptly.

ONA will soon begin serving new Americans with intellectual and/or developmental disabilities. ONA foresees this new programming will require developing and including targeted training and messaging to assess the implications of those who are asylum seekers but now may not be eligible for work benefits and the associated potential risk of homelessness and the inability to pay for specialized services specific to this population.

ONA community partner organizations have reported that with all the proposed rules changes taking place, including the public charge rule issued in August 2019, the amount of resources and time needed to train their staff, encourage clients to be calm, direct them to partner events and appointments if they need help, and evaluate available resources for people that may lose their homes as a result of unemployment will increase and stress these community-based providers even further.

## IV.  Impacts Compounded By "Chilling Effect" of Public Charge Rule

Without a source of income, asylum seekers are more likely to become reliant on public benefits to meet their basic needs such as food and healthcare. However, the ability of asylum seekers to seek out public benefits is currently being negatively impacted by the federal changes to the public charge rule, which has caused a "chilling effect" since 2018, due to concerns that being on a public benefit will impact your ability to change your immigration status, and as a result, even those who are not impacted by these changes are withdrawing or not applying for public benefits.[13]

In 2018, the U.S. Citizenship and Immigration Services (USCIS) issued proposed changes to the public charge rule, the final version of which was published on August 14, 2019. Since the

---

[13] https://www.migrationpolicy.org/news/chilling-effects-us-public-charge-rule-commentary

AR005519

rule was issued in 2018, ONA has witnessed the impact of the public charge rule, and the "chilling effect" this has had on the immigrant population, including those who are not affected by the rule change. In October and November 2018, the New Americans Hotline saw a significant spike in public charge inquiries from new Americans who were afraid that their receipt of benefits would negatively affect their eligibility to renew their legal permanent resident status or naturalize, would negatively affect visa petitions for family members abroad, or would negatively affect pending applications for adjustment of status.

Although asylum seekers are in a category of immigrants that is not subject to the public charge rule, unawareness of their protected status and incorrect news or information related to changes to the public charge rule, result in immigrants disenrolling or not seeking public benefits they are entitled to, thus further endangering their health and well-being, and that of their families and children.

ONA's community partners have identified that even those who are not legally impacted, such as asylum seekers, have withdrawn from public benefits because of fear and misunderstanding. Though ONA has already taken steps to alleviate fear and confusion in the immigrant community, ONA expects that if the proposed rule in regards to the EAD for asylum seekers becomes effective, it will further add to ONA's efforts to have to educate new Americans on the consequences of these many federal changes, including through phone banks, webinars, and coordination with other government agencies and community partners.

## V.    Conclusion

DHS has failed to account for the long-term impact that the proposed rule change will have on children, families, and society. The proposed rule change will cause irreparable harm to ONA and the people of the State of New York by significantly limiting the ability of asylum seekers to earn an income and thereby creating severe consequences in their day to day lives and their ability to provide for themselves and their families.

The rule change will also impact ONA's ability to fulfill its obligations under State law and would require ONA and its partners to expend costs and take on other burdens it cannot recoup. ONA has already and will continue to work closely with other State agencies to assess the implications of this rule and assess ways of alleviating homelessness and trafficking issues, among others.

Asylum seekers are already some of the most vulnerable immigrants seeking protection in the United States. The implementation of the proposed rule, along with the documented chilling effects of recent changes to the public charge rule, will further marginalize and endanger asylum seekers who, when they find themselves without an avenue to seek legal income opportunities, will either resort to unsafe and illicit means to support themselves and their families, strain public resources, or mistakenly avoid public benefits due to the chilling effects of the public charge rule. These impacts will affect not only the health and well-being of individual asylum seekers, but also the health and well-being of their families and communities.

AR005520

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7a-ju2s
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2735
Comment Submitted by Marla Samora

---

## Submitter Information

**Name:** Marla Samora

---

## General Comment

I am an immigration attorney who represents asylum seekers. Asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, straining their ability to support themselves and their families. USCIS admits that lost compensation to asylum applicants ranges from $255.88 million to $774.76 million in taxable income per year. The loss of income to asylum-seekers will cause an outsized amount of harm to this already-vulnerable community. A lack of income means not being able to afford food, housing, medical treatment, health insurance, or legal representation. Furthermore, individuals will be unable to secure a valid ID (needed for many social services) and be increasingly vulnerable to exploitation, trafficking, and underground economic risks. The lack of ability to work and correlating lack of income also vastly increases the risk that people coming to the United States will become a public charge. As the law is currently written, asylum seekers must wait 180 days before they may be granted authorization to work. They are permitted to submit their application after 150 days, giving USCIS the 30-day timeframe in question to process the requests. If USCISs goal is to have more time to process each request in order to increase flexibility and free up resources to work on other applications, then it could easily shorten the waiting time before asylum-seekers are allowed to submit their application. If USCIS feels that a 60-day timeframe would be more beneficial, then it may allow applications to be submitted after 120 days, rather than 150. Allowing asylum-seekers to submit their applications earlier could allow the department to have up to 180 days to process and properly vet each individual while reducing the risk of harm to each applicant.

AR005521

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7a-wutf
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2736
Comment Submitted by Franz Elliott

---

## Submitter Information

**Name:** Franz Elliott

---

## General Comment

Do not play with our national security, take the necessary time to do this right

AR005522

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7a-wn6j
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2737
Comment Submitted by Natalia Mercado Violand, Ropes & Gray LLP

---

## Submitter Information

**Name:** Natalia Mercado Violand
**Address:**
  800 Boylston St.
  Ropes & Gray LLP
  Boston, MA, 02199
**Email:** natalia.mercadovioland@ropesgray.com
**Phone:** 7036182663
**Organization:** Ropes & Gray LLP

---

## General Comment

I, through my employer Ropes & Gray LLP, have provided pro bono legal services to indigent asylum seekers. For all of these clients, we submitted Employment Authorization Document (EAD) applications. I submit these comments in opposition to the Proposed Rule Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications (Sep. 9, 2019), DHS Docket No. USCIS-2018-0001 (hereinafter, the Rule). The Rule would eliminate the requirement that DHS adjudicate initial requests for employment authorization by asylum applicants within 30-days of filing.

The Rule is not in the economic interest of the United States which benefits greatly from the contributions of refugees and asylum seekers. It compounds the impact of the already lengthy 180-day waiting period before asylum seekers are eligible for work authorization and is unnecessary given that DHS has shown itself capable of near complete compliance with the 30-day adjudication requirement. DHSs argument that the proposed rule is due in part to fraud concerns is contradictory since DHS should want to expedite EAD determinations and quickly vet applications, as it currently does, to detect and investigate any concerns about applications rather than create extensive delays.

Ensuring that asylum seekers can secure lawful employment as soon as possible is in the economic interest of the United States. According to the Department of Health and Human Services, refugees and their family members contributed more than $343 billion in revenue to federal, state and local coffers. On balance, refugees contributed $63 billion more than they received in benefits from various programs. The U.S. economy benefits greatly from

AR005523

this population that works so hard when given a chance and permission to work. According to the Brookings Institute, refugees and asylum seekers engage in entrepreneurship at much higher rates than U.S. born individuals. In the U.S., for example, while immigrants are 15 percent of the population, they represent 25 percent of entrepreneurs. Small businesses and the jobs they create are the engines of growth, innovation, and economic stability of the United States.

Given the fact that asylum seekers are fleeing persecution in their home countries, the vast majority do not have sufficient resources to support themselves and their families for the duration of their immigration proceedings. The rule to eliminate the 30-day adjudication requirement would impose additional hardship on asylum seekers because they would face uncertainty and inconsistency in DHS processing. The proposed Rule would prevent asylum seekers from being able to support themselves and their loved ones through lawful employment.

Asylum seekers already bear the burden of government back-logs and adjudication delays. Even with a return to the Asylum Offices processing of First in, First out, asylum applicants face great difficulties in getting their cases heard. When a decision on an asylum seekers case is delayed, it negatively impacts their ability to provide for themselves, support family, and build a life here in the United States. Many asylum seekers wait months, if not years, for their cases to be heard and then adjudicated.

Asylum seekers are already required to wait a lengthy period of 180-days before they are eligible for work authorization. During this time, as mentioned above, they rely on others for support to survive. Removing the 30-day processing time requirement would cause significant harm to already vulnerable individuals. Without a time limit for processing initial applications, DHS would have no incentive to adjudicate these cases in a timely manner and asylum seekers who are statutorily eligible to work would be unable to do so for an unknowable period of time.

We already see asylum seekers face significant barriers while waiting for the employment documents to be renewed. Eliminating the 30-day processing requirement would place initial EAD eligible asylum seekers in the same uncertain waiting period as renewal applicants, but it would be far worse for asylum seekers who were applying for work authorization for the first time as they would not have the ability to sustain themselves. At least for asylum seekers who are renewing work authorization, they have the benefit of the 180-day auto-extension while DHS manages its backlog and processing delays.

In July 2018, the U.S. District Court for the Western District of Washington ruled that USCIS must adjudicate asylum seekers initial applications for employment authorization within 30 days, as is specified at 8 C.F.R. 208.7(a)(1). As part of the ruling, USCIS was ordered to submit status reports indicating compliance with the 30-day adjudication requirement. In December 2018, DHS reported adjudicating 96.3% of asylum-seekers initial applications for employment authorization within 30 days.

AR005524

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7a-s4od
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2738
Comment Submitted by Rachel Pulda

---

## Submitter Information

**Name:** Rachel Pulda

---

## General Comment

In the notice, USCIS makes frequent reference to a rise in national security threats as a reason to spend more time and resources on each decision. However, USCIS has reported that it has been able to decide over 99% of EADs within the 30-day timeframe for over the past year. Therefore, USCIS has proven its ability to adequately vet the amount of requests in a timely fashion. Moreover, its argument regarding increased threats serves only to prompt the need for a speedier process to properly protect national security, rather than its request to delay the process further. This need for a speedier process is further compounded by the fact that the EAD applicants are asylum-seekers already residing in the United States. If vetting must be done to prevent security risks, then having unvetted people in the U.S. subjected to a potentially indefinite review period seems contrary to the departments stated interests.

AR005525

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7b-vil1
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2739
Comment Submitted by Ruth Fankushen

## Submitter Information

**Name:** Ruth Fankushen
**Address:**
  2205 Shasta Dr.
  Davis,  CA,  95616
**Email:** rfankushen@gmail.com
**Phone:** 5304002355
**Submitter's Representative:** Ruth Fankushen

## General Comment

Asylum seekers should be allowed to work as soon as possible.

AR005526

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7b-3e8l
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2740
Comment Submitted by Esther Benjamin, World Education Services

## Submitter Information

**Name:** Esther Benjamin
**Organization:** World Education Services

## General Comment

See attached file(s)

## Attachments

WES Comment Nov 8

AR005527



November 8, 2019

Ms. Samantha Deshommes
Chief, Regulatory Coordination Division Office of Policy and Strategy
U.S. Citizenship and Immigration Services, Department of Homeland Security
20 Massachusetts Avenue, NW, #2140
Washington, DC 20529

**Re: Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications (DHS Docket No. USCIS-2018-0001)**

Dear Ms. Deshommes:

**World Education Services** (WES) respectfully submits this comment in opposition to the proposed rule: Removal of 30-Day Processing Provisions for Asylum Applicant-Related Form I-765 Employment Authorization Applications, DHS Docket No. USCIS-2018-0001, which will result in extreme hardship for asylum seekers and their families and negatively impact the economy.

WES is a non-profit organization dedicated to helping international students and professionals, including immigrants, asylum seekers, and refugees, achieve their educational and professional goals in the United States and Canada. Founded in 1974, we evaluate and advocate for the recognition of international educational qualifications. For 45 years, we have set the standard of excellence with our credential evaluations. WES also pursues its mission in other ways. WES Global Talent Bridge works with institutional partners, community-based organizations, and policymakers to help skilled immigrants leverage their training and qualifications in the workforce. Our USD $30 million philanthropic initiative, the WES Mariam Assefa Fund, supports organizations that seek to bring down the barriers that keep immigrants and refugees from contributing their skills and joining the workforce in their new communities.

In proposing removal of the 30-day processing provision, DHS argues that it has measured risks and benefits adequately. *"DHS has determined that the proposed rule may delay the ability for some initial applicants to work, which could decrease disposable income of families . . . [H]owever, DHS has determined that the benefits of the action justify the potential financial impact on the family."*

WES disagrees with this risk-benefit proposition. We believe the proposed rule is ill-considered, and that it will cause needless financial harm to both the U.S. economy and perhaps irrecoverable harm to individual asylum seekers and their families.

**Many asylum seekers (as well as refugees and immigrants) come to the U.S. with in-demand skills and training**, yet they often face nearly insurmountable obstacles when they seek to rejoin their professions. Healthcare professionals, teachers, and engineers, among many others, come to the U.S. seeking refuge, leaving behind not only their countries but also their careers. The federal government should be making it easier, not harder for them to contribute to the economy and well-being of their communities.

AR005528

**The proposed rule blocks asylum seekers' ability to contribute to the US economy.**
According to USCIS estimates, the lost compensation to asylum applicants could range from approximately $255.88 to $744.76 million annually. Annual employment tax losses to the government could range from $39.15 to $118.54 million. At the same time, as of September 2019, there were seven million unfilled job openings in the U.S.[i]

**The proposed rule will cause extreme hardship to asylum seekers and their families.**
Asylum-seekers must wait six months before they are eligible to work. According to Human Rights First, "the inability to work for at least six months after requesting asylum already leaves many asylum seekers, who are often traumatized and vulnerable, in precarious situations—homeless, unable to feed themselves and their children, and struggling to get health care. Increasing that wait period could have devastating consequences."[ii]

**The proposed rule includes no provisions to mitigate these consequences and undermines long-standing U.S. asylum policies.** USCIS has in the past violated its own 30-day rule, leading to a court order in 2018 directing USCIS to comply with existing regulations. USCIS states in its proposed rule that prior to the court's 2018 decision, employment authorization applications exceeded the 30-day requirement more than half the time. USCIS has also delayed the adjudication of affirmative asylum applications. As of March 2018, according to USCIS, there were 317,395 affirmative asylum applications on the backlog.

USCIS acknowledges they have not determined the cost of hiring additional staff to clear the backlogs and comply with the thirty-day rule. In its proposed rule, USCIS states: "USCIS could hire more officers, but has not estimated the costs of this and therefore has not estimated the hiring costs that might be avoided if this proposed rule were adopted."

For the reasons outlined in this comment, World Education Services urges USCIS to rescind the proposed rule titled *Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications*.

Sincerely,

Esther Benjamin
CEO and Executive Director, World Education Services

---

[i] See U.S. Department of Labor Bureau of Labor Statistics, Job Openings and Labor Turnover Summary (Nov. 2019); available at: **https://www.bls.gov/news.release/jolts.nr0.htm**.

[ii] See Human Rights First, New Work Authorization Rule for Asylum Seekers Could Have Devastating Consequences (Sept. 2019); available at: **https://www.humanrightsfirst.org/press-release/new-work-authorization-rule-asylum-seekers-could-have-devastating-consequences**.

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7b-4j6p
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2741
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Asylum seekers should be allowed to work as soon as possible!

AR005530

file:///C/...p/AR%20Assignments/Asylum%2030-Day%20Download%20(uploaded)/Public%20Comments/files/USCIS-2018-0001-2741.html[9/15/2020 4:16:12 PM]

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7b-8eov
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2742
Comment Submitted by Nancy Kelly

## Submitter Information

**Name:** Nancy Kelly
**Address:**
  197 Frend Street
  Boston, MA, 02130
**Email:** nkelly@gbls.org; nkelly@law.harvard.edu
**Phone:** 617-603-1808
**Fax:** 617-371-1222

## General Comment

See attached file(s)

## Attachments

Kelly Nancy Comment 111 9 2019

AR005531

November 9, 2019

*Submitted via www.regulations.gov*

Samantha Deshommes
Chief, Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services, Department of Homeland Security
20 Massachusetts Avenue NW
Mailstop #2140
Washington, D.C. 20529-2140


**RE: Opposition to Proposed Federal Rule "Removal of 30-Day Processing Provision for Form I-765 (c) (8) Employment Authorization Applications,"** CIS No. 2617-18 **DHS Docket No. USCIS-2018-0001**

Dear Ms. Deshommes:

I am writing to express my strong opposition to the Department of Homeland Security's (hereinafter "DHS") Notice of Proposed Rulemaking on Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications, DHS Docket No. USCIS-2018-0001, issued September 9, 2019. I have been an attorney practicing Immigration Law for more than thirty years. I am currently the managing attorney of the Immigration unit at Greater Boston Legal Services and assistant director of the Harvard Immigration and Refugee Clinical Program. I have represented hundreds of asylum applicants throughout my years of practice. I have also supervised clinical students in the representation of asylum seekers and taught immigration and asylum law to students, attorneys, and adjudicators.

Currently, asylum seekers become eligible for employment authorization when their asylum applications have been pending for 180 days. This period is extended if any delay in the processing of the application is caused by the applicant. The 180 day waiting period was instituted to ensure that non-meritorious asylum applications were not filed solely to obtain employment authorization. The current regulation, 8 CFR 208.7(a)(1), attempts to ensure that this waiting period is not unnecessarily extended further by allowing asylum applicants to file their employment authorization applications once their asylum applications have been pending for 150 days and mandating adjudication of those applications within 30 days.

The proposed rule would remove the existing regulatory requirement that U.S. Citizenship and Immigration Services (USCIS) grant or deny an initial employment authorization application within 30 days of the filing of the asylum application. I strongly oppose this rule change because it would cause undue hardship to our most vulnerable immigrants and adversely impact the community as a whole.

Asylum seekers often arrive in the United States, traumatized and fleeing for their lives, with little more than the clothes on their backs. They have no independent resources on which they can

depend for support, and often have no family or close friends in the U.S. on whom they can rely. The existing rule already creates a severe hardship by depriving them of the ability to work lawfully in the U.S. for a period of 180 days. To extend this period indefinitely by removing the requirement that USCIS adjudicate their applications in a manner consistent with this requirement severely exacerbates the hardship they must already endure.

Asylum seekers are not eligible for most forms of government assistance. Usually, the only means of providing for themselves that their children is through their work. The clients I have represented are used to working and willing and anxious to work. Without employment authorization, they find themselves either dependent on others for support, or exploited by unscrupulous employers who are willing to hire them for substandard wages, often in dangerous or unsanitary conditions. I have represented many individuals who become the victims of wage theft by dishonest employers, or who are injured in their workplace yet deprived of the benefits to which they would be entitled if authorized to work. They often are forced to live in overcrowded and substandard housing, exploited by landlords who take advantage of their vulnerability. They often do not have sufficient resources to adequately provide for their children, including with proper nutrition and medical care. While churches and community groups often attempt to step in to fill the void, their resources are extremely limited and they cannot fill the void.

The deprivation of employment authorization to asylum seekers effectively ensures a population of undocumented workers who are willing to take jobs under conditions that U.S. citizens and authorized worker would not accept. This drives down wages and undermines labor standards and ultimately harms all workers. In addition, it allows unscrupulous landlords and others to take advantage of our most vulnerable immigrants, ultimately decreasing the standard of living for the community as a whole.

I urge you to withdraw this proposed rule change immediately.


Sincerely,

Nancy Kelly
HIRC at GBLS
197 Friend Street
Boston, MA 02114

AR005533

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7b-e74i
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2743
Comment Submitted by Anne Mackin, Greater Boston Legal Services

## Submitter Information

**Name:** Anne Mackin
**Address:**
   197 Friend Street
   Boston, MA, 02114
**Email:** amackin@gbls.org
**Phone:** 617-603-1808
**Fax:** 617-371-1222

## General Comment

See attached file(s)

## Attachments

Mackin Anne Comment 11 9 2019

AR005534



GREATER BOSTON
LEGAL SERVICES

*... and justice for all*

November 9, 2019

Submitted via *www.regulations.gov*

Samantha Deshommes
Chief, Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services, Department of Homeland Security
20 Massachusetts Avenue NW
Mailstop #2140
Washington, D.C. 20529-2140

RE: Opposition to Proposed Federal Rule "Removal of 30-Day Processing Provision for Form I-765 (c) (8) Employment Authorization Applications," CIS No. 2617-18 DHS Docket No. USCIS-2018-0001

Dear Ms. Deshommes:

I write to express my opposition to the proposed federal rule cited above which would remove the 30-day processing provision for Form I-765(c)(8) Employment Authorization Applications.

I work in the Immigration Unit at Greater Boston Legal Services and represent many young people who are seeking relief from abuse, abandonment, and neglect within their families and who have suffered persecution on account of their race, ethnicity, religion, political opinion, and/or because they are a member of a particular social group. Many have fled their home countries due to great fear for their lives, seeking protection and safety in the United States.

Many of these young immigrants have already learned the value of hard work. Many have come from rural areas where they have worked long days on farms, engaged in construction work to build modest housing, helped pour concrete or cement, or participated in other physical labor. They want to support themselves in the United States. They do not want nor do they seek government assistance. They long to work to become self-sufficient and contributing members of society.

The work that our clients do is often physically very demanding. They work in service jobs such as dishwashers in restaurants, cleaners in office buildings and hotels in late evening and overnight hours, commercial food preparation that starts at 4:00 or 5:00 a.m., laundries, and

in factories, to name a few industries that rely on their labor. The jobs are often paid at minimum wage, and longer hours are required to try to pay for the basic necessities of daily living. Without permission to work, immigrants who need to work are often exploited by employers who pay them very low wages for work in substandard or even dangerous conditions, simply in order to survive while their cases are winding through the asylum procedures.

Under the current rules, an asylum applicant can only apply for permission to work 150 days after his/her applicant is submitted. That is already five months of waiting, and somehow scraping by for food and a roof over their heads. Removal of the thirty day rule for processing initial work authorizations only extends the time that asylum applicants are barely surviving while seeking the protection to which they may be entitled under both U.S. and international law. This imposes an unjust burden on individuals who have already endured untold suffering for which they are seeking protection. Extending the time for granting permission to work indefinitely consigns asylum applicants to an untold period of difficulty and barely scraping by to meet their basic needs. Under the current system, albeit after six months, they can be taking care of themselves and contributing through their work and taxes paid to the U.S. economy. Otherwise, they will go without meeting their needs or live on a subsistence income which is more of a drain on the society then allowing immigrants to legally work.

U.S.C.I.S. has already demonstrated that it can meet the 30 day EAD processing deadline, after five months of waiting for processing of employment authorization have already passed. It is vital to the asylum applicant as well as the community to have work authorization as soon as possible.

Sincerely,

Anne Mackin

Anne Mackin
Senior Attorney

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** November 08, 2019
**Status:** Posted
**Posted:** November 13, 2019
**Tracking No.** 1k3-9d7g-lvz0
**Comments Due:** November 08, 2019
**Submission Type:** Web

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-2744
Comment Submitted by Tonya Mildon, University of Oregon

---

## Submitter Information

**Name:** Tonya Mildon
**Address:**
  225 9th St
  Springfield, OR, 97477
**Email:** mildon@uoregon.edu

---

## General Comment

My name is Tonya Mildon. I am currently an instructor at the University of Oregon, but my first teaching job was teaching job search and English language skills at a refugee center in Portland, Oregon.

Because it was my first job, I had no idea that near 100% attendance is not the normand this was for 6 hours a day, 5 days a week classes. I had no idea that it was unusual for mostif not allof my students to stay laser focused on the task at hand, hour after hour, day after day, no matter how dry or challenging the material. I had no idea that I would one day deal with 18 year olds who feel they are too good to do homework because they have rich parents, because at the refugee center, I had former doctors and lawyers who diligently applied themselves to learn the skills they would need to apply to be janitors and dishwashers in this new country. I had no idea that I would someday hear complaints about too much homework from students whose only responsibility is to go to school, because the refugees I was working with usually had children and aging parents and all the other responsibilities that go along with juggling a family anywhere, let alone in a new country as they were going to school full-time while also trying to find a job and a permanent place to live.

But I did have an idea of the trauma my students were overcoming. I had students break down crying in class describing the violent deaths of their loved ones, and their own flights from violence and war and poverty and persecution. And then I saw them get right back to work. I did have an idea of how proud they were of the work they were doing every day in my class, because it would bring them one step closer to finding a job that would allow them to support their families and begin to build a new life here. I did have an idea of what courage and strength and resilience looked like, because I witnessed it every day.

Asylum seekers must be allowed to work because, if they are like the 100s of refugees I was privileged to teach,

AR005537

they want to work, and they deserve to work. They want to support themselves and their families, and they want to become contributing members of the country that has given them shelter.

AR005538



## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 208**

[CIS No. 2617–18; DHS Docket No. USCIS–2018–0001]

**RIN 1615–AC19**

**Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule removes a Department of Homeland Security (DHS) regulatory provision stating that U.S. Citizenship and Immigration Services (USCIS) has 30 days from the date an asylum applicant files the initial Form I–765, Application for Employment Authorization, (EAD application) to grant or deny that initial employment authorization application. This rule also removes the provision requiring that the application for renewal must be received by USCIS 90 days prior to the expiration of the employment authorization.

**DATES:** This final rule is effective August 21, 2020.

**FOR FURTHER INFORMATION CONTACT:**
Daniel Kane, Branch Chief, Service Center Operations, U.S. Citizenship and Immigration Services (USCIS), DHS, 20 Massachusetts NW, Washington, DC 20529–2140; telephone: 202–272–8377.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Final Rule Provisions
  D. Summary of Costs and Benefits
  E. Effective Date
  F. Implementation
II. Background and Discussion
  A. Elimination of 30-Day Processing Timeframe
  B. Removal of the 90-Day Filing Requirement
  C. Corresponding U.S. Department of Justice (DOJ) Regulations
III. Response to Public Comments on the Proposed Rule
  A. General Feedback on the NPRM
  1. General Support for the NPRM
  2. General Opposition to the NPRM
  B. DHS Statutory Authority and Legal Issues
  1. DHS Statutory Authority
  2. *Rosario* v. *USCIS* Court Order
  3. Other Comments on Statutory Authority or Legal Issues
  C. Removal of 30-Day Processing Timeframe
  1. DHS Rationale and Need for the Rule
  D. Removal of 90-Day Filing Requirement
  1. Necessity of Rule and DHS Rationale
  E. Statutory and Regulatory Requirements
  1. Costs and Benefits (E.O. 12866 and 13563)
  a. Costs Associated With Hiring Additional Immigration Officers
  b. Population and Effect of Rule on Processing Times
  c. Wage Bases for Labor Earnings
  d. Lost Wages and Benefits
  e. Impact on Support Network
  f. Costs Related to Socioeconomic Factors and Impacts
  g. Impacts to Companies and Employers
  h. Tax Impacts
  i. Small Entity Impacts
  j. Benefits
  2. Other Statutory and Regulatory Requirements
  F. Out of Scope
  1. Comments on the Broader Asylum EAD NPRM
  2. Other Out of Scope Comments
IV. Statutory and Regulatory Requirements
  A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  1. Summary
  2. Background and Purpose of the Final Rule
  3. Population
  4. Transfers, Costs, and Benefits of the Rule
  a. Transfers and Cost
  b. Benefits
  c. Labor Market Overview
  d. Alternatives
  B. Regulatory Flexibility Act
  C. Congressional Review Act
  D. Unfunded Mandates Reform Act of 1995
  E. Executive Order 13132 (Federalism)
  F. Executive Order 12988 (Civil Justice Reform)
  G. Paperwork Reduction Act
  H. Family Assessment
  I. Executive Order 13175
  J. National Environmental Policy Act (NEPA)
  K. National Technology Transfer and Advancement Act
  L. Executive Order 12630
  M. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  N. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  O. Signature

### Table of Abbreviations

| | |
|---|---|
| BCU | Background Check Unit |
| CFDO | Center Fraud Detection Operations |
| CFR | Code of Federal Regulations |
| DHS | Department of Homeland Security |
| EAD | Employment Authorization Document |
| HSA | Homeland Security Act of 2002 |
| INA | Immigration and Nationality Act |
| NPR | Notice of Proposed Rulemaking |
| USCIS | U.S. Citizenship and Immigration Services |

## I. Executive Summary

### A. Purpose of the Regulatory Action

On September 9, 2019, DHS published a notice of proposed rulemaking in which it laid out its intention to eliminate the regulation articulating a 30-day processing timeframe for USCIS to adjudicate initial Applications for Employment Authorization (Forms I–765 or EAD applications) for asylum applicants. This change was proposed to (1) ensure USCIS has sufficient time to receive, screen, and process applications for an initial grant of employment authorization based on a pending asylum application, and to also (2) reduce opportunities for fraud and protect the security-related processes undertaken for each EAD application.[1] DHS also proposed to remove the provision requiring that the application for renewal must be received by USCIS 90 days prior to the expiration of their employment authorization. This change was proposed to align existing regulatory text with DHS policies implemented under the *Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers* final rule, 82 FR 82398, 82457 (2017 AC21 Rule), which became effective January 17, 2017. DHS provided its analysis and justifications and invited public comment. Following the review and analysis of public comments, DHS is adopting its proposed regulation in all material respects,[2] and incorporates by reference the reasoning, and data in the proposed rule, except to the extent indicated

---

[1] As noted in the proposed rule, prior to the *Rosario* v. *USCIS*, 365 F. Supp. 3d 1156 (W.D. Wash. 2018), court order in fiscal year 2017, the adjudication processing times for these employment authorization applications exceeded the regulatory set timeframe of 30 days more than half the time. In response to the *Rosario* v. *USCIS* litigation and to comply with the court order, USCIS dedicated as many resources as practicable to these adjudications, but continues to face a historic asylum application backlog, which in turn increases the numbers of applicants eligible for pending asylum EADs. However, USCIS does not want to continue this reallocation of resources as a long-term solution because it removes resources from other competing work priorities in other product lines and adds delays to other time-sensitive adjudication timeframes, and thus is finalizing this rule.

[2] DHS has made one technical correction to the proposed rule. DHS had proposed to replace old references to "the Service" in 8 CFR 208.7(a)(1) and (c)(3) with references to USCIS. But in context, the reference to "the Service" in 8 CFR 208.7(c)(3) is best read to refer to functions currently performed by U.S. Immigration and Customs Enforcement, a different component of DHS. The final rule therefore replaces the latter reference to "the Service" with a reference to "DHS" more broadly, rather than just USCIS.

AR005539

below. DHS also provides more recent data below, where available.

### B. Legal Authority

The authority of the Secretary of Homeland Security (Secretary) for these regulatory amendments is found in various sections of the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 101 *et seq.* General authority for issuing the final rule is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws and to establish such regulations as he deems necessary for carrying out such authority. *See also* 6 U.S.C. 271(a)(3)(A), (b). Further authority for the regulatory amendment in the final rule is found in section 208(d)(2) of the INA, 8 U.S.C. 1158(d)(2), which states that an applicant for asylum is not entitled to employment authorization, and may not be granted asylum application-based employment authorization prior to 180 days after filing of the application for asylum, but otherwise authorizes the Secretary to prescribe by regulation the terms and conditions of employment authorization for asylum applicants.

### C. Summary of the Final Rule Provisions

DHS considered the public comments received and this final rule adopts the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on September 9, 2019, in all material respects. *See Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications,* Proposed Rule, 84 FR 47148.

As a consequence, this final rule makes the following major revisions to the application for employment authorization for asylum seekers program regulations:

1. Eliminates the 30-day adjudication requirement for initial filings; and

2. eliminates the requirement that applications to renew employment authorization must be received by USCIS 90 days prior to the expiration of the applicant's employment authorization.

### D. Summary of Costs and Benefits

DHS notes that the estimates from the NPRM regarding unemployment, number of asylum applicants per year, and USCIS processing are not currently applicable as COVID–19 has had a dramatic impact on all three. DHS offers this analysis as a glimpse of the potential impacts of the rule, but the analysis relies on assumptions related to a pre-COVID economy. While future economic conditions are currently too difficult to predict with any certainty, DHS notes that a higher unemployment rate may result in lower costs of this rule as replacing pending asylum applicant workers would most likely be easier to do. Consequently, as unemployment is high, this rule is less likely to result in a loss of productivity on behalf of companies unable to replace forgone labor.

DHS is removing the requirement to adjudicate initial EAD applications for pending asylum applicants within 30 days. In FY 2017, prior to the *Rosario* v. *USCIS* court order, 365 F. Supp. 3d 1156 (W.D. Wash. 2018), the adjudication processing times for initial Form I–765 under the Pending Asylum Applicant category exceeded the regulatory-set timeframe of 30 days more than half the time. However, USCIS adjudicated approximately 78 percent of applications within 60 days. In response to the *Rosario* v. *USCIS* litigation and to comply with the *Rosario* court order, USCIS has dedicated as many resources as practicable to these adjudications, but continues to face a historic asylum application backlog, which in turn increases the numbers of applicants eligible for pending asylum EADs. However, USCIS finds this reallocation of resources unsustainable as a long-term solution because it removes resources from competing work priorities in other product lines and adds delays to other time-sensitive adjudication timeframes. By eliminating the 30-day adjudicative timeframe, USCIS is better able to prioritize status-granting workloads based on agency and department priorities. USCIS has not estimated the costs of hiring additional officers and therefore has not estimated the costs that might be avoided if the major revisions in this final rule are not implemented. Hiring more officers would not immediately and in all cases shorten adjudication timeframes because: (1) Additional time would be required to recruit, onboard and train new employees; and, (2) for certain applications, additional time is needed to fully vet applicants, regardless of staffing levels. Further, simply hiring more officers is not always feasible due to budgetary constraints and the fact that USCIS conducts notice and comment rulemaking to raise fees and increase revenue for such hiring actions. There is currently no fee for asylum applications or the corresponding initial EAD applications,[3] and the cost to the agency for adjudication is covered by fees paid by other benefit requesters. As a primary goal, USCIS seeks to adequately vet applicants and adjudicate applications as quickly and efficiently as possible. However, this final rule may delay the ability to work for some initial applicants whose EAD processing is delayed beyond the 30-day regulatory timeframe.

The impacts of this rule are measured against a baseline. While we have added some more recent data and information, pursuant to public comments, the costs are benchmarked to FY 2017, consistent with the NPRM. This baseline reflects the best assessment of the way the world would look absent this action. For this rulemaking, USCIS assumes that in the absence of this final rule the baseline amount of time that USCIS would take to adjudicate would be 30 days. USCIS also assumes that after this final rule becomes effective, adjudications will align with DHS processing times achieved in FY 2017 (before the *Rosario* v. *USCIS* court order). This is our best estimate of what will occur after this rule becomes effective. USCIS believes the FY 2017 timeframes are sustainable and expects to meet these timeframes following the effective date of this rule. Therefore, USCIS analyzed the impacts of this rule by comparing the costs and benefits of adjudicating initial EAD applications for pending asylum applications within 30 days compared to the actual time it took to adjudicate these EAD applications in FY 2017.

USCIS notes that in FY 2018, 80.3 percent of applications were processed within 30 days and 97.5 percent were processed within 60 days. In FY 2019, the figures were 96.9 percent and 99.2 percent, respectively. In the analysis of impacts of this rule, USCIS assumed 100

---

[3] On April 29, 2019, President Trump directed DHS to propose regulations that would set a fee for an asylum application not to exceed the costs of adjudicating the application, as authorized by section 208(d)(3) of the INA (8 U.S.C. 1158(d)(3)) and other applicable statutes, and would set a fee for an initial application for employment authorization for the period an asylum claim is pending. *See* Presidential Memorandum for the Attorney General and Secretary of Homeland Security on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019), *available at https:// www.whitehouse.gov/presidential-actions/ presidential-memorandum-additional-measures-enhance-border-security-restore-integrity-immigration-system/* (last visited June 26, 2019). The implementation of the President's directive would take place via a separate rulemaking (known as the fee rule, through which USCIS analyzes adjudicative and operational costs biannually and sets fees, *see* 84 FR 6228- (Nov. 14, 2019) (proposed rule), but it is uncertain whether such a revised fee structure would reduce the overall resource burden associated with the 30-day adjudication timeframe.

percent of adjudications happened within 30 days.[4] However, because actual adjudications in FYs 2018 and 2019 within the 30-day timeframe are slightly less than the 100 percent analyzed, USCIS has over-estimated the impacts of this rule with respect to this variable when less than 100 percent of adjudications happen within 30 days. It is noted that the reliance on the 100 percent rate slightly overstates the costs.

The impacts of this rule include both potential distributional effects (which are transfers) and costs.[5] The potential distributional impacts fall on the asylum applicants who may be delayed in entering the U.S. labor force. The potential distributional impacts (transfers) would be in the form of lost opportunity to receive compensation (wages and benefits). A portion of this lost compensation might be transferred from asylum applicants to others that are currently in the U.S. labor force, possibly in the form of additional work hours or overtime pay. A portion of the impacts of this rule may also be borne by companies that would have hired the asylum applicants had they been in the labor market earlier but were unable to find available workers. These companies would incur a cost, as they may be losing the productivity and potential profits the asylum applicant may have provided had the asylum applicant been in the labor force earlier.[6]

Companies may also incur opportunity costs by having to choose the next best alternative to immediately filling the job the asylum applicant would have filled. USCIS does not know what this next best alternative may be for those companies. As a result, USCIS does not know the portion of overall impacts of this rule that are transfers or costs. If companies can find replacement labor for the position the asylum applicant would have filled, this rule would have primarily distributional effects in the form of transfers from asylum applicants to others already in the labor market (or workers induced to return to the labor market). USCIS acknowledges that there may be additional opportunity costs to employers such as additional search costs. However, if companies cannot find a reasonable substitute for the labor an asylum applicant would have provided, this rule would primarily be a cost to these companies through lost productivity and profits.

USCIS uses the lost compensation to asylum applicants as a measure of the overall impact of the rule—either as distributional impacts (transfers) or as a proxy for businesses' cost for lost productivity. It does not include additional costs to businesses for lost profits and opportunity costs or the distributional impacts for those in an applicant's support network. The lost compensation to asylum applicants could range from $255.88 million to $774.76 million annually depending on the wages the asylum applicant would have earned. The 10-year total discounted lost compensation to asylum applicants at 3 percent could range from $2.183 billion to $6.609 billion and at 7 percent could range from $1.797 billion to $5.442 billion (years 2020–2029).

USCIS recognizes that the impacts of this final rule could be overstated if the provisions of a separate NPRM that DHS published in November 2019 (''broader asylum EAD NPRM'') are finalized as proposed. *See Asylum Application, Interview, and Employment Authorization for Applicants, Proposed Rule,* 84 FR 62374 (Nov. 14, 2019). Specifically, the broader asylum EAD NPRM would limit or delay eligibility for employment authorization for certain asylum applicants.[7]

Accordingly, if the population of aliens is less than estimated as a result of the broader asylum EAD rule, the estimated impacts of this rule could be overstated because the population affected may be lower than estimated in this rule.

In instances where a company cannot hire replacement labor for the position the asylum applicant would have filled, USCIS acknowledges that such delays may result in tax losses to the government. It is difficult to quantify income tax losses because individual tax situations vary widely[8] but USCIS estimates the potential loss to other employment tax programs, namely Medicare and social security which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively).[9] With both the employee and employer not paying their respective portion of Medicare and social security taxes, the total estimated tax loss for Medicare and social security is 15.3 percent.[10] Lost wages ranging from $255.88 million to $774.76 million would result in employment tax losses to the government ranging from $39.15 million to $118.54 million.[11] Again, depending on the circumstances of the employee, there could be additional federal income tax losses not estimated here. There may also be state and local income tax losses that would vary according to the jurisdiction.

This rule will possibly result in reduced opportunity costs to the federal government. Since the *Rosario* court order compelled USCIS to comply with the 30-day provision in FY 2018, USCIS has redistributed its adjudication resources to work up to full compliance. By removing the 30-day timeframe, these redistributed resources can be reallocated, potentially reducing delays in processing of status-granting benefit requests, and avoiding costs associated with hiring additional employees. USCIS has not estimated these avoided

---

[4] The information regarding the processing of these applications was provided by USCIS Office of Performance and Quality (OPQ).

[5] Transfer payments are monetary payments from one group to another that do not affect total resources available to society. *See* OMB Circular A–4 pages 14 and 38 for further discussion of transfer payments and distributional effects. Circular A–4 is available at: *https://www.whitehouse.gov/sites/ whitehouse.gov/files/omb/circulars/A4/a-4.pdf.*

[6] The analysis accounts for *delayed* entry into the labor force, and does not account for the potential circumstance under which this rule may completely foreclose an alien's entry into the labor force. Such a possible circumstance could occur if USCIS ultimately denies an EAD application that was pending past 30 days due to this rule, solely because the underlying asylum application had been denied during the extended pendency of the EAD application. In such a scenario, there would be additional costs and transfer effects due to this rule. Such costs and transfer effects are not accounted for below. Similarly, the rule does not estimate avoided turnover costs to the employer associated with such a scenario.

[7] In the broader asylum EAD NPRM, DHS proposed to modify its current regulations governing asylum applications, interviews, and eligibility for employment authorization based on a pending asylum application. That NPRM was intended to implement a Presidential directive related to employment authorization for asylum applicants. On April 29, 2019, President Trump directed DHS to propose regulations that would bar aliens who have entered or attempted to enter the United States unlawfully from receiving employment authorization before any applicable application for relief or protection from removal has been granted, and to ensure immediate revocation of employment authorization for aliens who are denied asylum or become subject to a final order of removal. *See* Presidential Memorandum for the Attorney General and Secretary of Homeland Security on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019), *available at https:// www.whitehouse.gov/presidential-actions/ presidential-memorandum-additional-measures-*

*enhance-border-security-restore-integrity- immigration-system/* (last visited June 26, 2019).

[8] *See* More than 44 percent of workers pay no federal income tax (September 16, 2018) available at *https://www.marketwatch.com/story/81-million- americans-wont-pay-any-federal-income-taxes-this- year-heres-why-2018-04-16.*

[9] The various employment taxes are discussed in more detail at *https://www.irs.gov/businesses/ small-businesses-self-employed/understanding- employment-taxes. See IRS Publication 15, Circular E, Employer's Tax Guide for specific information on employment tax rates. https://www.irs.gov/pub/irs- pdf/p15_18.pdf.*

[10] Calculation: (6.2 percent social security + 1.45 percent Medicare) × 2 employee and employer losses = 15.3 percent total estimated tax loss to government.

[11] Calculations: Lower bound lost wages $255.88 million × 15.3 percent estimated tax rate = $39.15 million.

Upper bound lost wages $774.76 million × 15.3 percent estimated tax rate = $118.54 million.

costs. Additionally, USCIS does not anticipate that removing the separate 90-day EAD filing requirement would result in any costs to the federal government.

This rule will benefit USCIS by allowing it to operate under long-term, sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identity verification. Applicants would rely on up-to-date processing times, which provide accurate expectations of adjudication times.

The technical change removing the 90-day filing requirement is expected to reduce confusion regarding EAD renewal requirements for pending asylum applicants and ensure the regulatory text reflects current DHS policy and regulations under DHS's final 2017 AC21 Rule.[12]

Table 1 provides a detailed summary of the regulatory changes and the expected impacts of this final rule.

TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS

| Current provision | Change to provision | Expected costs and transfers from changed provision | Expected benefits from changed provision |
|---|---|---|---|
| USCIS has a 30-day initial EAD adjudication timeframe for applicants who have pending asylum applications. | USCIS is eliminating the provisions for the 30-day adjudication timeframe and issuance of initial EADs for pending asylum applicants. | *Quantitative:* This provision could delay the ability of some initial asylum applicants to work. A portion of the impacts of the rule would be the lost compensation transferred from asylum applicants to others currently in the workforce, possibly in the form of additional work hours or overtime pay. A portion of the impacts of the rule would be lost productivity costs to companies that would have hired asylum applicants had they been in the labor market, but who were unable to find available workers. USCIS uses the lost compensation to asylum applicants as a measure of these distributional impacts (transfers) and as a proxy for businesses' cost for lost productivity. The lost compensation due to processing delays could range from $255.88 million to $774.76 million annually. The total ten-year discounted lost compensation for years 2020–2029 averages $4.396 billion and $3.619 billion at discount rates of 3 and 7 percent, respectively. USCIS does not know the portion of overall impacts of this rule that are transfers or costs. Lost wages ranging from $255.88 million to $774.76 million would result in employment tax losses to the government ranging from $39.15 million to $118.54 million annually. | *Quantitative:* Not estimated. |
| | | *Qualitative:* In cases where companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, affected companies would also lose profits from the lost productivity. In all cases, companies would incur opportunity costs by having to choose the next best alternative to immediately filling the job the pending asylum applicant would have filled. There may be additional opportunity costs to employers such as search costs. There may also be additional distributional impacts for those in an applicant's support network beyond a minimum of 180 days—if applicants are unable to work legally, they may need to rely on resources from family members, friends, non-profits, or government entities for support. | *Qualitative:* DHS will be able to operate under long-term sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identity verification without having to add any resources. |
| | | DHS notes that the estimates from the NPRM regarding unemployment, number of asylum applicants per year, and USCIS processing are not currently applicable as COVID–19 has had a dramatic impact on all three. DHS offers this analysis as a glimpse of the potential impacts of the rule, but the analysis relies on assumptions related to a pre-COVID economy. While future economic conditions are currently too difficult to predict with any certainty, DHS notes that a higher unemployment rate may result in lower costs of this rule as replacing pending asylum applicant workers would most likely be easier to do. Consequently, as unemployment is high, this rule is less likely to result in a loss of productivity on behalf of companies unable to replace forgone labor. | This rule is expected to result in reduced opportunity costs to the Federal Government. By removing the 30-day timeframe, USCIS will be able to reallocate the resources it redistributed to comply with the 30-day provision, potentially reducing delays in processing of other applications and avoiding costs associated with hiring additional employees. |
| Applicants can currently submit a renewal EAD application 90 days before the expiration of their current EAD. | This rule removes the 90-day submission requirement for renewal EAD applications. | *Quantitative:* None ........................................................................... | *Quantitative:* None. |
| | | *Qualitative:* None ............................................................................. | *Qualitative:* Applicants— Reduces confusion regarding EAD renewal requirements. Some confusion may nonetheless remain if applicants consult outdated versions of regulations or inapplicable DOJ regulations. |

[12] In the 2017 AC21 final rule, 81 FR 82398, USCIS amended 8 CFR 274a.13 to allow for the automatic extension of existing, valid EADs for up to 180 days for renewal applicants falling within certain EAD categories as described in the regulation and designated on the USCIS website. *See* 8 CFR 274a.13(d). Among those categories is asylum applicants. To benefit from the automatic extension, an applicant falling within an eligible category (1) must properly file his or her renewal request for employment authorization before its expiration date; (2) must request renewal based on the same employment authorization category under which the expiring EAD was granted; and (3) will continue to be authorized for employment based on his or her status, even after the EAD expires, if the applicant is applying for renewal under a category that does not first require USCIS to adjudicate an underlying application, petition, or request.

AR005542

TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS—Continued

| Current provision | Change to provision | Expected costs and transfers from changed provision | Expected benefits from changed provision |
|---|---|---|---|
| | | | DHS/USCIS— The DHS regulations are being updated to match those of other EAD categories. |

As previously discussed, USCIS does not know the portion of overall impacts of this rule that are transfers or costs, but estimates that the maximum monetized impact of this rule from lost compensation is $774.76 million annually. If all companies are able to easily find reasonable labor substitutes for all of the positions the asylum applicants would have filled, they will bear little or no costs, so the maximum of $774.76 million will be transferred from asylum applicants to workers currently in the labor force or induced back into the labor force (we assume no tax losses as a labor substitute was found). Conversely, if companies are unable to find any reasonable labor substitutes for the positions the asylum applicants would have filled, then $774.76 million is the estimated maximum monetized cost of the rule and $0 is the estimated minimum in monetized transfers from asylum applicants to other workers. In addition, under this scenario, because the jobs would go unfilled there would be a loss of employment taxes to the federal government. USCIS estimates $118.54 million as the maximum decrease in employment tax transfers from companies and employees to the federal government. The two scenarios described above represent the estimated endpoints for the range of monetized impacts resulting from this rule and are summarized in Table 2 below.

TABLE 2—SUMMARY OF RANGE OF MONETIZED ANNUAL IMPACTS

| Category | Description | Scenario: No replacement labor found for asylum applicants | | Scenario: All asylum applicants replaced with other workers | | Primary (half of the highest high for each row) |
|---|---|---|---|---|---|---|
| | | Low wage | High wage | Low wage | High wage | |
| Cost | Lost compensation used as proxy for lost productivity to companies. | $255.88 | $774.76 | $0.00 | $0.00 | $387.38 |
| Transfer | Compensation transferred from asylum applicants to other workers. | 0.00 | 0.00 | 255.88 | 774.76 | 387.38 |
| Transfer | Lost employment taxes paid to the Federal Government. | 39.15 | 118.54 | 0.00 | 0.00 | 59.27 |

As required by OMB Circular A–4, Table 3 presents the prepared A–4 accounting statement showing the costs and transfers associated with this final regulation. For the purposes of the A–4 accounting statement below, USCIS uses the mid-point as the primary estimate for both costs and transfers because the total monetized impact of the rule from lost compensation cannot exceed $774.76 million and as described, USCIS is unable to apportion the impacts between costs and transfers. Likewise, USCIS uses a mid-point for the reduction in employment tax transfers from companies and employees to the federal government when companies are unable to easily find replacement workers. USCIS notes that there may be some un-monetized costs such as additional opportunity costs to employers that would not be captured in these monetized estimates.

TABLE 3—OMB A–4 ACCOUNTING STATEMENT

[$ millions, 2017]

[Period of analysis: 2020–2029]

| Category | Primary estimate | | Minimum estimate | Maximum estimate | Source citation (RIA, preamble, etc.) |
|---|---|---|---|---|---|
| **Benefits:** | | | | | |
| Monetized Benefits | (7%) | N/A | N/A | N/A | RIA. |
| | (3%) | N/A | N/A | N/A | RIA. |
| Annualized quantified, but un-monetized, benefits. | N/A | | N/A | N/A | RIA. |
| Unquantified benefits | Applicants would benefit from reduced confusion over renewal requirements. DHS would be able to operate under sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identity verification | | | | RIA. |
| **Costs:** | | | | | |

TABLE 3—OMB A–4 ACCOUNTING STATEMENT—Continued

[$ millions, 2017]

[Period of analysis: 2020–2029]

| | | | | | |
|---|---|---|---|---|---|
| Annualized monetized costs (discount rate in parenthesis). | (7%) (3%) | $387.38 $387.38 | $0 $0 | $774.76 $774.76 | RIA. RIA. |
| Annualized quantified, but un-monetized, costs ...... | N/A | | N/A | N/A | N/A |
| Qualitative (unquantified) costs .............................. | In cases where companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, affected companies would also lose profits from the lost productivity. In all cases, companies would incur opportunity costs by having to choose the next best alternative to immediately filling the job the pending asylum applicant would have filled. There may be additional opportunity costs to employers such as additional search costs | | | | RIA. |
| Transfers: Annualized monetized transfers: "on budget" .. | (7%) (3%) | $0 $0 | $0 $0 | $0 $0 | RIA. |
| From whom to whom? ...................................... | N/A | | | | N/A. |
| Annualized monetized transfers: Compensation. | (7%) (3%) | $387.38 $387.38 | $0 $0 | $774.76 $774.76 | RIA. |
| From whom to whom? ...................................... | From asylum applicants to workers in the U.S. labor force or induced into the U.S. labor force. Additional distributional impacts from asylum applicant to the asylum applicant's support network that provides for the asylum applicant while awaiting an EAD | | | | RIA. |
| Annualized monetized transfers: Taxes ........... | (7%) (3%) | $59.27 $59.27 | $0 $0 | $118.54 $118.54 | RIA. |
| From whom to whom? ...................................... | A reduction in employment taxes from companies and employees to the Federal Government. There could also be a transfer of federal, state, and local income tax revenue | | | | RIA. |

| Category | Effects | Source citation (RIA, preamble, etc.) |
|---|---|---|
| Effects on state, local, and/or tribal governments ... | None; no significant impacts to national labor force or to the labor force of individual states is expected. Possible loss of tax revenue | RIA. |
| Effects on small businesses .................................. | None | RFA. |
| Effects on wages .................................................. | None | RIA. |
| Effects on growth ................................................. | None | RIA. |

### E. Effective Date

This final rule will be effective on August 21, 2020, 60 days from the date of publication in the **Federal Register**. DHS has determined that this 60-day period is reasonable as it does not impose new filing burdens on asylum seekers requesting initial employment authorization and simplifies the requirements for asylum seekers requesting to renew employment authorization.

### F. Implementation

The changes in this rule will apply to adjudication of initial applications for work authorization filed on or after the effective date of the rule by those with pending asylum applications and renewal applicants filing on or after the effective date. As noted in the preamble to the proposed rule, *Rosario* class members who have filed their initial

EAD applications prior to the effective date of the rule will be grandfathered into the 30-day adjudication timeframe. *See* 84 FR at 47153. DHS has determined that this manner of implementation best balances operational considerations with fairness to class members.

## II. Background and Discussion

### A. Elimination of 30-Day Processing Timeframe

Processing of Applications for Employment Authorization Documents (EADs)

Pursuant to 8 CFR 208.7, 274a.12(c)(8), and 274a.13(a)(2), pending asylum applicants may request an EAD by filing an EAD application using Form I–765, Application for Employment Authorization. Under 8 CFR 208.7(a)(1) prior to this final rule, USCIS' adjudicatory timeframe for

initial employment authorization requests under the (c)(8) category was 30 days. The 30-day timeframe in 8 CFR 208.7(a)(1) was established more than 20 years ago,[13] when the former Immigration and Naturalization Service (INS) adjudicated EAD applications at local INS offices. The adjudication process and vetting requirements have changed substantially since that time. EAD applications are now adjudicated at USCIS service centers. As discussed in the proposed rule and in response to comments below, DHS believes that the 30-day timeframe is outdated, does not account for the current volume of applications, and no longer reflects

[13] See *Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization,* 59 FR 62284 (Dec. 5, 1994); *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures,* 62 FR 10312, 10337 (Mar. 6, 1997).

current operational realities.[14] Specifically, in the time since the previous rule was enacted, asylum applications filed with USCIS have reached historic levels, peaking most recently at 142,760 in FY 2017. This increase in application receipts, along with the significant and longstanding backlog at USCIS of affirmative asylum applications ("asylum backlog" or "affirmative asylum backlog"), has contributed to an increase in receipts of initial EAD applications for pending asylum applicants that has surpassed available USCIS resources. By eliminating the 30-day provision, DHS seeks to maintain realistic case processing times for initial EAD applications filed by pending asylum applicants, to address national security and fraud concerns, and to maintain technological advances in document production and identity verification that USCIS must fulfill as a part of its core mission within DHS. This rulemaking does not change any requirements or eligibility for applying for or being granted asylum or employment authorization. Rather, it reflects the operational changes necessary due to increased employment authorization application volumes based on an underlying application for asylum.

Growth of Receipts and Backlog

The growth of asylum application receipts by USCIS, along with the growing asylum backlog, has contributed to an increase in EAD applications from pending asylum applicants that has surpassed available Service Center Operations resources. As of February 2020, the affirmative asylum caseload stood at approximately 339,000 applications [15] and it had been growing for several years. Credible fear screening for aliens apprehended at or near the U.S. border, *see* 8 CFR 208.30, increased to over 94,000 in fiscal year (FY) 2016 from 36,000 in FY 2013. Affirmative asylum applications increased to over 100,000 in FY 2016 for the first time in 20 years.[16] The USCIS Asylum Division received 44,453 affirmative asylum applications in FY 2013, 56,912 in FY

2014, 84,236 in FY 2015, 115,888 in FY 2016, 142,760 in FY 2017, 106,041 in FY 2018, and 96,861 in FY 2019.[17] While receipts have dipped slightly in the last two fiscal years, prior to that there was a 221.15 percent increase in annual affirmative asylum receipts over the span of 5 years that directly contributed to the increase in (c)(8) EAD receipts. USCIS received 41,021 initial EAD applications from aliens with pending asylum applications in FY 2013, 62,169 in FY 2014, 106,030 in FY 2015, 169,970 in FY 2016, 261,782 in FY 2017, 262,965 in FY 2018, and 216,038 in FY 2019. USCIS also received 37,861 renewal EAD applications from aliens with pending asylum applications in FY 2013, 47,103 in FY 2014, 72,559 in FY 2015, 128,610 in FY 2016, 212,255 in FY 2017, 62,026 in FY 2018 and 335,188 in FY 2019. In FY 2019, USCIS received a total of 556,996 applications (which include initial and renewals of 551,226 plus 5,770 replacements, the latter of which are immaterial to this rule) for Form I–765 from pending asylum applicants, with less than half as initial applications (216,038 or 38.8 percent). There were 335,188 renewal applications (60.2 percent) in FY 2019.

The increase in both initial and renewal EAD applications coupled with the growth in the number of asylum cases filed in recent years has grossly outpaced Service Center Operations resources, specifically because USCIS has had to reallocate resources from other product lines to adjudicate these EAD applications.[18]

Changes in Intake and Document Production

Additionally, at the time the 30-day timeframe was established, EADs, which were formerly known as Forms I–688B, were produced by local offices

that were equipped with stand-alone machines for such purposes. While decentralized card production resulted in immediate and customized adjudications for the public, the cards produced did not contain state-of-the-art security features, and they were susceptible to tampering and counterfeiting. Such deficiencies became increasingly apparent as the United States faced new and increasing threats to national security and public safety.

In response to these concerns, the former INS and DHS made considerable efforts to upgrade application procedures and leverage technology in order to enhance integrity, security, and efficiency in all aspects of the immigration process and by 2006, DHS fully implemented these centralization efforts.[19]

In general, DHS now requires applicants to file Applications for Employment Authorization at a USCIS Lockbox,[20] which is a Post Office box used to accelerate the processing of applications by electronically capturing data and receiving and depositing fees.[21] If DHS ultimately approves the application, a card order is sent to a card production facility, where a tamper-resistant card reflecting the specific employment authorized category is produced and then mailed to the applicant. While the 30-day timeframe may have made sense when local offices processed applications and produced the cards, DHS believes that the intervening changes discussed above now mean that a 30-day timeframe is not reflective of current processes.

Fraud, Criminality, and National Security Considerations

DHS has been unable to meet the 30-day processing timeframe in certain cases due to changes to the agency's vetting procedures and increased

---

[14] DHS continues to recognize the regulatory history for originally promulgating this provision, and discusses this extensively in the comment responses.

[15] An affirmative asylum application filed by a principal asylum applicant may include a dependent spouse and children, who may also file their own EAD applications based on the pending asylum application. An affirmative asylum application is one that is filed with USCIS and not in removal proceedings before the Executive Office for Immigration Review (EOIR).

[16] The USCIS Refugee, Asylum, and International Operations Parole System provided this data on March 15, 2018.

[17] These numbers only address the affirmative asylum applications that fall under the jurisdiction of USCIS' Asylum Division. Defensive asylum applicants, who file their asylum applications with the Department of Justice's Executive Office for Immigration Review (EOIR) are also eligible for (c)(8) EADs. There is an ongoing backlog of pending defensive asylum cases at EOIR, which has approximately 650,000 cases pending. *See* Memorandum from Jeff Sessions, Attorney General, *Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest* (Dec. 5, 2017). The defensive asylum backlog at EOIR also contributes to an increase in both initial and renewal (c)(8) EAD applications.

[18] In response to the growing backlog and court-ordered implementation of the 30-day adjudication timeline in *Rosario* v. *USCIS, Rosario* v. *USCIS*, 365 F. Supp. 3d 1156 (W.D. Wash. 2018), Service Center Operations re-allocated available officer resources to meet the 30-day processing time for initial EAD applications, causing a strain across other Service Center Operations product lines.

[19] *See* USCIS Memorandum from Michael Aytes, *Elimination of Form I–688B, Employment Authorization Card* (Aug. 18, 2006). In January 1997, the former INS began issuing new, more secure EADs from a centralized location, and assigned a new form number (I–766) to distinguish it from the less secure, locally produced EADs (Forms I–688B). DHS stopped issuing Form I–688B EADs from local offices altogether in 2006.

[20] Asylum applicants, however, make their initial request for employment authorization directly on the Application for Asylum and Withholding of Removal, Form I–589, and need not file a separate Application for Employment Authorization following a grant of asylum. If they are requesting employment authorization based on their pending asylum application, they must file a separate request for employment authorization on Form I–765.

[21] USCIS website at *https://www.uscis.gov/about-us/directorates-and-program-offices/lockbox-intake/lockbox-intake-processing-tip-sheet* (last viewed March 2, 2020).

background checks, which resulted from the government's response to September 11, 2001, terror attacks ("9/11"). Specifically, the Immigration and Naturalization Service (INS), followed by USCIS, made multiple changes to enhance the coverage of security checks, detect applicants who pose risks to national security and public safety, deter benefits fraud, and ensure that benefits are granted only to eligible applicants, in response to 9/11.

These changes included the creation of the Application Support Centers to collect applicant fingerprints, interagency systems checks for all applications and FBI name check screening, and the creation of USCIS's Office of Fraud Detection and National Security (FDNS) to provide centralized support and policy guidance for security checks and anti-fraud operations.[22] In August 2004, the Homeland Security Presidential Directive (HSPD) 11, *Comprehensive Terrorist-Related Screening Procedures*,[23] directed DHS to:

incorporate security features . . . that resist circumvention to the greatest extent possible [and consider] information individuals must present, including, as appropriate, the type of biometric identifier[s] or other form of identification or identifying information to be presented, at particular screening opportunities.

Since 9/11, USCIS implemented changes in the collection of biographic and biometric information for document production related to immigration benefits, including the Application for Employment Authorization (Form I–765). USCIS must verify the identity of an alien applying for an EAD and determine whether any criminal, national security, or fraud concerns exist and changes to biographic and biometric information improve USCIS's ability to carry out these functions. Under the current national security and fraud vetting guidelines, when an adjudicator determines that a criminal, national security and/or fraud concern exists, the case is forwarded to the Background Check Unit (BCU) or Center Fraud Detection Office (CFDO) for additional vetting.[24] Once vetting is

completed and a finding is made, the adjudicator uses the information provided from BCU and/or CFDO to determine whether the alien is eligible to receive the requested benefit.

These security procedures implemented post 9/11 and well after the establishment of the 30-day adjudication timeframe in 1994, coupled with sudden increases in applications, have extended adjudication and processing times for applications with potential eligibility issues discovered during background checks beyond the current regulatory 30-day timeframe. It would be contrary to USCIS' core missions and undermine the integrity of the cards issued if USCIS were to reduce or eliminate vetting procedures solely to meet a 30-day deadline established decades ago.

In sum, DHS is finalizing elimination of the 30-day processing provision at 8 CFR 208.7(a)(1) because of the increased volume of affirmative asylum applications and accompanying Applications for Employment Authorization, over two decades of changes in intake and EAD document production, and the need to appropriately vet applicants for fraud, criminality, and national security concerns. DHS believes that the 30-day timeframe did not provide sufficient flexibility for DHS to meet its core missions of enforcing and administering our immigration laws and enhancing security.

Case processing time information may be found at *https://egov.uscis.gov/ processing-times/,* and asylum applicants can access the web page for realistic processing times as USCIS regularly updates this information.

### B. Removal of the 90-Day Filing Requirement

DHS is removing 8 CFR 208.7(d), because 8 CFR 274a.13(d), as amended in 2017, serves the same policy purpose as 8 CFR 208.7(d), and is arguably at cross-purposes with that provision. Under the 2017 AC21 Rule, certain aliens eligible for employment authorization under designated categories may have the validity of their employment authorization (if applicable) and EADs extended for up to 180 days from the document's expiration date if they file an application to renew their EAD before the EAD's expiration date. *See* 8 CFR 274a.13(d)(1). Specifically, the 2017

AC21 Rule automatically extends the employment authorization and EADs falling within the designated categories as long as: (1) The alien filed the request to renew his or her EAD before its expiration date; (2) the alien is requesting renewal based on the same employment authorization category under which the expiring EAD was granted; and (3) the alien's request for renewal is based on a class of aliens whose eligibility to apply for employment authorization continues even after the EAD expires, and is based on an employment authorization category that does not first require USCIS to adjudicate an underlying application, petition, or request. *Id.* As noted in the preamble to the 2017 AC21 Rule and this rule, and as currently reflected on the USCIS website, the automatic extension amendment applies to aliens who have properly filed applications for asylum. *See id.;* 8 CFR 274a.12(c)(8); 81 FR 82398 at 82455–56 n.98.[25]

Because the 2017 AC21 Rule effectively prevents gaps in work authorization for asylum applicants with expiring employment authorization and EADs,[26] DHS finds it unnecessary to continue to require that pending asylum applicants file for renewal of their employment authorization 90 days before the EAD's scheduled expiration in order to prevent gaps in employment authorization. In order to receive the automatic extension, applications may be filed before the employment authorization expires, though it is advisable to submit the application earlier to make allowance for the time it takes for applicants to receive a receipt acknowledging USCIS' acceptance of the renewal application, which can be used as proof of the extension, and to account for current Form I–765 processing times. As the 90-day filing requirement is no longer necessary, DHS is finalizing removal of that regulatory provision.

---

[22] In 2010, FDNS was promoted to a Directorate within USCIS's organizational structure, which elevated its profile and brought operational improvements to its important work. *See* USCIS, Fraud Detection and National Security Directorate, *https://www.uscis.gov/about-us/directorates-and-program-offices/fraud-detection-and-national-security/fraud-detection-and-national-security-directorate.*

[23] HSPD11, *Comprehensive Terrorist-Related Screening Procedures* (Aug. 27, 2004), *available at https://fas.org/irp/offdocs/nspd/hspd-11.html.*

[24] USCIS conducts background checks on aliens applying for an immigration benefit because United

States immigration laws and regulations preclude USCIS from granting immigration benefits to aliens with certain criminal or administrative violations. *See, e.g.,* 8 CFR 208.7(a)(1) (aggravated felony bar to employment authorization for asylum applicants).

[25] *See also* USCIS, Automatic Employment Authorization Document (EAD) Extension, *https:// www.uscis.gov/working-united-states/automatic-employment-authorization-document-ead-extension* (last reviewed/updated Feb. 1, 2017).

[26] As EAD applicants with pending asylum applications are not authorized for employment, incident to status, these applicants need both their authorization and document to be extended. Thus, wherever DHS discusses expiration, renewal, or extension of an employment authorization document for this population, it also means expiration, renewal, or extension of employment authorization.

*C. Corresponding U.S. Department of Justice (DOJ) Regulations*

This rule removes (1) the 30-day processing provision for initial employment authorization applications for those with pending asylum applications, and (2) the 90-day timeframe for receipt of an application to renew employment authorization. *See* 8 CFR 208(a)(1), and (d). These provisions can still be found in the parallel regulations under the authority of the Department of Justice (DOJ), at 8 CFR part 1208. *Compare* old 8 CFR 208.7(a)(1) and (d), *with* 8 CFR 1208.7(a)(1) and (d).

This rule revises only the DHS regulations at 8 CFR 208.7. Notwithstanding the language of the parallel DOJ regulations in 8 CFR 1208.7, as of the effective date of this final rule, the revised language of 8 CFR 208.7(a)(1) and removal of 8 CFR 208.7(d) is binding on DHS and its adjudications. DHS will not be bound by the 30-day provision of the DOJ regulations at 8 CFR 1208.7(a)(1). DOJ has no authority to adjudicate employment authorization applications. DHS has been in consultation with DOJ on this rulemaking, and DOJ may issue conforming changes at a later date.

### III. Response to Public Comments on the Proposed Rule

*A. General Feedback on the NPRM*

In response to the proposed rule, DHS received over 3,200 comments during the public comment period. DHS reviewed the public comments received in response to the proposed rule and addresses relevant comments in the preamble to this final rule, grouped by subject area. DHS does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the changes proposed in the NPRM. This final rule does not resolve issues outside the scope of this rulemaking.

1. General Support for the NPRM

*Comments:* Many commenters provided general expressions of support for President Trump's overall immigration policies and reforms.

*Response:* DHS appreciates the expression of support for the Executive Branch in the realm of immigration policy; however, we note that the reason for promulgating this rule is to address capacity, resources, and efficiencies across USCIS operations. The legacy regulation fails to account for processing changes and increased filing volumes and does not provide the agency the flexibility it needs to effectively manage this workload while continuing to provide timely and accurate decisions across the many other types of benefit requests it receives.

*Comments:* Many commenters expressed support for the rule to assist the agency's thorough vetting processes and protections against fraud and national security concerns. Some commenters expressed concern that the 30-day timeframe would force the agency to "cut corners" in vetting processes.

*Response:* DHS appreciates commenters' general support for this rulemaking. In all adjudications, USCIS works to provide thorough vetting to advance U.S. interests, including detecting and deterring immigration fraud, and protecting against threats to national security and public safety, while at the same time fairly administering lawful immigration. The existing timeframe and court order have not resulted in the agency cutting corners in conducting background checks; however, it has placed a serious strain on the agency's resources to conduct these checks within 30 days. Vetting is triggered by individual benefit requests; in this case, the EAD application. Filing an application for asylum triggers vetting as does applying for employment authorization. Review of and resolution of derogatory information relating to an applicant is conducted within the office handling that particular application. Asylum applications are processed in asylum offices, while employment authorization applications are processed in service centers. Vetting is conducted throughout the adjudication process, however vetting often is occurring in relation to the particular application rather than in relation to the alien on an enterprise level.

*Comments:* Several commenters supported removing "bureaucratic" timelines. Commenters expressed that such timelines are arbitrary and are detrimental to proper vetting of applicants.

*Response:* USCIS agrees with commenters that a self-imposed 30-day timeframe is no longer an accurate reflection of the agency's ability to adjudicate these applications in a sustainable manner. This rulemaking will allow USCIS greater flexibility to shift workloads based on service center capacity and to continue to conduct necessary vetting, while providing accurate and timely adjudications without a disproportionate impact to the adjudication of other benefit requests.

2. General Opposition to the NPRM

*Comments:* A number of commenters noted that the proposed rule contradicts DHS's focus on requiring aliens to be self-sufficient. In particular, several commenters indicated that this regulation is in tension with the "Inadmissibility on Public Change Grounds" final rule, which was promulgated in August 2019. *See* 84 FR 41292 (Aug. 14, 2019). Commenters expressed concern that the potential for a longer wait to receive employment authorization would prevent asylum seekers from becoming self-sufficient as quickly as possible and could cause them to become a public charge. A commenter also cited 8 U.S.C. 1601, providing a Congressional statement that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes."

*Response:* USCIS disagrees with the premise of these comments. Asylum seekers are not subject to public charge in the adjudication of their asylum applications. Likewise, the public charge ground of inadmissibility is not applicable to asylees seeking adjustment of status to lawful permanent residence. Since this population is not subject to inadmissibility based on being likely to become a public charge, USCIS does not find this rule in tension with rulemaking related to this ground of inadmissibility. Additionally, the purpose of this rulemaking is to address the unsustainable burden due to rising number of EAD applications and the resources required to maintain 30-day processing times. USCIS data supports the operational need for this rulemaking based on the significant increase in EAD applications in recent years as well as increased requirements for security checks and vetting, which lengthen the time it takes to process each case. Increasing resources for this adjudication indefinitely to meet an outdated regulatory timeframe would come at significant cost, potentially in fees and efficiencies for other benefit requestors.[27] Additionally, this rulemaking brings the regulations relating to (c)(8) processing in line with other EAD classifications, for which

---

[27] On November 14, 2019, DHS proposed to set a $490 fee for initial employment authorization applications for those with pending asylum applications. *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 84 FR 62280 (Nov. 14, 2019). Although the fee rule has yet to be finalized, DHS stated that it was proposing to charge the fee to keep fees lower for all fee-paying EAD applicants. As discussed in the NPRM preceding this final rule, the agency is uncertain whether the fee would reduce the overall resource burden associated with the 30-day timeframe.

AR005547

processing timelines were previously removed.

*Comments:* Many commenters also indicated concern that this rulemaking would have a negative impact on applicants' wellbeing in that delays in EAD application processing would lead to or exacerbate issues like homelessness, food insecurity, mental health problems, and lack of access to healthcare.

*Response:* USCIS strives to process all benefits requests efficiently and this rulemaking does not make changes to eligibility requirements or the process by which asylum seekers obtain employment authorization. Regardless of the underlying basis for applying for employment authorization, all applicants filing initially are subject to some period of processing time that may delay their ability to obtain employment or other services.

*Comments:* Several commenters opposed the rule on the basis that EADs are essential to the economic survival of vulnerable asylum seekers.

*Response:* This rulemaking does not prevent eligible asylum seekers from obtaining EADs, nor does it make substantive changes to eligibility or adjudication requirements. It merely removes a self-imposed timeframe for USCIS to adjudicate such applications because that constraint is no longer operationally feasible. USCIS publicly posts processing time information, so that asylum seekers have information on how long the adjudicative process is taking and can plan accordingly. USCIS acknowledges that this rule may cause some processing delays that may increase the period during which asylum seekers rely on individuals or organizations for support. This rulemaking does not aim to create undue hardships, or to cause unnecessary delays in processing applications. Regardless of the underlying basis for applying for employment authorization, all applicants filing initially are subject to some period of processing time that may delay their ability to obtain lawful employment or other services. USCIS believes that its operational needs outweigh concerns over potential minor increases in processing times.

*Comments:* Some commenters expressed concern that delays in work authorization would prevent asylum seekers from obtaining valid state IDs.

*Response:* Individual state governments determine the documentary requirements for state-issued identifications and therefore these requirements are outside USCIS' purview.

*Comments:* Several commenters indicated they think asylum seekers should be able to work as soon as possible.

*Response:* While USCIS acknowledges these commenters' opinions, the earliest date legally possible is at the 180-day mark, as Congress explicitly determined that asylum applicants who are not otherwise eligible for employment authorization ''shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.'' INA section 208(d)(2); 8 U.S.C. 1158(d)(2). However, the operational realities are not that simple. USCIS is charged with dutifully administering lawful immigration benefits and the INA specifically charges the agency with the authority to implement the law, including the discretion to grant work authorization to those who have applied for asylum. USCIS endeavors to process benefit requests as quickly and efficiently as resources allow and will continue to do so for applicants seeking an EAD based on a pending application for asylum. This rulemaking simply removes an agency's antiquated and self-imposed constraint to account for increased operational and filing volume changes that have occurred over two decades since the promulgation of the previous rule.

*Comments:* Commenters stated they believe this rulemaking to be antithetical to American values. For example, one commenter stated, ''. . . [the United States is] considered the 'land of opportunity' but yet we refuse to give people running for fear of persecution the opportunity to try to assimilate to our culture.'' Another stated, ''. . . [l]et us not forget that we are a nation built on values that those who need help can always look to this great nation for support and refuge.''

*Response:* USCIS disagrees with the commenters' premise. This rule focuses on USCIS' operational capacity and the resources required to maintain the 30-day processing timeline as receipts and vetting requirements have increased drive this rulemaking. Continuously increasing resources allocated to a particular adjudication type negatively impacts production for other benefit request types. This rule does not reduce or eliminate the opportunity for an asylum seeker who has yet to establish eligibility for asylum on the merits to apply for or receive an EAD.

*Comments:* A couple of commenters indicated they thought this rulemaking was discriminatory to communities of color, including Hispanic individuals. Another commenter stated the proposed rule would continue what that commenter claimed was a history of

illegally discriminating against Central and South American migrants.

*Response:* This rulemaking applies equally to all asylum seekers, and does not discriminate against aliens based on ethnicity or country of origin. The demographics of asylum seekers, a population that has yet to establish eligibility for asylum, shift over time based on country conditions around the globe. This rulemaking addresses USCIS' available resources and capacity to process applications for asylum seekers of all ethnicities and nationalities and the processing changes provided by this rulemaking will continue to be applied equitably.

*Comments:* One commenter indicated that they thought the proposed rule is part of a structure intended to ignore migrants and trap them in an illegal status.

*Response:* Aliens seeking asylum must be physically present in the United States pursuant to INA section 208(a)(1), but may or may not have entered lawfully or be maintaining lawful status. Further, an EAD does not change an alien's underlying status or likelihood of being eligible for asylee status, but simply provides evidence that an alien is temporarily authorized to work in the United States, in this instance based on a pending application for asylum.

*Comments:* Some commenters suggested that the 30-day deadline is needed to ensure processing accountability.

*Response:* USCIS acknowledges the importance of accountability and continuously seeks to improve and streamline work processes to improve efficiency and provide accurate and timely adjudicative decisions. As with any adjudication, USCIS posts processing times for these applications so that applicants can understand what to expect.[28] Applicants have avenues to address excessive delays through case status inquiries, expedite requests when circumstances warrant, and even judicial redress through filing a mandamus action to compel a decision. Removing the 30-day timeframe does not absolve USCIS of its responsibility to adjudicate applications as quickly and efficiently as possible but does reconcile changes in processing requirements for vetting as well as increasing application volume.

*Comments:* Some commenters asserted that USCIS is capable of maintaining the 30-day adjudication

---

[28] *See* USCIS, Check Case Processing Times, *https://egov.uscis.gov/processing-times/* (last view February 26, 2020). Select the form type and the service center processing the applicable case.

AR005548

timeline, as it has been doing so for years.

*Response:* USCIS has achieved compliance with the *Rosario* v. *USCIS* court order, 365 F. Supp. 3d 1156 (W.D. Wash. 2018), as 96.9 percent of asylum-related EADs were processed within 30 days for FY2019. USCIS has had to devote significant additional resources to achieving these rates, which in turn adversely impacts other lines of adjudications. The resources needed to sustain this rate as application volumes and vetting requirements either increase or fail to abate from historically high levels will continue to force the agency to divert resources from other priorities at greater levels. This is not sustainable and unfair to other benefit requestors who also rely on timely adjudications from USCIS for other immigration status-granting benefit requests.

*B. DHS Statutory Authority and Legal Issues*

Some commenters provided input on DHS's statutory and legal authorities to promulgate this regulation.

1. DHS Statutory Authority

*Comments:* A commenter said the proposed rule contravenes Congress' intention to protect migrants with well-founded fears of persecution. Similarly, others commented that the proposed rule contravenes Congressional intent to promote effective settlement and conform with international law, as evidenced in the Refugee Act of 1980's legislative history and its language similar to that of the UN Protocol on the Status of Refugees of 1967. Another commenter agreed, stating that the 1967 Protocol and U.S. law were in response to World War II and the Holocaust.

*Response:* This rulemaking does not impede an alien's opportunity to seek asylum in the United States and does not contravene Congressional intent or explicit Congressional directives. Providing an asylum seeker with the opportunity to apply for temporary employment authorization while an application for asylum is pending is a discretionary benefit, as provided by Congress. *See* INA section 208(d)(2) ("An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the [Secretary of Homeland Security]"). USCIS strives to provide timely and efficient adjudications for all benefit requests, including asylum and related benefits, but the significant increases in applications for asylum are overtaxing our resources to process ancillary benefits within the 30-day regulatory timeframe.

*Comments:* Commenters stated that Congress intended for asylum applicants to have work authorization as soon as possible after the 180-day waiting period, as evidenced by the inclusion of such waiting period in the Immigration and Nationality Act (INA). Others likewise commented that INA's express waiting period cannot be extended by DHS, citing INA section 208(d)(5)(A)(iii), which provides that in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date such application is filed. The commenters stated that the 180-day statutory waiting period for employment authorization, taken together with the 180-day statutory timeframe for asylum adjudications, make clear that Congress intended asylum seekers to obtain work authorization as expeditiously as possible; either before 180 days if USCIS adjudicated the asylum application in that timeframe, or as soon as possible after 180 days if the asylum application was still pending at that time.

Another commenter stated, "[t]he Proposed Rule sharply contradicts a basic principle of United States immigration law since our nation's earliest immigration statutes were passed: Self-sufficiency," citing to 8 U.S.C. 1601 to justify the requirement for expeditious processing of asylum seekers' EAD applications.

*Response:* USCIS respectfully disagrees with the commenters' statutory interpretation. INA section 208(d)(2) states, in pertinent part: "An applicant for asylum *is not entitled* [emphasis added] to employment authorization, but such authorization may be provided under regulation by the [Secretary]. An applicant who is not otherwise eligible for employment authorization *shall not be granted such authorization prior to 180 days* [emphasis added] after the date of filing the application for asylum." The statutory language plainly creates a minimum requirement for the time an asylum application can be pending before the discretionary authority to grant employment authorization is permitted, but does not prohibit a longer wait time, whether by regulation, policy, or the time it takes to adjudicate such an application after a minimum of 180 days has passed. The separate provision articulating a 180-day asylum adjudication timeframe does not change this conclusion. Had Congress wished to require the Secretary to authorize employment for applicants after 180 days had elapsed since the asylum application was filed, it could have

indicated that intention. *Cf., e.g.,* National Defense Authorization Act for Fiscal Year 2020, Public Law 116–92, sec. 7611(d)(3)(B) ("Liberian Refugee Immigration Fairness") ("If an application for adjustment of status under subsection (b) is pending for a period exceeding 180 days and has not been denied, the Secretary shall authorize employment for the applicable alien."). But Congress did not even require DHS to offer employment authorization at all, let alone articulate an adjudication timeframe.

8 U.S.C. 1601 provides a Congressional statement that "Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statute." While USCIS agrees that self-sufficiency is an important aim of immigration law and policy, USCIS must consider its workloads and the operational impacts of outdated regulatory timelines for adjudicating EADs for aliens who have not yet established eligibility for asylum.

*Comments:* A commenter stated that the INA authorized DHS to promulgate the proposed rule. The commenter further stated that there is no fundamental right to seek safety and protection in the United States.

*Response:* USCIS concurs that it has the authority granted by the statute to promulgate this rulemaking. This rulemaking does not, however, impact an alien's right to seek safety and protection in the United States, nor does it impose changes to the process or eligibility requirements associated with seeking asylum.

*Comments:* Some commenters disagreed with eliminating the 30-day processing timeframe, stating that it is arbitrary and capricious. Commenters stated that there was no rational connection between the proposal and the facts relied upon, that the agency relied on inappropriate factors, and failed to consider alternatives. Specifically, they stated that the agency did not disclose the 2018–2019 processing times, can adequately vet applicants during the 30 days, failed to consider the impact to applicants not receiving an EAD, and inappropriately considered reduced litigation as a factor.

Commenters also stated that DHS did not adequately consider alternatives. Specifically, commenters stated that DHS did not explain why it cannot hire additional staff, why it is abandoning the timeframe altogether rather than extending it (challenging DHS's comparison to *Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers,* 81 FR

82398 (Nov. 18, 2016) ("AC21")), and asserted that DHS ignored that before *Rosario* v. *USCIS*, 92% of applicants were adjudicated within 90 days.

*Response:* DHS respectfully disagrees with commenters stated that it has not demonstrated a rational connection between its proposal and the facts before the agency. DHS has updated the rule with more data for FY 2018–2019. In the proposed rule, DHS provided data regarding FY 2017 processing times, described current processing times, explained its vetting procedures and how they have changed since September 11, 2001, and showed that most applications that required additional vetting took more than 30 days to adjudicate. DHS also explained that other adjudications have been delayed as a consequence of diverting significant resources from other benefit request types in order to adjudicate (c)(8) applications within the 30-day timeframe.

DHS considered alternatives, such as hiring additional staff or extending the timeframe to 90 days. DHS acknowledged that it is working to comply with the court order's processing times, but that such an approach is unsustainable due to the extreme resource strain. Even if DHS were able to hire staff to attempt to mitigate an increased timeframe from an operational perspective, DHS would still need to recruit, vet, onboard, and train new adjudicators, and likely extend the timeframe. Further, extending the regulatory timeframe to 60 or 90 days would not necessarily result in a timeframe that is feasible in all cases. DHS explicitly stated that before *Rosario*, it was adjudicating 92 percent of applications within 90 days, and thus disagrees with the commenter that DHS ignored that fact. DHS has seen a drastic increase in asylum applications in recent years, and this increase was not anticipated, and therefore could not have been considered when the former INS promulgated the 30-day timeframe more than 20 years ago. To promulgate another timeframe could lead to similar results and delays should volumes increase further in the future.

DHS recognizes that AC21 related to employment-based applications that do not necessarily involve the same humanitarian considerations. However, DHS also notes that though AC21 was primarily focused on employment-based immigration, it did provide for automatic extension of EADs for those who have properly filed asylum applications. See 8 CFR 274a.13(d)(1). The purpose of the discussion referenced by the commenter is to make clear why DHS rejected the option of changing the 30-day asylum applicant EAD processing timeframe to 90 days. As DHS wrote in the proposed rule, maintaining any adjudication timeframe for this EAD would unnecessarily constrict adjudication workflows. Ultimately, USCIS is unable to plan its workload and staffing needs with the level of certainty that a binding timeframe may require, and has no way of predicting what national security and fraud concerns may be or what procedures would be necessary in the future.

DHS recognizes potential impacts to applicants of not receiving an EAD at the earliest possible juncture, however, this rule does not prohibit or otherwise limit an asylum applicant's eligibility for an EAD or to apply for or receive asylum. USCIS expects that this rule will generally align adjudications with USCIS processing times achieved in FY 2017. A potentially small (such as a 30- to 60-day) delay in adjudication time, as compared to current processing times, would allow the agency the flexibility in resources to fully vet applicants through a sustainable approach for years to come.

Lastly, DHS did not wrongfully consider reduced litigation as a factor, as it was important and transparent to note to the public that it anticipated an end to litigation over the 30-day adjudication timeframe, but that applicants could in some cases still challenge the agency on "unreasonable delay" theories.

*Comments:* Commenters stated that the proposed rule was an unsupported significant departure from past policy and that it must analyze reliance interests, citing *FCC* v. *Fox Television Stations,* 556 U.S. 502 (2009). Commenters also stated that the agency's prior rulemakings on the issue enacted the 30-day timeframe for humanitarian reasons to mitigate hardships on asylum applicants, "to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible (citing to Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 10312, 10317–18 (Mar. 6, 1997)). Commenters stated that this rulemaking does not acknowledge humanitarian factors.

*Response:* For reasons discussed elsewhere in this final rule, as well as provided in the proposed rule, this rulemaking fully acknowledges the agency's past practice, and provided justifications and data to support its change. USCIS predicts, and expects, that with finalizing this rule, adjudications will generally align with DHS processing times achieved in FY 2017 (before the *Rosario* v. *USCIS* court order, 365 F. Supp. 3d 1156 (W.D. Wash. 2018)). To the extent that legitimate reliance interests may exist in this context, DHS adequately addressed such interests in DHS's proposal to grandfather into the 30-day adjudication timeframe all *Rosario* class members who filed their EAD applications prior to the effective date of the final rule.

DHS explicitly recognized its past regulatory history on this issue and humanitarian concerns in the proposed rule. DHS has tried to find ways to reduce adjudication times for this population, such as returning to the processing of affirmative asylum applications on a "last in, first out" (LIFO) basis. DHS has further considered humanitarian factors submitted by commenters, but as noted in the proposed rule, the existing 30-day timeframe has become untenable. DHS proposed and is finalizing a solution in this rulemaking that is intended to balance the agency's core missions with providing an avenue for asylum applicants to obtain employment authorization. DHS is committed to adjudicating these applications as quickly as possible in a transparent and sustainable manner.

### 2. Rosario v. USCIS Court Order

Some commenters provided input on the court order in *Rosario* v. *USCIS*, 365 F. Supp. 3d 1156 (W.D. Wash. 2018).

*Comments:* A commenter stated that the rule appears to be an attempt to reverse *Rosario* v. *USCIS*, asserting that it is very doubtful that courts will favorably review an attempt to reverse the previous ruling through a regulatory process. Similarly, another commenter said the proposed rule is an attempt to avoid the *Rosario* litigation and its compliance plan, analogizing the latter to a contract.

*Response:* The decision in *Rosario* v. *USCIS* was predicated on the existing regulatory scheme in which USCIS created a 30-day processing timeframe. Specifically, the *Rosario* court order found that USCIS violated the existing 30-day regulatory timeframe and enjoined USCIS "from further failing to adhere to the 30-day deadline for adjudicating EAD applications, as set forth in 8 CFR 208.7(a)(1)." The court order is contingent upon USCIS' existing antiquated rule. As the 30-day timeframe was established by agency rulemaking, it can likewise be changed by agency rulemaking when the agency acknowledges its prior policy, provides reasons for the change, and promulgates a new rule. As noted in this rulemaking

and supported with available data, USCIS has determined that changing conditions, including increased vetting requirements and rising application volumes, render the former regulatory scheme nonviable.

With respect to the claim that this rulemaking attempts to avoid the *Rosario* litigation and its compliance plan, USCIS respectfully disagrees with this characterization of the purpose and nature of this rulemaking. However, USCIS is in compliance with the court order in *Rosario*.

*Comments:* Several commenters stated that the *Rosario* decision recognized that the balance of equities supported expedient adjudication of initial EAD applications so that asylum seekers may obtain employment authorization when waiting—often for years—to have their asylum applications resolved. Commenters cited the 1994 proposed rule, in which INS concluded that it was appropriate to adjudicate applications for employment authorization within 30 days of receipt, regardless of the merits of the underlying asylum claim.[29]

*Response:* The rule does not change the basis upon which USCIS may grant employment authorization to an asylum seeker pursuant to INA section 208(d)(2). It removes an outdated timeframe for the reasons stated above. In the vast majority of cases, this will not result in additional years of delays in employment authorization. The merits of the underlying asylum application are a separate adjudication and until a decision is reached on that application, the asylum seeker may be granted an EAD on the basis of the pending application.

*Comments:* An organization commented that the *Rosario* court and U.S. Supreme Court precedent in *Pereira* v. *Sessions,* 138 S. Ct. 2105 (2018), determined that "resource constraints" and vague "practical concerns" do not justify departing from statutory obligations to protect human welfare. Another commenter stated that the proposed rule fails to acknowledge this humanitarian factor in its analysis, and an individual commenter said the proposal cites "vague" security concerns, stating that the federal court in *Rosario* found such concerns to be sufficiently low that it ordered USCIS to comply with the 30-day processing deadline.

*Response:* USCIS seeks to clarify that the *Rosario* court considered *Pereira* v. *Sessions* in a footnote, finding that "meritless considerations do not justify departing from the law's clear text."

---

[29] *See* 59 FR 14779, 14780 (Mar. 30, 1994).

*Rosario* v. *USCIS,* 365 F. Supp. 3d 1156, 1163 n.6 (W.D. Wash. 2018). The Court considered the human welfare concerns, not security concerns, as part of its analysis of the *TRAC* v. *FCC,* 750 F.2d 70 (D.C. Cir. 1984), factors. *See Rosario,* 365 F. Supp. 3d at 1162. With respect to the claims regarding statutory obligation, USCIS disagrees with the commenter, as it is not departing from any statutory obligation. INA section 208(d)(2) explicitly states that an "applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General." USCIS has not departed from the statute's text. The statute also prescribes a minimum period the asylum application must be pending prior to eligibility for consideration of an application for an EAD. The fact that the statute does not mandate employment authorization for this population demonstrates that the agency could comply with the statute's obligations to protect human welfare by not providing any avenue for employment authorization to this population. The agency has not elected to take that option, but rather has created a regulatory mechanism to provide an opportunity for employment authorization. Within that context, resource constraints and operational needs have caused DHS to reconsider the self-imposed regulatory timeframe. DHS is simply seeking to align the regulation with a feasible operational reality. With respect to the fraud and national security concerns discussed in the proposed rule and in this final rule, DHS reiterates that enhancing security is a core goal of the agency. USCIS faces limitations in identifying and tracking fraud, as explained in the GAO report discussed elsewhere in this preamble, yet the agency must ensure each applicant is properly vetted and provide its adjudicators with the requisite time to do so.

3. Other Comments on Statutory Authority or Legal Issues

*Comments:* One commenter questioned USCIS' authority to set any deadlines concerning U.S. immigration policies.

*Response:* As noted in section B of the Executive Summary in this preamble, the authority of the Secretary of Homeland Security (Secretary) for these regulatory amendments is found in various sections of the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 101 *et seq.* General authority for issuing the proposed rule

is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws and to establish such regulations as he deems necessary for carrying out such authority. *See also* 6 U.S.C. 271(a)(3)(A), (b). Further authority for the regulatory amendment in the final rule is found in section 208(d)(2) of the INA, 8 U.S.C. 1158(d)(2), which states an applicant for asylum is not entitled to employment authorization, and may not be granted asylum application-based employment authorization prior to 180 days after filing of the application for asylum, but otherwise authorizes the Secretary to prescribe by regulation the terms and conditions of employment authorization for asylum applicants.

International Law

*Comments:* A commenter stated that the proposed rule is contrary to the 1967 Protocol's "fair and efficient" asylum standard. The commenter provided citations to executive statements and case law in arguing that the 1967 Protocol is an authority in U.S. refugee law. Another commenter stated that the Universal Declaration of Human Rights (UDHR) and the United States' commitment to it in the International Convention on Civil and Political Rights, the Refugee Convention and Protocol, and the Convention Against Torture create a fundamental right to asylum that would be weakened by the proposed rule. Another commenter said the rule is a violation of the Universal Declaration of Human Rights Article 14, Section 1. Another commenter also cited the International Covenant on Economic, Social and Cultural Rights (ICESCR) as providing a right to work that the proposed rule would contravene. This commenter also cited Article 45 of the Organization of American States (OAS), Article XIV of the American Declaration on the Rights and Duties of Man, and Article 6 of the Additional Protocol to the American Convention on Human Rights in the Area of Economic, Social and Cultural Rights. Several commenters opposed the proposed rule, stating it contravenes the intent of the UN Refugee Convention and the Refugee Act of 1980. Another cited Articles 17 and 18 of the 1951 Refugee Convention as binding the United States to grant asylum-seekers the right to employment. The commenter provided examples of other nations with more generous work authorization laws.

*Response:* As a threshold matter, this rule does not abrogate the ability of asylum applicants to seek or receive employment authorization; rather, it

simply modifies the timeframes under which applications for such authorization may be adjudicated.

Although the United States is a party to the 1967 Protocol, which incorporates Articles 2 to 34 of the 1951 Refugee Convention, the Protocol is not self-executing. *See, e.g., INS* v. *Stevic,* 467 U.S. 407, 428 n.22 (1984); *Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009). The United States has implemented Article 34 of the 1951 Convention—which provides that party states ''shall as far as possible facilitate the assimilation and naturalization of refugees''—through the INA's asylum provision, section 208. *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987) (quotation marks omitted). As the Supreme Court has recognized, Article 34 is ''precatory'' and ''does not require [an] implementing authority actually to grant asylum to all'' persons determined to be refugees. *Id.* Nor is the United States required to provide work authorization for asylum applicants, let alone within a particular timeframe.

The INA provides that ''[a]n applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General.'' 8 U.S.C. 1158(d)(2). The implementing regulations establish that, subject to certain restrictions, an applicant for asylum shall be eligible to request employment authorization. 8 CFR 208.7(a). While the regulations allow asylum applicants to request employment authorization, the Act makes it clear that there is no entitlement to it. Additionally, the Act itself does not impose a temporal limitation on the agency to complete adjudications of asylum applicants' application for employment authorization. Eliminating the 30-day timeframe for adjudication of an asylum applicant's application for employment authorization is therefore consistent with the Act, which constitutes the U.S. implementation of the treaty obligations. *See Weinberger* v. *Rossi,* 456 U.S. 25, 34 (1982) (noting the general presumption that U.S. law conforms to U.S. international treaty obligations).

To the extent that commenters discussed other international treaties or instruments that articulate certain principles relating to a right to work, DHS acknowledges those treaties and instruments but notes that they are either non-self-executing or non-binding or are treaties to which the United States is not a party.[30] Here, Congress

has enacted a specific statute authorizing the agency in the realm of employment for asylum seekers. This rule is within the Department's statutory authority. In any event, the rule does not bar an asylum applicant from applying for or receiving work authorization or qualifying for asylum; rather, it aligns DHS's processing of such applications with agency resources and provides sufficient flexibility for DHS to meet its core missions of enforcing and administering our immigration laws and enhancing security.

Other Legal Comments

*Comments:* A commenter stated that the proposed rule presents a due process issue in discriminating against asylum applicants by denying them timely adjudications. Another commenter agreed, stating that removing the timeframe would effectively allow the government to deny asylum claims by ''doing nothing'', because removing the timeframe would deprive applicants of an opportunity to challenge agency delays. A commenter stated that, by denying asylum applicants the opportunity to receive timely 30-day notice of whether or not they have received employment authorization, this proposed rescinding of the 30-day timeline violates applicants' Fifth Amendment rights not to be deprived of life, liberty, or property without due process.

*Response:* USCIS disagrees with these comments that the rule violates due process. This rulemaking does not discriminate against asylum seekers or abridge their rights, as they are still able to apply for and receive employment authorization, but rather brings the regulatory scheme by which these applications are processed in line with processing for other types of applications for employment authorization. The rulemaking also does not effectively lead to denials of the underlying asylum claim because it does not amend any of the eligibility requirements or processes related to the asylum application. To the extent that it does cause delays in an applicant receiving an EAD, DHS notes that it expects to return to the processing timeframe in effect prior to *Rosario,* which the agency believes is a manageable and realistic timeframe. Further, providing employment

authorization to those with pending asylum applications is statutorily authorized but not mandated, and this rulemaking is intended to ensure that limited resources are allocated in a manner which best allows the agency to process not only asylum seekers' initial applications for employment authorization timely, but also all other benefit requests.

*Comments:* A commenter stated that USCIS must provide a clear picture of the impact of a proposal in its proposed rule and that updating its analysis in the final rule does not provide an adequate opportunity for public comment.

*Response:* USCIS would direct the commenter to the regulatory impact analysis in the proposed rule. USCIS monetized the impacts where possible, and discussed qualitatively those that could not be monetized. In addition, data updates incorporated in this final rule have not substantially changed the assessments of the proposed impacts. *See, e.g.,* 84 FR at 47149 (''The impacts of this rule would include both distributional effects (which are transfers) and costs.[FN2] The distributional impacts would fall on the asylum applicants who would be delayed in entering the U.S. labor force. The distributional impacts (transfers) would be in the form of lost compensation (wages and benefits). USCIS does not know the portion of overall impacts of this rule that are transfers or costs. If companies can find replacement labor for the position the asylum applicant would have filled, this rule would have primarily distributional effects in the form of transfers from asylum applicants to others already in the labor market (or workers induced to return to the labor market). However, if companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, this rule would primarily be a cost to these companies through lost productivity and profits. USCIS also solicited additional data and feedback from commenters. USCIS believes the proposal itself and the 60-day comment period provided more than sufficient opportunity for comment.

*C. Removal of 30-Day Processing Timeframe*

1. DHS Rationale and Need for the Rule

DHS received hundreds of submissions on the need for the proposed removal of the 30-day processing timeframe or DHS' rationale for the same.

---

[30] *See, e.g., Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004) (observing that the UDHR ''does

not of its own force impose obligations as a matter of international law''); *id.* at 735 (''[T]he United States ratified the [International] Covenant [on Civil and Political Rights] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts.'').

Fraud and National Security

*Comments:* Commenters asserted that security and fraud detection do not conflict with the 30-day rule, and that USCIS can already take additional time to process EADs where there is suspected fraud. One commenter stated that there is no evidence that the 30-day timeframe resulted in increased grants of fraudulent applications.

*Response:* DHS disagrees with commenters that if DHS retains the 30-day timeframe it will be able to take additional time to vet certain asylum applicants for the EAD, and that fraud detection does not conflict with the 30-day timeframe. The regulatory timeframe and *Rosario* court order restrict the agency's ability to, in a sustainable manner, fully and thoroughly vet applicants. Additionally, in most cases where additional vetting was necessitated, the adjudication took longer than 30 days.

Adequately and thoroughly vetting applicants improves USCIS's ability to detect fraud and national security concerns on individual cases as well as identify trends and compile statistical data on cases involving fraud and/or national security concerns.

*Comments:* A commenter stated that the majority of EAD applications are not fraudulent and can be processed quickly, as evidenced by compliance with the *Rosario* litigation. The commenter stated that this indicates that EAD adjudication processes need to change, not the deadline itself. Similarly, an organization stated that USCIS failed to provide evidence of fraud impacting the EAD process. An individual also stated that USCIS has not conducted any investigation as to the extent of EAD fraud, but that a Government Accountability Office (GAO) report stated that "only 374 asylum statuses were terminated for fraud between 2010–2014. In the same timeframe, well over 400,000 people fleeing war, disaster, political upheaval and imminent crisis were admitted to the United States to establish themselves for a better life and opportunity." An individual commenter stated that the reliance on "fraud" as the catch-all justification for every change that undermines the strength of this country's asylum program is "tiresome."

*Response:* USCIS agrees with commenters that the majority of (c)(8) EAD applicants are found eligible for employment authorization based on their pending asylum applications and recognizes the adjudication of employment authorization applications is not a flawless system. For reasons stated elsewhere in this rule, although USCIS is complying with the *Rosario* court order, *Rosario* v. *USCIS,* 365 F. Supp. 3d 1156 (W.D. Wash. 2018), doing so is causing a serious strain on agency resources.

Although USCIS has not published reports regarding fraud by aliens seeking an EAD based on a pending asylum application, it has internal procedures to monitor and vet applications and petitions for fraud risks. The GAO report focused on the merits of the underlying asylum application, and instances where an alien who was granted asylum status was later found to have obtained that status by fraud. Additionally, the GAO findings stated that USCIS has "limited capabilities to detect asylum fraud. . . . Identifying and implementing additional fraud detection tools could enable USCIS to detect fraud more effectively while using resources more efficiently." [31] The adjudication of applications for (c)(8) employment authorization is limited in scope to the instant application, however, and does not render a determination on frivolity or fraud for the underlying asylum application. The GAO acknowledges the limitations USCIS faces in identifying and tracking fraud, and encouraged the agency to implement additional tools to detect fraud. With this rulemaking, USCIS hopes to provide its adjudicators with the requisite time to accommodate existing vetting requirements and to maintain flexibility should trends change.

Fraud is not a constant. It is ever-evolving and efforts to commit fraud become increasingly sophisticated as methods for detecting fraud improve. USCIS must be continuously vigilant in an effort to detect new and advanced efforts to commit fraud. Additionally, agency rigor and dedication to uncovering fraud schemes serves as a deterrent. No amount of effort will detect all attempts to commit fraud, but USCIS must remain focused and diligent in order to deter fraudulent claims. USCIS relies on all available systems and documents to detect attempts to commit fraud, which increases the time spent on each adjudication. Maintaining appropriate vetting while processing historically high numbers of applications makes the current 30-day timeframe untenable without diverting significant resources from other benefit request types.

*Comments:* Several commenters stated that DHS already has the option of stopping the 30-day adjudication timeframe if it suspects fraud by requesting additional proof from an applicant.

*Response:* While it is true that the 30-day adjudication timeframe may be paused or restarted in certain instances, according to certain regulations,[32] pausing or restarting the adjudication timeframe is not possible in all instances to accommodate routine background checks and fraud detection activities and investigations. USCIS disagrees that it can or should stop the adjudication timeframe in the manner proposed to accommodate typical adjudicative procedures rather than removing the timeframe altogether, as this rule does.

*Comments:* A commenter stated that DHS receives biometric information during the 150-day waiting period, during which it has ample time to conduct background checks. Another commenter stated that, by proposing this regulation, USCIS is "broadcasting" that it has not done security checks on asylum seekers whose applications have been pending for many months. A commenter stated that background checks can begin with an applicant's arrival at the border, when their biometrics are taken with the IDENT system and could be compared against FBI and Interpol databases. Similarly, an individual commenter questioned USCIS' statement that a slower process will increase national security because applicants who are seeking work authorization due to pending asylum applications already have supplied biometric and biographical data, which should allow processing to go quickly.

*Response:* USCIS acknowledges that biometric data is often collected prior to an asylum seeker applying for employment authorization, including at a border encounter, as part of USCIS' adjudication of an asylum application, and/or during removal proceedings.[33] When an alien submits an application or petition with an associated biometrics requirement (*e.g.,* a pending asylum application), the data collected in relation to the asylum application is not systematically linked to a subsequently filed ancillary application for

---

[31] GAO, Asylum: *Additional Actions Needed to Assess and Address Fraud Risks* (Dec. 2015), *available at https://www.gao.gov/assets/680/ 673941.pdf.*

[32] *See* 8 CFR 103.2(b)(10)(ii) and 8 CFR 208.7(a)(2).

[33] DHS plans to propose a rule to modify its biometrics procedures, establish consistent identity enrollment and verification policies, and align USCIS' biometrics collection with other immigration operations. Office of Management and Budget, Executive Office of the President, *Collection and Use of Biometrics by USCIS* (Fall 2019 Unified Agenda), *https://www.reginfo.gov/ public/do/ eAgendaViewRule?pubId=201910&RIN=1615- AC14.*

AR005553

employment authorization. Vetting is triggered by individual benefit requests, in this case, the EAD application. Filing an application for an EAD triggers new vetting in association with this application. EAD officers are not permitted to "refresh" or otherwise rely on vetting performed in association with another application. Because USCIS's current vetting processes remain tied to the particular benefit request rather than the individual, vetting is initiated for the EAD application separate and apart from the asylum application. The proposed rule to eliminate the 30-day adjudication timeframe for initial (c)(8) EADs is not an admission of failing to conduct appropriate vetting in current adjudications, but rather is an operational necessity as asylum claims have reached historic levels in recent years, and because of the resources needed to adhere to the regulatory timeframe. Finally, USCIS notes that asylum seekers are not required to apply for an EAD and not all applicants will do so, so there is no operational efficiency to "pre-adjudicate" a benefit that may never be sought.

USCIS did not propose a slower process, but rather explained how its vetting procedures have changed since the 30-day timeframe was implemented more than 20 years ago, specifically to safeguard national security in response to the September 11, 2001, attacks. USCIS is removing this timeframe to provide its adjudicators a sustainable amount of time to complete these vetting procedures, as well as account for the historic number of filings in recent years.

*Comments:* Some commenters said fraud concerns are unfounded and should not cause delays, concluding that if DHS has a concern about an alien, then it should quickly vet the application, rather than delay it. Other commenters stated that USCIS' national security statements serve only to prompt the need for a speedier process to properly protect national security, rather than a proposal to delay the process further. Some commenters stated that this need for a speedier process is further compounded by the fact that the EAD applicants are asylum-seekers who are already residing in the United States, and having unvetted people in the U.S. subjected to a potentially indefinite review period seems contrary to the DHS's stated interests. An individual commenter concluded that any need for additional vetting prior to issuance of EADs could be addressed by means other than simply eliminating the processing parameters for all applicants.

*Response:* USCIS is charged with administering and safeguarding the integrity of the lawful immigration benefits. While some background checks are systematically initiated at intake, safeguarding against fraud and national security concerns also relies on manual processes in which officers analyze and assess the information available to them in the record and electronic databases. Likewise, officers are able to assess accurately whether a derogatory piece of information actually relates to the applicant, which allows applicants to receive a decision far more quickly than if any point of concern was routed outside of typical processing for additional scrutiny. Concerns involving fraud or national security are often identified in the course of adjudication, rather than quickly identified through an upfront review.

USCIS processes all EAD applications for asylum applicants as quickly as possible, including a careful review of those applications for aliens who may be flagged for additional scrutiny due to national security concerns. However, such additional review requires time, resources, and coordination with law enforcement agencies. Such review periods are not indefinite and are completed as expeditiously as possible.

Although there could be alternative means to address additional vetting, such as alternative timelines, USCIS believes eliminating the timeframe provides greater flexibility to the agency to balance its large workload efficiently.

*Comments:* Some commenters stated that not adjudicating EAD applications will not reduce national security threats, as asylum applicants are able to remain physically present in the United States regardless of the EAD decision. Others provided citations to articles relating unemployment and crime[34] to support assertions that the proposal could be counterproductive to public safety and security, as asylum applicants would be compelled to find illegitimate sources of income because of USCIS' refusal to provide them with EADs.

*Response:* USCIS disagrees that vetting of employment authorization applications does not reduce national security threats. As part of its mission as a screening and vetting agency, USCIS conducts national security and public safety checks on all applications,

[34] The commenter cited to Karin Edmark, *Unemployment and Crime: Is There a Connection?,* 107, The Scandinavian Journal of Economics No. 2, 353, 370 (Jun. 2005); Steven Raphael and Rudolf Winter-Ebmer, *Identifying the Effect of Unemployment on Crime,* Vol. 44 The Journal of Law & Economics No. 1, 259, 280 (Apr. 2001); Mikko Aaltonen et al., *Social determinants of crime in a welfare state: Do they still matter?,* Vol. 54 Acta Sociologica No. 2,161 (June 2011).

petitions, and benefit requests submitted to the agency. As indicated in response to a previous comment, vetting is triggered by individual benefit requests, in this case the EAD application. It is possible an asylum applicant became a potential threat to national security or public safety after the filing of the asylum application or that new information becomes available, but USCIS would not know until initiating security checks when the pending asylum EAD application is received. The agency is attempting to move away from these "point in time" checks, but that is something we continue to work toward. These checks, during the adjudication process, allow for referral to the Background Check Unit (BCU) or Center Fraud Detection Office (CFDO) for additional vetting where significant concerns are identified, as well as potential investigation by ICE, all of which take time which does not pause the 30-day regulatory timeframe. Further, in some circumstances, the findings may render the applicant subject to mandatory detention or ineligible for the underlying asylum claim and/or the EAD.

USCIS also does not agree that elimination of the 30-day timeframe and any potential attendant processing delays will negatively impact security or public safety by driving asylum seekers to criminal activity. The articles relied on by the commenter discuss studies conducted that generally find socio-economic status is strongly associated with crime, specifically property crime. USCIS recognizes that there may be a correlation between unemployment, socio-economic status, and crime; however, it does not concur that the extent of the change (returning to the adjudication timeframe pre-*Rosario*) would have such severe effects. Further, an asylum seeker who chooses criminal behavior to obtain a source of income, rather than waiting to receive employment authorization could be denied asylum as a result of such criminal activity, depending on its type and severity.

*Comments:* Some commenters stated that USCIS makes frequent reference to a rise in national security threats as a reason to spend more time and resources on each decision but has reported that it has been able to decide over 99 percent of EADs within the 30-day timeframe for over the past year, which proves the agency's ability to adequately vet requests in a timely manner. Another commenter stated that USCIS' national security justification is unsubstantiated, especially because USCIS explains that additional security

AR005554

and anti-fraud measures are already built into the EAD adjudication process. Others stated that the agency had a decade to implement the post-9/11 security checks that it now claims make the 30-day timeframe impracticable.

*Response:* As noted, the agency has had to comply with the *Rosario* court order, and as discussed elsewhere in this rule, continuing to adhere to the 30-day timeframe is not sustainable for USCIS and its adjudicators, and resources have been moved from other competing priorities in other product lines.

USCIS acknowledges that certain security checks are built into the EAD adjudication process across benefit types and this rule does not change those processes, it simply reflects that such procedures are resource intensive. Modernized vetting procedures are also not reflected in the current regulatory timeframe because that timeframe was created more than 20 years ago. Additionally, the level of fraud sophistication and the threat immigration-related national security concerns pose today are more complex than they were when the timeframe was created. Although the events of 9/11 prompted a new and intensive focus on national security, especially in the immigration context, vetting does not remain static as USCIS continually assesses its methods and systems to improve its ability to detect and deter those who would enter the United States to do harm. Those who do have ill intent continue to refine and improve their methods and USCIS must do the same. In all adjudications, USCIS works to provide thorough vetting and eligibility determinations and advance U.S. interests in fairly administering lawful immigration while detecting and deterring fraud and threats to national security and public safety.

*Comments:* One commenter asked how long it takes to vet somebody from another country without any paperwork or medical records.

*Response:* To the extent that the comment is relevant to this rulemaking, USCIS notes that the length of the vetting process varies, and this may depend on the documents an alien seeking asylum may have in their possession or to which they have access. USCIS uses a combination of systems, biometrics, and documents to vet aliens requesting benefits.

Resource Concerns and Efficiency

*Comments:* A commenter stated that the proposed rule would save costs by eliminating the need to litigate and comply with *Rosario.*

*Response:* USCIS has worked diligently to comply with the *Rosario* v. *USCIS* decision. Though USCIS predicts that this rule would end future litigation over the 30-day adjudication timeframe, even applications that are not subject to a set timeframe could, in some cases, be the subject of litigation on "unreasonable delay" theories. USCIS notes that cost-savings resulting from reduced litigation and the cost from potential future litigation on "unreasonable delay" are not monetized in the regulatory impact assessment below.

*Comments:* A commenter stated that USCIS cannot simply rely on the processing backlog to support its proposal, as the backlog was even greater when, in 1994, the Justice Department decided to finalize the 30-day rule. A commenter cited the proposal's statement that USCIS cannot predict future security needs and commented that no proposed rule can predict the future; however, USCIS faced the same uncertainty in 1994, when it finalized the 30-day timeframe rule. Others commented that changes to intake and EAD document production that have been in place for more than 15 years cannot justify the proposed rule, since logic would dictate that centralization would make the process more efficient. Another commenter cited the 2019 Ombudsman Report [35] as failing to list intake requirements or security and vetting as challenges to the timely adjudication of EAD applications.

*Response:* USCIS acknowledges that backlogs ebb and flow and agrees with commenters that, in some cases, an agency cannot predict future needs. Changing backlogs can result from any number of changed circumstances, including but not limited to, changes in receipt volumes, legal requirements, court rulings, regulation and policy changes, and changes to internal processing. Because of the many variables which contribute to changing backlogs, USCIS is best able to process the great number of benefit requests timely when it has flexibility to adjust workflows and staffing levels across form types. Hard processing timelines for one benefit type box the agency in and, as in this case, require the diversion of resources from other benefit types to maintain a processing time for one individual adjudication line.

With respect to the 1994 backlog, USCIS recognizes that there was a sharp

increase in initial EAD applications in the mid-1990s. FY 1993 had 90,883 initial EAD applications, which jumped to 176,041 in FY 1994 and remained high with 158,938 in FY 1995 and 120,621 in FY 1996 before dropping below 50,000 per year for several years. USCIS notes that even at the peak in 1994, the amount of applications received in 1994 is considerably lower than the number of applications filed in recent years, which peaked at 262,965 in FY 2018. And regardless, DHS is not bound to forever retain the 30-day regulatory timeframe, even assuming that the INS adopted that timeframe with full knowledge of a growing backlog. DHS retains the authority to remove the timeframe, and it is doing so here for the reasons stated in this preamble.

USCIS reviewed the 2019 Ombudsman Report and though it did not list intake requirements as a reason for increased EAD adjudication times, it did specifically state that "background vetting on applications, including the predicate petitions or applications upon which EAD applications are based, also contribute to EAD processing times."

The centralization of the agency's intake and EAD document production, though implemented in 2006, had led to a need to remove the 30-day timeframe. Centralized, rather than local, intake procedures provide efficiency in that USCIS is able to leverage contract staff to conduct high-volume data entry and other associated intake tasks. However, centralized intake, which occurs at offsite locations, also incurs delay and costs associated with shipping physical files to another location for adjudication. To comply with the *Rosario* court order, USCIS has been forced to conduct application intake onsite at the adjudicating office to avoid the delay caused by file shipment. This process is less efficient and more costly than Lockbox intake, but is necessary to attain compliance with the *Rosario* court order. These changes in intake procedures, coupled with the increased filings and modifications to vetting procedures, explain why the 30-day timeframe is no longer feasible.

*Comments:* A couple of commenters referenced DHS's statement that it expects to be able to meet FY 2017 adjudication timeframes, *i.e.,* to adjudicate 78 percent of EAD applications within 60 days. The commenters stated that this contention seems disingenuous considering that DHS does not propose a 60-day timeframe. The commenters went on to state that DHS's lack of commitment to a specific timeframe coupled with current EAD backlogs does not support

---

[35] USCIS Ombudsman, *Annual Report,* 78, (Jul. 2019), *available at https://www.dhs.gov/sites/ default/files/publications/cisomb/cisomb_2019- annual-report-to-congress.pdf.*

AR005555

DHS's claim of being able to adjudicate 78 percent of EAD applications within 60 days. Another commenter referenced the 78 percent statistic and asked if this would continue to occur if USCIS is not mandated to return them within 60 days. Another commenter stated that, even now, with guidelines in place, the agency fails to meet the 30-day mandate in more than half of cases.

*Response:* USCIS would like to provide clarity to commenters regarding the adjudication rates. USCIS stated that 78 percent of initial applications were adjudicated within 60 days prior to the *Rosario* court order, but since its issuance, USCIS has been in compliance with the order. USCIS continues to face a significant backlog but strives to provide timely adjudication across all form types, regardless of a regulatory timeframe. As stated in the proposed rule, DHS expects to return to the pre-*Rosario* timeframe with finalizing this rule, but it will not codify another regulatory timeframe at this time. While USCIS cannot predict ebbs and flows in receipts, removing the 30-day timeframe without creating another regulatory timeframe allows the agency to adjust workflows and staffing resources to maintain timely processing for this and other benefit requests.

*Comments:* A commenter stated that USCIS is unable to support either its justifications or its impact analysis without citation to recent and actual processing times. The commenter went on to state that USCIS explains that the court order has forced it to focus more resources on adjudicating initial EADs for asylum, but it does not explain how it allocated its resources before, which types of cases it prioritized, and which specific case types are suffering as a result of the court order. Further, this commenter said USCIS claims that the current rule is outdated, and the current adjudication process is more complex, but fails to recognize other important conditions that have changed since the rule was adopted (more funding, staff, and technology). Lastly, the commenter cited to the statement in the proposed rule that, if USCIS could predict a reduction in total application volume, such a reduction "would not, on its own, serve as a sufficient basis to leave the 30-day adjudication timeline in place" to demonstrate that USCIS admits that it would have proposed this rule regardless of the additional resource burden. The commenter states that this removes resource burden as a standalone justification for the proposed rule.

*Response:* USCIS's resource allocations and prioritizations are fluid and regularly adjusted based on demand, processing time constraints, resource availability, legislative and policy changes, and other considerations. To comply with the *Rosario* decision, USCIS increased officer hours for adjudication of initial (c)(8) applications, and centralized these adjudications to minimize time lost to file movement and allow for more accurate tracking of class members' applications, which has placed a strain on the agency's resources in a manner that is difficult to sustain. USCIS did provide recent and actual processing times in the proposed rule, and has supplemented this final rule with updated data. USCIS also explained in the proposed rule: (1) How its adjudications have changed and resources have shifted since the 30-day provision was promulgated, (2) how it prioritizes adjudications through LIFO [36], and (3) how changes in technology and security initiatives have impacted the process. While USCIS continues to work to improve efficiency and modernize adjudicative processes, the initial (c)(8) EAD applications continue to be filed on paper and processed using an older case management system. Unfortunately, modernizing intake and adjudication systems is a lengthy and labor intensive process and there is currently no expected timeframe in which USCIS expects a more modernized process for initial (c)(8) EAD applications.

With respect to the agency's statement on reduced application volume, USCIS disagrees with the commenter's understanding that it would have proposed this rule regardless of the current resource burden. While the number of applications received has dropped from peak levels in 2018, the situation created by unforeseen and sustained spikes in application volumes highlighted that such specific regulatory timeframes can cause significant operational burdens when circumstances outside USCIS' control and ability to anticipate occur. USCIS acknowledged that it could not predict how administrative measures and external factors, such as immigration court backlogs and changes in country conditions, would affect total volumes. It then acknowledged that even if it could predict such circumstances, it was proposing to remove the timeframe "in light of the need to accommodate existing vetting requirements and to maintain flexibility should trends change." 84 FR at 47161.

*Comments:* Multiple commenters stated that USCIS' compliance with the *Rosario* court order demonstrates that a 30-day timeframe is practicable and that USCIS could comply with the 30-day timeframe and retain vetting procedures, contrary to the proposed rule's contention that USCIS would have to reduce or eliminate vetting to continue complying. Another commenter cited to the 2019 Ombudsman Report and commented that the EAD processing delays had been increasing before the *Rosario* decision and were unrelated to any reallocation of resources. One commenter stated that "USCIS time frames posted publicly" show that Form I–765 takes mere minutes to process. The commenter stated that because it takes mere minutes to process such applications, it is only reasonable to retain the 30-day timeframe.

*Response:* DHS recognizes that EAD processing times had been increasing prior to *Rosario,* but DHS asserted and continues to assert that its reallocation of resources occurred due to the litigation and in order to comply with the court order, and that such reallocation of resources is not a long-term, sustainable solution because USCIS has many competing priorities and many time-sensitive adjudication timeframes. Although USCIS is currently in compliance with the *Rosario* court order, it continues to reiterate that maintaining the 30-day timeframe is not sustainable. This rulemaking is intended to ensure that limited resources are allocated in a manner which best allows the agency to process not only asylum seekers' initial applications for employment authorization timely, but also all other benefit requests, as maintaining the current 30-day processing time is already significantly diverting resources from other adjudications and is expected to continue to do so. Further, since the initial (c)(8) application does not currently require the applicant to pay a fee,[37] other benefit requestors are bearing the cost of these adjudications while resources are pulled away from the adjudication for which they paid a fee. This rulemaking brings the regulatory scheme by which these applications are processed in line with

---

[36] USCIS did note in the proposed rule that it anticipated updating its data regarding LIFO in the final rule; however, the change to LIFO was accompanied by a historic increase in filings, and it has been difficult for USCIS to ascertain all of the impacts.

[37] DHS has proposed to set a $490 fee for initial employment authorization applications for those with pending asylum applications. *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 84 FR 62280 (Nov. 14, 2019). DHS has not yet issued a final rule with respect to that proposal.

AR005556

processing for other types applications for employment authorization.

DHS acknowledges that the time an officer spends on the actual adjudication may take "mere minutes" on applications without eligibility or fraud concerns, but the time an officer spends on a particular application is not indicative of the totality of work that is involved in receiving, vetting, adjudication, and document production. The USCIS Case Processing Time website provides regularly updated and accurate total case processing time information at *https://egov.uscis.gov/processing-times/*.

Other Comments

*Comments:* Several commenters stated that the true intent of the proposal is to serve as deterrent for asylum applicants seeking protections in the United States. Other commenters made similar statements, citing the Migrant Protection Protocols, and rules such as Asylum Eligibility and Procedural Modifications.[38] Similarly, another commenter said indefinitely blocking asylum seekers' ability to support themselves and their families is an abuse of discretion and an attempt to further deter people from seeking asylum in the United States.

*Response:* DHS acknowledges commenter concerns; however, this rulemaking is not intended as a deterrent and does not impede an alien's opportunity to seek asylum in the United States. Neither does this rulemaking change the process by which an alien seeks asylum or any eligibility criteria for obtaining asylee status. This rule solely affects a benefit an asylum seeker may request while their application for asylum has been pending for a period of at least 180 days. USCIS is simply removing a self-imposed agency processing timeline that is no longer operationally feasible, without impacting the underlying basis for the benefit request.

Employment authorization for applicants with a pending asylum application, however, is not a statutory entitlement, unlike employment authorization for asylees, who are eligible for employment incident to status, as the statute explicitly states. *Compare* INA section 208(c)(1)(B) *with* (d)(2) ("An applicant for asylum is not entitled to employment authorization[.]"). USCIS has provided a regulatory avenue for asylum applicants to seek employment authorization; thus, the agency has not indefinitely blocked an applicant's ability to support themselves and their families. USCIS

strives to provide timely and efficient adjudications for all benefit requests, including asylum and related benefits, but the significant increases in applications for asylum in recent years are overtaxing agency resources to process ancillary benefits within the 30-day regulatory framework.

*Comments:* A commenter questioned the benefit of the proposed rule, reasoning that it would not reduce the immigration backlog any more quickly than the current timeframe and asking whether the purpose of the rule was to redirect resources to ICE. Similarly, a commenter questioned how the added "flexibility" from the proposal would help reduce immigration application backlogs, faulting DHS for refusing to commit to reducing other wait times as a result of eliminating the 30-day EAD timeframe. Another commenter stated that removing the incentive for USCIS to work quickly will result only in obligations being stripped and will not cause the agency to work more effectively.

*Response:* DHS did not assert that this change would reduce immigration benefit request backlogs, but rather that it was proposing this change, in significant part, because of the strain of the growing backlog coupled with the steady stream of new filings. This rulemaking is not an effort to redirect resources to ICE. In order to maintain the current 30-day processing time, USCIS has taken a number of dramatic measures to ensure compliance. This includes centralizing the workload in one service center to allow for close monitoring and reporting practices, eliminating lost time accrued through shipping physical files, and diverting both support and officer resources to ensure the timeline is met. With finalizing this rule, those diverted resources could return to the roles they performed prior to *Rosario*. DHS has chosen not to commit to defined adjudication times across all of its employment-authorization processing in order to provide flexibility for the agency to allocate its resources. As noted in the proposed rule, codifying by regulation any new adjudication timeframe for EADs would unnecessarily constrict adjudication workflows and the agency is unable to plan its workload and staffing needs with the level of certainty that a binding timeframe may require. Removing the 30-day timeline will allow greater flexibility, including to share this workload among other service centers and reallocate resources more evenly to meet demand.

*Comments:* A commenter cited a past rulemaking[39] to state that the 30-day deadline was initially implemented to ensure that bona fide asylees were eligible to obtain employment authorization as quickly as possible, not to ensure that USCIS and former INS had sufficient time to process applications.

*Response:* DHS has reviewed extensively the regulatory history of the promulgation of the employment authorization provisions for those with pending asylum applications. The rulemaking preamble cited to by commenter, and referenced in DHS's proposed rule, discusses the employment authorization provisions that "ensure that applicants who appear to an asylum officer to be eligible for asylum but have not yet received a grant of asylum are able to obtain employment authorization." 62 FR 10317. The rulemaking then discusses the lengthy process of identity and fingerprint checks, and states that given the statutory requirement that asylum not be granted until inadmissibility, deportability, or ineligibility are determined at INA section 208(d)(5)(A)(i), an alien who would otherwise appear to be eligible may have to wait a lengthy period of time before being granted employment authorization. *Id.* at 10317–18. The agency believed such a result was contrary to a main goal of the asylum reforms promulgated in 1995: "to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible". *Id.* "Bona fide" asylees are those who have been deemed eligible by the agency but have not yet received an approval.

USCIS is committed to adjudicating all employment authorization applications as quickly as practicable, however, both internal processes and external factors have changed in the intervening decades since the 30-day rule was promulgated.

3. Alternate Suggestions for Regulatory Amendments to 30-Day Timeframe

Approximately 310 commenters provided alternative suggestions for regulatory amendments to 30-day processing timeframe.

Alternative Proposals and Timeframes Rather Than Complete Removal

*Comments:* Some commenters said DHS should have proposed an alternative or extended adjudication

---

[38] 84 FR 33829 (July 16, 2019).

[39] Department of Justice, *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 FR 10312–01 (Mar. 6, 1997).

timeline, such as 45 or 60 days, or condition the length of the adjudication timeframe on reportable metrics, rather than a complete timeframe removal, in order to provide predictability and relief to asylum seekers. Some commenters stated that removing a timeframe without providing an alternative suggests that USCIS anticipates these applications being significantly delayed. Another commenter stated that the absence of an adjudication deadline is likely to result in unnecessarily lengthy adjudication periods for EAD applications, which are relatively simple to resolve and should not require more than 30 days. A few commenters stated that DHS has not sufficiently justified why an alternative or longer deadline would not be acceptable. Another commenter said amending a rule to limit the burden on USCIS to ensure the betterment of our country might be a good idea but doing so by removing the deadline without replacing it is not.

*Response:* DHS considered imposing a 90-day timeframe rather than removing the timeframe entirely, and discussed this extensively in the proposed rule. DHS appreciates commenters' suggestions regarding alternative timeframes, and recognizes that setting another timeframe could provide more predictability to asylum seekers and would provide USCIS with more time to adjudicate EAD applications. However, USCIS determined not to incorporate a new regulatory timeframe because USCIS is unable to plan its workload and staffing needs with the level of certainty that a binding timeframe may require, and has no way of predicting what national security and fraud concerns may be or what procedures will be necessary in the future. It is imprudent to impose hard processing deadlines, because USCIS cannot reliably predict future workload, processing, and other changes. Although imposing a deadline reliant on reportable metrics may alleviate some of the concern of a hard deadline, the commenter proposed no specific metrics and creating additional tracking and predictive assessments from the agency that have not yet been evaluated would be an imposition to the agency. Further, USCIS did not propose this approach or relevant metrics and thus to finalize such metrics in this final rule would be outside the scope of this rulemaking.

The processing of EAD applications is not simple, and increases in asylum-based filings in recent years, coupled with the changes to intake and vetting procedures, have placed a great strain on agency resources that lead to an increased processing time. DHS recognizes that removing the timeframe may cause concern to applicants regarding potential delays in adjudication; however, USCIS expects to return to the adjudicatory timeline before *Rosario.* While USCIS anticipates this change may lead to short processing delays, this change brings initial EAD application processing in line with other similar applications and allows operational flexibility to shift workloads and continue to vet and adjudicate applications in the most timely fashion practicable without detrimental impact to other benefit request types.

*Comments:* A commenter drew similarities to the AC21 rule repealing former 8 CFR 274a.13(d), which guaranteed the adjudication of employment authorization applications for most immigrant and nonimmigrant categories within 90 days, replacing it with, what the commenter claimed was an inadequate automatic 180-day extension. This commenter stated that the lack of any processing deadline on initial applications has caused significant disruption in the lives of those subject to the changed rule. The commenter opposed this change for similar reasons, stating that, without a clear processing deadline, asylum seekers and their families are faced with uncertainty as to whether they will be able to support themselves, and this unpredictability will severely impact them and their communities.

*Response:* With respect to commenter's concerns regarding AC21, USCIS does not possess data or other evidence to address the commenter's subjective assertion that processing times for other EAD categories have caused "significant disruption in the lives of those subject to [AC21]." In FY 2017, USCIS processed 94.2 percent of EAD classifications, excluding (c)(8), within 180 days; in FY 2018 it was 83.4 percent, in FY 2019, 81.5 percent, and as of February 29, 2020, 84 percent within 180 days. USCIS acknowledges the potential effect of this change on asylum seekers and their social support networks, but must weigh that effect against the impacts on other benefit requestors and USCIS operational realities given changed vetting requirements and increased receipt volume in recent years. By allowing the agency flexibility to shift workloads and resources to accommodate external and internal changes in the application landscape, USCIS believes this rule will allow greater efficiency throughout EAD application types. USCIS recognizes the potential uncertainty that may result and routinely updates publicly available processing times[40] to provide applicants with accurate information to plan for when to file applications and their personal financial needs.

*Comments:* Some commenters suggested that USCIS allow asylum-seekers to submit their employment authorization applications earlier (for example, after 90 days or 120 days instead of 150 days), or concurrently with their asylum applications, to allow USCIS more time to properly vet each alien while reducing the risk of harm to each applicant and the economy. Some commenters stated that under INA section 208(d)(2), asylum seekers may not be granted an initial EAD until their asylum applications have been pending for 180 days, but nothing prevents USCIS from accepting initial EAD applications concurrently with the filing of the asylum application. Commenters also stated that the number of EAD applications has dropped since 2017 and will likely continue to do so. Another commenter said concurrent filings would reduce costs to legal services providers and asylum seekers, by allowing both the Form I–589, Application for Asylum and Withholding of Removal, and the Form I–765, Application for Employment Authorization, to be finalized in a single appointment.

*Response:* DHS appreciates commenters' suggestions to permit asylum applicants to file during the 150-day waiting period. USCIS thinks, however, that allowing an applicant to file for and obtain an EAD earlier based on a pending asylum claim creates an incentive to file non-meritorious asylum applications. Additionally, allowing asylum seekers to file earlier creates a different operational burden. Because the statutory scheme mandates that employment authorization cannot be granted until the asylum application has been pending for a minimum of 180 days, not including delays requested or caused by the applicant, USCIS would need to implement new tracking and records mechanisms to ensure applications would not be adjudicated too early. This would impede the agency's ability to nimbly move workloads between centers and officers. Allowing applicants to file earlier than the 150 day timeline currently in place would necessitate creation of a new clock system to track how long asylum applications were pending prior to approval, in order to avoid approving an EAD when the asylum application had

---

[40] Case processing time information may be found at *https://egov.uscis.gov/processing-times/*, and asylum applicants can access the web page for realistic processing times as USCIS regularly updates this information.

been pending less than 180 days. This would require tracking and potentially holding applications over a longer span of time, adding complexity, and would additionally complicate accounting for applications subject to the prior rules and those subject to this rule on or after its effective date.

The burden associated with statutory compliance would create new operational costs related to new and additional tracking as well as bifurcated requirements related to cases pending on or after the effective date of this rule while not creating new efficiencies. Asylum applications are adjudicated by Asylum Officers within the Refugee, Asylum, and International Operations directorate, while applications for EADs are processed by Immigration Services Officers within the Service Center Operations Directorate. Asylum Officers receive intensive and specialized training to understand the nuances and sensitivities involved in assessing eligibility for asylum. Immigration Services Officers also receive specialized training, but they are frequently trained to adjudicate many different benefit request types and, as located in service centers, and do not have face to face interactions with benefit requestors. In short, the nature of and procedures for these adjudications are very different. If USCIS allowed concurrent filing, the applications would still need to be adjudicated through completely different processes. Additionally, as the proposed rule did not contemplate allowing earlier filing, it is outside the scope of this rulemaking.

DHS acknowledges that the volume of initial (c)(8) EAD applications has dropped slightly as compared to 2017. However, as of FY 2019, this type of application remains historically high, with FY 2018 receipts at 262,965 and FY 2019 at 216,038; maintaining the 30-day timeframe poses an unsustainable burden during periods of high application volumes, while allowing applicants to file earlier would create additional administrative costs and burdens.

## USCIS Should Acquire More Resources Instead of Removing the Timeframe

*Comments:* Several commenters stated that, rather than proposing this rule, DHS could acquire more resources for operations at each service center as well as at card production facilities (for example, by hiring more adjudication staff). A commenter said fees for other forms could be increased to accommodate the cost of hiring additional adjudicators. However, the commenter said, with the recent

elimination of an entire category of eligibility for fee waivers, it seems likely that fee increases would not even be necessary to increase revenue. Similarly, another commenter proposed hiring more USCIS staff as a solution, even if that means including a fee payment I–765 on asylum applications. Several commenters took issue with DHS's rationale that hiring staff ''would not immediately'' shorten adjudication timeframes, stating that it is no excuse for not considering that alternative, and that the concern should be whether doing so would address the issue long-term. Another commenter stated that the temporary delay between hiring new employees and their ability to process applications does not require a permanent elimination of a fixed processing timeframe.

*Response:* DHS seeks to complete every request as soon as it possibly can while ensuring that benefits are provided only to those who are eligible. As stated in the proposed rule, DHS has determined that it should not be subject to a procedural deadline codified in regulations to adjudicate a certain immigration benefit request in a very short time. As the commenters note, USCIS is authorized by law to set fees at a level necessary to recover the full costs of adjudication and naturalization services. *See* INA section 286(m), 8 U.S.C. 1356(m). As required by the Chief Financial Officers Act of 1990 (CFO Act), 31 U.S.C. 901–03, USCIS analyzes its costs every two years to determine if its fees are adequate to recover its full costs. If fee revenue is projected to be too high or low, USCIS conducts rulemaking to adjust its immigration benefit request fees to the amounts necessary to cover its operating costs. *See, e.g.,* 84 FR 62280 (Nov. 14, 2019). In November of 2019, DHS published a proposed rule that proposes a new fee schedule, including a fee for an initial EAD for asylum applicants. *Id.* at 62320.

DHS stated in the proposed rule for this rulemaking that providing the resources to meet this regulatory timeframe requires USCIS to use fees paid by other benefit requestors. *See* 84 FR at 47165. DHS believes USCIS requires the flexibility to devote its resources where they are needed to meet seasonal demands, filing surges, and DHS priorities and not to meet an outdated regulatory deadline. Therefore, DHS will remove the 30-day deadline from the regulations.

Further, even if and when the funds are available to hire additional staff and officers, there is a significant lag time in the course of posting job announcements, selecting candidates,

background investigations for selectees, onboarding, and training and mentoring before new hires are able to adjudicate. Throughout this time, backlogs build and resources continue to be diverted to support programs with processing timelines.

While DHS recognizes that the suggested staffing solution may be more long-term, the agency does need an immediate solution, as resources continue to be strained. While USCIS strives to maintain the staffing necessary to timely process all benefit request types and continuously analyzes workload trends and production, simply hiring more people does not provide a short term fix and, even when new hires are working at full competency, shifting demands and priorities continuously present new challenges that are even more difficult to adjust to with a processing timeline in place. As noted in the proposed rule, hiring additional staff may not shorten adjudication timeframes in all cases because (1) additional time would be required to onboard and train new employees, and (2) for certain applications, additional time is needed to fully vet an applicant, regardless of staffing levels.

*Comments:* A commenter said the rule suggests that it would be too expensive to hire additional officers to keep up with timely processing and cites to ''the historic asylum backlog,'' but the commenter stated the reasoning appeared to be pretextual since the proposed regulations only deal with initial EADs filed by asylum seekers and not EAD renewals for asylum seekers whose cases are currently in the asylum office backlog.

*Response:* The USCIS Asylum Division received 44,453 affirmative asylum applications in FY 2013, with increases each year up to a peak of 142,760 in FY 2017. This more a than three-fold increase in four years not only created backlogs in processing asylum applications, but also caused a steep increase in the number of both initial and renewal applications for employment authorization, with FY 2018 totals at 324,991 and FY 2019 totals at 551,266.[41] Both the initial workload and renewal workload are processed by officers with different specialized training to provide a more streamlined and efficient adjudication

---

[41] EADs currently have a 2-year validity period and this can cause cyclical fluctuations in renewal rates. The renewal receipts for FY 2018 were 62,026, which reflects the lower initial filings in FY 2016 (although receipt and adjudication dates routinely cross fiscal years, so this may include a portion of initial filings from 2015 and 2017). It is noted that replacement filings are excluded from the figures, as they are not relevant to this rulemaking.

process. Further, EAD renewal applications for asylum seekers are not subject to adjudication timelines, and also have an automatic extension clause to mitigate any lapse in employment authorization for these aliens. The 30-day rule and *Rosario* court order have created the necessity for a centralized process to ensure compliance, which prevents USCIS from shifting workloads among officers trained to adjudicate EAD applications, when it may be more efficient and offer a more timely adjudicative process. This rulemaking aims to improve flexibility and efficiency by taking away barriers to using existing resources to the greatest effect.

*Comments:* A commenter stated that the proposals that USCIS should hire and train more adjudicators ignores Congress' mandate that USCIS benefits processing costs must be funded through user fees. The commenter stated that USCIS should not be compelled to arbitrarily adhere to a rigid and disruptive processing deadline for "guaranteed" 30-day asylum EAD processing unless and until user-provided fee revenue is available to fully fund the needed dedicated agency personnel and resources.

*Response:* While USCIS fees are set through rulemaking and hiring additional adjudicators would not ignore a Congressional mandate, USCIS appreciates the commenter's understanding of the constraints involved in resources and hiring.

Ombudsman Report

*Comments:* Several commenters said USCIS failed to consider recommendations from the 2019 USCIS Ombudsman Report, which recommends that the agency take several steps to ensure timely adjudication of EADs, including augmenting staffing, implementing a public education campaign to encourage applicants to file I–765 renewal applications up to 180 days before the expiration of the current EAD, and establishing a uniform process to identify and expedite processing of EAD application resubmissions filed due to service error. Another commenter stated that the rule ignored the Ombudsman's recommendation of incorporating the Form I–765 into the agency's eProcessing procedures, which the commenter indicated would expedite the review process and improve review for purposes of fraud and national security concerns.

*Response:* USCIS carefully considers the observations and recommendations provided by the USCIS Ombudsman and if it agrees with a recommendation,

implements it to the extent practicable. The conclusions and recommendations referenced by commenters were the Ombudsman's recommendations for all EAD adjudications, and were not specific to the asylum-based applications and therefore not totally relevant to a 30-day processing timeframe. Nevertheless, as discussed elsewhere in response to comments, augmenting the staff dedicated to asylum-based EAD applications would not immediately and in all cases shorten adjudication timeframes, and would increase the cost-burden on the agency. With respect to implementing an education campaign, USCIS will update its public sources of information, such as the Policy Manual and website, provide updated information regarding the changes to expect relating to the promulgation of this rule, and continue to provide regular updates to processing times. With respect to establishing a uniform process to expedite resubmissions filed due to service error, USCIS has published guidance on its website [42] for obtaining a corrected EAD if there was a government error in the issuance as well as guidance for requesting expedited adjudication.[43]

USCIS is also working diligently to develop the IT infrastructure and systems needed for eProcessing, and acknowledges the benefits of eProcessing, especially with regard to efficiency and national security. This is a time and labor intensive endeavor, requiring the collaboration of developers and subject matter experts and others, as well as extensive testing and demos to ensure the new system and features function properly. USCIS is working and will continue to work towards full eProcessing across all benefit request types,[44] but there is currently no estimate available for when the application for an EAD will be available for eProcessing.

Other Suggestions

*Comments:* One commenter suggested providing each asylum applicant an

option of temporary work permit that can be cancelled if any red flags are found during further screening of the individual applicant.

*Response:* USCIS disagrees with commenter's suggestion, as the agency believes providing a temporary work permit at the time of initial filing invites fraud and abuse. A benefit that would be bestowed automatically simply upon filing provides no opportunity for vetting and encourages frivolous filings to obtain even a short-term benefit. Frivolous filings, in turn, exacerbate backlogs and cause greater delays in processing applications for those with meritorious claims.

*Comments:* One commenter suggested increasing the validity of (c)(8) EADs from 2 years to 5.

*Response:* Though DHS recognizes that increasing the validity period of an EAD may reduce the burden to adjudicate renewal EAD applications, the agency does not believe doing so would alleviate the burden the agency faces in adjudicating initial filings, which was the main goal of this rulemaking. Additionally, renewals of EADs for aliens with a pending asylum applications are not subject to the 30-day adjudication deadline.

*Comments:* One commenter recommended creating a new document for those granted asylum that clearly states that the asylee is authorized to work in the United States without restrictions, which would eliminate the entire (a)(5) product line (for those granted asylum and authorized to work incident to status) and free up adjudicators to work on (c)(8)s.

*Response:* This rule pertains to applicants for asylum, meaning those who have applied for asylum status but have not yet had their asylum application adjudicated on the merits. If an alien is granted asylum status, they are authorized to work incident to status, meaning that he/she no longer needs to apply for employment authorization but receives such authorization as an automatic benefit of that status. *See* 8 CFR 274a.12(a)(5). Accordingly, the process contemplated by the commenter already exists and the agency still faces resource constraints.

*Comments:* A commenter stated that, if DHS is not able to meet a 30-, 60-, or even 90-day deadline in all cases, it could institute a tiered or alternative system of deadlines for cases that require additional security vetting. The commenter said a stop-time mechanism for cases that require additional vetting would be a feasible way to maintain a fixed processing deadline without sacrificing the agency's flexibility. A commenter stated that USCIS does not

---

[42] USCIS, Employment Authorization Document (last updated Apr. 5, 2018), *https://www.uscis.gov/greencard/employment-authorization-document.*

[43] USCIS, How to Make an Expedite Request (last updated May 10, 2019), *https://www.uscis.gov/forms/forms-information/how-make-expedite-request.*

[44] *See* Office of Management and Budget, Executive Office of the President, *Electronic Processing of Immigration Benefit Requests* (Fall 2019 Unified Agenda), *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201910&RIN=1615-AC20;* USCIS, *USCIS Accelerates Transition to Digital Immigration Processing* (May 22, 2019), *https://www.uscis.gov/news/news-releases/uscis-accelerates-transition-digital-immigration-processing-0.*

explain why it did not consider the simple option of adding a stop-clock for the small percentage of applications referred to the Background Check Unit (BCU) and Service Center Fraud Detection Operation (CFDO), akin to the stop-clock currently in place for applications that require Requests for Evidence (RFEs). Just as an RFE pauses the 30-day processing timeframe until additional documentation is received, a new stop clock for BCU and CFDO referrals could pause processing from the time of referral until additional information is received from BCU and/or CFDO.

*Response:* While it is true that the 30-day adjudication timeframe may be paused and restarted in certain instances, according to certain regulations,[45] pausing and restarting the adjudication timeframe may not be possible in all instances to accommodate routine background checks and fraud detection. The agency initially scans specifically for indicators of national security concerns and those concerns are vetted immediately without respect to the 30-day adjudication timeframe. The vetting process, when a concern is identified, can be lengthy and sometimes requires consultation with or referral to outside agencies which cannot be completed within the 30-day timeline. Additional vetting also occurs during adjudication, which may warrant investigative action or require additional information but USCIS disagrees that it can or should stop the adjudication timeframe to accommodate typical adjudicative procedures rather than removing the timeframe altogether, as this rule does. Introducing additional pause and restart mechanisms for routine processing actions would also add a new administrative burden for USCIS to track the pending time of a broader swath of cases.

### D. Removal of 90-Day Filing Requirement

#### 1. Necessity of Rule and DHS Rationale

Approximately 10 commenters mentioned DHS's rationale for the 90-day filing requirement.

*Comments:* A couple of commenters agreed with the proposal to rescind the 90-day deadline for EAD renewals, stating that it is more efficient, more consistent with other regulations, and more fair to applicants to automatically extend an EAD when the alien files a renewal application prior to the current document's expiration. Another agreed that eliminating the 90-day renewal

requirement would mitigate confusion and reduce pressure on those that have an EAD. Another commenter stated that the three pre-conditions in the AC21 [46] rule for automatic extension eligibility will adequately ensure that renewal applications are not automatically granted to applicants whose asylum applications since have been denied.

*Response:* USCIS appreciates these comments in support of removing the 90-day renewal requirement.

*Comments:* A commenter supported the rule change but urged DHS to set a timeframe for adjudicating renewals due to concerns about applicants not receiving their EAD renewal cards by the time the automatic extension ends.

*Response:* USCIS respectfully disagrees that there is a need to set an adjudicative timeframe for adjudicating renewals. USCIS believes the ability to apply for renewal earlier, coupled with an automatic extension of 180 days provides adequate time for adjudication and poses minimal risk that an applicant will experience a lapse in employment authorization. In FY 2019, the average processing time for EAD classifications excluding the (c)(8) applications was 127 days and the median processing time was 100 days. While USCIS acknowledges cases may occasionally pend longer than 180 days due to unusual facts or circumstances or applicant-caused delays, the 180-day automatic extension has proven to avoid lapses in employment authorization for the majority of applicants. In FY 2017, 94.2 percent of applications were adjudicated within 180 days, in FY 2018, 83.4 percent, in FY 2019, 81.5 percent, and as of February 29, 2020, 84 percent of non-(c)(8) applications were adjudicated within 180 days in FY 2020.

### E. Statutory and Regulatory Requirements

#### 1. Costs and Benefits (E.O. 12866 and 13563)

##### k. Costs Associated With Hiring Additional Immigration Officers

*Comments:* Some commenters noted that the economic analysis did not attempt to take into account the costs and benefits of hiring additional USCIS officers to meet the 30-day timeframe. One stated that until cost-benefit analysis of additional hiring is done, and more detailed security protections are explained, this rule change should be viewed as arbitrary and capricious.

Another commenter said USCIS' failure to estimate these costs is "simply irrational" and fails to satisfy the most basic cost-benefit obligations the agency must meet under the APA.

An individual commenter said the rule argues that "the cost of hiring and training employees to adjudicate EADs would be passed onto asylum seekers, in the form of lost wages and higher application fees. However, USCIS offers no direct evidence of these transferred costs. It merely points to an accounting statement by the Office of Management and Budget for 2017 to predict possible costs for 2020–2029."

*Response:* USCIS included an extensive and plainly sufficient analysis of the proposed rule. USCIS acknowledges that it does not conduct a quantitative cost-benefit assessment of the costs and benefits of hiring additional USCIS officers to meet the 30-day timeframe. But this is because, at bottom, USCIS is unable to plan its workload and staffing needs with the level of certainty that a binding timeframe may require and has no way of predicting what national security and fraud concerns may be or what procedures will be necessary in the future.

In any case, the proposed rule did not state that hiring and training additional employees would result in lost wages for asylum seekers. With respect to application fees, the proposed rule stated, among other things, that providing the resources to meet this regulatory timeframe would require USCIS to use a significant amount of fees that are currently paid by other benefit requestors. DHS does not understand the remainder of the comment regarding an accounting statement by the Office of Management and Budget for 2017. The accounting statement in the proposed rule was prepared by DHS and is amply supported by the surrounding text.

DHS believes USCIS requires the flexibility to devote its resources where they are needed. Further, even if and when the funds are available to hire additional staff and officers (which requires increases to USCIS' operational budget and therefore possible increases to immigration benefit fees), there is a significant lag time in the course of posting job announcements, selecting candidates, background investigations for selectees, onboarding, and training and mentoring before new hires are able to adjudicate. Throughout this time, backlogs build and resources continue to be diverted to support programs with processing timelines. While DHS recognizes that the staffing solution may be more long-term, the agency does

---

[45] *See* 8 CFR 103.2(b)(10)(ii) and 8 CFR 208.7(a)(2).

[46] The preconditions are that the application is properly filed before the EAD's expiration date, based on the same category on their EAD and based on a class of aliens eligible to apply for an EAD notwithstanding expiration of the EAD. 8 CFR 274a.13(d)(1).

AR005561

need an immediate solution, as resources continue to be strained. While USCIS strives to maintain the staffing necessary to timely process all benefit request types and continuously analyzes workload trends and production, simply hiring more people does not provide a short term fix and, even when new hires are working at full competency, shifting demands and priorities continuously present new challenges that are even more difficult to adjust to with a processing timeline in place. As noted in the proposed rule, hiring additional staff may not shorten adjudication timeframes in all cases because: (1) Additional time would be required to onboard and train new employees; and (2) for certain applications, additional time is needed to fully vet an applicant, regardless of staffing levels.

l. Population and Effect of Rule on Processing Times

*Comments:* Commenters questioned USCIS's choice to adopt the 2017 level of I–765 applications as its forecast for the future number of applications. Commenters suggested that a trendline, or a range of estimates would be better than using one year's level as a default prediction.

*Response:* In the NPRM, USCIS wrote that USCIS does not use a trend line to forecast future projected initial I–765 applications because various factors outside this rulemaking may result in either a decline or, conversely, a continued rise of applications received. *See* 84 FR at 47162. For example, USCIS said that the number of initial I–765 applications has some correlation with changes in applications for asylum and that the return to LIFO for processing affirmative asylum applications may also impact initial I–765 applications. While DHS agrees with the commenter that using one year's level as a default prediction is not ideal, USCIS notes again that many factors affect USCIS's ability to predict the future number of initial I–765 applications. For example, Table 8 in this final rule shows that the number of initial I–765 receipts grew significantly from 2013 to 2017, held approximately constant in 2018 and declined in 2019. In addition, if finalized, the broader asylum applicant EAD rule may also affect the number of future initial I–765 applications. This illustrates that assuming a trend or range might not be as simple as the commenter suggests. USCIS believes that assuming a level of applications from a known year is a better approach than assuming an upward trendline, especially considering the decline in 2019.

*Comments:* Multiple commenters questioned USCIS's reliance on the assumption that it would return to its adjudication rate from 2017, before the *Rosario* court order. Commenters stated that it is unlikely and unrealistic to expect that USCIS would return to the pre-*Rosario* scenario without a timeline to do so or staffing increases, and that in reality, delays and costs will be more significant than estimated. An advocacy group claimed that the pre-*Rosario* baseline fails to account for "the historic asylum application backlog" that has increased over the past 5 years, which according to DHS is one of the reasons cited for eliminating the 30-day deadline.

One commenter explained that the improvement in processing times from 2015 to 2017 reflects the pending litigation and therefore using the FY 2017 processing numbers are inaccurate. This commenter said a more accurate baseline would be to look to the numbers for initial I–765 processing from before the Rosario class action was filed, which show that in FY 2015, only 27.2 percent of initial filings were completed within 30 days, as compared to 36.3 percent in FY 2016 and 52.4 percent in FY 2017.

Another commenter said DHS should provide the following data needed to better judge the reasonableness of estimated processing times under the rule: Average processing times for all EADs (with the exception of those initial EADs filed by asylum applicants) and average processing times for renewals of EADs based on pending asylum applications.

*Response:* Cost benefit analysis often involves making estimates of future outcomes (*ex ante*) based on the best information available to the agency at the time. USCIS believes FY 2017 provides a reasonable assessment of probable processing times under the adoption of this rule and reflects processing times that are sustainable and realistic, even though the future processing times cannot be predicted with precision and could vary due to any number of factors.

As of the drafting of this final rule, USCIS sees no reason why the FY 2017 processing times are unrealistic and as such, should not be utilized as the expected processing times after this rule is finalized. This rule allows for increases in processing times when necessary to identify fraud and to address other unforeseen requirements. The rule takes into consideration the asylum application processing times during the pre-*Rosario* baseline and we respectfully disagree that the improvement in processing times from

2015 to 2017 was solely a consequence of pending litigation. USCIS consistently evaluates and shifts workloads and resources to meet changing circumstances, such as increased backlogs, and legislative and policy changes. The changes in processing times from 2015 to 2017 were likely driven by a number of factors. USCIS chose FY 2017 because it represents the latest year prior to the *Rosario* court order. While USCIS relies on 2017 processing times, we acknowledge that if the actual processing times are longer than assumed, then the cost of the rule would be higher than estimated. Conversely, if processing times are shorter than assumed, then the cost of the rule would be lower than estimated.

USCIS also believes that average processing times for all EADs (with the exception of those initial EADs filed by asylum applicants) and average processing times for renewals of EADs based on pending asylum applications would not be demonstrative because there are about 50 EAD eligibility categories that USCIS processes, with a wide range of descriptions and variations in terms of applicant type. For any number of reasons, the asylum category could diverge from a generalized processing rate.

*Comment:* A commenter noted that the proposed rule fails to consider the significant impact on asylum applicants in defensive proceedings as much of the analysis in the NPRM focuses on affirmative asylum applicants only. As a result, by excluding defensive asylum EADs, the economic analysis fails to capture the full impacts. The commenter stated that DHS must provide further analysis germane to EAD applications from defensive asylum applicants. In addition, the commenter claims that the removal of the 30-day deadline will create additional backlogs in immigration courts and create investigatory burdens for the Internal Revenue Service (IRS) and Department of Labor (DOL).

*Response:* The analysis presented in the NPRM and updated in this final rule reflects data and information that includes receipts from both affirmative and defensive pending asylum applicants. *See* 84 FR at 47161. Although Table 7—Total Annual Form I–589 Receipts Received from Affirmative Asylum Applicants— addresses only affirmative cases, all parts of the analysis regarding I–765 receipts include both affirmative and defensive applicants because USCIS adjudicates all I–765 applications. Hence, the impacts do take into consideration defensive asylum EADs.

As it relates to the concerns regarding investigatory burdens, USCIS does not believe it is appropriate to assume causation between this rule and such stated impacts. The fact that tax losses may occur does not automatically map to more IRS investigations, just as the possibility that the timing of some EADs may be impacted does not causally map to increases in unauthorized work, wage theft, and dangerous work practices.

m. Wage Bases for Labor Earnings

*Comments:* Several commenters expressed concern with the wage benchmarks USCIS utilized in its analysis. One commenter claimed that the wide range of potential lost compensation ($255.9 million to $774.8 million) was excessively wide and that it is reasonable to assume that EAD applicants will be paid the average wage in the economy, and implied that USCIS did not take into account demographic and socioeconomic characteristics.

A couple of commenters stated that the rule's lower-bound estimate of lost earnings is an understatement because it assumes an $8.25 minimum wage. The commenters stated that 28 States plus the District of Columbia currently have minimum wages exceeding that $8.25 minimum.

Another commenter stated that calculating lost compensation by multiplying a constant wage rate by the projected length of the delay fails to account for the trajectory of future earnings. The commenter said data shows that asylum seekers' wage rates do not remain constant while they work, but rather rise the longer they have been in the work force. The commenter also challenged DHS's treatment of the future earnings of pending asylum applicants as unrelated to the length of delay before they have work authorization. The commenter cited a study by the Immigration Policy Lab at Stanford University that found a seven-month delay in work authorization for German asylum-seekers dragged down their economic outcomes for a decade after.

A couple of commenters challenged DHS's assertion that EAD holders "would not have been in the labor force long and would thus not be expected to earn relatively high wages." The commenters cited the salaries of participants in the Upwardly Global program, specifying that asylum seekers who have completed the program earn an average of $54,875 annually, significantly higher than the national annual mean wage of $51,960, and several program alumni earned six-figure salaries. However, another commenter commended the

assumptions regarding the lower and upper bounds on asylee wage rates (minimum wage and national wage, respectively), stating that, based on the New Immigrant Survey data, they are reliable.

*Response:* USCIS recognizes that the wage bounds relied upon generate a wide range of potential lost compensation. However, data are not directly available on the earnings of asylum seekers and, faced with uncertainty, DHS made reasonable estimates of the bounds.

In regard to the prevailing minimum wage, USCIS frequently relies on such a lower wage for recent or new labor force entrants in its rulemakings. We agree with commenters who note that some states and localities have adopted their own minimum wage. For this reason, USCIS chose to use an estimate of the prevailing minimum wage, as opposed to the base federal minimum wage, as a lower bound estimate. In addition, USCIS applied a multiplier of 1.46 to the $8.25 prevailing minimum wage to adjust for benefits. Therefore, the analysis used a full compensation cost of $12.05 ($8.25 × 1.46) to estimate the lower bound impacts, not the $8.25 base prevailing minimum wage. Again, this results in a lower bound wage that is higher than the actual prevailing minimum wage, although it is unlikely that all positions would provide such benefits.

Regarding the upper bound wage, USCIS does not have demographic or socioeconomic characteristics about asylum applicants and thus uses the national average wage as an upper bound estimate. USCIS agrees it is possible for some of the workers impacted to earn wages higher than the upper bound estimate, the national average across all occupations, just as it is plausible that some earn less than the burdened prevailing minimum wage. The lower and upper bounds simply represent estimates of the range for this population's average wage.

Regarding the rule's effect on earnings over time, USCIS agrees that earnings generally rise over time, and therefore that the earnings of EAD holders could be larger at a point in the future. In the NPRM, USCIS estimates that this rule will delay applicants' receipt of an EAD for an average of 31 calendar days, or 22 working days, if processing times returned to those achieved in FY 2017.[47] This is much less than the seven months

the commenter cited from the study. However, USCIS acknowledges that a 31-day delay caused by the rule could theoretically affect the stream of applicants' future earnings but believes it is too speculative to estimate.

n. Lost Wages and Benefits

*Comments:* Numerous commenters stated that asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, which will cause an outsized, devastating amount of harm to this already-vulnerable community. Many commenters reasoned that a lack of income would lead to not being able to afford food, housing, emergency services, and other benefits and assistances.

Many commenters cautioned that the rule change would cause significant hardship to applicants and their families, including destabilizing the financial and health situation of their children, spouses, parents, and other family members. One commenter cited reports indicating that a 6-month gap in employment contributes to "microeconomic scarring, or the damage a period of unemployment inflicts on individuals or household's [sic] future economic health even after the spell of joblessness ends."

*Response:* USCIS notes that asylum seekers statutorily cannot receive employment authorization prior to 180 days after filing an asylum application, but acknowledges that asylum applications that require additional processing time will delay applicants' entry into the U.S. labor force. USCIS does not anticipate the adoption of the rule to result in processing times that exceed the FY 2017 pre-*Rosario* processing times. This final rule allows for increases in processing times when necessary to reduce fraud and to address other unforeseen requirements, and variations in processing could occur due to unforeseen events and circumstances. In the NPRM, USCIS estimated an average delay of 31 calendar days if processing times returned to those achieved in FY 2017. As described in the NPRM, USCIS acknowledges the distributional impacts during this delay onto the applicant's support network. USCIS assumes the longer an asylum applicant's EAD is delayed, the longer the applicant's support network is providing assistance to the applicant.

o. Impact on Support Network

*Comments:* Approximately 250 commenters commented on the rule's impact on the support networks of asylum-seekers. Many commenters said the proposed "delayed" issuance of

---

[47] Table 10 at 84 FR 47164. 119,088 applications completed after 30 days for a total of 3,651,326 lost calendar days and 2,655,429 working days. 3,651,326/119,088 = an average of 30.7 calendar days delayed and 2,655,429/119,088 = an average of 22.3 working days delayed.

AR005563

EADs would over-burden organizations that provide financial, housing, legal, or other forms of assistance to asylum applicants. Multiple commenters contended that the rule would render asylum applicants unable to work and force them to become a public charge to welfare programs. These commenters stated that this rule is in direct contrast to the overall initiative of the administration and will create a financial burden for the United States.

As it relates specifically to the costs, a commenter stated that the rule explicitly refuses to factor into its cost analysis "distributional impacts for those in an applicant's support network." Similarly, a commenter said USCIS failed to fully consider the costs of delayed EAD adjudication to an asylum seeker's family and makes the statement that its own workload priorities outweigh these financial strains. Another commenter also stated that USCIS miscalculated the cost to support networks, citing data on community groups' limited budgets and resources.

Another commenter disagreed with USCIS' cost analysis and provided an alternative suggestion of measurement. The commenter calculated that the cost of providing for an individual is roughly equivalent to the prevailing wage, which would mean the actual cost of the proposed rule only to applicants' support network would be at least twice that calculated by USCIS.

*Response:* USCIS notes this rule does not directly regulate private support networks or any state program. How the states or private organizations allocate their resources is a choice by the state or organization and is not compelled by this rule. USCIS notes that asylum seekers statutorily cannot receive employment authorization prior to 180 days after filing an asylum application but acknowledges that asylum applications that require additional processing time may delay applicants' entrance into the U.S. labor force. This final rule allows for increases in processing times when necessary to identify fraud and to address other unforeseen requirements, and variations in processing could occur due to unforeseen events and circumstances. In the NPRM, USCIS estimated an average delay of 31 calendar days if processing times return to those achieved in FY 2017. In the NPRM, USCIS acknowledged "the longer an asylum applicant's EAD is delayed, the longer the applicant's support network is providing assistance to the applicant." *See* 84 FR at 47165. The impacted social networks could include, but are not limited to, family members and friends,

relatives, non-profit providers, nongovernmental organizations (NGOs), religious and community based affiliations, and charities. In addition, there could be impacts to state and local governments as well in terms of both their burden and taxes.

In the NPRM DHS requested comment on data or sources that demonstrate the amount or level of assistance provided to asylum applicants who have pending EAD applications. *See* 84 FR at 47165. One commenter specifically suggested that the cost of the proposed rule to applicants' support network is roughly equivalent to the prevailing wage. USCIS agrees that the immediate indirect impact of this rule to an applicant's support network is likely not significantly more than the wages and benefits the applicant would have earned without this rule.

p. Costs Related to Socioeconomic Factors and Impacts

*Comments:* Numerous commenters provided feedback concerning the impacts of the proposed rule involving loss of income to individuals linked to groups in terms of various socioeconomic factors. For example, multiple commenters warned that asylum seekers who are not authorized to work would have problems obtaining healthcare and medical treatment. Multiple commenters said that many asylum seekers will be without healthcare due to the lack of employer provided insurance and thus would be far more likely to skip the preventative care that keeps them healthy which will increase contagious diseases, decrease vaccinations, and overall negatively impact national public health. Another commenter said state-only Medicaid would likely be the only affordable health insurance option for asylum applicants who do not have an EAD; however, applicants will most likely not apply for Medicaid out of concern that receipt of any form of public assistance will harm their ability to adjust status under the DHS Public Charge Rule.

Several commenters said the rule would increase homelessness in communities. One discussed research on the already limited housing available for asylum applicants that will be negatively impacted by this rule, citing sources. A few commenters, citing research studies warned of the adverse short- and long-term consequences associated with homelessness, including chronic physical and mental health, behavioral problems, learning and cognition, academic achievement, and lifelong adult problems.

Numerous commenters asserted that asylum seekers without an EAD due to

the rule would have difficulty obtaining important documents, including a driver's license, state identification, and social security number. Others said obtaining a social security card is often essential to get into job training programs, to enroll in college, and to take many other steps towards integration into a community. Some commenters warned that not having a U.S. government-issued identification document can further limit an applicant's access to transportation, banking, education, heating and electricity, many government facilities and school grounds, as well as hinder the ability to get married.

Multiple commenters warned that asylum seekers who are not authorized to work and therefore lack sufficient funds as a result of this rule would have impeded access to competent legal services and counsel. Several commenters cited studies showing that immigrants who are represented by legal counsel are much more likely to win their cases than those appearing in immigration court without an attorney.

A few commenters reasoned that asylum applicants who do find pro bono or low cost representation, are unable, without work authorization, to pay for other costs inherent in immigration cases, including transportation to get to and from meetings with their attorney or even to court appearances.

A number of submissions cautioned that the above impacts would especially be serious for vulnerable groups, such as children, and that the rule stands to increase vulnerability to labor abuse, exploitation, human trafficking, and violence. In addition, some claimed that particular groups, including women, children, and lesbian, gay, bisexual, transgender, queer (LGBTQ) and HIV-positive asylum seekers, would face negative consequences.

*Response:* USCIS endeavors to process all benefits requests as quickly as possible and this rulemaking does not change the eligibility requirements or process by which asylum seekers obtain employment authorization or asylum status. This rulemaking does not aim to create undue hardships, including added stress or anxiety, on applicants for employment authorization or to cause unnecessary delays in processing applications. Regardless of the underlying basis for applying for employment authorization, all applicants filing initially are subject to some period of processing time that may delay their ability to obtain employment or other services.

Individual state governments determine the documentary requirements for state-issued

identifications. States may choose to rely on documents issued by USCIS, but these requirements are outside USCIS' purview. This rulemaking does not change the eligibility requirements or process by which asylum seekers obtain employment authorization. USCIS appreciates the concerns raised over impacts to particular groups. Furthermore, USCIS does not question the commenters' claims that asylum seeking in the U.S. tends to involve groups of persons with particular socioeconomic characteristics and situations. However, USCIS is unable to quantify the impacts to them as USCIS does not differentiate between the particular groups in adjudicating the EAD applications. As we have described, the rule only stands to possibly impact the timing under which some EADs could be approved.

q. Impacts to Companies and Employers

*Comments:* About 50 commenters focused on the impacts presented in the NPRM in terms of the effects on businesses and companies. Multiple commenters asserted that this rule would negatively impact United States employers and corporations.

Some commenters stated that, under the rule, companies that would otherwise employ asylum seekers will either have insufficient access to labor or bear the costs of finding alternative labor. Several commenters said the jobs that asylum seekers fill will be extremely hard to replace due to their skills, and because many Americans may not want to do their jobs.

Another commenter cited unemployment data and discussed a labor shortage, arguing that employers will be adversely affected by delaying asylum applicants' lawful labor force participation. Also addressing a labor shortage, another commenter cited that there were seven million unfilled U.S. job openings in 2019 and the proposal will block these from being filled. Multiple commenters discussed the significant labor shortage this rule would create for industries such as health care, agriculture, manufacturing, construction, and technology, citing research. Another cited the percentage of the state's workforce made up of immigrants, remarking that immigrants are a key solution to the state's workforce challenges due to the retiring baby boomer population.

Citing several sources, a couple of commenters described the significant financial loss to businesses that would absorb the cost to find and replace asylum seekers jobs. A few commenters stated that USCIS does not adequately analyze the costs to employers in the

rule and should more accurately quantify the impacts of hiring new employees.

*Response:* USCIS agrees there is a possibility a portion of the impacts of this rule could be borne by companies that would have hired the asylum applicants. USCIS has also reviewed the Bureau of Labor Statistics (BLS) data and other references cited by the commenters, and does not necessarily dispute the figures and statistics referenced for 2019. USCIS also notes that, as of November 2019, BLS data also showed approximately 4.3 million workers are considered to be ''part time for economic reasons,'' such as slack work or unfavorable business conditions, inability to find full-time work, or seasonal declines in demand.[48] USCIS recognizes that when unemployment rates are low, providing EADs to pending asylum applicants potentially fills an economic need. However, even during those times USCIS must first be sufficiently assured of applicant eligibility and ensure all background and security checks are completed.

Although the rule would possibly impact the timing that some asylum applicants might experience in entering the labor force, USCIS has no reason, as of the drafting of this final rule, to anticipate that processing times will be vastly different (on average) than those in FY 2017 and reiterates there should not be a significant increase, barring unforeseen variations and circumstances. In the NPRM, USCIS estimated an average delay of 31 calendar days if processing times returned to those achieved in FY 2017. The rule should allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identity verification without having to add any resources.

The rule has taken into consideration that a subset of asylum applicants' opportunity to participate in the labor market could be delayed if their application requires additional time to process. The analysis has also acknowledged that for the companies who are unable to substitute the labor that would have been provided by the asylum applicants, they could potentially experience a reduction in profit.

*Comments:* Some commenters said the rule would force the companies to

become less competitive by shrinking the ability to recruit a diverse and skilled workforce. Another commenter cited research, saying that USCIS failed to consider that asylum seekers bring a variety of professional experience to their work that cannot be replaced by a native workforce.

Another said the rule would make it more difficult for it to hire a diverse and talented workforce to meet the needs of individuals with psychiatric disabilities and require additional expenditures to recruit otherwise authorized employees.

*Response:* USCIS has reviewed the sources and figures presented in the comments, but does not see any compelling reason to assert that this rule, which could affect the timing under which some EADs are obtained by aliens with a pending asylum application, would hamper companies from achieving a diverse and talented workforce.

*Comments:* Some commenters described the spending power of immigrants in each state and the negative impact this rule would have on private profits, citing research and figures. Another, citing research, stated that asylum workers specifically fill in gaps that make businesses more productive and stimulate industries through entrepreneurship. Another commenter cited the NPRM's figure that the rule will result in a loss of $775 million annually, which will affect business profits.

*Response:* USCIS recognizes the research and literature concerning immigrants being involved in innovation and entrepreneurship. However, USCIS does not believe that this rule will reduce innovation and entrepreneurial activity, as it only stands to possibly impact the timing under which some asylum seekers are able to obtain an EAD. In the NPRM, USCIS estimated an average delay of 31 calendar days if processing times return to those achieved in FY 2017.

USCIS acknowledges that if companies cannot find reasonable substitutes for the position the asylum applicant would have filled, this rule will result in lost productivity and profits to companies.

*Comments:* A commenter commented that the rule would force asylum applicants to work illegally, which in turn could lower labor treatment for the United States labor force.

*Response:* The rule only stands to possibly impact the timing in which an asylum applicant can obtain an EAD, where asylum applicants are only eligible to receive employment authorization after their asylum application has been pending 180 days.

---

[48] Bureau of Labor Statistics, *Employment Situation News Release—November 2019,* Table A–8 Employed persons by class of worker and part-time status, February 21, 2020. Available at *https://www.bls.gov/news.release/archives/empsit_12062019.pdf.*

AR005565

Moreover, we see no reason at present that there will be an increase in average EAD processing times, beyond what was occurring pre-*Rosario,* although some EADs may take longer than average to adjudicate.

*Comment:* Another commenter noted that because DHS has said the rule would have no effect on wages, it implies that in the cases where businesses are able to find replacement labor for the position the asylum applicant would have filled, they would be shifting workers from elsewhere in the labor force rather than inducing people to shift away from leisure. The commenter said that means the rule is expected to shrink real output and that total lost wages therefore approximately represent the total economic cost of the rule, and not merely transfers.

*Response:* USCIS does not agree that under the scenario where businesses are able to find replacement workers, this rule would shrink real output. It is plausible that a currently unemployed (or underemployed) worker could fill a job that would have been filled by an asylum seeker without an increase in wages for that job. USCIS acknowledges that in economic theory, wage rates and income are economic variables that individuals consider when choosing between leisure and labor, and that changes in wage rates can either decrease or increase hours of work. This rule will have a short-term impact on labor availability for a relatively small population. The NPRM estimated that this rule would delay per year approximately 120,000 asylum applicants' entrance into the labor force by, on average, 31 calendar days. *See* 84 FR at 47164. As discussed later in this document in the ''Labor Market Overview'' section, the U.S. labor force as of November 2019, is approximately 164 million workers. While DHS does not have information about the industries in which asylum applicants work, DHS notes that applicants are not restricted to a certain industry and therefore these short-term delays to the relatively few number of workers are not concentrated in a single location or industry. Given the short-term nature and relatively small number of laborers disrupted, DHS maintains that the lost wages to asylum applicants is a transfer from asylum applicants to other workers when companies are able to find reasonable labor substitutes for the position the asylum applicant would have filled. DHS acknowledges that there likely are, however, other unquantified costs under this scenario, such as overtime pay or opportunity costs.

### r. Tax Impacts

*Comments:* Many commenters said this rule would negatively affect tax revenue, with many citing USCIS projected losses. Commenters, including individuals, a few advocacy groups, and a professional association, raised concerns regarding the rule's impact on tax losses, stating that these losses will negatively impact government programs and the economy. Multiple commenters, including a federal elected official and a few advocacy groups, discussed the loss of tax dollars and its impact on Medicare and social security. An advocacy group said this rule would contribute to the depletion of streets, schools, and healthier citizens through tax dollar loss.

A commenter stated that, while estimating the lost tax revenue based on the lost earnings estimate, the proposed rule notes, but does not try to quantify, the significant additional lost state income tax revenues. This commenter went on to say that rule does not mention that asylum seekers' earnings translate into lower spending on rent, food, and consumer goods, with the corresponding lost profits and tax revenues that those expenditures would generate. Similarly, another commenter said that USCIS miscalculates tax losses by only using employment taxes, while it should be using federal, state, and local income taxes.

Others said the rule does not account for the cost of losing tax revenue to local governments, which they expect to be significant. Multiple commenters, citing studies, estimated the loss in tax revenue for different individual states as a result of the proposed rule. Another projected that their state would suffer an estimated loss of $1.3 to 4 million dollars on top of lost federal tax dollars if the proposed rule was implemented and requested that USCIS withdraw the rule change. Another said the rule would force the applicants to work ''under the table,'' thus negatively affecting the economy by violating tax, insurance, and employment laws.

*Response:* USCIS appreciates the concerns of commenters and the acknowledgement of the potential projected tax loss stated in the rule. USCIS agrees with commenters that in circumstances in which a company cannot transfer additional work onto current employees and cannot hire replacement labor for the position the asylum applicant would have filled there would be an impact to state and local tax collection. The NPRM stated ''there may also be state and local income tax losses that would vary according to the jurisdiction.'' *See* 84 FR

at 47150. USCIS notes the tax rates of the states vary widely, and many states impose no income tax at all.[49] It is also difficult to quantify income tax losses because individual tax situations vary widely. The NPRM noted that more than 44 percent of Americans pay no federal income tax. *See* 47 FR at 47150. Although USCIS is unable to quantify potential lost income taxes, USCIS has provided a quantified estimate of lost employment taxes. We were able to estimate potential lost employment taxes since there is a uniform national rate (6.2 percent social security and 1.45 percent Medicare for both the employee and employer, for a total of 15.3 percent tax rate) for certain employment taxes. *See* 84 FR at 47150. USCIS recognizes that this quantified estimate is not representative of all potential tax losses by federal, state, and local governments and we made no claims this quantified estimate included all tax losses. We continue to acknowledge the potential for additional federal, state and local government tax loss in the scenario where a company cannot transfer additional work onto current employees and cannot hire replacement labor for the position the asylum applicant would have filled.

### s. Small Entity Impacts

*Comments:* A few commenters discussed the rule's impact on small entities. Some said the proposed rule would negatively impact small businesses and make it difficult for them to find workers. Another commenter, citing research, said immigrants represent 25 percent of entrepreneurs, arguing that this rule would disproportionality and negatively affect small businesses. Another said small town economic development is also hindered because family members who host asylum seekers awaiting EADs must expend material support during this time of limbo instead of starting or continuing small businesses.

*Response:* This rule may result in lost compensation for some initial applicants whose EAD processing is delayed beyond the 30-day regulatory timeframe. However, the rule does not directly regulate employers. In the NPRM USCIS stated that if companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, this rule would primarily be a cost to these companies through lost productivity and profits. USCIS uses the lost compensation to

---

[49] *See generally* Turbotax, 'States with the Highest and Lowest Taxes,'' *https://turbotax.intuit.com/tax-tips/fun-facts/states-with-the-highest-and-lowest-taxes/L6HPAVqSF* (last visited Feb. 24, 2020).

asylum applicants as a proxy for businesses' cost for lost productivity. *See* 84 FR at 47156.

DHS is unable to identify the next best alternative to hiring a pending asylum applicant and is therefore unable to reliably estimate the potential indirect costs to small entities from this rule. This rule will directly regulate pending asylum applicants, or individuals, applying for work authorization. DHS cannot reliably estimate how many small entities may be indirectly impacted as a result of this rule, but DHS believes the number of small entities directly regulated by this rule is zero.

### t. Benefits

*Comments:* Approximately a dozen submissions provided comments on the NPRM's discussion of benefits. A few stated that the lack of quantitative benefits does not support DHS's rationale for the rule. Some questioned whether the qualitative benefits that DHS presents were adequately weighed against the stated millions of dollars of revenue loss and lost wages. One commenter said the discussion of benefits lacks details regarding how DHS would be able to achieve the rule's goals. Another stated that the financial costs to individuals, businesses, and the federal government in the form of lost taxes far outweigh the financial benefits to USCIS. This commenter also said it is also "highly inappropriate" for USCIS to include the end of litigation as a benefit.

One commenter stated that USCIS failed to quantify benefits correctly, questioning why monetary benefits of not having to hiring additional workers is not described or estimated. This commenter also questioned why there was no evidence provided to suggest that removing adjudication standards would speed up the adjudication process. Another commenter stated that the stated benefits of the rule are achievable with a mere extension of the deadline and DHS has provided no evidence to the contrary.

*Response:* By eliminating the 30-day provision, DHS stands to be able to operate under long-term sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and, to maintain technological advances in document production and identity verification that USCIS must fulfill as a part of its core mission within DHS. Applicants would rely on up-to-date processing times, which provide realistic expectations and predictability of adjudication times.

While we believe we have discussed the benefits appropriately, it is not possible to monetize them.

### 2. Other Statutory and Regulatory Requirements

*Comments:* Several commenters addressed the broad statutory and regulatory requirements. One commenter noted the lack of analysis under Executive Order 13771, "Reducing Regulation and Controlling Regulatory Costs," which states that any regulation must result in a net cost of $0 or be paid for by eliminating other regulations. Another commenter said this rule violates Executive Order 13771 because it has estimated costs between $295 and $893 million dollars to the US economy (plus additional tax revenue loss and uncalculated costs), with no quantitative economic benefits estimated. The commenter said no offsetting regulations were identified nor were subsequent offsetting costs estimated.

Multiple commenters said that this rule does not contain an adequate analysis of federalism concerns or the proposal's fiscal impact. The commenters stated that USCIS did not analyze the harms to states' programs and a substantial loss in revenue. Further, the commenters stated that USCIS did not provide analysis required under the Unfunded Mandates Reform Act that would require it to fully consider reasonable alternatives to the rule.

*Response:* This rule has been designated a "significant regulatory action" that is economically significant regulatory under section 3(f)(1) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget. This rule is a regulatory action under Executive Order 13771. DHS is not required by law to include in this rulemaking further discussion regarding Executive Order 13771, such as discussions regarding offsets, but DHS intends to continue to comply with the Executive Order.

DHS did consider federalism concerns and determined that the rule would not have a substantial direct effect on the states, on the relationship between the Federal Government and the states, or on the distribution of power and responsibilities among the various levels of government, as it only removes an adjudicatory timeframe that is within the purview and authority of USCIS and does not directly affect states.

With respect to the Unfunded Mandates Reform Act, the proposed rule and this final rule each explain DHS's position with respect to that Act. In

addition, contrary to the commenters' position, the alternatives analysis provisions of that Act do not apply to rules, such as this one, that do not contain a covered Federal mandate. *See* 2 U.S.C. 1532(a), 1535(a). DHS nonetheless included an alternatives analysis in the regulatory analysis portion of the proposed rule, *see* 84 FR at 47166 *et seq.,* and this final rule, *see infra.*

### F. Out of Scope

#### 1. Comments on the Broader Asylum EAD NPRM

*Comments:* Approximately 10 submissions provided comments on the broader Asylum EAD proposed rule. *See* 84 FR 62374 (Nov. 14, 2019). A commenter said evaluation of the government's arguments is "essentially impossible" in light of their apparent inconsistency with the anticipated "Broader EAD NPRM" called for by a 2019 presidential memorandum. The commenter said USCIS only briefly notes that the rule's impact could be overstated if, as directed by the President, the Broader EAD NPRM is implemented. The commenter stated that USCIS simultaneously argues that the agency needs flexibility to handle increases in EAD applications, which would be false if, under the Broader EAD NPRM, most applicants became ineligible for EADs. The commenter concluded that USCIS must consider the two issues—EAD eligibility and processing timelines—jointly to determine accurately the costs and impact of its future EAD regime. Since the proposed rule is predicated on a situation that the agency intends to obviate by other policy changes, the commenter said its stated reasoning is irrational and fails to satisfy the APA.

*Response:* The two rules are intended to address different problems and are therefore the subject of separate proceedings. Although the broader asylum rule has been proposed, it is not yet final, and may not be finalized as proposed. USCIS recognizes that this rule and the proposed broader asylum-EAD rule could have some interaction, and to the extent that there is interaction or overlap, DHS will address such concerns if it finalizes the broader rule. USCIS disagrees with the comment claim based on a reduction of EADs under the broad rule because of increased ineligibility. USCIS would still receive many EAD filings, although it is possible that more applications may not be approved due to the additional and/or modified eligibility criteria proposed. In reality, because of the added criteria under the broader

proposed rule, adjudication may become more complex.

2. Other Out of Scope Comments

There were just over 600 comments that we have reviewed and determined are out of scope regrading this rule. These submissions can be bracketed generally as: (i) General requests for reform to the immigration system (a few of the comments specifically referred to immigration law; USCIS notes that statutory changes are outside of USCIS' authority. Other changes, such as specific regulatory changes not pertaining to the issues addressed by this rulemaking, would be outside the scope of this rulemaking); (ii) general support for President Trump; (iii) opinions on building a wall on the Southern border and securing American borders; (iv) opposition to illegal immigration and all forms of immigration; (v) support only for legal immigration; and (vi) suggestions that the government enforce immigration laws.

IV. Statutory and Regulatory Requirements

*A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if a regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. Executive Order 13771 ("Reducing Regulation and Controlling Regulatory Costs") directs agencies to reduce regulation and control regulatory costs and provides that "for every one new regulation issued, at least two prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process."

This rule has been designated as a "significant regulatory action" that is economically significant, under section 3(f)(1) of Executive Order 12866. Accordingly, the Office of Management and Budget (OMB) has reviewed this regulation. This final rule is considered an E.O. 13771 regulatory action.

1. Summary

DHS notes that the estimates from the NPRM regarding unemployment, number of asylum applicants per year, and USCIS processing are not currently applicable as COVID–19 has had a dramatic impact on all three. DHS offers this analysis as a glimpse of the potential impacts of the rule, but the analysis relies on assumptions related to a pre-COVID economy. While future economic conditions are currently too difficult to predict with any certainty, DHS notes that a higher unemployment rate may result in lower costs of this rule as replacing pending asylum applicant workers would most likely be easier to do. Consequently, as unemployment is high, this rule is less likely to result in a loss of productivity on behalf of companies unable to replace forgone labor.

This rule removes the timeline to adjudicate initial EAD applications for pending asylum applicants within 30 days and is enacting the proposal without change. In FY 2017, prior to the *Rosario* v. *USCIS* court order, the adjudication processing times for initial Form I–765 under the Pending Asylum Applicant category exceeded the regulatory set timeframe of 30 days more than half the time. However, USCIS adjudicated approximately 78 percent of applications within 60 days. In response to the *Rosario* v. *USCIS* litigation and to comply with the court order, USCIS continues to dedicate increased resources to adjudication of pending asylum EAD applications. USCIS has dedicated as many resources as practicable to these adjudications, but continues to face an asylum application backlog, which in turn increases the numbers of applicants eligible for pending asylum EADs. However, this reallocation of resources is not a long-term sustainable solution because USCIS has many competing priorities and many time-sensitive adjudication timeframes. Reallocating resources to adjudicate asylum EAD applications with the current regulatory-imposed timeframe in the long-term is not sustainable due to work priorities in other product lines. USCIS could hire more officers, but that would not immediately and in all cases shorten adjudication timeframes because: (1) Additional time would be required to recruit, vet, onboard and train new employees; and, (2) for certain applications, additional time is needed to fully vet an applicant, regardless of staffing levels. Further, simply hiring more officers is not always feasible due to budgetary constraints and the fact that USCIS conducts notice and

comment rulemaking to raise fees and increase revenue for such hiring actions.

There is currently no fee for asylum applications or the corresponding initial EAD applications, and the cost to the agency for adjudication is covered by fees paid by other benefit requesters. As a primary goal, USCIS seeks to adequately vet applicants and adjudicate applications as quickly and efficiently as possible. USCIS acknowledges this rule may delay the ability for some initial applicants whose EAD processing is delayed beyond the 30-day regulatory timeframe to work.

The impacts of this rule are measured against a baseline. While we have added some more recent data and information, pursuant to public comments, the costs are benchmarked to 2017, in keeping with the NPRM. This baseline reflects the best assessment of the way the world would look absent this action. In the NPRM, USCIS assumed that in the absence of this rule the baseline amount of time that USCIS would take to adjudicate all applications would be 30 days. USCIS also assumes that upon this rule going into effect, adjudications will align with USCIS processing times achieved in FY 2017 (before the *Rosario* v. *USCIS* court order). This is our best estimate of what will occur when this rule becomes effective. USCIS believes the FY 2017 timeframes are sustainable and USCIS expects to meet these timeframes. Therefore, USCIS analyzed the impacts of this rule by comparing the costs and benefits of adjudicating initial EAD applications for pending asylum applicants within 30 days compared to the actual time it took to adjudicate these EAD applications in FY 2017.

USCIS notes that in FY 2018, 80.3 percent of applications were processed within 30 days and 97.5 percent were processed within 60 days. In FY 2019, the figures were 96.9 percent and 99.2 percent, respectively. In the analysis of impacts of this rule, USCIS assumed 100 percent of adjudications happened within 30 days.[50] However, because actual adjudications in FYs 2018 and 2019 within the 30-day timeframe are slightly less than the 100 percent analyzed, USCIS has over-estimated the impacts of this rule with respect to this variable when less than 100 percent of adjudications happen within 30 days. It is noted that the reliance on the 100 percent rate slightly overstates the costs.

The impacts of this rule may include both distributional effects (which are

---

[50] The information regarding the processing of these applications was provided by USCIS Office of Performance and Quality (OPQ).

transfers) and costs.[51] The distributional impacts fall on the asylum applicants who would be delayed in entering the U.S. labor force. The distributional impacts (transfers) come in the form of lost compensation (wages and benefits). A portion of this lost compensation might be transferred from asylum applicants to others that are currently in the U.S. labor force, possibly in the form of additional work hours or overtime pay. A portion of the impacts of this rule may also be borne by companies that would have hired the asylum applicants had they been in the labor market earlier but were unable to find available workers. These companies may incur a cost, as they could lose productivity and potential profits the asylum applicant would have provided had the asylum applicant been in the labor force earlier.[52] Companies may also incur opportunity costs by having to choose the next best alternative to immediately filling the job the asylum applicant would have filled. USCIS does not know what this next best alternative may be for those companies. As a result, USCIS does not know the portion of overall impacts of this rule that are transfers or costs. If companies can find replacement labor for the position the asylum applicant would have filled, this rule would have primarily distributional effects in the form of transfers from asylum applicants to others already in the labor market (or workers induced to return to the labor market). USCIS acknowledges that there may be additional opportunity costs to employers such as additional search costs. However, if companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, this rule would primarily be a cost to these companies through lost productivity and profits.

USCIS uses the lost compensation to asylum applicants as a measure of the overall impact of the rule—either as a proxy for businesses' cost for lost productivity. These quantified impacts do not include additional costs to businesses for lost profits and opportunity costs or the distributional impacts for those in an applicant's support network. The lost compensation to asylum applicants could range from $255.88 million to $774.76 million annually depending on the wages the asylum applicant would have earned. The 10-year total discounted lost compensation to asylum applicants at 3 percent could range from $2.183 billion to $6.609 billion and at 7 percent could range from $1.797 billion to $5.442 billion (years 2020–2029). USCIS recognizes that the impacts of this rule could be overstated if the provisions in the broader asylum EAD NPRM are finalized as proposed. Specifically, the broader asylum EAD NPRM proposes to limit or delay eligibility for employment authorization for certain asylum applicants. Accordingly, if the population of affected aliens is less than estimated as a result of the broader asylum EAD rule, the estimated impacts of this rule could be overstated because the population affected may be lower than estimated in this rule.

In instances where a company cannot transfer additional work onto current employees and cannot hire replacement labor for the position the asylum applicant would have filled, USCIS acknowledges that delays may result in tax losses to the government. It is difficult to quantify income tax losses because individual tax situations vary widely [53] but USCIS estimates the potential loss to other employment tax programs, namely Medicare and social security which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively).[54] With both the employee and employer not paying their respective portion of Medicare and Social Security taxes, the total estimated tax loss for Medicare and social security is 15.3 percent.[55] Lost wages ranging from $255.88 million to $774.76 million would result in employment tax losses to the government ranging from $39.15 million to $118.54 million annually.[56] Adding the lost compensation to the tax losses provide total monetized estimates of this rule that range from $275.46 million to $834.03 million annually in instances where a company cannot hire replacement labor for the position the asylum applicant would have filled.[57] Again, depending on the circumstances of the employee, there could be additional federal income tax losses not estimated here. There may also be state and local income tax losses that would vary according to the jurisdiction.

This rule will potentially result in reduced opportunity costs to the Federal Government. Since *Rosario* compelled USCIS to comply with the 30-day provision in FY 2018, USCIS has redistributed its adjudication resources to work up to full compliance. With removing the 30-day timeframe, USCIS expects these redistributed resources could be reallocated, potentially reducing delays in processing of other applications and avoiding costs associated with hiring additional employees. USCIS has not estimated these avoided costs. Additionally, USCIS does not anticipate that removing the separate 90-day EAD filing requirement would result in any costs to the Federal Government.

This rule will benefit USCIS by allowing it to operate under long-term sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identify verification. Applicants will be able to rely on up-to-date processing times, which will provide accurate expectations of adjudication times. The technical change to remove the 90-day filing requirement is anticipated to reduce confusion regarding EAD renewal requirements for pending asylum applicants and ensure the regulatory text reflects current DHS policy and regulations under DHS's final 2017 AC21 Rule.[58]

---

[51] Transfer payments are monetary payments from one group to another that do not affect total resources available to society. *See* OMB Circular A–4 pages 14 and 38 for further discussion of transfer payments and distributional effects. Circular A-4 is available at: *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf*

[52] The analysis accounts for *delayed* entry into the labor force and does not account for the potential circumstance under which this rule may completely foreclose an alien's entry into the labor force. Such a possible circumstance could occur if USCIS ultimately denies an EAD application that was pending past 30 days due to this rule, solely because the underlying asylum application had been denied during the pendency of the EAD application. In such a scenario, there would be additional costs and transfer effects due to this rule. Such costs and transfer effects are not accounted for below. Similarly, the rule does not estimate avoided turnover costs to the employer associated with such a scenario.

[53] *See* More than 44 percent of Americans pay no federal income tax (September 16, 2018) available at *https://www.marketwatch.com/story/81-million-americans-wont-pay-any-federal-income-taxes-this-year-heres-why-2018-04-16.*

[54] The various employment taxes are discussed in more detail at *https://www.irs.gov/businesses/small-businesses-self-employed/understanding-employment-taxes. See* IRS Publication 15, Circular E, Employer's Tax Guide for specific information on employment tax rates. *https://www.irs.gov/pub/irs-pdf/p15_18.pdf.*

[55] Calculation: (6.2 percent social security + 1.45 percent Medicare) × 2 employee and employer losses = 15.3 percent total estimated tax loss to government.

[56] Calculations: Lower bound lost wages $255.88 million × 15.3 percent estimated tax rate = $39.15 million. Upper bound lost wages $774.76 million × 15.3 percent estimated tax rate = $118.54 million.

[57] Calculation: Lower bound lost wages $255.88 million + lower bound tax losses $19.58 million = total lower bound cost $275.46 million. Upper bound lost wages $774.76 million + upper bound tax losses $59.27 million = total upper bound cost $834.03 million.

[58] In the 2017 AC21 final rule, 81 FR 82398, USCIS amended 8 CFR 274a.13 to allow for the automatic extension of existing, valid EADs for up to 180 days for renewal applicants falling within certain EAD categories as described in the regulation and designated on the USCIS website. *See* 8 CFR 274a.13(d). Among those categories is

Table 4 provides a detailed summary of the regulatory changes and the expected impacts of this rule.

TABLE 4—SUMMARY OF PROVISIONS AND IMPACTS

| Current provision | Change to provision | Expected costs and transfers from changed provision | Expected benefits from changed provision |
|---|---|---|---|
| USCIS has a 30-day initial EAD adjudication timeframe for applicants who have pending asylum applications. | USCIS is eliminating the provisions for the 30-day adjudication timeframe and issuance of initial EADs for pending asylum applicants. | *Quantitative:* This provision could delay the ability of some initial applicants to work. A portion of the impacts of the rule would be the lost compensation transferred from asylum applicants to others currently in the workforce, possibly in the form of additional work hours or overtime pay. A portion of the impacts of the rule would be lost productivity costs to companies that would have hired asylum applicants had they been in the labor market, but who were unable to find available workers. USCIS uses the lost compensation to asylum applicants as a measure of these distributional impacts (transfers) and as a proxy for businesses' cost for lost productivity. The lost compensation due to processing delays could range from $255.88 million to $774.76 million annually. The total ten-year discounted lost compensation for years 2020–2029 averages $4.396 billion and $3.619 billion at discount rates of 3 and 7 percent, respectively. USCIS does not know the portion of overall impacts of this rule that are transfers or costs. Lost wages ranging from $255.88 million to $774.76 million would result in employment tax losses to the government ranging from $39.15 million to $118.54 million annually. | *Quantitative:* Not estimated. |
| | | *Qualitative:* In cases where companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, affected companies would also lose profits from the lost productivity. In all cases, companies would incur opportunity costs by having to choose the next best alternative to immediately filling the job the pending asylum applicant would have filled. There may be additional opportunity costs to employers such as search costs. There may also be additional distributional impacts for those in an applicant's support network beyond a minimum of 180 days—if applicants are unable to work legally, they may need to rely on resources from family members, friends, non-profits, or government entities for support.<br><br>DHS notes that the estimates from the NPRM regarding unemployment, number of asylum applicants per year, and USCIS processing are not currently applicable as COVID–19 has had a dramatic impact on all three. DHS offers this analysis as a glimpse of the potential impacts of the rule, but the analysis relies on assumptions related to a pre-COVID economy. While future economic conditions are currently too difficult to predict with any certainty, DHS notes that a higher unemployment rate may result in lower costs of this rule as replacing pending asylum applicant workers would most likely be easier to do. Consequently, as unemployment is high, this rule is less likely to result in a loss of productivity on behalf of companies unable to replace forgone labor. | *Qualitative:* DHS would be able to operate under long-term sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identity verification without having to add any resources.<br><br>This rule would result in reduced opportunity costs to the Federal Government. USCIS may also be able to reallocate the resources it redistributed to comply with the 30-day provision, potentially reducing delays in processing of other applications and avoiding costs associated with hiring additional employees. |
| Applicants can currently submit a renewal EAD application 90 days before the expiration of their current EAD. | USCIS is removing the 90-day submission requirement for renewal EAD applications. | *Quantitative:* None ........................................................<br>*Qualitative:* None ........................................................ | *Quantitative:* None.<br>*Qualitative:* Applicants—<br>   Reduces confusion regarding EAD renewal requirements. Some confusion may nonetheless remain if applicants consult outdated versions of regulations or inapplicable DOJ regulations.<br>DHS/USCIS—<br>   The regulations are being updated to match those of other EAD categories. |

As previously discussed, USCIS does not know the portion of overall impacts of this rule that are transfers or costs, but estimates that the maximum monetized impact of this rule from lost compensation is $774.76 million annually. If all companies are able to easily find reasonable labor substitutes for all of the positions the asylum applicants would have filled, they will bear little or no costs, so the maximum of $774.76 million will be transferred

asylum applicants. To benefit from the automatic extension, an applicant falling within an eligible category must (1) properly file his or her renewal request for employment authorization before its expiration date, (2) request renewal based on the same employment authorization category under which the expiring EAD was granted, and (3) will continue to be authorized for employment based on his or her status, even after the EAD expires, and is applying for renewal under a category that does not first require USCIS to adjudicate an underlying application, petition, or request.

from asylum applicants to workers currently in the labor force or induced back into the labor force (we assume no tax losses as a labor substitute was found). Conversely, if companies are unable to find any reasonable labor substitutes for the positions the asylum applicants would have filled, then $774.76 million is the estimated

maximum monetized cost of the rule and $0 is the estimated minimum in monetized transfers from asylum applicants to other workers. In addition, under this scenario, because the jobs would go unfilled there would be a loss of employment taxes to the Federal Government. USCIS estimates $118.54 million as the maximum decrease in

employment tax transfers from companies and employees to the Federal Government. The two scenarios described above represent the estimated endpoints for the range of monetized impacts resulting from this rule and are summarized in Table 5 below.

TABLE 5—SUMMARY OF RANGE OF MONETIZED IMPACTS

| Category | Description | Scenario: No replacement labor found for asylum applicants | | Scenario: All asylum applicants replaced with other workers | | Primary (half of the highest high for each row) |
|---|---|---|---|---|---|---|
| | | Low wage | High wage | Low wage | High wage | |
| Cost ...................... | Lost compensation used as proxy for lost productivity to companies. | $255.88 | $774.76 | $0.00 | $0.00 | $387.38 |
| Transfer ................ | Compensation transferred from asylum applicants to other workers. | 0.00 | 0.00 | 255.88 | 774.76 | 387.38 |
| Transfer ................ | Lost employment taxes paid to the Federal Government. | 39.15 | 118.54 | 0.00 | 0.00 | 59.27 |

As required by OMB Circular A–4, Table 6 presents the prepared A–4 accounting statement showing the costs and transfers associated with this regulation. For the purposes of the A–4 accounting statement below, USCIS uses the mid-point as the primary estimate for both costs and transfers

because the total monetized impact of the rule from lost compensation cannot exceed $774.76 million and as described, USCIS is unable to apportion the impacts between costs and transfers. Likewise, USCIS uses a mid-point for the reduction in employment tax transfers from companies and

employees to the Federal Government when companies are unable to easily find replacement workers. USCIS notes that there may be some un-monetized costs such as additional opportunity costs to employers that would not be captured in these monetized estimates.

TABLE 6—OMB A–4—ACCOUNTING STATEMENT

[$ millions, 2017]

[Period of analysis: 2019–2028]

| Category | Primary estimate | | Minimum estimate | Maximum estimate | Source citation (RIA, preamble, etc.) |
|---|---|---|---|---|---|
| **Benefits:** | | | | | |
| Monetized Benefits ............................................ | (7%) | N/A | N/A | N/A | RIA. |
| | (3%) | N/A | N/A | N/A | RIA. |
| Annualized quantified, but un-monetized, benefits. | ........................ | 0 | 0 | 0 | RIA. |
| Unquantified benefits ................................................. | Applicants would benefit from reduced confusion over renewal requirements. DHS would be able to operate under sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identity verification | | | | RIA. |
| **Costs:** | | | | | |
| Annualized monetized costs (discount rate in parenthesis). | (7%) | $387.38 | $0 | $774.76 | RIA. |
| | (3%) | $387.38 | $0 | $774.76 | RIA. |
| Annualized quantified, but un-monetized, costs ...... | N/A | | N/A | N/A | RIA. |
| Qualitative (unquantified) costs ............................... | In cases where companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, affected companies would also lose profits from the lost productivity. In all cases, companies would incur opportunity costs by having to choose the next best alternative to immediately filling the job the pending asylum applicant would have filled. There may be additional opportunity costs to employers such as additional search costs | | | | RIA. |
| **Transfers:** | | | | | |
| Annualized monetized transfers: "on budget" .. | (7%) | $0 | $0 | $0 | RIA. |

TABLE 6—OMB A–4–ACCOUNTING STATEMENT—Continued

[$ millions, 2017]

[Period of analysis: 2019–2028]

| | | | | | |
|---|---|---|---|---|---|
| | (3%) | $0 | $0 | $0 | |
| From whom to whom? ...................................... | N/A | | | | N/A. |
| Annualized monetized transfers: Compensation. | (7%)<br>(3%) | $387.38<br>$387.38 | $0<br>$0 | $774.76<br>$774.76 | RIA. |
| From whom to whom? ...................................... | From asylum applicants to workers in the U.S. labor force or induced into the U.S. labor force. Additional distributional impacts from asylum applicant to the asylum applicant's support network that provides for the asylum applicant while awaiting an EAD | | | | RIA. |
| Annualized monetized transfers: Taxes ........... | (7%)<br>(3%) | $59.27<br>$59.27 | $0<br>$0 | $118.54<br>$118.54 | RIA. |
| From whom to whom? ...................................... | A reduction in employment taxes from companies and employees to the Federal Government. There could also be a transfer of federal, state, and local income tax revenue | | | | |

| Category | Effects | Source citation (RIA, preamble, etc.) |
|---|---|---|
| Effects on state, local, and/or tribal governments ... | None; no significant impacts to national labor force or to the labor force of individual states is expected. Possible loss of tax revenue | RIA. |
| Effects on small businesses ................................... | None | RFA. |
| Effects on wages ................................................... | None | RIA. |
| Effects on growth .................................................. | None | RIA. |

## 2. Background and Purpose of the Final Rule

Aliens who are arriving or physically present in the United States generally may apply for asylum in the United States irrespective of their immigration status. To establish eligibility for asylum, an applicant must demonstrate, among other things, that they have suffered past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Applicants, with limited exceptions, are required to apply for asylum within one year of their last arrival in the United States. USCIS does not currently charge filing fees for certain humanitarian benefits, including asylum applications and applications concurrently filed with asylum applications. Asylum applicants whose cases remain pending without a decision for at least 150 days are eligible to apply for employment authorization, unless any delays are caused by the applicant (such as a request to reschedule an interview). 8 CFR 208.7, 274a.12(c)(8), 274a.13(a)(2). Applicants who are granted asylum (''asylees'') may work immediately. *See* INA section 208(c)(1)(B), 8 U.S.C. 1158(c)(1)(B). An asylee may choose to obtain an EAD for convenience or identification purposes, but this documentation is not necessary for an asylee to work. 8 CFR 274a.12(a)(5).

Currently, DHS regulations at 8 CFR 208.7(a)(1) provide that USCIS adjudicates a Form I–765 within 30 days of receiving a properly filed application from a pending asylum applicant. Asylum applicants must wait 150 days from the time of filing the asylum application before they can file a Form I–765. USCIS cannot grant employment authorization until the applicant has accumulated a total of 180 days, not including any delays caused or requested by the applicant, meaning the applicant's asylum case has been pending for a total of 180 days. 8 CFR 208.7(a)(1)–(2). This is known as the 180-Day Asylum EAD clock.[59] If USCIS approves the Form I–765, USCIS mails an EAD according to the mailing preferences indicated by the applicant. If USCIS denies the Form I–765, the agency sends a written notice to the applicant explaining the basis for denial.

However, if USCIS requires additional documentation from the applicant before a decision can be made, USCIS sends a request for evidence (RFE) and the 30-day processing timeframe for processing a Form I–765 is paused until additional documentation is received. Once USCIS receives all requested information in response to the RFE, the

[59] *See* The 180-Day Asylum EAD Clock Notice (May 9, 2017) *https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20&26%20Asylum/Asylum/Asylum_Clock_Joint_Notice_-_revised_05-10-2017.pdf.*

30-day timeframe continues from the point at which it stopped. In some instances, applications may require additional vetting by the Background Check Unit (BCU) and the Center Fraud Detection Operations (CFDO), for instance, to verify an applicant's identity. The 30-day timeframe does not stop in these situations, though these cases may take longer than 30 days to process. USCIS would make a decision only after all eligibility and background checks relating to the EAD application have been completed.

DHS considers the 30-day adjudication timeframe to be outdated, as it no longer reflects current DHS operational realities. In the 20-plus years since the timeframe was established, there has been a shift to centralized processing as well as increased security measures, such as the creation of tamper-resistant EAD cards. These measures reduce opportunities for fraud but can require additional processing time, especially as filing volumes remain high. By eliminating the 30-day provision, DHS will be able to maintain accurate case processing times for initial EAD applications for pending asylum applicants since, prior to the *Rosario* v. *USCIS* court order, it was not meeting the 30-day regulatory timeframe most of the time (53 percent), to address national security and fraud concerns for those applications that require additional vetting through RFEs or referrals to BCU and/or CFDO, and to

maintain technological advances in document production and identity verification that USCIS must fulfill as a part of its core mission within DHS such as the centralized production and creation of tamper-resistant cards.

The need for this final rule results in part from the resource burden associated with adjudicating, within the 30-day adjudication timeframe, a large number of initial Forms I–765 under the Pending Asylum Applicant category. The large number of applications results from a range of factors, such as recent growth in USCIS' asylum backlog, which USCIS continues to address through a number of different measures.

For example, in an effort to stem the growth of the agency's asylum backlog, USCIS returned to processing affirmative asylum applications on a "last in, first out" (LIFO) basis. Starting January 29, 2018, USCIS began prioritizing the most recently filed affirmative asylum applications when scheduling asylum interviews. The former INS first established this interview scheduling approach as part of asylum reforms implemented in January 1995 and it remained in place until December 2014. USCIS has returned to this approach in order to deter aliens from using asylum backlogs solely as a means to obtain employment authorization by filing frivolous, fraudulent or otherwise non-meritorious asylum applications. Giving priority to recent filings allows USCIS to promptly adjudicate asylum applications.[60]

Another possible effect of reinstating LIFO is that in the future, fewer affirmative asylum applications would remain pending before USCIS for 150 days. However, the majority of asylum applications filed with USCIS have been referred to the Department of Justice Executive Office for Immigration Review (EOIR) for consideration of the asylum application by an immigration judge. In FY 2017, 53 percent of asylum filings processed by USCIS resulted in a referral to an immigration judge.[61]

These applicants may be eligible to apply for an initial EAD under the (c)(8) category once the Asylum EAD Clock reaches 150 days.

In the end, however, USCIS cannot predict with certainty how LIFO and other administrative measures, as well as external factors such as immigration court backlogs and changes in country conditions, will ultimately affect total application volumes and the attendant resource burdens on USCIS. In addition, in light of the need to accommodate existing vetting requirements and to maintain flexibility should trends change, USCIS believes that even if it could reliably project a reduction in total application volume, such reduction would not, on its own, serve as a sufficient basis to leave the 30-day adjudication timeframe in place.

Finally, once an EAD is approved under the (c)(8) Pending Asylum Applicant category, it is currently valid for two years and requires renewal to extend an applicant's employment authorization if the underlying asylum application remains pending.[62] Currently, DHS regulations at 8 CFR 208.7(d) require that USCIS must receive renewal applications at least 90 days prior to the employment authorization expiration.[63] Removing the 90-day requirement will bring 8 CFR 208.7(d) in line with 8 CFR 274a.13(d), as amended in 2017; such amendments automatically extend renewal applications for up to 180 days. Additionally, under the 2017 AC21 Rule, applicants eligible for employment authorization can have the validity of their EADs automatically extended for up to 180 days from the document's expiration date, if they (1) file before its expiration date, (2) are requesting renewal based on the same employment authorization category under which the expiring EAD was granted, and (3) will continue to be authorized for employment based on their status, even after the EAD expires and are applying for renewal under a category that does not first require USCIS to adjudicate an underlying application, petition, or request.

### 3. Population

In this section, we have updated filing volumes and some additional metrics to capture FY 2018 and 2019 data and information. However, consistent with the NPRM, the costs and analysis is still benchmarked to FY 2017 processing times (before the *Rosario* v. *USCIS* court order). In FY 2019, USCIS received a total of 96,861 affirmative filings of Form I–589 applications for asylum. The number of total receipts for asylum applicants rose consistently from FY 2013 to FY 2017, before declining in FY 2018 and FY 2019 (Table 7). As the number of asylum applicants increases, the backlog continues to grow,[64] resulting in a greater number of people who are eligible to apply for EADs while they await adjudication of their asylum application.

TABLE 7—TOTAL ANNUAL AFFIRMATIVE FORM I–589 RECEIPTS RECEIVED FROM ASYLUM APPLICANTS[65]

| Fiscal year | Total receipts |
|---|---|
| 2013 | 44,453 |
| 2014 | 56,912 |
| 2015 | 84,236 |
| 2016 | 115,888 |
| 2017 | 142,760 |
| 2018 | 106,041 |
| 2019 | 96,861 |

Source: All USCIS Application and Petition Form Types, All Form Types Performance Data (Fiscal Year 2013–2019, 4th Qtr), *https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-all-uscis-application-and-petition-form-types.*

This larger number of Form I–765 filings linked to asylum claims has strained resources and led to longer processing times for adjudication. Table 8 shows the total, initial, and renewal applications received for Form I–765 for asylum applicants for FY 2013 to FY 2019.[66]

---

[60] USCIS now schedules asylum interviews based on three priority levels. First priority: Applications scheduled for an interview, but the interview had to be rescheduled at the applicant's request or the needs of USCIS. Second priority: Applications pending 21 days or less. Third priority: All other pending affirmative asylum applications, which will be scheduled for interviews starting with newer filings and working back towards older filings. *See* Affirmative Asylum Interview Scheduling (Jan. 26, 2018), available at *https://www.uscis.gov/humanitarian/refugees-asylum/asylum/affirmative-asylum-interview-scheduling.*

[61] *See* Notes from Previous Engagements, Asylum Division Quarterly Stakeholder Meeting (Feb. 7, May 2, Aug. 11, and Nov. 3, 2017), *https://www.uscis.gov/outreach/notes-previous-engagements?topic_id=9213&field_release_date_value%5Bvalue%5D%5Bmonth%5D=&field_*

*release_date_value_1%5Bvalue%5D%5Byear%5D=&multiple=&items_per_page=10.*

[62] EADs issued prior to October 5, 2016 had a validity period of one year. *See* USCIS Increases Validity of Work Permits to Two Years for Asylum Applicants (Oct. 6, 2016), available at *https://www.uscis.gov/news/alerts/uscis-increases-validity-work-permits-two-years-asylum-applicants.*

[63] For renewal applications, a properly filed application for pending asylum applicants is one that is complete, signed, accompanied by all necessary documentation and the current filing fee of $410.

[64] As of June 2018, the asylum backlog was still increasing, but its growth rate has begun to stabilize.

[65] These numbers only address the affirmative asylum applications that fall under the jurisdiction

of USCIS' Asylum Division. Defensive asylum applications, filed with the Department of Justice's Executive Office for Immigration Review (EOIR) are also eligible for (c)(8) EADs. There is an ongoing backlog of pending defensive asylum cases at EOIR, which has approximately 650,000 cases pending. *See* Memorandum from Jeff Sessions, Attorney General, *Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest* (Dec. 5, 2017). The defensive asylum backlog at EOIR also contributes to an increase in both initial and renewal (c)(8) EAD applications.

[66] Since LIFO was reinstated at the end of January 2018, there is not yet enough data currently available to determine the impact on asylum applications or initial EAD applications.

TABLE 8—TOTAL ANNUAL FORM I–765 RECEIPTS RECEIVED FROM PENDING ASYLUM APPLICANTS

| Fiscal year | Total receipts * | Total initial receipts | Total renewal receipts |
|---|---|---|---|
| 2013 | 78,882 | 41,021 | 37,861 |
| 2014 | 109,272 | 62,169 | 47,103 |
| 2015 | 178,589 | 106,030 | 72,559 |
| 2016 | 298,580 | 169,970 | 128,610 |
| 2017 | 474,037 | 261,782 | 212,255 |
| 2018 | 324,991 | 262,965 | 62,026 |
| 2019 | 551,226 | 216,038 | 335,188 |

Source: File Tracking Data, USCIS, Office of Performance and Quality
* Total receipts do not include replacement receipts.
**Note:** This data includes receipts received from both affirmative and defensive pending asylum applicants.

In FY 2019, USCIS received a total of 551,226 (non-replacement) applications for Form I–765 from pending asylum applicants, with less than half as initial applications (216,038 or 39.2 percent). There were 335,188 renewal applications (60.8 percent) in FY 2019. For this analysis, USCIS does not use a trend line to forecast future projected applications because various factors outside of this rulemaking may result in either a decline or, conversely, a continued rise of applications received. For example, while the number of initial applicants and renewals rose sharply during the last five years, peaking in 2017, DHS assumes the increase in initial EAD applications has some correlation with the high volumes of asylum applications in the same years. As pending asylum applications increased, the length of time it takes to adjudicate those applications increases, and it is reasonable to assume that the number of applicants who seek employment authorization on the basis of that underlying asylum application would also rise. On the other hand, initial EAD applications may decline. For instance, USCIS' return to a LIFO interview schedule to process affirmative asylum applications, may help stem the growth of the agency's asylum backlog, and may result in fewer pending asylum applicants applying for an EAD. But USCIS cannot predict such an outcome with certainty at this time. Therefore, since DHS anticipates similar outcomes to those achieved in FY 2017, USCIS anticipates receiving approximately 474,037 Form I–765 applications annually from pending asylum applicants, with an estimated 261,782 initial applications and 212,255 renewal applications.

In order to analyze USCIS processing times for Form I–765, USCIS obtained data on completed initial applications, which included the length of time to complete adjudication and information on investigative factors that may prolong the adjudication process. Table 9 differentiates between initial applications that USCIS adjudicated within the 30-day timeframe, and those that it did not. Specifically, Table 9A presents the data for FY 2017, reflecting the anticipated outcome of this rule, while Table 9B presents information for 2019, which reflect current processing times under the *Rosario* v. *USCIS* court order. The table also includes the initial applications that were adjudicated within a 60-day timeframe, along with the corresponding initial applications that required additional vetting. This additional vetting includes the issuance of RFEs and referrals for identity verification by the BCU and the CFDO, which can cause delays in processing. DHS notes that the 30-day timeframe pauses for RFEs but does not pause for BCU or CFDO checks, nor any referrals to outside agencies that may be needed. Delays could also be caused by rescheduled fingerprinting.

TABLE 9A—PERCENTAGE OF COMPLETIONS FOR INITIAL FORM I–765 FOR PENDING ASYLUM APPLICANTS IN FY 2017

| Number of days the initial application was pending | No additional vetting required (percent) | | Additional vetting required (percent) | | Total (percent) |
|---|---|---|---|---|---|
| | Approved initial applications | Denied initial applications | Approved initial applications | Denied initial applications | |
| 0–30 | 42 | 2 | 3 | 0 | 47 |
| 31–60 | 22 | 2 | 6 | 1 | 31 |
| Over 60 | 12 | 2 | 6 | 2 | 22 |
| Total (Percent) | 76 | 5 | 16 | 3 | 100 |

TABLE 9B—PERCENTAGE OF COMPLETIONS FOR INITIAL FORM I–765 FOR PENDING ASYLUM APPLICANTS IN FY 2019

| Number of days the initial application was pending | No additional vetting required (percent) | | Additional vetting required (percent) | | Total (percent) |
|---|---|---|---|---|---|
| | Approved initial applications | Denied initial applications | Approved initial applications | Denied initial applications | |
| 0–30 | 67 | 14 | 9 | 3 | 93 |
| 31–60 | 1 | 0 | 2 | 0 | 3 |

AR005574

Table 9B—Percentage of Completions for Initial Form I–765 for Pending Asylum Applicants in FY 2019—
Continued

| Number of days the initial application was pending | No additional vetting required (percent) | | Additional vetting required (percent) | | Total (percent) |
| --- | --- | --- | --- | --- | --- |
| | Approved initial applications | Denied initial applications | Approved initial applications | Denied initial applications | |
| Over 60 ............................................................ | 1 | 0 | 2 | 1 | 4 |
| Total (Percent) ................................................ | 69 | 14 | 13 | 5 | 100 |

Source: File tracking data, USCIS, Office of Performance and Quality.
**Note:** Additional vetting includes the applications issued an RFE, referred to BCU/CFDO and both.

In FY 2019, USCIS adjudicated within the 30-day timeframe the majority (93 percent)[67] of all initial Form I–765 applications received. USCIS approved within 30 days 67 percent[68] of the initial applications received and denied 14 percent that did not require any additional vetting. Of the 76 percent of approved applications, only 9 percent required additional vetting, while 67 percent did not. USCIS' completion rate within a 60-day timeframe increased to 96 percent overall, with 79 percent[69] of the 96 percent of applications approved and 17 percent[70] of the 96 percent of applications denied. Only 14 percent[71] of the 96 percent of applications adjudicated within 60 days required additional vetting, while the majority of applications did not (82 percent of the 96 percent of applications adjudicated within 60 days).[72]

By comparison, in FY 2017, the anticipated outcome of this rule, USCIS adjudicated within the 30-day timeframe just under half (47 percent) of all initial Form I–765 applications received. USCIS approved within 30 days 45 percent[73] of the initial applications received and denied 2 percent that did not require any additional vetting. Among the approved applications, only 3 percent of the total required additional vetting, while 42 percent did not. USCIS' completion rate within a 60-day timeframe increased to 78 percent overall, with 73 percent[74] of applications approved and 5 percent[75] denied. Only 10 percent[76] of applications adjudicated within 60 days required additional vetting, while the majority of approved applications did not (68 percent of the total).[77]

In FY 2017, prior to the *Rosario* v. *USCIS* court order, the majority of applications (53 percent) did not meet the required 30-day adjudication timeframe. In fact, it took up to 60 days for USCIS to adjudicate the majority of

applications. For applications that require additional vetting, most applications took more than 30 days to adjudicate as well. "Additional vetting" cases include those where an RFE is issued, which pauses the regulatory processing time. The findings in Table 9A underscore that while additional vetting and other delays may contribute to increased processing times, it may not be the only reason processing times have increased. It is likely that the increasing number of initial EAD applications is due to historically-high asylum receipt numbers in recent years, the asylum interview backlogs, and updated operations as outlined in the background of this rule.

With the removal of the 30-day adjudication timeframe, DHS anticipates similar outcomes to those achieved in FY 2017. DHS's primary goal is to adequately vet applicants and adjudicate cases as quickly and efficiently as possible.

### 4. Transfers, Costs, and Benefits of the Rule

#### a. Transfers and Costs

This final rule removes the 30-day adjudication timeframe in order to better align with DHS processing times achieved in FY 2017. USCIS recognizes that removing the 30-day regulatory timeframe could potentially result in longer processing times for some applicants and in such situations, this could lead to potential delays in employment authorization for some initial EAD applicants. As described above, these delays would have both distributional effects (which are transfers) and costs. Any delay beyond the regulatory 30-day timeframe would prevent an EAD applicant, if his or her application were approved, from earning wages and other benefits until authorization is obtained. A portion of this lost compensation would be a distributional impact and considered a transfer from asylum applicants to

---

[67] This figure is rounded from 92.8 percent. USCIS notes that earlier in the preamble, we conveyed that the FY 2019 processing rate for-under 30 days was 96.9 percent. The difference is due to the time deductions associated with requests for evidence (RFE). The latter, lower figure excludes RFE time deductions. A similar adjustment was made for the NPRM analysis benchmarked to FY 2017, which is what we base the costs on.

[68] Calculation of 30-day Approved: 67 (No Additional Vetting Percent Approved 0—30 days) + 9 (Additional Vetting Percent Approved 0—30 days) = 76 percent.

[69] Calculation of 60-day Approved: 67 (No Additional Vetting Percent Approved 0–30 days) + 1 (No Additional Vetting Percent Approved 31–60 days) + 9 (Additional Vetting Percent Approved 0–30 days) + 2 (Additional Vetting Percent Approved 31–60 days) = 79 percent.

[70] Calculation of 60-day Denied: 14 (No Additional Vetting Percent Denied 0–30 days) + 0 (No Additional Vetting Percent Denied 31–60 days) + 3 (Additional Vetting Percent Denied 0–30 days) + 0 (Additional Vetting Percent Denied 31–60 days) = 17 percent.

[71] Calculation of 60-day Additional Vetting: 9 (Additional Vetting Percent Approved 0–30 days) + 2 (Additional Vetting Percent Approved 31–60 days) + 0 (Additional Vetting Percent Denied 31–60 days) + 3 (Additional Vetting Percent Denied 0–30 days) = 14 percent.

[72] Calculation of 60-day No Additional Vetting: 67 (No Additional Vetting Percent Approved 0–30 days) + 1 (No Additional Vetting Percent Approved 31–60 days) + 14 (No Additional Vetting Percent

Denied 0–30 days) + 0 (No Additional Vetting Percent Denied 31–60 days) = 82 percent.

[73] Calculation of 30-day Approved: 42 (No Additional Vetting Percent Approved 0–30 days) + 3 (Additional Vetting Percent Approved 0—30 days) = 45 percent.

[74] Calculation of 60-day Approved: 42 (No Additional Vetting Percent Approved 0–30 days) + 22 (No Additional Vetting Percent Approved 31–60 days) + 3 (Additional Vetting Percent Approved 0–30 days) + 6 (Additional Vetting Percent Approved 31–60 days) = 73 percent.

[75] Calculation of 60-day Denied: 2 (No Additional Vetting Percent Denied 0—30 days) + 2 (No Additional Vetting Percent Denied 31–60 days) + 1 (Additional Vetting Percent Denied 31ndash;60 days) = 5 percent.

[76] Calculation of 60-day Additional Vetting: 3 (Additional Vetting Percent Approved 0–30 days) + 6 (Additional Vetting Percent Approved 31–60 days) + 1 (Additional Vetting Percent Denied 31–60 days) = 10 percent.

[77] Calculation of 60-day No Additional Vetting: 42 (No Additional Vetting Percent Approved 0–30 days) + 22 (No Additional Vetting Percent Approved 31–60 days) + 2 (No Additional Vetting Percent Approved 0–30 days) + 2 (No Additional Vetting Percent Denied 31–60 days) = 68 percent.

AR005575

others that are currently in the U.S. labor force, possibly in the form of additional work hours or overtime pay. In cases where companies that would have hired asylum applicants had they been in the labor market earlier are not able to find available workers, the lost compensation to asylum workers would be considered a proxy for the cost of lost productivity to those companies. However, USCIS does not know the portion of the overall impacts of this rule that are transfers or costs. One reason USCIS is unable to apportion these impacts is because the industries in which asylum applicants will work with their employment authorization is unknown; companies' responses to such a situation will vary depending on the industry and location of the company (for example, truck drivers are limited to the number of overtime hours they can work). Additional uncertainty in how companies will respond exists because while the official unemployment rate was low as of November 2019, there is still evidence of some labor market slack.[78] While USCIS is unable to apportion these impacts between transfers and costs, USCIS does use the lost compensation to asylum applicants, as described below, as a measure of these total impacts.

In FY 2017, the processing times for initial Form I–765 filings under the Pending Asylum Applicant category exceeded the regulatory set timeframe of 30 days more than half the time. However, USCIS adjudicated approximately 78 percent of applications within 60 days. In FY 2019, USCIS adjudicated approximately 96 percent of applications within 60 days. To estimate lost wages and other benefits, USCIS used FY 2017 daily processing time data as compared to the baseline, which assumes 100 percent of applications are adjudicated within 30 days. In FY 2017, USCIS adjudicated

119,088 approved applications [79] past the regulatory set timeframe.

USCIS recognizes that pending asylum EAD applicants do not currently participate in the U.S. labor market, and, as a result, are not represented in national average wage calculations. Further, USCIS recognizes that pending asylum applicants who obtain an EAD are not limited to certain types of employment or occupations nor does USCIS track the type of employment applicants obtain. Because the Form I–765 for the (c)(8) category does not include or legally require, at the initial or renewal stage, any data on employment, and, since it does not involve an associated labor condition application, DHS has no information on wages, occupations, industries, or businesses that may involve such workers.

In some DHS rulemakings, the estimates of distributional impacts and time-related opportunity costs are linked to the federal minimum wage for new entrants to the labor force. This reliance is grounded in the notion that most of the relevant EAD holders would not have been in the labor force long, and would thus not be expected to earn relatively high wages. In this rulemaking, we rely on a slightly more robust ''prevailing'' minimum wage of $8.25. As is reported by the Economic Policy Institute (EPI, 2016), many states have their own minimum wage, and, even within states, there are multiple tiers.[80] Although the minimum wage could be considered a lower-end bound on true earnings, the prevailing minimum wage is fully loaded, at $12.05, which is 13.8 percent higher than the federal minimum wage.[81] DHS also does not rule out the possibility that some portion of the population might earn wages at the average level for all occupations. Therefore, for the purpose of this analysis, USCIS uses both the prevailing minimum hourly wage rate of $8.25 to estimate a lower

bound and a national average wage rate of $24.98 [82] to take into consideration the variance in average wages across states as an upper bound. USCIS's lower and upper bounds represent estimates of the range for this population's average wage, understanding that it is possible that some workers may earn more than the average wage across all occupations, and, that some may earn lower than the prevailing minimum wage, such as federal minimum wage.

In order to estimate the fully loaded wage rates, to include benefits such as paid leave, insurance, and retirement using BLS data, USCIS calculated a benefits-to-wage multiplier of 1.46 [83] and multiplied it by the prevailing minimum hourly wage rate. The fully loaded per hour wage rate for someone earning the prevailing minimum wage rate is $12.05 [84] and $36.47 [85] for someone earning the average wage rate. Multiplying these fully loaded hourly wage rates by 8 to reflect an assumed 8-hour workday produces daily wage rates of $96.36 and $291.77,[86] respectively. USCIS also assumes that EAD holders would work 5 out of every 7 days, or an average of 21 days per month.

In the proposed rule, using FY 2017 data, USCIS estimated that the 119,088 approved EAD applicants experienced an estimated total 2,655,429 lost working days, and lost compensation could range from $255.88 million to $774.76 million.[87] USCIS understands that not all EAD recipients would work in minimum or average wage occupations, but provides these estimates as possible lower and upper bounds for approved applicants who would engage in full-time employment. Table 10 shows the number of applications completed in a period longer than the 30-day regulatory timeframe in FY 2017, the associated number of lost working days, and an estimate of the resulting lost compensation. The two categories over 120 days show the declining number of

---

[78] See Bureau of Labor Statistics, *Employment Situation News Release—November 2019*, Table A–8 Employed persons by class of worker and part-time status, February 21, 2020. Available at *https://www.bls.gov/news.release/archives/empsit_12062019.pdf.*

[79] In FY 2017, USCIS adjudicated 15,860 denied (c)(8) EAD applications past the regulatory set timeframe. Since denied applicants would not obtain work authorization and would not lose working days, this population is not impacted by this rule and are therefore not included in the analysis for lost compensation.

[80] See *When it comes to the minimum wage, we cannot just 'leave it to the states'* (November 10, 2016) available at: *https://www.epi.org/publication/when-it-comes-to-the-minimum-wage-we-cannot-just-leave-it-to-the-states-effective-state-minimum-wages-today-and-projected-for-2020//.* There are multiple tiers of minimum wages across many

states that apply to size of business (revenue and employment), occupations, working hours, and other criteria. Some of these variations per state are described at: *https://www.minimum-wage.org.*

[81] Calculations (1) for prevailing minimum wage: $8.25 hourly wage × benefits burden of 1.46 = $12.05; for federal minimum wage: $7.25 hourly wage × benefits burden of 1.46 = $10.59 *See* Minimum Wage, U.S. Department of Labor Available at *https://www.dol.gov/general/topic/wages/minimumwage;* (2) (($12.05 wage − $10.59 wage)/ $10.59)) wage = .1378, which rounded and multiplied by 100 = 13.8 percent.

[82] The wage update in April 2018 reflects the 2017 average for all occupations nationally. The data are found at the BLS Occupational Employment and Wage Estimates, United States, found at: *https://www.bls.gov/oes/2018/may/oes_nat.htm#00-0000.*

[83] The benefits-to-wage multiplier is calculated by the Bureau of Labor Statistics (BLS) as follows: ($36.32 Total Employee Compensation per hour)/ ($24.91 Wages and Salaries per hour) = 1.458 (1.46 rounded). *See* U.S. Department of Labor, Bureau of Labor Statistics, Economic News Release, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group (April 2019), available at *https://www.bls.gov/news.release/archives/ecec_03192019.pdf.*

[84] Calculation: $8.25 × 1.46 = $12.05 per hour.

[85] Calculation: $24.98 × 1.46 = $36.47 per hour.

[86] Calculations: $12.05 per hour × 8 hours = $96.36 per day; $36.47 per hour × 8 hours = $291.77 per day.

[87] Calculations: 2,655,429 lost working days * ($96.36 per day) = $255.88 million; 2,655,429 lost working days * ($291.77 per day) = $774.76 million.

applications that remain pending after 200 days and the maximum number of days it took to adjudicate an initial EAD completed in FY 2017, which was 810 calendar days.

TABLE 10—SUMMARY OF CALCULATIONS FOR INITIAL FORM I–765 FOR PENDING ASYLUM APPLICANTS THAT TOOK LONGER THAN

[FY 2017]

|  | 31–60 Days | 61–90 Days | 91–120 Days | 121–200 Days | 201–810 Days | Total |
|---|---|---|---|---|---|---|
| FY 2017 Completions | 71,556 | 31,356 | 11,734 | 4,048 | 394 | 119,088 |
| Lost Calendar Days | 899,402 | 1,377,308 | 817,073 | 466,524 | 91,019 | 3,651,326 |
| Lost Working Days | 691,314 | 992,880 | 581,237 | 330,038 | 59,960 | 2,655,429 |
| Lost Compensation (lower bound) | $66,615,017 | $95,673,917 | $56,007,997 | $31,802,462 | $5,777,746 | $255,877,138 |
| Lost Compensation (upper bound) | $201,702,197 | $289,689,023 | $169,585,427 | $96,293,999 | $17,494,313 | $774,764,960 |

Source: USCIS analysis.
**Note:** The prevailing minimum wage is used to calculate the lower bound while a national average wage is used to calculate the upper bound lost compensation.

If companies can find replacement labor for the position the asylum applicant would have filled, this rule would have primarily distributional effects in the form of transfers from asylum applicants to others already in the labor market (or workers induced to return to the labor market). USCIS acknowledges that there may be additional opportunity costs to employers such as additional search costs. However, if companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, this rule would primarily be a cost to these companies through lost productivity.

USCIS also recognizes that companies would incur additional costs not captured in the estimates of lost compensation above. In cases where companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, affected companies would also lose profits from the lost productivity. In all cases, companies would incur opportunity costs by having to choose the next best alternative to immediately filling the job the pending asylum applicant would have filled.

USCIS continues to resource the adjudication of pending asylum EAD applications. In response to the *Rosario* v. *USCIS* litigation and to comply with the court order, USCIS has dedicated as many resources as practicable to these adjudications but continues to face an increasing asylum application backlog, which in turn increases the numbers of applicants eligible for pending asylum EADs. However, this reallocation of resources is not a long-term sustainable solution because USCIS has many

competing priorities and many time-sensitive adjudication timeframes. Reallocating resources in the long-term is not sustainable due to work priorities in other product lines. USCIS could hire more officers, but that would not immediately and in all cases shorten adjudication timeframes because (1) additional time would be required to onboard and train new employees and (2) for certain applications, additional time is needed to fully vet an applicant, regardless of staffing levels. In addition, there is currently no fee for asylum applications or the corresponding initial EAD applications, and the cost of adjudication is covered by fees paid by other benefit requesters. USCIS is uncertain of the actual cost impacts of hiring additional adjudicators to process these EAD applications at this time. If the backlog dissipates in the future, USCIS may seek to redistribute adjudication resources. USCIS may also redistribute adjudication resources for other operational needs.

This rule may result in a delay for some applicants to earn compensation if EAD processing is delayed beyond the current 30-day regulatory timeframe. The lost compensation to asylum applicants could range from $255.88 million to $774.76 million annually, depending on the wages the asylum applicant would have earned. The ten-year total discounted costs at 3 percent could range from $2.182 billion to $6,609 billion, and at 7 percent could range from $1.797 billion to $5.442 billion (years 2020–2029). USCIS recognizes that the anticipated impacts of this rule could be overstated if the provisions in the broader asylum EAD NPRM are finalized as proposed.

Specifically, the broader asylum EAD NPRM proposes to limit or delay eligibility for employment authorization for certain asylum applicants. Accordingly, if the population of aliens is less than estimated as a result of the broader asylum EAD rule, the estimated impacts of this rule could be overstated because the population affected may be lower than estimated in this rule.

In instances where a company cannot hire replacement labor for the position the asylum applicant would have filled, USCIS acknowledges that delays may result in tax revenue losses to the government. It is difficult to quantify income tax losses because individual tax situations vary widely[88] but USCIS estimates the potential loss to other employment tax programs, namely Medicare and Social Security which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent respectively).[89] With both the employee and employer not paying their respective portion of Medicare and Social Security taxes, the total estimated tax loss for Medicare and social security is 15.3 percent.[90] Lost wages ranging from $255.88 million to $774.76 million

[88] *See* More than 44 percent of Americans pay no federal income tax (September 16, 2018) available at *https://www.marketwatch.com/story/81-million-americans-wont-pay-any-federal-income-taxes-this-year-heres-why-2018-04-16*.

[89] The various employment taxes are discussed in more detail at *https://www.irs.gov/businesses/small-businesses-self-employed/understanding-employment-taxes*. *See* IRS Publication 15, Circular E, Employer's Tax Guide for specific information on employment tax rates. *https://www.irs.gov/pub/irs-pdf/p15.pdf* (last viewed December 9, 2019).

[90] Calculation: (6.2 percent social security + 1.45 percent Medicare) × 2 employee and employer losses = 15.3 percent total estimated tax loss to government.

would result in employment tax losses to the government ranging from $39.15 million to $118.54 million annually.[91] Again, depending on the circumstances of the employee, there could be additional federal income tax losses not estimated here. There may also be state and local income tax losses that would vary according to the jurisdiction.

In addition to taxes, USCIS also considered the effects of this rule on USCIS resources. In response to the *Rosario* v. *USCIS* litigation and to comply with the court order, USCIS has dedicated as many resources as practicable to adjudications of initial EAD applications for pending asylum applicants, but continues to face a historic asylum application backlog, which in turn increases the numbers of applicants eligible for pending asylum EADs. However, this reallocation of resources is not a long-term, sustainable solution because USCIS has many competing priorities and many time-sensitive adjudication timeframes. Reallocating resources in the long-term is not sustainable due to work priorities in other product lines. Hiring more officers could bring improvements but that would not immediately shorten adjudication timeframes because additional time would be required to onboard new employees and train them. In addition, there is currently no fee for asylum applications or the corresponding initial EAD applications, and the cost of adjudication is covered by fees paid by other benefit requesters. USCIS is uncertain of the actual cost impacts of hiring additional adjudicators to process these EAD applications at this time. Finally, USCIS has found that certain applications inherently cannot be processed in a specific number of days due to vetting procedures and background checks that simply require additional time (see Table 10 where processing days in FY 2017 reached a maximum 810 days). Therefore, meeting the 30-day timeframe does not solely depend on hiring more adjudication officers because for certain applications additional time is needed for processing. Thus, USCIS is removing the 30-day timeline rather than increasing the number of adjudication officers in the long-term.

This rule is expected to result in reduced opportunity costs to the Federal Government. Since *Rosario* compelled USCIS to comply with the 30-day provision in FY 2018, USCIS has

redistributed its adjudication resources to work up to full compliance. When the 30-day timeframe is removed, these redistributed resources may be reallocated, potentially reducing delays in processing of other applications and avoiding costs associated with hiring additional employees. USCIS has not estimated these avoided costs.

DHS also acknowledges the distributional impacts associated with an applicant waiting for an EAD onto the applicant's support network. DHS assumes the longer an asylum applicant's EAD is delayed, the longer the applicant's support network is providing assistance to the applicant. DHS cannot determine how much monetary or other assistance is provided to such applicants.

USCIS does not anticipate that removing the separate 90-day EAD filing requirement would result in any costs to applicants or the Federal Government, as it makes a procedural change that benefits the applicant.

b. Benefits

By eliminating the 30-day provision, DHS will be able to operate under long-term sustainable case processing times for initial EAD applications for pending asylum applicants, to allow sufficient time to address national security and fraud concerns, and to maintain technological advances in document production and identity verification that USCIS must fulfill as a part of its core mission within DHS.

Applicants will rely on up-to-date processing times, which provide realistic expectations of adjudication times.

This rule would end future litigation over the 30-day adjudication timeframe, such as the litigation referenced above. Even applications that are not subject to a set timeframe, however, could in some cases be the subject of litigation on "unreasonable delay" theories. And more important, as indicated above, as a primary goal, USCIS seeks to adequately vet applicants and adjudicate applications as quickly and efficiently as possible.

USCIS will benefit from the removal of the 90-day renewal requirement, because regulations are being updated to match that of other EAD categories and it would ensure that the regulatory text reflects current DHS policy and regulations under DHS's 2017 AC21 Rule.

c. Labor Market Overview

As discussed in the population section of this analysis, USCIS anticipates receiving approximately 474,037 (non-replacement) Form I–765

applications annually from pending asylum applicants with an estimated 261,782 initial applications and 212,255 renewal applications. Since this rule will only affect initial applicants who experience potential delays in processing, USCIS estimates the affected population to be approximately 119,088 applications.[92] The U.S. labor force consists of a total of 164,404,000, according to November 2019 data.[93] Therefore, the population affected by this rule represents 0.07 percent of the U.S. labor force, suggesting that the number of potential workers no longer expecting a 30-day processing timeframe make up a very small percentage of the U.S. labor market.[94]

In any case, USCIS notes that this rule does not introduce any newly eligible workers into the labor force, or permanently prevent any eligible workers from joining the labor force. This rule only amends the processing of initial and renewal employment authorizations for pending asylum applicants. The ability of pending asylum applicants to be eligible for requesting employment authorization in certain circumstances is in existing regulations; this rulemaking is not seeking to alter which pending asylum applicants are eligible to apply for employment authorization. Therefore, this rule will not change the composition of the population of the estimated 261,782 initial applicants who may apply for employment authorization or the number of workers entering the labor force; rather, this rule could delay 119,088 pending asylum applicants from entering the U.S. labor market by an average of approximately 31 calendar days each, for a total of 3,651,326 days.[95]

d. Alternatives

(1) Alternative: 90-Day Regulatory Timeframe

DHS considered an alternative to removing the 30-day regulatory timeframe, to instead extend the regulatory timeframe to 90 days. Currently, under the *Rosario* v. *USCIS* court order, USCIS must comply with its existing regulation requiring a 30-day

---

[91] Calculations: Lower bound lost wages $255.88 million × 15.3 percent employee tax rate = $39.15 million. Upper bound lost wages $774.76 million × 15.3 percent employee tax rate = $118.54 million.

[92] In FY 2017, USCIS adjudicated 119,088 approved applications past the regulatory set timeframe.

[93] Figures obtained from Bureau of Labor Statistics, *Employment Situation News Release—November 2019,* Table A–8 Employed persons by class of worker and part-time status, February 21, 2020. Available at *https://www.bls.gov/ news.release/archives/empsit_12062019.pdf.*

[94] Calculation: (119,088 approximate initial applicants who could experience processing delays per year/164,404,000 workers) * 100 = 0.07 percent.

[95] Calculation: 3,654,326 total days/119,088 applicants = 31 days (rounded).

timeframe and process all initial EAD applications for asylum applicants within 30 days. Under this alternative, USCIS would instead process all future applications within 90 days. In FY 2017, prior to the *Rosario* v. *USCIS* court order, USCIS was able to sustainably process approximately 47 percent of applications within 30 days. USCIS, therefore, assumes 47 percent of applicants would remain unaffected under this 90-day alternative. USCIS assumes the remaining 53 percent of applicants would have their processing time extended under this alternative. In FY 2017 there were a total of 119,088 approved applications for which processing took more than 30 days. USCIS assumes approved applications that were processed in 31–60 days, and 61–90 days in FY 2017 (71,556 and 31,356 applicants, respectively) would be processed in a similar amount of time

under this alternative. For the 16,176 approved applications that took more than 90 days to process in FY 2017, USCIS assumes the processing time under this alternative would be 90 days, as this alternative would set the maximum processing time at 90 days. USCIS notes that while processing for this group under the 90-day alternative would be longer than the current 30-day processing time under the *Rosario* v. *USCIS* court order, it would be shorter as compared to this rule, which removes any processing timeframe.[96]

Based on the analysis provided in the Transfers and Costs section, USCIS used FY 2017 daily processing data to estimate lost wages, lost taxes, and other benefits for this alternative proposal. In FY 2017, USCIS adjudicated 102,912 approved applications[97] between 31 and 90 days. USCIS estimates that under this alternative the 102,912 approved

EAD applicants would have experienced an estimated total 1,684,194 lost working days, and lost compensation could have ranged from $158.82 million to $480.89 million[98] annually depending on the wages the asylum applicant would have earned. In FY 2017, USCIS adjudicated 16,176 approved applications in greater than 90 days. USCIS estimates that under this alternative the 16,176 approved EAD applicants would have experienced an estimated total 679,392 lost working days, and lost compensation could have ranged from $65.47 million to $198.23 million annually depending on the wages the asylum applicants would have earned. Table 11 shows the number of approved applications completed in more than 30 days in FY 2017, the associated number of lost working days, and an estimate of the resulting lost compensation.

TABLE 11—SUMMARY OF CALCULATIONS FOR INITIAL FORM I–765 FOR PENDING ASYLUM APPLICANTS IN FY 2017

|  | 31–60 Days | 61–90 Days | Greater than 90 days | Total |
|---|---|---|---|---|
| FY 2017 Completions | 71,556 | 31,356 | 16,176 | 119,088 |
| Lost Calendar Days | 899,402 | 1,377,308 | 970,560 | 3,247,270 |
| Lost Working Days | 691,314 | 992,880 | 679,392 | 2,377,451 |
| Lost Compensation (lower bound) | $66,615,017 | $95,673,917 | $65,466,213 | $227,755,147 |
| Lost Compensation (upper bound) | $201,702,197 | $289,689,023 | $198,223,758 | $689,614,978 |

Source: USCIS analysis.
**Note:** The prevailing minimum wage is used to calculate the lower bound while a national average wage is used to calculate the upper bound lost compensation.

In addition to the lost wages, USCIS acknowledges that such processing delays may result in the loss in tax revenue to the government. As was done in the analysis in the Transfers and Costs section, USCIS estimates the potential loss to Medicare and social security. Lost wages ranging $227.76 million to $689.61 million would result in employment tax revenue losses to the government ranging from $34.85 million to $105.51 million annually.[99] Again, depending on the circumstances of the employee, there could be additional federal income tax losses not estimated here. There may also be state and local income tax losses that would vary according to the jurisdiction. The ten-year total discounted lost compensation to asylum applicants at 3 percent could range from $1.943 billion to $5.883 billion, and at 7 percent could range from $1.600 billion to $4.844 billion (years 2020–2029). USCIS recognizes

that the impacts of this alternative could be overstated if the provisions in the broader asylum EAD NPRM are finalized as proposed. Specifically, the broader asylum EAD NPRM proposed to limit or delay eligibility for employment authorization for certain asylum applicants.

As previously discussed, USCIS does not know the portion of overall impacts of this rule that are transfers or costs, but estimates that the maximum monetized impact of this 90-day alternative from lost compensation is $689.61 million annually. Accordingly, if companies are unable to find reasonable labor substitutes for the position the asylum applicant would have filled then $689.61 million is the estimated maximum monetized cost of the rule and $0 is the estimated minimum in monetized transfers. Additionally, under this scenario, there would be a reduction of $105.51 million

in employment tax transfers from companies and employees to the Federal Government. Conversely, if all companies are able to easily find reasonable labor substitutes, they will bear little or no costs, so $689.61 million will be transferred from asylum applicants to workers currently in the labor force or induced back into the labor force (we assume no tax losses as a labor substitute was found).

(2) Comparison of Alternatives

Currently, the *Rosario* v. *USCIS* court decision, 365 F. Supp. 3d 1156 (W.D. Wash. 2018), requires USCIS to process asylum EAD applications in accord with the current regulatory timeframe of 30 days. This rule removes any adjudication timeframe for processing future asylum EAD applications. USCIS also considered an alternative under which USCIS would process all future applications within 90 days. In the table

[96] In FY 2017, USCIS adjudicated 16,176 approved and 5,202 denied (c)(8) EAD applications in over 90 days.

[97] In FY 2017, USCIS adjudicated 10,658 denied (c)(8) EAD applications between 31 and 90 days. Since denied applicants would not obtain work authorization and would not lose working days, this

population is not impacted by this rule and are therefore not included in the analysis for lost compensation.

[98] Calculations: 1,648,194 lost working days * ($96.36 per day) = $158.82 million; 1,648,194 lost working days * ($291.77 per day) = $480.89 million.

[99] Calculations: Lower bound lost wages $227.76 million × 15.3 percent employee tax rate = $34.85 million. Upper bound lost wages $689.61 million × 15.3 percent employee tax rate = $105.51 million.

AR005579

below, USCIS compares the lost working days and associated lost compensation and taxes under the 90-day alternative with the rule. As previously discussed, if companies can find replacement labor for the position the asylum applicant would have filled, the effects of this rule would be primarily transfers from asylum applicants to others already in the labor market (or induced to return). If companies cannot find reasonable substitutes, the rule would primarily be a cost to these companies through lost productivity and profits, and also result in a decrease in employment tax transfers from employees to the government. USCIS uses the lost compensation to asylum applicants as a measure of the overall impact of the rule—either as distribution impacts (transfers) or as a proxy for businesses' cost for lost productivity.

TABLE 12—COMPARISON OF ALTERNATIVES, USING FY 2017 ANNUAL DATA

| | Number of applicants impacted by change (FY 2017) | Lost working days | Lost compensation (lower bound) | Lost compensation (upper bound) | Lost employment taxes when replacement labor is not found (lower bound) | Lost employment taxes when replacement labor is not found (upper bound) |
|---|---|---|---|---|---|---|
| Current 30-day Processing Timeframe (*i.e.*, no action baseline) .. | N/A | N/A | N/A | N/A | N/A | N/A |
| 90-day Adjudication Timeframe Alternative ................................ | 119,088 | 2,377,451 | $227,755,147 | $689,614,978 | $34,846,537 | $105,511,092 |
| No Adjudication Timeframe ............ | 119,088 | 2,655,429 | 255,877,138 | 774,764,960 | 39,149,202 | 118,539,039 |

Source: USCIS analysis.

The distribution of existing government resources would vary under the baseline, the final rule, and the 90-day alternative. When *Rosario* compelled USCIS to comply with the 30-day regulatory provision in FY 2018 (the baseline), USCIS redistributed its adjudication resources to work up to full compliance. When the 30-day timeframe is removed all of these redistributed resources may be reallocated back to the way they were pre-*Rosario* (which USCIS assumes will look like FY 2017). Under the 90-day alternative, some of the resources could be moved back, but not all of them because in FY 2017 USCIS was able to adjudicate 92 percent of applicants in 90 days.

DHS did not pursue the 90-day alternative because although it would provide USCIS with more time to adjudicate initial EAD applications from pending asylum applicants and applicants with a new expected timeframe, it would not provide USCIS with the certainty and flexibility it needs to fulfill its core mission. Further, under DHS's final 2017 AC21 Rule, USCIS removed the 90-day timeframe for all other EAD categories. Maintaining any adjudication timeframe for this EAD would unnecessarily constrict adjudication workflows. Ultimately, USCIS is unable to plan its workload and staffing needs with the level of certainty that a binding timeframe may require and has no way of predicting what national security and fraud concerns may be or what procedures would be necessary in the future. DHS therefore declined to adopt a 90-day regulatory timeframe.

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires federal agencies to consider the potential impact of regulations on small entities during the development of their rules. The term "small entities" refers to small businesses, not-for-profit organizations that are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. This rule will continue to provide employment authorization to asylum applicants who voluntarily apply for such benefits. This rule only removes the 30-day adjudication timeframe and the corresponding 90-day renewal requirement. For the purposes of the RFA, DHS estimates that approximately 119,088 aliens may be impacted by this rule annually. Individuals are not considered by the RFA to be a small entity. As previously explained, this rule may result in lost compensation for some initial applicants whose EAD processing is delayed beyond the 30-day regulatory timeframe. However, the rule does not directly regulate employers.

The RFA does not require agencies to examine the impact of indirect costs to small entities. Regardless, DHS is unable to identify the next best alternative to hiring a pending asylum applicant and is therefore unable to reliably estimate the potential indirect costs to small entities from this rule.

Several public comments claimed that the rule would pose burdens to small entities, but no such comments claimed that the rule directly regulates or burdens small entities. USCIS emphasizes that the rule will not regulate employers and only regulate individuals. A final regulatory flexibility analysis (FRFA) follows.

(1) A Statement of the Need for, and Objectives of the Rule

This rule removes the 30-day regulatory timeframe for the adjudication of initial EAD applications by pending asylum applicants because it is outdated, does not account for the recent volume of applications and no longer reflects current operations. The rule also makes a technical change to remove the 90-day filing requirement to reduce confusion regarding EAD renewal requirements for pending asylum applicants and ensure the regulatory text reflects current DHS policy and regulations under DHS's final 2017 AC21 Rule.

(2) A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of any Changes Made in the Rule as a Result of Such Comments

Several commenters made reference to small entities.

*Comments:* A couple of commenters mentioned that refugees and asylees engage in entrepreneurial projects and employment at a higher rate than U.S.-born citizens, creating small businesses and thus jobs that drive growth in the US economy, and that the small businesses and the jobs they create are the engines of growth, innovation, and stability. A couple commenters claimed that lost wages to asylum-seekers would likely result in losses to small businesses in asylum-seekers, and that

AR005580

the rule would have significant negative impact not only on asylum seekers, but also on employers, small businesses, communities, and the economy as a whole.

*USCIS Response:* USCIS appreciates the commenters' input. As we have explained in our earlier responses and in the regulatory analysis, the rule might impact the timing under which asylum seekers are able to earn labor income, but it does not regulate employers. In the NPRM, USCIS acknowledged that if companies cannot find reasonable substitutes for the labor the asylum applicants would have provided, these companies would incur costs through lost productivity and profits. No commenters claimed that the rule directly regulates or directly impacts small entities. The rule is being adopted without material change from the NPRM.

(3) The Response of the Agency to any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments

DHS did not receive comments on this rule from Chief Counsel for Advocacy of the Small Business Administration.

(4) A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available

This rule directly regulates pending asylum applicants, or individuals, applying for work authorization. However, DHS presents this FRFA as the rule may indirectly impact small entities who incur opportunity costs by having to choose the next best alternative to immediately filling the job the asylum applicant would have filled. DHS cannot reliably estimate how many small entities may be indirectly impacted as a result of this rule, but DHS believes the number of small entities directly regulated by this rule is zero.

(5) A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

This rule would not directly impose any reporting, recordkeeping, or other compliance requirements on small entities. Additionally, this rule would

not require any additional professional skills.

(6) A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected

DHS is not aware of any alternatives to the rule that accomplish the stated objectives and that would minimize the economic impact of the rule on small entities as this rule imposes no direct costs on small entities.

*C. Congressional Review Act*

The Office of Information and Regulatory Affairs has determined that this is a major rule, as defined by 5 U.S.C. 804. Accordingly, absent exceptional circumstances, this rule will take effect 60 days after its publication. On or before the date of publication, DHS will submit to each House of Congress and the Comptroller General the reports required by 5 U.S.C. 801.

*D. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (UMRA) requires each federal agency to prepare a written statement assessing the effects of any federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by state, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995, adjusted for inflation to 2020 levels by the Consumer Price Index Inflation Calculator, is $172 million.[100]

Some private sector entities may incur a cost, as they could be losing the productivity and potential profits the asylum applicant could have provided had the asylum applicant been in the labor force earlier. Entities may also incur opportunity costs by having to choose the next best alternative to immediately filling the job the asylum applicant would have filled. In such instances, USCIS does not know if or to what extent this would impact the private sector, but assesses that such impacts would result indirectly from

delays in employment authorization, and would not be a consequence of an enforceable duty. As a result, such costs would not be attributable to a mandate under UMRA. *See* 2 U.S.C. 658(6), (7) (defining a federal private sector mandate as, *inter alia,* a regulation that imposes an enforceable duty upon the private sector except for a duty arising from participation in a voluntary Federal program); 2 U.S.C. 1502(1). Similarly, any costs or transfer effects on state and local governments would not result from a mandate under UMRA. *See* 2 U.S.C. 658 (5), (6) (defining a federal intergovernmental mandate as, *inter alia,* a regulation that imposes an enforceable duty upon State, local, or tribal governments, except for a duty arising from participation in a voluntary Federal program); 2 U.S.C 1502(1).

*E. Executive Order 13132 (Federalism)*

This rule would not have substantial direct effects on the states, on the relationship between the Federal Government and the states, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132 (Federalism), it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 (Civil Justice Reform).

*G. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This rule does not impose any reporting or recordkeeping requirements under the Paperwork Reduction Act.

*H. Family Assessment*

DHS has assessed this action in accordance with section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. With respect to the criteria specified in section 654(c)(1), DHS has determined that the rule may delay the ability for some initial applicants to work, which could decrease disposable income of families, as the lost compensation to asylum applicants could range from $255.88 million to $774.76 million annually depending on the wages the

---

[100] U.S. Bureau of Labor Statistics, *Consumer Price Index Inflation Calculator,* January 1995 to January 2020, available at *https://data.bls.gov/cgi-bin/cpicalc.pl* (last visited Feb. 26, 2020).

AR005581

asylum applicant would have earned. For the reasons stated elsewhere in this rule, however, DHS has determined that the benefits of the action justify the potential financial impact on the family. Further, the potential for lost compensation does not account for the fact that compliance with the 30-day timeframe is not sustainable in the long-term, as DHS has been unable to meet the 30-day processing timeframe in certain cases even with additional adjudication resources.

### I. Executive Order 13175

This rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

### J. National Environmental Policy Act (NEPA)

DHS Directive (Dir) 023–01 Rev. 01 and Instruction (Inst) 023–01–001 Rev. 1 establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500–1508.

The CEQ regulations allow federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. Inst. 023–01–001 Rev. 01 establishes Categorical Exclusions that DHS has found to have no such effect. Inst. 023–01–001 Rev. 01 Appendix A Table 1. Inst. 023–01–001 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Dir. 023–01 Rev. 01 section V.B (1)–(3).

This rule removes the following purely administrative provisions from an existing regulation: (1) The 30-day adjudication provision for EAD applications filed by asylum applicants, and (2) the provision requiring pending asylum applicants to submit Form I–765 renewal applications 90 days before their employment authorization expires. 8 CFR 208.7(a)(1), (d).

This rule clearly falls within categorical exclusions number A3(a) in Inst. 023–01–001 Rev. 01, Appendix A, Table 1: "Promulgation of rules . . . strictly of an administrative or procedural nature" and A3(d) for rules that interpret or amend an existing regulation without changing its environmental effect. Further, this rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

### K. National Technology Transfer and Advancement Act

The National Technology Transfer and Advancement Act (NTTAA) (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through OMB, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standard bodies. This rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

### L. Executive Order 12630

This rule would not cause the taking of private property or otherwise have taking implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

### M. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

Executive Order 13045 requires agencies to consider the impacts of environmental health risk or safety risk that may disproportionately affect children. DHS has reviewed this rule and determined that this rule is not a covered regulatory action under Executive Order 13045. Although the rule is economically significant, it would not create an environmental risk to health or risk to safety that might disproportionately affect children. Therefore, DHS has not prepared a statement under this executive order.

### N. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

Executive Order 13211 requires agencies to consider the impact of rules that significantly impact the supply, distribution, and use of energy. DHS has reviewed this rule and determined that this rule would not have a significant adverse effect on the supply, distribution, or use of energy. Therefore, this rule does not require a Statement of Energy Effects under Executive Order 13211.

### O. Signature

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, is delegating the authority to electronically sign this document to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the **Federal Register**.

### List of Subjects in 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

Accordingly, DHS amends part 208 of chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; 8 CFR part 2.

### § 208.7 [Amended]

■ 2. Amend § 208.7 by:

■ a. In paragraph (a)(1), removing the words "If the asylum application is not so denied, the Service shall have 30 days from the date of filing of the request employment authorization to grant or deny that application, except that no" and adding, in their place, the word "No" and removing the words "the Service" wherever they appear and adding, in their place, the word "USCIS";

■ b. In paragraph (c)(3), removing the words ''the Service'' and adding, in its place, the word ''DHS''; and

■ c. Removing paragraph (d).

**Chad R. Mizelle,**

*Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security.*

[FR Doc. 2020–13391 Filed 6–19–20; 8:45 am]

**BILLING CODE 9111–97–P**

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** September 24, 2019
**Status:** DoNotPost
**Tracking No.** 1k3-9ccw-b9kg
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment Authorization Applications

**Document:** USCIS-2018-0001-DRAFT-0024
Unrelated/PII Comment Submitted by Suyapa Guifarro

## Submitter Information

**Name:** Suyapa Guifarro
**Address:**
   859 Rontano ct
   Midvale,  UT,  84104
**Email:** usurico7@hotmail.com
**Phone:** 8014102032
**Fax:** 208-230-2273
**Submitter's Representative:** TOS or
**Organization:** N/A
**Government Agency Type:** Local
**Government Agency:** n/A

## General Comment

Suyapa Guifarro A 094-335-893 my last cad Exp 01/05/2018 I didnt renew 2018 I didnt have money for $650.00 charges including the notary for the procedures live in the United States sep/16/1989 I do not have a felony but. I was have traffic tickets only one and 1 minor charge bat nothing more and I already page pay off now everything is going well and Im gonna fixes for my TPS I have TPS since 1998 to 2018 please lets me know how much money I have to pay to get my cad back my last cad # EAC1790104907 A094-335-893 Suyapa Guifarro 208-230-2273 phone #. / Birthday 01/31/1969 Imail guifarrothsn@gmail.com please give my information about this case please I live with my boyfriend for tree years but we not married I dont know if I married is necessary because we have plans to do in 2020 please contact me please please call me back please thank you so much chao

AR005584

# PUBLIC SUBMISSION

**As of:** September 15, 2020
**Received:** September 24, 2019
**Status:** DoNotPost
**Tracking No.** 1k3-9ccw-ucy0
**Comments Due:** November 08, 2019
**Submission Type:** API

**Docket:** USCIS-2018-0001
Removal of 30-Day Processing Provision for Form I-765 (c)(8) Employment Authorization Applications

**Comment On:** USCIS-2018-0001-0001
Removal of 30- Day Processing Provision for Asylum Applicant- Related Form I-765 Employment
Authorization Applications

**Document:** USCIS-2018-0001-DRAFT-0025
Unrelated/PII Comment Submitted by Suyapa Guifarro

## Submitter Information

**Name:** Suyapa Guifarro
**Address:**
   859 Rontano ct
   Midvale,  UT,  84047
**Email:** lrico712@gmail.com
**Phone:** 8014102032
**Fax:** 2082302273
**Submitter's Representative:** Suyapa Guifarro
**Organization:** USCIS
**Government Agency Type:** Federal
**Government Agency:** BLM

## General Comment

See attached file(s) Suyapa Guifarro

## Attachments

Unrelated Comment Submitted by Suyapa Guifarrov

AR005585